Jon M. Sands
Federal Public Defender
District of Arizona
Mridula S. Raman (NY No. 5103528)
Sara Chimene-Weiss (MA No. 691394)
Assistant Federal Public Defenders
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
mridula_raman@fd.org
sara_chimene-weiss@fd.org
602.382.2816 Telephone
602.889.3960 Facsimile
*Counsel for Petitioner*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Alvie Copeland Kiles, | No. CV-17-04092-PHX-GMS |
| Petitioner, | |
| vs. | DEATH-PENALTY CASE |
| Charles L. Ryan, et al., | |
| Respondents. | |

# PETITION FOR WRIT OF HABEAS CORPUS
## 28 U.S.C. § 2254

1

2

# Table of Contents

3

I.    INTRODUCTION ................................................................................ 1

II.   FACTUAL HISTORY ........................................................................ 1

III.  STATE COURT PRESUMPTION OF CORRECTNESS ........................... 6

IV.   PROCEDURAL STATUS OF CLAIMS AND EXHAUSTION ................. 7

V.    RIGHT TO AMEND ......................................................................... 8

VI.   AEDPA IS UNCONSTITUTIONAL .................................................... 9

      A.    AEDPA unconstitutionally suspends the writ of habeas corpus......... 9

      B.    AEDPA violates the separation-of-powers doctrine........................ 10

      C.    Conclusion....................................................................................... 11

Claim One ............................................................................................... 12

Representation at trial was so marred by conflicts, misrepresentations, and
procedural violations that Kiles was denied effective counsel and fair and
reliable capital proceedings..................................................................... 12

      A.    Kiles received ineffective assistance of counsel from the start. ....... 12

            1.    Greg Clark's appointment did not satisfy Arizona's
                  standards for appointment as capital defense counsel. .......... 13

            2.    Clark failed to establish an attorney-client relationship with
                  Kiles. .................................................................................... 16

            3.    Clark's lack of communication and deficient performance
                  compelled co-counsel to withdraw. ....................................... 22

            4.    Clark blamed others for his irreparably fractured
                  relationship with Kiles. ........................................................ 24

            5.    Kiles filed a Complaint in Special Action with the Arizona
                  Supreme Court requesting new counsel.................................. 28

            6.    After Kiles's guilt-phase proceedings, Kiles continued to
                  request new counsel to represent him at the penalty phase. ... 30

            7.    Co-counsel represented Kiles while under a conflict of
                  interest. ................................................................................. 31

            8.    Counsel's conflicts and deficient performance undermined
                  the defense team and mitigation work in preparation for
                  Kiles's penalty-phase proceedings......................................... 35

      B.    Lead counsel's lack of qualifications and affirmative
            misrepresentations of those qualifications deprived Kiles of his
            right to due process and qualified counsel. ...................................... 38

1
2
    1. Lead counsel did not satisfy Arizona's standards for appointment as capital defense counsel, depriving Kiles of his due-process rights.................................................... 39

3
4
    2. Lead counsel and co-counsel misrepresented Clark's qualifications to the court, denying the court the ability to protect Kiles's due process rights. .......................... 41

5
6
  C. Kiles's counsel were ineffective due to a conflict of interest, denying Kiles his right to competent and un-conflicted representation. ............................................................. 43

7
8
  D. The irreparably fractured relationship between Kiles and Clark adversely affected the representation Kiles received....................... 46

9
  E. The contract structure under which Kiles's counsel were appointed created a financial conflict of interest. ............................ 48

10
11
  F. The state post-conviction court's decision that Kiles failed to state a colorable claim for relief was unreasonable and does not bar relief................................................................ 53

12
13
14
  G. Taken individually and together, these conflicts plaguing counsel, following from an initial denial of a liberty interest, resulted in a conviction and sentencing that cannot withstand constitutional scrutiny. .................................................... 54

15
Claim Two.................................................................. 55

16
Counsel's ineffective assistance in jury selection at the guilt-phase proceedings deprived Kiles of his rights to counsel, a fair trial, an impartial jury, due process, and equal protection. ............................................. 55

17
18
  A. A defendant has a Sixth Amendment right to the effective assistance of counsel during voir dire. ............................... 55

19
20
  B. Counsel were deficient in failing to adequately or meaningfully question prospective jurors to ensure a fair and impartial jury, thereby prejudicing Kiles. ............................... 57

21
    1. Counsel were deficient in failing to adequately screen prospective jurors through questionnaires. .............................. 58

22
23
    2. Counsel were deficient in failing to question those prospective jurors who were biased in favor of the death penalty.................................................................. 60

24
25
    3. Counsel were deficient in failing to question jurors who were likely biased due to past personal experiences. ............. 61

26
27
    4. Counsel were deficient in failing to question prospective jurors about their knowledge of Kiles's previous conviction................................................................. 64

28
    5. Counsel were deficient in failing to meaningfully question jurors about their exposure to Kiles's case in the media. ....... 65

C.   Counsel failed to challenge the denial of a fair cross-section of the community in the venire................................................. 67

D.   Counsel failed to make a record as to the reasons underlying the removal of many prospective jurors................................................. 68

Claim Three.......................................................................................................... 69

Kiles was denied effective assistance of counsel at his guilt-phase proceedings because counsel failed to investigate, develop, and present critical evidence, among other significant errors. ................................................. 69

A.   Background on guilt-phase proceedings. .......................................... 70

B.   A defendant has a Sixth Amendment right to the effective assistance of counsel at guilt-phase proceedings. ............................ 77

C.   Trial counsel were ineffective for failing because of their constitutionally inadequate investigation to present a reasonable defense for the death of Gunnel. .......................................... 79

    1.   Trial counsel performed deficiently by failing to conduct a reasonable investigation; that performance resulted in them settling on a legally unsound and ill-considered guilt-phase strategy. ............................................................ 80

    2.   Had trial counsel conducted an adequate investigation, counsel would have been able to develop a persuasive defense strategy................................................................. 90

    3.   Trial counsel's deficient performance prejudiced Kiles....... 107

D.   Counsel were ineffective for failing to object to Kiles's shackling. ................................................................................. 112

E.   Counsel rendered ineffective assistance during the defense's opening statement........................................................... 115

F.   Counsel were ineffective for failing to effectively cross-examine crucial State's witnesses on matters relating to whether Gunnel's death was premeditated. .............................................. 117

G.   Counsel were ineffective for stipulating to the admission of hearsay statements from Gunnel at the guilt-phase proceedings.... 121

H.   Counsel were ineffective for failing to object to the worst of the gruesome photographs repeatedly displayed at trial. ..................... 123

I.   Counsel rendered ineffective assistance by failing to request critical jury instructions................................................. 125

J.   Counsel provided ineffective assistance when they failed to object to numerous aspects of the State's closing argument. .................... 129

K.   Counsel also rendered ineffective assistance in failing to ensure that a record was made of key parts of the guilt-phase proceedings........................................................................ 134

iii

L.   Counsel's numerous errors, individually and cumulatively, undermined the reliability of Kiles's guilt-phase proceedings. ...... 135

M.   The state post-conviction court's decision that Kiles failed to state a colorable claim is no bar to this Court's de novo review of this claim. ................................................................................ 136

N.   Conclusion. ................................................................................ 140

Claim Four ........................................................................................ 140

Kiles's counsel's ineffective assistance in jury selection at the penalty phase of trial deprived Kiles of his rights to counsel, a fair trial, an impartial jury, reliable sentencing proceedings, due process, and equal protection. .................. 140

A.   Despite having won the right to question prospective jurors on specific types of mitigation, counsel failed to do so, thereby prejudicing Kiles. ................................................................ 143

B.   Counsel deficiently failed to question a number of seated jurors about their pro-death sentence biases, thereby prejudicing Kiles... 147

C.   Counsel deficiently altogether failed to question eight seated jurors, thereby prejudicing Kiles. .................................................. 148

D.   Counsel failed to question adequately and to challenge for cause jurors who should have been disqualified for cause. ...................... 150

E.   Counsel failed to rehabilitate prospective jurors who expressed discomfort with the death penalty but who still could have properly served. ........................................................................ 152

F.   Counsel failed to challenge the prosecutor's discriminatory use of peremptory strikes to exclude an African-American prospective juror. ........................................................................................ 155

G.   Counsel failed to challenge the denial of a fair cross-section of the community in the venire. ............................................................ 158

H.   Counsel failed to make a record as to the reasons underlying the removal of many prospective jurors. ............................................. 159

Claim Five ........................................................................................ 160

Kiles was denied effective assistance of counsel at his aggravation-phase proceedings because counsel failed to adequately challenge the alleged aggravating circumstances and otherwise defend against a death sentence. ........ 160

A.   Background on aggravation-phase proceedings. ............................ 160

B.   Trial counsel has a duty to make every effort to avoid a death sentence, including by investigating and contesting the aggravating circumstances alleged against Kiles. ............................ 166

C.   Counsel were ineffective for failing to effectively challenge the (F)(2) aggravating circumstance, especially as Kiles's prior aggravated assault conviction was an invalid basis for that circumstance. ................................................................... 167

    1.   Kiles's 1986 conviction for aggravated assault does not qualify as a prior violent felony for the purposes of the (F)(2) aggravator. ................................................. 168

    2.   Counsel performed deficiently and prejudiced Kiles in failing to challenge the 1986 conviction as a basis for the (F)(2) aggravator. ................................................ 172

D.   Counsel were ineffective for failing to investigate and adequately challenge the (F)(6) "especially heinous, cruel or depraved" aggravating circumstance. ............................................. 175

    1.   Counsel unreasonably failed to investigate in preparation for a challenge to "cruelty" for the purposes of the (F)(6) aggravating circumstance. .................................... 176

    2.   Because of the insufficient investigation and lack of preparation, counsel failed to mount an adequate challenge to the (F)(6) aggravator, thereby prejudicing Kiles. ............. 181

E.   Counsel performed deficiently and prejudiced Kiles by failing to frontload mitigation at the aggravation phase. .................. 184

F.   Counsel were ineffective for failing to properly object to Kiles's restraints. ......................................................... 187

G.   Counsel were ineffective for failing to object to, or to request a curative instruction for, the prosecutor's misconduct in opening and closing statements. ................................................... 189

H.   Counsel were ineffective for failing to object to the trial court's erroneous instruction defining reasonable doubt. ........................ 192

I.   Counsel were ineffective for failing to ensure that a complete record was made of aggravation-phase proceedings. ...................... 192

J.   Counsel's numerous errors, individually and cumulatively, undermined the reliability of Kiles's aggravation phase. ............. 193

K.   The state post-conviction court's decision that Kiles did not state a colorable claim is no bar to this Court's de novo review of this claim. ....................................................................... 194

L.   Conclusion. ....................................................................... 196

Claim Six.......................................................................... 196

Kiles was denied effective assistance of counsel at his mitigation phase when his counsel failed to investigate and present powerful mitigating evidence, among other significant errors. ........................................................... 196

A.   A capital defendant must receive an individualized sentencing after a full and fair consideration by the jury. ................................ 196

B.   Kiles's personal history. ................................................................ 197

C.   A defendant's right to a full mitigation investigation and presentation necessitates effective counsel at the mitigation phase of trial. ......................................................................................... 210

D.   Lead counsel's derogation of his duties and the resulting team dysfunction led to a deficient mitigation investigation and inadequate presentation. .............................................................. 212

   1.   Lead counsel did not assist in the mitigation-phase investigation, leaving Kiles with one attorney in violation of prevailing professional norms. ......................................... 212

   2.   Counsel failed to request a mitigation specialist or to begin a mitigation investigation upon appointment. ...................... 213

   3.   Counsel's failure to be involved in the investigation and the subsequent resignation of the mitigation specialist resulted in a disjointed mitigation investigation. ................................. 214

E.   Trial counsel were ineffective for failing to reasonably investigate, develop, and present important mitigation evidence. ... 219

   1.   Counsel failed to properly investigate, develop, and present mitigation evidence pertaining to lay witnesses. ................. 220

   2.   Counsel failed to retain the necessary experts to properly investigate and explain several avenues of mitigation. ........ 232

   3.   Counsel performed deficiently in failing to provide the experts she did retain with complete and accurate information. ....................................................................... 240

   4.   Counsel's unreasonable investigation and failure to provide experts with critical information resulted in the jury hearing a constitutionally inadequate mitigation presentation. ......... 249

   5.   Counsel provided ineffective assistance in failing to adequately investigate and address the State's evidence and arguments in mitigation rebuttal. ........................................ 256

   6.   Counsel's mitigation-phase closing argument constituted deficient performance that prejudiced Kiles. ...................... 264

   7.   Counsel provided ineffective assistance when she failed to object to numerous aspects of the State's closing argument. ............................................................................ 267

   8.   Counsel's deficient performance at the mitigation phase prejudiced Kiles. .............................................................. 270

vi

F.    Counsel provided ineffective assistance in failing to request a special verdict form listing which mitigating circumstances the jury found proven. ....................................................................... 273

G.    Counsel were ineffective in failing to object to juror questionnaires and jury instructions that primed the jury to find that death was the appropriate sentence. ......................................... 274

H.    The cumulative effect of trial counsel's many instances of deficient performance deprived Kiles of his right to counsel at the mitigation phase and resulted in an unreliable sentencing proceeding. ................................................................................. 277

I.    The state post-conviction court's decision that Kiles did not state a colorable claim is no bar to this Court's de novo review of this claim. .................................................................................... 278

J.    Conclusion ...................................................................... 281

Claim Seven ............................................................................ 281

The trial court's numerous errors during the guilt phase of trial violated Kiles's constitutional rights. ..................................................................... 281

A.    The trial court erred by not appointing qualified, un-conflicted counsel, violating Kiles's rights under the Sixth and Fourteenth Amendments. ................................................................... 281

    1.    The trial court erred by failing to conduct an appropriate inquiry into counsel's conflicts. .......................................... 281

    2.    The trial court erred by failing to appoint qualified, un-conflicted counsel. .................................................. 283

B.    The trial court denied Kiles a fair trial by denying his motion for a change of venue. ................................................................ 284

    1.    Kiles's trial was marked by pervasive, prejudicial media coverage. ............................................................... 285

    2.    Clearly established federal law required a change of venue to ensure Kiles's due process rights. .............................. 286

    3.    As the media attention prevented Kiles from receiving a fair trial, the trial court erred in denying the motion for change of venue. ................................................... 287

C.    The trial court erred by not dismissing the venire after a highly prejudicial statement poisoned the jury pool. .............................. 289

    1.    A prospective juror disclosed highly prejudicial information before the venire. ...................................... 289

    2.    The trial court erred by failing to grant the motion to dismiss the venire. ............................................... 290

D. The trial court's admission of an excessively gruesome photograph during Kiles's trial resulted in the denial of a fair trial and due process. ............................................................... 292

    1. The trial court failed to exclude an irrelevant and gruesome autopsy photograph during the guilt-phase proceedings. ..... 292

    2. The trial court's admission of an excessively gruesome photograph to the jury was violative of due process and undermined the fairness of the proceedings. ........................ 293

E. The trial court declined to give the jury instructions to which Kiles was constitutionally entitled. ............................................... 294

    1. The trial court erred in failing to instruct the jury that premeditation requires actual reflection. .............................. 295

    2. The trial court erred in denying Kiles an intoxication defense, which he was constitutionally entitled to present... 296

    3. The trial court erred in improperly instructing the jury on the definition of "reasonable doubt." ................................... 299

F. The trial court unconstitutionally required that Kiles be physically restrained at the guilt phase. .......................................... 300

G. The trial court failed to make a complete record of the guilt-phase proceeding in violation of Kiles's constitutional rights. ................. 302

H. The trial court violated Kiles's right to be free from double jeopardy and a reliable sentencing determination. .......................... 303

I. The cumulative effect of these trial-court errors prejudiced Kiles. ................................................................................ 304

Claim Eight .......................................................................... 305

The trial court's numerous errors during the penalty phase of trial violated Kiles's constitutional rights. ............................................. 305

A. The trial court unconstitutionally required that Kiles be physically restrained at the penalty phase. ......................................... 306

B. The trial court violated Kiles's constitutional rights during his penalty-phase voir dire. ................................................... 308

    1. The trial court should not have struck Prospective Juror 56 based on her views of the death penalty, as she evidenced her ability to be fair and impartial. ..................................... 308

    2. The trial court should have struck Prospective Jurors 78 and 82 for cause based on their views of the death penalty. ....... 310

    3. The trial court erred in permitting statements in voir dire and on the juror questionnaire that implied that, if sentenced to life in prison, Kiles would be eligible for parole in 25 years. ............................................................... 312

C.    The trial court erred in denying defense counsel's motion for a directed verdict on the "especially heinous, cruel or depraved" aggravating circumstance. ................................................................ 314

D.    The trial court erred in not striking the (F)(8) aggravator as unconstitutionally vague. ................................................................ 316

E.    The trial court denied Kiles's due-process rights by admitting a gruesome and unduly prejudicial photograph. ................................ 317

F.    The trial court unconstitutionally permitted the victims' attorney to file pleadings, including a requested jury instruction. ............... 318

G.    The trial court unconstitutionally permitted the introduction of victim-impact evidence. .................................................................. 318

H.    The trial court unconstitutionally permitted the State to ask witnesses at trial about statements contained in the reports of experts who testified at the first trial but not at the second trial, in violation of Kiles's rights. ............................................................ 321

I.    The trial court unconstitutionally failed to provide the jury with a special verdict form listing the specific mitigating factors they found proven, violating Kiles's rights. ........................................... 323

J.    The trial court unconstitutionally failed to make a complete record at trial, in violation of Kiles's rights. ............................................. 325

K.    The cumulative effect of these trial-court errors prejudiced Kiles. .............................................................................................. 326

Claim Nine ............................................................................................... 326

Kiles was deprived of his right to due process and a fair trial because the prosecutor engaged in pervasive misconduct. ....................................... 326

A.    The prosecutor committed misconduct in the guilt-phase proceedings. .............................................................................. 328

    1.    The prosecutor repeatedly mischaracterized testimony, made speculative arguments, and used inflammatory language in its guilt-phase opening and closing. .................. 329

    2.    The prosecutor mischaracterized the scientific evidence during the guilt phase. ......................................................... 331

    3.    The prosecutor improperly testified on the record during the guilt phase. ....................................................................... 332

    4.    The prosecutor failed to disclose information on one of its witnesses. ........................................................................ 333

    5.    The prosecutor improperly dehumanized the defendant in the guilt-phase closing. ......................................................... 333

B.    The prosecutor committed further misconduct in the penalty-phase proceedings. ........................................................................ 335

ix

1. The prosecutor improperly struck a juror on the basis of race during voir dire................................................ 335

2. The prosecutor improperly vouched for witnesses and evidence. .......................................................... 336

3. The prosecutor continued to advance an unsupported theory of the crime through improper questioning of expert witnesses. .......................................................... 337

4. The prosecutor used inflammatory language to influence the jury. .......................................................... 339

5. The prosecutor's theory of the crime was not reasonably inferred from the evidence. ................................... 339

C. The prosecutor's performance rendered the trial fundamentally unfair and violated Kiles's substantive rights. ................ 340

Claim Ten........................................................................ 341

Juror misconduct at Kiles's guilt- and penalty-phase proceedings deprived Kiles of his rights to a fair and impartial jury, the assistance of counsel, confrontation, equal protection, and a fair trial. ................ 341

A. Jurors considered extraneous evidence at Kiles's guilt-phase proceedings................................................... 344

B. Jurors committed misconduct in multiple ways at Kiles's penalty-phase proceeding. ............................................ 345

1. Jurors' deliberations were informed by extraneous influences. .......................................................... 345

2. Jurors slept through the proceedings. ................... 347

3. Jurors improperly considered extraneous and incorrect information about race and criminality during their deliberations. ................................................. 349

4. Jurors curtailed their deliberations or compromised their votes because one member of the jury was gravely ill. ........ 351

C. Juror misconduct throughout the course of proceedings violated Kiles's right to due process and a fair trial. ................... 352

Claim Eleven.................................................................... 353

Kiles's appellate counsel failed to provide effective assistance........................ 353

A. Appellate counsel focused his efforts on a claim that was not cognizable on appeal. ...................................... 355

B. Appellate counsel was ineffective for failing to raise meritorious claims................................................... 358

1. Appellate counsel failed to challenge the child-abuse convictions. .......................................................... 358

2.    Appellate counsel failed to challenge the trial court's denial of a mistrial due to prosecutorial misconduct. ...................... 361

3.    Appellate counsel failed to adequately brief his challenge to the improperly admitted gruesome photographs. ............. 364

4.    Appellate counsel failed to challenge the trial court's error in allowing the State to question statements made to defense experts in a prior trial. .............................................. 365

5.    Appellate counsel failed to present an argument for leniency on independent review by the Arizona Supreme Court. .................................................................................... 366

6.    Appellate counsel failed to adequately challenge the (F)(2) aggravating circumstance. ...................................................... 367

7.    Appellate counsel failed to challenge Kiles's shackling during his proceedings. ........................................................ 368

C.    Conclusion. .................................................................................... 368

Claim Twelve .......................................................................................................... 369

The Arizona Supreme Court's decision affirming Kiles's death sentence violated Kiles's constitutional rights. .................................................................. 369

A.    The Arizona Supreme Court violated Kiles's due process rights in its review of the prior-conviction aggravating circumstance. ..... 371

1.    The Arizona Supreme Court denied Kiles his right to due process in upholding the prior-conviction aggravating circumstance. .............................................................................. 371

2.    The Arizona Supreme Court violated Kiles's rights by summarily determining that the invalidation of one prior conviction was immaterial. .................................................... 374

B.    The Arizona Supreme Court denied Kiles meaningful appellate review when it arbitrarily upheld the (F)(6) aggravating factor. .... 376

C.    The Arizona Supreme Court denied Kiles meaningful appellate review by inflating the weight of the (F)(8) aggravating circumstance. .... 381

D.    The Arizona Supreme Court denied Kiles his constitutionally protected right to meaningful independent review when it ignored many of his mitigating factors and mischaracterized others. .......... 383

E.    The Arizona Supreme Court's decision denied Kiles meaningful appellate review by irrationally discounting and failing to give effect to the mitigating circumstances it did acknowledge. ............ 384

F.    The Arizona Supreme Court's individual and cumulative errors deprived Kiles of his constitutional rights. ..................................... 387

G.    This Court may review this claim de novo. .................................... 388

Claim Thirteen ........................................................................................................ 388

xi

Kiles's jury-imposed death sentence unconstitutionally relied upon two invalid prior convictions. ........................................................................................ 388

Claim Fourteen ........................................................................................... 391

Kiles's second state post-conviction counsel were constitutionally ineffective.  391

    A.    Post-conviction counsel were ineffective ........................................ 393

        1.    Post-conviction counsel failed to adequately raise claims. .. 393

        2.    Post-conviction counsel failed to adequately develop mitigation evidence with both lay and expert witnesses. ..... 394

        3.    Post-conviction counsel failed to file a reply. ...................... 399

    B.    Post-conviction counsel's ineffectiveness excuses any procedural default of claims raised throughout this Petition. ......................... 400

    C.    Post-conviction counsel's ineffectiveness entitles Kiles to relief... 403

Claim Fifteen .............................................................................................. 405

Trial counsel was ineffective for failing to file a motion to remand because of errors rendering the grand-jury proceedings unconstitutional. ........................... 405

    A.    Counsel planned to file a motion to remand to address improprieties with the grand-jury session and the resulting indictment. ....................................................................................... 407

    B.    Counsel was deficient in failing to file a motion to remand based on the fact that a grand juror had prior knowledge of the facts of the crime. ..................................................................................... 408

    C.    Counsel was deficient in failing to file a motion to remand based on the fact that the State knew that Imojean Kiles was an incompetent witness during her grand-jury testimony.................... 410

    D.    Counsel was ineffective for failing to file a motion to remand because Kiles was denied his right to a grand jury free from discrimination. ............................................................................ 411

    E.    Conclusion. ................................................................................... 414

Claim Sixteen ............................................................................................. 415

Counsel were ineffective for failing to ensure that critical portions of the record were preserved and recorded. ....................................................................... 415

    A.    Trial counsel failed to preserve evidence needed for proper consideration of Kiles's claims on appeal ...................................... 416

        1.    Trial counsel denied Kiles's right to be present at unrecorded proceedings. ....................................................... 416

        2.    Trial counsel failed to record and retain evidence during voir dire. ........................................................................... 417

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3.    Trial counsel failed to ensure bench conferences were on the record.................................................................................. 418

4.    Trial counsel failed to ensure conferences on jury instructions were on the record. ............................................. 419

B.    Counsel's ineffectiveness for failing to ensure a complete record violated Kiles's rights......................................................... 420

Claim Seventeen ................................................................................. 422

Capital punishment is per se cruel and unusual.................................... 422

Claim Eighteen.................................................................................... 425

Arizona's death-penalty statute unconstitutionally serves no deterrent purpose, exceeds any legitimate retributive aim, is without penological justification, and results in the gratuitous infliction of suffering. .................................... 425

Claim Nineteen .................................................................................. 428

Arizona's capital-sentencing scheme unconstitutionally does not genuinely narrow the murder cases eligible for the death penalty and fails to channel the discretion of the sentencing jury. .......................................................... 428

Claim Twenty...................................................................................... 432

Arizona's capital-sentencing scheme unconstitutionally affords the prosecutor unlimited discretion to seek the death penalty.......................................... 432

Claim Twenty-One ............................................................................. 433

Arizona's capital-sentencing scheme is unconstitutional because it does not require the State to prove, or the jury to find beyond a reasonable doubt, that the aggravating factors outweighed the mitigating circumstances..................... 433

A.    The trial court's penalty-phase instructional error regarding the burden and standard of proof, derived from Arizona's unconstitutional statute, violated Kiles's rights under clearly established precedent..................................................................... 434

B.    If *Hurst* instead announced a new rule of constitutional law, it is retroactive to cases on collateral review. ....................................... 437

C.    Conclusion........................................................................... 438

Claim Twenty-Two .............................................................................. 439

Arizona's capital-sentencing scheme unconstitutionally requires a defendant to affirmatively prove that the jury should spare his life.................................... 439

Claim Twenty-Three ............................................................................ 440

Arizona's capital-sentencing scheme unconstitutionally fails to require the cumulative consideration of mitigation. ................................................... 440

Claim Twenty-Four.............................................................................. 442

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Arizona's death-penalty statute is unconstitutional because it fails to require the jury to make specific findings as to each mitigating circumstance. .............. 442

Claim Twenty-Five ................................................................ 444

Arizona's capital-sentencing scheme unconstitutionally limits the jury's full consideration of mitigation by requiring that mitigating circumstances be proven by a preponderance of the evidence............................................ 444

Claim Twenty-Six ................................................................ 445

Arizona's capital-sentencing scheme unconstitutionally fails to set forth objective standards to guide the sentencer in weighing the aggravating circumstances against the mitigating circumstances. ........................................ 445

Claim Twenty-Seven ................................................................ 446

Arizona's capital-sentencing scheme unconstitutionally denies capital defendants the benefit of proportionality review of their sentences.................... 446

Claim Twenty-Eight................................................................ 447

Arizona's capital-sentencing scheme unconstitutionally discriminates against poor, young, African-American male defendants................................................ 447

Claim Twenty-Nine ................................................................ 450

The death qualification of Kiles's guilt- and penalty-phase juries was unconstitutional.................................................................. 450

Claim Thirty ................................................................ 453

The "especially heinous, cruel or depraved" aggravating circumstance is unconstitutionally vague. ................................................................ 453

Claim Thirty-One ................................................................ 457

Arizona's prior felony conviction aggravating circumstance is unconstitutionally vague. ................................................................ 457

Claim Thirty-Two ................................................................ 459

Kiles is innocent of first-degree murder and of the death penalty...................... 459

Claim Thirty-Three ................................................................ 461

Kiles's death sentence constitutes an impermissible violation of the Ex Post Facto Clause. ................................................................ 461

Claim Thirty-Four ................................................................ 463

Executing Kiles after more than 28 years on death row violates the Eighth and Fourteenth Amendments. ................................................................ 463

Claim Thirty-Five ................................................................ 467

Due process requires that this Court re-evaluate Kiles's death sentence in light of the significant changes to Kiles's circumstances in the 12 years since he was sentenced. ................................................................ 467

1

Claim Thirty-Six ............................................................................ 470

2

Executing Kiles is unconstitutional because he has a serious mental illness. ..... 470

3

Claim Thirty-Seven ......................................................................... 474

4

Subjecting Kiles to execution in Arizona will deny his fundamental human rights under binding international law norms. ...................................... 474

5

Claim Thirty-Eight .......................................................................... 479

6

Kiles will be unable to receive a fair clemency process in Arizona. ................... 479

7

Claim Thirty-Nine ........................................................................... 480

8

Kiles's convictions and sentences must be vacated because of the cumulative prejudicial effect of all of the errors in this case. ................................ 480

9

PRAYER FOR RELIEF ........................................................................ 482

10

Certificate of Service ........................................................................ 484

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## I.    INTRODUCTION

2

Pursuant to 28 U.S.C. § 2254, Alvie Copeland Kiles respectfully petitions

3 this Court for a writ of habeas corpus. He is currently in the custody of Respondents,

4 who are detaining him pursuant to judgments and sentences of the Arizona state

5 courts. In 2000, Kiles was convicted of three counts of first-degree murder and two

6 counts of child abuse. He was subsequently sentenced to death for the first-degree

7 murder of Valerie Gunnel and to life imprisonment on each of the remaining counts.

8 Through this Petition, Kiles challenges his first-degree murder conviction and death

9 sentence for the death of Valerie Gunnel and his convictions and sentences on the

10 child-abuse counts, as these convictions and sentences were obtained in violation

11 of his rights under the Constitution, laws, and treaties of the United States. He

12 requests that this Court grant a writ of habeas corpus and any other appropriate

13 relief from these unconstitutional convictions and sentences.[1]

14

## II.    FACTUAL HISTORY

15

In February 1989, Alvie Kiles was living with his girlfriend, Valerie Gunnel,

16 and her two daughters, five-year-old Shemaeah Gunnel and nine-month-old

17 LeCresha Kirklin. (Tr. July 17, 2000 at 152; Tr. July 12, 2000 at 5–6, 32.)[2] The four

18

---

19 [1] While Kiles maintains that he is factually innocent of the crimes underlying his
first-degree murder convictions for the deaths of Shemaeah Gunnel and LeCresha

20 Kirklin, he recognizes the risk in seeking relief from those convictions—
convictions for which he was not sentenced to death—and therefore declines at

21 present to do so.

22 [2] When counsel is referring to the state-court record, transcripts are designated "Tr."
followed by the relevant date and page number. Indexed documents from Case No.

23 CR89-15444 supplied by the Arizona Supreme Court as part of the record on appeal
are designated "ROA," followed by the docket number. If the indexed document

24 appears only in Case No. CR89-15577, the document is designated "CR89-15577
ROA," followed by the docket number. Exhibits from the 1989 trial, the 1990

25 sentencing proceeding, the 2000 guilt phase, and 2006 penalty phase are designated,
respectively, "1989 State [or Def.] Trial Ex.," "1990 State [or Def.] Trial Ex.,"

26 "2000 Trial Ex.," and "2006 Trial Ex.," followed by the exhibit number. Direct
appeal documents from Case No. CR-90-0106-AP supplied by the Arizona

27 Supreme Court are designated "DA1," followed by the docket number. Direct
appeal documents from Case No. CR-06-0240-AP supplied by the Arizona

28

of them were staying at Gunnel's apartment in a complex on South First Avenue in Yuma, Arizona. (Tr. July 17, 2000 at 152; Tr. July 12, 2000 at 5–6, 32.) On February 9, 1989, Gunnel visited Kiles's mother, Imojean Kiles, at her workplace; Gunnel claimed that Kiles had stolen her food stamps and that she had no money to feed her children. (Tr. July 11, 2000 at 32.) Kiles later testified that he and Gunnel devised a plan for him to sell the food stamps to get dope for them to use together. (Tr. July 17, 2000 at 155–56.) Imojean gave Gunnel twenty dollars to buy food and told Gunnel to "leave little Alvie alone." (Tr. July 17, 2000 at 145–46.)

At some point during the night of February 9, 1989, or early the following morning, Gunnel and her children were killed. Kiles later testified that he had an argument with Gunnel; she had slapped him once, and when she slapped him a second time, he grabbed a tire jack that was on the ground and killed her. (Tr. July 17, 2000 at 164–65.) Kiles testified that the argument began when he returned home intoxicated with drugs and alcohol, having used all of the drugs that he had acquired for him and Gunnel to use together. (Tr. July 17, 2000 at 157–58.)

He disclaimed responsibility for the deaths of Shemaeah and LeCresha, testifying that he saw his friend Kale Johnson swinging the jack at the children while they were on a bed. (Tr. July 17, 2000 at 170.) Kiles further testified that Johnson and another friend took Kiles's car to dispose of the children's bodies, while Kiles remained in the apartment to try to clean up the crime scene. (Tr. July

---

Supreme Court are designated "DA2," followed by the docket number. Documents from the first and second state post-conviction proceedings are also designated "ROA," followed by the docket number. Exhibits to the first post-conviction petition are labeled "ROA 225 Ex.," followed by the exhibit number. Exhibits from the second post-conviction petition are labeled "PFR2," with the appropriate docket and exhibit number, as these exhibits were re-filed during the second petition for review proceedings before the Arizona Supreme Court. Documents from the 1996 and 1997 petition for review proceedings are labeled "PFR1," followed by the docket number. Documents from the petition for review proceedings under Case No. CR-16-0072 are designated "PFR2," followed by the docket number. Special Action documents are designated by the case number, name of pleading, date, and page number.

2

1   17, 2000 at 172–73.)

2       Around 9:00 a.m. on February 10, 1989, Kiles knocked on the door of the
3   home of his brother-in-law, Larry Hawkins. (Tr. July 13, 2000 at 5–7.) As Hawkins
4   had just finished a 24-hour shift at work, he declined to answer the door, but he did
5   notice that Kiles had driven over in Gunnel's car. (Tr. July 13, 2000 at 6–7.) Kale
6   Johnson, who later claimed to have nothing to do with the killings, said that he
7   encountered Kiles, who was seated in Gunnel's car, at Carver Park on the afternoon
8   of February 10, 1989. (Tr. July 14, 2000 at 74–75, 128–29.) There, according to
9   Johnson's testimony, Kiles confessed, "I killed Valerie." (Tr. July 14, 2000 at 76–
10  77.) Johnson then accompanied Kiles to Gunnel's apartment, where Johnson
11  observed "Valerie lying on the floor." (Tr. July 14, 2000 at 79–82.) Johnson
12  testified that he only entered Gunnel's apartment, inspected her body, and then left
13  (Tr. July 14, 2000 at 130), but he was later discovered with blood on his Converse
14  shoes, clothing, and hands (Tr. July 14, 2000 at 132–33; Tr. July 17, 2000 at 78).
15  Johnson admitted that he may have wiped his hands on his pants and the inside
16  frame of Gunnel's apartment door after getting blood on them. (Tr. July 14, 2000
17  at 134–35; Tr. July 17, 2000 at 35; PFR2 Dkt. 20 Ex. 1 at 7.)

18      On the evening of February 10, 1989, Kiles returned to Larry Hawkins's
19  house with Johnson. (Tr. July 13, 2000 at 9–10; Tr. July 14, 2000 at 91–92.)
20  According to Hawkins, Kiles informed him that he had "killed Valerie and possibly
21  her children too." (Tr. July 13, 2000 at 12.) Hawkins asked Kiles, "Why the
22  children?" and said that Kiles that it was because they had seen him. (Tr. July 13,
23  2000 at 13). Hawkins testified that Kiles was high when he arrived at Hawkins's
24  apartment and that he was still doing cocaine at Hawkins's apartment when he
25  shared this information. (Tr. Mar. 22, 2006 at 47–48, 69.) Hawkins described Kiles
26  as "not himself. He had a crazed look in his eyes, and was rambling and, at times,
27  incoherent. . . . He was acting really crazy and paranoid." (ROA 225 Ex. 38 at 2–3;
28  Tr. Mar. 22, 2006 at 66–67.) Four or five days later, Hawkins authored a letter to

3

1    Silent Witness, Yuma's anonymous tip line, to provide information to authorities
2    to help fill in the missing pieces of evidence from what he had heard on the radio,
3    on the news, and from others. (Tr. July 13, 2000 at 16–18, 59; Tr. Mar. 22, 2006 at
4    62–63.) Even so, Hawkins later acknowledged, "I don't know that anything [Kiles]
5    told me that day was accurate." (ROA 225 Ex. 38 at 2–3.)

6         Kiles and Johnson also went to Imojean Kiles's work place on the evening
7    of February 10, 1989. (Tr. July 11, 2000 at 28–29.) Kiles told Imojean that he had
8    killed someone, and he went on to say that he had killed Gunnel. (Tr. July 11, 2000
9    at 30–31.) Imojean stated that Kiles said that the children were "taken care of" as
10   well. (Tr. Feb. 21, 1989 at 57–58.) She denied, though, that Kiles told her he had
11   killed the children. (Tr. July 11, 2000 at 31, 44.) Imojean described Kiles as
12   nervous; he seemed like he was on some kind of drug. (Tr. Feb. 21, 1989 at 59.)

13        In the early morning of February 11, 1989, lead investigator Detective Brian
14   Rodgers of the Yuma Police Department arrived at Gunnel's apartment and
15   requested assistance from Detective Cynthia Anderson. (Tr. July 11, 2000 at 140.)
16   The apartment was in disarray, with cartons of eggs on the kitchen floor, smeared
17   blood stains, furniture overturned, and a body that was later identified as that of
18   Gunnel. (Tr. July 11, 2000 at 143–44.) The living room had a pool of blood on the
19   carpet under an overturned ottoman, which was later confirmed through DNA
20   testing to be Gunnel's blood. (Tr. July 17, 2000 at 8–9.) There was also blood on a
21   soft-back chair. (Tr. July 17, 2000 at 9–10.) A ratchet mechanism for a car jack,
22   which had Gunnel's blood and hair on it, was found in the east bedroom under a
23   pillow with blood. (Tr. July 11, 2000 at 170–71; Tr. July 17, 2000 at 26.) The
24   bathroom had blood smears on the floor, smelled like cleanser, and contained a pile
25   of bloody towels. (Tr. July 11, 2000 at 144.)

26        Police found shoe impressions, Converse, Adidas-style, and "running Ws,"
27   throughout and around the apartment. (Tr. July 11, 2000 at 158–60; Tr. July 12,
28   2000 at 48–49; Tr. July 17, 2000 at 19–23.) The police also identified Converse and

4

1   Adidas-style shoe impressions close to Gunnel's vehicle, which was recovered near
2   Carver Park. (Tr. July 12, 2000 at 48–52.) Rodgers testified that he saw Converse
3   shoe impressions in the sand where the children's bodies were potentially put into
4   the river, but that he failed to take any photographs. (Tr. July 17, 2000 at 94–95.)

5        As Rodgers was preparing to leave the crime scene on the morning of
6   February 10, 1989, he ran into Kale Johnson outside Gunnel's apartment. (Tr. July
7   17, 2000 at 30–31.) Rodgers arrested Johnson upon realizing that he was wearing
8   Converse shoes with blood stains. (Tr. July 17, 2000 at 30–31.) DNA analysis later
9   confirmed that the blood on Johnson's shoes belonged to Gunnel. (Tr. July 12, 2000
10  at 122.) Johnson was also wearing grey pants and a grey jacket at the time of his
11  arrest; the pants had Gunnel's blood on them, and the one spot of blood on the jacket
12  that was tested came from an unidentified male. (Tr. July 12, 2000 at 129, 137–38.)
13  After arresting Johnson, Rodgers took him to the police station, where he was
14  questioned and threatened with murder charges if he did not testify against Kiles.
15  (PFR2 Dkt. 20 Exs. 1-2 at 9.) Johnson ultimately pled to hindering prosecution and
16  was sentenced to two and a half years in prison. (Tr. July 14, 2000 at 103–04.)

17       In the early morning hours of February 11, 1989, Officer David Sherman of
18  the Yuma Police Department found Kiles hiding under a bunk bed at a friend's
19  apartment. (Tr. July 17, 2000 at 201–03.) Kiles's clothing contained Gunnel's blood
20  and blood from a source consistent with an offspring of Gunnel and Ward Wade,
21  Jr. (Tr. July 12, 2000 at 122–24)—i.e., their only child, Shemaeah. Following
22  Kiles's arrest, while at the jail, Kiles told Detective Anderson that he wanted her to
23  know that he had not killed the children. (Tr. July 10, 2000 at 194–95.) A few days
24  later, on February 14, 1989, Kiles's parole officer Ramon Mendoza interviewed
25  Kiles. (2006 Trial Ex. 169 at 2.) Kiles conveyed to Mendoza, too, that he had killed
26  Gunnel, but that he had not killed the children. (2006 Trial Ex. 175 at 2.) Kiles told
27  Mendoza he was under the influence of cocaine, crack, heroin, and alcohol at the
28  time of the crime. (2006 Trial Ex. 175 at 2.)

5

1    During the course of the investigation, detectives learned that on February
2    10, 1989, Kiles and Johnson had sold some of Gunnel's possessions to various
3    individuals. (Tr. July 17, 2000 at 55.) Kiles and Johnson had ransacked the
4    apartment in search of property they could sell for drugs. (Tr. July 17, 2000 at 190–
5    91.) On February 10, 1989, Kiles and Johnson sold a telephone from Gunnel's
6    apartment to Jesse Solomon, a friend of the Kiles family. (Tr. July 10, 2000 at 145–
7    46.) Once Johnson left, Kiles cried and told Solomon that he had killed somebody.
8    (Tr. July 10, 2000 at 148–49.)

9    On February 17, 1989, Anderson and Lieutenant John Lekan, of the Yuma
10   Police Department, traveled to a city in Mexico to retrieve the body of LeCresha,
11   who had been found in the Central Canal. (Tr. July 12, 2000 at 59–60, 64.)
12   Shemaeah's body was never found. (Tr. July 12, 2000 at 63.)

13   Robert Mallon, M.D., a pathologist with the Yuma Regional Medical Center,
14   performed autopsies on both Gunnel and LeCresha. (Tr. July 13, 2000 at 95, 101.)
15   He concluded that Gunnel had died from "multiple blunt trauma to the head with
16   multiple scalp lacerations, skull fractures, laceration to the brain." (Tr. July 13, 2000
17   at 97.) Gunnel also had a "fracture of the right arm, laceration to the skin of the
18   right arm, and fracture of the bone." (Tr. July 13, 2000 at 97.) Dr. Mallon further
19   concluded that LeCresha had died from "blunt trauma to the skull with extensive
20   skull fractures and brain laceration." (Tr. July 13, 2000 at 101.)

21   **III.   STATE COURT PRESUMPTION OF CORRECTNESS**

22   Kiles hereby challenges the presumption of correctness provided for by 28
23   U.S.C. § 2254(e)(1) that could, in different circumstances, attach to certain factual
24   findings made by the state courts in his case. As detailed throughout this Petition—
25   and as evidentiary development will further illustrate—such factual findings, to the
26   extent any are found to exist, are not entitled to the presumption of correctness in
27   § 2254(e)(1).

28   More specifically, Kiles asserts that findings of fact made by the state courts

6

1    at his retrial, on direct appeal, during state post-conviction proceedings, or at any

2    other point since legal proceedings began in this case in 1989—should any such

3    findings exist—are not entitled to this Court's deference because those findings are

4    not fairly supported by the record before the state courts. Kiles further asserts that

5    the presumption of correctness is inapplicable and inappropriate in this case for

6    several additional reasons, including but not limited to (1) the state courts' fact-

7    finding procedures were inadequate to afford his constitutional claims full and fair

8    consideration; (2) material facts were not adequately developed in state-court

9    proceedings; (3) he did not receive full, fair, and adequate hearings in state court;

10   and (4) the state-court proceedings otherwise denied him due process of law.

11   **IV.    PROCEDURAL STATUS OF CLAIMS AND EXHAUSTION**

12           Most of the federal constitutional claims alleged throughout this Petition

13   have been exhausted in proceedings before Arizona courts. Some claims, however,

14   were not fully presented in state court, were not ripe for review, or could only be

15   adequately raised in this forum. Respondents bear the burden of demonstrating that

16   Kiles has failed to exhaust a particular claim. *See, e.g.*, *Johnson v. Zerbst*, 304 U.S.

17   458, 464 (1938); *Esslinger v. Davis*, 44 F.3d 1515, 1528 (11th Cir. 1995); *Herbst

18   v. Scott*, 42 F.3d 902, 905 (5th Cir. 1995); *Brown v. Maass*, 11 F.3d 914, 914 (9th

19   Cir. 1993) (per curiam).

20           To the extent that any claim is deemed procedurally defaulted, and because

21   the doctrine of procedural default is based upon comity rather than upon

22   jurisdiction, this Court retains the power to consider the merits of that claim. *See,

23   e.g.*, *Reed v. Ross*, 468 U.S. 1, 9 (1984). Further, this Court may review the merits

24   of any procedurally defaulted claim because Kiles can demonstrate both cause for

25   any failure to properly exhaust a particular claim and prejudice from the alleged

26   constitutional violation. Alternatively, Kiles can demonstrate that a fundamental

27   miscarriage of justice would result if this Court declined to hear any particular claim

28   on the merits. *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991). And, to the

1   extent that Respondents argue that any state-court decisions adverse to Kiles were
2   based upon state procedural grounds, those grounds were neither adequate to
3   support the state court's judgments nor independent of federal constitutional
4   guarantees. *See generally Stewart v. Smith*, 536 U.S. 856 (2002) (per curiam); *Ford*
5   *v. Georgia*, 498 U.S. 411, 423–24 (1991).

6       As an additional matter, for any claims not raised or properly exhausted due
7   to the ineffective assistance of prior counsel, Kiles can show, with the benefit of
8   evidentiary development, that he has cause to overcome any procedural default of
9   his meritorious constitutional claims. *See, e.g.*, *Martinez v. Ryan*, 566 U.S. 1, 9
10  (2012). Further, as Kiles will explain in his evidentiary-development motions,
11  Rules 6 (discovery), 7 (expansion of the record), and 8 (evidentiary hearing) of the
12  Rules Governing Section 2254 Cases in the United States District Courts require
13  that federal courts provide a habeas petitioner with reasonable means to investigate
14  and factually support the claims presented in a petition for a writ of habeas corpus.
15  *See McCleskey v. Zant*, 499 U.S. 467, 498 (1991).

16      Lastly, Kiles respectfully reserves the right to timely request a limited stay
17  and abeyance pursuant to *Rhines v. Weber*, 544 U.S. 269 (2005), in order to return
18  to state court to present any unexhausted claims, should the need to do so become
19  apparent.

20  **V.    RIGHT TO AMEND**

21      Kiles expressly reserves his right to amend this Petition, both as a matter of
22  course under Federal Rule of Civil Procedure 15(a)(1) and later, as necessary and
23  appropriate. *See* Rule 12, Rules Governing Section 2254 Cases in the United States
24  District Courts (applying Federal Rules of Civil Procedure to habeas proceedings).
25  In *McCleskey v. Zant*, the Supreme Court reaffirmed the "principle that [a]
26  petitioner must conduct a reasonable and diligent investigation aimed at including
27  all relevant claims and grounds for relief in the first federal habeas petition." 499
28  U.S. 467, 498 (1991). Kiles believes that additional claims may be identified

8

1   through ongoing investigation, after discovery is conducted and completed, and/or

2   after an evidentiary hearing is held. At the appropriate time during these

3   proceedings, Kiles will therefore present any additional claims through

4   amendments or supplements to this Petition.

5   **VI.   AEDPA IS UNCONSTITUTIONAL**

6          As an initial matter, the principle that every prisoner must have all of his

7   constitutional claims heard by a court is central to fundamental fairness and the

8   integrity of the justice system. *See Bounds v. Smith*, 430 U.S. 817, 822–23 (1977).

9   One essential method of ensuring that a prisoner's constitutional claims are heard

10  is through the availability of the writ of habeas corpus. However, the passage of the

11  Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) substantially

12  changed the law that governs habeas petitions. *See Felker v. Turpin*, 518 U.S. 651,

13  654 (1996). AEDPA's restrictions suspend the writ of habeas corpus and violate the

14  separation of powers, which results in prisoners remaining in prison without review

15  of alleged constitutional defects of their convictions and sentences.

16         **A.   AEDPA unconstitutionally suspends the writ of habeas corpus.**

17         Congress cannot define prisoners' rights so narrowly that it, in effect,

18  suspends the writ of habeas corpus. The writ of habeas corpus is guaranteed by the

19  U.S. Constitution in the Suspension Clause, which provides that "[t]he Privilege of

20  the Writ of Habeas Corpus shall not be suspended, unless when in Cases of

21  Rebellion or Invasion the public Safety may require it." U.S. Const. art. I, § 9, cl. 2.

22  The Suspension Clause is a structural limitation on the power of Congress. Like

23  bills of attainder and ex post facto laws, which are also prohibited in Article I,

24  section 9, the suspension of habeas (except in cases of rebellion or invasion) belongs

25  to a "category of congressional actions which the Constitution barred." *United*

26  *States v. Lovett*, 328 U.S. 303, 315 (1946). The writ "can be preserved in practice

27  no other way than through the medium of the courts of justice; whose duty it must

28  be to declare all acts contrary to the manifest tenor of the Constitution void." *Id.* at

314 (quoting The Federalist No. 78 (Alexander Hamilton)).

AEDPA prevents federal courts in certain circumstances from granting relief when it is undisputed that a conviction or sentence is unconstitutional. *See* 28 U.S.C. § 2254. Under AEDPA, before granting the writ a federal court must determine whether, for example, the complete deprivation of a jury in a capital case is a "reasonable" or "unreasonable" constitutional violation. As explained long ago,

> habeas is "the most important human right" in the Constitution because it functions as a mechanism for the enforcement of the Bill of Rights against the federal government: "Censorship can be evaded; prosecutions against ideas may break down; a prison wall is there. Only habeas corpus can penetrate it. When imprisonment is possible without explanation or redress, every form of liberty is impaired.

Dan Poulson, Note, *Suspension for Beginners: Ex parte Bollman and the Unconstitutionality of the 1996 Antiterrorism and Effective Death Penalty Act*, 35 Hastings Const. L. Q. 373, 399 (2008) (quoting Zechariah Chafee, Jr., How Human Rights Got Into the Constitution 53 (1952)). This restriction on courts' ability to grant relief constitutes an unconstitutional suspension of the writ.

## B.     AEDPA violates the separation-of-powers doctrine.

Congress cannot impinge on the courts' duty to say what the law is, but Congress does so when it requires Article III courts to ignore any part of the Constitution and to instead give effect to a contrary law. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 178 (1803). Congress has the power to constrain courts' authority. *See Keene Corp. v. United States*, 508 U.S. 200, 207 (1993); *see also* U.S. Const. art. III, § 1 ("The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."). However, there are limits on that power. On such limit is that Congress must not manipulate the "test for determining the scope of [habeas corpus]" because the writ "is designed to restrain" Congress, and because the writ is "an indispensable mechanism for monitoring the separation of powers."

10

1   *Boumediene v. Bush*, 553 U.S. 723, 765–66 (2008).

2       The separation-of-powers doctrine found in Article III "serves both to protect
3   the role of the independent judiciary within the constitutional scheme of tripartite
4   government . . . and to safeguard litigants' right to have claims decided before
5   judges who are free from potential domination by other branches of government."
6   *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 848 (1986) (citations
7   and internal quotation marks omitted). When confronted with an unconstitutional
8   provision, the Supreme Court in *Marbury* considered whether courts are bound by
9   "an act of the legislature" that is "repugnant to the constitution." The Court
10  concluded, "It is emphatically the province and duty of the judicial department to
11  say what the law is." 5 U.S. at 177.

12      "[I]f Congress does provide for habeas in the federal courts, Congress cannot
13  . . . instruct the federal courts, whether acting in a federal or in a state case, how to
14  think, how to ascertain the law, how to judge." *Irons v. Carey*, 505 F.3d 846, 855
15  (9th Cir. 2007) (Noonan, J., concurring), *overruled on other grounds by Hayward*
16  *v. Marshall*, 603 F.3d 546 (9th Cir. 2010) (en banc). AEDPA infringes upon the
17  power of the courts to say what the law is and to give effect to that law and thereby
18  violates the separation-of-powers doctrine.

19      **C.    Conclusion.**

20      AEDPA unconstitutionally suspends the writ of habeas corpus and violates
21  the separation-of-powers doctrine because it dictates that courts must not "grant
22  relief to citizens who are being held in prison in violation of their constitutional
23  rights unless the constitutional error that led to their unlawful conviction or sentence
24  is one that could not have been made by a reasonable jurist." *Irons*, 505 F.3d at 859
25  (Reinhardt, J., concurring specially). Also, AEDPA does not allow an appellate
26  judge to correct an unlawful detention if a lower court's "error is understandable,"
27  which is inconsistent with a judge's duty "to enforce the laws and protect the rights
28  of our citizens against arbitrary state action." *Id.* "Whether it was reasonable for a

1    state court to misapprehend the dictates of the Constitution in a particular case
2    hardly seems relevant to a citizen's right not to be imprisoned in violation of the
3    fundamental liberties he is granted by the document that governs our societal
4    structure." *Id.* As AEDPA is unconstitutional, this Court should not be constrained
5    by its dictates.

6                                    **Claim One**

7        **Representation   at   trial   was   so   marred   by   conflicts,
         misrepresentations, and procedural violations that Kiles was denied
8        effective counsel and fair and reliable capital proceedings.**

9        Kiles's trial began with a procedural due-process violation, proceeded with
10   counsel whose interests diverged from their client's during the course of
11   representation, and ended in a capital sentence that can only be described as
12   arbitrary and unfair, in violation of the Sixth, Eighth, and Fourteenth Amendments
13   to the U.S. Constitution. Kiles presented this claim below. (ROA 1189 at 10–18,
14   23–30; PFR2 Dkt. 1 at 12–18, 25–30.) Kiles incorporates by specific reference all
15   facts, allegations, and arguments made elsewhere in this Petition.

16       **A.    Kiles received ineffective assistance of counsel from the start.**

17       Kiles's first trial, held in 1989, was reversed on state post-conviction review
18   based on ineffective-assistance-of-counsel grounds in 1996. (ROA 314 at 4.) The
19   case was referred back to Yuma County Superior Court and assigned to Judge Kirby
20   Kongable. (ROA 337 at 1.) Kiles's state post-conviction counsel, Mary Boyte,
21   moved to withdraw, as she was not qualified to be lead counsel on a trial-level
22   capital case. (Tr. Mar. 13, 1998 at 4.) Initially, the Yuma County Office of the Legal
23   Defender was appointed to the case. (Tr. Mar. 13, 1998 at 6.) Given the size of the
24   case, the Office of the Legal Defender determined it was insufficiently staffed to
25   retain the case, and the case was assigned to two private defense attorneys, Robert
26   Roberson and Jerrold Shelley. (ROA 352 at 1.) After concerns were raised, Mary
27   Boyte was appointed as special counsel to investigate whether Roberson and
28   Shelley had a conflict of interest. (Tr. Mar. 13, 1998 at 36–37). As a result of

                                         12

1    multiple conflicts, Roberson and Shelley were forced to withdraw. (ROA 376 at 3–
2    10; ROA 377 at 1.) Kiles's case was referred back to the Office of the Legal
3    Defender for assignment of counsel. (ROA 377 at 1.)

**1.    Greg Clark's appointment did not satisfy Arizona's standards for appointment as capital defense counsel.**

6    At the time of Kiles's trial, Yuma County had adopted a bidding system to
7    appoint counsel for indigent defendants. While the court appointed attorneys to
8    represent indigent defendants, the Office of the Legal Defender held the contracts
9    providing payment to private attorneys. On September 10, 1998, after Roberson and
10   Shelley had withdrawn from Kiles's case, the Yuma County Legal Defender and
11   Conflict Administrator Jose de la Vara solicited a bid from Phoenix attorney Greg
12   Clark to represent Kiles. Clark submitted a bid that same day, attesting that he had
13   tried 25 first-degree murder cases, including eight capital cases, and that he had
14   only one client on death row. However, Clark had at least three clients on death row
15   at the time of his bid.[3] Clark's material misrepresentation was the first in a long
16   string of misrepresentations by Clark throughout the eight years he was appointed
17   to represent Kiles.

18   Clark had also been publicly censured in 1997 for ineffective assistance in a
19   juvenile case. Despite being on notice that Clark had been disciplined by the
20   Arizona State Bar Association (hereinafter "Bar"), de la Vara nevertheless sought
21   his appointment.[4] De la Vara also requested that Mark Reeves, an attorney from the
22   Office of the Legal Defender, be appointed as co-counsel.

---

24   [3] At the time of Greg Clark's appointment to Kiles's case, Clark's former clients Michael Gallegos, Timothy Ring, and Kenneth Laird were on Arizona's death row.
25   *See Gallegos v. Schriro*, 583 F. Supp. 2d 1041 (D. Ariz. 2008); *State v. Ring*, 25 P.3d 1139 (Ariz. 2000), *overruled by Ring v. Arizona*, 536 U.S. 584 (2002); *State v. Laird*, 920 P.2d 769 (Ariz. 1996).

27   [4] In a letter to Mary Boyte, Jose de la Vara stated that he did not take the time to investigate whether Greg Clark was qualified for appointment because de la Vara had known Clark for a long time and relied on that relationship of trust.

1     Mary Boyte, in her role as special counsel, filed a notice with the court on
2  October 2, 1998 stating that she was "concerned that the attorneys who are being
3  designated for appointment by the Office of the Legal Defender and the Yuma
4  County Board of Supervisors do not meet the requirements for representation of
5  capital defendants as set forth in Rule 6.8 [of the Arizona Rules of Criminal
6  Procedure]." (ROA 379 at 1–2.) Arizona Rule of Criminal Procedure (hereinafter
7  "Rule") 6.8, which contains Arizona's Standards for Appointment of Counsel in
8  Capital Cases, requires that to be eligible for appointment in a capital case, an
9  attorney "shall have been a member in good standing of the State Bar of Arizona
10  for at least five years immediately preceding the appointment." Rule 6.8(a)(1). The
11  court held a hearing to determine whether Clark met the qualifications under Rule
12  6.8. Boyte informed the court that Clark had been censured in 1997 for providing
13  ineffective assistance in a juvenile transfer case and had been suspended for
14  administrative proceedings a few months prior. (Tr. Oct. 7, 1998 at 5–6.)

15     In response, Clark misrepresented to the court the nature and severity of those
16  disciplinary actions. Clark said that the public censure for his ineffective assistance
17  was not a failing on his part but "a judgment call and, you know, given the facts as
18  they were then and today, I probably would do the same thing." (Tr. Oct. 7, 1998
19  at 10.) He then misrepresented his suspension, asserting that the mistake was not
20  his, but that of the Bar's. "The Bar believed that I did not pay my dues this year. So
21  as a matter of course, they issued an order of suspension which they later retracted
22  almost immediately when it was learned that, in fact, I had paid those dues." (Tr.
23  Oct. 7, 1998 at 10.)

24     Neither of these accounts was accurate. Regarding the public censure for
25  ineffective assistance of counsel, Clark failed, despite ample evidence, support, and
26  opportunity, to effectively advocate for his juvenile client. Clark's inadequate
27  representation resulted in the juvenile being transferred to adult court. In order to
28  receive no more severe a punishment than public censure, Clark conditionally

14

admitted to the Disciplinary Commission of the Supreme Court that his conduct was in violation of ethical rules governing competence, diligence, and communication. Clark's discipline was not the result of a mere bad "judgment call," but the result of his repeated failures during the representation to provide constitutionally effective counsel. The Arizona Court of Appeals found that Clark's actions in the case were so unreasonable as to be constitutionally deficient. Indeed, the court declared that Clark's "failure to even attempt" to advocate whatsoever for his juvenile client, even when given multiple opportunities to do so, "leads us to conclude that 'but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Matter of Appeal in Maricopa Cty., Juvenile Action No.* JV-511576, 925 P.2d 745, 748 (Ariz. Ct. App. 1996) (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). As to the suspension as a result of the non-payment of dues, the mistake was not on the part of the Bar. It appears that Clark had in fact failed to pay his dues and was only reinstated upon payment of those dues, two weeks later. (Tr. Oct. 7, 1998 at 10; PFR2 Dkt. 1 at 16.)

Four months before the hearing regarding Clark's suitability for appointment, the prosecutor at the time had emphasized to the court, "Your Honor, this is a capital case. Under Rule 6.8 there are standards for appointment of counsel in capital cases that we have to observe." (Tr. Mar. 13, 1998 at 5). At the hearing regarding Clark's qualifications, however, prosecutor David Powell, who had recently taken over the case on behalf of the Arizona Attorney General's Office, told the judge that Clark "enjoys a wonderful reputation in Maricopa [County]" and that his main concern was whatever was "most expeditious." (Tr. Oct. 7, 1998 at 11–12.)

The court relied on the State's representations to approve Clark's appointment, in violation of Rule 6.8 and without any further inquiry. The court stated:

> Well, even Mr. Powell thinks that Mr. Clark enjoys an excellent reputation in Maricopa County. That's one thing . . . I am not at all concerned about the Bar thinking maybe

15

> he hadn't paid his dues when he had and that matter being
> resolved in a quick matter. The incident that occurred in
> 1995 perhaps causes me some concern, but I think when
> you weigh that against his experience and reputation and
> the fact that may very well have been a judgment call on
> his part, that that's not enough for me to say that I don't
> feel Mr. Clark is qualified.

(Tr. Oct. 7, 1998 at 21.) Accordingly, the court expressly relied on Clark's misrepresentations in discounting the importance of his disciplinary issues.

After the hearing, Clark submitted a Notice of Compliance with Rule 6.8, stating that he had met the practice element of the Rule. (ROA 381.) He, notably, did not assert that he had been in good standing with the Bar for the preceding five years, nor did he attach a Certificate of Good Standing, which at the time under Rule 74 of the Rules of the Arizona Supreme Court would have listed his disciplinary record. However, to prove he met the training requirement under Rule 6.8, Clark provided his attendance form and a copy of the check in payment for the training. The check was from his IOLTA account, itself a violation of his obligations as an attorney.[5] (ROA 381 at 6.)

The court subsequently appointed Clark as lead counsel for Kiles. The terms of the contract with the Office of the Legal Defender provided for a flat fee of $25,000 for Clark to accept the case, with another $25,000 in the event the case went to trial. (Tr. Nov. 29, 1999 at 6.) The contract required that Clark meet the requirements for attorneys handling death-penalty cases in Arizona as set forth in Rule 6.8. (PFR2 Dkt. 22 Ex. 10 at 1.)

### 2. Clark failed to establish an attorney-client relationship with Kiles.

Clark's relationship with his client was tenuous from the start. After the court

---

[5] IOLTA accounts contain client funds and should not be co-mingled with the attorney's own money or used to attend seminars. *See* Ariz. R. Professional Conduct, ER 1.15; (DA2 Dkt. 86 at 71 n.7). The same month Clark was appointed to Kiles's case, he was placed in a counseling program to address his ethical misconduct for trust account violations. (ROA 1189 at 16; PFR2 Dkt. 29 Ex. 37.)

16

hearing on Clark's qualifications, Kiles expressed some concern to his state post-conviction counsel. She listed questions Kiles could ask Clark about his experience in order to assuage any concerns. However, Kiles never had the opportunity to ask those questions, and Clark's representation in the initial months of his appointment only heightened Kiles's concerns. On January 6, 1999, Kiles sent a letter to Judge Kirby Kongable requesting new counsel, stating that in the first three months of appointment Clark had spoken with him for only two hours and that Clark had informed Kiles that he was not going to "baby-sit" him. (ROA 392 at 5.) Kiles wrote that communication with Clark was down to "zero." (ROA 392 at 3.) In response, Clark filed an ex parte response with Judge Kongable and defended himself by portraying Kiles as difficult.[6] Clark agreed he was not communicating with Kiles, but he blamed Kiles for this failure. (ROA 393 at 1.) Clark further defended himself by stating that until he had completely read the case file and discovery was complete, he would be "unable to have any meaningful communication" with Kiles.[7] (ROA 393 at 2.) Clark concluded his response by writing, "It is only human nature that differences of opinion arise and other conflicts come about." (ROA 393 at 3.)

At a status hearing only three months after Clark's appointment, Kiles again informed the judge of his concerns regarding Clark's effectiveness, especially his lack of communication. (Tr. Jan. 22, 1999 at 5.) Kiles told the court that from October 17, 1998 to January 5, 1999, he had had no communication whatsoever

---

[6] Under Arizona law at that time, Judge Kongable would have made the capital-sentencing decision in the event Kiles was convicted of first-degree murder.

[7] In contrast, Roberson and Shelley, who had been appointed prior to Clark, informed the court that adequately preparing to represent Kiles would take approximately one hundred hours of jail visits. (Tr. Mar. 24, 1998 at 21–22; DA2 Dkt. 89 at 78.) This representation was more in line with the prevailing standards of care in Arizona at the time of these proceedings. Ariz. Attorneys for Crim. Justice & Ariz. Capital Rep. Project, *Arizona Capital Case Defense Manual* at 20–21 (1995 ed.).

from Clark, prompting Kiles's January 1999 letter to the judge.[8] (Tr. Jan. 22, 1999 at 5–6.) The court demurred—its first in a long series of refusals to take action to ensure appropriate representation—and merely admonished all parties do the best they could to work together. (Tr. Jan. 22, 1999 at 10–11.) One month later, Mark Reeves withdrew as co-counsel after he discovered a conflict that prohibited his office from representing Kiles, and Mary Boyte was appointed as Kiles's second counsel. (Tr. Dec. 9, 1998 at 5; ROA 399 at 1.)

In the first year of Clark's appointment, the irreparable breakdown between attorney and client was clear. In July 1999, Kiles filed a pro per motion requesting new counsel, asserting that, though the court had accused him at the January 1999 hearing of trying to "interject error into the proceedings, this was not my intention then or now. I just want adequate attorneys." (ROA 407 at 4.) Kiles wrote that Clark had promised to send Kiles legal material pertaining to his case but had not done so; Kiles also stated that Clark had told Kiles to call, but that Clark's staff would often hang up when Kiles did so. (ROA 407 at 6–7.) Kiles supplemented this motion two days later "to correct a lie told to the court" by Clark and to inform the court about Kiles's first legal visit from Clark in five months. (ROA 408 at 1.) The lie was in a motion to continue that Clark had submitted that stated, "Defense counsel has spoken with the Defendant in this matter, who has [] indicated that he has no objection to continuing this matter." (ROA 405 at 1–2.) Kiles reported that he could not have agreed to a continuation, as he had never been asked by Clark. (ROA 408 at 1.) As to the legal visit, it was not a productive visit; Clark did not bring any papers, nor even anything to write with or on, and therefore nothing was accomplished. (ROA 408 at 2–3.)

At an August 1999 hearing regarding second counsel Boyte's motion to

---

[8] In response to Clark's allegations that Kiles was at fault for the lack of communication, Kiles told the court, "I mean, I can't get out of jail and go to his office. So how could it be my choice not to communicate with him?" (Tr. Jan. 22, 1999 at 5.)

withdraw from the case,[9] Kiles flagged for the court Clark's continued misrepresentations to him. For example, when Clark was appointed, Clark had both promised Kiles and informed the court that he would be filing a motion to challenge Kiles's grand-jury proceedings. (ROA 388 at 1–2.) That motion was never filed. (Tr. Aug. 6, 1999 at 14–15.) As another example, Kiles notified the court that Clark had misled him, pushing him toward an early trial date based on Clark's assertion that doing so would encourage a plea deal. (Tr. Aug. 6, 1999 at 11.) Kiles agreed to Clark's proposed early trial date, only to later discover that the State had rejected any such deal a month prior to Kiles's conversation with Clark. (Tr. Aug. 6, 1999 at 11.) Kiles expressed concern that Clark was failing to do any investigation in his case and that he was also refusing to read the file from Kiles's successful state post-conviction petition. Clark readily agreed about prior counsel's file: "I certainly did indicate—and [Kiles] is absolutely right—that the boxes of information that are out there now were worthless." (Tr. Aug. 6, 1999 at 30.)

The previous case file, however, was not worthless. Kiles's second trial was based on the same State's facts that had been challenged during state post-conviction proceedings and involved many of the same witnesses who had been interviewed during those proceedings. Moreover, the case file highlighted the mistakes of counsel during the first trial, which would have been instructive for Clark as he prepared for Kiles's retrial. Still, Clark chose not to avail himself of this crucial information.

Kiles told the court that he was not the only one with whom Clark would not communicate. Boyte was having the same problem with Clark. While Kiles often had trouble getting Clark on the phone, when Kiles succeeded, he then had to call Boyte to relay what Clark had said. Otherwise, Boyte was left in the dark. (Tr. Aug. 6, 1999 at 12.) Kiles told the court that this method of communication between

---

[9] Mary Boyte's motion and its impetus are discussed in greater depth below.

1    co-counsel was "ridiculous." (Tr. Aug. 6, 1999 at 17.)

2          Additionally, Kiles was concerned about informal discussions between
3    counsel and with the court that were off-the-record and outside of his presence. (Tr.
4    Aug. 6, 1999 at 13.) He told the court that, as his life was on the line, he believed
5    he had a right to be present for informal meetings about him or his case, or at least
6    have the opportunity to read a transcript later. (Tr. Aug. 6, 1999 at 13–14.) Kiles
7    said simply, "I am not trained as an attorney. I respect Mr. Clark as an attorney, but
8    still I am not an idiot. I can read; I can write. So I would like to be there." (Tr. Aug.
9    6, 1999 at 14.) But when Kiles informed Clark that he would like to be present,
10   Clark refused the request and told Kiles he would continue to have off-the-record
11   discussions.[10] (Tr. Aug. 6, 1999 at 14.) Clark's unauthorized waiver of his client's
12   constitutional rights left Kiles without an advocate he could trust to be honest with
13   the court.

14         That fundamental lack of trust also affected Kiles's ability to lay out his
15   concerns before the court at the hearing. Kiles stated that he felt like he was at a
16   disadvantage because he was unsure whether what he wanted to say could harm
17   him or his case. (Tr. Aug. 6, 1999 at 15.) Kiles told the court, "If I had an attorney
18   stand up here I can trust, I would ask him." (Tr. Aug. 6, 1999 at 15.) But because
19   he was unsure if he should relay all of his concerns about Clark for fear of
20   endangering his case, Kiles felt compelled to stay silent. (Tr. Aug. 6, 1999 at 15.)
21   The court made no further inquiries as to those concerns.

22         When given the opportunity to respond, Clark told the judge that, "with
23   regard to what has been going on in this case; I have been to the scene, I have been
24   to the place where the bodies were found. I have made a complete review of all of
25   the documentation in this case." (Tr. Aug. 6, 1999 at 31.) Clark also claimed,
26   "Judge, I have done everything I can on [Kiles's] behalf in this case." (Tr. Aug. 6,

27
28   [10] Kiles was right to be concerned, as trial counsel were ineffective for failing to
     make a record at every stage of the proceedings. *See* Claim 16, *infra*.

20

1999 at 33.) Beyond asserting that he had done a complete review of the documentation of the case after stating that the case file was "worthless," Clark was not in control of the basic facts of the case. Clark had neither conducted witness interviews nor arranged to speak with any experts, as confirmed by the time logs Clark later submitted to the court. (Tr. Aug. 6, 1999 at 41–42; ROA 414 at 32–49.) And at the August 1999 hearing, Clark asserted, "It is to no defendant's advantage in a capital case to rush quickly to trial," even though Kiles had filed his request for new counsel precisely because he believed (accurately) that Clark was rushing to trial. (Tr. Aug. 6, 1999 at 11, 34; ROA 409 at 2.)

By this time, Clark had been lead counsel for ten months. When Clark was first appointed to Kiles's case, he had told Kiles that if Kiles asked him to withdraw for good reason, Clark would do so. (Tr. Aug. 6, 1999 at 12.) Kiles believed his and Clark's inability to maintain communication, trust, or any kind of working relationship was a good reason. (Tr. Aug. 6, 1999 at 12.) Kiles was also frustrated with Clark's dishonesty, both to him and to the court, and with Clark's waiver of Kiles's right to be present at pretrial proceedings. (Tr. Aug. 6, 1999 at 12–14.) Kiles felt Clark was preventing Kiles's ability to participate in his own defense. (Tr. Aug. 6, 1999 at 14.) Therefore, Kiles had asked Clark to withdraw, but Clark had refused.[11] (Tr. Aug. 6, 1999 at 12.) Frustrated with Clark's misrepresentations, Kiles expressed desperation:

> I am at the point now where I don't believe anything he tells me. Nothing whatsoever. I have asked him to withdraw from being my attorney. He told me when I first -- when he was first appointed to my case, that if I asked him to withdraw for a good reason, he would do just that and I think it's a good reason. I feel like I have been lied to.

---

[11] Clark may have refused to withdraw for financial reasons. Kiles's prior attorneys, who withdrew before Clark was appointed due to a conflict of interest, were required to refund Yuma County the majority of their flat-fee payment after subtracting for the hours they had worked on Kiles's case at a rate set by the court. (Tr. Nov. 29, 1999 at 3–8.)

21

1

2

> I know I have been lied to by him. He lied to the court on
> me and said something I didn't say.

(Tr. Aug. 6, 1999 at 12.) Kiles had a good relationship with Boyte—she had guided him to relief previously—and made multiple requests to the court to deny Boyte's motion to withdraw and assign adequate counsel to replace Clark. (Tr. Aug. 6, 1999 at 10, 15–16, 27.) Kiles told the court, "If you keep Mr. Clark on my case, I don't know how he is going to be able to defend me because there is some things I need to tell my attorney, but I will not tell him." (Tr. Aug. 6, 1999 at 17.) Yet the court granted Boyte's motion to withdraw, and Clark remained lead counsel. (Tr. Aug. 6, 1999 at 48.)

### 3.  Clark's lack of communication and deficient performance compelled co-counsel to withdraw.

The client-attorney relationship was not the only relationship that Clark had irredeemably destroyed. Mark Reeves, initially appointed as Clark's co-counsel, was required to withdraw due to a conflict, and Mary Boyte replaced Reeves as Kiles's second trial attorney. (ROA 399 at 1.) Boyte, Kiles's state post-conviction counsel, had a strong relationship with Kiles and a deep familiarity with the case. Rather than relying on her as an asset, however, Clark largely ignored Boyte. (ROA 409 at 1.)

In the four months after her appointment in March 1999, Boyte had no communication with Clark save a single fax. (ROA 409 at 1.) When Clark pushed for a speedy trial, Boyte expressed concern that Clark wanted a trial date in November 1999, as "there has been no investigation or pretrial work of any kind conducted" in the case. (ROA 409 at 2.) Although funding for an investigator and a mental-health expert had been approved by the court, no investigator had been hired, no witnesses had been interviewed, and the lone proposed expert had not been contacted. (ROA 409 at 2.) Boyte also believed that Clark's lump-sum, contingency fee contract with the Office of the Legal Defender was pushing Clark

22

1   to go to trial without sufficient investigation or preparation and that the contract

2   violated ER 1.5(D)(2) of the Arizona Rules of Professional Conduct, which

3   prohibited attorneys from entering into an arrangement to represent a defendant in

4   a criminal case for a contingent fee. (ROA 409 at 3.)

5          Based upon what she perceived as her ethical obligations and Clark's failure

6   to provide effective assistance of counsel, Boyte moved to withdraw on July 16,

7   1999. (ROA 409 at 3–4.) At the August 1999 hearing on Boyte's motion to

8   withdraw, Kiles testified that Clark had justified his refusal to speak with Boyte by

9   telling Kiles that Boyte would not understand strategy and might object to some of

10  the things Clark was doing. (Tr. Aug. 6, 1999 at 16.) In other words, according to

11  Kiles, Clark acknowledged that he was interfering with Kiles's ability to have two

12  trial attorneys, to which Kiles had a right under Arizona law. *See* Ariz. R. Crim. P.

13  6.2(b).

14         At the hearing on her motion, Boyte was represented by attorney Robert

15  Wood, a member of the State Bar of Arizona Ethics Committee. Wood stated he

16  had urged Boyte to withdraw. (Tr. Aug. 6, 1999 at 22.) Wood informed the court

17  that there was a "complete lack of cooperation" of the "kind between lead counsel

18  and second counsel." (Tr. Aug. 6, 1999 at 23.) Wood also stated that Boyte believed

19  "the flat fee arrangement that Mr. Clark has with the county is in effect a contingent

20  fee." (Tr. Aug. 6, 1999 at 24–25.) While Wood explained that he was not there to

21  argue the ethical nature of Clark's contract, he supported Boyte's decision to not

22  enter into a similar contract as co-counsel. He did so given Boyte's concerns about

23  the perverse incentives such a contract creates in general, as well as the conflict it

24  created for Boyte with lead counsel, as Boyte believed the defense was unprepared

25  for trial and disagreed with Clark over how they should proceed.[12] (Tr. Aug. 6, 1999

26  ───────────────

27  [12] As the person most knowledgeable about Kiles's case, Boyte did not believe the
    case should proceed to trial, much less without investigation or expert witnesses. In

28  correspondence with her attorney, she stated that she and the other state post-
    conviction attorneys who had previously assisted with the case believed that the

23

1   at 25–26.)

2      After listening to testimony, Judge Kongable acknowledged on the record
3   that he believed Kiles's concerns were "genuine." After the previous request for
4   new counsel, Judge Kongable had been "hoping that communication would
5   increase." (Tr. Aug. 6, 1999 at 46–47.) Judge Kongable said that lack of
6   communication concerned him, but concluded that it appeared—despite Kiles's and
7   Boyte's reports to the contrary, and indeed Clark's own admission that the case files
8   were "worthless"—Clark was "making progress in terms of going through
9   voluminous material." (Tr. Aug. 6, 1999 at 30, 47.) And though Clark had been on
10  Kiles's case for ten months, Judge Kongable credited Clark as taking preparatory
11  steps toward basic investigation, such as "setting up interviews" and "making
12  arrangements for an investigation." (Tr. Aug. 6, 1999 at 47.) Judge Kongable
13  therefore did not believe "certainly to this point" Kiles was receiving ineffective
14  assistance of counsel. (Tr. Aug. 6, 1999 at 47.)

15     Thus, despite the irreconcilable conflict with the client, despite Clark's
16  misrepresentations, and over Kiles's objections, the court granted Boyte's request
17  to withdraw. (ROA 412 at 1.) Clark remained lead counsel.

18     Four days later, Treasure VanDreumel, an attorney also based in Phoenix,
19  accepted the position as second chair. Her contract was also structured on a flat fee,
20  contingency basis: she would receive $10,000 for accepting the appointment to the
21  case and another $10,000 if the case went to trial.

### 4.   Clark blamed others for his irreparably fractured relationship with Kiles.

24     The conflicts between lead counsel and Kiles, and between counsel
25  themselves, did not improve. In September 1999, Kiles submitted his third pro per
26  motion to the court, informing it that the communication between him and Clark
27  had deteriorated even further since the evidentiary hearing the previous month.

28  best possible outcome would be for Kiles to not proceed to trial.

24

1    (ROA 413 at 1–2.) Kiles wrote that he understood, "I am not allowed an attorney
2    of my choice since I am indigent but I do believe I have the right to attorneys who
3    are effective and competent." (ROA 413 at 5.) Kiles stated that communication with
4    his attorneys had become more difficult, as now neither of his attorneys practiced
5    in Yuma but in Phoenix; upon VanDreumel's appointment, he had been given no
6    contact information to communicate with her. (ROA 413 at 2.) Though Clark had
7    promised to schedule a legal visit at which he, VanDreumel, and the investigator
8    would be present, Kiles reported Clark had failed to do so. (ROA 413 at 2.) Kiles
9    informed the court that he had learned that Clark had another client in Yuma who
10   he had visited without also seeing Kiles. (ROA 413 at 4.) Kiles explained to the
11   court that he simply wished he could have legal visits on a regular basis, but Clark
12   had refused. (ROA 413 at 4.)

13       Also in September 1999, Judge Kongable received a call from another Yuma
14   County judge, Judge Nelson, expressing concern that Kiles was "potentially not
15   receiving adequate representation." (ROA 414 at 16.) This phone call arose from a
16   conversation that Boyte had had with Judge Nelson, which he relayed in part to
17   Judge Kongable. (Tr. Oct. 8, 1999 at 3, 10–11.) Judge Kongable set a hearing to
18   address these issues for October 8, 1999. Clark filed a response with the court
19   stating, "It is the position of undersigned counsel that this issue has been
20   manufactured by Mary Boyte, Esq. and the defendant in a blatant effort to create
21   what they believe is error." (ROA 414 at 4.)[13]

22       Because Boyte's conversation with Judge Nelson had precipitated the phone
23   call to Judge Kongable, Boyte was put on the stand and questioned by the court at
24   the October 1999 hearing. The court also allowed the prosecutor David Powell to
25   cross-examine Boyte regarding whether she was conspiring to undermine Clark's

_____

27   [13] Despite Clark's conspiracy theory, Kiles's counsel would later rely on Boyte to
28   obtain signatures and file motions for them so they would not have to travel to
     Yuma to do so.

25

representation of Kiles. Powell questioned Boyte about her continuing relationship with Kiles. (Tr. Oct. 8, 1999 at 18–19.) Boyte stated she was still visiting Kiles, as she was representing him on civil matters. (Tr. Oct. 8, 1999 at 20.) When the court cautioned Powell that his questions were straying into privileged attorney-client communications, Powell responded, "Judge, it is the theory of the State, as well as I believe Mr. Clark, that this witness . . . is trying to do anything to have Mr. Clark taken off. I am trying to point out the extremes she has gone to to subvert Mr. Clark's representation." (Tr. Oct. 8, 1999 at 22.)

Boyte stated she could not understand what could be gained from her creating conflict between Kiles and Clark. (Tr. Oct. 8, 1999 at 35–36.) Rather, when she was co-counsel, she "asked that the defendant make every attempt to get along with Mr. Clark. I encouraged that. And the defendant did that. He really did make every attempt." (Tr. Oct. 8, 1999 at 36.) She stated that Clark had simply made the decision "not to communicate with this defendant." (Tr. Oct. 8, 1999 at 36.)

Boyte explained that she had spoken to Judge Nelson "just for advice, more than anything. I did not expect him to take any action." (Tr. Oct. 8, 1999 at 10.) She believed that the conversation was only "going to be between him and myself." (Tr. Oct. 8, 1999 at 7.) Boyte went to him because, she said, "I have a burden in my heart, because I don't feel that [Kiles] is being defended the way he needs to be defended." (Tr. Oct. 8, 1999 at 10.) She had simply been trying to ascertain "whether or not I had some kind of obligation" to take action about her concerns. (Tr. Oct. 8, 1999 at 27.)

Clark was also given the opportunity to question Boyte, and he made clear that his concerns were the allegations against him, rather than the quality of his representation to his client. He told the court, "This is just the type of thing that, you know, can rear its ugly head later on down the road sometime in a PCR. I don't want to get blind-sided." (Tr. Oct. 8, 1999 at 33.)

Clark was questioned as well, and when asked by the judge, admitted, "I

26

don't tend to waste a whole lot of time in discussing [trial] issues with someone in Mr. Kiles's position." (Tr. Oct. 8, 1999 at 41.) Clark said he was "not the type of lawyer that holds someone's hand." (Tr. Oct. 8, 1999 at 45.) Additionally, he made the claim, "I have probably tried more murder cases at federal level than anyone in this part of the United States, just because of our proximity in the federal system and jurisdiction we have in this state." (Tr. Oct. 8, 1999 at 45.) He disclosed trial strategy in an attempt to portray himself in a positive light, telling the court,

> I have, you know, have done the research that I have needed to do with regard to the current state of the law regarding the imposition of the death penalty. I have done the research that deals with the applicable issues on the old code. Because, at some point in time, his earlier counsel chose not to pursue a defense, which was absolutely applicable 12 years ago, when this conviction occurred, which can have a great impact with regard to how this case is ultimately portrayed in front of the jury, allowing him to pursue less included offenses, that will be well brought, and not summarily denied by a court, when offered by way of an instruction.

(Tr. Oct. 8, 1999 at 41.)

Powell was also given a chance to question Clark.[14] Under friendly questioning, Clark again misrepresented that he had been qualified for the capital appointment, stating "it was [Boyte's] assumption, somehow, I was suspended from the Bar."[15] (Tr. Oct. 8, 1999 at 53.) Clark again called the case file from Kiles's first state post-conviction "worthless," even though the file contained the extensive investigation information, expert reports, and witness interviews that had won Kiles a new trial. (Tr. Oct. 8, 1999 at 65.) And Clark assured the court, "If in fact I perceive some problem with adequately representing Mr. Kiles, I will be the first to step up to the plate." (Tr. Oct. 8, 1999 at 59.)

---

[14] It is unclear why the State had standing or grounds to do so.

[15] As discussed further below, Clark had been suspended from the Bar a few months prior to his appointment on Kiles's case.

27

1    At the hearing, Kiles clarified that the conflict between him and Clark was

2    not due to Boyte, but Clark's misrepresentations and his continued failure to follow

3    through with his promises. Kiles testified that Clark had previously misrepresented

4    to the court Clark's involvement in a previous attempt at victim contact, as well as

5    that Clark had lied to Kiles about the possibility of a plea bargain. (Tr. Oct. 8, 1999

6    at 84–85, 90.)[16] Kiles told the court, "He tells me so many different things, and

7    contradicts them, and I don't understand why he is still on my case. I don't know if

8    it's for financial reasons. I don't believe he is trying to help me." (Tr. Oct. 8, 1999

9    at 81.)

10    Despite Kiles's repeated insistence that Clark was lying to him about material

11    facts and legal matters, Judge Kongable refused to take action. The court

12    announced, "I think, when all of the shouting is said and done, Mr. Clark is going

13    to probably do a bang-up job for Mr. Kiles. So request to remove him is denied."

14    (Tr. Oct. 8, 1999 at 97.)

15    **5.    Kiles filed a Complaint in Special Action with the Arizona
         Supreme Court requesting new counsel.**

16

17    Given the outcome of the above hearing, Kiles wrote to Clark, telling him

18    that, as they were still forced to work together, Kiles would try to work with him

19    and the recently appointed Treasure VanDreumel to assist in his defense. This good-

20    faith attempt by Kiles to give Clark a chance to be honest and communicative failed,

21    prompting Kiles to file a pro per motion in January 2000. Kiles requested a stay to

22    pursue a Special Action with the Arizona Supreme Court and requested the court

23    appoint him counsel to do so. (ROA 428; ROA 430.) The court denied both

24    requests, stating, "Defendant already has competent counsel. This issue has been

25    _____

26    [16] Kiles raised the additional concern that Clark had represented Powell's wife in a
       previous legal action. "Then, today, I see Mr. Powell defending Greg Clark. So
27    what is going on there? I don't know what is going on there. Is that a conflict?" (Tr.
       Oct. 8, 1999 at 81.) Whether this created an actual conflict between Powell and
28    Clark or not, it added to the conflict between Kiles and Clark.

1    thoroughly litigated. If defense counsel felt that a special action were appropriate,

2    he would have pursued the matter." (ROA 427 at 1.) It is worth noting the paradox

3    embedded in the court's statement: ineffective counsel would hardly pursue a

4    Special Action to establish his own ineffectiveness. Additionally, the court claimed

5    that, "At this date any petition for special action would seem to be untimely as

6    well." (ROA 427 at 1.) The court did so despite the fact that "Arizona's Rules of

7    Procedure for Special Actions, A.R.S. 17B, provide no limits on the time within

8    which a special action may be filed." *State ex rel. McDougall v. Tvedt*, 787 P.2d

9    1077, 1079 (Ariz. Ct. App. 1989).

10         Kiles had, from the beginning of Clark's appointment, made a record that he

11    was not receiving effective representation.[17] It was only after the trial court's

12    repeated refusals to investigate Kiles's claims that Kiles was forced to petition

13    another juridical body for help.

14         Despite the ruling, and out of desperation, Kiles submitted his pro per

15    Complaint in Special Action with the Arizona Supreme Court on March 10, 2000.

16    (Case No. M-00-0006, Pet. For Special Action, Mar. 10, 2000.) He informed the

17    court that Clark had (1) revealed privileged information in court, (2) to date not read

18    the full file, (3) undertaken little to no pretrial investigation, and (4) lied to Kiles

19    about his trial and to the court about communication with Kiles. (Case No. M-00-

20    0006, Pet. For Special Action, Mar. 10, 2000 at 4–5.) Kiles's concerns included that

21    Clark had aggressively misrepresented to the court the work he had done, when

22    there had been little to no pretrial investigation to that point.[18] (Case No. M-00-

23

---

24    [17] The court had additional notice that Clark had not been providing adequate

25    representation. In June 2000, Kiles wrote a letter to Judge Kongable requesting an
attorney to represent him after being subpoenaed to testify in a different case

26    regarding Clark's ineffective assistance of another client. The request was denied,
and therefore Kiles did not testify.

27    [18] Kiles noted that Clark's assertion that he had interviewed "more witnesses than

28    anybody has interviewed prior to this time, in this case" was especially outrageous.
*See* Claim 3, *infra*. Clark's own time logs, which he had submitted to the court after

0006, Pet. For Special Action, Mar. 10, 2000 at 5.) Kiles expressed his concern that his trial was set for the following month, but to date there had been only one single pretrial motion submitted by his counsel. (Case No. M-00-0006, Reply re: Pet. For Special Action, Apr. 10, 2000 at 4.) And despite his quickly upcoming trial date, Kiles said Clark was refusing to discuss with him the most basic aspects of his trial. (Case No. M-00-0006, Reply re: Pet. For Special Action, Apr. 10, 2000 at 6.) Kiles did not know what defense would be presented, and he and counsel had not yet discussed whether Kiles should testify at trial. (Case No. M-00-0006, Reply re: Pet. For Special Action, Apr. 10, 2000 at 8–9.) When he was able to speak with his attorneys, Kiles received conflicting information from Clark and VanDreumel. (Case No. M-00-0006, Reply re: Pet. For Special Action, Apr. 10, 2000 at 4.) In his reply, Kiles wrote that his complaint was not based on feelings, but rights: "Petitioner is not requesting a 'meaningful relationship' with counsel. He is requesting an ethical and adequate one." (Case No. M-00-0006, Reply re: Pet. For Special Action, Apr. 10, 2000 at 9.) The Arizona Supreme Court declined to accept jurisdiction of the Special Action. (ROA 441.)

### 6.   After Kiles's guilt-phase proceedings, Kiles continued to request new counsel to represent him at the penalty phase.[19]

Because of Clark's continued deficient performance, Kiles filed a pro per motion in January 2001 requesting new counsel and a supplement to that motion in March 2001. (ROA 519; ROA 522.) The motion stated that Kiles believed he was not adequately represented before or during his July 2000 guilt-phase proceeding. Kiles moreover asserted that he was not given adequate time to speak with counsel in order to assist in his own defense. (ROA 519 at 4.) The supplement contained an affidavit from a third party, a student at Arizona State University, with no prior

---

this claim, listed no time spent interviewing witnesses. (ROA 414 at 32–49.)

[19] Throughout this Petition, Kiles uses the term "penalty phase" to refer to the 2006 aggravation-phase and mitigation-phase proceedings together.

knowledge of or connection to Kiles's case. The student had overheard Clark announce that he had just finished a case in Yuma where the client was guilty from the beginning, and the "whole thing was a waste of his time and there had been no point in being there at all." (ROA 522 at 3.) Kiles stated that in light of receiving that affidavit, he was concerned there was no confidentiality between him and his attorneys, and he was again "put in a situation where he doubts he can trust his attorney." (ROA 522 at 1–2.)

Despite the court's repeated refusals to ensure adequate representation, Kiles continued to plead with the court for new counsel. Kiles made clear that he did not want Clark to represent him or speak for him and that there was no possible relationship between them. Kiles was unequivocal: "I would like the court to understand that what Mr. Clark says in no way represents me. I object to anything and everything Mr. Clark says." (ROA 576 at 2.) Competent counsel would have recognized that effective representation was no longer possible and moved to withdraw. Despite Clark's earlier assurance to the court that he would withdraw if necessary, at no point did Clark do so. (Tr. Oct. 8, 1999 at 59 ("If in fact I perceive some problem with adequately representing Mr. Kiles, I will be the first to step up to the plate.").)

### 7. Co-counsel represented Kiles while under a conflict of interest.

Compounding Clark's irreconcilable conflict with Kiles, VanDreumel's own conflicts hindered her ability to fully and adequately represent Kiles.[20] In March

---

[20] Kiles believed that part of counsel's failure to adequately represent him stemmed from the nature of the contract his attorneys had signed. In a pro per motion to appoint new counsel after the guilt phase of his trial, Kiles stated to the court that Clark had no incentive to continue to work on his case, as the fee structure and contingency fee arrangement meant that Clark was losing money by continuing to represent him through the penalty phase of the trial. (ROA 549 at 20.) Kiles wrote to VanDreumel in 2001, asserting his belief that the contingency fee had affected how she and Clark had handled his case. Kiles suggested VanDreumel request additional compensation from the court so she would represent him effectively.

31

2000, Clark hired VanDreumel to represent him before the Disciplinary Commission of the Supreme Court of Arizona regarding allegations by the Bar. (PFR2 Dkt. 1 at 16.) VanDreumel continued to represent Clark until he was censured again for trust account issues on June 28, 2001. (PFR2 Dkt. 1 at 16; PFR2 Dkt. 29 Ex. 35 at 1.) Notably, Clark hired VanDreumel after Kiles had filed his request with the trial court to pursue a Complaint in Special Action with the Arizona Supreme Court against Clark, and VanDreumel represented Clark throughout the time Kiles sought recourse from the Bar after filing a complaint against Clark. VanDreumel represented both Clark and Kiles for the duration of Kiles's guilt-phase proceedings. (ROA 1189 at 16; PFR2 Dkt. 29 Ex. 35 at 1.)

As a result of lead counsel's actions, VanDreumel was divided in her loyalties: She was representing Clark against allegations of dereliction of duties as an attorney, and she therefore had a duty to not undermine his position before the Bar. (PFR2 Dkt. 29 Ex. 35.) She also had a conflicting duty to Kiles, another client. To admit or support Kiles's allegations against Clark, she would have had to undermine her representation of Clark before the Bar. Under the Arizona Rules of Professional Conduct, these incompatible duties gave rise to a conflict of interest. Specifically, ER 1.7 provides that with respect to current clients, a concurrent conflict of interest exists if "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibility to another client." ER 1.7(a)(2).

VanDreumel's relationship with Kiles showed the strain of working with unqualified lead counsel, as well as her own conflict between her two clients. When VanDreumel was first appointed, she wrote to Kiles stressing that she, Clark, and Kiles must present a unified front and work together to focus on the case and the issues. While she stated she did not believe it necessary, she did acknowledge Kiles's right to submit motions pro per and represent himself if he believed counsel to be ineffective. She informed Kiles, however, that the most difficult aspect of the

32

case was working with him. As VanDreumel interpreted Kiles's appropriate requests for communication as a sign of his lack of gratitude, she told Kiles she was not eager to spend her time working for someone who did not appreciate her efforts.

After Clark hired VanDreumel to represent him in March 2000, however, her representations to Kiles became increasingly inconsistent, perhaps due to the conflict created by lead counsel.[21] While recognizing the animosity between Clark and Kiles, VanDreumel told Kiles there was nothing she could do to cure it; apparently she did not consider supporting Kiles's efforts to obtain effective representation an option. Occasionally VanDreumel expressed fondness for Kiles, calling him "dear" and "darlin'," and she told him he was never far from her thoughts. However, when Kiles insisted to VanDreumel that she get Clark off the case, VanDreumel responded harshly. She told Kiles that if he raised his complaints about Clark's representation in open court, the jury would judge him harshly and most certainly sentence him to death.

Between his guilt and sentencing phases, Kiles alerted the court to VanDreumel's conflict. On July 8, 2002, Kiles informed the court "that the friendship that Ms. VanDreumel shares with Mr. Clark is also detrimental to me. Their friendship won't allow Ms. VanDreumel to objectively criticize Mr. Clark's effectiveness on this case and this damages my chances at justice. This put [sic] Ms. VanDreumel in a very precarious situation." (ROA 576 at 3; ROA 615 at 3.) Kiles also raised VanDreumel's conflicting duties to her two clients to the court, stating that "Ms. VanDreumel is not candid about Mr. Clark's ineffectiveness in this case," possibly because VanDreumel represented Clark before the Disciplinary Commission of the Supreme Court of Arizona, "where Mr. Clark was censured for

---

[21] VanDreumel's correspondence occasionally anticipated charges of deficient performance. For example, VanDreumel sent Kiles a letter soon after his guilt-phase trial telling him that his request for copies of documents—a routine request for items Kiles was entitled to receive—was just another one of his attempts to create grounds for state post-conviction relief and that it would not work.

33

1   conduct in violation of his duties and obligations as a lawyer, while they were both

2   still appointed to my case." (ROA 585 at 7.)

3        The court held a status hearing in January 2002 at which the conflict was

4   discussed. At that status hearing, VanDreumel misrepresented Clark's

5   qualifications under Rule 6.8 to the court:

> KILES: So here we have a capital case and here's my attorney and he is in trouble with the State Bar and I have my other attorney representing him. I just don't think it's right, Your Honor. I think it's a conflict. I think I should be given new attorneys. I think because I opposed Mr. Clark from the beginning—and the record speaks for itself—I think I should be given a new trial with adequate attorneys. I just think the record speaks for itself, Your Honor.
>
> THE COURT: All right. Thank you. Mr. Clark, you want to respond?
>
> MR. CLARK: Judge, no. I think we have gone over this area before. The court is well-aware of what has transpired.
>
> THE COURT: Ms. Van Dreumel, anything from you?
>
> MS. VAN DREUMEL: Only, Your Honor, that I—I have spoken with Mr. Kiles about this issue. I explained to him that the State Bar proceedings are confidential and so I could not—it could not be discussed with him and I can say, as I have told Alvie, that the most recent State Bar proceeding involved simply a trust account issue. It was a money issue. And that was the sum and substance of that. It had nothing to do with representation and I also explained under 6.2 and 6.8 of the Supreme Court rules to Alvie, those rules require a lawyer to be in good standing and Mr. Clark is still in good standing with the State Bar and meets the qualifications set forth under the rule.[22]

_____

[22] Clark was ultimately censured by the Arizona Supreme Court for his conduct in the matter for which he retained VanDreumel to represent him. (PFR2 Dkt. 29 Ex. 35 at 1.) During the course of his representation of Kiles, Clark was also informally reprimanded for ineffective assistance of counsel twice. On October 28, 2002, Clark was reprimanded for failing to adequately communicate with his client, and on February 9, 2004, he was placed on probation for a year for failing to communicate with his client, charging a fee that was not earned, and not timely refunding that fee. *See In The Matter of Greg Clark, Attorney No. 009431*, Respondent, Supreme Court No. SB-01-0118-D, 2001 Ariz. LEXIS 99 (2001); (*see also* PFR2 Dkt. 22 Ex. 4 at 1–2; PFR2 Dkt. 29 Ex. 38 at 1–2).

34

(Tr. Jan. 7, 2002 at 68–69.) But Clark had again been suspended for non-payment of dues from April 28, 2000 to May 5, 2000. In 2002, he would not have met Rule 6.8's requirement that an attorney remain in good standing for the five years immediately prior in order to qualify for a capital appointment.[23]

> **8.** **Counsel's conflicts and deficient performance undermined the defense team and mitigation work in preparation for Kiles's penalty-phase proceedings.**

Clark and VanDreumel's inadequate representation and conflicted, contentious relationships with Kiles adversely affected other members of the defense team. After having tried unsuccessfully to work with counsel, the first mitigation specialist hired after the guilt-phase trial, Jan Dowling, resigned.

The court approved funding and appointment for Jan Dowling on October, 6, 2000. (ROA 510 at 1.) Dowling had been a practicing lawyer and was an experienced capital mitigation specialist at the time of her appointment. Dowling found Kiles an easy client to work with, but struggled to maintain communication and a working relationship with Kiles's attorneys. (ROA 533 Ex. A at 3–4.)

One of the precipitating events that necessitated Dowling's resignation was when VanDreumel released Dowling's work product, clearly marked "Not for Distribution to Client," to Kiles.[24] (ROA 533 Ex. A at 2.) When Dowling asked VanDreumel why she had released the documents, VanDreumel admitted that in any other case she would not have done so. However, in this case, Kiles had

---

[23] Additionally, under Rule 63(a) of the Rules of the Arizona Supreme Court, within ten days of his suspension in 2000, Clark was required to provide notice to co-counsel, the court, opposing counsel, and his client that he had been suspended. There is no evidence in the record that Clark fulfilled this obligation.

[24] The memos VanDreumel shared with Kiles contained notes from Dowling about her perceptions of Kiles's close family members and friends. These notes were intended to assist the defense team, and would have included, for instance, Dowling's personal observations about whether a witness was candid or whether a witness would seem credible to a jury. These observations could have caused Kiles offense and damaged Dowling's relationship with Kiles, harming her ability to get information from him that was essential to the mitigation investigation.

35

continued to file motions with the court alleging ineffective assistance of counsel, and he had filed a complaint with the Bar against Clark. VanDreumel defended her decision by explaining that, by providing work product to Kiles, VanDreumel hoped to mitigate his dissatisfaction with counsel.[25] But by continuing to focus on Clark's disciplinary issues, VanDreumel placed Clark's interests before Kiles's and thus furthered the conflict of interest. VanDreumel's decision not only undermined a member of her defense team, it threatened the critical relationship between the mitigation specialist and Kiles.

Dowling, who as a seasoned mitigation specialist had experience working with numerous defense teams, was also greatly concerned about Clark's involvement in Kiles's case. In June 2001, after she had been on the case for eight months, Dowling wrote to Judge Kongable: "In particular, lead counsel, Greg Clark, made no effort to contact or meet me. Months passed, and counsel made no effort to meet and discuss the case, or comment on the information being gathered." (ROA 533 Ex. A at 1.) During her time working on the Kiles case, there was but a single hour of "meaningful discussion" with counsel, which was the only interaction Dowling ever had with Clark. (ROA 533 Ex. A at 1–2.) Dowling stated that this was not typical: "In *all* of my other cases, the two attorneys and I actually discuss the case." (ROA 533 Ex. A at 1–2.) Dowling concluded that this was not a case where attorneys had different strategies or working styles; rather, "[t]his is a case where both the client and I have been completely abandoned by counsel." (ROA 533 Ex. A at 3.)

In response, VanDreumel filed a motion to appoint a new mitigation specialist, and she took the opportunity to attack Dowling and the claims in her

_____

[25] VanDreumel did not truly believe, as she stated to Dowling, that Kiles should receive copies of all documentation in his case; she was merely attempting to navigate her role between Clark and Kiles in disclosing Dowling's memos. VanDreumel later told Kiles he did not need a copy of the mitigation notebook prepared for his penalty phase (although the State was provided one).

letter. (ROA 533 Ex. C at 1–7.) Dowling wrote back to Judge Kongable, stating that VanDreumel was not being honest with the court, and Dowling offered to provide documentation of those misrepresentations. (ROA 533 Ex. D at 1–5.) The court demurred. Judge Kongable wrote back to Dowling:

> I have read your letter of July 6, 2001 and noted the points which you raise. Mr. Kiles and Ms. Boyte have voiced similar concerns.
>
> After some deliberation I have concluded that nothing positive would result from a hearing in court in an attempt to establish "who is right and who is wrong," at least at this time. I strongly suspect that whatever sentence I end up imposing, there will be filed a petition for post conviction relief alleging ineffective assistance of trial counsel. In the overall scheme of things that would be the appropriate time for me to take action, if any.

(ROA 533 Ex. E at 1.)

After Dowling resigned, the ongoing mitigation work in Kiles's case proceeded, albeit deficiently, as the work was hampered by Clark's complete lack of interest or involvement. Although another mitigation specialist was subsequently appointed (ROA 530 at 1), Clark's failure to consider mitigation hindered Kiles's penalty-phase case from the beginning. VanDreumel told Kiles that competent counsel would have hired a mitigation specialist when counsel was first appointed —though when Kiles questioned why this was not done, VanDreumel defended Clark for not having done so. Meanwhile, VanDreumel admitted to the mitigation specialist hired after Dowling's withdrawal that Clark had been ineffective for failing to bring on the mitigation specialist immediately after he was appointed.

Further, while VanDreumel told Kiles in correspondence that she was continuing to fight battles for him every day and that she was ready to tackle the issues in his case, she admitted to the mitigation specialist that she was trying to keep too many balls in the air, was at her limit managing the work on Kiles's case, and needed assistance. VanDreumel also directed the mitigation specialist to check

37

on Clark's representations, as VanDreumel herself did not trust them.[26] By the time Kiles's sentence was handed down, Clark had ceased keeping up appearances of adequately representing his client; Kiles had not spoken to Clark outside of a courtroom in years, and Clark did not even show up for the sentencing. (ROA 924 at 1.)

Kiles was sentenced to death, after eight years of representation by dishonest, unqualified, and conflicted counsel. Over those eight years, Kiles repeatedly begged his attorneys to effectively advocate for him, but for personal, professional, and financial reasons, they did not.

**B.    Lead counsel's lack of qualifications and affirmative misrepresentations of those qualifications deprived Kiles of his right to due process and qualified counsel.**

To provide the "counsel" guaranteed by the Sixth and Fourteenth Amendments, a lawyer must satisfy standards set by the courts for practice. *See Reese v. Peters*, 926 F.2d 668, 669 (7th Cir. 1991) ("The 'Counsel' to which the sixth amendment refers is a professional advocate who meets the standards set by the court." (citing *Solina v. United States*, 709 F.2d 160 (2d Cir. 1983))). Performance standards for attorney appointment are specifically promulgated to ensure adequate representation and to preserve a defendant's right to a fair trial. A court that appoints counsel who falls short of those standards also falls short of ensuring the constitutional rights of due process and effective representation. *See*

---

[26] Moreover, the correspondence between Kiles and VanDreumel contains troubling hints about what VanDreumel was telling Kiles in person and on the phone. Kiles believed at one point, and accordingly informed the court, that VanDreumel would support Kiles about Clark's ineffectiveness at an upcoming hearing, though VanDreumel ultimately declined to do so. (ROA 615 at 3.) Kiles said VanDreumel was using him to deliver messages to the court because she could not get in contact with Clark and that she was using Kiles as a sounding board to complain about Clark. Shortly before his penalty phase, Kiles asked if he could take VanDreumel up on her offer to speak with the State, the judge, and Clark off the record and have another attorney appointed as lead counsel. (Kiles had only objected to this proffer previously because it would be off the record.) Whether VanDreumel's offer was in earnest is unknown because of her own conflict of interest.

38

1   *id*. at 670. Especially in a capital case, the defendant "has a substantial and
2   legitimate expectation that he will be deprived of his liberty" only after the state has
3   followed its own statutory guidelines setting forth the mandatory protections
4   guaranteed to preserve a defendant's right to a fair trial and adequate representation.
5   *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980). The expectation of adequate counsel,
6   and the expectation that the state will adhere to its own rules ensuring that right, is
7   a fundamental liberty interest "that the Fourteenth Amendment preserves against
8   arbitrary deprivation by the State." *Id*.

9       In Arizona, the appointment of capital-defense counsel who did not meet the
10  requirements under Rule 6.8 deprives a capital defendant of his Sixth and
11  Fourteenth Amendment rights. Where a state has provided specific regulations
12  regarding how capital trials shall proceed, "it is not correct to say that the
13  defendant's interest" in having those rules adhered to, especially when those rules
14  were created specifically to protect his rights, "is merely a matter of state procedural
15  law." *Id*. "The failure of a state to abide by its own statutory commands" implicates
16  "a liberty interest protected by the Fourteenth Amendment against arbitrary
17  deprivation by a state." *Fetterly v. Paskett,* 997 F. 2d 1295, 1300 (9th Cir. 1993).
18  The State of Arizona failed to ensure Kiles received adequate representation in
19  compliance with its own law, in violation of Kiles's Sixth and Fourteenth
20  Amendment rights.

21          **1.    Lead counsel did not satisfy Arizona's standards for
22                  appointment as capital defense counsel, depriving Kiles of
                    his due-process rights.**
23

24      Rule 6.8, promulgated by the Arizona Supreme Court, sets forth the
25  qualifications required for appointment in capital cases.[27] *See, e.g.*, *State v. Snelling*,
26  
_____

27  [27] The Rules referenced here are those applicable in 1998, at the time of Clark's
28  appointment; though some have changed in numbering, they are substantively the
    same as those presently in force.

236 P.3d 409, 413 (Ariz. 2010). As the Arizona Attorney General has emphasized, these "standards of competency" are both "comprehensive and mandatory." Brief of Respondents-Appellants at 9, 2001 WL 34092875, *Spears v. Stewart*, 283 F.3d 992 (9th Cir. 2002). Among other requirements, Rule 6.8 restricts eligibility to serve as counsel in capital trials to attorneys who "have been a member in good standing of the State Bar of Arizona for at least five years immediately preceding the appointment."

Because Clark did not meet this requirement, the State of Arizona failed to adhere to its own "comprehensive and mandatory" rules for appointment of counsel in capital cases when Clark was appointed as Kiles's lead counsel. While "good standing" is not defined in Rule 6.8 itself, the term appears in Rule 33(d) of the Rules of the Arizona Supreme Court, which describes those eligible for admission pro hac vice to practice in Arizona courts. Those who submit an application to practice pro hac vice are required to be in good standing, "currently eligible to practice in those courts" in which the submitter was already admitted, and "not currently suspended or disbarred in any court" at the time in which the application is made. Clark was suspended by the Bar for non-payment of dues mere months before his appointment to Kiles's case. Accordingly, Clark was not in good standing with the Bar at that time, and he thus did not meet the requirement under Rule 6.8 that he be in good standing for the five years immediately preceding his appointment as lead counsel in Kiles's case. Indeed, though Clark submitted a motion claiming he satisfied Rule 6.8 requirements, he failed to attach a Certificate of Good Standing from the Bar, possibly because under Rule 74(c) of the Rules of the Arizona Supreme Court, the certificate would have noted his suspension and his prior public discipline for ineffective assistance of counsel.

The State of Arizona's failure to ensure the requirements of Rule 6.8 were met is not a mere state procedural matter, as is illustrated by the string of disciplinary measures and sanctions against Clark throughout his representation of

40

Kiles.[28] The requirements of Rule 6.8 were designed to prevent what ultimately occurred—the consistent failure of appointed counsel to conduct himself in accordance with the ethical rules governing attorneys. The denial here of procedural due process implicates every decision that followed made by counsel on Kiles's case, leading to the unreliable and arbitrary imposition of a death sentence.

The State of Arizona failed to follow its own procedures ensuring that capital defendants receive adequate counsel under the Sixth and Fourteenth Amendments. "Such an arbitrary disregard of the petitioner's right to liberty is a denial of due process of law." *Hicks*, 447 U.S. at 346. Kiles was denied the guaranteed right to effective counsel in violation of his Constitutional rights, and as his sentence is arbitrary and unreliable, it must be overturned.

### 2. Lead counsel and co-counsel misrepresented Clark's qualifications to the court, denying the court the ability to protect Kiles's due process rights.

On October 8, 1998, the trial court conducted an inquiry into whether Clark and his co-counsel at the time, Mark Reeves, were qualified to be appointed to a capital case under Rule 6.8. Clark's statements during the trial court's inquiry into his eligibility for appointment under Rule 6.8 denied the court the ability to make an informed and accurate decision and constituted ineffective assistance of counsel, as well as a denial of Kiles's procedural due-process rights protected under the Fourteenth Amendment. *Hicks*, 447 U.S. at 346.

Mary Boyte, Kiles's previous state post-conviction counsel, raised two concerns at the court's inquiry about Clark's appointment: (1) Clark's public censure for ineffective assistance of counsel on a juvenile transfer case; and (2) Clark's suspension from the Bar for non-payment of dues. (Tr. Oct. 7, 1998 at 5–6.) Clark misrepresented both of those issues to the court.[29] He informed the court

---

[28] These disciplinary measures are discussed in footnote 22, *supra*.

[29] In submitting a bid for appointment to Kiles's case, Clark misrepresented to the Yuma County Legal Defender how many clients he had on death row. Clark said

that the first was merely a "judgment call," after he himself had conditionally admitted his conduct failed to meet the ethical duties of competence and diligence. In reviewing the claims against Clark, the Court of Appeals of Arizona found there was a "failure to even attempt" to advocate for his former client. *See Matter of Appeal in Maricopa Cty., Juvenile Action* No. JV-511576, 925 P.2d 745, 748 (Ariz. Ct. App. 1996) (quoting *Strickland*, 466 U.S. at 694). He also stated to the court that the Bar had made the mistake regarding payment of dues, and that it had rectified it immediately. This was not true. The Arizona Supreme Court issued an order regarding non-payment, and the Bar only reinstated Clark after he submitted payment, two weeks later.

At a January 2002 hearing, VanDreumel, who was at the time representing Clark before the Bar on another matter,[30] also misrepresented Clark's qualifications for appointment under Rule 6.8. VanDreumel informed the court that Clark was in good standing and had remained in good standing, and thus that he "meets the qualifications set forth under the rule." (Tr. Jan. 7, 2002 at 68–69.) As stated above, to qualify under Rule 6.8, Clark would have had to remain in good standing with the Bar for the five years immediately preceding the appointment. But Clark had not remained in good standing; he had again been suspended for non-payment of dues in 2000. Thus, Clark would not have been eligible for appointment to a capital

---

he only had one former client sitting on death row; upon information and belief, he had at least three. *See* footnote 3, *supra*. Clark had previously misrepresented his work history and was exposed for falsely claiming to be a former Navy SEAL and lying about his military service in Vietnam. According to retired U.S. Navy veteran Jim Wade, who directed the investigation into Clark's falsehoods, Clark also claimed to have "participated in the failed Iran hostage rescue operation Desert One."

[30] The Arizona Supreme Court censured Clark in June 2001 for failure to respond to a request for information from the Bar, failure to provide full and complete responses to inquiries from the Bar, and for trust account violations. (PFR2 Dkt. 29 Ex. 35 at 1.) The check Clark submitted to show the court he had completed his capital training, and that he was qualified to be lead counsel, had been improperly issued from his IOLTA account. (ROA 381 at 6.)

42

1    case at the time of VanDreumel's representation.

2         Further, VanDreumel and the court should have already been aware of

3    Clark's failure to meet the good standing requirement. Under Rule 63(a) of the

4    Rules of the Arizona Supreme Court, Clark was required to notify co-counsel, the

5    court, opposing counsel, and the client of his suspension in 2000. There is no

6    evidence in the record that he did so, and the court seems to have been unaware of

7    his suspension. Therefore, VanDreumel either knowingly misrepresented Clark's

8    disciplinary history to the court, or she was misled as to Clark's qualifications and

9    subsequently misled the court.

10        Ultimately, Clark's misrepresentations and failure to act ethically and

11   professionally resulted in the court's extralegal appointment, violating the Arizona

12   Rules of Criminal Procedure. The process that permitted Clark's appointment had

13   a substantial and injurious effect on Kiles's conviction and sentencing, as discussed

14   below in the numerous claims of ineffective assistance of trial counsel.[31] *See Brecht*

15   *v. Abramson*, 507 U.S. 619, 623 (1993); *see also, e.g.*, *infra*, Claim 3. Because Kiles

16   failed to receive qualified counsel as required by state law, violating his Sixth

17   Amendment right to counsel and his liberty rights as protected under the Fourteenth

18   Amendment, and that failure had substantial and injurious effect, habeas relief is

19   warranted. *Hicks*, 447 U.S. at 346; *Brecht*, 507 U.S. at 623.

20   ## C.   Kiles's counsel were ineffective due to a conflict of interest,
21   denying Kiles his right to competent and un-conflicted representation.

22        "The Sixth Amendment right to counsel requires effective assistance by an

23   attorney, which has two components: competence and conflict-free representation."

24   *Garcia v. Bunnell*, 33 F.3d 1193, 1195 (9th Cir. 1994) (citing *Wood v. Georgia*, 450

25   U.S. 261, 271 (1981)). The right to conflict-free representation is a right to

26

27   [31] Kiles incorporates by specific reference into this discussion of prejudice the
     following claims of ineffective assistance of trial counsel: Claim 2, Claim 3, Claim
28   4, Claim 5, Claim 6, Claim 15, and Claim 16, *infra*.

1   counsel's undivided loyalty, and it is evaluated by a different standard than one
2   measuring competence. *See Cuyler v. Sullivan*, 446 U.S. 335, 348–49 (1980);
3   *Wood*, 450 U.S. at 271. The Supreme Court has stated that to establish a Sixth
4   Amendment violation based on a conflict of interest, a defendant must make two
5   showings: (1) that counsel actively represented conflicting interests, and (2) that the
6   actual conflict of interest adversely affected the lawyer's performance. *Hovey v.
7   Ayers*, 458 F.3d 892, 907–08 (9th Cir. 2006) (citing *Cuyler*, 446 U.S. at 348–50).
8   Unlike a challenge to counsel's competency, prejudice is presumed if the defendant
9   shows both prongs have been met. *Strickland*, 466 U.S. at 692; *United States v.
10  Miskinis*, 966 F.2d 1263, 1268 (9th Cir. 1992).

11      Although the test articulated in *Cuyler* involved an attorney representing two
12  clients with conflicting interests, the presumption of prejudice extends to conflicts
13  between a client and his lawyer's personal, professional, or financial interests.
14  *Mannhalt v. Reed*, 847 F.2d 576, 579–80 (9th Cir. 1988); *see also Pometta v. Poole*,
15  992 F.2d 1220 (9th Cir. 1993); *United States v. Hoffman*, 733 F.2d 596, 601–02
16  (9th Cir. 1984) (finding a conflict based on attorney's failure to notify federal judge
17  of state bar suspension); *United States v. Hearst*, 638 F.2d 1190, 1193 (9th Cir.
18  1980) (finding a conflict based on attorney's private financial interests).

19      Counsel in this case actively represented conflicting interests. Clark created
20  the conflict of interest when he hired VanDreumel to defend his conduct as an
21  attorney before the Bar. At the same time that she represented Clark, VanDreumel
22  also represented a client, Kiles, who was actively litigating Clark's ineffective
23  assistance and conduct as an attorney before the Arizona Supreme Court and the
24  Bar. Clark, as lead counsel, was responsible for both the effective representation of
25  his client and the integrity and working relationship of the defense team; he failed
26  in both respects. VanDreumel could not have assisted Kiles in ensuring he received
27  effective assistance without undermining Clark's interests before the Bar; she
28  furthered the conflict by accepting the dual representation and failing to recognize

1    that her actions sacrificed one client's interests in favor of another.

2          There is no doubt that VanDreumel's representation was adversely affected
3    by her conflict of interest; VanDreumel admitted so to mitigation specialist Jan
4    Dowling. VanDreumel shared memos from Dowling with Kiles that were clearly
5    marked as "Not for Distribution to Client." VanDreumel justified doing so because
6    Kiles was filing motions with the court and had just filed a complaint with the Bar
7    about Clark's ineffective assistance. VanDreumel's decision was one of the issues
8    that led Dowling to resign. In other words, VanDreumel chose to undermine a
9    specialist hired on one client's case to benefit another client. This was not sound
10   legal strategy, but an attempt to navigate the conflict of interest lead counsel had
11   created.

12         Clark was not providing effective assistance, so VanDreumel had a duty to
13   speak to the court on behalf of Kiles. That she could not and did not do so satisfies
14   the two-pronged test in *Cuyler*. Instead, during a hearing, VanDreumel
15   misrepresented Clark's qualifications under Rule 6.8 after Kiles raised his concerns
16   about her representation of Clark to the court. (Tr. Jan. 7, 2002 at 68–69.)

17         Additionally, VanDreumel made troubling attempts to silence her client
18   about lead counsel's ineffective assistance, which shed light on the conflict under
19   which she was laboring. In correspondence, Kiles demanded that VanDreumel take
20   action to represent him and remove Clark. In response, VanDreumel insisted to
21   Kiles that raising Clark's ineffective assistance during his trial would cause a jury
22   to judge him harshly and condemn him to death. She was protecting Clark, her
23   client and her co-counsel, with whom she had a personal and professional
24   relationship, at Kiles's expense. *See United States v. Williams*, 594 F.2d 1258, 1260
25   (9th Cir. 1979) (finding sufficient conflict existed where the attorney-client
26   relationship was "a stormy one" with "threats, and counter-threats").

27         "The very premise of our adversary system of criminal justice is that partisan
28   advocacy on both sides of a case will best promote the ultimate objective that the

45

guilty be convicted and the innocent go free." *Herring v. New York*, 422 U.S. 853, 862 (1975). In Kiles's case, the State received partisan advocacy, while Kiles's counsel had divided loyalties. Moreover, counsel's interests directly contradicted Kiles's interest. Prejudice must be presumed, as a conflict between Kiles and his counsel existed and adversely affected counsel's performance. *Cuyler*, 446 U.S. at 348–50.

### D.  The irreparably fractured relationship between Kiles and Clark adversely affected the representation Kiles received.

To "compel one charged with grievous crime to undergo a trial with the assistance of an attorney with whom he has become embroiled in irreconcilable conflict is to deprive him of the effective assistance of any counsel whatsoever." *Brown v. Craven*, 424 F.2d 1166, 1170 (9th Cir. 1970); *see also United States v. Moore*, 159 F.3d 1154, 1158 (9th Cir. 1998). Accordingly, the "Sixth Amendment requires on the record an appropriate inquiry into the grounds for such a motion [for new counsel], and that the matter be resolved on the merits before the case goes forward." *Schell v. Witek*, 218 F.3d 1017, 1025 (9th Cir. 2000). Further, if a "serious conflict did exist that resulted in the constructive denial of assistance of counsel, no further showing of prejudice is required," and the trial is "presumed to have been unfair." *Id.* at 1027; *see also Frazer v. United States*, 18 F.3d 778, 782 (9th Cir. 1994); *Williams*, 594 F.2d at 1260.

The conflict between Kiles and Clark deprived Kiles of his effective assistance of counsel. As stated above, to establish an ineffective assistance of counsel claim based on conflict of interest, a defendant must show that "an actual conflict of interest adversely affected his lawyer's performance." *Cuyler*, 446 U.S. at 350.

Sufficient conflict exists when the defendant was forced to trial with the "assistance of a particular lawyer with whom he was dissatisfied, with whom he would not cooperate, and with whom he would not, in any manner whatsoever,

46

communicate." *Brown*, 424 F.2d at 1169. Kiles stated to the court, "If you keep Mr. Clark on my case, I don't know how he is going to be able to defend me because there is some things I need to tell my attorney, but I will not tell him." (Tr. Aug. 6, 1999 at 17.) "When a defendant accuses his counsel of improper behavior and the counsel disputes his client's accusations, an actual conflict of interest results because 'any contention by counsel that defendant's allegations were not true would (and did) contradict his client.'" *United States v. Shorter*, 54 F.3d 1248, 1252–53 (7th Cir. 1995). Clark repeatedly defended himself to the court by disparaging his client. (ROA 393 at 1; ROA 414 at 4.) As Kiles could not communicate with Clark, and as Clark blamed their failure to communicate on Kiles, there could be no attorney-client relationship whatsoever. Accordingly, Kiles and Clark had a conflict of the sort contemplated by *Brown*.

Further, if a "defense attorney was required to make a choice advancing his own interests to the detriment of his client's interests," an actual conflict of interest exists, meeting the first prong of a *Cuyler* test. *United States v. Horton*, 845 F.2d 1414, 1419 (7th Cir. 1988). Thus, the court hearings on Kiles's motions for new counsel during the very first year of Clark's appointment only helped solidify the conflict between Kiles and Clark. At those hearings, Clark was representing himself, not his client. Therefore the "interests of counsel were diametrically opposed to those" of Kiles. *United States v. Del Muro*, 87 F.3d 1078, 1080 (9th Cir. 1996) (holding that the trial court's determination that an evidentiary hearing was warranted heightened the conflict). Throughout the eight years Clark represented Kiles, Clark's continued need to justify his performance before the court, to the detriment of his client, resulted in a conflict of interest under *Cuyler* that was never resolved. This is especially true in light of the ongoing Bar proceedings against Clark—his interests were necessarily split between adequately representing Kiles and protecting himself against further disciplinary action.

*Cuyler*'s second prong, requiring an adverse effect, is satisfied where an

47

1   attorney's conflict of interest causes a "lapse in representation contrary to the
2   defendant's interests." *Wilson v. Mintzes*, 761 F.2d 275, 286 (6th Cir.1985) (quoting
3   *Sullivan v. Cuyler*, 723 F.2d 1077, 1086 (3d Cir. 1983)).[32] Mary Boyte testified
4   before the court only a year after Clark's appointment, "There is, as best as I can
5   tell, no attorney-client relationship between Mr. Kiles and Mr. Clark." (Tr. Oct. 8,
6   1999 at 31.) The lapse in representation lasted for another seven years. It was not a
7   reasonable legal or ethical decision for Clark to continue to represent Kiles, with
8   whom Clark had "no attorney-client relationship." Clark's continued representation
9   was contrary to Kiles's interest, as Kiles stated repeatedly he could not assist Clark,
10  and therefore himself, in his own defense. The irreconcilable conflict between Clark
11  and Kiles had an adverse effect on Kiles's representation. Therefore, Kiles failed to
12  receive the effective representation required under *Cuyler* and the Sixth
13  Amendment. *See Brown*, 424 F.2d at 1170.

### E.   The contract structure under which Kiles's counsel were appointed created a financial conflict of interest.

16      Kiles's counsel were appointed to his case under contracts that gave rise to a
17  conflict of interest and that had an adverse effect on representation, in violation of
18  Kiles's Sixth, Eighth, and Fourteenth Amendment rights.

19      Both lead and co-counsel in Kiles's case had contracts for appointment that
20  amounted to contingency fees and that disincentivized effective representation in a
21  capital case. Clark's contract stated Clark would receive $25,000 for accepting lead
22  counsel appointment on Kiles's case and would receive another $25,000 if the case
23  went to trial. (Tr. Nov. 29, 1999 at 6.) VanDreumel agreed to accept $10,000 for
24  taking Kiles's case, with another $10,000 if the case went to trial. Accordingly,
25  counsel (especially Clark, as VanDreumel was appointed not long before trial) had

---

26  [32]As noted above, Kiles's prior attorneys were required to refund their fee after they
27  withdrew. (ROA 1189 at 26; PFR2 Dkt. 22 Ex 11.) Financial concerns may have
    been motivating Clark's insistence he remain Kiles's attorney contrary to Kiles's
28  interests.

a financial interest in not adequately representing Kiles at pretrial proceedings, as the first lump sum was paid upon appointment. There was no additional compensation for adequate representation, but there was compensation for gambling with Kiles's life at trial.[33] Counsel's contracts not only created a conflict at the pretrial stage—under the contracts' express terms, counsel were paid for guilt-phase representation—but no additional funds were to be disbursed for penalty-phase representation. These financial incentives led to deficient performance of counsel at both phases of trial, and a capital sentence against Kiles that is arbitrary and unreliable.

Flat fee and contingency fee contracts are not per se violations of the Sixth Amendment. Rather, the defendant must show that the fee arrangement constituted an actual conflict of interest. *See Cuyler*, 446 U.S. at 348. "Under this standard, an 'actual conflict' is '*a conflict that affected counsel's performance*'—as opposed to a mere theoretical division of loyalties." *United States v. Wells*, 394 F.3d 725, 733 (9th Cir. 2005) (quoting *Mickens v. Taylor*, 535 U.S. 162, 171 (2002)). Additionally, the defendant must show adverse effect. Beyond that, a showing of prejudice is not required, "but only 'that some plausible alternative defense strategy or tactic might have been pursued but was not and that the alternative defense was inherently in conflict with or not undertaken'" due to the attorney's financial interests. *Id.* (quoting *United States v. Stantini*, 85 F.3d 9, 16 (2d Cir. 1996)).

The contract structure under which Clark and VanDreumel were appointed created clear conflicts of interest and affected their representation of Kiles's interests. That Clark stood to benefit financially if Kiles went to trial, and to obtain the flat fee promised regardless of the hours worked, adversely affected Clark's efforts on behalf of Kiles at the pretrial stage and after the guilt phase.

---

[33] VanDreumel has stated that Clark, as lead counsel, made all the strategic decisions as to the defenses to be raised and the witnesses called at the guilt phase and that those decisions were made before VanDreumel's appointment to Kiles's case.

Adequate representation of capital defendants requires extensive pretrial investigation and mitigation work, work that would conflict with the terms of a contract that financially incentivized and compensated trial work, not pretrial work. The emphasis on pretrial representation was the norm expected of capital defense attorneys at the time of Clark's and VanDreumel's appointments. In 1989, the American Bar Association (ABA) promulgated its Guidelines for the Appointment and Performance in Death Penalty Cases, which it had drafted over the course of several years and which reflected a national consensus among capital defense practitioners as to the obligations of counsel for capital cases in the 1980s. *See* ABA Guidelines for the Appointment and Performance in Death Penalty Cases (1989)[34] (hereinafter "1989 ABA Guideline(s)"). The Supreme Court has consistently relied upon guidelines from the ABA and similar professional groups to inform the inquiry into reasonable professional conduct. *See, e.g.*, *Padilla v. Kentucky*, 559 U.S. 356, 366–67 (2010) ("We long have recognized that the '[p]revailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable. . . .'" (omissions in original) (quoting *Strickland*, 466 U.S. at 688)); *see also, e.g.*, *Bobby v. Van Hook*, 558 U.S. 4 (2009) (per curiam); Ariz. Att'ys for Crim. Just. & Ariz. Cap. Representation Project, Arizona Capital Case Defense Manual (1995).

As the 1989 ABA Guidelines explained, effective advocacy in a capital case must begin immediately upon appointment. "Counsel should conduct independent investigations relating to the guilt/innocence phase and to the penalty phase of a capital trial. Both investigations should begin immediately upon counsel's entry into the case and should be pursued expeditiously." 1989 ABA Guideline 11.4.1(A). As to the guilt-phase investigation, while Clark did initially request funding for an investigator, one was not hired until nearly a year after his appointment. (ROA 384

---

[34] The ABA updated these guidelines in 2003. The updated version will hereinafter be referred to as the "2003 ABA Guideline(s)."

50

at 1; Tr. Oct. 8, 1999 at 74.) Moreover, Clark testified that his investigation was not independent, but based almost entirely upon information provided by the State.[35] Unfortunately, Clark's decision not to conduct any independent investigation was a fiscally sound, financially responsible decision under his contract. The flat fee, contingency contract in this case created a conflict of interest between Kiles's right to effective representation and Clark's financial welfare. This is undoubtedly why the ABA Guidelines adopted an hourly rate model of compensation: "Capital counsel should be compensated for actual time and service performed. The objective should be to provide a reasonable rate of hourly compensation which is commensurate with the provision of effective assistance of counsel." 1989 ABA Guideline 10.1(A).

Concurrent with the guilt-phase investigation, the mitigation investigation "should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." 1989 ABA Guideline 11.4.1(C). In Kiles's case, lead counsel failed to do any mitigation investigation, before or after the guilt phase. Indeed, Clark had access to boxes and boxes worth of mitigation material from Kiles's first successful state post-conviction petition, but rather than review that important information in the critical period before the trial, Clark insisted it was "worthless." (Tr. Oct. 8, 1999 at 65.) No mitigation investigation was undertaken by Clark until after Kiles had been found guilty. (ROA 509 at 1.) This was not in line with long-standing norms of appropriate representation for capital representation at the time.

---

[35] "Mr. Powell and I sat down and went through the complete trial record of this case, located every piece of evidence, went through every piece of evidence that was used in the last trial, judge. We ordered additional pieces of evidence because from what we now know of the trial from the appellate records, there are items of evidence that are certainly out there that are to Mr. Kiles' advantage. We have located those and I have ordered copies of all of the photographs that were used both in the trial and the photographs that were not used in the trial." (Tr. Aug. 6, 1999 at 31.)

51

VanDreumel admitted as much to Kiles and to the mitigation specialists, who were hired later in the proceedings.

Once Kiles's guilt-phase trial was over, the fee arrangement still created a financial conflict for both of his counsel. Once the second lump sum was paid for the guilt-phase proceeding and no more funds were forthcoming, any additional work on Kiles's case went unpaid. Clark was rarely involved in the case after the guilt phase was completed. VanDreumel alerted the court to Clark's inaction when she wrote asking for additional funds, stating that she alone had done all post-trial work and that she could no longer do so without financial compensation. While the court approved additional monies, VanDreumel still did the majority of the work for Kiles's penalty phase with little assistance from Clark, who had no financial incentive to assist.

Given the financial and personal conflicts of interest under which Kiles's attorneys represented him at the penalty phase, "it is virtually impossible for a reviewing court to determine what evidence would have been presented if substitute counsel had been appointed, or how the presentation of testimony might have been affected by trial counsel's conflicting interest." *Del Muro*, 87 F.3d at 1080. Indeed, as discussed below, trial counsel failed to investigate and present a wealth of mitigation that has since been uncovered. *See infra*, Claim 6. What is clear is that Kiles was denied his right to un-conflicted, effective representation. The perverse incentives of the contract and the adverse effect on representation harmed the quality of representation Kiles received.

Because the fee arrangement with Kiles's counsel created a conflict of interest adversely affecting their representation both before and after trial, Kiles's conviction and sentence are unreliable and in violation of his constitutional right to effective assistance.

1
2

**F.    The state post-conviction court's decision that Kiles failed to state a colorable claim for relief was unreasonable and does not bar relief.**

3
4
5
6
7
8

Kiles raised these claims below in similar form on direct appeal. (DA2 Dkt. 86 at 66–84.) The Arizona Supreme Court declined to consider the claims, saying that they were more appropriate for a state post-conviction proceeding. *See State v. Kiles*, 213 P.3d 174, 183–84 & n.12 (Ariz. 2009) ("Because we do not address his claims of ineffective assistance, we express no opinion on the allegations or their veracity and leave them for Kiles to raise in a proper proceeding").

9
10
11
12
13
14

These claims were then appropriately presented in Kiles's state post-conviction relief petition. (ROA 1189 at 10–18, 23–30.) The post-conviction court's order was the last reasoned state-court decision, and it is therefore the subject of this Court's review. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). The state post-conviction court denied the claims on the merits, ruling that Kiles failed to state a colorable claim. (ROA 1214 at 1).

15
16
17
18
19
20
21
22
23
24
25
26
27
28

This denial, with its justification that Kiles's claim lacked the requisite specificity, was unreasonable. Kiles's state post-conviction petition included details on Clark's suspensions from the Bar. It also included facts that demonstrated that the conflicts under which counsel labored while representing Kiles were actual, not theoretical. (*See, e.g.*, ROA 1189 at 11, 12–18.) Additionally, the petition laid out a number of ways in which counsel performed deficiently, adversely affecting Kiles, as a result of those conflicts. (*See, e.g.*, ROA 1189 at 28, 30 ("[T]he relationship between Mr. Kiles and Mr. Clark was irrevocably fractured," which resulted in a failure to communicate and establish an attorney-client relationship); *see also* ROA 1189 at 23–30.) Because the allegations in Kiles's state post-conviction petition were adequately specific and would, if proven, entitle him to relief, he stated a colorable claim. *See Phillips v. Woodford*, 267 F.3d 966, 992 (9th Cir. 2001). The state court's denial was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court.

53

*See* 28 U.S.C. § 2254(d)(1). The state court's denial was also based upon unreasonable factual determinations in light of the record before the court. *See* 28 U.S.C. § 2254(d)(2).

Kiles has, therefore, satisfied the strictures of § 2254(d), and this Court must review the merits of his claim de novo. *See Frantz v. Hazey*, 533 F.3d 724, 736 (9th Cir. 2008) (en banc) (stating that once § 2254(d)'s limitation on relief has been satisfied, a federal court conducts a de novo review of the underlying constitutional violation).[36]

> **G.    Taken individually and together, these conflicts plaguing counsel, following from an initial denial of a liberty interest, resulted in a conviction and sentencing that cannot withstand constitutional scrutiny.**

Following an initial due-process violation, Kiles never had qualified, effective, conflict-free counsel, creating a breakdown in the adversarial process. Indeed, for much of the proceedings, counsel and client acted as adversaries while the State took sides, advocating for defense counsel and against Kiles's interests. (*See, e.g.*, Tr. Oct. 8, 1999 at 22.) Once the adversarial process between appropriate parties breaks down "and loses its character as a confrontation between adversaries, the constitutional guarantee [of counsel] is violated." *United States v. Cronic*, 466 U.S. 648, 656–57 (1984).

That breakdown throws Kiles's sentencing into question and negates any inference that the myriad unreasonable decisions counsel made cataloged in this Petition "were carefully considered." *Bemore v. Chappell*, 788 F.3d 1151, 1162 (9th Cir. 2015). The myriad of conflicts and violations listed here "are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Cronic*, 466 U.S. at 658. As Kiles's convictions and sentences were

---

[36] Alternatively, Kiles alleges he can overcome any default by showing cause and prejudice, because of the ineffective assistance of state counsel. *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *Strickland*, 466 U.S. at 688, 694.

54

1   the products of these Sixth, Eighth, and Fourteenth Amendment violations, Kiles is
2   entitled to relief.

3                                          **Claim Two**

4       **Counsel's ineffective assistance in jury selection at the guilt-phase**
        **proceedings deprived Kiles of his rights to counsel, a fair trial, an**
5       **impartial jury, due process, and equal protection.**

6           Counsel's ineffective assistance in guilt-phase jury selection deprived Kiles
7   of his rights to counsel, a fair trial, impartial jury, due process, and equal protection
8   in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S.
9   Constitution. Kiles incorporates by specific reference all facts, allegations, and
10  arguments made elsewhere in this Petition.

11          Kiles did not present this claim in state court. Kiles can overcome any default
12  by showing cause and prejudice, as the ineffective assistance of Kiles's state post-
13  conviction counsel in failing to raise this claim constitutes cause for the default and
14  resulted in prejudice to Kiles. *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *Strickland*
15  *v. Washington*, 466 U.S. 668, 688, 694 (1984). Kiles will demonstrate at an
16  evidentiary hearing that state post-conviction counsel fell below the standards of
17  minimally competent capital post-conviction attorneys when they failed to raise this
18  meritorious claim. Because this claim has not been adjudicated by the Arizona state
19  courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this
20  Court's review, and the Court may consider the merits of the claim de novo.

21      **A.    A defendant has a Sixth Amendment right to the effective**
              **assistance of counsel during voir dire.**
22

23          The Sixth Amendment guarantees to a defendant the right to effective
24  assistance of counsel, which in turn protects the due-process right to a fair trial.
25  *Strickland*, 466 U.S. at 684; *see also Kimmelman v. Morrison*, 477 U.S. 365, 374
26  (1986) ("The right to counsel is a fundamental right of criminal defendants; it
27  assures the fairness, and thus the legitimacy, of our adversary process."). Under
28  *Strickland*, a defendant was denied effective assistance when (1) the "representation

                                              55

1    fell below an objective standard of reasonableness," and (2) "there is a reasonable
2    probability that, but for counsel's unprofessional errors, the result of the proceeding
3    would have been different." *Strickland*, 466 U.S. at 687–88, 694. Ultimately, "[t]he
4    benchmark for judging any claim of ineffectiveness must be whether counsel's
5    conduct so undermined the proper functioning of the adversarial process that the
6    trial cannot be relied on as having produced a just result." *Id.* at 686.

7          With respect to the first prong of the *Strickland* test, "[t]he proper measure
8    of attorney performance remains simply reasonableness under prevailing
9    professional norms." *Id.* at 688. The Supreme Court has consistently relied upon
10   guidelines from the ABA and similar professional groups to inform the inquiry into
11   reasonable professional conduct. *See, e.g.*, *Padilla v. Kentucky*, 559 U.S. 356, 366–
12   67 (2010) ("We long have recognized that the '[p]revailing norms of practice as
13   reflected in American Bar Association standards and the like . . . are guides to
14   determining what is reasonable. . . .'" (omissions in original) (quoting *Strickland*,
15   466 U.S. at 688)); *see also* 1989 ABA Guidelines; 2003 ABA Guidelines. Courts
16   have regularly used these and similar guidelines to help determine whether counsel
17   performed deficiently. *See, e.g.*, *Rompilla v. Beard*, 545 U.S. 374, 387 & n.7 (2005)
18   (citing the 1982 ABA Criminal Justice Standards for Criminal Justice when
19   deeming trial counsel ineffective for their failure to conduct a thorough
20   investigation); *Wiggins v. Smith*, 539 U.S. 510, 524–25 (2003) ("Counsel's conduct
21   similarly fell short of the standards for capital defense work articulated by the
22   American Bar Association (ABA)—standards to which we long have referred as
23   'guides to determining what is reasonable.'")

24         With respect to the prejudice prong of the *Strickland* test, the inquiry is
25   whether there is a "reasonable probability" that the jury would have reached a
26   different result absent counsel's errors. *Strickland*, 466 U.S. at 694. A "reasonable
27   probability" is just one "sufficient to undermine confidence in the outcome"—a
28   "defendant need not show that counsel's deficient conduct more likely than not

56

1    altered the outcome." *Id.* at 693–94.

2           The effective assistance of counsel is particularly necessary to ensure that a

3    defendant's rights are protected during one of the most critical phases of trial: jury

4    selection. "*Voir dire* plays a critical function in assuring the criminal defendant that

5    his [constitutional] right to an impartial jury will be honored. Without an adequate

6    *voir dire* the trial judge's responsibility to remove prospective jurors who will not

7    be able impartially to follow the court's instructions and evaluate the evidence

8    cannot be fulfilled." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981)

9    (plurality opinion). The importance of jury selection is heightened in a capital

10   case—jury selection can even be dispositive. *See Harris ex rel. Ramseyer v.*

11   *Blodgett*, 853 F. Supp. 1239, 1265 (W.D. Wash. 1994); Gary Goodpaster, *The Trial*

12   *for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. Rev.

13   299 (1983). Because of the critical nature of jury selection, especially in capital

14   cases, counsel's failure to engage in adequate voir dire can constitute ineffective

15   assistance. *See Strickland*, 466 U.S. at 688, 694; *Ybarra v. McDaniel*, 656 F.3d 984,

16   1001 (9th Cir. 2011) (analyzing claim of ineffective assistance of counsel with

17   respect to jury selection).

18          As elaborated below, defense counsel performed deficiently in multiple ways

19   during jury selection at Kiles's guilt-phase proceeding, and Kiles was prejudiced as

20   a result. Accordingly, counsel were ineffective. *See Strickland*, 466 U.S. at 688,

21   694.

22          **B.    Counsel were deficient in failing to adequately or meaningfully**
             **question prospective jurors to ensure a fair and impartial jury,**
23           **thereby prejudicing Kiles.**

24          To ensure a fair trial, defendants have a right to have their cases heard "by a

25   panel of impartial, indifferent jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)

26   (internal quotation marks omitted). Voir dire is a critical tool in ensuring that those

27   prospective jurors who cannot fairly assess the evidence and follow the law are

28   removed from the jury pool. *See Rosales-Lopez*, 451 U.S. at 188 (plurality opinion).

The 1989 ABA Guidelines list requirements counsel must meet to adequately represent a capital defendant during voir dire. *See* 1989 ABA Guideline 11.7.2. These guidelines require capital counsel to familiarize themselves "with the precedents relating to questioning and challenging of potential jurors, including the procedures surrounding 'death qualification' concerning any potential juror's beliefs about the death penalty." *Id.* The standards therefore require counsel to ask about more than just prospective jurors' views on the death penalty. It is critical counsel learn the juror's feelings on issues relevant to the case at bar. For example, a juror might personally feel that a lesser-included charge is never appropriate if a defendant has committed a crime involving children or domestic violence. Effective counsel must know of these impairments before they select the jury. In order to elicit the information necessary to avoid the selection of biased jurors, counsel must use vigorous voir dire to fully explore each prospective juror's views, knowing well ahead the information that both parties will likely present. Here, counsel failed to satisfy even the most minimal standards for competent jury selection.

### 1. Counsel were deficient in failing to adequately screen prospective jurors through questionnaires.

Prior to Kiles's trial, prospective jurors were asked to complete a questionnaire. (*See* Tr. July 5, 2000 at 7–8.) The State's proffered questionnaire was entered into the record. (CR89-15577 ROA 169 at 2–10.) Pursuant to a stipulation off the record, the questionnaire from the State was submitted to defense counsel, who were given the opportunity to submit additional questions before sending the questionnaire to the court for approval. The questionnaires provided a brief summary of the crime and then asked each prospective juror for limited background information, as well as information about views on the death penalty. The questionnaires themselves were incomplete, and defense counsel from the start should have requested that questions be added to adequately evaluate prospective jurors and determine an effective and thorough strategy for voir dire. Counsel

58

1    should have requested questions on such topics as race, views on drug addiction,

2    whether the prospective juror or someone close to that person had been a victim of

3    domestic violence, whether the prospective juror had previous knowledge about the

4    crime through the media or other means, and whether the death of young children

5    in a crime would have an effect. There were also no questions about whether

6    prospective jurors had themselves been or knew someone who had been the victim

7    of a similar crime.

8         Moreover, there were no questions asking prospective jurors about the depth

9    of their personal knowledge about Kiles's case. This was unreasonable in light of

10   Kiles's first trial and conviction; it was even more unreasonable given that defense

11   counsel were litigating the extensive coverage of the ongoing 2000 proceedings in

12   the local news. (*See* Tr. Apr. 11, 2000 at 8; DA2 Dkt. 86 at 85–87; Case No. CV-

13   00-0143, Pet. For Special Action, May 5, 2000.)

14        Though defense counsel were given the opportunity to do so, they failed to

15   add any questions or request additional information; the State's proffered

16   questionnaire was given to jurors unaltered. Defense counsel's failure to solicit

17   meaningful information from prospective jurors impaired counsel's ability to

18   conduct voir dire effectively and ensure an impartial jury was empaneled.

19        Defense counsel have a duty to question jurors beyond "general inquiries,"

20   as such inquiries are inadequate to "detect those jurors with views preventing or

21   substantially impairing their duties in accordance with their instructions and oath."

22   *Morgan v. Illinois*, 504 U.S. 719, 734–735 (1992). Kiles's counsel were given the

23   opportunity to use questionnaires to investigate the ability of prospective jurors to

24   be fair and impartial, given the facts and defenses in Kiles's case, but counsel failed

25   to take it. As a result, counsel were unable to make strategic decisions when

26   conducting voir dire, in violation of their duty to ensure a fair and impartial duty.

27   *See id.* And, as described below, the failure to elicit critical information led to the

28   empaneling of a biased jury.

59

1
2

**2.    Counsel were deficient in failing to question those prospective jurors who were biased in favor of the death penalty.**

3
4
5
6
7
8

While the Constitution "does not dictate a catechism for *voir dire*," it entitles a defendant to a voir dire proceeding that is adequate to ensure both that an impartial jury is empaneled and that unqualified jurors are identified. *Morgan*, 504 U.S. at 729; *Dennis v. United States*, 339 U.S. 162, 171–72 (1950). To effectuate that right, counsel must elicit information that goes to whether a prospective juror is unable to be impartial. *See Morgan*, 504 U.S. at 729; 1989 ABA Guideline 11.7.2.

9
10
11
12
13
14
15
16
17
18
19

Despite the paucity of information elicited by the questionnaires, some of the jurors who were ultimately seated gave answers that should have alerted defense counsel of their bias in favor of the death penalty. Those jurors had a "substantial[] impair[ment]" that required challenges for cause or, at the very least, further examination during voir dire. *See Morgan*, 504 U.S. at 728. Defense counsel failed to do either of those things. The failure to ask follow-up questions or to challenge prospective jurors for cause, which was the result of lack of diligent preparation and investigation, was unreasonable. *See Wiggins*, 539 U.S. at 521–22 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.").

20
21
22
23

The questionnaire given to prospective jurors included the following question: "Which of the following statements comes closest to your feeling on the death penalty?"[37] Several prospective jurors indicated that they had strong views in favor of the death penalty, by marking either (1) that they were in favor of the death

24

25
26
27
28

[37] Prospective jurors were given six options. They ranged from being so opposed to the death penalty that the juror would not vote guilty for first-degree murder even if it were proven beyond a reasonable doubt, to feeling that the death penalty should be used in every case when a person knowingly or intentionally takes the life of another. The middle-ground option was "I am not opposed to the death penalty, but feel it should be used only in special cases." (CR89-15577 ROA 169 at 8–9.)

60

penalty in every case where the state has proven beyond a reasonable doubt a person killed another with premeditation, or (2) that they felt the death penalty should be used when a person knowingly or intentionally takes the life of another. Among these prospective jurors were nine jurors who were ultimately seated, including Jurors L.G., L.W., D.W., B.S., D.M., B.M., A.M., C.A.K., and T.D.[38] Even though these jurors provided glaring indications of a likely "substantial impairment" under *Morgan*, counsel failed to ask these nine prospective jurors any questions before they were seated. (Tr. July 7, 2000 at 75–80, 100–170.)

One juror, expressed Juror H.D., strong pro-death penalty beliefs and was questioned at voir dire before being seated. However, defense counsel did not question him on his views on capital punishment. (Tr. July 7, 2000 at 114–16.) Juror H.D. was only asked cursorily about his exposure to the case in the media.[39] (Tr. July 7, 2000 at 114–16.)

Because the ineffectual voir dire led to the seating of jurors with actual pro-death biases, Kiles was prejudiced. *See Ybarra*, 656 F.3d at 1001.

### 3. Counsel were deficient in failing to question jurors who were likely biased due to past personal experiences.

Counsel also deficiently failed to question or challenge jurors who had a "substantial impairment" based on their prior personal experiences, prejudicing Kiles. *See Morgan*, 504 U.S. at 728.

Two of the empaneled jurors, Jurors L.W. and C.A.K., stated on their questionnaires that they had been victims of domestic violence. Neither of these jurors were asked *any* questions at voir dire. (Tr. July 7, 2000 at 75–80, 100–70.) This failure was especially egregious given counsel's guilt-phase strategy, which was to contend that Gunnel's murder was a "heat of passion" crime. Such a defense

---

[38] Voir dire at the guilt phase used last names rather than numbers.

[39] Juror H.D. ultimately served as an alternate juror. (Tr. July 19, 2000 at 99.)

61

invited association with domestic violence. Accordingly, defense counsel should have been trying to determine whether prospective jurors—especially those who had been victims of domestic violence—would have difficulty being impartial in a case involving a female victim who had been killed by her partner. When a prospective juror has been the victim of a crime similar to the one at issue, it is imperative that counsel question the prospective juror about that experience. If, in response, the juror cannot conclusively state that he can be impartial, bias is presumed. *Cf. United States v. Kechedzian,* No. 16-50326, 2018 WL 4200969, at *6 (9th Cir. Sept. 4, 2018) (holding where a juror has been a victim of a similar crime, the juror must unequivocally state he can be impartial or he must be excused for cause). Therefore, Kiles's counsel should have been particularly diligent in questioning jurors who had been involved in or were victims of domestic violence. It was unreasonable for defense counsel to not question these jurors about whether those experiences impaired their ability to remain impartial.

Juror C.L.K. wrote on her questionnaire that her maternal great-grandfather was murdered, as was her best friend's father. But defense counsel asked Juror C.L.K. no questions about these murders at voir dire. Rather, Clark questioned her what she remembered about the instant crime from the media. (Tr. July 7, 2000 at 134.) Juror C.L.K. remembered that a woman and children had died, that one of the children was found in a canal, and that the other was never found. (Tr. July 7, 2000 at 134.) Clark asked no follow-up questions. (Tr. July 7, 2000 at 75–80, 100–70.) Asking Juror C.L.K. solely about her media exposure, when her ability to remain indifferent may have been compromised by her close experiences with murder and the impact it had on a family, was neither reasoned nor strategic, and counsel were deficient for making such a glaring error. *See Wiggins*, 539 U.S. at 521–22.

Instead of asking pertinent questions of prospective jurors whose questionnaires revealed potential bias, defense counsel failed to inquire whatsoever into whether any of the jurors who were ultimately seated were *Morgan*-impaired.

62

(Tr. July 7, 2000 at 75–80, 100–70.) Defense counsel's failure to question or to meaningfully question those jurors was deficient. Moreover, that failure resulted in the seating of several jurors who likely had significant actual biases based on their personal experiences. *See United States v. Gonzalez*, 214 F.3d 1109, 1112 (9th Cir. 2000) (explaining that a court may assume a juror is biased where he "has had some personal experience that is similar or identical to the fact pattern at issue in the trial"). Because counsel's deficient voir dire resulted in the seating of a jury that was not impartial, counsel were ineffective. *See Ybarra*, 656 F.3d at 1001.

Finally, Juror A.B. babysat a little girl who was kidnapped, raped, and murdered in 1988. Juror A.B. was close with the family, worked with the little girl's father, and saw how her murder affected him. While not discussed on her questionnaire, this experience directly affected the way in which Juror A.B. heard the evidence at Kiles's trial; the testimony of Shemaeah's father deeply affected her, as she had seen another father of a murdered child go through a similar tragedy. Having such an experience could have only been prejudicial against Kiles, but no appropriate questioning at voir dire was done. Juror A.B. was only asked a few questions about whether she had seen anything about Kiles's case or the crime in the media when it occurred. (Tr. July 7, 2000 at 106–07.) She was seated without further questioning. Having been close to a victim and family of a similar crime is a substantial impairment under *Morgan*, and adequate defense counsel would not have allowed a juror to be seated with such a cursory questioning or investigation to uncover such bias.

That these jurors were seated on Kiles's jury denied Kiles his right to an impartial jury, a fair trial, and a reliable verdict. Defense counsel's ineffective assistance at voir dire resulted in a jury that could not "stand impartial and indifferent to the extent commanded by the Sixth Amendment." *Morgan*, 504 U.S. at 727.

63

1

2

### 4. Counsel were deficient in failing to question prospective jurors about their knowledge of Kiles's previous conviction.

3  At capital re-trials or re-sentencings, it is universally acknowledged as

4  extremely damaging and prejudicial to inform the new jury of the prior death

5  sentence or to make repeated references to the fact that defendant has been

6  previously convicted and on death row. *See, e.g., Fullwood v. Lee*, 290 F.3d 663,

7  682–83 (4th Cir. 2002) (remanding for hearing to determine whether jurors were

8  exposed to information about prior death sentence because "generally speaking,

9  such information is prejudicial in nature"); *Atkins v. Commonwealth*, 631 S.E.2d

10  93, 100 (Va. 2006) (reversing death sentence reached at resentencing because the

11  jury was made aware of prior death sentence); *People v. Woolley*, 793 N.E.2d 519,

12  524 (Ill. 2002) (reversing death sentence because "[t]he fact that the jurors heard

13  that another jury sentenced defendant to death could have mitigated the serious

14  consequences of their decision"); *Hammond v. State*, 776 So.2d 884, 889 (Ala.

15  Crim. App. 1998) (holding that the prosecutor "committed reversible error when he

16  informed the jury that Hammond had previously been sentenced to death for the

17  same offense at a previous trial"); *State v. Miller*, 771 S.W.2d 401, 404 (Tenn. 1989)

18  ("[I]t is clearly improper, as a general rule, to inform a jury at a resentencing hearing

19  that at a prior trial defendant was sentenced to death."); *State v. Britt*, 220 S.E.2d

20  283, 292 (N.C. 1975) ("[N]o instruction by the court could have removed from the

21  minds of the jurors the prejudicial effect that flowed from knowledge of the fact

22  that defendant had been on death row as a result of his prior conviction of first

23  degree murder in this very case."). For this reason, competent capital counsel should

24  have questioned jurors individually as to whether they had personal knowledge of

25  the crime or defendant prior to their being called to serve. Kiles's counsel failed to

26  add any germane questions to the questionnaire; counsel again failed by not asking

27  jurors questions during voir dire that would have flagged jurors with potentially

28  damaging knowledge of Kiles's prior proceedings. (Tr. July 7, 2000 at 75–80, 100–

70.) Given the risks associated with a seated juror having knowledge of Kiles's prior convictions and death sentences, counsel's failure to address this topic even obliquely was deficient. *See Strickland*, 466 U.S. at 688.

At least one juror was aware at the time he was seated on the jury that Kiles had been convicted at a prior trial and that the jury was not supposed to know that fact. The juror was uncertain whether he was supposed to alert counsel or the judge about his knowledge of the case. Because the juror was not questioned on the matter, he assumed it was of no consequence. That this juror was seated without any questioning is evidence enough of ineffective assistance. However, the failure by counsel to uncover his knowledge of Kiles's prior conviction was prejudicial to Kiles. *See, e.g.*, *Fullwood*, 290 F.3d at 682–83 (holding that jurors' exposure to information about prior death sentence is "prejudicial in nature").

### 5. Counsel were deficient in failing to meaningfully question jurors about their exposure to Kiles's case in the media.

Kiles's guilt-phase voir dire was completely unproductive. Counsel did not ask *any* individual questions of eleven people who were selected for Kiles's jury: Jurors E.B., T.D., C.A.K., A.M., B.M., D.M., B.S., L.W., D.W., L.G., and C.M. Jurors L.G. and C.M. were alternates. (Tr. July 7, 2000 at 75–80, 100–70; ROA 479.)

This was especially unreasonable, as defense counsel were well aware of the extensive coverage in local news of the crime, the criminal proceedings, and Kiles's prior convictions and sentences. To combat bias from media exposure, the defense filed a petition for special action with the Arizona Supreme Court for a change of venue. The petition detailed how pervasive news coverage was in Yuma regarding Kiles's case. (Case No. CV-00-0143, Pet. For Special Action, May 5, 2000 at 4–46.) The defense further argued against a motion by the Yuma Sun, a prominent local newspaper, to print information about Kiles's former trial and conviction; the Yuma Sun was given permission to print the information. (ROA 491 at 3–8; Tr.

July 7, 2000 at 9–14.) On another occasion, defense counsel told the court, "It is apparent, based upon my investigation of the pleadings, when they're filed with the court that the press is—they come and get them almost the next day, if not the very same day, and then they're reported in the press." (Tr. Apr. 11, 2000 at 8.) Defense counsel knew exactly how widespread the media coverage of the case was. Yet counsel still failed to ask a single question of the majority of jurors who were seated on Kiles's jury. This failure was simply unreasonable.

Given the objective importance of capital jury selection, the legal precedent and established professional norms require counsel to question prospective jurors on their knowledge of a prior capital sentence when a case is being retried, as well as their potential biases or inability to fairly consider the evidence before them. Kiles's counsel permitted 11 of 16 jurors to be selected without asking *any* questions. Kiles's counsel's failure to ask even one question of these jurors to assess whether they were substantially impaired constitutes deficient performance. *See Morgan*, 504 U.S. at 728; *Virgil v. Dretke*, 446 F.3d 598, 613 (5th Cir. 2006) (counsel must make reasonable efforts "to explore the depth or intensity" of potentially disqualifying views among the venire).

Kiles's counsel's failure to ask any questions of most of the seated jurors, and failure to adequately question other seated jurors, resulted in multiple people on Kiles's jury who should have been disqualified for cause because their ability to consider all the evidence or be free of biases was substantially impaired. *See Ybarra*, 656 F.3d at 1001. Such a jury was unconstitutional, as "due process alone has long demanded that, if a jury is to be provided the defendant, regardless of whether the Sixth Amendment requires it, the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment." *Morgan*, 504 U.S. at 727.

**C.    Counsel failed to challenge the denial of a fair cross-section of the community in the venire.**

A venire comprised of "a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial." *Taylor v. Louisiana*, 419 U.S. 522, 528 (1975). It is unconstitutional where a "distinctive" group is not fairly represented due to systematic exclusion, without a significant state interest justifying it. *Duren v. Missouri*, 439 U.S. 357 (1979); *Taylor*, 419 U.S. at 533–35. The under-representation need not be intentional or a product of bad faith. *Glasser v. United States,* 315 U.S. 60, 86 (1942).

Counsel's failure to object to the fair cross-section violation in Kiles's case was deficient, as *Taylor* long pre-dated Kiles's 2000 guilt phase. *See* 1989 ABA Guideline 11.7.2(A) (requiring counsel to consider challenges to the venire panel). Kiles's guilt-phase jury was chosen through a selection process that involved excessive unsupervised discretion and that was therefore susceptible to abuse. The Jury Commissioner for the County of Yuma mailed questionnaires to prospective jurors who were selected from voter registration lists. (ROA 225 at 5; ROA 225 Ex. 55 at 1.) If the questionnaire was returned due to a bad address, there was no follow up or attempt to locate these individuals. (ROA 225 at 5; ROA 225 Ex. 55 at 1.) The Jury Commissioner eliminated prospective jurors based on the returned questionnaires at the Jury Commissioner's sole discretion. (ROA 225 at 5; ROA 225 Ex. 55 at 1–2.) These questionnaires were then destroyed, without any possibility for review by litigants or judicial officers. (ROA 225 at 5; ROA 225 Ex. 63 at 2.) Therefore, there is no way to ensure that the venire represented a fair cross-section of the community.

Compounding the failure to challenge the flawed method above, trial counsel failed to seek information about race on the questionnaires (CR89-15577 ROA 169 at 4–11) provided to jurors. It is unknown if the defense took contemporaneous notes on prospective jurors or if they took an accounting of race of the prospective

67

1   juror pool.[40] Counsel's failure to investigate or object to the lack of a fair cross-
2   section was deficient. *See Taylor*, 419 U.S. at 533–35; 1989 ABA Guideline
3   11.7.2(A).

4       Kiles was prejudiced by his counsel's failure to investigate or object, as the
5   failure to do so deprived Kiles of a fair trial. *Strickland*, 466 U.S. at 687. Jury
6   selection from a venire that violates the fair cross-section guarantee is structural
7   error. *United States v. Rodriguez-Lara*, 421 F.3d 932, 940 (9th Cir. 2005), *overruled*
8   *on other grounds by United States v. Hernandez-Estrada*, 749 F.3d 1154 (9th Cir.
9   2014). Here, had counsel objected to the denial of the fair cross-section, "there is a
10   reasonable probability that the claim [counsel] failed to raise at trial would have
11   prevailed, either at trial or on appeal." *Doe v. Ayers*, 782 F.3d 425, 432 (9th Cir.
12   2015) (citing *Strickland*, 466 U.S. at 694). Kiles was therefore prejudiced by his
13   counsel's deficient performance.

14       **D.   Counsel failed to make a record as to the reasons underlying the
           removal of many prospective jurors.**
15

16       Finally, counsel failed to make a complete record regarding jury selection,
17   compromising Kiles's right to meaningful appellate review. *See Gregg v. Georgia*,
18   428 U.S. 153, 195 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.);
19   *Dobbs v. Zant*, 506 U.S. 357, 358 (1993) ("We have emphasized before the
20   importance of reviewing capital sentences on a complete record."). Counsel's
21   failure was deficient and prejudiced Kiles. *See Strickland*, 466 U.S. at 688, 694; *see*
22   *also* Claim 16, *infra*.

23       Kiles's counsel and the State stipulated to the removal of a vast majority of
24   prospective jurors, without providing any reason for their removal on the record.
25   After reviewing the questionnaires, but without engaging in any voir dire of these

26   _____

27   [40] Defense counsel failed to preserve the 2000 guilt-phase proceeding juror
     questionnaires. This was part of a pattern of failing to create a record. *See* Claim
28   16, *infra*.

prospective jurors, trial counsel and the State stipulated that 41 prospective jurors should be excused. (ROA 456.) The record of jury selection does not reflect the fact of these prospective jurors' removal, let alone the reasons underlying removal. (*See* Tr. July 7, 2000 at 19–28.) Thus, the record on appeal lacked critical information necessary for Kiles's appellate lawyer to challenge his convictions, prejudicing Kiles. The failure to make a complete record constituted ineffective assistance by Kiles's counsel. *See* Claim 16, *infra*.

In capital cases, "certain inquiries must be made to effectuate constitutional protections." *Morgan*, 504 U.S. at 730. In Kiles's case, however, counsel's voir dire performance did not satisfy objective standards of capital representation. The standards were developed to ensure capital counsel's performance adhered to prevailing Supreme Court law, and at the time of retrial, counsel were obligated to know and follow these standards. *See* 1989 ABA Guideline 11.7.2. Reasonably competent capital attorneys would have worked to uncover jurors' biases justifying their removal for cause, as well as information that would have enabled counsel to make informed peremptory strikes. Competent counsel would have rehabilitated prospective jurors rather than release them by stipulation and would have ensured a complete record. The failure of Kiles's counsel to do so undermined his right to an impartial jury, and therefore to a fair trial, such that Kiles is entitled to relief.

## Claim Three

**Kiles was denied effective assistance of counsel at his guilt-phase proceedings because counsel failed to investigate, develop, and present critical evidence, among other significant errors.**

Kiles's trial counsel failed to investigate and prepare adequately for the guilt phase of trial and consequently neglected to develop and present Kiles's only viable defense to first-degree murder for the death of Valerie Gunnel. Counsel's deficient performance in that respect and others, both individually and cumulatively, prejudiced Kiles and thereby violated his rights under the Sixth and Fourteenth Amendments to the U.S. Constitution. Kiles incorporates by specific reference all

1  facts, allegations, and arguments made elsewhere in this Petition. Kiles presented

2  this claim below. (ROA 1189 at 23–25, 30–40, 42–46; PFR2 Dkt. 1 at 23–46.)

3        **A.    Background on guilt-phase proceedings.**

4        The trial commenced on July 10, 2000, with prosecutor David Powell's

5  opening statement. Powell offered the jury a brief overview of the State's theory of

6  the crime: Late on February 9, 1989, Kiles returned home to Gunnel's apartment,

7  where he and Gunnel argued over food stamps that he had taken from her. (Tr. July

8  10, 2000 at 12–13.) She slapped him twice, after which he went to his car, returned

9  with a tire jack, and began beating her. (Tr. July 10, 2000 at 12–13.) Powell

10  contended that the assault began in the east bedroom and continued into the living

11  room, where Gunnel eventually died. (Tr. July 10, 2000 at 13.) According to

12  Powell, Kiles then went into the west bedroom, where "the carnage continued" as

13  Kiles beat both of Gunnel's children, Shemaeah and LeCresha, to death. (Tr. July

14  10, 2000 at 13.) He later disposed of the children's bodies in the river. (Tr. July 10,

15  2000 at 13.)

16        Powell laid out for the jury the three types of witnesses the State planned to

17  present. First, the State would offer the testimony of several witnesses who would

18  help lay the scene for what occurred on the day of the crime and until Kiles's arrest.

19  (Tr. July 10, 2000 at 14–15.) Second, the State would present several "scientific

20  witnesses." (Tr. July 10, 2000 at 16.) Powell overstated what these experts could

21  attest to, claiming for example that, through DNA evidence, the State would explain

22  "the chronology of what happened inside that apartment." (Tr. July 10, 2000 at 16–

23  17.) Powell similarly insisted that blood-spatter expert Tom Bevel would be able to

24  "explain exactly what happened," including that "there were a minimum of 14

25  blows struck" in the west bedroom. (Tr. July 10, 2000 at 19–20.) In addition, the

26  State would use the DNA expert and a statistician to establish that Shemaeah had

27  been killed, even though her body had not been found, and would present the

28  testimony of R.B. Mallon, M.D., who conducted the autopsies. (Tr. July 10, 2000

70

1   at 18–20.) Lastly, the State would call witnesses who could speak to Kiles's

2   statements in the wake of the killings. (Tr. July 10, 2000 at 21.) One such witness

3   would be Kiles's mother; Powell asserted that she would testify that Kiles said,

4   "point blank, 'I killed Valerie and the kids.'" (Tr. July 10, 2000 at 21.)

5       Lead defense counsel Greg Clark had three focal points during his opening.

6   First, despite Powell's misrepresentations, Clark extolled the scientific evidence in

7   this case, hammering home for the jury that it was incontrovertible. Clark informed

8   the jury that "Mr. Powell [wa]s absolutely correct with regard to the blood spatter

9   evidence." (Tr. July 10, 2000 at 34.) The field was "a very scientific area"; further,

10  "[y]ou can't fight the DNA. You can't. You can't find [sic] that blood spatter

11  because that is a forensic fact in this case." (Tr. July 10, 2000 at 34–35.) In that

12  same vein, Clark confirmed for the jury, "I can tell you now that the physical

13  evidence, that scientific evidence doesn't lie. It's not going to lie and it's never lied.

14  It is what it is." (Tr. July 10, 2000 at 41.)

15      Second, Clark laid out the defense's theory of the case. Clark made clear

16  from the outset that Kiles was "absolutely responsible for the death of Valerie

17  Gunnel. That is not [the] issue." (Tr. July 10, 2000 at 39–40.) What was at issue,

18  however, was Kiles's degree of culpability for the death, which Clark noted

19  occurred "during the heat of the passion, a heated, ugly fight." (Tr. July 10, 2000 at

20  40.) With respect to the children's deaths, Kiles "didn't act alone." (Tr. July 10,

21  2000 at 40.)

22      Third, Clark previewed for the jury Kiles's anticipated testimony. Clark

23  explained that Gunnel and Kiles had used drugs together on February 9, 1989, to

24  celebrate his new job, until Kiles eventually used Gunnel's food stamps to buy

25  drugs and use them with friends. (Tr. July 10, 2000 at 42–43.) When he went home

26  with his friends to "face the music," Gunnel started an argument because Kiles had

27  returned without the drugs he had promised. (Tr. July 10, 2000 at 44–45.) Clark

28  noted Kiles had had "a little bit to drink, he's had a lot of drugs," and "[h]e [was]

71

not having any of it." (Tr. July 10, 2000 at 44.) He started preparing to leave, but the argument escalated when Gunnel slapped Kiles twice. (Tr. July 10, 2000 at 45.) At that point, he reached down, grabbed the tire jack by his side, and hit her. (Tr. July 10, 2000 at 45–46.) After the shock lessened, Kiles went to look for his friends; he found them in the bedroom and saw that they had killed the children. (Tr. July 10, 2000 at 46.) Kiles tried to clean the apartment while his friends left to dispose of the children's bodies. (Tr. July 10, 2000 at 47–48.) Later, because he still "wants to get high," Kiles tried to sell some of Gunnel's property in order to get money for more drugs. (Tr. July 10, 2000 at 49.)

As Powell had pledged, the State did offer three types of witnesses over the course of six days of testimony. Through several witnesses, the State tried to develop a timeline of events starting on February 9, 1989. (*See, e.g.*, Tr. July 12, 2000 at 6–9, 11–13 (Gunnel's sister giving overview of when she saw Gunnel on February 9, 1989); Tr. July 12, 2000 at 42–43 (Shemaeah's father testifying about when he saw Gunnel and Shemaeah on that day).) Several Yuma Police Department officers, including lead investigator Detective Brian Rodgers, detailed the crime scene and aspects of the investigation. (*See, e.g.*, Tr. July 11, 2000 at 143–44 (Rodgers describing crime scene at Gunnel's apartment).) Defense counsel concentrated on asserting that Kale Johnson was responsible for the deaths of the children, so counsel focused their cross-examinations on undercutting the credibility of these witnesses, especially those who suggested that Johnson was not involved in the crime. (*See, e.g.*, Tr. July 12, 2000 at 158–61, 168–69, 172–83 (defense counsel trying to impeach credibility of Deirdre Johnson, who had suggested that Kale Johnson had not seen Kiles on the morning of February 10, 1989).) Defense counsel further elicited testimony on cross-examination regarding forensic evidence, including Kale Johnson's shoeprints at Gunnel's apartment and blood on Johnson's clothing, tying Johnson to the crime scene. (*See, e.g.*, July 17, 2000 at 74–76 (Rodgers testifying that Converse prints appearing to match

72

Johnson's shoes were found in the hallway and back patio area of Gunnel's apartment); July 17, 2000 at 83–84 (Rodgers testifying that Gunnel's blood was found on Johnson's shoes and pants).) Little, if anything, of relevance to how Gunnel's death unfolded emerged.

The State then presented the testimony of four experts.[41] First, DNA analyst David Duplissa informed the jury that he had analyzed 11 items from the crime scene for DNA profiles and had compared those profiles to five known standards, including those of Gunnel, Kiles, and Kale Johnson. (Tr. July 12, 2000 at 114–17.) Among the items that had blood with Gunnel's DNA profile were a tire jack ratchet, a shoe, and a swab from the living room door. (Tr. July 12, 2000 at 122–23.) Kiles's trial counsel, seeking to bolster their third-party defense, drew out on cross-examination that one of Johnson's Converse shoes and his pants had Gunnel's blood on them, as well as that the blood on Johnson's jacket had a DNA profile from an unidentified individual. (Tr. July 12, 2000 at 132–38.)

The State next sought to establish the fact of Shemaeah's death through Thomas Wiltbank, M.D., who testified that it was "extremely likely" that the blood on the bedsheet submitted for testing was from an offspring of Gunnel and Ward Wade, namely Shemaeah. (Tr. July 13, 2000 at 87, 92.) The defense asked no questions of Dr. Wiltbank.

Third, the State called the pathologist, Dr. Mallon, who had conducted the autopsies of Gunnel and LeCresha Kirklin. Dr. Mallon identified the primary cause of death of both victims as blunt trauma to the head. (Tr. July 13, 2000 at 97, 101.) He further defined the term "defensive wound" and indicated that he saw evidence of such a wound with Gunnel's broken arm. (Tr. July 13, 2000 at 99.) On cross-examination, defense counsel made a particular point of getting Dr. Mallon to agree that this defensive wound must have occurred when Gunnel was conscious,

---

[41] The State also presented Rodgers as a crime-scene management expert. (ROA 446 at 2.)

73

1   meaning that it must have occurred early on during the beating. (Tr. July 13, 2000
2   at 105.)

3        Fourth, blood-spatter expert and crime-scene reconstructionist Tom Bevel
4   testified on behalf of the State. He declared that blood-stain analysis can provide
5   "in essence, a reconstruction of the occurrences that might have taken place in order
6   to produce the blood as it is found." (Tr. July 14, 2000 at 8–9.) From his photograph-
7   based analysis of the west bedroom, where the children were killed, Bevel testified
8   that there had been a minimum of 14 blows and that the attacker was right-handed.
9   (Tr. July 14, 2000 at 15, 19, 27.) On cross-examination, the defense once again
10  focused on its third-party defense and had Bevel discuss what the implications
11  would be (in terms of who was swinging the weapon) if the blood on Johnson's
12  jacket were castoff or spatter. (Tr. July 14, 2000 at 37–39.) Bevel also testified that
13  for a shoeprint to be made in blood, that blood still has to be in a liquid state; he
14  was unable to identify any clotting in the photographs of the bloody Converse
15  shoeprints in Gunnel's apartment, suggesting that the blood was "[f]resher" when
16  the Converse shoe was placed in it. (Tr. July 14, 2000 at 40–44.) Bevel
17  acknowledged that a compromised crime scene—one that has changed since the
18  crime—can limit what blood-stain evidence can say about the crime. (Tr. July 14,
19  2000 at 47–48.) Defense counsel's cross-examination focused nearly exclusively
20  on information relating to the children's deaths, not to Gunnel's. (*See* Tr. July 14,
21  2000 at 30–50, 55–59.)

22       Lastly, the State called Imojean Kiles, Jesse Solomon, Larry Hawkins, and
23  Kale Johnson to testify about the admissions Kiles made to them. The State's
24  purpose was to establish that Kiles had repeatedly confided to family and close
25  friends that he had killed Gunnel and her children and had disposed of the children's
26  bodies, and moreover that he had not implicated Johnson in the crimes. (*See, e.g.*,
27  Tr. July 13, 2000 at 12–13.) The State further elicited testimony from Hawkins
28  about what he claimed to have learned from Kiles, including that (1) the assault

74

began after Gunnel slapped Kiles, "enrag[ing] him," (2) Kiles went outside to get the tire jack from the car and then returned and struck Gunnel, and (3) Gunnel regained consciousness at one point during the attack, after which Kiles beat her again until she died. (Tr. July 13, 2000 at 23–24, 28–29, 32–33.)

For all of these witnesses, the defense focused heavily on undercutting any suggestion that Kiles had admitted to killing the children or disposing of their bodies. (*See, e.g.*, Tr. July 11, 2000 at 79 (Imojean Kiles testified that she understood from Johnson that he had been involved in the killings); Tr. July 13, 2000 at 57–58 (defense getting Hawkins to admit that some of the information he gave to police must have been based on news sources, not just information from Kiles).) During the cross-examination of Johnson and other testimony about Johnson, the defense determinedly sought to highlight inconsistencies in his prior statements, his inadequate explanation for Gunnel's blood on his clothing, the fact that he spent much of the day after the killings with Kiles, and the fact that he was spared murder charges once he named Kiles as the sole culprit in the killings. (*See, e.g.*, Tr. July 14, 2000 at 113–15 (Johnson indicating he signed affidavit stating he would have been indicted for murder if he did not testify); Tr. July 14, 2000 at 129 (Johnson dismissing the blood spots on his clothing as having gotten there "some type of way" when he was in Gunnel's apartment); Tr. July 17, 2000 at 89 (Rodgers admitting that Johnson "didn't have an explanation for the [blood on his] jacket").) Once again, the defense focused on Johnson's involvement and paid little heed to Gunnel's death.

The centerpiece of the defense case was Kiles's testimony. After briefly presenting only three other witnesses (*see* Tr. July 17, 2000 at 127, 138, 145), the defense called Kiles to the stand. Kiles set out in detail his relationship with Gunnel, that he had just gotten a job the morning of February 9, 1989, and how he and Gunnel planned to sell her food stamps for drugs so they could celebrate. (Tr. July 17, 2000 at 153–55.) Kiles walked the jury through much of the day in question,

75

1   including his drinking and drug use with Johnson and others in the afternoon. (Tr.
2   July 17, 2000 at 157–58.) Kiles further testified that he and his friends, including
3   Johnson and one Mike Parker, used all of the drugs and the money—such that they
4   had to return to Gunnel's apartment with no food stamps, no money, and no drugs.
5   (Tr. July 17, 2000 at 158–60.)

6          Kiles continued that Gunnel started arguing with him because he had come
7   back empty-handed, so he and his friends started packing his stuff to move out. (Tr.
8   July 17, 2000 at 160.) To make room in his car for his belongings, which included
9   a television, clothes, and a bed, Kiles had to move some of the items in his car—
10  including a tire jack—into the apartment. (Tr. July 17, 2000 at 160–62.) But Gunnel
11  was still arguing with him, and things got "so heated." (Tr. July 17, 2000 at 164.)
12  Kiles testified, "She slapped me. I asked her not to do that. Well, I told her, Don't
13  slap me again. More words was exchanged and she slapped me again." (Tr. July 17,
14  2000 at 165.) Then Kiles "just reached down and grabbed the jack and just swung
15  it." (Tr. July 17, 2000 at 165.) Gunnel, who had been facing Kiles, fell into a leather
16  chair; Kiles continued, "I guess I hit her more than one time." (Tr. July 17, 2000 at
17  165–66.) Kiles explained that Gunnel went down quickly: once he hit her, "[s]he
18  didn't move again." (Tr. July 17, 2000 at 166.) She did not regain consciousness or
19  speak again. (Tr. July 17, 2000 at 166.) He went into shock and dropped the tire
20  jack; it was only once a noise roused him that he went to the west bedroom, where
21  he saw Johnson swinging the tire jack at the children and Parker watching from
22  nearby. (Tr. July 17, 2000 at 167–70.)

23         Afterward, Parker, Johnson, and Kiles devised a plan: Parker and Johnson
24  would dispose of the children's bodies, while Kiles tried to clean the apartment.
25  (Tr. July 17, 2000 at 170–73.) As part of the attempted clean-up, Kiles wrapped
26  Gunnel's body in a blanket and moved her from the chair into the hallway, out of
27  sight from the apartment's front door. (Tr. July 17, 2000 at 171.) Kiles testified that
28  he later passed out; afterward, he and Johnson ransacked Gunnel's apartment for

76

1  property they could sell in order to feed their addictions. (Tr. July 17, 2000 at 177,
2  190.)

3       On cross-examination, Kiles testified that anyone who said that he had killed
4  all three victims was wrong—that Johnson was lying. (Tr. July 17, 2000 at 215.)

5       Powell's closing argument for the State emphasized just how much time
6  Kiles had, according to the State's version of events, to think about what he was
7  doing. (Tr. July 19, 2000 at 36.) Powell announced, "The state maintains to you,
8  ladies and gentlemen, never has a case exhibited more premeditation than the one
9  we exhibit now." (Tr. July 19, 2000 at 36–37.) Powell further shared that he
10 personally did not credit Kiles's testimony that Johnson had killed the children. (Tr.
11 July 19, 2000 at 30.) During closing argument, with regard to Gunnel's death,
12 defense counsel countered that the State's theory that the attack on Gunnel started
13 in the bedroom was untenable. (Tr. July 19, 2000 at 51.) Lauding Bevel as "the
14 foremost expert" in blood-stain analysis, Clark noted that some of Bevel's
15 testimony corroborated Kiles's statement that he did not kill the children. (Tr. July
16 19, 2000 at 57.) Clark also told the jury that it could consider intoxication when
17 assessing whether the killings were premeditated. (Tr. July 19, 2000 at 70–71.)

18      With respect to Gunnel's death, the court instructed the jury on premeditated
19 first-degree murder, second-degree murder, heat-of-passion manslaughter, and
20 reckless manslaughter. The court also provided additional instructions for the
21 counts regarding Shemaeah and LeCresha. (Tr. July 19, 2000 at 86–99.) After what
22 appears to have been more than a full day of deliberations, the jury returned verdicts
23 of guilty as to three counts of first-degree murder and two counts of child abuse.
24 (*See* ROA 479 at 1; CR89-15577 ROA 217 at 1.)

25 **B.    A defendant has a Sixth Amendment right to the effective
26      assistance of counsel at guilt-phase proceedings.**

27      As described in Claim 2, *supra*, the Sixth Amendment guarantees to a
28 defendant the right to effective assistance of counsel. *Strickland v. Washington*, 466

U.S. 668, 684 (1984). Under *Strickland*, a defendant is denied effective assistance when (1) the "representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 687–88, 694.

Whether an attorney performed deficiently depends on the "reasonableness [of the attorney's actions] under prevailing professional norms." *Id.* at 688. As noted previously, the Supreme Court has consistently relied upon guidelines from the ABA and similar professional groups to inform the inquiry into reasonable professional conduct. *See, e.g.*, *Padilla v. Kentucky*, 559 U.S. 356, 366–67 (2010); *Bobby v. Van Hook*, 558 U.S. 4 (2009) (per curiam); *Rompilla v. Beard*, 545 U.S. 374, 387 & n.7 (2005); *see also* 1989 ABA Guidelines; 2003 ABA Guidelines. While strategic choices made by trial counsel are presumed reasonable, that deference applies only insofar as the choices resulted from "thorough investigation of law and facts relevant to plausible options[.]" *Strickland*, 466 U.S. at 689–90. "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Wiggins v. Smith*, 539 U.S. 510, 521–22 (2003).

Notably, whether an attorney performed reasonably takes into account the attorney's professional history: the "character of a particular lawyer's experience may shed light in an evaluation of his actual performance." *United States v. Cronic*, 466 U.S. 648, 665 (1984); *see supra*, Claim 1 (discussing some of trial counsel's relevant history).

Whether an attorney's deficient performance caused prejudice depends on whether there is a "reasonable probability" that the jury would have reached a different result absent counsel's errors. *Cronic*, 466 U.S. at 694. A "reasonable

78

probability" is just one "sufficient to undermine confidence in the outcome"—a "defendant need not show that counsel's deficient conduct more likely than not altered the outcome." *Id.* at 693. Further, because of the requirement of unanimity, prejudice turns on whether there is a reasonable probability that even one juror would have made a different decision. *Wiggins*, 539 U.S. at 537.

When evaluating prejudice, a court must consider "the totality of the evidence—both that adduced at trial, *and the evidence adduced in the habeas proceeding*[*s*]." *Id.* at 536 (alteration in original) (quoting *Williams v. Taylor*, 529 U.S. 362, 397–98 (2000)). And, critically, the question is not only whether each instance of deficient performance was on its own prejudicial, but also whether the combined effect of all of those instances was to undermine confidence in the outcome. *See Strickland*, 466 U.S. at 694; *see also, e.g.*, *Martin v. Grosshans*, 424 F.3d 588, 592 (7th Cir. 2005) ("[E]ven if these [unprofessional] errors, in isolation, were not sufficiently prejudicial, their cumulative effect prejudiced Martin's defense.").

**C.   Trial counsel were ineffective for failing because of their constitutionally inadequate investigation to present a reasonable defense for the death of Gunnel.**

One of the primary duties of trial counsel is to conduct a reasonable investigation. *See Kimmelman*, 477 U.S. at 384 (concluding that the adversarial process "will not function properly unless defense counsel has done some investigation into the prosecution's case and in to various defense strategies"). Counsel must "conduct a prompt investigation of the circumstances of the case and . . . explore all avenues leading to facts relevant to the merits of the case." *Doe v. Ayers*, 782 F.3d 425, 434 (9th Cir. 2015) (alteration and internal quotation marks omitted). Then, once counsel has conducted a reasonable investigation, counsel may make strategic decisions based upon the information gathered—including the decision to curtail further investigation. Simply put, investigation must precede and inform strategy. *See Wiggins*, 539 U.S. at 521–22. Counsel's decisions warrant

1   deference only when those decisions follow a "thorough investigation of law and
2   facts relevant to plausible options[.]" *Strickland*, 466 at 689–90. Such is not the
3   case when counsel (1) adopts a strategy after an inadequate investigation, and then
4   (2) limits further investigation based on that ill-conceived strategy. *See Wiggins*,
5   539 U.S. at 521–22; *Weeden v. Johnson*, 854 F.3d 1063, 1070 (9th Cir. 2017)
6   ("[C]ounsel could not have reasonably concluded that obtaining a psychological
7   examination would conflict with his trial strategy without first knowing what such
8   an examination would reveal.").

9        Trial counsel failed to adequately investigate the law and facts related to
10   Kiles's guilt-phase proceedings, especially as they related to the charge of first-
11   degree murder with premeditation for the death of Gunnel. Instead of conducting a
12   reasonable investigation and then developing a strategy for the defense, counsel
13   conducted an extremely limited investigation, settled on a strategy, and then tailored
14   subsequent investigative and other decisions to fit with that predetermined and
15   unsupportable strategy. As described below, had counsel conducted a reasonable
16   investigation and *then* determined trial strategy, taking into account expert
17   consultations, witness interviews, and the like, counsel would have been able to
18   present a reasonable defense and undercut the State's case, such that there is a
19   reasonable probability that at least one juror would have concluded that Kiles was
20   guilty of second-degree murder, not first-degree murder, in Gunnel's death.

21                **1.    Trial counsel performed deficiently by failing to conduct a
22                        reasonable investigation; that performance resulted in them
                         settling on a legally unsound and ill-considered guilt-phase
23                       strategy.**

24        From the outset, lead counsel Greg Clark had a wealth of information on
25   valuable avenues of investigation for Kiles's guilt-phase proceedings. Indeed, Kiles
26   had previously been convicted of all three counts of first-degree murder, and first
27   state post-conviction counsel had obtained relief from those convictions based on
28   ineffective assistance both of trial counsel in preparing and presenting a defense

1    and of appellate counsel. (*See* CR89-15577 ROA 60 at 3–4.)

2         First, state post-conviction counsel had alleged that Kiles's 1989 trial counsel

3    performed deficiently in numerous respects, including by (1) failing to request the

4    appointment of experts to evaluate blood spatter and other forensic evidence, and

5    (2) failing to investigate and present evidence that Kiles could not and did not

6    premeditate murder because of his intoxication and impulsivity. (ROA 225 at 37–

7    41, 66.) Counsel attached to their petition over 80 exhibits, including an affidavit

8    from expert criminalist Peter Barnett critiquing the work of Tom Bevel, the State's

9    blood-spatter expert (*see* ROA 225 Ex. 59; ROA 225 Ex. 79), and an affidavit from

10   psychiatrist and neurologist Albert Globus, M.D., discussing such topics as Kiles's

11   dysfunctional family, childhood trauma, struggles with addiction, and impulsivity

12   (ROA 225 Ex. 60.) At the subsequent state post-conviction hearing in 1996, Dr.

13   Globus testified extensively about Kiles's impulsivity, which Dr. Globus concluded

14   was likely attributable to in utero toxic exposure and aggravated by chronic

15   depression and intoxication. (*See, e.g.*, Tr. Feb. 21, 1996 at 177–78.) Dr. Globus

16   further described how organic brain damage and genetic predisposition contributed

17   to Kiles's addictions and how Kiles's "toxic psychosis from the drugs" led to

18   "severely disordered" thought processes at the time of the offense. (*See, e.g.*, Tr.

19   Feb. 21, 1996 at 177–85.) Persuaded by such testimony, the state post-conviction

20   court granted relief in 1996. (*See* CR89-15577 ROA 60.)

21        Competent subsequent trial counsel would have regarded prior counsel's

22   extensive investigation as a resource and would have reviewed it carefully. Clark,

23   however, did not do so. *See Rompilla*, 545 U.S. at 383–84 (counsel performed

24   deficiently when they were on notice that a readily available file had relevant,

25   helpful information but failed to review it). After Clark's appointment as lead

26   counsel in September 1998 (*see* Tr. Oct. 7, 1998 at 2–4), Clark moved for funding

27   for an investigator and for a mental-health expert (ROA 384 at 1–2). At a hearing

28   on that motion, Clark indicated that the mental-health expert would conduct "just,

81

1   I think, probably a pre-screen type examination." (Tr. Oct. 30, 1998 at 45–46.)
2   Clark further specified that the court should appoint Dr. Globus, noting that "[i]t
3   appears this gentleman has had some contact with Mr. Kiles. . . . [Dr. Globus] was
4   somebody, I think, [who was] referenced in the appellate procedure, judge. Possibly
5   a PCR." (Tr. Oct. 30, 1998 at 45–46.) Clark had no idea that Dr. Globus had testified
6   at the post-conviction hearing, let alone the substance of that testimony.

7        The court[42] granted Clark's request for funding for an investigator and for
8   Dr. Globus's pre-screening examination. (ROA 386 at 1); *see also* ABA Guideline
9   8.1 cmt. (recognizing the importance of trained investigators as support for
10  counsel). But Clark made no move to contact either an investigator or Dr. Globus.
11  *See Richey v. Bradshaw*, 498 F.3d 344, 362 (6th Cir. 2007) ("[T]he mere hiring of
12  an expert is meaningless if counsel does not consult with that expert to make an
13  informed decision about whether a particular defense is viable.").

14       Sixth Amendment precedent and professional guidelines required Clark to
15  expeditiously investigate guilt/innocence issues. *See, e.g.*, *Doe*, 782 F.3d at 434;
16  1989 ABA Guideline 11.4.1(A); *see also, e.g.*, ABA Standards for Criminal
17  Justice—Defense Function (3d ed. 1993) (hereinafter "ABA Defense Standard(s)"),
18  Standard 4-4.1(a) ("Defense counsel should conduct a prompt investigation of the
19  circumstances of the case and explore all avenues leading to facts relevant to the
20  merits of the case. . . .").

21       Nearly nine months later, however, "no investigation or pretrial work of any
22  kind [had been] conducted in this case." (ROA 409 at 2.) On July 16, 1999, then-
23  second counsel Mary Boyte cited the complete lack of investigation and trial
24  preparation as a justification for her motion to withdraw from the case. (ROA 409
25  at 1–5.) Boyte informed the court that Clark, despite having done none of the
26  requisite investigation, was pushing for a November 1999 trial date. (ROA 409 at

27
28  _____
    [42] Kiles's case was, by this time, in front of a different judge than the one who had
    granted state post-conviction relief.

2.) Boyte also alerted the court to the extent of Clark's failure to investigate up to that point:

1. No investigator had been hired or had done any work on this case, despite the court's allocation of funding;

2. No witnesses had been interviewed;

3. No contact had been made with Dr. Globus, again despite the court's appointment of the expert; and

4. Clark had not reviewed the prior trial and post-conviction investigation files, which were in Boyte's possession and which Clark refused to collect.

(ROA 409 at 2.) At that point, to Boyte's knowledge Clark had possession of and had reviewed only police reports and the 1989 trial transcripts, as well as a few pages of additional information. (ROA 409 at 2.) Boyte further cited the breakdown in communication between Clark and Kiles and her belief that "the Defendant is not receiving effective assistance of counsel" before seeking permission to withdraw from the case. (ROA 409 at 2–4.)

At the hearing on Boyte's motion to withdraw, Clark laid out for the court his investigation to date: he had (1) been "to the place where the bodies were found," (2) obtained the court's appellate and post-conviction records, (3) reviewed the trial exhibits and evidence with the prosecutor, (4) "ordered additional pieces of evidence," as well as copies of all of the relevant photographs, and (5) had the investigator at the Office of the Legal Defender—which was conflicted off this case—locate witnesses.[43] (Tr. Aug. 6, 1999 at 31–33.) Clark made no mention of having contacted a single potential expert or witness. (*See* Tr. Aug. 6, 1999 at 27–37.) Prosecutor David Powell confirmed that Clark had received police reports and grand jury transcripts, had reviewed exhibits, and had "made numerous requests [to

---

[43] Clark added that he had "made a complete review of all of the documentation in this case," but he appears to have been referring to the trial and appellate documentation. Certainly he had not read first post-conviction counsel's file. (Tr. Aug. 6, 1999 at 31–32.)

1  the State] to do interviews." (Tr. Aug. 6, 1999 at 41–42.) Powell also made clear
2  that no interviews had occurred—"we haven't really done any interview
3  discovery." (Tr. Aug. 6, 1999 at 41–42.) After professing his belief that the state
4  post-conviction investigation materials were "worthless" (Tr. Aug. 6, 1999 at 30–
5  31), Clark announced that Kiles—whose prior counsel had won post-conviction
6  relief—was "in a better position now than he has ever been with regards to being
7  represented adequately and effectively." (Tr. Aug. 6, 1999 at 35.)

8      Clark so proclaimed despite having neglected some of the most basic aspects
9  of a criminal-defense investigation. *See, e.g.*, *Cannedy v. Adams*, 706 F.3d 1148,
10 1166 (9th Cir. 2013) (highlighting importance of interviewing potentially crucial
11 witnesses); *see also, e.g.*, *Weeden*, 854 F.3d at 1070 (faulting counsel for failing to
12 investigate psychological guilt-phase defense with assistance of expert); *Elmore v.
13 Ozmint*, 661 F.3d 783, 786, 859 (4th Cir. 2011) (holding that counsel were
14 ineffective for failing to conduct an independent examination of the State's forensic
15 evidence, when such evidence was central to conviction); 1989 ABA Guideline
16 11.4.1(D)(3) (listing the types of witnesses counsel should consider interviewing,
17 including "witnesses familiar with aspects of the client's life history that might
18 affect the likelihood that the client committed the charged offense(s)"). 
19 Accordingly, having conducted not even a minimally adequate investigation, Clark
20 was in no position to make reasonable, sound, deference-worthy strategic decisions
21 at that time. *See, e.g.*, *Bemore v. Chappell*, 788 F.3d 1151, 1165 (9th Cir. 2015)
22 (deference to strategic judgments is defined in terms of the adequacy of the
23 investigation supporting those judgments); *Phillips v. Woodford*, 267 F.3d 966, 978
24 (9th Cir. 2001) (emphasizing that the rejection of an alternative defense cannot be
25 considered strategic when not preceded by an investigation allowing for an
26 informed decision).

27     The lack of preparation, however, did not stop Clark. Although he had done
28 no interviews, had consulted with no experts, and had no investigator working on

the case (*see* ROA 414 at 31–49), he had done one thing by the time of the August 1999 hearing on co-counsel's motion to withdraw: he had already settled on his trial strategy. By the time new second counsel Treasure VanDreumel and investigator Mary Meyer joined the defense just days after that hearing,[44] Clark had committed to the strategy later presented at trial. There were no team strategy discussions, and VanDreumel accepted Clark's uninformed plan without question. For the death of Gunnel, the defense would argue that Kiles was guilty of a heat-of-passion crime that was not premeditated and therefore not first-degree murder. For the deaths of the children, counsel would argue that Kiles was not the perpetrator.[45]

Kiles, whose relationship with Clark had fractured many months earlier, filed in September 1999 a motion for new counsel.[46] (*See* ROA 413); *see also* Claim 1, *supra*. At the hearing on that motion, the court had Clark give sworn testimony about a number of issues, including his work to date. (Tr. Oct. 8, 1999 at 39.) Clark testified in open court that he had "interviewed more witnesses—more witnesses than anybody has interviewed prior to this time, in this case, because the file I received never had any transcripts of any witnesses that testified at this trial." (Tr. Oct. 8, 1999 at 40.) In other words, Clark claimed to have interviewed more than

---

[44] After the August 1999 hearing, the court granted Boyte's motion to withdraw. (Tr. Aug. 6, 1999 at 48.) Treasure VanDreumel signed on to the case as second counsel within four days of that hearing, and it appears that she brought with her investigator Mary Meyer—the first defense investigator to work on the case and to use the funding granted over nine months prior. (*See, e.g.*, Tr. Oct. 8, 1999 at 74.)

[45] Even if Clark's actions to this point could be construed as investigation, that does not render the strategy decision reasonable. *See, e.g.*, *Wiggins*, 539 U.S. at 526 (stating that "*Strickland* does not establish that a cursory investigation automatically justifies a tactical decision"); *Driscoll v. Delo*, 71 F.3d 701, 709 (8th Cir. 1995) (even when defense counsel elicited a concession from state expert, counsel was deficient for having failed to take measures to understand the testing performed and the meaning of the results); *Dugas v. Coplan*, 428 F.3d 317, 328 (1st Cir. 2005) (defense counsel failed to adequately investigate a defense that no arson occurred, even though counsel had inspected the fire scene, talked with the state's experts, done some reading, and spoken with other defense attorneys).

[46] This was Kiles's third such plea to the court. (*See* ROA 395 at 1; ROA 407 at 1.)

the zero witnesses interviewed (as far as Clark was aware) by prior trial counsel. Clark so testified despite the fact that he still had not bothered to review first state post-conviction counsel's investigative file—he again dismissed it as "worthless" (Tr. Oct. 8, 1999 at 65)—even though the file included notes on state post-conviction counsel's interviews of many of the 100 or more witnesses to whom they had spoken (PFR2 Dkt. 21 Ex. 7 at 1–3). And Clark so testified even though his time logs from the day of his appointment to the day prior to the hearing reflected not even one minute spent interviewing any witness.[47] (*See* ROA 414 at 31–49.)

In the two months before trial, long after determining their trial strategy (*see* Tr. Oct. 8, 1999 at 44), Clark and VanDreumel did have the prosecutor set up interviews of several witnesses, including law enforcement personnel and State's experts. Apart from the defense's contact with Imojean Kiles, there is no indication that trial counsel conducted a single interview that was not organized by the prosecutor.[48] Further, trial counsel knew full well that the State planned to call several experts, among them the pathologist who conducted the autopsies of two victims, the blood-spatter expert who had testified during the 1989 trial, and a DNA expert. (*See* ROA 446.) Even so, and despite Kiles's pleas to bring defense experts on board, counsel still declined—based on their previously determined trial strategy—to retain and consult with even one independent expert before trial.[49]

---

[47] Clark also testified that he had reviewed the evidence, read "all of the transcripts," reviewed the "entire appellate file" and made arrangements to have it copied, ordered photographs, reviewed exhibits, requested additional evidence not presented at trial with forensic significance, been to the crime scene, and been to the river bed, "where the bodies were recovered." (Tr. Oct. 8, 1999 at 39–40.) He still did not hint at any expert consultation.

[48] Investigator Mary Meyer had two primary tasks: (1) maintain contact with Imojean Kiles, and (2) unearth background information on other witnesses. Her focus was not on interviewing witnesses.

[49] Clark's reliance on the prosecutor to arrange what little investigation occurred is further cause for alarm. Clark repeatedly cited his friendship with Powell as a virtue in court, and he depended upon Powell and law enforcement to arrange witness interviews and the like. In doing so, Clark butted up against the fundamental

As a result, the defense theory presented at trial for the death of Gunnel was deeply problematic. Counsel conceded that Kiles had killed Gunnel, but argued that he had done so (1) while intoxicated, and (2) in the heat of passion. (*See, e.g.*, Tr. July 10, 2000 at 40 (Clark announcing during opening statement that Kiles struck Gunnel "during the heat of the passion, a heated, ugly fight").) Counsel evidently hoped that intoxication, heat of passion, or the combination of the two would convince the jury to determine that Kiles was guilty not of first-degree murder but instead of a lesser-included offense.

Counsel's focus should have been on undercutting evidence of premeditation. In order to convict Kiles of first-degree murder, the State had to convince the jury that Kiles knowingly killed Gunnel and that he did so with premeditation. Given Kiles's admission that he killed Gunnel, the only real issue was that of premeditation.[50] Importantly, the jury would have had to conclude that Kiles was not guilty of first-degree murder before the jury could even consider any lesser-included offense. (Tr. July 19, 2000 at 95–96.) In other words, if the jury found that the State had proven beyond a reasonable doubt that the killing was premeditated and knowing, then nothing else mattered.

Under Arizona case law, however, intoxication was not a legal defense to first-degree murder as charged in this case (i.e., to premeditation). The Arizona Supreme Court had previously rejected the argument that intoxication could negate either premeditation or the mens rea of "knowingly." *See State v. Rankovich*, 765 P.2d 518, 524 (Ariz. 1988) (holding that a defendant charged with knowingly

---

principle that the purpose of defense counsel is to ensure "a reliable adversarial testing process." *Strickland*, 466 U.S. at 688. Counsel's duty to make that "testing process work in the particular case [is] an obligation that cannot be shirked because of the lawyer's unquestioning confidence in the prosecution." *Elmore*, 661 F.3d at 859 (citation and internal quotation marks omitted).

[50] "Knowingly means that a defendant acted with awareness of the existence of conduct or circumstances constituting an offense." (Tr. July 19, 2000 at 91.) Trial counsel did not attempt to argue that the crime was not "knowingly" committed.

committing first-degree murder was not entitled to a voluntary-intoxication instruction and that "the fact that first-degree murder requires a finding of premeditation has no bearing on this result"). Even while trial counsel argued that the jury could consider intoxication, they acknowledged that it was not on its own a legal defense to the charge of knowing first-degree murder. (Tr. July 18, 2000 at 18 (VanDreumel agreeing with court that "from a legal standpoint intoxication is not or was not at the time a defense to a crime charged as knowingly" and that the jury "will not be instructed" otherwise).) Ultimately, the trial court gave the jury the legal definition of voluntary intoxication, but in accordance with state law did not instruct jurors that intoxication could figure into their determination as to premeditation.[51] (Tr. July 19, 2000 at 92.) Accordingly, the jury had no court-sanctioned mechanism through which to conclude that intoxication affected its decision on first-degree murder.[52] This aspect of counsel's defense was, at best, legally and strategically suspect.

Trial counsel's heat-of-passion argument against premeditation fared no better. Kiles's testimony was the principal evidence of how his fight with Gunnel unfolded and, therefore, of heat of passion. Kiles testified that Gunnel was angry at him for using her food stamps to get drugs and then using the drugs before he returned home; the two were arguing. (Tr. July 17, 2000 at 159.) (In contrast, Kiles's mother had previously suggested that Gunnel had needed the food stamps

[51] This instruction declared to the jury that "[n]o act committed by a person while in the state of voluntary intoxication is less criminal by reason of his having been in such condition." (Tr. July 19, 2000 at 92.)

[52] If counsel were going to argue effectively that intoxication could negate premeditation even without an accompanying jury instruction, that argument required substantial evidentiary support of the sort discussed below. Clark's proffer to the jury that Kiles's "perception [wa]s a little skewed from having imbibed, you know, the cocaine and the alcohol," supported largely by Kiles's own testimony, was far from sufficient. (Tr. July 10, 2000 at 44–45; *see also* ROA 225 Ex. 49 at 1 (juror at 1989 trial noting that lackluster intoxication argument made at first trial was unimpressive in light of jury instructions, but that juror had wanted to know more about how Kiles's cocaine addiction affected him).)

88

1   to buy food for her children. (Tr. July 17, 2000 at 145.)) Kiles continued, "[Gunnel]
2   had pretty much been fighting with me the whole night, pushing on me, pulling—
3   this and that. Then she just slapped me. . . . It was so heated." (Tr. July 17, 2000 at
4   163–64.) "She slapped me. I asked her not to do that. Well, I told her, [d]on't slap
5   me again. More words was exchanged and she slapped me again." (Tr. July 17,
6   2000 at 165.) When asked what happened next, Kiles testified, "I just reached down
7   and grabbed the jack and just swung it." (Tr. July 17, 2000 at 165.)

8       The problem was that, in order for the jurors to determine that the crime
9   occurred in the heat of passion and was therefore not premeditated, counsel needed
10  two things to happen. The jury not only needed to accept as true Kiles's testimony,
11  but also needed to conclude that his testimony was sufficient to establish that he
12  had acted in the heat of passion and to give rise to reasonable doubt regarding
13  premeditation. That counsel failed to corroborate Kiles's testimony was one major
14  hurdle to success. *See Bennett v. Cate*, 407 F. App'x 213, 215 (9th Cir. 2010). That
15  counsel also did little to challenge the State's theory or purported forensic evidence
16  of premeditation practically ensured that this argument would fall flat.

17      Finally, counsel argued that the jury should find that Kiles committed heat-
18  of-passion manslaughter. In order to so find, the jury would have had to find, among
19  other things, that (1) Kiles "acted upon a sudden quarrel or heat of passion," and
20  (2) the quarrel "resulted from adequate provocation by the person who was killed."
21  (Tr. July 19, 2000 at 94.) "Adequate provocation" required "conduct or
22  circumstances sufficient to deprive a reasonable person of self control." (Tr. July
23  19, 2000 at 94.) In arguing that the killing occurred in the heat of passion, counsel
24  were contending to the jury that Gunnel's second slap was adequate provocation
25  that would cause a reasonable person—not Kiles himself, not an intoxicated person,
26  but a reasonable person—to lose control.[53] This is a particularly high hurdle when

27
28  [53] Clark argued in closing that the jury had to consider Kiles's intoxication when
    considering what constituted adequate provocation (Tr. July 19, 2000 at 72), but

89

the jury may have concluded from Imojean Kiles's and others' testimony that Gunnel's anger stemmed from the fact that her food stamps, which she had needed to buy food for her children, had instead been used to purchase drugs for others. In effect, counsel were telling the jury that Gunnel's second slap was provocation enough that it was reasonable to kill her. A jury could easily have found that argument more offensive than persuasive, leaving the defense with no defense at all to first-degree murder.[54]

Trial counsel had scant hope of such success with such a legally flawed and factually dubious strategy. But having settled on that strategy early on, counsel tailored their subsequent investigative decisions to bolster that approach, leaving them—and Kiles—ill-equipped for trial when the time came.

> ## 2. Had trial counsel conducted an adequate investigation, counsel would have been able to develop a persuasive defense strategy.

Instead of embracing a deficient defense strategy early on, trial counsel could have conducted an adequate investigation—one that involved consulting with independent forensic experts, speaking with one or more experts who could have helped explore viable defenses to premeditation, and interviewing witnesses familiar with Kiles's character, history, and addictions. Armed with that information, counsel would then have been able to prepare a legally and factually defensible challenge to the charge of first-degree murder.

Preliminarily, as the Supreme Court has recognized, "[c]riminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence." *Hinton v. Alabama*, 571 U.S. 263,

---

again, that seemed inconsistent with the objective standard laid out in the jury instructions.

[54] Because of the inadequate guilt-phase voir dire, counsel did not know, for example, whether seated jurors had personal and familial experience with domestic-violence incidents or how such jurors might have perceived such an argument. *See* Claim 2, *supra*. In fact, at least one seated juror had personal exposure to a similarly violent homicide before her jury service.

273 (2014). That is particularly true when the State's case features several experts, including forensic experts who would, per the State, explain to the jury "exactly what happened" at the crime scene. (Tr. July 10, 2000 at 19–20); *see Richey*, 498 F.3d at 362 (identifying cases with critical scientific evidence and "wherein lawyers altogether fail to hire an expert" as the "most egregious" of cases); *see also Hinton*, 571 U.S. at 273 (highlighting import of consulting with an adequate expert when forensic evidence was a centerpiece of the State's case). In this case, trial counsel should have consulted with several experts to fulfill counsel's obligation to independently examine the forensic evidence. *Elmore*, 661 F.3d at 859; *Dees v. Caspiri*, 904 F.2d 452, 454 (8th Cir. 1990) (per curiam) ("Considering the importance of the shoe print evidence in this case, counsel had a duty to make a diligent investigation of the forensic evidence and its potential weaknesses."); *see also, e.g.*, 1989 ABA Guideline 11.4.1(D)(7) (requiring independent experts to help with preparation of the defense).

Counsel should have consulted with the following medical and forensic experts:

Pathologist: The State's medical examiner, Dr. Mallon, testified at trial that Gunnel showed evidence of a defensive wound on her forearm. (Tr. July 13, 2000 at 99.) At the defense's prodding, Dr. Mallon further testified that Gunnel must have received that wound early on during the altercation, as she needed to have been conscious to incur a defensive wound. (Tr. July 13, 2000 at 105.) It appeared that defense counsel had accepted that Gunnel had a defensive wound and were trying to spin it as evidence of a serious fight between Gunnel and Kiles—evidence that he acted in the heat of passion. (Tr. July 10, 2000 at 46 (Clark promising the jury "medical testimony" corroborating that there was a fight).) However, that attempted spin made no sense and was thus unreasonable: One person can attack another out of the blue and still cause a defensive wound.

If, instead, counsel had consulted an independent pathologist, that expert

91

would have educated counsel about defensive wounds. *See, e.g.*, *Lindstadt v. Keane*, 239 F.3d 191, 201 (2d Cir. 2001) (criticizing counsel for failing to educate themselves on meaning of physical "evidence" of abuse cited by state expert). Counsel would have learned that, while Gunnel's wound was "consistent with" a defensive wound, that meant only that the possibility that the wound was defensive could not be excluded. There is no way to establish that the wound was in fact a defensive wound. Indeed, as an independent pathologist would have testified, it is eminently possible that Gunnel received the arm wound after she had already died.

Had counsel known that Gunnel's broken forearm was very plausibly not a defensive wound, they could have challenged Dr. Mallon's premise, rather than committing to a bizarre story that the wound was evidence of a fight and emphasizing the aggravating possibility that Gunnel was conscious for that wound. Counsel could have had their expert testify to the facts, as opposed to Dr. Mallon's suppositions. *See Thomas v. Clements*, 789 F.3d 760, 769–71 (7th Cir. 2015) (finding counsel ineffective when decision "[t]o not even contact an expert . . . was to accept [the State's expert's] finding of intentional death without challenge and basically doom the defense's theory of the case"). At the very least, a defense expert could have helped fashion an effective cross-examination, in particular one that highlighted the fact that Dr. Mallon seemed during his 1989 testimony far less certain then he seemed in his 2000 testimony that the wound was defensive in nature. (*Compare* Mallon Tr. Dec. 12, 1989 at 8 (such wounds "can be defensive wounds"), *with* Tr. July 13, 2000 at 105 (agreeing that arm wound was a defensive wound)); *see Lindstadt*, 239 F.3d at 201–02 (deeming counsel ineffective for failing to retain expert or otherwise conduct adequate research to cross-examine State's expert); *see also* 1989 ABA Guideline 11.4.1(D)(7) (instructing counsel on importance of independent experts to help provide "adequate understanding of the prosecution's case").

Blood-spatter expert: State's expert Tom Bevel testified that, among other

92

things, there had been a minimum of 14 blows in the bedroom where the children were killed, their attacker was right-handed, and there was evidence of movement on the bed. (Tr. July 14, 2000 at 16, 19, 23, 27.) The defense embraced his testimony—Clark later hailed Bevel in closing as "the foremost expert" in the field (Tr. July 19, 2000 at 57)—but not because any testimony elicited by the State was helpful to the defense. Instead, trial counsel had Bevel explain to the jury how blood moves and that there was no evidence of coagulation on the bloody shoeprints that appeared to have been made by Kale Johnson's Converse shoes. (Tr. July 14, 2000 at 40–44.) The lack of evidence of coagulation meant that the blood was "[f]resher" when stepped in (Tr. July 14, 2000 at 43–44), suggesting that Johnson was at Gunnel's apartment closer in time to the killings than he had admitted. In response to a jury question, not one from the defense, Bevel testified that the most "primitive stages" of coagulation are visible approximately 30 minutes after the blood is released. (Tr. July 14, 2000 at 54.)

Even though counsel sought some helpful testimony from Bevel, that did not obviate their duty to independently investigate his work. They could well have hired an independent expert in blood-spatter analysis, such as Peter Barnett, to describe blood movement and coagulation for the jury. (*See, e.g.*, ROA 225 Ex. 59; ROA 1189 at 32–35.) Moreover, the need for due diligence on Bevel's work was heightened because of his checkered history: his testimony in other cases has come into question for its unreliability or indefensibility. *See Rivas v. Fischer*, 780 F.3d 529 (2d Cir. 2015) (concluding counsel's conduct in failing to investigate medical examiner's qualifications and background was deficient).

Indeed, an independent expert could have informed counsel that Bevel's conclusions were incorrect on several fronts. First, Bevel's claim that he could count the minimum number of blows in an area was unfounded. (*See* Tr. July 14, 2000 at 9.) As a different expert could have explained to trial counsel—and as was well known by 2000—a separate blow or impact is not needed to produce each

93

castoff pattern; a separate movement of the instrument carrying blood (even if it does not strike anything) is sufficient. In other words, the number of castoff patterns reflects the number of swings of the instrument, not the number of times it hit anything. (*See* ROA 225 Ex. 79 at 4 (noting that castoff "comes off a bloody object as it is swung"); *see also* ROA 1189 at 35.) Second, Bevel erred in saying that the rightward arcing pattern of the blood stains indicated a right-handed assailant. (*See* Tr. July 14, 2000 at 19.) Instead, all that the pattern meant was that the *swing* was to the right, which can be achieved with the right hand, with both hands, or with the left hand. Nothing could be concluded about handedness. Third, normal clotting time for blood that has left the body is five to eight minutes, not the 30 minutes posited by Bevel. (*See* Tr. July 14, 2000 at 54.) Finally, Bevel appeared to assume that all of the blood spatter on the walls occurred during the attack; however, it is possible that some of the spatter happened afterward, for example when the bodies were moved.

Trial counsel were on notice of the need for independent evaluation, not only because of the State's heavy reliance on Bevel's testimony, but because the first state post-conviction counsel had asserted that 1989 trial counsel were ineffective for not challenging that same testimony from Bevel. (*See* ROA 225 at 37–41); *see also, e.g.*, *Elmore*, 661 F.3d at 786 (admonishing defense counsel for "blind acceptance of the State's forensic evidence"). With testimony from an independent expert, counsel could have conveyed the information about blood spatter and bloody shoeprints that they wanted to highlight, along with the useful detail that coagulation occurs even faster than Bevel had suggested. That testimony would have undercut Kale Johnson's testimony and, by extension, bolstered Kiles's credibility—both that he was not responsible for the children's death and more generally, including his description of not premeditating Gunnel's death. Counsel could further have elicited expert testimony (1) on the fact that the blood spatter and castoff in the living room was near the ground, suggesting that Gunnel was not

standing for any blow that produced spatter,[55] and (2) that the blood stain in the chair was consistent with the blood source—presumably Gunnel's head injury—being low to the chair cushion.[56] Those tidbits would have provided key corroboration for Kiles's testimony that Gunnel fell into the chair after a single blow and, in turn, for his lack of premeditation. (Tr. July 17, 2000 at 165–66.) Anything—especially expert testimony—that corroborated Kiles's testimony would have buttressed the defense as a whole. *See, e.g.*, *Cunningham v. Wong*, 704 F.3d 1143, 1168 (9th Cir. 2013) (Pregerson, J., concurring in part and dissenting in part) (recognizing that "[a]n expert opinion is one from an objective third party that carries an aura of special reliability and trustworthiness," while a defendant's testimony "may be viewed by the jury as a desperate attempt to save himself" (internal quotation marks omitted)).

Finally, counsel could further have damaged the credibility of a crucial State witness through an effective cross-examination on Bevel's work in other cases, as well as on how Bevel counted his minimum number of blows and determined handedness. *See Dugas*, 428 F.3d at 331–32 (counsel deficient for failing to consult expert or research science sufficiently to challenge State's expert witnesses). That the jurors asked questions on Bevel's testimony reflected its import to them, and counsel's failure to consult an expert about blood-stain analysis before trial meant that they missed crucial opportunities to advance their case. (*See* Tr. July 14, 2000 at 54); *see also, e.g.*, *Bennett*, 407 F. App'x at 215 ("The jury asked questions . . . that revealed the critical importance of the blood evidence.").

Crime-scene management expert: Yuma law enforcement officers, including Rodgers, testified that a number of items of forensic interest had not been tested,

---

[55] The first blow to a victim does not produce spatter. (Tr. July 14, 2000 at 26.)

[56] Bevel testified to these two points in 2006, during the State's aggravation-phase direct examination. (Tr. Mar. 27, 2006 at 65–66, 71.) With proper preparation and the aid of a defense expert, trial counsel could have brought out this corroborative information at the guilt-phase proceedings.

including latent prints lifted from surfaces in the apartment, a bloody fingerprint from the living room door, and blood on a pillow found in the east bedroom. (*See, e.g.*, Tr. July 17, 2000 at 29, 63–64.) Rodgers further testified that photographs had not been taken of tire tracks and shoeprints found near the river, even though the tire tracks appeared similar to those from Kiles's car and the shoeprints resembled Kale Johnson's shoeprints. (Tr. July 17, 2000 at 92–95.) Analysis of such items could have helped corroborate the defense on important points, including that (1) the fingerprint on the door and the blood on the pillow may have belonged to someone other than Gunnel, leaving no forensic indication that she was conscious after the initial blow, and (2) Johnson's shoeprints were at the likely disposal site for the children's bodies (and therefore that Johnson was lying during his testimony). Counsel clearly recognized the importance of these matters—they requested a *Willits* instruction allowing the jury to draw an adverse inference from the police's failure to preserve evidence. (Tr. July 18, 2000 at 21; ROA 489 at 4.) Even the jury's interest was piqued, as illustrated by the question submitted by the jury to Rodgers about the failure to analyze latent prints. (Tr. July 17, 2000 at 108.)

Had defense counsel consulted with an expert in crime-scene investigation, that expert would have informed them as to whether the Yuma Police Department's decisions regarding what to test and what not to test were reasonable or whether to request testing of additional items. *See Lindstadt*, 239 F.3d at 201–02. An expert would also have helped counsel develop effective cross-examinations on the reasonableness of law enforcement's decisions, as well as about the nature and magnitude of the problems created for investigators by a compromised crime scene. With such information in hand, counsel might well have been able to convey that the attack against Gunnel had not started in the bedroom and that she had not left a fingerprint on the door after being hit—both support for Kiles's testimony. *See, e.g.*, *Cunningham*, 704 F.3d at 1168 (Pregerson, J., concurring in part and dissenting in part). Counsel could also have more conclusively established that Johnson's

1    shoeprints were at the disposal site, which would have further undercut Johnson's
2    credibility and bolstered Kiles's.

3        If counsel had consulted with such experts as a pathologist, blood-spatter
4    expert, and crime-scene management expert, counsel would have been far better
5    equipped to start making certain strategy decisions.[57] But, because their
6    "investigation into the State's forensic evidence never started, there could be no
7    reasonable strategic decision either to stop the investigation or to forgo use of the
8    evidence that the investigation would have uncovered." *Elmore*, 661 F.3d at 864.

9        Likewise, counsel should have consulted with appropriate experts before
10   declining to pursue the impulsivity defense recognized by *State v. Christensen*, 628
11   P.2d 580 (Ariz. 1981). *See, e.g.*, *Bemore*, 788 F.3d at 1165 (deeming counsel
12   ineffective when "a potentially viable alternative defense" was available but not
13   explored); *Phillips*, 267 F.3d at 976; *Sowell v. Anderson*, 663 F.3d 783, 790–91 (6th
14   Cir. 2011) (counsel did not make a reasonable choice among alternative strategies
15   when choice stemmed from ignorance about evidence); *see also Wiggins*, 539 U.S.
16   at 521. In *Christensen*, the Arizona Supreme Court held that a tendency to act
17   impulsively can negate premeditation: "The establishment of the character trait of
18   acting without reflection tends to establish that appellant acted impulsively. From
19   such a fact, the jury could have concluded that he did not premeditate the homicide."
20   628 P.2d at 583. While an expert could not testify to the ultimate jury question

21

22   [57] Counsel should also have consulted with a DNA expert or other appropriate
23   experts before deciding not to challenge the State's evidence regarding Shemaeah's
     death. (*See* ROA 1189 at 36.) This is especially true given Dr. Wiltbank's improper
24   use of statistics in his testimony. *See* Nat'l Institute of Justice, *DNA for the Defense*
     *Bar*, June 2012, at 34 ("Consulting is invaluable in DNA cases and can assist
25   counsel in understanding all of the issues. . . . Typically, the question in a DNA case
26   is not 'Do I need an expert?' but rather 'What kind of expert do I need?'. . . . If the
     statistics are questionable or flawed, a statistician or population geneticist is a much
27   better choice. . . ."). While Kiles is not presently challenging his conviction for
     Shemaeah's death, the defense's failure to investigate before making this decision
28   confirms the broader failure to investigate.

1   whether the defendant was acting reflexively at the time of the killing, the expert

2   could testify to a defendant's tendency to act reflexively and the bases of such an

3   opinion. *Id.* at 582–84. Counsel were well aware of the *Christensen* defense and its

4   potential applicability to Kiles's case, as first state post-conviction counsel had

5   successfully asserted that 1989 trial counsel was ineffective for failing to investigate

6   and present the defense.[58] (ROA 225 at 1–2, 66); *see also Bemore*, 788 F.3d at

7   1165–66 (noting that counsel was on notice of the defense he ineffectively failed to

8   investigate). And, as the only viable way to counter the first-degree murder charge

9   was to undercut the case for premeditation, counsel should not have discounted so

10  lightly a defense to premeditation that had been espoused by Arizona courts.

11       To adequately investigate the applicability of the *Christensen* defense,

12  counsel should have spoken to at least some of the following experts:

13       <u>Psychiatrist and/or psychologist</u>: As psychiatrist and neurologist Dr. Globus

14  demonstrated at the 1996 state post-conviction hearing and again during the 2006

15  penalty phase, a psychiatrist or psychologist would have helped defense counsel

16  understand impulsivity and how it plays out in real-life situations. (*See* Tr. Feb. 21,

17  1996 at 167–21; Tr. May 8, 2006 at 3–51.) Had counsel consulted a psychiatrist or

18  psychologist, that person would have explained that impulsivity is a "term of art"

19  meaning a "behavior or more often a whole series of behaviors that are performed

20  in a semi-automatic way without evaluating the goals . . . or assessing the

21  consequences of the behavior." (Tr. May 8, 2006 at 33.) It is not the case that an

22  impulsive person can *never* consider consequences—that would involve complete

23  ablation of the frontal lobe—but only that such a person's ability to consider

---

25  [58] Counsel's failures in this aspect are even more pronounced because Clark and
26  VanDreumel believed that the crime was caused by Kiles's impulsivity, as counsel
    latched onto his impulsivity as mitigation shortly after the guilt-phase proceedings
27  and made impulsivity a central theme of the 2006 mitigation case. (*See, e.g.*, ROA
    509 Ex. A at 1; Tr. Apr. 25, 2006 at 101 (Dr. Globus testifying that homicides were,
28  to a reasonable degree of medical certainty, attributable to Kiles's impulsivity, over
    which he had no control).)

1  consequences is significantly impaired. An impulsive person might do something,
2  or even a sequence of things, without thinking, especially when impaired.[59] (*See*
3  Apr. 25, 2006 at 99–100.) He might also do something impulsively, again without
4  thinking, and regret it immediately *afterward* or even take steps to mitigate his
5  actions. (*See* Tr. Feb. 21, 1996 at 220.) Even acts that do not on their face seem
6  impulsive may in fact be done without any thought as to consequence. (Tr. May 8,
7  2006 at 36–37 (Dr. Globus explaining why Kiles's involvement in a 1984 fight
8  might well have been impulsive, even though Kiles claimed he "sat down and
9  thought" before assaulting the other individual).) The operative issue is whether the
10 person considered the consequences of his actions before acting. (Tr. May 8, 2006
11 at 36.)

12      Moreover, an expert could have informed trial counsel of some of the major
13 causes of impulsivity, such as brain damage (including damage due to in utero
14 exposure to toxins), mental illness that interferes with someone's ability to
15 understand his surroundings, and intoxication. (Tr. Feb. 21, 1996 at 177, 192; Tr.
16 May 8, 2006 at 33–34.)

17      A psychiatrist or psychologist could, relatedly, have reviewed Kiles's
18 personal history and his family history—including his sister's and parents' own
19 struggles with impulsivity[60]—and interviewed him to assess whether he had a
20 tendency toward impulsivity. (*See* ROA 225 Ex. 60.) By reviewing Kiles's personal
21 history, an expert would have seen that Kiles suffered from all of the major causes
22 of impulsivity and that his behavior over many years reflected that impulsive nature.

23 _____

24 [59] According to Dr. Globus, in response to an environmental stimulus, "like being
25 struck . . . instead of going through the process of thinking about the consequences
   of behavior, [an impulsive person] go[es] directly to the behavior. So there's no
26 imposition of thinking between the impulse . . . and the behavior." (Tr. May 8, 2006
   at 34–35.)

27 [60] For example, Kiles's sister, Janell Hawkins, suffered from kleptomania (*cf., e.g.*,
28 Tr. Feb. 21, 1996 at 185; ROA 225 Ex. 36 at 23–24, 34–35, 42–43), evidencing her
   struggles with impulsivity (Tr. May 9, 2006 at 38-39).

99

1    (*See* ROA 225 Ex. 60 at 26–37.)

2         With that background, counsel would have understood how to educate the

3    jury about Kiles's seemingly lifelong impulsivity, as they did at the mitigation

4    phase through Dr. Globus's testimony. Such evidence would have been pivotal to

5    counsel in trying to determine an appropriate guilt-phase strategy.

6         <u>Neuropsychologist and/or neuroimaging specialist</u>: Trial counsel should

7    further have consulted with a neuropsychologist and/or a neuroimaging specialist

8    prior to settling on their defense strategy. *See Bemore*, 788 F.3d at 1165–66;

9    *Phillips*, 267 F.3d at 976–80. Impulsivity is a result of brain dysfunction generally

10   attributable to some combination of brain damage, mental illness, childhood

11   trauma, and substance abuse. Accordingly, counsel should have sought out

12   neuropsychological testing and neuroimaging to learn whether Kiles had

13   demonstrable deficits of the sort associated with impulsivity and its underlying

14   causes. Indeed, later neuropsychological, especially executive-function, testing

15   revealed "clear indications . . . of impulsivity and difficulties with self-regulation,"

16   which became even more apparent when considered in the context of Kiles's

17   history.[61] (PFR2 Dkt. 27 Ex. 24 at 1.) In that testing, neuropsychologist John Toma,

18   Ph.D., repeatedly highlighted Kiles's impulsivity (*see, e.g.*, PFR2 Dkt. 27 Ex. 24 at

19   2), and he diagnosed Kiles with a disorder defined in large part by that impulsivity

20   (PFR2 Dkt. 27 Ex. 24 at 2). Similarly, had trial counsel obtained brain imaging and

21   consulted a neuroimaging expert (for example, a radiologist), counsel would have

22   learned that Kiles had brain damage, including a reduced-size corpus callosum and

23   damage to the frontal lobe, that was observable on brain scans. (*See* PFR2 Dkt. 28

24   Ex. 25 at 7 (expert during second state post-conviction proceedings discussing

25   Kiles's brain abnormalities and damage observable on images).) Both forms of

26   brain damage are causally related to impulsivity. (*See, e.g.*, Tr. May 8, 2006 at 33–

27   

28   [61] Kiles has also been diagnosed with Attention Deficit Hyperactivity Disorder, an
     impulse-control related disorder. (Tr. May 9, 2006 at 41, 64.)

34.)

If counsel had armed themselves with such information, they would have understood that they could (1) contend persuasively that Kiles had an impulsive nature, and, as importantly, (2) ground that information in neuropsychological and neuroimaging evidence to make clear that impulsivity is not simply a bad personality trait, but the result of brain dysfunction. Expert consultations would have painted for counsel a picture of an individual whose brain did not work the same way a "normal" adult brain is expected to work. Counsel, in turn, could have painted that picture for the jury to help demonstrate why Kiles did not premeditate the killing of Gunnel. Counsel had a duty to obtain such information before deciding strategy. *See Bemore*, 788 F.3d at 1165–66, *Phillips*, 267 F.3d at 976–80.

<u>Pharmacologist or neurotoxicologist</u>: Additionally, counsel should have consulted with a pharmacologist, neurotoxicologist, or similar individual with expertise in the effect on the brain of drugs and alcohol. Counsel were on notice of Kiles's alcoholism, cocaine addiction, and related issues, as well as of his familial history of alcoholism and other addictions. (*See, e.g.*, Tr. Feb. 21, 1996 at 178–86.) Indeed, counsel made a feeble attempt to communicate Kiles's drug use to the jury and to use that as evidence of a lack of premeditation. (*See, e.g.*, Tr. July 10, 2000 at 44 (Clark setting forth in opening that "Alvie by this time has had a little bit to drink, he's had a lot of drugs to do.").)

Still, in order to fulfill the obligation to investigate, counsel should have consulted a pharmacologist or comparable expert. *See Bemore*, 788 F.3d at 1165–66, *Phillips*, 267 F.3d at 976–80. Such an expert could have explained the effects of long-term addiction on the brain and on an individual's thought processes. That sort of expertise is particularly useful in a case like this, where counsel needed to understand the interplay of numerous substances, including alcohol. In fact, if provided with an adequate social history, a pharmacologist would have offered that Kiles was in a drug-induced psychosis at the time of the crime. (PFR2 Dkt. 28 Ex.

101

25 at 5.) Because of the extent to which that psychosis disordered Kiles's thought processes, Kiles was experiencing severe paranoid delusions, impaired judgment, and impaired mental flexibility when he killed Gunnel. (PFR2 Dkt. 28 Ex. 25 at 5.) Counsel tendered to the jury only meager evidence of drug use, primarily through Kiles's own testimony. Instead, counsel could have had an expert present a compelling explanation of what was happening inside Kiles's head at the time. Such evidence would have supported the idea that Kiles was acting impulsively and without premeditation at the time of the crime and, accordingly, was crucial for counsel to know before adopting a strategy.[62]

Beyond speaking with experts, counsel had a duty to interview lay witnesses who could have enlightened counsel on issues bearing on premeditation, including Kiles's impulsivity, the causes of his impulsivity, and the debilitating extent of his addictions. *See Cannedy*, 706 F.3d at 1161 (counsel deficient for failing to interview potentially favorable witness "when that witness had been clearly identified, . . . was easily accessible[,] and [was] willing to provide information"); *see also* 1989 ABA Guideline 11.4.1(D)(3) (instructing counsel to interview potential witnesses regarding "aspects of the client's life history that might affect the likelihood that the client committed the charged offense(s)" (i.e., premeditated murder)). While counsel had access to a great deal of this information from earlier proceedings, nothing that counsel did reflects that they made use of—or even that they reviewed—the relevant affidavits and expert reports discussing Kiles's impulsivity or addictions before Clark committed to his defense approach. (*See* Tr. Aug. 6, 1999 at 31–33.) That noted, as part of a reasonable investigation preceding that decision,

---

[62] Such information about the effects of addiction was critical even to the intoxication defense that trial counsel ultimately presented, as presumably only powerful evidence of the effects of intoxication could have convinced jurors to take intoxication into account when assessing premeditation. Instead, counsel offered the jury some paltry evidence of Kiles's drug use and none at all of the effects of his addictions on his thinking or his ability to premeditate.

102

1  defense counsel should have tried to speak to at least some of the following
2  witnesses:

3      <u>Witnesses regarding impulsivity</u>: Numerous people who knew Kiles
4  throughout his life could have provided trial counsel with information that bore
5  upon his impulsive nature and/or the causes of such impulsivity. For example,
6  Kiles's sister Janell Hawkins could have informed counsel of Kiles's history of
7  childhood trauma and physical abuse—terrors of the sort that lead to mental
8  illness—as well as the familial history of addiction, including her own. (*See* ROA
9  225 Ex. 39.) As noted earlier, such problems are known causes of the brain
10 dysfunction associated with impulsivity. Janell Hawkins could also have spoken of
11 her own problems with shoplifting (*see, e.g.*, ROA 225 Ex. 39 at 5, 7), reflecting an
12 issue with impulsivity that mirrored Kiles's.

13     Imojean Kiles could have told counsel about any number of aspects of Kiles's
14 childhood, including the head trauma he suffered when struck by a car at age five—
15 childhood traumatic brain injury is a major causal factor in producing impulse-
16 control disorders—and the violence he endured at his father's hands.[63] (*See, e.g.*,
17 ROA 225 Ex. 37.) Again, brain damage and mental illness stemming from
18 childhood trauma can cause impulsivity.

19     Similarly, Kiles's aunt, Darnella Long, among numerous other relatives,
20 could have spoken to the trauma Kiles endured as a child and the severe dysfunction
21 of the Kiles family. (*See* ROA 225 Ex. 54 at 5.) Moreover, Kiles's associates from
22 around the time of the crime and the years before, including Griffen Lewis, Jimmy
23 Gilmore, and Virgil Schultz, would have been able to tell counsel that Kiles was
24 short-fused and would have been able to provide anecdotes about his outbursts.
25 (*See, e.g.*, ROA 225 Ex. 44 at 1; ROA 225 Ex. 46 at 1.) Such behavior is strongly
26 associated with impulsivity. (PFR2 Dkt. 27 Ex. 24 at 3.)

27
28 [63] While counsel spoke to Imojean Kiles before guilt-phase proceedings, there is
nothing to indicate that the discussion covered the types of matters noted above.

103

Accordingly, these witnesses could have provided useful social-history context for experts in diagnosing Kiles's impulsivity and its causes and for counsel in determining whether and how to present that information to the jury. *See Bemore*, 788 F.3d at 1164–66 (counsel ineffective for failing to explore viable mental-health defense, including by investigating statements from friends and family that should have put counsel on notice of possible defense).

<u>Witnesses regarding Kiles's addictions</u>: Any number of people who knew Kiles in the years, and particularly in the weeks, around the time of the crime could have furnished useful information to counsel about Kiles's addictions and their effects on his thinking. For example, Kiles's associates, such as John Hendrix, Jr., Griffen Lewis, Virgil Schultz, and Walter "Pierre" Hogan, could have conveyed just how terribly Kiles's drug usage had disordered his thinking around the time of the crime. According to Hendrix, "Alvie was completely out of it. He acted crazy. He was really high on some kind of drug. . . . [He] was rambling and making little sense. . . . He seemed deranged." (ROA 225 Ex. 41 at 1.) Lewis, who had seen Kiles's addictions worsen over time, described Kiles as being around the time of the crime "as deep into drugs as [Lewis] had ever seen him." (ROA 225 Ex. 44 at 1.) Schultz noted that on February 10, 1989, Kiles was "strung out. . . . Alvie was acting very crazy. He was coming off the wall." (ROA 225 Ex. 46 at 1.) Schultz had to leave Kiles because of how "high and out of control" Kiles was that day. (ROA 225 Ex. 46 at 1.) Even some of Kiles's friends and colleagues from the Air Force had valuable information on the progression of Kiles's alcoholism. (*See, e.g.*, ROA 225 Ex. 58 at 1 (noting that while in the Air Force, Kiles started drinking "more and more," to the point that "he couldn't lift his head off the bed" and "started having blackouts").)

Witnesses such as Kiles's probation officer, Ramon Mendoza, and the Yuma County Adult Detention Center nursing director at the time of Kiles's arrest, Linda

104

1    Rautenberg, had similarly useful information.[64] (*See, e.g.*, ROA 225 Ex. 48 at 2

2    (noting that when Kiles was arrested, he weighed a measly 147.5 pounds); *see also*

3    2006 Trial Ex. 169 at 2 (Mendoza reporting that just after arrest, Kiles had said he

4    was on crack cocaine, alcohol, and heroin at the time of the offense).) And counsel

5    should certainly have interviewed Janell Hawkins to appreciate fully how poorly

6    Kiles was functioning at the time of the crime. As she had previously stated, "I

7    know better than anyone what drugs do to Alvie and me. It makes us crazy." (ROA

8    225 Ex. 39 at 8.) As sustained alcohol and drug use both causes and exacerbates

9    impulsivity, such information was important for counsel to know when evaluating

10   the viability of the impulsivity defense. *See Bemore*, 788 F.3d at 1164-66.

11   　　　The fact that many of these witnesses spoke to first state post-conviction

12   counsel and were willing to provide affidavits suggests that (1) the witnesses could

13   be located, and (2) attempts to speak with them would have been fruitful. (*See, e.g.*,

14   ROA 225 Ex. 39 at 8.) But counsel appears to not have interviewed any lay witness,

15   save some witnesses noticed by the State.[65] (*See* ROA 446 at 1–2.)

16   　　　Finally, as part of a reasonable investigation, counsel should have made use

17   of the two resources most easily available to them: previously collected records and

18   their own client. First state post-conviction counsel had collected myriad records

19   and materials concerning Kiles and his family, many of which had information

20   relevant to an impulsivity defense. (*See, e.g.*, ROA 225 Ex. 5; ROA 225 Ex. 36.)

21   Once again, it does not appear that counsel were aware of the contents of the vast

22   majority of these records and accordingly performed deficiently. *See Rompilla*, 545

23

24   _____

25   [64] Kiles also told Mendoza shortly after being arrested that he had not killed the
     children, so Mendoza's testimony would have been useful on multiple fronts. (*See*
26   2006 Trial Ex. 169 at 2.)

27   [65] Counsel also should have interviewed witnesses, like Louie Gomez, who could
     have corroborated Kiles's testimony that he was in Gunnel's apartment with two
28   other men. Clark was notified well before trial that Gomez had relevant
     information.

U.S. at 383–84 (counsel deficient for failure to review easily accessible known to have critical information); *Bemore*, 788 F.3d at 1165–66 (counsel deficient for failing to investigate readily available evidence). Additionally, nobody had more information pertaining to the crime, the days around the time of the crime, and possible defenses than Kiles himself. As discussed in detail previously, counsel did not develop a relationship with the client that was adequate to ensure that Kiles was willing and able to communicate with them. *See* Claim 1, *supra.* Because of that and counsel's lack of interest in Kiles's thoughts, counsel were unable to avail themselves of the beneficial information they had in determining strategy. *See United States v. Tucker*, 716 F.2d 576, 582 (9th Cir. 1983) ("Adequate consultation between attorney and client is an essential element of competent representation of a criminal defendant. . . . While the amount of consultation will depend on the facts of each case, the consultation should be sufficient to determine all legally relevant information known to the defendant."); *see also, e.g.*, *Correll v. Ryan*, 539 F.3d 938, 943 (9th Cir. 2008); 1989 ABA Guideline 11.4.1(D)(2) (requiring counsel to seek information from client regarding events giving rise to charges, as well as regarding client's mental state).

In sum, counsel failed to conduct an adequate investigation before making strategy decisions for Kiles's guilt-phase proceedings. Accordingly, counsel's decisions were uninformed, unreasoned, and unworthy of any sort of deference. *See Wiggins*, 539 U.S. at 521; *Bemore*, 788 F.3d at 1162–69. Even if counsel's strategy was reasonable in the abstract, "it was not reasonable in this case because counsel were not fully aware of their options." *Sowell*, 663 F.3d at 794. That counsel's strategy—to try to establish intoxication and heat-of-passion manslaughter in the death of Gunnel—was legally and factually not viable only emphasizes the unreasonableness of counsel's actions.

If counsel had instead conducted a constitutionally adequate investigation, they would have had access to a wealth of information regarding the accuracy of

1  the State's forensic evidence and the applicability of a court-approved alternative

2  defense to premeditation. With such information in hand, counsel could have made

3  an informed and reasoned decision as to when to discontinue their investigation and

4  as to which defense to pursue at trial. *See Wiggins*, 539 U.S. at 521. But counsel did

5  not do so, and the fact that counsel may have performed capably at some points

6  during trial does not excuse their foundational failure to investigate. *See Rogers v.*

7  *Israel*, 746 F.2d 1288, 1295 n.5 (7th Cir. 1984) ("The fact that trial counsel's

8  performance was otherwise admirable would not excuse the failure to conduct a

9  proper investigation."); *see also Moore v. United States*, 432 F.2d 730, 739 (3d Cir.

10  1970 (en banc); ABA Defense Standard 4-4.1 cmt. ("The effectiveness of advocacy

11  is not to be measured solely by what the lawyer does at the trial; without careful

12  preparation, the lawyer cannot fulfill the advocate's role."). Here, counsel failed to

13  conduct a reasonable investigation and, as a consequence of that abridged

14  investigation, adopted a faulty strategy. Counsel thus performed deficiently under

15  *Strickland*.

16        **3.      Trial counsel's deficient performance prejudiced Kiles.**

17        As discussed previously, defense counsel went into trial equipped with at

18  best a half-baked defense against the charge of first-degree murder for the death of

19  Gunnel. Nearly the only evidence proffered by the defense regarding Gunnel's

20  death was Kiles's testimony—everything hinged on whether the jury found his

21  account credible.[66] Practically speaking, the jury not only needed to believe Kiles,

22  but also needed to find that his account gave rise to reasonable doubt as to

23  premeditation.[67] For that, counsel sought to rely on evidence of intoxication and

---

[66] As a further consequence of this reliance on Kiles's testimony alone, nearly all of the trial testimony focused on the deaths of Shemaeah and LeCresha. That the defense spent relatively little time on Gunnel's death likely made it seem to jurors as though defense counsel recognized the uphill battle they faced on the resultant charge.

[67] While the burden of proof for premeditation remained on the State, the fact that Kiles testified that he killed Gunnel by beating her with a tire jack effectively meant

1    heat of passion. But, while other witnesses mentioned Kiles's drug use (*see, e.g.*,

2    Tr. July 12, 2000 at 200–01; Tr. July 13, 2000 at 61), only Kiles testified about his

3    drug use on the day of the crime (*see* Tr. July 17, 2000 at 157–58, 177, 209). And

4    even he hardly alluded to the effects of that drug use—that is, to why his drug use

5    scrambled his thinking and, relatedly, his ability to premeditate. (*See generally* Tr.

6    July 17, 2000 at 151–222.) Similarly, Kiles's testimony offered little basis for the

7    jury to understand why Gunnel's actions—just two slaps—roiled Kiles so much

8    that he grabbed the tire jack in a heat of passion and reacted without thinking. (*See*

9    *generally* Tr. July 17, 2000 at 151–222.)

10          Trial counsel were thus asking the jury to believe Kiles and to find that there

11   was no premeditation despite having presented no evidence explaining *why* Kiles's

12   addictions might have affected his ability to premeditate or *why* he was in such a

13   heat of passion that he did not premeditate. Counsel were further doing so despite

14   the fact that Kiles, as the State pointed out, was not entitled under state law to have

15   the court instruct the jury that voluntary intoxication could negate premeditation.[68]

16   *See Rankovich*, 765 P.2d at 524. As a result, the jury had little reason to conclude

17   that the State had not proven premeditation beyond a reasonable doubt. That, in

18   combination with Kiles's testimony that he killed Gunnel, led directly to the first-

19   degree murder conviction. *See Yun Hseng Liao v. Junious*, 817 F.3d 678, 694 (9th

20   Cir. 2016) ("[O]ur precedent recognizes that prejudice is established when . . .

21   counsel's error left the defense with weaknesses that were exploited by the

22   prosecution." (internal quotation marks omitted).)

23          If counsel had conducted an adequate investigation, however, the defense

24   could have taken on an entirely different hue. Counsel could have submitted to the

25   _____

26   that the defense needed to undercut the State's proffered evidence of premeditation
     to avoid the first-degree murder conviction.

27   [68] Powell announced during the State's closing that "[a]nything about intoxication
     does not apply when you consider first-degree murder. That is all there is to it. . . .
28   That's the law." (Tr. July 19, 2000 at 42.)

1    jury that Kiles had an impulsive nature due to brain dysfunction, *see Christensen*,
2    628 P.2d at 582–84, which was partly due to and partly exacerbated by his
3    addictions. Instead of gambling entirely on Kiles's ability to persuade the jury,
4    counsel could have offered a psychiatrist or psychologist to explain the nature of
5    Kiles's impulsivity and how his thought processes were consequently impaired. *See*
6    *id.* (allowing expert testimony to explain a defendant's impulsive nature); (*see also,*
7    *e.g.*, Tr. Feb. 21, 1996 at 167–21; Tr. May 8, 2006 at 33–34). Counsel could have
8    presented a neuropsychologist and a neuroimaging expert to show to the jury that
9    Kiles had demonstrable markers of brain damage, trauma, and other known causes
10   of impulsivity, as well as that his performance on testing made clear his struggles
11   with impulsivity. (*See, e.g.*, PFR2 Dkt. 27 Ex. 24 at 1–2; PFR2 Dkt. 28 Ex. 25 at
12   7.) In addition, counsel could have had a pharmacologist or comparable expert lay
13   out for the jury the effect of Kiles's addictions on his tendency toward impulsivity
14   and thought processes around the time of the crime. (*See, e.g.*, PFR2 Dkt. 28 Ex. 25
15   at 5.) Lay-witness testimony could have corroborated that expert testimony about
16   Kiles's impulsivity, its causes, and its effects. (*See, e.g.*, ROA 225 Ex. 44 at 1; ROA
17   225 Ex. 46 at 1.)

18        While an impulsivity defense could have opened the door for the State to
19   introduce parts of Kiles's criminal history, even such testimony could have been
20   used by the defense to further illustrate Kiles's impulsivity. Indeed, much of Kiles's
21   criminal history is proof of his impulsive nature. (*See, e.g.*, PFR2 Dkt. 27 Ex. 24 at
22   1–2.) Further, such evidence would have given Kiles's experts an opportunity to
23   explain that even actions that superficially seem reflective may well be impulsive
24   and done without prior thought to consequences.[69] (Tr. May 8, 2006 at 36–37 (Dr.
25   Globus detailing how Kiles's actions in a 1984 fight might well have been

---

26   [69] Any argument that opening the door to Kiles's criminal history would have
27   increased the likelihood of conviction in Gunnel's death falls flat, given that Kiles
     testified that he was responsible for her death and had no chance of escaping a
28   conviction.

1  impulsive, even though Kiles claimed he "sat down and thought" before responding

2  to assault against him).)

3        Overall, then, defense experts on impulsivity, corroborated appropriately by

4  lay witnesses, would have given the jurors what they were missing: a compelling

5  explanation as to *why* Kiles's actions were, given his nature, inconsistent with

6  premeditation.

7        An even minimally adequate investigation would also have allowed defense

8  counsel to confront head-on critical aspects of the State's forensic case. Had counsel

9  retained a pathologist, they could have persuasively challenged the State's claim

10 that the assault against Gunnel was prolonged—and thus more likely

11 premeditated—because Gunnel had a defensive wound. Through a blood-spatter

12 expert, counsel could have conveyed to the jury that the forensic evidence strongly

13 indicated that Gunnel quickly went down once attacked, as well as that several of

14 Tom Bevel's key conclusions were unsound. (*See* ROA 225 Ex. 79 at 4.) In so

15 doing, defense counsel could have decimated the testimony of an expert whom the

16 State lionized as a centerpiece of its case. Finally, a crime-scene management expert

17 could have helped trial counsel attack the reasonableness of key aspects of the

18 crime-scene investigation. Such information both would have given the jury reason

19 to view the State's evidence with great skepticism and would have highlighted the

20 absence of reliable physical evidence of premeditation. *See Elmore*, 661 F.3d at 870

21 ("With investigation, the jury undeniably would have seen a drastically different—

22 and significantly weaker—prosecution case.").

23       Critically, an adequate investigation would have allowed counsel to present

24 evidence that both corroborated and provided critical context for Kiles's testimony.

25 The Ninth Circuit has repeatedly found that the failure to corroborate the

26 defendant's testimony, when possible to do so, is prejudicial. For example, in *Riley*

27 *v. Payne*, counsel was ineffective for failing to call a witness who could have

28 corroborated portions of the defendant's account of self defense. 352 F.3d 1313,

1319–20 (9th Cir. 2003) (finding prejudice when the witness's "testimony would have been consistent with [the defendant's] account and would have created more equilibrium in the evidence presented to the jury" (internal quotation marks omitted).). Similarly, the court found *Strickland* prejudice in *Brown v. Myers*, when counsel neglected to have several witnesses testify who could have "buttressed [the defendant's] account on [a] crucial point." 137 F.3d 1154, 1157–58 (9th Cir. 1998); *see also, e.g.*, *Bennett*, 407 F. App'x at 215 ("Because [the defendant] took the stand, it was critical to have any objective physical and forensic evidence to support his version."). Accordingly, while Kiles's testimony would still have been the linchpin of the defense's case, corroborating that testimony with forensic evidence and with evidence of his impulsivity would have bolstered the defense case immeasurably.

Because counsel failed to adequately investigate, they lost the opportunity to present a legally sound, reasonable defense to first-degree murder that was compelling because it both undermined the State's forensic evidence and explained why Kiles's character for impulsivity undercut premeditation. And, because counsel had instead opted for a legally and factually problematic defense to the first-degree murder charge for Gunnel's death, counsel allowed that charge—and Gunnel's death—to get lost in the stream of information about the remaining murder charges. The result was a breakdown in the adversarial system, sufficient to undermine confidence in the conviction. *See Strickland*, 466 U.S. at 687. In this case, all that is needed to undermine confidence is a reasonable probability that at least one juror would have rejected first-degree murder in favor of a lesser-included offense, such as second-degree murder. *See Jennings v. Woodford*, 290 F.3d 1006, 1019 (9th Cir. 2002); *see also Strickland*, 466 U.S. at 694 (declaring that a showing of "a reasonable probability" is a lesser standard than "a preponderance of the evidence").

Here, the jurors could have heard an entirely different story than the one

111

presented. They could have heard that key aspects of the State's forensic case were exaggerated or wholly unsupportable. They could have heard that the little physical evidence offered regarding Gunnel's killing did not suggest, let alone prove, that the killing was premeditated. They could have learned that Kiles suffered from brain dysfunction and, consequently, impulsivity, which bore heavily upon whether he premeditated the killing. Importantly, such powerful evidence that Kiles did not premeditate Gunnel's death would not have been lost or obscured in the grand scheme of the trial. If the jury had been offered this evidence, then "it might nonetheless have convicted [Kiles of premeditated first-degree murder]. . . . But there is at least a reasonable probability that it would not have done so." *Thomas v. Chappell*, 678 F.3d 1086, 1098 (9th Cir. 2012).

### D. Counsel were ineffective for failing to object to Kiles's shackling.

Kiles's counsel were deficient for failing to object to Kiles's shackling, as well as for failing to ensure that Kiles's restraints were not visible to the jury, and counsel's deficient performance prejudiced Kiles.

Throughout guilt-phase proceedings, Kiles was forced to wear a leg brace—designed to lock up if a defendant moved too quickly—and ankle shackles. Kiles had to hold the leg brace in place when he was walking, including to the witness stand to testify, to prevent it from locking up as he moved. Multiple jurors saw and/or heard Kiles's shackles, and at least one juror noticed Kiles's odd gait, attributable to the leg brace.

However, Kiles had a right under the Due Process Clause not to be tried wearing shackles unless there were no acceptable alternatives. The Supreme Court has "defined shackling as 'the sort of inherently prejudicial practice that . . . should be permitted *only* where justified by an essential state interest specific to each trial.'" *Hedlund v. Ryan*, 854 F.3d 557, 568 (9th Cir. 2017) (footnote omitted) (quoting *Holbrook v. Flynn*, 475 U.S. 560, 568–69 (1986)).

Counsel had a duty to protect Kiles from the inherent prejudice of shackling,

112

1   but failed to do so. *See Roche v. Davis*, 291 F.3d 473, 483 (7th Cir. 2002) (holding
2   that counsel's performance was deficient in failing to object to client's shackling
3   and in failing to ensure that shackles were not visible to the jury); *see also*
4   *Strickland*, 466 U.S. at 688. Preliminarily, counsel failed to object when the court
5   neglected to inquire into whether there were compelling circumstances to justify
6   the use of physical restraints. *Spain v. Rushen*, 883 F.2d 712, 716 (9th Cir. 1989).
7   In failing to conduct that individualized inquiry, the court committed constitutional
8   error. *See id.*; *see also infra*, Claim 7. By extension, counsel performed deficiently
9   in failing to ensure that Kiles's due-process rights were vindicated.[70] *See Roche*,
10  291 F.3d at 483. Then, having failed to object to the unjustified use of restraints,
11  counsel did not ensure that the jury could not see Kiles's physical restraints.[71] In
12  that way, too, counsel performed deficiently. *See id.*

13      The prejudice arising from shackling—and the ways in which it undermined
14  Kiles's rights—is manifold. First, shackling compromises the defendant's right to
15  a fair trial by (1) crippling the presumption of innocence, and (2) denying the
16  defendant an impartial jury. *See Illinois v. Allen*, 397 U.S. 337, 344–45 (1970);
17  *Estelle v. Williams*, 425 U.S. 501, 504–05 (1976) (recognizing shackles as a
18  "constant reminder of the accused's condition . . . [that] may affect a juror's
19  judgment" and are "so likely to be a continuing influence throughout the trial that
20  . . . an unacceptable risk is presented of impermissible factors coming into play");

---

22  [70] Had counsel objected and forced the trial court to conduct the constitutionally
23  requisite inquiry, the trial court would likely have determined that less-restrictive
    alternatives were appropriate. The trial court had a lot of evidence to consider in its
24  individualized review. By the time of trial, Kiles had spent 11 years in jail and
    prison, and his record was exemplary. (*See* Tr. Apr. 27, 2006 at 6, 31–32 (prison-
25  operations expert testifying that Kiles had zero infractions from 1990 through early
    1998 and that such a spotless record was "baffling . . . I have never seen anything
26  like this").)

27  [71] Kiles may also have been wearing a stun belt. If that was so, then that restraint,
28  even though not visible to the jury, only exacerbated the problems caused by Kiles's
    visible restraints. *See Gonzalez v. Pliler*, 341 F.3d 897, 900 (9th Cir. 2003).

1    *see also Deck v. Missouri*, 544 U.S. 622, 633 (2005) (noting that shackles imply
2    that the court considers the defendant dangerous, which is "nearly always a relevant
3    factor in jury decisionmaking" in a capital case). Second, restraints inhibit the
4    defendant, thereby impeding his ability to assist counsel in his own defense, which
5    is critical to his ability to present a meaningful defense. *See id.* at 631–32 ("The use
6    of physical restraints diminishes that right."). Shackling has been found to impede
7    easy communication with counsel. *See Allen*, 397 U.S. at 344. Physical restraints
8    can further "confuse and embarrass the defendant, thereby impairing his mental
9    faculties; and they may cause him pain." *Duckett v. Godinez*, 67 F.3d 734, 747–48
10   (9th Cir. 1995) (quoting *Spain*, 883 F.2d at 720–21). Third, "the use of [shackling]
11   is itself something of an affront to the very dignity and decorum of judicial
12   proceedings." *Allen*, 397 U.S. at 344.

13        All of these forms of prejudice plagued Kiles's guilt-phase proceedings,
14   rendering counsel ineffective for failing to protect Kiles's rights. *See State v.
15   Gomez*, 123 P.3d 1131, 1141 (Ariz. 2005) (remanding for new sentencing when
16   shackling of defendant during capital-sentencing proceedings was unjustified and
17   prejudicial). The fragility of the presumption of innocence and the crucial need for
18   an impartial jury were only heightened in Kiles's case, where at least one juror was
19   aware that Kiles had previously been convicted of the crimes at issue and multiple
20   jurors had been exposed to media about the crimes and Kiles's legal proceedings.
21   In a case involving such brutal crimes, when jurors were able to see and hear Kiles's
22   restraints, the jurors were able to quickly and reasonably infer that the court had
23   already deemed him a danger. *See Deck*, 544 U.S. at 633. As a result, the
24   presumption of innocence was vitiated. *See Spain*, 883 F.2d at 721 (recognizing
25   that shackling can "revers[e] the presumption of innocence"). Further, the restraints
26   limited Kiles's ability to communicate freely with his counsel and undermined the
27   dignity and decorum of the judicial proceedings. Given the degree of prejudice on
28   multiple fronts from the visible shackles, there is a reasonable probability that,

1    absent counsel's failures, at least one juror would have voted differently. *See*
2    *Strickland*, 466 U.S. at 694.

3    **E.    Counsel rendered ineffective assistance during the defense's**
      **opening statement.**
4

5    A criminal defendant has the right to effective assistance of counsel during
6    the defense's opening statement. *See, e.g.*, *Wilson v. Mazzuca*, 570 F.3d 490, 502–
7    07 (2d Cir. 2009) (finding counsel ineffective in part due to failures during opening
8    statement). However, Clark's opening statement worked to Kiles's detriment in a
9    number of ways. *See Strickland*, 466 U.S. at 688.

10   Clark undermined the defense's credibility from the outset, by making
11   promises he did not keep. *See, e.g.*, *Anderson v. Butler*, 858 F.2d 16, 17 (1st Cir.
12   1988) ("[L]ittle is more damaging than to fail to produce important evidence that
13   ha[s] been promised in an opening."). After lauding the State's blood-spatter
14   evidence as a "forensic fact in this case" that would be "foolish" to challenge[72] (Tr.
15   July 10, 2000 at 35), Clark guaranteed the jury that the DNA and blood-spatter
16   evidence would establish that Gunnel died in the leather chair: "[T]he DNA, the
17   blood spatter and Mr. Kiles' testimony will all tell that that's where [Gunnel]
18   expired at, in the living room, in that chair." (Tr. July 10, 2000 at 46.) That never
19   came to pass. The location where Gunnel died was critical to the defense, as it spoke
20   both to premeditation and to the credibility of Kiles's narrative. But, after having
21   promised this "very scientific" support for Kiles's testimony (Tr. July 10, 2000 at
22   34), the defense failed to come through. The DNA evidence did not establish that
23   Gunnel died in the chair, because the blood on the chair was never tested by the
24   DNA analyst. (*See* Tr. July 12, 2000 at 114–16 (DNA analyst listing items with
25   bloodstains that he tested).) Similarly, no blood-spatter evidence established that
26   Gunnel died in the chair, because defense counsel neglected to elicit such evidence

27   _____
28   [72] That the defense was, because of counsel's inadequate investigation, vouching
     for unreliable blood-spatter evidence was an independent problem.

115

when questioning the State's expert.[73] (*See* Tr. July 14, 2000 at 30–50, 55–59.)

Clark then, for no discernible reason, told the jury the following:

> [Kiles] and his friends . . . decide to do what they have done in the past, and that's—they're going to shoplift some Circle K's. Evidently, it's an easy thing to do. They steal some cigarettes and they steal some liquor. They take the cigarettes and trade them for some more cocaine. They do this three times.

(Tr. July 10, 2000 at 43–44.) Even assuming this information were true, none of it came into evidence at trial. As counsel knew or should have known, the only witness noticed by the State who could potentially have testified to these matters was Kale Johnson. (*See* ROA 446 at 1–2.) Johnson, however, had committed to saying that he did not leave his aunt's apartment on the day in question. (*See* Tr. July 14, 2000 at 136–37.) And the State could not produce such "other crimes" evidence during Kiles's cross-examination. *See* Ariz. R. Evid. 404(b). The defense thus announced to the jury that their client had spent the day of the crime robbing stores for money for drugs. In doing so, counsel undermined Kiles's credibility for no reason whatsoever, even though the case hinged on Kiles's testimony.

In sum, then, defense counsel promised corroboration for a key aspect of Kiles's testimony—one going to whether Kiles premeditated Gunnel's death—and failed to deliver. In addition, counsel affirmatively undercut Kiles's credibility by

---

[73] Clark made other promises the defense failed to keep. For example, he began his opening by insisting that attorneys "don't come into these rooms at this point in time and ask questions we don't already know the answers to." (Tr. July 10, 2000 at 29.) But defense counsel were repeatedly stumped when State's witnesses failed to respond to questions as anticipated. As another example, Clark announced, "I'll tell you now that a great number of these [State's] witnesses will be recalled in the defense's case in chief. . . . [T]hat's going to happen." (Tr. July 10, 2000 at 37.) Of the State's twenty or so witnesses, the defense recalled only two. (*See* Tr. July 17, 2000 at 127, 145.) In doing so after promising "a great number" of witnesses, counsel intimated to the jury that the defense had less to offer—that it was weaker— than anticipated. *See, e.g.*, *Williams v. Woodford*, 859 F. Supp. 2d 1154, 1173 (E.D. Cal. 2012).

116

alerting the jury that Kiles had been robbing stores for money for drugs, on which point there was no testimony whatsoever. Given the centrality of Kiles's testimony to the case as presented, these errors prejudiced Kiles. *See, e.g.*, *United States v. Gonzalez-Maldonado*, 115 F.3d 9, 15 (1st Cir. 1997) ("A defendant's opening statement prepares the jury to hear his case. If the defense fails to produce promised expert testimony that is critical to the defense strategy, a danger arises that the jury will presume . . . the defense is flawed."); *Cunningham*, 704 F.3d at 1168 (Pregerson, J., concurring in part and dissenting in part); *see also Strickland*, 466 U.S. at 694.

**F.      Counsel were ineffective for failing to effectively cross-examine crucial State's witnesses on matters relating to whether Gunnel's death was premeditated.**

Trial counsel likewise had a duty under the Sixth Amendment to test the State's case by adequately cross-examining the State's witnesses on points critical to the defense. *See Crawford v. Washington*, 541 U.S. 36, 61 (2004) (recognizing the "testing [of evidence] in the crucible of cross-examination" as crucial constitutional guarantee of reliability); *see also, e.g.*, *Richey*, 498 F.3d at 362–64 (holding counsel ineffective in part for failure to prepare sufficiently to cross-examine State's witnesses). Again, trial counsel's strategy was to have Kiles admit that he killed Gunnel, but then to convince the jury that the crime was not premeditated and therefore not first-degree murder. (Tr. July 10, 2000 at 39–40.) Indeed, counsel made a point during closing argument of dismissing the State's theory that the attack on Gunnel started in the bedroom and moved to the living room—a theory suggestive of a prolonged attack and therefore of premeditation. (Tr. July 19, 2000 at 51.) Having committed to this approach, though, counsel had an obligation to pounce on every opportunity to undercut the State's case for premeditation. Instead, counsel missed critical chances to effectively cross-examine several of the State's witnesses, thereby unnecessarily ceding key points to the prosecution.

117

1    For example, as laid out above, counsel failed to cross-examine two of the

2    State's forensic experts on key points. At no point during the cross-examination of

3    Tom Bevel did counsel touch on the blood-stain evidence in the living room. (*See*

4    Tr. July 14, 2000 at 30–50, 55–59.) However, had counsel done so, counsel could

5    have elicited from Bevel that the low-to-the-ground blood spatter and castoff in the

6    living room suggested that Gunnel was not standing for any blow that produced

7    such spatter. (Tr. Mar. 27, 2006 at 65–66, 71.) Counsel could moreover have had

8    Bevel testify that the blood stain in the leather chair was consistent with the blood

9    source (i.e., Gunnel's head injury) being low to the chair cushion. (Tr. Mar. 27,

10   2006 at 65–66, 71.) Counsel could even have elicited from Bevel that he had no

11   way of knowing whether the ratchet was originally in the east bedroom and that it

12   could have been moved there after the killings. (*Cf.* Tr. Mar. 27, 2006 at 113–14.)

13   This testimony—much of which was elicited during the aggravation phase—would

14   have corroborated Kiles's account of the attack on Gunnel, including that it was not

15   premeditated. (Tr. July 17, 2000 at 165–66); *see also Bennett*, 407 F. App'x at 215.

16   Similarly, instead of blindly accepting Dr. Mallon's assertion that Gunnel

17   exhibited "evidence of a defensive wound" (Tr. July 13, 2000 at 99), counsel could

18   have confronted Dr. Mallon with his far-less-definitive statement at the 1989 trial

19   that Gunnel's forearm wound merely could be a defensive wound.[74] (Tr. Dec. 12,

20   1989 at 8.) Clearly counsel was interested in impeaching Dr. Mallon with his prior

21   testimony, as she did so on a different issue. (*See* Tr. July 13, 2000 at 106–07.) But

22   the failure to cross-examine him about the defensive wound marked another missed

23   opportunity to buttress Kiles's version of events.[75] *See Nixon v. Newsome*, 888 F.2d

24

---

25   [74] Relatedly, counsel could have confronted Dr. Mallon with his 1989 testimony
     that he could not say whether Gunnel was conscious for any particular blow. (*See*
26   Tr. Dec. 12, 1989 at 15 (testifying that "it would be speculation" to say whether
27   Gunnel was conscious after the first blow).)

28   [75] Of course, as discussed previously, counsel should have retained experts to help
     them understand and navigate the State's experts' conclusions. Even lacking such

1  112, 114–15 (11th Cir. 1989) (counsel ineffective for failing to cross-examine

2  witness on the "crucial discrepancies" between her testimony at two trials).

3     Counsel's failure to effectively cross-examine extended to lay witnesses. As

4  an example, counsel did not adequately cross-examine Larry Hawkins using the

5  affidavit he had provided in 1994, his 1989 testimony, or other impeachment

6  material. (ROA 1189 at 6.) Hawkins's Silent Witness Letter and testimony were

7  key evidence of premeditation (*see, e.g.*, Tr. July 13, 2000 at 32–35), and counsel

8  missed chances to undermine this testimony. Counsel could have asked Hawkins

9  about the following sworn statement he made in 1994: "Alvie came to my house

10 the day of the homicides, as I testified in court. He was not himself. He had a crazed

11 look in his eyes and was rambling and at times, incoherent. I don't know that

12 anything he told me that day was accurate." (PFR2 Dkt. 20 Ex. 2 at 2–3.)

13 Confronting Hawkins with that prior attestation would have undermined the value

14 of his testimony about what Kiles had said after the homicides. Counsel could

15 further have impeached Hawkins with his 1989 testimony about Kiles's alcohol

16 problem and that Kiles was "shooting cocaine" when he spoke to Hawkins on

17 February 10, 1989. (Tr. Dec. 13, 1989 (Hawkins testimony) at 27–28.) And,

18 because the State framed Hawkins as Kiles's confidant from its opening statement

19 onward (*see, e.g.*, Tr. July 10, 2000 at 24), counsel could have elicited testimony

20 from Hawkins that he and Kiles had a falling out when Hawkins beat up Kiles's

21 sister (*see* PFR2 Dkt. 21 Ex. 3 at 34). Instead, counsel failed to counter testimony

22 regarding premeditation on which the State relied heavily. *See Reynoso v. Giurbino*,

23 462 F.3d 1099, 1114 (9th Cir. 2006) (counsel ineffective for failing to investigate

24 material for cross-examination).

25    Counsel could likewise have impeached Kale Johnson with his August 1994

26 affidavit. (*See* ROA 1189 at 39–40; ROA 225 Ex. 45 at 1–3.) In that affidavit,

27

28 help, though, counsel could have better fashioned their attacks on these experts
   during cross-examination.

119

Johnson attested that when he returned with Kiles to Gunnel's apartment,

> Alvie was not bragging about what he had done at all. He was really freaked out and upset. Alvie was very high on drugs and alcohol, and he was staggering. . . . He started down the hallway, but because he was so messed up he accidentally stumbled over Valerie's body. . . . He did not deliberately step on Valerie's face, and he did not step on her face to prove that she was dead.

(ROA 225 Ex. 45 at 2.) While Clark attempted to impeach Johnson's testimony at trial, Clark did not use this affidavit. Instead, Clark highlighted Johnson's April 2000 unsworn statement to defense counsel, as well as Johnson's 1989 testimony, in which Johnson testified that Kiles stepped on Gunnel on purpose to show that she was dead. (Tr. July 14, 2000 at 165–66.) That counsel failed to use this affidavit for impeachment was not strategic, as much of counsel's guilt-phase focus was on undercutting Johnson's testimony.

Finally, counsel failed to adequately cross-examine certain law-enforcement witnesses. Perhaps most importantly, counsel did not ask Rodgers, who was the lead investigator on the case, whether the evidence supported the State's theory that the attack on Gunnel started in the bedroom.[76] Had counsel done so, he would presumably have testified as he did during the 2006 aggravation-phase cross-examination: "[A]fter things started, I don't think [Gunnel] ever made it to the east bedroom." (Tr. Apr. 3, 2006 at 100.) He could have elaborated that the ratchet, along with Gunnel's tooth fragment and hair, found in the east bedroom could have been transferred there—there was no way to tell from the physical evidence whether the ratchet was used in the bedroom. (Tr. Apr. 3, 2006 at 99–100.) The State harped on this theory that the attack on Gunnel started in the bedroom; it came up time and time again in the State's closing as the basis for premeditation. Had Rodgers, the State's crime-scene management expert (ROA 446 at 2), obliterated that theory, the

---

[76] It is unclear whether defense counsel interviewed Rodgers prior to trial.

120

1   State's case for premeditation would have been in shambles. Counsel were

2   ineffective for missing—with no justification—such a valuable opportunity to

3   strike at the core of the State's case.[77] *See Reynoso*, 462 F.3d at 1099; *Richey*, 498

4   F.3d at 362–64.

5          Counsel's failures with respect to cross-examination were not based on any

6   informed, reasoned decisions, but on a lack of preparation and investigation. Had

7   counsel effectively challenged the testimony of these key State witnesses, there is

8   a reasonable probability that the jury's verdict would have been different. *See*

9   *Strickland*, 466 U.S. at 688, 694.

10         **G.    Counsel were ineffective for stipulating to the admission of**

11              **hearsay statements from Gunnel at the guilt-phase proceedings.**

12         As part of counsel's duty to test the State's case, counsel were required to

13   contest the admission of unreliable hearsay. *See Pearce v. Nooth*, No. 17-35326,

14   2018 WL 3639534, at *2 (9th Cir. Aug. 1, 2018) (finding counsel ineffective for

15   failing to make meritorious hearsay objection). Kiles's counsel were ineffective for

16   failing to object to such hearsay. (*See* ROA 1189 at 37–39.)

17         Before Kiles's guilt-phase proceedings, defense counsel—specifically,

18   VanDreumel—made several stipulations in a letter to the State. (*See* ROA 497.)

19   One of those stipulations was as follows:

20              Next, consistent with the doctrine of the law of the case,
                [the defense] will not challenge the admissibility of Valerie
21              Gunnel's statements to ImoJean [sic] Kiles reference her
                needing money because our client took her food stamps.
22              Similarly, we will not challenge the admissibility of Sandra
                Mercado's claim that Valerie told her that she (Valerie)
23

24   _____

25   [77] Further, if the defense was aware that Officer David Sherman, Kiles's arresting
     officer, had previously falsified a urine test, counsel should have raised that
26   information on cross-examination. Although Sherman did not testify on matters
     related to premeditation, casting his credibility into question could have affected
27   the jurors' perception of the State's law enforcement witnesses. And, if the State
     did not disclose this impeachment information about Sherman to the defense, that
28   withholding of material violated Kiles's rights.

didn't have any money, and that she (Valerie) wanted our client to move out, and that our client responded that the only way he would move out were if she (Valerie) called the police. Please know that we are not stipulating that these witnesses['] claims regarding Valerie's statements are truthful, and we intend to challenge the testifying witnesses thereon. We simply understand that those statements will be admitted.

(ROA 497 at 3.) At trial, Imojean Kiles and Sandra Brown (formerly Mercado) testified to these and other hearsay statements from Gunnel pursuant to counsel's stipulation. (*See, e.g.*, Tr. July 11, 2000 at 32 (Imojean Kiles testifying that Gunnel said that Alvie Kiles had taken her food stamps); Tr. July 12, 2000 at 9–10 (Brown testifying that Gunnel complained that she wanted Kiles to leave her apartment and that she was going to throw him out); Tr. July 12, 2000 at 11 (Brown testifying that Gunnel believed Kiles had taken her purse).)[78]

Preliminarily, while counsel claimed to be deferring to the law-of-the-case doctrine, counsel later argued against the doctrine on a matter related to aggravating circumstances. (*See* ROA 756 at 2–5.) Accordingly, counsel's stated justification for the stipulation is untenable.[79]

Gunnel's statements—particularly that she needed money because Kiles had taken her food stamps and that he would only move out if she called the police on him—were inadmissible hearsay. The statements were offered to prove the truth of

---

[78] At one point during Brown's testimony, Clark objected to the hearsay. (Tr. July 12, 2000 at 9.) There was an off-the-record bench conference (Tr. July 12, 2000 at 9), at which point Clark was presumably reminded that the defense had stipulated to the admission of hearsay testimony. If, instead, the defense withdrew their stipulation, objected to the hearsay, and were overruled by the trial court, the constitutional error lies with the trial court for allowing the admission of unreliable hearsay in violation of Kiles's rights to due process, confrontation, and a fair trial. Regardless, defense did not object to Imojean Kiles's relaying of hearsay (*see* Tr. July 11, 2000 at 32), and the failure of counsel to ensure a complete record of this important discussion regarding hearsay was ineffective, *see infra*, Claim 16.

[79] Moreover, the hearsay issues were not raised to the Arizona Supreme Court during Kiles's first direct-appeal proceedings. *See State v. Kiles*, 857 P.2d 1212 (Ariz. 1993).

122

1   the matters asserted. Moreover, there was no dispute that, for example, Gunnel was

2   angry with Kiles at the time of the crime. Because these statements do not fall within

3   exceptions to the prohibition on hearsay under Arizona law, they were inadmissible.

4   *See, e.g.*, *State v. Charo*, 754 P.2d 288 (Ariz. 1988) (holding that hearsay from

5   deceased victim to prove an unwitnessed prior bad act by the defendant was

6   inadmissible); Ariz. R. Evid. 803. Accordingly, counsel were deficient in

7   stipulating to their admission. *See Pearce*, 2018 WL 3639534, at *2.

8        Counsel's failure to object was, moreover, prejudicial. The State relied on

9   the hearsay in its closing, arguing that the jury should believe Brown's testimony

10  as to what Gunnel had said and, in turn, reject Kiles's testimony. (*See* Tr. July 19,

11  2000 at 25–26.) In particular, Gunnel's hearsay statements made it harder for a jury

12  to accept that her later fight with Kiles, if attributable to the fact that he took her

13  food stamps, was the adequate provocation necessary for a finding of heat-of-

14  passion manslaughter. If the jury had not heard this hearsay, there is a reasonable

15  probability that it would not have convicted Kiles of first-degree murder for

16  Gunnel's death. *See Strickland*, 466 U.S. at 694.

### H.   Counsel were ineffective for failing to object to the worst of the gruesome photographs repeatedly displayed at trial.

19       Despite the excessively disturbing nature of some of the photographs of the

20  victims, Kiles's counsel failed to object to their admission and repeated display at

21  trial. That failure was particularly abject with respect to the photograph admitted

22  into evidence of LeCresha Kirklin, Gunnel's nine-month-old daughter. (*See* 2000

23  Trial Ex. 72.) Because of the particularly haunting nature of that image, counsel's

24  failure to object to its admission at trial was ineffective. *See Strickland*, 466 U.S. at

25  688, 694; *see also, e.g.*, *Duncan v. Henry*, 513 U.S. 364, 366 (1995) (recognizing

26  due-process violation when evidence is admitted that is so inflammatory as to

27  prevent a fair trial); (ROA 1189 at 30–32).

28       Exhibit 72 from the 2000 trial showed LeCresha on an autopsy table, her skin

123

1    grossly discolored and speckled by her prolonged submersion in water. (*See* Tr.

2    July 13, 2000 at 103.) The photograph showed her skin slippage and the erosion of

3    her soft tissue—also attributable to the immersion (Tr. Dec. 12, 1989 at 10; Tr. July

4    13, 2000 at 103), as well as bites and other marks from fish and aquatic animals (Tr.

5    Mar. 20, 2006 at 26). LeCresha's face appeared bloated, and at least one of her eyes

6    appeared to have been lost when she was submerged.

7          Defense counsel knew or should have known how inflammatory the

8    photograph of LeCresha was. During Kiles's first state post-conviction

9    proceedings, multiple jurors from his 1989 trial had commented on how troubling

10   the photographs were. (ROA 225 Ex. 49 at 1 ("I remember the case very well,

11   particularly the gruesome photographs. I had nightmares for a long time after seeing

12   them. [They] seemed unnecessary. The photographs really influenced the jury.");

13   ROA 225 Ex. 51 at 1 ("The photographs of the crime scene and the victims were

14   particularly gruesome and upsetting.").) Indeed, VanDreumel challenged the

15   admission of Exhibit 72 and other graphic photographs in 2006, before the penalty

16   phase, noting the photograph of LeCresha in particular "still bothers me, that

17   photograph does." (Tr. Mar. 20, 2006 at 26–27.)

18         As evidenced by the fact that counsel later challenged the photograph,

19   counsel had no justification for failing to do so at the guilt phase. (*See* Tr. Mar. 20,

20   2006 at 26–27.) VanDreumel even acknowledged that "perhaps, [the failure] was

21   an error of some magnitude" on the defense's part. (Tr. Mar. 20, 2006 at 35.)

22         Moreover, had counsel challenged the admission of Exhibit 72, they would

23   have prevailed. Inflammatory photographs are inadmissible under Arizona Rule of

24   Evidence 403 when they have little tendency to establish any issue in dispute in the

25   case; in such cases, the photographs serve primarily to inflame the jury. *State v.*

26   *Bocharski*, 22 P.3d 43, 56 (Ariz. 2001). Here, the photograph was not probative of

27   any matter in dispute. The defense did not dispute the identity of the child, that she

28   had died, her cause of death, or that she had been placed in the river. The defense

1    disputed only who caused LeCresha's death, a matter on which the photograph shed

2    no light whatsoever. Therefore, the photograph was inadmissible. *Id.* (recognizing

3    that when defense does not contest the facts of which an inflammatory photograph

4    is probative, the "prejudicial effect [of such a photograph] can be significant").[80]

5        Powell knew how disturbing—and potent—the image of the decomposed

6    body of the infant was. (*See* Tr. July 12, 2000 at 61.) Even so, he displayed Exhibit

7    72 for the jurors multiple times during the course of the guilt phase. (*See* Tr. July

8    12, 2000 at 61; Tr. July 13, 2000 at 103.) The jurors were subjected to a deeply

9    disturbing image that some continue to find haunting. Because of the power and

10   inflammatory nature of such a photograph, its prejudice is not just limited to crimes

11   against LeCresha; the photograph surely colored the jurors' view of all of the

12   evidence and affected all of the verdicts. Exhibit 72 was particularly prejudicial

13   with respect to the child-abuse charges, as the photograph showed all sorts of

14   horrifying damage to LeCresha's body that occurred long after any alleged child

15   abuse by Kiles. Seeing a child in that state, with the effects of the immersion of

16   water, must have made a difference. Had the jury not been repeatedly shown Exhibit

17   72, there is a reasonable probability that its verdicts would have been different. *See*

18   *Strickland*, 466 U.S. at 694.

19       **I.    Counsel rendered ineffective assistance by failing to request**
20           **critical jury instructions.**

21       Defense counsel failed to request several critical jury instructions; the court,

22   accordingly, neglected to instruct the jury appropriately. Because counsel's failure

23   prejudiced Kiles with respect to his conviction for first-degree murder for the death

24   of Gunnel and his convictions for child abuse, counsel provided ineffective

25   assistance. *See Strickland*, 466 U.S. at 688, 694; *see also Pirtle v. Morgan*, 313 F.3d

26

27   [80] Even when the trial court ruled the photograph admissible for the aggravation
     phase, the court acknowledged that the calculus would be different at guilt-phase
28   proceedings, where there would be greater prejudice. (*See* Tr. Mar. 20, 2006 at 38.)

125

1160, 1162 (9th Cir. 2002) (deeming counsel ineffective for failing to request a guilt-phase instruction on diminished capacity).

As Kiles testified that he killed Gunnel, the issue of premeditation—the difference between first-degree murder and second-degree murder—was pivotal. (*See* Tr. July 19, 2000 at 92–93.) Counsel thus had an absolute duty to ensure that the jury was properly instructed on premeditation. (*See* ROA 1189 at 42–45); *see also Pirtle*, 313 F.3d at 1162 (instructions relating to premeditation were crucial when "the only issue in dispute was whether [the defendant] acted with premeditation). The court instructed the jury as follows:

> Premeditation means the defendant acts with the knowledge that he will kill another human being when such intention or knowledge proceeds [sic] the killing by a length of time to permit reflection. An act is not done with premeditation if there is any instant—if it is the instant effect of a sudden quarrel or heat of passion.

(Tr. July 19, 2000 at 92–93.) That statutory definition was confusing, as evidenced by the string of later state-court opinions trying to make sense of the term's meaning. *See, e.g.*, *State v. Thompson*, 65 P.3d 420, 425–27 (Ariz. 2003) (discussing various interpretations of "premeditation" over time). Further, the definition effectively elided the distinction between the elements of "premeditation" and "knowledge" and robbed "premeditation" of any actual meaning.[81] In order to assist the jury in understanding premeditation, counsel should have requested clarifying instructions to supplement and shed light on the definition provided. (*See* ROA 489 at 1–6 (noting instructions requested by defense).)

First, counsel should have asked the court to instruct the jury that it must find

---

[81] The court gave the following unhelpful definition of "knowingly": "Knowingly means that a defendant acted with awareness of the existence of conduct or circumstances constituting an offense. It does not mean that the defendant must have known the conduct is forbidden by law." (Tr. July 19, 2000 at 91.)

126

1   "beyond a reasonable doubt that the defendant actually reflected." *Thompson*, 65
2   P.2d at 428.[82] Such an instruction, which was presaged before Kiles's trial by *State*
3   *v. Ramirez*, would have made clear to the jury that premeditation was distinct from
4   knowledge and required actual reflection. 945 P.2d 376, 380–81 (Ariz. 1997) ("Just
5   as murder requires actual killing, premeditation requires actual reflection."),
6   *superseded by statute as stated in State v. Zamora*, 63 P.3d 1050 (Ariz. Ct. App.
7   2003). Kiles's jury was left to deliberate without knowing that premeditation does
8   in fact require reflection—not merely time to reflect.

9        Second, and relatedly, counsel should have requested that the court define
10  "reflection" as an intentional act when deciding the issue of premeditation. (*See*
11  ROA 1189 at 42.) Such an instruction would have further given substance to the
12  meaning of premeditation.

13       Third, to ascertain that the jury understood that premeditation differed from
14  knowledge, counsel should have asked the court to specifically state that "reflection
15  differs from the intent or knowledge that conduct will cause death." *Ramirez*, 945
16  P.2d at 378 (quoting Recommended Arizona Criminal Jury Instruction 11.051);
17  (*see also* ROA 225 at 20). Such an instruction would have ensured that the jury
18  recognized that premeditation did not necessarily follow from knowledge and that
19  it was a discrete element of the crime of first-degree murder. *Cf. Riley v. McDaniel*,
20  786 F.3d 719, 723–27 (9th Cir. 2015) (holding that a jury instruction that combined
21  defined premeditation in terms of deliberation, another element of the crime,
22  relieved the state of its burden of proof on each distinct element). Informing the
23  jury as much was of particular importance when premeditation was defined in terms
24  of knowledge. (*See* Tr. July 19, 2000 at 92–93); *Riley*, 786 F.3d at 723–27.

25       Because these instructions were available under Arizona law, and because

27  [82] While *Thompson* contemplated a revised definition of premeditation, the
28  requirement that the jury find actual reflection necessarily applies to the 1989
definition of premeditation offered by the trial court.

1    premeditation was the primary controverted issue for Gunnel's death, counsel was

2    obligated to request these clarifying instructions. Had the jury been given any one

3    or any combination of these instructions, the jurors would have understood that the

4    State needed to prove actual reflection and that reflection differed from knowledge.

5    *See Strickland*, 466 U.S. at 694; *see also Pirtle*, 313 F.3d at 1162. If the jury had so

6    understood, there is a reasonable probability that one juror would not have

7    convicted Kiles of having premeditated Gunnel's killing.[83]

8         Finally, counsel should have requested clarifying instructions with regard to

9    the definition of "child abuse." Specifically, counsel should have requested an

10   instruction making clear to the jury that child abuse had not been proven if the child

11   abuse necessarily occurred as part of the premeditated murder of a child. *See State*

12   *v. Styers*, 865 P.2d 765, 771 (Ariz. 1993) ("If a defendant cannot be convicted for

13   an intentional aggravated assault that necessarily occurs when there is a

14   premeditated murder, it logically follows that he also cannot be convicted for an

15   intentional child abuse that necessarily occurs when there is a premeditated murder

16   of a child victim.") Trial counsel knew full well the import of *Styers* to Kiles's case:

17   counsel argued repeatedly before, during, and after trial that the child-abuse

18   charges, and later convictions, should be dismissed under *Styers*. (*See, e.g.*, ROA

19   443; Tr. July 17, 2000 at 109–13.) However, counsel failed to request a simple

20   instruction that would have clarified for the jurors that, if they concluded that Kiles

21   had committed premeditated murder of one or both children, they could not also

22   convict him of child abuse without finding that he had committed some other

23   harmful act that was separate from the premeditated murder.

24         The prejudice from this error is clear. With respect to Shemaeah, ten jurors

25   _____

26   [83] Counsel should similarly have asked for an instruction explaining that the jury
     could take into account voluntary intoxication when determining whether Kiles was

27   in the "heat of passion," for the purposes of undercutting premeditation. (*See* Tr.
     July 19, 2000 at 92–93 (noting that "[a]n act is not done with premeditation . . . if

28   it is the instant effect of a sudden quarrel or heat of passion"); ROA 1189 at 44.)

1   found Kiles guilty of premeditated murder. (ROA 482 at 5.) With respect to
2   LeCresha, seven jurors found Kiles guilty of premeditated murder. (ROA 482 at 6.)
3   Had the jurors understood that they had to find child abuse separate and apart from
4   premeditated murder, it is likely that each juror who found premeditated murder
5   would *not* have found Kiles guilty of child abuse. Accordingly, Kiles was easily
6   prejudiced by counsel's failure to request this important instruction properly
7   explaining child abuse to the jury.

8   Trial counsel's failure to request clarifying instructions on key issues, with
9   respect to the first-degree murder charge for Gunnel and both child-abuse charges,
10  prejudiced Kiles. *See Strickland*, 466 U.S. at 688, 694; *Pirtle*, 313 F.3d at 1162. He
11  is therefore entitled to relief from all three of the resulting convictions.

12
13  **J.    Counsel provided ineffective assistance when they failed to object to numerous aspects of the State's closing argument.**

14  Trial counsel listened as the State repeatedly mischaracterized and
15  misrepresented evidence, vouched for witnesses, and otherwise engaged in
16  improper conduct. In failing to object to these and other aspects of the State's
17  closing argument, counsel were ineffective. *See Zapata v. Vasquez*, 788 F.3d 1106,
18  1112 (9th Cir. 2015).

19  The most egregious of the State's transgressions during its closing occurred
20  when the State fabricated evidence supporting its theory of how Gunnel was killed.
21  The Supreme Court has recognized that a prosecutor "overstep[s] the bounds of . . .
22  propriety" when he "put[s] into the mouths of . . . witnesses things which they had
23  not said." *Berger v. United States*, 295 U.S. 78, 84 (1935). In doing so, the Court
24  cautioned that "while [a prosecutor] may strike hard blows, he is not at liberty to
25  strike foul ones," and that it is "his duty to refrain from improper methods calculated
26  to produce a wrongful conviction." *Id.* at 88.

27  Here, the State flouted *Berger*'s proscription against "foul" blows. The State
28  wanted to persuade jurors that Gunnel's death was premeditated, in part by arguing

129

that she endured a prolonged attack that started in the east bedroom and moved to the living room. (*See, e.g.*, Tr. July 10, 2000 at 13.) To do so, the State relied heavily on Larry Hawkins's testimony, and accordingly, focused a great deal during its closing on depicting Hawkins's testimony as accurate. "Let's talk about Larry Hawkins. Larry Hawkins, he said it all," the prosecutor proclaimed. (Tr. July 19, 2000 at 14.) He improperly vouched for the correctness of Hawkins's testimony, noting that after the initial stumbles during questioning, "[Hawkins] finally said completely, accurate [sic] everything that was said to him by the defendant." (Tr. July 19, 2000 at 16); *see also United States v. Sanchez*, 176 F.3d 1214, 1224 (9th Cir. 1999) ("As a general rule, a prosecutor may not express his opinion of the defendant's guilt or his belief in the credibility of government witnesses.") (quoting *United States v. Molina*, 934 F.2d 1440, 1444 (9th Cir. 1991). The State continued that Hawkins's letter to Silent Witness had details that were just "not something . . . Mr. Hawkins would have come up with." (Tr. July 19, 2000 at 18.) In case the State's embrace of Hawkins was not yet clear, the State continued, "But we have Larry Hawkins and the [S]tate [is] saying you should believe Larry Hawkins." (Tr. July 19, 2000 at 19.)

Having impressed upon the jury the importance and accuracy of Hawkins's testimony, the State then spun a tale about what Hawkins had in fact said. At no point had any witness testified that Kiles said that the attack on Gunnel started in the east bedroom. Hawkins certainly had not done so. (*See* Tr. July 13, 2000 at 3–79.) Instead, Hawkins had testified that after grabbing the tire jack, Kiles went into the apartment and "struck her." (Tr. July 13, 2000 at 29.) Hawkins made no mention of Kiles attacking Gunnel in the bedroom, either when testifying or in the Silent Witness letter Hawkins had submitted to the police in the wake of the crime. (*See* 2000 Trial Ex. 90 at 1.) That, however, did not prevent the State from asserting, over and over, that Hawkins had testified that the attack on Gunnel started in the bedroom. When trying to discredit Kiles's testimony, the prosecutor announced,

130

> However, we also have the ratchet over here in the other bedroom along with the bloody pillow. Now, what makes more sense? [Kiles's version or the] Larry Hawkins version about the thing [i.e., the attack on Gunnel] happening back there first and then coming on out and the rest happening in the front?

(Tr. July 19, 2000 at 27.) Shortly afterward, the prosecutor again declared,

> The ratchet was back in the bedroom along with the blood, just as Larry said.

(Tr. July 19, 2000 at 27.) The State misrepresented Hawkins's testimony once more in closing:

> No reason for that pillow to get bloody unless that is where the assault initiated like Mr. Hawkins told you.

(Tr. July 19, 2000 at 30.) And, for good measure, when discussing the east bedroom, the State punctuated its rebuttal with one more reference to Hawkins:

> Look at the photograph of that pillow. You got the jack, the ratchet part in there, but that's where it began. Again, just like Larry Hawkins' letter says and just like he testified here. (Tr. July 19, 2000 at 82.)

As noted, Hawkins had never said any such thing. But the State's repetition of its convenient misrepresentation—and trial counsel's failure to object—would certainly have convinced the jury otherwise. *See Berger*, 295 U.S. at 88 ("[I]mproper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.").

The State's misrepresentations did not end there. The State made a concerted effort to undermine Kiles's credibility, telling the jury that, in order to believe Kiles, it would "need to forge through and bastardize the facts of this case." (Tr. July 19, 2000 at 19; Tr. July 19, 2000 at 25–26, 33, 35 (dismissing Kiles's "concocted" account as an attempt "to put square pegs in the portions of his round holes" in order to challenge premeditation and "maintain[ing]" defendant's guilt); *see Sanchez*, 176

131

1    F.3d at 1224. Then, the State proceeded to mischaracterize Kiles's testimony to

2    suggest that it could not be reconciled with the physical evidence. When Kiles was

3    asked whether he struck Gunnel more than once before she hit that chair, Kiles

4    testified, "I hit her. I – yeah, I guess I hit her more than one time." (Tr. July 17,

5    2000 at 166.) Powell, however, claimed that Kiles testified that "he remembers

6    [hitting Gunnel] once." (Tr. July 19, 2000 at 27.) The State again misquoted Kiles

7    in an attempt to damage Kiles's credibility: "The back of her head is nothing but

8    blood. Do you think that was from one blow in the living room when she was

9    standing up?" (Tr. July 19, 2000 at 29.) As even Kiles had acknowledged, it was

10   not. The State had spun yet another tale to persuade the jury to find that Gunnel's

11   death was premeditated.

12        Beyond misstating the evidence to bolster its case for premeditation,[84] the

13   State made a multitude of other improper comments. For example, its closing

14   teemed with inflammatory statements, including the racially tinged and repeated

15   claim that the crimes were "a feeding frenzy" and Powell's reference to Kiles, Kale

16   Johnson, and Mike Parker as "the three amigos." (*See, e.g.*, Tr. July 19, 2000 at 30,

17   31, 77); *see also Zapata*, 788 F.3d at 1114 (declaring improper any inflammatory

18   statements designed to appeal to jury's passions). When trying to explain his own

19   use of the phrase "feeding frenzy," Powell offered the inflammatory and wildly

20   speculative claim that the killer was thinking, "I guess since we're killing one we

21   may as well kill them all. Let's kill the whole family. Let's kill two generations."

22   (Tr. July 19, 2000 at 77); *see Zapata*, 788 F.3d at 1112–13 (criticizing prosecutor

23   for speculative and "falsified story" of defendant's last words to victim). The State

24   _____

25   [84] The State's mischaracterizations of evidence did not end there. As just one more

26   example, the State claimed, "[W]e do know that Valerie had absolutely no drugs in
     her system when she died. . . . You heard that from the doctor." (Tr. July 19, 2000

27   at 83.) As Dr. Mallon had testified, however, Gunnel's negative drug test results
     were necessarily limited to the drugs for which Dr. Mallon had tested, and he had

28   not tested her body for marijuana. (Tr. July 13, 2000 at 100–01.)

1   further speculated, again improperly, that there were at the time of trial Converse

2   prints near the river, suggesting that the shoeprints found there earlier should be

3   dismissed as meaningless. (Tr. July 19, 2000 at 80.)

4       In addition, the State misrepresented the defense's position by suggesting

5   that counsel was arguing for the jury "to excuse[] [Kiles's] conduct on the murder

6   of three people" (Tr. July 19, 2000 at 84), when defense counsel were by no means

7   asking the jury to let Kiles off scot-free for Gunnel's death. The State also misstated

8   the law, in telling the jury that premeditation required only "a time to permit

9   reflection, that can be instantaneous." (Tr. July 19, 2000 at 35.) The prosecutor even

10  injected into his closing his personal belief that he could not follow the defense's

11  argument. (*See* Tr. July 19, 2000 at 30.) As a final example, the State closed its

12  rebuttal argument by basically telling the jurors that it was their duty, in the name

13  of justice, to convict Kiles:

14          The [S]tate is here asking for justice. . . . The best
            definition of justice I ever heard was assignment of
15          responsibility. Because we base our community and society
            on acceptance of responsibility, whether it's done willingly
16          or unwillingly. You get that old speeding ticket and April
            15th comes around and you write that big check. It is a part
17          of being a citizen. Some people don't accept it and we have
            to assign responsibility to them. They won't accept it. It's
18          a big job. . . . Ladies and gentlemen, it's you, and you know
            who it is. . . . You can assign responsibility. That's what
19          we're asking you to do now, ladies and gentlemen, please.
20

21   (Tr. July 19, 2000 at 85.) In effect, the State ended the trial by telling the jurors that

22  it was their job, as citizens who cared about their community and their society, to

23  convict Kiles. *See Sanchez*, 176 F.3d at 1224–25 (finding prosecutorial misconduct

24  because it is "improper for the prosecutor to state that the duty of the jury is to find

25  the defendant guilty").[85]

26  _____

27  [85] The State's repeated statement that some people do not accept responsibility—
     and the implication that Kiles was such a person and that he was wrong for not
28   accepting responsibility—further suggested to the jury that Kiles was wrong for
     having asserted his Sixth Amendment right to go to trial on the charges against him.

1        Despite all of these errors, defense counsel objected only once to the State's
2   closing, when the State improperly "maintain[ed] to you . . . [that] never has a case
3   exhibited more premeditation" than Kiles's case. (*See* Tr. July 19, 2000 at 36–37.)
4   Even then, counsel did nothing when the trial court gave an instruction that did not
5   address the underlying problem: that the State expressed its belief that the evidence
6   before the jury clearly showed premeditation. (*See* Tr. July 19, 2000 at 36–37.) In
7   the face of so many other missteps by the State, including the misrepresentation of
8   evidence going to premeditation—the core issue for Gunnel's death—trial
9   counsel's failure to object was deficient. *See Zapata*, 788 F.3d at 1112. Because of
10  that deficient performance, the last few things the jury heard were that Hawkins had
11  testified that the attack on Gunnel started in the bedroom, that Kiles's testimony did
12  not fit with the physical evidence, and that it was the jury's duty to assign
13  responsibility when Kiles had chosen not to accept it himself. Had counsel objected
14  to this prosecutorial display, at least signaling to the jury that the State was
15  misguided, then there is a reasonable probability that at least one juror would have
16  come out differently with regard to premeditation, and therefore first-degree
17  murder, for Gunnel's death. *See Strickland*, 466 U.S. at 694.

18       **K.    Counsel also rendered ineffective assistance in failing to ensure
19              that a record was made of key parts of the guilt-phase proceedings.**

20       As discussed in depth in Claim 16, *infra*, Kiles's counsel let significant
21  portions of the pretrial and trial proceedings go unrecorded. Counsel did so despite
22  Kiles's specific request that a record be made of all proceedings (*see, e.g.*, Tr. Aug.
23  6, 1999 at 13), and despite the need for meaningful appellate review, *see Gregg v.*
24  *Georgia*, 428 U.S. 153, 197–98 (1976) (joint opinion of Stewart, Powell, and
25  Stevens, JJ.). In doing so, counsel performed deficiently and prejudiced Kiles. *See*
26  *Strickland*, 466 U.S. at 688, 694.

27
28

1

2

**L.   Counsel's numerous errors, individually and cumulatively, undermined the reliability of Kiles's guilt-phase proceedings.**

3    While each instance of deficient performance described above is prejudicial

4    on its own, counsel's guilt-phase errors were decidedly prejudicial when considered

5    cumulatively. When evaluating an ineffective-assistance claim, this Court must

6    consider the cumulative impact of counsel's various errors. As the Supreme Court

7    has stated, "In making this [prejudice] determination, a court hearing an

8    ineffectiveness claim must consider the totality of the evidence before the judge or

9    jury." *Strickland*, 466 U.S. at 695; *see Williams (Terry) v. Taylor*, 529 U.S. 362,

10   397–98 (2000); *see also White v. Ryan*, 895 F.3d 641, 645 n.1 (9th Cir. 2018) (ruling

11   that the district court erred by granting a certificate of appealability on a portion of

12   an ineffective assistance claim because the petitioner "has but a single claim

13   regarding his right to the effective assistance of counsel at the penalty phase");

14   *Martin*, 424 F.3d at 590–92 ("[E]ven if [trial counsel's] errors, in isolation, were

15   not sufficiently prejudicial, their cumulative effect prejudiced Martin's defense.");

16   *Alcala v. Woodford*, 334 F.3d 862, 882–83 (9th Cir. 2003) (granting relief on basis

17   of cumulative impact of multiple errors by counsel); *Lindstadt*, 239 F.3d 191, 205

18   (2d Cir. 2001) (granting relief where petitioner was prejudiced by cumulative effect

19   of errors committed by trial counsel); *Harris ex rel. Ramseyer v. Wood*, 64 F.3d

20   1432, 1439 (9th Cir. 1995) (holding that cumulative impact of numerous

21   deficiencies in defense counsel's performance was prejudicial, warranting habeas

22   relief).

23   Here, had counsel not performed deficiently, the jury would have heard a

24   legally cognizable and factually supported defense to premeditation, would have

25   seen the State's forensic case get undercut on cross-examination and by defense

26   experts, and would have been properly instructed that premeditation requires more

27   than just the passage of time. The jury would not have been misled by the State's

28   closing into overestimating the strength of the State's case that Gunnel's death was

135

premeditated. Further, the jury would have been spared unduly prejudicial photographs and would have known the appropriate definition of child abuse under Arizona law. Had counsel performed competently, there is at least a reasonable probability that one juror would have decided differently on the first-degree murder count for Gunnel's death and on each of the child-abuse counts. *See Strickland*, 466 U.S. at 694.

**M.    The state post-conviction court's decision that Kiles failed to state a colorable claim is no bar to this Court's de novo review of this claim.**

The state post-conviction court said the following in rejecting Kiles's guilt-phase claim of ineffective assistance of counsel:

> Defendant's claims regarding deficient attorney performance related to Exhibit 2 [Larry Hawkins's affidavit from 1994] do not demonstrate a prejudice that would have been suffered by defendant.
>
> Defendant's claims concerning the blood spatter expert and blood volume evidence do not demonstrate a deficient performance by counsel *or that the outcome would have been different*.
>
> Nor has Defendant shown deficient performance or prejudice as to the impeachment of Kale Johnson.
>
> Defendant's claims as to the reflection instruction is [sic] also precluded.
>
> Defendant has failed to make the requisite showing as to deficient performance or prejudice in relationship to the Christensen defense . . . and presentation of impulsivity evidence.

(ROA 1214 at 2 (emphasis added).)

First, the court invoked a procedural bar with respect to "Defendant's claims as to the reflection instruction." (ROA 1214 at 2.) Preliminarily, that ruling is insufficiently explicit as to the basis of preclusion to constitute a procedural bar to this Court's review. *See McKenna v. McDaniel,* 65 F.3d 1483, 1488 (9th Cir. 1995). More critically, any preclusion bar here is neither adequate nor independent of federal grounds for relief. The state post-conviction court ruled an ineffective-

136

1    assistance-of-counsel claim precluded, even though the claim could not have been

2    brought during earlier proceedings. *See Martinez v. Ryan*, 566 U.S. 1, 10–11 (2012).

3    Because Arizona state courts do not regularly treat ineffective-assistance claims as

4    precluded during initial state post-conviction proceedings—the state court here did

5    not attempt to do so with regard to other ineffective-assistance claims—the

6    procedural ruling is not adequate and is no bar to federal review. *See Coleman v.*

7    *Thompson*, 501 U.S. 722, 729 (1991); *Beard v. Kindler*, 558 U.S. 53, 60–61 (2009)

8    (on adequacy requirement); *Ford v. Georgia*, 498 U.S. 411, 423–24 (1991) (holding

9    that a state procedural bar is not adequate unless it is "firmly established and

10   regularly followed").

11          The state-court merits ruling on this claim is, moreover, contrary to and/or

12   an unreasonable application of clearly established federal law for two distinct

13   reasons. *See* 28 U.S.C. § 2254(d)(1). First, as described below, the court applied the

14   wrong prejudice standard for *Strickland* claims. Second, the court failed to consider

15   the cumulative impact of counsel's instances of deficient performance.

16          Under the clearly established federal law in *Strickland*, counsel's deficient

17   performance prejudices a defendant when "there is a reasonable probability that,

18   but for counsel's unprofessional errors, the result of the proceeding would have

19   been different." 466 U.S. at 687–88, 694. The *Strickland* Court explicitly rejected

20   an "outcome-determinative standard." *Id.* at 693-94. Indeed, any standard other

21   than that explicitly laid out in *Strickland* is contrary to clearly established Supreme

22   Court precedent. *See Williams*, 529 U.S. at 397.

23          Here, the state post-conviction court adopted an outcome-determinative

24   standard, as opposed to the *Strickland* standard. The court dismissed part of Kiles's

25   claim as not colorable because he did "not demonstrate . . . that the outcome would

26   have been different." (ROA 1214 at 2.) At no point did the court cite any other

27   prejudice standard for an ineffective-assistance claim, and at no point did the court

28

cite a case applying the correct *Strickland* standard.[86] (*See* ROA 1214 at 1-2.) Accordingly, the state post-conviction court unambiguously applied a standard that was contrary to and/or an unreasonable application of clearly established federal law, satisfying 28 U.S.C. § 2254(d)(1). *See, e.g.*, *Thomas*, 789 F.3d at 767–68 (holding that court's "would have led to a different result" prejudice standard was an unreasonable application of *Strickland*, when the state court did not explain why there was no prejudice or otherwise demonstrate that it had used the correct standard); *Martin*, 424 F.3d at 592 (holding that the state court's prejudice inquiry—whether "the result of the proceeding would have been different"—was contrary to *Strickland*).

In addition, under *Strickland* and other Supreme Court precedent, the court must evaluate prejudice cumulatively. *See Strickland*, 466 U.S. at 694–95 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional *errors*, the result of the proceeding would have been different. . . . In making this [prejudice] determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury."); *see also, e.g.*, *Williams*, 529 U.S. at 397–98. In fact, *Strickland* explicitly adopted the materiality standard in *United States v. Agurs*, 427 U.S. 97 (1976), for a suppression-of-evidence claim. *Strickland*, 466 U.S. at 694. The Supreme Court has repeatedly and forcefully held that the materiality standard considers cumulative prejudice; in other words, when assessing materiality, the suppressed evidence must be "considered collectively, not item by item." *Kyles v. Whitley*, 514 U.S. 419, 436 (1995). Accordingly, in order to comply with clearly established Supreme Court precedent, "[s]eparate errors by counsel at trial and at sentencing should be analyzed together

---

[86] Indeed, at no point did the state post-conviction court cite any case at all. (*See* ROA 1214 at 1-2.) Further, because the state court never gave any indication that it was applying the correct prejudice standard under *Strickland*, it must have applied the incorrect standard—the sole standard for prejudice it cited—to every ineffective-assistance claim it considered.

1   to see whether their cumulative effect deprived the defendant of his right to
2   effective assistance." *Sanders v. Ryder*, 342 F.3d 991, 1001 (9th Cir. 2003). "They
3   are, in other words, not separate claims, but rather different aspects of a single claim
4   of ineffective assistance of trial counsel." *Id.* Even if prejudice does not result from
5   an individual error, it may nevertheless result from cumulative errors. *See Boyde v.*
6   *Brown*, 404 F.3d 1159, 1176 (9th Cir. 2005).

7       Kiles's state post-conviction court, however, considered the prejudice from
8   each instance of deficient performance (albeit using the wrong standard) separately.
9   The court did not consider or even allude to cumulative prejudice. Because the state
10  court failed to do so, its ruling was an unreasonable application of and/or contrary
11  to Supreme Court precedent. *See Strickland*, 466 U.S. at 694–95.

12      The state court's decision of no colorable showing with respect to deficient
13  performance was likewise an unreasonable application of or contrary to Supreme
14  Court precedent; further, the decision on both prongs turned on an unreasonable
15  determination of fact. *See* 28 U.S.C. § 2254(d)(2); *see also, e.g.*, *Taylor v. Maddox*,
16  366 F.3d 992, 999–1001 (9th Cir. 2004) (discussing ways in which § 2254(d)(2)
17  can be satisfied). As just one example, the state court necessarily ignored counsel's
18  wholesale lack of investigation before adopting a trial strategy, which is an
19  unreasonable application of *Strickland* and/or an unreasonable determination of
20  fact. *See Taylor*, 366 F.3d at 1001 ("the state-court fact-finding process is
21  undermined where the state court has before it, yet apparently ignores, evidence
22  that supports the petition's claim"). Because Kiles has satisfied § 2254(d), this
23  Court's analysis is "unconstrained" by AEDPA deference.[87] *See Williams*, 529 U.S.
24  at 405–06.

25
26

---

27  [87]Alternatively, Kiles alleges he can overcome any default by showing cause and
    prejudice attributable to the ineffective assistance of state post-conviction counsel.
28  *See Martinez*, 566 U.S. at 9; *Strickland*, 466 U.S. at 688, 694.

139

N.     Conclusion.

For the reasons stated above, Kiles's counsel provided ineffective assistance at Kiles's guilt-phase proceedings, thereby prejudicing Kiles. The state-court decision is no bar to this Court's de novo review of this claim, and Kiles is entitled to relief from his unconstitutional convictions.

Claim Four

**Kiles's counsel's ineffective assistance in jury selection at the penalty phase of trial deprived Kiles of his rights to counsel, a fair trial, an impartial jury, reliable sentencing proceedings, due process, and equal protection.**

Kiles's counsel's ineffective assistance in penalty-phase jury selection deprived Kiles of his rights to counsel, a fair trial, impartial jury, reliable sentencing proceedings, due process, and equal protection in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution. Kiles incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Kiles did not present this claim in state court. Kiles can overcome any default by showing cause and prejudice, as the ineffective assistance of Kiles's state post-conviction counsel in failing to raise this claim constitutes cause for the default and resulted in prejudice to Kiles. *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). Kiles will demonstrate at an evidentiary hearing that state post-conviction counsel fell below the standards of a minimally competent capital post-conviction attorney when they failed to raise this meritorious claim. Because this claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider the merits of the claim de novo.

As noted in Claim 2, *supra*, "the selection of jurors is a critical area of a jury trial, especially in a capital case." *Harris ex rel. Ramseyer v. Blodgett*, 853 F. Supp. 1239, 1265 (W.D. Wash. 1994); *see also* Gary Goodpaster, *The Trial for Life:*

140

*Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. Rev. 299, 325 n.125 (1983) (because a death verdict must be unanimous, "it is critically important that the defense secure jurors disfavoring the death penalty").

The Constitution safeguards against a mandatory death sentence upon conviction. *Woodson v. North Carolina*, 428 U.S. 280 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.). At the core of that protection is the right to be sentenced by jurors who make an individualized, reasoned moral decision whether life or death is the appropriate sentence, by considering and giving full effect to all mitigation. *See Lockett v. Ohio*, 438 U.S. 586 (1978); *Eddings v. Oklahoma*, 455 U.S. 104 (1982). Thus, in selecting a capital jury, counsel must elicit sufficient information to determine whether a prospective juror has a "substantial[] impair[ment]" regarding sentencing—if the answer is yes, that juror cannot serve. *See Morgan v. Illinois*, 504 U.S. 719, 728 (1992).

Jurors with absolutist views for or against the death penalty must be disqualified. *Wainwright v. Witt*, 469 U.S. 412, 424–26 (1985). Such jurors include those who would automatically vote for the death penalty if, for example, a certain type of aggravating circumstance were established. "The risk that such jurors may have been empaneled [] and 'infected petitioner's capital sentencing [is] unacceptable in light of the ease with which that risk could have been minimized.'" *Morgan*, 504 U.S. at 736 (quoting *Turner v. Murray*, 476 U.S. 28, 36 (1986)). To avoid such an outcome, counsel must learn jurors' feelings on issues relevant to the individual case. Counsel must utilize vigorous voir dire to fully explore each prospective juror's views and mitigation impairments, which requires familiarity with the information that both parties will likely present at the penalty phase. *See Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) ("*Voir dire* plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored. Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to

141

1    follow the court's instructions and evaluate the evidence cannot be fulfilled.")

2    Because of the critical nature of jury selection, especially in capital cases,
3    counsel's failure to engage in adequate voir dire can constitute ineffective
4    assistance. *See Strickland*, 466 U.S. at 688, 694; *Ybarra v. McDaniel*, 656 F.3d 984,
5    1001 (9th Cir. 2011) (analyzing claim of ineffective assistance of counsel with
6    respect to jury selection).

7    The 2003 ABA Guidelines obligated counsel to familiarize themselves "with
8    the precedents relating to questioning and challenging of prospective jurors,
9    including the procedures surrounding 'death qualification' concerning any
10   prospective juror's beliefs about the death penalty." 2003 ABA Guideline
11   10.10.2(B). The Guidelines further required capital counsel to be familiar with how
12   to do the following: (1) expose those prospective jurors who would automatically
13   impose the death penalty following a murder conviction or a finding that the
14   defendant is death-eligible, regardless of the individual circumstances of the case;
15   (2) uncover those prospective jurors who could not give meaningful consideration
16   to mitigating evidence; and (3) rehabilitate prospective jurors whose initial
17   indications of opposition to the death penalty could make them excludable. *Id.*

18   By the time of Kiles's 2006 sentencing, the proper methods for selecting a
19   capital jury were established and routinely followed in other cases. While capital
20   jury selection was relatively new to Arizona, others nationwide had engaged in the
21   practice for some time, and literature and trainings were widely available in Arizona
22   well before Kiles's trial. *See, e.g.*, John H. Blume, et al., *Probing "Life*
23   *Qualification" Through Effective Voir Dire*, 29 Hofstra L. Rev. 1209 (2001). The
24   need for training was particularly acute after the switch to jury sentencing in
25   Arizona, given the nuances of effective capital jury selection.

26   Kiles's counsel, however, lacked the requisite training and experience in
27   capital jury selection. As a result, counsel failed to question prospective jurors in a
28   manner designed to expose and exclude, or rehabilitate if appropriate, jurors

1   impaired under *Morgan*, given Kiles's individual circumstances. As elaborated

2   below, counsel's voir dire failed to uncover the jurors who were unable to give full

3   and fair consideration to Kiles's mitigation evidence as constitutionally required.

4   Because some jurors unable to do so were then seated, that ineffective voir dire

5   prejudiced Kiles. *See Ybarra*, 656 F.3d at 1001 (prejudice from deficient voir dire

6   shown when "any juror who harbored an actual bias was seated on the jury as a

7   result of counsel's failure to voir dire" on the relevant subject matter).

8       **A.**    **Despite having won the right to question prospective jurors on**

9                        **specific types of mitigation, counsel failed to do so, thereby prejudicing Kiles.**

10      Kiles's counsel performed deficiently, as the failure to question jurors

11  individually about the specific types of mitigation to be presented, after winning the

12  right to do so, fell short of "prevailing professional norms." *Strickland*, 466 U.S. at

13  688. The 2003 ABA Guidelines required counsel to learn techniques for

14  "uncovering those prospective jurors who [were] unable to give meaningful

15  consideration to mitigating evidence." 2003 ABA Guideline 10.10.2(B). Jury

16  selection is especially critical in a capital case. *Harris*, 853 F. Supp. at 1265.

17      The right to adequate voir dire as guaranteed by *Morgan* hinges on counsel

18  making reasoned professional judgments. While counsel's decisions are typically

19  given deference, this deference applies only insofar as counsel makes a strategic

20  decision based on reasonable professional judgment, based on "thorough

21  investigation of law and facts relevant to plausible options[.]" *Strickland*, 466 U.S.

22  at 690–91; *Williams v. Taylor*, 529 U.S. 362, 373 (2000). Deference is not

23  warranted where a decision is based on inattention. *See Rompilla v. Beard*, 545 U.S.

24  374, 395–96 (2005) (finding prejudice where counsel made a decision that

25  prejudiced a defendant as "the result of inattention, not reasoned strategic

26  judgment") (quoting *Wiggins v. Smith*, 539 U.S. 510, 534 (2003)).

27      Kiles's second counsel, Treasure VanDreumel, knew the importance of

28  questioning prospective jurors individually, particularly on their views on specific

143

1   mitigation. Shortly before voir dire began on March 6, 2006, VanDreumel filed a
2   "Request to Voir Dire Prospective Jurors re: Mitigating Factors Recognized by
3   Law," accompanied by a memorandum arguing the need to question jurors
4   individually about mitigation, with hypotheticals, to ensure that the jurors would
5   consider mitigation and not automatically impose the death penalty. (ROA 729.)
6   When the State opposed the motion (*see* ROA 742 at 2), VanDreumel urged lead
7   counsel Clark to argue the motion, noting that where a trial court prevents counsel
8   from asking about prospective jurors' views on mitigation through voir dire,
9   appellate courts have held it a due-process error. Kiles won this motion.

10  However, Clark conducted the voir dire, and he did not ask prospective jurors
11  about specific types of mitigation or hypotheticals relevant to Kiles or his case.
12  Indeed, shortly after jury selection ended, Kiles's mitigation specialist, Tyrone
13  Mayberry, e-mailed VanDreumel expressing his frustration with the jury selection
14  process, and specifically with the fact that Clark had picked a jury without knowing
15  anything about Kiles's mitigation. VanDreumel responded that she normally would
16  agree, especially as she fought to win the motion, but that at least none of the seated
17  jurors admitted to being an automatic vote for a death sentence. She noted that
18  asking about Kiles-specific mitigation would have been helpful only if Clark had
19  been well-versed on the Colorado Method,[88] which he was not. Lead counsel was
20  not trained to conduct or experienced with the premier method for conducting
21  capital voir dire; even worse, he knew nothing about the mitigation his own team
22  planned to present.[89] Still, he conducted the bulk of voir dire at sentencing.

23  _____

24  [88] The "Colorado Method" is a name for a system of *Morgan*-based voir dire that
    includes questions on hypothetical, case-specific mitigation, "developed for use [in]
25  capital cases to rate potential jurors . . . based on their views on the death penalty."
    *Fulks v. United States*, 875 F. Supp. 2d 535, 600 (D.S.C. 2010). By September
26  2002, the Maricopa County Office of the Public Defender's Capital Unit required
27  that its attorneys be trained on and use the Colorado Method for jury selection.

28  [89] As discussed in Claim 6, *infra*, lead counsel's failure to familiarize himself with
    any of the mitigation pertaining to his capital client, and the team's general

1    Moreover, Clark's deficient performance prejudiced Kiles, as there was "a

2    reasonable probability that, but for counsel's unprofessional errors, the result of the

3    proceeding would have been different." *Strickland*, 466 U.S. at 694. "'Establishing

4    *Strickland* prejudice in the context of juror selection requires a showing that, as a

5    result of trial counsel's [error], the jury panel contained at least one juror who was

6    biased.'" *Ybarra*, 656 F.3d at 1001 (quoting *Davis v. Woodford*, 384 F.3d 628, 643

7    (9th Cir. 2004)) (alteration in original).

8    Here, counsel failed to question multiple people who served on Kiles's jury

9    who indicated that they could not be impartial or fully consider mitigation. For

10   example, Juror 6 wrote repeatedly on his questionnaire that, when he was a child

11   about the same age as a victim in Kiles's case, his father murdered his mother. He

12   wrote that he received mental-health treatment because of the domestic violence in

13   his home, ending with his father murdering his mother. Juror 6 wrote that his father

14   was paroled after 12½ years, and moreover that parole should not be allowed for

15   such a crime. In response to the question whether a particular life event influenced

16   his view on the death penalty, his questionnaire cited his experience with his

17   mother's murder. The State asked him about his mother's murder, and he said that

18   he was adopted by his mother's side of the family, but he could not specify how her

19   murder affected him, beyond forcing him to grow up quickly. (Tr. Mar. 7, 2006 at

20   7–8.) Inexplicably, Clark asked him zero questions. (Tr. Mar, 7, 2006 at 9.) This

21   juror was victimized by a domestic-violence crime with facts strikingly similar to

22   those alleged by the State in Kiles's case, calling into question Juror 6's ability to

23   remain impartial and fair. *See* Ariz. Rev. Stat. § 13-4401(19).[90] It is inexcusable

24   that counsel did not ask him a single question or ask that he be struck for cause. *See*

25

26   dysfunction, denied Kiles effective assistance of counsel throughout proceedings, including at voir dire.

27   [90] This Petition cites the current version of the Arizona Revised Statutes (hereinafter

28   "A.R.S."), except when it is not substantially similar to the version of the statute at issue.

145

1   *United States v. Gonzalez*, 214 F.3d 1109, 1112 (9th Cir. 2000) (explaining that a

2   court may assume a juror is biased where he "has had some personal experience

3   that is similar or identical to the fact pattern at issue in the trial"); *see also Tinsley*

4   *v. Borg*, 895 F.2d 520, 528 (9th Cir. 1990) (explaining that "[c]ourts have been

5   willing to presume bias where a juror or his close relatives have been personally

6   involved in a situation involving a similar fact pattern").

7        Juror 2 said that her sister had been severely beaten and moved "from room

8   to room" during an assault in her home—another crime notably reminiscent of the

9   State's version of the crime at issue. (Tr. Mar. 6, 2006 at 81.) Further, for years

10  Juror 2 had worked on criminal cases in the county attorney's office, and her best

11  friend's sister had been killed. (Tr. Mar. 6, 2006 at 81–89.) Again, even though

12  Juror 2's prior experiences begged for further questioning to explore her ability to

13  be impartial, Clark asked her no questions about her personal experience with

14  violent crime. (Tr. Mar. 6, 2006 at 81–89.) He also did not challenge her for cause,

15  even though such a challenge would have been granted. *See Gonzalez*, 214 F.3d at

16  1112; *Tinsley*, 895 F.2d at 528.

17       Clark continued to fail to question prospective jurors on critical topics. Juror

18  3 wrote on her questionnaire that her friend had been killed by a drunk driver. Clark

19  did not ask about this experience or whether it would impair her ability to consider

20  substance-abuse mitigation; he also did not challenge her for cause. (Tr. Mar. 6,

21  2006 at 95–98.) Juror 5's siblings worked as police officers and for the county

22  attorney. Clark asked Juror 5 no questions on this or whether she would give greater

23  weight to the prosecutor or law-enforcement witnesses because of her familial

24  connections. (Tr. Mar. 7, 2006 at 10–16.) Juror 14 wrote that his wife and step-

25  daughter were in treatment for post-traumatic stress. Clark did not ask why they

26  were in such treatment or whether that could impair his ability to consider

27  mitigation fairly. (Tr. Mar. 15, 2006 at 38–45.)

28       Counsel's unprofessional failure to ask questions on hypothetical mitigation

146

given the facts of the case resulted in the seating of multiple jurors who were unwilling to consider as mitigating some of the evidence presented at trial or who were otherwise biased. *Ybarra*, 656 F.3d at 1001; *see also, e.g.*, *Gonzalez*, 214 F.3d at 1112. Accordingly, counsel provided ineffective assistance during the penalty-phase voir dire.

**B.    Counsel deficiently failed to question a number of seated jurors about their pro-death sentence biases, thereby prejudicing Kiles.**

Counsel failed to ask any questions of some seated jurors and failed to meaningfully question other seated jurors. This resulted in multiple people serving on Kiles's jury who should have been struck for cause because their ability to consider voting for a life sentence was substantially impaired.

In *Morgan*, the Supreme Court reiterated that any juror who would automatically impose the death penalty upon conviction must be disqualified for cause. 504 U.S. at 729, 735–36. The Court further held that capital defendants are constitutionally entitled to examine prospective jurors on voir dire with enough specificity to identify and challenge any juror holding such views. *Id.* at 729, 735–36. As discussed above, the 2003 ABA Guidelines required capital counsel to be familiar with techniques for upholding a defendant's rights under *Morgan*. 2003 ABA Guideline 10.10.2(B). Clark was obligated to familiarize himself with techniques for uncovering those prospective jurors who are unable to give meaningful consideration to the mitigating evidence at issue. *See* 2003 ABA Guideline 10.10.2(B); *Morgan*, 504 U.S. at 736. Indeed, "the starkest failures of capital voir dire are the failure to uncover jurors who will automatically impose the death penalty following a conviction or finding of the circumstances which make the defendant eligible for the death penalty[.]"). 2003 ABA Guideline 10.10.2(B) cmt.; *see also Virgil v. Dretke*, 446 F.3d 598, 613 (5th Cir. 2006) (counsel must make reasonable efforts "to explore the depth or intensity" of potentially disqualifying views among the venire).

147

1    Clark repeatedly failed to ask prospective jurors questions sufficient to
2    uncover biases in favor of death, including biases that might require
3    disqualification. Moreover, he did so even though the prospective jurors'
4    questionnaires and other voir dire answers raised serious concerns that they could
5    not be impartial and could not meaningfully consider mitigation evidence. In doing
6    so, Clark performed deficiently. *See Strickland*, 466 U.S. at 694.

7    For example, Juror 1 wrote on her questionnaire that, if there were a fair trial,
8    she would support the death penalty; she added that the death penalty was more
9    appropriate in this case than a life sentence. Juror 2 wrote on her questionnaire that
10   she was okay with the death penalty for first-degree murder if the person was
11   convicted beyond a reasonable doubt; she could vote for life with parole eligibility
12   after 25 years, but she did not like that sentence for such a crime. Instead of
13   challenging these jurors for cause, or questioning them to establish that they should
14   be disqualified as automatic death votes, Clark asked a few questions, and the jurors
15   were seated. (Tr. Mar. 6, 2006 at 70–72, 86–89.) Clark failed to question other
16   people who should have been disqualified or removed via defense peremptory,
17   including Juror 12 wrote who on his questionnaire that the death penalty was
18   appropriate for a first-degree murder conviction, because you pay for what you do
19   in life. Defense counsel did not ask him a single question and did not challenge him
20   for cause. (Tr. Mar. 8, 2006 at 71–72.) Juror 12 was then seated.[91]

21   Because jurors were seated despite their inability to fairly consider a life
22   sentence, counsel's deficient performance at voir dire prejudiced Kiles. *See Ybarra*,
23   656 F.3d at 1001.

24   **C.    Counsel deficiently altogether failed to question eight seated**
25   **jurors, thereby prejudicing Kiles.**

26   Kiles's counsel failed to ask a single question of eight jurors who were
27
28   ───────────────
     [91] Ultimately, Juror 12 served as an alternate juror. (Tr. Apr. 12, 2006 at 29–30.)

1   ultimately selected. Kiles's attorneys failed to use the tools at their disposal, and as

2   a result, a number of jurors were seated without any defense questions at voir dire.

3       As discussed above, given the importance of jury selection in a capital case,

4   it is incumbent upon counsel to ensure that seated jurors are able to consider

5   mitigating circumstances and are able to consider a life sentence. 2003 ABA

6   Guideline 10.10.2(B) cmt.; *see also Virgil*, 446 F.3d at 613. In failing abjectly to do

7   so, counsel performed deficiently.

8       More specifically, Kiles's counsel did not ask a single individual question of

9   eight people who were selected for Kiles's jury: Jurors 6, 9, 10, 11, 12, 13, 15 and

10  16.[92] (Tr. Mar. 7, 2006 at 9, 117; Tr. Mar. 8, 2006 at 32, 43–44, 71–72; Tr. Mar. 15,

11  2006 at 70, 74.) This was despite statements on their questionnaires and during the

12  State's voir dire that called into question their ability to be fair and impartial and

13  their ability to fully consider mitigating evidence. In addition to the jurors discussed

14  in Sections A and B, *supra*, other jurors raised what should have been red flags for

15  the defense. For example, Juror 14 said during the State's questions that he

16  volunteered at a crisis center for abused children. (Tr. Mar. 15, 2006 at 64.) Given

17  that Kiles had been convicted of the first-degree murder of two children and two

18  counts of child abuse, counsel was required to follow up on how Juror 14's

19  volunteer work affected his ability to be fair in this case. Similarly, Jurors 11 and 9

20  stated that they were burglary victims. (Tr. Mar. 8, 2006 at 11–12.) Still, Clark

21  asked them no questions.

22      Again, because jurors who harbored actual biases based on their personal

23  experiences were seated because of counsel's deficient performance during voir

24  dire, Kiles was prejudiced. *See Ybarra*, 656 F.3d at 1001.

25

26

27

28  [92] Jurors 10, 12, and 13 were alternates.

149

1
2

**D.     Counsel failed to question adequately and to challenge for cause jurors who should have been disqualified for cause.**

3   Kiles's counsel was ineffective in failing to adequately question multiple
4   jurors whose questionnaires or answers to the State's questions indicated that the
5   prospective jurors should be struck for cause. As a result of this failure of advocacy,
6   Kiles's counsel had to use peremptory strikes against these jurors, depriving Kiles
7   of a fair and impartial jury.

8   As discussed above, counsel conducting capital voir dire must know
9   techniques for exposing prospective jurors who would automatically impose the
10  death penalty or who are unable to give meaningful consideration to mitigating
11  evidence. 2003 ABA Guideline 10.10.2(A), (B). Such jurors are impaired under
12  *Morgan* and cannot serve. *Morgan*, 504 U.S. at 728.

13  Kiles's counsel unreasonably failed to utilize such techniques. Many jurors
14  against whom defense counsel used peremptory strikes could have been challenged
15  for cause, had counsel properly questioned them. For example, prospective Juror
16  23 wrote on her questionnaire that she believed the death penalty was appropriate
17  for first-degree murder because she believed in an eye for an eye, you get what you
18  give. She wrote that a life sentence was not fair or just: Why should a person be
19  allowed to live when he took a life? She expanded that in prison you get three meals,
20  showers, library, and a clean bed to sleep in. The defense did not even attempt to
21  challenge this juror for cause; counsel instead wasted a peremptory strike.

22  Similarly, prospective Juror 63 said in voir dire that the death penalty should
23  be used in cases with aggravating factors, such as child victims. (Tr. Mar. 7, 2006
24  at 103.) Clark questioned him, but did not ask if he would impose the death penalty
25  in every case with child victims—whether the prospective juror could consider a
26  life sentence in this case. (Tr. Mar. 7, 2006 at 105–06.) Again, defense counsel did
27  not challenge the prospective juror for cause and instead used a peremptory strike.

28  Further, defense counsel failed altogether to question three prospective jurors

150

1   whom the defense later struck: prospective Jurors 37, 98, and 85. Competent voir

2   dire would likely have elicited that they were substantially impaired under *Morgan*.

3   For example, prospective Juror 37 wrote on her questionnaire and said during the

4   State's voir dire that her friend's two-year-old granddaughter had been killed the

5   prior year. (Tr. Mar. 7, 2006 at 72.) She said in response to the State's questioning

6   that this experience would not affect her; she could be impartial, as long as she was

7   not facing the person who had killed her friend's grandchild. (Tr. Mar. 7, 2006 at

8   73.) However, she wrote on her questionnaire that the death penalty took too long,

9   hurting victims' families, and that it was not imposed frequently enough. Clark

10  could have questioned her to elicit specific instances in which she could not be

11  impartial, such as when there was a child victim. Instead, he asked no questions.[93]

12  (Tr. Mar. 7, 2006 at 75.)

13       While Kiles's counsel did challenge two prospective jurors for cause,

14  counsel's failure to effectively argue the challenges caused counsel to lose both

15  times. (*See* Tr. Mar. 16, 2006 at 9–15.) Counsel made for-cause challenges against

16  only prospective Jurors 78 and 82. (Tr. Mar. 16, 2006 at 9, 13.) But counsel failed

17  to properly ask them questions to fully expose the extent to which they should have

18  been excluded as jurors who would have automatically imposed death. (*See* Tr.

19  Mar. 8, 2006 at 47–61, 88–106.) Prospective Juror 78 stated on his questionnaire

20  and in voir dire that he would vote for death for first-degree murder if it were an

21  option; if a person were guilty beyond a reasonable doubt, he would give death. (Tr.

22  Mar. 8, 2006 at 58.) Prospective Juror 82 stated that the death penalty should be

23  mandatory where there is no remorse. (Tr. Mar. 8, 2006 at 103–04.) He also said

24  that his aunt was murdered in 2001 by a man who entered her home and beat her,

25  _____

26  [93] Counsel failed to preserve the jury questionnaires of Prospective Jurors 98 and
    85. Given that the defense struck these two prospective jurors, it is likely that the
27  questionnaires contained something indicating that they would be biased against
    the defense. Counsel could have elicited these biases through questioning, obviating
28  the need to use peremptory strikes on these prospective jurors.

1    that proceedings were ongoing in that case, and that he had voted to sentence a

2    person to death while serving on a Nevada jury in the late 1980s. (Tr. Mar. 8, 2006

3    at 99–102.) When arguing the challenge for cause against Prospective Juror 82,

4    counsel did not even mention the prospective juror's aunt was murdered or his prior

5    capital jury service. As a result, the court did not disqualify these jurors for cause.

6    (Tr. Mar. 16, 2006 at 13, 15.)

7        Counsel's tepid advocacy left counsel with no option but to use peremptory

8    strikes against these prospective jurors. As a result, once counsel had used all of

9    their allotted strikes (*see* ROA 895), counsel were unable to remove biased jurors,

10   including those described above. And, because at least one biased juror served on

11   Kiles's jury as a result of counsel's deficient performance, Kiles suffered prejudice.

12   *Ybarra*, 656 F.3d at 1001.

13       **E.    Counsel failed to rehabilitate prospective jurors who expressed
14              discomfort with the death penalty but who still could have
                properly served.**

15       Not only did defense counsel allow pro-death jurors to serve, counsel made

16   little attempt to rehabilitate jurors who expressed some opposition to the death

17   penalty. Indeed, counsel often stipulated to their removal without questioning them

18   at all.

19       Constitutional principles carefully restrict the disqualification of jurors based

20   on anti-death penalty views. The Supreme Court has made clear that the exclusion

21   of prospective jurors from service solely because they had reservations about capital

22   punishment violated capital defendants' due process right not to be placed on trial

23   before a "tribunal organized to return a verdict of death." *Witherspoon v. Illinois*,

24   391 U.S. 510, 521–22 (1968). The Court has reformulated this rule to forbid courts

25   from disqualifying a juror on the basis of death-penalty opposition unless that

26   opposition is so categorical that it "would prevent or substantially impair the

27   performance of his duties as a juror in accordance with his instructions and his

28   oath." *Witt*, 469 U.S. at 420. "Those who firmly believe that the death penalty is

152

1  unjust may nevertheless serve as jurors in capital cases so long as they state clearly

2  that they are willing to temporarily set aside their own beliefs in deference to the

3  rule of law." *Lockhart v. McCree*, 476 U.S. 162, 176 (1986).

4      A core obligation for capital counsel is to familiarize themselves "with the

5  precedents relating to questioning and challenging of prospective jurors, including

6  the procedures surrounding 'death qualification' concerning any prospective juror's

7  beliefs about the death penalty." 2003 ABA Guideline 10.10.2(B); *see also Morgan*,

8  504 U.S. at 719, 728. Counsel had a duty to "rehabilitate jurors who appear to have

9  made it unmistakably clear that they would never vote for death by eliciting that, in

10 some set of circumstances, such a juror could vote for the imposition of the death

11 penalty." Goodpaster, *The Trial for Life*, 58 N.Y.U. L. Rev. at 326. Here, however,

12 rather than attempt to rehabilitate these jurors, Kiles's counsel stipulated with the

13 State to disqualify them. This constituted deficient performance.

14     As far as the record shows, only five of the 142 prospective jurors were

15 challenged for cause by one side.[94] A majority of prospective jurors were dismissed

16 via stipulation between Kiles's counsel and the State. Many expressed the type of

17 opposition to the death penalty for which a person may not constitutionally be

18 excluded. For example, Prospective Juror 59's questionnaire indicated that she

19 would not administer the death penalty herself and that she did not consider the

20 death penalty a moral and proper function of the justice system. Still, she specified

21 that her decision to impose would depend on the facts and circumstances of the

22 case, she would follow instructions, and she had no objections to the death penalty.

23 She was asked no questions at voir dire, and no reason was given for her dismissal.

24 There were no other obvious grounds for her dismissal.

25     Counsel stipulated with the State to dismiss multiple jurors who, like

26 Prospective Juror 59, indicated some opposition to the death penalty on their

27

28 [94] This count excludes prospective jurors who were excused for hardship reasons
and challenges for cause that the non-moving party did not oppose.

questionnaires but may have been eligible to serve. Counsel made no effort to rehabilitate these jurors, which include Prospective Jurors 110, 136, and 138, even where they stated they could follow the law. For example, the prosecutor sent a list to Kiles's counsel of prospective jurors who should be removed, including Prospective Jurors 110, 136 and 138, citing their opposition to the death penalty. Defense counsel appear to have agreed to removing all 22 prospective jurors suggested by the State without counter-proposing a single prospective juror, as all were struck without questioning at the day's start with no names added. (Tr. Mar. 15, 2006 at 3–4.)

Further, the court struck one prospective juror for cause because of defense counsel's failure to adequately rehabilitate her. The State moved to strike Prospective Juror 56 because of her opposition to the death penalty. (Tr. Mar. 16, 2006 at 3.) Defense counsel failed to rehabilitate her through voir dire and advocacy. (Tr. Mar. 16, 2006 at 3–5.) Though the prospective juror expressed that she did not personally believe in the death penalty, she also said she could impose it. (Tr. Mar. 7, 2006 at 92–93.) However, after the State argued that she should be dismissed for cause, VanDreumel argued only briefly against it, then quickly ceded that she would "leave this one to the Court's discretion." (Tr. Mar. 16, 2006 at 4.) In response, the court stated that he would dismiss the prospective juror because she was "just too conflicted . . . to be fair and impartial." (Tr. Mar. 16, 2006 at 5.)

Kiles's counsel failed to attempt to rehabilitate jurors who were uncomfortable with the death penalty but could nevertheless have properly fulfilled their duties. Instead, counsel unreasonably stipulated to their removal, in violation of prevailing norms and Kiles's constitutional rights.

Counsel's failure to rehabilitate these jurors prejudiced Kiles. Had counsel successfully rehabilitated them, they would have either served on Kiles's jury or the State would have had to use peremptory strikes on them. The resulting jury would have less resembled one "organized to return a verdict of death."

154

*Witherspoon*, 391 U.S. at 521. The Supreme Court has underscored the importance of jurors with concerns regarding the death penalty—but still willing to impose it— serving on a capital defendant's jury. Where a "scrupled, yet eligible" juror is removed in violation of *Witherspoon* and *Witt*, it constitutes fundamental error, and prejudice is assumed. *Gray v. Mississippi*, 481 U.S. 648, 668 (1987). Had counsel rehabilitated these jurors and avoided the apparent *Witherspoon* violations, there is a "probability sufficient to undermine confidence in the outcome" that the proceeding's outcome would have differed. *Strickland*, 466 U.S. at 694.

### F.   Counsel failed to challenge the prosecutor's discriminatory use of peremptory strikes to exclude an African-American prospective juror.

Kiles's counsel provided ineffective assistance in failing to object under *Batson v. Kentucky*, 476 U.S. 79 (1986), at the penalty-phase jury selection when the State used a peremptory strike to exclude an African American based on race. In *Batson*, the Supreme Court held that the use of peremptory challenges based on race violates the Equal Protection Clause. *Id.* at 89.

The three-step analysis applied to a *Batson* challenge is well-known: "First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race." *Hernandez v. New York*, 500 U.S. 352, 358–59 (1991) (plurality opinion). To establish a prima facie case, a defendant must show "that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Batson*, 476 U.S. at 94. A comparative analysis of seated and challenged jurors may raise an inference of discrimination. *Green v. LaMarque*, 532 F.3d 1028, 1030 n.3 (9th Cir. 2008). The burden to make a prima facie *Batson* showing is "minimal." *Johnson v. Finn*, 665 F.3d 1063, 1071 (9th Cir. 2011). However, counsel must make a timely objection to the discriminatory strike. *See Doe v. Ayers*, 782 F.3d 425, 432 (9th Cir. 2015).

Counsel could have established prima facie discrimination, and the burden would have shifted to the prosecutor to "explain adequately the racial exclusion by

offering permissible race-neutral justifications for the strikes." *Johnson v. California*, 545 U.S. 162, 168 (2005). The State must "(1) assert that specific, race-neutral reasons were the *actual* reasons for the challenged strikes, and (2) offer some evidence which, if credible, would support the conclusion that those reasons were the *actual* reasons for the strikes." *Shirley v. Yates*, 807 F.3d 1090, 1104 (9th Cir. 2016). Finally, the court must determine whether the defendant has proven purposeful discrimination by a preponderance of the evidence. *Hernandez*, 500 U.S. at 359.

At the time of Kiles's trial, *Batson* was longstanding precedent. Further, the 2003 ABA Guidelines obligated counsel to consider "challenges to the procedures for selecting the jury that would be available in any criminal case (particularly those relating to bias on the basis of race or gender)." 2003 ABA Guideline 10.10.2(A).

Given the facts at Kiles's trial, counsel's notes, prevailing professional norms, and the "minimal" burden to prove a prima facie *Batson* case, it was unreasonable for counsel to fail to raise a *Batson* objection to the strike of Prospective Juror 96. *See Doe*, 782 F.3d at 432 (counsel performed deficiently where of the four African-American prospective jurors, the State struck one, with no objection from the defense, and one was empaneled). Kiles's counsel's notes indicate that, to their knowledge, out of 142 prospective jurors, four were African American. The State used a peremptory strike to remove one, Prospective Juror 96, without apparent cause. (ROA 895 at 4.) Defense counsel wrote "*Batson*" next to his name, but did not object on the record. (*See* Tr. Mar. 16, 2006; ROA 804 at 1.) Only one African-American person served on Kiles's penalty-phase jury.

There is no clear reason other than race for the State to have stricken African-American Prospective Juror 96. While he indicated that he had a long-ago acquaintance who had been killed (Tr. Mar. 8, 2006 at 110–11), Juror 6 was seated despite his mother having been killed. (Tr. Mar. 7, 2006 at 7–8.) Prospective Juror 96's father-in-law was a corrections officer (Tr. Mar. 8, 2006 at 110–12), but Jurors

156

7 and 9 had close relatives in corrections and were still seated. (Tr. Mar. 7, 2006 at 79–80.) Prospective Juror 96's father, to whom Prospective Juror 96 had not spoken in years, had drug problems, but seated Juror 3 also had an immediate family member with drug problems. Finally, Prospective Juror 96 wrote on his questionnaire that some people may deserve the death penalty, but he was not sure if he would be comfortable imposing it. However, he noted that his decision to impose death would depend on the facts and circumstances of the case, that he would follow the law, and that he had no objections to the death penalty. When questioned by the State, he repeated that he would decide on a "case-by-case" basis. (Tr. Mar. 8, 2006 at 113, 116.) When questioned by the defense, he explained his uncertainty was because he did not know the facts of the case. (Tr. Mar. 8, 2006 at 115–16.) Multiple jurors who were not African-American were seated even though they expressed similar discomfort with the death penalty; they include Juror 7, who called the death penalty "a necessary evil," and Juror 16, who wrote that it could be a deterrent but that he worried about error.

Kiles was prejudiced by counsel's failure to object. To prove ineffective assistance for counsel's failure to make a *Batson* motion, petitioner must show prejudice by "showing that there is a reasonable probability that the claim [counsel] failed to raise at trial would have prevailed, either at trial or on appeal." *Doe*, 782 F.3d at 432 (citing *Strickland*, 466 U.S. at 694). Given the facts at Kiles's voir dire, and the absence of any reason other than race for the State's peremptory strike, there is a reasonable probability that counsel would have prevailed on an objection to the State's discriminatory use of peremptory strikes. Further, a *Batson* violation is structural, and a conviction must be vacated if a prosecutor's strike was race-motivated. *Turner v. Marshall*, 121 F.3d 1248, 1254 n.3 (9th Cir. 1997), *overruled on other grounds by Tolbert v. Page*, 182 F.3d 677 (9th Cir. 1999) (en banc). Accordingly, had counsel objected and Kiles prevailed on appeal, his conviction would have been vacated.

157

1

2

### G.  Counsel failed to challenge the denial of a fair cross-section of the community in the venire.

3

4

5

6

7

8

9

10

11

12

13

14

As laid out *supra*, Claim 2, a venire comprised of "a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial." *Taylor v. Louisiana*, 419 U.S. 522, 528 (1975). In this case, counsel's failure to object to the lack of a fair cross-section was deficient, as *Taylor* was well-known and long-established precedent at the time of Kiles's penalty phase. The 2003 ABA Guidelines also required counsel to consider challenges to the venire. 2003 ABA Guideline 10.10.2(A). Kiles's counsel's notes indicate that, to their knowledge, there were four African Americans in the venire, out of 142 people. Counsel's notes further indicated that counsel knew of the need for a racially representative venire. Given prevailing professional norms, it was unreasonable for counsel to fail to object to the denial of a fair cross-section. *See Strickland*, 466 U.S. at 688.

15

16

17

18

19

20

21

22

23

24

25

26

Moreover, in July 2006, shortly after Kiles's trial ended, an e-mail from a former Maricopa County Superior Court project manager informed Kiles's counsel that the program the county had used since 2002 to select the venire was flawed: it was not updated with new census data, division juror usage, or ZIP codes. The program excluded people from certain ZIP codes due to an algorithm failure. An exclusion based on geographical location violated Kiles's rights. *See Lockhart*, 476 U.S. at 174 (noting that a group whose recognition would advance the purposes of the fair cross-section requirement may not be systematically excluded without a significant government interest). When Kiles's counsel received this information, instead of seeking to address the violation in Kiles's case, VanDreumel asked Clark to send her the questionnaires of seated jurors in Kiles's case—for use in another case.

27

28

Kiles was prejudiced by his counsel's failure to object, as the failure to do so deprived Kiles of a fair trial. *Strickland*, 466 U.S. at 687. Like a *Batson* violation, a

158

1   violation of the fair cross-section requirement is structural error. *United States v.*
2   *Rodriguez-Lara*, 421 F.3d 932, 940 (9th Cir. 2005), *overruled on other grounds by*
3   *United States v. Hernandez-Estrada*, 749 F.3d 1154 (9th Cir. 2014). Here, had
4   counsel objected to the denial of the fair cross-section, "there is a reasonable
5   probability that the claim [counsel] failed to raise at trial would have prevailed,
6   either at trial or on appeal." *Doe*, 782 F.3d at 432 (citing *Strickland*, 466 U.S. at
7   694). Then, had Kiles prevailed on appeal, his conviction would have been vacated.
8   Kiles was therefore prejudiced by his counsel's deficient performance.

9       **H.    Counsel failed to make a record as to the reasons underlying the**
10              **removal of many prospective jurors.**

11      Finally, a complete record regarding jury selection is necessary to protect
12  Kiles's right to meaningful appellate review. *See Gregg v. Georgia*, 428 U.S. 153,
13  195 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.); *Dobbs v. Zant*, 506
14  U.S. 357, 358 (1993) ("We have emphasized before the importance of reviewing
15  capital sentences on a complete record.").

16      In failing to make such a record, counsel performed deficiently and
17  prejudiced Kiles. *See Strickland*, 466 U.S. at 688, 694; *see also* Claim 16, *infra*. A
18  majority of prospective jurors were removed by stipulation between Kiles's counsel
19  and the State, without any reason provided on the record as to why they were
20  removed. Many prospective jurors were removed without either side asking a single
21  individual question at voir dire. The official juror sheet lists 23 people struck for
22  cause, where even the fact of their removal—let alone the underlying reasons for
23  their removal—appears nowhere on the record. (*See* ROA 895; *see also generally*
24  Tr. Mar. 6, 2006; Tr. Mar. 7, 2006; Tr. Mar. 8, 2006; Tr. Mar. 15, 2006: Tr. Mar.
25  16, 2006.) Thus, Kiles's appellate lawyer lacked critical information to challenge
26  his sentence, thereby compromising his appeals.

27      In sum, counsel's voir dire performance did not comport with objective
28  standards of capital representation. The standards were developed to ensure capital

counsel's performance adhered to prevailing Supreme Court law, and at the time of sentencing, counsel were obligated to know and follow these standards. Kiles's counsel lacked the necessary knowledge and experience to select jurors who could and would fully and fairly consider Kiles's mitigation evidence. Reasonably competent capital attorneys would have used the common tools to uncover impairments of jurors that would have removed them for cause, and information that would have enabled counsel to make informed peremptory strikes. Competent counsel would have objected to the State's discriminatory strikes, objected to the lack of a fair cross-section, and ensured a complete record. Counsel's deficient performance undermined Kiles's constitutional right to an individualized sentencing by jurors capable of giving full effect and consideration to his mitigation evidence, entitling Kiles to relief.

**Claim Five**

**Kiles was denied effective assistance of counsel at his aggravation-phase proceedings because counsel failed to adequately challenge the alleged aggravating circumstances and otherwise defend against a death sentence.**

Kiles's trial counsel failed to investigate and prepare adequately for the aggravation phase of trial, and as a result counsel failed to mount necessary challenges to the State's aggravation case. Counsel's deficient performance in that respect and others, both individually and cumulatively, prejudiced Kiles and thereby violated his rights under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution. Kiles incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition. Kiles presented this claim below. (ROA 1189 at 32–35, 39–40, 46–48; PFR2 Dkt. 32–36, 39–41, 47–48.)

**A.     Background on aggravation-phase proceedings.**

After a delay caused by, among other things, Arizona's switch to jury sentencing, Kiles's penalty phase began with his aggravation hearing in March 2006. At the aggravation phase, the State sought first to prove that Kiles had

160

1   sufficient personal culpability in the deaths of Shemaeah Gunnel and LeCresha
2   Kirklin to potentially be eligible for the death penalty. (Tr. Mar. 20, 2006 at 56–57
3   (court laying out *Enmund/Tison* factors in preliminary jury instructions).) The State
4   also alleged and sought to prove the following aggravating factors with respect to
5   each victim: (1) Kiles was convicted of a prior felony involving the use or threat of
6   violence, A.R.S. § 13-703(F)(2) (1988); (2) the homicide occurred in a manner that
7   was "especially heinous, cruel or depraved," *id.* § 13-703(F)(6); and (3) Kiles was
8   convicted of one or more homicides during the commission of the offense, *id.* § 13-
9   703(F)(8).[95] (ROA 503 at 1–2.) With respect to the deaths of Shemaeah and
10  LeCresha, the State further alleged that Kiles was an adult at the time of the offense
11  and that each victim was under 15 years of age. (ROA 503 at 2); *see also* A.R.S.
12  § 13-703(F)(9).

13      The State provided notice that it would offer two prior convictions to support
14  the (F)(2) aggravating circumstance: an attempted aggravated assault conviction
15  from 1984, and an aggravated assault conviction from 1986. (ROA 743 at 2.) Before
16  the penalty phase, trial counsel argued that the attempted aggravated assault could
17  not support the (F)(2) aggravating circumstance. (*See* ROA 743 at 4.) The trial court
18  rejected that argument, even though the Arizona Supreme Court had agreed in *State
19  v. Williams* that the crime of attempt could not satisfy the (F)(2) aggravating
20  circumstance. 904 P.2d 437, 451 (Ariz. 1995); (Tr. Mar. 20, 2006 at 23). In so
21  ruling, the trial court relied on the opinion in Kiles's direct appeal upholding the
22  attempted aggravated assault as a valid basis for the (F)(2) aggravating
23  circumstance. (Tr. Mar. 20, 2006 at 23); *see State v. Kiles*, 857 P.2d 1212, 1224
24  (Ariz. 1993). Trial counsel did not attempt to challenge the aggravated assault as a
25  basis for the (F)(2) aggravating circumstance. (*See* Tr. Mar. 20, 2006 at 16–17.)

26      Further, trial counsel conceived of the aggravation phase as, in effect, a re-

27  _____
28  [95] The State alleged both that the homicides were especially cruel and that they were
    especially heinous or depraved. (*See* ROA 719 at 5–6.)

161

do of the guilt phase. (*See* Tr. Mar. 27, 2006 at 40 (counsel informing the court that they "have been parroting for this jury what took place in Yuma back in 2000); Tr. Mar. 27, 2006 at 42 (counsel asking court "that th[e] testimony and evidence to be adduced is the same that was adduced in Yuma [at the guilt phase].").) Counsel did so despite the fact that the State was seeking to prove significantly different matters, for example that the killings were especially cruel, than it had proven at the guilt phase. But, because counsel were largely seeking to repeat the guilt phase, counsel conducted no investigation directed toward challenging the alleged aggravating circumstances.[96] The record reflects no attempt to retain an expert for aggravation-phase purposes, even though counsel knew the State intended to present expert testimony. For example, counsel noted on the record that they had not consulted with a crime-scene expert to counter the testimony of State's expert Tom Bevel, even though "[t]here are experts out there who disagree with Mr. Bevel." (*See* Tr. Mar. 27, 2006 at 41.) In fact—despite the centrality of Bevel's testimony to the State's case—counsel had not even interviewed Bevel for purposes of the aggravation phase.[97] (Tr. Mar. 27, 2006 at 38.) This approach made no sense as an aggravation-phase plan for Kiles's conviction in Gunnel's death, where there was no question that Kiles had committed the killing.[98] And, because of counsel's focus on re-doing the guilt phase, counsel missed opportunities to start introducing the

---

[96] The most charitable justification for counsel's focus on guilt-phase issues is that counsel were seeking to establish reasonable doubt on the *Enmund/Tison* findings for the deaths of the children. That, however, cannot justify a failure to investigate counsel's ability to challenge the aggravators, especially as there was no doubt as to who killed Gunnel.

[97] Further, counsel did not re-interview guilt-phase witnesses. (*See, e.g.*, Tr. Mar. 22, 2006 at 56 (counsel noting that he had interviewed witness Larry Hawkins "some years ago").)

[98] While this approach made better sense with respect to the deaths of the children, as counsel could focus on residual doubt (*see, e.g.*, Tr. May 22, 2006 at 48–56), counsel needed an approach or approaches that minimized the likelihood of all three death sentences—not just of two out of three.

162

1    jury to Kiles's mitigation.

2         After the completion of voir dire, discussed *supra*, Claim 4, the aggravation
3    phase continued over 11 days. Two of the centerpieces of the State's case that
4    Gunnel's death was "especially heinous, cruel or depraved" were pathologist
5    Robert Mallon, M.D., and blood-spatter expert Tom Bevel, both of whom testified
6    at Kiles's guilt phase. *See supra*, Claim 3. Dr. Mallon had conducted the autopsies
7    of Gunnel and LeCresha. (Tr. Mar. 21, 2006 a.m. at 4, 11; Tr. Mar. 21, 2006 at 8.)
8    On direct examination, Dr. Mallon reviewed in detail each of Gunnel's injuries,
9    which included "extensive trauma mostly to the head and neck area, as well as the
10   upper forearms. And in the rest of the body there wasn't evidence of trauma." (Tr.
11   Mar. 21, 2006 a.m. at 15–26; Tr. Mar. 21, 2006 at 4–7.) The prosecutor walked Dr.
12   Mallon through the severity of each wound, including that Gunnel's skull exhibited
13   a severe fracture that looked like "an eggshell that's been broken in multiple
14   pieces." (Tr. Mar. 21, 2006 a.m. at 23.) The prosecutor also had Dr. Mallon confirm
15   that Gunnel's right forearm wound was "consistent with a defensive wound," as
16   well as that it would be "axiomatic that a person would have to be conscious to have
17   a defensive wound." (Tr. Mar. 21, 2006 a.m. at 21.)

18        On cross-examination, defense counsel did not question whether Gunnel's
19   forearm wound was indeed a defensive wound. (*See* Tr. Mar. 21, 2006 at 20.)
20   Instead, counsel tried to get Dr. Mallon to acknowledge that it was possible for the
21   forearm wound and one of the facial wounds to have resulted from the same blow.
22   (*See* Tr. Mar. 21, 2006 at 20–21.) In response to that line of questioning, Dr. Mallon
23   testified that

24          [Gunnel] could have guarded herself against the first blow.
             She was conscious and was aware of what was going on,
25          otherwise she wouldn't have used her arm. . . . But that
             forearm was used. She was conscious and was aware, using
26          that forearm in a defensive posture and as a defensive
             method.
27

28   (Tr. Mar. 21, 2006 at 23.) Dr. Mallon also continued that Gunnel "could very easily

163

1    have sustained those kinds of frontal injuries and still remained conscious. That's

2    possible." (Tr. Mar. 21, 2006 at 24.) Dr. Mallon then proceeded to testify, still on

3    cross-examination, that Gunnel could have remained conscious for many of the

4    wounds. (Tr. Mar. 21, 2006 at 24.) He added, "If I were guessing . . . I would say

5    probably the blow to the forearm was the first one." (Tr. Mar. 21, 2006 at 27.)

6         The State also prominently featured the testimony of Tom Bevel, the State's

7    blood-spatter expert, in its case for the (F)(6) aggravating circumstance in Gunnel's

8    death. Bevel described the blood stains visible in Gunnel's living room, pointing

9    out that there were blood stains, fairly low to the ground, on two different walls.

10    (Tr. Mar. 27, 2006 at 62–69.) Bevel explained his opinion that the source of the

11    blood on the walls had to be "lower toward the floor, as opposed to, for example,

12    standing" in order to cause those blood stains. (Tr. Mar. 27, 2006 at 71.) He also

13    testified that the blood stains on two different walls suggested "movement . . .

14    usually the victim and/or the person that is delivering the blows." (Tr. Mar. 27, 2006

15    at 71.) Bevel also suggested that the blood on the pillowcase found in the east

16    bedroom showed "some movement . . . where the blood source has had lateral

17    motion." (Tr. Mar. 27, 2006 at 72–73.) Bevel did not testify on these topics at the

18    2000 guilt-phase proceedings, and defense counsel had not interviewed him prior

19    to the 2006 proceedings to prepare themselves for cross-examination. (Tr. Mar. 27,

20    2006 at 38.) Bevel further testified to topics he had addressed in his 2000 testimony,

21    among them the blood spatter in the west bedroom, where the children were killed.

22    (*See, e.g.*, Tr. Mar. 27, 2006 at 82–85.)

23         The defense, with its focus on residual doubt and Kale Johnson's

24    involvement in the killing of the children, started its cross-examination by

25    questioning Bevel about shoe impressions made in blood. (Tr. Mar. 27, 2006 at 99–

26    101.) Later, after having Bevel confirm that the crime scene had been altered before

27    and while photographs were taken of it (*see, e.g.*, Tr. Mar. 27, 2006 at 106–07, 112),

28    the defense turned to the blood spatter in the room where the children were killed.

1    (Tr. Mar. 27, 2006 at 108–12.) Bevel also discussed the blood stain in the chair in

2    the living room,[99] before returning to the blood spatter in the west bedroom and the

3    shoe impressions (*see* Tr. Mar. 27, 2006 at 112–18)—matters primarily relevant to

4    the aggravating factors alleged in the deaths of the children. Counsel accepted

5    Bevel's testimony that the source of the blood on the pillowcase found in the east

6    bedroom moved, but Bevel confirmed that he could not say how the blood source

7    was moved. (Tr. Mar. 27, 2006 at 119.) Counsel then focused much of the

8    remainder of cross-examination on questions regarding the bloody shoe

9    impressions and blood found on Kale Johnson's shoes and clothing. (*See* Tr. Mar.

10   27, 2006 at 122–34.)

11       The State also had lead investigator Detective Brian Rodgers testify, as well

12   as Larry Hawkins. (Tr. Mar. 22, 2006 at 31.) Hawkins recounted for the jury Kiles's

13   statement that he had killed Gunnel with a tire iron by striking her on the head after

14   she had slapped him twice. (Tr. Mar. 22, 2006 at 37–38.) Hawkins testified that he

15   did not remember where Kiles and Gunnel were when he struck her or what Kiles

16   might have done after striking Gunnel, but he did say that Gunnel "asked him why

17   was this happening and I think he said he struck her again." (Tr. Mar. 22, 2006 at

18   37–39.) The State had Hawkins review line-by-line his Silent Witness letter, which

19   was admitted into evidence. (*See* Tr. Mar. 22, 2006 at 40–49; *see also* 2006 Trial

20   Ex. 90.) On cross-examination, counsel tried to establish that Hawkins had based

21   that information on a number of sources, not on Kiles's statements. (*See, e.g.*, Tr.

22   Mar. 22, 2006 at 61.)

23       Notably, because counsel conceived of the proceedings as a re-do of the guilt

24   phase, counsel allowed the 2000 guilt-phase testimony of several witnesses to be

25   _____

26   [99] Having done insufficient investigation, counsel did not realize there were two
     similar-looking chairs in the living room and so asked Bevel some questions

27   suggesting that a single chair had been moved around the living room. (Tr. Mar. 27,
     2006 at 113–14.) The State later pointed out counsel's errors on redirect. (Tr. Mar.

28   27, 2006 at 136–37.)

1    read into the record. (*See, e.g.*, Tr. Mar. 22, 2006 at 28–30 (discussing testimony);
2    Tr. Mar. 23, 2006 at 59 (testimony of Sandra Mercado); Tr. Mar. 29, 2006 at 113
3    (testimony of Harman Burton); Tr. Apr. 4, 2006 at 4–5 (testimony of Cynthia
4    Anderson).) Counsel even allowed the testimony of Kale Johnson to be read into
5    the record (*see* Mar. 23, 2006 at 60; Mar. 27, 2006 at 142), even though that left
6    them unable to cross-examine him on aggravation-specific issues. Kiles's guilt-
7    phase testimony was also read into the record. (Tr. Mar. 23, 2006 at 54–55.) The
8    defense offered no live witness testimony to the jury. (Tr. Apr. 4, 2006 at 4–5.)

9        After deliberations, the jury unanimously determined that the *Enmund/Tison*
10   factors were satisfied for the deaths of Shemaeah and LeCresha; however, for each
11   victim, two jurors did not find that Kiles had actually killed the victim. (*See* ROA
12   879 at 4.) For the deaths of Shemaeah and LeCresha, the jury found each of the four
13   alleged aggravators proven. (ROA 879 at 5–10, 14–15.)

14       With respect to Gunnel's death, the jury found the (F)(2) aggravating
15   circumstance proven, with unanimous findings as to each of the prior convictions
16   proffered by the State. (ROA 879 at 11–12.) The jury also unanimously found the
17   (F)(6) aggravating circumstance proven. (ROA 879 at 12.) The only component of
18   that aggravator that the jury unanimously found was "cruelty." (ROA 879 at 12.)
19   Finally, the jury also found that the State had proven the (F)(8) aggravating
20   circumstance. (ROA 879 at 12.)

21       **B.    Trial counsel has a duty to make every effort to avoid a death**
22            **sentence, including by investigating and contesting the**
             **aggravating circumstances alleged against Kiles.**

23       Under Supreme Court precedent, the Sixth Amendment right to effective
24   assistance of counsel, and in turn the right to a fair trial, extends to the aggravation
25   phase of trial. *See, e.g.*, *Rompilla v. Beard*, 545 U.S. 374, 385–93 (2005) (counsel
26   were ineffective in part for failing to investigate State's aggravation case); *see also*
27   *Strickland v. Washington*, 466 U.S. 668, 684 (1984). Capital-defense counsel have
28   an obligation to contest aggravating factors alleged by the State against their client.

1    *See, e.g.*, *Correll v. Ryan*, 539 F.3d 938, 947–48 (9th Cir. 2008) (finding deficient
2    performance when, among other things, counsel failed to challenge three of five
3    alleged aggravating factors); 2003 ABA Guideline § 10.11(A) (discussing
4    counsel's duty to investigate issues and seek information that establishes mitigation
5    or rebuts aggravation); *id.* § 10.11(H) (requiring trial counsel to determine as
6    quickly as possible what aggravating factors will be alleged and the evidence used
7    to support them); *id.* § 10.11(I) (requiring counsel at all stages to consider whether
8    evidence offered in aggravation is improper, inaccurate, misleading or
9    inadmissible).

10   Simply put, the aim of a capital-defense attorney at penalty-phase
11   proceedings is to avoid the imposition of the death penalty. *See, e.g.*, 2003 ABA
12   Guideline 10.11(A) (emphasizing "continuing duty" to rebut aggravation and
13   bolster mitigation); 1989 ABA Guideline 11.8.2(E) (requiring counsel to "develop
14   a plan for seeking to avoid the death penalty"). Discharging that duty requires
15   counsel to make every reasonable effort to contest or otherwise undercut the
16   aggravating circumstances alleged by the prosecution. *See Correll*, 539 F.3d at 948.

17   Kiles's counsel, however, failed to investigate and make critical challenges,
18   supported by Arizona Supreme Court precedent, to the alleged aggravating
19   circumstances. Instead, counsel treated the aggravation phase as a re-do of the guilt
20   phase. (*See, e.g.*, Tr. Mar. 27, 2006 at 40–41.) Such failures rendered counsel's
21   performance deficient and prejudiced Kiles. *See Strickland*, 466 U.S. at 688, 694.

**C.    Counsel were ineffective for failing to effectively challenge the (F)(2) aggravating circumstance, especially as Kiles's prior aggravated assault conviction was an invalid basis for that circumstance.**

25   The sole prior conviction currently supporting Kiles's conviction under
26   A.R.S. § 13-703(F)(2) (1988) is a 1986 conviction for aggravated assault. However,
27   that conviction—under Arizona Supreme Court precedent that predated Kiles's
28   trial—is an invalid basis for the (F)(2) aggravating circumstance. Counsel were

167

1    ineffective for failing to challenge this proffered basis for the (F)(2) aggravating

2    circumstance. (ROA 1189 at 46–48.)

3          **1.   Kiles's 1986 conviction for aggravated assault does not**

4          **qualify as a prior violent felony for the purposes of the (F)(2)**
     **aggravator.**

5          Prior to the penalty phase, the State alleged the (F)(2) aggravating

6    circumstance, that "the defendant was previously convicted of a felony in the

7    United States involving the use or threat of violence on another person." (ROA 503

8    at 1 (quoting A.R.S. § 13-703(F)(2) (1988).) In support, the State sought to prove

9    that Kiles had committed two prior felonies that fell within the ambit of the

10   aggravator: (1) attempted aggravated assault on April 17, 1984, and (2) aggravated

11   assault on May 15, 1986. (ROA 637 at 2.) Trial counsel challenged the *attempted*

12   aggravated assault vigorously, arguing that under Arizona Supreme Court

13   precedent, the conviction did not qualify for the purposes of the (F)(2) aggravating

14   circumstance. (*See* ROA 743 at 1.) However, trial counsel did not challenge Kiles's

15   prior conviction for aggravated assault, even though that conviction too could not

16   support the (F)(2) aggravating circumstance as it was defined in 1989.

17         In 1989, the (F)(2) aggravating circumstance required that the defendant have

18   been "previously convicted of a felony in the United States involving the use or

19   threat of violence on another person."[100] A.R.S. § 13-703(F)(2) (1988). The Arizona

20   Supreme Court then defined "violence" for the purposes of (F)(2) as follows: "the

21   exertion of any physical force with the intent to injure or abuse." *State v. Walden*,

---

23   [100] "[I]n 1993, the [Arizona] legislature abandoned the (F)(2) language 'use or threat
24   of violence' and replaced it with 'serious offense.'" *State v. Martinez*, 999 P.2d 795,
     806 (Ariz. 2000). Kiles was convicted of crimes that occurred in 1989. To avoid a
25   violation of the Ex Post Facto Clauses of the state and U.S. Constitutions, the
     aggravating circumstance as it was defined in 1989—involving "the use or threat
26   of violence"—applies to Kiles's case. *State v. Schackart*, 947 P.2d 315, 324–35
     (Ariz. 1997) (rejecting request to apply rewritten (F)(2) aggravating circumstances
27   when capital crime occurred before change in statutory text, because doing so
     would create ex post facto problems); (*see also* ROA 503 at 1 (State alleging (F)(2)
28   aggravating circumstance as it was worded in 1989)).

168

905 P.2d 974, 996 (Ariz. 1995) (citing *State v. Fierro*, 804 P.2d 72, 82 (Ariz. 1990), *overruled on other grounds by State v. Ives*, 927 P.2d 762 (Ariz. 1996)); *see also, e.g.*, *State v. Williams*, 904 P.2d 437, 451 (Ariz. 1995) (applying this definition of "violence" when the capital crime and prior conviction supporting (F)(2) both occurred in 1990).

When evaluating whether a prior conviction can support the 1989 (F)(2) aggravator, a court must look to whether the earlier felony "*by statutory definition*, involved violence or the threat of violence." *Schackart*, 947 P.2d at 323 (emphasis added). Because "violence" requires "the intent to injure or abuse," to qualify under (F)(2), the statutory definition of the earlier felony must require the mental state of intent. *Id.* If the statutory definition of the prior felony does not require that same mental state, then the felony is not a valid basis for the (F)(2) aggravating circumstances. *Id.*

Further, when considering whether a defendant has a prior conviction whose statutory definition qualifies under (F)(2), courts can only consider a limited range of judicial documents. *See State v. Rogovich*, 932 P.2d 794, 800 (Ariz. 1997) (noting that court can review "relevant statutes, pleadings, jury instructions, and verdicts" when evaluating whether prior conviction qualifies as a basis for (F)(2) aggravating circumstance). However, testimony or other evidence from the victims of the prior crime must not be considered. *See, e.g.*, *State v. Van Adams*, 984 P.2d 16 (1999) (holding that court erred in considering testimony of victim of prior felony to establish basis of (F)(2) aggravating circumstance); *State v. Gillies*, 662 P.2d 1007, 1018 (Ariz. 1983) ("We cannot allow what is, in effect, a second trial on defendant's prior conviction to establish the existence of an A.R.S. § 13-703(F)(2) aggravating circumstance.").

Kiles was convicted of one count of aggravated assault under A.R.S. § 13-1204(A)(8), a subsection of the aggravated assault statute. (2006 Trial Ex. 140 at 10.) Under § 13-1204(A)(8), aggravated assault occurs when a person "commits

169

assault as defined in § 13-1203 . . . while the victim is bound or otherwise physically restrained or while the victim's capacity to resist is substantially impaired." A.R.S. § 13-1204(A)(8) (1985). Assault under § 13-1203 can occur in one of three ways: (1) "Intentionally, knowingly or recklessly causing any physical injury to another person," A.R.S. § 13-1203(A)(1); (2) "Intentionally placing another person in reasonable apprehension of imminent physical injury," A.R.S. § 13-1203(A)(2); or (3) "Knowingly touching another person with the intent to injure, insult or provoke such person," A.R.S. § 13-1203(A)(3). In other words, assault can occur with the mental state of "intentionally," "knowingly," or even "recklessly," for someone charged under § 13-1203(A)(1).

Moreover, § 13-1204(A)(8) includes no mens rea requirement at all. *See* A.R.S. § 13-1204(A)(8) (1989) (aggravated assault occurs when a person "commits assault as defined in § 13-1203 . . . while the victim is bound or otherwise physically restrained or while the victim's capacity to resist is substantially impaired."). First, the subsection does not require that the person who commits the assault is the person who restrained the victim or limited the victim's capacity to resist. In fact, the statute was derived from an older statute, which deemed assault aggravated "when committed by a person of robust health or strength upon one who is decrepit." *Matter of Appeal in Maricopa Cnty. Juvenile Action* No. JV-123196, 834 P.2d 160, 164 (Ariz. Ct. App. 1992). Decrepitude is not a condition caused by the person committing assault, and likewise the restraint of limited capacity to resist need not be caused by the person committing assault. Second, it is entirely possible to recklessly assault someone who—through no action or intent of the person committing the assault—is restrained or unable to resist.[101] Accordingly, § 13-1204(A)(8) does not provide the mens rea necessary for violence that is

---

[101] For example, under § 13-1204(A)(8), recklessly throwing a ball in the air—with no intent to injure or abuse—and hitting and injuring someone in a wheelchair constitutes aggravated assault.

1    missing from § 13-1203.

2        Then, because aggravated assault under § 13-1204(A)(8) could well be based

3    on a reckless act under § 13-1201(A)(1), the statutory definition of aggravated

4    assault does not constitute a crime that *necessarily* involves violence—the intent to

5    injure or abuse—for the purposes of the 1989 (F)(2) aggravating circumstance.

6    *Schackart*, 947 P.2d at 323.

7        The Arizona Supreme Court laid this out unambiguously when considering

8    the (F)(2) aggravating circumstance as it existed in 1989. "If an assault is committed

9    recklessly pursuant to § 13-1203(A)(1), the former (F)(2) factor cannot be

10   established because the required mental state is lacking." *Id.*; *see also, e.g.*, *Walden*,

11   905 P.2d at 996 (holding that aggravated assault did not provide basis for (F)(2)

12   aggravating circumstance when it could have been committed recklessly); *State v.*

13   *McKinney*, 917 P.2d 1214, 1230 (Ariz. 1996) (holding that "because [the

14   defendant's] prior conviction was for a crime that, on the face of the statute, might

15   have been committed recklessly, it does not qualify as a crime of violence" for the

16   purposes of the former (F)(2) aggravating circumstance).

17       Consequently, unless the conviction reflects that the predicate assault was

18   under § 13-1203(A)(2) or (A)(3)—meaning that the aggravated assault was

19   committed knowingly or intentionally—then aggravated assault under § 13-

20   1204(A)(8) is not a valid basis for the (F)(2) aggravating circumstance.[102] *See*

21   *Schackart*, 947 P.2d at 323 (rejecting aggravated assault as support for (F)(2) when

22   there was no proof as to which subsection of § 13-1203(A) was the basis for

23   defendant's prior conviction). As the Arizona Supreme Court erred in 1993 in

24   upholding the attempted aggravated assault as a basis for the (F)(2) aggravating

25   circumstance, so did it err with respect to the aggravated assault. *See Kiles*, 857

26

27   _____

28   [102] Moreover, even under § 13-1203(A)(3), it is possible to commit assault with the intent to provoke or insult, which does not satisfy the intent requirement of "violence."

1    P.2d at 1223–24.

2         Here, the State did not specify whether Kiles was convicted under

3    § 13-1203(A)(1), or § 13-1203(A)(2), or § 13-1203(A)(3).[103] (*See* 2006 Trial Ex.

4    140 at 8–11.) There is no way to tell whether he was convicted of acting with intent,

5    knowledge, or just recklessness. As a result, Kiles's 1986 conviction for aggravated

6    assault does not support the (F)(2) aggravating circumstance.

7              **2.    Counsel performed deficiently and prejudiced Kiles in
                       failing to challenge the 1986 conviction as a basis for the
8                      (F)(2) aggravator.**

9         Not only did counsel have a duty to investigate the alleged aggravators,

10   counsel had a further duty to contest them on legal grounds as appropriate. *See*

11   *Correll*, 539 F.3d at 947–48. Counsel did make some legal challenges to the alleged

12   aggravators, by arguing for example that Kiles's prior conviction for attempted

13   aggravated assault could not support the (F)(2) aggravating circumstance.[104] (*See*

14   ROA 743 at 1.) However, counsel failed to contend that the aggravated assault

15   could not support the (F)(2) aggravating circumstance. Instead, when arguing that

16   the attempted aggravated assault should be precluded, counsel conceded, "[t]he

17   other one, the aggravated assault, clearly comes in." (Tr. Mar. 20, 2006 at 16–17.)

18

19   [103] In fact, the judgment from 1986 originally failed to mention the assault statute
20   altogether and instead mistakenly cited the statute for endangerment. (*See* Trial Ex.
     140 at 10 (listing conviction for A.R.S. § 13-1201).) In 1990, the superior court
21   corrected the judgment to reflect that Kiles was convicted for assault under A.R.S.
     § 13-1203, instead of for endangerment under A.R.S. § 13-201. Even then, the court
22   provided no indication of which subsection of § 13-1201 was at issue. Powell
     sought to enter the 1990 order correcting the judgment into evidence, but then
23   withdrew the proffered exhibit. (*See* Tr. Apr. 4, 2006 at 3–4.)

24   [104] While the Arizona Supreme Court had previously upheld the aggravated
25   assaulted as a valid basis for the (F)(2) aggravator in this case, it had held the same
     for the attempted aggravated assault conviction. *See State v. Kiles*, 857 P.2d 1212,
26   1224 (Ariz. 1993). That ruling had not stopped counsel from challenging the latter
     conviction. (*See* Tr. Mar. 20, 2006 at 14–20.) Moreover, counsel did try,
27   unavailingly, to challenge the authentication of the State's evidentiary proof of the
     aggravated assault under the Arizona Rules of Evidence. (*See* Tr. Apr. 3, 2006 at
28   6–9.)

172

1    Counsel were deficient for not disputing whether the aggravated assault

2    could support the (F)(2) aggravating circumstance. Counsel had an obligation under

3    the Sixth Amendment to contest aggravators. *See White v. Ryan*, 895 F.3d 641, 664,

4    666 (9th Cir. 2018) (recognizing counsel's obligation to challenge aggravating

5    circumstances and holding counsel deficient for failing to do so). Here, counsel

6    made no strategic decision not to contest the aggravating circumstance. Instead,

7    counsel made a mistake of law. Counsel knew that the former version of the (F)(2)

8    aggravator applied—they corrected the court's proposed jury instruction to ensure

9    that it reflected the statutory text at the time of Kiles's crime. (*See* Tr. Mar. 16, 2006

10   at 24.) Even so, counsel did not research adequately and find the Arizona Supreme

11   Court cases making clear that Kiles's conviction did not suffice under the old

12   statutory text. Counsel wrongly believed that Kiles's conviction for aggravated

13   assault supported the (F)(2) aggravator. (*See* Tr. Mar. 20, 2006 at 16–17.) But a

14   mistake of law is not a reasoned judgment; it is deficient performance. *See Hinton*

15   *v. Alabama*, 571 U.S. 263, 275 (2014) (deeming counsel's "inexcusable mistake of

16   law" deficient performance); *White*, 895 F.3d at 666 ("A decision based on a

17   misunderstanding of the law is not sound trial strategy."). Accordingly, counsel's

18   error was unreasonable and deficient.[105]

19   Had counsel raised this challenge to the trial court, there is a reasonable

20   likelihood that there would have been a different outcome. Because Arizona

21

22   [105] Independently, counsel had an obligation to investigate the basis for the State's

23   alleged aggravator. *See* 2003 ABA Guideline 1.1 cmt. (noting that counsel may

     need to mount a collateral attack on a prior conviction); 2003 ABA Guideline 10.7

24   cmt. Had counsel investigated Kiles's 1986 aggravated assault, upon information

25   and belief counsel would have learned that Kiles's attorney at the time had not

     interviewed the eye-witnesses to the incident before advising Kiles to plead guilty

26   and that the 1984 attorney was potentially ineffective for failing to have done so.

     Trial counsel might have been able to challenge the conviction directly on

27   constitutional grounds. (Notably, counsel for Kiles's first state post-conviction

     proceedings had investigated the attempted aggravated assault and had filed a

28   petition challenging that conviction. (*See* ROA 225 at 80.))

173

1    Supreme Court precedent is clear that Kiles's aggravated assault did not constitute
2    a prior violent felony for the purposes of the (F)(2) aggravating circumstance as it
3    existed in 1989, the trial court could not have submitted the conviction for the jury's
4    consideration. That, in turn, would have significantly changed the jury's calculus,
5    as Kiles no longer had a pattern of criminal convictions that predated his capital
6    conviction. (*See* ROA 911 at 11–12 (noting that every juror found proven that Kiles
7    was previously convicted of aggravated assault).) This was especially important
8    because the defense made Kiles's good behavior—the fact that he was not a future
9    danger—central to the mitigation story (*see* Tr. Apr. 27, 2006 at 4–54 (defense
10   expert testimony on Kiles's exemplary behavior in prison))—and the improper
11   consideration of a prior aggravated assault undercut that story.[106] In such
12   circumstances, the fact that the jury improperly considered a prior aggravated
13   assault conviction—indeed, a pattern of escalating criminal violence that the jury
14   should not have seen—undermines the reliability of the verdict. *See Strickland*, 466
15   U.S. at 694.

16       Even if the trial court had rejected counsel's challenge, trial counsel's
17   objection would have preserved the error for appellate review. Had the Arizona
18   Supreme Court properly analyzed the issue instead of relying on its 1993 opinion
19   in Kiles's case, the court would have been forced to strike down the conviction as
20   a basis for the (F)(2) aggravator. *See infra,* Claim 12. And, because the court
21   determined that the *attempted* aggravated assault was likewise invalid as support,
22   the court would have had to strike down the (F)(2) aggravator altogether. The
23   Arizona Supreme Court would then have had to remand the case for a new jury
24   sentencing so that a jury would have the opportunity to determine if the mitigation
25   was sufficiently substantial to call for leniency, in light of the State's diminished

---

26   [106] Further, because effective counsel would not only have challenged the
27   aggravated assault as a basis for (F)(2), but also would have presented a
     significantly better mitigation story, *see infra*, Claim 6, the jury's entire analysis
28   would have been different. *See infra*, Claim 39.

1    aggravation case. *See Ring v. Arizona*, 536 U.S. 584, 589 (2002); *see also id.* at
2    618–19 (Breyer, J., concurring) (concluding that "the Eighth Amendment requires
3    individual jurors to make . . . a decision to sentence a person to death"); Claim 21,
4    *infra*. At the very least, the Arizona Supreme Court would have had to reweigh the
5    remaining aggravation, without the (F)(2) aggravator, against all of Kiles's
6    mitigation. *See Styers v. Schriro*, 547 F.3d 1026, 1028 (9th Cir. 2008) (per curiam)
7    (citing *Clemons v. Mississippi*, 494 U.S. 738 (1990)). Either way, there can be no
8    confidence in the reliability of Kiles's penalty-phase proceeding. *See Strickland*,
9    466 U.S. at 694.

10   **D.    Counsel were ineffective for failing to investigate and adequately**
11   **challenge the (F)(6) "especially heinous, cruel or depraved"**
     **aggravating circumstance.**

12   Because counsel treated the aggravation phase as a reprise of the guilt phase,
13   counsel failed to conduct any investigation geared toward challenging the (F)(6)
14   aggravator, in particular the State's assertion that the killing of Gunnel was
15   "especially cruel," prejudicing Kiles. (ROA 1189 at 39–40.)

16   Cruelty concerns primarily the victim's pain and suffering before death. *State*
17   *v. Anderson*, 111 P.3d 369, 394 n.19 (Ariz. 2005). To establish that a crime was
18   "especially cruel," the State must prove beyond a reasonable doubt that the "victim
19   was conscious during the infliction of the violence and experienced significant
20   uncertainty as to his or her ultimate fate." *Id.* Moreover, the State must prove that
21   "[t]he defendant [knew] or should have known that the victim would suffer." *Id.*

22   In failing to investigate, counsel squandered the opportunity to develop and
23   present a viable attack on the State's evidence of cruelty in the killing of Valerie
24   Gunnel. For Gunnel's death, the State had to rely on some combination of the
25   following evidence in its attempt to establish cruelty: (1) the testimony of the
26   medical examiner, (2) evidence from the crime scene, as interpreted by blood-
27   spatter expert Bevel and as described by lead investigator Rodgers, and (3) the
28   testimony of Hawkins about statements purportedly made to him by Kiles. As the

175

1   State had relied on generally the same types of evidence to establish premeditation

2   at the guilt phase, counsel should have known what they were facing as the

3   aggravation phase began. Even so, counsel failed entirely in their duty to

4   investigate. Because of that failure, the jury unanimously found that the State had

5   proven cruelty in Gunnel's killing.[107] (ROA 879 at 11–12.) Had counsel adequately

6   investigated and presented a challenge to the (F)(6) aggravator, there is a reasonable

7   probability that at least one juror would have found otherwise. *See Strickland*, 466

8   U.S. at 694.

9           **1.**     **Counsel unreasonably failed to investigate in preparation**

10                     **for a challenge to "cruelty" for the purposes of the (F)(6) aggravating circumstance.**

11         Just as with the guilt phase, counsel had a duty to investigate before the

12  aggravation phase. 2003 ABA Guideline 10.11 ("[C]ounsel . . . have a continuing

13  duty to investigate issues bearing upon penalty and to seek information that

14  supports mitigation or rebuts the prosecution's case in aggravation."); *see also*

15  *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (ineffectiveness inquiry looks into

16  "whether the investigation supporting counsel's decision [regarding penalty-phase

17  presentation] *was itself reasonable*"). And, just as with the guilt phase, counsel

18  failed to do so. In particular, counsel failed to consult with or retain experts who

19  could have helped them combat the State's case for cruelty. Indeed, counsel did

20  nothing that could constitute investigation with respect to the State's alleged

21  aggravators, even though proving, for example, cruelty under the (F)(6) aggravator

22  required a different focus than what occurred at Kiles's guilt phase. There is nothing

23

24  [107] Because the jury did not unanimously find either heinousness or depravity (ROA 879 at 11–12), the Arizona Supreme Court considered and upheld only the finding of cruelty on direct appeal, *State v. Kiles*, 213 P.3d 174, 188 (2009). Accordingly, Kiles presently details only counsel's ineffectiveness with respect to that component of the (F)(6) aggravator. However, counsel also could and should have mounted a strong challenge to heinousness and depravity in Gunnel's killing, by presenting evidence of the effects on Kiles of his intoxication at the time of the crime, *see infra*, Claim 6, and were ineffective for failing to do so.

176

to suggest, for example, that counsel re-interviewed any witnesses (*see, e.g.*, Tr. Mar. 22, 2006 at 56), or adequately reviewed the crime-scene photographs (*see* Tr. Mar. 27, 2006 at 136–37 (State eliciting during redirect examination that defense counsel had misinterpreted the crime-scene photographs).

Most critically, though, counsel once again failed to consult with any expert prior to the aggravation phase. This, despite the fact that counsel knew full well that much of the State's case for (F)(6) hinged on expert testimony. *See Hinton*, 571 U.S. at 273 (recognizing that in some cases the only available defense strategy demands expert assistance). That counsel did not even bother to contact an expert before the aggravation phase, even if only to understand the testimony that the State's experts could offer, was deficient performance. *See, e.g.*, *Dees v. Caspiri*, 904 F.2d 452, 454 (8th Cir. 1990) (per curiam) (determining that counsel had a duty to "make a diligent investigation of the forensic evidence"); *Correll*, 539 F.3d at 947–48 (recognizing that counsel's duties extend to the State's aggravation case); 2003 ABA Guideline 10.11 cmt. (requiring counsel to "thoroughly investigate to determine whether [the State's aggravation] can be excluded, rebutted, or undercut").

In light of the types of evidence that counsel knew the State would present in support of cruelty, counsel again should have consulted with the following experts:

<u>Pathologist</u>: The State's medical examiner, Dr. Mallon, testified at the aggravation phase the Gunnel had a defensive wound on her right forearm, and, because of an ill-conceived cross-examination, stated conclusively that Gunnel must have been conscious for the blow that caused that wound. (Tr. Mar. 21, 2006 a.m. at 21; Tr. Mar. 21, 2006 at 23–24.) Because counsel had done no reasonable investigation before the guilt or aggravation phases, defense counsel again never questioned Dr. Mallon's premise: whether the wound was in fact defensive in nature. (*See* Tr. Mar. 21, 2006 at 20.) Instead, counsel tried repeatedly to establish that the same blow during which Gunnel incurred the wound could also have hit

177

1  her head and knocked her unconscious. (Tr. Mar. 21, 2006 at 21–25.) Counsel

2  succeed primarily in getting Dr. Mallon to say, over and over, that Gunnel was

3  conscious and aware for that part of the attack.[108] (Tr. Mar. 21, 2006 at 21–25.)

4      As noted *supra*, Claim 3, however, counsel should have consulted an

5  independent pathologist. *See Thomas v. Clements*, 789 F.3d 760, 769–71 (7th Cir.

6  2015). Counsel's disastrous cross-examination revealed a complete lack of

7  understanding of Dr. Mallon's findings and how best to address them, which a

8  consultation with an independent pathologist could have cured. As a pathologist

9  could have informed counsel and could have testified, there is no way to determine

10  whether Gunnel's forearm wound was a defensive wound. Gunnel may well have

11  already been dead when the trauma to her arm occurred.

12      That very basic piece of knowledge would have transformed defense

13  counsel's approach to Dr. Mallon's testimony. Counsel conceded that Gunnel had

14  a defensive wound and argued about how long she could have remained conscious

15  after the first blow, undercutting Kiles's testimony that Gunnel went down after the

16  first blow. (*See* 2006 Trial Ex. 134 at 165–66.) By presenting independent expert

17  testimony or by fashioning a better cross-examination after consulting with an

18  independent expert, counsel could instead have established that what Kiles said—

19  that Gunnel was not conscious after the first blow—was as consistent with the

20  pathologist's testimony as the State's theory that Gunnel had remained conscious

21  for some period of time. *See Lindstadt v. Keane*, 239 F.3d 191, 201–02 (2d Cir.

22  2001) (holding counsel ineffective when counsel failed to educate themselves on

23  the meaning of State's expert's findings).

24      Blood-spatter expert: Just as counsel should have consulted with a blood-

25

---

26  [108] Counsel's attempt to get Dr. Mallon to say generally that there could have been

27  fewer blows that injuries—because a single blow could have caused multiple
   injuries—also backfired. Dr. Mallon simply explained "And the opposite is true . . .

28  [T]he blow in the back of the head could be as a result of one blow or three or four."
   (Tr. Mar. 21, 2006 at 17.)

spatter expert before the guilt phase, they should have done so before the aggravation phase. *See supra*, Claim 3; (*see also* ROA 1189 at 32–35). Through Tom Bevel, the State elicited that the blood stains on more than one wall of the living room, where Gunnel was killed, showed "movement." (Tr. Mar. 27, 2006 at 71.) Bevel said the same for the pillowcase found in the east bedroom, where the State alleged that the attack on Gunnel began: the blood on the pillowcase evinced "some movement . . . where the blood source has had lateral motion." (Tr. Mar. 27, 2006 at 72–73.)

An independent expert could have explained to counsel how to challenge these conclusions, both of which suggested that Gunnel was moving during the attack and was therefore conscious and perhaps aware of the uncertainty of her fate. *See Anderson*, 111 P.3d at 394 n.19 (defining "especially cruel"). Both conclusions likewise contradicted Kiles's testimony. (*See* 2006 Trial Ex. 134 at 165–66.) First, an independent expert would have informed counsel that there is no way to tell whether the blood stains on the various living room walls all occurred *during* the attack. It is entirely plausible that some of the stains were caused by a flick of a hand with blood on it or the swing of another item with blood *after* Gunnel's death. This is especially true as there was a pool of blood on the floor, and people such as Kiles and Kale Johnson were moving around the apartment long before the blood dried. (Tr. July 17, 2000 at 8–9 (Rodgers testifying that the blood in the living room was "still quite wet" when police were at the crime scene); Tr. July 17, 2000 at 190 (Kiles testifying that he and Johnson ransacked the apartment looking for things to sell).) Similarly, while counsel accepted Bevel's testimony that the source of the blood on the pillowcase moved (Tr. Mar. 27, 2006 at 119), an independent expert could have testified that it was plausible that the pillowcase instead moved across a blood source, for example the bloody mattress in the west bedroom (*see* Tr. Feb. 21, 1989 at 37–38 (Rodgers testifying that the blood on the mattress was still wet when police arrived)).

179

1    Armed with such information, counsel could have vigorously challenged
2   both the State's assertions that (1) the attack started in the bedroom, where the
3   pillowcase was found, and (2) Gunnel was conscious and moving around the living
4   room. (*See* Tr. Mar. 20, 2006 at 69–70.) Moreover, an independent expert would
5   have alerted counsel to the fact that Bevel's methodology for determining the
6   number of blows was incorrect, as discussed *supra*, Claim 3; had counsel pointed
7   this out through a defense expert or through cross-examination, that testimony
8   would have damaged Bevel's credibility overall. (*See, e.g.*, ROA 225 Ex. 59.)
9   Because competent counsel has a duty to "understand the basics of the science
10  involved" in expert testimony, "at least for purposes of cross-examining the State's
11  experts," counsel's failure was deficient. *Richey v. Bradshaw*, 498 F.3d 344, 362
12  (6th Cir. 2007); *see also* 2003 ABA Guideline 1.1 cmt. (capital trial counsel "must
13  be able to challenge zealously the prosecution's evidence and experts through
14  effective cross-examination").

15   Counsel went into the aggravation phase having conducted no aggravation-
16  focused investigation and entirely unprepared to reasonably challenge the State's
17  case for cruelty. Had counsel consulted with experts beforehand, counsel would
18  have had the information necessary to develop an appropriate strategy for their
19  presentation and to introduce at least reasonable doubt into the State's presentation
20  of the aggravating factors. Just as before, though, counsel's "investigation into the
21  State's forensic evidence never started," and so counsel were ill-equipped to make
22  any kind of reasonable decision as to how to proceed. *Elmore v. Ozmint*, 661 F.3d
23  783, 865 (4th Cir. 2011). But "[u]nder *Strickland*, counsel's investigation must
24  determine trial strategy, not the other way around." *Weeden*, 854 F.3d at 1070.
25  Because counsel conducted none of the investigation needed to determine strategy,
26  the decisions they made as to how to contest the State's aggravation case were
27  neither informed nor reasoned. *See Wiggins*, 539 U.S. at 521; *Bemore*, 788 F.3d at
28  1162–69.

180

1

2

     **2.**    **Because of the insufficient investigation and lack of preparation, counsel failed to mount an adequate challenge to the (F)(6) aggravator, thereby prejudicing Kiles.**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

     Counsel's unreasoned decision to treat the aggravation phase as a second guilt phase—in general, the lack of preparation—left counsel scrambling in their attempt to defend against the State's allegation that Gunnel's death was especially cruel. Instead of corroborating Kiles's testimony through expert testimony that Gunnel's forearm wound could well have occurred after unconsciousness or post-mortem, counsel had Dr. Mallon state over and over that Gunnel was conscious and aware past the first blow.[109] (Tr. Mar. 21, 2006 at 23–4.) Counsel could have had a blood-spatter expert corroborate Kiles's testimony, damage Bevel's credibility, and undermine the theory that Gunnel moved around the apartment by eliciting testimony that the blood-stain evidence was consistent with Gunnel having fallen unconscious (and having remained unconscious) after the initial below. (*See, e.g.*, ROA 225 Ex. 59.) Instead, counsel allowed Bevel's testimony to suggest that Gunnel moved around the living room during the attack. (Tr. Mar. 27, 2006 at 62–71.) In so doing, counsel performed deficiently. *See Richey*, 498 F.3d at 362; *Elmore*, 661 F.3d at 865.

18

19

20

21

22

23

24

     Moreover, because counsel indefensibly treated the aggravation phase as a guilt phase redux, they failed to challenge the lay-witness testimony that supported the State's depiction of Gunnel's killing as especially cruel. Notably, the defense did not object when Kale Johnson's testimony was read into the record. (*See* Tr. Mar. 23, 2006 at 60; Mar. 27, 2006 at 141.) Indeed, defense counsel actively sought to have the transcript of Johnson's testimony admitted into the record. (*See* Tr. Mar.

25

26

27

28

---

[109] As noted *supra*, Claim 3, counsel also could have confronted Dr. Mallon about his evolving testimony regarding defense wounds, in particular his increasing certainty over the years that Gunnel in fact had such a wound and that Gunnel was conscious after the initial blow. (*Compare, e.g.*, Mallon Tr. Dec. 12, 1989 at 8 (such wounds "can be defensive wounds"), *with* Tr. July 13, 2000 at 105 (agreeing that arm wound was a defensive wound)).

181

23, 2006 at 60; *see also* 2006 Trial Ex. 136.) In doing so, counsel sacrificed Kiles's opportunity to confront Johnson, even though different issues were important at aggravation than had been dispositive at the guilt phase. (*See* ROA 1189 at 39–40.) For example, at the guilt phase, counsel had attempted to get Johnson to agree that he had previously testified that his "fingerprints in blood are on the doorframe in Valerie's bedroom." (2006 Trial Ex. 136 at 168.) Johnson repeatedly said, "I don't remember" and expressed confusion about the question, so counsel just moved on. (2006 Trial Ex. 136 at 168–69.) If counsel had properly prepared for the aggravation phase and had not unreasonably permitted Johnson's prior testimony to come in, counsel could have elicited testimony about (or impeached him with) his August 1994 affidavit. In that affidavit, Johnson stated under oath, "When I was in the apartment, I got some blood on my hands. I tried to get rid of it by wiping my hand on the inside frame of the apartment door." (ROA 225 Ex. 45 at 2.) Counsel's failure to elicit such testimony during the aggravation phase was deficient.[110]

Counsel's unreasonable missteps with respect to the State's case for cruelty prejudiced Kiles. The Arizona Supreme Court later highlighted the evidence that it believed supported that cruelty had been proven beyond a reasonable doubt:

> The evidence shows beyond a reasonable doubt that the murder of Valerie was especially cruel. Kiles admitted that Valerie remained conscious after the attack began, and the medical testimony regarding defensive wounds supported that conclusion. . . . A pillow with blood on it consistent with a source that continued to move was found in Valerie's bedroom. A transfer stain consistent with a person running a bloody hand along a door was also identified. Blood spatter was found between eighteen and twenty-four inches from the ground, indicating that "the source of the blood would be lower toward the floor." The transfer stain on the door, together with spatter on the lower part of the north and south walls of the living room, indicated that either the blood source or the attacker was moving. A piece of the jack itself was found in the bedroom

---

[110] Counsel should also have confronted Johnson as discussed *supra*, Claim 3, as the issues discussed in that section also mattered to aggravation.

182

1
2
3

> with Valerie's blood on it. This evidence directly
> contradicts Kiles' trial testimony, when, contrary to his
> earlier admissions,[111] he claimed that when he hit Valerie
> with the jack, she fell down in a living room chair and never
> got up.

4  *Kiles*, 213 P.3d at 188. If counsel had investigated reasonably and presented a

5  defense based on that investigation, counsel could have hammered back at nearly

6  every piece of evidence later cited by the court. Had counsel performed reasonably,

7  the "medical testimony regarding defensive wounds"[112] would not have supported

8  the conclusion that Gunnel had a defensive wound, but would have said that the

9  trauma to Gunnel's forearm was consistent either with a defensive wound or with a

10  wound inflicted after loss of consciousness, or even with a wound inflicted after

11  death. The bloody pillowcase would have suggested only that the pillowcase was

12  moved while the apartment was ransacked (Tr. July 17, 2000 at 190), not that

13  Gunnel moved after the attack began. Similarly, the blood stains in the living room

14  would have been evidence of movement by someone at some time, plausibly after

15  the attack was over, not movement by Gunnel during the attack. That the jack was

16  found in the bedroom would have been immaterial, as much of the crime scene had

17  been compromised by the time it was photographed. And the jury would have

18  known that Kale Johnson left the transfer stain on the door (*see* ROA 225 Ex. 45 at

19  2); Gunnel did not do so during the attack.

20       Perhaps most importantly, counsel would have neutralized much of the

21  State's expert and other testimony that contradicted Kiles's claim and that therefore

22  damaged his credibility. Kiles's testimony was critical, in that it explained to the

23  jury how this crime could have occurred *without* being especially cruel under

24  Arizona law. Accordingly, bolstering Kiles's credibility—instead of making

25

26  [111] The only contrary statement Kiles purportedly made was the one about which

27  Hawkins testified. (*See* Tr. Mar. 22, 2006 at 35–39.)

28  [112] Even accepting as true Dr. Mallon's testimony, Gunnel had only one defensive
wound. (*See* Tr. Mar. 21, 2006 a.m. at 15–26.)

1    concessions that affirmatively damaged it—was essential to the defense case. *See*

2    *Bennett v. Cate*, 407 F. App'x 213, 215 (9th Cir. 2010) ("Because [the defendant]

3    took the stand, it was critical to have any objective physical and forensic evidence

4    to support his version.").

5         Had counsel investigated and prepared in accordance with their Sixth

6    Amendment obligations, the jury would have been left with no "conclusive

7    evidence that the victim was conscious during the infliction of the violence and

8    experienced significant uncertainty as to [her] ultimate fate." *Anderson*, 111 P.3d

9    at 395 n.19. Practically every facet of the State's case for cruelty would have been

10   countered by equally compelling evidence from the defense. The State could not

11   have proven beyond a reasonable doubt that Gunnel was conscious after the first

12   blow or that she experienced any pain.[113] *See State v. Clark*, 616 P.2d 888, 896

13   (Ariz. 1980) (rejecting a finding of cruelty when there was insufficient evidence

14   that the victims suffered pain). In such circumstances, there is a reasonable

15   probability that at least one juror would have concluded that the State had not

16   proven beyond a reasonable doubt that the killing of Gunnel was especially cruel.

17   *See Strickland*, 466 U.S. at 694. Counsel were thus ineffective for failing to

18   reasonably challenge the (F)(6) aggravator with respect to Gunnel's death.

19        **E.    Counsel performed deficiently and prejudiced Kiles by failing to
           frontload mitigation at the aggravation phase.**

20

21        As the primary goal of a capital-defense attorney is to avoid a death sentence,

22   counsel must take every reasonable opportunity to ensure that outcome. *See* 2003

23   ABA Guideline 10.11 ("[c]ounsel at every stage of the case should take advantage

24   of all appropriate opportunities to argue why death is not suitable punishment for

25   their particular client"). One critical way of doing so is to ensure that the jury is

26   _____

27   [113] This is not to suggest that proof beyond a reasonable doubt of consciousness
     alone would have sufficed to establish cruelty. *See State v. Soto-Fong*, 928 P.2d

28   610, 627–28 (Ariz. 1996).

184

1   introduced to the defense's mitigation story as early as possible during proceedings.
2   In other words, counsel must "frontload" the mitigation. *See Eaton v. Wilson*, No.
3   09-CV-261-J, 2014 WL 6622512, at *149 (D. Wyo. Nov. 20, 2014) (citing expert
4   testimony on frontloading and calling the frontloading of mitigation "so crucial in
5   a death penalty case"). This is especially important as there is "reason to believe
6   that a number of jurors make up their minds about the defendant's punishment even
7   before they hear any evidence in the penalty phase." Stephen Garvey, *Aggravation
8   and Mitigation in Capital Cases: What Do Jurors Think?* 98 Colum. L. Rev. 1538,
9   1543 (Oct. 1998). Here, given the near certainty that the State would be able to
10  establish at least one aggravator for at least one victim in Kiles's case, counsel had
11  a duty to frontload mitigation for Gunnel's death during the aggravation phase. *See*
12  2003 ABA Guideline 10.11; *see also Strickland*, 466 U.S. at 688.

13          As the State had alleged Gunnel's and the children's deaths were especially
14  heinous and depraved for purposes of the (F)(6) aggravator, trial counsel had an
15  opportunity to frontload mitigation. Under Arizona law, the "terms 'heinous' and
16  'depraved' focus on the defendant's mental state and attitude at the time of the
17  offense as reflected by his words and actions." *Anderson*, 111 P.3d at 395 n.19.
18  Because the State put Kiles's mental state at issue, counsel had a clear opportunity
19  to introduce evidence going to Kiles's mental state that also previewed for the jury
20  Kiles's impairments. Indeed, the Ninth Circuit has specifically concluded that
21  evidence of a defendant's mental impairments can counter the State's evidence that
22  a crime was committed in an especially heinous manner under Arizona's (F)(6)
23  aggravator. *Summerlin v. Schriro*, 427 F.3d 623, 641–42 (9th Cir. 2005) (en banc).

24          Counsel's failure to frontload mitigation relating to Gunnel's death was not
25  strategic. Counsel did not even consider the possibility of frontloading mitigation.
26  As counsel did not even make a conscious decision not to begin introducing
27  mitigation at the aggravation phase, counsel's performance is owed no deference as
28  a matter of strategy. *Cf. Wiggins*, 539 U.S. at 521–22 (counsel's decisions are due

1   deference only when informed by reasonable investigation).

2          Had counsel considered introducing mitigation at the aggravation stage,
3   counsel could have previewed for the jury a number of relevant themes that the jury
4   later saw. *See infra*, Claim 6 (discussing mitigation available in this case). For
5   example, counsel could have offered evidence of Kiles's impulsivity, a major focus
6   of the mitigation phase, to rebut the allegation of heinousness; similarly, counsel
7   could have offered evidence of Kiles's organic brain dysfunction to demonstrate
8   Kiles's state of mind around the time of the crime. (*See, e.g.*, Tr. Apr. 25, 2006 at
9   101 (defense expert testifying that homicides were, to a reasonable degree of
10  medical certainty, attributable to Kiles's impulsivity).) In fact, in *Summerlin*, the
11  Ninth Circuit held that the "strong psychiatric evidence of Summerlin's lack of
12  impulse and emotional control and organic brain dysfunction could have provided
13  significant mitigating evidence countering the State's circumstantial evidence" of
14  heinousness. 427 F.3d at 641–42. Kiles's counsel could have done the same.
15  Moreover, Kiles's counsel could have started to introduce the jury to Kiles's
16  addictions and their effects on him. While counsel sporadically had witnesses touch
17  upon Kiles's drug use during the aggravation phase (*see, e.g.*, Tr. Mar. 22, 2006 at
18  67–68), no effort was made to start explaining to the jury the *effects* of those
19  addictions on Kiles's brain and mental state—including the effects of his drug-
20  induced psychosis—around the time of the crime (*see, e.g.*, Tr. Feb. 21, 1996 at
21  177–85). Counsel's failure to do so was deficient performance.

22         Kiles was, moreover, prejudiced by counsel's failure. Counsel could have
23  framed the jury's understanding of Kiles's crime from the outset in terms of his
24  impairments, giving the jury and integrated understanding of both the crime and
25  why it occurred. As the jurors learned about the crime, they would also have learned
26  about Kiles's mental illness and impairments. *See Eaton*, 2014 WL 6622512 at
27  *149 (quoting expert testimony on how frontloading "help[s] the jury to understand
28  [the defendant] as fully human as early as possible"). This approach would have

helped the jurors absorb Kiles's ensuing mitigation presentation and use it to give context to the crime. While this may not have affected the aggravation-phase outcome, there is a reasonable probability that at least one juror, having heard the mitigation at the outset and throughout the penalty-phase proceedings, would have voted differently on the sentence for Gunnel's death. *Cf. Jackson v. Calderon*, 211 F.3d 1148, 1164 (9th Cir. 2000) (noting the importance of mitigation and finding prejudice from deficient performance with respect to mitigation when crime was "an unplanned encounter between a grossly intoxicated, originally unarmed defendant and a victim suddenly ending in death").

### F. Counsel were ineffective for failing to properly object to Kiles's restraints.

Kiles's counsel were deficient for failing to properly object to Kiles's shackling, as well as for failing to ensure that Kiles's restraints were not visible to the jury, and counsel's deficient performance prejudiced Kiles.

Throughout penalty-phase proceedings, Kiles was forced to wear a leg brace—designed to lock up if he moved too quickly—and an electric stun belt around his waist. Kiles had to hold the leg brace in place at times when he was walking to prevent it from locking up as he moved. At least one juror saw Kiles's physical restraints—including a belly chain with handcuffs—both when a door opened when he was waiting to come into the courtroom and when he was sitting at the defense table.

As detailed *supra*, Claim 3, Kiles had a right under the Due Process Clause not to be tried wearing shackles unless there were no acceptable alternatives, because of the inherent prejudice of shackles. *Holbrook v. Flynn*, 475 U.S. 560, 568–69 (1986). That right was intended to protect the presumption of innocence and the impartiality of the jury, preserve Kiles's ability to assist counsel in his own defense, and to ensure the dignity of judicial proceedings. *See Illinois v. Allen*, 397 U.S. 337, 344–45 (1970); *see also supra*, Claim 3. However, Ninth Circuit

1    precedent makes clear that even restraints that are not visible to the jury—namely,

2    the electric stun belt—can undermine those rights and interests. *See Gonzalez v.*

3    *Pliler*, 341 F.3d 897, 900 (9th Cir. 2003).

4         Before Kiles's aggravation phase, trial counsel objected to visible shackling

5    and leg braces, but did not object to making Kiles wear the electric stun belt. (*See*

6    Tr. Feb. 14, 2006 at 41–43 ("I'm agreed with what they make him wear under his

7    clothes. I just don't want him to be hobbling in here with those leg things that lock

8    up.").) However, as detailed *infra*, Claim 8, even non-visible restraints such as the

9    electric stun belt can have a devastating effect on, for example, a defendant's ability

10   to communicate easily with counsel. *Gonzalez*, 341 F.3d at 900 (noting that the use

11   of a stun belt "raises all of the traditional concerns about the imposition of physical

12   restraints".) Accordingly, counsel had a duty to challenge the use of that restraint

13   without an individualized finding of necessity just as much as counsel had a duty

14   to challenge visible shackles. *See id.*; *see also, e.g.*, *Roche v. Davis*, 291 F.3d 473,

15   483 (7th Cir. 2002). Moreover, for the reasons *infra*, Claim 8, and *supra*, Claim 3,

16   if faced with such a challenge, the trial court likely would not have required Kiles

17   to wear a stun belt, because as even the court recognized, Kiles was no security

18   threat. (Tr. Feb. 14, 2006 at 42 (court "[could not] recall any time that Mr. Kiles

19   ha[d] been a security problem, or risk").)

20        Counsel's aggravation-phase failure to protect Kiles's due-process rights not

21   to be restrained unnecessarily, in conjunction with counsel's failure to ensure that

22   Kiles's restraints were not visible, was prejudicial. This is especially true because

23   of the particular dangers of stun belts, *see Gonzalez*, 341 F.3d at 901, and the fact

24   that at least one juror saw Kiles's wearing chains around his waist. Had counsel

25   properly protected Kiles's rights, there is a reasonable probability that at least one

26   juror would have voted differently. *See Strickland*, 466 U.S. at 694; *see also State*

27   *v. Gomez*, 123 P.3d 1131, 1139–42 (Ariz. 2005) (reversing death sentence because

28   capital defendant was shackled without necessary individualized finding).

1

2

### G.   Counsel were ineffective for failing to object to, or to request a curative instruction for, the prosecutor's misconduct in opening and closing statements.

3

4

5

6

7

8

During the aggravation phase, the prosecutor gave an opening statement that consisted largely of improper argument and gave a closing statement filled with vouching, mischaracterizations of the evidence, insults to the defense, and other misconduct. Counsel were ineffective for failing to object to the State's closing and to request a curative instruction regarding the opening or the closing. *See Zapata v. Vasquez*, 788 F.3d 1106, 1112 (9th Cir. 2015).

9

10

11

12

As discussed in detail *infra*, Claim 9, Powell used his aggravation-phase opening statement to lay out an improper argument, filled with vouching and other misconduct, for the jury. Throughout the statement, Powell repeatedly informed the jury of what "we know." For example, he declared,

13

14

15

16

17

18

> February 9th, Thursday. What do we know about that day? We know that the defendant and Valerie did laundry. We know that Wade Ward . . . stopped by to visit. Stopped by the apartment to see Shemaeah and to talk to Valerie. And we also know that during that day the defendant stole Valerie's food stamps; the food stamps that she used to feed her children. We then know that the defendant sold them so that he could purchase drugs, which he did, so that he and his friends could use drugs, which they did.

19

20

21

22

23

24

25

26

27

28

(Tr. Mar. 20, 2006 at 67–68.) Powell continued in that vein, instructing the jurors as to what the State *knew* to be true—even though some of this information had been contested at the guilt phase—and therefore throwing the weight of the State behind the credibility and accuracy of certain testimony that was to come. *See United States v. Younger*, 398 F.3d 1179, 1191 (9th Cir. 2005) (prosecutor should not use the phrase "we know" unless summarizing evidence already admitted at trial). Powell further improperly vouched for the credibility of various pieces of evidence and misled the jury. (*See, e.g.*, Tr. Mar. 20, 2006 at 79 (Powell telling the jury that Hawkins's Silent Witness letter was "consistent with the physical evidence")); *see also United States v. Kerr*, 981 F.2d 1050, 1053 (9th Cir. 1992)

189

1   ("A prosecutor has no business telling the jury his individual impressions of the
2   evidence.").

3          Trial counsel repeatedly objected to the prosecutor's improper argument (*see*
4   Tr. Mar. 20, 2006 at 76, 79), and eventually moved for a mistrial (Tr. Mar. 20, 2006
5   at 84). The court denied that motion, but failed to give—and counsel failed to
6   request—a curative instruction as to the prosecutor's vouching. (*See* Tr. Mar. 20,
7   2006 at 91.) Given the obvious harm from the prosecutor's vouching, counsel
8   should have requested a jury instruction that the prosecutor's comments on the
9   veracity of the evidence or what the State knew to be true should be disregarded.
10  Counsel knew full well how hard it would be for the defense "to unring this bell"
11  (Tr. Mar. 20, 2006 at 87), and counsel were deficient for failing to request an
12  instruction from the court to help them do so. *See Strickland*, 466 U.S. at 688.

13         Counsel failed also to object to most of the prosecutor's closing, although
14  that too was littered with instances of misconduct. *See* Claim 9, *infra*. Throughout
15  his closing, Powell belittled the defense, calling it "this ruse" and dismissing the
16  "defense story." (Tr. Apr. 11, 2006 at 18, 22.) Powell even disparaged defense
17  lawyers, proclaiming that "where defense attorneys make their money is arguing
18  reasonable doubt." (Tr. Apr. 11, 2006 at 39); *see Wilson v. Sirmons*, 536 F.3d 1064,
19  1119 (10th Cir. 2008) (recognizing that a prosecutor's attacks on defense counsel
20  can constitute misconduct). Powell further misstated the evidence, just as he had in
21  the guilt phase, for example, by asserting that Larry Hawkins's Silent Witness letter
22  said that after attacking Gunnel, "the defendant then went out into the living room
23  and sat there." (Tr. Apr. 11, 2000 at 25); *see also supra*, Claim 3; *infra*, Claim 9.
24  But the letter did not even intimate that the attack had moved from room to room.
25  (*See* 2006 Trial Ex. 90 at 1; *see also* Tr. Apr. 11, 2006 at 66.) Then, to corroborate
26  his own misstatements of the evidence, Powell repeatedly announced to the jury
27  that "we know," for example, "that it was a prolonged beating [of Gunnel]," when
28  such matters were in dispute. (*See, e.g.*, Tr. Apr. 11, 2006 at 25); *see also United*

1   *States v. Sanchez*, 176 F.3d 1214, 1224 (9th Cir. 1999) ("As a general rule, a

2   prosecutor may not express his opinion of the defendant's guilt or his belief in the

3   credibility of government witnesses.") (quoting *United States v. Molina*, 934 F.2d

4   1440, 1444 (9th Cir. 1991). The prosecutor even closed by instructing the jurors as

5   to exactly what they were going to do: "Twelve people are going to find

6   unanimously that he killed." (Tr. Apr. 12, 2006 at 25.)

7        Even so, trial counsel failed to object to all but one instance of the

8   prosecutor's misconduct and failed to seek any kind of curative instruction. (*See* Tr.

9   Apr. 11, 2006 at 16–84; Tr. Apr. 12, 2006 at 3–25.) Given the prosecutor's

10  concerted effort—starting in his opening—to mislead the jury as to the strength of

11  the State's evidence and to cement in the jury's minds the credibility of State's

12  witnesses, that failure was deficient. *See Zapata*, 788 F.3d at 1112.

13       Moreover, much of prosecutor's improper argument went directly toward an

14  attempt to establish that Gunnel's death was especially cruel for the purposes of the

15  (F)(6) aggravator. (*See, e.g.*, Tr. Apr. 11, 2006 at 25.) The harm from that

16  misconduct was only exacerbated by the fact that defense counsel said nothing

17  regarding the evidence in his own opening (*see* Tr. Mar. 20, 2006 at 94–106),[114]

18  and, further, lauded Powell as "a very skilled lawyer" and as "a very good lawyer"

19  who "knows what he's doing" (Tr. Mar. 20, 2006 at 96, 98). Because of the

20  prosecutor's pervasive misconduct in opening and closing, there is a reasonable

21  probability that absent counsel's errors in failing to cure that harm at least one juror

22  would have come to a different conclusion. *See Strickland*, 466 U.S. at 694.

23  _____

24  [114] Except for the brief mentions of Powell, the defense team, the dates at issue with
    the crime, and the fact that Kiles would never be eligible for parole, counsel said

25  nothing that was specific to Kiles's case. (*See* Tr. Mar. 20, 2006 at 94–106.) Instead,
    perhaps reflecting the fact that he had not worked on the case for counsel said such

26  things as, "During the course of the trial – and in any trial – we are here because of
    a dispute. We're here because the State has a view of facts different than the

27  defense. We're here because things have happened outside of your view – outside
    of even your concern at this point – has [sic] brought us to this point, to this precise

28  moment." (Tr. Mar. 20, 2006 at 97.)

1

2

### H.   Counsel were ineffective for failing to object to the trial court's erroneous instruction defining reasonable doubt.

3    Counsel were ineffective in failing to object to the reasonable-doubt

4 instruction given to the jury. The trial court instructed the jury that "[p]roof beyond

5 a reasonable doubt is proof that leaves you firmly convinced that the alleged

6 aggravating factor is proven." (Tr. Apr. 11, 2006 at 7–8.) Later, the court instructed

7 the jury that "conclusive evidence" of cruelty sufficed to establish the (F)(6)

8 aggravator. (Tr. Apr. 11, 2006 at 13.) Even though counsel had, at the guilt phase,

9 objected to the instruction lessening the standard of proof that the State had to

10 satisfy (Tr. July 18, 2000 at 27), counsel neglected to do so at the aggravation phase.

11    But the phrase "firmly convinced" reduced the State's burden of proof to

12 something less than reasonable doubt; it is akin to "clear and convincing." *See, e.g.*,

13 *State v. Perez*, 976 P.2d 427, 442 (Haw. Ct. App. 1998), *aff'd in part, rev'd in part*

14 *on other grounds*, 976 P.2d 379 (Haw. 1999). "[T]he reasonable-doubt standard is

15 indispensable to command the respect and confidence of the community in

16 applications of the criminal law." *In re Winship*, 397 U.S. 358, 364 (1970). "It is

17 critical that the moral force of the criminal law not be diluted by a standard of proof

18 that leaves people in doubt whether innocent men are being condemned." *Id.* A

19 lesser standard of proof, such as "firmly convinced" violates a defendant's rights to

20 due process under the Fifth and Fourteenth Amendments to the U. S. Constitution.

21 *See id.* Given the defense's focus on reasonable doubt throughout its presentation

22 (*see, e.g.*, Tr. Apr. 11, 2006 at 76), there is a reasonable probability that the

23 proceeding would have had a different outcome if the jury had been properly

24 instructed on the definition of reasonable doubt. *See Strickland*, 466 U.S. at 694.

25

### I.   Counsel were ineffective for failing to ensure that a complete record was made of aggravation-phase proceedings.

26

27    As discussed in Claim 16, *infra*, Kiles's counsel permitted significant

28 portions of the aggravation phase to go unrecorded. Counsel did so despite Kiles's

192

specific request that a record be made of all proceedings (*see, e.g.*, Tr. Aug. 6, 1999 at 13), and despite the need for meaningful appellate review, *see Gregg v. Georgia*, 428 U.S. 153, 197–98 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.). In doing so, counsel performed deficiently and prejudiced Kiles. *See Strickland*, 466 U.S. at 688, 694.

### J.   Counsel's numerous errors, individually and cumulatively, undermined the reliability of Kiles's aggravation phase.

Each instance of deficient performance described above is prejudicial was on its own, but counsel's aggravation-phase errors caused even more pronounced prejudice. When evaluating an ineffective-assistance claim, this Court must consider the cumulative impact of counsel's various errors. As the Supreme Court has stated, "In making this [prejudice] determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695; *see Williams (Terry) v. Taylor*, 529 U.S. 362, 397–98 (2000); *see also White*, 895 F.3d at 645 n.1 (ruling that the district court erred by granting a certificate of appealability on a portion of an ineffective assistance claim because the petitioner "has but a single claim regarding his right to the effective assistance of counsel at the penalty phase"); *Martin v. Grosshans*, 424 F.3d 588, 590–92 (7th Cir. 2005) ("[E]ven if [trial counsel's] errors, in isolation, were not sufficiently prejudicial, their cumulative effect prejudiced Martin's defense."); *Alcala v. Woodford*, 334 F.3d 862, 882–83 (9th Cir. 2003) (granting relief on basis of cumulative impact of multiple errors by counsel); *Lindstadt*, 239 F.3d 191, 205 (2d Cir. 2001) (granting relief where petitioner was prejudiced by cumulative effect of errors committed by trial counsel); *Harris ex rel. Ramseyer v. Wood*, 64 F.3d 1432, 1439 (9th Cir. 1995) (holding that cumulative impact of numerous deficiencies in defense counsel's performance was prejudicial, warranting habeas relief).

Here, had counsel not performed deficiently, the jury would not have heard

193

1   that Kiles had a prior "violent" felony conviction for aggravated assault, but would

2   instead have been introduced to his brain dysfunction and addictions, giving some

3   sort of context to the crime. Moreover, the jury would have heard that the State's

4   case that Gunnel's killing was cruel came down to possibilities and conjecture, but

5   certainly nothing that could establish beyond a reasonable doubt that she was

6   conscious and in pain for a prolonged beating or that she experienced great

7   uncertainty as to her fate. Had counsel performed competently, there is at least a

8   reasonable probability that the outcome of the aggravation phase would have been

9   different. *See Strickland*, 466 U.S. at 694.

10  **K.    The state post-conviction court's decision that Kiles did not state**
11  **a colorable claim is no bar to this Court's de novo review of this**
    **claim.**

12       The state post-conviction court's reasoned decision on this claim stated that,

13  with respect to counsel's failure to challenge the 1986 aggravated assault as a basis

14  for the (F)(2) aggravating circumstance, Kiles had shown neither deficient

15  performance nor prejudice. (*See* ROA 1214 at 2.)

16       The state-court merits ruling on this claim is contrary to and/or an

17  unreasonable application of clearly established federal law for two distinct reasons.

18  *See* 28 U.S.C. § 2254(d)(1). As noted *supra*, Claim 3, the only standard the state

19  post-conviction court ever stated with respect to the prejudice prong of an

20  ineffectiveness-of-counsel claim was an outcome-determinative standard: whether

21  "the outcome would have been different." (ROA 1214 at 2.) That standard,

22  however, is contrary to or an unreasonable application of the prejudice standard in

23  *Strickland*. *See, e.g.*, *Thomas*, 789 F.3d at 767–68 (holding that court's "would have

24  led to a different result" prejudice standard was an unreasonable application of

25  *Strickland*); *Martin*, 424 F.3d at 592 (holding that the state court's prejudice

26  inquiry—whether "the result of the proceeding would have been different"—was

27  contrary to *Strickland*). Moreover, the state court's failure to consider the

28  cumulative effect of the prejudice from the various challenges to aggravators

194

foregone by trial counsel was likewise an unreasonable application of or contrary to clearly established Supreme Court precedent. *See, e.g.*, *Strickland*, 466 U.S. at 694–95 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional *errors*, the result of the proceeding would have been different. . . . In making this [prejudice] determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury."); *White*, 895 F.3d at 671; *see also, supra*, Claim 3.

In addition, the ruling that there was no showing of deficient performance was an unreasonable application of *Strickland* and *Wiggins*, which unambiguously provide that unreasoned "decisions" based on no investigation or preparation are afforded no deference. *See Strickland*, 466 U.S. at 688; *Wiggins*, 539 U.S. at 521. To the extent that the state court made a determination of fact on this front, that too was unreasonable. *See* 28 U.S.C. § 2254(d)(2); *see also, e.g.*, *Taylor v. Maddox*, 366 F.3d 992, 999–1001 (9th Cir. 2004) (discussing ways in which § 2254(d)(2) can be satisfied). As the state-court record makes clear—indeed, as counsel effectively acknowledged on the record—counsel did no investigation to prepare specifically for the aggravation phase. (*See, e.g.*, Tr. Mar. 22, 2006 at 56; Tr. Mar. 27, 2006 at 38.) Given this failure to investigate, counsel's choices to forego a meritorious challenge to the (F)(2) aggravator and to mount an uninformed defense to the (F)(6) aggravator, among other errors, were necessarily deficient.

The finding of no prejudice was likewise unreasonable, both because the state court used the improper legal standard as described above, but also because the state court—to the extent it made a factual finding—relied on an unreasonable determination under § 2254(d)(2). *See Taylor*, 366 F.3d at 1001 ("[W]here the state courts plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable."). Here, the state post-conviction court

195

ignored the prejudice from the improper finding of the (F)(6) aggravator in coming to this conclusion (*see* ROA 1214 at 1–2), rendering it unreasonable within the meaning of § 2254(d)(2).

Because Kiles has satisfied § 2254(d), this Court's analysis is "unconstrained" by AEDPA deference.[115] *See Williams*, 529 U.S. at 405–06.

### L.    Conclusion.

For the reasons stated above, Kiles's counsel provided ineffective assistance at Kiles's aggravation phase, thereby prejudicing Kiles. The state-court decision is no bar to this Court's de novo review of this claim, and Kiles is entitled to relief.

**Claim Six**

**Kiles was denied effective assistance of counsel at his mitigation phase when his counsel failed to investigate and present powerful mitigating evidence, among other significant errors.[116]**

Counsel's failure to investigate and present powerful mitigating evidence, and counsel's other significant errors, violated Kiles's rights under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution. Kiles incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition. He presented this claim below in similar form. (ROA 1189 at 23–25, 48–61; PFR2 Dkt. 1 at 23–25, 48–61.)

### A.    A capital defendant must receive an individualized sentencing after a full and fair consideration by the jury.

"There is no more important hearing in law or equity than the penalty phase of a capital trial." *Correll v. Ryan,* 539 F.3d 938, 946 (9th Cir. 2008) (quoting *Gerlaugh v. Stewart*, 129 F.3d 1027, 1050 (9th Cir. 1997) (Reinhardt, J., concurring

---

[115]Alternatively, Kiles alleges he can overcome any default by showing cause and prejudice attributable to the ineffective assistance of state post-conviction counsel. *See Martinez*, 566 U.S. at 9; *Strickland*, 466 U.S. at 688, 694.

[116] As noted earlier, Kiles uses "mitigation phase" to describe the phase at which the defense put on its case for leniency and "penalty phase" to describe his aggravation and mitigation phases together.

196

and dissenting)). The Eighth and Fourteenth Amendments enshrine the guarantee of individualized sentencing and due process in the capital context. *See*, *e.g.*, *Lockett v. Ohio*, 438 U.S. 586, 602–05 (1978) (plurality opinion). Accordingly, a capital sentencer must be afforded the opportunity to assess "the character and record of the individual offender." *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982) (quoting *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976)). As the Supreme Court has explained,

> If the sentencer is to make an individualized assessment of the appropriateness of the death penalty, "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse."

*Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002). The assistance of competent and qualified counsel is necessary to safeguard these fundamental principles. *E.g.*, *Strickland v. Washington*, 466 U.S. 668, 685 (1984) ("[C]ounsel's skill and knowledge is necessary to accord defendants the 'ample opportunity to meet the case of the prosecution to which they are entitled.'") (quoting *Adams v. United States ex rel. McCann*, 317 U.S. at 275, 276 (1942)).

## B.    Kiles's personal history.

Kiles was born on May 21, 1961, to Imojean Long Kiles and Alvie Kiles, Sr., in Yuma, Arizona. (ROA 225 Ex. 1 at 1.) Imojean met Alvie, Sr. when she was 16 years old. (ROA 225 Ex. 37 at 3.) A few years later, after his marriage to another woman was annulled, Alvie, Sr. and Imojean married in 1952. (ROA 225 Ex. 37 at 3.) She did not love him and married him only to escape her own violent and erratic father. (ROA 225 Ex. 37 at 3.) Her mother had died when she was 12. Alvie, Sr. sent a letter from California to Imojean, proposing and stating that he needed to be

married by the year's end. She agreed, and they married two months later.

Imojean and Alvie, Sr.'s relationship, marred by alcoholism and mental illness, was chaotic and tenuous from the start. Alvie, Sr. drank often. (ROA 225 Ex. 37 at 3.) The two fought constantly. (ROA 225 Ex. 39 at 1.) Alvie, Sr. began hitting Imojean whenever she said something he did not like; she quickly learned that he was mean and violent. (ROA 225 Ex. 37 at 4.) After just four months of marriage, he beat her so hard she was left with scars on both of her legs. (PFR2 Dkt. 27 Ex. 21 at 21.) She fled back to her abusive and alcoholic father's house in Yuma, as even the violence of that home was preferable to her life with Alvie, Sr. (PFR2 Dkt. 27 Ex. 21 at 21.) Alvie, Sr. followed her, and she agreed to get back together with him on the condition that they move to Yuma, which they did. (PFR2 Dkt. 27 Ex. 21 at 21.) This was the first go-around in an unending cycle of Imojean and Alvie, Sr. separating and reuniting, a pattern that recurred for the duration of their relationship. (ROA 225 Ex. 37 at 7.)

When they married, Imojean was unaware of Alvie, Sr.'s addiction to alcohol and its effects. He initially drank heavily only on the weekends, when he was not working. (PFR2 Dkt. 27 Ex. 21 at 20.) But his drinking worsened over time. Alvie, Sr. drank heavily for decades, only stopping when he had to near the end of his life by medical conditions. (PFR2 Dkt. 22 Ex. 3 at 3.) His alcoholism was likely both an inheritance and a coping mechanism. He had come from a family full of people, including his mother and siblings, battling alcohol and drug addictions. (ROA 225 Ex. 37 at 5.)

Likely unbeknownst to Imojean, Alvie, Sr. had also been struggling with serious mental-health issues. One month before he proposed to her, he was diagnosed with Schizoid Personality Disorder. (ROA 225 Ex. 66 at 4.) At the height of the Korean War, when the military was desperate for servicemen, U.S. Navy medical officers deemed him unfit for service because of his mental illness and discharged him. (ROA 225 Ex. 66 at 5.) There were other indications that he was

1   unwell, like reports of his heavy alcohol intake and persistent headaches.

2       Alvie, Sr. never wanted to have children, while Imojean wanted a big family.
3   (ROA 225 Ex. 37 at 4.) She miscarried three times before giving birth to a child
4   that was stillborn; it was the son that she had desperately wanted. (ROA 225 Ex. 37
5   at 4.) Alvie, Sr. disposed of the baby without getting Imojean's consent or giving
6   her the chance to say goodbye. (ROA 225 Ex. 37 at 4.) Their first surviving baby
7   was Janell Kiles, born in 1956. (ROA 225 Ex. 37 at 4.)

8       About three years after Janell was born, Imojean's own mental illness
9   became unmanageable. Imojean had suffered with mental illness for years, which
10  went untreated because of her impoverished upbringing and dysfunctional
11  childhood. As an adult, her illness was exacerbated by the abuse and unhappiness
12  of her marriage. (ROA 225 Ex. 37 at 1–2, 4.) Eventually, Imojean crumbled into a
13  state of complete emotional distress; she mentally decompensated so thoroughly
14  that she had to be hospitalized. (ROA 225 Ex. 37 at 4.) Her doctor insisted she stay
15  in bed, and Janell was sent to California to stay with Alvie, Sr.'s mother, whom
16  Janell described as "mean." (ROA 225 Ex. 37 at 4; ROA 225 Ex. 39 at 4.). Imojean
17  was prescribed anti-anxiety medication and antidepressants. (ROA 225 Ex. 60 at
18  28.) Following her mental breakdown, Imojean and Alvie, Sr. continued to fight
19  viciously; she coped by downing alcohol and taking prescription medication. (ROA
20  225 Ex. 37 at 4; ROA 225 Ex. 39 at 4; ROA 225 Ex. 60 at 14–15.)

21      While Imojean drank alcohol daily and ingested medication, a combination
22  that took an irreparable physical toll, she and Alvie, Sr. conceived another child.
23  (ROA 225 Ex. 60 at 14–15.) Because of her history of difficulty in carrying babies
24  to term, she did not expect her baby to survive. Thus, she ignored signs of distress,
25  like her nonstop illness, and continued to drink throughout her pregnancy.
26  However, the child did survive, and Kiles was born in 1961, five years after his
27  sister and only surviving sibling. (ROA 225 Ex. 1 at 1.)

28      Kiles began suffering with asthma as an infant. (ROA 225 Ex. 60 at 3.) He

199

was prescribed medication (potentially harmful stimulant drugs) as treatment both as a child and as an adult. (ROA 225 Ex. 60 at 3, 31–32) At one point, Kiles experienced life-threatening breathing difficulties—traumatic to a young child— and was tossed in the back of the family car and rushed to medical treatment. (PFR2 Dkt. 23 Ex. 19 at 5.) His parents were incapable of properly tending to Kiles's serious health problems due to their own struggles with addiction and mental illness. Instead of getting Kiles actual treatment for his asthma, his family told him to hold a Chihuahua in his lap to "help" him breathe when he struggled for air.

Kiles was hit by a moving vehicle shortly before he turned five and rushed to the doctor. He had to stay in bed for weeks after. Following this, he suffered from regular nosebleeds and severe headaches. (ROA 225 Ex. 60 at 4.) Also as a child, Kiles was struck in the head with a baseball bat and lost consciousness. Kiles suffered chronic headaches into adulthood, and even in prison years later, he requested ibuprofen nearly every day for his debilitating headaches. In addition, as a child Kiles wet the bed; he endured bouts of sleep disturbance, nightmares, and sleepwalking into his teenage years.

Alvie, Sr. and Imojean were seemingly good financial providers. They worked a variety of jobs throughout Kiles's childhood. Kiles's father did maintenance for U.S. Border Patrol and ran a cleaning business. (ROA 225 Ex. 60 at 17.) His mother did domestic work; she also worked at the local country club, a marine base, and a cafeteria. (PFR2 Dkt. 27 Ex. 21 at 14–15.) Though his parents worked hard and tried to maintain a veneer of normalcy outside the home, their struggles with alcohol addiction and mental illness shaped their parenting behind closed doors. (ROA 225 Ex. 60 at 27.)

Within their home, Alvie, Sr. and Imojean were ill-equipped to provide a safe, nurturing environment conducive to child-rearing. The home in which Kiles and his sister grew up was an unstable, dangerous place. (ROA 225 Ex. 60 at 28– 29.) It was filled with vicious fights and violence. (ROA 225 Ex. 60 at 15.) Alvie,

200

Sr. continued to physically assault Imojean and did so in front of Kiles and Janell. (ROA 225 Ex. 39 at 1.) He "cold-cocked" her on multiple occasions. (ROA 225 Ex. 42 at 1.) The cruelty in their relationship was not one-sided. Imojean mistreated Alvie, Sr. (ROA 225 Ex. 38 at 4.) They beat each other up, and threatened each other with weapons, including hatchets and butcher knives. (PFR2 Dkt. 20 Ex. 2 at 1; Tr. May 9, 2006 at 57.) One time, Imojean drew a knife on Alvie, Sr. (Tr. Feb. 20, 1996 at 34.) In another incident after he got another woman pregnant, she hit him in the head with a telephone. The assault was so brutal that Janell felt ill at the sight of her father's bloody head. (ROA 225 Ex. 39 at 1.)

Imojean's alcoholism was one of the greatest sources of turbulence in the family, contributing to the home's unpredictability and chaos. (ROA 225 Ex. 61 at 10.) Her drinking was a source of tension with her husband and emotional distress for her children. (ROA 225 Ex. 61 at 10.) Alcohol fueled her temper, causing her to lash out at those around her, including her son and daughter. Kiles hated that his mother drank and he often had to deal with the aftermath, especially when she was in public in a drunken stupor and he had to retrieve her from a bar and put her to bed. (ROA 225 Ex. 61 at 10–11.) He missed many Mondays at school because he did not want to have to deal with what people said about his mother's behavior over the weekend. (Tr. May 16, 2006 at 26.)

Kiles and Janell were tormented by their parents' behavior toward each other, and at times threw themselves in between their parents. (ROA 225 Ex. 60 at 15.) The children were, quite literally, caught in the middle; they often had to pull their parents off each other to get them to stop hurting one another. (PFR2 Dkt. 22 Ex. 3 at 1.) This incubation of terror had dire effects on Kiles and Janell. The constant fighting terrified them. Kiles and Janell called the police on multiple occasions to beg them to stop the fighting, out of fear of what their parents might do to each other. (PFR2 Dkt. 22 Ex. 3 at 1.) Despite the children's pleas, the police usually did not come. (PFR2 Dkt. 22 Ex. 3 at 1.)

When Kiles reached a certain age, he tried to protect his mother from his father by telling his father not to hit her anymore; that made his mother proud despite the fact that it thrust Kiles further into his parents' dysfunctional relationship. (ROA 225 Ex. 37 at 6; ROA 225 Ex. 60 at 22.) Kiles also had to protect his father from his mother at times. One time, Kiles had to stop Imojean from pouring hot grease on Alvie, Sr. while he slept. (Tr. May 9, 2006 at 57.)

The parents were not only violent to each other, they were violent to the children as well. Kiles and Janell were disciplined harshly. They were beaten if they did not finish all of the food on their plates, or if they got dirty playing outside. (PFR2 Dkt. 22 Ex. 3 at 2.) Their father derived a sinister pleasure from beating his kids. (ROA 225 Ex. 37 at 6.) Alvie, Sr. left marks and scars on Kiles and Janell after whipping them with belts and cords. (ROA 225 Ex. 60 at 16.) Imojean also hit her kids and threw things at them. (ROA 225 Ex. 60 at 16.) After one particularly severe whipping, Janell was left covered with welts. (PFR2 Dkt. 22 Ex. 3 at 2.) And though Alvie, Sr. favored Janell over Kiles, that did not protect her from the brutal attacks. He whipped Janell hard enough with a rope that he drew blood. (PFR2 Dkt. 27 Ex. 21 at 18.)

Kiles's father also verbally and physically assaulted and belittled Kiles. (ROA 225 Ex. 60 at 16.) Alvie, Sr. never wanted a son, and he was jealous of the close relationship that Imojean and Kiles shared. (PFR2 Dkt. 27 Ex. 21 at 20.) He rarely took any interest in Kiles, but when he did, it was violent. Alvie, Sr. once pulled a gun on his own son. (ROA 225 Ex. 60 at 16.)

Alvie, Sr. and Imojean also had ongoing, repeated extramarital affairs, which they wielded as weapons against each other. (ROA 225 Ex. 39 at 4.) Alvie, Sr. constantly, and accurately, accused Imojean of sleeping with other men. (ROA 225 Ex. 42 at 1.) However, he also serially cheated on her, including with members of her own family. (ROA 225 Ex. 54 at 5) Alvie, Sr. had an affair with Imojean's sister Darnella, which Imojean discovered while pregnant with Kiles; Alvie, Sr. and

202

Darnella even had a child together. Additionally, Alvie, Sr. twice impregnated his niece, the daughter of another one of Imojean's sisters.

In 1970, when Kiles was eight years old, Imojean filed for and was granted a divorce for reasons of cruel treatment causing great mental pain and anguish. (ROA 225 Ex. 17 at 4, 8.) After his parents' separation, Kiles lived with his mother, and his father had visitation rights. (PFR2 Dkt. 27 Ex. 21 at 21.) Post-divorce, Imojean and Alvie, Sr. continued to fight. Alvie, Sr. did not want Imojean to have a life without him, so he stalked her, parking his car outside of her house to watch her. (2006 Trial Ex. 174 at 22.) One time, he saw her boyfriend's car parked outside and smashed all of the windows. (PFR2 Dkt. 22 Ex. 3 at 4.) Even so, Imojean and Alvie, Sr. remarried in 1976. Kiles was 15 years old, and his parents' reunion felt like an intrusion into the less chaotic life that Kiles and his mom had created.

Imojean regularly threw wild parties at the family home that lasted late into the night. (PFR2 Dkt. 22 Ex. 3 at 4.). People drank, danced, and stripped their clothing off. (Tr. Apr. 26, 2006 at 93.) The next morning, with the adults passed out from drinking too much, Kiles (who was used to alcohol because of his grandfather's babysitting style) walked through the house, taking sips of alcohol from cups left out. Kiles and other children were left unsupervised at these parties, but they were privy to their parents' and other adults' behavior.

These parties were symptomatic of the family's complete lack of appropriate sexual boundaries. At the parties, Kiles's aunt, Darnella Long, regularly performed sexual dances, during which she moaned and simulated sex, in view of Kiles and the other children. When Kiles was a teenager, Darnella threatened Imojean by telling Imojean that she was going to sleep with Kiles, her nephew. Later, Darnella got into a fight with Kiles's sister Janell because Darnella tried to sleep with Janell's husband. Kiles's uncle and father figure Thom Long was known for sexually propositioning family members and for his fixation with watching his pet rabbits have sex; he constantly invited Kiles to watch. Kiles himself began having sexual

203

experiences as young as age six or eight, likely because of the sexual abuse he experienced.

Throughout his childhood, Kiles was sometimes left to the care of others. These "caretakers" variously abused and neglected Kiles. At the age of four or five, his grandfather babysat him and regularly plied him with alcohol. (Tr. May 11, 2006 at 38.) Kiles spent time with his mother's brother Thom, who was famous in town for stripping naked and crowing like a rooster. Kiles was left unsupervised with Janell, who sought him out as a target after suffering through her own beatings. She regularly kicked him in the face, knocked him down, and otherwise assaulted him. By the time Kiles was a pre-teen, Janell had introduced him to drugs.

Kiles and his sister shared traumatic experiences growing up in the same dysfunctional home, and the damaging effects of their childhood manifested throughout their lives in ways both similar and different. Their troubles stemmed from a profound lack of parental instruction in appropriate socialization. (ROA 225 Ex. 60 at 27.) They were deprived of stable primary caregivers who modeled appropriate behavior. For example, Alvie, Sr. was a compulsive shoplifter, and he taught Janell to shoplift because it was a fun thing to do. (ROA 225 Ex. 54 at 5.) This behavior haunted Janell from the time she was a young girl through adulthood, as she racked up an extensive history of legal problems related to theft and other charges, and leading to frequent arrests and incarceration. Even when Janell was young and her parents gave her everything she could ever want, she still compulsively stole.

Imojean described her daughter as being "trouble since the day she was born." Janell's life-long legal troubles were both caused complicated by a relentless battle with addiction. Burdened by a genetic predisposition to alcoholism and shaped by a traumatic childhood, she began drinking when she was just a girl. Janell and Kiles were allowed to drink at home; their mother purchased wine coolers and beer for them. (ROA 225 Ex. 39 at 5.) As a teenager, Janell was already drinking

1   heavily; she was ultimately suspended from high school for drinking and fighting,

2   and she did not graduate. (ROA 225 Ex. 39 at 5.) But Alvie, Sr. and Imojean had

3   their own problems to deal with, and they never got Janell any help.

4       It was also during high school that Janell turned to drugs as a means of coping

5   with her intolerable life. (ROA 225 Ex. 39 at 5.) Janell introduced her younger

6   brother Kiles to drugs as well—a decision she would later regret. (ROA 225 Ex. 39

7   at 5.) Janell also ran away from home multiple times. (ROA 225 Ex. 39 at 5.)

8       In an eerie repeat of Imojean's history decades earlier, a teenage Janell

9   attempted to escape her miserable home life by running away with a man. She

10  married him and moved to California. She conceived a child, but the marriage only

11  lasted for a few months. (ROA 225 Ex. 39 at 5–6.) Janell then returned home and,

12  a few years later, married Larry Hawkins, a fellow addict who physically abused

13  and mistreated her. (ROA 225 Ex. 39 at 6.) During one assault, he knocked her front

14  teeth out. Kiles, just a teenager at the time, tried his best to defend his sister from

15  Hawkins's brutality. (ROA 225 Ex. 39 at 6.)

16      Janell suffered from cocaine addiction and spent years in and out of prison

17  as a result. (PFR2 Dkt. 27 Ex. 21 at 22–23.) The disease of addiction took

18  precedence over everything else for Janell, including her children. (ROA 225 Ex.

19  39 at 7.) Janell ultimately had three daughters, all of whom were raised by Imojean

20  and other family members because Janell was unable to care for them herself.

21  (PFR2 Dkt. 27 Ex. 21 at 25.) At least one of her children was born cocaine-addicted

22  and taken away by the state. (PFR2 Dkt. 27 Ex. 21 at 26.)

23      Kiles, too, failed to escape the long-lasting effects of family dysfunction.

24  Imojean developed an emotionally unhealthy bond—one that was hyper-dependent

25  and pathological—with her son. Everyone in the extended family and in their small

26  town knew that Kiles was close with his mother and that Janell was close with her

27  father; in the Kiles family, each parent had a favorite child. (PFR2 Dkt. 27 Ex. 23

28  at 9.) In a similar vein, Imojean declared that her son was the only man in her life

205

(ROA 225 Ex. 37 at 5), and that she loved him more than she loved God. Alvie, Sr. was jealous of Imojean and Kiles's close relationship. (ROA 225 Ex. 37 at 5.) Later, Imojean's boyfriend was so disturbed by their relationship that the boyfriend accused Imojean of sleeping with her son. (ROA 225 Ex. 37 at 7.)

Kiles also struggled in school, likely because of his brain damage and resultant attention-deficit issues. He had no parents to advocate for him, and he attended a small-town school system ill-equipped to provide for students whose limitations were not immediately apparent. Eventually, Kiles was put into a vocational program in high school. He worked at a store for much of the day, and received failing grades in the classes he did take, with no academic assistance.

Kiles learned early on, long before he could make reasoned decisions for himself, that alcohol and substances were a means to self-medicate and deal with unpleasant emotions and experiences. (ROA 225 Ex. 60 at 22–23.) The promise of escape through alcohol and other mind-altering drugs was irresistible in a world where he had been exposed daily to circumstances that threatened his existence and over which he had no control. (ROA 225 Ex. 60 at 22–23.) The mental instability that resulted from living in constant fear, desperation, and loneliness further exacerbated the effects of both Kiles's inherited and acquired mental and physical impairments. The combination allowed his addiction to flourish.

Kiles maintained a facade of functionality, even as his dependence on substances increased. He graduated high school, worked low-wage jobs, and made a brief attempt to attend college. (ROA 225 Ex. 4.) But he struggled in the absence of structure, and Kiles realized he was going nowhere; there were no opportunities, and he was falling prey to his addictions. Drugs were heavily trafficked in Yuma and thus were readily available to feed his habit.

Growing up in Yuma provided its own threats to Kiles's development. Yuma is famously an agricultural community and, for long periods, carried with it a serious risk of environmental-toxin exposure. The pesticides used when Kiles was

a child in the 1960s and 1970s were toxic to a child's development, and many have since been banned. Kiles picked fruit for local farmers as a youth, and he spent time playing in fields with friends, picking fruit off trees and eating it. He fished out of the Colorado River, which runs through Yuma, and ate the fish that he caught. The Colorado River was also polluted from pesticides and likely provided Yuma's drinking water.[117] Yuma is even home to a Superfund site: the Yuma Marine Corps Air Station, where Kiles's mother worked. All of these factors affected Kiles's environment and potentially his development.

Struggling to find a place for himself, Kiles saw the military as a viable opportunity to make something of himself and get out of Yuma. He knew that if he stayed in Yuma, he would be doomed to a life he knew he didn't want for himself. He wanted something better. He had relatives, including his father, who had served in the armed forces; he saw examples in other young men from the community who served and returned with good, stable employment. He wanted that for himself.

Kiles joined the Air Force and moved out of Yuma to a base in Spokane in an effort to regain control of his life. His effort was not supported by everyone in his family. Imojean could not handle her son's departure, and she suffered another mental decline because of the separation from her son. (ROA 225 Ex. 60 at 17.) After he left, she drank excessively, cried continuously, and slept in his bed. (ROA 225 Ex. 60 at 17.)

Kiles enlisted with the full intent and the earnest desire to stop using alcohol and drugs and to embark on a military career. He envisioned a whole future for himself, a full and stable life, including a plan to retire from the military and become

---

[117] Yuma experienced excessive pesticide use and studies from the 1960s showed that the Colorado River in Yuma was so polluted by agricultural pesticides that it constituted a "serious hazard" to fish and users of its water, which was used for domestic consumption. *See* EPA, Review and Evaluation Report on Pesticide Pollution of the Lower Colorado River (May 1973), https://nepis.epa.gov/Exe/ ZyPDF.cgi/91022Q8X.PDF?Dockey=91022Q8X.PDF at 2, 4.

207

a firefighter. The structure of the military helped Kiles focus on his future, and he excelled in some respects in the Air Force. He was selected to return to Yuma to recruit high school students and march in a parade. But the grip of alcoholism—a progressive disease worsened by his genetic predisposition to addiction and brain damage—proved too strong. (ROA 225 Ex. 60 at 25.) Because of his addiction, Kiles endured an earlier-than-wanted departure from the service and faced a humiliating return to Yuma.

Kiles's father, Alvie, Sr., had become ill while Kiles was a teenager, and for years, Alvie, Sr. dealt with a myriad of health issues. (ROA 225 Ex. 60 at 17–18.) While Kiles was away in the military, his father took a turn for the worse, which greatly upset Kiles. (ROA 225 Ex. 57 at 2.) Shortly after Kiles returned from the military, Alvie, Sr. died. Even though Kiles had endured countless beatings and humiliations at his father's hand, the death devastated Kiles. (ROA 225 Ex. 60 at 28–29.) Kiles was aware that his father resented him, but he was still desperate for his father's affection. Now, he would never have a chance to gain his approval.

Kiles's ejection from the Air Force in 1983 took a psychological toll on him, and derailed his sole plan for success. Kiles was clinically depressed; he felt defeated, hopeless, and lost, and he coped the same way he learned to cope during his childhood—by escaping with substance abuse. (ROA 225 Ex. 39 at 5; ROA 225 Ex. 60 at 35–36.) Friends and family noticed an immediate difference in Kiles after his discharge; "he was empty inside." He began associating with other addicts. In the ensuing years, Kiles's life devolved into a pattern of increased drinking and drug dependence linked to legal troubles, multiple incarcerations, difficulty maintaining employment, and general instability.

In an attempt to escape his environment, Kiles fled Yuma again for Las Vegas in 1985. There, he was involved in an automobile collision, where he lost consciousness. Despite the head injury and continued substance use, he had been having a modicum of success. He had two jobs and was living with relatives, when

208

his mother—grieving the loss of her on-again-off-again husband—threatened to kill herself if Kiles did not return to Yuma. Kiles was so torn about the prospect of returning to Yuma that he wept while debating his options with his cousin.

Once forced to return to Yuma, Kiles's emotional instability worsened by the day. Every time Kiles attempted to dig himself out, he failed. By this time, his addiction was dictating his behavior. Every impulsive reaction or decision—the ones that often led to an altercation or a legal problem—occurred while Kiles was high. He managed to stay clean when in the structure of a prison setting, but he struggled when in the community, particularly considering the superficial interventions and limited level of treatment available in Yuma at the time. The parole officer to whom Kiles was assigned did not make Kiles submit to regular urinalysis testing, as required by his conditions of release. He also allowed Kiles to visit the "Black Elks" Club, a well-known local watering hole, full of partying alcoholics.[118] Kiles attended some AA/NA meetings and made small steps of progress. He strived for sobriety and began to realize the detrimental effects of growing up in a family of people struggling with addiction. However, he was unable to truly address his addiction without outside support and while still stuck in Yuma.

In early 1989, Kiles encountered Kale Johnson at a local park. Johnson, who was also an addict, urged Kiles to shoot up cocaine. The following weeks were one extended drug and alcohol binge, during which Kiles was not eating or sleeping, and was both losing weight and losing touch with reality. In a moment of desperation, he asked his mother to get him into the hospital for help, but he was so impaired that he could not follow through. At her wit's end, Imojean tried to convince her son's parole officer to find Kiles in violation of his parole, so that Kiles would end up back in jail and could get some help for his debilitating

---

[118] In Yuma, there were two Elks Clubs, and they were divided by race. They were referred to as the "Black Elks" and the "White Elks." Yuma was an extremely racially segregated place, and racism was pervasive.

209

1  addiction. Rather than investigating further and facilitating the appropriate services,

2  the parole officer was not concerned, even though by that time Kiles was

3  incoherent, rambling, and paranoid—in the throes of a drug-induced psychosis.

4  (ROA 225 Ex. 38 at 2–3; ROA 225 Ex. 41 at 1.)

5         **C.**   **A defendant's right to a full mitigation investigation and presentation necessitates effective counsel at the mitigation phase of trial.**

7  As discussed above, a defendant's right to place before the sentencer all

8  relevant evidence during the mitigation phase of sentencing hinges on the right to

9  effective counsel. Kiles's counsel had a duty to ensure that the jury heard the full

10  scope of mitigating evidence, including Kiles's full social history. The

11  consideration of the defendant's life history is a "constitutionally indispensable part

12  of the process of inflicting the penalty of death." *Woodson*, 428 U.S. at 304.

13  In *Strickland*, the Supreme Court outlined the standard for determining when

14  counsel has provided ineffective assistance. *See, e.g.*, Claim 2, *supra*. Under

15  *Strickland*, counsel is constitutionally ineffective if (1) "representation fell below

16  an objective standard of reasonableness," and (2) "there is a reasonable probability

17  that, but for counsel's unprofessional errors, the result of the proceeding would have

18  been different." 466 U.S. at 687–88, 694. When evaluating prejudice, a court must

19  consider "the totality of the evidence—*both that adduced at trial, and the evidence*

20  *adduced in the habeas proceeding[s]*." *Wiggins v. Smith*, 539 U.S. 510, 536 (2003)

21  (quoting *Williams v. Taylor*, 529 U.S. 362, 397–398 (2000)).

22  The Supreme Court has since repeatedly applied the requirements of

23  *Strickland* and the Sixth Amendment to the capital-sentencing context. It is clearly

24  established federal law that counsel provides ineffective assistance where he or she

25  "fail[s] to investigate and to present substantial mitigating evidence to the

26  sentencing jury." *Williams*, 529 U.S. at 390.

27  Absent an objectively reasonable basis for doing otherwise, "counsel must

28  conduct sufficient investigation and engage in sufficient preparation to be able to

210

1    'present [ ] and explain[ ] the significance of all the available [mitigating]
2    evidence.'" *Correll*, 539 F.3d at 942 (alterations in original) (quoting *Mayfield v.*
3    *Woodford*, 270 F.3d 915, 927 (9th Cir. 2001) (en banc) (quoting *Williams*, 529 U.S.
4    at 399)); *see also, e.g.*, *Sears v. Upton*, 561 U.S. 945, 953 (2010) (holding that trial
5    counsel's inadequate investigation, which led to a misleading portrayal of
6    petitioner's upbringing, was deficient and prejudicial); *Wiggins*, 539 U.S. at 534–
7    35 (counsel's decision to limit mitigation investigation was unreasonable and
8    prejudicial); *Williams*, 529 U.S. at 396 (concluding that counsel's failure to uncover
9    and present extensive mitigation was not a tactical decision when counsel had not
10   thoroughly investigated defendant's background). Of course, individualized
11   sentencing demands that the jury be able to consider mitigating evidence, and so
12   counsel's duties do not end with unearthing that evidence. The Court has thus also
13   made clear that defense counsel has a constitutional duty to present to the jury the
14   mitigation. *See Williams*, 529 U.S. at 396 (faulting counsel's failure to introduce
15   mitigating evidence as an abrogation of duty); *Bean v. Calderon*, 163 F.3d 1073,
16   1079 (9th Cir. 1998).

17        Further, as noted earlier, the Supreme Court has consistently relied upon
18   guidelines from the ABA and other professional groups to inform the inquiry into
19   reasonable professional conduct. *See, e.g.*, *Rompilla v. Beard*, 545 U.S. 374, 387 &
20   n.7 (2005). The 2003 ABA Guidelines outlined the key aspects of competent capital
21   representation applicable to Kiles's mitigation proceeding, which commenced in
22   mid-2006. In fact, at the time of Kiles's mitigation phase, Arizona Rule of Criminal
23   Procedure 6.8 required counsel to be familiar with the ABA Guidelines to be
24   eligible for appointment. Ariz. R. Crim. P. 6.8(b)(1)(iii) (2000). By the time of
25   Kiles's penalty phase, there was no question as to counsel's duty to thoroughly
26   investigate, present, and explain the significance of all relevant mitigation.

27

28

211

**D.    Lead counsel's derogation of his duties and the resulting team dysfunction led to a deficient mitigation investigation and inadequate presentation.**

Kiles's legal team did not operate as a team. Lead counsel Greg Clark effectively abdicated responsibility for Kiles's case after the guilt-phase verdicts on July 20, 2000, leaving second chair Treasure VanDreumel as the sole attorney for Kiles's aggravation and mitigation phases.

"Lead counsel bears overall responsibility" for a capital case. 2003 ABA Guideline 10.4(B). Moreover, "the provision of high quality legal representation in capital cases requires a team approach that combines the different skills, experience, and perspectives of several disciplines." 2003 ABA Guideline 10.4(B) cmt. Kiles's capital representation met neither of these standards. Lead counsel's failure to assemble and manage a defense team to conduct an investigation fell below prevailing professional norms and resulted in an unreasonable mitigation investigation. *See, e.g.*, *Correll*, 539 F.3d at 942; *Mayfield*, 270 F.3d at 927; *Williams*, 529 U.S. at 399; *Sears*, 561 U.S. at 953.

**1.    Lead counsel did not assist in the mitigation-phase investigation, leaving Kiles with one attorney in violation of prevailing professional norms.**

Because of the complex nature of capital cases, the 2003 ABA Guidelines called for at least two attorneys in capital cases; even the 1989 ABA Guidelines required two attorneys for a capital case. 2003 ABA Guideline 4.1(A)(1); 1989 ABA Guideline 2.1. However, Kiles was effectively left with one attorney for much of the critical investigation portion of his case after the guilty verdict and for much of the mitigation presentation.

Clark did little, if any, work for Kiles's mitigation-phase investigation and trial. Clark's contract granted a set sum for taking Kiles's case and an additional set sum if the case went to a guilt-phase trial. *See* Claim 1, *supra*. Clark received no further funds for post-guilt-phase proceedings, which stretched on for nearly six years. Other than conducting the penalty-phase voir dire, Clark did little on Kiles's

212

case after the guilty verdict. Clark's lack of preparation at voir dire was evidenced by his ignorance of Kiles's mitigation evidence. *See* Claim 4, *supra*. When VanDreumel requested time after time that Clark contact a single expert, he did not accomplish even that one task.

Kiles moved to remove Clark for his failure to assist in the mitigation-phase preparation. (ROA 615.) However, the court permitted Clark to remain on the case, effectively leaving VanDreumel as Kiles's sole lawyer throughout the penalty phase. VanDreumel wrote to the judge on September 10, 2003, requesting additional funds, because she had exclusively handled the investigation and preparation of the mitigation phase. Her request was granted.

### 2. Counsel failed to request a mitigation specialist or to begin a mitigation investigation upon appointment.

Counsel did not request a mitigation specialist or begin a mitigation investigation until after the guilty verdict. Given prevailing professional norms, and that a review of Kiles's first state post-conviction file would have revealed the vast complexity of potential mitigation evidence, it was unreasonable for counsel to fail to request a mitigation specialist until after Kiles was found guilty.

"[L]egal experts agree that preparation for the sentencing phase of a capital case should begin early and even inform preparation for a trial's guilt phase." *Allen v. Woodford*, 395 F.3d 979, 1001 (9th Cir. 2005). The 1989 ABA Guidelines, in effect at the time of Kiles's guilt phase, required that counsel's mitigation-phase investigation "begin immediately upon counsel's entry into the case and should be pursued expeditiously." 1989 ABA Guideline 11.4.1(A). Attorney Robert J. Roberson, who was appointed in March 1998 to represent Kiles at trial after Kiles obtained state post-conviction relief, asked the court to appoint a mitigation specialist and fact investigator in August 1998.[119] (ROA 372 at 1.) Roberson

---

[119] Roberson argued in his motion that "[c]urrent law clearly provides that the mitigation phase of the sentencing portion of this case is extremely important. . . .

1   withdrew for unrelated conflict reasons, and when Clark was appointed, he did not
2   argue the need for a mitigation specialist despite the pending motion. (*See* Tr. Aug.
3   21, 1998 at 40–43.) After the guilt phase, VanDreumel acknowledged that counsel
4   should have hired a mitigation specialist and begun an investigation upon
5   appointment.

6       Kiles was found guilty on July 20, 2000. (ROA 482 at 1–8.) It was not until
7   October 4, 2000 that Kiles's counsel moved for appointment of a mitigation
8   specialist. (ROA 509 at 1.) Within days, the court appointed Jan Dowling, an
9   experienced mitigation specialist. (ROA 510 at 1.)

10
11
>           **3.    Counsel's failure to be involved in the investigation and the
>                   subsequent resignation of the mitigation specialist resulted
>                   in a disjointed mitigation investigation.**

12      After the court appointed Jan Dowling as the mitigation specialist,
13  VanDreumel failed to provide the resources Dowling requested and to supervise
14  Dowling's investigation. Because of counsel's failure to be involved in the
15  mitigation investigation, Dowling resigned, resulting in a disjointed mitigation
16  investigation and an inexperienced mitigation specialist taking over Kiles's case.

17
18
>           **a.    Clark's abdication and VanDreumel's unreasonable
>                   mitigation decisions led to a team breakdown.**

19      Dowling began her investigation immediately after her appointment to
20  Kiles's case, meeting with Kiles within days and his mother within weeks. The
21  team's lack of communication and direction were apparent from the start, as
22  Dowling reported to VanDreumel that Kiles was annoyed that no one had notified
23  him Dowling had been appointed or that she was visiting him. Throughout late
24  2000, Dowling worked independently on the mitigation investigation, without

25  _____

26  It is suggested that waiting until after sentencing to appoint such a specialist would
27  be impractical since the magnitude of the job would take a considerable amount of
    time. The only real practical way to proceed in this matter is to appoint a mitigation
    specialist now and allow that person to get to work seeking out records, people, and
28  events which would have a bearing on sentencing." (ROA 372 at 1.)

214

1   direction from counsel, while counsel focused on Kiles's motion for a new trial. In

2   December 2000, the court denied defense counsel's motion for a new trial and set

3   the penalty-phase hearing for April 2001, at defense counsel's request. (ROA 518;

4   Tr. Dec. 29, 2000 at 29.)

5          Counsel's failure to maintain contact with Kiles critically hindered the

6   mitigation investigation. "Adequate consultation between attorney and client is an

7   essential element of competent representation." *United States v. Tucker*, 716 F.2d

8   576, 581 (9th Cir. 1983); (*see also* ROA 519). Even after the court denied the

9   motion for a new trial, the attorneys neither participated in the investigation nor

10  visited Kiles. During this time, Kiles had no contact with Clark and only one phone

11  call with VanDreumel. (ROA 519 at 5.) On January 30, 2001, Kiles filed a pro se

12  request for new counsel, citing counsel's lack of investigation and lack of

13  communication with him. (ROA 519); *see also supra*, Claim 1 (discussing

14  attorneys' lack of communication and conflicts with Kiles). The court scheduled

15  another status hearing for April 2001, to hear Kiles's motion.[120]

16         By April 2001, Dowling and VanDreumel's working relationship had

17  crumbled. As described in detail *supra*, Claim 1, VanDreumel sent Dowling's

18  confidential interview memos to Kiles, even though Dowling had warned her that

19  doing so would impede the investigation. (ROA 533 Ex. A at 2.) Then, when

20  Dowling requested VanDreumel's input into the mitigation investigation,

21  VanDreumel explained that she did not feel it was her role to participate in the

22  mitigation investigation until after Dowling finished interviewing people and

23  gathering information and wrote a final report. Then VanDreumel would decide

24  who would be called to testify. VanDreumel rejected Dowling's request for team

25  meetings and aid of counsel. Instead, she expected Dowling to interview whoever

26  _____

27  [120] At a scheduling hearing, Kiles pleaded with the court to set a time for him to
    speak with his counsel on the phone, as he had been trying since July to reach them.
    The court had to arrange an appointment for Kiles and Clark to speak by phone.

28  (ROA 521 at 1.)

1   Dowling could find. She explained that she assumed Dowling knew the statutory
2   and non-statutory mitigators in Arizona. VanDreumel described Dowling's visits
3   to meet with Kiles and his family as "useless" trips.

4          Dowling wrote a letter to the court to identify her concerns about Kiles's
5   attorneys: They showed no interest in the case; they did not want to talk about
6   potential themes and theories; they did not initiate meetings with witnesses; and
7   they failed to address questions and issues arising during the investigation. Based
8   on her extensive experience, she knew that prevailing professional norms required
9   that counsel provide input on the mitigation investigation. (ROA 533 Ex. A at 2.)

10         On June 4, 2001, Dowling resigned from the case because of ethical concerns
11  regarding Clark's and VanDreumel's failure to adequately investigate Kiles's
12  mitigation and failure to communicate. She noted that counsel had stated incorrectly
13  at the April status hearing that they had "nothing to do at this stage" but wait for
14  her report, that counsel's lack of participation fell well below the prevailing norms
15  in her other capital cases, and that she had been abandoned by them. She affirmed
16  that Kiles was cooperative and that his repeated complaints about his counsel were
17  "justified and legitimate." She noted that she had reviewed the files from the first
18  state post-conviction proceedings, which counsel had not done. (ROA 533 Ex. A at
19  3–4.) Kiles then filed a motion echoing Dowling's statements that his counsel had
20  failed to participate in the investigation.

21         On June 19, 2001, VanDreumel moved for the appointment of a new
22  mitigation specialist and used the filing as an opportunity to lambast Dowling and
23  her work. (ROA 533 Ex. C at 1–2.) VanDreumel rejected Dowling's assertion that
24  she should have reviewed the first state post-conviction files, as she had reviewed
25  the sworn statements and pleadings provided by the Attorney General's office.
26  (ROA 533 Ex. C at 3.) VanDreumel reiterated her belief that there was nothing for
27  counsel to discuss with the mitigation specialist. VanDreumel also reported to the
28  court that Dowling had been fired by another capital client, while failing to note

216

1   that the client had fired the attorney on the case, too. (ROA 533 Ex. C at 5–6.)

2       Dowling responded to VanDreumel's motion for appointment of a new

3   mitigation specialist, explaining to the court counsel's failure to direct the

4   mitigation investigation. (ROA 533 Ex. D at 1.) Dowling further noted her belief

5   that VanDreumel's lies to the court about Dowling's investigation warranted

6   sanction. (ROA 533 Ex. D at 1.) Dowling stated that she had sent counsel memos

7   starting in October 2000, but months later, it was apparent that counsel had not read

8   them. Further, she delineated VanDreumel's various lies, including VanDreumel's

9   claim that Dowling was unavailable and had provided no records and the claim that

10  VanDreumel had reviewed records obtained from sources other than Dowling.

11  (ROA 533 Ex. D at 2–3.)

12      Of note, Dowling stated that VanDreumel had lied about possessing vital

13  records from the first state post-conviction proceeding. In November 2000,

14  VanDreumel had e-mailed Dowling to tell her she did not have mental-health

15  records, school records, police or presentence reports on Kiles's prior convictions;

16  VanDreumel had only documents she and Clark had created for purposes of the

17  guilt phase. (ROA 533 Ex. D at 3.) Dowling noted:

18          It has been my experience that *competent* counsel in capital
            cases do meet and discuss testimony with witnesses long
19          before the actual hearing. Competent counsel do not
            consider witness discussions to be "unnecessary.". . . I can
20          think of no circumstances under which it is appropriate for
            counsel in a capital case to not discuss the case with their
21          mitigation specialist.

22

23  (ROA 533 Ex. D at 3.) Dowling pointed out that VanDreumel had not identified

24  any work she had done on the mitigation investigation beyond organizing the file

25  in the eight months since the verdict. (ROA 533 Ex. D at 3.)

26      The court responded to Dowling in a letter on which all parties, including the

27  prosecutor, were copied. The court noted that Kiles and his first state post-

28  conviction counsel, Boyte, had "voiced similar concerns." However, the court

217

1    wrote, "I strongly suspect that whatever sentence I end up imposing, there will be
2    filed a petition for post conviction relief alleging ineffective assistance of trial
3    counsel . . . [T]hat would be the appropriate time for me to take action, if any."
4    (ROA 533 Ex. E at 1.) After Dowling resigned, she sent VanDreumel her files and
5    the records she had gathered.

### b.    Counsel failed to direct the second mitigation specialist.

8        In moving for a new mitigation specialist, Kiles's counsel specifically
9    requested the appointment of Mary Durand, who had a great deal of capital-
10   mitigation experience. (ROA 533 Ex. B at 1) VanDreumel, however, did not first
11   ensure that Durand was available before the court appointed her on June 20, 2001.
12   (ROA 530 at 1.) After the appointment, VanDreumel misrepresented to Durand that
13   the investigation was practically done. As a result, Durand agreed to the
14   appointment but enlisted Tyrone Mayberry, who was quite new to capital
15   mitigation, to take charge of Kiles's mitigation. (Tr. Dec. 3, 2001 at 17.)

16       Kiles was thus effectively left with only one attorney, who at one point
17   leading up to Kiles's penalty phase had four other capital cases, and an
18   inexperienced mitigation specialist. VanDreumel's lack of involvement (and
19   Clark's complete abdication) was exacerbated by Mayberry's lack of experience,
20   compromising the mitigation investigation.

21       After Dowling's withdrawal, the penalty phase was rescheduled for July
22   2002. (ROA 561 at 1.) Two weeks before the penalty phase was scheduled to begin,
23   the U.S. Supreme Court struck down Arizona's capital-sentencing scheme as
24   unconstitutional in *Ring v. Arizona*, 536 U.S. 584 (2002). Kiles's proceedings were
25   delayed further, and VanDreumel turned her attention to motions related to the
26   sentencing scheme. (Tr. July 8, 2002 at 3–4; *see also, e.g.*, ROA 579, ROA 580.)

27       Lead counsel Clark abdicated responsibility for the mitigation investigation.
28   Second chair VanDreumel then failed to direct that investigation, even though the

218

1    mitigation specialist was inexperienced. Due to counsel's failure to direct the
2    investigation, the mitigation specialist relied largely on the investigation that had
3    been done over a decade prior. The result of the team's dysfunction was an
4    inadequate and unreasonable investigation during which, as discussed below, the
5    defense team missed critical red flags that warranted attention. And the result of
6    that insufficient investigation was an internally contradictory and confusing
7    mitigation presentation that left the jury unwilling to consider leniency for the
8    killing of Gunnel.

9              **E.      Trial counsel were ineffective for failing to reasonably investigate,
10                      develop, and present important mitigation evidence.**

11             Competent counsel must conduct a thorough mitigation investigation, and
12   the failure to do so constitutes deficient performance. The Sixth Amendment
13   imposes on a capital-defense attorney "a duty to investigate, develop, and present
14   mitigation evidence during penalty phase proceedings." *Summerlin v. Schriro*, 427
15   F.3d 623, 630 (9th Cir. 2005) (en banc). In *Porter v. McCollum*, the Supreme Court
16   described this obligation as "unquestioned" as of 1988. 558 U.S. 30, 38–39 (2009).

17             "[A] decision not to present . . . particular mitigating evidence is
18   unreasonable unless counsel has explored the issue sufficiently to discover the facts
19   that might be relevant to his making an informed decision." *Lambright v. Schriro*,
20   490 F.3d 1103, 1116 (9th Cir. 2007) (citing *Wiggins*, 539 U.S. 510, 522–23 (2003)
21   and *Stankewitz v. Woodford*, 365 F.3d 706, 719 (9th Cir. 2004)). It "is imperative
22   that all relevant mitigating information be unearthed for consideration at the capital
23   sentencing phase." *Wharton v. Chappell*, 765 F.3d 953, 970 (9th Cir. 2014) (quoting
24   *Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1999)). "To that end, trial counsel
25   must inquire into a defendant's social background, family abuse, mental
26   impairment, physical health history, and substance abuse history; obtain and
27   examine mental and physical health records, school records, and criminal records;
28   consult with appropriate medical experts; and pursue relevant leads." *Bemore v.*

1    *Chappell*, 788 F.3d 1151, 1171 (9th Cir. 2015) (quoting *Wharton*, 765 F.3d at 970).

2    "Where counsel is aware of potentially mitigating evidence, he or she must

3    investigate that evidence, absent a reasonable strategic reason not to do so." *Id.*

4    (quoting *Hendricks v. Calderon*, 70 F.3d 1032, 1039 (9th Cir. 1995)).

5           Counsel must decide on a mitigation strategy after a reasonable investigation;

6    investigation cannot follow an already-settled mitigation strategy. *See Wiggins*, 539

7    U.S. at 521–22; *Strickland*, 466 U.S. at 691. The Ninth Circuit has made clear that

8    "[a]n uninformed strategy is not a reasoned strategy. It is, in fact, no strategy at all."

9    *Correll*, 539 F.3d at 949. The mitigation that is presented must not just support a

10   "superficially reasonable mitigation theory," *Sears v. Upton*, 561 U.S. 945, 953–54

11   (2010), nor may it be "haphazard." *Doe v. Ayers*, 782 F.3d 425, 435 (9th Cir. 2015).

12   Pursuant to *Strickland*, *Williams*, and *Wiggins*, in addition to the prevailing

13   professional norms in Arizona at the time, counsel had an obligation to conduct a

14   thorough investigation of Kiles's background and mitigating evidence in

15   preparation for sentencing.

16                    **1.    Counsel failed to properly investigate, develop, and present**
                              **mitigation evidence pertaining to lay witnesses.**
17

18          It is imperative that counsel thoroughly investigate a defendant's background

19   in order to accurately present a complete history of the defendant's life. *See Bemore*,

20   788 F.3d at 1171. This investigation should include speaking to lay witnesses such

21   as family members, past and present friends, and co-workers, among many others.

22   *See, e.g., Allen*, 395 F.3d at 1001; *Hamilton v. Ayers*, 583 F.3d 1100, 1114 (9th Cir.

23   2009). Both the 1989 and 2003 ABA Guidelines require a full investigation into a

24   defendant's background, including consultation with lay witnesses. 2003 ABA

25   Guideline 10.11(F)(1), (2); 1989 Guideline 11.8.3(F)(1). It is unreasonable for

26   counsel to fail to interview favorable, willing, and accessible witnesses. *See*

27   *Cannedy v. Adams*, 706 F.3d 1148, 1161 (9th Cir. 2013) (counsel deficient for

28   failing to interview potentially favorable witness at the guilt phase "when that

                                              220

1

2

witness had been clearly identified, . . . was easily accessible[,] and [was] willing to provide information").

3

4

5

6

7

8

An investigation into a defendant's background is critical to show that a defendant warrants leniency. *Boyde v. California*, 494 U.S. 370, 382 (1990); *see also Douglas v. Woodford*, 316 F.3d 1079, 1090 (9th Cir. 2003) (deeming "mental health" and "social background" evidence "precisely the type of evidence that we have found critical for a jury to consider when deciding whether to impose a death sentence").

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

"[W]hen 'tantalizing indications in the record' suggest that certain mitigating evidence may be available, those leads must be pursued." *Lambright*, 490 F.3d at 1117 (quoting *Stankewitz*, 365 F.3d at 719–20). This is particularly true where defense counsel has possession of files that contain leads to mitigating evidence. *Stankewitz v. Wong,* 698 F.3d 1163, 1171 (9th Cir. 2012). Critically, it is not sufficient to start an investigation and not continue to pursue leads, or to rely on existing documents. *Douglas*, 316 F.3d at 1088 (finding ineffective assistance where counsel's initial investigation put counsel on notice that defendant had a difficult childhood, yet there was no attempt to contact additional persons who might have had more detailed information about the defendant's past). Kiles's mitigation specialist did interview some family members and friends, but this was not sufficient for a reasonable investigation. *See Hamilton*, 583 F.3d at 1114 (finding ineffective assistance where counsel conducted some interviews with family members and people who had information on the client's childhood, but failed to further investigate).

24

25

26

### a.    Counsel failed to conduct an adequate investigation into witnesses who could speak first-hand about Kiles's background.

27

28

The defense team failed to locate and investigate readily available mitigation witnesses, including family members, people who had written affidavits in 1994 for

221

the first post-conviction proceedings, and, in some cases, testified at the 1996 post-conviction hearing. Counsel relied heavily on the mitigation investigation conducted in 1994 for Kiles's first state post-conviction proceedings. Counsel should have ensured that these affidavits and interviews were updated and expanded through continued investigation. The prevailing professional norms for a mitigation investigation had changed since 1994, with the updated ABA Guidelines going into effect in 2003. *See* 2003 ABA Guidelines. Further, there were ample leads from the 1994 investigation that could have been fruitful. The team failed to locate and follow up with witnesses whom Dowling had identified as needing follow up.

VanDreumel had little idea what was going on with the lay-witnesses investigation until just prior to the start of the mitigation phase. While VanDreumel had seen, likely years earlier, the first state post-conviction exhibits with information from lay witnesses, she did not review them again until March 2006, on the eve of Kiles's penalty-phase trial. She then seemed pleasantly surprised by them, remarking to Mayberry that they were great—previewing that the expert witness testimony she had coordinated had not taken them into account.[121] As the mitigation proceeding drew near, VanDreumel revealed that she knew little about the lay witnesses who would testify. Even after jury selection was complete and the aggravation phase had begun, VanDreumel had no sense of who many of the lay witnesses Mayberry wanted to present were and had to ask Mayberry.

As part of a reasonable mitigation investigation in which counsel followed prevailing mitigation investigation norms and followed up on "tantalizing leads," counsel should have contacted or instructed the mitigation specialist to contact at least some of the following witnesses:[122]

---

[121] Though VanDreumel had told Kiles in 2001 that she would participate in follow-up interviews with witnesses that Dowling identified, her lack of knowledge of these witnesses on the eve of trial indicates that she did not.

[122] Some portion of the failure to interview witnesses may be attributable to an inability to locate them; however, many were still living in Yuma. Further, counsel

1    <u>Family members:</u> It appears that in Kiles's family, Mayberry spoke only with
2    Kiles's mother Imojean, his sister Janell Hawkins, his niece, and his cousin.
3    Mayberry spoke with the niece and cousin once each, shortly before the penalty
4    phase began.

5    However, Kiles's first state post-conviction proceedings and Dowling's
6    preliminary investigation contained ample evidence that Kiles's childhood and
7    family history were essential to mitigation and included numerous investigatory
8    leads. Relatives could have provided information on Kiles's childhood and family
9    history. Further, relatives could have provided more information on his mental
10   health and brain damage, including the head trauma Kiles experienced when struck
11   by a car at age five. Dowling had spoken with many of Kiles's relatives in May
12   2001, but no one followed up with them or with the other relatives listed in
13   Dowling's memos. These conversations revealed important red flags for further
14   investigation, including intergenerational substance addiction, mental illness, and
15   other trauma, as well as Kiles's traumatic childhood and his resultant impairments
16   at the time of the crime. Indeed, in May 2002, Mayberry created a "Family History"
17   document that listed many members of Kiles's extended family, noting their
18   experiences with substance abuse, domestic violence, and mental illness. This
19   incomplete document shows that Mayberry knew of many relatives whom he did
20   not contact and the critical subjects about which they could speak.

21   Mayberry could have spoken with many other members of Kiles's large
22   extended family, most of whom were still in close touch with Kiles's mother and
23   living in Arizona or over the border in California. Many had expressed willingness
24   and eagerness to cooperate with Kiles's mitigation investigation, as they had

25   _____
26   should have made use of the private investigator, Mary Meyer, who had been
     appointed at the guilt phase and remained technically on the case. (Tr. Oct. 8, 1999
27   at 73–74.) Meyer did little, if any work during the penalty phase—the mitigation
     specialist did not interact with her, and it appears she was only asked to locate one
28   witness.

223

1    cooperated with the first state post-conviction investigation and with Dowling. (*See,*
2    *e.g.*, ROA 225 Ex. 54 at 6; ROA 225 Ex. 38 at 3.)

3         For example, Mayberry should have spoken to Kiles's aunt Darnella Long.
4    (ROA 225 Ex. 54; Tr. Feb. 20, 1996 at 110–30.) Her testimony at the first state
5    post-conviction hearing and affidavit discussed the family history as slaves in
6    Louisiana, intergenerational domestic violence, mental illness, child abuse,
7    substance addiction, and racism in Yuma. (ROA 225 Ex. 54; Tr. Feb. 20, 1996 at
8    110–30.) She also spoke about Imojean's and Janell's mental illnesses and alcohol
9    addictions.[123] (ROA 225 Ex. 54; Tr. Feb. 20, 1996 at 127–28.) Kiles's brother-in-
10   law Larry Hawkins also signed an affidavit for the first state post-conviction
11   proceeding with information on Kiles's parents' abusive relationship and the
12   violence they inflicted on their children, Janell's mental illness, Imojean's alcohol
13   addiction, and extended relatives' substance addictions and mental illness. Hawkins
14   attested to Kiles's substance addiction and mental illness, throughout Kiles's life
15   and in the days surrounding the crime. (PFR2 Dkt. 20 Ex. 2 at 12–15.) VanDreumel
16   also should have contacted Kiles's uncle Alan Long, who wrote an affidavit for
17   Kiles's second post-conviction petition about the family history and racism in
18   Yuma. (PFR2 Dkt. 28 Ex. 29 at 51–52.)

19        <u>Friends who wrote affidavits for the first state post-conviction proceedings</u>:
20   Kiles's first state post-conviction attorneys gathered signed affidavits from 17
21   people who knew Kiles throughout his life. (ROA 225 Exs. 37–64; PFR2 Dkt. 23
22   Ex. 18 at 1–2.) Of these people, it appears that Mayberry tried to contact only a
23   small number to expand on the information they provided. For example, Mayberry
24   should have interviewed Kiles's friends from his time in the Air Force, some of
25   whom signed affidavits for Kiles's first and second post-conviction proceedings,
26   who could have provided insight into the progression of Kiles's alcoholism and his

27
28   [123] Though Darnella Long died in 2003, she could have provided further information
     and investigative leads to Mayberry.

efforts to overcome his addiction and mental illness at a turning point in his life. (*E.g.*, ROA 225 Ex. 57; ROA 225 Ex. 58; PFR2 Dkt. 28 Ex. 31; PFR2 Dkt. 28 Ex. 32.)

People who knew Kiles in the years, and particularly in the weeks, leading up to the crime could have furnished useful information about Kiles's addictions and his worsening mental decompensation at the time of the crime, had the defense team contacted them for mitigation purposes. For example, Kale Johnson, who pled guilty to hindering prosecution in Kiles's case (ROA 75 at 2), signed two affidavits for the first state post-conviction proceeding and was cooperative with Kiles's prior counsel. (PFR2 Dkt. 20 Ex. 1.) His affidavit described Kiles as "on a binge" in the weeks leading to the crime and detailed Kiles's extensive drug use. (PFR2 Dkt. 20 Ex. 1 at 1–2.) He described Kiles as "very high on drugs and alcohol" and "staggering" around at the time of the crimes. (PFR2 Dkt. 20 Ex. 1 at 2.) Additionally, Willie Shepherd and Virgil Schultz both saw Kiles around the day of the crime and knew of his substance addiction and intoxication that day, and the resulting mental decompensation. (ROA 225 Ex. 46; Tr. Apr. 26, 2006 at 113; Tr. Apr. 27, 2006 at 62–63.)

Family and friends who assisted in the 1989 mitigation investigation: At Kiles's 1989 trial, people who knew Kiles as a child wrote letters about his character and his childhood. (2006 Tr. Ex. 152; Tr. Apr. 26, 2006 at 40–50.) It is likely that in the intervening years, some may have been willing to speak more openly and provide new leads.

Other witnesses named in Kiles's records: People listed in Kiles's criminal, medical, school and other records were another obvious source of information. For example, it appears that counsel did not try to contact anyone referenced in Kiles's records relating to his time on probation and his attempts to obtain vocational rehabilitation and substance abuse counseling, even in the months directly before the crime. These witnesses could have provided insight into Kiles's struggle to

225

1    maintain sobriety and his worsening mental illness in the months before the crime.

2          **b.    Because counsel failed to adequately investigate,**
3          **counsel could not present lay witnesses who could**
           **adequately describe Kiles's history.**

4          To put on a competent mitigation presentation, counsel must "use lay

5    witnesses as much as possible to provide the factual foundation for the expert's

6    conclusions," as "[f]amily members and friends can provide vivid first-hand

7    accounts of the poverty and abuse that characterize the lives of many capital

8    defendants. These witnesses can also humanize the client. . . ." 2003 ABA

9    Guideline 10.11 cmt. Here, counsel were deficient because, despite the availability

10   of numerous lay witnesses who could have provided compelling testimony, counsel

11   presented next to no first-hand lay-witness testimony.

12         VanDreumel had only two lay witnesses testify about Kiles's life before the

13   crime: Kathy Perrone, his sister's high school friend, and Yolanda Biebrich, his

14   high school girlfriend. Neither knew Kiles well, and together they relayed a

15   misleading image that cut against the core of VanDreumel's mitigation

16   presentation.[124] Neither had had much interaction with Kiles in many years. (Tr.

17   Apr. 24, 2006 at 34–35, 51); *see Libberton v. Ryan*, 583 F.3d 1147, 1168–69 (9th

18   Cir. 2009) (finding ineffective assistance where counsel called only lay witnesses

19   who did not know defendant well). And yet, VanDreumel had them set the stage

20   for the rest of the defense's mitigation presentation.

21         While Kathy Perrone testified about the whippings Kiles's sister Janell had

22   endured as a youth and her struggles with shoplifting, fighting, and drug addiction,

23   

24   [124] Counsel presented two other lay witnesses: Harold Ulmer and James Prather
25   Gill, two correction officers who had overseen Kiles while he was incarcerated.
     They spoke about his exemplary behavior while in custody, which made him seem
26   like a mentally healthy and well-adjusted person. (*See generally* Tr. Apr. 26, 2006
     at 4–23.) While it was reasonable to present their testimony, counsel's decision to
27   present it so early on, without the context of experts who could explain that Kiles
     did well in structured settings, was unreasonable. This supported expert testimony
28   by James Aiken, a prison management expert. (Tr. Apr. 27, 2006 at 5–54.)

226

she had little to offer about Kiles himself as a child. (Tr. Apr. 24, 2006 at 35, 38, 40–43.) Her testimony was ultimately damaging to Kiles's case, as she stated that she chose to live with the Kiles family in high school, undercutting much of the later testimony about the Kiles's dysfunctional and violent home. (Tr. Apr. 24, 2006 at 34.) On cross-examination, she testified that she never saw Kiles struck by his parents and that she never saw him use drugs. (Tr. Apr. 24, 2006 at 45–46.) She described him as generally a "happy" person who did well in school. (Tr. Apr. 24, 2006 at 37.)

Biebrich similarly minimized the dysfunction of the Kiles home and Kiles's mother's mental illness and addiction, stating only that Kiles's mother had a drinking problem and got "loud." (Tr. Apr. 24, 2006 at 52.) She painted a picture of Kiles as happy and highly functional, and she took pains to emphasize that he did not use drugs. (Tr. Apr. 24, 2006 at 53–54, 59.) She testified on cross-examination that Kiles had everything he could ever have wanted in terms of material goods and that she had never seen fights at the Kiles home or Kiles struck by either of his parents. (Tr. Apr. 24, 2006 at 61.)

Then, instead of presenting vivid first-hand accounts of Kiles's abusive childhood and resulting addiction and impairment through Kiles's family and others who knew him, VanDreumel offered the testimony of the mitigation specialist. Mayberry offered second- and third-hand accounts that were misleading and confusing. Mayberry began by reading a set of character letters written for Kiles's 1990 sentencing, which conveyed that Kiles was a happy child who grew up in a nice family, but who had a personality change and turned to drinking and drugs. (Tr. Apr. 26, 2006 at 40–59.) He did so even though the story conveyed in those letters conflicted with many of the mitigation themes VanDreumel was attempting to present at the 2006 mitigation phase.

Mayberry also provided second- and third-hand testimony on numerous topics that would have been effective as first-hand testimony. Instead of calling

227

Kiles's friends and family members, VanDreumel had Mayberry—a member of the defense team—testify about people he had spoken with about Kiles's childhood, family, and drug use leading up to and at the time of the crime, some of whom had previously written affidavits. (*E.g.*, Tr. Apr. 26, 2006 at 85–108; Tr. Apr. 27, 2006 at 59–62, 86–91, 94–109.) He testified about information from a nurse at the Yuma Jail who saw Kiles after he was first arrested, sharing second-hand that she said that at the time of his arrest, Kiles showed signs of psychological impairment. (Tr. Apr. 27, 2006 at 82–86.) Mayberry even testified about information provided by Kiles's mother and sister regarding such topics as Kiles's traumatic childhood and the family history of mental illness. (Tr. Apr. 27, 2006 at 111–23.) But as the information did not come directly from the nurse or Kiles's mother or sister, and the jury would have perceived that they were not willing to testify at Kiles's mitigation phase, it lacked mitigating effect. *See Powell v. Collins*, 332 F.3d 376, 400 (6th Cir. 2003) (finding ineffective assistance where counsel presented mitigation testimony about a client's background through an expert discussing information contained in affidavits by friends and family members, instead of through first-hand accounts).

As a result, the jury heard a misleading picture of Kiles's childhood, addictions, and mental illness from Biebrich and Perrone, who knew Kiles for a limited time but who appeared to be the only two of Kiles's family and friends willing to testify for him. "The inescapable message sent to the jury was that no one who really knew the young man [] found guilty of murder—not parents, not family members, not friends—would take the stand to explain why his life was still worth saving." *Cargle v. Mullin*, 317 F.3d 1196, 1211 (10th Cir. 2003). But, in fact, this was not true, as many other individuals could have testified, as described above.

Moreover, counsel did not adequately prepare these two witnesses in order to present Kiles's social history "to the jury in a sufficiently detailed and sympathetic manner." *Douglas*, 316 F.3d at 1087–89. Their testimony undermined

228

many of the mitigating factors that defense counsel urged that centered on Kiles's traumatic childhood and his limitations in functioning. (Tr. May 22, 2006 at 19–21.) The State used Perrone and Biebrich's testimony to cross-examine defense's mental-health experts on their findings that were based on Kiles and others reporting that he was abused as a child. (*E.g.*, Tr. May 9, 2006 p.m. at 22–23.) Moreover, Biebrich's and Perrone's in-person testimony likely painted a more vivid picture than the second- and third-hand accounts Mayberry provided. The ABA Guidelines note that in-person testimony is more likely to affect a jury's decision-making. *See* 2003 ABA Guideline 10.11 cmt. (explaining that "[c]ounsel should ordinarily use lay witnesses as much as possible to provide the factual foundation for the expert's conclusions. Community members [with] relevant personal knowledge or experience often speak to the jury with particular credibility.") Social science research indicates that defense experts are viewed with great skepticism and often regarded as "hired guns" unless their conclusions are supported by abundant, credible evidence from lay witnesses. *See, e.g.*, Scott E. Sundby, *The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert and Lay Testimony,* 83 Va. L. Rev. 1109 (1997) (finding that two-thirds of the witnesses jurors thought "backfired" were defense experts).

In sum, then, the defense's first two witnesses—and the only two people who knew Kiles before the crime and who testified in person on his behalf—directly contradicted and undermined the credibility of much of the rest of the mitigation presentation, especially the expert mental-health testimony emphasizing Kiles's addiction, mental illness, and abusive childhood.

VanDreumel's decision to present the lay-witness testimony through Perrone, Biebrich, and Mayberry was not a reasoned decision but the product of a grossly inadequate investigation. Counsel's failure to be involved in the investigation and preparation of lay witnesses, or to even learn what they were to testify about until shortly before trial, was deficient, and that failure led to a

229

1   disjointed and misleading mitigation presentation. Counsel's duty to investigate and

2   present a case to spare a client's life is not "discharged merely by . . . providing the

3   sentencing court with a cursory or 'abbreviated' presentation of potentially

4   mitigating factors." *Lambright,* 490 F.3d at 1120 (quoting *Stankewitz,* 365 F.3d at

5   716). Counsel's decision to have Mayberry testify about information from lay

6   witnesses indicates that VanDreumel felt the information was relevant mitigation.

7   It underscores that the decision to not follow up on these "tantalizing" leads was

8   not reasonable, and that the investigation was inadequate. VanDreumel also had a

9   duty to present these witnesses to the jury—to investigate and then reach out to

10  potential lay mitigation witnesses to explain to them the importance of mitigation

11  in an effort to get them to testify. *See Allen*, 395 F.3d at 1002 (finding deficient

12  performance where at habeas evidentiary hearing, "many family members, friends,

13  and former associates [] affirmed that they would have testified as mitigation

14  witnesses if [] counsel had asked them or if he had explained the importance of their

15  testimony," which "then-prevailing professional norms required"). The decision to

16  have Mayberry testify second-hand was not the result of a reasoned, strategic

17  decision, but instead was the result of an inadequate investigation by counsel. *See*

18  *Wiggins*, 539 U.S. at 521–22; *Correll*, 539 F.3d at 949.

19      The deficient performance with regard to the lay-witness presentation

20  prejudiced Kiles. This testimony gave jurors the false impression that Kiles was a

21  well-adjusted man who had a fine childhood, calling into doubt the credibility of

22  the experts who followed. *See Mayfield*, 270 F.3d at 932. VanDreumel should have

23  called such witnesses as Janell Hawkins, Kiles's uncle Alan Long, and any number

24  of Kiles's friends and associates from the Air Force. These witnesses could have

25  provided powerful testimony to the jury and helped to "humanize" Kiles. *See White*

26  *v. Ryan*, 895 F.3d 641, 671 (9th Cir. 2018). They could have spoken first-hand to

27  Kiles's addiction at the time of the crime, his mental illness, the abuse he endured

28  as a child, and his family's multigenerational history of substance addiction and

mental illness, bolstering and adding color to the expert testimony that was to come.

Instead, VanDreumel had Mayberry read old testimony and affidavits into the record, resulting in a cursory presentation of Kiles's social history that was "not particularly useful or compelling."[125] *Douglas*, 316 F.3d at 1090 (finding ineffective assistance where counsel "introduced some of [the defendant's] social history" but did so in a "cursory manner that was not compelling"); *see also Bean*, 163 F.3d at 1081 (finding deficient performance where "numerous" mitigating factors "were reported to the jury only in the vaguest of terms" in finding deficient performance); *see also Powell*, 332 F.3d at 400 (finding prejudice where counsel presented background evidence through an expert, because "if counsel had actually conducted an investigation and produced pertinent witnesses, jurors would have heard first-hand accounts from those who knew Petitioner best. We believe that such personal testimony would have been of significant benefit during the penalty phase"). "[C]ounsel's gross mishandling of the penalty-phase defense left [her] client's fate to jurors who could only wonder why . . . [no] member of his family would step up to explain, in personal human terms, why his life should be spared notwithstanding the reprehensible conduct of which he had been found guilty." *Cargle*, 317 F.3d at 1211.

That the jury did not hear evidence of Kiles's background and addiction in a reasonable manner "undermine[s] confidence in the outcome" of Kiles's mitigation hearing. *See Douglas*, 316 F.3d at 1091 (quoting *Strickland,* 466 U.S. at 694). Had the jury heard any of this evidence, there is a reasonable probability that at least one juror would have voted for life for the killing of Gunnel. *See Bemore v. Chappell*, 788 F.3d 1151, 1176 (9th Cir. 2015).

---

[125] Counsel should have been on notice to the ineffectiveness of this method of presentation, because at the aggravation phase only days before, the jury had asked a question about why so much testimony was being read into the record instead of in-person. (*See* ROA 870 at 1.)

1
2

### 2.   Counsel failed to retain the necessary experts to properly investigate and explain several avenues of mitigation.

3    Kiles's counsel were ineffective in failing to hire the necessary and
4    appropriate experts who could evaluate Kiles and explain his personal history and
5    impairments to the jury. Hiring appropriate experts is a central duty of capital
6    counsel. "It is not enough just to present 'extensive mitigating evidence' where
7    particularly persuasive evidence—especially evidence in the form of expert
8    testimony—was omitted." *Bemore*, 788 F.3d at 1172; *see also* 2003 ABA Guideline
9    10.11(F)(2), 10.11 cmt.

10    Counsel should have consulted with experts on trauma, brain damage, and
11    neurotoxin exposure. In failing to pursue obvious lines of investigation,
12    VanDreumel's actions fell below prevailing professional norms. Counsel need not
13    "investigate every conceivable line of mitigating evidence no matter how unlikely
14    the effort would be to assist the defendant at sentencing," however, a "decision not
15    to investigate [] 'must be directly assessed for reasonableness in all the
16    circumstances.'" *Wiggins*, 539 U.S. at 533 (quoting *Strickland* 466 U.S. at 691).
17    Where "'tantalizing indications in the record' suggest that certain mitigating
18    evidence may be available, those leads must be pursued." *Lambright*, 490 F.3d at
19    1117 (quoting *Stankewitz*, 365 F.3d at 719–20). Here, VanDreumel missed just such
20    "tantalizing indications in the record" of necessary follow-up investigation, and the
21    decision not to pursue these paths of mitigation was not based on adequate
22    investigation or sound strategic judgment.

23    In failing, without sound reason, to consult with experts in these fields,
24    counsel failed to properly investigate Kiles's mitigation and failed to contextualize
25    the mitigation evidence that was presented. Counsel should have consulted with the
26    following experts:

27    <u>Trauma expert</u>: VanDreumel should have consulted with a trauma expert.
28    The mitigation investigation uncovered extensive evidence of Kiles's childhood

232

trauma, as detailed above, and various experts and the mitigation specialist presented this to the jury in scattershot form. However, counsel failed to consult a trauma expert who could have properly investigated Kiles's childhood trauma and put his crimes and substance addiction into context by explaining how chronic abuse of varied kinds during his formative years caused Kiles's mental illness. Further, a trauma expert could have properly investigated evidence of sexual abuse, of which there were many indications. For example, Kiles suffered from nightmares, sleepwalking, and enuresis as a child—all red flags for potential sexual abuse. (1990 Trial Def. Ex. 4 at 7.) Kiles's grandfather regularly babysat Kiles and plied him with alcohol when he was as young as four or five. (Tr. May 11, 2006 at 38.) Moreover, Kiles's childhood was marked by his family's complete lack of sexual boundaries. His mother regularly threw wild family parties, where his mother and her sisters would take off their clothes. (Tr. Apr. 26, 2006 at 93.) VanDreumel knew as much, as prior mitigation specialist Jan Dowling discussed these parties in memos she gave VanDreumel. At these parties, Kiles's aunt, Darnella Long, would regularly perform sexual dances in view of the children during which she would moan and simulate sex. Dowling's memos also noted that Kiles's father had a child with Darnella (Kiles's mother's sister) and that Kiles's uncle was known for sexually propositioning family members and would frequently invite a young Kiles to watch pet rabbits have sex. The family history compiled by Mayberry, noted that Darnella, Kiles's aunt, told her sister, Kiles's mother, that she was going to sleep with Kiles, her nephew. In an affidavit from the first state post-conviction proceeding, Kiles's mother stated that a boyfriend of hers had accused her of sleeping with her son. (PFR2 Dkt. 23 Ex. 19 at 7.) Kiles began having sexual relations at a young age, another indicator of sexual abuse.

Despite these "tantalizing indications," VanDreumel failed to hire an expert who could have used her specialized skills to investigate and then present to the jury that Kiles was exposed at an early age to sexual violence, was subjected to the

233

1  complete obliteration of normal adult-child sexual boundaries, and, upon
2  information and belief, was further sexually abused. *See Stankewitz*, 365 F.3d at
3  719. The ABA Guidelines note the need to hire a mental-health expert to examine
4  sexual abuse, as having suffered such trauma is "common among persons convicted
5  of violent offenses on death row." 2003 ABA Guideline 4.1 cmt.; *see also* 1989
6  ABA Guideline 11.8.6(B)(5) (obligating counsel to consider presenting evidence
7  of sexual abuse). The 2003 ABA Guidelines further recognize that it can be difficult
8  to elicit such information. 2003 ABA Guideline 4.1 cmt. The Supreme Court has
9  specifically pointed to sexual abuse as the type of "powerful" evidence that, where
10  counsel fails to present it to the jury, the client is prejudiced. *Wiggins*, 539 U.S. at
11  534–35.

12        Because VanDreumel failed to retain someone with the appropriate expertise
13  to interview Kiles and investigate his abuse and trauma more thoroughly,
14  VanDreumel was unable to appropriately present the full extent of his trauma.
15  Instead, witnesses sporadically alluded to the possibility of childhood sexual abuse,
16  without context or meaning. Because VanDreumel had not adequately investigated,
17  she actively undercut this mitigating evidence. When she asked psychiatrist Albert
18  Globus, M.D., about Kiles's experience living with his mother, Imojean, and her
19  abusive boyfriend shortly before the crime, VanDreumel noted that Imojean had
20  written in an affidavit that the boyfriend had accused Imojean of sleeping with
21  Kiles. (Tr. Apr. 24, 2006 at 111.) VanDreumel then said she wanted to "clean up"
22  that there was no sexual element to Kiles's relationship with his mother—despite
23  the fact that such sexual abuse, if present, would be compelling mitigation. (Tr. Apr.
24  25, 2006 at 39); *see Wharton v. Chappell*, 765 F.3d 953, 978 (9th Cir. 2014) (finding
25  failure to present sexual abuse by parent prejudicial because it was particularly
26  mitigating in part due to its "personal" nature). Dr. Globus answered that, while
27  there was "no specific indication being of a suspicious nature, I'm not so sure. . . .
28  I didn't find any specific evidence and she certainly didn't admit it." (Tr. Apr. 25,

1    2006 at 39.) Due to VanDreumel's failure to investigate and consult with

2    appropriate experts, she could not present effective expert testimony regarding

3    evidence of family sexual abuse.

4         An expert is important to contextualize and explain the effects of trauma;

5    such an expert could have shed light on just how out of control and unsafe life was

6    for Kiles growing up. *See, e.g., Caro v. Woodford*, 280 F.3d 1247, 1255 (9th Cir.

7    2002) ("'[T]he introduction of expert testimony would also have been important'

8    to explain the effects that 'serious physical and psychological abuse and neglect as

9    a child' had on the defendant" (quoting *Ainsworth v. Woodford,* 268 F.3d 868, 876

10   (9th Cir. 2001)). As a child, Kiles's mentally ill parents constantly inflicted violence

11   on each other and on their children. Their children were caught in the middle. Kiles

12   often had to stop his parents from hurting each other—which resulted in physical

13   and psychological abuse directed at him. Kiles's mother regularly drank to the point

14   where, even as a child, Kiles had to pick her up and carry her home. (Tr. Apr. 27,

15   2006 at 59.) He would miss school after this happened because he was so

16   embarrassed. An expert would have been able to illuminate the degree to which

17   Kiles's family dynamic shaped Kiles throughout his life, and VanDreumel's

18   decision not to consult one was unreasonable.

19        Neuroimaging specialist: Trial counsel failed to consult with an expert who

20   could have conducted and evaluated appropriate brain imaging to investigate signs

21   that Kiles had organic brain damage. (ROA 1189 at 48–52, 60–61.) Second state

22   post-conviction counsel hired neuroimaging specialist Joseph Wu, M.D., to

23   perform an MRI of Kiles's brain, which revealed abnormalities consistent with

24   brain damage. (ROA 1189 at 50; PFR2 Dkt. 28 Ex. 25 at 4–20.) These images

25   revealed observable white-matter hyperintensities in the frontal lobe of Kiles's

26   brain and a reduced-size corpus callosum. Both are consistent with traumatic brain

27   injury. This type of injury as a child is related to attention-deficit (i.e., impulsivity)

28   disorders. Dr. Wu concluded that Kiles had brain damage. (ROA 1189 at 50.)

235

The use of brain scans, and in particular MRIs, to investigate (and later present) brain damage for mitigation purposes was widespread before the 2006 penalty phase. Brain injury is considered "classic mitigation evidence," and "Arizona courts place significant weight on brain injuries as mitigating evidence." *Correll*, 539 F.3d at 950, & n.3. The 2003 ABA Guidelines emphasize the need to investigate brain impairment and that brain scans may be necessary. 2003 ABA Guideline 4.1 cmt. Further, the Ninth Circuit has made clear that, "where counsel is on notice that his client may be mentally impaired, counsel's failure to investigate his client's mental condition as a mitigating factor in a penalty phase hearing, without a supporting strategic reason, constitutes deficient performance." *Hendricks v. Calderon*, 70 F.3d 1032, 1043 (9th Cir. 1995); *see Smith v. Mullin*, 379 F.3d 919, 943 (10th Cir. 2004) (recognizing jury knew of defendant's impulsivity and lack of emotional control, but defendant was prejudiced by counsel's failure to present an explanation of how organic brain damage "caused this 'kind hearted' person to commit such a shocking crime").

VanDreumel knew that Kiles had risk factors for and signs of brain damage. For example, medical and legal records available to VanDreumel showed that Kiles was hit by a car around age five, after which he suffered from regular nosebleeds and severe headaches.[126] Further, Dr. Globus testified at the first state post-conviction hearing that Kiles was addicted to substances as a consequence of "organic disorders in the brain." (Tr. Feb. 21, 1996 at 177.) Dr. Globus described Kiles's impulsivity and specifically noted that impulsivity is often concomitant to brain damage. (Tr. Feb. 21, 1996 at 198.) Moreover, when VanDreumel first requested funds to hire a mitigation specialist in 2000, she wrote: "When the matter was overturned on PCR, the PCR had several affidavits indicating an impulsivity disorder which is likely related to brain damage, so we are pursuing that." (ROA

---

[126] Indeed, regular nosebleeds in the wake of a head trauma can indicate a fractured skull.

236

509 Ex. A at 1.)

VanDreumel knew that a brain scan was necessary to determine the extent of Kiles's brain damage as early as July 2001. Still, counsel failed to hire an expert who could produce and evaluate brain scans to investigate Kiles's brain damage. As a result, VanDreumel failed to procure and present neuroimaging evidence that Kiles did indeed have brain damage. This failure was particularly unreasonable given that a central theme at the mitigation-phase trial was Kiles's impulsivity, a form of brain dysfunction often attributable to brain damage. (*See* Tr. May 22, 2006 at 19 (jury instructions listing "possible neurological damage" as a mitigating factor for the jury to consider)); *Lambright*, 490 F.3d at 1117 (counsel has a duty to pursue "tantalizing indications in the record"). Had VanDreumel retained an expert to investigate Kiles's brain damage by conducting the proper brain scans, there would have been no question about the neurological damage. (ROA 1189 at 50.)

A qualified expert would have obtained the necessary images and would have been able to show the jury Kiles's brain damage. Instead, the jury heard disorganized and easily dismissed testimony about Kiles's "possible" brain damage. (*E.g.*, Tr. Apr. 24, 2006 at 86; Tr. May 8, 2006 at 20; Tr. May 10, 2006 at 106.) For example, the State elicited from Dr. Globus that there was no evidence of organic brain damage—based on the lack of testing.[127] (Tr. May 8, 2006 at 37.)

And, critically, irrefutable evidence of brain damage would have undercut a key aspect of the State's rebuttal evidence. Evidence of brain damage would have harmed the State's experts' testimony that Kiles had anti-social personality disorder ("ASPD"), as such a diagnosis requires ruling out that the underlying behavior is

---

[127] On redirect, Dr. Globus testified incorrectly (without being qualified to do so) that a scan would not have helped determine brain damage, based on the type of damage he believed Kiles had and because Kiles had been off drugs and in prison for so long. (Tr. May 8, 2006 at 26.) Dr. Globus though, was not a brain-damage expert; he testified that he did not find Kiles's severe lifelong headaches to be significant, showing his lack of expertise in brain damage. VanDreumel seemed surprised when he answered this way. (Tr. Apr. 24, 2006 at 94.)

237

1    not a consequence of head trauma. *See Mann v. Ryan*, 828 F.3d 1143, 1172 (9th

2    Cir. 2016) (en banc) (Thomas, C.J., dissenting); Am. Psychiatric Ass'n, *Diagnostic*

3    *and Statistical Manual of Mental Disorders* 630 (4th ed. Text Revision 2000)

4    (hereinafter "DSM-IV-TR").

5        The failure to hire a brain-imaging specialist had further consequences that

6    reverberated throughout Kiles's trial. For example, because of the lack of brain

7    imaging, VanDreumel ultimately decided not to have the substance-abuse expert

8    they had hired testify. This was because VanDreumel was concerned that the expert

9    would be cross-examined on the lack of brain-imaging evidence. But, as Kiles's

10    addictions were central in so many ways to his story—both as the result of his

11    trauma and as direct cause of the crime—the absence of testimony by the substance-

12    abuse expert left a gaping hole in the defense's presentation.

13        "An uninformed strategy is not a reasoned strategy. . . . [I]n the absence of

14    diligent investigation, counsel cannot make a reasoned tactical decision regarding

15    whether or not to present mitigating evidence." *Correll*, 539 F.3d at 949. Here,

16    counsel's failure to get brain imaging was not strategic. VanDreumel did not have

17    the expertise to make this determination, and it was unreasonable insofar as it was

18    based on a lack of a proper investigation into Kiles's social history.[128] Further,

19    counsel must engage experts to evaluate specific mental conditions: "[c]ounsel's

20    own observations of the client's mental status . . . can hardly be expected to be

21    sufficient to detect the array of conditions . . . that could be of critical importance."

22    2003 ABA Guideline 4.1 cmt.; *see also Summerlin*, 427 F.3d at 630 (reasoning that

23    counsel must examine client's physical-health history for evidence of potential

24    organic brain damage.)

25

---

26    [128] To the extent that VanDreumel's decision was based on the report of

27    neuropsychologist Scott Sindelar, Ph.D., the decision cannot be considered
strategic or defensible. As discussed below, Dr. Sindelar was inadequately prepared

28    for his examination of Kiles, and his report was accordingly unreliable and
demonstrably inaccurate.

Counsel's decision to abandon the investigation at a critical juncture, with red flags of brain damage abounding, was deficient performance, and the lack of brain-damage evidence at Kiles's mitigation phase prejudiced him.

Expert in environmental toxins: Kiles was born and raised in Yuma, Arizona, and lived there at the time of the crimes. Kiles's family had lived in Yuma for generations. Yuma is famously an agricultural community, which carried a serious risk of environmental-toxin exposure.[129] Yuma is also home to a Superfund site: the Yuma Marine Corps Air Station, where Kiles's mother worked.[130]

In 2002, the Ninth Circuit found ineffective assistance where counsel consulted four experts, but failed to hire a neurologist or toxicologist to investigate exposure to pesticides and the effects on the client's brain. *Caro v. Woodford*, 280 F.3d at 1255. Still, Kiles's counsel did not consult with an expert about this matter. Kiles's counsel was further on notice because Dowling included in a 2000 memo

---

[129] By 2000, there was widespread knowledge about the long-term dangers— including brain damage—of agricultural toxins, including pesticides used when Kiles was a child in the 1960s and 1970s. *See, e.g.,* Natural Resources Defense Council, *Trouble on the Farm: Growing Up with Pesticides in an Agricultural Community* (Oct. 1998) (discussing Yuma among agricultural communities where children are exposed to toxins); *see also* Matthew L. Wald, *Citing Children, EPA is Limiting Use of a Pesticide*, N.Y. Times, Aug. 2, 1999 (describing the banning of widely used agricultural pesticides); EPA, *Review and Evaluation Report on Pesticide Pollution of the Lower Colorado River* (May 1973) https:// nepis.epa.gov/Exe/ZyPDF.cgi/91022Q8X.PDF?Dockey=91022Q8X.PDF at 2, 4 (discussing extensive pesticide use in Yuma and how 1960s studies showed that the Colorado River in Yuma was so polluted by agricultural pesticides that it constituted a "serious hazard" to fish and users of its water, which was used for domestic consumption); Patricia Sánchez Lizardi et al., *The Effects of Organophosphate Pesticide Exposure on Hispanic Children's Cognitive and Behavioral Functioning*, 33 *Journal of Pediatric Psychology*, Jan. 1 2008, at 91– 101, https://doi.org/10.1093/jpepsy/jsm047 (describing articles from the 1980s through early 2000s on the harmful effects of pesticides).

[130] Superfund sites are designated by the Environmental Protection Agency as containing chemical contaminants that pose an "unacceptable risk to human health or the environment." The Yuma site contains groundwater contaminated by four different contaminants of concern. It was placed on the National Priorities List in 1990. Environmental Protection Agency, *Yuma Marine Corps Air Station: Background*, https://cumulis.epa.gov/supercpad/cursites/csitinfo.cfm?id=0900885.

1    to counsel that Kiles picked fruit for local farmers. As discussed previously, counsel

2    knew that Kiles may have had brain damage and that he had other symptoms

3    associated with pesticide exposure, such as headaches and asthma. (ROA 1189 at

4    50–51.) Even so, counsel failed to retain the necessary and appropriate expert to

5    evaluate Kiles to assess his exposure to and the potential effects of environmental

6    toxins. It was unreasonable to forgo this line of inquiry without good cause. It is

7    deficient performance where, as here, counsel "ignored pertinent avenues for

8    investigation of which [she] should have been aware." *Porter*, 558 U.S. at 40.

9          Counsel were ineffective in failing to consult with experts in these fields.

10    "[I]t is not enough that some of the defense witnesses informed the jury of the facts

11    that might *underlie* a mental health mitigation defense; expert testimony to explain

12    the ramifications of those experiences on [petitioner's] behavior . . . is necessary."

13    *Bemore*, 788 F.3d at 1172 (internal quotation marks omitted). Absent a sound

14    strategic reason for not doing so, counsel were required to conduct sufficient

15    investigation and preparation to be able to present and explain the significance of

16    all the available mitigating evidence. Counsel could not fulfil this duty without

17    consulting the above experts, and as a result, the evidence that the jury saw was

18    incomplete and misleading. *Lambright,* 490 F.3d at 1120. Because counsel's

19    decisions to truncate the investigation meant that counsel failed to present a variety

20    of critical and compelling mitigation, counsel's error "undermine[s] confidence in

21    the outcome" of Kiles's mitigation-phase hearing. *See Douglas*, 316 F.3d at 1091.

22          **3.**    **Counsel performed deficiently in failing to provide the**

23                   **experts she did retain with complete and accurate information.**

24          Closely related to the duty to thoroughly investigate and present mitigation

25    is the duty to provide complete and accurate information about the defendant's

26    background to evaluating mental-health professionals. Counsel have "an

27    affirmative duty to provide mental-health experts with information needed to

28    develop an accurate profile of the defendant's mental health." *Caro v. Woodford*,

1   280 F.3d at 1254. The "duty to provide the appropriate experts with pertinent
2   information about the defendant is key to developing an effective penalty phase
3   presentation." *Id.* at 1255 (citing *Bean*, 163 F.3d at 1079–80); *see also, e.g.*,
4   *Lambright*, 490 F.3d at 1117 (counsel has an affirmative duty to provide mental-
5   health experts with social-history information needed to develop an accurate
6   mental-health profile of the defendant); *Clabourne v. Lewis*, 64 F.3d 1373, 1384
7   (9th Cir. 1995) (counsel failed to provide mental-health experts with records
8   sufficient to develop an accurate psychological profile of defendant). Counsel must
9   provide their experts with sufficient information to ensure that the experts can
10  "'present[] and explain[] the significance of all available [mitigating] evidence.'"
11  *Correll*, 539 F.3d at 942 (alternations in original) (quoting *Mayfield*, 270 F.3d at
12  927).

13       In order to provide that foundational information, counsel must first conduct
14  a reasonable investigation into mitigation. *See Caro v. Woodford*, 280 F.3d at 1255
15  (finding deficient performance when counsel "neither investigated fully this history
16  nor informed the experts . . . of those facts that were known to him"). Only once
17  counsel has assembled an adequate social history and provided that information to
18  experts will they be able to conduct and complete a reliable mental-health
19  evaluation and to recommend additional experts as needed. *See, e.g.*, Russell
20  Stetler, *Mental Health Evidence and the Capital Defense Function: Prevailing
21  Norms*, 82 UMKC L. Rev. 407 (2014); George W. Woods et al., *Neurobehavioral
22  Assessment in Forensic Practice*, 35 Int'l J. of L. & Psychiatry 432 (2012).

23       Though VanDreumel hired a number of experts, she unreasonably failed to
24  prepare these experts with an adequate social history. As discussed above,
25  VanDreumel did not direct the mitigation investigation insofar as it involved lay
26  witnesses, instead leaving it in the hands of an inexperienced mitigation specialist.
27  The resulting investigation was incomplete and fell below prevailing professional
28  norms. VanDreumel's unreasonable investigation into Kiles's life led to an

241

incomplete social history. As a result, the social history provided to experts was inadequate. Further, VanDreumel did not provide to the experts many records which were in her possession and which were necessary to allow the experts to accurately assess Kiles's mental health. This failure to adequately inform experts was compounded by counsel's failure to consult with experts on trauma, brain damage, and neurotoxin exposure. *See, e.g.*, *Bean*, 163 F.3d at 1079-80; *Lambright*, 490 F.3d at 1117; *Caro v. Woodford*, 280 F.3d at 1255.

In April 2002, with trial scheduled for July 2002, counsel asked the court to appoint three mental-health experts: Scott Sindelar, Ph.D., a neuropsychologist, Thomas Gaughan, M.D., a psychiatrist, and Ashley Hart, Ph.D., a psychologist.[131] (Tr. Apr. 8, 2002 at 10, 14.) Dr. Hart was an expert for the State at Kiles's trial in 1989 and 1990, but he then signed an affidavit for the defense in Kiles's first state post-conviction proceedings.[132]

Following their appointment, Ty Mayberry, the mitigation specialist, contacted VanDreumel to say he wanted to touch base and get on the same page, because Kiles had told him that experts had been hired. Mary Durand, who oversaw the mitigation specialists in Maricopa County, e-mailed Mayberry around the same

---

[131] While the transcript reflects that counsel requested and the court appointed all three experts, the filed motion and the order only call for the appointment of Dr. Gaughan and Dr. Sindelar. (*See* ROA 572 at 1; Tr. Apr. 4, 2002 at 10, 14.) This was likely because Clark filed the motion and proposed order, and he was not involved in the decision-making or the case beyond the simple tasks delegated to him. Dr. Hart was appointed a month later, when Kiles himself asked the judge about the discrepancy. (Tr. May 6, 2002 at 36.)

[132] Dr. Hart evaluated Kiles and testified at the first sentencing hearing that Kiles suffered from a personality disorder and would not have committed the crimes had a police officer been at his shoulder, rebutting defense counsel's theory that Kiles was impaired at the time under a statutory mitigator, A.R.S. § 13-703(G)(1). (Tr. Feb. 7, 1990 at 99, 138, 142.) In 1996, he signed an affidavit stating that after reviewing the extensive social history created by post-conviction counsel, he concluded that Kiles's use of intoxicants was an attempt to self-medicate his longstanding mental illness. (Tr. May 9, 2006 at 60, 65; ROA 304 Ex. A at 3.) There is nothing to suggest that Dr. Hart conducted an updated evaluation of Kiles.

time to tell him that she ran into Clark, who had told her they hired Dr. Sindelar; Durand wished that counsel had let them know in advance, likely so they could have had input into the decision. As Mayberry was not consulted in connection with the hiring of experts, the selection of experts was entirely divorced from the little lay-witness investigation that had occurred.

At the end of May 2002, counsel sent each expert a stack of papers that constituted counsel's mitigation "binder." VanDreumel included a cover letter that detailed the facts of the crime, rather than any background on Kiles's social history. The letter included, on its final page, one paragraph on Kiles's social history, which focused on the possibility that Kiles suffered from a character trait of impulsivity and lack of anger control and coping mechanisms. The paragraph framed Kiles's character as the result of the fact that he was struck by a car as a young child, grew up in a household with domestic violence, and had previously been sent to prison for beating a woman after she slapped him.

The materials provided lacked many of the documents considered classic examples of social history to be provided to capital sentencing experts.[133] *See, e.g.*, *Correll*, 539 F.3d at 943; *see also Caro v. Calderon*, 165 F.3d at 1226–27. VanDreumel provided the experts with some records, including the following: parole records with psychological evaluations and information on Kiles's attempts

---

[133] In July 2002, Dr. Gaughan requested additional documents—the documents that VanDreumel should have initially provided to him and all experts. These included the following: witness statements from the first trial and affidavits gathered for the first state post-conviction proceedings; Kiles's missing medical, birth and school records, military records of discipline, military psychological or psychiatric evaluations referenced by date in other evaluations, legible copies of Kiles's Arizona Department of Corrections (hereinafter "ADOC") records of psychological evaluation and vocational rehabilitation services, ADOC testing from 1986 including IQ testing, interviews with Janell Kiles regarding Kiles or their childhood, and divorce records of Kiles's parents. Dr. Gaughan's request reveals the extent to which the information that counsel initially provided was below prevailing professional norms. While counsel sent Dr. Gaughan the materials he requested, it is unclear if Dr. Hart and Dr. Sindelar ever received them.

243

to obtain addiction counseling and vocational rehabilitation services after prison; Kiles's father's naval records and other medical records; Kiles's incarceration and medical records from ADOC through 1990; medical records from Kiles's childhood; only some of his mother's mental health and medical records; and his sister's criminal history and a summary of presentence reports in her cases. VanDreumel provided a mix of expert testimony and reports on Kiles's mental health from the first trial, as well as a mental-health expert's affidavit from the first state post-conviction proceedings.[134]

Counsel had in their possession, but failed to provide to these experts additional critical records including, for example Kiles's incarceration and medical records beyond 1990; more-complete documentation of his parents' medical and mental-health history; Kiles's school records and Air Force records; and legal records from when Kiles was hit by a car as a child.[135] (*E.g.*, ROA 225 Exs. 3, 5, 16, 19, 22.)

In addition to missing critically important school, military, and updated

---

[134] Moreover, VanDreumel relayed the documents she did provide in an unreasonable manner which fell below prevailing professional norms. Mayberry, new to capital mitigation, sent the documents in a large pile, not in a binder, to save money. Experts received a 950-page pile without any context or indication as to what the documents were and which were important. On top were graphic photographs of Valerie Gunnel's head injuries, photographs of the blood-spattered apartment, and a photograph of the nine-month-old victim after her body was found in a river. While these photographs were removed for some of the experts, at least some received them. Counsel did not send photographs of Kiles as a child and in the military that Dowling had tracked down. Following the photographs, counsel included police reports on the crime, and Kiles's and the medical examiner's graphic 1989 testimony. It was unreasonable for counsel to place these on top of a disorganized stack of papers, giving the experts a negative perspective on Kiles from the beginning. Potentially helpful documents, such as the timeline that Mayberry compiled, were hidden in the middle of this stack.

[135] Other useful documents that counsel should have had from the first post-conviction proceedings include Kiles's birth certificate and birth-related records, his parents' marriage license and divorce filings, his father's death certificate, and his sister's medical and pregnancy records. (ROA 225 Exs. 1, 2, 14, 17, 21, 70.)

ADOC records, VanDreumel failed to provide any of the affidavits painstakingly collected by Kiles's first state post-conviction counsel. VanDreumel also failed to include testimony from the 1996 state post-conviction hearing, which revealed important details to contextualize Kiles's life. This mitigation-focused information from the first state post-conviction proceedings would have provided important context on, for example, the violent household in which Kiles was raised, childhood trauma, mental illness, substance addiction, potential brain damage, his mother's alcohol and prescription drug use while pregnant with him, and an intergenerational history of mental illness and substance addiction. These affidavits included ones by Kiles's mother and sister. (ROA 225 Ex. 37; PFR2 Dkt. 22 Ex. 3.) VanDreumel also did not include testimony from the 1990 trial that spoke about Kiles's childhood and substance abuse, or any letters written on his behalf as character references for that trial. While counsel could not rely solely on this information as the basis for the mitigation investigation, it was important to provide this already-collected information to experts.

Counsel's failure to provide experts with a full social history, including the already-obtained affidavits and records, was particularly egregious given that Kiles was previously granted relief for ineffective assistance of counsel. In particular, Kiles's first state post-conviction counsel argued that Kiles's original trial counsel "failed to gather the records and background information necessary for a thorough and complete mental health evaluation of Alvie Kiles." (ROA 225 at 69.) First state post-conviction counsel argued that these experts were not adequately informed of Kiles's social history in rendering their opinions. (ROA 225 at 68–73.)

The materials that VanDreumel failed to send were important to making mental health diagnoses. Kiles's attorney for his first trial failed to provide many of these same materials to experts. Kiles's first post-conviction counsel later provided these materials to one of those experts, psychiatrist Alexander Don. He then wrote in an affidavit for the first state post-conviction proceedings that after reviewing the

245

1   new material, he was able to more correctly diagnose Kiles with mental illnesses
2   than he had been at trial, when he was not provided with all the relevant materials,
3   underscoring the importance of these materials. (ROA 225 Ex. 78 at 3.) He
4   specifically listed materials that were not provided to him initially which he later
5   was able to review; these almost identically match the list of materials counsel
6   failed to provide to experts at the second trial.[136] (ROA 225 Ex. 78 at 2–3.)

7        Dr. Sindelar was hired to conduct a neuropsychological evaluation of Kiles
8   to determine if he had issues such as frontal-lobe brain injury, perhaps as a result of
9   being hit by a car as a child, which caused him to act impulsively. VanDreumel had
10  determined that Kiles's impulsivity would be a central mitigation theme, even
11  before having contacted any experts. However, due to the failure to provide Dr.
12  Sindelar with adequate background information, it appears that he did not know it
13  was a death-penalty case. The resulting report was unusable and directly
14  contradicted Kiles's known history. As a result, VanDreumel was not able to
15  provide other experts with a valid, up-to-date neuropsychological assessment of
16  Kiles, nor were the experts able to effectively counter the State's neuropsychologist
17  at trial. This undermined the entire mitigation investigation and presentation.

18       Beginning in 2004, once it was clear that Kiles would receive a jury
19  sentencing, counsel retained additional mental-health experts.[137] In September
20  2005, with trial scheduled for October 2005, counsel contacted Dr. Albert Globus,
21  a psychiatrist who had testified at the 1996 state post-conviction hearing. Dr.
22  Globus agreed to testify, but said he needed to meet with Kiles again. It appears he

23

24  [136] Inexplicably, counsel did not provide this affidavit by Alexander Don, M.D., to
25  the second penalty-phase experts; instead, she gave an earlier one he had written
    before he had an opportunity to review the new information. (ROA 225 Ex. 62.)
26
27  [137] The penalty-phase trial was delayed for a number of years following *Ring*;
    however, it does not appear that any experts hired in 2002 conducted further
28  evaluations of Kiles, nor did counsel send them new information beyond updated
    ADOC records.

246

never did. (Tr. Apr. 25, 2006 at 93.) In July 2004, the court appointed Lesley Hoyt Croft, Ph.D., as a substance-abuse expert. (ROA 630 at 1.) In 2005, counsel began to consult with Mark Cunningham, Ph.D., a forensic psychologist; the court appointed him in September 2005. (ROA 681 at 1.)

While counsel appears to have provided at least some experts with essential social-history records, counsel failed to provide them with "information needed to develop an accurate profile of defendant's mental health." *Caro v. Woodford*, 280 F.3d at 1254. Counsel gave Dr. Cunningham the social history that had been developed, including Dowling's memos, the affidavits from the first state post-conviction proceedings, and the records that she had, but counsel gave Dr. Croft the same minimal information they had given to Drs. Gaughan, Hart, and Sindelar in 2002, with the addition of the new expert reports. Ultimately, because they failed to conduct an adequate investigation, counsel failed to provide the mental-health experts with sufficient underlying information. Some experts had largely outdated information, while at least two had not evaluated Kiles in over a decade.

VanDreumel hired Dr. Croft because she recognized the need for a substance-abuse expert, given the importance of Kiles's addiction as a mitigating factor and the effects of substance abuse on the brain. Dr. Croft met with Kiles and drafted multiple versions of her report. However, VanDreumel voiced concern with Dr. Croft's description of the brain damage sustained by heavy drug users such as Kiles. Ultimately, VanDreumel appears to not have called her because she was concerned that Dr. Croft could be cross-examined on the lack of brain damage evidence.[138]

VanDreumel also failed to work closely with the experts to provide them with adequate information and to ensure that the experts' testimony, taken together,

---

[138] Kiles's second state post-conviction counsel retained an expert to conduct neuroimaging, which demonstrated that Kiles had brain damage. (PFR2 Dkt. 28 Ex. 25 at 1.) VanDreumel was not aware of this due to her failure to hire an expert to conduct the necessary and clearly indicated brain imaging.

247

was coherent. This was in part due to Clark's almost-complete abdication of responsibilities in this case and to Mayberry's lack of experience. While VanDreumel consulted with Mayberry, she repeatedly voiced the need to sit down with lead counsel, Mayberry, and Durand, who was supposed to be supervising Mayberry's investigation. However, it appears that VanDreumel did not make this happen. When Mayberry sought to be involved in meetings with experts, VanDreumel declined, saying that she would handle the experts and that he should focus on the Yuma investigation. In the months before the trial, VanDreumel reached out to Clark asking for help, saying she was struggling to get the many experts in line by herself. When VanDreumel contacted experts, she noted the need to meet but said she did not have time, given her five capital cases and the time she was losing trying to get Clark up to speed. VanDreumel similarly conveyed to Mayberry in the months before trial that she was overwhelmed and ready to quit because she had not signed up to be in charge. All of this was happening while VanDreumel was attempting to address evidentiary and jury-instruction matters. (E.g., ROA 677, ROA 678, ROA 682, ROA 692.)

As jury selection began in March 2006, VanDreumel had not finalized the mitigation presentation nor spoken to all experts about their testimony. Even after jury selection was complete and the penalty phase was beginning, VanDreumel did not even know who many of Mayberry's intended lay witnesses were.

Dr. Globus reached out to VanDreumel in late March 2006, and she responded that she was sorry she could not return his phone calls because she was so busy, but relayed instructions about his testimony via e-mail. VanDreumel e-mailed Dr. Hart—who had evaluated Kiles in 1990—in late April 2006, days before his testimony, to introduce herself and indicate what she hoped he would testify about. (1990 Trial State Ex. 8 at 1; ROA 304 Ex. A.)

The resulting presentation of mental-health expert testimony "did not arise from the requisite informed judgment, and constituted ineffective assistance of

248

counsel." *See Bean*, 163 F.3d at 1079 (internal quotation marks omitted) (finding counsel performed deficiently where they did not provide experts with records or prepare them to testify); *see also Caro v. Woodford*, 280 F.3d at 1254 (extending this to records that the experts do not specifically request and explaining that the "duty to provide the appropriate experts with pertinent information about the defendant is key to developing an effective penalty phase presentation"). Trial counsel performed deficiently in failing to adequately prepare their experts to testify. A failure to prepare witnesses is an "inadequac[y] in rudimentary trial preparation and presentation," and as such, it is "not a strategic decision." *Bean*, 163 F.3d at 1079–80 (describing elements of adequate trial preparation as "an integral thread in the fabric of constitutionally effective representation").

### 4. Counsel's unreasonable investigation and failure to provide experts with critical information resulted in the jury hearing a constitutionally inadequate mitigation presentation.

Instead of a credible and persuasive mitigation presentation, counsel's failure to conduct an adequate investigation resulted in a string of mental-health expert witnesses testifying on an assortment of topics. They did not build on each other or present a coherent story; instead, they undercut each other's testimony. While some of the evidence that jurors heard may have been persuasive independently, it was contradicted by other testimony. This contradictory presentation underscored that counsel's strategy was not based on a reasonable investigation. *See Correll*, 539 F.3d at 949. Insofar as there was a theme presented in mitigation, it was that Kiles was a violent individual, which was prejudicial to Kiles.

Defense's mental-health experts failed to present a persuasive mitigation story for Kiles. Their contradictions cut against each other's credibility. Further, defense counsel continued to frame Kiles's story as one of aggression and substance use, instead of one about a traumatized man, suffering from brain damage and struggling to overcome his addictions, abuse, and other impairments. Because counsel did not properly investigate Kiles's childhood sexual abuse, childhood

249

trauma, brain damage or neurotoxin exposure, the mental-health experts were left to speculate and make conclusions based on incomplete information, leaving them less credible to the jury and vulnerable on cross-examination. Had counsel conducted an adequate investigation, their mental-health experts would not have contradicted each other and undermined both the reliability of their diagnoses and their own credibility as experts before the jury. Instead, the jury heard a series of conflicting diagnoses even before the State presented its case.

Dr. Globus diagnosed Kiles with polysubstance abuse, alcohol and cocaine dependency, chronic depression stemming from childhood, drug use resulting in psychotic decompensation, and some partial fetal alcohol syndrome. (Tr. Apr. 24, 2006 at 107, 118; Tr. May 8, 2006 at 14.)

Dr. Gaughan testified the day after Dr. Globus, but said that, while Kiles may have faced situations that caused him to feel depressed, he did not diagnose depression—"nothing pervasive or primary." (Tr. May 9, 2006 a.m. at 37.) He found that Kiles did not have a psychotic disorder, though he did hallucinate under the influence of drugs. (Tr. May 9, 2006 a.m. at 36.) He diagnosed Kiles with Post-Traumatic Stress Disorder ("PTSD") resulting from his childhood (Tr. May 9, 2006 at 53–64) and attention-deficit hyper-activity disorder ("ADHD"), which often follows from fetal alcohol exposure. (Tr. May 9, 2006 a.m. at 64–66.) As a result of his ADHD, Kiles developed substance abuse. (Tr. May 9, 2006 a.m. at 69.) Further, he diagnosed Kiles with obsessive compulsive disorder ("OCD") and narcissistic personality traits. (Tr. May 9, 2006 a.m. at 75, 80.)

Dr. Hart stood by his 1996 diagnoses of Kiles of long-standing dysthymia, depression, and pre-existing bi-polar disorder. (Tr. May 9, 2006 p.m. at 65.)

Dr. Cunningham said that Kiles had substance abuse, hyperactivity, and attention-deficit issues, a probable learning disability, indications of attention-deficit issues, cocaine psychosis, fetal alcohol exposure, and potentially OCD. (Tr. May 10, 2006 at 108, 131; Tr. May 11, 2006 at 35, 63; Tr. May 15, 2006 at 38.)

250

1    Counsel's failure to conduct an adequate mitigation investigation and
2    provide their experts with adequate records and other pertinent information resulted
3    in an incomprehensible mess of conflicting diagnoses and other contradictory
4    conclusions. For example, given the State's focus on portraying Kiles as a high-
5    functioning individual who was not mentally impaired but chose a "selfish lifestyle"
6    (Tr. May 22, 2006 at 60), and given defense's lack of brain imaging, it was
7    imperative that counsel prepare defense experts to present a coherent story of
8    Kiles's mental impairment. This included his performance in school, which was a
9    focus of the State that they referenced in closing. (Tr. May 22, 2006 at 74.) Instead,
10   while Dr. Cunningham referenced Kiles's "academic failure" and Dr. Gaughan said
11   he was a "marginal" student whose difficulty in math was "suggestive of a learning
12   disorder," Dr. Globus said Kiles was an average student in school. (Tr. May 10,
13   2006 at 52; Tr. May 9, 2006 a.m. at 22; Tr. May 8, 2006 p.m. at 20.)

14   Moreover, given the State's focus on Kiles's "choice" to drink, it was
15   essential that counsel present a unified story on how and why Kiles turned to
16   alcohol. However, the defense experts provided different reasons as to why Kiles
17   began drinking: Dr. Globus testified it was due to Kiles's chronic depression,
18   stemming from childhood. (Tr. Apr. 24, 2006 at 118.) Dr. Gaughan testified it was
19   as a result of impaired impulse control, stemming from Kiles's attention-deficit
20   disorder and fetal alcohol exposure. (Tr. May 9, 2006 a.m. at 69–70.) Dr. Hart
21   testified that it was an attempt to self-medicate his long-standing dysthymia,
22   depression, and bi-polar disorder. (Tr. May 9, 2006 p.m. at 65.) Dr. Cunningham
23   attributed it to a constellation of things, including the fact that Kiles was given
24   alcohol when he was five years old. (Tr. May 15, 2006 at 69.) Additionally, Dr.
25   Globus testified that people are not predisposed to alcohol; instead, they are
26   predisposed to depression, which leads them to alcohol. (Tr. May 8, 2006 at 22.)
27   The very next day, both Drs. Gaughan and Hart testified about predisposition to
28   alcohol (Tr. May 9, 2006 a.m. at 78; Tr. May 9, 2006 p.m. at 66), and a few days

251

1    later Dr. Cunningham testified about predisposition to alcohol and drugs (Tr. May

2    15, 2006 at 47). The State took advantage of these inconsistencies in cross-

3    examination and closing.

4         The failure to provide each of these mental-health experts with proper

5    records, to prepare them for testimony, and to properly investigate Kiles's

6    mitigation to form a reasonable mitigation strategy damaged each expert at trial.

7    The following examples illustrate the problems that arose at trial due to counsel's

8    failures:

9         <u>Dr. Globus</u>: Though Dr. Globus was a neuropsychiatrist, he was not a brain-

10   damage expert. He testified that he did not find Kiles's severe lifelong headaches

11   to be significant and did not explore it (Tr. Apr. 24, 2006 at 94), despite chronic

12   headaches being an indication of head injury. In lieu of calling Kiles's family

13   members or a more qualified expert, counsel asked Dr. Globus to serve as Kiles's

14   social historian. Dr. Globus provided a cursory overview of Kiles's child abuse, his

15   parents' dysfunctional relationship, his family history, and intergenerational cycles

16   of abuse—going back to how Imojean's great-grandfather was a slave in Louisiana.

17   (Tr. Apr. 25, 2006 at 5–18, 21–24.) This was based on affidavits Kiles's first state

18   post-conviction counsel gathered in 1994.[139]

19        Dr. Globus also appears to have testified in lieu of a substance-abuse expert,

20   explaining various drugs and their effects, even though he explained his knowledge

21   came from a textbook. (Tr. Apr. 25, 2006 at 63–68.) Instead of properly presenting

22   drug addiction and impairment as a progressive disease that vitiates a person's

23   ability to make "choices" in the traditional sense of the word, he repeatedly used

24   disparaging terms—terms that did not evoke any compassion—such as that Kiles

25   _____

26   [139] At times, Dr. Globus was confused as to what he was supposed to be testifying
     to. (Tr. Apr. 25, 2006 at 21.) Counsel did not ask him to elaborate on any of these
27   "tantalizing" leads, such as Kiles's parents getting divorced and then remarrying,
     likely because he could not—he only knew what was contained in the affidavits he
28   conspicuously read from. (Tr. Apr. 25, 2006 at 22.)

was "acting crazy," "fried," "tweaking," and that people using drugs "freak out." (Tr. Apr. 25, 2006 at 69, 71–75.) Juror questions asked at the end of each day of Dr. Globus's testimony show that he did not adequately convey that addiction and depression were uncontrollable diseases that weighed in favor of leniency. For example, one asked about the percentage of people who return to drugs after choosing to seek treatment, and another asked: "To what degree is a pathological lack of personal responsibility contributory to substance abuse and/or addiction?" (Tr. Apr. 25, 2006 at 102–03.) At the end of his final day of testimony, the jury asked: "Do people suffering from depression typically act irresponsibly and/or fail to be accountable for their actions?" and "Can a person with depression still act within the legal constraints of society, without treatment?" (Tr. May 8, 2006 p.m. at 49–51.) To the last question, he answered: "most do." (Tr. May 8, 2006 p.m. at 51.) His answers were inadequate, failing to humanize Kiles and make a case for leniency.

Dr. Gaughan: Counsel next called Dr. Gaughan, another psychiatrist. (Tr. May 9, 2006 at 4.) Again, his testimony was framed around a theme of a history of "violence" and "drug problems." (*E.g.*, Tr. May 9, 2006 a.m. at 17–18.) The gap in time between his evaluation in 2003 and his testimony, and counsel's failure to prepare him, came out as well—he could not recall whether he had reviewed Kiles's father's military records: "You know, at this point, I don't remember. I will be guessing that's true." (*E.g.*, Tr. May 9, 2006 a.m. at 19.)

Dr. Hart: When Mayberry first contacted Dr. Hart, he indicated that he did not fully stand behind the affidavit that the first state post-conviction counsel had prepared for him. VanDreumel appears to have not followed up on this concern. As a result, when testifying, Dr. Hart told the jury that he had not written the affidavit and that the prior lawyers had "put the grind on" him to sign it. (Tr. May 9, 2006 p.m. at 82.) And, he enthusiastically agreed with the State's theory on cross-examination: that it had been Kiles's choice to use substances, despite knowing that

253

1   drinking caused him to be violent, stating: "Yes, the childhood then could have been

2   abusive, but it doesn't change the fact that he understood that if he used drugs he

3   became violent." (Tr. May 9, 2006 p.m. at 81–82.) He also undercut the defense

4   theory that Kiles suffered from PTSD when he stated that science said it had to

5   result from a single event, and he expressed during cross-examination that he shared

6   the prosecutor's doubts about Kiles having been abused as a child. (Tr. May 9, 2006

7   p.m. at 79–81.)

8        Dr. Cunningham: Dr. Cunningham testified for two-and-a-half days. While

9   his testimony covered important information for the jury to hear and presented a

10  broad scope of Kiles's life and family history, it was largely focused on Department

11  of Justice ("DOJ") studies on the causes of criminal violence. (Tr. May 10, 2006 at

12  20.) Thus, instead of explaining how Kiles's trauma experiences and genetic

13  dispositions left him mentally ill, brain-damaged, and struggling to overcome his

14  resulting addiction, his testimony instead told the jury how Kiles ended up a violent

15  person with "bad outcomes:" "psychological disorder, victimized relationships,

16  drug dependency, criminal activity." (Tr. May 10, 2006 at 37.) While Dr.

17  Cunningham discussed risk factors and adverse developmental factors that shaped

18  Kiles, and how trauma shapes a person throughout his life, the complete picture

19  painted was that Kiles was a violent person who was not deserving of leniency. (*See*

20  Tr. May 10, 2006 at 93–106, 135.) Counsel's questions were framed in terms of

21  violence and further supported this picture. (*See, e.g.,* Tr. May 10, 2006 at 85.)

22       Further, VanDreumel's failure to adequately Dr. Cunningham led her to elicit

23  testimony that seemed to suggest a connection between race and violence. At trial,

24  Dr. Cunningham referenced a series of studies. One looked at delinquency rates in

25  three Washington, D.C. neighborhoods, and reported that in these neighborhoods,

26  80% of young men are "actively involved in criminal activity." (Tr. May 11, 2006

27  at 15.) He continued on to reference a NAACP study that, "at any given point in

28  time in Washington, D.C. or Baltimore, about half of the black males are in the

254

criminal justice system." (Tr. May 11, 2006 at 16.) He also cited a study that found that the rate of homicide among black males 18 to 24 is "about 30 times greater" than in the population as a whole. (Tr. May 11, 2006 at 17.) While Dr. Cunningham tried to explain that it is "not about race. It isn't being black that creates that issue," he failed. (Tr. May 11, 2006 at 16–17.) A juror submitted a question asking how Yuma could be compared to Washington, D.C., which the juror wrote was 99% black and had the highest crime rate in the nation.[140] (Tr. May 11, 2006 at 88.) Race was on the jurors' minds, and Dr. Cunningham was raising questions in at least some jurors' minds on the connection between race and violent crime. *Cf. Buck v. Davis*, 137 S. Ct. 759, 775 (2017) (finding ineffective assistance where capital-defense counsel called an expert who presented evidence that African-American client's race increased his risk of being a continuing threat to society, reasoning that "race [is] among factors that are 'constitutionally impermissible or totally irrelevant to the sentencing process'" (quoting *Stephens*, 462 U.S. at 885) and further that "[n]o competent defense attorney would introduce [racially prejudicial] evidence about his own client"). VanDreumel's elicitation of this troubling testimony amounts to ineffective assistance.

Had counsel conducted an adequate mitigation investigation, consulted with the necessary experts, and provided their experts with proper information, they could have presented Kiles to the jury as described above, in section B: a seriously impaired man, who suffered brain damage as the result of being hit by a car as a child, with mental illness that he inherited from his parents, all of which was compounded by childhood trauma of being raised in a terrifying and chaotic home with parents and a sister who abused him as the result of their own mental illness,

---

[140] In responding to the jury question, Dr. Cunningham again said that "black overrepresentation in criminality and violence" was not because of race. (Tr. May 11, 2006 at 90–91.) He then added that most of the homicides among African-American men were because "[t]hey're killing their own." (Tr. May 11, 2006 at 92.)

substance addictions, and an intergenerational history of trauma. The jury could have learned that despite his life-long efforts to escape and project a veneer of normalcy, Kiles was ultimately unable to overcome his limitations, overcome his addictions, or escape the traumatic family dynamic that had shaped his life. Counsel failed to conduct sufficient investigation and engage in sufficient preparation to ensure that the experts could "present and explain the significance of all available mitigating evidence." *Correll*, 539 F.3d at 942.

Instead, based on the inadequate investigation, counsel arrived at an incoherent and ultimately harmful theme of mitigation: that Kiles was violent as a result of his violent parents and his drug abuse. Kiles's traumatic childhood was framed as the reason why Kiles was violent, not why he was a mentally ill individual, warranting leniency. His substance use was similarly framed as the reason he became aggressive and violent before and leading up to the crime, instead of being framed as a disease that, when compounded with his brain damage, seriously impaired him.

This was the mitigation VanDreumel offered the jury to request leniency for the premeditated murder by bludgeoning. These errors were only compounded by counsel's incompetent handling of the State's rebuttal evidence.

### 5. Counsel provided ineffective assistance in failing to adequately investigate and address the State's evidence and arguments in mitigation rebuttal.

The State hired John Scialli, M.D., a psychiatrist, and John Moran, Ph.D., a clinical psychologist, who then interviewed Kiles together in 2003. (Tr. May 16, 2006 at 16, 19.) Defense counsel failed to investigate these experts and the validity of their test results and reports, resulting in a failure to object to their improper testimony, an inadequate cross-examination, and a failure to properly prepare defense's own witnesses to rebut the state's witnesses.

While the only statutory limit on the State's rebuttal evidence at the mitigation phase is that it must be "relevant" to the mitigation, the rebuttal evidence

1    is also constrained by the Due Process Clause of the Fourteenth Amendment. *State*

2    *v. Hampton*, 140 P.3d 950, 962 (Ariz. 2006); *see also Gardner v. Florida*, 430 U.S.

3    349, 358 (1977) (plurality opinion) ("the sentencing process . . . must satisfy the

4    requirements of the Due Process clause"). "Trial courts should not allow the penalty

5    phase to devolve into a limitless and standardless assault on the defendant's

6    character and history." *Hampton*, 140 P.3d at 963. Further, trial counsel had a duty

7    under the Sixth Amendment to test the State's case by adequately cross-examining

8    the State's witnesses on points critical to the defense. *See Crawford v. Washington*,

9    541 U.S. 36, 61 (2004) (recognizing the "testing [of evidence] in the crucible of

10   cross-examination" as central to the constitutional guarantee of reliability).

11          To discharge their duty to provide effective assistance, counsel should have

12   been present at the experts' interviews of Kiles, interviewed the experts,

13   investigated the experts' opinions and the bases for their conclusions, and objected

14   to the experts' testimony. *Tucker*, 716 F.2d at 581 ("Pretrial investigation and

15   preparation are the keys to effective representation of counsel. Courts have

16   repeatedly stressed the importance of . . . interviewing of important witnesses.");

17   *see also* 2003 ABA Guideline 10.11 cmt. ("[c]ounsel should also object to and be

18   prepared to rebut arguments that improperly minimize the significance of

19   mitigating evidence").

20          However, VanDreumel was not present when the State's experts interviewed

21   Kiles, despite Dr. Scialli's testimony that counsel could have attended and he often

22   did interviews with defense counsel present. (Tr. May 16, 2006 at 22.)

23   Compounding this error, counsel failed to interview the State's experts in advance

24   of trial, despite being permitted to do so.[141] *See* Ariz. R. Crim. P. 14.1(b)(1);

25   15.3(a)(2). VanDreumel also failed to adequately investigate how to undercut the

26   State's rebuttal evidence. *See* 2003 ABA Guideline 10.11 cmt. Instead, counsel sat

27   _____

28   [141] In contrast, the State interviewed many of the defense experts before trial.

257

1    idly while the jurors heard the following inadequately challenged evidence that

2    shaped their decision:

3        <u>Dr. Scialli</u>: In a full day's worth of testimony, Dr. Scialli gave misleading

4    testimony on Kiles's childhood abuse and his family's histories of mental illness

5    and addiction. (*E.g.*, Tr. May 16, 2006 at 27–30.) He minimized Kiles's struggles

6    in school and his neurological impairments. (Tr. May 16, 2006 at 28.) He

7    characterized Kiles as a violent person who was not impulsive but instead felt a

8    need to hurt others as retribution for perceived transgressions. (Tr. May 16, 2006 at

9    33–36.) He diagnosed Kiles with ASPD and attributed many mitigating factors,

10   including Kiles's impulsivity and his genetic predisposition to alcoholism, to

11   ASPD.[142] (Tr. May 16, 2006 at 40, 44, 56.)

12       VanDreumel failed to object when Dr. Scialli testified on topics he was

13   unqualified to discuss. For example, he testified that Kiles did not have Fetal

14   Alcohol Syndrome ("FAS"), because such a diagnosis requires a low birth weight.

15   (Tr. May 16, 2006 at 38.) This was false. Still, counsel neither objected to Dr. Scialli

16   testifying outside his expertise nor cross-examined Dr. Scialli on the matter.[143]

17   Relatedly, counsel failed to impeach Dr. Scialli when his testimony differed from

18   his report. For example, Dr. Scialli testified that Kiles did not have PTSD because

19   he did not have symptoms such as "vigilance," and he had not experienced any

20   precipitating event like threatened death. (Tr. May 16, 2006 at 51.) However, he

21   wrote in his report that, as a result of Kiles's parents' violence, Kiles was "vigilant"

22   and a "sentry," and that Kiles was shot at multiple times in his youth. Counsel failed

23   ────────────

24   [142] Counsel should have objected to the prosecutor's misconduct during his
     examination. For example, when Dr. Scialli could not answer a question about

25   Kiles's parents' substance abuse, Powell answered his own question. (Tr. May 16,
     2006 at 29.) Counsel also failed to object when the State asked questions in a

26   leading and prejudicial manner. For example, Powell asked Dr. Scialli: "Doctor,
     tell us about the defendant's progression of violence." (Tr. May 16, 2006 at 30.)

27

28   [143] Powell referenced this specific testimony in closing and highlighted that it came
     from a "doctor." (Tr. May 22, 2006 at 72.) *See* Claim 9, *infra*.

258

to point out this obvious inconsistency in testimony in cross-examination. (Tr. May 16, 2006 at 72–130.)

Dr. Scialli also provided damaging testimony dismissing the genetic component of substance and alcohol addiction and, instead, suggested that addiction can be attributed to ASPD. (Tr. May 16, 2006 at 43–44.) He emphasized that even for an alcoholic, the decision to drink is a choice. (Tr. May 16, 2006 at 47.) While counsel attempted to cross-examine Dr. Scialli on this issue, counsel did not call or recall a witness, such as an FAS expert or a substance-abuse expert, to rebut Dr. Scialli's harmful and false claims. Counsel contacted Dr. Cunningham after Dr. Scialli's testimony to ask about the link between genetics and non-alcohol substance abuse, and the expert provided scientific studies that rebutted Dr. Scialli's conclusions, but by that time it was too late to cross-examine Dr. Scialli with the information. She did not recall Dr. Cunningham to the stand.

Through Dr. Scialli, the State propounded its theory that Kiles was a violent person with ASPD who sought to inflict violence on anyone who he perceived as slighting him. (Tr. May 16, 2006 at 32–36.) Powell finished his direct examination of Dr. Scialli by returning to his theme of choice: He asked if Kiles's substance addiction "in any way negated his ability to make choices" including on the night of the crime. Dr. Scialli answered no. (Tr. May 16, 2006 at 71.) Counsel did not object, allowing the jury to believe that relevant mitigation was limited to that with a casual nexus to the crime or that which proved the statutory (G)(1) mitigator. [144]

Dr. Moran: During his day-long testimony, Dr. Moran mainly read aloud the

_____

[144] A.R.S. § 13-703(G)(1) (renumbered § 13-751(G)(1)) provided that the sentencer "shall consider as mitigation" that the "defendant's capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution." VanDreumel was ineffective for failing to allege this as a mitigating factor. There was no justification for completely foreclosing this avenue. A wealth of information, of which VanDreumel was aware, supported a "(G)(1)" finding in this case, including Kiles's mental impairments, brain damage, mental illness, and intoxication. However, VanDreumel did not allege any statutory mitigators.

1   results of the Millon Clinical Multiaxial Inventory-III ("MCMI") test, which he
2   used to diagnose Kiles with ASPD. (Tr. May 17, 2006 at 4–57.)

3       The MCMI was widely discredited as a mental-health assessment by the time
4   of trial. It is not a diagnostic measure of mental disorders, nor does it formally
5   evaluate the DSM criteria for psychiatric diagnoses. *See* Richard Rogers, *Forensic*
6   *Use and Abuse of Psychological Tests: Multiscale Inventories*, 9(4) Journal of
7   Psychiatric Practice 316, 319 (2003) (hereinafter "*Rogers*").[145] The MCMI is
8   particularly unreliable in a forensic context, because there is no "normal" reference
9   group and the test "exaggerates an individual's psychopathology." Gerald Young,
10  et. al., *Causality of Psychological Injury: Presenting Evidence in Court*, Springer
11  (2007) ("In forensic work, in contrast, the exaggeration can make a 'normal'
12  individual appear psychologically pathological.") Most importantly, "MCMI-III
13  scales cannot be used to diagnose DSM-IV personality disorders; the test may
14  generate errors in about 80% of diagnosed cases." *Rogers* at 319. Experts have
15  pointed to the diagnosis of ASPD as an improper use of the MCMI: "Should
16  elevations on these scales–even marked ones—be seen as evidence of antisocial
17  personality disorder? The answer is *definitely not*." *Rogers* at 319–20. Courts have
18  forbidden the use of the MMPI, a similar multiscale inventory, because of the
19  "inadequacy of the correlation factors and the validity factors." *Usher v. Lakewood*
20  *Engineering & Mfg. Co.*, 158 F.R.D. 411, 413 (N.D. Ill. 1994.) All of this was
21  known for years before the penalty phase; however, counsel inexplicably failed to
22  object to the use of the tests, and to Dr. Moran's testimony about the substance of
23  his results. (*See* Tr. May 17, 2006.) She failed to offer any expert to rebut it.

---

24
25  [145] Multi-scale inventories like the MCMI are sometimes referred to as "objective
    tests" because answers are input into a testing service, which spits out a series of
26  potentially responsive answers. However, "the term 'objective tests' is a
    misnomer. . . . Although the scoring is objective, the interpretation is not." *Rogers*
27  at 316. The clinician chooses from multiple set interpretations; this leads to cherry-
    picking and confirmation-bias errors, which Dr. Moran did. (Tr. May 17, 2006 at
28  23 ("I included in the report only information that I thought was confirmed.").)

260

Dr. Moran's resulting testimony was highly damaging, painting a picture of Kiles as someone who exploited others and who did not think that rules applied to him. (Tr. May 17, 2006 at 26.) Beyond diagnosing Kiles with ASPD, Dr. Moran expanded on the MCMI results without support, noting for example that "[t]he highest elevation on [Kiles's] Millon is sadism. And sadism is a person who derives pleasure from inflicting pain or humiliation." (Tr. May 17, 2006 at 29.) He further testified that

> So he's an impulsive person who instead of taking responsibility and saying I shouldn't get angry, I have to find some way of approaching this that's polite and acceptable and constructive, he's like I'm angry. It's okay if I express it I think because he felt that he was entitled, he had some special entitlement to be the person that he was. . . . And that he's, you know, he's a dangerous person because of that sadistic quality and because of the fact he doesn't feel empathy.

(Tr. May 17, 2006 at 30.) Counsel did not object to Dr. Moran's "explanation" of the already-invalid MCMI results, which were pure speculation. Counsel also did not object when Dr. Moran used the MCMI results to rebut the concept of mitigation in general: "So again, we're looking at his way of thinking. Is he taking personal responsibility or is he saying I behaved badly because of things that happened to me or because people mistreated me." (Tr. May 17, 2006 at 28–29); *see also* 2003 ABA Guideline 10.11 cmt. n.315 (noting that counsel should object on Eighth Amendment grounds to rebuttal testimony that seeks to nullify virtually all mitigation evidence).

Rather than framing Kiles's substance addiction as an illness, Dr. Moran used it as an example of his belief that the rules did not apply to him. He explained it as a method which Kiles used to relieve himself of the guilt he normally felt about discharging his hostile impulses, which Dr. Moran summed up as: "instant A-hole, just add alcohol." (Tr. May 17, 2006 at 33–34.) Still, VanDreumel did not object.

During cross-examination, VanDreumel neglected to confront Dr. Moran

261

1    with the well-established problems with the MCMI, the basis of hours of disastrous

2    testimony. *See Driscoll v. Delo*, 71 F.3d 701, 709 (8th Cir. 1995) (even when

3    defense counsel elicited a concession from state expert, counsel was deficient for

4    having failed to take measures to understand the testing performed and the meaning

5    of the results). While she got Dr. Moran to say that the results of the MCMI testing

6    only "probably" applied to Kiles (Tr. May 17, 2006 at 64), that hardly sufficed to

7    counteract the damage.

8          Dr. Moran testified next about another inapplicable and speculative test,

9    which he said could be used to predict future violent behavior: the Violence Risk

10   Assessment Guide ("VRAG"). (Tr. May 17, 2006 at 48.) The VRAG was not in Dr.

11   Moran's report, and on this basis alone, counsel should have objected to Dr.

12   Moran's testimony. Moreover, the VRAG was both widely criticized and

13   inapplicable to Kiles. *See* Daryl G. Kroner, *A Coffee Can, factor analysis, and*

14   *prediction of antisocial behavior: The structure of criminal risk*, Internat'l J.L. &

15   Psychiatry, 28(4), 360–74 (2005) (finding that the VRAG did not predict post-

16   release failure better than randomly-generated instruments); *See* John M. Fabian, *A*

17   *Literature Review of the Utility of Selected Violence and Sexual Violence Risk*

18   *Assessment Instruments,* J. Psychiatry & L., 34(3), 307–50 (2006) (explaining that

19   the VRAG was meant to measure short-term, low-risk offenders' risk of

20   reoffending when released from secure confinement, not to measure the risk of

21   reoffending in a high-security prison). The State wielded the VRAG to rebut Dr.

22   Cunningham's testimony on Kiles's upbringing and Aiken's testimony on his

23   likelihood of future lack of violence in prison. (Tr. May 17, 2006 at 53–54.)

24         Powell concluded his direct examination by having Dr. Moran testify that

25   Kiles was able to make the choice to stop drinking, and that none of the factors that

26   the mental-health experts on both sides had identified—including Kiles's

27   childhood, substance abuse, and ASPD—negated Kiles's ability to make choices

28   the night of the crime. (Tr. May 17, 2006 at 55–56.) Counsel should have objected

to the State's continued effort to mischaracterize the nature of the mitigation at issue and to mislead the jury that a causal nexus was required.

VanDreumel had Dr. Moran's report, which indicated that he was going to discuss the MCMI, in 2003, years ahead of trial. Still, counsel did not make any attempt to investigate its validity with the help of experts, and she did not prepare defense experts to rebut it in advance. She did not try to prevent the use of invalidated testing, she did not interview Dr. Moran before he testified, and she did not object to this testimony at trial. The 2003 ABA Guidelines obligate counsel to "consider witnesses familiar with and evidence . . . that . . . would rebut or explain evidence presented by the prosecutor" and "expert and lay witnesses along with supporting documentation . . . to rebut or explain evidence presented by the prosecutor." 2003 ABA Guideline 10.11(F)(1),(2). There is no evidence that it was a strategic decision to conduct at most a perfunctory investigation of the State's experts and their reports. Counsel's failure was deficient.

Dr. Scialli and Dr. Moran reframed and mischaracterized Kiles's mitigation evidence to portray him as a violent, anti-social pleasure-seeker who sought to get high and hurt people, instead of a man with a constellation of impairments including substance addiction, whose traumatic abuse was crushingly formative. Each testified for a whole day, stating unsupported conclusions that painted Kiles as a monster, with the imprimatur of expertise. They used subjective, irrelevant tests to discredit the already disjointed mitigation evidence Kiles's counsel presented, minimizing Kiles's impairments and psychological trauma to support the narrative that Kiles was undeserving of leniency.

Had counsel objected to this testimony before it was introduced, or objected to the State's experts' testing measures, there is a probability the jury never would have heard any of this damaging evidence. Moreover, counsel should have prepared, and recalled, if necessary, defense experts to rebut the invalid testing and

263

1    conclusions of the State's witnesses.[146] It was imperative that counsel at least recall

2    Dr. Cunningham to explain to the jury that ASPD and the effects of trauma and

3    mental illness are often conflated, as well as that substance addiction is not a choice.

4    But counsel did not. Instead, the last testimony the jurors heard before determining

5    whether Kiles should live or die was two full days of the State's inflammatory,

6    unsubstantiated, and largely unchallenged witnesses. Had counsel performed

7    adequately, it would have substantially "altered the sentencing profile presented"

8    to the jury, *Strickland*, 466 U.S. at 700, and there is a reasonable probability that at

9    least one juror would have voted for life. *See Bemore*, 788 F.3d at 1176.

10          **6.    Counsel's mitigation-phase closing argument constituted**
                  **deficient performance that prejudiced Kiles.**

11

12          Competent counsel must "take advantage of all appropriate opportunities to

13   argue why death is not [a] suitable punishment for their particular client." 2003

14   ABA Guideline 10.11(L). There is perhaps no more important moment to fulfill this

15   obligation than closing argument. "The right to effective assistance extends to

16   closing arguments. . . . Closing arguments should 'sharpen and clarify the issues for

17   resolution by the trier of fact. . . .'" *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003)

18   (citation omitted) (quoting *Herring v. New York*, 422 U.S. 853, 862 (1975)); *see*

19   *also Strickland*, 466 U.S. at 669.

20          However, VanDreumel failed to use this critical opportunity and performed

21   deficiently. VanDreumel failed to argue that there was mitigation to warrant

22   leniency for all three crimes for which Kiles faced death. Instead, she spent an

23   inordinate amount of the closing arguing the circumstances supporting residual

24   doubt that Kiles was responsible for the deaths of the two child victims. (Tr. May

25   22, 2006 at 48–56, 76–77.) That this affected the jury is clear given that the jury

26   ─────────────────────

27   [146] For example, counsel could have presented expert testimony explaining that the
     DSM-IV-TR requires that, to diagnose any personality disorder, the underlying
28   behavior cannot be due to the effect of a medical condition such as head trauma.
     DSM IV-TR at 630. Brain imaging evidence would have addressed this as well.

264

1   sentenced Kiles to death for the adult victim, but failed to reach a verdict on the two
2   child victims—surely an unusual result. Despite not receiving death on two counts,
3   Kiles was still sentenced to death at the end of the mitigation phase. Counsel failed
4   to make the case for life with respect to all three counts.

5        Instead of making the case for life, VanDreumel continued to push the
6   narrative that everything in Kiles's life had made Kiles inherently and inevitably
7   violent. She argued that, based on Kiles's life, "subsequent violence should not
8   surprise anybody in here," and that abused children "are more likely to be arrested
9   as juveniles and adults for violent crime." (Tr. May 22, 2006 at 31, 32.) She asked:
10  "Does it surprise anybody that Alvie's crime was a crime of domestic violence?"
11  (Tr. May 22, 2006 at 40.) In addition to repeating that Kiles was violent, framing
12  the crime as domestic violence was confusing, as the crime had not been presented
13  that way—indeed, this contradicted the defense's theory that this was an impulsive
14  crime, and not based on the patterns inherent in domestic violence. This was
15  particularly damaging given that one of the jurors had written extensively on his
16  questionnaire that his father had murdered his mother, a "victim of domestic
17  violence." Counsel magnified the error later by again later characterizing the crime
18  as "horrific domestic violence committed by Alvie." (Tr. May 22, 2006 at 43.)

19       VanDreumel minimized Kiles's serious mental illness, neurological
20  impairments, brain dysfunction, and addiction as "mental health problems,
21  educational difficulties, alcohol and drug abuse." (Tr. May 22, 2006 at 32.) She
22  repeatedly described his addiction as "drinking and drugging." (Tr. May 22, 2006
23  at 41.) VanDreumel asked: "Did Alvie drink to self-medicate to quash the
24  depression? Don't know. That's one of the reasons people use drugs." (Tr. May 22,
25  2006 at 81.) This failed to sharpen the issues for consideration and contradicted the
26  testimony of defense experts, further confusing the issues. Instead of framing
27  cocaine's effect as mental impairment, counsel framed it as: "cocaine causes
28  aggression. Cocaine causes hostility. Cocaine causes impulsivity." (Tr. May 22,

1   2006 at 34.) Counsel needlessly highlighted to the jurors an image of Kiles as a

2   violent, aggressive man.

3       VanDreumel highlighted inconsistencies in defense experts' testimony,

4   listing all of their diagnoses on large sheets of paper, despite the fact that some had

5   directly contradicted each other, noting "you know, for the most part, all of the

6   doctors agree, even the State's doctors." (Tr. May 22, 2006 at 33.) She inherently

7   highlighted the lack of consensus. The bottom line, she said, was that "Alvie acts

8   impulsively" (Tr. May 22, 2006 at 34), and not that Kiles was neurologically

9   impaired, brain-damaged, or mentally ill.[147] (Tr. May 22, 2006 at 31.)

10      Moreover, VanDreumel early in her closing repeated the State's greatest

11  theme: that Kiles "had a choice, he chose drugs, he could have just stopped." (Tr.

12  May 22, 2006 at 28.) She further argued that she had no "quarrel" with the State's

13  diagnoses, despite the extended time she spent eliciting testimony from her own

14  witnesses that Kiles did not have ASPD, and despite the State's inflammatory,

15  damaging testimony that included for example, that Kiles was a sadist. (Tr. May

16  22, 2006 at 38; Tr. May 17, 2006 at 29.) After she effectively conceded the State's

17  damaging diagnoses, she next argued that the only question was how he ended up

18  that way. This was not going to convince any juror that leniency was warranted.

19      Had Kiles's counsel offered the jury some explanation as to how Kiles's

20  mitigation warranted leniency, there is a reasonable probability that the outcome of

21  the proceeding would have been different. *See Smith v. Spisak*, 558 U.S. 139, 155

22  (2010) (recognizing the importance of having fresh in jurors' minds the connection

23  between mitigating circumstances and the crimes). Had VanDreumel focused on

24  why leniency was warranted for all three convictions, or had she not undermined

25  _____

26  [147] Counsel made odd arguments based on race to try to explain why Kiles had not
    been forthcoming about his traumatic childhood: "And don't even think about
27  speaking badly about your parents if you are black because there is a real loyalty
    there. It is embedded in the culture. Did it take this trial for us to learn that?" (Tr.
28  May 22, 2006 at 39.)

her own presentation by framing Kiles as a violent person lacking morality, there is a reasonable probability that the outcome of the proceeding would have been different. Kiles was thus prejudiced by counsel's deficient performance at closing argument. *See Strickland*, 466 U.S. at 669.

> **7.** **Counsel provided ineffective assistance when she failed to object to numerous aspects of the State's closing argument.**

Trial counsel failed to object during the State's closing argument to several instances of misconduct. *See* Claim 9, *infra.*

The purpose of closing argument "is to explain to the jury what it has to decide and what evidence is relevant to its decision." *Sandoval v. Calderon*, 241 F.3d 765, 776 (9th Cir. 2000). Arguments that frustrate this purpose are improper. *Id.* When a prosecutor crosses the line of permissible advocacy, a defendant relies on his attorney to challenge the misconduct and seek corrective action, by objecting, urging curative or limiting instructions, or seeking a mistrial. *See Zapata v. Vasquez,* 788 F.3d 1106, 1116 (9th Cir. 2015) (finding ineffective assistance for failing to object to prosecutor's closing). Counsel's decision to sit idly during the prosecutor's misconduct was unreasonable.

Most egregiously, the prosecutor urged jurors to disregard the law and the Constitution's requirements. Noting that the instructions permitted the jurors to sentence Kiles to life based on mercy without finding any specific mitigation proven, Powell argued "that might be the law, but is that justice? Is that right?" (Tr. May 22, 2006 at 75.)

Additionally, the prosecutor misled the jury on the law. For example, he argued that, while he agreed that childhood trauma affects adult behavior and that substance use affects people, it only affects moral culpability "when it takes away volition, when a person cannot control, when it's to that degree or to that extent." (Tr. May 22, 2006 at 58.) The State argued throughout its closing that Kiles retained the ability to make choices, and so, leniency was not warranted. For example,

267

1    Powell argued that, even if Kiles did suffer child abuse, the jury had to decide "the

2    grade agent, how much is there, if it was really so bad that it took away his ability

3    to make choices, to make proper choices." (Tr. May 22, 2006 at 73–74; *see also* Tr.

4    May 22, 2006 at 58–59, 71.) This implied that the jury could only consider

5    mitigation evidence if it rendered a defendant incapable of volition or if it had a

6    causal connection to the crime.[148] The Supreme Court has repeatedly held this is

7    unconstitutional. *See, e.g.*, *Tennard v. Dretke*, 542 U.S. 274, 284–87 (2004).

8            The prosecutor also argued non-statutory aggravating factors and urged

9    jurors to consider mitigation evidence as aggravation, in violation of the Due

10   Process Clause. *See* A.R.S. § 13-703(F) (1988). For example, the State argued that

11   Kiles's model behavior in prison should weigh against him, as it showed he could

12   do the right thing when he wanted to. (Tr. May 22, 2006 at 59, 61.) The prosecutor

13   told the jury to consider the victims, as "we have aggravation as well as mitigation."

14   (Tr. May 22, 2006 at 75.) This was improper. *See Humphries v. Ozmint*, 397 F.3d

15   206, 235 (4th Cir. 2005) (Wilkinson, C.J., dissenting) (arguing to overturn a death

16   sentence where the State urged the jury to weigh the victim's life against the

17   defendant's, as "[n]o person should be executed in America on the theory that his

18   life is of less worth than that of someone else.").

19           The prosecutor also misrepresented the evidence in order to mislead the jury.

20   *See Darden v. Wainwright*, 477 U.S. 168, 181–82 (1986); *see also Berger*, 295 U.S.

21   at 88 (prosecutor's improper suggestions "are apt to carry much weight against the

22   accused when they should properly carry none"). For example, Powell emphasized

23   that Dr. Scialli testified that one has to have low birth weight to be diagnosed with

---

25   [148] The Ninth Circuit has held that Arizona's use of a causal-nexus test was contrary
26   to clearly established federal law. *McKinney v. Ryan*, 813 F.3d 798, 821 (9th Cir.
     2015) (en banc). Although the Arizona courts paid lip service to *Tennard* at the time
27   of Kiles's penalty-phase, *see, e.g.*, S*tate v. Anderson,* 111 P.3d 369, 391 (Ariz.
     2005), the errors continued in part because prosecutors urged juries to give no
28   weight to mitigation evidence alleged not to have a causal nexus.

268

fetal "exposure or to have any type of syndrome or anything like that." (Tr. May 22, 2006 at 72.) Because Kiles did not have a low birth weight, "[w]e don't have anything there." (Tr. May 22, 2006 at 72.) This was false, as Dr. Scialli was specifically discussing FAS, not any of the related disorders. (Tr. May 16, 2006 at 37.) Dr. Cunningham and Dr. Gaughan made clear that FAS and fetal alcohol exposure are not the same thing and that Kiles had the latter. (Tr. May 9, 2006 a.m. at 40–41; Tr. May 15, 2006 at 38.) As another example, Powell stated that Kiles was never in special education or "anything like that," when Kiles had been placed in a vocational program in high school. (Tr. May 22, 2006 at 74.)

Further, the prosecutor stated that Kiles cut a man with a box-cutter "just because of a foul in a basketball game"—conveniently leaving out that the man had knocked out Kiles's teeth. (*Compare* Tr. May 22, 2006 at 61 *with* Tr. May 9, 2006 p.m. at 34.) He said that Kiles had assaulted his brother-in-law, but made no mention of the fact that Kiles was protecting his sister from a beating. (*Compare* Tr. May 22, 2006 at 62 *with* Tr. May 9, 2006 a.m. at 27.)

The prosecutor argued facts outside of the record when he told the jury a detail of the crime that was not in the evidence; it had come up only at Kiles's 1990 hearing. (Tr. May 22, 2006 at 63 (stating that Kiles took Gunnel's food stamps while she was in the shower); Tr. Feb. 7, 1990 at 133; PFR2 Dkt. 27 Ex. 23 at 2.)

The prosecutor improperly vouched for evidence presented at trial. *See United States v. Younger*, 398 F.3d 1179, 1190 (9th Cir. 2005). For example, he repeatedly used the term "we know" to describe a sequence of events that had not been proven. (Tr. May 22, 2006 at 64.) The Ninth Circuit has specifically cautioned: "We emphasize that prosecutors should not use 'we know' statements in closing argument." *Younger*, 398 F.3d at 1191.

Counsel also failed to object to Powell's improper inflammatory comments. S*ee Zapata*, 788 F.3d at 1114 (declaring inflammatory statements designed to appeal to jury's passions improper, and ineffective assistance where defense fails

269

1    to object). For example, the prosecutor told the jurors that life outside of prison was
2    "like a jungle for [Kiles]," relying on racist and prejudicial stereotypes. (Tr. May
3    22, 2006 at 61.) "The Constitution prohibits racially biased prosecutorial
4    arguments." *McCleskey v. Kemp*, 481 U.S. 279, 309 n.30 (1987). Additionally, the
5    prosecutor preyed on the jurors' fears, telling them that, if Kiles was not sentenced
6    to death and put in solitary confinement, he would be around other people and
7    "someone might touch him inappropriately. And who knows what will happen at
8    that time." (Tr. May 22, 2006 at 61.) This was misleading, as Kiles had not been on
9    death row in the eight prior years and had been a model inmate. (*E.g.,* Tr. Apr. 27,
10   2006 at 32.)

11       The prosecutor's misleading and prejudicial remarks prejudiced Kiles by
12   creating the risk that he was sentenced to death in an arbitrary and capricious
13   manner. *See Furman*, 408 U.S. at 274 (Brennan, J., concurring). Had trial counsel
14   objected and the trial court appropriately restrained the State, there is a reasonable
15   probability that the outcome of the sentencing proceeding would have been
16   different. The failure was also prejudicial because it limited appellate review to
17   independent review of the "propriety of the sentence." *See Kiles*, 213 P.3d at 187.

18       **8.    Counsel's deficient performance at the mitigation phase
19            prejudiced Kiles.**

20       As discussed above, defense counsel conducted a deficient mitigation
21   investigation. Had counsel adequately investigated and prepared for mitigation,
22   Kiles's jury would "have been faced with a strikingly different and more accurate
23   picture" of Kiles's life circumstances. *Hovey v. Ayers*, 458 F.3d 892, 927 (9th Cir.
24   2006). A defendant is prejudiced where there is a reasonable probability that at least
25   one juror would have been persuaded to vote for life by what could have been
26   presented in mitigation had counsel not performed deficiently. *See, e.g.*, *Sears*, 561
27   U.S. at 954–55.

28       In sum, because of counsel's insufficient investigation and unreasoned

270

1    decisions, the mitigation presentation consisted of two lay witnesses who did not

2    know Kiles well, but who suggested he had a fine childhood and was a well-

3    functioning individual; a member of the defense team who testified to second- and

4    third-hand information, and who gave the impression that no family member was

5    willing to testify on Kiles's behalf; multiple witnesses who testified that Kiles

6    behaved well in prison—which, when not given the appropriate neuropsychological

7    context, implied that Kiles could behave well when he chose to do so; mental-health

8    experts who failed to properly describe addiction as a disease and conveyed that

9    Kiles was violent; and Dr. Hart, who essentially testified for the State.

10         This was the mitigation VanDreumel offered the jury to request leniency for

11   the premeditated murder of Gunnel.

12         The State followed this ineffectual presentation by offering two full days of

13   testimony by experts who hammered that Kiles had ASPD and was a selfish, violent

14   person who enjoyed inflicting pain on others. They dismissed Kiles's serious

15   mental illness, childhood trauma, and substance addiction, instead attributing

16   everything to his ASPD and violent choices. Dr. Moran read from and expanded on

17   the baseless MCMI results as if they were fact. VanDreumel did not object to any

18   of this and failed to meaningfully cross-examine the State's experts, underscoring

19   the impression of validity.

20         VanDreumel herself focused on a theme of Kiles as an inherently violent and

21   aggressive individual with a quick temper, which she drove home in questioning

22   witnesses and in closing. (E.g., Tr. May 9, 2006 a.m. at 67–68; Tr. May 22, 2006 at

23   31, 38, 45.) She minimized his mental illness, substance addiction and childhood

24   trauma. Thus, she framed the question to the jury as whether this violent and

25   aggressive man (who may have become this way through no fault of his own, but

26   instead due to his family and how he was raised) warranted leniency. Had counsel

27   conducted an adequate investigation, the discussion at the mitigation phase would

28   not have been about a violent man, but a mentally ill man, struggling to overcome

lifelong trauma and substance addiction.

With an adequate mitigation investigation and testimony from a trauma expert, an addiction expert, and a brain-damage expert, the jury would have heard a properly contextualized mitigation story. These experts could have shown the jury how Kiles suffered brain damage, and explained how it impaired his ability to cope with the world around him. A substance-abuse expert could have explained the truth about addiction: it is a disease, not a choice, that over time damages a person's brain and ability to engage in impulse control and emotional regulation. A trauma expert could have explained how the instability and constant state of fear that Kiles experienced as a child—and the family dysfunction that continued throughout his life—shaped him and impaired his ability to respond to life's challenges. These experts could have explained how Kiles's organic brain damage, combined with his traumatic childhood and addiction, caused a number of deficits that seriously impaired his ability to cope with the world around him, despite his desperate efforts to overcome his limitations and make a better life for himself. A brain-damage expert, a substance-abuse expert and a trauma expert would have contextualized Kiles's brain damage, traumatic childhood and addiction and explained why these factors warranted leniency. These experts could have humanized Kiles as mentally ill man.

Further, an adequate investigation would have undercut key elements of the State's case. First, appropriate and adequately prepared experts would have been able to directly undercut the State's claims about Kiles's ASPD and the MCMI results. Further, the State would not have been able to hammer its point about the lack of concrete brain damage evidence. This would have provided a counterweight to the State's efforts to reframe the results of Kiles's mental illness, addiction, and life-shaping trauma as signs of a personality disorder. Additionally, it would have counteracted the State's claims that Kiles's mental-health and background-centered mitigation was all based on Kiles's self-report—which he had a motive to lie about.

272

(Tr. May 9, 2006 p.m. at 24, 26; Tr. May 15, 2006 at 27–29, 50; Tr. May 22, 2006 at 72.)

Had counsel provided effective assistance to Kiles, the question to the jury would not have been whether this violent man had the capacity to make choices, but instead whether a mentally ill man in the throes of addiction warranted mercy. Had Kiles's jury been presented with this more accurate picture, there is a reasonable probability that at last one of Kiles's jurors would have imposed a sentence less than death. *Hovey*, 458 F.3d at 927. This is especially true where the jury "ultimately return[ed] a death verdict [for one death] and a verdict of life without parole [for the other deaths]." *Bean*, 163 F.3d at 1081. Because counsel failed to present a variety of critical and compelling mitigation, counsel's error undermines confidence in the outcome of Kiles's mitigation-phase hearing.

**F.    Counsel provided ineffective assistance in failing to request a special verdict form listing which mitigating circumstances the jury found proven.**

Trial counsel performed deficiently and prejudiced Kiles when counsel failed to ask that the court use special verdict forms at the mitigation phase, which would have clarified what mitigating circumstances the jury found proven in imposing death. The Eighth and Fourteenth Amendments require states to provide a mechanism for meaningful direct review of death sentences. *Gregg v. Georgia*, 428 U.S. 153, 197–98 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.); *see also State v. Brewer*, 826 P.2d 783, 790 (Ariz. 1992). To achieve such meaningful review, "it is important that the record on appeal disclose to the reviewing court the considerations which motivated the death sentence in every case in which it is imposed." *Gardner*, 430 U.S. at 361 (plurality opinion). Arizona law helps to ensure meaningful review in non-capital cases, for which the court is required to state for the record the mitigating and aggravating factors it considers and applies when imposing any sentence other than the presumptive term. A.R.S. § 13-701(C); *State v. Harrison*, 985 P.2d 486 (Ariz. 1999). However, Arizona law fails to offer such

273

protections to capital defendants. Arizona's death-penalty statute does not require the jury to identify in its verdict form which mitigating circumstances individual jurors deemed proven. *See* A.R.S. § 13-701 (1988). Counsel must request that specific findings be made. Because Kiles's counsel did not make such a request, the verdict forms in Kiles's case reflect only the ultimate sentence the jury imposed for each first-degree murder conviction. (*See* ROA 919 at 1–3.)

As a result, when the Arizona Supreme Court conducted its independent review of the "aggravation, mitigation, and the propriety of the sentence" in Kiles's case, *Kiles*, 213 P.3d at 187, it did so without the benefit of knowing which mitigating circumstances jurors had found proven. In other words, the court conducted its appellate review without knowing the considerations that motivated the death sentence. That appellate review was not the meaningful review contemplated by *Gregg*. *See Gardner*, 430 U.S. at 361 (plurality opinion). That such a review—done without information on what informed the jury's decision—could not have been meaningful is especially true in this case, where the jury was asked to consider 30 mitigating circumstances and where the jury determined that death was the appropriate sentence on one count but that life imprisonment was appropriate for other counts. (*See* Tr. May 22, 2006 at 19–21; ROA 919 at 1–3.)

Counsel's failure to request special verdict forms indicating which mitigating circumstances the jurors had found proven deprived Kiles of an adequate appellate review and violated his rights under the Eighth and Fourteenth Amendments to the U.S. Constitution. Kiles was thus prejudiced by counsel's deficient performance.

**G.    Counsel were ineffective in failing to object to juror questionnaires and jury instructions that primed the jury to find that death was the appropriate sentence.**

The Eighth Amendment demands a heightened degree of "reliability in the determination that death is the appropriate punishment in a specific case." *Woodson*, 428 U.S. at 305. A sentencer must make an "*individualized* determination on the basis of the character of the individual and the circumstances of the crime."

274

*Stephens*, 462 U.S. at 879. Moreover, the Sixth Amendment requires that an independent and impartial jury, not a judge, make the requisite findings for a death sentence. *See Ring*, 536 U.S. at 609. Consequently, for a death sentence to pass constitutional muster, an independent jury must impose it after an individualized determination of the appropriate punishment.

Counsel provided ineffective assistance in failing to object to the juror questionnaires and the jury instructions on the grounds that they conditioned the jury to favor the death penalty. As a result, Kiles did not receive an independent or individualized jury sentencing.

From the first part of the penalty phase, jurors were given the impression that they needed to be comfortable with imposing death because their role was to sentence Kiles to death. In the questionnaire, 10 of the 67 questions were about the death penalty, whereas only two asked about a life sentence. Moreover, the questions implied that it was the jury's duty to impose the death penalty. For example, question 56 asked:

> Assume you are on a jury to determine the punishment for a defendant who has already been convicted of murder and the law gives you a choice of imposing death or life imprisonment with parole eligibility after 25 years. Please check the statement below that best describes your feelings. Check only one.

Jurors were given the following four options, all focused on the death penalty:

> (1) I cannot vote to give the death penalty under any circumstances.
>
> (2) I am opposed to the death penalty but could vote to impose it in a proper case.
>
> (3) My decision on whether to impose the death penalty would depend upon the facts and circumstances of the case.
>
> (4) I would vote to impose the death penalty in every case where I could.

The questionnaire did not frame the jurors' choice as one between life or death, but instead as among four different death-focused options. Through such questions, the

275

1    jurors were conditioned from the outset to view death as the default sentence,[149]

2    with no objection from trial counsel.

3         The mitigation-phase instructions similarly primed jurors to favor a death

4    sentence. The jurors received instructions at the beginning of the mitigation phase

5    and at the end, shortly before they began deliberations. (Tr. Apr. 24, 2006 at 4–10;

6    Tr. May 22, 2006 at 14–26.) The instructions made the desired end point clear from

7    the start, declaring that this was a "death penalty case[.]" (Tr. Apr. 24, 2006 at 7.)

8    The instructions stated that the jurors needed to decide "whether to *oppose* the death

9    penalty" and that "each juror may vote for death or against," again framing a

10   decision for a life sentence as a contrary or aberrant position. (Tr. Apr. 24, 2006 at

11   8–9 (emphasis added); Tr. May 22, 2006 at 23.) Further, the instructions framed the

12   question for the jurors as "whether to impose the death penalty" without providing

13   a sentence of life as the other, equal choice. (Tr. Apr. 24, 2006 at 9; Tr. May 22,

14   2006 at 23.) Life in prison was not presented as an equally appropriate sentence.

15        Both the preliminary and final mitigation-phase instructions included the

16   following particularly stark statement: "If your verdict is that the Defendant should

17   be sentenced to death, the Defendant will be sentenced to death. If your verdict is

18   that the Defendant should be sentenced to life, the Defendant will not be sentenced

19   to death and the Court will sentence the Defendant to life in prison." (Tr. Apr. 24,

20   2006 at 9–10; Tr. May 22, 2006 at 24.). Again, the instruction insinuated to the jury

21   that its duty was to impose death and that, should the jury abdicate that duty, then

22   the court would be forced to step in and sentence the defendant.

23        In acceding to such instructions, counsel allowed the sentencing jurors to be

24   given the impression that they had to act outside of the norm to impose a life

25   sentence. As a result, Kiles's sentencing jurors were primed to impose death,

26   instead of making an independent and individualized decision based on the facts of

27

28

[149] Given the importance of primacy in learning, this emphasis on the death penalty when the jurors were first introduced to the case would have had a profound effect.

276

his case. *See Hurst*, 136 S. Ct. at 624; *see also Ring*, 536 U.S. at 597. Counsel's failure to object to these instructions undermined Kiles's constitutional right to a reliable, individualized sentencing determination made by an unbiased jury; this failure amounts to deficient performance. Moreover, this failure prejudiced Kiles: had counsel objected to the instructions, there is a reasonable probability that the court would have reworded the instructions and that, in turn, at least one juror would have voted differently. Accordingly, Kiles's counsel were constitutionally ineffective with respect to the mitigation-phase instructions, and Kiles is entitled to sentencing relief.

**H.     The cumulative effect of trial counsel's many instances of deficient performance deprived Kiles of his right to counsel at the mitigation phase and resulted in an unreliable sentencing proceeding.**

While each instance of trial counsel's deficient performance prejudiced Kiles, the cumulative effect of those unreasonable missteps was particularly pronounced.

Even in a case in which error examined in isolation is not sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors can still require relief. *See Alcala v. Woodford*, 334 F.3d 862, 882–83 (9th Cir. 2003) (affirming grant of habeas relief on basis of cumulative effect of multiple errors by counsel); *Killian v. Poole*, 282 F.3d 1204, 1211 (9th Cir. 2002) (stating that the cumulative effect of errors may be so prejudicial as to require reversal); *Harris By & Through Ramseyer v. Wood*, 64 F.3d 1432, 1439 (9th Cir. 1995) (holding that the cumulative impact of numerous deficiencies in defense counsel's performance was prejudicial). Even if this Court finds that no single error caused prejudice, it nonetheless should apply cumulative error principles to grant relief. *See Boyde v. Brown*, 404 F.3d 1159, 1176 (9th Cir. 2005).

Counsel committed multiple errors during Kiles's mitigation proceeding. Even if this Court were to find that no single error merits relief, the cumulative

277

1    effect of all the errors is so prejudicial that Kiles is entitled to relief on that basis.

2    To the extent the post-conviction court declined to find cumulative error
3    because the Arizona state courts do not recognize the doctrine of cumulative
4    prejudice, its decision contravenes *Strickland*. See 28 U.S.C. § 2254(d); *see also*
5    *White*, 895 F.3d at 671 (holding that the Arizona post-conviction court erred by
6    separately addressing the prejudice arising from separate deficiencies at mitigation
7    phase and observing that "[t]he test is whether it is reasonably likely that the result
8    of the proceeding would have been different but for counsel's 'errors'" (quoting
9    *Strickland*, 466 U.S. at 694)).

10   Kiles's counsel's failure to object to Kiles being visibly physically restrained
11   and to ensure a complete record to protect Kiles's right to meaningful appellate
12   review compounded all of counsel's errors during the mitigation phase and
13   throughout trial. *See* Claim 3, *supra* and Claim 16, *infra*. Counsel's errors were
14   cumulatively so serious that they deprived him of "a trial whose result is reliable."
15   *Strickland*, 466 U.S. at 687. Had counsel provided effective assistance at the
16   mitigation phase and throughout trial, there is a reasonable probability that at least
17   one juror would have not have voted to impose death. *See Bemore*, 788 F.3d at
18   1176. This Court should find that, taken together, the multiple unreasonable actions
19   and errors of trial counsel warrant relief.

20   **I.    The state post-conviction court's decision that Kiles did not state
21          a colorable claim is no bar to this Court's de novo review of this
          claim.**

22   The state post-conviction court's reasoned decision on this claim, with
23   respect to counsel's failures in the mitigation phase of trial, including the failure to
24   present brain scans and evidence of intermittent explosive disorder, stated that Kiles
25   had shown neither deficient performance nor prejudice. (*See* ROA 1214 at 2.)

26   The state-court merits ruling on this claim is contrary to and/or an
27   unreasonable application of clearly established federal law for two distinct reasons.
28   *See* 28 U.S.C. § 2254(d)(1). As noted *supra*, Claim 3, the only standard the state

post-conviction court ever stated with respect to the prejudice prong of an ineffectiveness-of-counsel claim was an outcome-determinative standard: whether "the outcome would have been different." (ROA 1214 at 2.) That standard, however, is contrary to or an unreasonable application of the prejudice standard in *Strickland*. *See, e.g.*, *Thomas v. Clements*, 789 F.3d 760, 767–68 (7th Cir. 2015) (holding that the state court's "would have led to a different result" prejudice standard was an unreasonable application of *Strickland*); *Martin v. Grosshans*, 424 F.3d 588, 592 (7th Cir. 2005) (holding that the state court's prejudice inquiry— whether "the result of the proceeding would have been different"—was contrary to *Strickland*). Moreover, as noted earlier, the state court's failure to consider the cumulative effect of the prejudice from the various failures by trial counsel in the mitigation investigation and presentation was likewise an unreasonable application of or contrary to clearly established Supreme Court precedent. *See, e.g.*, *Strickland*, 466 U.S. at 694–95 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional *errors*, the result of the proceeding would have been different. . . . In making this [prejudice] determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury."); *Williams*, 529 U.S. at 397–98; *see also, supra*, Claim 3.

In addition, the ruling that there was no showing of deficient performance was an unreasonable application of *Strickland* and *Wiggins*, which unambiguously provide that unreasoned "decisions" based on an unreasonable investigation are afforded no deference. *See Strickland*, 466 U.S. at 688; *Wiggins*, 539 U.S. at 521. The Supreme Court has made clear that a state court must look beyond whether the mitigation presented supports a "superficially reasonable mitigation theory" and to the underlying investigation. *Sears*, 561 U.S. at 953–54.

To the extent that the state court made a determination of fact on this front, that too was unreasonable. *See* 28 U.S.C. § 2254(d)(2); *see also, e.g.*, *Taylor v. Maddox*, 366 F.3d 992, 999–1001 (9th Cir. 2004) (discussing ways in which

§ 2254(d)(2) can be satisfied). As the state-court record makes clear, counsel failed to investigate obvious lines of mitigation; failed to hire crucial experts who could investigate such lines of mitigation, including brain damage; failed to provide their own experts with critical information, failed to investigate the State's rebuttal experts and failed to develop a theory of mitigation that would persuade any jury that leniency was warranted. In light of this failure to investigate, counsel's choice to present no lay witnesses who knew Kiles well, to present no brain-damage expert or evidence of brain damage, to present no trauma expert or anyone who could properly explain and contextualize Kiles's traumatic upbringing, and to present a mitigation theory that centered on Kiles as a violent individual, among other errors, were necessarily deficient.

The finding of no prejudice was likewise unreasonable, both because the state court used the improper legal standard, as described above, but also because the state court—to the extent it made a factual finding—relied on an unreasonable determination under § 2254(d)(2). *See Taylor*, 366 F.3d at 1001 ("[W]here the state courts plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable."). Here, the state post-conviction court ignored the prejudice demonstrated by the totality of persuasive mitigation evidence that trial counsel could have presented had they conducted an adequate investigation and been able to present and explain the significance of all relevant mitigating evidence. The finding was thus unreasonable within the meaning of § 2254(d)(2). *See Williams,* 529 U.S. at 397–398; *Wiggins*, 539 U.S. at 536.

Because Kiles has satisfied § 2254(d), this Court's analysis is "unconstrained" by AEDPA deference.[150] *See Williams*, 529 U.S. at 405–06.

---

[150]Alternatively, Kiles alleges he can overcome any default by showing cause and prejudice attributable to the ineffective assistance of state post-conviction counsel.

280

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**J.     Conclusion**

For the reasons stated above, Kiles's counsel provided ineffective assistance at Kiles's mitigation phase, thereby prejudicing Kiles. The state-court decision is no bar to this Court's de novo review of this claim, and Kiles is entitled to relief.

**Claim Seven**

**The trial court's numerous errors during the guilt phase of trial violated Kiles's constitutional rights.**

The trial court committed numerous errors during Kiles's guilt phase, infringing upon his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution. Kiles incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

**A.     The trial court erred by not appointing qualified, un-conflicted counsel, violating Kiles's rights under the Sixth and Fourteenth Amendments.**

This claim was presented in Kiles's state post-conviction relief petition. (ROA 1189 at 10–18, 23–30.) The state post-conviction court denied the claim on the merits. (ROA 1214 at 1). For the reasons below, the state court's denial of this claim constituted an unreasonable application of clearly established federal law, 28 U.S.C. § 2254(d)(1), and an unreasonable determination of the facts, *id.* § 2254(d)(2). Accordingly, § 2254(d) places no limitation on relief, and this Court may review the exhausted claims de novo.

**1.     The trial court erred by failing to conduct an appropriate inquiry into counsel's conflicts.**

Kiles petitioned the trial court for appointment of un-conflicted counsel on numerous occasions. (*See* ROA 392 at 5; ROA 407 at 4; ROA 413 at 1–2; ROA 519 at 4; ROA 522 at 1–3; ROA 585 at 7.) There were two specific conflicts which the trial court was constitutionally required to address to ensure the Sixth

---

*See Martinez*, 566 U.S. at 9; *Strickland*, 466 U.S. at 688, 694.

281

Amendment right to counsel. *See Cuyler v. Sullivan*, 446 U.S. 335, 347 (1980). The first was the irrevocably fractured relationship between Kiles and Greg Clark, who was Kiles's lead counsel. The second was the conflict of interest with co-counsel, Treasure VanDreumel.[151] Clark hired VanDreumel to defend Clark's conduct as an attorney before the Arizona State Bar Association ("Bar"). (ROA 585 at 7.) At the same time, VanDreumel was representing Kiles while he was actively litigating Clark's ineffective assistance and conduct as an attorney in front of the Arizona Supreme Court and the Bar. (Tr. Jan. 7, 2002 at 68–69.) *See* Claim 1, *supra*. The court failed to address either, and as a result Kiles was deprived of his right to have effective assistance of counsel in violation of the Sixth Amendment.

Despite Kiles "alleg[ing] an actual conflict and adverse effect in sufficient and not implausible detail," the court failed to conduct more than perfunctory, superficial hearings on the truth of the allegations. *United States v. Hearst*, 638 F.2d 1190, 1195 (9th Cir. 1980). The first time Kiles requested new counsel, the court accused Kiles of trying to inject error into the proceedings.[152] (Tr. Jan. 22, 1999 at 14.) In another hearing, Kiles informed the court, "[i]f you keep Mr. Clark on my case, I don't know how he is going to be able to defend me because there is some things I need to tell my attorney, but I will not tell him." (Tr. Aug. 6, 1999 at 17.)

---

[151] There were two other issues which Kiles alerted the court to regarding counsel: (1) Clark was unqualified to be appointed as capital counsel under the Arizona Rules of Criminal Procedure, and (2) the contract structure under which both his attorneys were paid created a conflict of interest. *See* Claim 1, *supra*. As to the first, the trial court held a hearing about Clark's qualifications, but deemed him qualified partly based on misrepresentations by Clark. (Tr. Oct. 7, 1998 at 21.) And as to the second, the court decided that claim was best left for collateral review to determine whether a "plausible alternative defense strategy or tactic might have been pursued but was not" due to the attorneys' financial interests. *United States v. Wells*, 394 F.3d 725, 733 (9th Cir. 2005).

[152] Inexplicably, the court also believed that *because* Kiles was facing capital punishment, his attorney did not need to meet with him or have substantive communication with him. "Well, if this were a simple burglary case, I would have expected Mr. Clark to be down and have a heart-to-heart conversation with Mr. Kiles." (Tr. Jan. 22, 1999 at 10.)

282

1  The court failed to recognize the irreparable conflict between Kiles and Clark, and
2  instead held that Kiles to that point had not yet received ineffective assistance of
3  counsel. (Tr. Aug. 6, 1999 at 47.)

4       Often the court would choose to do whatever was most expedient rather than
5  consider Kiles's pleas for his right to counsel. For instance, when the conflict was
6  first raised, the court said, "I think if I appoint new counsel, we are going to be no
7  further ahead. In fact, we will be—in terms of time—we will be that much farther
8  behind." (Tr. Jan. 22, 1999 at 10.) This was nearly 18 months before Kiles's trial
9  began. And when Kiles alerted the court of the conflict under which VanDreumel
10 represented him, the court, without any reasoning, denied the request for un-
11 conflicted counsel. The court was clearly leaving the issue for appeal, as all he
12 stated as a basis for his denial was, "[W]e are making a record." (Tr. Jan. 7, 2002
13 at 70.) This was not a determination on the merits, as constitutionally required.
14 *Schell v. Witek*, 218 F.3d 1017, 1025 (9th Cir. 2000).

15      Therefore, the superficial hearings and cursory dismissals of Kiles's repeated
16 pleas fell well short of the trial court's duty to ensure Kiles's right to effective
17 representation.

18              **2.    The trial court erred by failing to appoint qualified,**
19                     **un-conflicted counsel.**

20      "[A] court confronted with and alerted to possible conflicts of interest must
21 take adequate steps to ascertain whether the conflicts warrant separate counsel."
22 *Wheat v. United States*, 486 U.S. 153, 160 (1988); *see also Holloway v. Arkansas*,
23 435 U.S. 475, 483–84 (1978); *Cuyler*, 446 U.S. at 347.

24      Under the Sixth Amendment's right to counsel, "a state trial court has no
25 discretion to ignore an indigent defendant's timely motion to relieve an appointed
26 attorney." *Schell*, 218 F.3d at 1025. Where there is a conflict, generally a court may
27 not resort to a concern about a delay in the proceedings in denying a request for
28 appointment of un-conflicted counsel. *See United States v. Moore*, 159 F.3d 1154,

283

1  1161 (9th Cir. 1998) (holding that if a request for un-conflicted counsel was not on

2  the eve of trial, a court may not dismiss such a request on the basis of meeting a

3  trial schedule or because to appoint new counsel would require a continuance).

4      The trial court here was continually "confronted with and alerted to possible

5  conflicts of interest." *Wheat*, 486 U.S. at 160. Kiles informed the court explicitly in

6  pro per motions and at hearings that he had an irreparably fractured relationship

7  with lead counsel. (*See, e.g.*, ROA 413 at 1–2; Tr. Aug. 6, 1999 at 12–15.) Kiles

8  alerted the court that Clark had hired VanDreumel to represent Clark in Bar

9  proceedings, creating a conflict between VanDreumel's loyalties to both clients.

10  (Tr. Jan. 7, 2002 at 68–69.) Because Kiles's motions and statements on the conflicts

11  made "a strong showing," and the "matter was called to the attention of the trial

12  court well before the date of trial," the "denial of appellant's motion for a change

13  of appointed counsel was error." *United States v. Williams*, 594 F.2d 1258, 1261

14  (9th Cir. 1979).

15      "[T]o compel one charged with [a] grievous crime to undergo a trial with the

16  assistance of an attorney with whom he has become embroiled in irreconcilable

17  conflict is to deprive him of the effective assistance of any counsel whatsoever."

18  *Brown v. Craven*, 424 F.2d 1166, 1170 (9th Cir.1970). The trial court deprived

19  Kiles of his Sixth Amendment right to counsel, leading to a "substantial and

20  injurious effect" on his conviction. *See Brecht v. Abrahamson*, 507 U.S. 619, 623

21  (1993). As such, Kiles's habeas relief must be granted.

22      **B.**    **The trial court denied Kiles a fair trial by denying his motion for**
           **a change of venue.**

23

24      Kiles raised this claim in his direct appeal. (DA2 Dkt. 86 at 85–90.) The state

25  court denied the claim. *See State v. Kiles*, 213 P.3d 174, 184–85 (Ariz. 2009). The

26  state court's determination constituted an unreasonable application of clearly

27  established federal law, 28 U.S.C. § 2254(d)(1), and an unreasonable determination

28  of the facts, *id.* § 2254(d)(2). Therefore the strictures of § 2254(d) do not apply and

this Court can review the exhausted claims de novo.

### 1. Kiles's trial was marked by pervasive, prejudicial media coverage.

"The requirement that a jury's verdict must be based upon the evidence developed at the trial goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury." *Turner v. Louisiana*, 379 U.S. 466, 472 (1965) (internal quotation marks omitted). Given the rampant, negative publicity Kiles and his case had received in Yuma, Kiles's defense counsel submitted a pretrial motion for a change of venue. Defense counsel argued pretrial publicity had the probable effect of precluding a trial of fair and impartial jurors. (Tr. Apr. 11, 2000 at 10.)

At argument on the motion, defense counsel stated, "Since the inception of this case there's been two motions for change of venue. Both times it was reported in the press, and not only was it reported in the press, but the comments made by defense counsel as to why venue should be changed was reported." (Tr. Apr. 11, 2000 at 7.) In other words, because of how extensively the press was covering the proceedings, counsel's complaints about what the press were reporting were then re-reported in the press, exacerbating the very problem counsel hoped to proscribe.

The State told the court, "I really don't care where we try this case" (Tr. Apr. 11, 2000 at 29), but believed the motion for change of venue was premature because there had not yet been any voir dire. (Tr. Apr. 11, 2000 at 29.)

The court denied the motion, in part because the judge stated if he had not been involved, he personally "would really have remembered very little about this case." (Tr. Apr. 11, 2000 at 33–34.) And the court did acknowledge that the press coverage had been prejudicial against Kiles: "You kind of have to trust the press to give a balanced account. I would hope from this point forward the press does give a balanced account and that their news accounts would not seem to have Mr. Kiles convicted before the trial even starts." (Tr. Apr. 11, 2000 at 34.) Still, the court

285

1   agreed to file the change-of-venue motions under seal, as they would be reported
2   on and further prejudice Kiles. (Tr. Apr. 11, 2000 at 35–36.)

3        Upon that denial, defense counsel filed a petition for special action with the
4   Arizona Supreme Court, arguing that the media coverage was so pervasive and
5   negative to Kiles he could not receive a fair trial in Yuma. (Case No. M-00-0006,
6   Pet. For Special Action, Mar. 10, 2000.) The Arizona Supreme Court declined to
7   accept jurisdiction over the complaint. (ROA 441 at 1.)

8   ### 2. Clearly established federal law required a change of venue to ensure Kiles's due process rights.
9

10       "[T]he right to jury trial guarantees to the criminally accused a fair trial by a
11  panel of impartial, indifferent jurors" whose decisions "must be based upon the
12  evidence developed at the trial." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (internal
13  citation and quotation marks omitted). While total ignorance of the facts and issues
14  is not required, a court "cannot foreclose inquiry as to whether, in a given case, the
15  application of that rule works a deprivation of the prisoner's life or liberty without
16  due process of law." *Id.* at 723 (quoting *Lisenba v. People of State of California*,
17  314 U.S. 219, 236 (1941)). Where, as in Kiles's case, the "build-up of prejudice is
18  clear and convincing," the trial court erred in denying a motion for change of venue.
19  *Irvin*, 366 U.S. at 725.

20       In *Irvin*, the facts are remarkably similar to those in Kiles's case. In that case,
21  news stories revealed the details of the petitioner's prior crimes and called him a
22  "confessed slayer." *Id.* at 725–26. Specifically, the newspaper articles in *Irvin*
23  "reported petitioner's offer to plead guilty if promised a 99-year sentence, but also
24  the determination, on the other hand, of the prosecutor to secure the death penalty."
25  *Id.* at 725–726. No matter jurors' statements at voir dire, "influence that lurks in an
26  opinion once formed is so persistent that it unconsciously fights detachment from
27  the mental processes of the average man." *Id.* at 727–28 (internal citations

28

1    omitted).[153]

2        A court has committed error in failing to grant a motion for change of venue

3    if there was "reasonable likelihood that prejudicial news prior to trial . . .

4    prevent[ed] a fair trial." *Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966). Prejudice

5    is presumed where the pretrial publicity is "massive," "pervasive," and "virulent."

6    *Id.* at 335, 354. When determining whether a change of venue is warranted, courts

7    must analyze such factors as the timing of the media, the degree of exposure to the

8    investigation, and whether the media is primarily factual or prejudicial. *See Casey*

9    *v. Moore*, 383 F.3d 896, 907–08 (9th Cir. 2004); *Ainsworth v. Calderon*, 138 F.3d

10   787, 795 (9th Cir. 1998), as amended, 152 F.3d 1223 (9th Cir. 1998).

11   ### 3.   As the media attention prevented Kiles from receiving a fair
12   trial, the trial court erred in denying the motion for change of venue.

13       The trial court erred in not granting Kiles's motion for change of venue, as

14   the pervasive, negative, prejudicial media denied his constitutional right to trial

15   before a fair and unbiased jury.

16       Here, the media reporting on Kiles's case was pervasive enough that motions

17   had to be filed under seal. Defense counsel reported that the press was reporting on

18   motions as she filed them. (Tr. Apr. 11, 2000 at 8.) There was no break in time

19   between reporting and Kiles's trial, and he was tried before a biased jury as a result.

20       In addition, the reporting was not factual but highly prejudicial. One article

21   printed in the Yuma Sun before Kiles's second trial commenced declared, "Judge

22   Denies Killer Use of a Pen." (Tr. Apr. 11, 2000 at 25–26; Case No. CV-00-0143,

23   _____

24   [153] As Justice Frankfurter wrote regarding the inherent tensions in deciding such
25   issues, "One of the rightful boasts of Western civilization is that the State has the
     burden of establishing guilt solely on the basis of evidence produced in court and
26   under circumstances assuring an accused all the safeguards of a fair procedure. . . .
     The Court has not yet decided that, while convictions must be reversed and
27   miscarriages of justice result because the minds of jurors or potential jurors were
     poisoned, the poisoner is constitutionally protected in plying his trade." *Irvin*, 366
28   U.S. at 729–30 (Frankfurter, J. concurring).

287

1   Pet. For Special Action, May 5, 2000 at 44.) Other headlines included, "Retrial for
2   Convicted Murderer in Limbo" (Case No. CV-00-0143, Pet. For Special Action,
3   May 5, 2000 at 37) and "Convicted Killer's Attorney Gets More Time to Appeal."
4   (Case No. CV-00-0143, Pet. For Special Action, May 5, 2000 at 43.) As in *Irvin*,
5   366 U.S. at 725–26, news articles in Yuma before Kiles's trial in 2000 consistently
6   reported that Kiles had been convicted before "based on overwhelming evidence of
7   premeditation" and that he had confessed to multiple people. (Case No. CV-00-
8   0143, Pet. For Special Action, May 5, 2000 at 36; Tr. Apr. 11, 2000 at 16.) And as
9   in *Irvin*, news articles also published statements from Kiles's prior trial and
10  appellate attorneys that Kiles was not innocent and would have pleaded guilty but
11  for the State seeking the death penalty. (Tr. Apr. 11, 2000 at 13–15.)

12         Moreover, the press was reporting inflammatory details that jurors would
13  never have heard in the courtroom. For instance, the newspapers reported in detail
14  about Kiles's prior violent felony—details that were so similar to the facts of the
15  current case that they "could never come inside of a criminal trial." (Tr. Apr. 11,
16  2000 at 11.)

17         Finally, using materials from the first trial, newspaper articles in Yuma
18  opined on the testimony and credibility of witnesses at the second trial, including
19  Kiles himself. (Tr. Apr. 11, 2000 at 20–21.) Given the ineffective assistance of
20  counsel that Kiles received at his first trial, "there was plenty of testimony and
21  information that came in that was totally excludable from any other criminal case."
22  (Tr. Apr. 11, 2000 at 26.) As a result, the press reporting was much more damaging
23  than in the majority of cases covered by the media, and as such, there is a reasonable
24  likelihood Kiles failed to receive a fair trial in Yuma.

25         Because the newspaper reporting of Kiles's case was "massive," "pervasive,"
26  and "virulent," there was a "reasonable likelihood that prejudicial news prior to trial
27  . . . prevent[ed] a fair trial." *Sheppard*, 384 U.S. at 335, 363. As such, the trial court
28  was in error and violated Kiles's Fifth, Sixth, Eighth, and Fourteenth Amendment

1   rights. *See Brecht*, 507 U.S. at 623. Relief must be granted.

2         **C.**    **The trial court erred by not dismissing the venire after a highly**

3                   **prejudicial statement poisoned the jury pool.**

4         Kiles did not present this claim in state court. Kiles can overcome any default

5   by showing cause and prejudice, as the ineffective assistance of Kiles's state post-

6   conviction counsel in failing to raise this claim constitutes cause for the default and

7   resulted in prejudice to Kiles. *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *Strickland*

8   *v. Washington*, 466 U.S. 668, 688, 694 (1984). Kiles will demonstrate at an

9   evidentiary hearing that state post-conviction counsel fell below the standards of

10   minimally competent capital post-conviction attorneys when they failed to raise this

11   meritorious claim.

12         Because this claim has not been adjudicated by the Arizona state courts, the

13   limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's

14   review, and the Court may consider the merits of the claim de novo.

15             **1.**    **A prospective juror disclosed highly prejudicial information**

16                   **before the venire.**

17         The voir dire for Kiles's second trial was conducted on July 7, 2000. Before

18   any juror questionnaires had been given out or counsel had an opportunity to ask

19   questions, the court began by asking the entire venire, "Have any of you ever seen

20   or heard or read anything about this case or have any of you ever heard anyone

21   express an opinion about this case?" (Tr. July 7, 2000 at 39.) The question itself

22   was anodyne, but invited prospective jurors to introduce extraneous information

23   about the case to the entire venire if they offered details beyond a yes or no answer.

24         At the court's instigation, one person did just that. One venire member who

25   raised her hand told the judge that Shemaeah Gunnel's uncle worked with her

26   husband and was a family friend when the crime occurred. Rather than speak to the

27   potential juror individually, the court asked follow-up questions before the entire

28   venire, inviting details. The court asked, "Did you talk to the—talk about the case

either to him or talk to your husband and he talked about things. . . ." The juror answered that the uncle had told them about the crime, and told them about the service held for the child. The court continued, and asked a question that would naturally elicit prejudicial details:

> THE COURT: Do you feel that you perhaps might have some inside information that other people don't?
>
> JUROR: No.
>
> THE COURT: Okay.
>
> JUROR: I just don't -- when they found the defendant guilty I was happy, you know.

(Tr. July 7, 2000 at 45–46.)

Defense counsel immediately requested that questioning stop being conducted in this manner and moved to strike the venire. (Tr. July 7, 2000 at 46.) Counsel correctly pointed out that a curative instruction would only have exacerbated the problem, drawing more attention to the juror's statements about Kiles's prior conviction. (Tr. July 7, 2000 at 47.) The judge denied the motion, saying that it was premature, as the court and counsel could continue asking individual jurors generally about media exposure to Kiles's case. It is worth noting that the judge failed to even identify the problem, as the prejudicial information introduced to the venire was not from the media, but rather from a prospective juror who stated that she was happy when she learned of Kiles's previous conviction.

Despite this being a capital case, the court failed to take even basic precautions to ensure Kiles received his right to a fair and impartial jury.

### 2. The trial court erred by failing to grant the motion to dismiss the venire.

"The requirement that a jury's verdict must be based upon the evidence developed at the trial goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury." *Turner v. Louisiana*, 379 U.S. 466, 472 (1965) (internal quotation marks omitted). The integrity of the jury, especially in a

290

capital case, is paramount, and "any ground of suspicion that the administration of justice has been interfered with" cannot be tolerated. *Mattox v. United States*, 146 U.S. 140, 149 (1892), *superseded by rule as stated in Pena-Rodriguez v. Colorado*, 137 S. Ct. 855 (2017). Additionally, "[i]t is vital in capital cases that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment." *Id.*

Here a juror introduced highly inflammatory, prejudicial information to the entire venire that the court and both parties had "gone to extraordinary lengths" to keep out of the proceedings. (Tr. July 7, 2000 at 46.) The court could not have conducted an inquiry into whether this extraneous information biased jurors without further reference to that prejudicial information. Though constitutional rights should never be subject to scheduling concerns, as this information was introduced on the first day of venire, the court could easily have dismissed the pool of prospective jurors and started without a biased jury pool.

To ensure due process, "the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors" whose decisions "must be based upon the evidence developed at trial." *Irvin*, 366 U.S. at 722 (internal quotation marks and citations omitted). Here, because the court denied the motion to strike the venire, Kiles was denied his constitutional right to a fair and impartial jury. Moreover, as noted by defense counsel, a number of jurors most certainly overheard that prejudicial, extraneous information introduced. (Tr. July 7, 2000 at 46.) If even one juror's deliberations were affected, the defendant is denied the constitutional right to an impartial jury. *Mach v. Stewart*, 137 F.3d 630, 633 (9th Cir. 1997). The trial court's denial of the motion to strike the venire violated Kiles's due process rights under the Fourteenth Amendment and had a "substantial and injurious effect" on his conviction. *See Brecht*, 507 U.S. at 623.

291

1
2

**D.    The trial court's admission of an excessively gruesome photograph during Kiles's trial resulted in the denial of a fair trial and due process.**

3
4
5
6
7
8
9
10
11
12
13
14
15
16

The admission of a photograph of LeCresha's decomposed body (*see* 2000 Trial Ex. 72) was raised by Kiles's appellate counsel as both a guilt-phase and penalty-phase trial-court error. (DA2 Dkt. 86 at 56–66.) The Arizona Supreme Court held that because the penalty-phase jury did not sentence Kiles to death for the killing of the children, Kiles suffered no prejudice. *See Kiles*, 213 P.3d at 183. Where, as in Kiles's case, there were two different juries for conviction and sentence, the court's holding was unreasonable. It failed to recognize that regardless of the ultimate sentence imposed, the photograph was so unduly prejudicial that it rendered the guilt-phase proceeding fundamentally unfair. Therefore, the state court's denial of this claim was an unreasonable application of or contrary to clearly established federal law, *see* 28 U.S.C. § 2254(d)(1), and rested on an unreasonable determination of the facts, *id.* § 2254(d)(2). Accordingly, the strictures of § 2254(d) do not apply to this claim, and this Court may review the merits of this claim de novo.

17
18

**1.    The trial court failed to exclude an irrelevant and gruesome autopsy photograph during the guilt-phase proceedings.**

19
20
21
22
23
24
25
26

During questioning of the medical examiner, the State introduced Exhibit 72, a gruesome photograph of the body of LeCresha Kirklin, to the jury. (Tr. July 13, 2000 at 101–03; 2000 Trial Ex. 72.) LeCresha's body had been discovered in a Mexican canal two weeks after her death. The photograph was illustrative not of her injuries from the crime but of the grisly result of decomposition from having been in the water for an extended period of time. The photograph showed "skin slippage," skin discoloration, soft tissue loss, and damage from crabs and other aquatic animals feeding on the body. (Tr. July 13, 2000 at 102–03.)

27
28

Notably, because of the damage to the body, the photograph could not demonstrate the wounds which caused LeCresha's death. While the photograph

1    showed "evidence of skin laceration" which may have been caused during the
2    assault, the medical pathologist stated that the "hole in the skull where the soft tissue
3    has been eroded" was "all probably due—part of it—due to immersion" in the
4    water. (Tr. July 13, 2000 at 103.) The photograph showed no evidence of an assault
5    otherwise. The photograph served no evidentiary purpose, as it did not illustrate or
6    support the medical examiner's testimony about LeCresha's cause of death.

7    The defense asked no questions about LeCresha's autopsy or the photo, as
8    there were no material issues of fact for which the photograph had any evidentiary
9    value. (Tr. July 13, 2000 at 103–07.)

10   As there was no probative value to the photograph except to inflame and
11   appall the jury, the court's failure to strike the photograph was a violation of Kiles's
12   due process rights.

13                    **2.     The trial court's admission of an excessively gruesome
                             photograph to the jury was violative of due process and
14                           undermined the fairness of the proceedings.**

15   The introduction of gruesome photographs of victims in capital trials raises
16   issues of constitutional dimension. In *Zant v. Stephens*, the Supreme Court held that
17   the jury should not be allowed to consider evidence that is "totally irrelevant to the
18   sentencing process" and fails to focus on "the character of the individual and the
19   circumstances of the crime." 462 U.S. 862, 879, 885 (1983). In addition, if the jury
20   is permitted to consider evidence that is so unduly prejudicial that it renders the trial
21   fundamentally unfair, the Due Process Clause of the Fourteenth Amendment has
22   been violated. *See Romano v. Oklahoma*, 512 U.S. 1, 12 (1994); *Darden v.*
23   *Wainwright*, 477 U.S. 168, 179-83 (1986); *Donnelly v. DeChristoforo*, 416 U.S.
24   637, 643 (1974).

25   Here, the admission of the photograph undermined the fairness of the trial
26   and "so infected the sentencing proceeding with unfairness as to render the jury's
27   imposition of the death penalty a denial of due process." *Romano*, 512 U.S. at 12;
28   *Bruton v. United States*, 391 U.S. 123, 131 n.6 (1968) ("An important element of a

293

fair trial is that a jury consider only relevant and competent evidence bearing on the issue of guilt or innocence."). The medical examiner's testimony regarding the victims' injuries and causes of death was uncontroverted by the defense. (Tr. July 13, 2000 at 103–07.) The medical examiner gave a cause of death without reference to the photograph. (Tr. July 13, 2000 at 101–03). The presentation of the gruesome photographs added nothing probative to the evidence, especially as the photograph was not illustrative of the injuries suffered, but rather of the state of the body after having been in the water for two weeks.

The admission of Exhibit 72 at trial only served to incite the passions of the jurors. The highly prejudicial effect of this evidence easily outweighed any potential minimal probative value, and the introduction of the photograph undermined the fairness of the trial and sentencing proceeding. It had a "substantial and injurious effect" on Kiles's conviction. *See Brecht*, 507 U.S. at 623. The trial court abused its discretion by allowing the photo to be admitted by the jury and violated Kiles's right to due process under the Fourteenth Amendment. *See Romano*, 512 U.S. at 12; *Bruton*, 391 U.S. at 131 n.6.

**E.     The trial court declined to give the jury instructions to which Kiles was constitutionally entitled.**

At Kiles's guilt phase, despite the fact that Kiles had been charged with premeditated murder, the trial court declined to instruct the jury that it could consider an intoxication defense. The court likewise declined to properly instruct the jury on premeditation and on reasonable doubt. The court's ineffectual jury instructions denied Kiles his rights to a fair trial, to a complete defense, and to due process under the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution.

Except as noted below, Kiles presented this claim on direct appeal. (DA2 Dkt. 86 at 42–56.) The Arizona Supreme Court's denial of this claim was contrary to or involved an unreasonable application of the clearly established federal law

294

1
2
discussed below, *see* 28 U.S.C. § 2254(d)(1); it further rested on an unreasonable determination of fact, *see id.* § 2254(d)(2).

3
4
> ### 1.   The trial court erred in failing to instruct the jury that premeditation requires actual reflection.

5
6
7
Despite Arizona law explaining that premeditation requires actual reflection, the trial court declined to give an instruction properly defining premeditation. The court instructed the jury as follows:

8
9
10
11
> Premeditation means the defendant acts with the knowledge that he will kill another human being when such intention or knowledge proceeds [sic] the killing by a length of time to permit reflection. An act is not done with premeditation if there is any instant – if it is the instant effect of a sudden quarrel or heat of passion.

12
13
14
15
16
17
18
19
20
(Tr. July 19, 2000 at 92–93.) Without additional clarification, the jury could not tell whether premeditation required actual reflection or simply time to premeditate. Further, the trial court's definition amounted to telling the jury that premeditation equaled knowledge plus "a length of time to permit reflection." In other words, premeditation equaled knowledge plus time. But then the prosecutor argued that premeditation "can be instantaneous. I mean that can be so fast." (Tr. July 19, 2000 at 35.) In essence, the court's instruction, especially as eroded by the State's argument, informed the jury that the State did not need to prove Kiles actually reflected for the jury to convict him of premeditated murder.

21
22
23
24
25
26
27
28
Under Arizona law, however, premeditation required *actual* reflection. *State v. Thompson*, 65 P.3d 420, 428 (Ariz. 2003) (explaining that the jury must find "beyond a reasonable doubt that the defendant actually reflected"); *see also State v. Dann*, 74 P.3d 231, 239 (Ariz. 2003) ("[I]f a court's instruction or a prosecutor's comment to the jury signals that the mere passage of time will suffice to establish the element of premeditation, those instructions or comments constitute error."); *supra*, Claim 3. Because the jury was not so instructed, it did not need to find anything more than knowledge and time in order to find Kiles guilty of Gunnel's

1   premeditated first-degree murder.

2      The omission of actual reflection from the jury instructions meant that,
3   ultimately, the State was relieved of its burden to prove Kiles guilty of every
4   element of first-degree murder. That violated one of the most basic tenets of due
5   process: "the Due Process Clause protects the accused against conviction except
6   proof beyond a reasonable doubt of every fact necessary to constitute the crime with
7   which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970); *see also Sullivan v.*
8   *Louisiana*, 508 U.S. 275, 277–78 (1993). The Arizona Supreme Court decision
9   contravened and/or unreasonably applied this Supreme Court precedent and,
10  further, relied on an unreasonable determination of fact that the jury instruction
11  conveyed that premeditation required reflection. *State v. Kiles*, 213 P.3d 174, 179–
12  80 (Ariz. 2009). Premeditation was the only issue in dispute for Gunnel's death,
13  and the defense sought to argue that her killing was not first-degree murder because
14  it was not premeditated. (*See* Tr. July 19, 2000 at 92–93); *see also supra*, Claim 3.
15  Because of the singular importance of premeditation in this case and the
16  fundamental nature of the constitutional violation that occurred, the violation had a
17  substantial and injurious effect on the verdict. *Brecht*, 507 U.S. at 623.

18      **2.   The trial court erred in denying Kiles an intoxication
19      defense, which he was constitutionally entitled to present.**

20      Kiles was charged with the knowing premeditated first-degree murder of
21  Gunnel. *Kiles*, 213 P.3d at 181. The State charged Kiles with knowing, instead of
22  intentional, murder to take advantage of a workaround in Arizona law: a defendant
23  charged with *intentional* first-degree murder may raise the defense of voluntary
24  intoxication under Arizona law, but a defendant charged with *knowing* first-degree
25  murder may not. *Id.* at 182 (noting that A.R.S. § 13-503 (1989) "unambiguously
26  provides that intoxication is a defense only against the culpable mental state of
27  intentionally"). Because Kiles was not charged with a crime of intent, the trial court
28  declined to instruct the jury that intoxication was a defense to the crime of first-

degree murder. (*See* Tr. July 19, 2000 at 86–99.) As a result, the jury had no legal avenue to consider whether and how Kiles's intoxication at the time of the crime bore upon the element of premeditation. (*See, e.g.*, Tr. July 17, 2000 at 157–58, 177.)

The court's denial of an instruction on an intoxication defense was unconstitutional for multiple reasons. First, it resulted from arbitrary State action, in violation of Kiles's due-process and equal-protection rights. Kiles was charged with a crime of knowledge solely to vitiate his intoxication defense. *Cf. State v. Lavers*, 814 P.2d 333, 346 (Ariz. 1991) ("Even if the State charged knowingly rather than intentionally to preclude the introduction of evidence of defendant's intoxication, we find such a legal strategy acceptable."). However, in the context of premeditated murder, there is no meaningful difference between intentional murder and knowing murder. Under Arizona law, "'[p]remeditation' is the distinguishing feature of first degree murder. Its essence is reflective intent to kill." *State v. Walton*, 650 P.2d 1264, 1271 (Ariz. Ct. App. 1982 (quoting Judge R. Gerber, Criminal Law of Arizona at 147 (1978)).[154] In such a scheme, allowing a State to discriminate against certain comparably situated defendants, who could be charged with either knowing or intentional premeditated first-degree murder, based on whether the State wants to give the defendant the opportunity to present an intoxication defense is both a due-process and an equal-protection violation. *Cf. Walton*, 650 P.2d at 1270 (recognizing that "[a] statute which prescribes different degrees of punishment for the same acts committed under like circumstances by persons in like situations is violative of a person's right to equal protection of the laws"

---

[154] This is in part because the definition of premeditated knowing murder, as given to Kiles's jury and as discussed above, makes little sense and effectively stripped "premeditation" of any meaning. Even the standard legal meaning of premeditation incorporates intent: premeditation is defined as the "[c]onscious consideration and planning that precedes an act." Black's Law Dictionary (10th ed. 2014). "[P]lanning" necessarily involves intent.

297

1   (alteration in original) (quoting *People v. Calvaresi*, 534 P.2d 316, 318 (Colo.

2   1975)).

3        Second, the denial of the intoxication defense infringed on Kiles's right to

4   present a complete defense. "Whether rooted directly in the Due Process Clause of

5   the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses

6   of the Sixth Amendment, the Constitution guarantees criminal defendants 'a

7   meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476

8   U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)

9   (citations omitted); *see also Simmons v. South Carolina*, 512 U.S. 154, 175 (1994)

10  (O'Connor, J., concurring) ("[O]ne of the hallmarks of due process in our adversary

11  system is the defendant's ability to meet the State's case against him."). While a

12  State can limit the availability of an affirmative defense based on a "valid" reason

13  without contravening due process, *Montana v. Egelhoff*, 518 U.S. 37, 53, 56 (1996),

14  the State cannot do so arbitrarily. Arizona allows defendants charged with crimes

15  of intent access to an intoxication defense; it can have no valid reason to deny other

16  defendants the ability to meet the State's case against them.

17       The denial of the opportunity to present a meaningful defense is particularly

18  stark in this context because, under Arizona law, the State need not *prove* actual

19  reflection. *Thompson*, 65 P.3d at 427 (premeditation requires actual reflection, but

20  the State need not offer direct proof of that actual reflection). When the State need

21  not directly prove premeditation, eliminating the intoxication defense drastically

22  curtails the opportunity to fairly challenge the element of premeditation, even when

23  the defendant was intoxicated to the point that he lacked the capacity to premeditate.

24  Especially in these circumstances, the denial of the intoxication defense amounted

25  to the denial of Kiles's right to present a meaningful defense.

26       Finally, given that the State need not offer direct proof of premeditation, the

27  denial of the intoxication defense effectively allowed the jury to find the defendant

28  guilty without the State having to prove every element of the crime. *See In re*

298

1    *Winship,* 397 U.S. at 364.

2         The court unconstitutionally denied Kiles the right to present an intoxication

3    defense, and the Arizona Supreme Court's contrary decision was an unreasonable

4    application of the clearly established federal law cited herein. A legal mechanism

5    for consideration of his intoxication evidence would have altered the jury's analysis

6    considerably, and so the court's error violated Kiles's rights.[155] *See Brecht*, 507 U.S.

7    at 623.

8         **3.    The trial court erred in improperly instructing the jury on**
     **the definition of "reasonable doubt."**

9

10        Kiles did not present this issue in state court. Kiles alleges he can overcome

11   any default by showing cause and prejudice because of the ineffective assistance of

12   appellate and state post-conviction counsel. *See Martinez*, 566 U.S. at 9; *Evitts v.*

13   *Lucey*, 469 U.S. 387, 396 (1985); *Strickland*, 466 U.S. at 688, 694. Because this

14   claim has not been adjudicated by the Arizona state courts, the limitations on relief

15   imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court

16   may consider the merits of the claim de novo.

17        Contrary to the wishes of trial counsel, the court instructed the jury that

18   "[p]roof beyond a reasonable doubt is proof that leaves you firmly convinced of the

19   defendant's guilt." (Tr. July 19, 2006 at 87; *see also* Tr. July 18, 2006 at 27–28

20   (counsel requesting a different instruction on the definition of reasonable doubt).)

21   The phrase "firmly convinced" reduced the standard of proof the State had to satisfy

22   to something less than reasonable doubt; it is akin to "clear and convincing." *See,*

23   *e.g.*, *State v. Perez*, 976 P.2d 427, 442 (Haw. Ct. App. 1998), *aff'd in part, rev'd in*

24   *part on other grounds*, 976 P.2d 379 (Haw. 1999).

25        The reasonable-doubt standard "is indispensable to command the respect and

26   confidence of the community in applications of the criminal law." *In re Winship*,

27   _____

28   [155] That the court's instructions on intoxication were unclear only exacerbated the
     problem. *See United States v. Bagby*, 451 F.2d 920, 927 (9th Cir. 1971).

397 U.S. at 364. "It is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned." *Id.* As there is a reasonable likelihood that the jury interpreted "firmly convinced" as a lesser standard of proof than "beyond a reasonable doubt," the court's instruction violated Kiles's rights to due process and trial by jury under the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution. *See id.*; *see also Sullivan*, 508 U.S. at 278; *Estelle v. McGuire*, 504 U.S. 62, 72 (1991). Further, given the nature of this constitutional error and the fact that the defense contended that the State could not prove issues like premeditation beyond a reasonable doubt, the error was not harmless. *See Brecht*, 507 U.S. at 623.

### F.   The trial court unconstitutionally required that Kiles be physically restrained at the guilt phase.

Kiles did not present this claim in state court. Kiles alleges he can overcome any default by showing cause and prejudice because of the ineffective assistance of appellate and state post-conviction counsel. *See Martinez*, 566 U.S. at 9; *Evitts*, 469 U.S. at 396; *Strickland*, 466 U.S. at 688, 694. Because this claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider the merits of the claim de novo.

The trial court abused its discretion by requiring that Kiles be physically restrained during the guilt-phase proceeding in violation of Kiles's rights under the Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution. As discussed in Claims 3 and 5, *supra*, Kiles had a due-process right to be tried without physical restraints absent a compelling justification that those restraints were necessary.

"[G]enerally, a criminal defendant has a constitutional right to appear before a jury free of shackles." *Gonzalez v. Pliler*, 341 F.3d 897, 900 (9th Cir. 2003) (quoting *Spain v. Rushen*, 883 F.2d 712, 716 (9th Cir. 1989)). Absent a determination by the trial court that a compelling circumstance justifies their use to

1  maintain courtroom security, and that there is no less restrictive measure to achieve
2  that aim, the Constitution prohibits the use of physical restraints during any phase
3  of a capital case. *See Gonzalez*, 341 F.3d at 900.

4      For the duration of his guilt-phase proceedings, Kiles was forced to wear a
5  leg brace and ankle shackles. The leg brace would lock up if Kiles moved too
6  quickly, forcing him to hold the leg brace in place while he was walking. This
7  included walking to the witness stand to testify in front of the jury. Multiple jurors
8  saw and/or heard the shackles, or noticed Kiles's odd gait due to the leg brace.

9      By failing to determine that shackling was necessary before requiring
10 restraints, the trial court denied Kiles the right to a fair trial. Juror observance of
11 shackling undermined the presumption of innocence to which Kiles was entitled,
12 and it denied him an impartial jury. *See Illinois v. Allen*, 397 U.S. 337, 344–45
13 (1970); *Estelle v. Williams*, 425 U.S. 501, 504–05 (1976) (recognizing shackles as
14 a "constant reminder of the accused's condition . . . [that] may affect a juror's
15 judgment" and are "so likely to be a continuing influence throughout the trial that
16 . . . an unacceptable risk is presented of impermissible factors coming into play");
17 *see also Deck v. Missouri*, 544 U.S. 622, 633 (2005) (noting that shackles imply
18 that the court considers the defendant dangerous, which is "nearly always a relevant
19 factor in jury decisionmaking" in a capital case).

20     The Supreme Court has "defined shackling as 'the sort of inherently
21 prejudicial practice that . . . should be permitted only where justified by an essential
22 state interest specific to each trial.'" *Hedlund v. Ryan*, 854 F.3d 557, 568 (9th Cir.
23 2017) (footnote omitted) (quoting *Holbrook v. Flynn*, 475 U.S. 560, 568–69
24 (1986)). In failing to conduct any inquiry into whether an essential state interest
25 justified shackling Kiles, the court violated Kiles's due process rights and had a
26 "substantial and injurious effect" on his conviction. *See Brecht*, 507 U.S. at 623;
27 *see also State v. Gomez*, 123 P.3d 1131, 1139–42 (Ariz. 2005) (vacating death
28 sentence because defendant was shackled at penalty phase without individualized

1  finding of necessity).

2  **G.    The trial court failed to make a complete record of the guilt-phase**
3  **proceeding in violation of Kiles's constitutional rights.**

4  Kiles did not present this claim in state court. Kiles alleges he can overcome

5  any default by showing cause and prejudice because of the ineffective assistance of

6  appellate and state post-conviction counsel. *See Martinez*, 566 U.S. at 9; *Evitts*, 469

7  U.S. at 396; *Strickland*, 466 U.S. at 688, 694. Because this claim has not been

8  adjudicated by the Arizona state courts, the limitations on relief imposed by 28

9  U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider

10  the merits of the claim de novo.

11  As discussed in Claim 16, *infra*, a complete record is necessary to protect

12  Kiles's Fourteenth Amendment right to meaningful appellate review. In capital

13  cases, where heightened reliability is required, *see Woodson v. North Carolina*, 428

14  U.S. 280, 305 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.), the U.S.

15  Supreme Court has "emphasized repeatedly the crucial role of meaningful appellate

16  review in ensuring that the death penalty is not imposed arbitrarily or irrationally."

17  *Parker v. Dugger*, 498 U.S. 308, 321 (1991). To ensure that reliability, a defendant

18  must be provided "a sufficiently complete record of the trial proceedings," *Draper*

19  *v. Washington*, 372 U.S. 487, 500 (1963), in order to have "an adequate opportunity

20  to present his claims fairly in the context of the [s]tate's appellate process." *Ross v.*

21  *Moffitt*, 417 U.S. 600, 616 (1974).

22  During the guilt-phase proceeding, the trial court failed to record bench-

23  conferences (*see, e.g.*, Tr. July 12, 2000 at 82 ("THE COURT: We are back on the

24  record. We talked about several things."); Tr. July 18, 2000 at 31 ("THE COURT:

25  Okay. If you will stick around, we will informally go over the forms of verdict. MS.

26  VANDREUMEL: Thank you, Judge."); conferences on jury instructions (Tr. July

27  18, 2000 at 2); discussions on how Kiles's penalty-phase would proceed after

28  Arizona's sentencing scheme was declared unconstitutional in *Ring v. Arizona*, 536

302

1   U.S. 584 (2002) (ROA 584 at 1); and a conference on the failure to give appropriate

2   jury instructions resulting in a questionable verdict (Tr. July 20, 2000 at 3). The

3   failure to make a record is not harmless; these off-the-record conferences raise

4   serious, substantive constitutional issues that required appellate review to ensure

5   Kiles was not denied his fundamental rights. *See Brecht*, 507 U.S. at 623.

6       In Kiles's case there was not a "'record of sufficient completeness,' for

7   adequate consideration of the errors assigned." *Draper*, 372 U.S. at 497 (quoting

8   *Coppedge v. United States*, 369 U.S. 438, 446 (1962)). As the trial court's failures

9   denied Kiles meaningful appellate review in violation of his due process rights,

10  relief must be granted.

11      **H.    The trial court violated Kiles's right to be free from double
              jeopardy and a reliable sentencing determination.**

12

13      Kiles did not present this claim in state court. Kiles alleges he can overcome

14  any default by showing cause and prejudice because of the ineffective assistance of

15  appellate and state post-conviction counsel. *See Martinez*, 566 U.S. at 9; *Evitts*, 469

16  U.S. at 396; *Strickland*, 466 U.S. at 688, 694. Because this claim has not been

17  adjudicated by the Arizona state courts, the limitations on relief imposed by 28

18  U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider

19  the merits of the claim de novo.

20      With respect to the children, Kiles was indicted on and charged with six

21  counts: two counts of premeditated murder, two counts of child abuse, and two

22  counts of felony murder. (ROA 1 at 2.) He was convicted on all six counts. (ROA

23  482 at 5–8.) As explained in Claim 11, *infra*, by allowing the child-abuse

24  convictions to stand, the trial court subjected Kiles to double jeopardy. A child-

25  abuse charge necessarily merges with premeditated murder where the only child

26  abuse alleged *is* the premeditated murder. As the Arizona Supreme Court explained:

27              [T]he child abuse-murder situation is akin to the assault-
              murder situation. Although "assault and battery are always
28              included in an unlawful homicide, they are not degrees of

303

such offense requiring the court where death results, to instruct that the defendant may be found guilty thereof."

*State v. Styers*, 865 P.2d 765, 771 (Ariz. 1993) (quoting *State v. Myers*, 125 P.2d 441, 444 (Ariz. 1942)). Notably, Kiles was only charged with a single count against Valerie Gunnel—premeditated murder. He was not also charged with her assault. (ROA 1 at 2.)

Since the child-abuse convictions should be subsumed by the premeditated murder convictions for his child victims, Kiles's separate child abuse convictions are a violation of his right to be free from double jeopardy under the Fifth Amendment to the U.S. Constitution. Included in that Fifth Amendment right is "protect[ion] against multiple punishments for the same offense." *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969). This is precisely what Kiles was subject to.

While the prosecution for both child abuse and premeditated murder was itself improper, the trial court erred by not striking the child-abuse convictions upon receipt of the jury verdicts. A number of jurors found Kiles guilty of premeditated murder and child abuse, thereby convicting Kiles of the same crime twice. The defense requested the child abuse charges be vacated, as the Arizona Supreme Court had explicitly held that "[t]he first degree murder statute, A.R.S. § 13-1105(A)(1), *not the child abuse statute*, applies when a person intentionally kills a child victim." *Styers*, 865 P.2d at 772 (emphasis added). But rather than address the multiple convictions on the same offense, the trial court stated that while the defense motion raised "interesting issues," it would not vacate the child-abuse verdicts. (Tr. Dec. 29, 2000 at 19–20.)

As Kiles was subject to double jeopardy, the trial court's error violated Kiles's Fifth Amendment right and had "a substantial and injurious effect" on the reliability of his conviction. *See Brecht*, 507 U.S. at 623.

**I.    The cumulative effect of these trial-court errors prejudiced Kiles.**

The Ninth Circuit recognizes that the cumulative effect of multiple errors

304

1    may prejudice a defendant, even where no single trial error examined alone does

2    so. *See Parle v. Runnels*, 505 F.3d 922, 934 (9th Cir. 2007) (finding habeas relief

3    warranted when combined effect of multiple trial errors resulted in injurious effect

4    on jury's verdict); *Alcala v. Woodford*, 334 F.3d 862, 894–95 (9th Cir. 2003)

5    (affirming grant of habeas relief where multiple errors by court and counsel

6    deprived defendant of a fundamentally fair trial); *Killian v. Poole*, 282 F.3d 1204,

7    1211 (9th Cir. 2002) (stating that the cumulative effect of errors may be so

8    prejudicial as to require reversal).

9         The trial court committed numerous errors during the guilt phase of Kiles's

10   trial. Even if this Court were to find that none of them merits relief alone, the

11   cumulative effect of all the errors is so prejudicial that Kiles is also entitled to relief

12   on that basis.

13                                    **Claim Eight**

14   **The trial court's numerous errors during the penalty phase of trial**
     **violated Kiles's constitutional rights.**

15

16        The trial court committed numerous errors during Kiles's penalty phase,

17   infringing upon his rights under the Fifth, Sixth, Eighth, and Fourteenth

18   Amendments to the U.S. Constitution. Kiles incorporates by specific reference all

19   facts, allegations, and arguments made elsewhere in this Petition.

20        Except as noted below, Kiles did not present this claim in state court. Kiles

21   alleges that any procedural bar is not adequate or independent and/or that imposing

22   default would be a miscarriage of justice. Alternatively, Kiles alleges he can

23   overcome any default by showing cause and prejudice, including the ineffective

24   assistance of state counsel. *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *Strickland*

25   *v. Washington*, 466 U.S. 668 (1984). Because this claim has not been adjudicated

26   by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d)

27   do not apply to this Court's review, and the Court may consider the merits of the

28   claim de novo.

1
2

###### A. The trial court unconstitutionally required that Kiles be physically restrained at the penalty phase.

3
4
5

The trial court's error in requiring that Kiles be physically restrained during the penalty phase of trial violated his rights under the Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution.

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

As discussed in Claims 3, 5, and 7, *supra*, Kiles had a right under the Due Process Clause and the fair-trial guarantee not to be tried wearing physical restraints unless there was a compelling reason. "[G]enerally, a criminal defendant has a constitutional right to appear before a jury free of shackles." *Gonzalez v. Pliler*, 341 F.3d 897, 900 (9th Cir. 2003) (quoting *Spain v. Rushen*, 883 F.2d 712, 716 (9th Cir. 1989)). The use of a stun belt in particular both "raises all of the traditional concerns about the imposition of physical restraints" and interferes with "a different set of a defendant's constitutionally guaranteed rights." *Gonzalez*, 341 F.3d at 900 (quoting *United States v. Durham*, 287 F.3d 1297, 1305 (11th Cir. 2002)). These include the Sixth Amendment right to confer with counsel at trial and to participate in his case. *Gonzalez,* 341 F.3d at 900. Absent a determination by the trial court that a compelling circumstance justifies their use to maintain courtroom security, and that there is no less restrictive measure to achieve that aim, the Constitution prohibits the use of physical restraints during any phase of a capital case. *See Gonzalez*, 341 F.3d at 900.

21
22

Throughout penalty-phase proceedings, Kiles was forced to wear a leg brace and an electric stun belt around his waist.[156] Kiles had to hold the leg brace in place

23
24

---

[156] As the Ninth Circuit explained:

25
26
27
28

A stun belt is an electronic device that is secured around a prisoner's waist. Powered by nine-volt batteries, the belt is connected to prongs attached to the wearer's left kidney region. When activated remotely, the belt delivers a 50,000-volt, three to four milliampere shock lasting eight seconds. Upon activation of the belt, an electrical current enters the body near the wearer's kidneys and travels along blood channels and nerve pathways. The shock administered from the activated belt 'causes incapacitation in the first few seconds and severe pain during the entire

at times when he was walking to prevent it from locking up as he moved. At least one juror saw Kiles's physical restraints—including, once, a belly chain with handcuffs—both as Kiles was waiting to enter the courtroom and when he was sitting at the defense table.

The court failed to make the required finding before forcing Kiles to wear physical restraints. On February 14, 2006, defense counsel raised the issue of restraints at a hearing. (Tr. Feb. 14, 2006 at 41.) The trial judge agreed that he would not have Kiles shackled while in the courtroom as he could not "recall any time that Mr. Kiles has been a security problem, or risk." (Tr. Feb. 14, 2006 at 42.) The prosecutor agreed that Kiles was not a bad inmate and said he did not see any need for shackles. (Tr. Feb. 14, 2006 at 42.) However, the prosecutor argued for leg braces, and the parties determined that they needed someone from the Sheriff's Office to be involved. (Tr. Feb. 14, 2006 at 43.) They agreed that, at an already-scheduled hearing the following week, they would discuss shackling with someone representing the Sheriff's Office. (Tr. Feb. 14, 2006 at 45.) However, the record on appeal contains no minute order nor transcript from a hearing taking place that day.

Regardless of what transpired at that hearing, Kiles was ultimately restrained at trial in a stun belt and leg braces, despite the court and the prosecutor agreeing that Kiles did not present a security risk. This violated Kiles's constitutional rights.[157]

---

period. Activation may also cause immediate and uncontrolled defecation and urination, and the belt's metal prongs may leave welts on the wearer's skin requiring as long as six months to heal. Activation of a stun belt can cause muscular weakness for approximately 30–45 minutes and heartbeat irregularities or seizures. Accidental activations are not unknown.

*Gonzalez*, 341 F.3d at 901 (citations and internal quotation marks omitted).

[157] Further, to the extent that the Sheriff's Office made the decision regarding the stun belt, that decision process was unconstitutional. *See Gonzalez*, 341 F.3d at 902 (finding a court violated defendant's constitutional rights where correctional officers made the stun belt determination, as "[t]he use of physical restraints is subject to close *judicial,* not law enforcement, scrutiny").

1    Because of the variety of prejudices attributable to restraints—both visible to

2    the jury and not—that the trial court forced Kiles to wear restraints without an

3    individualized finding of necessity violated Kiles's rights to a fair trial, to an

4    impartial jury, and to effective assistance of counsel. With respect to the stun belt

5    in particular, "the nature of the device and its effect upon the wearer when activated,

6    requiring an unwilling defendant to wear a stun belt during trial may have

7    significant psychological consequences . . . [which] cannot be understated."

8    *Gonzalez*, 341 F.3d at 900. Even more so than shackles, the stun belt "may impede

9    the defendant's ability to communicate with his counsel and to participate in the

10   defense of the case." *Gonzalez*, 341 F.3d at 900; *see also Deck v. Missouri*, 544

11   U.S. 622, 631–32 (2005). All of these forms of prejudice infected Kiles's penalty-

12   phase proceedings and had a "substantial and injurious effect" on his sentence. *See*

13   *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993); *see also State v. Gomez*, 123 P.3d

14   1131, 1139–42 (Ariz. 2005) (vacating death sentence because defendant was

15   shackled at penalty phase without individualized finding of necessity). Kiles is

16   entitled to relief.

17   **B.    The trial court violated Kiles's constitutional rights during his**
18   **penalty-phase voir dire.**

19   As discussed in Claim 4, *supra*, the Constitution safeguards against a

20   mandatory death sentence upon conviction. *Woodson v. North Carolina*, 428 U.S.

21   280 (1976). At the heart of that protection is the right to be sentenced by jurors who

22   make an individualized and reasoned moral decision whether life or death is the

23   appropriate sentence by considering and giving full effect to all mitigation. *See,*

24   *e.g.*, *Lockett v. Ohio*, 438 U.S. 586 (1978).

25   **1.    The trial court should not have struck Prospective Juror 56**
26   **based on her views of the death penalty, as she evidenced her**
     **ability to be fair and impartial.**

27   The trial court's removal of Prospective Juror 56 for cause violated Kiles's

28   federal constitutional rights. As discussed in Claim 4, *supra*, a state may not

"entrust the determination of whether a man should live or die to a tribunal organized to return a verdict of death." *Witherspoon v. Illinois*, 391 U.S. 510, 521 (1968). In *Witherspoon*, the Supreme Court held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Id*. at 522. The imposition of death upon a criminal defendant by "a hanging jury" simply "cannot be squared" with the due process guarantee. *Id*. at 522–23. The Supreme Court has since clarified that the operative question is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)).

In *Adams*, the Court reversed a defendant's death sentence under circumstances similar to those in Kiles's case. There, a trial court excused prospective jurors from jury service who stated during voir dire "that they would be 'affected' by the possibility of the death penalty, but who apparently meant only that the potentially lethal consequences of their decision would invest their deliberations with greater seriousness and gravity or would involve them emotionally." 448 U.S. at 49. The trial court also excluded for cause jurors who "were unable positively to state whether or not their deliberations would in any way be 'affected.'" *Id*. at 50. In reversing the defendant's death sentence, the Supreme Court stated: "[N]either nervousness, emotional involvement, nor inability to deny or confirm any effect whatsoever is equivalent to an unwillingness or an inability on the part of the jurors to follow the court's instructions and obey their oaths, regardless of their feelings about the death penalty." *Id*. It concluded that the trial court's "grounds for excluding these jurors were consequently insufficient under the Sixth and Fourteenth Amendments." *Id*.

As in *Adams*, the trial court's for-cause removal of Prospective Juror 56 due

309

1    to her views on capital punishment violated Kiles's constitutional rights. The record

2    contains no indication that Prospective Juror 56's views on capital punishment

3    "would prevent or substantially impair the performance of [her] duties as a juror[.]"

4    *Wainwright*, 469 U.S. at 434. Indeed, the record illustrates that Prospective Juror

5    56 instead expressed that, though she did not personally believe in the death penalty,

6    she could impose it. (Tr. Mar. 7, 2006 at 93.) The court stated that he would dismiss

7    her because she did not want to be a part of the process and was "just too conflicted,

8    I think, in her views to be fair and impartial." (Tr. Mar. 16, 2006 at 5.) However,

9    Prospective Juror 56 stated in voir dire that she could consider all evidence and

10   keep an open mind. (Tr. Mar. 7, 2006 at 92–93.) She explained more than once that

11   she would follow the law. (Tr. Mar. 7, 2006 at 94, 96.) In sum, she was qualified to

12   serve on Kiles's jury.

13       The trial court's decision to strike Prospective Juror 56 for cause prejudiced

14   Kiles. Where a "scrupled, yet eligible" juror is removed in violation of *Witherspoon*

15   and *Witt*, it constitutes prejudice and no harmless-error analysis is required. *Gray*

16   *v. Mississippi*, 481 U.S. 648, 668 (1987).

17               **2.    The trial court should have struck Prospective Jurors 78**
                 **and 82 for cause based on their views of the death penalty.**
18

19       The trial court erred in refusing to strike for cause Prospective Jurors 78 and

20   82, who would have automatically imposed the death penalty and were substantially

21   impaired in their ability to be fair and impartial. Under the Sixth and Fourteenth

22   Amendments, a defendant has a right to an unbiased and impartial jury. *Morgan v.*

23   *Illinois*, 504 U.S. 719, 727 (1992). In *Morgan*, the Supreme Court emphasized that

24   any juror who would automatically impose the death penalty upon conviction of the

25   capital offense charged must be disqualified for cause. 504 U.S. at 729, 735–36.

26       Kiles's counsel moved to strike Prospective Jurors 78 and 82 for cause

27   because their ability to act impartially was substantially impaired by their strong

28   support for the death penalty and other facts. (Tr. Mar. 16, 2006 at 9–15.) These

                                              310

were the only two prospective jurors whom counsel moved to strike for cause.

Prospective Juror 78 stated on his questionnaire and in voir dire that he would vote for death for first-degree murder if it were an option, that he would give death if a person were guilty beyond a reasonable doubt, and that a person should "expect the max." (Tr. Mar. 8, 2006 at 55.) The court stated that he would not dismiss Prospective Juror 78 for cause because:

> a lot of people come into the process thinking that if you're convicted it's an automatic thing, the death penalty's an automatic thing, and they kind of have to be educated and they have to be impartially so, so I don't give an extreme amount of weight to those comments.

(Tr. Mar. 16, 2006 at 12.) This reasoning flies in the face of constitutional precedent. The court conceded that "it's a little bit of a close case." (Tr. Mar. 16, 2006 at 12.) The prospective juror's statements were particularly concerning given that a different jury had already found Kiles guilty beyond a reasonable doubt in 2000; this jury was going to be instructed to rely on that finding.

Prospective Juror 82 stated that the death penalty should be required where there is no remorse. (Tr. Mar. 8, 2006 at 103–04.) He also said that his aunt was beaten and murdered in 2001 by a man who entered her home, that proceedings were ongoing for mental-illness reasons, and that he had sentenced a person to death while serving on a Nevada jury in the late 1980s. (Tr. Mar. 8, 2006 at 99–102.) The court denied counsel's motion to dismiss him for cause because he felt his concerns could be addressed with jury instructions and arguments of counsel.[158] (Tr. Mar. 16,

---

[158] The court relied on the State's arguments that both Prospective Jurors 78 and 82 said that they could follow instructions. Promises that a juror can be fair or follow the law are insufficient under the Constitution. "It may be that a juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty would prevent him or her from doing so." *Morgan*, 504 U.S. at 735 (footnote omitted). The court failed to search beyond the promise to be fair, to follow instructions, to inquire into the dogmatic beliefs of the jurors as required by *Morgan*.

311

25

1   2006 at 15.)

2       In order to determine if a defendant was prejudiced by the trial court's failure

3   to excuse a biased juror for cause, this Court must determine whether the

4   composition of the jury panel as a whole was affected by the trial court's error.

5   *Gray*, 481 U.S. at 665. This decision by the trial court was in error and prejudiced

6   Kiles. Preliminarily, the "presence of a biased juror cannot be harmless; the error

7   requires a new trial without a showing of actual prejudice." *United States v.*

8   *Gonzalez*, 214 F.3d 1109, 1111 (9th Cir. 2000) (quoting *Dyer v. Calderon*, 151 F.3d

9   970, 973 n.2 (9th Cir. 1998)); *Hughes v. United States*, 258 F.3d 453, 463 (6th Cir.

10  2001). Here, as a result of the trial court's errors, defense counsel was required to

11  use two peremptory strikes to remove these biased jurors from the panel. This was

12  improper and a violation of Kiles's Sixth Amendment rights. *See Ross v. Oklahoma*

13  487 U.S. 81, 89 (1988) ("[T]he right to peremptory challenges is denied or impaired

14  only if the defendant does not receive that which state law provides." (internal

15  quotation marks omitted)). Further, the trial court's failure to strike these

16  prospective jurors meant that Kiles's peremptory challenges were unavailable to

17  remove other jurors who ultimately served on his jury even though they too were

18  biased against Kiles. *See* Claim 4*, supra.* The trial court's refusal to strike these two

19  prospective jurors for cause had a "substantial and injurious effect" on Kiles's

20  sentence. *See Brecht*, 507 U.S. at 623.

21   **3.   The trial court erred in permitting statements in voir dire**
22   **and on the juror questionnaire that implied that, if**
     **sentenced to life in prison, Kiles would be eligible for parole**
23   **in 25 years.**

24       Both the juror questionnaire and voir dire proceedings included multiple

25  statements that implied that Kiles could be eligible for parole after serving 25 years.

26  This was not accurate based on the crimes of which he had been convicted. While

27  the court later attempted to correct this misstep with a jury instruction (Tr. May 22,

28  2006 at 15; Tr. Mar. 16, 2006 at 17–19), that instruction was insufficient to counter

312

the belief implanted in the jurors' minds from the outset that Kiles could be eligible for parole after 25 years in prison. This was particularly damaging given that Kiles had already served 17 years in prison by the time the penalty phase commenced.

The Supreme Court has held that a jury must be properly informed of a defendant's lack of eligibility for parole. *See Simmons v. South Carolina*, 512 U.S. 154, 163 (1994); *see also Lynch v. Arizona*, 136 S. Ct. 1818, 1819 (2016).

The first page of the juror questionnaire stated that, if the jury found that there were aggravating factors in this case, they would determine the penalty to be imposed. The questionnaire indicated, "[t]here would be two options. They include (a) death or (b) life in prison for which the defendant will be eligible for parole after serving 25 years. There are no other possible sentences for the murder charge." This statement was misleading, as it (1) failed to mention that Kiles already faced two sentences of 35 years in prison without the possibility of parole for his child-abuse convictions, and (2) minimized that Kiles had been found guilty of three counts of first-degree murder. The questionnaire asked jurors their feelings on "a sentence of life in prison with parole eligibility after 25 years for a person convicted of first-degree murder." The questionnaire also posed a question that started as follows: "Assume you are on a jury to determine the punishment for a defendant who has already been convicted of murder and the law gives you a choice of imposing death or life imprisonment with parole after 25 years." Throughout voir dire, prosecutor Powell made reference to these questions, including when speaking to jurors who were eventually seated. (*E.g.*, Tr. Mar. 6, 2006 at 98, 129; Tr. Mar. 8, 2006 at 53, 102.)

This clearly influenced prospective jurors, likely including those who were ultimately seated. The majority of the venire voiced objections to the release of a person convicted of first-degree murder after 25 years. (ROA 760 at 4.) After voir dire, defense counsel argued a motion to clarify that Kiles would not be eligible for parole after 25 years. (Tr. Mar. 16, 2006 at 18.) The court admitted his error during

313

1   voir dire, stating: "Yeah, and I feel bad about that." (Tr. Mar. 16, 2006 at 19.) The

2   court decided that they could "probably undo the damage."[159] He continued: "I

3   wasn't thinking in terms of the 35 with the kids, and I was only thinking about the

4   murder counts. I wasn't even factoring in the child abuse." (Tr. Mar. 16, 2006 at

5   19.). Even the prosecutor noted: "That was the one theme that ran through all the

6   juror questionnaires more than anything else. People were concerned with life with

7   a possibility in 25." (Tr. Mar. 16, 2006 at 26.)

8        The trial court's error in permitting the jurors to hear via questionnaire and

9   voir dire that Kiles would be eligible for parole after 25 years had a "substantial and

10  injurious effect" on Kiles's sentence. *See Brecht*, 507 U.S. at 623. Jurors who

11  believed that Kiles could be released if they did not sentence Kiles to death were

12  much more likely to vote for death. *See Simmons*, 512 U.S. at 163 ("Holding all

13  other factors constant, it is entirely reasonable for a sentencing jury to view a

14  defendant who is eligible for parole as a greater threat to society than a defendant

15  who is not."). "The shorter the period of time a juror thinks the defendant will be

16  imprisoned, the more likely he or she is to vote for death on the final ballot." John

17  H. Blume, et al., *Future Dangerousness in Capital Cases: Always "At Issue,"* 86

18  Cornell L. Rev. 397, 404 (2001). Kiles was prejudiced and is entitled to relief.

19      **C.    The trial court erred in denying defense counsel's motion for a
20            directed verdict on the "especially heinous, cruel or depraved"
              aggravating circumstance.**

21       The trial court denied defense counsel's motion pursuant to Arizona Rule of

22  Criminal Procedure 20 for a directed verdict on the "especially heinous, cruel or

23  depraved" aggravator under A.R.S. § 13-703(F)(6) (1988). (Tr. Apr. 4, 2006 at 25.)

24  That denial was of constitutional magnitude, as no reasonable factfinder could find

25

26  _____

27  [159] The trial court further compounded this error—and did not undo the damage—
    by declining to sentence Kiles on the two child abuse counts prior to the aggravation
28  phase, as defense counsel requested, to make clear to the jury that Kiles was not
    going to be released from prison. (Tr. Mar. 16, 2006 at 30.)

314

1    beyond a reasonable doubt that the aggravating circumstance existed based on the

2    facts presented at trial.

3          Kiles raised this claim on direct appeal. (DA2 Dkt. 86 at 91–92.) The Arizona

4    Supreme Court determined that its analysis of this claim was subsumed by its

5    independent review of the aggravating circumstances and denied the claim. *State v.*

6    *Kiles*, 213 P.3d 174, 188 n.18 (Ariz. 2009). As explained in Claim 12, *infra*, that

7    ruling was an unreasonable application of or contrary to clearly established federal

8    law, *see* 28 U.S.C. § 2254(d)(1), and was based on unreasonable determination of

9    facts, *see id.* § 2254(d)(2). Preliminarily, the Arizona Supreme Court relied upon

10   Kiles's "admissions" and the testimony regarding "defensive wounds" in finding

11   that the State had established "cruelty." *Kiles*, 213 P.3d at 188. Kiles made only one

12   admission about how Gunnel's death unfolded, to Larry Hawkins, and there was

13   testimony about only one defensive wound. (Tr. July 13, 2000 at 99; *see also* Tr.

14   Mar. 21, 2006 at 21.) The Arizona Supreme Court also relied, for example, on the

15   transfer blood stain on the door as evidence that Gunnel or her attacker was moving;

16   however, Kiles's friend, Kale Johnson, had given a sworn statement acknowledging

17   that he had caused the blood stain on the door. (Tr. July 14, 2000 at 134–35; Tr.

18   July 17, 2000 at 35; Tr. Apr. 27, 2006 at 78; PFR2 Dkt. 20 Ex. 1 at 7.)

19         As explained in detail in Claim 12, *infra*, based on the State's evidence at

20   trial, no reasonable jury could find the (F)(6) aggravating circumstance proven

21   beyond a reasonable doubt. *Lewis v. Jeffers*, 497 U.S. 764, 783 (1990). The trial

22   court's finding that sufficient evidence existed to support this aggravator "was so

23   arbitrary or capricious as to" violate Kiles's due process and Eighth Amendment

24   rights. *See id.* at 780. "Cruelty" was the sole aspect of the (F)(6) aggravator found

25   unanimously by the jury and affirmed on appeal with respect to Gunnel's death, and

26   the elimination of the (F)(6) aggravator would have significantly affected the jury's

27   sentencing deliberations. The trial court's denial thus had a substantial and injurious

28   effect on the sentencing verdict. *See Rogers v. McDaniel*, 793 F.3d 1036, 1042 (9th

315

1  Cir. 2015) ("[W]here a judge in a habeas proceeding is in grave doubt as to the
2  harmlessness of the error, the habeas petitioner must win." (quoting *Pensinger v.*
3  *Chappell*, 787 F.3d 1014, 1029 (9th Cir. 2015)).

4       **D.    The trial court erred in not striking the (F)(8) aggravator as
             unconstitutionally vague.**
5

6       After the aggravation phase, the jury made *Enmund*/*Tison* findings regarding
7  the deaths of the two children. (*See* ROA 879 at 1–4.) Those findings reflected that
8  two of the jurors were not convinced beyond a reasonable doubt that Kiles himself
9  killed the children. (ROA 879 at 1–4.) Even so, the jury proceeded to find that the
10 State had proven the (F)(8) aggravator for multiple homicides. (*See* ROA 879 at 6,
11 9, 12); *see also* A.R.S. § 13-703(F)(8) (1988) ("[t]he defendant has been convicted
12 of one or more other homicides . . . committed during the commission of the
13 offense").

14      Accordingly, the jury applied the (F)(8) aggravator even though it found the
15 State had not proven beyond a reasonable doubt that the defendant himself killed
16 more than one victim. If the aggravating circumstance applies in such broad
17 circumstances, it fails to genuinely narrow the class of offenders eligible for the
18 death penalty. *See Maynard v. Cartwright*, 486 U.S. 356, 363 (1988) (aggravating
19 circumstances that do not appropriately limit application of the death penalty are
20 unconstitutional because they fail to adequately channel the sentencing discretion
21 of the jury). The (F)(8) aggravator thus runs afoul of the Eighth Amendment. *See*
22 *id.*; *see also, e.g.*, *Godfrey v. Georgia*, 446 U.S. 420, 433 (1980).

23      Kiles raised this claim on direct appeal. (DA2 Dkt. 86 at 92–93.) However,
24 at no point did the Arizona Supreme Court consider or address Kiles's argument of
25 vagueness under the Eighth Amendment. Instead of considering the issue raised by
26 Kiles, the court misconstrued Kiles's argument and reaffirmed that the jury finding
27 of the (F)(8) aggravator was not in error. *Kiles*, 213 P.3d at 186. Because the state
28 court did not adjudicate this claim on the merits, this Court is not bound by the

strictures of § 2254(d). The trial court erred in not striking this aggravator as vague, and—because Arizona is a weighing state in which jurors weigh the aggravators against the mitigation—that error was substantial and injurious. *See Brecht*, 507 U.S. at 623; *see also Brown v. Sanders*, 546 U.S. 212, 220 (2006).

**E.     The trial court denied Kiles's due-process rights by admitting a gruesome and unduly prejudicial photograph.**

Over defense objection, the trial court admitted into evidence a gruesome photograph, described in Claims 3 and 7, *supra*, at Kiles's aggravation phase. (Tr. Mar. 20, 2006 at 25–38; *see also* 2006 Trial Ex. 72.) The admission of that photograph, which was so haunting as to infect the reliability of Kiles's entire penalty phase, violated Kiles's due-process rights. *See, e.g.*, *Zant v. Stephens*, 462 U.S. 862, 879, 885 (1983) (the jury should not be allowed to consider evidence that is "totally irrelevant to the sentencing process" and fails to focus on "the character of the individual and circumstances of the crime"); *Romano v. Oklahoma*, 512 U.S. 1, 12 (1994).

Kiles raised this claim on appeal. (DA2 Dkt. 86 at 56–66) As discussed *supra*, Claim 7, the Arizona Supreme Court's determination that this photograph did not prejudice Kiles, *see Kiles*, 213 P.3d at 183, was an unreasonable application of or contrary to clearly established Supreme Court precedent, *see* 28 U.S.C. § 2254(d)(1), and rested on an unreasonable determination of fact, *see id.* § 2254(d)(2). Certainly the prejudice from such a disturbing image can infect matters beyond whether the defendant is sentenced to death for killing the particular victim in the photograph. Because of the horrifying nature of Exhibit 72 and its tendency to arouse emotion in the jurors, along with its complete lack of probative value, the trial court's admission of the photograph violated Kiles's due-process rights and prejudiced him. *See Brecht*, 507 U.S. at 623.

317

1

2

**F.**   **The trial court unconstitutionally permitted the victims' attorney to file pleadings, including a requested jury instruction.**

3   The trial court permitted the victims' attorney to file pleadings and suggest

4   jury instructions. This caused the victims' attorney to effectively become a second

5   prosecutor, which violated Kiles's rights to due process and to a fair trial under the

6   Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.

7   The laws of Arizona prescribe in detail the rights of victims. Here, the trial

8   court erred when it permitted the victims' attorney to file pleadings. The victims'

9   attorney both filed a motion in response to the defense's motion to preclude victim-

10   impact evidence and filed a motion in limine to request a jury instruction on victim-

11   impact evidence (ROA 724; ROA 775.) The court adopted this instruction, but

12   added limitations. (Tr. May 22, 2006 at 22.)

13   That the trial court allowed Kiles to face prosecution by not one, but two,

14   entities violated his constitutional rights to due process and a fair trial. This error

15   had a "substantial and injurious effect" on Kiles's sentence. *See Brecht*, 507 U.S. at

16   623. Kiles is entitled to relief.

17

18

**G.**   **The trial court unconstitutionally permitted the introduction of victim-impact evidence.**

19   The trial court violated Kiles's constitutional rights when it permitted

20   prejudicial victim-impact evidence to be presented to the jury. The admission at a

21   capital-sentencing proceeding of any victim-impact evidence violates the Sixth,

22   Eighth, and Fourteenth Amendments to the U.S. Constitution. The constitutionality

23   of a capital-sentencing proceeding hinges entirely on its reliability—on minimizing

24   the risk that the sentencer will impose a death sentence based on an impermissible

25   consideration. *See, e.g.*, *Gardner v. Florida*, 430 U.S. 349, 358 (1977) (plurality

26   opinion) ("It is of vital importance to the defendant and to the community that any

27   decision to impose the death sentence be, and appear to be, based on reason rather

28   than caprice or emotion."); *Gregg v. Georgia*, 428 U.S. 153, 189 (1976) (joint

318

1    opinion of Stewart, Powell, and Stevens, JJ.) (declaring that "where discretion is
2    afforded a sentencing body on a matter so grave as the determination of whether a
3    human life should be taken or spared, that discretion must be suitably directed and
4    limited so as to minimize the risk of wholly arbitrary and capricious action").

5          Victim-impact evidence is emotionally laden; it provokes in jurors a response
6    that is neither reasoned nor rational and that jurors are ill-equipped to set aside.
7    Accordingly, victim-impact evidence is inadmissible at a capital-sentencing
8    proceeding. *See* Susan A. Bandes & Jessica M. Salerno, *Emotion, Proof and*
9    *Prejudice: The Cognitive Science of Gruesome Photos and Victim Impact*
10   *Statements*, 46 Ariz. St. L.J. 1003, 1035–36 (2014) (citing research on the increased
11   punitiveness of jurors exposed to victim-impact evidence); *but see Payne v.*
12   *Tennessee*, 501 U.S. 808 (1991). The admission of Gunnel's family's emotionally
13   fraught statements, alongside the pictures, prejudiced Kiles.

14         The Supreme Court has recognized that victim-impact evidence can be so
15   unduly prejudicial as to render a sentencing fundamentally unfair. *See Payne*, 501
16   U.S. at 825; *see also Gretzler v. Stewart*, 112 F.3d 992, 1009 (9th Cir. 1997). And,
17   when members of the victim's family offer characterizations and opinions about the
18   crime, the defendant suffers a fundamental violation of his due-process and Eighth-
19   Amendment rights. *See Booth v. Maryland*, 482 U.S. 496, 509 (1987), *overruled on*
20   *other grounds by Payne*, 501 U.S. at 808.

21         The parties litigated the admissibility of and restrictions on victim-impact
22   evidence in 2000 and then again in 2005. (Tr. Dec. 29, 2000 at 28–29; ROA 512 at
23   1; ROA 517 at 1; ROA 722 at 1; ROA 724 at 1; ROA 733 at 1.) The court precluded
24   victim-impact evidence from the presentence report but determined that victims
25   could make impact statements at the hearing. (ROA 481 at 1; Tr. Dec. 29, 2000 at
26   27–29.) In 2005, defense counsel sought to have victim-impact evidence precluded
27   altogether and, failing that, to have limitations placed on the evidence to cabin its
28   prejudicial nature. (*See* ROA 695 at 1.)

1    After defense counsel's opening statement, the State presented victim-impact
2    statements. (Tr. Apr. 24, 2006 at 22–27.) The attorney for the victims read a letter
3    by Gunnel's brother. (Tr. Apr. 24 2006 at 22–24.) Gunnel's mother then made a
4    statement in person. (Tr. Apr. 24, 2006 at 24–26.) She then read a letter by Gunnel's
5    sister. (Tr. Apr. 24, 2006 at 26–27.) While the jury listened to the victim-impact
6    statements, the State displayed a large exhibit on an easel that was a collage of
7    photographs of the victims. (Tr. Apr. 24, 2006 at 22; 2006 Trial Ex. 163 at 1–2.)

8    The victim-impact evidence at trial violated Kiles's constitutional rights to a
9    fair trial and a reliable sentence by injecting an irrelevant and highly prejudicial
10   characterization of the crime into his capital sentencing proceedings. The
11   statements detailing the victims' lives from childhood on, in conjunction with
12   numerous photographs shown to the jury, were so prejudicial as to undermine the
13   reliability of the sentencing proceeding. (Tr. Apr. 24, 2006 at 22, 24–26.) It likely
14   aroused in jurors enormous sympathy toward the victims and antipathy toward the
15   defendant, especially when the grandmother detailed how her granddaughter's body
16   was found floating in a river. (Tr. Apr. 24, 2006 at 26.) Accordingly, the victim-
17   impact testimony in this case violated Kiles's constitutional rights by inviting a
18   verdict based on sentiment, instead of the requisite reasoned judgment.

19   Finally, witnesses, including victim-impact witnesses, making statements at
20   penalty-phase proceedings must be under oath and subject to cross-examination.
21   The Sixth and Fourteenth Amendments guarantee a defendant the "right to be
22   confronted with the witnesses against him." *See Pointer v. Texas*, 380 U.S. 400,
23   405 (1965) (internal quotation marks omitted). The Supreme Court made clear in
24   *Crawford v. Washington* that the Confrontation Clause guarantees confrontation
25   against those "who bear testimony" against a defendant. 541 U.S. 36, 51 (2004).
26   The right to confrontation is the favored procedure for determining the reliability
27   of a witness's statements, *see id.* at 61, and nowhere is that reliability more
28   necessary than in a capital-sentencing proceeding, *see Woodson*, 428 U.S. at 305.

320

1    Accordingly, all who bear witness during the penalty phase of a capital trial must

2    be subject to confrontation.

3        Here, the State presented one in-person victim-impact witness who was not

4    under oath or subject to cross-examination, and read two letters by people who were

5    not present. (Tr. Apr. 24, 2006 at 22–27.) Kiles was thus denied the opportunity to

6    cross-examine these witnesses, and that denial prejudiced Kiles and violated his

7    Sixth and Fourteenth Amendment rights.

8        The presentation of victim-impact evidence influenced the jury. One juror

9    commented that as soon as they saw the photographs, they had made up their mind

10   on death. The admission of victim-impact evidence prejudiced Kiles as it had a

11   "substantial and injurious effect" on Kiles's sentence. *See Brecht*, 507 U.S. at 623.

12   Accordingly, Kiles is entitled to relief.

13   **H.    The trial court unconstitutionally permitted the State to ask**

14   **witnesses at trial about statements contained in the reports of**
     **experts who testified at the first trial but not at the second trial, in**

15   **violation of Kiles's rights.**

16       The trial court violated Kiles's rights under the Sixth and Fourteenth

17   Amendments when it permitted the State to ask witnesses about the content of

18   reports by experts who testified at Kiles's first trial in 1990, but who did not testify

19   at the second trial in 2006.

20       As discussed above, the Sixth and Fourteenth Amendments guarantee a

21   criminal defendant the "right to be confronted with the witnesses against him."

22   *Pointer*, 380 U.S. at 405 (internal quotation marks omitted). The Supreme Court

23   has repeatedly held that admitting testimonial out-of-court statements where

24   defense counsel has not had the opportunity to cross-examine the witness violates

25   these principles. *E.g.*, *Crawford*, 541 U.S. at 68–69 ("Where testimonial statements

26   are at issue, the only indicium of reliability sufficient to satisfy constitutional

27   demands is the one the Constitution actually prescribes: confrontation."); *see also*

28   *State v. Prince*, 250 P.3d 1145, 1159 (Ariz. 2011) (holding that a "defendant has a

1    right to confront testimonial hearsay evidence introduced to establish an
2    aggravating factor"). The defendant's right to cross-examine all who would offer
3    evidence at trial is necessary to ensure the reliability of proceedings required by the
4    due process clause, and nowhere is that reliability more necessary than in a capital-
5    sentencing proceeding. *See Woodson*, 428 U.S. at 305. Testimonial evidence—that
6    is, evidence prepared in anticipation of trial—must be presented by the person who
7    prepared it. *See, e.g., Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 308–11
8    (2009).

9        At trial, the State directly asked multiple experts about Kiles's statements
10   that experts retained for the first penalty-phase hearing in 1990 recorded in their
11   reports. (*E.g.*, Tr. May 8, 2006 at 41–44; Tr. May 9, 2006 p.m. at 11–12; Tr. May
12   15, 2006 at 50, 55.) However, the proceedings for which these reports were
13   produced were deemed unreliable because of the ineffective assistance of counsel,
14   and Kiles was granted state post-conviction relief. (*See* ROA 314 at 4.)
15   Nevertheless, the court allowed the State to ask the experts about the content of
16   these reports and whether they differed from Kiles's later statements. (*E.g.*, Tr. May
17   8, 2006 at 41–44; Tr. May 9, 2006 p.m. at 11–12; Tr. May 15, 2006 at 50, 55.)

18       VanDreumel objected the first time the State did this, because permitting
19   these statements to come in violated Kiles's constitutional confrontation clause
20   rights under *Crawford*. (Tr. May 8, 2006 at 41, 43, 54.) She argued that Kiles was
21   being denied his right to cross-examine the doctors who wrote the reports as to
22   whether Kiles made the statements in question. (Tr. May 8, 2006 at 54.) While
23   VanDreumel objected during the testimony, the grounds for her objection were not
24   placed on the record until the end of the day, and the court did not clearly rule on
25   the objection on the record. (Tr. May 8, 2006 at 54–58.) The court did state that he
26   would not allow a particular question. (Tr. May 8, 2006 at 44.) However, Powell
27   continued to ask questions along these lines, apparently with the court's approval,
28   even though these reports were clearly testimonial, as they had been prepared in

1   advance of the first trial and entered into evidence at the first trial. (Tr. May 8, 2006
2   at 44–47; 1990 Trial Def. Ex. 3; 1990 Trial Def. Ex. 4; 1990 Trial State Ex. 7.)

3   　　　Putting this evidence before the jury violated Kiles's Sixth and Fourteenth
4   Amendment rights to confront the witnesses against him, and was inconsistent with
5   the Supreme Court's Sixth Amendment jurisprudence including *Crawford*. Even if
6   the rules of evidence regarding "hearsay" did not apply to the State's penalty-phase
7   presentation, the Sixth Amendment demands more. *See Crawford*, 541 U.S. at 68.

8   　　　Kiles suffered prejudice from the court permitting the contents of prior
9   experts' reports into evidence. Throughout the penalty phase, the State hammered
10  the theme that Kiles was not telling the truth—in particular, that his story had
11  changed over the years. (*E.g.*, Tr. May 22, 2006 at 72; Tr. May 8, 2006 at 48; Tr.
12  May 9, 2006 p.m. at 11–12; Tr. May 15, 2006 at 55.) As a result, the State argued
13  that the jury should not believe his mitigation pertaining to his traumatic childhood,
14  substance abuse, and mental illness. (*E.g.*, Tr. May 22, 2006 at 72.) In closing, the
15  State focused on how Kiles's experts' diagnoses were based on Kiles's "self-
16  serving" statements. (Tr. May 22, 2006 at 72.) The State went so far as to say "as
17  you have heard from some of the earlier doctors that examined him, everything was
18  fine," as if those doctors had testified. (Tr. May 22, 2006 at 73.) However, Kiles
19  did not have a chance to cross-examine these doctors, as required by *Crawford*. The
20  jury was likely influenced by this testimony, which became central to the State's
21  penalty-phase case. The constitutional violation therefore had a substantial and
22  injurious effect at the penalty phase. *See Ocampo v. Vail*, 649 F.3d 1098, 1114 (9th
23  Cir. 2011) (citing *Brecht,* 507 U.S. at 623, in finding that a confrontation clause
24  violation warranted habeas relief.). Accordingly, Kiles is entitled to relief.

25  **I.　　The trial court unconstitutionally failed to provide the jury with a
26  　　　special verdict form listing the specific mitigating factors they
　　　found proven, violating Kiles's rights.**

27  　　　The trial court violated Kiles's rights under the Eighth and Fourteenth
28  Amendments to the U.S. Constitution because it did not require the jurors to make

1    specific findings as to each proffered mitigating factor.

2          The Eighth and Fourteenth Amendments require states to provide a
3    mechanism for meaningful direct review of death sentences. *Gregg*, 428 U.S. at
4    197–98 (joint opinion of Stewart, Powell, and Stevens, JJ.). In order to achieve such
5    meaningful review, "it is important that the record on appeal disclose to the
6    reviewing court the considerations which motivated the death sentence in every
7    case in which it is imposed." *Gardner*, 430 U.S. at 361 (plurality opinion). Arizona
8    law helps to ensure meaningful review in non-capital cases, for which the court is
9    required to state for the record the mitigating and aggravating factors it considers
10   and applies when imposing any sentence other than the presumptive term. A.R.S. §
11   13-701(C); *State v. Harrison*, 985 P.2d 486 (Ariz. 1999). However, Arizona fails
12   to offer such protections to capital defendants. The trial court did not require the
13   jury to identify in its verdict form which mitigating circumstances individual jurors
14   deemed proven. *See* A.R.S. § 13-701. The verdict forms in Kiles's case thus reflect
15   only the ultimate sentence the jury deemed appropriate for each first-degree murder
16   conviction. (*See* ROA 919 at 1–3.)

17         As a result, when the Arizona Supreme Court conducted its independent
18   review of the "aggravation, mitigation, and the propriety of the sentence" in Kiles's
19   case, *see Kiles*, 213 P.3d at 187–92, it did so without the benefit of knowing which
20   mitigating circumstances jurors had found proven. In other words, the court
21   conducted its appellate review without knowing the considerations that motivated
22   the death sentence. That appellate review was not the meaningful review
23   contemplated by *Gregg. See Gardner*, 430 U.S. at 361 (plurality opinion). That such
24   a review—done without information on what informed the jury's decision—could
25   not have been meaningful is especially true in this case, where the jury was asked
26   to consider an enumerated list of mitigating circumstances and where the jury
27   determined that death was the appropriate sentence on one count of first-degree
28   murder but that life imprisonment was appropriate for two other counts. (*See* Tr.

                                          324

1    May 22, 2006 at 19–21; ROA 919 at 1–3.)

2        The trial court's failure to require special verdict forms indicating which

3    mitigating circumstances the jurors found proven deprived Kiles of an adequate

4    appellate review and violated his rights under the Eighth and Fourteenth

5    Amendments to the U.S. Constitution. This error had a "substantial and injurious

6    effect" on Kiles's sentence. *See Brecht*, 507 U.S. at 623. Accordingly, Kiles is

7    entitled to relief.

8        **J.    The trial court unconstitutionally failed to make a complete record**
         **at trial, in violation of Kiles's rights.**
9

10       As discussed above, a complete record is necessary to protect Kiles's

11   Fourteenth Amendment right to meaningful appellate review. *See Gregg*, 428 U.S.

12   at 195 (joint opinion of Stewart, Powell, and Stevens, JJ.); *Dobbs v. Zant*, 506 U.S.

13   357, 358 (1993). A state must provide the defendant "a sufficiently complete record

14   of the trial proceedings," *Draper v. Washington*, 372 U.S. 487, 500 (1963), to

15   "assure the indigent defendant an adequate opportunity to present his claims fairly

16   in the context of the [s]tate's appellate process." *Ross v. Moffitt*, 417 U.S. 600, 616

17   (1974).

18       Kiles's trial court failed to make a record of a number of essential penalty-

19   phase proceedings. For example, there is no transcript or other record of any

20   discussion regarding either party's proposed penalty-phase jury instructions.

21   Further, at multiple points, counsel approached the bench and had discussions that

22   were not recorded. (*E.g.*, Tr. Apr. 27, 2006 at 50; Tr. May 16, 2006 at 45.) In

23   addition, the questionnaires completed by Prospective Jurors 98 and 85, whom the

24   defense struck using peremptory strikes, were not preserved. (ROA 895 at 4.)

25       The omissions from the trial court record deprived Kiles of meaningful

26   review, because it was impossible for counsel or the courts after the conviction to

27   conduct a proper review of the proceedings against Kiles. This knowledge is crucial

28   to a meaningful review of counsel's performance, and to meaningful appellate

325

review of Kiles's convictions and sentence. The trial court's failure to ensure a complete record deprived Kiles of a meaningful appellate review and violated his rights under the Eighth and Fourteenth Amendments. This error had a "substantial and injurious effect" on Kiles's sentence. *See Brecht*, 507 U.S. 619 at 623. Accordingly, Kiles is entitled to relief.

### K.      The cumulative effect of these trial-court errors prejudiced Kiles.

The Ninth Circuit recognizes that the cumulative effect of multiple errors may still prejudice a defendant where no single trial error examined in isolation is sufficiently prejudicial to warrant reversal. *See Parle v. Runnels*, 505 F.3d 922, 934 (9th Cir. 2007) (finding habeas relief warranted when combined effect of multiple trial errors resulted in injurious effect on jury's verdict); *Alcala v. Woodford*, 334 F.3d 862, 894–95 (9th Cir. 2003) (affirming grant of habeas relief where multiple errors by court and counsel deprived defendant of a fundamentally fair trial); *Killian v. Poole*, 282 F.3d 1204, 1211 (9th Cir. 2002) (stating that the cumulative effect of errors may be so prejudicial as to require reversal).

The trial court committed numerous errors during the mitigation phase of Kiles's trial. Even if this Court were to find that none of them merit relief alone, the cumulative effect of all the errors is so prejudicial that Kiles is entitled to relief on that basis. For all the reasons discussed above, Kiles's constitutional rights were violated, and he is entitled to relief.

**Claim Nine**

**Kiles was deprived of his right to due process and a fair trial because the prosecutor engaged in pervasive misconduct.**

The State's misconduct violated Kiles's rights to a fair trial, to present a complete defense, to due process, and to reliable guilt and sentencing determinations in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution. Kiles incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

326

1    This claim was raised by Kiles's appellate counsel, but it was waived because
2    Kiles's appellate attorney failed to argue the claim in his opening brief. (*See* ROA
3    1189 at 64–65); *see* Claim 11, *infra*. However, the claim was addressed on the
4    merits by the state post-conviction court when the court considered appellate
5    counsel's ineffective assistance. (ROA 1214 at 2; *see also* ROA 1189 at 61–65.)
6    The state court's denial of this claim as not colorable was an unreasonable
7    application of or contrary to clearly established federal law, *see* 28 U.S.C.
8    § 2254(d)(1), and rested on an unreasonable determination of the facts, *id.*
9    § 2254(d)(2). Accordingly, the strictures of § 2254(d) do not apply to this claim,
10   and this Court may review the merits of this claim de novo.[160]

11   Prosecutors occupy a unique position in the justice system and are therefore
12   subject to uniquely rigorous standards. Although a prosecutor "may strike hard
13   blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from
14   improper methods calculated to produce a wrongful conviction as it is to use every
15   legitimate means to bring about a just one." *Berger v. United States*, 295 U.S. 78,
16   88 (1935). His interest in a criminal prosecution is not to win a case, but "that justice
17   shall be done." *Id.* at 88; *see also United States v. Kojayan*, 8 F.3d 1315, 1323 (9th
18   Cir. 1993) (explaining that a "prosecutor's job isn't just to win, but to win fairly,
19   staying well within the rules"). Kiles's prosecutor David Powell engaged in
20   misconduct: he vouched for witnesses, mischaracterized or misstated evidence, put
21   words into the mouths of witnesses, and put his own testimony into the record. The
22   cumulative effect of Powell's acts rendered the trial fundamentally unfair and
23   prejudiced Kiles's substantive rights.

24   To prevail on a prosecutorial misconduct claim, a petitioner must
25   demonstrate that the prosecutor's conduct either (1) prejudiced a substantive right,

---

26   [160] Alternatively, Kiles alleges he can overcome any default by showing cause and
27   prejudice attributable to the ineffective assistance of state post-conviction counsel.
     *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *Strickland v. Washington*, 466 U.S.
28   668, 688, 694 (1984).

327

*see Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) (citing *Griffin v. California*, 380 U.S. 609 (1965)), or (2) rendered the trial fundamentally unfair, *see Berger*, 295 U.S. at 78. When evaluating instances of prosecutorial misconduct, the reviewing court must consider the cumulative effect of the harm. *See Berger*, 295 U.S. at 89 (awarding a new trial because of "probable cumulative effect" of instances of prosecutorial misconduct). Here, Kiles can show that the prosecutor's conduct both prejudiced his substantive rights and rendered the trial fundamentally unfair. Thus, the prosecutorial misconduct had a "substantial and injurious effect" on Kiles's convictions and sentences. *See Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993).

### A.   The prosecutor committed misconduct in the guilt-phase proceedings.

Powell argued a theory of how the crime was committed that could not be reasonably inferred from the evidence. *See United States v. Hermanek*, 289 F.3d 1076, 1101 (9th Cir. 2002) (holding that the prosecutor committed misconduct in urging the jury to assume facts that were not in evidence and could not be reasonably inferred from the evidence). There was little evidence to support Powell's theory of how the crime occurred. (*See* Tr. July 12, 2000 at 104–41; Tr. July 13, 2000 at 93–107; Tr. July 14, 2000 at 4–61; Tr. Mar. 21, 2006 at 4–34; Tr. Mar. 27, 2006 at 11–140; Tr. Mar. 29, 2006 at 26–74.)

Additionally, Powell's misleading and inflammatory arguments were not based on the evidence and were improper. *See Darden v. Wainwright*, 477 U.S. 168, 180–81 (1986) (explaining that a prosecutor commits misconduct when he manipulates or misstates the evidence at trial); *Zapata v. Vasquez*, 788 F.3d 1106, 1113–14 & n.6 (9th Cir. 2015) (explaining that the prosecutor committed "serious misconduct" by offering "as though it was fact" a "fictional" account of the defendant's use of racial slurs as the victim died).

1
2

> **1.** **The prosecutor repeatedly mischaracterized testimony, made speculative arguments, and used inflammatory language in its guilt-phase opening and closing.**

3
4
5
6
7
8
9
10

A prosecutor may not make inaccurate statements about the record that may mislead or confuse the jury. *See King v. United States*, 372 F.2d 383, 395 (D.C. Cir. 1966); *United States v. Robledo-Vela*, 45 F. App'x 567, 568 (9th Cir. 2002) (finding "significant prosecutorial misconduct in the form of misstating evidence, and that this error was not harmless"). A prosecutor's comments create prejudicial error if they constitute personal and institutional guarantees of trustworthiness of the government and its case. *See United States v. Smith*, 962 F.2d 923, 933 (9th Cir. 1992).

11
12
13
14
15
16
17
18
19
20
21
22
23
24

As discussed in Claim 3, *supra*, Powell's theory of the crime had next to no support from the evidence. In his guilt-phase opening statement, Powell claimed that Kiles began beating Valerie Gunnel in her bedroom. (Tr. July 10, 2000 at 13.) The beating continued into the living room, where Gunnel died. (Tr. July 10, 2000 at 13.) Presumably, Powell's objective was to convey that the prolonged, moving attack was evidence that Kiles premeditated the killing. However, as Detective Brian Rodgers testified, there was no blood spatter or castoff on the walls in Gunnel's bedroom. (Tr. July 17, 2000 at 65.) Though a bloody pillow and a ratchet were found in Gunnel's bedroom, Rodgers testified that items were moved around after the murder in what looked like an attempt to clean up the scene. (Tr. July 11, 2000 at 166–67.) Powell never asked the State's experts—the pathologist or the blood-spatter expert—about evidence probative of where the attack on Gunnel had started. (Tr. July 13, 2000 at 93–107; Tr. July 14, 2000 at 4–61.) Regardless, Powell asserted that Gunnel was first attacked in her bedroom.

25
26
27
28

Because Powell had little evidentiary support for this theory, he mischaracterized—and even made up—testimony to support his claim that Kiles had first hit Gunnel in her bedroom. Perhaps most egregious were Powell's repeated and forceful misrepresentations during closing argument of Larry Hawkins's

329

1   testimony. *See supra*, Claim 3. For instance, Powell proclaimed several times that
2   Hawkins had testified that Kiles first attacked Gunnel in her bedroom. (Tr. July 18,
3   2000 at 22; Tr. July 19, 2000 at 27; Tr. July 19, 2000 at 30; Tr. July 19, 2000 at 81–
4   82.) However, Hawkins never testified to this. (Tr. July 13, 2000 at 3–80.) Rather,
5   Hawkins stated that after grabbing the tire jack, Kiles went into the apartment and
6   "struck [Valerie]." (Tr. July 13, 2000 at 29.) Also contrary to Powell's claim,
7   Hawkins's Silent Witness letter nowhere suggested that Kiles beat Gunnel in her
8   bedroom. (Tr. Mar. 20, 2006 at 77.) Powell further alleged in closing that Gunnel
9   "put up a fight," and he claimed that Hawkins had testified to that point. (Tr. July
10  19, 2000 at 82.) But Hawkins never did. (Tr. July 13, 2000 at 3–80.) Powell
11  intentionally misstated Hawkins's testimony to mislead the jury into believing the
12  State had a clear-cut case that Gunnel's death was premeditated.

13          Powell also told the jury in closing that photographs of blood patterns from
14  the crime scene were "physical evidence." Powell continued, "Like [defense]
15  counsel told you in opening, it can't be argued with." (Tr. July 19, 2000 at 29.) In
16  so arguing, Powell purposefully misstated defense counsel's position and conflated
17  physical evidence with scientific or forensic evidence. Defense counsel had
18  conveyed in opening that the scientific evidence in Kiles's case was not subject to
19  argument. (Tr. July 10, 2000 at 34–35); *see*, *e.g.*, Claim 3, *supra*. However, counsel
20  had not said the same of the photographs. Moreover, there was no scientific
21  evidence that Gunnel was attacked in her bedroom; none of the State's experts gave
22  any such testimony at the guilt phase. (Tr. July 12, 2000 at 104–41; Tr. July 13,
23  2000 at 93–107; Tr. July 14, 2000 at 4–61.) Rather, Powell told the jury, "Let's all
24  be blood spatter experts for a little bit now, okay." (Tr. July 19, 2000 at 28.) Powell
25  misled the jurors, insinuating that the State's theory of the crime and the "physical
26  evidence" had the same credibility as the testimony given by experts on forensic
27  evidence.

28          Compounding the mischaracterizations of evidence, Powell made comments

330

1   intended to inflame the jury. For example, he announced that Gunnel had "savage
2   wounds" on her; the wound on her face was "ungodly." (Tr. July 19, 2000 at 28.)
3   He also made speculative and inflammatory comments during his rebuttal
4   argument, surmising that Kiles's thought process must have been, "I guess since
5   we're killing one we may as well kill them all. Let's kill the whole family. Let's
6   kill two generations." (Tr. July 19, 2000 at 77.)

7       Finally, in his closing statement of the guilt-phase proceeding, Powell told
8   the jury: "The [S]tate maintains to you, ladies and gentlemen, never has a case
9   exhibited more premeditation than the one we exhibit now." (Tr. July 19, 2000 at
10  36–37.) Powell's comments created prejudicial error as they constituted personal
11  and institutional guarantees of trustworthiness of the government and its case. *See*
12  *Smith*, 962 F.2d at 933.

13      The purpose of a closing argument "is to explain to the jury what it has to
14  decide and what evidence is relevant to its decision." *Sandoval v. Calderon*, 241
15  F.3d 765, 776 (9th Cir. 2000). Instead of offering relevant evidence, Powell gave
16  the jury extraneous information about this case by comparing it to other government
17  cases—information that the jury could not consider in its deliberations. *See Fields*
18  *v. Brown*, 503 F.3d 755, 779 (9th Cir. 2007) (holding that "evidence developed
19  against a defendant must come from the witness stand"). This was improper and
20  prejudicial. *See Darden*, 477 U.S. at 180–81; *Smith*, 962 F.2d at 933; *Robledo-Vela*,
21  45 F. App'x at 568; *Zapata*, 788 F.3d at 1113–14.

22          **2.    The prosecutor mischaracterized the scientific evidence**
                    **during the guilt phase.**
23

24      In his opening statement in the guilt-phase proceeding, Powell also misled
25  the jury in a different way, by misrepresenting what the scientific evidence in
26  Kiles's case could prove. Powell stated that DNA could show the "chronology of
27  what happened inside [Gunnel's] apartment" and "it's going to prove to you what
28  the defendant did, that he killed three people." (Tr. July 10, 2000 at 16–17.) But

331

1     DNA testing can do neither of those things. In this case, it was used to determine
2 whether an "individual can be the source of this stain" of blood taken from the crime
3 scene. (Tr. July 12, 2000 at 112–13.) The State's expert described it as "a simple
4 pattern comparison"—either an individual likely was the source of a blood sample
5 or likely was not—and nothing more. (Tr. July 12, 2000 at 112–13.) Still, Powell
6 attempted to falsely ascribe forensic certainty to the State's theory. *See United*
7 *States v. Ruiz*, 710 F.3d 1077, 1085 (9th Cir. 2013) (holding that improper vouching
8 includes "suggesting that information not presented to the jury supports the
9 witness's testimony"); *see also United States v. Kerr*, 981 F.2d 1050, 1053 (9th Cir.
10 1992) (holding that a prosecutor "has no business telling the jury his individual
11 impressions of the evidence").

12       Powell also misled the jury as to what the blood-spatter expert, Tom Bevel,
13 could tell them when he testified at trial. Powell told them that Bevel would tell the
14 jury "what happened in that west bedroom to those two children." (Tr. July 10, 2000
15 at 20.) Blood-spatter science is an inexact one, and while it can perhaps provide
16 background on how blood evidence came to be in a crime scene, like DNA it cannot
17 tell the jury who did the crime or how the crime happened. (Tr. July 12, 2000 at
18 112–13.)

19       Powell's repeated insistence that the scientific and forensic evidence given
20 at trial supported the State's theory of the crime was misleading. Powell tried to
21 stamp the State's theory of the crime with the imprimatur of scientific certainty (*see*
22 Tr. July 10, 2000 at 16–17), and, in doing so, committed misconduct.

23          **3.**     **The prosecutor improperly testified on the record during**
24                 **the guilt phase.**

25       Powell improperly put his own testimony on the record when questioning
26 witnesses. In one example, when Powell was questioning a witness for the State
27 about statements made by Kiles, Powell asked leading, testimonial questions:

28         Q. Do you recall him saying anything about, Valerie just

1
2

went off on me. I had no choice in the matter. I had to beat her to death.

A. No, sir, no, sir.

3
4

Q. Did he tell you anything about, I'm really in a bind, I got three bodies I need to get rid of here?

5

A. No, sir, no, sir.

6

Q. Did he mention anything about the two guys that also helped him kill someone leaving him in a lurch?

7

A. He didn't mention nothing like that to me, sir.

8

(Tr. July 10, 2000 at 173.) That Powell testified to the crime and how it was

9

committed, rather than eliciting that testimony from the witness, was misconduct.

10

While the jury was instructed before deliberations that "what the lawyers said is not

11

evidence" (Tr. July 19, 2000 at 87), that charge was far from adequate to cure the

12

State's pattern of improper questioning.

13
14

**4.      The prosecutor failed to disclose information on one of its witnesses.**

15

Kiles's arresting officer, Officer David Sherman, who testified for the State,

16

had committed malfeasance by previously falsifying a urine test. The malfeasance

17

was discovered prior to Kiles's trial, and Sherman chose to retire rather than face

18

disciplinary sanctions.

19

Under *Brady v. Maryland*, 373 U.S. 83 (1963), the State was required to

20

disclose this impeachment information about Sherman to the defense. It is unclear

21

whether this material was disclosed to defense counsel in a timely manner. Without

22

this information, defense counsel was hindered from effectively impeaching

23

Sherman. Any withholding of this or other impeachment material by the State

24

constituted misconduct. *See Brady*, 373 U.S. at 90.

25
26

**5.      The prosecutor improperly dehumanized the defendant in the guilt-phase closing.**

27

"[P]resented with a criminal defendant, even well-meaning people fall prey

28

to the stereotype that, whether for reason of biology or culture, Black people are

333

1   inherently violent and dangerous." *See* Br. for the Nat'l Black Law Students Ass'n

2   as Amicus Curiae in Support of Pet'r, *Buck v. Davis*, 137 S. Ct. 759 (2017) (No.

3   15-8049), at 2.

4         Where the State could not support its narrative with evidence, it tried to draw

5   on jurors' implicit racial biases. The State improperly used the phrase "feeding

6   frenzy" to dehumanize Kiles, an African-American man, and to invoke the racial

7   stereotype of African-American men as dangerous and animalistic.[161] "By

8   describing a defendant in animalistic terms, a prosecutor is improperly bringing

9   race into the courtroom." Shana Heller, *Dehumanization and Implicit Bias: Why*

10  *Courts Should Preclude References to Animal Imagery in Criminal Trials*, 51 No.

11  4 Crim. L. Bulletin ART 4 (Summer 2015).

12        Powell first used the term while cross-examining Kiles. Powell asked Kiles

13  about Kale Johnson, another African-American male, and his involvement in the

14  crime. Kiles testified that Johnson killed the children. Powell asked, "Was it like a

15  feeding frenzy now?" Kiles answered, "I can't answer for Kale Johnson. I can only

16  answer for myself, sir." (Tr. July 17, 2000 at 209.)

17        In closing, Powell repeatedly invoked this highly prejudicial phrase against

18  Kiles. "[I]t's gory, this feeding frenzy." (Tr. July 19, 2000 at 30.) Powell went on

19  to say "feeding frenzy was a word I generated, of course, because. . . . How else do

20  you describe that?" (Tr. July 19, 2000 at 77.) In his attempt to portray Kiles as a

21  hyper-violent predator, Powell told the jury that, when Kiles was beating the

22  children, he was "just walking around, just making sure they were dead." (Tr. July

23  19, 2000 at 36.) Such statements were intended to play on the jury's implicit biases

24  about African-American men as dangerous and predatory.

25  _____

26  [161] According to Merriam-Webster, a "feeding frenzy" is defined as "a wildly
    aggressive attack of prey by an animal or group of animals" or an "aggressive

27  human activity likened to frenzied feeding by predatory animals." Merriam-
    Webster, *Feeding Frenzy* (Sept. 18, 2018), https://www.merriam-

28  webster.com/dictionary/feeding%20frenzy.

334

Studies have confirmed that implicit racial biases affect how jurors make determinations of guilt or innocence. *See, e.g.*, Justin D. Levinson et al., *Devaluing Death: An Empirical Study of Implicit Racial Bias on Jury-Eligible Citizens in Six Death Penalty States*, 89 N.Y.U. L. Rev. 513, 563 (2014). Crucially, "jurors unknowingly misremember case facts in racially biased ways." Justin D. Levinson, *Forgotten Racial Equality: Implicit Bias, Decisionmaking, and Misremembering*, 57 Duke L.J. 345 (2007). The State's invoking of a racial stereotype to improperly influence the jurors' determinations prejudiced Kiles and rendered his conviction unreliable. As the prosecutor's conduct during the guilt phase both prejudiced Kiles's substantive rights and rendered the trial fundamentally unfair, habeas relief is warranted. *Donnelly*, 416 U.S at 643. These errors individually and cumulatively caused prejudice. *See Berger*, 295 U.S. at 89 (granting a new trial because of "probable cumulative effect" of instances of prosecutorial misconduct).

**B.     The prosecutor committed further misconduct in the penalty-phase proceedings.**

The State's misconduct continued during the penalty-phase proceeding, prejudicing Kiles. Kiles can again show that the prosecutor's conduct both prejudiced his substantive rights and rendered the trial fundamentally unfair. *See Donnelly*, 416 U.S. at 643; *Berger*, 295 U.S. at 78.

**1.     The prosecutor improperly struck a juror on the basis of race during voir dire.**

The State committed misconduct in using a peremptory strike to exclude an African-American prospective juror from the jury based on race. In *Batson v. Kentucky*, 476 U.S. 79 (1986), the Supreme Court held that the use of peremptory challenges to strike jurors based on race violates the Equal Protection Clause. Kiles's counsel's notes indicate that there were four African-American prospective jurors of 142. Only one African-American person ultimately served on Kiles's jury. (ROA 895.) The State used a peremptory strike to remove another African-

335

American person, Prospective Juror 96, without apparent cause. (ROA 895 at 4.) As discussed *supra*, Claim 4, nothing in the juror's questionnaire evidenced a justification for the strike, and several white jurors who expressed similar discomfort with the death penalty (and who were comparable to Prospective Juror 96 in other ways) were not struck. *See Miller-El v. Dretke*, 545 U.S. 231, 241 (2005) (holding "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination"). Because the prosecutor's race-based strike undermined the fairness of Kiles's trial, the misconduct by the State prejudiced Kiles. *Id.*

**2.   The prosecutor improperly vouched for witnesses and evidence.**

Powell's opening statement at the aggravation phase of Kiles's trial involved repeated improper vouching, "placing the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggesting that information not presented to the jury supports the witness's testimony." *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993). Powell told the jury he was going to prove the case through "good police work." (Tr. Mar. 20, 2006 at 72.) He also vouched for the letter Hawkins had written, telling the jury it was "consistent with the physical evidence." (Tr. Mar. 20, 2006 at 79.) But doing so was misconduct. *See United States v. Kerr*, 981 F.2d 1050, 1053 (9th Cir. 1992) ("A prosecutor has no business telling the jury his individual impressions of the evidence.").

In addition, in his opening, Powell repeatedly—and improperly—used the phrase "we know" to tell the jury what facts "we know" about the crime. (Tr. Mar. 20, 2006 at 67–69, 71, 72, 73.) For instance, after listing several things "we know," Powell told the jury, "We know this because the defendant admitted it to several people" (Tr. Mar. 20, 2006 at 68), though these admissions were contested by

witnesses at the guilt phase. (Tr. July 10, 2000 at 165–66; Tr. July 13, 2000 at 12; Tr. July 17, 2000 at 149; Tr. July 17, 2000 at 195–96.) The use of the phrase "we know" by a prosecutor blurs the line between improper vouching and legitimate summary. *United States v. Younger*, 398 F.3d 1179, 1191 (9th Cir. 2005). The Ninth Circuit has held that "we know" is only properly used if it is used "to marshal evidence actually admitted at trial and reasonable inferences from that evidence, not to vouch for witness veracity or suggest that evidence not produced would support a witness's statements." *Id.* In Kiles's case, the State told the jury "we know" to establish the State's theory of the crime before any evidence or witnesses had been introduced to the jury. It therefore amounted to misconduct.

Because of the improper vouching and argument in Powell's opening at the aggravation phase, the defense moved for a mistrial. (Tr. Mar. 20, 2006 at 84–88.) As the prosecutor had the opportunity in the opening statement to set the stage for the rest of the penalty-phase proceeding, defense counsel argued it would be "hard to unring this bell." (Tr. Mar. 20, 2006 at 87.) Despite recognizing that "Mr. Powell did cross the line in terms of arguing his case," the trial court denied the motion, and the jury were left with the State's insupportable theory framing the proceedings. (Tr. Mar. 20, 2006 at 91.) The court declined to issue a contemporaneous curative instruction (Tr. Mar. 20, 2006 at 91), and the State's vouching went uncured, causing prejudice to Kiles.

### 3. The prosecutor continued to advance an unsupported theory of the crime through improper questioning of expert witnesses.

Rather than eliciting testimony based on the facts of the crime, at the penalty phase Powell asked hypothetical questions of the State's forensics experts in order to support his theory of the crime. As Powell's hypotheticals were divorced from the evidence, this method of questioning was misleading to the jury. Powell questioned the medical examiner who autopsied Gunnel with such a hypothetical:

337

> Q. Doctor, if the testimony in this case were that an assault took place on Valerie in one room and that she was knocked unconscious and that she later regained consciousness and walked into another room where the assault continued, would that mean to you that she was awake at the time?
>
> A. Well, she would have to be able to walk.
>
> Q. And that means the first blow would not have been the fatal blow?
>
> A. That's correct.
>
> MR. POWELL: Nothing further. Thank you.

(Tr. Mar. 21, 2006 at 34.) Of course, there was no such testimony in this case.

In similar fashion, Powell asked the State's blood-spatter expert, Tom Bevel, to opine on hypotheticals outside of Bevel's area of expertise to try to establish the State's theory of the crime:

> Q. And have you learned from your studies and your experience, the type of force that is necessary to generate energy like that to cause a skull to fracture like that?
>
> MR. CLARK: Objection, judge. We don't know if this is skull. We don't know what it is.
>
> MR. POWELL: If we were to assume this is skull?
>
> THE COURT: Objection is overruled.
>
> THE WITNESS: And I'm sorry. What was the question now?
>
> BY MR. POWELL:
>
> Q. The type of force that would need to be generated to create a fracture so that bone would break off the skull?
>
> A. It was certainly forceful, yes, sir.

(Tr. Mar. 27, 2006 at 68.) Beyond the unsupported hypothetical, Bevel was not a medical examiner or a forensic pathologist. That, however, did not stop Powell from trying to elicit testimony beyond the scope of Bevel's expertise. *See Cheney v. Washington*, 614 F.3d 987, 996 n.4 (9th Cir. 2010) (holding that "prosecutorial misconduct may occur through the prosecutor's own vouching remarks or when the prosecutor elicits vouching testimony from witnesses").

338

Finally, Powell misstated Kiles's testimony to confirm the State's allegations. As one example, while questioning a detective about Kiles's arrest, Powell asked, "[W]e have a man who's testified that he killed his girlfriend and her two children by beating them to death and there's no blood on those shoes, correct?" (Tr. Apr. 3, 2006 at 130.) But Kiles had never testified that he had killed the children. (Tr. July 17, 2000 at 151–224.) Powell's assertion was "calculated to mislead the jury," undermining the integrity of the trial and prejudicing Kiles. *See Berger*, 295 U.S. at 85.

### 4.    The prosecutor used inflammatory language to influence the jury.

As he had done during the guilt phase, Powell improperly used inflammatory phrases during the penalty phase. He told the jurors they would see "ungodly amounts of blood" from Valerie's murder. (Tr. Mar. 20, 2006 at 70.) He said that "as disturbing as that is," Kiles then beat the girls, and "[h]e beat them so fiercely that one of his hands become [sic] raw, torn, and bloody." (Tr. Mar. 20, 2006 at 70–71.) In truth, the testimony had been that Kiles's hand was "scratched up" (Tr. July 17, 2000 at 223), and that Kiles had "a few scars on his hand" (Tr. July 10, 2000 at 144–45). Powell called the crime scene "carnage." (Tr. Mar. 20, 2006 at 71.) Powell used such language to inflame the jury and influence their deliberations.

### 5.    The prosecutor's theory of the crime was not reasonably inferred from the evidence.

Once again, the State's theory of the crime was not a reasonable inference based on the evidence presented at trial. *See Hermanek*, 289 F.3d at 1101.

Detective Brian Rodgers again testified at the penalty phase that there was no blood spatter or castoff in Gunnel's bedroom to support the State's theory. (Tr. Apr. 3, 2006 at 22.) Though there were individual bloody items found in Gunnel's bedroom, Rodgers testified he believed they had been transferred there, as many of the items in the house were moved after the crime. (Tr. Apr. 3, 2006 at 99–100.)

339

1    Moreover, Rodgers was the only person to testify directly about the validity of the

2    State's theory. Rodgers, an experienced detective and lead investigator on Kiles's

3    case, opined, "I don't think [Gunnel] was—after things started, I don't think she

4    ever made it to the east bedroom." (Tr. Apr. 3, 2006 at 100.)

5        Even so, in his closing, Powell continued to assert the State's fictional story

6    of the crime by saying that "the physical evidence is very strong" that Gunnel "ran

7    to the east bedroom. The defendant chased her there." (Tr. May 22, 2006 at 64.)

8    Gunnel's death "had to be a long, drawn out fight." (Tr. May 22, 2006 at 64.) These

9    allegations were still almost wholly unsupported by the evidence and were far from

10   a reasonable inference from the evidence. (Tr. July 12, 2000 at 104–41; Tr. July 13,

11   2000 at 93–107; Tr. July 14, 2000 at 4–61; Tr. Mar. 21, 2006 at 4–34; Tr. Mar. 27,

12   2006 at 11–141; Tr. Mar. 29, 2006 at 26–74.) They served only to influence the jury

13   in its determination of Kiles's sentence.

14       As the prosecutor's penalty-phase misconduct both prejudiced Kiles's

15   substantive rights and rendered the trial fundamentally unfair, habeas relief is

16   warranted. *See Griffin*, 380 U.S. at 623; *Zapata*, 788 F.3d at 1114–15; *Hermanek*,

17   289 F.3d at 1101; *Berger,* 295 U.S. at 78.

18   **C.   The prosecutor's performance rendered the trial fundamentally**
         **unfair and violated Kiles's substantive rights.**
19

20       A prosecutor oversteps "the bounds of that propriety and fairness which

21   should characterize the conduct of such an officer" when he, among other things,

22   misstates facts in his cross-examination of witnesses, "put[s] into the mouths of

23   such witnesses things which they had not said," and assumes prejudicial facts not

24   in evidence. *Berger*, 295 U.S. at 84. As the Supreme Court has acknowledged, "the

25   average jury, in a greater or less degree, has confidence that these obligations . . .

26   will be faithfully observed. Consequently, improper suggestions, insinuations, and,

27   especially, assertions of personal knowledge are apt to carry much weight against

28   the accused when they should properly carry none." *Id.* at 88.

340

The State committed each of these indiscretions, prejudicing Kiles. The cumulative effect of the State's misconduct rendered Kiles's proceedings unfair and violated his due-process rights. *See Wood v. Ryan*, 693 F.3d 1104, 1116 (9th Cir. 2012) (explaining that "[e]ven when separately alleged incidents of prosecutorial misconduct do not independently rise to the level of reversible error, '[t]he cumulative effect of multiple errors can violate due process.'" (quoting *United States v. Nobari*, 574 F.3d 1065, 1082 (9th Cir. 2009))). The State's misconduct had a substantial and injurious effect on Kiles's convictions and sentences. *See Brecht*, 507 U.S. at 623. Kiles is therefore entitled to habeas relief.

## Claim Ten

**Juror misconduct at Kiles's guilt- and penalty-phase proceedings deprived Kiles of his rights to a fair and impartial jury, the assistance of counsel, confrontation, equal protection, and a fair trial.**

Because of juror misconduct, Kiles was denied the right to be tried by a fair and impartial jury, and to a fair trial, among other rights, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution. Kiles incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

While this claim was not presented below, there was no adequate state-court mechanism for this claim to be heard previously. *See* 28 U.S.C. § 2254(b)(1)(B). Under Rule 32 of the Arizona Rules of Criminal Procedure, extra-record claims are appropriately brought in state post-conviction proceedings. *See, e.g.*, *Lambright v. Stewart*, 241 F.3d 1201, 1203–04 (9th Cir. 2001) (explaining that Arizona courts required that claims needing factual development be raised in post-conviction relief proceedings rather than on direct appeal); *State v. Blazak*, 643 P.2d 694, 700 (Ariz. 1982) ("The alleged misconduct of the county attorney and the extent of that alleged misconduct is better shown at a proper post-conviction hearing, at which time evidence may be taken to show the truth or falsity of defendant's allegations.");

341

*State v. West*, 845 P.2d 1097, 1102 (Ariz. Ct. App. 1992) (explaining that petitioner's claims of prosecutorial misconduct "would require an evidentiary record that could be created through a petition for post-conviction relief pursuant to Rule 32, Arizona Rules of Criminal Procedure").[162] In this case, however, state post-conviction counsel were precluded by order from speaking to jurors. (ROA 1056 at 1.) Because this claim has not been adjudicated by Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not restrict review, and the Court may consider the claim de novo.[163]

The Supreme Court has long held that "[t]he requirement that a jury's verdict must be based upon the evidence developed at the trial goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury." *Turner v. Louisiana*, 379 U.S. 466, 472 (1965) (internal quotation marks omitted). The integrity of the jury is paramount, and "any ground of suspicion that the administration of justice has been interfered with" cannot be tolerated. *Mattox v. United States*, 146 U.S. 140, 149 (1892), *superseded by rule as stated in Pena-Rodriguez v. Colorado*, 137 S. Ct. 855 (2017). Additionally, "[i]t is vital in capital cases that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment." *Id.*

---

[162] Though the Arizona Supreme Court has recently stated that juror-misconduct claims are not appropriate for state post-conviction proceedings, this holding was not in effect at the time of Kiles's trial, and the trial court and counsel could not have predicted this ruling. *See, e.g.*, *State v. Kolmann*, 367 P.3d 61, 67 (Ariz. 2016) (holding that "[b]ecause claims of juror misconduct can be raised on post-trial motion under Rule 24, Kolmann generally is precluded from raising them in a petition for post-conviction relief. Ariz. R. Crim. P. 32.2(a)(1)"). If trial counsel should have raised this claim, then they were ineffective for failing to do so. State post-conviction counsel's ineffectiveness excuses the default of the ineffective-assistance-of-trial-counsel claim. *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984).

[163] Alternatively, Kiles alleges he can overcome any default by showing cause and prejudice attributable to the ineffective assistance of state post-conviction counsel. *See Martinez*, 566 U.S. at 9; *Strickland*, 466 U.S. at 688, 694.

If a juror brings in extraneous evidence and introduces it to the jury,

> [A] defendant has effectively lost the rights of confrontation, cross-examination, and the assistance of counsel with regard to jury consideration of the extraneous evidence. In one sense the violation may be more serious than where these rights are denied at some other stage of the proceedings because the defendant may have no idea what new evidence has been considered. It is impossible to offer evidence to rebut it, to offer a curative instruction, to discuss its significance in argument to the jury, or to take other tactical steps that might ameliorate its impact.

*Gibson v. Clanon*, 633 F.2d 851, 854 (9th Cir. 1980); *see also Sassounian v. Roe*, 230 F.3d 1097, 1108 (9th Cir. 2000); *Fields v. Brown*, 503 F.3d 755, 779 (9th Cir. 2007) ("[E]vidence developed against a defendant must come from the witness stand.").

Moreover, misconduct need not have infected the entire jury. If even one juror has committed misconduct affecting his or her own deliberations, the defendant is denied the constitutional right to an impartial jury. *Mach v. Stewart*, 137 F.3d 630, 633 (9th Cir. 1997). And because of the potential for prejudice, it is immaterial whether a juror or the jury admits that the extraneous information mattered to the ultimate decision, as "[t]estimony as to the subjective effects of extraneous information is outside the relevant scope of inquiry of a reviewing court." *Jeffries v. Blodgett*, 5 F.3d 1180, 1191 (9th Cir. 1993) (citing *United States v. Bagnariol*, 665 F.2d 877 (9th Cir. 1981)).

Jurors in Kiles's guilt- and penalty-phase proceedings variously considered extraneous evidence (including extraneous information regarding race), slept through portions of trial, and compromised or curtailed their deliberations because of an ill juror. Individually and cumulatively, these incidents of juror misconduct denied Kiles's rights to due process, a fair trial, and a fair and impartial jury.

343

### A.   Jurors considered extraneous evidence at Kiles's guilt-phase proceedings.

Upon information and belief, Kiles's rights to due process, confrontation, and a fair and impartial jury, among others, were violated by the introduction of extraneous information into a juror's deliberations. *See generally Turner*, 379 U.S. at 472.

The court admonished Kiles's guilt-phase jury on multiple occasions to avoid media during the trial. Jurors were first admonished after being sworn in. The judge instructed the jurors to "avoid any reading of newspapers or watching TV news accounts and things like that during the trial, and if you do encounter something about this case in the news media during the trial we ask that you end your exposure to it immediately and also bring that to my attention through the court staff." (Tr. July 7, 2000 at 183.) The judge reminded the jurors of the admonition continually throughout the proceedings. (*See, e.g.*, Tr. July 7, 2000 at 82, 174; Tr. July 10, 2000 at 83; Tr. July 11, 2000 at 63, 101, 177; Tr. July 12, 2000 at 94.)

Upon information and belief, at least one juror consistently ignored the admonition and read the newspaper every day during the trial. Given the pervasive news coverage of trial, the juror would have been exposed to extrinsic information about the case on which he was empaneled.[164] Also upon information and belief, another juror was aware of the extraneous and prejudicial information that Kiles had previously been convicted for the crimes for which he was on trial.

The jury's knowledge of and reliance upon extrinsic evidence violated Kiles's constitutional rights to confrontation, due process, a fair trial, assistance of

---

[164] The media coverage of Kiles's case was extensive. The defense's petition for special action with the Arizona Supreme Court for a change of venue contained detailed information on the numerous news articles and extensive news coverage of the trial in Yuma. (Case No. CV-00-0143, Pet. for Special Action, May 5, 2000 at 4–46.) Additionally, the Yuma Sun published information about Kiles's prior trial and conviction after winning the right to do so based on First Amendment grounds. (ROA 491 at 3–8; Tr. July 7, 2000 at 9–14.)

344

1    counsel, and a fair and impartial jury. A jury's verdict "must be based upon the

2    evidence developed at the trial" to ensure the integrity of the constitutional right to

3    trial by jury. *Irvin v. Dowd*, 366 U.S. 717, 722 (1961); *see also Fields v. Brown*,

4    503 F.3d 755, 779 (9th Cir. 2007). In addition, bringing extrinsic facts into

5    deliberations implicates the Confrontation Clause. *Sassounian*, 230 F.3d at 1108.

6    Upon information and belief, these constitutional violations were not harmless

7    errors; the extrinsic information had a "substantial and injurious effect or influence"

8    in determining at least one juror's verdict. *Brecht v. Abrahamson*, 507 U.S. 619,

9    623 (1993); *Mach*, 137 F.3d at 634.

10   **B.    Jurors committed misconduct in multiple ways at Kiles's penalty-**
11   **phase proceeding.**

12       Multiple jurors in Kiles's case sought out and considered evidence

13   extraneous to the proceedings, slept through trial, and considered incorrect and

14   extraneous information about race during their deliberations. In addition, the jury

15   compromised or curtailed deliberations due to the severe illness of one of the jurors.

16   This violated Kiles's rights to due process and a fair trial, among other rights. *See*

17   *Turner*, 379 U.S. at 472.

18       **1.    Jurors' deliberations were informed by extraneous**
19   **influences.**

20       Once empaneled, the judge gave the jurors at Kiles's penalty phase an

21   admonition. The admonition stated, "Do not do any research or make any

22   investigation about the case on your own." (Tr. Mar. 20, 2006 at 54–55.) In addition,

23   the judge instructed, "Do not talk to anyone about the case." (Tr. Mar. 20, 2006 at

24   55.) The jurors were again reminded of the admonition throughout the proceedings.

25   (*See, e.g.*, Tr. Mar. 20, 2006 at 160; Tr. Mar. 22, 2006 at 29; Tr. Mar. 27, 2006 at

26   35, 142.)

27       However, upon information and belief, several jurors actively sought out

28   extraneous information to assist in deliberations. This violated Kiles's

345

constitutional rights to confrontation, assistance of counsel, and a fair and impartial jury. "Private communications, possibly prejudicial, between jurors and third persons . . . are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear." *Mattox*, 146 U.S. at 150; *see also Fields*, 503 F.3d at 779 ("[E]vidence developed against a defendant must come from the witness stand."). Jurors researched Kiles's case—seeking out extraneous information—because they were curious about information beyond what was being presented at trial. Especially given the extensive media coverage that had surrounded Kiles's earlier proceedings, including his original trial and death sentences, this error was not harmless. *See, e.g.*, *Bulger v. McClay*, 575 F.2d 407, 409, 412 (2d Cir. 1978) (affirming grant of habeas relief where one juror later admitted that he changed his vote after another juror discussed contents of a newspaper article during deliberations).

In addition, upon information and belief, one juror spoke to her husband, who was incarcerated at the time, to assess the credibility and accuracy of penalty-phase defense expert James Aiken. Aiken testified about the classification system in Arizona prisons; he further testified about Kiles's history as a model prisoner. (*See* Tr. Apr. 27, 2006 at 4–54.) Aiken told the jury:

> Like I said, I have been in this business well over 30 years, and I have classified a lot of inmates, thousands and thousands of inmates. And they come in and they commit some type of violation. Some type of violation, whether it's not tucking their shirt in or having a junkie room, and this is baffling. I mean, I don't see one significant report in relationship to [Kiles's] behavior while confined. And like I said, I have been doing this for many, many years. And counsel can tell you I had to go back through it and look through it and back through it and check and double-check, because I have never seen anything like this.

(Tr. Apr. 27, 2006 at 32.)

However, after asking her husband about Aiken's testimony, the juror then conveyed to the panel her husband's opinion that Aiken's testimony was not

346

credible—it was either an exaggeration or flatly inaccurate. This undermined the credibility of a defense expert during the mitigation stage of Kiles's proceedings, and the defense had no opportunity to address or correct the information the jury received. *See Gibson*, 633 F.2d at 854; *Sassounian*, 230 F.3d at 1108. Moreover, jurors were in effect told, by what appeared to be a well-informed source, that a defense expert was lying. This also undercut the credibility of defense counsel and the entire defense mitigation presentation—including the other defense experts who formed the bulk of the defense case for leniency. Additionally, the extraneous information was singularly important, as it contradicted the defense's argument that Kiles posed no future danger if sentenced to life in prison. Notably, future dangerousness is always a matter of significant concern for capital juries. *See* John H. Blume, Stephen P. Garvey & Sheri Lynn Johnson, *Future Dangerousness in Capital Cases: Always "At Issue,"* 86 Cornell L. Rev. 397, 410 (2001). If Aiken's testimony was dismissed, jurors would have been more likely to consider the factor of Kiles's potential for future violence in their vote for a death sentence. That the jury heard such extraneous information was prejudicial. *Jeffries*, 5 F.3d at 1191.

Given the importance of the mitigation phase of a capital trial, it is critical that the jurors charged with determining the appropriate punishment consider all of the mitigation evidence presented to them, without being influenced by information outside the proceedings. *See Lockett v. Ohio*, 438 U.S. 586, 605 (1978) ("Given that the imposition of death by public authority is so profoundly different from all other penalties, we cannot avoid the conclusion that an individualized decision is essential in capital cases."). Juror misconduct thus undermined the integrity of the deliberations, prejudicing Kiles. *See Brecht*, 507 U.S. at 623.

### 2.    Jurors slept through the proceedings.

At least three jurors slept through various parts of Kiles's aggravation phase. Defense counsel notified the court that Jurors 9, 11, and 13 were nodding off; Juror 13 slept soundly enough that counsel "thought he was going to fall out of his chair

a couple times." (Tr. Mar. 22, 2006 at 4.) The defense asked the record to reflect that, with respect to Jurors 11 and 13, "they have been continually nodding off." (Tr. Mar. 22, 2006 at 4.) Juror 9 was "a newcomer to the sleep fest here." (Tr. Mar. 22, 2006 at 4.) The prosecutor confirmed that Juror 11 may have been sleeping; also, he (the prosecutor) and members of his team had seen Juror 13 sleep "on a pretty regular basis" for substantial periods of time. (Tr. Mar. 22, 2006 at 5–6.) While Juror 13 was made an alternate, Jurors 9 and 11 participated in deliberations. (Tr. Apr. 12, 2006 at 29–30.)

Given the importance of the penalty phase of a capital trial, the jurors charged with determining the appropriate punishment must hear and consider all of the evidence presented to them. *See Lockett*, 438 U.S. at 605; *see also Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982). Prolonged juror inattentiveness in a criminal trial, especially a capital trial, jeopardizes the defendant's Sixth, Eighth, and Fourteenth Amendment rights. *See Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 866 (2017). "A fair trial presupposes careful attention by the jurors to all of the testimony, and that both the court and counsel must do all in their power to ensure that jurors do not in fact sleep through any part of the proceedings." *Welch v. United States*, 807 A.2d 596, 604 n.8 (D.C. 2002); *see also United States v. Freitag*, 230 F.3d 1019, 1023 (7th Cir. 2000) ("If sleep by a juror makes it impossible for that juror to perform his or her duties or would otherwise deny the defendant a fair trial, the sleeping juror should be removed from the jury.").

Here, as reflected on the record, jurors were seen sleeping during at least one day of the State's presentation supporting the charged aggravators. Among other witnesses, these jurors missed the questioning of Imojean Kiles, who was a key witness testifying largely in Kiles's favor. As neither the court nor counsel took affirmative steps to correct the jurors' behavior (Tr. Mar. 22, 2006 at 6), it is likely that these and other jurors missed evidence and testimony that was important to their deliberations.

348

1   Jurors sleeping through proceedings is not harmless conduct, especially

2   given the law's requirement of heightened reliability in capital cases. *See United*

3   *States v. Barrett*, 703 F.2d 1076, 1083 (9th Cir. 1983); *see also Romano v.*

4   *Oklahoma*, 512 U.S. 1, 20–21 (1994) ("[T]his Court's Eighth Amendment

5   jurisprudence instructs, capital sentencing procedures must be especially reliable"

6   given the jury's "awesome responsibility.") (quoting *Caldwell v. Mississippi*, 472

7   U.S. 320, 329 (1985)). This form of juror misconduct had a substantial and injurious

8   effect on the outcome of Kiles's capital sentencing. *See Brecht*, 507 U.S. at 623.

9          **3.     Jurors improperly considered extraneous and incorrect**
10                   **information about race and criminality during their**
                     **deliberations.**

11   Upon information and belief, the jury in Kiles's penalty phase considered

12   Kiles's race, in the context of extraneous and incorrect information about African

13   Americans, during their penalty-phase deliberations. This violated, among other

14   rights, Kiles's rights to a fair and impartial jury, equal protection, and a fair trial.

15   During the mitigation presentation, the defense called psychologist Mark

16   Cunningham, Ph.D., to discuss the predictors of violence. (Tr. May 11, 2006 at 3.)

17   Dr. Cunningham was asked to explain how broad historic and socio-cultural factors

18   can affect individual decision-making. (Tr. May 11, 2006 at 10–22.) He told the

19   jury that a study found that, "at any given point in time in Washington, D.C. or

20   Baltimore, about half of the black males are in the criminal justice system." (Tr.

21   May 11, 2006 at 16.) Dr. Cunningham clarified that "[t]his is not about race. It isn't

22   being black that creates the issue." However, he told the jury that the rate of

23   homicide for black males was "[a]bout 30 times greater" than that of white males.

24   (Tr. May 11, 2006 at 16–17.)

25   Unfortunately, Dr. Cunningham's testimony supported racial stereotypes of

26   black men as more dangerous and violent.[165] Regardless of whether the testimony

27

28   [165] "[P]resented with a criminal defendant, even well-meaning people fall prey to
     the stereotype that, whether for reason of biology or culture, Black people are

349

was that black men are inherently more violent because of their race, or that black men end up more violent because of historic, economic, or socio-cultural factors, the jurors would have had the same takeaway: black men are more violent.

It was clear that race and criminality were on the jurors' minds after Dr. Cunningham's testimony. The jury submitted the following question to Dr. Cunningham:

> For your representative city regarding violent crime, you chose the District of Columbia. As D.C. is 99% Black and has the highest violent crime rate in the nation, is that an accurate comparison to a community like Yuma, AZ? According to Professor John Lott's book "More Guns, Less Crime," the disproportional rate of crime is due to the fact that D.C. has the strictest gun laws in the nation, rather than socio-economic conditions. Does your comparison still apply regarding Yuma?

(ROA 885 at 1.) The juror's question, which was read in open court, introduced extraneous information about race and criminality, as well as about the expert's credibility, into the proceedings. Particularly concerning is that it raised *incorrect* extraneous information about race and criminality to determine the credibility of expert testimony. It was incorrect because (1) while exact numbers for 2006 are unknown, according to the U.S. Census, in 2000, D.C. was 60% black; by 2010 the black population had dropped to 51%,[166] (2) in 2006, D.C. did not even make the top 25 most dangerous cities,[167] and (3) John Lott's scholarship has been

_____

inherently violent and dangerous." *See* Br. for the Nat'l Black Law Students Ass'n as Amicus Curiae in Support of Pet'r, *Buck v. Davis*, 137 S. Ct. 759 (2017) (No. 15-8049), at 2; *see also* Justin D. Levinson et al., *Devaluing Death: An Empirical Study of Implicit Racial Bias on Jury-Eligible Citizens in Six Death Penalty States*, 89 N.Y.U. L. Rev. 513, 563 (2014).

[166] *See* United States Census Bureau, District of Columbia (last visited Sept. 19, 2018), https://factfinder.census.gov/faces/nav/jsf/pages/communityfacts.xhtml?src=bkmk.

[167] *See* Les Christie, *Top 25: Most Dangerous and Safest Cities*, CNN Money (Oct. 30, 2006), https://money.cnn.com/2006/10/30/realestate/Mostdangerouscities/index.htm.

1    discredited.[168]

2        Unfortunately, Dr. Cunningham's reply could not correct the error—the juror

3    had already entered extraneous information into the proceedings that both cast

4    doubt on Dr. Cunningham's testimony and explicitly linked race to criminality. And

5    Dr. Cunningham's reply did not address the juror's erroneous information about

6    race and crime rates in the District of Columbia. Indeed, the reply may have offered

7    more support for the extraneous, incorrect information injected into the proceedings

8    by even more explicitly connecting race and criminality.[169] (Tr. May 11, 2006 at

9    90–92.)

10       It is clear that jurors were considering race and racial stereotypes in relation

11   to criminality and dangerousness, including extraneous information, during their

12   deliberations. This was improper. "Permitting racial prejudice in the jury system

13   damages 'both the fact and the perception' of the jury's role as 'a vital check against

14   the wrongful exercise of power by the State.'" *Pena-Rodriguez*, 137 S. Ct. at 868

15   (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)).

16       The juror's introduction of incorrect information regarding the link between

17   race and criminality into the proceedings constituted misconduct, and prejudiced

18   Kiles. *See Brecht*, 507 U.S. at 637–38.

19       **4.    Jurors curtailed their deliberations or compromised their**
           **votes because one member of the jury was gravely ill.**

20

21       Upon information and belief, the jurors at Kiles's mitigation phase curtailed

22   their deliberations, as one juror was gravely ill and was delaying cancer treatments

23   _____

24   [168] *See* Emily Badger, *More Guns, Less Crime? Not Exactly*, The Washington Post
     (July 29, 2014), https://www.washingtonpost.com/news/wonk/wp/2014/07/29/

25   more-guns-less-crime-not-exactly/.

26   [169] Dr. Cunningham responded to the question saying, "Nationwide, I think about
     14 percent of the population is African-American. And my recollection is that those

27   individuals account for about half of the homicides, about three times the expected
     rate nationwide. . . . They're killing their own." (Tr. May 11, 2006 at 90–92); *see*

28   Claim 6, *supra*.

1    until a verdict was reached. Had the jury not rushed deliberations so that one of its

2    members could receive medical treatment, there is a reasonable probability that

3    Kiles would not have received a death sentence. *Cf. United States v. Evanston*, 651

4    F.3d 1080, 1087–88 (9th Cir. 2011) (holding that outside influences being injected

5    into the jury's deliberative process raised the specter of jury coercion).

6         At Kiles's mitigation phase, the jury was scheduled to deliberate for only two

7    days, including one partial day. (ROA 888 at 1.) The schedule was set partly

8    because one of the jurors had to begin a course of radiation and chemotherapy,

9    which was set to last for six weeks. (ROA 888 at 1.)

10        The Arizona Constitution requires that "[t]he right of trial by jury shall

11   remain inviolate. . . . In all criminal cases the unanimous consent of all the jurors

12   shall be necessary to render a verdict." Ariz. Const. art. II, § 23. Upon information

13   and belief, some of the jurors were holding out for a life sentence for the killing of

14   Gunnel. If they had not been rushed to reach a verdict to allow a juror necessary

15   medical treatment, there is a reasonable probability the jury would not have been

16   unanimous with respect to Gunnel's death sentence. The jury's compromised and

17   curtailed deliberations prejudiced Kiles. *See Brecht*, 507 U.S. at 623.

18   **C.    Juror misconduct throughout the course of proceedings violated
          Kiles's right to due process and a fair trial.**
19

20        The number of jurors affected by the misconduct "does not weigh heavily in

21   the prejudice calculus for even a single juror's improperly influenced vote deprives

22   the defendant of an unprejudiced, unanimous verdict." *Lawson v. Borg*, 60 F.3d

23   608, 613 (9th Cir. 1995); *see also Parker v. Gladden*, 385 U.S. 363, 366 (1966) (a

24   defendant is "entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced

25   jurors"). In Kiles's case, these instances of misconduct demonstrate that jurors were

26   improperly influenced in multiple ways, individually and cumulatively causing a

27   substantial and injurious effect on the juries' verdicts and rendering Kiles's

28   convictions and death sentence unreliable. *See Brecht*, 507 U.S. at 623. Kiles is

352

therefore entitled to relief.

**Claim Eleven**

**Kiles's appellate counsel failed to provide effective assistance.**

Kiles was denied the effective assistance of appellate counsel in violation of the Sixth and Fourteenth Amendments to the U.S. Constitution. Kiles incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

"Is it a violation of the ABA standards not to brief mitigation in an appellate case?"

The Arizona Supreme Court asked this question of Paul Mattern, Kiles's counsel on direct appeal, during oral argument. Mattern had started his argument by apologizing for not briefing the issue of the court's independent review.[170] Mattern then spent the majority of his time before the court trying to argue a claim that was not cognizable on appeal: ineffective assistance of trial counsel. When one of the justices interrupted him to ask about his own failure to address a key issue in the case, Mattern had no answer.

Kiles previously raised several aspects of this claim in his state post-conviction proceedings. (ROA 1189 at 31–32, 61–69.) The state court denied these claims on the merits, saying that Kiles had not stated a colorable claim for relief. (ROA 1214 at 2.) The state court's denial of these claims constituted an unreasonable application of or was contrary to clearly established federal law, 28 U.S.C. § 2254(d)(1), and rested on an unreasonable determination of the facts, *id.* § 2254(d)(2). Accordingly, § 2254(d) places no limitation on relief, and this Court may review the exhausted sections de novo.

Parts B(4) through B(7) of this claim were not raised in Kiles's state-court

---

[170] Because Kiles was convicted of a crime that occurred before August 1, 2002, by statute the Arizona Supreme Court was required to independently review Kiles's death sentence. *See State v. Grell*, 291 P.3d 350, 351 (Ariz. 2013); A.R.S. § 13-755(A)–(C) (Supp. 2008).

353

proceedings. Kiles alleges he can overcome any default by showing cause and prejudice, including because of the ineffective assistance of state post-conviction counsel. *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984); *but see Davila v. Davis*, 137 S. Ct. 2058 (2017). Kiles will demonstrate at an evidentiary hearing that post-conviction counsel's performance fell below the standards of minimally competent capital attorneys and that counsel's failures prejudiced him. Alternatively, Kiles alleges that any procedural bar is not adequate or independent and that imposing default would be a miscarriage of justice.

Effective assistance of appellate counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985) ("A first appeal as of right . . . is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney."); *see id.* at 395 ("Because the right to counsel is so fundamental to a fair trial, the Constitution cannot tolerate trials in which counsel, though present in name, is unable to assist the defendant to obtain a fair decision on the merits."). As such, "nominal representation" during an appeal "does not suffice to render the proceedings constitutionally adequate." *Id.* at 396.

Claims of ineffective assistance of appellate counsel are governed by the standard of review set forth in *Strickland*, 466 U.S. at 686–87. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000). Accordingly, Kiles must show that appellate counsel's representation "fell below an objective standard of reasonableness," *Strickland*, 466 U.S. at 688, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. In addition, the ABA Guidelines are instructive in evaluating the reasonableness of counsel's conduct. *See, e.g.*, *Rompilla v. Beard*, 545 U.S. 374, 387 (2005). Regarding appellate counsel's performance, the ABA Guidelines indicate that "counsel should seek to litigate all issues . . . that are arguably

354

1   meritorious[.]" 2003 ABA Guideline § 10.15.1(C). Therefore, when appellate
2   counsel fails to raise a meritorious issue and there is a reasonable probability that
3   such a challenge would have resulted in the reversal of a conviction or sentence,
4   counsel has necessarily caused prejudice to the defendant. *See, e.g.*, *Strickland*, 466
5   U.S. at 694. Because he fixated on a claim he could not bring on direct appeal,
6   Mattern failed to raise several viable claims. This failure prejudiced Kiles because,
7   as described below, the claims Mattern failed to raise have merit.

8   **A.    Appellate counsel focused his efforts on a claim that was not**
9           **cognizable on appeal.**

10      Kiles's appellate attorney unreasonably focused his investigation and
11  briefing on a single claim: ineffective assistance of trial counsel. This narrow focus
12  was inexplicable, because in Arizona ineffective-assistance claims—particularly
13  those that depend on extra-record evidence—are *not* cognizable on appeal. In
14  Arizona, it has been long established that claims about the ineffective assistance of
15  trial counsel are properly brought in a state post-conviction petition. *See* Ariz. R.
16  Crim. P. 32; *e.g., State v. Spreitz*, 39 P.3d 525, 527 (Ariz. 2002). In fact, in Kiles's
17  case, the Arizona Supreme Court explained:

18          Because we cannot consider facts outside the record, our
19          consideration of ineffective assistance of counsel claims on
            direct appeal would rarely result in reversal. We caution
20          that raising an argument such as this on direct appeal gains
            very little, but risks a great deal, as the defendant who asks
21          this Court to determine issues of ineffectiveness on the
            appellate record faces the possibility of later preclusion.
22

23  *State v. Kiles*, 213 P.3d 174, 183–84 (Ariz. 2009) (citing Ariz. R. Crim. P. 32.2(a)(2)
24  ("A defendant shall be precluded from relief under this rule based upon any ground
25  . . . [f]inally adjudicated on the merits on appeal or in any previous collateral
26  proceeding. . . .")). Despite the clear, then-existing authority to the contrary,
27  Mattern nevertheless pursued an ineffective-assistance claim during the appeal, to
28  Kiles's detriment.

355

1    Mattern was appointed as Kiles's attorney on direct appeal on June 21, 2006.

2    (ROA 931 at 1.) Kiles was Mattern's first capital appellate client, and Mattern made

3    many critical mistakes. The first was in building an inappropriate relationship with

4    Kiles that revolved around the ineffective assistance of Kiles's trial counsel, which,

5    as explained above, Mattern could not properly bring as a claim on direct appeal.

6    Mattern's correspondence with Kiles was filled with foul language, diatribes

7    against courts, lawyers, and the justice system, and a fixation specifically on Kiles's

8    prior counsel, Clark and VanDreumel. Kiles was particularly vulnerable, having

9    just been sentenced to death for a second time, and Mattern's correspondence was

10   often unprofessional. Mattern promised he would risk financial ruin, his reputation,

11   and even his health in his crusade to defend Kiles. By Mattern's second letter to

12   Kiles, his focus on Clark was evident. Mattern acknowledged to Kiles that

13   information about Clark's ineffectiveness would not legally assist Kiles in his

14   appeal, but Mattern nonetheless told Kiles that he was going to follow that lead.

15   Mattern did not direct his efforts toward reviewing the record for claims that

16   were appropriate to bring on appeal. *See Kiles*, 213 P.3d at 183. Instead, Mattern

17   investigated Clark and VanDreumel, drafted complaints about Clark for Kiles to

18   file with the State Bar, and spent considerable time trying to obtain extra-record

19   materials from VanDreumel that could not be submitted to support claims in Kiles's

20   direct appeal. Mattern's insistence on obtaining records from VanDreumel that

21   could not be cited in his appeal was finally resolved by court order, only a month

22   before Mattern's opening brief was initially due. (ROA 1016 at 1–2.) Though

23   Mattern gained the ability to access files best left for state post-conviction

24   proceedings, he wasted time that he could have spent identifying, researching, and

25   presenting cognizable and meritorious claims.

26   Kiles's opening brief on appeal was filed on July 14, 2008. (DA2 Dkt. 86.)

27   The brief was 97 pages long, but the statement and facts of the case comprised a

28   full 42 pages of the brief, most of which were irrelevant to the legal claims raised

356

1   therein. As noted by the Arizona Supreme Court during argument, Mattern failed
2   in his remaining pages to argue that mitigation in Kiles's case was compelling
3   enough to warrant leniency.[171] Of the pages remaining for substantive legal
4   arguments, Mattern devoted nearly half to the non-cognizable ineffective-
5   assistance-of-counsel claim. (DA2 Dkt. 86 at 66–84.)

6       Mattern's singular focus on the ineffective-assistance claim was not
7   "reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688.
8   Although defense counsel has broad discretion when making strategic decisions,
9   those decisions must be reasonable and informed. *Id.* at 691; *see also Correll v.*
10  *Ryan*, 539 F.3d 938, 949 (9th Cir. 2008) (holding that an "uninformed strategy" is
11  "no strategy at all"). In fact, the Arizona Supreme Court stated that, as the
12  ineffective-assistance claim was improvidently raised, it would not consider the
13  merits of the argument. *Kiles*, 213 P.3d at 183–84. Focusing one's effort on a claim
14  that the appellate court predictably finds was improvidently raised does not amount
15  to reasonable professional judgment.

16      As justification for pursuing his non-cognizable claim, Mattern repeatedly
17  invoked the 2003 ABA Guidelines, which state that appellate counsel should "make
18  every professionally appropriate effort to present issues in a manner that will
19  preserve them for subsequent review." 2003 ABA Guideline 10.15.1(C). Had the
20  Arizona Supreme Court decided to rule on the merits of the ineffectiveness claims

21

---

22  [171] This failure is particularly striking in that the Arizona Supreme Court had
23  repeatedly addressed similar failures in opinions issued before the brief in this case
    was filed. *State v. Andriano*, 161 P.3d 540, 554 n.11 (Ariz. 2007) ("Andriano did
24  not argue why the Court should find in its independent review that the mitigating
    circumstances were 'sufficiently substantial to call for leniency.' A.R.S.
25  § 13-703(E). Counsel in capital cases 'should take advantage of all appropriate
26  opportunities to argue why death is not suitable punishment for their particular
    client.' *ABA Guidelines for the Appointment and Performance of Defense Counsel*
27  *in Death Penalty Cases* Guideline 10.11(L) (2003)."); *see also State v. Garza*, 163
28  P.3d 1006, 1021 n.16 (Ariz. 2007) (same); *State v. Morris*, 160 P.3d 203, 219 n.10
    (Ariz. 2007) (same).

as raised, Kiles would then have been precluded from raising them in his state post-conviction proceedings, when he would have had the opportunity to investigate, develop, and present extra-record evidence in support of his claims. Rather than preserving issues for subsequent review, Mattern risked forfeiting Kiles's chance to raise the claims in a procedurally appropriate manner.

That this singular focus on a non-cognizable claim worked to the detriment of raising meritorious claims was clear at oral argument. Mattern spent all of his available time at argument either addressing the issue he acknowledged he failed to raise—the Arizona Supreme Court's independent review—or arguing with the justices about his decision to inappropriately bring an ineffective-assistance-of-counsel claim on direct appeal. Several cognizable issues that required appellate review in Kiles's case therefore went un-briefed and un-argued.

**B.    Appellate counsel was ineffective for failing to raise meritorious claims.**

Because Mattern was so focused on bringing a non-cognizable claim on direct appeal, he failed to identify and properly brief important appellate issues that were apparent from the record. If Kiles had had competent appellate counsel, there is a reasonable probability he would have had his conviction or death sentence reversed. *See Strickland*, 466 U.S. at 694.

**1.    Appellate counsel failed to challenge the child-abuse convictions.**

Mattern stated in his opening brief that his challenges were limited to the premeditated murder of Valerie Gunnel and the imposition of the death sentence for her murder. (DA2 Dkt. 86 at 2.) Therefore, he neglected to bring the meritorious claim that Kiles's child-abuse convictions should have been dismissed by the court.

Kiles was indicted on first-degree premeditated murder charges for LeCresha Kirklin and Shemaeah Gunnel; the State charged him in the alternative with felony murder, based upon the predicate felony of child abuse. (ROA 1 at 2.) Before

Kiles's guilt-phase proceedings, defense counsel submitted a pretrial motion to dismiss the child-abuse charges pursuant to *State v. Styers*, 865 P.2d 765 (1993). (ROA 443 at 3–6.) *Styers* held that a separate child-abuse conviction cannot stand in a case where the premeditated murder of the child *is* the abuse alleged in a separate count. The Arizona Supreme Court made it clear that child abuse may still be a predicate felony for felony murder where the abuse results in the death of the child. This, however, is at odds with premeditated murder, where a person knowingly or intentionally causes the death of another. "Although felony murder is first degree murder, it is arrived at differently than premeditated murder." *Styers*, 865 P.2d at 772. One cannot be guilty of murder for the death of a child as the result of intentional child abuse, where the only act of child abuse is the premeditated murder of the child.

The Arizona Supreme Court's holding in *Styers* emphasized the fact that the defendant had been convicted of premeditated murder. Any assault on a child during a premeditated murder of that child necessarily merged with the murderous assault. "If a defendant cannot be convicted for an aggravated assault that necessarily occurs when there is a premeditated murder, it logically follows that he also cannot be convicted for an intentional child abuse that necessarily occurs where there is a premeditated murder of a child victim." *Styers*, 865 P.2d at 771.

Kiles's counsel argued this issue multiple times at trial, including in a pretrial motion requesting that the child-abuse charges be struck. (ROA 443 at 3–6.) The State responded that Kiles's motion was premature. (ROA 444 at 2.) There was no argument on the issue before trial. After the State rested its case, however, defense counsel moved for a directed verdict on the two counts each of child abuse and felony murder based on the holding in *Styers*. (Tr. July 17, 2000 at 109–25; Tr. July 18, 2000 at 3–11.) Defense counsel urged that the State had failed to support a felony-murder charge, as it had presented no evidence that the deaths of the children were in "furtherance" of the alleged child abuse. (Tr. July 17, 2000 at 113–14.) The

1    court denied the motion as premature, saying, "[W]e can vacate some of the verdicts
2    if that's what needs to be done, but I think I mostly agree with Mr. Powell that this
3    is a jury question to determine what happened and it is premature at this present
4    point for me to take anything from the jury." (Tr. July 17, 2000 at 125.)

5         The jury verdict, however, made the issue ripe, as some guilt-phase jurors
6    found Kiles guilty of premeditated murder of the children and *also* guilty of child
7    abuse. (ROA 482 at 5–8.) That even one juror so found invalidated the child-abuse
8    verdicts. The defense thus renewed its motion to have the felony-murder and child-
9    abuse convictions vacated. (ROA 488 at 2–8.) Despite Arizona Supreme Court
10   precedent, the trial court said that, while the defense had raised "interesting issues,"
11   it would not vacate the child-abuse verdicts. (Tr. Dec. 29, 2000 at 19–20.)

12        The trial court's decision to allow the child-abuse convictions to stand,
13   despite the findings of premeditated murder, was in error and was ripe for appellate
14   review.[172] Mattern should have been on notice of the issue, given the concerted
15   efforts of trial counsel during Kiles's proceedings. Trial counsel raised the issue in
16   motions practice (ROA 443 at 3–6), requested a directed verdict (Tr. July 17, 2000
17   at 109–25; Tr. July 18, 2000 at 3–11), filed a motion for judgment of acquittal on
18   the child-abuse charges (ROA 488 at 1–8), included the issue in a motion for new
19   trial (ROA 500 at 17–18), and presented the issue at argument (Tr. Dec. 29, 2000
20   at 2–12). Moreover, the trial court's suggestion that the issue could be addressed at
21   a later time "if that's what needs to be done" should have alerted Mattern to its
22   suitability for appellate review.

23        Mattern failed to challenge this issue, despite the likelihood of a successful
24   challenge, given the clear precedent on the same issue and near-identical facts. The
25   Arizona Supreme Court had explicitly said, "The first degree murder statute, A.R.S.
26   § 13-1105(A)(l), *not the child abuse statute*, applies when a person intentionally

27
28   [172] While Mattern could also have challenged the felony-murder convictions under
     *Styers*, Kiles is not challenging those convictions at this time.

1    kills a child victim." *Styers*, 865 P.2d at 772 (emphasis added). In failing to

2    challenge the trial court's error that disregarded that holding, Mattern provided

3    ineffective assistance, and Kiles was thereby prejudiced. *See Evitts*, 469 U.S. at

4    396; *Strickland*, 466 U.S. at 694.

5           **2.     Appellate counsel failed to challenge the trial court's denial**
            **of a mistrial due to prosecutorial misconduct.**

6

7           Mattern also failed to challenge in his direct appeal the improper

8    prosecutorial opening argument during the aggravation phase of Kiles's trial. (ROA

9    1189 at 62.)

10          After the State's opening statement in the aggravation phase, the defense

11   moved for a mistrial. (Tr. Mar. 30, 2006 at 84–88.) Prosecutor Powell's opening

12   statement repeatedly commented on the evidence, told the jurors to be prepared for

13   "ungodly amounts of blood," improperly vouched for witnesses and evidence by

14   repeating phrases like "we know" and "I believe," and improperly misstated Kiles's

15   former testimony. (Tr. Mar. 30, 2006 at 84–88.) Kiles's defense counsel stated that

16   the remarks hamstrung the defense from the beginning. When Powell, as a

17   representative of the State, commented on evidence or vouched for witnesses,

18   Kiles's counsel asked the court, "I mean, how are we going to confront that?" (Tr.

19   Mar. 30, 2006 at 91.) The court agreed that "to some extent Mr. Powell did cross

20   the line in terms of arguing his case," but denied the motion for a mistrial.[173] (Tr.

21   Mar. 30, 2006 at 91); *see* Claim 8, *supra*.

22          Mattern was deficient in failing to challenge on appeal the judge's denial of

23   the mistrial. This failure prejudiced Kiles, as there was a reasonable probability that

24   the trial-court error claim before the Arizona Supreme Court would have prevailed.

25   In Arizona, a conviction may be reversed on appeal for prosecutorial misconduct if

26   "(1) misconduct is indeed present; and (2) a reasonable likelihood exists that the

27

28   ---
     [173] Relatedly, the trial court's error in denying the motion for mistrial violated
     Kiles's constitutional rights to due process and a fair trial.

misconduct could have affected the jury's verdict, thereby denying [the] defendant a fair trial." *State v. Gallardo*, 242 P.3d 159, 167 (2010) (quoting *State v. Velazquez*, 166 P.3d 91, 102 (Ariz. 2007)). If the defendant objects, the trial court's determination is reviewed for harmless error. *Id.*

In Kiles's case, the prosecutor's opening statement contained pervasive improper vouching, "placing the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggesting that information not presented to the jury supports the witness's testimony." *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993); *see also United States v. Younger*, 398 F.3d 1179, 1191 (9th Cir. 2005) (recognizing that the use of the phrase "we know" by a prosecutor blurs the line between improper vouching and legitimate summary). The Ninth Circuit has held that "we know" is only properly used if it is used to "to marshal evidence actually admitted at trial and reasonable inferences from that evidence, not to vouch for witness veracity or suggest that evidence not produced would support a witness's statements." *Younger*, 398 F.3d at 1191. In Kiles's case, where "we know" was used by the State before any evidence or witnesses had even been introduced to the jury, it amounted to prosecutorial misconduct.

Additionally, in his opening statement, Powell repeatedly and improperly conveyed his personal beliefs about the credibility of the witnesses. (Tr. Mar. 20, 2006 at 72, 79); *State v. Lamar*, 72 P.3d 831, 841 (Ariz. 2003) ("A prosecutor must not convey his personal belief about the credibility of a witness."). And as the prosecutor had set the stage for the rest of the penalty-phase proceeding, defense counsel argued it would be "hard to unring that bell." (Tr. Mar. 20, 2006 at 87.) Given the extent of the prosecutor's misconduct, there is a reasonable likelihood that the conduct denied Kiles a fair trial, and the trial court's error was not harmless.

There was no reasonable strategy for Mattern to fail to raise this claim on appeal. However, Mattern's opening brief contained only one brief reference to

362

1   prosecutorial misconduct. (DA2 Dkt. 86 at 47.) His reply brief attempted to raise,

2   for the first time, an additional nine arguments in support of the prosecutorial

3   misconduct claim. (ROA 1189 at 64–65.) But having failed to raise the arguments

4   in his opening brief, Mattern had waived them. *See State v. Aleman*, 109 P.3d 571,

5   575 (Ariz. Ct. App. 2005) (holding issues raised for first time in reply brief untimely

6   and may be disregarded by court); *see also State v. Carver*, 771 P.2d 1382, 1390

7   (Ariz. 1989) (stating "opening briefs must present significant arguments, supported

8   by authority, setting forth an appellant's position on the issues raised").

9        Because of Mattern's deficient performance, the appellate court was denied

10  the ability to assess the cumulative impact of repeated instances of prosecutorial

11  misconduct on the jury's verdict. (ROA 1189 at 64–65.) A pattern of pervasive

12  misconduct was reasonably likely to have affected the outcome of the trial. "[E]ven

13  if there [is] no error or an error [is] harmless and so by itself does not warrant

14  reversal, an incident may nonetheless contribute to a finding of persistent and

15  pervasive misconduct if the cumulative effect of the incidents shows that the

16  prosecutor intentionally engaged in improper conduct and 'did so with indifference,

17  if not a specific intent, to prejudice the defendant.'" *State v. Morris*, 160 P.3d 203,

18  214 (Ariz. 2007) (quoting *State v. Roque*, 141 P.3d 368, 403 (Ariz. 2006)).

19  Mattern's failure to preserve arguments for appellate review fell short of the

20  standards of reasonableness required for appellate counsel. *See* ABA Guideline

21  10.15.1(C).

22       When appellate counsel fails to raise meritorious issues that could have

23  resulted in a reversal of conviction or a sentence, counsel has necessarily caused

24  prejudice to the defendant. There was a reasonable probability that the Arizona

25  Supreme Court would have found that the trial court's denial of a mistrial, as well

26  as the pervasive prosecutorial misconduct, required reversal of Kiles's sentence.

27  Thus, Kiles was prejudiced due to his appellate counsel's ineffective assistance. *See*

28  *Strickland*, 466 U.S. at 694 (prejudice occurs when, absent counsel's deficiencies,

1    there is a reasonable probability that the result of proceeding would have been

2    different).

3              **3.     Appellate counsel failed to adequately brief his challenge to
                       the improperly admitted gruesome photographs.**
4

5              Mattern failed to adequately challenge inflammatory and unduly prejudicial

6    photographs introduced as evidence during Kiles's trial.

7              Kiles's opening brief on appeal objected to a number of gruesome

8    photographs that were improperly introduced during the guilt-phase proceeding

9    without objection by trial counsel.[174] (DA2 Dkt 86 at 56.) While Mattern listed

10   several exhibits that should not have been admitted, the Arizona Supreme Court

11   held that the claim was inadequately briefed: "Kiles' opening brief does not specify

12   his objection to any but two of the challenged photographs. He has therefore waived

13   any argument as to the other photographs." *Kiles*, 213 P.3d at 183. The court found

14   the two photographs that Mattern sufficiently objected to did not prejudice Kiles.

15   This was due to Mattern's failure to challenge the child abuse convictions. *Id.*

16             As a result of Mattern's failure to provide reasoning for his challenges to all

17   of the photographs, as well as his failure to challenge the child-abuse convictions,

18   the trial court found that there was no prejudice to Kiles. Mattern's deficient

19   performance resulted in the waiver of claims regarding several inflammatory

20   photographs. The 2003 ABA Guidelines state that appellate counsel are required to

21   litigate all issues "that are arguably meritorious under the standards applicable to

22   high quality defense representation," as well as "make every professionally

23   appropriate effort to present issues in a manner that will preserve them for

24   subsequent review." 2003 ABA Guideline 10.15.1(C). Mattern failed to do either.

25   _____

26   [174] Defense counsel later tried to object to the photographs being introduced as
     evidence at the penalty phase, stating, "We didn't litigate this prior to the guilt
27   phase. And we never filed the motion to preclude photographs in the guilt phase.
     And, perhaps, that was an error of some magnitude on our part." (Tr. Mar. 20, 2006
28   at 35.) The court denied the motion. (Tr. Mar. 20, 2006 at 38.)

1    Given Mattern's failure to raise claims on appeal adequately to ensure effective
2    review, the state post-conviction court's holding that Mattern was not ineffective
3    was an unreasonable application of both law and fact under § 2254(d).

4              **4.    Appellate counsel failed to challenge the trial court's error
                       in allowing the State to question statements made to defense
5                      experts in a prior trial.**

6            Mattern failed to raise a claim that the trial court erred by letting the State
7    cross-examine defense experts from Kiles's previous trial regarding statements
8    Kiles made to them in the course of that trial, when the verdicts from that trial were
9    overturned due to the ineffective assistance of counsel. Although trial counsel
10   objected to this line of cross-examination, the trial court overruled the objection.
11   (Tr. May 8, 2006 at 54–55.) Mattern should have been on notice that this issue
12   presented a claim ripe for appellate review, as the State explicitly said, "This is
13   something that hasn't been resolved yet. . . . It's for the appellate courts to decide
14   later." (Tr. May 8, 2006 at 56.) Mattern's unreasonable failure to recognize and
15   allege this meritorious claim amounts to deficient performance. *See Strickland*, 466
16   U.S. at 694.

17           Effective counsel would have brought a claim that the trial court improperly
18   allowed the questioning based on an evidentiary ruling that was determined in a
19   "never, neverland" where "the Rules of Evidence could not apply." (Tr. May 8,
20   2006 at 55.) Because Kiles's prior statements to the experts directly undermined his
21   counsel's strategy at trial, there is a reasonable probability that their admission
22   affected the outcome of his trial. Upon review, there is a reasonable probability that
23   the Arizona Supreme Court would have recognized that allowing testimony to
24   Kiles's statements made in the course of a case that was overturned due to
25   ineffective assistance of counsel would be unduly prejudicial in Kiles's second trial.
26   The mistakes of previous counsel, especially where those mistakes would not have
27   been made but for previous counsel's deficient performance, should not then be
28   repeated. To allow the use of reports produced through the ineffectiveness of prior

                                          365

1   counsel is to deny the curative value of a new trial. *See* Claim 8, *supra*. Thus,

2   Mattern's failure to challenge the admissibility of this line of cross-examination on

3   appeal prejudiced Kiles. *See Evitts*, 469 U.S. at 396; *Strickland*, 466 U.S. at 694.

**5.    Appellate counsel failed to present an argument for leniency
on independent review by the Arizona Supreme Court.**

6   As stated above, for any capital murder committed before August 1, 2002,

7   the Arizona Supreme Court was required to "independently review the propriety of

8   the death sentence." *Grell*, 291 P.3d at 351. The question in this independent review

9   was "not whether the trial court properly imposed the death penalty, but whether,

10  based upon the record before [the Arizona Supreme Court], we believe that the

11  death penalty should be imposed." *State v. Trostle*, 951 P.2d 869, 888 (Ariz. 1997)

12  (quoting *State v. Watson*, 628 P.2d 943, 946 (Ariz. 1981)).

13  By his own admission, Mattern failed to include argument in his opening

14  brief regarding the Arizona Supreme Court's independent review, the only issue on

15  which Kiles was entitled to de novo review. When the justices asked Mattern at oral

16  argument to address independent review, he was unprepared to discuss

17  mitigation.[175] And after argument, Mattern was ineffective in failing to challenge

18  independent review in the motion for reconsideration, especially in light of his

19  admission that he had neglected to adequately brief the issue. (DA2 Dkt. 118 at 1.)

20  For a defendant, independent review was a second chance to argue his

21  mitigation case—"something anathema in any other context." *State v. Stuard*, 863

22  P.2d 881, 902 (Ariz. 1993) (quoting *State v. Salazar*, 844 P.2d 566, 585 (Ariz. 1992)

23  (Martone, J., specially concurring)). This second chance had proven successful for

---

25  [175] Though Mattern was able to identify some of the mitigation that was introduced
    at the penalty phase, he also argued that the guilty verdicts returned on the children
26  in Kiles's guilt phase were invalid based on the evidence presented.  This was not
    an issue the Arizona Supreme Court could have considered in its independent
27  review. Rather, the court must "independently review the aggravating and
    mitigating factors found by the trial court to ensure that they were properly
28  determined and weighed." *State v. Fierro*, 804 P.2d 72, 81 (Ariz. 1990).

366

1   many defendants. The Arizona Supreme Court has overturned several death

2   sentences based on its independent review of aggravating and mitigating

3   circumstances. *See, e.g.*, *Grell*, 291 P.3d at 351; *Roque*, 141 P.3d at 405–06; *Trostle*,

4   951 P.2d at 888; *Stuard*, 863 P.2d at 902; *State v. Herrera*, 850 P.2d 100, 113 (Ariz.

5   1993); *State v. Jiménez*, 799 P.2d 785, 801 (Ariz. 1990); *State v. Rockwell*, 775 P.2d

6   1069, 1080 (Ariz. 1989); *State v. Mauro*, 766 P.2d 59, 81 (Ariz. 1988); *State v.*

7   *Valencia*, 645 P.2d 239, 241 (Ariz. 1982); *Watson*, 628 P.2d at 947.

8           The 2003 ABA Guidelines emphasize that capital counsel have a

9   professional obligation to "take advantage of all appropriate opportunities to argue

10  why death in not a suitable punishment" for their client. 2003 ABA Guideline

11  10.11(L). Mattern failed to do so, offering no reasonable explanation at oral

12  argument, instead stating: "I neglected to brief independent review. It's my own

13  fault entirely. I accept responsibility." *Cf. Correll*, 539 F.3d at 949 (holding that an

14  "uninformed strategy" is "no strategy at all").

15          If Mattern had briefed independent review, there is a reasonable likelihood

16  the Arizona Supreme Court would not have ignored or mischaracterized the

17  mitigation evidence when conducting its independent review. As laid out in greater

18  detail in Claim 12, *infra*, the court failed to consider the majority of the 30 non-

19  statutory mitigators Kiles alleged at trial (Tr. May 22, 2006 at 19–21), claimed Kiles

20  failed to prove two statutory mitigators when neither was alleged (Tr. May 22, 2006

21  at 19–21), and discounted the extensive evidence presented that Kiles had an

22  abusive childhood. *Kiles*, 213 P.3d at 189.

23          Mattern may have offered to take responsibility, but it is Kiles who must bear

24  the punishment due to Mattern's deficient performance. Mattern squandered Kiles's

25  opportunity to have his death sentence reduced to life in prison, prejudicing Kiles.

26          **6.      Appellate counsel failed to adequately challenge the (F)(2)**
27          **aggravating circumstance.**

28          The State alleged the (F)(2) aggravator in the aggravation phase of Kiles's

trial. The relevant version of the (F)(2) aggravator applies when a defendant "was previously convicted of a felony in the United States involving the use or threat of violence on another person." (ROA 503 at 1 (quoting A.R.S. § 13-703(F)(2) (1988).) The State alleged that Kiles had committed two prior felonies that qualified—an attempted aggravated assault and an aggravated assault. Trial counsel challenged the attempted aggravated assault, claiming it did not qualify under (F)(2), but lost. Mattern then successfully challenged the attempted assault as a basis for the (F)(2) aggravator on appeal. *See Kiles*, 213 P.3d at 185–86. However, appellate counsel failed to challenge the use of Kiles's aggravated assault as a basis for the (F)(2) aggravating circumstance. This failure was unreasonable, given that Mattern clearly realized that challenging the (F)(2) aggravator was a viable strategy. Mattern's deficient performance prejudiced Kiles, because, as discussed *supra*, Claim 5, and *infra*, Claim 12, there is a reasonable likelihood the Arizona Supreme Court would have found that Kiles's aggravated assault conviction did not support the (F)(2) aggravator and that the aggravator was therefore invalid.

> **7.   Appellate counsel failed to challenge Kiles's shackling during his proceedings.**

Mattern failed to challenge the use of shackles and a stun belt, which Kiles was forced to wear throughout his proceedings. "[G]enerally, a criminal defendant has a constitutional right to appear before a jury free of shackles." *Gonzalez v. Pliler*, 341 F.3d 897, 900 (9th Cir. 2003) (quoting *Spain v. Rushen*, 883 F.2d 712, 716 (9th Cir. 1989) (citing *Wilson v. McCarthy*, 770 F.2d 1482, 1484 (9th Cir. 1985)). The trial court failed to make a required finding that shackles and a stun belt were required, as discussed in Claims 3, 5, 7, and 8, *supra*. Had Mattern raised this claim, there is a reasonable likelihood it would have succeeded on appeal. Kiles was thus prejudiced.

> **C.   Conclusion.**

Individually and cumulatively, these deficiencies constitute ineffective

1    assistance of appellate counsel. The state court's determination that this claim was
2    not colorable and did not warrant an evidentiary hearing constituted an
3    unreasonable application of clearly established federal law, 28 U.S.C. § 2254(d)(1),
4    and an unreasonable determination of the facts, *id.* § 2254(d)(2). As to sections
5    B(4)–B(7), the ineffective assistance of Kiles's post-conviction counsel in failing
6    to raise these parts of this claim constitutes cause for the default and resulted in
7    prejudice to Kiles. *See Martinez*, 132 S. Ct. at 1320; *but see Davila*, 137 S. Ct. at
8    2065. Kiles is therefore entitled to relief.

9                                    **Claim Twelve**
10       **The Arizona Supreme Court's decision affirming Kiles's death**
         **sentence violated Kiles's constitutional rights.**
11

12       The Arizona Supreme Court's decision affirming Kiles's death sentence
13   violated Kiles's rights under the Sixth, Eighth, and Fourteenth Amendments to the
14   U.S. Constitution. Kiles hereby incorporates by specific reference all facts,
15   allegations, and arguments made elsewhere in this Petition.

16       This claim is exhausted, as the Arizona Supreme Court considered and ruled
17   on its merits on direct appeal.[176] *See Kiles*, 213 P.3d at 187–92. The state-court
18   decision was an unreasonable application of, or contrary to, clearly established
19   federal law, *see* 28 U.S.C. § 2254(d)(1), and an unreasonable determination of the
20   facts, *id.* § 2254(d)(2). Accordingly, § 2254(d) places no limitation on relief, and
21   this Court should review the claim de novo.

22   _____

23   [176] To the extent this claim was not raised on direct appeal, it was still exhausted
24   because "[e]ven if a petitioner fails to raise a constitutional claim in state court, the
     exhaustion requirement may be satisfied . . . where the state court itself exhausts
25   the claim." *Comer v. Schriro*, 480 F.3d 960, 981 (9th Cir. 2007). The Arizona
     Supreme Court did so in conducting its independent review. *State v. Kiles*, 213 P.3d
26   174, 187 (Ariz. 2009). In the alternative, if any portion of this claim was found not
     to have been decided by the state court on the merits, the ineffective assistance of
27   Kiles's post-conviction counsel in failing to raise this claim constitutes cause for
     the default and resulted in prejudice to Kiles. *See Martinez v. Ryan*, 566 U.S. 1, 9
28   (2012); *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984).

                                          369

In order to try to satisfy the heightened standard of reliability necessary in the death-penalty context, *see Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.), the U.S. Supreme Court has "emphasized repeatedly the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally." *Parker v. Dugger*, 498 U.S. 308, 321 (1991); *see also Zant v. Stephens*, 462 U.S. 862, 890 (1983) ("Our decision in this case depends in part on the existence of an important procedural safeguard, the mandatory appellate review of each death sentence by the Georgia Supreme Court to avoid arbitrariness and to assure proportionality.").

As the purpose of appellate review is to ensure the constitutionality of a death sentence, the review must itself be constitutional. *Cf. Clemons v. Mississippi*, 494 U.S. 738, 748–51 (1990) (evaluating constitutionality of appellate review). To that end, meaningful appellate review cannot lose sight of the fact that "[t]he primary concern in the Eighth Amendment context [is] that the sentencing decision be based on the facts and circumstances of the defendant, his background, and his crime." *Id.* at 748; *cf. Smith v. Texas*, 543 U.S. 37, 44–45 (2004) (rejecting state court's reliance during appellate review on causal-nexus text that limited consideration of relevant mitigation). Moreover, the appellate review must not inject "arbitrar[iness] or irrational[ity]" into the sentencing process. *Parker*, 498 U.S. at 321. Finally, once a state has provided a mechanism for meaningful appellate review, it must follow its own laws regarding that mechanism; the failure to do so results in the denial of a liberty interest protected by the Due Process Clause of the Fourteenth Amendment. *See Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980) (recognizing that the grant of a state-law procedural right to a criminal defendant at sentencing can give rise to a constitutionally protected liberty interest).

The Arizona Supreme Court has defined its procedure for independent review:

> When a death sentence is imposed in Arizona, this court

370

independently reviews the entire record for error, determines whether the aggravating circumstances have been proved beyond a reasonable doubt, considers any mitigating circumstances, and then weighs the aggravating and mitigating circumstances in deciding whether there are mitigating circumstances sufficiently substantial to call for leniency.

*State v. Stokley*, 898 P.2d 454, 465 (1995). The court has emphasized that independent review is broad: "We must [] conduct a de novo review of the trial court's rulings concerning aggravation and mitigation, and then decide independently whether the death sentence should be imposed." *State v. Brewer*, 826 P.2d 783, 790–91 (Ariz. 1992). The court must "painstakingly examine the record to determine whether [the death penalty] has been erroneously imposed." *State v. Stuard*, 863 P.2d 881, 897 (Ariz. 1993) (quoting *State v. Richmond*, 560 P.2d 41, 51 (Ariz. 1976)). The Arizona Supreme Court itself has recognized that it must follow its own procedures: "we are bound by the gravity of the death penalty to insure proper compliance with Arizona's death penalty statute." *Brewer*, 826 P.2d at 790.

In 2009, the Arizona Supreme Court conducted an independent review of Kiles's death sentence under A.R.S. § 13-755(A)-(C). *Kiles*, 213 P.3d at 187. The manner in which the Arizona Supreme Court conducted its independent review violated Kiles's constitutional rights by denying him meaningful appellate review and due process, in violation of the Sixth, Eighth, and Fourteenth Amendments.

**A.     The Arizona Supreme Court violated Kiles's due process rights in its review of the prior-conviction aggravating circumstance.**

The Arizona Supreme Court violated federal constitutional guarantees in its review of whether the (F)(2) aggravator had been properly found.

**1.     The Arizona Supreme Court denied Kiles his right to due process in upholding the prior-conviction aggravating circumstance.**

The Arizona Supreme Court violated Kiles's rights when it improperly

371

upheld the (F)(2)[177] aggravating circumstance based upon Kiles's 1986 conviction for aggravated assault, which was in fact not a valid basis for the circumstance. *See* Claim 5, *supra*.

The (F)(2) aggravating circumstance applies when the defendant was previously convicted of a felony in the United States "involving the use or threat of violence on another person." A.R.S. § 13-703(F)(2) (1988). At the aggravation phase of trial, the jury found the (F)(2) aggravator proven based on two prior offenses, an aggravated assault under A.R.S. § 13-1204(A)(8) and § 13-1203, and an attempted aggravated assault under A.R.S. § 13-1001(A). *Kiles*, 213 P.3d at 185; (*see also* ROA 879 at 5–6).

In its decision, the Arizona Supreme Court correctly held that Kiles's prior *attempted* aggravated assault could not establish the (F)(2) aggravator, as by the crime's statutory definition it *could* have been committed without the use or threat of violence. *Kiles*, 213 P.3d at 185–86 (citing *State v. McCray*, 183 P.3d 503, 508 (Ariz. 2008)); *see also State v. Williams*, 904 P.2d 437, 451 (Ariz. 1995).

However, the court did not review whether this same reasoning applied to the aggravated assault conviction. The court had a duty to do so as part of its established independent review procedure. The court addressed the (F)(2) aggravator twice in its decision: first in part (III)(A), and again as part of its independent review in part (IV). *Kiles*, 213 P.3d at 185, 187–88. In each instance, the court summarily assumed that Kiles's aggravated assault conviction satisfied (F)(2). However, A.R.S. § 13-1204(A)(8) does not by its statutory definition necessarily involve the mens rea necessary to establish the use or threat of violence. Nor does the general assault statute. *See* Claim 5, *supra.*

Prior to its review of Kiles's case, the Arizona Supreme Court had analyzed

---

[177] As noted *supra*, Claim 5, the text of the (F)(2) aggravating circumstance was changed in 1993. *State v. Martinez*, 999 P.2d 795, 806 (Ariz. 2000). The pre-1993 version of the aggravating circumstance applies to Kiles's case.

372

the (F)(2) aggravating circumstance applicable here (i.e., the pre-1993 version),
which requires the use or threat of violence, and had found it was not supported by
a prior conviction for aggravated assault. *See, e.g.*, *State v. Walden*, 905 P.2d 974,
996 (Ariz. 1995) (holding that aggravated assault did not provide basis for (F)(2)
aggravating circumstance when it could have been committed recklessly),
*overruled on other grounds by State v. Ives*, 927 P.2d 762 (Ariz. 1996); *State v.
McKinney*, 917 P.2d 1214, 1230 (Ariz. 1996) (holding that "because [the
defendant's] prior conviction was for a crime that, on the face of the statute, might
have been committed recklessly, it does not qualify as a crime of violence" for the
purposes of the former (F)(2) aggravating circumstance); *State v. Schackart*, 947
P.2d 315, 323 (Ariz. 1997). Thus the Arizona Supreme Court should have similarly
struck the (F)(2) aggravator in Kiles's case, as neither the conviction for aggravated
assault nor the conviction for attempted aggravated assault were sufficient to prove
the (F)(2) aggravator under the version of the statute applicable in this case.

   The Eighth Amendment requires capital sentencing to meet exacting
standards. "The fundamental respect for humanity underlying the Eighth
Amendment's prohibition against cruel and unusual punishment gives rise to a
special 'need for reliability in the determination that death is the appropriate
punishment' in any capital case." *Johnson v. Mississippi*, 486 U.S. 578, 584 (1988)
(quoting *Gardner v. Florida*, 430 U.S. 349, 363–64 (1977) (White, J., concurring
in judgment)). Further, capital sentencing must be individualized. *Clemons*, 494
U.S. at 748. Such reliable, individualized sentencing does not occur when a death
sentence is imposed based in part on an invalid aggravating factor. *See Johnson*,
486 U.S. at 585.

   The Eighth Amendment error is even more serious where the invalid
aggravating factor caused the jury to consider irrelevant evidence, such as
inapplicable prior convictions. *Id.* at 590; *see also Brown v. Sanders*, 546 U.S. 212,
220 (2006). This concern is particularly heightened in a "weighing" state like

373

Arizona, where the jury must weigh the aggravators and mitigators against each other to determine whether to impose death. *See Styers v. Schriro*, 547 F.3d 1026, 1034 (9th Cir. 2008). The court should have struck the (F)(2) aggravator and remanded to a jury for resentencing. *See Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Ring v. Arizona*, 536 U.S. 584 (2002); *Hurst v. Florida*, 136 S. Ct. 616 (2016); *Pavatt v. Royal*, 894 F.3d 1115, 1152–53 (10th Cir. 2017) (Briscoe, C.J., concurring in part and dissenting in part) (noting that, in light of *Ring*'s and *Hurst*'s holdings that a defendant is entitled to a jury determination of all facts that can increase his sentence, *Clemons*'s rule permitting reweighing by an appellate court was unconstitutional, as *Hurst* and *Ring* explicitly overruled the cases on which *Clemons* was based). Though a jury resentencing was constitutionally mandated, at a minimum, the court should have conducted its own reweighing of the remaining aggravators and all of the mitigation.

The Arizona Supreme Court's failure to painstakingly review the entire record in search of error, including this significant error regarding the (F)(2) aggravator, injected arbitrariness and irrationality into the sentencing process and denied Kiles the due-process protections afforded other capital defendants in Arizona. The Arizona Supreme Court's decision was thus contrary to clearly established federal law. *See* 28 U.S.C. § 2254(d)(1); *Parker*, 498 U.S. at 321; *Hicks*, 447 U.S. at 346. Its finding that the (F)(2) aggravator was applicable based on Kiles's prior convictions also amounts to an unreasonable determination of fact in light of the evidence presented at trial. *See* 28 U.S.C. § 2254(d).

> **2.** **The Arizona Supreme Court violated Kiles's rights by summarily determining that the invalidation of one prior conviction was immaterial.**

The Arizona Supreme Court violated Kiles's right to be free from cruel and unusual punishment under the Eighth Amendment and his right to due process under the Fourteenth Amendment when it summarily determined that the invalidation of his prior conviction for attempted aggravated assault as a basis for

374

1   the (F)(2) aggravator was immaterial. *Kiles*, 213 P.3d at 188.

2       As discussed above, the Arizona Supreme Court should have struck the

3   (F)(2) aggravating circumstance entirely. Setting aside the court's error with respect

4   to the aggravated assault conviction explained above, the court erred in summarily

5   upholding the (F)(2) aggravator when it struck one of the supporting convictions.

6   The court correctly held that one of the prior convictions that the jury found

7   supported the (F)(2) aggravating circumstance was legally inadequate to establish

8   that circumstance. *Id.* at 186 ("the attempted aggravated assault conviction does not

9   establish the (F)(2) aggravator"). But the court committed constitutional error by

10  then summarily upholding the (F)(2) aggravating circumstance with no further

11  discussion. *Id.* at 188.

12      That conclusion was contrary to clearly established federal law, as the

13  Arizona Supreme Court failed to follow its own procedures requiring it to "consider

14  the quality and the strength, not simply the number, of aggravating and mitigating

15  factors," *see id.* at 187; *see Hicks*, 447 U.S. at 346. Whether the aggravating

16  circumstance was supported by multiple or only one prior conviction went directly

17  to the quality and strength of that aggravating circumstance and was therefore of

18  great significance. The Arizona Supreme Court's failure to conduct a "painstaking"

19  de novo review of the trial court's determination regarding the legally valid bases

20  for the (F)(2) aggravator and the propriety of the death sentence violated Kiles's

21  Eighth and Fourteenth Amendment rights and was an unreasonable application of

22  federal law. *See Hicks*, 447 U.S. at 346.

23      The magnitude of the Arizona Supreme Court's constitutional error in

24  summarily dismissing the invalid prior conviction as immaterial is exacerbated by

25  the fact that the jury considered irrelevant evidence—the inapplicable prior

26  conviction—as aggravating evidence. *See Johnson*, 486 U.S. at 590. It was

27  improper for the court not to analyze whether the additional prior conviction may

28  have affected the jury's deliberations. This need is particularly heightened in a

1   "weighing" state like Arizona, where the jury must weigh the aggravators and

2   mitigators against each other to determine whether to impose death. In Kiles's case,

3   the court instructed the jury that the decision whether there was mitigation

4   sufficiently substantial to call for leniency was to be based on "each juror's

5   individual qualitative evaluation of the facts of the case, the *severity of the*

6   *aggravating factors*, and the quality of any mitigating evidence." (Tr. May 22, 2006

7   at 23–24 (emphasis added).) It is evident that where there was a pattern of prior

8   convictions, as opposed to just one, jurors were likely to find the aggravating

9   circumstance more severe and weigh it more heavily against the mitigating factors.

10  A capital sentence is unconstitutional where, as here, an element of an invalid

11  sentencing factor adds an "improper element to the aggravation scale in the

12  weighing process." *Sanders*, 546 U.S. at 220. None of the other sentencing factors

13  enabled the sentencer to give aggravating weight to the same facts and

14  circumstances as Kiles's inapplicable prior conviction. It was an unreasonable

15  application of federal law for the Arizona Supreme Court to summarily conclude

16  that the partial invalidation of an aggravating circumstance based on an inapplicable

17  prior conviction was immaterial. *See Johnson*, 486 U.S. at 585. As discussed above,

18  the court should have remanded for jury resentencing or at a minimum, conducted

19  an appellate reweighing. *See Ring*, 536 U.S. at 589; *Hurst*, 136 S. Ct. at 616; *Pavatt*,

20  894 F.3d at 1152–53 (Briscoe, C.J., concurring in part and dissenting in part).

21      The court's summary conclusion that the removal of one of the convictions

22  supporting the (F)(2) factor did not affect Kiles's sentence violated Kiles's

23  constitutional rights under the Eighth and Fourteenth Amendments. Accordingly,

24  Kiles is entitled to relief.

25      **B.    The Arizona Supreme Court denied Kiles meaningful appellate**

26          **review when it arbitrarily upheld the (F)(6) aggravating factor.**

27      The evidence in Kiles's case did not support the (F)(6) aggravating factor

28  beyond a reasonable doubt; the Arizona Supreme Court violated his constitutional

376

1    rights in upholding it.[178] An appellate court cannot uphold a death sentence that

2    rests on an aggravating circumstance "that upon the record evidence adduced at the

3    trial no rational trier of fact could have found [proven] beyond a reasonable doubt."

4    *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *see also Lewis v. Jeffers*, 497 U.S.

5    764, 781 (1990) (applying the standard from *Jackson* to the question whether, on

6    habeas review, an aggravating circumstance was unsupported by the record).

7        The Arizona Supreme Court deprived Kiles of meaningful appellate review

8    when it upheld the (F)(6) aggravating factor where it could not have been proven

9    beyond a reasonable doubt had the court "review[ed] the entire record." *Stokley*,

10   898 P.2d at 465. The court cherry-picked parts of the record that supported this

11   factor, while ignoring entirely those that did not. It is critical that an aggravator is

12   proven beyond a reasonable doubt. "The specified statutory aggravators in

13   Arizona's death penalty scheme are designed to narrow, in a constitutional manner,

14   the class of first degree murderers who are death-eligible. If proof of an aggravator

15   does not rise to the necessary standard, the aggravator has not been proven and may

16   not be considered at sentencing." *State v. Soto-Fong*, 928 P.2d 610, 626 (Ariz.

17   1996).

18       The court upheld the (F)(6) aggravator based on a finding of cruelty. *Kiles*,

19   213 P.3d at 188. The State argued at trial its theory that Kiles began attacking

20   Gunnel in her bedroom, where he struck her a number of times in the head with a

21   tire iron and she lost consciousness. (*See* Tr. Apr. 11, 2006 at 34–35; Tr. May 22,

22   2006 at 64.) The State argued that she then regained consciousness and came into

23

24   [178] The (F)(6) aggravating circumstance, *see* A.R.S. § 13-703(F)(6) (1988), is also
25   unconstitutionally overbroad and vague. *See infra*, Claim 30; *see also Maynard v.
     Cartwright*, 486 U.S. 356, 363 (1988); *Walton v. Arizona*, 497 U.S. 639, 654 (1990)
26   (finding that Arizona's especially heinous, cruel, or depraved aggravating
     circumstance was facially vague, but did not violate the Eighth and Fourteenth
27   Amendments because capital-sentencing decisions were made by trial judges, who
     could be presumed to follow the law), *overruled on other grounds by Ring*, 536
28   U.S. 584.

1  the living room, where Kiles killed her. The Arizona Supreme Court adopted the
2  State's theory of the crime, even though it was not supported by the evidence
3  beyond a reasonable doubt. *See Claim 9, supra.* In upholding the (F)(6) aggravator,
4  the court found that "the evidence shows that Valerie was conscious after the attack
5  began." *Kiles*, 213 P.3d at 188. The court based this finding on its conclusion that
6  "Kiles admitted that Valerie remained conscious after the attack began, and the
7  medical testimony regarding defensive wounds supported that conclusion." *Id.* The
8  court apparently based this finding on Kiles's purported admission after-the-fact to
9  his brother-in-law, Larry Hawkins.[179] *See id.* ("Additional evidence supports the
10  (F)(6) aggravator and the version of events Kiles admitted to Hawkins.").

11      However, at the aggravation phase, Hawkins's testimony did not support this
12  theory. He testified twice that he did not remember Kiles telling him where in the
13  apartment Kiles struck Gunnel. (Tr. Mar. 22, 2006 at 38, 39.) Both in his testimony
14  and in a Silent Witness letter describing a version of events, Hawkins made no
15  mention of Gunnel moving from room to room. (2006 Trial Ex. 90 at 1; Tr. July 13,
16  2000 at 3–79.) Notably, the detective who investigated the case, Brian Rodgers,
17  testified at the aggravation phase that "I don't think [Gunnel] was – after things
18  started, I don't think she ever made it to the east bedroom." (Tr. Apr. 3, 2006 at
19  100.) Thus even the State's lead investigator rejected the State's theory of the crime.

20      Moreover, there was ample reason to doubt Hawkins's testimony and letter
21  on this purported admission. Hawkins was telling a story second-hand, based on
22  what Kiles told him while intoxicated on alcohol, cocaine, and other drugs. (Tr.
23  July 13, 2000 at 60–62.) At the guilt phase, Hawkins admitted that his letter was
24  only a rough picture of what Kiles had told him. (Tr. July 13, 2000 at 18.) Further,
25  he testified at the aggravation phase that he wrote the letter after seeing news reports
26  about the crime and speaking to other people, including the detective investigating

[179] The State never alleged that Hawkins was present for the crime; instead, his testimony was based on what he remembered Kiles telling him after the crime.

378

1   the crime, which would have improperly infected his recollection of what Kiles told

2   him. (Tr. Mar. 22, 2006 at 61–63, 75.)

3          The Arizona Supreme Court stated that additional evidence supported the

4   version of events Kiles purportedly admitted to Hawkins. *Kiles*, 213 P.3d at 188.

5   But, the physical evidence the court did have before it did not prove at all, much

6   less beyond a reasonable doubt, that Gunnel regained consciousness. For example,

7   the court noted that a piece of the jack was found in Gunnel's bedroom. *Id.*

8   However, many sources, including Rodgers, testified that items in the house were

9   moved after the crime.[180] (Tr. July 11, 2000 at 166–67; Tr. Apr. 3, 2006 at 99–100.)

10  The court itself recognized that Kiles attempted to clean up the scene—and

11  therefore that the crime scene was compromised—as reason for discounting his

12  intoxication as a mitigating factor. *Kiles* 213 P.3d at 190.

13         The court also pointed to a pillow that was found with blood on it "consistent

14  with a source that continued to move." *Id.* at 188. However, the testimony of Tom

15  Bevel, the blood-spatter expert, was that something was "smearing the blood,"

16  which indicated that "the blood source or something that is in fact bloody, isn't just

17  resting down." (Tr. Mar. 27, 2006 at 72–73.) This smear easily could have occurred

18  while Kiles was moving things around, or after the victim was deceased. *See* Claim

19  5, *supra.* The court also cited "a transfer stain consistent with a person running a

20  bloody hand along a door" as evidence supporting the theory that Gunnel regained

21  consciousness during the attack. But the evidence demonstrated that it was not

22  Gunnel who had made the transfer stain. Kale Johnson, who pleaded guilty to

23  hindering the prosecution in Kiles's case, testified via affidavit that he got blood on

24  his hand and tried to wipe it off on the inside frame of the apartment door; this

25  sworn statement was read into the record at the mitigation phase. (Tr. July 14, 2000

26  at 134–35; Tr. July 17, 2000 at 35; Tr. Apr. 27, 2006 at 78; PFR2 Dkt. 20 Ex. 1 at

27

28  [180] Rodgers also testified at the aggravation phase that there was no blood spatter or castoff in Gunnel's bedroom to support the State's theory. (Tr. Apr. 3, 2006 at 22.)

7.) The court noted that this transfer stain, along with blood-spatter evidence, "indicated that *either* the blood source or the attacker was moving." Kiles, 213 P.3d at 188 (emphasis added). The ambiguous blood-stain evidence certainly does not prove beyond a reasonable doubt that Gunnel was conscious after the attack began. (Tr. July 13, 2000 at 93–107; Tr. July 14, 2000 at 4–61.)

The Arizona Supreme Court similarly erred when it cited the medical examiner's testimony on "defensive wounds" as supporting the conclusion that Gunnel remained conscious. The medical expert testified that Gunnel's arm had evidence of a single "defensive wound." (Tr. July 13, 2000 at 99; *see also* Tr. Mar. 21, 2006 at 21 (Gunnel's injury "consistent with" a defensive wound).)

Finally, the court distinguished Kiles's case from *Soto-Fong*, in which it rejected the (F)(6) factor because, although the defendant thought a victim remained conscious, it was not proven beyond a reasonable doubt. *See Soto-Fong*, 928 P.2d at 625 (it would be unconstitutional for "an alternative finding based on a hypothetical set of facts" to support an aggravating factor). The Arizona Supreme Court referred to Kiles's "admissions" as evidence supporting the finding that Gunnel regained consciousness. But Hawkins's testimony and Silent Witness letter alone did not support that finding beyond a reasonable doubt, and the State presented no other alleged admission from Kiles regarding how Gunnel's death unfolded. In fact, Kiles later testified on the stand that, once he hit Gunnel with the jack, she fell down in a chair and never got up. (Tr. July 17, 2000 at 165.) And there was no other evidence to support the (F)(6) aggravator beyond a reasonable doubt.

Thus, in upholding the (F)(6) aggravator, the court appears to have relied on argument and hypotheticals offered by the State, not on testimony by medical or other witnesses. (Tr. Mar. 21, 2006 at 34); *see* Claim 9 *supra.* "To conclude that a murder would be especially cruel or heinous if committed in an assumed manner, without evidence that it was committed in that manner, falls short of the mark." *Soto-Fong*, 928 P.2d at 626. On this record, no rational factfinder could have found

380

1    beyond a reasonable doubt that Gunnel regained consciousness after Kiles struck
2    her, a requirement for finding cruelty. *See Lewis*, 497 U.S. at 781. The Arizona
3    Supreme Court's decision upholding this aggravating factor unconstitutionally
4    denied Kiles his right to meaningful appellate review and amounts to an
5    unreasonable application of federal law.[181] *See Parker*, 498 U.S. at 321; *Jackson*,
6    443 U.S. at 324; *Lewis*, 497 U.S. at 781.

7        **C.    The Arizona Supreme Court denied meaningful appellate review**
8            **by inflating the weight of the (F)(8) aggravating circumstance.**

9        The Arizona Supreme Court deprived Kiles of meaningful appellate review
10   by automatically assigning "extraordinary weight" to the multiple-homicides
11   aggravating circumstance. *See* A.R.S. § 13-703(F)(8) (1988). Without considering
12   the specific circumstances of Kiles's case, the court stated that this circumstance
13   "receives extraordinary weight." *Kiles*, 213 P.3d at 191 (quoting *State v. Boggs*,
14   185 P.3d 111, 130 (Ariz. 2008)). This violated Kiles's constitutional rights. *See*
15   *Parker*, 498 U.S. at 321.

16       That premise originated in *State v. Rogovich*, 932 P.2d 794 (Ariz. 1997), in
17   which the defendant had been found guilty of four counts of first-degree murder
18   and two counts of armed robbery, among other convictions. *Id.* at 796. The trial
19   court found in aggravation that the defendant had "been convicted of: (1) another
20   offense in the United States for which under Arizona law a sentence of life
21   imprisonment or death was imposable; (2) a felony involving the use or threat of
22   violence on another person; and (3) one or more other homicides committed during
23   the commission of the offense." *Id.* at 800 (citations omitted). During its appellate
24   review, the Arizona Supreme Court found that, of the three aggravating
25   circumstances found, "the (F)(8) circumstance carrie[d] the most weight." *Id.* at
26   802.

27   ――――――――――――――――
28   [181] The court compounded this constitutional harm when it arbitrarily decided to
     accord "significant weight" to the (F)(6) aggravator. *Kiles*, 213 P.3d at 191.

1    Since *Rogovich*, however, the Arizona Supreme Court has made an
2    unconstitutional blanket declaration that the multiple-homicides aggravating
3    circumstance warrants "extraordinary weight." The court has then cited to
4    *Rogovich*, or to a case citing *Rogovich*, despite the fact that *Rogovich* does not
5    support such a declaration. For example, in *State v. Hampton*, the defendant was
6    convicted of murdering a man and a pregnant woman, and the jury found that two
7    aggravating circumstances, including multiple homicides, had been proven. 140
8    P.3d 950, 954–55 (Ariz. 2006). During its independent review, the Arizona
9    Supreme Court declared that "[t]he (F)(8) multiple homicides aggravator is
10   extraordinarily weighty." *Id.* at 967. And the court cited *Rogovich*, which made no
11   such sweeping statement. More recently, the Arizona Supreme Court has cited
12   *Hampton* for the principle that the multiple-murders circumstance carries
13   "extraordinary weight." *See, e.g.*, *Boggs*, 185 P.3d at 118, 130, 132 (upholding
14   death sentences in a case where defendant was convicted of three counts of first-
15   degree murder).

16   The Arizona Supreme Court in this case likewise afforded the multiple-
17   homicides aggravating circumstance "extraordinary weight," with no support or
18   explanation beyond the citation to *Boggs*. *Kiles*, 213 P.3d at 191. The court ignored
19   the fact that, in the *Enmund/Tison* findings for the two child victims, the jury could
20   not reach a unanimous verdict as to whether Kiles had intentionally killed them. *Id.*
21   at 186. The court did not consider this nuance during its independent review.[182] The
22   court should further have considered that Kiles did not receive death sentences for
23   all of the victims, likely the result of lingering doubt. Instead, the court assigned the
24   multiple-homicide aggravating circumstance the same "extraordinary weight" that

---

26   [182] The court further erred when it stated that "Kiles no longer disputes that he
27   murdered the children." *Kiles*, 213 P.3d at 188. Kiles did not concede his guilt, but
     instead made a strategic decision to waive his appellate rights to challenge the
28   convictions and sentences to avoid two additional potential death sentences. (*See*
     DA2 Dkt. 86 at 12, 13.)

1    the court would have afforded it had Kiles been sentenced to death for all three
2    convictions.

3         The court's arbitrary assigning of extraordinary weight to the multiple-
4    homicides aggravating circumstance, with complete disregard for the
5    circumstances of the offense, violates the individualized sentencing at the
6    cornerstone of Eighth-Amendment jurisprudence and is contrary to federal law. *See*
7    *Parker*, 498 U.S. at 321 ("[M]eaningful appellate review requires that the appellate
8    court consider the defendant's actual record. 'What is important . . . is an
9    *individualized* determination on the basis of the character of the individual and the
10   circumstances of the crime.'" (quoting *Stephens*, 462 U.S. at 879)). A denial of this
11   individualized consideration thus equates to a denial of meaningful appellate
12   review. *See id.*; *see also Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982) ("[A]
13   consistency produced by ignoring individual differences is a false consistency.").

14   **D.    The Arizona Supreme Court denied Kiles his constitutionally
15           protected right to meaningful independent review when it ignored
             many of his mitigating factors and mischaracterized others.**

16        Because Arizona defined its appellate review process to include independent
17   review, its independent review was required to comport with the requirements of
18   the Sixth, Eighth, and Fourteenth Amendments. *See Hicks*, 447 U.S. at 346. It was
19   also required to comport with the requirements that the Arizona Supreme Court has
20   itself outlined, described above. Here, the court did not conduct a "de novo,"
21   "painstaking" review. Instead, it upheld all of the aggravators with little thought
22   and misconstrued or minimized mitigating evidence. Though Kiles alleged 30 non-
23   statutory mitigating factors, the court did not even mention or address most of them.
24   *See Kiles*, 213 P.3d at 189; (*see also* Tr. May 22, 2006 at 19–21). In its
25   "independent" review, the court instead discussed Kiles's failure to prove two
26   statutory factors. *Id.* But, at trial Kiles did not allege either of those two statutory
27   mitigators. (Tr. May 22, 2006 at 19–21.) The court similarly misconstrued Kiles's
28   extensive mental-health evidence as an attempt to prove the statutory mitigating

1    factor of impaired capacity. *Kiles*, 213 P.3d at 189. In fact, the defense sought to
2    use that evidence to prove a variety of non-statutory mitigating circumstances,
3    including depression, possible neurological damage, and psychological disorders,
4    in order to demonstrate that Kiles warranted leniency. (Tr. May 22, 2006 at 19–21.)
5    In discussing Kiles's abusive childhood, the court focused disproportionately on the
6    few pieces of evidence that pointed to a happy childhood and discounted extensive
7    testimony to the contrary. *Kiles*, 213 P.3d at 189. The court found only that his
8    childhood was "less than ideal." *Id.* In sum, the Arizona Supreme Court failed to
9    independently and fairly analyze whether mitigation was sufficiently substantial to
10   warrant leniency, in violation of Kiles's rights to due process and meaningful
11   appellate review. Its decision is therefore contrary to clearly established federal law.
12   *See Hicks*, 447 U.S. at 346; *Parker*, 498 U.S. at 321.

13   **E.    The Arizona Supreme Court's decision denied Kiles meaningful**
         **appellate review by irrationally discounting and failing to give**
14       **effect to the mitigating circumstances it did acknowledge.**

15       To achieve the reliability demanded of a capital sentence, state courts must
16   not only provide meaningful appellate review, but must ensure that the review does
17   not inject any irrationality into the sentencing process. *See Parker*, 498 U.S. at 321.
18   Moreover, the process must allow the sentencer not only to consider, but also to
19   give effect to, mitigation. *Tennard v. Dretke*, 542 U.S. 274, 285 (2004). And, just
20   as the jury must be able to give effect to mitigation in a rational manner, so must a
21   state appellate court. *Cf. Eddings*, 455 U.S. at 114–15.

22       When considering mitigating factors, the Arizona Supreme Court has
23   developed a body of case law to determine what weight to give to each factor. The
24   effect of this case law, however, is that individualized consideration of the
25   defendant's character is gutted based on irrelevancies. *See Eddings*, 455 U.S. at 112
26   (requiring focus "on the characteristics of the person who committed the crime"
27   (quoting *Gregg v. Georgia*, 428 U.S. 153, 197 (1976) (joint opinion of Stewart,
28   Powell, and Stevens, JJ.)). Moreover, the considerations the state supreme court

1    uses to determine the weight to give a particular mitigating circumstance ultimately

2    preclude the court from giving effect to certain types of mitigation. *See Tennard*,

3    542 U.S. at 285.

4        The court made an unconstitutional error in imposing a causal-nexus

5    requirement on the mitigating factors it found proven. *Kiles*, 213 P.3d at 191.

6    Because the psychiatric testimony "did not establish a sufficient connection to the

7    murder to warrant significant weight," the court essentially discounted it. *Id.*

8    Similarly, the court held that Kiles's childhood "carries minimal weight 'because

9    the evidence . . . is far removed from the crime.'" *Id.* (quoting *State v. Armstrong*,

10   189 P.3d 378, 392–93 (Ariz. 2008)). The U.S. Supreme Court has repeatedly held

11   that such a causal-nexus test violates the Eighth and Fourteenth Amendments

12   because it precludes the sentencer from giving effect to certain types of mitigation.

13   *See Tennard*, 542 U.S. at 285. The Arizona Supreme Court's use of a causal-nexus

14   test in reviewing Kiles's sentence is contrary to *Edding*'s clearly established federal

15   law. *See McKinney v. Ryan*, 813 F.3d 798, 821 (9th Cir. 2015) (en banc).

16       The court discounted the other mitigation it found Kiles had proven for

17   various arbitrary reasons. For example, it arbitrarily discounted Kiles's model

18   behavior in prison: "though Kiles established that he has been a model prisoner

19   since being taken into custody, this Court accords this mitigating factor minimal

20   weight because of the expectation that prisoners behave in prison." *Kiles*, 213 P.3d

21   at 191 (quoting *State v. Dann*, 207 P.3d 604, 628 (Ariz. 2009)). This was not

22   individualized consideration, as it failed to take into account that Kiles had spent

23   nearly 20 years in various prison and jail settings and had demonstrated exemplary

24   behavior in all of them.[183] This was also in violation of clearly established federal

25   law, as the U.S. Supreme Court held in *Skipper v. South Carolina*, 476 U.S. 1, 5,

26

27   [183] Two of Kiles's former prison guards testified on his behalf at his penalty-phase
     trial. (Tr. Apr. 26, 2006 at 4–23.) A prison management expert testified that he had
     never seen a record as spotless as Kiles's. (Tr. Apr. 27, 2006 at 32); *see* Claim 6,
28   *supra.*

1    (1986), that a capital sentencer must give consideration to a defendant's good
2    behavior in custody as mitigation evidence.

3         The court further dismissed Kiles's "psychiatric testimony" because "at most
4    it established his bad judgment, not his inability to judge." *Kiles*, 213 P.3d at 191
5    (citing *State v. Tucker*, 160 P.3d 177, 202 (Ariz. 2007) and *State v. Pandeli*, 161
6    P.3d 557, 576 (Ariz. 2007) for the proposition that "insubstantial impairment and
7    defendant's ability to discern right from wrong lead to according such mitigation
8    lesser weight").) If Kiles had a psychiatric condition that rendered him unable to
9    judge right from wrong, he could not have been held legally accountable for the
10   crimes at issue. To refuse to give effect to any mitigation that falls below this
11   threshold is unconstitutional. *See Eddings*, 455 U.S. at 114–15.

12        Moreover, the court held that it would not give great weight to the fact that
13   Kiles acted impulsively, "suggesting this means he could not control his behavior,"
14   because this "does not account for the sustained attack on Valerie, nor his decision
15   to murder the children." *Kiles*, 213 P.3d at 191. As discussed above, the State did
16   not prove beyond a reasonable doubt that there was a sustained attack on Gunnel.
17   Second, in so concluding, the court improperly relied on facts not found by the jury:
18   neither the guilt-phase jury nor the penalty-phase jury unanimously found that Kiles
19   had made a premeditated "decision" to kill the children. *Kiles*, 213 P.3d at 186. The
20   Sixth Amendment does not allow a defendant to be "expose[d] . . . to a penalty
21   exceeding the maximum he would receive if punished according to the facts
22   reflected in the jury verdict alone." *Apprendi*, 530 U.S. at 483. This applies to
23   capital sentencing as well: a defendant is "entitled to a jury determination" of facts
24   that can increase the sentence he faces. *Ring*, 536 U.S. at 589.

25        Finally, the court deemed that Kiles had established the mitigation of chronic
26   intoxication, but that it warranted reduced weight "given that his efforts to cover up
27   the crime demonstrate his knowledge of its wrongfulness." *Kiles* 213 P.3d at 191
28   (citing *State v. Rienhardt*, 951 P.2d 454, 466–67 (Ariz. 1997)). The blanket

1    application of a rule like this is arbitrary and contrary to federal law. *See Parker*,

2    498 U.S. at 321. Moreover, the court ignored the fact that Kiles's ineffectual and

3    haphazard effort to clean up the crime scene also involved ransacking the apartment

4    to find property to sell for drugs—again, a product of Kiles's intoxication and

5    addictions.

6         The court effectively and unreasonably eviscerated mitigation stemming

7    from Kiles's background and character. The court relied on illogical considerations

8    to undercut established mitigating factors' weight, thereby arbitrarily failing to give

9    that form of mitigation any effect.

10        The Arizona Supreme Court's consideration of Kiles's mitigating

11   circumstances violated the bedrock principles of reliability in sentencing. *See, e.g.*,

12   *Tennard*, 542 U.S. at 285; *Eddings*, 455 U.S. at 112–15. By conditioning the value

13   of a factor like mental health or intoxication on the circumstances of the crime, the

14   court failed to take into account Kiles's personal characteristics, as required by

15   *Eddings* and the Eighth Amendment. *See Eddings*, 455 U.S. at 112. Further, the

16   court injected an impermissible dose of irrationality into capital sentencing. *See*

17   *Parker*, 498 U.S. at 321. And, by applying a causal-nexus test and otherwise

18   arbitrarily undercutting the significance of mitigating circumstances, the court

19   failed to give effect to mitigation. *See Tennard*, 542 U.S. at 285. As a result, the

20   Arizona Supreme Court's decision is contrary to clearly established federal law.

21   *See* 28 U.S.C. § 2254(d)(1).

22        Because the procedure used to affirm Kiles's sentence did not satisfy the

23   standard required in capital cases, *see Woodson*, 428 U.S. at 305, Kiles's sentence

24   is constitutionally infirm, and he is entitled to relief.

25        **F.    The Arizona Supreme Court's individual and cumulative errors**
          **deprived Kiles of his constitutional rights.**

26

27        The Arizona Supreme Court's various errors, including the denial of

28   meaningful appellate review, due process, and individualized sentencing, violated

1   Kiles's rights under the Sixth, Eighth, and Fourteenth Amendments. Moreover,
2   each of the court's errors deprived Kiles of his protected liberty interest in the
3   Arizona Supreme Court's independent review. *See Hicks*, 447 U.S. at 346. Had the
4   court provided meaningful appellate review unmarred by constitutional error, it
5   would not have upheld Kiles's lone death sentence.

6          **G.     This Court may review this claim de novo.**

7          This Court may review this claim de novo, as 28 U.S.C. § 2254(d) poses no
8   bar to relief. The state court's decision was contrary to, or involved an unreasonable
9   application of, clearly established federal law, as determined by U.S. Supreme
10  Court precedent. *See* 28 U.S.C. § 2254(d)(2); *see also, e.g.*, *Hicks*, 447 U.S. at 346
11  (due process requires meaningful appellate review); *Parker*, 498 U.S. at 321
12  (meaningful appellate review in the capital-sentencing context requires an
13  individualized determination based on the character of the individual and the
14  circumstances of the crime); *Lewis*, 497 U.S. at 781 (1990) (aggravating factor
15  cannot be upheld where no rational trier of fact could have found it proven beyond
16  a reasonable doubt); *Johnson*, 486 U.S. at 585 (death sentence cannot be imposed
17  based in part on invalid aggravating factor); *Tennard*, 542 U.S. at 285 (sentencer
18  must be able to give effect to all mitigation). Moreover, the state-court decision was
19  based on an unreasonable determination of the facts in light of the evidence
20  presented, as discussed above. *See* 28 U.S.C. § 2254(d)(2). Accordingly, Kiles is
21  entitled to relief.

22                          **Claim Thirteen**

23          **Kiles's jury-imposed death sentence unconstitutionally relied upon
24          two invalid prior convictions.**

25          Kiles was sentenced to death by a jury that considered two prior convictions
26  that were legally insufficient to support Arizona's (F)(2) aggravator, *see* A.R.S.
27  § 13-703(F)(2) (1988), in violation of Kiles's rights under the Sixth, Eighth, and
28  Fourteenth Amendments to the U.S. Constitution. Kiles incorporates by specific

                                    388

1   reference all facts, allegations, and arguments made elsewhere in this Petition.

2       This claim was effectively addressed on the merits by the state post-

3   conviction court when it held that there was no colorable showing of prejudice

4   regarding trial counsel's ineffective assistance with respect to the invalid (F)(2)

5   aggravator. (ROA 1214 at 2; *see also* ROA 1189 at 46–48; PFR2 Dkt. 1 at 47–48.)

6   The state court's denial of this claim was an unreasonable application of or contrary

7   to the clearly established Sixth and Eighth Amendment precedent discussed below,

8   *see* 28 U.S.C. § 2254(d)(1), and rested on an unreasonable determination of the

9   facts, *id.* § 2254(d)(2). The strictures of § 2254(d) thus do not apply to this claim,

10  and this Court may review the merits of this claim de novo.[184]

11      Because of the particular need for reliability in capital cases, no death

12  sentence "predicated on mere 'caprice' or on 'factors that are constitutionally

13  impermissible'" may stand. *Johnson v. Mississippi*, 486 U.S. 578, 584–85 (1988)

14  (quoting *Zant v. Stephens*, 462 U.S. 862, 885 (1983)). In particular, no death

15  sentence may stand when based in part on a conviction that was impermissible

16  support for an aggravating circumstance. *See id.* at 585–89 (deeming

17  unconstitutional a death sentence based in part on prior conviction that had been

18  reversed). Further, in a state where the jury has to "weigh" the aggravation versus

19  the mitigation in arriving at its sentencing decision, the determination is necessarily

20  affected by the consideration of an impermissible aggravator, especially one based

21  on an invalid prior conviction. *See Stringer v. Black*, 503 U.S. 222, 232–33 (1992)

22  ("But when the sentencing body is told to weigh an invalid factor in its decision . . .

23  the weighing process itself has been skewed. . . ."). Succinctly put,

---

[184] Alternatively, Kiles alleges he can overcome any default by showing cause and
prejudice attributable to the ineffective assistance of state post-conviction counsel.
*See Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *Strickland v. Washington*, 466 U.S.
668, 688, 694 (1984).

1
2
3
4

> [a]n invalidated sentencing factor (whether an eligibility factor or not) will render the sentence unconstitutional by reason of its adding an improper element to the aggravation scale in the weighing process unless one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances.

5 *Brown v. Sanders*, 546 U.S. 212, 220 (2006) (footnote omitted).

6   Moreover, when the basis of an aggravator found by the jury is invalid, the
7 only constitutional recourse under the Sixth Amendment is a remand for a new
8 sentencing before a jury. *See Apprendi v. New Jersey*, 530 U.S. 466, 469, 497
9 (2000); *Ring v. Arizona*, 536 U.S. 584, 588 (2002); *Hurst v. Florida*, 136 S. Ct. 616,
10 621 (2016); *Pavatt v. Royal*, 894 F.3d 1115, 1152–53 (10th Cir. 2017) (Briscoe,
11 C.J., concurring in part and dissenting in part) (explaining that in light of *Ring* and
12 *Hurst*, which held that a defendant is entitled to a jury determination of all facts that
13 can increase his sentence, appellate reweighing is no longer constitutional); *see also*
14 *infra*, Claim 21.

15   As explained in depth in Claims 5, 11, and 12, *supra*, Kiles's penalty-phase
16 jury considered two prior felony convictions that were legally insufficient to
17 establish the (F)(2) aggravator. The Arizona Supreme Court on direct appeal
18 acknowledged that the first of those two convictions, an attempted aggravated
19 assault conviction, could not support the (F)(2) aggravator. *State v. Kiles*, 213 P.3d
20 174, 185–86 (Ariz. 2009). The court did not similarly re-evaluate whether Kiles's
21 prior conviction for aggravated assault was likewise invalid and so wrongly upheld
22 that conviction as a basis for the aggravator. *See id.*; *see supra*, Claim 5. The court
23 then concluded that the invalidated basis was immaterial, as there existed a separate
24 conviction to support the (F)(2) aggravator, and upheld Kiles's death sentence. *Id.*
25 at 186, 192.

26   This procedure was unconstitutional in light of the U.S. Supreme Court's
27 Sixth and Eighth Amendment jurisprudence. First, the weighing process itself was
28 skewed by the jury's consideration of the attempted aggravated assault conviction,

390

as the jury could not otherwise have considered this prior conviction as aggravation. *See Brown*, 546 U.S. at 220. As a result, under the Eighth Amendment, Kiles's death sentence could not stand. *See id.*; *Johnson*, 486 U.S. at 584–85. That error was compounded by the Arizona Supreme Court's failure to strike the aggravated assault prior conviction for the purposes of the (F)(2) aggravator and, by extension, to strike the aggravator altogether. *See, e.g.*, Claims 5, 12, *supra.*

In sum, the jury was given two prior convictions, evincing a pattern of escalating violence, to consider as aggravation under the (F)(2) aggravator. The State told the jury that its finding should be clear-cut (Tr. Apr. 11, 2006 at 31–32), and even the defense did not contest that the aggravated assault satisfied the (F)(2) aggravator. (Tr. Apr. 11, 2006 at 80 ("That attempted assault doesn't qualify, but the other assault conviction—aggravated assault—does. And it proved the factor period.").) But the jury should not have been able to consider either conviction as aggravation; the jury should not have been able to consider the (F)(2) aggravating circumstance at all. In such circumstances, the constitutional error was substantial and injurious, infecting Kiles's entire penalty phase. *See Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993). Kiles is entitled to relief.

## Claim Fourteen

**Kiles's second state post-conviction counsel were constitutionally ineffective.**

Kiles's second state post-conviction counsel were ineffective and deprived Kiles of his constitutional rights to due process and effective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the U.S. Constitution. Kiles incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

By the nature of this claim, these proceedings are the first in which Kiles can raise these issues. Because no state court has decided the merits of this claim, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply, and this Court's

1    review of this claim should be de novo.

2          In Arizona, "the initial-review collateral proceeding is the first designated
3    proceeding for a prisoner to raise a claim of ineffective assistance at trial, the
4    collateral proceeding is in many ways the equivalent of a prisoner's direct appeal."
5    *Martinez v. Ryan*, 566 U.S. 1, 11 (2012). And the direct appeal is a critical
6    component of a constitutional sentencing scheme. *Parker v. Dugger*, 498 U.S. 308,
7    321 (1991) ("[The Supreme Court] has emphasized repeatedly the crucial role of
8    meaningful appellate review in ensuring that the death penalty is not imposed
9    arbitrarily or irrationally.").

10         "Without the help of an adequate attorney, a prisoner will have . . .
11   difficulties vindicating a substantial ineffective-assistance-of-trial-counsel claim."
12   *Martinez*, 566 U.S. at 11. Ineffective-assistance claims "often require investigative
13   work and an understanding of trial strategy. When the issue cannot be raised on
14   direct review, moreover, a prisoner asserting an ineffective-assistance-of-trial
15   counsel claim" during post-conviction proceedings cannot "rely on a court opinion
16   or the prior work of an attorney addressing that claim." *Id.* at 11–12. Thus, "[t]o
17   present a claim of ineffective assistance at trial in accordance with the State's
18   procedures . . . a prisoner likely needs an effective attorney." *Id.*

19         Kiles's second state post-conviction team failed to provide effective
20   representation. Kerrie Droban (DA2 Dkt. 126 at 1) and Sharmila Roy (ROA 1035
21   at 1), Kiles's appointed counsel, had a difficult time working together. The physical
22   file was divided between their offices, and their approach was divided as well. Their
23   conflicts adversely affected the rest of the team. They let go of an experienced
24   mitigation specialist because of personality conflicts and hired someone with no
25   capital mitigation experience. They could not agree on what was important at
26   mitigation, leading to a disjointed, incomplete presentation of Kiles's personal
27   mitigating history to the state court. And their inability to work together culminated
28   in a failure to file a reply brief in Kiles's second state post-conviction proceedings.

The 2003 ABA Guidelines state that post-conviction counsel have a duty to "seek to litigate all issues, whether or not previously presented, that are arguably meritorious under the standards applicable to high quality capital defense representation, including challenges to any overly restrictive procedural rules." 2003 ABA Guideline 10.15.1(C). This Droban and Roy did not do. Their representation fell below the standards required for constitutionally effective post-conviction counsel. *See Martinez*, 566 U.S. at 11–12.

Kiles's state post-conviction counsel were deficient in a number of ways, elaborated upon below, and Kiles was prejudiced.

### A.      Post-conviction counsel were ineffective.

For the reasons articulated throughout this Petition, Kiles's second state post-conviction counsel's performance fell below the standard of minimally competent assistance. Three non-exhaustive examples underscore post-conviction counsel's deficiencies. Because Kiles did not receive effective assistance during his state post-conviction proceedings, he failed to have effective post-conviction review of a number of meritorious claims, including ineffective assistance of trial and appellate counsel, before the state courts.

### 1.      Post-conviction counsel failed to adequately raise claims.

State post-conviction counsel failed to raise several meritorious claims, specifically ineffective-assistance-of-counsel claims, which could only be appropriately raised in a state post-conviction proceeding. *See State v. Kiles*, 213 P.3d 174, 183–84 (Ariz. 2009).

For example, Droban and Roy did not raise ineffective-assistance claims for failure to competently conduct voir dire at the guilt and penalty phases, *see* Claims 2 and 4, *supra*, failure to make a complete record, *see* Claim 16, *infra*, and failure to challenge Kiles's grand-jury proceedings, *see* Claim 15, *infra*. Notably, post-conviction counsel raised a challenge to Kiles's grand-jury proceedings as a standalone constitutional claim, even though counsel knew or should have known

that such a claim would be precluded. This is especially problematic when the record itself included signs of deficient performance by trial counsel: counsel requested an extension of time to file a motion to challenge the grand-jury proceedings, but then never subsequently filed the motion. (ROA 388 at 1–2.)

Droban and Roy therefore failed to bring meritorious ineffective-assistance claims for state post-conviction review, fell below the standards expected of post-conviction counsel, and prejudiced Kiles. *See Kiles*, 213 P.3d at 183; *Martinez*, 566 U.S. at 11; *Strickland v. Washington*, 466 U.S. 668 (1984); *see also* 2003 ABA Guideline 10.15.1(C).

### 2. Post-conviction counsel failed to adequately develop mitigation evidence with both lay and expert witnesses.

Post-conviction counsel failed to uncover significant mitigation. Their performance was deficient as to both lay witnesses and experts.

Droban and Roy's initial error was dismissing a seasoned mitigation specialist in part because of a personality conflict. Moreover, as an experienced mitigation specialist, she believed that more extensive efforts would be required to conduct a reasonable mitigation investigation, relative to what the attorneys were willing to undertake. As a replacement, they hired a mitigation investigator with no capital mitigation experience. Jeff Trollinger had never previously worked on a capital mitigation case, received no training prior to his appointment, and got very little direction from Droban and Roy. As a result, he did not conduct an independent, thorough mitigation investigation but rather focused on re-investigating the crime. He mainly chose to interview witnesses who had signed affidavits during Kiles's first state post-conviction proceedings to determine whether their statements were still consistent. Because of his lack of training, the majority of his questions went toward re-investigating the facts of Kiles's guilt

394

rather than building a mitigation history.[185] He failed to conduct a mitigation investigation beyond the record that already existed, which defeated the purpose of state post-conviction proceedings. Due to counsel's failure to conduct a thorough investigation into Kiles's mitigating personal history, Kiles never had his mitigation effectively reviewed by the state post-conviction court.

While Trollinger failed to work effectively with lay witnesses for Kiles's post-conviction mitigation presentation, Droban and Roy failed to work effectively with mitigation experts. First, Droban and Roy failed to hire a trauma specialist to interview Kiles and present a compelling portrait of the trauma he had suffered and the effect it had on him. They failed to reasonably present to the state post-conviction court that starting at a young age, Kiles had suffered from mental illness and depression, which stemmed from abuse, neglect, and the predisposition toward mental illness and addiction in his family. They further failed to adequately explain that, compounding Kiles's genetic predisposition toward addiction, Kiles had been given alcohol from a young age and his sister had exposed him to drugs by the time he was a pre-teen. Counsel did not adequately convey the level of abuse and dysfunction present around Kiles throughout his formative years, further hindering his ability to function successfully as an adult.

Rather than hire an appropriate trauma specialist, Droban and Roy hired an expert who could discuss the effects of race broadly on African Americans, but who had little to offer about the effects of racism on Kiles specifically. (ROA 1189 at 52–57.) For example, while the expert stated that certain events "may have resulted in racism-based traumatic stress," some of these events concerned Yuma broadly, rather than Kiles specifically. And while the expert interviewed Kiles, he did not interview his family and was thus unable to present a compelling narrative about

---

[185] For instance, Trollinger spent a considerable amount of time trying to investigate a baseless rumor that Gunnel's daughter Shemaeah was not dead but had been trafficked.

how racism specifically impacted Kiles due to intergenerational trauma. Moreover, the expert's report was unable to explain how the trauma that African-Americans endure in general in America manifested in Kiles in particular, which was necessary for the report to be compelling as mitigation. Had Droban and Roy hired appropriate experts in trauma, they would have been able to present evidence that was both comprehensive and also specific to Kiles, his family, and his history.

Second, Droban and Roy hired a series of neuropsychologists to evaluate Kiles. (ROA 1047 at 1; ROA 1057 at 1; ROA 1132 at 1.) However, each neuropsychologist was directed to give the same or similar tests, rendering the results of certain testing unreliable due to the practice effect. "[U]nder the practice effect, a person scores higher on a test when it is readministered within a short period of time because he has become familiar with the test." *See Smith v. Ryan*, 813 F.3d 1175, 1183 (9th Cir. 2016). Droban and Roy should have been aware of the practice effect, as Arizona courts had already recognized its existence. *See State ex rel. Thomas v. Duncan*, 216 P.3d 1194, 1195 n.4 (Ariz. Ct. App. 2009) ("The practice effect occurs when a person performs better on a test because he or she has taken it before."). Clinical guidelines widely available at the time also recognized the practice effect. *See, e.g.*, Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 37 (5th ed. 2013) ("DSM-5").

In defiance of best practices and prevailing clinical information on neuropsychological testing, Droban and Roy elected to have three neuropsychologists evaluate Kiles using the same or similar tests within a short period. Two neuropsychologists visited Kiles just a year apart: neuropsychologist Paul Connor, Ph.D., administered tests on April 12 and 13, 2012, and John Toma, Ph.D., tested Kiles on May 8 and 10, 2013.[186] (PFR2 Dkt. 27 Ex. 24 at 1.) While

---

[186] The practice effect varies depending on the test given, but clinicians have recognized that the practice effect can render scores unreliable even if several years have passed between tests. *See, e.g.*, *United States v. Williams*, 1 F. Supp. 3d 1124, 1143–45 (D. Haw. 2014) (discussing practice effect).

1   some of Dr. Toma's results remain well-founded, some are affected by the practice

2   effect and cannot be considered reliable. (ROA 1189 at 57–58.) It is worth noting

3   that the third neuropsychologist who was asked to evaluate Kiles, Karen Froming,

4   Ph.D., refused to re-test Kiles, citing the practice effect. Post-conviction counsel's

5   deficient performance left Kiles unable to present reliable neuropsychological

6   results to the state post-conviction court. Had counsel obtained valid

7   neuropsychological test results, they would have found that, for example, Kiles had

8   deficits related to memory and deficits indicative of impaired executive functioning.

9   These results would have corroborated Kiles's history of trauma and the resultant

10  neural dysfunction. They would also have informed Kiles's other experts as they

11  explored issues such as the nature and extent of Kiles's brain damage.[187]

12      Third, Droban and Roy retained psychiatrist Joseph Wu, M.D., to do

13  neuropsychiatric imaging of Kiles's brain. However, some of Dr. Wu's quantitative

14  results were unreliable. While there are clear signs of brain damage on the images,

15  Dr. Wu used a diffusion tensor imaging ("DTI") scan, which is very sensitive and

16  specific to the scanner used. (PFR2 Dkt. 28 Ex. 25 at 5.) Therefore, any quantitative

17  analysis of a DTI scan should be made using a comparison group that was imaged

18  with the same scanner. Here, Dr. Wu did not do so. Instead, he compared Kiles's

19  images to images developed on a different scanner. Additionally, Dr. Wu failed to

20  include in his report critical information about the comparison group whose DTI

21  scans were used for Kiles's comparison.[188] (PFR2 Dkt. 28 Ex. 25 at 16.)

22      Perhaps most concerning, Dr. Wu failed to comment upon signs of brain

23  damage that are indisputable based on a visual review of Kiles's brain scans. These

[187] State post-conviction counsel's inability to get valid neuropsychological test results only exacerbated trial counsel's failure to do the same years before, after inadequately preparing neuropsychologist Scott Sindelar, Ph.D., to evaluate Kiles. *See supra*, Claim 6.

[188] There is no information, for example, about whether the comparison group controlled for age. (PFR2 Dkt. 28 Ex. 25 at 16.)

397

mistakes should have been obvious to an expert in Dr. Wu's field. While Dr. Wu was correct in concluding that Kiles has brain damage, some of his quantitative conclusions are suspect, and he failed to note some of the obvious damage revealed by the brain scans. Had Droban and Roy obtained a reliable and credible expert in the field, they would have been able to present more persuasive and credible findings of brain damage.

Finally, Droban and Roy retained pharmacologist Edward French, Ph.D., to evaluate how Kiles's polysubstance abuse affected his behavior. Dr. French's report was not filed with the post-conviction petition. State post-conviction counsel maintained that this was because Dr. French would not say with certainty that, while under the influence of cocaine, Kiles could do routine acts like driving, but would still have significant impairment in decision-making ability and perception of reality. This was an inaccurate interpretation of Dr. French's report, as the report explained that while cocaine use can cause psychotic symptoms and severely impair impulse control, it does not impair the ability to engage in organized activities like driving or speaking with others. Because post-conviction counsel failed to read their own expert's report thoroughly and undertake basic, necessary follow-up with the expert, they failed to present additional, compelling mitigation information to the post-conviction court.[189]

Individually and cumulatively, these mistakes prevented Kiles from having an effective post-conviction review of his prior state proceedings. Kiles was thus prejudiced. *See Martinez*, 566 U.S. at 9; *Strickland*, 466 U.S. at 694.

---

[189] This was especially troubling in light of the pervasive effects of Kiles's addictions and trial counsel's ineffectiveness in failing to have a substance-abuse expert counter the State's narrative that addiction is a choice. *See supra*, Claim 6. Further, despite counsel's reservations about Dr. French's report, they shared it with at least one other expert, who then relied on it to inform his own findings. (*See* PFR2 Dkt. 28 Ex. 25 at 2 (Dr. Wu discussing Dr. French's conclusions).)

398

### 3.    Post-conviction counsel failed to file a reply.

Kiles's second state post-conviction counsel failed to file a reply in support of Kiles's petition for post-conviction relief, prejudicing his ability to have a full and effective review of meritorious claims raised in the opening brief.

Kiles's state post-conviction opening brief was filed on November 24, 2014. (ROA 1189 at 1.) The State's response was filed on July 6, 2015. (ROA 1198 at 1.) On February 1, 2016, the date the reply brief was due, Kiles's state post-conviction counsel filed a motion asking the court to allow Roy to withdraw and requesting a short extension of time. (ROA 1213 at 1–2.) The motion stated that Roy's "personal and family circumstances have prevented her from drafting her portion of the reply." (ROA 1213 at 2.) Additionally, "Roy's inability to contribute as expected to the drafting of this reply has caused conflict between her and Ms. Droban, which is likely to impair the representation of Mr. Kiles from this time forward." (ROA 1213 at 3–4.) Droban stated in the motion she would be able to complete the petition with only a two-week extension of time, asking for a new filing date of February 15, 2016. (ROA 1213 at 5.)

Two days later, without ruling on either Roy's request to withdraw or Droban's request for a short extension of time, and thus without the benefit of a reply brief, the state post-conviction court issued its order denying post-conviction relief. (ROA 1214 at 1–2.)

The failure to file a reply brief in Kiles's case was not a strategic decision that would require deference. Indeed, the motion that Droban and Roy filed requesting a short extension of time explicitly acknowledged that Roy had provided ineffective assistance to Kiles. The failure to file a reply brief denied a full and effective review of Kiles's state post-conviction claims.

Further, the failure to file a reply was not a harmless error. The State argued in its response brief that claims were, for instance, procedurally precluded, or that they failed to meet the standard required for establishing a colorable claim. (ROA

399

1198 at 8–10.) Without the chance to reply, Droban and Roy were unable to refute these points and correct points of law and fact the State misstated in its response. Moreover, the 2003 ABA Guidelines provide that state post-conviction counsel have a duty to "seek to litigate all issues, whether or not previously presented, that are arguably meritorious under the standards applicable to high quality capital defense representation, including challenges to any overly restrictive procedural rules." 2003 ABA Guideline 10.15.1(C). Therefore, under the prevailing standards, Droban and Roy were required to file a reply that not only argued all meritorious claims, but that also (1) refuted the State's arguments regarding reclusion, and (2) explained where the State applied the law incorrectly.

Droban and Roy's deficient performance hindered the post-conviction court's opportunity to adequately and effectively rule on Kiles's claims. It also prejudiced Kiles, as there was a reasonable likelihood that with adequate briefing the post-conviction court would have found these claims colorable. *See Strickland*, 466 U.S. at 694.

### B.   Post-conviction counsel's ineffectiveness excuses any procedural default of claims raised throughout this Petition.

This Court may consider the merits of any claims that would otherwise be procedurally defaulted because Kiles can demonstrate cause and prejudice to overcome any default. *See generally Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *see also Smith v. Murray*, 477 U.S. 527, 533 (1986). "Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Martinez*, 566 U.S. at 9.

Kiles can demonstrate cause under *Martinez* because the underlying claims (i.e., the defaulted claims) are substantial, and post-conviction counsel's performance was inadequate. *See id.* at 14. To show his claims are "substantial," Kiles needs to demonstrate they have "some merit." *Id.* at 12. *In Martinez*, the Court

specifically cited the standard for issuance of a Certificate of Appealability ("COA"). *Id.* at 14 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)). By citing *Miller-El*'s discussion of COA standards, the Court indicated that the COA standard applies when determining if an underlying claim is "substantial." Under the COA standard, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). *Slack*'s holding "would mean very little if appellate review were denied because the prisoner did not convince a judge, or, for that matter, three judges, that he or she would prevail." *Miller-El*, 537 U.S. at 337. The COA standard is a low bar intended to screen out only the clearly frivolous claims, and therefore, any doubt whether Kiles has advanced a non-frivolous claim should be resolved in his favor. *See Lambright v. Stewart*, 220 F.3d 1022, 1025 (9th Cir. 2000). Further, "[a]lthough not dispositive," a death sentence "is a proper consideration" in deciding whether to issue a COA. *Id.* (internal quotation marks omitted).

Conducting a full merits review on the undeveloped record would frustrate the intention of *Martinez* to avoid the circumstance of a prisoner never receiving a proper hearing on a claim involving a "bedrock principle," *Martinez*, 566 U.S. at 1, the right to effective trial counsel. The Ninth Circuit's jurisprudence on *Martinez* supports these principles. In *Detrich v. Ryan*, a four-judge plurality explained that, where a prisoner demonstrates that his post-conviction counsel performed deficiently and failed to raise a "substantial" claim of ineffective assistance of trial counsel, the prisoner satisfies *Martinez*'s cause-and-prejudice standard. 740 F.3d 1237, 1245 (9th Cir. 2013) (en banc). A petitioner shows cause by showing post-conviction counsel was deficient and demonstrates prejudice by showing that the ineffective-assistance-of-trial-counsel claim is substantial. *Id.* at 1245–46. Judge Fletcher explained that, for the "narrow purpose" of showing cause under *Martinez*, a "prisoner need not show actual prejudice resulting from his [post-conviction]

401

counsel's deficient performance, over and above his required showing that the trial-counsel [ineffectiveness] claim be 'substantial[.]'" *Id.* The plurality reasoned that, if a petitioner "were required to show that the defaulted trial-counsel [ineffectiveness] claims fully satisfied *Strickland* . . . this would render superfluous the first *Martinez* requirement of showing that the underlying *Strickland* claims were 'substantial[.]'" *Id.* at 1246.

In *Dickens v. Ryan*, an eight-judge majority largely paralleled the plurality's analysis in *Detrich*. 740 F.3d 1302 (9th Cir. 2014) (en banc). In *Dickens*, the Court instructed that the petitioner could show cause for default if he could show the first two *Martinez* elements: "(1) the [defaulted] claim is substantial and (2) his PCR counsel was ineffective under *Strickland*." *Id.* at 1320. Thus, because Kiles's post-conviction counsel were inadequate and substantial claims went un-reviewed in state court, he can show cause to overcome any procedural default.

The prejudice element of the cause-and-prejudice test remains settled. Generally, once the petitioner has shown cause, the Court should consider whether there is prejudice based on the underlying constitutional claim. *See, e.g.*, *Walker v. Martin*, 562 U.S. 307, 315 (2011) (describing cause and prejudice as "cause for the delay in asserting his claims and actual prejudice resulting from the State's alleged violation of his constitutional rights"); *Smith*, 477 U.S. at 533 ("actual prejudice resulting from the alleged constitutional violation" (quoting *Wainwright v. Sykes*, 433 U.S. 72, 84 (1997))).

Thus, this Court should determine whether there is a reasonable probability that the errors alleged undermined confidence in the outcome of the proceedings against Kiles. In undertaking this analysis, the Court should bear in mind that *Martinez* provided an equitable avenue for federal courts to review the merits of non-frivolous constitutional violations, and that evidentiary development is necessary to establishing cause and prejudice. *See, e.g., Woods v. Sinclair*, 764 F.3d 1109, 1138 n.16 (9th Cir. 2014) (rejecting argument that "*Pinholster*

402

and 2254(e)(2) categorically bar [habeas petitioners] from obtaining such a hearing or from presenting extra-record evidence to establish cause and prejudice for the procedural default").

The circumstances described above and those uncovered during habeas counsel's investigation of this case demonstrate post-conviction counsel were ineffective. That ineffectiveness provides cause and prejudice sufficient to excuse the default of the claims raised in this Petition.

### C. Post-conviction counsel's ineffectiveness entitles Kiles to relief.

While acknowledging contrary authority, *see Coleman v. Thompson*, 501 U.S. 772, 757 (1991), Kiles respectfully asserts that he is constitutionally entitled to the effective assistance of post-conviction counsel, and this Court should grant relief on this basis. Arizona's post-conviction process was inadequate and ineffective to protect Kiles's constitutional right to counsel, and his post-conviction counsel performed deficiently and prejudiced him. As explained in *Martinez*, Arizona prisoners must raise ineffectiveness of trial counsel in a petition for post-conviction relief, not on direct appeal. *See State v. Spreitz*, 39 P.3d 525, 527 (Ariz. 2002). Kiles's post-conviction proceedings were his only opportunity to pursue ineffective-assistance claims (and, for that matter, any other claims that relied on more than the cold trial record). Thus, those post-conviction proceedings were a "first appeal as of right" as to those claims, and he should have a constitutional right to the effective assistance of counsel in those proceedings. *See Evitts v. Lucey*, 469 U.S. 387, 396 (1985).

In Arizona, post-conviction proceedings are part of an established, mandatory appellate process, initiated by the Arizona Supreme Court. *See* Ariz. R. Crim. P. 32.4(a) (on issuance of mandate affirming conviction and death sentence on direct appeal, clerk of court files automatic notice for post-conviction relief); *State v. Bolton*, 896 P.2d 830, 839 (Ariz. 1995) (explaining that Rule 32 proceeding is mandatory on affirmance of death sentence). Here, state post-conviction

403

proceedings are not only automatic on the affirmance of a death sentence; they are also a defendant's only chance to present constitutional claims based on evidence outside the record, including the ineffective assistance of trial and appellate counsel. They are, thus, appeals "as of right" for these claims, and the State must provide the effective assistance of counsel. *See Jackson v. State*, 732 So. 2d 187, 190 (Miss. 1999) ("The reality is that post-conviction efforts, though collateral, have become an appendage, or part, of the death penalty appeal process at the state level."). By not assuring competent counsel for these claims, post-conviction review of the competence of capital attorneys becomes a "meaningless ritual." *See Evitts*, 469 U.S. at 394 (internal quotation marks omitted); *see also Jackson v. Weber*, 637 N.W.2d 19, 24–25 (S.D. 2001) ("If the defense attorney was ineffective in the original criminal proceeding and habeas counsel was thereafter ineffective in ferreting out the invalidity of the conviction, we may never know if the convicted person had a fair trial or, God forbid, was actually innocent.").

Further, because Arizona entitles a defendant to the appointment of state post-conviction counsel and provides standards in an attempt to ensure counsel's competence, due process requires that counsel be effective. Implementation of this statutorily provided right must comport with due process: "when a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution—and, in particular, in accord with the Due Process Clause." *Evitts*, 469 U.S. at 401. Due process demands that when a statutory right to counsel is established, the concomitant right to effective assistance of counsel must also be recognized; otherwise, the statutory right would be meaningless. *See id.* at 396 ("[A] party whose counsel is unable to provide effective representation is in no better position than one who has no counsel at all.").

Other state courts have recognized that, because their state statutes provide for counsel in post-conviction proceedings, due process demands that counsel perform effectively: "[W]e will not presume that our legislature has mandated some

404

1    'useless formality' requiring the mere physical presence of counsel as opposed to

2    effective and competent counsel." *Jackson*, 637 N.W.2d at 23. Their reasoning has

3    been based on the well-established principle that the right to counsel means the right

4    to the effective assistance of counsel. The Due Process Clause of the Constitution

5    ensures fundamental fairness. If Arizona ignores the dictates of its own statute and

6    appoints incompetent counsel, the petitioner is entitled to relief. *Cf. Lozada v.*

7    *Warden*, 613 A.2d 818, 822 (Conn. 1992) ("[F]undamental fairness opens the door

8    for relief by habeas corpus when the state, in discharging its statutory duty, appoints

9    incompetent counsel.").

10        In sum, Kiles's post-conviction counsel were ineffective. This deprived him

11   of his constitutional rights to due process and the effective assistance of counsel,

12   and also provides cause and prejudice to overcome the default of any claims raised

13   in this Petition. Kiles is entitled to evidentiary development and relief.

14                              **Claim Fifteen**

15       **Trial counsel was ineffective for failing to file a motion to remand**
         **because of errors rendering the grand-jury proceedings**
16       **unconstitutional.**

17        Kiles's counsel's ineffective assistance in failing to file a motion to remand

18   for new grand-jury proceedings deprived Kiles of his rights to counsel, reliable

19   proceedings, due process, and equal protection in violation of the Sixth, Eighth, and

20   Fourteenth Amendments to the U.S. Constitution. Kiles incorporates by specific

21   reference all facts, allegations, and arguments made elsewhere in this Petition.

22        Kiles did not present this claim in state court. Kiles alleges he can overcome

23   any default by showing cause and prejudice, as the ineffective assistance of Kiles's

24   state post-conviction counsel in failing to raise this claim constitutes cause for the

25   default and resulted in prejudice to Kiles.[190] *See Martinez v. Ryan*, 566 U.S. 1, 9

26   _____

27   [190] Kiles's state post-conviction counsel did raise a standalone challenge to the
     grand-jury proceedings, but should have anticipated that the court would deem that
28   challenge defaulted. (*See* ROA 1214 at 1 ("The court rejects Defendant's arguments

                                    405

(2012); *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). Kiles will demonstrate at an evidentiary hearing that state post-conviction counsel fell below the standards of minimally competent capital post-conviction attorneys when they failed to raise this meritorious claim. Because this claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider the merits of the claim de novo.

"Pretrial investigation and preparation are the keys to effective representation of counsel." *United States v. Tucker*, 716 F.2d 576, 581 (9th Cir. 1983); *see also Strickland*, 466 U.S. at 684 (guaranteeing defendants the effective assistance of counsel under the Sixth Amendment); *supra*, Claim 2 (discussing *Strickland* standard). Filing relevant pretrial motions—particularly one that counsel himself describes as significant—constitutes rudimentary trial preparation. Failure to file such motions "is not a strategic decision." *Strickland*, 466 U.S. at 689–90; *Wiggins v. Smith*, 539 U.S. 510, 521–22 (2003); *see also Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) (finding counsel ineffective for failing to file a pretrial motion). It is deficient where counsel's decisions result from inattention instead of reasoned judgment. *See Wiggins*, 539 U.S. at 534. Further, under the 1989 ABA Guidelines, counsel were obligated to examine a case's charging documents to identify "any issues, constitutional or otherwise" that could be raised to attack them. 1989 ABA Guideline 11.4.1(D)(1)(C). The 1989 ABA Guidelines also include that counsel should consider pretrial motions related to "potential defects in the charging process." 1989 ABA Guideline 11.5.1(B)(3); *see also* 1989 ABA Guideline 11.5.1(B) (instructing counsel to consider all pretrial motions potentially available).

---

regarding the grand jury composition and the testimony of Imogene Kiles before the grand jury. Those claims are precluded under the rule.").)

1

2

### A. Counsel planned to file a motion to remand to address improprieties with the grand-jury session and the resulting indictment.

3

4

5

6

7

8

9

10

11

12

13

14

As early as fall 1998, Kiles's trial counsel Greg Clark planned to file a motion to remand for a new grand-jury proceeding, based largely on the unconstitutional elements of the grand-jury proceedings described below. (Tr. Oct. 30, 1998 at 47; PFR2 Dkt. 21 Ex. 6 at 1–11.) In October 1998, the court ordered that the motion be filed within a reasonable time. (Tr. Oct. 30, 1998 at 47.) Kiles's counsel during his first state post-conviction proceedings had extensively investigated the underlying support for the motion; it was clear the claims were well-supported. (*See* PFR2 Dkt. 23 Ex. 19; PFR2 Dkt. 27 Ex. 22; ROA 225 Ex. 55; ROA 225 Ex. 63; Tr. Feb. 20, 1996 at 40–43, 47–49, 53–55, 71–75, 90–96; Tr. Feb. 22, 1996 at 225–26.) Indeed, Clark asked for and received multiple extensions of time to file a motion to remand based on challenges to the grand-jury proceedings. (Tr. Dec. 9, 1998 at 4; Tr. Jan. 22, 1999 at 11.)

15

16

17

18

In February 1999, the parties stipulated to extending the deadline for Clark to file a motion to remand. (ROA 397 at 1.) Clark exchanged drafts of this motion with Mary Boyte, who was briefly his co-counsel and who had been Kiles's counsel in his first state post-conviction proceedings.[191] (PFR2 Dkt. 21 Ex. 6 at 1–11.)

19

20

21

22

23

24

In April 1999, Clark stated at a status hearing that he and the prosecutor were going to sit down to discuss the motion and potentially enter into a stipulation to remand. (Tr. Apr. 2, 1999 at 4.) He said: "I thought the issues we have developed in that regard are significant to the point where I think that's justified and it may be fruitful and it would certainly save a tremendous amount of court time just from that standpoint." (Tr. Apr. 2, 1999 at 4.) In July 1999, Kiles filed a pro per motion

25

26

27

28

---

[191] Second state post-conviction counsel attached one of these drafts as an exhibit to Kiles's second post-conviction petition, but Boyte had urged Clark to include additional claims not listed in that draft, including racial discrimination in grand-jury selection. (*See* PFR2 Dkt. 21 Ex. 6 at 1–11.)

1    complaining that the motion to remand had not yet been filed, and he did not know

2    why. (ROA 407 at 7.) Also in July 1999, Boyte filed a motion to withdraw as

3    counsel based on Clark's incompetent representation and failure to communicate

4    with her and Kiles. (ROA 409 at 2.) This was based in part on the fact that she had

5    prepared the motion to remand, but Clark had not filed it—she did not know and

6    could not determine why. (Tr. Aug. 6, 1999 at 15.) In October 1999, Kiles stated at

7    a status hearing that he did not know what was happening with the motion, though

8    he had seen a draft. (Tr. Oct. 8, 1999 at 75.)

9        Although his co-counsel had sent him a draft, Clark never filed this motion.

10    The failure to file this motion was not based on reasoned strategic judgment.

11    *Strickland*, 466 U.S. at 689–90.

12       **B.**    **Counsel was deficient in failing to file a motion to remand based**
                **on the fact that a grand juror had prior knowledge of the facts of**
13                  **the crime.**

14        Clark was ineffective for failing to file a motion to remand for a new

15    indictment because one of the grand jurors knew about the facts of the crime from

16    Valerie Gunnel's brother-in-law.

17        A defendant has a right to be "prosecuted only 'on the basis of the facts

18    presented to the grand jury. . . .'" *United States v. Du Bo*, 186 F.3d 1177, 1179 (9th

19    Cir. 1999) (quoting *United States v. Rosi*, 27 F.3d 409, 414 (9th Cir. 1994)). It

20    violates due process where a defendant is tried "on an indictment returned by a

21    biased grand jury." *United States v. Samango*, 607 F.2d 877, 881 (9th Cir. 1979)

22    (overturning an indictment where the prosecutor's conduct created a biased jury).

23    Further, the prosecutor has a duty to ensure the "wise exercise" of the grand jury's

24    investigatory power. *Hoffman v. United States*, 341 U.S. 479, 485 (1951). While

25    prosecutors have broad discretion before a grand jury, "this prosecutorial discretion

26    is not boundless." *United States v. De Rosa*, 783 F.2d 1401, 1404 (9th Cir. 1986)

27    (quoting *United States v. Al Mudarris*, 695 F.2d 1182, 1185 (9th Cir. 1983)). "The

28    prosecutor may not circumvent the constitutional safeguard of a grand jury by

1  overreaching conduct that impinges on the grand jury's autonomy and interferes

2  with its exercise of unbiased judgment." *De Rosa*, 783 F.2d at 1404.

3       Kiles's grand-jury proceedings violated his rights because one grand juror

4  knew the facts of the crime before serving on the grand jury. At the start of the

5  grand-jury hearing, after mentioning the victims' names, Yuma County Attorney

6  Phillip Hall asked the grand jurors if they had any reason to believe they could not

7  be fair and impartial. (Tr. Feb. 21, 1989 at 9.) One grand juror raised his hand and

8  explained that he worked with Gunnel's brother-in-law, Nate Bailey; upon further

9  prompting, he added that Bailey had told him about the crime a few days earlier.

10 (Tr. Feb. 21, 1989 at 9.) Hall pressed on, asking if he had any conversations with

11 Bailey about the alleged evidence or what may have occurred and who was

12 responsible. (Tr. Feb. 21, 1989 at 9–10.) The grand juror responded that Bailey had

13 told him "what had happened to the woman; the injuries she received." (Tr. Feb.

14 21, 1989 at 10.) Instead of removing this man from the grand jury based on his

15 extraneous knowledge, Hall asked him:

16        So, I guess, I have got to come back to you and ask you

17        whether or not you can lay aside any conversations that you
       may have had with Mr. Bailey and determine based solely

18        upon the evidence presented here whether or not probable
       cause exists to believe that Mr. Kiles or anyone else for that

19        matter should be indicted for the death of Mrs. Gunnell
       [sic].

20

21 (Tr. Feb. 21, 1989 at 10.) The grand juror stated that he did not have any prejudice,

22 and Hall allowed him to remain. (Tr. Feb. 21, 1989 at 10.) This was an abuse of

23 prosecutorial discretion. Hall should not have allowed that grand juror to consider

24 the indictment, given that he had first-hand outside information. Instead, Hall

25 perfunctorily asked the grand juror if he could lay it aside, and the juror agreed.

26 Where a juror is biased, it is not sufficient for him to perfunctorily agree that he can

27 be fair. *See Morgan v. Illinois*, 504 U.S. 719, 735 (1992).

28      It was below prevailing professional norms for counsel to fail to file a motion

409

1   to remand because a grand juror had outside knowledge of the crime, which resulted

2   in Kiles being charged based on facts outside of the grand jury presentation. Clark's

3   stated plan to file the motion, and his assertion that he thought there was strong

4   support for it, further underscore this.[192] Had counsel filed the motion to remand,

5   the constitutionally deficient indictment would have required reversal. *See Du Bo*,

6   186 F.3d at 1179. "Failing to enforce this requirement would allow a court to 'guess

7   as to what was in the minds of the grand jury at the time they returned the

8   indictment.'" *Id.* (quoting *United States v. Keith*, 605 F.2d 462, 464 (9th Cir. 1979)).

9   Clark's failure thus prejudiced Kiles.

10         **C.**    **Counsel was deficient in failing to file a motion to remand based
11   on the fact that the State knew that Imojean Kiles was an
    incompetent witness during her grand-jury testimony.**

12         The grand-jury proceedings were further infected by prosecutorial

13   misconduct because the prosecutor knew that a central witness, Kiles's mother

14   Imojean Kiles, was an incompetent witness. (Tr. Feb. 21, 1989 at 52–83.) The

15   morning of her grand-jury testimony, Imojean took two nerve pills and shots of

16   brandy. (PFR2 Dkt. 23 Ex. 19 at 9.) She arrived at court, but she was told to return

17   in the afternoon, so she went home and drank more brandy. (PFR2 Dkt. 23 Ex. 19

18   at 9.) Before taking the stand that afternoon, Imojean told Hall and the lead detective

19   on the case, Detective Brian Rodgers, that she needed to take a nerve pill. Hall gave

20   her a glass of water, and he and Rodgers watched her take the pill. (PFR2 Dkt. 23

21   Ex. 19 at 9.) In an affidavit written for the first state post-conviction proceedings,

22   she explained her resulting mental state on the stand: "I was really out of it. I was

23   so confused. I had trouble thinking clearly. I didn't understand some of the

24   questions. I said things I knew wasn't right but I was so out of it I no longer knew

25   what was right anymore. I don't remember much of it." (PFR2 Dkt. 23 Ex. 19 at 9–

26   10.) Imojean Kiles's friend Geraldine Dickey accompanied her to the grand-jury

27
—————————————————————

28   [192] It was also important for Clark to file pretrial motions to strengthen the defense's
    position during the ongoing plea negotiations.

1  proceedings and swore in an affidavit to Imojean Kiles's drinking, pill-taking, and
2  resultant incompetence on the stand. (PFR2 Dkt. 27 Ex. 22 at 2.)

3       Imojean Kiles was a key witness at the grand-jury proceedings. She testified
4  about Kiles's admission to her that he killed Valerie Gunnel. (Tr. Feb. 21, 1989 at
5  52–60.) However, her testimony reflected that she was impaired and confused on
6  the stand. (*E.g.*, Tr. Feb. 21, 1989 at 63–64.) At the second grand-jury hearing in
7  April 1989, the prosecutor gave the grand jurors a transcript of the prior
8  proceedings, including Imojean Kiles's testimony. (Tr. Apr. 4, 1989 at 31.)

9       As discussed above, a prosecutor has a duty to ensure that justice is done at
10  a grand-jury proceeding. He violated this duty—and Kiles's due process rights—
11  when he put Imojean Kiles on the stand to testify in front of the grand jury, knowing
12  that she was an incompetent witness. Clark was deficient for failing to file the
13  motion to remand on this basis when he knew that the motion was "significant" and
14  when his failure had no strategic justification. (Tr. Apr. 2, 1999 at 4.) This
15  prejudiced Kiles, as it is probable that the cumulative errors at his grand-jury
16  proceedings would have warranted a remand.

17      **D.**    **Counsel was ineffective for failing to file a motion to remand**
18             **because Kiles was denied his right to a grand jury free from**
           **discrimination.**

19       Given prevailing professional norms and well-known constitutional
20  precedent, it was unreasonable for counsel to fail to file a motion to remand, because
21  Kiles was charged by a jury selected on the basis of race. *See Strickland*, 466 U.S.
22  at 688.

23       It violates the Equal Protection Clause of the Fourteenth Amendment where
24  there is racial discrimination in the grand-jury selection process. Even a conviction
25  cannot "cure the taint attributable to a charging body selected on the basis of race."
26  *Vasquez v. Hillery*, 474 U.S. 254, 264 (1986). The Supreme Court has established
27  "mandatory reversal" in this circumstance. *Id.* at 264. The Court has emphasized
28  that, "having found discrimination in the selection of a grand jury, we simply cannot

411

1   know that the need to indict would have been assessed in the same way by a grand
2   jury properly constituted." *Id.* A defendant need not be the same race as excluded
3   jurors to challenge a grand jury infected by discrimination. *Campbell v. Louisiana*,
4   523 U.S. 392, 398 (1998) ("Regardless of his or her skin color, the accused suffers
5   a significant injury in fact when the composition of the grand jury is tainted by
6   racial discrimination.")

7        In *Castaneda v. Partida,* 430 U.S. 482 (1977), the Supreme Court articulated
8   a three-part test to evaluate allegations of equal-protection violations in the context
9   of grand-jury selection:

10            The first step is to establish that the group is one that is a
11       recognizable, distinct class, singled out for different
         treatment under the laws, as written or as applied. Next, the
12       degree of underrepresentation must be proved, by
         comparing the proportion of the group in the total
13       population to the proportion called to serve as grand jurors.
         . . . Finally, as noted above, a selection procedure that is
14       susceptible of abuse or is not racially neutral supports the
         presumption of discrimination raised by the statistical
15       showing. Once the defendant has shown substantial
         underrepresentation of his group, he has made out a prima
16       facie case of discriminatory purpose and the burden then
17       shifts to the State to rebut that case.

18   *Id.* at 494–95 (internal citations omitted). Racial discrimination in grand-jury
19   selection may be inferred via statistical underrepresentation combined with
20   subjective selection procedures. *Id.*

21        A Yuma County grand jury indicted Kiles in February and April 1989. (ROA
22   1; CR89-15577 ROA 1.) Nearly the same grand jury panel indicted him both times.
23   (Tr. Apr. 4, 1989 at 3–4.) At the time of the 1990 U.S. census, Yuma County was
24   2.9% African-American and 40.6% "Hispanic origin." *See* U.S. Bureau of the
25   Census, *1990 Census: Arizona, Table 5: Race and Hispanic Origin*,
26   https://www2.census.gov/library/publications/decennial/1990/cp-1/cp-1-4.pdf    at
27   29. The February grand jury included three individuals of Hispanic origin out of 15
28   grand jurors, or 20% of the panel. (ROA 225 at 4–5.) The April grand jury included

412

three individuals of Hispanic origin out of 15 grand jurors, or 13% of the panel. (ROA 225 at 5.) No grand juror in either February or April 1989 was African American. (ROA 225 at 4.)

The grand-jury selection procedure at the time of Kiles's indictments resulted in a significant underrepresentation of non-white grand jury members. The selection process was subject to abuse because of an excess of unsupervised discretion. (ROA 225 Ex. 63 at 2.) The Jury Commissioner selected prospective juror names from voter-registration and Department of Motor Vehicles lists and mailed questionnaires. (ROA 225 Ex. 63 at 2.) Whenever those letters were returned due to a bad address, no one attempted to locate that individual. (ROA 225 Ex. 55 at 1.) Similarly, no one followed up with people who did not return their questionnaires. (ROA 225 Ex. 55 at 1.) The Jury Commissioner reviewed juror questionnaires and had total discretion to remove names from consideration based on their responses. (ROA 225 Ex. 63 at 2.) The prospective juror questionnaires were destroyed after 90 days, without any possibility for review by litigants or judicial officers. (ROA 225 Ex. 63 at 3.) Of the 60 potential grand jurors called to court, the judge and county attorney selected 16 grand jurors and four alternates. (ROA 225 Ex. 63 at 3.) It is unclear what, if any, criteria they used.

It is improper to allow a jury commissioner unfettered discretion in selecting potential grand jurors. When statistics demonstrate dramatic under-representation of a suspect class, together with a selection procedure that systematically excludes a great proportion of those classes, that discretion must be challenged. *See Castaneda*, 430 U.S. at 482 (holding it unconstitutional where statistical underrepresentation of Mexican-Americans in grand-jury services was the result of "highly subjective" selection procedures). It is difficult to imagine a process more susceptible to abuse than one in which not only the Jury Commissioner, but also the defendant's prosecutor, have unbridled discretion to exclude potential grand jurors.

413

1   The facts of Kiles's case are very similar to those in *Castaneda*.[193]

2       It was unreasonable and fell below prevailing professional norms for counsel

3   to fail to challenge this unconstitutional selection process. *Vasquez* and *Castaneda*

4   were both well-known, longstanding precedent by the time of Kiles's case. The

5   need to examine the record for any instances of racial discrimination should have

6   been clear to competent counsel. Further, Clark was on notice of this concern

7   because the first state post-conviction counsel had raised this claim in their petition.

8   (ROA 225 at 3–9; ROA 268 at 5–21.) The 1999 Arizona Capital Case Defense

9   Manual, which counsel had, also instructed counsel to investigate the composition

10  of the grand and petit venires. In addition, correspondence shows that Mary Boyte

11  urged Clark to include this challenge in his motion to remand. (PFR2 Dkt. 21 Ex. 6

12  at 1–11.) In February and March 1999, she sent him the materials from the first

13  state post-conviction proceedings and urged him to include this challenge.

14      Counsel's failure to file a motion to remand based on the grand jury's racially

15  discriminatory composition prejudiced Kiles. Had counsel challenged the grand

16  jury composition, "there is a reasonable probability that the claim [counsel] failed

17  to raise at trial would have prevailed, either at trial or on appeal." *Doe v. Ayers*, 782

18  F.3d 425, 432 (9th Cir. 2015) (citing *Strickland*, 466 U.S. at 694). Then, had Kiles

19  prevailed at trial or on appeal, his indictment would have been vacated. *See*

20  *Vasquez*, 474 U.S. at 264. Kiles was therefore prejudiced by his counsel's deficient

21  performance.

22      **E.   Conclusion.**

23      In sum, Clark provided ineffective assistance by failing to file a motion to

24

---

25  [193] The state post-conviction court ruled in 2016 that Kiles had not shown a
26  colorable claim as to discriminatory intent in grand jury composition. (ROA 1214
    at 1.) This ruling on the merits is contrary to and/or an unreasonable application of
27  clearly established federal law under *Castaneda*. *See* 28 U.S.C. § 2254(d)(1). To
    the extent that the state court made a determination of fact, that too was
28  unreasonable, as described above. *See* 28 U.S.C. § 2254(d)(2).

414

1 remand for new grand-jury proceedings. He planned to file the motion and knew

2 that it was "significant." (Tr. Apr. 2, 1999 at 4.) His failure to do so was not based

3 on reasoned strategic judgment, but was instead inexplicable and unjustifiable. Had

4 Clark filed and argued this motion, he likely would have succeeded, based on the

5 facts described above. Further, it would have put him in an advantageous position

6 to settle—particularly important because the crime had occurred a decade earlier,

7 and Kiles was eager to settle for a life sentence. Where counsel, like Clark, performs

8 ineffectively, it undermines the reliability of the proceedings. *Strickland*, 466 U.S.

9 at 693; *see also Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (joint

10 opinion of Stewart, Powell, and Stevens, JJ.).

11                                    **Claim Sixteen**

12        **Counsel were ineffective for failing to ensure that critical portions
          of the record were preserved and recorded.**

13

14        Trial counsel's failure to ensure that all proceedings were recorded and that

15 all crucial documents were preserved hindered Kiles's ability to effectively

16 challenge his convictions and sentences, violating his rights under the Sixth, Eighth,

17 and Fourteenth Amendments to the U.S. Constitution. Kiles incorporates by

18 specific reference all facts, allegations, and arguments made elsewhere in this

19 Petition.

20        Kiles did not present this claim in state court. Kiles can overcome any default

21 by showing cause and prejudice, as the ineffective assistance of Kiles's state post-

22 conviction counsel in failing to raise this claim constitutes cause for the default and

23 resulted in prejudice to Kiles. *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *Strickland*

24 *v. Washington*, 466 U.S. 668, 688, 694 (1984). Kiles will demonstrate at an

25 evidentiary hearing that state post-conviction counsel fell below the standards of

26 minimally competent capital post-conviction attorneys when they failed to raise this

27 meritorious claim. Because this claim has not been adjudicated by the Arizona state

28 courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this

Court's review, and the Court may consider the merits of the claim de novo.

### A. Trial counsel failed to preserve evidence needed for proper consideration of Kiles's claims on appeal.

Kiles's counsel made a practice of conducting proceedings off the record and, as a result, failed to preserve critical portions of the record for subsequent review. In the capital context, where heightened reliability is required, *see Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.), the Supreme Court has "emphasized repeatedly the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally." *Parker v. Dugger*, 498 U.S. 308, 321 (1991); *see also Zant v. Stephens*, 462 U.S. 862, 890 (1983) (recognizing mandatory appellate review as "an important procedural safeguard . . . to avoid arbitrariness.") Counsel's failure to ensure a complete record crippled Kiles's ability to seek meaningful appellate review. This was deficient and prejudiced Kiles. *See Strickland*, 466 U.S. at 694; *see also* 2003 ABA Guideline 10.7 ("Counsel at every stage have an obligation to satisfy themselves independently that the official record of the proceedings is complete and to supplement it as appropriate.").

### 1. Trial counsel denied Kiles's right to be present at unrecorded proceedings.

First, during pretrial proceedings, Kiles specifically informed his trial counsel that he would like to be present for any off-record conferences between the State, defense counsel, and the court. (Tr. Aug. 6, 1999 at 14.) Kiles was concerned that these informal meetings were not recorded and could not be challenged, so he requested that he at least be present for them. (Tr. Aug. 6, 1999 at 13–14.) But Kiles's attorney refused the request and indicated that he would continue to have off-the-record discussions. (Tr. Aug. 6, 1999 at 14.)

Kiles's request was well-founded. For example, Kiles expressed concern to counsel about a minute entry dated October 7, 2002, where defense counsel waived

his presence and no transcript was made of the proceedings. (ROA 584 at 1.) Though the minute entry states "no real substance [was] being discussed," the discussion was likely about how Kiles's sentencing would move forward after *Ring v. Arizona*, 536 U.S. 584 (2002), in which the Supreme Court had found Arizona's death-penalty scheme unconstitutional just a few months earlier. (ROA 584 at 1.) This conference may have contained critical information for appellate counsel. Counsel were ineffective both for an unauthorized waiver of his client's rights, *see* Claim 1, *supra*, and for failing to make a record such that appellate counsel could ensure a meaningful review of the proceedings. *See Strickland*, 466 U.S. at 694.

## 2.    Trial counsel failed to record and retain evidence during voir dire.

Defense counsel failed to maintain a record and preserve evidence necessary to allow Kiles effective review on appeal of his jury selection. During voir dire at the guilt phase, defense counsel erred in failing to add a question about the prospective jurors' race to the State's questionnaire. (CR89-15577 ROA 169 at 2–11.) Without a question regarding the race of the juror, appellate counsel could not determine whether the State sought to remove jurors by stipulation or peremptory challenge based on race, which would be impermissible under *Batson v. Kentucky*, 476 U.S. 79 (1986). Trial counsel then failed to preserve the guilt-phase juror questionnaires, frustrating appellate counsel's ability to determine if there were other errors that needed to be raised to the Arizona Supreme Court.

Compounding these hindrances to effective review of voir dire, Kiles's trial counsel failed to note on the record why each juror was excluded. The majority of prospective jurors, 41 in the guilt phase, were removed by stipulation between Kiles's counsel and the State, without any reason on the record justifying removal. (ROA 456 at 1.) In the penalty phase, 23 prospective jurors were struck for cause, though even the fact of their removal, let alone the reasons underlying removal, appears nowhere on the record during jury selection. (ROA 895; Tr. Mar. 6, 2006;

Tr. Mar. 7, 2006; Tr. Mar. 8, 2006; Tr. Mar. 15, 2006; Tr. Mar. 16, 2006.) Thus, Kiles's appellate lawyers lacked critical information necessary to challenge his convictions and sentence, prejudicing his appeals.

Defense counsel was ineffective for failing to maintain a complete and proper record of the voir dire proceedings in both the guilt and penalty phase, including why each juror was excluded. These errors prevented Kiles from effectively raising claims regarding the death-qualification of jurors or other potential voir dire issues.

### 3. Trial counsel failed to ensure bench conferences were on the record.

On numerous occasions in the state-court proceedings, the court and counsel held off-the-record discussions without making a record of, in many instances, what was discussed or argued or, in other instances, the reasons specific decisions were made. During the guilt phase, a review of pretrial and trial transcripts reveals at least 15 separate instances of unrecorded bench conferences between the trial judge and counsel. (*See* Tr. July 7, 2000 at 139; Tr. July 10, 2000 at 82; Tr. July 10, 2000 at 140; Tr, July 10, 2000 at 174; Tr. July 11, 2000 at 62; Tr. July 11, 2000 at 83; Tr. July 12, 2000 at 9; Tr. July 12, 2000 at 30; Tr. July 12, 2000 at 82 ("THE COURT: We are back on the record. We talked about several things."); Tr. July 13, 2000 at 75; Tr. July 17, 2000 at 144; Tr. July 17, 2000 at 224; Tr. July 18, 2000 at 31 ("THE COURT: Okay. If you will stick around, we will informally go over the forms of verdict. MS. VANDREUMEL: Thank you, Judge."); Tr. July 20, 2000 at 2; Tr. July 20, 2000 at 3.) The specific contents of these bench conferences is, of course, unknown, but a review of the record surrounding the conferences suggests that they included discussions regarding whether the State could impeach its own witnesses, whether testimony from the victim was hearsay and should be excluded (the testimony was subsequently given), objections to juror questions, an issue with the jury verdicts, and various unknown subjects.

Counsel were no more effective at ensuring that a complete record of

418

1   proceedings was made during Kiles's penalty phase. There were again numerous
2   off-the-record bench conversations. (*See* Tr. Mar. 20, 2006 at 178; Tr. Mar. 21,
3   2006 at 66; Tr. Mar. 21, 2006 at 98; Tr. Mar. 22, 2006 at 7; Tr. Mar. 22, 2006 at 27;
4   Tr. Mar. 22, 2006 at 79; Tr. Mar. 23, 2006 at 31; Tr. Mar. 23, 2006 at 60; Tr. Mar.
5   29, 2006 at 54; Tr. Apr. 3, 2006 at 6; Tr. Apr. 3, 2006 at 76; Tr. Apr. 4, 2006 at 3–
6   4; Tr. Apr. 4, 2006 at 5–6; Tr. Apr. 12, 2006 at 30; Tr. Apr. 26, 2006 at 23; Tr. Apr.
7   27, 2006 at 50; Tr. May 11, 2006 at 87–88; Tr. May 16, 2006 at 45.) Some of these
8   bench conferences may have been about juror questions, hearsay objections, and
9   the admission of exhibits, but for the majority of these off-the-record discussions,
10  their content is entirely opaque. Because the preserved record was so far from
11  complete, appellate counsel had little idea what happened at numerous important
12  points during the proceedings below. This prevented Kiles from receiving effective
13  assistance of appellate counsel and meaningful appellate review of key issues raised
14  at trial.

15          **4.     Trial counsel failed to ensure conferences on jury**
16                  **instructions were on the record.**

17          One example from the guilt-phase trial highlights the difficulties created by
18  a Swiss-cheese record. There were a series of informal conferences about the jury
19  instructions at the guilt-phase proceeding. The judge stated on the record, "The
20  record will show that I have been meeting informally with counsel and the
21  defendant has been here regarding the process of arriving at jury instructions that
22  are still in progress, but I think we can make a record at this point." (Tr. July 18,
23  2000 at 2.) However, defense counsel were ineffective for not ensuring the
24  conferences themselves were on the record. Without a complete record, appellate
25  counsel was unable to effectively challenge any issues raised regarding jury
26  instructions.

27          These off-the-record conferences may have ultimately led to a problem with
28  the verdict. After the judge received the verdict from the jury, he announced:

1
2
3
4
5
6
7

>THE COURT: Ladies and gentlemen, the possibility exists—and I and the attorneys aren't sure that you misunderstood the numerical part of the calculations of the verdict, so what I'm going to do is ask you to go back down to the jury room and the attorneys and I will meet and discuss it further. We may be resubmitting that portion of the verdict to you for your further deliberation, because our instructions may not have been all that great. I'll have you go back down with Ms. Robbins and go back down to the jury room and we'll proceed. Counsel wish to meet in chambers to discuss this?

8

>MR. CLARK: Yes.

9

(Tr. July 20, 2000 at 3.) A problem with jury instructions and verdicts in the guilt-

10

phase proceeding would be a proper issue for appellate review. This is especially

11

critical in a capital case, where the reliability of verdicts is of utmost importance.

12

Unfortunately, defense counsel's ineffectiveness at ensuring the conferences were

13

on the record before and after the verdict forms were submitted to the jury precluded

14

meaningful review of the issue.

15

### B.    Counsel's ineffectiveness for failing to ensure a complete record violated Kiles's rights.

16

"As any effective appellate advocate will attest, the most basic and

17

fundamental tool of his profession is the complete trial transcript, through which

18

his trained fingers may leaf and his trained eyes may roam in search of an error, a

19

lead to an error, or even a basis upon which to urge a change in an established and

20

hitherto accepted principle of law." *Hardy v. United States*, 375 U.S. 277, 288

21

(1964) (Goldberg, J., concurring). The Supreme Court has made clear that an

22

indigent defendant has both due-process and equal-protection rights to the "basic

23

tools" of a constitutionally complete and adequate judicial review—a

24

constitutionally effective attorney acting as an advocate, *e.g.*, *Strickland*, 466 U.S.

25

at 684–85; *Evitts v. Lucey*, 469 U.S. 387 (1985), and a record that will permit

26

meaningful, effective presentation of his claims, *e.g.*, *Griffin v. Illinois*, 351 U.S.

27

12, 18–19 (1956).

28

420

In the death-penalty context, the opportunity to have "meaningful appellate review" is especially crucial "in ensuring that the death penalty is not imposed arbitrarily or irrationally." *Parker*, 498 U.S. at 321. There must be a "'record of sufficient completeness,' for adequate consideration of the errors assigned." *Draper v. Washington*, 372 U.S. 487, 497 (1963) (quoting *Coppedge v. United States*, 369 U.S. 438, 446 (1962)). In the absence of a "complete verbatim transcript," a "record of sufficient completeness" must include an "equivalent report of the events at trial from which the appellant's contentions arise." *Mayer v. City of Chicago*, 404 U.S. 189, 194 (1971) (quoting *Draper*, 372 U.S. at 495–96).

Because Kiles has no way of knowing what was discussed at the many unrecorded bench conferences throughout his proceedings, he could not previously and cannot here raise constitutional claims arising out of those discussions. For example, courts have held that prejudicial comments made by the judge during a bench conference and overheard by the jury could be cause for a mistrial. *See, e.g.*, *Coast-to-Coast Stores, Inc. v. Womack-Bowers, Inc.*, 818 F.2d 1398, 1402 (8th Cir. 1987) (stating that the district court judge's comments made during a bench conference, "if overheard by the jury, constituted prejudicial error" and would have been grounds for mistrial if properly presented to the district court (emphasis omitted)). But, on this incomplete and insufficient record, there is no way of knowing whether this or other errors of constitutional magnitude occurred during Kiles's trial. Trial counsel's failure to object to the lack of recording was deficient performance. *See Strickland*, 466 U.S. at 688. Further, trial counsel's failure to maintain a complete and proper record of the voir dire proceedings, including why each juror was excluded, has prevented Kiles from effectively raising certain claims regarding the death-qualification of jurors, the exclusion of jurors based on race in his guilt-phase proceedings under *Batson*, 476 U.S. at 79, and other potential issues related to voir dire. (*See, e.g.*, Tr. Mar. 8, 2006 at 2–3); *see also* Claim 4, *supra*.

Throughout Kiles's proceedings, trial counsel consistently, and therefore

1    ineffectively, failed to preserve these crucial pieces of the record. This prejudiced
2    Kiles, because it has deprived and continues to deprive him of an adequate and
3    complete review and undermines confidence in the reliability of his proceedings.
4    *See Strickland*, 466 U.S. at 694. Kiles is therefore entitled to relief.

5                                    **Claim Seventeen**
6                **Capital punishment is per se cruel and unusual.**

7            Capital punishment is per se cruel and unusual, in violation of the Eighth and
8    Fourteenth Amendments to the U.S. Constitution. Kiles incorporates by specific
9    reference all facts, allegations, and arguments made elsewhere in this Petition.

10           Kiles raised this claim on direct appeal. (DA2 Dkt. 86 at 94.) The Arizona
11   Supreme Court noted in the Appendix to its Opinion that this claim was preserved
12   and had previously been rejected. *State v. Kiles*, 213 P.3d 174, 192 (Ariz. 2009).
13   That notation does not constitute an adjudication on the merits, so the limitations
14   on relief laid out by 28 U.S.C. § 2254(d) do not apply to this Court's review of this
15   claim. Even if noting this issue in the Appendix does qualify as a decision on the
16   merits, the state court's denial of this claim was (1) contrary to, or involved an
17   unreasonable application of, clearly established federal law, and (2) based on an
18   unreasonable determination of the facts. 28 U.S.C. § 2254(d). Section 2254(d) thus
19   places no bar on relief.[194]

20           The Eighth Amendment precludes the imposition of punishments that are
21   "cruel and unusual" as assessed according to the "evolving standards of decency
22   that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 100–01
23   (1958). In 1976, the Supreme Court held the "the death penalty is not a form of
24   punishment that may never be imposed," on the assumption that the penalty could
25   further "two principal social purposes," namely retribution and deterrence. *Gregg
26   v. Georgia*, 428 U.S. 153, 183, 187 (1976) (joint opinion of Stewart, Powell, and

27
28   [194] To conserve space and avoid unnecessary repetition, Kiles will incorporate this
     discussion of the applicability of § 2254(d) into subsequent claims as appropriate.

                                           422

Stevens, JJ.). Since that time, however, scholarship and empirical work has emerged eroding these two justifications for capital punishment. *See, e.g.,* Carol S. Steiker, *No, Capital Punishment Is Not Morally Required: Deterrence, Deontology, and the Death Penalty*, 58 Stan. L. Rev. 751, 766–76, 786–89 (2005); John J. Donohue & Justin Wolfers, *Uses and Abuses of Empirical Evidence in the Death Penalty Debate*, 58 Stan. L. Rev. 791, 794 (2005). Because the death penalty serves neither retribution nor deterrence, and given the evolving standards of decency, the death penalty is unconstitutional.

In addition, the death penalty is cruel for two reasons: it is both unreliable and arbitrarily imposed. First, in spite of the need for heightened reliability in a proceeding when a sentence of death is at stake, *see Woodson v. North Carolina*, 428 U.S. 280, 305 (1976), capital punishment is unreliable because of the significant risk that an innocent person will be sentenced to death or even executed. *See Glossip v. Gross*, 135 S. Ct. 2726, 2757 (2015) (Breyer, J., dissenting). Between 1989 and 2012, there were 115 exonerations from capital convictions; there were six more based on actual innocence in 2014 alone. *Id*. Research suggests that 4.1% of the people on death row are actually innocent. *See id*. at 2758 (citing Samuel R. Gross et al., *Rate of False Conviction of Criminal Defendants Who Are Sentenced to Death*, 111 Proc. of the Nat'l Acad. of Sci. 7230 (2014)). Moreover, there is compelling evidence that innocent individuals have in fact been executed. *See, e.g.*, David Grann, *Trial by Fire: Did Texas Execute an Innocent Man?*, The New Yorker (Sept. 7, 2009), http://www.newyorker.com/magazine/2009/09/07/trial-by-fire.

Capital punishment is also unreliable because it is frequently imposed on people whose impairments make them insufficiently culpable for such a sentence. The Supreme Court has held that the death penalty cannot be imposed on those without extreme culpability. *See Atkins v. Virginia*, 536 U.S. 304, 319 (2002). Those who are impaired as the result of mental illness, intellectual limitation, child abuse, substance addiction, or other deprivation have lessened moral culpability.

423

*See, e.g.,* Steiker, *supra*, at 766–67; *see also, e.g.*, *California v. Brown*, 479 U.S. 538, 545, (1987) (O'Connor, J., concurring) ("evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse"). Even so, people whose impairments make them insufficiently culpable for capital punishment are routinely sentenced to death and executed, rendering the death penalty unreliable. *See, e.g.*, Steiker, *supra*, at 766–68.

Second, the death penalty is cruel because it is wholly arbitrary. The imposition of the death penalty should turn on the crime and the offender's culpability; capital punishment is to be reserved for "those offenders . . . whose extreme culpability makes them 'the most deserving of execution.'" *Roper v. Simmons*, 543 U.S. 551, 568 (2005) (quoting *Atkins*, 536 U.S. at 319). Instead, research demonstrates that a number of irrelevant factors, including the race and gender of the victim or defendant and the geographic location of the crime, have an impermissible bearing on the probability of a death sentence. *See, e.g.*, Steven F. Shatz & Terry Dalton, *Challenging the Death Penalty with Statistics: Furman, McCleskey, and a Single County Case Study*, 34 Cardozo L. Rev. 1227, 1244–56 (2013) (citing studies finding gender, racial, and geographic disparities in the imposition of death sentences).

That the death penalty is both unreliable and turns on constitutionally irrelevant factors renders it cruel. *Cf. Furman v. Georgia*, 408 U.S. 238, 309–10 (1972) (Stewart, J., concurring) (deeming "cruel and unusual" the "wanton[] and so freakish[]" imposition of death sentences).

The death penalty has also become unusual. The number of death sentences, the number of states that use the death penalty, and the number of executions nationally have declined significantly over the last 15 years. *See Glossip*, 135 S. Ct.

424

at 2772–75. Perhaps most striking is the "consistency of the direction of change." *Atkins*, 536 U.S. at 315. As a result, the vast majority of death sentences originate in just a handful of counties. *See Glossip*, 135 S. Ct. at 2774. Now, especially, geography "plays an important role in determining who is sentenced to death," and "[b]etween 2004 and 2009, for example, just 29 counties (fewer than 1% of counties in the country) accounted for approximately half of all death sentences imposed nationwide." *See id*. at 2761.

The death penalty is cruel and unusual and incompatible with the evolving standards of decency; it is therefore unconstitutional. Accordingly, Kiles's death sentence is unconstitutional, and he is entitled to relief.

### Claim Eighteen

**Arizona's death-penalty statute unconstitutionally serves no deterrent purpose, exceeds any legitimate retributive aim, is without penological justification, and results in the gratuitous infliction of suffering.**

Because Arizona's death-penalty statute serves no deterrent purpose, exceeds any legitimate retributive aim, is without penological justification, and results in the gratuitous infliction of suffering, the statute violates the Eighth and Fourteenth Amendments to the U.S. Constitution. Kiles incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Kiles raised this claim on direct appeal. (DA2 Dkt. 86 at 97.) For the reasons set forth in Claim 17, *supra*, 28 U.S.C. § 2254(d) places no limitation on relief.

The Supreme Court recognized two potential "principal social purposes: retribution and deterrence of capital crimes by prospective offenders." *Gregg*, 428 U.S. at 183 (joint opinion of Stewart, Powell, and Stevens, JJ.). However, the Court also declared that a "sanction imposed cannot be . . . totally without penological justification." *Id.* Unless the death penalty "measurably contributes to one or both of the[] goals [of retribution and deterrence], 'it is nothing more than the purposeless and needless imposition of pain and suffering,' and hence an

425

unconstitutional punishment." *Enmund v. Florida*, 458 U.S. 782, 798 (1982) (quoting *Coker v. Georgia*, 433 U.S. 584, 592 (1977) (plurality opinion)). Kiles's death sentence serves neither of these purposes, particularly now, more than 28 years after he was first sentenced to death. *See Foster v. Florida*, 537 U.S. 990 (2002) (mem.) (Breyer, J., dissenting from denial of certiorari); *Lackey v. Texas*, 514 U.S. 1045 (1995) (mem.) (Stevens, J., respecting denial of certiorari); *see also supra*, Claim 17; *infra*, Claim 34.

First, the death penalty serves no deterrent value. The theory of deterrence assumes that humans will not commit a crime if the consequence of committing that crime becomes too high. Frank G. Carrington, *Deterrence, Death, and the Victims of Crime: A Common Sense Approach*, 35 Vand. L. Rev. 587, 588 (1982). This deterrence theory assumes all individuals act rationally and will undertake a cost/benefit analysis before acting. *See* Rudolph J. Gerber, *Economic and Historical Implications for Capital Punishment Deterrence*, 18 Notre Dame J.L. Ethics & Pub. Pol'y 437, 440 (2004). This assumption has proven faulty. Murders are often committed by perpetrators who lack the capacity to act rationally, perhaps because they are under the influence of alcohol or drugs, in a sudden fit of rage, or mentally impaired. *See* Jeffrey Fagan, *Death and Deterrence Redux: Science, Law and Causal Reasoning on Capital Punishment*, 4 Ohio St. J. Crim. L. 255, 276–77 (2006). Relatedly, even for potential perpetrators who might have the capacity to be deterred, the arbitrariness of the imposition of the death penalty, the length of time that elapses between the crime and any execution, and the real possibility that no execution will ever occur wholly undercut any possible deterrent effect. *See, e.g.*, *Glossip*, 135 S. Ct. at 2767–68 (Breyer, J., dissenting); *Coleman v. Balkcom*, 451 U.S. 949 (1981) (mem.) (Stevens, J., respecting denial of certiorari) (recognizing that an execution adds no deterrent value beyond that of the lengthy incarceration that precedes it); *see also* Claim 19, *infra*.

Recent studies largely confirm that the death penalty has no measurable

426

deterrent effect. *See* Thomas E. Robins, *Retribution, the Evolving Standard of Decency, and Methods of Execution: The Inevitable Collision in Eighth Amendment Jurisprudence*, 119 Penn. St. L. Rev. 885, 897 (2015) ("[a] recent study conducted by the National Academy of Sciences found no evidence that capital punishment affected homicide rates"); Michael L. Radelet & Traci L. Lacock, *Do Executions Lower Homicide Rates?: The Views of Leading Criminologists*, 99 J. Crim. L. & Criminology 489, 489–90 (2009) ("The findings demonstrate an overwhelming consensus among these criminologists that the empirical research conducted on the deterrence question strongly supports the conclusion that the death penalty does not add deterrent effects to those already achieved by long imprisonment.").

Second, the death penalty does not measurably advance any legitimate retributive goal. That it is regularly imposed on individuals with mild or borderline intellectual disability, organic brain damage, severe mental illness, and other forms of mental impairments—individuals such as Kiles—demonstrate as much, given the lessened culpability of such individuals. *See Atkins*, 536 U.S. at 319 (recognizing that mentally impaired offenders are less culpable and therefore less deserving of retribution); *see also, e.g.*, *Ex parte Moore*, 548 S.W.3d 552 (Tex. Crim. App. 2018) (deeming petitioner not intellectually disabled, and so not exempt from death penalty, despite—as acknowledged in the dissent—broad consensus otherwise); Frank R. Baumgartner & Betsy Neill, *Does the death penalty target people who are mentally ill? We checked*, Wash. Post, Apr. 3 2017, https://www.washingtonpost.com/news/monkey-cage/wp/2017/04/03/does-the-death-penalty-target-people-who-are-mentally-ill-we-checked/?noredirect=on&utm_term=.c64ca4c30c28 (describing a study which found that "43 percent of inmates executed between 2000 and 2015 had received a mental illness diagnosis at some point in their lives"); *see also* Bob Taft and Joseph E. Kernan, *End the death penalty for mentally ill criminals*, Wash. Post, Mar. 24 2017, https://www.washingtonpost.com/opinions/end-the-death-penalty-for-mentally-ill-criminals/2017/03/24/f0796

427

74e-0506-11e7-b1e9-05d3c21f7cf_story.html?Noredirect=on&utm_term=.20f93 2350b6d (describing that recently executed prisoners include a man diagnosed with bipolar disorder and placed on lithium at age four and a decorated Vietnam War veteran who qualified for 100 percent disability because of his PTSD and bipolar disorder).

And, as with deterrence, the marginal retributive value of execution over a sentence of life imprisonment is negligible at best. *See Glossip*, 135 S. Ct. at 2769. Finally, any interest in retribution is eroded by the time that passes between the crime and the ultimate punishment. *See Knight v. Florida*, 528 U.S. 990 (1999) (mem.) (Breyer, J., dissenting from denial of certiorari) ("[The] longer the delay, the weaker the justification for imposing the death penalty in terms of punishment's basic retributive or deterrent purposes.").

The "pointless and needless extinction of life with only marginal contributions to any discernible social or public purposes . . . [is] patently excessive and . . . violative of the Eighth Amendment." *Furman*, 408 U.S. at 312 (White, J., concurring). As the death penalty, including in Arizona, serves no cognizable penological end, it amounts to the infliction of gratuitous suffering and violates the Eighth and Fourteenth Amendments. Accordingly, Kiles's sentence is unconstitutional, and he is entitled to relief.

### Claim Nineteen

**Arizona's capital-sentencing scheme unconstitutionally does not genuinely narrow the murder cases eligible for the death penalty and fails to channel the discretion of the sentencing jury.**

Because Arizona's capital-sentencing scheme does not genuinely narrow the murder cases eligible for the death penalty and fails to channel the discretion of the sentencing jury, it is arbitrary and irrational and violates the Eighth and Fourteenth Amendments to the U.S. Constitution. Kiles incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Kiles raised this claim on direct appeal. (DA2 Dkt. 86 at 95.) For the reasons

428

1    set forth in Claim 17, *supra*, 28 U.S.C. § 2254(d) does not limit relief.

2         Arizona's death-penalty statute makes nearly everyone involved in a murder

3    eligible for the death penalty. *See* A.R.S. § 13-1105. Further, Arizona's aggravating

4    circumstances sweep broadly and fail to guide the sentencing jury in selecting who

5    should receive the death penalty. *See* A.R.S. § 13-703(F) (1988).[195] As a result, the

6    capital-sentencing statute fails to narrow the class of death-eligible persons, to

7    reasonably justify the imposition of a harsher penalty, and to channel the

8    sentencer's discretion in imposing the death penalty. Thus, in Arizona, the

9    distinction between capital and non-capital cases is not meaningful but is instead

10   unconstitutionally arbitrary and irrational.

11        In *Furman*, the Supreme Court declared that a capital-sentencing scheme is

12   unconstitutional when it provides "no meaningful basis for distinguishing the few

13   cases in which [death] is imposed from the many cases in which it is not." 408 U.S.

14   at 313 (White, J., concurring). "*Furman* mandates that where discretion is afforded

15   a sentencing body on a matter so grave as the determination of whether a human

16   life should be taken or spared, that discretion must be suitably directed and limited

17   so as to minimize the risk of wholly arbitrary and capricious action." *Gregg*, 428

18   U.S. at 189 (joint opinion of Stewart, Powell, and Stevens, JJ.).

19        For the death penalty to be constitutional, the legislature must establish a

20   narrowing process. *See id.* at 207 (the selection of who can be prosecuted and

21   ultimately sentenced to death "[must] always [be] circumscribed by . . . legislative

22   guidelines"); *Lowenfield v. Phelps*, 484 U.S. 231, 246 (1988) (the "legislature"

23   must provide a means of "narrow[ing] the class of death-eligible murderers"). "Part

24   of a State's responsibility in this regard is to define the crimes for which death may

25   be the sentence in a way that obviates 'standardless [sentencing] discretion.'"

26   *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980) (alteration in original) (quoting

27

28   [195] The current version, at A.R.S. § 13-751(F), includes additional aggravating
     circumstances.

1    *Gregg*, 428 U.S. at 196 n.47 (joint opinion of Stewart, Powell, and Stevens, JJ.)).

2    Ultimately, "[t]o pass constitutional muster, a capital sentencing scheme must

3    'genuinely narrow the class of persons eligible for the death penalty and must

4    reasonably justify the imposition of a more severe sentence on the defendant

5    compared to others found guilty of murder.'" *Lowenfield*, 484 U.S. at 244 (quoting

6    *Zant v. Stephens*, 462 U.S. 862, 877 (1983)); *see also Brown v. Sanders*, 546 U.S.

7    212, 216 (2006) (explaining the Supreme Court has "required States to limit the

8    class of murderers to which the death penalty may be applied.")

9        Arizona's statute violates these mandates. While narrowing can occur with

10   either the defining of death-eligible murder or the requirement of aggravating

11   circumstances that apply to only a fraction of murders, Arizona's statute features

12   neither approach. First, the narrowing process does not occur with Arizona's

13   definition of death-eligible murders. Under Arizona law, first-degree murder is

14   comprised of a broad range of conduct, including intentional killings, knowing

15   killings, premeditated killings, and killings committed in the course of numerous

16   other crimes. *See* A.R.S. § 13-1105(A). This "pool" of crimes initially eligible to

17   be charged as capital crimes is so broadly defined that it encompasses the vast

18   majority of murders actually committed. This is seen both through a reading of the

19   statute, which fails to meaningfully distinguish between first-degree murder and

20   second-degree murder, and through a review of actual cases, which demonstrates

21   that almost all murders in Arizona qualify as first-degree murder. *See Hidalgo v.*

22   *Arizona*, 138 S. Ct. 1054, 1055 (2018) (mem.) (Breyer, J., respecting denial of

23   certiorari) ("Perhaps not surprisingly, Arizona did not argue below and does not

24   suggest now that the State's first-degree murder statute[196] alone can meet the Eighth

25   _____

26   [196] The homicide statute and the section of the capital-punishment statute on
     aggravating circumstances have been modified since 1988 but are largely

27   unchanged. While not every aggravating circumstance relied upon in *Hidalgo*
     existed in the statute under which Kiles was sentenced, the vast majority did,

28   including the particularly broad-reaching circumstance that applies when "[t]he

                                        430

1    Amendment's narrowing requirement.").

2          The narrowing function, then, is ostensibly performed by the aggravating

3    circumstances; a jury must find at least one to make a first-degree-murder defendant

4    death-eligible. *See id.* ("Because Arizona law broadly defines capital murder, the

5    State has sought to comply with the narrowing requirement through the second

6    method—namely, by setting forth statutory 'aggravating circumstances' designed

7    to permit the 'jury . . . at the penalty phase' to make 'findings' that will narrow the

8    legislature's broad definition of the capital offense." (quoting *Lowenfield*, 484 U.S.

9    at 246)). However, Arizona's aggravating circumstances are so expansive that they

10   do not meaningfully separate out the group of defendants whose crimes are so

11   egregious they should be eligible for the death penalty. *See Hidalgo*, 138 S. Ct. at

12   1056 (mentioning unrebutted evidence that "'one or more aggravating

13   circumstances were present in'" 98 percent of first-degree murder defendants

14   prosecuted between 2002 and 2012 in Maricopa County, Arizona (quoting *State v.

15   Hidalgo*, 390 P.3d 783, 789 (Ariz. 2017)). Moreover, individual aggravating

16   circumstances cover a wide swath of conduct. *See, e.g.*, Claim 30, *infra*.

17   Accordingly, Arizona's aggravating circumstances do not serve to narrow the pool

18   of death-eligible murders.

19         Where there is no meaningful basis to distinguish between those first-degree

20   murder defendants who do receive the death penalty and those who do not, and a

21   sentencer's discretion to impose the death penalty is not adequately channeled, the

22   imposition of the death penalty is arbitrary and irrational. *Furman*, 408 U.S. at 313.

23   Kiles's sentence of death is arbitrary and irrational since he is not among the worst

24   criminals, for whom because of their "extreme culpability" the death penalty is

25   reserved. *Simmons*, 543 U.S. at 568. There is no rational, constitutionally

26   permissible basis for distinguishing Kiles's case, or the few cases in which the death

27   _____

28   defendant committed the offense in an especially heinous, cruel or depraved
     manner." *See* A.R.S. § 13-703(F)(6) (1988).

1   penalty has been imposed in Arizona and in the United States, from the majority of
2   first-degree murder cases in which it has not been imposed. The arbitrary
3   application of the death penalty in Kiles's case amounts to cruel and unusual
4   punishment in violation of the Eighth Amendment and violates his rights to a
5   reliable sentence and due process under the Eighth and Fourteenth Amendments to
6   the U.S. Constitution. *See Glossip*, 135 S. Ct. at 2755–56 (Breyer, J., dissenting);
7   *Jeffers v. Lewis*, 38 F.3d 411, 425 (9th Cir. 1994) (en banc) (Noonan, J., dissenting)
8   ("[T]he administration of the death penalty in Arizona is so arbitrary as to constitute
9   cruel and unusual punishment . . . ."). Accordingly, Kiles's death sentence is
10  unconstitutional, and Kiles is entitled to relief.

11                              **Claim Twenty**

12          **Arizona's capital-sentencing scheme unconstitutionally affords the
            prosecutor unlimited discretion to seek the death penalty.**
13

14          Because Arizona's capital-sentencing scheme affords the prosecutor
15  unlimited discretion to seek the death penalty, it violates the Eighth and Fourteenth
16  Amendments to the U.S. Constitution. Kiles incorporates by specific reference all
17  facts, allegations, and arguments made elsewhere in this Petition.

18          Kiles raised this claim on direct appeal. (DA2 Dkt. 86 at 96.) For the reasons
19  set forth in Claim 17, *supra*, 28 U.S.C. § 2254(d) places no limitation on relief.

20          In Arizona, each prosecutor has the sole authority and complete discretion to
21  determine whether to seek the death penalty as a sentencing option, following his
22  or her unreviewable determination that one or more aggravating circumstances
23  exists. The prosecutor's discretion is limited only by his or her individual whims as
24  to which cases are appropriate for the death penalty. *See State v. Harding*, 670 P.2d
25  383, 397 (Ariz. 1983). Further, each prosecutor has significant discretion to choose
26  whether to accept a plea deal in exchange for a sentence of life in each case. Here,
27  the prosecutor stated on the record that with regard to plea deals, "it's my case; I
28  make the calls on it." (Tr. Aug. 6, 1999 at 38–39.) Thus, whether a defendant is

offered a plea deal or sentenced to death may arbitrarily turn on such a factor as the prosecutor's personal relationship with defense counsel, which may have occurred in this case,[197] instead of on a constitutionally required determination based on "the character and record of the individual offender." *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982).

Arizona's scheme therefore allows arbitrary and capricious charging decisions and creates a substantial risk of variation between similar cases. Such "arbitrary and wanton" discretion in seeking a death sentence, *see Woodson v. North Carolina*, 428 U.S. 280, 303 (1976), leads to the "wanton[] and so freakish[]" imposition of the death penalty, *see Furman*, 408 U.S. at 310 (Stewart, J., concurring).

That Arizona prosecutors have unbridled discretion, without objective standards, to seek the death penalty—and to decide not to continue seeking the death penalty—violates the Eighth and Fourteenth Amendments. *See Godfrey*, 446 U.S. at 428; *Gregg*, 428 U.S. at 195 n.47 (joint opinion of Stewart, Powell, and Stevens, JJ.); *Furman*, 408 U.S. at 313 (White, J., concurring). Accordingly, Kiles's sentence is unconstitutional, and he is entitled to relief.

### Claim Twenty-One

**Arizona's capital-sentencing scheme is unconstitutional because it does not require the State to prove, or the jury to find beyond a reasonable doubt, that the aggravating factors outweighed the mitigating circumstances.**

Because Arizona's capital-sentencing scheme does not require the State to prove beyond a reasonable doubt that the aggravation outweighs the mitigation and that the death penalty is the appropriate sentence, the scheme violates the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution. Kiles

---

[197] Other impermissible considerations include race, the prosecutor's career ambitions, and the wishes of the victims—the last of which may also have played a role in this case.

1   incorporates by specific reference all facts, allegations, and arguments made
2   elsewhere in this Petition.

3       Kiles raised this claim on direct appeal. (DA2 Dkt. 86 at 96.) For the reasons
4   set forth in Claim 17, *supra*, 28 U.S.C. § 2254(d) places no limitation on relief.

5       **A.**   **The trial court's penalty-phase instructional error regarding the**
6                   **burden and standard of proof, derived from Arizona's**
                    **unconstitutional statute, violated Kiles's rights under clearly**
7                   **established precedent.**

8       Before the jury may impose a death sentence, Arizona's death-penalty statute
9   requires the jury to find that aggravating circumstances outweigh mitigating
10  circumstances. However, Arizona's capital-sentencing scheme does not specify
11  either which party bears the burden of proof or what the appropriate standard of
12  proof is with regard to the weighing of aggravating and mitigating circumstances.
13  *See* A.R.S. § 13-751(E). The trial court in Kiles's case accordingly instructed the
14  jurors only that they "decide whether there is mitigation that is sufficiently
15  substantial to call for leniency." (Tr. May 22, 2006 at 24.) At no point did the trial
16  court instruct the jury about a burden of persuasion with regard to the weighing of
17  aggravating and mitigating circumstances. (*See* Tr. May 22, 2006 at 14–26.) Like
18  Arizona's statute, the jury instructions therefore relieved the prosecutor of his
19  burden of proving beyond a reasonable doubt that the mitigation was not
20  sufficiently substantial to call for leniency. By extension, the instructions also
21  relieved the jury of having to determine beyond a reasonable doubt that the death
22  penalty was the appropriate punishment. This violated Kiles's clearly established
23  rights.

24      The Supreme Court has repeatedly held that "any fact (other than prior
25  conviction) that increases the maximum penalty for a crime must be charged in an
26  indictment, submitted to a jury, and proven beyond a reasonable doubt." *Jones v.*
27  *United States*, 526 U.S. 227, 243 n.6 (1999); *see also Apprendi v. New Jersey*, 530
28  U.S. 466, 476 (2000) (applying this principle to states through the Fourteenth

Amendment). The Court reaffirmed this principle in the capital context in *Ring v. Arizona*: "If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it— must be found by a jury beyond a reasonable doubt." 536 U.S. 584, 602 (2002); *see also id.* at 610 (Scalia, J., concurring) ("[T]he fundamental meaning of the jury-trial guarantee of the Sixth Amendment is that all facts essential to imposition of the level of punishment that the defendant receives—whether the statute calls them elements of the offense, sentencing factors, or Mary Jane—must be found by the jury beyond a reasonable doubt."). Because aggravating circumstances must be found to outweigh mitigating circumstances before a death sentence can be imposed in Arizona, under *Ring* and its antecedents, that weighing is a fact that must be found by a jury beyond a reasonable doubt. *See Murdaugh v. Ryan*, 724 F.3d 1104, 1115 (9th Cir. 2013) ("In [*Ring*], the Supreme Court described several determinations that had to occur under Arizona law before a defendant became death-eligible, including the judge's determination that 'there are no mitigating circumstances sufficiently substantial to call for leniency.'").

The accuracy of Kiles's position on appeal was made explicit when the Supreme Court decided *Hurst v. Florida*, 136 S. Ct. 616 (2016), in which the Court held that the failure to require a jury to determine the relative weight of aggravating and mitigating circumstances beyond a reasonable doubt violates the Sixth Amendment right to a jury trial as well as the Fourteenth Amendment's Due Process Clause. The Court reiterated the Sixth Amendment's basic requirement that "any fact that 'expose[s] the defendant to a greater punishment than that authorized by the jury's guilty verdict' is an 'element' that must be submitted to the jury." *Id.* at 621 (quoting *Apprendi*, 530 U.S. at 494). The Court also emphasized that under *Ring*, this principle applies with equal force to death-penalty statutes: "The Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death." *Id.* at 619. The Court further recognized that under *Alleyne v.*

435

1   *United States*, 133 S. Ct. 2151, 2156 (2013), "each element of a crime [must] be
2   proved to a jury beyond a reasonable doubt." *Hurst*, 136 S. Ct. at 621;
3   *see also Apprendi*, 530 U.S. at 498 (Scalia, J., concurring) (stating that charges
4   against the accused, and the corresponding maximum exposure he faces, must be
5   determined "*beyond a reasonable doubt by the unanimous vote of 12 of his fellow*
6   *citizens*").

7        In *Hurst*, the State of Florida argued that the weighing process fell outside
8   the ambit of *Ring* and *Apprendi*, as the defendant was death eligible after the jury
9   found at least one aggravating circumstance. *Hurst*, 136 S. Ct. at 622. The Court
10  rejected this contention, and *Hurst* therefore stated what earlier Sixth Amendment
11  precedent had already established: It is not constitutionally sufficient for a jury to
12  find the existence of at least one aggravating circumstance beyond a reasonable
13  doubt, because the determination regarding the relative weight of aggravating and
14  mitigating circumstances is also a factual finding necessary to a defendant's
15  eligibility for a sentence of death. *Id.*; *see also Rauf v. State*, 145 A.3d 430 (Del.
16  2016) (per curiam) (striking down Delaware's capital sentencing scheme on the
17  basis of *Hurst* and determining that the Sixth Amendment requires a jury to find,
18  beyond a reasonable doubt, each aggravating circumstance and that the aggravation
19  outweighs mitigation); *Hurst v. State*, 202 So.3d 40, 57 (Fla. 2016) (finding that
20  *Hurst* "mandates that all the findings necessary for the imposition of a death
21  sentence are 'elements' that must be found by a jury" and holding that "before the
22  trial judge may consider imposing a sentence of death, the jury in a capital case
23  must . . . unanimously find that the aggravating factors outweigh the mitigating
24  circumstances").

25       *Hurst* built upon *Ring* and *Apprendi* but did not create new law.
26  Section 2254(d)(1) is no bar to relief, because the state court's failure to recognize
27  the violation of Kiles's rights was an unreasonable application of clearly established
28  federal law, and Kiles is entitled to relief.

1
2

**B.**    **If *Hurst* instead announced a new rule of constitutional law, it is retroactive to cases on collateral review.**

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17

In the alternative, if *Hurst* did not simply apply existing precedent and instead created a new rule of constitutional law, that ruling applies retroactively on collateral review. *But see Ybarra v. Filson*, 869 F.3d 1016, 1033 (9th Cir. 2017). First, *Hurst* is retroactive because it is substantive. *See Montgomery v. Louisiana*, 136 S. Ct. 718, 728 (2016) (explaining that under *Teague v. Lane*, 489 U.S. 288 (1989), "courts must give retroactive effect to new substantive rules of constitutional law"). The Supreme Court consistently held that decisions establishing a requirement of proof beyond a reasonable doubt apply retroactively. *See Hankerson v. North Carolina*, 432 U.S. 233 (1977); *Ivan V. v. City of New York*, 407 U.S. 203, 205 (1972) (per curiam). Under *Teague*'s framework, rules about the standard of proof are retroactive because they lessen the "risk that a defendant . . . faces a punishment that the law cannot impose upon him." *Schriro v. Summerlin*, 542 U.S. 348, 351–52 & n.4 (2004); *cf. In re Winship*, 397 U.S. 358, 363 (1970). *Hurst*, which implicates the standard of proof by which the weighing finding must be made, is similarly substantive in nature and therefore retroactive.

18
19
20
21
22
23
24
25
26
27
28

Further, *Hurst* is substantive because it prohibits the death penalty—a category of punishment—for those made eligible for the penalty other than by a jury finding beyond a reasonable doubt that aggravation outweighs mitigation—a class of defendants. *See Montgomery*, 136 S. Ct. at 728. *Hurst* also imposes a new burden on the State whenever it seeks a death sentence and places that punishment outside the power of the State unless that burden has been met. *See Summerlin*, 542 U.S. at 352 (describing "substantive" rules as those that put particular punishments beyond the power of the State to impose). Finally, *Hurst* narrowed the scope of Arizona's capital sentencing statute, which does not impose any standard of proof on a capital jury's weighing determination, by making it more difficult for juries to return death verdicts. *See id*. at 351 (describing "substantive" rules as those that

1 "narrow the scope of a criminal statute by interpreting its terms").

2      Even if procedural and not substantive, *Hurst*'s beyond-a-reasonable-doubt
3 holding would constitute a "watershed" procedural rule under *Teague*. *See Powell*
4 *v. State*, 153 A.3d 69, 74–75 (Del. 2016) (finding retroactive its prior decision in
5 *Rauf*, which invalidated Delaware's death penalty statute under *Hurst*, because it
6 fell "squarely within the second exception set forth in *Teague* requiring retroactive
7 application of 'new rules' of criminal procedure"). This is because *Hurst*
8 "implicate[s] the fundamental fairness and accuracy," of sentencing. *Welch*, 136 S.
9 Ct. at 1264. *Hurst* does so by mandating the use of the beyond-a-reasonable-doubt
10 standard, which "is a prime instrument for reducing the risk of convictions resting
11 on factual error." *Ivan*, 407 U.S. at 204 (quoting *Winship*, 397 U.S. at 363–64).
12 *Hurst*, if deemed procedural, would therefore constitute a watershed new rule and
13 would be retroactive. Accordingly, if the Court finds that *Hurst* announced a new
14 rule of constitutional law, it applies retroactively to Kiles's case.

15     **C.**    **Conclusion**

16      The statutorily driven failure to instruct Kiles's jury on the proper burden of
17 proof is structural error not subject to harmlessness review. *See Sullivan v.*
18 *Louisiana*, 508 U.S. 275, 281 (1993) (refusing to apply harmless-error analysis
19 where trial court erred in describing burden of proof in a criminal case, reasoning
20 that "a misdescription of the burden of proof . . . vitiates *all* the jury's findings").
21 Even if the error was not structural, Kiles was prejudiced. *See Valerio v. Crawford*,
22 306 F.3d 742, 763 (9th Cir. 2002) (noting that the inquiry under *Brecht v.*
23 *Abrahamson*, 507 U.S. 619, 637–38 (1993), is whether "a single member of the
24 jury . . . could have" found in favor of the petitioner). The jury instructions in this
25 case violated Kiles's rights, and Arizona's statute is unconstitutional. Under any
26 construction of the import of *Hurst*, Kiles is entitled to relief.

27
28

438

**Claim Twenty-Two**

**Arizona's capital-sentencing scheme unconstitutionally requires a defendant to affirmatively prove that the jury should spare his life.**

Arizona's death-penalty statute creates a presumption that death is the appropriate sentence and forces the defendant to affirmatively prove that the jury should spare his life, in violation of the Fifth, Eighth, and Fourteenth Amendments to the U.S. Constitution. Kiles incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Kiles raised this claim on direct appeal. (DA2 Dkt. 86 at 95.) For the reasons stated in Claim 17, *supra*, 28 U.S.C. § 2254(d) does not limit relief.

Arizona law required Kiles to prove mitigating circumstances by a preponderance of the evidence before the sentencing jury could rely on those circumstances to spare his life. *See* A.R.S. § 13-751(C); (Tr. May 22, 2006 at 18); *see also State v. Ramirez*, 871 P.2d 237, 252–53 (Ariz. 1994) (requiring the defendant to prove mitigating evidence by a preponderance of the evidence before the sentencer may "accept[]" the evidence as mitigating). Further, Arizona law required the jury to weigh the aggravation against the mitigation and determine whether the mitigation was "sufficiently substantial" before deciding whether to impose a death sentence. *See Richmond v. Lewis*, 506 U.S. 40, 47 (1992). In effect, then, Arizona law required the jury to presume that death was the appropriate sentence for Kiles and for him to prove that it was not.[198]

However, the Eighth Amendment demands a heightened degree of "reliability in the determination that death is the appropriate punishment in a specific case." *Woodson*, 428 U.S. at 305 (joint opinion of Stewart, Powell, and Stevens, JJ.). That reliability is undermined when a jury is instructed to presume

---

[198] Arizona's capital statute also requires a sentence of death when one aggravating circumstance is proven and no sufficiently substantial mitigation is proven, *see* A.R.S. § 13-751(E), further entrenching the presumption in favor of death.

439

1  that death is appropriate. *See Walton v. Arizona*, 497 U.S. 639, 687–88 (1990)
2  (Blackmun, J., dissenting) (recognizing that, with the statutory presumption of
3  death, imposing a death sentence may "run[] directly counter to the Eighth
4  Amendment requirement" of reliability set out in *Woodson*), *overruled on other*
5  *grounds by Ring*, 536 U.S. at 584.

6     In *Kansas v. Marsh*, 548 U.S. 163 (2006), the Supreme Court indirectly
7  questioned the constitutionality of Arizona's death-penalty statute when it upheld
8  the Kansas statute, which permitted a death sentence when the aggravating and
9  mitigating circumstances were in equipoise. The Court noted that Arizona's statute
10  is comparable to that of Kansas, except that Arizona, "once the State has met its
11  burden, tasks the defendant with the burden of proving sufficient mitigating
12  circumstances to overcome the aggravating circumstances and that a sentence less
13  than death is therefore warranted." *Id.* at 173. Unlike Arizona's statute, "the Kansas
14  statute requires the State to bear the burden of proving to the jury, beyond a
15  reasonable doubt, that aggravators are not outweighed by mitigators and that a
16  sentence of death is therefore appropriate; it places no additional evidentiary burden
17  on the capital defendant." *Id.* The Court noted that "[t]his distinction operates in
18  favor of Kansas capital defendants," and in light of this distinction, the Court upheld
19  Kansas's statute as constitutional. *Id.*

20     Without such safeguards, Arizona's capital-sentencing scheme cannot ensure
21  the requisite reliability, and accordingly, it violated Kiles's rights under the Fifth,
22  Eighth, and Fourteenth Amendments to the U.S. Constitution. *See Woodson*, 428
23  U.S. at 305; *Patterson v. New York*, 432 U.S. 197, 210–11 (1977). *But see Walton*,
24  497 U.S. at 651–52. Kiles's sentence is unconstitutional, and he is entitled to habeas
25  relief.

26                              **Claim Twenty-Three**

27     **Arizona's capital-sentencing scheme unconstitutionally fails to require the cumulative consideration of mitigation.**
28

1    Arizona's capital-sentencing scheme violates the Eighth and Fourteenth

2  Amendments to the U.S. Constitution because it does not require the cumulative

3  consideration of mitigation. Kiles incorporates by specific reference all facts,

4  allegations, and arguments made elsewhere in this Petition.

5    Kiles raised this claim on direct appeal. (DA2 Dkt. 86 at 96.) For the reasons

6  set forth in Claim 17, *supra*, 28 U.S.C. § 2254(d) does not bar relief.

7    The Eighth Amendment requires that a sentencer "be able to consider and

8  *give effect to*" all mitigating evidence when making its sentencing determination.

9  *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (emphasis added), *abrogated on other*

10  *grounds by Atkins*, 536 U.S. at 304. "[E]ven if [specific mitigating facts] are not in

11  themselves cause for a sentence less than death, they are still relevant to mitigation

12  and must be weighed in conjunction with other factors to determine if all of the

13  circumstances together warrant a lesser sentence." *Smith v. McCormick*, 914 F.2d

14  1153, 1168 (9th Cir. 1990).

15    At trial, the court instructed the jury that its sentencing decision came down

16  to "whether there is mitigation that is sufficiently substantial to call for leniency."

17  (Tr. May 22, 2006 at 24.) However, the court did not make clear that each juror

18  could consider the cumulative effect of the mitigation, as opposed to considering

19  only whether each piece of mitigation individually was sufficiently substantial to

20  warrant leniency. (*See* Tr. May 22, 2006 at 14–26.) Indeed, some of the court's

21  instructions suggested the opposite: "A mitigating factor that motivates one juror to

22  vote for a sentence of life in prison may be evaluated by another juror as . . . not

23  significant to the assessment of the appropriate penalty." (Tr. May 22, 2006 at 22–

24  23.) Absent an explicit instruction to consider the cumulative effect of the

25  mitigation, and with individual instructions implying that the jury should not do so,

26  Kiles's jury was unable to adequately give effect to the sum of the mitigation

27  presented in his case.

28    Due process requires that a jury be fully and correctly instructed on

441

1   sentencing law to prevent an unconstitutional and arbitrary deprivation of the
2   defendant's liberty. *See Hicks v. Oklahoma*, 447 U.S. 343, 346–47 (1980); *see also*
3   *Taylor v. Kentucky*, 436 U.S. 478, 488–89 (1978) (holding that the "arguments of
4   counsel cannot substitute for instructions by the court"). The jury instructions in
5   this case on the consideration of mitigation did not—and Arizona's death-penalty
6   statute does not—comply with the Eighth and Fourteenth Amendments to the U.S.
7   Constitution. As a result, Kiles's death sentence is unconstitutional, and he is
8   entitled to relief.

9                               **Claim Twenty-Four**

10          **Arizona's death-penalty statute is unconstitutional because it fails
11          to require the jury to make specific findings as to each mitigating
            circumstance.**

12          Arizona's death-penalty statute violates the Eighth and Fourteenth
13   Amendments to the U.S. Constitution because it neglects to require the jurors to
14   make specific findings as to each proffered mitigating factor. Kiles incorporates by
15   specific reference all facts, allegations, and arguments made elsewhere in this
16   Petition.

17          Kiles raised this claim on direct appeal. (DA2 Dkt. 86 at 96.) For the reasons
18   set forth in Claim 17, *supra*, 28 U.S.C. § 2254(d) does not bar relief.

19          The Eighth and Fourteenth Amendments require states to provide a
20   mechanism for meaningful direct review of death sentences. *Gregg*, 428 U.S. at
21   197–98 (joint opinion of Stewart, Powell, and Stevens, JJ.); *see also State v.*
22   *Brewer*, 826 P.2d 783, 790 (Ariz. 1992) ("Appellate review of sentencing is, of
23   course, even more necessary in the context of a capital case. The penalty of death
24   differs from all other forms of criminal punishment in terms of severity and
25   irrevocability, and may not be exacted in the absence of certain constitutional
26   safeguards."). In order to achieve such meaningful review, "it is important that the
27   record on appeal disclose to the reviewing court the considerations which motivated
28   the death sentence in every case in which it is imposed." *Gardner v. Florida*, 430

                                        442

1    U.S. 349, 361 (1977) (plurality opinion). Arizona law helps to ensure meaningful

2    review in non-capital cases, for which the court is required to state for the record

3    the mitigating and aggravating factors it considers and applies when imposing any

4    sentence other than the presumptive term. A.R.S. § 13-701(C); *State v. Harrison*,

5    985 P.2d 486 (Ariz. 1999). However, Arizona fails to offer such protections to

6    capital defendants.

7            Under Arizona law, the trier of fact in a capital case is charged with

8    determining whether the mitigating circumstances are "sufficiently substantial to

9    call for leniency"; whether a mitigating circumstance is proven is determined by

10   each juror individually. A.R.S. § 13-751(C), (E). But Arizona's death-penalty

11   statute does not require the jury to identify in its verdict form which mitigating

12   circumstances individual jurors deemed proven. *See id.* The verdict forms in Kiles's

13   case thus reflect only the ultimate sentence the jury deemed appropriate for each

14   first-degree murder conviction. (*See* ROA 919 at 1–3.)

15           As a result, when the Arizona Supreme Court conducted its independent

16   review of the "aggravation, mitigation, and the propriety of the sentence" in Kiles's

17   case, *Kiles*, 213 P.3d at 187, the court did so without the benefit of knowing which

18   mitigating circumstances jurors had found proven. In other words, the court

19   conducted its appellate review without knowing the considerations that motivated

20   the death sentence. That appellate review was not the meaningful review

21   contemplated by *Gregg*. *See Gardner*, 430 U.S. at 361 (plurality opinion). That such

22   a review—done without information on what informed the jury's decision—could

23   not have been meaningful is especially true in this case, where the jury was asked

24   to consider an enumerated list of mitigating circumstances and where the jury

25   determined that death was the appropriate sentence on one count but that life

26   imprisonment was appropriate for other counts. (*See* Tr. May 22, 2006 at 19–21;

27   ROA 919 at 1–3.)

28           The trial court's failure to require special verdict forms indicating which

443

1   mitigating circumstances the jurors had found proven—and the fact that such forms
2   are not statutorily required—deprived Kiles of an adequate appellate review and
3   violated his rights under the Eighth and Fourteenth Amendments to the U.S.
4   Constitution. Accordingly, Kiles is entitled to relief.

5                              **Claim Twenty-Five**

6          **Arizona's capital-sentencing scheme unconstitutionally limits the
       jury's full consideration of mitigation by requiring that mitigating
7       circumstances be proven by a preponderance of the evidence.**

8          In requiring that mitigation be proven by a preponderance of the evidence,
9   Arizona's capital-sentencing scheme violates the Eighth and Fourteenth
10  Amendments to the U.S. Constitution. Kiles incorporates by specific reference all
11  facts, allegations, and arguments made elsewhere in this Petition.

12         Kiles raised this claim on direct appeal. (DA2 Dkt. 86 at 96.) For the reasons
13  set forth in Claim 17, *supra*, 28 U.S.C. § 2254(d) places no limitation on relief.

14         At trial, in accordance with Arizona statute, the court instructed the jury as
15  follows: "The burden of proving the existence of mitigation is on the defendant.
16  The defendant must prove the existence of mitigation by a preponderance of the
17  evidence." (Tr. May 22, 2006 at 18); *see also* A.R.S. § 13-751(C). The court further
18  instructed the jury that "[a] party having the burden of proof by a preponderance of
19  the evidence must persuade you by the evidence that the claim or a fact is more
20  probably true than not true. This means the evidence that favors that party
21  outweighs the opposing evidence." (Tr. May 22, 2006 at 18.) By requiring Kiles to
22  prove mitigation by a preponderance of the evidence, the jury instruction
23  constrained the jury's ability to consider all of the mitigation presented.

24         In *Lockett v. Ohio*, the United States Supreme Court concluded that, "in all
25  but the rarest kind of capital case," the sentencer must "not be precluded from
26  considering, as a mitigating factor, any aspect of a defendant's character or record
27  and any of the circumstances of the offense . . . [offered] as a basis for a sentence
28  less than death." 438 U.S. 586, 604–05 (1978) (emphasis omitted). Moreover, "it is

                                        444

not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing [the] sentence." *Penry*, 492 U.S. at 319, *abrogated on other grounds by Atkins*, 536 U.S. at 304; *see also Tennard v. Dretke*, 542 U.S. 274, 285 (2004) ("[T]he 'Eighth Amendment requires that the jury be able to consider and give effect to' a capital defendant's mitigating evidence.") (quoting *Boyde v. California*, 494 U.S. 370, 377–78 (1990)). Imposing a standard that limits the mitigating evidence considered by the jury violates the Eighth Amendment's requirement that the sentencer be allowed to consider any aspect of the defendant's character or record that counsels in favor of a sentence other than death. *See, e.g.*, *Smith v. Texas*, 543 U.S. 37 (2004) (per curiam); *Tennard*, 542 U.S. at 285; *Lockett*, 438 U.S. at 604. *But see Walton*, 497 U.S. at 649–51 (plurality opinion), *overruled on other grounds by Ring*, 536 U.S. at 584.

The jury instruction limiting the mitigation the jury could consider, alone and when considered cumulatively with the other instructional errors, violated Kiles's constitutional rights and prejudiced him. Kiles's death sentence is therefore unconstitutional, and he is entitled to relief.

## Claim Twenty-Six

**Arizona's capital-sentencing scheme unconstitutionally fails to set forth objective standards to guide the sentencer in weighing the aggravating circumstances against the mitigating circumstances.**

Because Arizona's death-penalty statute offers no objective standards to guide the sentencer in weighing the aggravating versus mitigating evidence, the statute violates the Eighth and Fourteenth Amendments to the U.S. Constitution. Kiles incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Kiles raised this claim on direct appeal. (DA2 Dkt. 86 at 96.) For the reasons set forth in Claim 17, *supra*, 28 U.S.C. § 2254(d) places no limitation on relief.

Under the Eighth and Fourteenth Amendments to the U.S. Constitution, a

445

capital defendant is entitled to an individualized sentencing determination. *See Stephens*, 462 U.S. at 879. That determination cannot be arbitrary, *see Furman*, 408 U.S. at 310 (Stewart, J., concurring), or made without adequate consideration of factors that might call for a sentence less than death. *See, e.g.*, *Atkins*, 536 U.S. at 320–21. Kiles was denied a constitutionally appropriate individualized sentencing determination because his sentencing jury had no objective guidance in determining whether the mitigating evidence presented was sufficiently substantial to call for leniency. (*See* Tr. May 22, 2006 at 22 ("Sufficiently substantial to call for leniency means that the mitigation must be of such quality or value that it is adequate in the opinion of an individual juror to persuade that juror to vote for a sentence of life imprisonment.")); *see also State ex rel. Thomas v. Granville*, 123 P.3d 662, 666 (Ariz. 2005) (recognizing that, under Arizona's statute, neither party bears the burden on whether the mitigation warrants leniency). In the absence of such guidance, there is an intolerably high risk that Kiles's death sentence was the result of unfettered discretion. *See, e.g.*, *Furman*, 408 U.S. at 239–40 (1972) (per curiam). Accordingly, Kiles's sentence is unconstitutional, and he is entitled to relief.

## Claim Twenty-Seven

**Arizona's capital-sentencing scheme unconstitutionally denies capital defendants the benefit of proportionality review of their sentences.**

The capital-sentencing scheme in Arizona under which Kiles was sentenced denies a proportionality review in violation of the Fifth, Eighth, and Fourteenth Amendments of the U.S. Constitution. Kiles incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Kiles raised this claim on direct appeal. (DA2 Dkt. 86 at 97.) For the reasons set forth in Claim 17, *supra*, 28 U.S.C. § 2254(d) places no limitation on relief.

The Arizona Supreme Court failed to conduct a comparative proportionality review of Kiles's death sentence, rendering the sentence unconstitutional. When the United States Supreme Court sanctioned the modern death-penalty scheme, it did

1    so based on the belief that state supreme courts would conduct careful and effective
2    proportionality reviews in individual cases to guard against the arbitrary and
3    capricious infliction of the death penalty. *See Gregg*, 428 U.S. at 203–06 (joint
4    opinion of Stewart, Powell, and Stevens, JJ.) (highlighting proportionality review
5    on appeal as an important protection against caprice in sentencing); *Proffitt v.*
6    *Florida*, 428 U.S. 242, 258 (1976) (joint opinion of Stewart, Powell, and Stevens,
7    JJ.) (same); *see also Glossip*, 135 S. Ct. at 2763 (Breyer, J., dissenting) (recognizing
8    the importance of comparative proportionality review to avoid arbitrary imposition
9    of the death penalty). *But see Pulley v. Harris*, 465 U.S. 37, 50–51 (1984). The
10   Arizona Supreme Court, however, has abandoned this procedural safeguard. *See*
11   *State v. Salazar*, 844 P.2d 566, 583–84 (Ariz. 1992). The denial of proportionality
12   review allows for the death penalty to be applied arbitrarily in Arizona and violates
13   the Fifth, Eighth, and Fourteenth Amendments to the U.S. Constitution. Kiles's
14   sentence, affirmed without such a review, is constitutionally unsound, and Kiles is
15   entitled to relief.

### Claim Twenty-Eight

16

17   **Arizona's capital-sentencing scheme unconstitutionally**
18   **discriminates against poor, young, African-American male**
     **defendants.**

19       Kiles was sentenced to death under a statutory scheme that discriminates
20   against poor, young, African-American males in violation of the Fourteenth
21   Amendment to the U.S. Constitution. Kiles incorporates by specific reference all
22   facts, allegations, and arguments made elsewhere in this Petition.

23       This claim was not raised in state court. Kiles alleges he can overcome any
24   default of this claim by showing that it was caused by the ineffective assistance of
25   appellate and state post-conviction counsel and that he was prejudiced by the
26   default. *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *Edwards v. Carpenter*, 529
27   U.S. 446, 453 (2000); *but see Davila v. Davis*, 137 S. Ct. 2058 (2017). Kiles will
28   demonstrate at an evidentiary hearing that appellate and post-conviction counsel's

447

1  performance fell below the standards of minimally competent capital attorneys and
2  that their failures prejudiced him. Alternatively, he alleges that any procedural bar
3  is neither adequate nor independent and that imposing default would be a
4  miscarriage of justice. Because this claim has not been adjudicated on the merits by
5  the Arizona state courts, the barrier to relief imposed by 28 U.S.C. § 2254(d) does
6  not apply, and the Court may consider the merits of the claim de novo.

7  Kiles, an African-American male, who was 27 years old at the time of the
8  crime for which he was later convicted and sentenced to death (*see* ROA 1 at 1;
9  ROA 225 Ex. 1), was condemned pursuant to a statutory scheme that is
10  discriminatorily applied. The Fourteenth Amendment guarantees that no state shall
11  "deny to any person within its jurisdiction the equal protection of the laws." U.S.
12  Const. amend. XIV, § 1. The Equal Protection Clause protects criminal defendants
13  from being sentenced based on purposeful discrimination. *McCleskey v. Kemp*, 481
14  U.S. 279, 292 (1987). Still, Arizona's death row is predominantly populated by
15  indigent males. For example, although women commit nearly 12 percent of all
16  murders and non-negligent manslaughters, only three of the 117 persons on
17  Arizona's death row are women. *See* FBI, *Crime in the United States 2015, Table*
18  *42: Arrests by Sex, 2015*, https://ucr.fbi.gov/crime-in-the-u.s/2015/crime-in-the-
19  u.s.-2015/tables/table-42; Arizona Department of Corrections, *Death Row*
20  *Demographics* (last visited Aug. 13, 2018), http://corrections.az.gov/node/431.
21  Indeed, research suggests that "women homicide defendants receive more favorable
22  treatment at each stage of the criminal process," even in capital cases. Shatz &
23  Dalton, *supra*, at 1251–53 (citing studies finding gender disparities in the
24  imposition of death sentences).

25  Additionally, studies have found that, along with gender, "the racial
26  composition of and distribution within a county plays an important role" in
27  determining who receives the death penalty while "proper factors—such as
28  'egregiousness'—do not." *Glossip*, 135 S. Ct. at 2760–62 (Breyer, J., dissenting).

448

1    That Kiles was sentenced by a Maricopa County jury on its own likely affected his
2    sentence. *See, e.g.*, Levinson, Smith, & Young, *Devaluing Death: An Empirical*
3    *Study of Implicit Racial Bias on Jury–Eligible Citizens in Six Death Penalty States*,
4    89 N.Y.U. L. Rev. 513, 533–536 (2014). As "numerous studies have criticized the
5    death penalty as disproportionately affecting defendants of color," and defendants
6    have had death sentences "fortuitously imposed simply because of the county" in
7    which the defendant is sentenced, "our historic inability to devise a method to
8    implement the death penalty free from human bias and error" has been laid bare.
9    *State v. Bush*, 423 P.3d 370, 395–96 (Ariz. 2018) (Winthrop, J., dissenting). Given
10   that race, gender, geography, and access to resources determine the likelihood of a
11   death sentence, there is no question that Kiles, a poor, young, African-American
12   man, was subject to the arbitrary imposition of a capital sentence. *See, e.g.*, Shatz
13   & Dalton, *supra*, at 1245–51; Stephen Bright, *Counsel for the Poor: The Death*
14   *Sentence Not for the Worst Crime but for the Worst Lawyer*, 103 Yale L.J. 1835
15   (1994).

16        If a defendant similarly situated to Kiles happened to have been a woman, or
17   white, or wealthy, there would likely have been no sentence of death imposed.
18   Nothing regarding the nature of the crime, or the aggravating or mitigating
19   circumstances, can explain this disproportionate pattern other than systemic
20   discrimination on the basis of age, race, class, and sex. The discriminatory
21   application of the death penalty in Arizona violates Kiles's constitutional rights as
22   guaranteed by the Due Process and Equal Protection Clauses of the Fourteenth
23   Amendment to the U.S. Constitution. This discrimination prejudiced Kiles at all
24   phases of his proceedings, and he is entitled to relief.

25
26
27
28

449

1

**Claim Twenty-Nine**

2

**The death qualification of Kiles's guilt- and penalty-phase juries**
**was unconstitutional.**

3

4        Kiles's convictions and death sentence result from the unconstitutional

5   "death qualification" of his guilt- and penalty-phase juries, in violation of the Sixth,

6   Eighth, and Fourteenth Amendments to the U.S. Constitution. Kiles incorporates

7   by specific reference all facts, allegations, and arguments made elsewhere in this

8   Petition.

9        Before Kiles's guilt phase, defense counsel moved to preclude the "death

10   qualification" of the jury. (ROA 493 at 2–3 (citing studies showing that "death

11   qualified juries are substantially more likely to convict or to convict on more serious

12   charges than juries on which opponents of capital punishment are permitted to

13   serve").) The trial court denied Kiles's request and proceeded to excuse prospective

14   jurors because of their opposition to the death penalty. (*See, e.g.*, Tr. July 7, 2000

15   at 67, 157.) The trial court also excused at least one prospective juror at Kiles's

16   penalty phase because she expressed some opposition to the death penalty. (*See,*

17   *e.g.*, Tr. Mar. 16, 2006 at 3–5.) Because there was a substantial record made at the

18   trial-court level, the Arizona Supreme Court was on notice of this claim, and it was

19   impliedly exhausted during that court's independent review in this case. *See Comer*

20   *v. Schriro*, 480 F.3d 960, 981 (9th Cir. 2007) (en banc) (finding that "[e]ven if a

21   petitioner fails to raise a constitutional claim in state court, the exhaustion

22   requirement may be satisfied . . . where the state court itself exhausts the claim").

23   The state-court denial of this claim was contrary to or an unreasonable application

24   of Supreme Court precedent; the denial further turned on an unreasonable

25   determination of facts. *See* 28 U.S.C. § 2254(d). Accordingly, this Court may

26   review the merits of this claim de novo.[199]

27

28   [199] To the extent that this claim is not sufficiently exhausted, Kiles alleges he can
overcome any default of this claim by showing that it was caused by the ineffective

450

1    Death qualification—"the exclusion for cause, in capital cases, of jurors

2    opposed to capital punishment," *Wainwright v. Witt*, 469 U.S. 412, 439 (1985)

3    (Brennan, J., dissenting)—violates the Sixth, Eighth, and Fourteenth Amendments

4    for two reasons. First, it produces a biased jury. Second, by excluding a segment of

5    the population, death qualification violates the fair cross-section requirement of the

6    Sixth Amendment.

7    A defendant has the right to an unbiased and impartial jury. *Morgan v.*

8    *Illinois*, 504 U.S. 719, 726–27 (1992) (identifying an impartial tribunal as a

9    fundamental requirement of due process); *see also Groppi v. Wisconsin*, 400 U.S.

10   505, 509 (1971). The "'presence of a biased juror cannot be harmless; the error

11   requires a new trial without a showing of actual prejudice.'" *United States v.*

12   *Gonzalez*, 214 F.3d 1109, 1111 (9th Cir. 2000) (quoting *Dyer v. Calderon*, 151 F.3d

13   970, 973 n.2 (9th Cir. 1998)).

14   The process of death qualification, however, produces not an unbiased jury,

15   but a jury predisposed both to convict and to impose death. Empirical research

16   demonstrates that the death-qualification process facilitates the selection of jurors

17   who are more likely to return a guilty verdict and then more likely to return a death

18   sentence. *See* Susan D. Rozelle, *The Principled Executioner: Capital Juries' Bias*

19   *and the Benefits of True Bifurcation*, 38 Ariz. St. L.J. 769, 784–85 (2006)

20   (reviewing data showing that "[t]he death qualification process today still seats

21   juries uncommonly willing to find guilt, and uncommonly willing to mete out

22   death"); William J. Bowers & Wanda D. Foglia, *Still Singularly Agonizing: Law's*

23   *Failure to Purge Arbitrariness from Capital Sentencing*, 39 Crim. L. Bull. 51, 61–

24   66 (2003) (reviewing studies demonstrating that death-qualified jurors are more

25

26   assistance of appellate and state post-conviction counsel and that he was prejudiced
     by the default. *See Martinez*, 566 U.S. at 9; *Carpenter*, 529 U.S. at 453;
27   *but see Davila*, 137 S. Ct. at 2058. Alternatively, he alleges that any procedural bar
     is neither adequate nor independent and that imposing default would be a
28   miscarriage of justice.

1    likely to convict and to return a death verdict); *see also Wainwright*, 469 U.S. at
2    460 & n.11 (Brennan, J., dissenting) ("Death-qualification works to the advantage
3    of only the prosecutor; if not carefully controlled, it is [a] tool with which the
4    prosecutor can create a jury perhaps predisposed to convict and certainly
5    predisposed to impose the ultimate sanction." (footnote omitted)).

6         Moreover, research has established that even the process of death
7    qualification influences jurors to adopt pro-conviction and pro-death attitudes. *See,*
8    *e.g.*, Craig Haney, *On the Selection of Capital Juries: The Biasing Effects of the*
9    *Death-Qualification Process*, 8 L. & Hum. Behav. 121 (1984), available at
10   https://capitalpunishmentincontext.org/files/resources/deathqual/Haney1984.pdf.
11   Haney's study confirmed this:

12              Exposure to death qualification increased subjects' belief
13              in the guilt of the defendant and their estimate that he would
                be convicted. It also increased their estimate of the
14              prosecutor, defense attorney, and judge's belief in the guilt
                of the defendant. The death qualification process led
15              subjects to perceive both prosecutor and judge as more
                strongly in favor of the death penalty, and to believe that
16              the law disapproves of people who oppose the death
                penalty. And it led jurors to choose the death penalty as an
17              appropriate punishment much more frequently than
                persons not exposed to it. Thus, persons who had been
18              exposed to death qualification not only differed from non-
                death-qualified subjects, but they differed in ways that
19              were consistently prejudicial to the interests and rights of
20              the defendants.

21   *Id.* at 128–29. The effects of death qualification are enhanced because "the voir dire
22   phase of the trial represents the jurors' first introduction to the substantive factual
23   and legal issues in a case." *Powers v. Ohio*, 499 U.S. 400, 412 (1991) (internal
24   quotation marks omitted) (recognizing that "[t]he influence of the voir dire process
25   may persist through the whole course of the trial proceedings"). Critically, when a
26   sentencing jury is death-qualified and therefore biased in favor of death, any
27   resulting death sentence is not a reliable indicator of the defendant's culpability, as
28   is required by the Eighth Amendment. *See Woodson v. North Carolina*, 428 U.S.

452

1    280, 305 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.).

2    Apart from generating a biased jury, death qualification violates the
3    defendant's right to a jury pool that represents a fair cross-section of the community.
4    A jury unlikely to reflect such community views violates the Sixth Amendment.
5    *See Taylor v. Louisiana*, 419 U.S. 522, 537 (1975). However, the process of death
6    qualification permits the broad exclusion of jurors, even though some may possess
7    the ability to judge impartially, regardless of their beliefs about the death penalty.
8    With the exclusion of a broad segment of the community, the right to a fair cross-
9    section is lost.

10   Because Kiles's guilt-phase and sentencing-phase juries were selected using
11   death qualification, his convictions and sentences are unconstitutional under the
12   Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution. Kiles is
13   entitled to relief.

14                                **Claim Thirty**

15   **The "especially heinous, cruel or depraved" aggravating**
     **circumstance is unconstitutionally vague.**
16

17   The move to jury sentencing in Arizona rendered the "especially heinous,
18   cruel or depraved" aggravating circumstance, which the jury found proven in
19   Kiles's case, unconstitutionally vague under the Eighth and Fourteenth
20   Amendments to the U.S. Constitution. Kiles incorporates by specific reference all
21   facts, allegations, and arguments made elsewhere in this Petition.

22   Before the sentencing phase, defense counsel moved to dismiss the "heinous,
23   cruel, or depraved" aggravating circumstance, arguing that it was unconstitutionally
24   vague and overbroad and that it was applied in an arbitrary and capricious manner.
25   (ROA 600); *see* A.R.S. §13-703(F)(6) (1988). Counsel cited *Maynard v.*
26   *Cartwright*, 486 U.S. 356, 363 (1988), and *Gregg*, 428 U.S. at 158 (joint opinion of
27   Stewart, Powell, and Stevens, JJ.), to establish that the Supreme Court had
28   previously struck language that was no more vague than the aggravating

                                     453

circumstance in Kiles's case. The trial court denied Kiles's request without fully addressing the merits, ruling not that the statute was constitutional, but that the court could attempt to deal with the vagueness through jury instructions. (ROA 650 at 1; Tr. Feb. 15, 2005 at 28.)[200] Because there was a substantial record made at the trial-court level, the Arizona Supreme Court was on notice of this claim, and it was impliedly exhausted during that court's independent review in this case. *See Comer*, 480 F.3d at 981 (en banc) (finding that "[e]ven if a petitioner fails to raise a constitutional claim in state court, the exhaustion requirement may be satisfied . . . where the state court itself exhausts the claim"). The state-court denial of this claim was contrary to or an unreasonable application of Supreme Court precedent; the denial further turned on an unreasonable determination of facts. *See* 28 U.S.C. § 2254(d). Accordingly, this Court may review the merits of this claim de novo.[201]

The Eighth Amendment requires that the aggravating circumstances within a state's capital-sentencing scheme genuinely narrow the class of offenders who are eligible for the death penalty. *See, e.g.*, *Loving v. United States*, 517 U.S. 748, 755 (1996); *Stephens*, 462 U.S. at 877. To comply with the Eighth Amendment, states must establish a threshold below which the death penalty cannot be imposed and must "establish rational criteria that narrow the decisionmaker's judgment as to whether the circumstances of a particular defendant's case meet the threshold."

---

[200] "I'm going to deny the request. You've made a great record. We'll see where we end up. I feel hesitant to just say we're totally precluded at this point from at least attempting to fashion some kind of instruction that—that gets it right for the jury and for all of us." (Tr. Feb. 15, 2005 at 28.)

[201] To the extent that this claim is not sufficiently exhausted, Kiles alleges he can overcome any default of this claim by showing that it was caused by the ineffective assistance of appellate and state post-conviction counsel and that he was prejudiced by the default. *See Martinez*, 566 U.S. at 9 (2012); *Carpenter*, 529 U.S. at 453; *but see Davila*, 137 S. Ct. at 2058. Alternatively, he alleges that any procedural bar is neither adequate nor independent and that imposing default would be a miscarriage of justice.

1    *McCleskey*, 481 U.S. at 305; *see also Lowenfield*, 484 U.S. at 231; *Stephens*, 462

2    U.S. at 877. Further, a state's sentencing procedure must suitably direct and limit

3    the sentencing body's discretion "so as to minimize the risk of wholly arbitrary and

4    capricious action." *Stephens*, 462 U.S. at 874 (quoting *Gregg*, 428 U.S. at 189 (joint

5    opinion of Stewart, Powell, and Stevens, JJ.)). Vague standards are unconstitutional

6    because they fail to adequately "channel the sentencing decision patterns of juries."

7    *Gregg*, 428 U.S. at 195 n.46 (joint opinion of Stewart, Powell, and Stevens, JJ.).

8          The Supreme Court has repeatedly held that, on their face, aggravating

9    circumstances based on the heinousness, cruelty, or depravity of a murder fail to

10   narrow death-penalty eligibility because their text is too vague to adequately guide

11   the discretion of the sentencer. *See Cartwright*, 486 U.S. at 363 ("There is nothing

12   in these few words, standing alone, that implies any inherent restraint on the

13   arbitrary and capricious infliction of the death sentence." (quoting *Godfrey*, 446

14   U.S. at 428–29)); *see also Walton*, 497 U.S. at 654, *overruled on other grounds by*

15   *Ring*, 536 U.S. at 584 (finding that Arizona's "especially heinous, cruel or

16   depraved" aggravating circumstance is facially vague). The plain language of the

17   heinous, cruel, or depraved aggravating circumstance could easily apply to any

18   intentional or knowing homicide and therefore fails to "suitably direct[] and limit[]"

19   the sentencer's discretion in imposing the death penalty. *See Gregg*, 428 U.S. at

20   189.

21         In *Walton*, the Supreme Court noted that "there is no serious argument that

22   Arizona's 'especially heinous, cruel or depraved' aggravating factor is not facially

23   vague." 497 U.S. at 654. The Court went on to conclude that while Arizona's

24   especially heinous, cruel, or depraved aggravating circumstance was facially vague,

25   it did not violate the Eighth and Fourteenth Amendments because sentencing was

26   the responsibility of the trial judge, and the judge could be presumed to follow the

27   narrowed definition of the aggravating circumstance as construed by the Arizona

28   Supreme Court. *Id.* at 653–54. However, *Walton* does not apply in the context of

jury sentencing. *Id.* at 653 (distinguishing prior cases which struck similar aggravating circumstance under jury-sentencing schemes because the "logic of those cases has no place in the context of sentencing by a trial judge").

With the shift to jury sentencing in Arizona, this aggravating circumstance became unconstitutionally vague. When the jury is the factfinder, the vague statutory definition of especially cruel does not suffice. How the jury interprets this factor can "only be the subject of sheer speculation." *Godfrey*, 446 U.S. at 429 (discussing the aggravating circumstance of "outrageously or wantonly vile, horrible and inhuman"). A standardless capital-punishment statute allows for the imposition of the death penalty in an arbitrary and capricious manner, violating the Eighth Amendment. *Cartwright*, 486 U.S. at 361–62.

In addition, state-court interpretations of the heinous, cruel, or depraved aggravating circumstance, and any jury instructions based on such interpretations, have failed to narrow the class of offenders eligible for the death penalty. For example, in Arizona, a murder in which the killer uses excessive force is considered "cruel" for purposes of the death penalty. *State v. Summerlin*, 675 P.2d 686, 696 (Ariz. 1983). But using insufficient force to commit a murder is also "cruel." *See State v. Chaney*, 686 P.2d 1265, 1282 (Ariz. 1984) (finding "cruelty" because defendant used insufficient force, causing the victim to suffer). Given the susceptibility of this aggravating circumstance to arbitrary imposition, this Court cannot be sure that Kiles's death sentence was not imposed in a wanton and freakish manner. *Cf. Gregg*, 428 U.S. at 195. Thus, the fact that the trial court defined the element of cruelty as whether the infliction of pain was "in an especially wanton" or "insensitive" manner did not constitutionally narrow this facially vague aggravating circumstance. (ROA 909 at 12.) If anything, the terms used by the trial court make the aggravating circumstance more arbitrary and fluid.

In any event, jury instructions cannot cure the unconstitutional vagueness. Jurors, unlike judges who see a range of first-degree murders, have no points of

comparison as to whether a particular murder imposes "extreme" pain or mental anguish. Jurors are quite likely to believe that every murder causes extreme pain or anguish. *Cf. Cartwright*, 486 U.S. at 364 ("[A]n ordinary person could honestly believe that every unjustified, intentional taking of human life is 'especially heinous.'"). Additionally, in this case, the definitions offered to the jury were hopelessly convoluted. For example, the jury was instructed that it could consider whether the murder was "senseless" to help determine whether the crime was "heinous or depraved." (ROA 909 at 13.) Recognizing that all murders are senseless, the court tried to clarify this further, instructing the jury that a "'senseless' murder is one that is unnecessary to achieve Defendant's objective." (ROA 909 at 13–14.) This "clarification" only further confused and expanded the aggravating circumstance. *See Cartwright v. Maynard*, 822 F.2d 1477, 1489 (10th Cir. 1987) ("Vague terms do not suddenly become clear when they are defined by reference to other vague terms."). The jury instructions in the instant case failed to cure the statute's unconstitutionality; instead, they further enabled the jury to capriciously apply the aggravating circumstance.

Arizona's shift to jury sentencing undermines *Walton*'s analysis on whether the "especially heinous, cruel or depraved" aggravating circumstance passes constitutional muster. Arizona's heinous, cruel, or depraved aggravating circumstance is vague and overbroad and fails to adequately narrow the class of offenders subject to the death penalty. Accordingly, Kiles was sentenced to death in violation of his Eighth and Fourteenth Amendment rights, and he is entitled to relief.

## Claim Thirty-One

**Arizona's prior felony conviction aggravating circumstance is unconstitutionally vague.**

The aggravating circumstance of a prior conviction does not genuinely narrow the class of death-eligible offenders and therefore violates the Eighth and

457

1   Fourteenth Amendments to the U.S. Constitution. Kiles incorporates by specific

2   reference all facts, allegations, and arguments made elsewhere in this Petition.

3       While Kiles did not present this claim in state court, the Arizona Supreme

4   Court implicitly considered the claim when it affirmed this aggravating

5   circumstance during its independent review of the aggravating factors and

6   mitigating circumstances. *See Kiles*, 213 P.3d at 187–88; *see also Comer*, 480 F.3d

7   at 981 (en banc) (finding that "[e]ven if a petitioner fails to raise a constitutional

8   claim in state court, the exhaustion requirement may be satisfied . . . where the state

9   court itself exhausts the claim"). The denial of this claim (1) was contrary to, or

10  involved an unreasonable application of, clearly established federal law, and (2)

11  was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d).[202]

12      The Eighth Amendment requires that a state's capital-sentencing scheme

13  genuinely narrow the class of offenders eligible for the death penalty, which some

14  states achieve by requiring proof of at least one aggravating circumstance before a

15  death sentence can be imposed. *See Stephens*, 462 U.S. at 877; *Loving*, 517 U.S. at

16  755. Aggravating circumstances that do not appropriately limit application of the

17  death penalty are unconstitutional because they fail to adequately channel the

18  sentencing discretion of the jury. *Cartwright*, 486 U.S. at 361–62.

19      The (F)(2) aggravating circumstance applies when the defendant was

20  previously convicted of a violent offense. A.R.S. § 13-703(F)(2) (1988). Under

21  Arizona law, a prior conviction satisfies the (F)(2) circumstance if "by its statutory

22  definition" the prior conviction "involves violence or the threat of violence on

---

[202] To the extent that this claim was not adequately presented below, Kiles alleges he can overcome any default of this claim by showing cause and prejudice, including because of the ineffective assistance of appellate and state post-conviction counsel. *See Martinez*, 566 U.S. at 9; *Carpenter*, 529 U.S. at 453; *Strickland*, 466 U.S. at 687–88; *but see Davila*, 137 S. Ct. at 2058. Alternatively, any procedural bar is neither adequate nor independent, and imposing default would be a miscarriage of justice. If this claim was not adjudicated on the merits below, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider the merits of the claim de novo.

1  another person." *State v. Gillies*, 662 P.2d 1007, 1018 (Ariz. 1983). The trial court

2  may not look to the underlying facts of the prior conviction. *See id.* ("We cannot

3  allow what is, in effect, a second trial on defendant's prior conviction to establish

4  the existence of an A.R.S. § 13-703(F)(2) aggravating circumstance.").

5      Because the (F)(2) aggravating circumstance does not discriminate among

6  prior violent felonies, it impermissibly fails to genuinely narrow the class of death-

7  eligible defenders. *See Loving*, 517 U.S. at 755. The (F)(2) aggravating

8  circumstance fails to differentiate between a defendant who has multiple prior

9  murder convictions as a principal and a defendant who has been convicted of a

10 single, far less violent offense as an accomplice. As a result, such a broad swathe

11 of capital defendants satisfy this aggravating circumstance that it does not "establish

12 rational criteria that narrow the decisionmaker's judgment" as to whether death may

13 be an appropriate sentence. *McCleskey*, 481 U.S. at 305.

14     Kiles was sentenced on the basis of an unconstitutional aggravating

15 circumstance, and he is therefore entitled to relief. *See Johnson v. Mississippi*, 486

16 U.S. 578, 580, 590 (1988).

## Claim Thirty-Two

**Kiles is innocent of first-degree murder and of the death penalty.**

19     Because Kiles is innocent both of first-degree murder in the death of Valerie

20 Gunnel and of the death penalty, his conviction and sentence violate the Fifth, Sixth,

21 Eighth, and Fourteenth Amendments to the U.S. Constitution. Kiles incorporates

22 by specific reference all facts, allegations, and arguments made elsewhere in this

23 Petition.

24     Kiles did not present this claim in state court. However, because declining to

25 hear this claim on the merits would result in a fundamental miscarriage of justice,

26 this Court should disregard any default.[203] *See Coleman v. Thompson*, 501 U.S. 722,

---

[203] Indeed, procedural default should not apply to freestanding innocence claims precisely because of the gravity of the constitutional interests at stake.

459

735 n.1 (1991). Alternatively, Kiles alleges he can overcome any default of this claim by showing that it was caused by the ineffective assistance of appellate and state post-conviction counsel and that he was prejudiced by the default. *See Martinez*, 566 U.S. at 9; *Carpenter*, 529 U.S. at 453; *but see Davila*, 137 S. Ct. at 2058. He further alleges that any procedural bar asserted by Respondents is neither adequate nor independent. As this claim has not been adjudicated on the merits by the state courts, the barrier to relief imposed by 28 U.S.C. § 2254(d) does not apply, and this Court may consider the merits of the claim de novo.

Kiles is innocent of the crime of first-degree murder with which he was charged. At the time of the crime, first-degree murder under Arizona law required either premeditation or felony murder, meaning that the killing occurred in the course of, in furtherance of, or in the immediate flight from an enumerated offense. *See* A.R.S. § 13-1105(A) (1988). Kiles was not charged with felony murder in the killing of Valerie Gunnel; he was charged with, and convicted of, only premeditated murder. (*See* ROA 1 at 1–2; ROA 482 at 1.) However, as detailed previously, Kiles did not premeditate the murder. Not only did he have a tendency toward impulsivity as a result of extensive childhood trauma, prior head injuries, and the disease of addiction, *see supra*, Claim 3, he also was in a drug-induced psychosis at the time of the crime and was therefore, at that moment, incapable of premeditating, *see supra*, Claim 6. The killing was unplanned; it involved no time for reflection and no actual reflection. Instead, when he felt provoked by Gunnel's slap, he immediately and reflexively picked up a nearby instrument and attacked. Because there was no premeditation involved, no rational trier of fact could find proof of guilt beyond a reasonable doubt, and Kiles is innocent of first-degree murder. *See Herrera v. Collins*, 506 U.S. 390, 429 (1993) (White, J., concurring). Accordingly, neither his first-degree murder conviction nor his resultant death sentence can stand.

Kiles is independently innocent of the death penalty. Kiles was death-eligible for the murder of Gunnel because the jury found that the State had proven beyond

460

a reasonable doubt the three aggravating circumstances it had alleged: (1) prior conviction of a violent felony, A.R.S. § 13-703(F)(2) (1988), (2) the offense was "especially heinous, cruel or depraved," *id.* § 13-703(F)(6), and (3) multiple homicides during the commission of the offense, *id.* § 13-703(F)(8). (*See* ROA 911 at 11–13.) First, as discussed earlier, Kiles's 1986 aggravated-assault conviction is an invalid basis for the (F)(2) aggravating circumstance; as that conviction is the sole support for that aggravator, the (F)(2) aggravating circumstance must be stricken. *See, e.g.*, *supra*, Claim 5. As illustrated by Claim 12 and Claim 11, *supra*, among others, no rational trier of fact could find any of these three aggravating circumstances beyond a reasonable doubt. *See Herrera*, 506 U.S. at 429 (White, J., concurring). Moreover, the (F)(2) and (F)(6) aggravating circumstances are unconstitutionally overbroad and thus cannot stand as aggravating circumstances in this case. *See infra* Claim 30; Claim 31. Because no constitutional aggravating circumstance supported by the evidence exists in this case, Kiles is innocent of the death penalty, and he is entitled to relief from his capital sentence.

## Claim Thirty-Three

### Kiles's death sentence constitutes an impermissible violation of the Ex Post Facto Clause.

Kiles's death sentence results from the unconstitutional ex post facto application of Arizona's current death-penalty statute to his crime. Kiles incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

This claim was not raised in state court. Kiles alleges he can overcome any default of this claim by showing that it was caused by the ineffective assistance of appellate and state post-conviction counsel and that he was prejudiced by the default. *See Martinez*, 566 U.S. at 9; *Carpenter*, 529 U.S. at 453; *but see Davila*, 137 S. Ct. at 2058. Kiles will demonstrate at an evidentiary hearing that appellate and post-conviction counsel's performance fell below the standards of minimally

competent capital attorneys and that their failures prejudiced him. Alternatively, he alleges that any procedural bar is neither adequate nor independent and that imposing default would be a miscarriage of justice. Because this claim has not been adjudicated on the merits by the Arizona state courts, the barrier to relief imposed by 28 U.S.C. § 2254(d) does not apply, and the Court may consider the merits of the claim de novo.

Article I, section 10 of the U.S. Constitution prohibits ex post facto laws. In *Weaver v. Graham*, the Supreme Court recognized that the problem with ex post facto laws is "the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated." 450 U.S. 24, 30 (1981). Pursuant to *Weaver*, a newly enacted law is being applied in violation of the ex post facto doctrine when (1) the law "appl[ies] to events occurring before its enactment," and (2) the law disadvantages the defendant with respect to a substantial, not procedural, right. *Id*. at 29 & n.12.

The application of Arizona's current death-penalty scheme to Kiles constitutes an ex post facto violation under *Weaver*. First, the offense for which Kiles was convicted and sentenced to death occurred on February 10, 1989. (ROA 1 at 1–2.) The statute under which Kiles was charged capitally in 1989 was unconstitutional. (*See* ROA 1 at 1–2 (citing A.R.S. § 13-703)); *Ring*, 536 U.S. at 609 (striking down Arizona's then-extant capital-sentencing statute as unconstitutional under the Sixth Amendment because it did not require that a jury find the aggravating circumstances that rendered a capital defendant death-eligible). The statute enforced at Kiles's sentencing trial was not enacted until August 1, 2002, well over a decade after the crime in question. 2002 Ariz. Sess. Laws, 5th Spec. Sess., ch.1. The newly enacted statute was therefore applied retrospectively to a crime predating its enactment. *See Weaver*, 450 U.S. at 29.

Second, the enactment of the new statute changed substantial rights and disadvantaged Kiles. In compliance with *Ring*, the statute required that a jury find

the enumerated aggravating factors, which "operate as 'the functional equivalent of an element of a greater offense.'" 536 U.S. at 609 (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 494 n.19 (2000)). Further, the new law expanded the State's authority to present "any evidence that demonstrates that the defendant should not be shown leniency." A.R.S. § 13-752(G). The new law also allowed for victim-impact evidence in any format, *id.* § 13-752(Q), and it did not require any special verdict form. *See* A.R.S. § 13-752. Such changes implicated substantial rights and disadvantaged Kiles. At its core, the change allowed Arizona to sentence Kiles to death even though no constitutionally sound death-penalty statute existed at the time of the crime.

The application to Kiles of Arizona's current death-penalty statute "increase[d] the possible penalty" he faced, *Lindsey v. Washington*, 301 U.S. 397, 401 (1937), thereby violating the Ex Post Facto Clause. *But see Dobbert v. Florida*, 432 U.S. 282, 294 (1977); *Summerlin*, 542 U.S. at 358. Kiles is entitled to relief.

## Claim Thirty-Four

**Executing Kiles after more than 28 years on death row violates the Eighth and Fourteenth Amendments.**

To subject Kiles to execution after nearly 30 years either charged with a capital crime or on death row violates the Eighth and Fourteenth Amendments to the U.S. Constitution. Kiles incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Kiles presented this claim in his direct appeal. (DA2 Dkt. 86 at 97.) For the reasons set forth in Claim 17, *supra*, 28 U.S.C. § 2254(d) places no limitation on relief. In the event that this Court determines that this claim is not yet ripe, Kiles nevertheless intends to preserve it for future review in light of *Allen v. Ornoski*, 435 F.3d 946, 958 (9th Cir. 2006).

The Eighth and Fourteenth Amendments require that state-imposed punishment remain within civilized standards. *See Robinson v. California*, 370 U.S.

463

660, 675 (1962) (Douglas, J., concurring). Kiles has been in prison for nearly 30 years, of which he has spent approximately 20 years on death row.[204] For several reasons, executing Kiles after so long on death row does not fall within those civilized bounds.

First, executing Kiles after so long spent on death row is inconsistent with the history of the Eighth Amendment and foundational British and American jurisprudence. At the time the Bill of Rights was adopted, the Anglo-American legal tradition—which had a direct influence on the framers of the U.S. Constitution— had uniformly denounced undue delays between death sentences and executions as cruel and unusual. *See, e.g.*, Blackstone's Commentaries on the Laws of England, Book IV, reprinted in 2 Jones, Blackstone at 2650 (1976) ("[I]t has been well observed, that it is of great importance, that [capital] punishment should follow the crime as early as possible."); Beccaria, An Essay on Crimes and Punishments, ch. XIX at 73 (5th ed. 1804) (immediate punishment will be more just "because it spares the criminal the cruel and superfluous torment of uncertainty . . .; and because the privation of liberty, being [in and of itself] a punishment, ought to be inflicted before condemnation, but for as short a time as possible"); *see also, e.g.*, *Harmelin v. Michigan*, 501 U.S. 957, 966 (1991) (there is no doubt the English Declaration of Rights of 1689, which prohibited "cruel and unusual punishments," is the "antecedent of our constitutional text[s]"); *Ex parte Grossman*, 267 U.S. 87, 108–09 (1925) (Eighteenth-century English criminal jurisprudence directly relevant to determining what framers intended in drafting Bill of Rights).

The framers' writings confirm that they also viewed such inordinate delay as inherently "cruel and unusual." *See, e.g.*, 2 Robert Green McCloskey, The Works

---

[204] That Kiles has been imprisoned for so long before entering federal-habeas proceedings is not his own fault, but is largely attributable to his counsel's ineffective assistance at Kiles's initial state-court proceedings, resulting in a new trial and delays outside of Kiles's control between his second trial and sentencing phases.

1    of James Wilson at 629–30 (1957); 2 The Papers of John Marshall 208 (Univ. of

2    N.C. Press 1977) (clemency petition filed by Marshall and others sought

3    commutation in part because prisoner's execution was delayed five months).

4    Historically, then, executing Kiles after nearly 30 years charged with a capital crime

5    or on death row would have been considered cruel and unusual.

6         Second, such a punishment is no less cruel and unusual under modern

7    jurisprudence. The current death-penalty scheme is purported to serve two

8    purposes: retribution and deterrence. *Gregg*, 428 U.S. at 183 (joint opinion of

9    Stewart, Powell, and Stevens, JJ.). But, the "longer the delay, the weaker the

10   justification for imposing the death penalty in terms of punishment's basic

11   retributive or deterrent purposes." *Knight*, 528 U.S. at 990 (mem.) (Breyer, J.,

12   dissenting from denial of certiorari); *see also Lackey*, 514 U.S. at 1045 (mem.)

13   (Stevens, J., dissenting from denial of certiorari) ("It is arguable that neither

14   [retribution nor deterrence] retains any force for prisoners who have spent some 17

15   years under a sentence of death."). The lengthy delay between the day of

16   incarceration and the day of execution "can inflict 'horrible feelings' and 'in (sic)

17   immense mental anxiety amounting to a great increase of the offender's

18   punishment.'" *Foster v. Florida*, 537 U.S. 990, 992 (2002) (mem.) (Breyer, J.,

19   dissenting from denial of certiorari). After inflicting such anxiety on the petitioner

20   by making him wait long periods before carrying out his death sentence, the State

21   hardly furthers the goal of retribution by finally executing him. *See, e.g.*, *District*

22   *Attorney for the Suffolk Cnty. Dist. v. Watson,* 411 N.E.2d 1274, 1287 (Mass. 1980).

23   Further, the added deterrent effect of executing someone who has spent a long time

24   on death row awaiting his execution is slight indeed. *See Coleman v. Balkcom*, 451

25   U.S. 949, 952 (1981) (mem.) (Stevens, J., respecting denial of certiorari). When the

26   death penalty ceases to realistically further the purposes of retribution and

27   deterrence, its imposition is simply "the pointless and needless extinction of life

28   with only marginal contributions to any discernible social or public purposes."

465

*Lackey*, 514 U.S. at 1046 (mem.) (Stevens J., dissenting from denial of certiorari) (quoting *Furman*, 408 U.S. at 312 (White, J., concurring)). "A penalty with such negligible returns to the State would be patently excessive and cruel and unusual punishment violative of the Eighth Amendment." *Id.*

Any penological goals served in 1990, when Kiles was first sentenced to death, no longer apply. Executing Kiles, almost three decades after the crime for which he was condemned, can have no deterrent or retributive purpose.

Third, the stress of living under threat of death for lengthy periods is so oppressive that it, on its own, can constitute cruel and inhuman treatment. *See infra,* Claim 37. Conditions of confinement on death row can be "so degrading and brutalizing to the human spirit as to constitute psychological torture." *People v. Anderson*, 493 P.2d 880, 894 (Cal. 1972), *superseded as stated in Strauss v. Horton*, 207 P.3d 48 (Cal. 2009); *see also Solesbee v. Balkcom*, 339 U.S. 9, 14 (1950) (Frankfurter, J., dissenting) ("[T]he onset of insanity while awaiting execution of a death sentence is not a rare phenomenon."); *In re Medley*, 134 U.S. 160, 172 (1890) ("[W]hen a prisoner sentenced by a court to death is confined in the penitentiary awaiting execution of the sentence, one of the most horrible feelings to which he can be subjected during that time is the uncertainty during the whole of it."). "Whatever one believes about the cruelty of the death penalty itself, this violence done to the prisoner's mind must afflict the conscience of enlightened government and give the civilized heart no rest." *Watson*, 411 N.E.2d at 1291 (Liacos, J., concurring). Certainly, then, such cruel treatment also renders any further punishment, namely execution, unconstitutional.

Finally, Kiles spent 12 years in solitary confinement—in the particularly oppressive conditions that prevailed on Arizona's death row—after his 2006 sentencing. The Supreme Court in 1890 recognized time spent in solitary confinement awaiting execution as "an additional punishment of the most important and painful character," *In re Medley*, 134 U.S. 160, 171 (1890) (Brewer and

466

1   Bradley, JJ., dissenting), and "research still confirms what [the] Court suggested
2   over a century ago: Years on end of near-total isolation exact a terrible price." *Davis*
3   *v. Ayala*, 135 S. Ct. 2187, 2210 (2015) (Kennedy, J., concurring). Accordingly, the
4   American Bar Association and the United Nations Special Rapporteur on Torture
5   have recommended limitations on the use of solitary confinement. *See Glossip*, 135
6   S. Ct. at 2765 (Breyer, J., dissenting). Indeed, foreign courts have found that
7   extended delay in the imposition of a death sentence "renders ultimate execution
8   inhuman, degrading, or unusually cruel." *Knight*, 528 U.S. at 990 (Breyer, J.,
9   dissenting from denial of certiorari). Execution after 12 years in solitary
10  confinement is cruel and unusual.

11      Given the length of time Kiles has spent on death row, the conditions of
12  confinement, including the unique stress of living under threat of execution,
13  historical understandings of "cruel and unusual" punishment, and the evolving
14  standards of decency, executing Kiles at this time would constitute cruel and
15  unusual punishment in violation of the Eighth and Fourteenth Amendments to the
16  U.S. Constitution.

17                              **Claim Thirty-Five**

18      **Due process requires that this Court re-evaluate Kiles's death**
     **sentence in light of the significant changes to Kiles's circumstances**
19   **in the 12 years since he was sentenced.**

20      Kiles's death sentence must be reevaluated to satisfy the due-process and
21  reliability requirements of the Fifth, Eighth, and Fourteenth Amendments to the U.S
22  Constitution. Kiles incorporates by specific reference all facts, allegations, and
23  arguments made elsewhere in this Petition.

24      This claim was not raised in state court because this claim previously was not
25  available or ripe for review, and there is no longer any mechanism for state merits
26  review. *See* 28 U.S.C. § 2254(b); *see also Panetti v. Quarterman*, 551 U.S. 930,
27  947 (2007). Because this claim has not been adjudicated by Arizona state courts,
28  the limitations on relief imposed by 28 U.S.C. § 2254(d) do not restrict review, and

1   the Court may consider the claim de novo.

2       Kiles was sentenced to death over 12 years ago; he is currently approaching

3   60 years of age and has an impeccable prison record. In light of these circumstances,

4   due process requires that his death sentence be re-evaluated.

5       "The fundamental requirement of due process is the opportunity to be heard

6   'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S.

7   319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). A capital

8   sentencing "must satisfy the requirements of the Due Process Clause," *Gardner v.*

9   *Florida*, 430 U.S. 349, 358 (1977) (plurality opinion), and capital defendants retain

10  a liberty interest in life even after conviction and sentence, *see Ohio Adult Parole*

11  *Auth. v. Woodard*, 523 U.S. 272, 288 (1998) (O'Connor, J., concurring in part and

12  concurring in the judgment, joined by Souter, J., Ginsburg, J., and Breyer, J.); *id.* at

13  290–91 (Stevens, J., concurring in part and dissenting in part). In accordance with

14  these principles and the heightened reliability requirement for the death penalty, if

15  a defendant's circumstances change significantly between the time when his death

16  sentence is imposed and the time when it will be carried out, due process requires

17  that the propriety of the sentence be re-evaluated in light of the changed

18  circumstances and characteristics of the defendant. *See Kelly v. Brewer*, 525 F.2d

19  394, 399–400 (8th Cir. 1975) (finding due process required meaningful periodic

20  reviews of inmates in segregation to determine if segregation is still appropriate).

21      The Court should consider whether a capital sentence is still appropriate for

22  Kiles. Since Kiles was sentenced in 2006, he has been successfully incarcerated,

23  and he has demonstrated that he is non-violent in a structured prison setting.

24  Moreover, he has been a model of good behavior. *See State v. Watson*, 628 P.2d

25  943, 945 (Ariz. 1981) (setting aside death sentence in part because of defendant's

26  good conduct while in prison); *State v. Richmond*, 886 P.2d 1329, 1336–37 (Ariz.

27  1994) (reducing death sentence to life imprisonment in part because of defendant's

28  changed character), *abrogated on other grounds by State v. Mata*, 916 P.2d 1035

468

1    (Ariz. 1996).

2         Recently, Arizona made significant changes to the housing of death-row
3    prisoners; these changes diminish the differences between the incarceration
4    conditions of those sentenced to life without the possibility of parole and those
5    sentenced to death. *See generally* Gabriella Robles, Condemned to Death—And
6    Solitary Confinement, The Marshall Project (July 23, 2017), https://www.
7    themarshallproject.org/2017/07/23/condemned-to-death-and-solitary-confinement
8    (explaining policy change allowing death-row prisoners with suitable disciplinary
9    records to be housed in lower-security settings). Under the old rules, death-row
10   prisoners were automatically classified as maximum security and kept in solitary
11   confinement. New rules permit death-row prisoners who do not pose a security
12   threat to be kept in lower-security settings with more out-of-cell time, contact visits
13   with family and legal counsel, outdoor group recreation, and the opportunity to
14   work or take education courses. In recognition of Kiles's consistently good
15   behavior on death row, Kiles was granted close-custody status and moved to the
16   lower-security facility. He continues to do well in this setting.

17        In addition, since his reclassification, the Arizona Department of Corrections
18   has entrusted Kiles to be an aide for another prisoner constrained by disability
19   issues. Kiles assists the prisoner with reading and writing, cleans his cell for him,
20   and ensures that he is able to participate in activities. Kiles has therefore contributed
21   to smooth functioning of the prison and to the well-being of the prison community.

22        Kiles is now approaching 60 years of age. He is not the same person who was
23   sentenced to death in 2006 and certainly not the same person he was when first
24   sentenced to death in 1990. He has not committed any violence in this setting, is
25   unlikely to do so in the future, and should be able to continue being of assistance to
26   others, especially given that he is incarcerated with an aging population
27   increasingly in need of such aid. Due process dictates that Kiles have the
28   appropriateness of his death sentence re-evaluated in light of the changes that have

1    occurred since he was sentenced. At an evidentiary hearing, Kiles will demonstrate

2    that these changes are significant and that they change the calculus of whether his

3    death sentence is an appropriate punishment. Accordingly, Kiles is entitled to relief.

4                                    **Claim Thirty-Six**

5    **Executing Kiles is unconstitutional because he has a serious mental**

6    **illness.**

7        Because Kiles has a serious mental illness, his sentence of death violates the

8    Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution. Kiles

9    incorporates by specific reference all facts, allegations, and arguments made

10   elsewhere in this Petition.

11       This claim was not raised in state court. Kiles alleges he can overcome any

12   default of this claim by showing that it was caused by the ineffective assistance of

13   appellate and state post-conviction counsel and that he was prejudiced by the

14   default. *See Martinez*, 566 U.S. at 9; *Carpenter*, 529 U.S. at 453; *but see Davila*,

15   137 S. Ct. at 2058. Kiles will demonstrate at an evidentiary hearing that appellate

16   and post-conviction counsel's performance fell below the standards of minimally

17   competent capital attorneys and that their failures prejudiced him. Alternatively, he

18   alleges that any procedural bar is neither adequate nor independent and that

19   imposing default would be a miscarriage of justice. Because this claim has not been

20   adjudicated on the merits by the Arizona state courts, the barrier to relief imposed

21   by 28 U.S.C. § 2254(d) does not apply, and the Court may consider the merits of

22   the claim de novo.

23       Kiles suffers from serious mental illness. Though experts differed on their

24   specific diagnoses at his trial, they all agreed that Kiles suffered from serious mental

25   illness. (*See* Tr. May 22, 2006 at 32–34 (counsel listing in closing the experts'

26   various mental-illness diagnoses).) Additional experts hired in state post-conviction

27   proceedings similarly found that Kiles was mentally ill. (*See* ROA 1189 at 60.) As

28   a result of Kiles's serious mental illness discussed throughout this Petition, he

                                         470

suffered substantial impairment of his ability to appreciate and understand the actions of others, to act rationally, to make fully reasoned decisions, and to otherwise conform his conduct to the requirements of the law and societal norms. The imposition of the death penalty on an individual like Kiles, who suffers from mental illness that limits his ability to modulate or control his behavior, violates his right to be free from cruel and unusual punishment, and his rights to a fair trial, due process, equal protection, and punishment that is not arbitrarily, wantonly, and capriciously imposed, as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments.

The Eighth Amendment precludes the imposition of punishments that are "cruel and unusual," as assessed according to the "evolving standards of decency that mark the progress of a maturing society." *Trop*, 356 U.S. at 100, 101. "The Eighth Amendment 'is not fastened to the obsolete but may acquire meaning as public opinion becomes enlightened by a humane justice.'" *Hall v. Florida*, 134 S. Ct. 1986, 1992 (2014) (quoting *Weems v. United States*, 217 U.S. 349, 378 (1910)). The evolving standards of decency embodied in the Eighth and Fourteenth Amendments demand that the imposition of the death penalty on seriously mentally ill defendants be recognized as unconstitutional.

Whether someone is constitutionally eligible for the death penalty under the Eighth Amendment turns on whether he is sufficiently "culpable" to deserve such a penalty. *See, e.g.*, *Tison v. Arizona*, 481 U.S. 137, 149 (1987); *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring). Personal culpability hinges upon a defendant's ability to make fully reasoned decisions and conform his behavior to societal norms. *Thompson v. Oklahoma*, 487 U.S. 815, 835 (1988) (plurality opinion). Moreover, in order for the death penalty to be constitutional, it must serve either the goal of retribution or that of deterrence of capital crimes; when it does not, "it 'is nothing more than the purposeless and needless imposition of pain and suffering,' and hence an unconstitutional punishment." *Enmund v.*

471

*Florida*, 458 U.S. 782, 798 (1982) (quoting *Coker v. Georgia*, 433 U.S. 584, 592 (1977) (plurality opinion)). Based on these considerations, in *Atkins*, 536 U.S. at 304, *Simmons*, 543 U.S. at 551, and *Ford v. Wainwright*, 477 U.S. 399 (1986), the Supreme Court ruled categorically unconstitutional the execution of, respectively, intellectually disabled individuals, juveniles, and those who are incompetent.

The reasoning underlying *Atkins* and *Simmons*, in particular, applies with equal force to a person who suffers from serious mental illness like Kiles. Those who are seriously mentally ill are defined by characteristics that diminish their culpability in precisely the ways the Supreme Court has relied on in establishing the categorical exemptions in *Atkins* and *Simmons*. "The diminished capacity of the intellectually disabled lessens moral culpability and hence the retributive value of the punishment." *Hall*, 134 S. Ct. at 1993. For example, in *Atkins*, one cited characteristic that decreased the culpability of people with intellectual disability was "significant limitations in adaptive skills such as communication, self-care, and self-direction." 536 U.S. at 318. Serious mental illness similarly results in extreme functional impairments and limitations in adaptive behavior. *See* Helen Shin, Note, *Is the Death of the Death Penalty Near? The Impact of* Atkins *and* Roper *on the Future of Capital Punishment for Mentally Ill Defendants*, 76 Fordham L. Rev. 465, 488 (2007). The *Atkins* Court also focused on the cognitive deficiencies suffered by the intellectually disabled. *Atkins*, 536 U.S. at 320. Mentally ill individuals typically experience disorganized thinking and "deficits in sustaining attention and concentration." *Indiana v. Edwards*, 544 U.S. 164, 176 (2008). The nature of the impairments relied on in *Atkins* and *Simmons* as indicators of lessened culpability are directly analogous to the impairments suffered by the seriously mentally ill.

Moreover, in holding the death penalty unconstitutional for juveniles, the Supreme Court reasoned that the limitations of juveniles make them less likely to engage in the "cost-benefit analysis that attaches any weight to the possibility of execution." *Simmons*, 543 U.S. at 571–72 (quoting *Thompson*, 487 U.S. at 837).

472

1    The same is true of those with serious mental illness. They suffer from directly
2    comparable deficits in cognitive and adaptive functioning, thus the distant
3    possibility of execution does not act as an effective deterrent. Any decision-making
4    process is infected by the deficits in perception that are characteristic of serious
5    mental illness; in short, "[c]ertainly no one believes that the death penalty can deter
6    people from becoming psychotic." Amnesty Int'l, *United States of America: The*
7    *Execution of Mentally Ill Offenders* 50, Al Index AMR 51/003/2006 (Jan. 2006),
8    www.amnesty.org/en/documents/AMR51/003/2006/en/.

9         A person who is seriously mentally ill is also likely to have his or her rights
10   to a fair trial and to the effective assistance of counsel compromised by illness. The
11   Supreme Court has reasoned that the intellectually disabled face "a special risk of
12   wrongful execution" because they are more likely to give false confessions, are
13   often poor witnesses, and are less able to give meaningful assistance to their
14   counsel. *Hall*, 134 S. Ct. at 1993 (quoting *Atkins*, 536 U.S. at 320–21). The same is
15   true of those with serious mental illness. *See, e.g.*, Brandon L. Garrett, *The*
16   *Substance of False Confessions*, 62 Stan. L. Rev. 1051, 1067 (2010) ("[P]olice have
17   long known that suspects may admit to crimes that they did not commit for a range
18   of reasons, including mental illness.").

19        Finally, both legal and professional mental-health organizations have
20   expressed their opposition to the execution of the seriously mentally ill. The ABA
21   and most major mental health professional associations in the United States
22   recognize that executing mentally ill persons serves no penological purpose, and
23   advocate an end to executing mentally ill offenders. *See, e.g.*, ABA, Death Penalty
24   Representation Project, Mental Illness Resolution (2006), www.americanbar.org/
25   groups/committees/death_penalty_representation/resources/dp-policy/mental-illne
26   ss-2006.html;   Am.   Psychiatric   Ass'n   Position   Statement,   *Diminished*
27   *Responsibility in Capital Sentencing* (2004).

28        The imposition of the death penalty on the seriously mentally ill, like its

1  imposition on the intellectually disabled, juveniles, and incompetent, does not
2  further either retribution or deterrence. It amounts to the infliction of gratuitous
3  suffering. As executing Kiles, who is seriously mentally ill, serves no cognizable
4  penological end, Kiles's sentence is unconstitutional, and he is entitled to relief.

**Claim Thirty-Seven**

**Subjecting Kiles to execution in Arizona will deny his fundamental human rights under binding international law norms.**

8   The death penalty as carried out in Arizona denies Kiles's fundamental
9  human rights under international law and thereby violates the Eighth Amendment
10  to the U.S. Constitution. Kiles incorporates by specific reference all facts,
11  allegations, and arguments made elsewhere in this Petition.

12   This claim was not raised in state court. Kiles alleges he can overcome any
13  default of this claim by showing cause and prejudice, including because of the
14  ineffective assistance of appellate and state post-conviction counsel. *See Martinez*,
15  566 U.S. at 9; *Carpenter*, 529 U.S. at 453; *Strickland*, 466 U.S. at 687–88; *but see*
16  *Davila*, 137 S. Ct. at 2058. Appellate and post-conviction counsel's performance
17  fell below the standards of minimally competent capital attorneys and prejudiced
18  Kiles; alternatively, any procedural bar is neither adequate nor independent, and
19  imposing default would be a miscarriage of justice.[205] As this claim has not been

---

[205] Procedural default and other bars to this claim are themselves a violation of international law in a capital case. *See Germany v. United States*, 2001 I.C.J. 466 (2001); *Mexico v. United States*, 2004 I.C.J. 12 (2004); IACHR, Report No. 78/15, Case 12.831. Merits (Publication). Kevin Cooper. United States. Oct. 28, 2015, at ¶ 125. AEDPA and the doctrines of exhaustion and procedural default restrict safeguards that ensure Kiles a full and effective review of his trial and sentence, bringing the United States in violation of its obligations under the International Covenant on Civil and Political Rights ["ICCPR"], adopted Dec. 19, 1966, 999 U.N.T.S. 171 (entered into force Mar. 23, 1976). Under Article 6, "Every human being has the inherent right to life. This right shall be protected by law. No one shall be arbitrarily deprived of his life." Per the Safeguards Guaranteeing Protections of the Rights of those Facing the Death Penalty, the United Nations council clarified: "Capital punishment may only be carried out . . . after legal process which gives all possible safeguards to ensure a fair trial[.]" E.S.C. Res. 1948/50, U.N. ESCOR,

1   adjudicated on the merits, the limitations on relief imposed by 28 U.S.C. § 2254(d)

2   do not apply to this Court's review, and the Court may consider the merits of the

3   claim de novo.

4        First, Kiles's prolonged stay on death row violates his basic human rights as

5   guaranteed under international law. Kiles was first sentenced to death in 1990 (*see*

6   ROA 174 at 3–5); he has remained in prison since that time and has been on death

7   row for approximately twenty years (*see* ROA 345 at 1; ROA 924 at 3–4). The

8   Inter-American human-rights system has previously found that keeping those

9   sentenced to death on death row for a significant amount of time amounts to a denial

10  of an individual's human rights. In *Hilaire, Constantine and Benjamin et al. v.*

11  *Trinidad and Tobago*, Judgment of June 21, 2002. (Ser. C) No. 94, ¶ 170, the Inter-

12  American Court of Human Rights found that the harsh conditions on death row over

13  extended periods "impinge[d] on the [prisoners'] physical and psychological

14  integrity and therefore constitute[d] cruel, inhuman and degrading treatment." The

15  European Court of Human Rights has held similarly, finding that "the

16  foreknowledge of death at the hands of the State must inevitably give rise to intense

17  psychological suffering." Detaining prisoners on death row for extended periods

18  thus violates Article 3 of the European Charter of Human Rights, "which prohibits

19  torture and inhumane or degrading treatment or punishment." *Al-Saadoon and*

20  *Mufdhi v. United Kingdom*, App. No. 61498/08, Eur. Ct. H.R., ¶ 137 (Apr. 10,

21  2010).

22        Other nations that retain the death penalty have limited the time a prisoner

23  can remain on death row before such detention violates a prisoner's human rights.

24  In Uganda, for example, it is three years on death row after the sentence is finalized;

25

26  Supp. No. 1, at 33, U.N. Doc. E/1984/92, 5 (1984). Additionally, "'arbitrariness' is
    not to be equated with 'against the law', but must be interpreted more broadly to

27  include elements of inappropriateness, injustice and lack of predictability." U.N.
    Doc. CCPR/C/39/D/305/1988, Hugo van Alphen v. the Netherlands, adopted 23

28  July 1990.

in Zimbabwe, it is four and one-half years. *See Supreme Court of Uganda in Attorney General v. Susan Kigula and 417 others* (Constitutional Appeal No. 3 of 2006), 2009 (holding that it is unconstitutional to execute a prisoner who has spent over three years on death row after his sentence is final); Judgment of the Supreme Court of Zimbabwe of June 24, 1993 in Catholic Commissioner for Justice and Peace in *Zimbabwe v. Attorney General* (4) SA 239 (ZS). Kiles has been either on death row or facing capital charges for nearly 30 years, a clear violation of his human rights as protected by international law.

Second, the death penalty as carried out in Arizona is a per se violation of international law norms. Subjecting Kiles to death by lethal injection or lethal gas is nonconsensual human experimentation and a grave violation of the customary international law norms as originally set out in the Nuremberg Code.[206] *See, e.g.*, Ben Crair, *Lethal Entanglements*, The New Republic (May 20, 2015), https:// newrepublic.com/article/121845/lethal-injection-has-become-testing-ground-toxic -drugs (reporting that Arizona executed death-row prisoner with an illegal drug). The Commentary to the Geneva Convention Relative to the Protection of Civilian Persons in Time of War makes explicit that medical experimentation must be consensual, and "[p]rotected persons must not in any circumstances be used as 'guinea pigs' for medical experiments." Commentary on the Geneva Conventions of 12 August 1949: IV Geneva Convention Relative to the Protection of Civilian Persons in Time of War 224 (Oscar Uhler and Henri Coursier eds., 1958). Under United States law, "protected persons" include those in vulnerable positions, such as prisoners. *Cf.* 45 C.F.R. § 46.302; 43 Fed. Reg. 53652 (Nov. 16, 1978).

Nonconsensual human experimentation is prohibited by a wide range of treaties and agreements, as well as by customary international law. *See generally*

---

[206] In Arizona, death sentences are inflicted by lethal injection. *See* A.R.S. Const. art. 22 § 22. Because, however, Kiles's crime predated the adoption of that constitutional provision, Kiles will have the choice between lethal injection and lethal gas. *See id.*

*Abdullahi v. Pfizer*, 562 F.3d 163 (2d Cir. 2009). Article 7 of the ICCPR reads, "No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment. In particular, no one shall be subjected without his free consent to medical or scientific experimentation." 999 U.N.T.S. 171.[207] Arizona is currently under a stipulated agreement to not utilize a specific lethal-injection method in executions. *See* Order for Dismissal of Claim One, *First Amendment Coal. of Ariz. v. Ryan*, No. 2:14-CV-01447-NVW (D. Ariz. Dec. 22, 2016), ECF No. 155; Order for Dismissal of Claims Six and Seven, *First Amendment Coal. of Ariz. v. Ryan*, No. 2:14-CV-01447-NVW (D. Ariz. June 22, 2017), ECF No. 187. However, nothing is preventing the State from moving forward under a new, untested execution protocol. This puts Kiles at risk of being subject not only to nonconsensual human experimentation, but also to torture, should the experimental method not proceed as the State intends. *See Filártiga v. Peña-Irala*, 630 F.2d 876, 884 (2d Cir. 1980) ("[W]e conclude that official torture is now prohibited by the law of nations. The prohibition is clear and unambiguous.").

As early as 1900, the Supreme Court recognized that "[i]nternational law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction, as often as questions of right depending upon it are duly presented for their determination." *The Paquete Habana*, 175 U.S. 677, 700 (1900). International legal norms have binding effect where it is "accepted and recognized by the international community of states as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character." *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 714 (9th Cir. 1992). Pursuant to binding international law norms, (1) the constraints imposed by AEDPA on habeas

---

[207] The treaty makes clear that this right is non-derogable; even those who have been convicted of crimes may not be stripped of this right and involuntarily experimented upon by the State.

1    proceedings, *see* Section VI, *supra*, (2) the prolonged period of time a person
2    spends on death row, and (3) the experimental and nonconsensual nature of
3    executions violate basic human rights. Accordingly, the death penalty, as applied
4    in Arizona, violates the Eighth and Fourteenth Amendments to the U.S.
5    Constitution.

6         Further, the Supreme Court has explained that the Eighth Amendment's
7    prohibition on cruel and unusual punishments takes into account "the evolving
8    standards of decency" as reflected, in part, by international legal norms. *Simmons*,
9    543 U.S. at 560–61; *id*. at 575 ("[A]t least from the time of the Court's decision in
10   *Trop* [356 U.S. at 86], the Court has referred to the laws of other countries and to
11   international authorities as instructive for its interpretation of the Eighth
12   Amendment's prohibition of 'cruel and unusual punishments.'"). While the
13   international community has largely evolved away from capital punishment,
14   Arizona has remained committed to this irrevocable sanction—and has become an
15   outlier in a world that regards the death penalty as a violation of fundamental human
16   rights. Amnesty International, Global Report: Death Sentences and Executions
17   2017 5 (Apr. 2018), https://www.amnesty.org/download/Documents/ACT
18   5079552018ENGLISH.PDF (reporting that by the end of 2017, "106 countries had
19   abolished the death penalty in law for all crimes and 142 countries had abolished
20   the death penalty in law or practice," while "[o]nly an isolated minority of countries
21   continue to resort to executions").

22        Because the U.S. Constitution specifies that states are bound by international
23   treaties, *see* U.S. Const. art. VI, cl. 2, and because the constitutionality of Arizona's
24   death penalty must be measured against the "evolving standards of decency that
25   mark the progress of a maturing society," *Trop*, 356 U.S. at 101, Kiles's sentence
26   is unconstitutional. He is entitled to relief.

27
28

478

**Claim Thirty-Eight**

**Kiles will be unable to receive a fair clemency process in Arizona.**

Kiles will be denied a fair clemency process, in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution. Kiles incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Kiles has not yet presented this claim to the state courts, as his opportunity to seek executive clemency has not yet become ripe. He presents this claim now in order to avoid difficulties with raising this claim in future habeas proceedings. *See Stewart v. Martinez-Villareal*, 523 U.S. 637, 643–46 (1998).

Under Arizona law, Kiles has the right to seek executive clemency before execution. *See* Ariz. Const. art. V, § 5; A.R.S. §§ 31-401–31-403 (2016). Clemency is, in effect, part of the constitutional scheme that ensures the reliability of criminal convictions and the propriety of sentences. *See Herrera v. Collins*, 506 U.S. 390, 415 (1993). Accordingly, Kiles has a due-process liberty interest in the impartiality of the system by which clemency may be afforded to him. *See generally Mathews v. Eldridge*, 424 U.S. 319 (1976).

Contrary to the dictates of due process, Kiles's clemency proceedings will not be impartial. Arizona's Board of Executive Clemency ("the Board") consists of five members appointed by the Governor, who also designates the Board's chairman. A.R.S. § 31-401(A), (F). The Governor can remove Board members for cause. *Id.* § 31-401(E). Pursuant to statute, the Attorney General's Office, which advocated for Kiles's death at trial, on appeal, and in state post-conviction proceedings, is involved with training Board members regarding their duties. *Id.* § 31-401(C). On information and belief, Kiles asserts that both the selection process for members of the Board and the conflicting roles of the Attorney General's Office—as his litigation adversary and as the office that trains the arbiters of clemency—will work to deprive him of a fair clemency proceeding. *See Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S.

479

1   602, 617–18 (1993) (declaring that due process demands a neutral arbiter). Without
2   judicial review of the bias inherent in the clemency process, Kiles will not have an
3   opportunity to vindicate his right to a fair and impartial clemency proceeding. For
4   these reasons, Arizona's clemency procedures do not comport with the procedural
5   due-process protections guaranteed to Kiles by the Eighth and Fourteenth
6   Amendments to the U.S. Constitution, and he is entitled to relief.

7                                 **Claim Thirty-Nine**

8   **Kiles's convictions and sentences must be vacated because of the**
    **cumulative prejudicial effect of all of the errors in this case.**
9

10      The cumulative prejudice of the constitutional errors in Kiles's case demands
11  that his convictions and sentences be vacated under the Fifth, Sixth, Eighth, and
12  Fourteenth Amendments to the U.S. Constitution. Kiles incorporates by specific
13  reference all facts, allegations, and arguments made elsewhere in this Petition. He
14  also re-urges and incorporates by specific reference all objections, arguments, and
15  claims of error made at trial, on appeal, and during post-conviction proceedings.

16      Kiles presented this claim below. (*See* ROA 1189 at 23, 25, 61; PFR2 Dkt. 1
17  at 23, 25, 61.) If the state court is deemed to have adjudicated this claim on the
18  merits, the denial of this claim (1) was contrary to, or involved an unreasonable
19  application of, clearly established federal law, and (2) was based on an
20  unreasonable determination of the facts. 28 U.S.C. § 2254(d). Should this Court
21  consider this claim defaulted, Kiles alleges he can overcome any default of this
22  claim by showing cause and prejudice, including because of the ineffective
23  assistance of appellate and state post-conviction counsel. *See Martinez*, 566 U.S. at
24  9; *Carpenter*, 529 U.S. at 453; *Strickland*, 466 U.S. at 687–88; *but see Davila*, 137
25  S. Ct. at 2058. Alternatively, any procedural bar is neither adequate nor
26  independent, and imposing default would be a miscarriage of justice. If this claim
27  was not adjudicated on the merits below, the limitations on relief imposed by 28
28  U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider

                                    480

1    the merits of the claim de novo.

2          The combination of errors in this case, discussed in the preceding claims,

3    deprived Kiles of such rights as his rights to a fair trial, trial by impartial jury, equal

4    protection, due process, effective assistance of counsel, freedom from cruel and

5    unusual punishment, presentation of a complete defense, confrontation, a reliable

6    determination at both the guilt and penalty phases, and fundamental fairness. Even

7    if the errors are deemed harmless when viewed individually, their cumulative effect

8    substantially prejudiced Kiles and undermined the fairness and reliability of his

9    proceedings.

10         Even in cases where no single trial error examined on its own is sufficiently

11   prejudicial to warrant reversal, the cumulative effect of multiple errors may still

12   prejudice a defendant. *See, e.g.*, *Parle v. Runnels*, 505 F.3d 922, 934 (9th Cir. 2007)

13   (affirming grant of habeas relief based on the cumulative prejudicial effect of

14   multiple errors); *Alcala v. Woodford*, 334 F.3d 862, 894–95 (9th Cir. 2003) (same);

15   *Duckett v. Mullin*, 306 F.3d 982, 992 (10th Cir. 2002) ("[T]he 'cumulative effect of

16   two or more individually harmless errors has the potential to prejudice a defendant

17   to the same extent as a single reversible error.'" (quoting *United States v. Rivera*,

18   900 F.2d 1462, 1469 (10th Cir. 1990))). When evaluating cumulative error, while

19   only guilt-phase errors are relevant to Kiles's convictions, "all errors are relevant

20   to the sentence." *Darks v. Mullin*, 327 F.3d 1001, 1018 (10th Cir. 2003); *see also*

21   *Satterwhite v. Texas*, 486 U.S. 249, 261 (1988) (Marshall, J., concurring).

22         In this case, as a result of the cumulative effect of the errors in the guilt and

23   penalty phases, Kiles's convictions and sentences were unlawfully and

24   unconstitutionally imposed. The aggregate harm of these constitutional violations

25   warrants granting this petition without any determination of whether these

26   violations substantially affected or influenced the jury's verdict. *See Brecht*, 507

27   U.S. at 638 n.9. Further, these constitutional violations so infected the integrity of

28   the proceedings that the errors cannot be deemed harmless, and they did in fact have

481

a substantial and injurious effect on the guilt and penalty judgments. Considering all the errors above, this Court should conclude that Kiles was denied fair and reliable proceedings and grant him habeas relief.

**PRAYER FOR RELIEF**

WHEREFORE, Kiles respectfully prays this Court to do the following:

1.    Order that Kiles be granted leave to conduct discovery pursuant to Rule 6 of the Rules Governing Section 2254 Cases and permit him to use the processes of discovery set forth in Federal Rules of Civil Procedure 26 through 37, to the extent necessary to fully develop and identify the facts supporting his Petition and any defenses thereto raised by Respondents' answer;

2.    Order that upon completion of discovery, Kiles be granted leave to amend his Petition to include any additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the course of discovery, and that Kiles be granted leave to expand the record pursuant to Rule 7 of the Rules Governing Section 2254 Cases to include additional materials related to the Petition;

3.    Grant an evidentiary hearing pursuant to Rule 8 of the Rules Governing Section 2254 Cases, at which proof may be offered concerning the allegations set forth in this Petition;

4.    Issue a writ of habeas corpus to have Kiles brought before this Court, to the end that he may be discharged from his unconstitutional confinement and restraint;

5.    In the alternative to the relief requested in Paragraph 4, if this Court should deny the relief as requested in Paragraph 4, issue a writ of habeas corpus to have Kiles brought before this Court to the end that he may be relieved of his unconstitutional sentences; and

6.    Grant such other relief as may be appropriate and dispose of the matter as law and justice require.

1

Respectfully submitted this 26th day of September, 2018.

2

3                                    Jon M. Sands
                                     Federal Public Defender
4                                    District of Arizona

5
                                     Mridula S. Raman
6                                    Sara Chimene-Weiss

7

8

9                                    By  s/Mridula S. Raman
                                     Counsel for Petitioner
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

483

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Certificate of Service**

I hereby certify that on September 26, 2018, I electronically filed the foregoing Petition for Writ of Habeas Corpus with the Clerk's Office by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ Catherine Jacobs
Assistant Paralegal
Capital Habeas Unit

484