1   Jon M. Sands
2   Federal Public Defender
    District of Arizona
3   Mridula S. Raman (NY No. 5103528)
    Sara Chimene-Weiss (MA No. 691394)
4   Assistant Federal Public Defenders
5   850 West Adams Street, Suite 201
    Phoenix, Arizona 85007
6   mridula_raman@fd.org
7   sara_chimene-weiss@fd.org
    602.382.2816 Telephone
8   602.889.3960 Facsimile
9   *Counsel for Petitioner*

10          **IN THE UNITED STATES DISTRICT COURT**
11
            **FOR THE DISTRICT OF ARIZONA**
12

13   Alvie Copeland Kiles,                No. CV-17-04092-PHX-GMS

14                  Petitioner,

15   vs.                                  DEATH-PENALTY CASE

16   Charles L. Ryan, et al.,

17                  Respondents.

18

19

20        **AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

21                     **28 U.S.C. § 2254**

22

23

24

25

26

27

28

1

**Table of Contents**

2    I.     INTRODUCTION .................................................................................. 1

3    II.    BACKGROUND ................................................................................... 1

4           A.    Factual History. .................................................................... 1

            B.    Procedural History............................................................... 6

5    III.   STATE COURT PRESUMPTION OF CORRECTNESS......................... 12

6    IV.    PROCEDURAL STATUS OF CLAIMS AND EXHAUSTION ............... 13

7    V.     RIGHT TO AMEND ........................................................................... 14

8    VI.    AEDPA IS UNCONSTITUTIONAL...................................................... 15

9           A.    AEDPA unconstitutionally suspends the writ of habeas corpus....... 15

            B.    AEDPA violates the separation-of-powers doctrine......................... 16

10          C.    Conclusion. ........................................................................ 17

11   **Claim One** ................................................................................................ 18

12   Representation at trial was so marred by conflicts, misrepresentations, and

13   procedural violations that Kiles was denied effective counsel and fair and
     reliable capital proceedings........................................................................ 18

14          A.    Kiles received ineffective assistance of counsel from the start. ....... 18

15          B.    Lead  counsel's  lack  of  qualifications  and  affirmative
                  misrepresentations of those qualifications deprived Kiles of his

16                right to due process and qualified counsel. ....................................... 43

17          C.    Kiles's counsel were ineffective due to a conflict of interest,
                  denying  Kiles  his  right  to  competent  and  un-conflicted

18                representation. .................................................................... 49

19          D.    The irreparably fractured relationship between Kiles and Clark
                  adversely affected the representation Kiles received....................... 51

20
            E.    The  contract  structure  under  which  Kiles's  counsel  were
21                appointed created a financial conflict of interest. ............................ 53

22          F.    The state post-conviction court's decision that Kiles failed to state
                  a colorable claim for relief was unreasonable and does not bar

23                relief................................................................................ 58

24          G.    Taken individually and together, these conflicts plaguing counsel,
                  following from an initial denial of a liberty interest, resulted in a

25                conviction and sentencing that cannot withstand constitutional

26                scrutiny. ............................................................................ 59

     **Claim Two**................................................................................................ 60
27
     Counsel's ineffective assistance in jury selection at the guilt-phase proceedings
28   deprived Kiles of his rights to counsel, a fair trial, an impartial jury, due

process, and equal protection. ................................................................. 60

    A.    A defendant has a Sixth Amendment right to the effective assistance of counsel during voir dire. ............................................... 60

    B.    Counsel were deficient in failing to adequately or meaningfully question prospective jurors to ensure a fair and impartial jury, thereby prejudicing Kiles. ................................................................. 62

    C.    Counsel failed to challenge the denial of a fair cross-section of the community in the venire. ................................................................. 71

    D.    Counsel failed to make a record as to the reasons underlying the removal of many prospective jurors. ................................................. 72

**Claim Three** ........................................................................................... 73

Kiles was denied effective assistance of counsel at his guilt-phase proceedings because counsel failed to investigate, develop, and present critical evidence, among other significant errors. .......................................................... 73

    A.    Background on guilt-phase proceedings. .......................................... 74

    B.    A defendant has a Sixth Amendment right to the effective assistance of counsel at guilt-phase proceedings. ............................. 81

    C.    Trial counsel were ineffective for failing because of their constitutionally inadequate investigation to present a reasonable defense for the death of Gunnel. ......................................................... 83

    D.    Counsel were ineffective for failing to object to Kiles's shackling. ........................................................................................ 116

    E.    Counsel rendered ineffective assistance during the defense's opening statement. ......................................................................... 118

    F.    Counsel were ineffective for failing to effectively cross-examine crucial State's witnesses on matters relating to whether Gunnel's death was premeditated. ................................................................. 120

    G.    Counsel were ineffective for stipulating to the admission of hearsay statements from Gunnel at the guilt-phase proceedings. ... 124

    H.    Counsel were ineffective for failing to object to the worst of the gruesome photographs repeatedly displayed at trial. ...................... 127

    I.    Counsel rendered ineffective assistance by failing to request critical jury instructions. ................................................................. 129

    J.    Counsel provided ineffective assistance when they failed to object to numerous aspects of the State's closing argument. ..................... 132

    K.    Counsel also rendered ineffective assistance in failing to ensure that a record was made of key parts of the guilt-phase proceedings. ................................................................................... 137

    L.    Counsel's numerous errors, individually and cumulatively,

undermined the reliability of Kiles's guilt-phase proceedings. ...... 138

M.   The state post-conviction court's decision that Kiles failed to state a colorable claim is no bar to this Court's de novo review of this claim. ............................................................................................ 139

N.   Conclusion. ................................................................................ 143

**Claim Four** ................................................................................................ 143

Counsel's ineffective assistance in jury selection at the penalty phase of trial deprived Kiles of his rights to counsel, a fair trial, an impartial jury, reliable sentencing proceedings, due process, and equal protection. ................................. 143

A.   Despite having won the right to question prospective jurors on specific types of mitigation, counsel failed to do so, thereby prejudicing Kiles. ........................................................................... 146

B.   Counsel deficiently failed to question a number of seated jurors about their pro-death sentence biases, thereby prejudicing Kiles... 149

C.   Counsel deficiently altogether failed to question eight seated jurors, thereby prejudicing Kiles. .................................................. 151

D.   Counsel failed to question adequately and to challenge for cause jurors with biases, forcing counsel to use peremptory strikes. ....... 152

E.   Counsel failed to rehabilitate prospective jurors who expressed discomfort with the death penalty but who still could have properly served. ............................................................................. 154

F.   Counsel failed to challenge the prosecutor's discriminatory use of peremptory strikes to exclude an African-American prospective juror. .......................................................................................... 156

G.   Counsel failed to challenge the denial of a fair cross-section of the community in the venire. ............................................................. 159

H.   Counsel failed to make a record as to the reasons underlying the removal of many prospective jurors. ............................................. 160

**Claim Five** ................................................................................................ 161

Kiles was denied effective assistance of counsel at his aggravation-phase proceedings because counsel failed to adequately challenge the alleged aggravating circumstances and otherwise defend against a death sentence. ........ 161

A.   Background on aggravation-phase proceedings. ............................ 161

B.   Trial counsel has a duty to make every effort to avoid a death sentence, including by investigating and contesting the aggravating circumstances alleged against Kiles. ............................ 167

C.   Counsel were ineffective for failing to effectively challenge the (F)(2) aggravating circumstance, especially as Kiles's prior aggravated assault conviction was an invalid basis for that circumstance. ................................................................................ 168

D.    Counsel were ineffective for failing to investigate and adequately challenge the (F)(6) "especially heinous, cruel or depraved" aggravating circumstance. ............................................. 176

E.    Counsel performed deficiently and prejudiced Kiles by failing to frontload mitigation at the aggravation phase. ............................... 185

F.    Counsel were ineffective for failing to properly object to Kiles's restraints. ........................................................ 188

G.    Counsel were ineffective for failing to object to, or to request a curative instruction for, the prosecutor's misconduct in opening and closing statements. ............................................... 189

H.    Counsel were ineffective for failing to object to the trial court's erroneous instruction defining reasonable doubt. ........................... 192

I.    Counsel were ineffective for failing to ensure that a complete record was made of aggravation-phase proceedings. ...................... 193

J.    Counsel's numerous errors, individually and cumulatively, undermined the reliability of Kiles's aggravation phase. .............. 193

K.    The state post-conviction court's decision that Kiles did not state a colorable claim is no bar to this Court's de novo review of this claim. ........................................................ 195

L.    Conclusion. ................................................ 196

**Claim Six** ................................................................ 197

Kiles was denied effective assistance of counsel at his mitigation phase when his counsel failed to investigate and present powerful mitigating evidence, among other significant errors. .............................................. 197

A.    A capital defendant must receive an individualized sentencing after a full and fair consideration by the jury. ............................... 197

B.    Kiles's personal history. ................................... 198

C.    A defendant's right to a full mitigation investigation and presentation necessitates effective counsel at the mitigation phase. ........................................................ 213

D.    Lead counsel's derogation of his duties and the resulting team dysfunction led to a deficient mitigation investigation and inadequate presentation. ........................................ 215

E.    Trial counsel were ineffective for failing to reasonably investigate, develop, and present important mitigation evidence. ... 222

F.    Counsel provided ineffective assistance in failing to request a special verdict form listing which mitigating circumstances the jury found proven. ........................................... 270

G.    Counsel were ineffective in failing to object to juror questionnaires and jury instructions that primed the jury to find

iv

that death was the appropriate sentence. ........................................ 271

    H.    The cumulative effect of trial counsel's many instances of deficient performance deprived Kiles of his right to counsel at the mitigation phase and resulted in an unreliable sentencing proceeding. ................................................................................... 274

    I.    The state post-conviction court's decision that Kiles did not state a colorable claim is no bar to this Court's de novo review of this claim. .................................................................................................. 275

    J.    Conclusion .................................................................................... 277

**Claim Seven** .............................................................................................. 277

The trial court's numerous errors during the guilt phase of trial violated Kiles's constitutional rights. ............................................................................................. 277

    A.    The trial court erred by not appointing qualified, un-conflicted counsel, violating Kiles's rights under the Sixth and Fourteenth Amendments. ................................................................................. 277

    B.    The trial court denied Kiles a fair trial by denying his motion for a change of venue. ........................................................................ 281

    C.    The trial court erred by not dismissing the venire after a highly prejudicial statement poisoned the jury pool. ................................ 284

    D.    The trial court's admission of an excessively gruesome photograph during Kiles's trial resulted in the denial of a fair trial and due process. ............................................................................ 287

    E.    The trial court declined to give the jury instructions to which Kiles was constitutionally entitled. ............................................................ 289

    F.    The trial court unconstitutionally required that Kiles be physically restrained at the guilt phase. .......................................................... 295

    G.    The trial court failed to make a complete record of the guilt-phase proceeding in violation of Kiles's constitutional rights. ................. 296

    H.    The trial court violated Kiles's right to be free from double jeopardy and a reliable sentencing determination. .......................... 297

    I.    The cumulative effect of these trial-court errors prejudiced Kiles. .................................................................................................. 298

**Claim Eight** ............................................................................................... 299

The trial court's numerous errors during the penalty phase of trial violated Kiles's constitutional rights. .............................................................................................. 299

    A.    The trial court unconstitutionally required that Kiles be physically restrained at the penalty phase. ..................................................... 299

    B.    The trial court violated Kiles's constitutional rights during his penalty-phase voir dire. ............................................................... 302

C.    The trial court erred in denying defense counsel's motion for a directed verdict on the "especially heinous, cruel or depraved" aggravating circumstance. ............................................................. 308

D.    The trial court erred in not striking the (F)(8) aggravator as unconstitutionally vague. ...................................................... 309

E.    The trial court denied Kiles's due-process rights by admitting a gruesome and unduly prejudicial photograph. .............................. 310

F.    The trial court unconstitutionally permitted the victims' attorney to file pleadings, including a requested jury instruction. ............... 311

G.    The trial court unconstitutionally permitted the introduction of victim-impact evidence. .............................................................. 311

H.    The trial court unconstitutionally permitted the State to ask witnesses at trial about statements contained in the reports of experts who testified at the first trial but not at the second trial, in violation of Kiles's rights. .............................................................. 314

I.    The trial court unconstitutionally failed to provide the jury with a special verdict form listing the specific mitigating factors they found proven, violating Kiles's rights. ................................................. 316

J.    The trial court unconstitutionally failed to make a complete record at trial, in violation of Kiles's rights. ............................................. 317

K.    The cumulative effect of these trial-court errors prejudiced Kiles. ................................................................................................... 317

**Claim Nine** ................................................................................................. 318

Kiles was deprived of his right to due process and a fair trial because the prosecutor engaged in pervasive misconduct. ...................................................... 318

A.    The prosecutor committed misconduct in the guilt-phase proceedings. ................................................................................. 319

B.    The prosecutor committed further misconduct in the penalty-phase proceedings. .......................................................................... 326

C.    The prosecutor's performance rendered the trial fundamentally unfair and violated Kiles's substantive rights. ................................. 331

**Claim Ten** .................................................................................................. 332

Juror misconduct at Kiles's guilt- and penalty-phase proceedings deprived Kiles of his rights to a fair and impartial jury, the assistance of counsel, confrontation, equal protection, and a fair trial. ................................................ 332

A.    Jurors considered extraneous evidence at Kiles's guilt-phase proceedings. ................................................................................. 334

B.    Jurors committed misconduct in multiple ways at Kiles's penalty-phase proceeding. ............................................................................ 335

C.      Juror misconduct throughout the course of proceedings violated Kiles's right to due process and a fair trial. ..................................... 342

**Claim Eleven**.......................................................................................... 343

Kiles was denied effective assistance of counsel on direct appeal...................... 343

A.      Appellate counsel focused his efforts on a claim that was not cognizable on appeal. ...................................................................... 345

B.      Appellate counsel was ineffective for failing to raise meritorious claims............................................................................................... 348

C.      Conclusion......................................................................................... 358

**Claim Twelve** ......................................................................................... 358

The Arizona Supreme Court's decision affirming Kiles's death sentence violated Kiles's constitutional rights. ...................................................... 358

A.      The Arizona Supreme Court violated Kiles's due process rights in its review of the prior-conviction aggravating circumstance...... 361

B.      The Arizona Supreme Court denied Kiles meaningful appellate review when it arbitrarily upheld the (F)(6) aggravating factor. .... 366

C.      The Arizona Supreme Court denied meaningful appellate review by inflating the weight of the (F)(8) aggravating circumstance. .... 370

D.      The Arizona Supreme Court denied Kiles his constitutionally protected right to meaningful independent review when it ignored many of his mitigating factors and mischaracterized others.......... 372

E.      The Arizona Supreme Court's decision denied Kiles meaningful appellate review by irrationally discounting and failing to give effect to the mitigating circumstances it did acknowledge............ 373

F.      The Arizona Supreme Court's individual and cumulative errors deprived Kiles of his constitutional rights. ..................................... 376

G.      This Court may review this claim de novo. .................................... 377

**Claim Thirteen** ...................................................................................... 377

Kiles's second state post-conviction counsel were constitutionally ineffective.  377

A.      Post-conviction counsel were ineffective........................................ 379

B.      Post-conviction counsel's ineffectiveness excuses any procedural default of claims raised throughout this Petition. ........................... 385

C.      Post-conviction counsel's ineffectiveness entitles Kiles to relief... 388

**Claim Fourteen**...................................................................................... 390

Trial counsel was ineffective for failing to file a motion to remand because of errors rendering the grand-jury proceedings unconstitutional........................... 390

A.      Counsel planned to file a motion to remand to address

improprieties with the grand-jury session and the resulting indictment. ................................................................... 392

B.    Counsel was deficient in failing to file a motion to remand based on the fact that a grand juror had prior knowledge of the facts of the crime. ................................................................... 393

C.    Counsel was deficient in failing to file a motion to remand based on the fact that the State knew that Imojean Kiles was an incompetent witness during her grand-jury testimony. .................. 395

D.    Counsel was ineffective for failing to file a motion to remand because Kiles was denied his right to a grand jury free from discrimination. ........................................................... 396

E.    Conclusion. .................................................................... 399

**Claim Fifteen** ................................................................. 399

Counsel were ineffective for failing to ensure that critical portions of the record were preserved and recorded. ........................................ 399

A.    Trial counsel failed to preserve evidence needed for proper consideration of Kiles's claims on appeal. ..................................... 400

B.    Counsel's ineffectiveness for failing to ensure a complete record violated Kiles's rights. ...................................................... 404

**Claim Sixteen** ............................................................... 406

Capital punishment is per se cruel and unusual. ............................... 406

**Claim Seventeen** ........................................................... 409

Arizona's death-penalty statute unconstitutionally serves no deterrent purpose, exceeds any legitimate retributive aim, is without penological justification, and results in the gratuitous infliction of suffering. ...................................... 409

**Claim Eighteen** ............................................................ 412

Arizona's capital-sentencing scheme unconstitutionally does not genuinely narrow the murder cases eligible for the death penalty and fails to channel the discretion of the sentencing jury. ......................................... 412

**Claim Nineteen** ............................................................ 415

Arizona's capital-sentencing scheme unconstitutionally affords the prosecutor unlimited discretion to seek the death penalty. .................................... 415

**Claim Twenty** .............................................................. 416

Arizona's capital-sentencing scheme is unconstitutional because it does not require the State to prove, or the jury to find beyond a reasonable doubt, that the aggravating factors outweighed the mitigating circumstances. ...................... 416

A.    The trial court's penalty-phase instructional error regarding the burden and standard of proof, derived from Arizona's unconstitutional statute, violated Kiles's rights under clearly

established precedent........................................................... 417

    B.    If *Hurst* instead announced a new rule of constitutional law, it is retroactive to cases on collateral review. ........................... 419

    C.    Conclusion .......................................................... 421

**Claim Twenty-One** ....................................................... 421

Arizona's capital-sentencing scheme unconstitutionally requires a defendant to affirmatively prove that the jury should spare his life...................... 421

**Claim Twenty-Two** ....................................................... 423

Arizona's capital-sentencing scheme unconstitutionally fails to require the cumulative consideration of mitigation. .................................. 423

**Claim Twenty-Three** ..................................................... 424

Arizona's death-penalty statute is unconstitutional because it fails to require the jury to make specific findings as to each mitigating circumstance. ............. 424

**Claim Twenty-Four** ...................................................... 426

Arizona's capital-sentencing scheme unconstitutionally limits the jury's full consideration of mitigation by requiring that mitigating circumstances be proven by a preponderance of the evidence............................... 426

**Claim Twenty-Five** ...................................................... 427

Arizona's capital-sentencing scheme unconstitutionally fails to set forth objective standards to guide the sentencer in weighing the aggravating circumstances against the mitigating circumstances. .......................... 427

**Claim Twenty-Six** ....................................................... 428

Arizona's capital-sentencing scheme unconstitutionally denies capital defendants the benefit of proportionality review of their sentences.................. 428

**Claim Twenty-Seven** ..................................................... 429

Arizona's death-penalty scheme unconstitutionally discriminates against poor, young, African-American male defendants. ........................... 429

**Claim Twenty-Eight** ..................................................... 431

The death qualification of Kiles's guilt- and penalty-phase juries was unconstitutional.......................................................... 431

**Claim Twenty-Nine** ...................................................... 434

The "especially heinous, cruel or depraved" aggravating circumstance is unconstitutionally vague. ............................................... 434

**Claim Thirty** ........................................................... 439

Arizona's prior felony conviction aggravating circumstance is unconstitutionally vague. ............................................... 439

**Claim Thirty-One**........................................................ 440

ix

Kiles is innocent of first-degree murder and of the death penalty ...................... 440

**Claim Thirty-Two** ............................................................................... 442

Kiles's death sentence constitutes an impermissible violation of the Ex Post Facto Clause. .......................................................................................... 442

**Claim Thirty-Three** ............................................................................. 444

Executing Kiles after more than 28 years on death row violates the Eighth and Fourteenth Amendments. .......................................................................... 444

**Claim Thirty-Four** .............................................................................. 448

Due process requires that this Court re-evaluate Kiles's death sentence in light of the significant changes to Kiles's circumstances in the 12 years since he was sentenced. ................................................................................................ 448

**Claim Thirty-Five** ............................................................................... 450

Executing Kiles is unconstitutional because he has a serious mental illness. ..... 450

**Claim Thirty-Six** ................................................................................ 454

Subjecting Kiles to execution in Arizona will deny his fundamental human rights under binding international law norms. .................................................... 454

**Claim Thirty-Seven** ............................................................................ 458

Kiles will be unable to receive a fair clemency process in Arizona. ................... 458

**Claim Thirty-Eight** ............................................................................. 460

Kiles's convictions and sentences must be vacated because of the cumulative prejudicial effect of all of the errors in this case. ............................................. 460

Prayer for Relief .................................................................................... 461

Certificate of Service ............................................................................. 463

1    **I.   INTRODUCTION**

2         Pursuant to 28 U.S.C. § 2254, Alvie Copeland Kiles respectfully petitions

3    this Court for a writ of habeas corpus. He is currently in the custody of Respondents,

4    who are detaining him pursuant to judgments and sentences of the Arizona state

5    courts. In 2000, Kiles was convicted of three counts of first-degree murder and two

6    counts of child abuse. He was subsequently sentenced to death for the first-degree

7    murder of Valerie Gunnel and to life imprisonment on each of the remaining counts.

8    Through this Petition, Kiles challenges his first-degree murder conviction and death

9    sentence for the death of Valerie Gunnel and his convictions and sentences on the

10   child-abuse counts, as these convictions and sentences were obtained in violation

11   of his rights under the Constitution, laws, and treaties of the United States. He

12   requests that this Court grant a writ of habeas corpus and any other appropriate

13   relief from these unconstitutional convictions and sentences.[1]

14   **II.  BACKGROUND**

15        **A.   Factual History.**

16        In February 1989, Alvie Kiles was living with his girlfriend, Valerie Gunnel,

17   and her two daughters, five-year-old Shemaeah Gunnel and nine-month-old

18   LeCresha Kirklin. (Tr. July 17, 2000 at 152; Tr. July 12, 2000 at 5–6, 32.)[2] The four

---

20   [1] While Kiles maintains that he is factually innocent of the crimes underlying his
21   first-degree murder convictions for the deaths of Shemaeah Gunnel and LeCresha
     Kirklin, he recognizes the risk in seeking relief from those convictions—
     convictions for which he was not sentenced to death—and therefore declines at
22   present to do so.

23   [2] When counsel is referring to the state-court record, transcripts are designated "Tr."
24   followed by the relevant date and page number. Indexed documents from Case No.
     CR89-15444 supplied by the Arizona Supreme Court as part of the record on appeal
25   are designated "ROA," followed by the docket number. If the indexed document
     appears only in Case No. CR89-15577, the document is designated "CR89-15577
26   ROA," followed by the docket number. Exhibits from the 1989 trial, the 1990
     sentencing proceeding, the 2000 guilt phase, and 2006 penalty phase are designated,
27   respectively, "1989 State [or Def.] Trial Ex.," "1990 State [or Def.] Trial Ex.,"
     "2000 Trial Ex.," and "2006 Trial Ex.," followed by the exhibit number. Direct
28   appeal documents from Case No. CR-90-0106-AP supplied by the Arizona

of them were staying at Gunnel's apartment in a complex on South First Avenue in Yuma, Arizona. (Tr. July 17, 2000 at 152; Tr. July 12, 2000 at 5–6, 32.) On February 9, 1989, Gunnel visited Kiles's mother, Imojean Kiles, at her workplace; Gunnel claimed that Kiles had stolen her food stamps and that she had no money to feed her children. (Tr. July 11, 2000 at 32.) Kiles later testified that he and Gunnel devised a plan for him to sell the food stamps to get dope for them to use together. (Tr. July 17, 2000 at 155–56.) Imojean gave Gunnel twenty dollars to buy food and told Gunnel to "leave little Alvie alone." (Tr. July 17, 2000 at 145–46.)

At some point during the night of February 9, 1989, or early the following morning, Gunnel and her children were killed. Kiles later testified that he had an argument with Gunnel; she had slapped him once, and when she slapped him a second time, he grabbed a tire jack that was on the ground and killed her. (Tr. July 17, 2000 at 164–65.) Kiles testified that the argument began when he returned home intoxicated with drugs and alcohol, having used all of the drugs that he had acquired for him and Gunnel to use together. (Tr. July 17, 2000 at 157–58.)

He disclaimed responsibility for the deaths of Shemaeah and LeCresha, testifying that he saw his friend Kale Johnson swinging the jack at the children while they were on a bed. (Tr. July 17, 2000 at 170.) Kiles further testified that Johnson and another friend took Kiles's car to dispose of the children's bodies,

---

Supreme Court are designated "DA1," followed by the docket number. Direct appeal documents from Case No. CR-06-0240-AP supplied by the Arizona Supreme Court are designated "DA2," followed by the docket number. Documents from the first and second state post-conviction proceedings are also designated "ROA," followed by the docket number. Exhibits to the first post-conviction petition are labeled "ROA 225 Ex.," followed by the exhibit number. Exhibits from the second post-conviction petition are labeled "PFR2," with the appropriate docket and exhibit number, as these exhibits were re-filed during the second petition for review proceedings before the Arizona Supreme Court. Documents from the 1996 and 1997 petition for review proceedings are labeled "PFR1," followed by the docket number. Documents from the petition for review proceedings under Case No. CR-16-0072 are designated "PFR2," followed by the docket number. Special action documents are designated by the case number, name of pleading, date, and page number.

2

1    while Kiles remained in the apartment to try to clean up the crime scene. (Tr. July
2    17, 2000 at 172–73.)

3         Around 9:00 a.m. on February 10, 1989, Kiles knocked on the door of the
4    home of his brother-in-law, Larry Hawkins. (Tr. July 13, 2000 at 5–7.) As Hawkins
5    had just finished a 24-hour shift at work, he declined to answer the door, but he did
6    notice that Kiles had driven over in Gunnel's car. (Tr. July 13, 2000 at 6–7.) Kale
7    Johnson, who later claimed to have nothing to do with the killings, said that he
8    encountered Kiles, who was seated in Gunnel's car, at Carver Park on the afternoon
9    of February 10, 1989. (Tr. July 14, 2000 at 74–75, 128–29.) There, according to
10   Johnson's testimony, Kiles confessed, "I killed Valerie." (Tr. July 14, 2000 at 76–
11   77.) Johnson then accompanied Kiles to Gunnel's apartment, where Johnson
12   observed "Valerie lying on the floor." (Tr. July 14, 2000 at 79–82.) Johnson
13   testified that he only entered Gunnel's apartment, inspected her body, and then left
14   (Tr. July 14, 2000 at 130), but he was later discovered with blood on his Converse
15   shoes, clothing, and hands (Tr. July 14, 2000 at 132–33; Tr. July 17, 2000 at 78).
16   Johnson admitted that he may have wiped his hands on his pants and the inside
17   frame of Gunnel's apartment door after getting blood on them. (Tr. July 14, 2000
18   at 134–35; Tr. July 17, 2000 at 35; PFR2 Dkt. 20 Ex. 1 at 7.)

19        On the evening of February 10, 1989, Kiles returned to Larry Hawkins's
20   house with Johnson. (Tr. July 13, 2000 at 9–10; Tr. July 14, 2000 at 91–92.)
21   According to Hawkins, Kiles informed him that he had "killed Valerie and possibly
22   her children too." (Tr. July 13, 2000 at 12.) Hawkins asked Kiles, "Why the
23   children?" and said that Kiles that it was because they had seen him. (Tr. July 13,
24   2000 at 13). Hawkins testified that Kiles was high when he arrived at Hawkins's
25   apartment and that he was still doing cocaine at Hawkins's apartment when he
26   shared this information. (Tr. Mar. 22, 2006 at 47–48, 69.) Hawkins described Kiles
27   as "not himself. He had a crazed look in his eyes, and was rambling and, at times,
28   incoherent. . . . He was acting really crazy and paranoid." (ROA 225 Ex. 38 at 2–3;

3

Tr. Mar. 22, 2006 at 66–67.) Four or five days later, Hawkins authored a letter to Silent Witness, Yuma's anonymous tip line, to provide information to authorities to help fill in the missing pieces of evidence from what he had heard on the radio, on the news, and from others. (Tr. July 13, 2000 at 16–18, 59; Tr. Mar. 22, 2006 at 62–63.) Even so, Hawkins later acknowledged, "I don't know that anything [Kiles] told me that day was accurate." (ROA 225 Ex. 38 at 2–3.)

Kiles and Johnson also went to Imojean Kiles's work place on the evening of February 10, 1989. (Tr. July 11, 2000 at 28–29.) Kiles told Imojean that he had killed someone, and he went on to say that he had killed Gunnel. (Tr. July 11, 2000 at 30–31.) Imojean stated that Kiles said that the children were "taken care of" as well. (Tr. Feb. 21, 1989 at 57–58.) She denied, though, that Kiles told her he had killed the children. (Tr. July 11, 2000 at 31, 44.) Imojean described Kiles as nervous; he seemed like he was on some kind of drug. (Tr. Feb. 21, 1989 at 59.)

In the early morning of February 11, 1989, lead investigator Detective Brian Rodgers of the Yuma Police Department arrived at Gunnel's apartment and requested assistance from Detective Cynthia Anderson. (Tr. July 11, 2000 at 140.) The apartment was in disarray, with cartons of eggs on the kitchen floor, smeared blood stains, furniture overturned, and a body that was later identified as that of Gunnel. (Tr. July 11, 2000 at 143–44.) The living room had a pool of blood on the carpet under an overturned ottoman, which was later confirmed through DNA testing to be Gunnel's blood. (Tr. July 17, 2000 at 8–9.) There was also blood on a soft-back chair. (Tr. July 17, 2000 at 9–10.) A ratchet mechanism for a car jack, which had Gunnel's blood and hair on it, was found in the east bedroom under a pillow with blood. (Tr. July 11, 2000 at 170–71; Tr. July 17, 2000 at 26.) The bathroom had blood smears on the floor, smelled like cleanser, and contained a pile of bloody towels. (Tr. July 11, 2000 at 144.)

Police found shoe impressions, Converse, Adidas-style, and "running Ws," throughout and around the apartment. (Tr. July 11, 2000 at 158–60; Tr. July 12,

2000 at 48–49; Tr. July 17, 2000 at 19–23.) The police also identified Converse and Adidas-style shoe impressions close to Gunnel's vehicle, which was recovered near Carver Park. (Tr. July 12, 2000 at 48–52.) Rodgers testified that he saw Converse shoe impressions in the sand where the children's bodies were potentially put into the river, but that he failed to take any photographs. (Tr. July 17, 2000 at 94–95.)

As Rodgers was preparing to leave the crime scene on the morning of February 10, 1989, he ran into Kale Johnson outside Gunnel's apartment. (Tr. July 17, 2000 at 30–31.) Rodgers arrested Johnson upon realizing that he was wearing Converse shoes with blood stains. (Tr. July 17, 2000 at 30–31.) DNA analysis later confirmed that the blood on Johnson's shoes belonged to Gunnel. (Tr. July 12, 2000 at 122.) Johnson was also wearing grey pants and a grey jacket at the time of his arrest; the pants had Gunnel's blood on them, and the one spot of blood on the jacket that was tested came from an unidentified male. (Tr. July 12, 2000 at 129, 137–38.) After arresting Johnson, Rodgers took him to the police station, where he was questioned and threatened with murder charges if he did not testify against Kiles. (PFR2 Dkt. 20 Exs. 1–2 at 9.) Johnson ultimately pled to hindering prosecution and was sentenced to two and a half years in prison. (Tr. July 14, 2000 at 103–04.)

In the early morning hours of February 11, 1989, Officer David Sherman of the Yuma Police Department found Kiles hiding under a bunk bed at a friend's apartment. (Tr. July 17, 2000 at 201–03.) Kiles's clothing contained Gunnel's blood and blood from a source consistent with an offspring of Gunnel and Ward Wade, Jr. (Tr. July 12, 2000 at 122–24)—i.e., their only child, Shemaeah. Following Kiles's arrest, while at the jail, Kiles told Detective Anderson that he wanted her to know that he had not killed the children. (Tr. July 10, 2000 at 194–95.) A few days later, on February 14, 1989, Kiles's parole officer Ramon Mendoza interviewed Kiles. (2006 Trial Ex. 169 at 2.) Kiles conveyed to Mendoza, too, that he had killed Gunnel, but that he had not killed the children. (2006 Trial Ex. 175 at 2.) Kiles told Mendoza he was under the influence of cocaine, crack, heroin, and alcohol at the

5

1    time of the crime. (2006 Trial Ex. 175 at 2.)

2         During the course of the investigation, detectives learned that on February

3    10, 1989, Kiles and Johnson had sold some of Gunnel's possessions to various

4    individuals. (Tr. July 17, 2000 at 55.) Kiles and Johnson had ransacked the

5    apartment in search of property they could sell for drugs. (Tr. July 17, 2000 at 190–

6    91.) On February 10, 1989, Kiles and Johnson sold a telephone from Gunnel's

7    apartment to Jesse Solomon, a friend of the Kiles family. (Tr. July 10, 2000 at 145–

8    46.) Once Johnson left, Kiles cried and told Solomon that he had killed somebody.

9    (Tr. July 10, 2000 at 148–49.)

10        On February 17, 1989, Anderson and Lieutenant John Lekan, of the Yuma

11   Police Department, traveled to a city in Mexico to retrieve the body of LeCresha,

12   who had been found in the Central Canal. (Tr. July 12, 2000 at 59–60, 64.)

13   Shemaeah's body was never found. (Tr. July 12, 2000 at 63.)

14        Robert Mallon, M.D., a pathologist with the Yuma Regional Medical Center,

15   performed autopsies on both Gunnel and LeCresha. (Tr. July 13, 2000 at 95, 101.)

16   He concluded that Gunnel had died from "multiple blunt trauma to the head with

17   multiple scalp lacerations, skull fractures, laceration to the brain." (Tr. July 13, 2000

18   at 97.) Gunnel also had a "fracture of the right arm, laceration to the skin of the

19   right arm, and fracture of the bone." (Tr. July 13, 2000 at 97.) Dr. Mallon further

20   concluded that LeCresha had died from "blunt trauma to the skull with extensive

21   skull fractures and brain laceration." (Tr. July 13, 2000 at 101.)

22        **B.    Procedural History.**

23        On February 21, 1989, a Yuma County Grand Jury indicted Kiles on one

24   count of first-degree murder of Valerie Gunnel and one count of first-degree murder

25   and one count of child abuse of LeCresha Kirklin. (ROA 1 at 1–2.) With respect to

26   Gunnel's death, the grand jury charged Kiles with "knowingly and with

27   premeditation" committing first-degree murder in violation of Arizona Revised

28   Statutes sections ("A.R.S. §§") 13-1105(A)(1), 13-1101, 13-703, and 13-801.

6

(ROA 1 at 2.) With respect to LeCresha's death, the grand jury charged Kiles with one count of first-degree murder under two theories: (1) that he "knowingly and with premeditation" murdered her in violation of A.R.S. §§ 13-1105(A)(1), 13-1101, 13-703, and 13-801; or, in the alternative, (2) that he "knowingly" committed the felony of child abuse upon her, "a child under fifteen years of age, thereby causing her death," in violation of A.R.S. §§ 13-1105(A)(2), 13-1101, 13-3623(B)(1), 13-3623(A), 13-703, and 13-801. (ROA 1 at 2.) The grand jury charged Kiles in a separate count with having knowingly committed child abuse, in violation of A.R.S. §§ 13-3623(B)(1), 13-3623(A), 13-604.01, and 13-801. (ROA 1 at 2.)

On April 4, 1989, a Yuma County Grand Jury indicted Kiles on one count of first-degree murder and one count of child abuse of Shemaeah Gunnel. The grand jury charged Kiles with one count of first-degree murder under the same two theories charged in LeCresha's death: that he "knowingly and with premeditation" murdered Shemaeah, in violation of A.R.S. §§ 13-1105(A)(1), 13-1101, 13-703, and 13-801; or in the alternative, that he "knowingly" committed the felony of child abuse upon her, "a child under fifteen years of age, thereby causing her death," in violation of A.R.S. §§ 13-1105(A)(2), 13-1101, 13-3623(B)(1), 13-3623(A), 13-703 and 13-801. (CR89-15577 ROA 1 at 1–2.) The grand jury also charged Kiles with having knowingly committed child abuse, in violation of A.R.S. §§ 13-3623(B)(1), 13-3623(A), 13-604.01, and 13-801. (CR89-15577 ROA 1 at 2.)

After a five-day trial in December 1989, a jury convicted Kiles of all three counts of first-degree murder and both counts of child abuse. (ROA 150 at 1); *see also State v. Kiles*, 857 P.2d 1212, 1215 (Ariz. 1993). The trial court held a separate sentencing proceeding and then sentenced Kiles to death for each of the first-degree murder convictions and to consecutive 22-year terms of imprisonment for the child-abuse convictions. *Kiles*, 857 P.2d at 1215. Kiles appealed his death sentences, and the Arizona Supreme Court affirmed on April 15, 1993. *Id.* at 1231.

1    Kiles filed his first state post-conviction petition on September 30, 1994.
2    (ROA 225.) That petition was supported by extensive records, affidavits from
3    people who knew Kiles's familial history and who had known Kiles throughout his
4    life, and expert reports. (*See generally* ROA 225 Exs. 1–81.) The state post-
5    conviction court held a three-day evidentiary hearing in February 1996. (Tr. Feb.
6    20, 1996; Tr. Feb. 21, 1996; Tr. Feb. 22, 1996.) On November 7, 1996, the court
7    granted Kiles's petition for post-conviction relief, concluding that Kiles had been
8    denied effective assistance of counsel, and ordered a new trial. (ROA 314 at 2–4.)
9    The Arizona Supreme Court denied the State's petition for review. (ROA 341 at 1.)
10   Upon remand, the State, in March 1998, filed a new notice of intent to seek
11   the death penalty. (ROA 350 at 1.) In October 1998, the court appointed attorney
12   Greg Clark as Kiles's lead counsel, even though Clark had recently faced censure
13   for providing ineffective assistance. (Tr. Oct. 7, 1998 at 5, 15, 21–22.) In August
14   1999, Kiles's second counsel moved to withdraw from the case because of Clark's
15   inadequate representation. (ROA 409 at 3–4.) The court granted the motion to
16   withdraw (ROA 412 at 1), and shortly thereafter, attorney Treasure VanDreumel
17   accepted the second chair position.
18   Throughout his proceedings, Kiles repeatedly requested that the court
19   appoint him qualified, un-conflicted trial counsel who communicated with him
20   about his case. (*See, e.g.*, ROA 392 at 5; ROA 407 at 4; ROA 522 at 1–3.) The trial
21   court failed to grant Kiles's requests. (*See, e.g.*, Tr. Jan. 22, 1999 at 14; Tr. Aug. 6,
22   1999 at 47–48; Tr. Jan. 7, 2002 at 70.) Indeed, on March 10, 2000, Kiles filed a pro
23   per petition for special action in the Arizona Supreme Court requesting new
24   counsel. (Case No. M-00-0006, Pet. for Special Action, Mar. 10, 2000.) The
25   Arizona Supreme Court declined to accept jurisdiction over the special action.[3]

26   _____
27   [3] During Kiles's proceedings, four other petitions for special action were filed; the
     Arizona Supreme Court declined jurisdiction over each one. In August 1994,
28   Kiles's first state post-conviction counsel filed a petition for special action to recuse
     the Yuma County Superior Court bench because the original prosecutor on Kiles's

8

1    (ROA 441 at 1.)

2         After a cursory voir dire, Kiles's guilt phase began on July 10, 2000. (*See,*

3    *e.g.*, Tr. July 7, 2000 at 34–174; *see also* Tr. July 10, 2000 at 12.) The State called

4    a number of lay witnesses, including Kiles's mother, Kiles's former brother-in-law,

5    and Kale Johnson, who had pled guilty to hindering the prosecution of the crimes

6    in question. (Tr. July 11, 2000 at 26–84; Tr. July 13, 2000 at 3–80; Tr. July 14, 2000

7    at 65–174.) In addition, the State called, among other experts, a blood-spatter expert

8    (Tr. July 14, 2000 at 4–61), and the pathologist who performed the autopsies of

9    Gunnel and LeCresha (Tr. July 13, 2000 at 93–107). Kiles's defense team failed to

10   present any experts; instead, counsel recalled two of the State's lay witnesses and

11   offered brief testimony from a third lay witness. (*See* Tr. July 17, 2000 at 127–50.)

12   Kiles also testified on his own behalf. (Tr. July 17, 2000 at 151–223.) He testified

13   that he had killed Valerie reflexively after she slapped him twice during an

14   argument, and that Kale Johnson had killed the children. (Tr. July 17, 2000 at 165,

15   170.) On July 20, 2000, a jury again convicted Kiles of three counts of first-degree

16   murder and two counts of child abuse. (Tr. July 20, 2000 at 4–5.)

17        Largely because of *Ring v. Arizona*, 536 U.S. 584 (2002), the penalty-phase

18   trial did not occur until 2006. Pursuant to a stipulation by the parties and a signed

19   waiver by Kiles, the penalty-phase proceedings took place in Maricopa County. (Tr.

20   Feb. 14, 2006 at 4–6; ROA 750 at 1.) The trial court empaneled a jury different

21   from the guilt-phase jury. (*See, e.g.*, Tr. Mar. 6, 2006.)

22        The aggravation phase largely repeated the guilt-phase trial. The jury made

23   ———————————————

24   case had become a judge on the court. (Case No. CV-94-0333-SA, Pet. for Special
     Action.) In February 1996, Kiles's first state post-conviction counsel filed a petition

25   for special action to remove the presiding judge because her law partner had sued
     him. (Case No. CV-96-0100-SA, Pet. for Special Action at 2.) In May 2000, Kiles's

26   trial counsel filed a petition for special action challenging the trial court's denial of
     his motion for change of venue due to pretrial publicity. (Case No. CV-00-0143-

27   SA, Pet. for Special Action at 3.) Finally, in January 2006, the State filed a petition
     for special action arguing against the presentation of residual doubt at sentencing.

28   (Case No. CA-SA-06-0012, Pet. for Special Action, at 1–2.)

9

1  *Enmund*/*Tison* findings regarding the children's murders, but did not find

2  unanimously that Kiles had killed or had attempted to kill either child. (ROA 879

3  at 1–4.) The jury then found three aggravating factors for Gunnel's death: (1) Kiles

4  had been previously convicted of a violent felony, (2) he had been convicted of

5  multiple homicides, and (3) he had committed the offense in an especially cruel,

6  heinous, or depraved manner. (ROA 879 at 11–13); *see* A.R.S. §§ 13-703(F)(2),

7  (F)(6), (F)(8) (1988). The jury found the same three aggravators for the deaths of

8  Shemaeah and LeCresha. The jury also found a fourth aggravating factor in the

9  children's deaths: that the crime was committed by an adult against a person less

10  than 15 years of age. (ROA 879 at 7, 10); *see* A.R.S. § 13-703(F)(9) (1988).

11       The mitigation phase[4] of trial began on April 24, 2006. After defense

12  counsel's opening statement, the jury heard victim-impact evidence. (Tr. Apr. 24,

13  2006 at 21–27.) The defense's mitigation presentation consisted of two lay-

14  witnesses who did not know Kiles well, the mitigation specialist, witnesses who

15  spoke to Kiles's model behavior in prison, and mental-health experts who offered

16  conflicting testimony. (*See, e.g.*, Tr. Apr. 24, 2006 at 28–119; Tr. Apr. 25, 2006;

17  Tr. Apr. 26, 2006.) The State put on two mental-health experts, each of whom

18  testified for a full day. (*See* Tr. May 16, 2006; Tr. May 17, 2006.) The defense

19  offered no rebuttal to the State's presentation. On the final day, Kiles read his

20  allocution, and each side made a closing argument. (*See* Tr. May 22, 2006.)

21       After deliberating, the jury sentenced Kiles to death for the murder of Valerie

22  Gunnel. (ROA 887 at 1.) The jury reached no unanimous agreement on the

23  appropriate sentences for the deaths of LeCresha and Shemaeah. (ROA 887 at 2–

24  3.) The trial court then sentenced Kiles to death for the murder of Gunnel and to

25  life in prison on each of the four remaining count, to be served consecutively to

26

---

27  [4] Throughout this Petition, Kiles uses "mitigation phase" to describe the phase at
which the defense put on its case for leniency and "penalty phase" to describe his
28  aggravation and mitigation phases together.

10

1  each other and to the death sentence.[5] (Tr. June 13, 2006 at 9–11.)

2       The Yuma County Superior Court appointed Paul Mattern as Kiles's counsel

3  for direct appeal. (ROA 930 at 1.) Mattern filed Kiles's opening brief on July 14,

4  2008. (*See* DA2 Dkt. 86.) Mattern failed to brief independent review of Kiles's

5  death sentence[6] and instead focused on ineffective assistance of trial counsel, a non-

6  cognizable claim on direct appeal. (DA2 Dkt. 86 at 66–84.) The Arizona Supreme

7  Court refused to rule on the ineffective-assistance-of-counsel claim. *Kiles*, 213 P.3d

8  at 183–84. The court held that Kiles's prior conviction for attempted aggravated

9  assault could not be the basis for the aggravating circumstance in A.R.S.

10  § 13-703(F)(2) (1988), but denied the rest of Kiles's claims. *See id*. at 185–86. After

11  conducting an independent review of the aggravators and the mitigation presented

12  at trial, the court affirmed Kiles's death sentence. *Id*. at 189.

13       The court appointed attorneys Kerrie Droban and Sharmila Roy to represent

14  Kiles in state post-conviction proceedings. (DA2 Dkt. 126 at 1; ROA 1035 at 1.)

15  They filed Kiles's state post-conviction petition on November 24, 2014, raising

16  such claims as ineffective assistance of trial counsel at the guilt, aggravation, and

17  mitigation phases, and ineffective assistance of appellate counsel. (*See, e.g.*, ROA

18  1189 at 23–48.) State post-conviction counsel attached in support of the petition

19  numerous exhibits, including affidavits from Kiles's friends and relatives and

20  reports from experts on topics related to both guilt- and penalty-phase issues. (*See*

21  PFR2 Dkt. 20 at 3–4.) State post-conviction counsel further requested an

22  evidentiary hearing. (ROA 1189 at 21.)

23       The State filed a response to the petition (ROA 1198), but Kiles's counsel

24

25  [5] On June 13, 2006, the State moved to dismiss the death penalty allegation with
26  respect to LeCresha and Shemaeah. (ROA 852.) The court granted it at the
   sentencing hearing. (Tr. June 13, 2006 at 3.)

27  [6] Because Kiles's crime occurred before August 1, 2002, the court was statutorily
28  required to independently review Kiles's death sentence. *See State v. Kiles*, 213
   P.3d 174, 187 (Ariz. 2009) (citing A.R.S. § 13-755(A)-(C) (Supp. 2008)).

1   neglected to file a reply brief. The state post-conviction court denied relief without
2   holding an evidentiary hearing. (ROA 1214 at 1–2.) Counsel submitted a petition
3   for review on February 19, 2016, again raising claims of ineffective-assistance of
4   trial and appellate counsel and requesting that the court remand Kiles's case for an
5   evidentiary hearing. (*See* PFR2 Dkt. 1.) The Arizona Supreme Court denied Kiles's
6   petition for review on October 17, 2017. (PFR2 Dkt. 30 at 1.)

7       Kiles filed before this Court an application to proceed in forma pauperis and
8   a motion for appointment of counsel on November 6, 2017. (ECF No. 2; ECF No.
9   3.) On November 9, 2017, the Court entered an order granting the application to
10  proceed in forma pauperis and appointing the Federal Public Defender for the
11  District of Arizona to represent Kiles in these proceedings. (ECF No. 5 at 1.) Kiles
12  and Respondents agreed that the limitations period under 28 U.S.C. § 2244(d) for
13  Kiles's habeas petition runs on October 9, 2018, and proposed a briefing schedule.
14  (ECF No. 9 at 1–2.) The Court ordered Kiles to file his habeas petition by
15  September 14, 2018 (ECF No. 16 at 1), and, at Kiles's request, subsequently
16  extended the deadline to October 5, 2018 (ECF No. 32 at 1). Kiles filed an initial
17  habeas petition on September 26, 2018 (ECF No. 33), and he files this Amended
18  Petition on October 5, 2018. This Amended Petition is timely filed.

19  **III.   STATE COURT PRESUMPTION OF CORRECTNESS**

20      Kiles hereby challenges the presumption of correctness provided for by 28
21  U.S.C. § 2254(e)(1) that could, in different circumstances, attach to certain factual
22  findings made by the state courts in his case. As detailed throughout this Petition—
23  and as evidentiary development will further illustrate—such factual findings, to the
24  extent any are found to exist, are not entitled to the presumption of correctness in
25  § 2254(e)(1).

26      More specifically, Kiles asserts that findings of fact made by the state courts
27  at his retrial, on direct appeal, during state post-conviction proceedings, or at any
28  other point since legal proceedings began in this case in 1989—should any such

findings exist—are not entitled to this Court's deference because those findings are not fairly supported by the record before the state courts. Kiles further asserts that the presumption of correctness is inapplicable and inappropriate in this case for several additional reasons, including but not limited to (1) the state courts' fact-finding procedures were inadequate to afford his constitutional claims full and fair consideration; (2) material facts were not adequately developed in state-court proceedings; (3) he did not receive full, fair, and adequate hearings in state court; and (4) the state-court proceedings otherwise denied him due process of law.

## IV.   PROCEDURAL STATUS OF CLAIMS AND EXHAUSTION

Most of the federal constitutional claims alleged throughout this Petition have been exhausted in proceedings before Arizona courts. Some claims, however, were not fully presented in state court, were not ripe for review, or could only be adequately raised in this forum. Respondents bear the burden of demonstrating that Kiles has failed to exhaust a particular claim. *See, e.g.*, *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938); *Esslinger v. Davis*, 44 F.3d 1515, 1528 (11th Cir. 1995); *Herbst v. Scott*, 42 F.3d 902, 905 (5th Cir. 1995); *Brown v. Maass*, 11 F.3d 914, 914 (9th Cir. 1993) (per curiam).

To the extent that any claim is deemed procedurally defaulted, and because the doctrine of procedural default is based upon comity rather than upon jurisdiction, this Court retains the power to consider the merits of that claim. *See, e.g.*, *Reed v. Ross*, 468 U.S. 1, 9 (1984). Further, this Court may review the merits of any procedurally defaulted claim because Kiles can demonstrate both cause for any failure to properly exhaust a particular claim and prejudice from the alleged constitutional violation. Alternatively, Kiles can demonstrate that a fundamental miscarriage of justice would result if this Court declined to hear any particular claim on the merits. *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991). And, to the extent that Respondents argue that any state-court decisions adverse to Kiles were based upon state procedural grounds, those grounds were neither adequate to

13

1  support the state court's judgments nor independent of federal constitutional
2  guarantees. *See generally Stewart v. Smith*, 536 U.S. 856 (2002) (per curiam); *Ford*
3  *v. Georgia*, 498 U.S. 411, 423–24 (1991).

4        As an additional matter, for any claims not raised or properly exhausted due
5  to the ineffective assistance of prior counsel, Kiles can show, with the benefit of
6  evidentiary development, that he has cause to overcome any procedural default of
7  his meritorious constitutional claims. *See, e.g.*, *Martinez v. Ryan*, 566 U.S. 1, 9
8  (2012). Further, as Kiles will explain in his evidentiary-development motions,
9  Rules 6 (discovery), 7 (expansion of the record), and 8 (evidentiary hearing) of the
10 Rules Governing Section 2254 Cases in the United States District Courts require
11 that federal courts provide a habeas petitioner with reasonable means to investigate
12 and factually support the claims presented in a petition for a writ of habeas corpus.
13 *See McCleskey v. Zant*, 499 U.S. 467, 498 (1991).

14       Lastly, Kiles respectfully reserves the right to timely request a limited stay
15 and abeyance pursuant to *Rhines v. Weber*, 544 U.S. 269 (2005), in order to return
16 to state court to present any unexhausted claims, should there be a need to do so.

17 **V.    RIGHT TO AMEND**

18       Kiles expressly reserves his right to amend this Petition, both as a matter of
19 course under Federal Rule of Civil Procedure 15(a)(1) and later, as necessary and
20 appropriate. *See* Rule 12, Rules Governing Section 2254 Cases in the United States
21 District Courts (applying Federal Rules of Civil Procedure to habeas proceedings).
22 In *McCleskey v. Zant*, the Supreme Court reaffirmed the "principle that [a]
23 petitioner must conduct a reasonable and diligent investigation aimed at including
24 all relevant claims and grounds for relief in the first federal habeas petition." 499
25 U.S. 467, 498 (1991). Kiles believes that additional claims may be identified
26 through ongoing investigation, after discovery is conducted and completed, and/or
27 after an evidentiary hearing is held. At the appropriate time during these
28 proceedings, Kiles will therefore present any additional claims through

14

1  amendments or supplements to this Petition.

2  **VI.   AEDPA IS UNCONSTITUTIONAL**

3      As an initial matter, the principle that every prisoner must have all of his
4  constitutional claims heard by a court is central to fundamental fairness and the
5  integrity of the justice system. *See Bounds v. Smith*, 430 U.S. 817, 822–23 (1977).
6  One essential method of ensuring that a prisoner's constitutional claims are heard
7  is through the availability of the writ of habeas corpus. However, the passage of the
8  Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) substantially
9  changed the law that governs habeas petitions. *See Felker v. Turpin*, 518 U.S. 651,
10  654 (1996). AEDPA's restrictions suspend the writ of habeas corpus and violate the
11  separation of powers, which results in prisoners remaining in prison without review
12  of alleged constitutional defects of their convictions and sentences.

13      **A.   AEDPA unconstitutionally suspends the writ of habeas corpus.**

14      Congress cannot define prisoners' rights so narrowly that it, in effect,
15  suspends the writ of habeas corpus. The writ of habeas corpus is guaranteed by the
16  U.S. Constitution in the Suspension Clause, which provides that "[t]he Privilege of
17  the Writ of Habeas Corpus shall not be suspended, unless when in Cases of
18  Rebellion or Invasion the public Safety may require it." U.S. Const. art. I, § 9, cl. 2.
19  The Suspension Clause is a structural limitation on the power of Congress. Like
20  bills of attainder and ex post facto laws, which are also prohibited in Article I,
21  section 9, the suspension of habeas (except in cases of rebellion or invasion) belongs
22  to a "category of congressional actions which the Constitution barred." *United*
23  *States v. Lovett*, 328 U.S. 303, 315 (1946). The writ "can be preserved in practice
24  no other way than through the medium of the courts of justice; whose duty it must
25  be to declare all acts contrary to the manifest tenor of the Constitution void." *Id.* at
26  314 (quoting The Federalist No. 78 (Alexander Hamilton)).

27      AEDPA prevents federal courts in certain circumstances from granting relief
28  when it is undisputed that a conviction or sentence is unconstitutional. *See* 28

15

U.S.C. § 2254. Under AEDPA, before granting the writ a federal court must
determine whether, for example, the complete deprivation of a jury in a capital case
is a "reasonable" or "unreasonable" constitutional violation. As explained long ago,

> habeas is "the most important human right" in the
> Constitution because it functions as a mechanism for the
> enforcement of the Bill of Rights against the federal
> government: "Censorship can be evaded; prosecutions
> against ideas may break down; a prison wall is there. Only
> habeas corpus can penetrate it. When imprisonment is
> possible without explanation or redress, every form of
> liberty is impaired.

Dan Poulson, Note, *Suspension for Beginners: Ex parte Bollman and the
Unconstitutionality of the 1996 Antiterrorism and Effective Death Penalty Act*, 35
Hastings Const. L. Q. 373, 399 (2008) (quoting Zechariah Chafee, Jr., How Human
Rights Got Into the Constitution 53 (1952)). This restriction on courts' ability to
grant relief constitutes an unconstitutional suspension of the writ.

### B. AEDPA violates the separation-of-powers doctrine.

Congress cannot impinge on the courts' duty to say what the law is, but
Congress does so when it requires Article III courts to ignore any part of the
Constitution and to instead give effect to a contrary law. *See Marbury v. Madison*,
5 U.S. (1 Cranch) 137, 178 (1803). Congress has the power to constrain courts'
authority. *See Keene Corp. v. United States*, 508 U.S. 200, 207 (1993); *see also*
U.S. Const. art. III, § 1 ("The judicial Power of the United States, shall be vested in
one supreme Court, and in such inferior Courts as the Congress may from time to
time ordain and establish."). However, there are limits on that power. One such
limit is that Congress must not manipulate the "test for determining the scope of
[habeas corpus]" because the writ "is designed to restrain" Congress, and because
the writ is "an indispensable mechanism for monitoring the separation of powers."
*Boumediene v. Bush*, 553 U.S. 723, 765–66 (2008).

The separation-of-powers doctrine found in Article III "serves both to protect
the role of the independent judiciary within the constitutional scheme of tripartite

16

1   government . . . and to safeguard litigants' right to have claims decided before
2   judges who are free from potential domination by other branches of government."
3   *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 848 (1986) (citations
4   and internal quotation marks omitted). When confronted with an unconstitutional
5   provision, the Supreme Court in *Marbury* considered whether courts are bound by
6   "an act of the legislature" that is "repugnant to the constitution." The Court
7   concluded, "It is emphatically the province and duty of the judicial department to
8   say what the law is." 5 U.S. at 177.

9       "[I]f Congress does provide for habeas in the federal courts, Congress cannot
10  . . . instruct the federal courts, whether acting in a federal or in a state case, how to
11  think, how to ascertain the law, how to judge." *Irons v. Carey*, 505 F.3d 846, 855
12  (9th Cir. 2007) (Noonan, J., concurring), *overruled on other grounds by Hayward*
13  *v. Marshall*, 603 F.3d 546 (9th Cir. 2010) (en banc). AEDPA infringes upon the
14  power of the courts to say what the law is and to give effect to that law and thereby
15  violates the separation-of-powers doctrine.

16      **C.    Conclusion.**

17      AEDPA unconstitutionally suspends the writ of habeas corpus and violates
18  the separation-of-powers doctrine because it dictates that courts must not "grant
19  relief to citizens who are being held in prison in violation of their constitutional
20  rights unless the constitutional error that led to their unlawful conviction or sentence
21  is one that could not have been made by a reasonable jurist." *Irons*, 505 F.3d at 859
22  (Reinhardt, J., concurring specially). "Whether it was reasonable for a state court
23  to misapprehend the dictates of the Constitution in a particular case hardly seems
24  relevant to a citizen's right not to be imprisoned in violation of the fundamental
25  liberties he is granted by the document that governs our societal structure." *Id.* As
26  AEDPA is unconstitutional, this Court should not be constrained by its dictates.

27
28

1

**Claim One**

2

3

**Representation at trial was so marred by conflicts, misrepresentations, and procedural violations that Kiles was denied effective counsel and fair and reliable capital proceedings.**

4       Kiles's trial began with a procedural due-process violation, proceeded with

5 counsel whose interests diverged from their client's during the course of

6 representation, and ended in with an arbitrary capital sentence, in violation of the

7 Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution. Kiles

8 presented this claim below. (ROA 1189 at 10–18, 23–30; PFR2 Dkt. 1 at 12–18,

9 25–30.) Kiles incorporates by specific reference all facts, allegations, and

10 arguments made elsewhere in this Petition.

11      **A.   Kiles received ineffective assistance of counsel from the start.**

12      Kiles's first trial, held in 1989, was reversed on state post-conviction review

13 in 1996 due to ineffective assistance of counsel. (ROA 314 at 4.) The case was

14 referred back to Yuma County Superior Court and assigned to Judge Kirby

15 Kongable. (ROA 337 at 1.) Kiles's state post-conviction counsel, Mary Boyte,

16 moved to withdraw, as she was not qualified to be lead counsel for a capital trial.

17 (Tr. Mar. 13, 1998 at 4.) Initially, the Yuma County Office of the Legal Defender

18 was appointed to the case. (Tr. Mar. 13, 1998 at 6.) The Office of the Legal

19 Defender determined it was insufficiently staffed to retain the case, and the case

20 was assigned to two private defense attorneys, Robert Roberson and Jerrold

21 Shelley. (ROA 352 at 1.) After concerns arose that the two attorneys might have a

22 conflict of interest, Mary Boyte was appointed as special counsel to investigate. (Tr.

23 Mar. 13, 1998 at 36–37). That investigation revealed multiple conflicts, and

24 Roberson and Shelley were forced to withdraw. (ROA 376 at 3–10; ROA 377 at 1.)

25 Kiles's case was referred back to the Office of the Legal Defender for assignment

26 of counsel. (ROA 377 at 1.)

27

28

1

2

### 1. Greg Clark's appointment did not satisfy Arizona's standards for appointment as capital defense counsel.

3   At the time of Kiles's trial, Yuma County had a bidding system to appoint

4   counsel for indigent defendants. While the court appointed attorneys to represent

5   indigent defendants, the Office of the Legal Defender held the contracts providing

6   payment to private attorneys. On September 10, 1998, after Roberson and Shelley

7   had withdrawn from Kiles's case, the Yuma County Legal Defender and Conflict

8   Administrator Jose de la Vara solicited a bid from Phoenix attorney Greg Clark to

9   represent Kiles. Clark submitted a bid that same day, attesting that he had tried 25

10  first-degree murder cases, including eight capital cases, and that he had only one

11  client on death row. However, Clark had at least three clients on death row at the

12  time of his bid.[7] This material misrepresentation was the first in a long string of

13  misstatements by Clark throughout the eight years he represented Kiles.

14  Clark had also been publicly censured in 1997 for ineffective assistance in a

15  juvenile case. De la Vara sought Clark's appointment despite being on notice that

16  Clark had been disciplined by the Arizona State Bar Association ("Bar").[8] De la

17  Vara also requested that Mark Reeves, an attorney from the Office of the Legal

18  Defender, be appointed as Clark's co-counsel.

19  Mary Boyte, in her role as special counsel, notified the court on October 2,

20  1998 that she was "concerned that the attorneys who are being designated for

21  appointment by the Office of the Legal Defender and the Yuma County Board of

22  Supervisors do not meet the requirements for representation of capital defendants

23  _____

24  [7] At the time of Greg Clark's appointment to Kiles's case, Clark's former clients
    Michael Gallegos, Timothy Ring, and Kenneth Laird were on Arizona's death row.
25  *See Gallegos v. Schriro*, 583 F. Supp. 2d 1041 (D. Ariz. 2008); *State v. Ring*, 25
    P.3d 1139 (Ariz. 2000), *overruled by Ring v. Arizona*, 536 U.S. 584 (2002); *State*
26  *v. Laird*, 920 P.2d 769 (Ariz. 1996).

27  [8] In a letter to Mary Boyte, Jose de la Vara stated that he did not take the time to
    investigate whether Greg Clark was qualified for appointment because de la Vara
28  had known Clark for a long time and relied on that relationship of trust.

19

as set forth in Rule 6.8 [of the Arizona Rules of Criminal Procedure]." (ROA 379 at 1–2.) Arizona Rule of Criminal Procedure ("Rule") 6.8, which contains Arizona's Standards for Appointment of Counsel in Capital Cases, requires that to be eligible for appointment in a capital case, an attorney "shall have been a member in good standing of the State Bar of Arizona for at least five years immediately preceding the appointment." Rule 6.8(a)(1). The court held a hearing to determine whether Clark met the qualifications under Rule 6.8. Boyte informed the court that Clark had been censured in 1997 for providing ineffective assistance in a juvenile transfer case and had been suspended for administrative proceedings a few months prior. (Tr. Oct. 7, 1998 at 5–6.)

In response, Clark misrepresented to the court the nature and severity of those disciplinary actions. Clark said that the public censure for his ineffective assistance was not a failing on his part but "a judgment call and, you know, given the facts as they were then and today, I probably would do the same thing." (Tr. Oct. 7, 1998 at 10.) He then misrepresented his suspension, asserting that the mistake was not his, but the Bar's. "The Bar believed that I did not pay my dues this year. So as a matter of course, they issued an order of suspension which they later retracted almost immediately when it was learned that, in fact, I had paid those dues." (Tr. Oct. 7, 1998 at 10.)

Neither account was accurate. Regarding the public censure for ineffective assistance of counsel, Clark failed, despite ample evidence, support, and opportunity, to effectively advocate for his juvenile client. Clark's inadequate representation resulted in the juvenile being transferred to adult court. In order to receive no more severe a punishment than public censure, Clark conditionally admitted to the Disciplinary Commission of the Supreme Court that his conduct was in violation of ethical rules governing competence, diligence, and communication. Clark's discipline was not the result of a mere bad "judgment call," but the result of his repeated failures during the representation to provide

20

constitutionally effective counsel. The Arizona Court of Appeals found that Clark's actions in the case were so unreasonable as to be constitutionally deficient. The court declared that Clark's "failure to even attempt" to advocate whatsoever for his juvenile client, even when given multiple opportunities to do so, "leads us to conclude that 'but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Matter of Appeal in Maricopa Cty., Juvenile Action No.* JV-511576, 925 P.2d 745, 748 (Ariz. Ct. App. 1996) (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). As to the suspension as a result of the non-payment of dues, the mistake was not on the part of the Bar. It appears that Clark had in fact failed to pay and was only reinstated upon payment of those dues, two weeks later. (Tr. Oct. 7, 1998 at 10; PFR2 Dkt. 1 at 16.)

Four months before the hearing regarding Clark's suitability for appointment, the prosecutor at the time had emphasized to the court, "Your Honor, this is a capital case. Under Rule 6.8 there are standards for appointment of counsel in capital cases that we have to observe." (Tr. Mar. 13, 1998 at 5.) At the hearing regarding Clark's qualifications, however, prosecutor David Powell, who had recently taken over the case on behalf of the Arizona Attorney General's Office, told the judge that Clark "enjoys a wonderful reputation in Maricopa [County]" and that his main concern was whatever was "most expeditious." (Tr. Oct. 7, 1998 at 11–12.)

The court relied on the State's representations to approve Clark's appointment, in violation of Rule 6.8 and without further inquiry. The court stated:

> Well, even Mr. Powell thinks that Mr. Clark enjoys an excellent reputation in Maricopa County. That's one thing . . . I am not at all concerned about the Bar thinking maybe he hadn't paid his dues when he had and that matter being resolved in a quick matter. The incident that occurred in 1995 perhaps causes me some concern, but I think when you weigh that against his experience and reputation and the fact that may very well have been a judgment call on his part, that that's not enough for me to say that I don't feel Mr. Clark is qualified.

21

1   (Tr. Oct. 7, 1998 at 21.) Accordingly, the court expressly relied on Clark's

2   misrepresentations in discounting the importance of his disciplinary issues.

3       After the hearing, Clark submitted a Notice of Compliance with Rule 6.8,

4   stating that he had met the practice element of the Rule. (ROA 381.) He, notably,

5   did not assert that he had been in good standing with the Bar for the preceding five

6   years, nor did he attach a Certificate of Good Standing, which at the time under

7   Rule 74 of the Rules of the Arizona Supreme Court would have listed his

8   disciplinary record. However, to prove he met the training requirement under Rule

9   6.8, Clark provided his attendance form and a copy of the check in payment for the

10  training. The check was from his IOLTA account, itself a violation of his

11  obligations as an attorney.[9] (ROA 381 at 6.)

12      The court subsequently appointed Clark as lead counsel for Kiles. The terms

13  of the contract with the Office of the Legal Defender provided for a flat fee of

14  $25,000 for Clark to accept the case, with another $25,000 in the event the case

15  went to trial. (Tr. Nov. 29, 1999 at 6.) The contract required that Clark meet the

16  requirements for attorneys handling death-penalty cases in Arizona as set forth in

17  Rule 6.8. (PFR2 Dkt. 22 Ex. 10 at 1.)

18          **2. Clark failed to establish an attorney-client relationship with**
19          **Kiles.**

20      Clark's relationship with his client was tenuous from the start. After the court

21  hearing on Clark's qualifications, Kiles expressed some concern to his state post-

22  conviction counsel. She listed questions Kiles could ask Clark about his experience

23  in order to assuage any concerns. However, Kiles never had the opportunity to ask

24  those questions, and Clark's representation in the initial months of his appointment

25  _____

26  [9] IOLTA accounts contain client funds and should not be co-mingled with the
    attorney's own money or used to attend seminars. *See* Ariz. R. Professional
27  Conduct, ER 1.15; (DA2 Dkt. 86 at 71 n.7). The same month Clark was appointed
    to Kiles's case, he was placed in a counseling program to address his ethical
28  misconduct for trust account violations. (ROA 1189 at 16; PFR2 Dkt. 29 Ex. 37.)

only heightened Kiles's concerns. On January 6, 1999, Kiles sent a letter to Judge Kirby Kongable requesting new counsel, stating that in the first three months of appointment Clark had spoken with him for only two hours and that Clark had informed Kiles that he was not going to "baby-sit" him. (ROA 392 at 5.) Kiles wrote that communication with Clark was down to "zero." (ROA 392 at 3.) In response, Clark filed an ex parte response with Judge Kongable and defended himself by portraying Kiles as difficult.[10] Clark agreed he was not communicating with Kiles, but he blamed Kiles for this failure. (ROA 393 at 1.) Clark further defended himself by stating that until he had completely read the case file and discovery was complete, he would be "unable to have any meaningful communication" with Kiles.[11] (ROA 393 at 2.) Clark concluded by writing, "It is only human nature that differences of opinion arise and other conflicts come about." (ROA 393 at 3.)

At a status hearing only three months after Clark's appointment, Kiles again informed the judge of his concerns regarding Clark's effectiveness, especially his lack of communication. (Tr. Jan. 22, 1999 at 5.) Kiles told the court that from October 17, 1998 to January 5, 1999, he had had no communication whatsoever from Clark, prompting Kiles's January 1999 letter to the judge.[12] (Tr. Jan. 22, 1999 at 5–6.) The court demurred—its first in a long series of refusals to take action to ensure appropriate representation—and merely admonished all parties do the best

---

[10] Under Arizona law at that time, Judge Kongable would have made the capital-sentencing decision in the event that Kiles was convicted of first-degree murder.

[11] In contrast, Roberson and Shelley, who had been appointed prior to Clark, informed the court that adequately preparing to represent Kiles would take approximately 100 hours of jail visits. (Tr. Mar. 24, 1998 at 21–22; DA2 Dkt. 89 at 78.) This representation was more in line with the prevailing standards of care in Arizona at the time of these proceedings. Ariz. Attorneys for Crim. Justice & Ariz. Capital Rep. Project, *Arizona Capital Case Defense Manual* at 20–21 (1995 ed.).

[12] In response to Clark's allegations that Kiles was at fault for the lack of communication, Kiles told the court, "I mean, I can't get out of jail and go to his office. So how could it be my choice not to communicate with him?" (Tr. Jan. 22, 1999 at 5.)

23

they could to work together. (Tr. Jan. 22, 1999 at 10–11.) One month later, Mark Reeves withdrew as co-counsel after he discovered a conflict that prohibited his office from representing Kiles, and Mary Boyte was appointed as Kiles's second counsel. (Tr. Dec. 9, 1998 at 5; ROA 399 at 1.)

In the first year of Clark's appointment, the irreparable breakdown between attorney and client was clear. In July 1999, Kiles filed a pro per motion requesting new counsel, asserting that, though the court had accused him at the January 1999 hearing of trying to "interject error into the proceedings, this was not my intention then or now. I just want adequate attorneys." (ROA 407 at 4.) Kiles wrote that Clark had promised to send Kiles legal material pertaining to his case but had not done so; Kiles also stated that Clark had told Kiles to call, but that Clark's staff would often hang up when Kiles did so. (ROA 407 at 6–7.) Kiles supplemented this motion two days later "to correct a lie told to the court" by Clark and to inform the court about Kiles's first legal visit from Clark in five months. (ROA 408 at 1.) The lie was in a motion to continue that Clark had submitted that stated, "Defense counsel has spoken with the Defendant in this matter, who has [] indicated that he has no objection to continuing this matter." (ROA 405 at 1–2.) Kiles reported that he could not have agreed to a continuation, as he had never been asked by Clark. (ROA 408 at 1.) As to the legal visit, it was not productive; Clark brought neither papers, nor anything to write with or on, so nothing was accomplished. (ROA 408 at 2–3.)

At an August 1999 hearing regarding second counsel Boyte's motion to withdraw from the case,[13] Kiles flagged for the court Clark's continued misrepresentations to him. For example, when Clark was appointed, Clark had both promised Kiles and informed the court that he would be filing a motion to challenge Kiles's grand-jury proceedings. (ROA 388 at 1–2.) That motion was never filed. (Tr. Aug. 6, 1999 at 14–15.) As another example, Kiles notified the court that Clark

---

[13] Mary Boyte's motion and its impetus are discussed in greater depth below.

24

had misled him, pushing him toward an early trial date based on Clark's assertion that doing so would encourage a plea deal. (Tr. Aug. 6, 1999 at 11.) Kiles agreed to Clark's proposed early trial date, only to later discover that the State had rejected any such deal a month prior to Kiles's conversation with Clark. (Tr. Aug. 6, 1999 at 11.) Kiles expressed concern that Clark was failing to do any investigation in his case and that he was also refusing to read the file from Kiles's successful state post-conviction petition. Clark readily agreed about prior counsel's file: "I certainly did indicate—and [Kiles] is absolutely right—that the boxes of information that are out there now were worthless." (Tr. Aug. 6, 1999 at 30.)

The previous case file, however, was not worthless. Kiles's second trial was based on the same State's facts that had been challenged during state post-conviction proceedings and involved many of the same witnesses who had been interviewed during those proceedings. Moreover, the case file highlighted the mistakes of counsel during the first trial, which would have been instructive for Clark as he prepared for Kiles's retrial. Still, Clark chose not to avail himself of this crucial information.

Kiles told the court that he was not the only one with whom Clark would not communicate. Boyte was having the same problem with Clark. While Kiles often had trouble getting Clark on the phone, when Kiles succeeded, he then had to call Boyte to relay what Clark had said. Otherwise, Boyte was left in the dark. (Tr. Aug. 6, 1999 at 12.) Kiles told the court that this method of communication between co-counsel was "ridiculous." (Tr. Aug. 6, 1999 at 17.)

Additionally, Kiles was concerned about informal discussions between counsel and with the court that were off-the-record and outside of his presence. (Tr. Aug. 6, 1999 at 13.) He told the court that, as his life was on the line, he believed he had a right to be present for informal meetings about him or his case, or at least have the opportunity to read a transcript later. (Tr. Aug. 6, 1999 at 13–14.) Kiles said simply, "I am not trained as an attorney. I respect Mr. Clark as an attorney, but

25

still I am not an idiot. I can read; I can write. So I would like to be there." (Tr. Aug. 6, 1999 at 14.) But when Kiles informed Clark that he would like to be present, Clark refused and told Kiles he would continue to have off-the-record discussions.[14] (Tr. Aug. 6, 1999 at 14.) Clark's unauthorized waiver of his client's constitutional rights left Kiles without an advocate he could trust to be honest with the court.

That fundamental lack of trust also affected Kiles's ability to lay out his concerns before the court at the hearing. Kiles stated that he felt like he was at a disadvantage because he was unsure whether what he wanted to say could harm him or his case. (Tr. Aug. 6, 1999 at 15.) Kiles told the court, "If I had an attorney stand up here I can trust, I would ask him." (Tr. Aug. 6, 1999 at 15.) But because he was unsure if he should relay all of his concerns about Clark for fear of endangering his case, Kiles felt compelled to stay silent. (Tr. Aug. 6, 1999 at 15.) The court made no further inquiries as to those concerns.

When given the opportunity to respond, Clark told the judge that, "with regard to what has been going on in this case; I have been to the scene, I have been to the place where the bodies were found. I have made a complete review of all of the documentation in this case." (Tr. Aug. 6, 1999 at 31.) Clark also claimed, "Judge, I have done everything I can on [Kiles's] behalf in this case." (Tr. Aug. 6, 1999 at 33.) Beyond asserting that he had done a complete review of the documentation of the case after stating that the case file was "worthless," Clark was not in control of the basic facts of the case. Clark had neither conducted witness interviews nor arranged to speak with any experts, as confirmed by the time logs Clark later submitted to the court. (Tr. Aug. 6, 1999 at 41–42; ROA 414 at 32–49.) And at the August 1999 hearing, Clark asserted, "It is to no defendant's advantage in a capital case to rush quickly to trial," even though Kiles had filed his request for new counsel precisely because he believed (accurately) that Clark was rushing to

---

[14] Kiles was right to be concerned, as trial counsel were ineffective for failing to make a record at every stage of the proceedings. *See* Claim 15, *infra*.

26

1    trial. (Tr. Aug. 6, 1999 at 11, 34; ROA 409 at 2.)

2          By this time, Clark had been lead counsel for ten months. When Clark was

3    first appointed to Kiles's case, he had told Kiles that if Kiles asked him to withdraw

4    for good reason, Clark would do so. (Tr. Aug. 6, 1999 at 12.) Kiles believed his and

5    Clark's inability to maintain communication, trust, or any kind of working

6    relationship was a good reason. (Tr. Aug. 6, 1999 at 12.) Kiles was also frustrated

7    with Clark's dishonesty, both to him and to the court, and with Clark's waiver of

8    Kiles's right to be present at pretrial proceedings. (Tr. Aug. 6, 1999 at 12–14.) Kiles

9    felt Clark was preventing Kiles's ability to participate in his own defense. (Tr. Aug.

10   6, 1999 at 14.) Therefore, Kiles had asked Clark to withdraw, but Clark had

11   refused.[15] (Tr. Aug. 6, 1999 at 12.) Frustrated with Clark's misrepresentations,

12   Kiles expressed desperation:

13         I am at the point now where I don't believe anything he
           tells me. Nothing whatsoever. I have asked him to
14         withdraw from being my attorney. He told me when I first
           -- when he was first appointed to my case, that if I asked
15         him to withdraw for a good reason, he would do just that
           and I think it's a good reason. I feel like I have been lied to.
16         I know I have been lied to by him. He lied to the court on
17         me and said something I didn't say.

18   (Tr. Aug. 6, 1999 at 12.) Kiles had a good relationship with Boyte—she had guided

19   him to relief previously—and repeatedly asked the court to deny her motion to

20   withdraw and to replace Clark instead. (Tr. Aug. 6, 1999 at 10, 15–16, 27.) Kiles

21   told the court, "If you keep Mr. Clark on my case, I don't know how he is going to

22   be able to defend me because there is some things I need to tell my attorney, but I

23   will not tell him." (Tr. Aug. 6, 1999 at 17.) Yet the court granted Boyte's motion to

24   withdraw, and Clark remained lead counsel. (Tr. Aug. 6, 1999 at 48.)

25   _____

26   [15] Clark may have refused to withdraw for financial reasons. Kiles's prior attorneys,
     who withdrew before Clark was appointed due to a conflict of interest, were
27   required to refund Yuma County the majority of their flat-fee payment after
     subtracting for the hours they had worked on Kiles's case at a rate set by the court.
28   (Tr. Nov. 29, 1999 at 3–8.)

27

1

2

### 3. Clark's lack of communication and deficient performance compelled co-counsel to withdraw.

3      The client-attorney relationship was not the only relationship that Clark

4 destroyed. Mark Reeves, initially appointed as Clark's co-counsel, was required to

5 withdraw due to a conflict, and Mary Boyte replaced Reeves as Kiles's second trial

6 attorney. (ROA 399 at 1.) Boyte, Kiles's state post-conviction counsel, had a strong

7 relationship with Kiles and a deep familiarity with the case. Rather than relying on

8 her as an asset, however, Clark largely ignored Boyte. (ROA 409 at 1.)

9      In the four months after her appointment in March 1999, Boyte had no

10 communication with Clark save a single fax. (ROA 409 at 1.) When Clark pushed

11 for a speedy trial, Boyte expressed concern that Clark wanted a trial date in

12 November 1999, as "there has been no investigation or pretrial work of any kind

13 conducted" in the case. (ROA 409 at 2.) Although funding for an investigator and

14 a mental-health expert had been approved by the court, no investigator had been

15 hired, no witnesses had been interviewed, and the lone proposed expert had not

16 been contacted. (ROA 409 at 2.) Boyte also believed that Clark's lump-sum,

17 contingency fee contract with the Office of the Legal Defender was pushing Clark

18 to go to trial without sufficient investigation or preparation and that the contract

19 violated ER 1.5(D)(2) of the Arizona Rules of Professional Conduct, which

20 prohibited attorneys from entering into an arrangement to represent a defendant in

21 a criminal case for a contingent fee. (ROA 409 at 3.)

22      Based upon what she perceived as her ethical obligations and Clark's failure

23 to provide effective assistance of counsel, Boyte moved to withdraw on July 16,

24 1999. (ROA 409 at 3–4.) At the August 1999 hearing on Boyte's motion to

25 withdraw, Kiles testified that Clark had justified his refusal to speak with Boyte by

26 telling Kiles that Boyte would not understand strategy and might object to some of

27 the things Clark was doing. (Tr. Aug. 6, 1999 at 16.) In other words, according to

28 Kiles, Clark acknowledged that he was interfering with Kiles's ability to have two

28

1   trial attorneys, to which Kiles had a legal right. *See* Ariz. R. Crim. P. 6.2(b).

2       At the hearing on her motion, Boyte was represented by attorney Robert
3   Wood, a member of the State Bar of Arizona Ethics Committee. Wood stated he
4   had urged Boyte to withdraw. (Tr. Aug. 6, 1999 at 22.) Wood informed the court
5   that there was a "complete lack of cooperation" of the "kind between lead counsel
6   and second counsel." (Tr. Aug. 6, 1999 at 23.) Wood also stated that Boyte believed
7   "the flat fee arrangement that Mr. Clark has with the county is in effect a contingent
8   fee." (Tr. Aug. 6, 1999 at 24–25.) While Wood explained that he was not there to
9   argue the ethical nature of Clark's contract, he supported Boyte's decision to not
10  enter into a similar contract as co-counsel. He did so given Boyte's concerns about
11  the perverse incentives such a contract creates, as well as the conflict it created for
12  Boyte with lead counsel, as Boyte believed the defense was unprepared for trial and
13  disagreed with Clark over how they should proceed.[16] (Tr. Aug. 6, 1999 at 25–26.)

14      After listening to testimony, Judge Kongable acknowledged on the record
15  that he believed Kiles's concerns were "genuine." After the previous request for
16  new counsel, Judge Kongable had been "hoping that communication would
17  increase." (Tr. Aug. 6, 1999 at 46–47.) Judge Kongable said that lack of
18  communication concerned him, but concluded that it appeared—despite Kiles's and
19  Boyte's reports to the contrary, and indeed Clark's own admission that the case files
20  were "worthless"—Clark was "making progress in terms of going through
21  voluminous material." (Tr. Aug. 6, 1999 at 30, 47.) And though Clark had been on
22  Kiles's case for ten months, Judge Kongable credited Clark as taking preparatory
23  steps toward basic investigation, such as "setting up interviews" and "making
24  arrangements for an investigation." (Tr. Aug. 6, 1999 at 47.) Judge Kongable

25  _____

26  [16] As the person most knowledgeable about Kiles's case, Boyte did not believe the
    case should proceed to trial, much less without investigation or expert witnesses. In
27  correspondence with her attorney, she stated that she and the other state post-
    conviction attorneys who had previously assisted with the case believed that the
28  best possible outcome would be for Kiles to not proceed to trial.

1   therefore did not believe "certainly to this point" Kiles was receiving ineffective

2   assistance of counsel. (Tr. Aug. 6, 1999 at 47.)

3          Thus, despite the irreconcilable conflict with the client, despite Clark's

4   misrepresentations, and over Kiles's objections, the court granted Boyte's request

5   to withdraw. (ROA 412 at 1.) Clark remained lead counsel.

6          Four days later, Treasure VanDreumel, an attorney also based in Phoenix,

7   accepted the position as second chair. Her contract was also structured on a flat fee,

8   contingency basis: she would receive $10,000 for accepting the appointment to the

9   case and another $10,000 if the case went to trial.

10
11              **4.  Clark blamed others for his irreparably fractured relationship
                     with Kiles.**

12          The conflicts between lead counsel and Kiles, and between counsel

13  themselves, did not improve. In September 1999, Kiles submitted his third pro per

14  motion to the court, informing it that the communication between him and Clark

15  had deteriorated even further since the evidentiary hearing the previous month.

16  (ROA 413 at 1–2.) Kiles wrote that he understood, "I am not allowed an attorney

17  of my choice since I am indigent but I do believe I have the right to attorneys who

18  are effective and competent." (ROA 413 at 5.) Kiles stated that communication with

19  his attorneys had become more difficult, as now neither of his attorneys practiced

20  in Yuma but in Phoenix; upon VanDreumel's appointment, he had been given no

21  contact information to communicate with her. (ROA 413 at 2.) Though Clark had

22  promised to schedule a legal visit at which he, VanDreumel, and the investigator

23  would be present, Kiles reported Clark had failed to do so. (ROA 413 at 2.) Kiles

24  informed the court that he had learned that Clark had another client in Yuma who

25  he had visited without also seeing Kiles. (ROA 413 at 4.) Kiles explained to the

26  court that he simply wished he could have legal visits on a regular basis, but Clark

27  had refused. (ROA 413 at 4.)

28          Also in September 1999, Judge Kongable received a call from another Yuma

County judge, Judge Nelson, expressing concern that Kiles was "potentially not receiving adequate representation." (ROA 414 at 16.) This phone call arose from a conversation that Boyte had had with Judge Nelson, which he relayed in part to Judge Kongable. (Tr. Oct. 8, 1999 at 3, 10–11.) Judge Kongable set a hearing to address these issues for October 8, 1999. Clark filed a response with the court stating, "It is the position of undersigned counsel that this issue has been manufactured by Mary Boyte, Esq. and the defendant in a blatant effort to create what they believe is error." (ROA 414 at 4.)[17]

Because Boyte's conversation with Judge Nelson had precipitated the phone call to Judge Kongable, Boyte was put on the stand and questioned by the court at the October 1999 hearing. The court also allowed the prosecutor David Powell to cross-examine Boyte regarding whether she was conspiring to undermine Clark's representation of Kiles. Powell questioned Boyte about her continuing relationship with Kiles. (Tr. Oct. 8, 1999 at 18–19.) Boyte stated she was still visiting Kiles, as she was representing him on civil matters. (Tr. Oct. 8, 1999 at 20.) When the court cautioned Powell that his questions were straying into privileged attorney-client communications, Powell responded, "Judge, it is the theory of the State, as well as I believe Mr. Clark, that this witness . . . is trying to do anything to have Mr. Clark taken off. I am trying to point out the extremes she has gone to to subvert Mr. Clark's representation." (Tr. Oct. 8, 1999 at 22.)

Boyte stated she could not understand what could be gained from her creating conflict between Kiles and Clark. (Tr. Oct. 8, 1999 at 35–36.) Rather, when she was co-counsel, she "asked that the defendant make every attempt to get along with Mr. Clark. I encouraged that. And the defendant did that. He really did make every attempt." (Tr. Oct. 8, 1999 at 36.) She stated that Clark had simply made the

---

[17] Despite Clark's conspiracy theory, Kiles's counsel would later rely on Boyte to obtain signatures and file motions for them so they would not have to travel to Yuma to do so.

decision "not to communicate with this defendant." (Tr. Oct. 8, 1999 at 36.)

Boyte explained that she had spoken to Judge Nelson "just for advice, more than anything. I did not expect him to take any action." (Tr. Oct. 8, 1999 at 10.) She believed that the conversation was only "going to be between him and myself." (Tr. Oct. 8, 1999 at 7.) Boyte went to him because, she said, "I have a burden in my heart, because I don't feel that [Kiles] is being defended the way he needs to be defended." (Tr. Oct. 8, 1999 at 10.) She had simply been trying to ascertain "whether or not I had some kind of obligation" to take action about her concerns. (Tr. Oct. 8, 1999 at 27.)

Clark was also given the opportunity to question Boyte, and he made clear that his concerns were the allegations against him, rather than the quality of his representation to his client. He told the court, "This is just the type of thing that, you know, can rear its ugly head later on down the road sometime in a PCR. I don't want to get blind-sided." (Tr. Oct. 8, 1999 at 33.)

Clark was questioned as well, and when asked by the judge, admitted, "I don't tend to waste a whole lot of time in discussing [trial] issues with someone in Mr. Kiles's position." (Tr. Oct. 8, 1999 at 41.) Clark said he was "not the type of lawyer that holds someone's hand." (Tr. Oct. 8, 1999 at 45.) Additionally, he made the claim, "I have probably tried more murder cases at federal level than anyone in this part of the United States, just because of our proximity in the federal system and jurisdiction we have in this state." (Tr. Oct. 8, 1999 at 45.) He disclosed trial strategy in an attempt to portray himself in a positive light, telling the court,

> I have, you know, have done the research that I have needed to do with regard to the current state of the law regarding the imposition of the death penalty. I have done the research that deals with the applicable issues on the old code. Because, at some point in time, his earlier counsel chose not to pursue a defense, which was absolutely applicable 12 years ago, when this conviction occurred, which can have a great impact with regard to how this case is ultimately portrayed in front of the jury, allowing him to

32

> pursue less included offenses, that will be well brought, and not summarily denied by a court, when offered by way of an instruction.

(Tr. Oct. 8, 1999 at 41.)

Powell was also given a chance to question Clark.[18] Under friendly questioning, Clark again misrepresented that he had been qualified for the capital appointment, stating "it was [Boyte's] assumption, somehow, I was suspended from the Bar."[19] (Tr. Oct. 8, 1999 at 53.) Clark again called the case file from Kiles's first state post-conviction "worthless," even though the file contained the extensive investigation information, expert reports, and witness interviews that had won Kiles a new trial. (Tr. Oct. 8, 1999 at 65.) And Clark assured the court, "If in fact I perceive some problem with adequately representing Mr. Kiles, I will be the first to step up to the plate." (Tr. Oct. 8, 1999 at 59.)

At the hearing, Kiles clarified that the conflict between him and Clark was not due to Boyte, but to Clark's misrepresentations and his continued failure to follow through with his promises. Kiles testified that Clark had previously misrepresented to the court Clark's involvement in an attempt at victim contact, as well as that Clark had lied to Kiles about the possibility of a plea deal. (Tr. Oct. 8, 1999 at 84–85, 90.)[20] Kiles told the court, "He tells me so many different things, and contradicts them, and I don't understand why he is still on my case. I don't know if it's for financial reasons. I don't believe he is trying to help me." (Tr. Oct. 8, 1999 at 81.)

---

[18] It is unclear why the State had standing or grounds to do so.

[19] As discussed further below, Clark had been suspended from the Bar a few months prior to his appointment on Kiles's case.

[20] Kiles raised the additional concern that Clark had represented Powell's wife in a previous legal action. "Then, today, I see Mr. Powell defending Greg Clark. So what is going on there? I don't know what is going on there. Is that a conflict?" (Tr. Oct. 8, 1999 at 81.) Whether this created an actual conflict between Powell and Clark or not, it added to the conflict between Kiles and Clark.

33

1    Despite Kiles's insistence that Clark was lying about material facts and legal

2    matters, Judge Kongable refused to take action. The court announced, "I think,

3    when all of the shouting is said and done, Mr. Clark is going to probably do a bang-

4    up job for Mr. Kiles. So request to remove him is denied." (Tr. Oct. 8, 1999 at 97.)

5        **5. Kiles filed a petition for special action with the Arizona**
         **Supreme Court requesting new counsel.**

6

7    Given the outcome of the above hearing, Kiles wrote to Clark, telling him

8    that, as they were still forced to work together, Kiles would try to work with him

9    and the recently appointed Treasure VanDreumel to assist in his defense. This good-

10   faith attempt by Kiles to give Clark a chance to be honest and communicative failed,

11   prompting Kiles to file a pro per motion in January 2000. Kiles requested a stay to

12   pursue a special action with the Arizona Supreme Court and requested the court

13   appoint him counsel to do so. (ROA 428; ROA 430.) The court denied both

14   requests, stating, "Defendant already has competent counsel. This issue has been

15   thoroughly litigated. If defense counsel felt that a special action were appropriate,

16   he would have pursued the matter." (ROA 427 at 1.) It is worth noting the paradox

17   embedded in the court's statement: ineffective counsel would hardly pursue a

18   special action to establish his own ineffectiveness. Additionally, the court claimed

19   that, "At this date any petition for special action would seem to be untimely as

20   well." (ROA 427 at 1.) The court did so despite the fact that "Arizona's Rules of

21   Procedure for Special Actions, A.R.S. 17B, provide no limits on the time within

22   which a special action may be filed." *State ex rel. McDougall v. Tvedt*, 787 P.2d

23   1077, 1079 (Ariz. Ct. App. 1989).

24   Kiles had, from the beginning of Clark's appointment, made a record that he

25   was not receiving effective representation.[21] It was only after the trial court's

26   _____

27   [21] The court had additional notice that Clark had not been providing adequate
     representation. In June 2000, Kiles wrote a letter to Judge Kongable requesting an
28   attorney to represent him after being subpoenaed to testify in a different case
     regarding Clark's ineffective assistance when representing another client. The

34

1   repeated refusals to investigate Kiles's claims that Kiles was forced to petition
2   another juridical body for help.

3          Despite the ruling, and out of desperation, Kiles submitted his pro per
4   Complaint in Special Action with the Arizona Supreme Court on March 10, 2000.
5   (Case No. M-00-0006, Pet. For Special Action, Mar. 10, 2000.) He informed the
6   court that Clark had (1) revealed privileged information in court, (2) to date not read
7   the full file, (3) undertaken little to no pretrial investigation, and (4) lied to Kiles
8   about his trial and to the court about communication with Kiles. (Case No. M-00-
9   0006, Pet. For Special Action, Mar. 10, 2000 at 4–5.) Kiles's concerns included that
10  Clark had aggressively misrepresented to the court the work he had done, when
11  there had been little to no pretrial investigation to that point.[22] (Case No. M-00-
12  0006, Pet. For Special Action, Mar. 10, 2000 at 5.) Kiles expressed his concern that
13  his trial was set for the following month, but to date there had been only one single
14  pretrial motion submitted by his counsel. (Case No. M-00-0006, Reply re: Pet. For
15  Special Action, Apr. 10, 2000 at 4.) And despite his quickly upcoming trial date,
16  Kiles said Clark was refusing to discuss with him the most basic aspects of his trial.
17  (Case No. M-00-0006, Reply re: Pet. For Special Action, Apr. 10, 2000 at 6.) Kiles
18  did not know what defense would be presented, and he and counsel had not yet
19  discussed whether Kiles should testify at trial. (Case No. M-00-0006, Reply re: Pet.
20  For Special Action, Apr. 10, 2000 at 8–9.) When he was able to speak with his
21  attorneys, Kiles received conflicting information from Clark and VanDreumel.
22  (Case No. M-00-0006, Reply re: Pet. For Special Action, Apr. 10, 2000 at 4.) In his
23  reply, Kiles wrote that his complaint was not based on feelings, but rights:
24  "Petitioner is not requesting a 'meaningful relationship' with counsel. He is

25  ─────────────────
26  request was denied, and therefore Kiles did not testify.

27  [22] Kiles noted that Clark's assertion that he had interviewed "more witnesses than
    anybody has interviewed prior to this time, in this case" was especially outrageous.
28  *See* Claim 3, *infra*. Clark's own time logs, which he had submitted to the court after
    this claim, listed no time spent interviewing witnesses. (ROA 414 at 32–49.)

requesting an ethical and adequate one." (Case No. M-00-0006, Reply re: Pet. For Special Action, Apr. 10, 2000 at 9.) The Arizona Supreme Court declined to accept jurisdiction of the special action. (ROA 441.)

### 6. After Kiles's guilt-phase proceedings, Kiles continued to request new counsel to represent him at the penalty phase.

Because of Clark's continued deficient performance, Kiles filed a pro per motion in January 2001 requesting new counsel and a supplement to that motion in March 2001. (ROA 519; ROA 522.) The motion stated that Kiles believed he was not adequately represented before or during his July 2000 guilt-phase proceeding. Kiles moreover asserted that he was not given adequate time to speak with counsel in order to assist in his own defense. (ROA 519 at 4.) The supplement contained an affidavit from a third party, a student at Arizona State University, with no prior knowledge of or connection to Kiles's case. The student had overheard Clark announce that he had just finished a case in Yuma where the client was guilty from the beginning, and the "whole thing was a waste of his time and there had been no point in being there at all." (ROA 522 at 3.) Kiles stated that in light of receiving that affidavit, he was concerned there was no confidentiality between him and his attorneys, and he was again "put in a situation where he doubts he can trust his attorney." (ROA 522 at 1–2.)

Despite the court's repeated refusals to ensure adequate representation, Kiles continued to plead with the court for new counsel. Kiles made clear that he did not want Clark to represent him or speak for him and that there was no possible relationship between them. Kiles was unequivocal: "I would like the court to understand that what Mr. Clark says in no way represents me. I object to anything and everything Mr. Clark says." (ROA 576 at 2.) Competent counsel would have recognized that effective representation was no longer possible and moved to withdraw. Despite Clark's earlier assurance to the court that he would withdraw if necessary, at no point did Clark do so. (Tr. Oct. 8, 1999 at 59 ("If in fact I perceive

1    some problem with adequately representing Mr. Kiles, I will be the first to step up

2    to the plate.").)

3              **7. Co-counsel represented Kiles while under a conflict of interest.**

4              Compounding Clark's irreconcilable conflict with Kiles, VanDreumel's own

5    conflicts hindered her ability to fully and adequately represent Kiles.[23] In March

6    2000, Clark hired VanDreumel to represent him before the Disciplinary

7    Commission of the Supreme Court of Arizona regarding allegations by the Bar.

8    (PFR2 Dkt. 1 at 16.) VanDreumel continued to represent Clark until he was

9    censured again for trust account issues on June 28, 2001. (PFR2 Dkt. 1 at 16; PFR2

10   Dkt. 29 Ex. 35 at 1.) Notably, Clark hired VanDreumel after Kiles had filed his

11   request with the trial court to pursue a special action with the Arizona Supreme

12   Court against Clark, and VanDreumel represented Clark throughout the time Kiles

13   sought recourse from the Bar after filing a complaint against Clark. VanDreumel

14   represented both Clark and Kiles for the duration of Kiles's guilt-phase

15   proceedings. (ROA 1189 at 16; PFR2 Dkt. 29 Ex. 35 at 1.)

16             As a result of lead counsel's actions, VanDreumel was divided in her

17   loyalties: She was representing Clark against allegations of dereliction of duties as

18   an attorney, and she therefore had a duty to not undermine his position before the

19   Bar. (PFR2 Dkt. 29 Ex. 35.) She also had a conflicting duty to Kiles, another client.

20   To admit or support Kiles's allegations against Clark, she would have had to

21   undermine her representation of Clark before the Bar. Under the Arizona Rules of

22   Professional Conduct, these incompatible duties gave rise to a conflict of interest.

23

24   [23] Kiles believed that part of counsel's failure to adequately represent him stemmed
     from the nature of the contract his attorneys had signed. In a pro per motion to
25   appoint new counsel after the guilt phase of his trial, Kiles stated to the court that
     Clark had no incentive to continue to work on his case, as the fee structure and
26   contingency fee arrangement meant that Clark was losing money by continuing to
     represent him through the penalty phase of the trial. (ROA 549 at 20.) Kiles wrote
27   to VanDreumel in 2001, asserting his belief that the contingency fee had affected
     how she and Clark had handled his case. Kiles suggested VanDreumel request
28   additional compensation from the court so she would represent him effectively.

Specifically, ER 1.7 provides that with respect to current clients, a concurrent conflict of interest exists if "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibility to another client." ER 1.7(a)(2).

VanDreumel's relationship with Kiles showed the strain of working with unqualified lead counsel, as well as her own conflict between her two clients. When VanDreumel was first appointed, she wrote to Kiles stressing that she, Clark, and Kiles must present a unified front and work together to focus on the case and the issues. While she stated she did not believe it necessary, she did acknowledge Kiles's right to submit motions pro per and represent himself if he believed counsel to be ineffective. She informed Kiles, however, that the most difficult aspect of the case was working with him. VanDreumel interpreted Kiles's appropriate requests for communication as a sign of his lack of gratitude, and she told Kiles she was not eager to spend her time working for someone who did not appreciate her efforts.

After Clark hired VanDreumel to represent him in March 2000, however, her representations to Kiles became increasingly inconsistent, perhaps due to the conflict created by lead counsel.[24] While recognizing the animosity between Clark and Kiles, VanDreumel told Kiles there was nothing she could do to cure it; apparently she did not consider supporting Kiles's efforts to obtain effective representation an option. Occasionally VanDreumel expressed fondness for Kiles, calling him "dear" and "darlin'," and she told him he was never far from her thoughts. However, when Kiles insisted to VanDreumel that she get Clark off the case, VanDreumel responded harshly. She told Kiles that if he raised his complaints about Clark's representation in open court, the jury would judge him harshly and

---

[24] VanDreumel's correspondence occasionally anticipated charges of deficient performance. For example, VanDreumel sent Kiles a letter soon after his guilt-phase trial telling him that his request for copies of documents—a routine request for items Kiles was entitled to receive—was just another one of his attempts to create grounds for state post-conviction relief and that it would not work.

38

1    most certainly sentence him to death.

2         Between his guilt and sentencing phases, Kiles alerted the court to

3    VanDreumel's conflict. On July 8, 2002, Kiles informed the court "that the

4    friendship that Ms. VanDreumel shares with Mr. Clark is also detrimental to me.

5    Their friendship won't allow Ms. VanDreumel to objectively criticize Mr. Clark's

6    effectiveness on this case and this damages my chances at justice. This put [sic] Ms.

7    VanDreumel in a very precarious situation." (ROA 576 at 3; ROA 615 at 3.) Kiles

8    also raised VanDreumel's conflicting duties to her two clients to the court, stating

9    that "Ms. VanDreumel is not candid about Mr. Clark's ineffectiveness in this case,"

10   possibly because VanDreumel represented Clark before the Disciplinary

11   Commission of the Supreme Court of Arizona, "where Mr. Clark was censured for

12   conduct in violation of his duties and obligations as a lawyer, while they were both

13   still appointed to my case." (ROA 585 at 7.)

14        The court held a status hearing in January 2002 at which the conflict was

15   discussed. At that status hearing, VanDreumel misrepresented Clark's

16   qualifications under Rule 6.8 to the court:

17               KILES: So here we have a capital case and here's my
                 attorney and he is in trouble with the State Bar and I have
18               my other attorney representing him. I just don't think it's
                 right, Your Honor. I think it's a conflict. I think I should be
19               given new attorneys. I think because I opposed Mr. Clark
                 from the beginning—and the record speaks for itself—I
20               think I should be given a new trial with adequate attorneys.
                 I just think the record speaks for itself, Your Honor.
21

22               THE COURT: All right. Thank you. Mr. Clark, you want
                 to respond?
23
                 MR. CLARK: Judge, no. I think we have gone over this
24               area before. The court is well-aware of what has transpired.

25               THE COURT: Ms. Van Dreumel, anything from you?

26               MS. VAN DREUMEL: Only, Your Honor, that I—I have
                 spoken with Mr. Kiles about this issue. I explained to him
27               that the State Bar proceedings are confidential and so I
                 could not—it could not be discussed with him and I can
28               say, as I have told Alvie, that the most recent State Bar

                                    39

proceeding involved simply a trust account issue. It was a
money issue. And that was the sum and substance of that.
It had nothing to do with representation and I also
explained under 6.2 and 6.8 of the Supreme Court rules to
Alvie, those rules require a lawyer to be in good standing
and Mr. Clark is still in good standing with the State Bar
and meets the qualifications set forth under the rule.[25]

(Tr. Jan. 7, 2002 at 68–69.) But Clark had again been suspended for non-payment
of dues from April 28, 2000 to May 5, 2000. In 2002, he would not have met Rule
6.8's requirement that an attorney remain in good standing for the five years
immediately prior in order to qualify for a capital appointment.[26]

### 8. Counsel's conflicts and deficient performance undermined the defense team and mitigation work in preparation for Kiles's penalty-phase proceedings.

Clark and VanDreumel's inadequate representation and conflicted,
contentious relationships with Kiles adversely affected other members of the
defense team. After having tried unsuccessfully to work with counsel, the first
mitigation specialist hired after the guilt-phase trial, Jan Dowling, resigned.

The court approved funding and appointment for Jan Dowling on October,
6, 2000. (ROA 510 at 1.) Dowling had been a practicing lawyer and was an
experienced capital mitigation specialist at the time of her appointment. Dowling

---

[25] Clark was ultimately censured by the Arizona Supreme Court for his conduct in
the matter for which he retained VanDreumel to represent him. (PFR2 Dkt. 29 Ex.
35 at 1.) During the course of his representation of Kiles, Clark was also informally
reprimanded for ineffective assistance of counsel twice. On October 28, 2002, Clark
was reprimanded for failing to adequately communicate with his client, and on
February 9, 2004, he was placed on probation for a year for failing to communicate
with his client, charging a fee that was not earned, and not timely refunding that
fee. *See In The Matter of Greg Clark, Attorney No. 009431*, Respondent, Supreme
Court No. SB-01-0118-D, 2001 Ariz. LEXIS 99 (2001); (*see also* PFR2 Dkt. 22
Ex. 4 at 1–2; PFR2 Dkt. 29 Ex. 38 at 1–2).

[26] Additionally, under Rule 63(a) of the Rules of the Arizona Supreme Court, within
ten days of his suspension in 2000, Clark was required to provide notice to
co-counsel, the court, opposing counsel, and his client that he had been suspended.
There is no evidence in the record that Clark fulfilled this obligation.

found Kiles an easy client to work with, but struggled to maintain communication and a working relationship with Kiles's attorneys. (ROA 533 Ex. A at 3–4.)

One of the precipitating events that necessitated Dowling's resignation was when VanDreumel released Dowling's work product, clearly marked "Not for Distribution to Client," to Kiles.[27] (ROA 533 Ex. A at 2.) When Dowling asked VanDreumel why she had released the documents, VanDreumel admitted that in any other case she would not have done so. However, in this case, Kiles had continued to file motions with the court alleging ineffective assistance of counsel, and he had filed a complaint with the Bar against Clark. VanDreumel defended her decision by explaining that, by providing work product to Kiles, VanDreumel hoped to mitigate his dissatisfaction with counsel.[28] But by continuing to focus on Clark's disciplinary issues, VanDreumel placed Clark's interests before Kiles's and thus furthered the conflict of interest. VanDreumel's decision not only undermined a member of her defense team, it threatened the critical relationship between the mitigation specialist and Kiles.

Dowling, who as a seasoned mitigation specialist had experience working with numerous defense teams, was also greatly concerned about Clark's involvement in Kiles's case. In June 2001, after she had been on the case for eight months, Dowling wrote to Judge Kongable: "In particular, lead counsel, Greg Clark, made no effort to contact or meet me. Months passed, and counsel made no

---

[27] The memos VanDreumel shared with Kiles contained notes from Dowling about her perceptions of Kiles's close family members and friends. These notes were intended to assist the defense team, and would have included, for instance, Dowling's personal observations about whether a witness was candid or whether a witness would seem credible to a jury. These observations could have caused Kiles offense and damaged Dowling's relationship with Kiles, harming her ability to get information from him that was essential to the mitigation investigation.

[28] VanDreumel did not truly believe, as she stated to Dowling, that Kiles should receive copies of all documentation in his case; she was merely attempting to navigate her role between Clark and Kiles in disclosing Dowling's memos. VanDreumel later told Kiles he did not need a copy of the mitigation notebook prepared for his penalty phase (although the State was provided one).

41

effort to meet and discuss the case, or comment on the information being gathered." (ROA 533 Ex. A at 1.) During her time working on the Kiles case, there was but a single hour of "meaningful discussion" with counsel, which was the only interaction Dowling ever had with Clark. (ROA 533 Ex. A at 1–2.) Dowling stated that this was not typical: "In *all* of my other cases, the two attorneys and I actually discuss the case." (ROA 533 Ex. A at 1–2.) She concluded that this was not a case where attorneys had different working styles; rather, "[t]his is a case where both the client and I have been completely abandoned by counsel." (ROA 533 Ex. A at 3.)

In response, VanDreumel filed a motion to appoint a new mitigation specialist, and she took the opportunity to attack Dowling and the claims in her letter. (ROA 533 Ex. C at 1–7.) Dowling wrote back to Judge Kongable, stating that VanDreumel was not being honest with the court, and Dowling offered to provide documentation of those misrepresentations. (ROA 533 Ex. D at 1–5.) The court demurred. Judge Kongable wrote back to Dowling:

> I have read your letter of July 6, 2001 and noted the points which you raise. Mr. Kiles and Ms. Boyte have voiced similar concerns.
>
> After some deliberation I have concluded that nothing positive would result from a hearing in court in an attempt to establish "who is right and who is wrong," at least at this time. I strongly suspect that whatever sentence I end up imposing, there will be filed a petition for post conviction relief alleging ineffective assistance of trial counsel. In the overall scheme of things that would be the appropriate time for me to take action, if any.

(ROA 533 Ex. E at 1.)

After Dowling resigned, the ongoing mitigation work in Kiles's case proceeded, albeit deficiently, as the work was hampered by Clark's complete lack of interest or involvement. Although another mitigation specialist was subsequently appointed (ROA 530 at 1), Clark's failure to consider mitigation hindered Kiles's penalty-phase case from the beginning. VanDreumel told Kiles that competent counsel would have hired a mitigation specialist when counsel was first appointed

42

—though when Kiles questioned why this was not done, VanDreumel defended Clark for not having done so. Meanwhile, VanDreumel admitted to the mitigation specialist hired after Dowling's withdrawal that Clark had been ineffective for failing to bring on the mitigation specialist immediately after he was appointed.

Further, while VanDreumel told Kiles in correspondence that she was continuing to fight battles for him every day and that she was ready to tackle the issues in his case, she admitted to the mitigation specialist that she was trying to keep too many balls in the air, was at her limit managing the work on Kiles's case, and needed assistance. VanDreumel also directed the mitigation specialist to check on Clark's representations, as VanDreumel herself did not trust them.[29] By the time Kiles was sentenced, Clark had dropped all appearances of adequately representing his client; he had not spoken to Kiles outside of a courtroom in years, and Clark did not even show up for the sentencing. (ROA 924 at 1.)

Kiles was sentenced to death, after eight years of representation by dishonest, unqualified, and conflicted counsel. Over those eight years, Kiles repeatedly begged his attorneys to effectively advocate for him, but for personal, professional, and financial reasons, they did not.

**B.    Lead counsel's lack of qualifications and affirmative misrepresentations of those qualifications deprived Kiles of his right to due process and qualified counsel.**

To provide the "counsel" guaranteed by the Sixth and Fourteenth

---

[29] Moreover, the correspondence between Kiles and VanDreumel contains troubling hints about what VanDreumel was telling Kiles in person and on the phone. Kiles believed at one point, and accordingly informed the court, that VanDreumel would support Kiles about Clark's ineffectiveness at an upcoming hearing, though VanDreumel ultimately declined to do so. (ROA 615 at 3.) Kiles said VanDreumel was using him to deliver messages to the court because she could not get in contact with Clark and that she was using Kiles as a sounding board to complain about Clark. Shortly before his penalty phase, Kiles asked if he could take VanDreumel up on her offer to speak with the State, the judge, and Clark off the record and have another attorney appointed as lead counsel. (Kiles had only objected to this proffer previously because it would be off the record.) Whether VanDreumel's offer was in earnest is unknown because of her own conflict of interest.

43

Amendments, a lawyer must satisfy standards set by the courts for practice. *See Reese v. Peters*, 926 F.2d 668, 669 (7th Cir. 1991) ("The 'Counsel' to which the sixth amendment refers is a professional advocate who meets the standards set by the court." (citing *Solina v. United States*, 709 F.2d 160 (2d Cir. 1983))). Performance standards for attorney appointment are specifically promulgated to ensure adequate representation and to preserve a defendant's right to a fair trial. A court that appoints counsel who falls short of those standards also falls short of ensuring the constitutional rights of due process and effective representation. *See id.* at 670. Especially in a capital case, the defendant "has a substantial and legitimate expectation that he will be deprived of his liberty" only after the state has followed its own statutory guidelines setting forth the mandatory protections guaranteed to preserve a defendant's right to a fair trial and adequate representation. *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980). The expectation of adequate counsel, and the expectation that the state will adhere to its own rules ensuring that right, is a fundamental liberty interest "that the Fourteenth Amendment preserves against arbitrary deprivation by the State." *Id.*

In Arizona, the appointment of capital-defense counsel who did not meet the requirements under Rule 6.8 deprives a capital defendant of his Sixth and Fourteenth Amendment rights. Where a state has provided specific regulations regarding how capital trials shall proceed, "it is not correct to say that the defendant's interest" in having those rules adhered to, especially when those rules were created specifically to protect his rights, "is merely a matter of state procedural law." *Id.* "The failure of a state to abide by its own statutory commands" implicates "a liberty interest protected by the Fourteenth Amendment against arbitrary deprivation by a state." *Fetterly v. Paskett,* 997 F. 2d 1295, 1300 (9th Cir. 1993). The State of Arizona failed to ensure Kiles received adequate representation in compliance with its own law, in violation of Kiles's Sixth and Fourteenth Amendment rights.

44

1    **1.    Lead counsel did not satisfy Arizona's standards for
2         appointment as capital defense counsel, depriving Kiles of
          his due-process rights.**

3    Rule 6.8, promulgated by the Arizona Supreme Court, sets forth the
4    qualifications required for appointment in capital cases.[30] *See, e.g.*, *State v. Snelling*,
5    236 P.3d 409, 413 (Ariz. 2010). As the Arizona Attorney General has emphasized,
6    these "standards of competency" are both "comprehensive and mandatory." Brief
7    of Respondents-Appellants at 9, 2001 WL 34092875, *Spears v. Stewart*, 283 F.3d
8    992 (9th Cir. 2002). Among other requirements, Rule 6.8 restricts eligibility to
9    serve as counsel in capital trials to attorneys who "have been a member in good
10   standing of the State Bar of Arizona for at least five years immediately preceding
11   the appointment."

12   Because Clark did not meet this requirement, the State of Arizona failed to
13   adhere to its own "comprehensive and mandatory" rules for appointment of counsel
14   in capital cases when Clark was appointed as Kiles's lead counsel. While "good
15   standing" is not defined in Rule 6.8 itself, the term appears in Rule 33(d) of the
16   Rules of the Arizona Supreme Court, which describes those eligible for admission
17   pro hac vice to practice in Arizona courts. Those who submit an application to
18   practice pro hac vice are required to be in good standing, "currently eligible to
19   practice in those courts" in which the submitter was already admitted, and "not
20   currently suspended or disbarred in any court" at the time in which the application
21   is made. Clark was suspended by the Bar for non-payment of dues mere months
22   before his appointment to Kiles's case. Accordingly, Clark was not in good standing
23   with the Bar at that time, and he thus did not meet the requirement under Rule 6.8
24   that he be in good standing for the five years immediately preceding his
25   appointment as lead counsel in Kiles's case. Indeed, though Clark submitted a

26   _____

27   [30] The Rules referenced here are those applicable in 1998, at the time of Clark's
28   appointment; though some have changed in numbering, they are substantively the
     same as those presently in force.

45

motion claiming he satisfied Rule 6.8 requirements, he failed to attach a Certificate of Good Standing from the Bar, possibly because under Rule 74(c) of the Rules of the Arizona Supreme Court, the certificate would have noted his suspension and his prior public discipline for ineffective assistance of counsel.

The State of Arizona's failure to ensure the requirements of Rule 6.8 were met is not a mere state procedural matter, as is illustrated by the string of disciplinary measures and sanctions against Clark throughout his representation of Kiles.[31] The requirements of Rule 6.8 were designed to prevent what ultimately occurred—the consistent failure of appointed counsel to conduct himself in accordance with the ethical rules governing attorneys. The denial here of procedural due process implicates every decision that followed made by counsel on Kiles's case, leading to the unreliable and arbitrary imposition of a death sentence.

The State of Arizona failed to follow its own procedures ensuring that capital defendants receive adequate counsel under the Sixth and Fourteenth Amendments. "Such an arbitrary disregard of the petitioner's right to liberty is a denial of due process of law." *Hicks*, 447 U.S. at 346. Kiles was denied the guaranteed right to effective counsel in violation of his Constitutional rights, and as his sentence is arbitrary and unreliable, it must be overturned.

### 2. Lead counsel and co-counsel misrepresented Clark's qualifications to the court, denying the court the ability to protect Kiles's due-process rights.

On October 8, 1998, the trial court conducted an inquiry into whether Clark and his co-counsel at the time, Mark Reeves, were qualified to be appointed to a capital case under Rule 6.8. Clark's statements during the trial court's inquiry into his eligibility for appointment under Rule 6.8 denied the court the ability to make an informed and accurate decision and constituted ineffective assistance of counsel, as well as a denial of Kiles's procedural due-process rights protected under the

---

[31] These disciplinary measures are discussed in footnote 25, *supra*.

46

1    Fourteenth Amendment. *Hicks*, 447 U.S. at 346.

2        Mary Boyte, Kiles's previous state post-conviction counsel, raised two

3    concerns at the court's inquiry about Clark's appointment: (1) Clark's public

4    censure for ineffective assistance of counsel on a juvenile transfer case; and (2)

5    Clark's suspension from the Bar for non-payment of dues. (Tr. Oct. 7, 1998 at 5–

6    6.) Clark misrepresented both of those issues to the court.[32] He informed the court

7    that the first was merely a "judgment call," after he himself had conditionally

8    admitted his conduct failed to meet the ethical duties of competence and diligence.

9    In reviewing the claims against Clark, the Court of Appeals of Arizona found there

10   was a "failure to even attempt" to advocate for his former client. *See Matter of*

11   *Appeal in Maricopa Cty., Juvenile Action* No. JV-511576, 925 P.2d 745, 748 (Ariz.

12   Ct. App. 1996) (quoting *Strickland*, 466 U.S. at 694). He also stated to the court

13   that the Bar had made the mistake regarding payment of dues, and that he had

14   rectified it immediately. This was not true. The Arizona Supreme Court issued an

15   order regarding non-payment, and the Bar only reinstated Clark after he submitted

16   payment two weeks later.

17       At a January 2002 hearing, VanDreumel, who was at the time representing

18   Clark before the Bar on another matter,[33] also misrepresented Clark's qualifications

19

20   [32] In his bid for appointment to Kiles's case, Clark misrepresented to the Yuma
21   County Legal Defender how many clients he had on death row. Clark said he only
     had one former client sitting on death row; upon information and belief, he had at
22   least three. *See* footnote 7, *supra*. Clark had previously misrepresented his work
     history; he was exposed for falsely claiming to be a former Navy SEAL and lying
23   about his military service in Vietnam. According to retired U.S. Navy veteran Jim
24   Wade, who directed the investigation into Clark's falsehoods, Clark also claimed
     to have "participated in the failed Iran hostage rescue operation Desert One."

25   [33] The Arizona Supreme Court censured Clark in June 2001 for failure to respond
26   to a request for information from the Bar, failure to provide full and complete
     responses to inquiries from the Bar, and for trust account violations. (PFR2 Dkt. 29
27   Ex. 35 at 1.) The check Clark submitted to show the court he had completed his
     capital training, and that he was qualified to be lead counsel, had been improperly
28   issued from his IOLTA account. (ROA 381 at 6.)

47

for appointment under Rule 6.8. VanDreumel informed the court that Clark was in good standing and had remained in good standing, and thus that he "meets the qualifications set forth under the rule." (Tr. Jan. 7, 2002 at 68–69.) As stated above, to qualify under Rule 6.8, Clark would have had to remain in good standing with the Bar for the five years immediately preceding the appointment. But Clark had not remained in good standing; he had again been suspended for non-payment of dues in 2000. Thus, Clark would not have been eligible for appointment to a capital case at the time of VanDreumel's representation.

Further, VanDreumel and the court should have already been aware of Clark's failure to meet the good standing requirement. Under Rule 63(a) of the Rules of the Arizona Supreme Court, Clark was required to notify co-counsel, the court, opposing counsel, and the client of his suspension in 2000. There is no evidence in the record that he did so, and the court seems to have been unaware of his suspension. Therefore, VanDreumel either knowingly misrepresented Clark's disciplinary history to the court, or she was misled as to Clark's qualifications and subsequently misled the court.

Ultimately, Clark's misrepresentations and failure to act ethically and professionally resulted in the court's extralegal appointment, violating the Arizona Rules of Criminal Procedure. The process that permitted Clark's appointment had a substantial and injurious effect on Kiles's conviction and sentencing, as discussed below in the numerous claims of ineffective assistance of trial counsel.[34] *See Brecht v. Abramson*, 507 U.S. 619, 623 (1993); *see also, e.g., infra*, Claim 3. Because Kiles failed to receive qualified counsel as required by state law, violating his Sixth Amendment right to counsel and his liberty rights as protected under the Fourteenth Amendment, and that failure had substantial and injurious effect, habeas relief is

---

[34] Kiles incorporates by specific reference into this discussion of prejudice the following claims of ineffective assistance of trial counsel: Claim 2, Claim 3, Claim 4, Claim 5, Claim 6, Claim 14, and Claim 15, *infra*.

48

1  warranted. *Hicks*, 447 U.S. at 346; *Brecht*, 507 U.S. at 623.

2      **C.**    **Kiles's counsel were ineffective due to a conflict of interest,
3  denying Kiles his right to competent and un-conflicted
    representation.**

4      "The Sixth Amendment right to counsel requires effective assistance by an

5  attorney, which has two components: competence and conflict-free representation."

6  *Garcia v. Bunnell*, 33 F.3d 1193, 1195 (9th Cir. 1994) (citing *Wood v. Georgia*, 450

7  U.S. 261, 271 (1981)). The right to conflict-free representation is a right to

8  counsel's undivided loyalty, and it is evaluated by a different standard than one

9  measuring competence. *See Cuyler v. Sullivan*, 446 U.S. 335, 348–49 (1980);

10  *Wood*, 450 U.S. at 271. The Supreme Court has stated that to establish a Sixth

11  Amendment violation based on a conflict of interest, a defendant must make two

12  showings: (1) that counsel actively represented conflicting interests, and (2) that the

13  actual conflict of interest adversely affected the lawyer's performance. *Hovey v.*

14  *Ayers*, 458 F.3d 892, 907–08 (9th Cir. 2006) (citing *Cuyler*, 446 U.S. at 348–50).

15  Unlike a challenge to counsel's competency, prejudice is presumed if the defendant

16  shows both prongs have been met. *Strickland*, 466 U.S. at 692; *United States v.*

17  *Miskinis*, 966 F.2d 1263, 1268 (9th Cir. 1992).

18      Although the test articulated in *Cuyler* involved an attorney representing two

19  clients with conflicting interests, the presumption of prejudice extends to conflicts

20  between a client and his lawyer's personal, professional, or financial interests.

21  *Mannhalt v. Reed*, 847 F.2d 576, 579–80 (9th Cir. 1988); *see also Pometta v. Poole*,

22  992 F.2d 1220 (9th Cir. 1993); *United States v. Hoffman*, 733 F.2d 596, 601–02

23  (9th Cir. 1984) (finding a conflict based on attorney's failure to notify federal judge

24  of state bar suspension); *United States v. Hearst*, 638 F.2d 1190, 1193 (9th Cir.

25  1980) (finding a conflict based on attorney's private financial interests).

26      Counsel in this case actively represented conflicting interests. Clark created

27  the conflict of interest when he hired VanDreumel to defend his conduct as an

28  attorney before the Bar. At the same time that she represented Clark, VanDreumel

also represented a client, Kiles, who was actively litigating Clark's ineffective assistance and conduct as an attorney before the Arizona Supreme Court and the Bar. Clark, as lead counsel, was responsible for both the effective representation of his client and the integrity and working relationship of the defense team; he failed in both respects. VanDreumel could not have assisted Kiles in ensuring he received effective assistance without undermining Clark's interests before the Bar; she furthered the conflict by accepting the dual representation and failing to recognize that her actions sacrificed one client's interests in favor of another.

There is no doubt that VanDreumel's representation was adversely affected by her conflict of interest; VanDreumel admitted so to mitigation specialist Jan Dowling. VanDreumel shared memos from Dowling with Kiles that were clearly marked as "Not for Distribution to Client." VanDreumel justified doing so because Kiles was filing motions with the court and had just filed a complaint with the Bar about Clark's ineffective assistance. VanDreumel's decision was one of the issues that led Dowling to resign. In other words, VanDreumel chose to undermine a specialist hired on one client's case to benefit another client. This was not sound strategy, but an attempt to navigate the conflict of interest lead counsel had created.

Clark was not providing effective assistance, so VanDreumel had a duty to speak to the court on behalf of Kiles. That she could not and did not do so satisfies the two-pronged test in *Cuyler*. Instead, during a hearing, VanDreumel misrepresented Clark's qualifications under Rule 6.8 after Kiles raised his concerns about her representation of Clark to the court. (Tr. Jan. 7, 2002 at 68–69.)

Additionally, VanDreumel made troubling attempts to silence her client about lead counsel's ineffective assistance, which shed light on the conflict under which she was laboring. In correspondence, Kiles demanded that VanDreumel take action to represent him and remove Clark. In response, VanDreumel insisted to Kiles that raising Clark's ineffective assistance during his trial would cause a jury to judge him harshly and condemn him to death. She was protecting Clark, her

50

1    client and her co-counsel, with whom she had a personal and professional
2    relationship, at Kiles's expense. *See United States v. Williams*, 594 F.2d 1258, 1260
3    (9th Cir. 1979) (finding sufficient conflict existed where the attorney-client
4    relationship was "a stormy one" with "threats, and counter-threats").

5    "The very premise of our adversary system of criminal justice is that partisan
6    advocacy on both sides of a case will best promote the ultimate objective that the
7    guilty be convicted and the innocent go free." *Herring v. New York*, 422 U.S. 853,
8    862 (1975). In Kiles's case, the State received partisan advocacy, while Kiles's
9    counsel had divided loyalties. Moreover, counsel's interests directly contradicted
10   Kiles's interests. Prejudice must be presumed, as a conflict between Kiles and his
11   counsel existed and adversely affected counsel's performance. *Cuyler*, 446 U.S. at
12   348–50.

13   ## D.   The irreparably fractured relationship between Kiles and Clark
14   adversely affected the representation Kiles received.

15   To "compel one charged with grievous crime to undergo a trial with the
16   assistance of an attorney with whom he has become embroiled in irreconcilable
17   conflict is to deprive him of the effective assistance of any counsel whatsoever."
18   *Brown v. Craven*, 424 F.2d 1166, 1170 (9th Cir. 1970); *see also United States v.*
19   *Moore*, 159 F.3d 1154, 1158 (9th Cir. 1998). Accordingly, the "Sixth Amendment
20   requires on the record an appropriate inquiry into the grounds for such a motion [for
21   new counsel], and that the matter be resolved on the merits before the case goes
22   forward." *Schell v. Witek*, 218 F.3d 1017, 1025 (9th Cir. 2000). Further, if a "serious
23   conflict did exist that resulted in the constructive denial of assistance of counsel, no
24   further showing of prejudice is required," and the trial is "presumed to have been
25   unfair." *Id.* at 1027; *see also Frazer v. United States*, 18 F.3d 778, 782 (9th Cir.
26   1994); *Williams*, 594 F.2d at 1260.

27   The conflict between Kiles and Clark deprived Kiles of effective assistance
28   of counsel. As stated above, to establish an ineffective assistance of counsel claim

51

based on conflict of interest, a defendant must show that "an actual conflict of interest adversely affected his lawyer's performance." *Cuyler*, 446 U.S. at 350.

Sufficient conflict exists when the defendant was forced to trial with the "assistance of a particular lawyer with whom he was dissatisfied, with whom he would not cooperate, and with whom he would not, in any manner whatsoever, communicate." *Brown*, 424 F.2d at 1169. Kiles stated to the court, "If you keep Mr. Clark on my case, I don't know how he is going to be able to defend me because there is some things I need to tell my attorney, but I will not tell him." (Tr. Aug. 6, 1999 at 17.) "When a defendant accuses his counsel of improper behavior and the counsel disputes his client's accusations, an actual conflict of interest results because 'any contention by counsel that defendant's allegations were not true would (and did) contradict his client.'" *United States v. Shorter*, 54 F.3d 1248, 1252–53 (7th Cir. 1995). Clark repeatedly defended himself to the court by disparaging his client. (ROA 393 at 1; ROA 414 at 4.) As Kiles could not communicate with Clark, and as Clark blamed their failure to communicate on Kiles, there could be no attorney-client relationship whatsoever. Accordingly, Kiles and Clark had a conflict of the sort contemplated by *Brown*.

Further, if a "defense attorney was required to make a choice advancing his own interests to the detriment of his client's interests," an actual conflict of interest exists, meeting the first prong of a *Cuyler* test. *United States v. Horton*, 845 F.2d 1414, 1419 (7th Cir. 1988). Thus, the court hearings on Kiles's motions for new counsel during the very first year of Clark's appointment only helped solidify the conflict between Kiles and Clark. At those hearings, Clark was representing himself, not his client. Therefore the "interests of counsel were diametrically opposed to those" of Kiles. *United States v. Del Muro*, 87 F.3d 1078, 1080 (9th Cir. 1996) (holding that the trial court's determination that an evidentiary hearing was warranted heightened the conflict). Throughout the eight years Clark represented Kiles, Clark's continued need to justify his performance before the court, to the

52

1  detriment of his client, resulted in a conflict of interest under *Cuyler* that was never

2  resolved. This is especially true in light of the ongoing Bar proceedings against

3  Clark—his interests were necessarily split between adequately representing Kiles

4  and protecting himself against further disciplinary action.

5      *Cuyler*'s second prong, requiring an adverse effect, is satisfied where an

6  attorney's conflict of interest causes a "lapse in representation contrary to the

7  defendant's interests." *Wilson v. Mintzes*, 761 F.2d 275, 286 (6th Cir. 1985)

8  (quoting *Sullivan v. Cuyler*, 723 F.2d 1077, 1086 (3d Cir. 1983)).[35] Mary Boyte

9  testified before the court only a year after Clark's appointment, "There is, as best

10  as I can tell, no attorney-client relationship between Mr. Kiles and Mr. Clark." (Tr.

11  Oct. 8, 1999 at 31.) The lapse in representation lasted for another seven years. It

12  was not a reasonable legal or ethical decision for Clark to continue to represent

13  Kiles, with whom Clark had "no attorney-client relationship." Clark's continued

14  representation was contrary to Kiles's interest, as Kiles stated repeatedly he could

15  not assist Clark, and therefore himself, in his own defense. The irreconcilable

16  conflict between Clark and Kiles had an adverse effect on Kiles's representation.

17  Therefore, Kiles failed to receive the effective representation required under *Cuyler*

18  and the Sixth Amendment. *See Brown*, 424 F.2d at 1170.

19      **E.    The contract structure under which Kiles's counsel were**
       **appointed created a financial conflict of interest.**
20

21      Kiles's counsel were appointed to his case under contracts that gave rise to a

22  conflict of interest and that had an adverse effect on representation, in violation of

23  Kiles's Sixth, Eighth, and Fourteenth Amendment rights.

24      Both lead and co-counsel in Kiles's case had contracts for appointment that

25  amounted to contingency fees and that disincentivized effective representation in a

26  ───────────────

27  [35] Kiles's prior attorneys were required to refund most of their fee after they
    withdrew. (ROA 1189 at 26; PFR2 Dkt. 22 Ex 11.) Financial concerns may have
28  motivated Clark's insistence that he remain on Kiles's case.

53

capital case. Clark's contract stated Clark would receive $25,000 for accepting lead counsel appointment on Kiles's case and would receive another $25,000 if the case went to trial. (Tr. Nov. 29, 1999 at 6.) VanDreumel agreed to accept $10,000 for taking Kiles's case, with another $10,000 if the case went to trial. Accordingly, counsel (especially Clark, as VanDreumel was appointed not long before trial) had a financial interest in not adequately representing Kiles at pretrial proceedings, as the first lump sum was paid upon appointment. There was no additional compensation for adequate representation, but there was compensation for gambling with Kiles's life at trial.[36] Counsel's contracts not only created a conflict at the pretrial stage—under the contracts' express terms, counsel were paid for guilt-phase representation—but no additional funds were to be disbursed for penalty-phase representation. These financial incentives led to deficient performance of counsel at both phases of trial, and a capital sentence against Kiles that is arbitrary and unreliable.

Flat-fee and contingency-fee contracts are not per se violations of the Sixth Amendment. Rather, the defendant must show that the fee arrangement created an actual conflict of interest. *See Cuyler*, 446 U.S. at 348. "Under this standard, an 'actual conflict' is '*a conflict that affected counsel's performance*.'—as opposed to a mere theoretical division of loyalties." *United States v. Wells*, 394 F.3d 725, 733 (9th Cir. 2005) (quoting *Mickens v. Taylor*, 535 U.S. 162, 171 (2002)). Additionally, the defendant must show adverse effect. No further showing of prejudice is required, "only 'that some plausible alternative defense strategy or tactic might have been pursued but was not and that the alternative defense was inherently in conflict with or not undertaken'" due to the attorney's financial interests. *Id*. (quoting *United States v. Stantini*, 85 F.3d 9, 16 (2d Cir. 1996)).

---

[36] VanDreumel stated that Clark, as lead counsel, made all the strategic decisions as to the defenses to be raised and the witnesses called at the guilt phase and that those decisions were made before VanDreumel's appointment to Kiles's case.

1    The contract structure under which Clark and VanDreumel were appointed
2    created clear conflicts of interest and affected their representation of Kiles's
3    interests. That Clark stood to benefit financially if Kiles went to trial, and to obtain
4    the flat fee promised regardless of the hours worked, adversely affected Clark's
5    efforts on behalf of Kiles at the pretrial stage and after the guilt phase.

6    Adequate representation of capital defendants requires extensive pretrial
7    investigation and mitigation work, work that would conflict with the terms of a
8    contract that financially incentivized and compensated trial work, not pretrial work.
9    The emphasis on pretrial representation was the norm expected of capital defense
10   attorneys at the time of Clark's and VanDreumel's appointments. In 1989, the
11   American Bar Association (ABA) promulgated its Guidelines for the Appointment
12   and Performance in Death Penalty Cases, which it had drafted over the course of
13   several years and which reflected a national consensus among capital defense
14   practitioners as to the obligations of counsel for capital cases in the 1980s. *See* ABA
15   Guidelines for the Appointment and Performance in Death Penalty Cases (1989)[37]
16   ("1989 ABA Guideline(s)"). The Supreme Court has consistently relied upon
17   guidelines from the ABA and similar professional groups to inform the inquiry into
18   reasonable professional conduct. *See, e.g.*, *Padilla v. Kentucky*, 559 U.S. 356, 366–
19   67 (2010) ("We long have recognized that the '[p]revailing norms of practice as
20   reflected in American Bar Association standards and the like . . . are guides to
21   determining what is reasonable. . . .'" (omissions in original) (quoting *Strickland*,
22   466 U.S. at 688)); *see also*, *e.g.*, *Bobby v. Van Hook*, 558 U.S. 4 (2009) (per curiam);
23   Ariz. Att'ys for Crim. Just. & Ariz. Cap. Representation Project, Arizona Capital
24   Case Defense Manual (1995).

25   As the 1989 ABA Guidelines explained, effective advocacy in a capital case
26   must begin immediately upon appointment. "Counsel should conduct independent

27
28   [37] The ABA updated these guidelines in 2003. The updated version will hereinafter be referred to as the "2003 ABA Guideline(s)."

55

1    investigations relating to the guilt/innocence phase and to the penalty phase of a
2    capital trial. Both investigations should begin immediately upon counsel's entry
3    into the case and should be pursued expeditiously." 1989 ABA Guideline 11.4.1(A).
4    As to the guilt-phase investigation, while Clark did initially request funding for an
5    investigator, one was not hired until nearly a year after his appointment. (ROA 384
6    at 1; Tr. Oct. 8, 1999 at 74.) Moreover, Clark testified that his investigation was not
7    independent, but based almost entirely upon information provided by the State.[38]
8    Unfortunately, Clark's decision not to conduct any independent investigation was
9    a fiscally sound, financially responsible decision under his contract. The flat fee,
10   contingency contract in this case created a conflict of interest between Kiles's right
11   to effective representation and Clark's financial welfare. This is undoubtedly why
12   the ABA Guidelines espoused an hourly rate model of compensation: "Capital
13   counsel should be compensated for actual time and service performed. The
14   objective should be to provide a reasonable rate of hourly compensation which is
15   commensurate with the provision of effective assistance of counsel." 1989 ABA
16   Guideline 10.1(A).

17        Concurrent with the guilt-phase investigation, the mitigation investigation
18   "should comprise efforts to discover all reasonably available mitigating evidence
19   and evidence to rebut any aggravating evidence that may be introduced by the
20   prosecutor." *Id.* § 11.4.1(C). In Kiles's case, lead counsel failed to do any mitigation
21   investigation, before or after the guilt phase. Indeed, Clark had access to boxes and
22   boxes worth of mitigation material from Kiles's first successful state post-

---

24   [38] "Mr. Powell and I sat down and went through the complete trial record of this
25   case, located every piece of evidence, went through every piece of evidence that
     was used in the last trial, judge. We ordered additional pieces of evidence because
26   from what we now know of the trial from the appellate records, there are items of
     evidence that are certainly out there that are to Mr. Kiles' advantage. We have
27   located those and I have ordered copies of all of the photographs that were used
     both in the trial and the photographs that were not used in the trial." (Tr. Aug. 6,
28   1999 at 31.)

conviction petition, but rather than review that important information in the critical period before the trial, Clark insisted it was "worthless." (Tr. Oct. 8, 1999 at 65.) No mitigation investigation was undertaken by Clark until after Kiles had been found guilty. (ROA 509 at 1.) This was not in line with norms of appropriate capital representation at the time. VanDreumel admitted as much to Kiles and to the mitigation specialists, who were hired later in the proceedings.

After Kiles's guilt phase was over, the fee arrangement still created a financial conflict for both of his counsel. Once the second lump sum was paid for the guilt-phase proceeding and no more funds were forthcoming, any additional work on Kiles's case went unpaid. Clark was rarely involved in the case after the guilt phase ended. VanDreumel alerted the court to Clark's inaction when she wrote asking for additional funds, stating that she alone had done all post-trial work and that she could no longer do so without compensation. While the court approved additional monies, VanDreumel still did the vast majority of the work for Kiles's penalty phase with little aid from Clark, who had no financial incentive to assist.

Given the financial and personal conflicts of interest under which Kiles's attorneys represented him at the penalty phase, "it is virtually impossible for a reviewing court to determine what evidence would have been presented if substitute counsel had been appointed, or how the presentation of testimony might have been affected by trial counsel's conflicting interest." *Del Muro*, 87 F.3d at 1080. Indeed, as discussed below, trial counsel failed to investigate and present a wealth of mitigation that has since been uncovered. *See infra*, Claim 6. What is clear is that Kiles was denied his right to un-conflicted, effective representation. The perverse incentives of the contract and the adverse effect on representation harmed the quality of representation Kiles received.

Because the fee arrangement with Kiles's counsel created a conflict of interest adversely affecting their representation both before and after trial, Kiles's conviction and sentence are unreliable and unconstitutional.

1

2

    **F.**    **The state post-conviction court's decision that Kiles failed to state a colorable claim for relief was unreasonable and does not bar relief.**

3

4

5

6

7

8

    Kiles raised these claims below in similar form on direct appeal. (DA2 Dkt. 86 at 66–84.) The Arizona Supreme Court declined to consider the claims, saying that they were more appropriate for a state post-conviction proceeding. *See State v. Kiles*, 213 P.3d 174, 183–84 & n.12 (Ariz. 2009) ("Because we do not address his claims of ineffective assistance, we express no opinion on the allegations or their veracity and leave them for Kiles to raise in a proper proceeding").

9

10

11

12

13

14

    These claims were then appropriately presented in Kiles's state post-conviction relief petition. (ROA 1189 at 10–18, 23–30.) The post-conviction court's order was the last reasoned state-court decision, and it is therefore the subject of this Court's review. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). The state post-conviction court denied the claims on the merits, ruling that Kiles failed to state a colorable claim. (ROA 1214 at 1).

15

16

17

18

19

20

21

22

23

24

25

26

27

28

    This denial, with its justification that Kiles's claim lacked the requisite specificity, was unreasonable. Kiles's state post-conviction petition included details on Clark's suspensions from the Bar. It also included facts that demonstrated that the conflicts under which counsel labored while representing Kiles were actual, not theoretical. (*See, e.g.*, ROA 1189 at 11, 12–18.) Additionally, the petition laid out a number of ways in which counsel performed deficiently, adversely affecting Kiles, as a result of those conflicts. (*See, e.g.*, ROA 1189 at 28, 30 ("[T]he relationship between Mr. Kiles and Mr. Clark was irrevocably fractured," which resulted in a failure to communicate and establish an attorney-client relationship); *see also* ROA 1189 at 23–30.) Because the allegations in Kiles's state post-conviction petition were adequately specific and would, if proven, entitle him to relief, he stated a colorable claim. *See Phillips v. Woodford*, 267 F.3d 966, 992 (9th Cir. 2001). The state court's denial was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court.

58

1  *See* 28 U.S.C. § 2254(d)(1). The state court's denial was also based upon
2  unreasonable factual determinations in light of the record before the court. *See* 28
3  U.S.C. § 2254(d)(2).

4  Kiles has, therefore, satisfied the strictures of § 2254(d), and this Court must
5  review the merits of his claim de novo. *See Frantz v. Hazey*, 533 F.3d 724, 736 (9th
6  Cir. 2008) (en banc) (stating that once § 2254(d) has been satisfied, a federal court
7  conducts a de novo review of the underlying constitutional violation).[39]

8    **G.   Taken individually and together, these conflicts plaguing counsel,**
9    **following from an initial denial of a liberty interest, resulted in a**
     **conviction and sentencing that cannot withstand constitutional**
10   **scrutiny.**

11  Following an initial due-process violation, Kiles never had qualified,
12  conflict-free counsel, creating a breakdown in the adversarial process. Indeed, for
13  much of the proceedings, counsel and client acted as adversaries while the State
14  took sides, advocating for defense counsel and against Kiles's interests. (*See, e.g.*,
15  Tr. Oct. 8, 1999 at 22.) When the adversarial process breaks down "and loses its
16  character as a confrontation between adversaries, the constitutional guarantee [of
17  counsel] is violated." *United States v. Cronic*, 466 U.S. 648, 656–57 (1984).

18  That breakdown throws Kiles's sentencing into question and negates any
19  inference that the myriad unreasonable decisions counsel made cataloged in this
20  Petition "were carefully considered." *Bemore v. Chappell*, 788 F.3d 1151, 1162 (9th
21  Cir. 2015). The conflicts and violations described here "are so likely to prejudice
22  the accused that the cost of litigating their effect in a particular case is unjustified."
23  *Cronic*, 466 U.S. at 658. As Kiles's convictions and sentences were the products of
24  these Sixth, Eighth, and Fourteenth Amendment violations, Kiles is entitled to
25  relief.

26  _____

27  [39] Alternatively, Kiles alleges he can overcome any default by showing cause and
28  prejudice, because of the ineffective assistance of state counsel. *See Martinez v.*
    *Ryan*, 566 U.S. 1, 9 (2012); *Strickland*, 466 U.S. at 688, 694.

**Claim Two**

**Counsel's ineffective assistance in jury selection at the guilt-phase proceedings deprived Kiles of his rights to counsel, a fair trial, an impartial jury, due process, and equal protection.**

Counsel's ineffective assistance in guilt-phase jury selection deprived Kiles of his rights to counsel, a fair trial, impartial jury, due process, and equal protection in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution. Kiles incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Kiles did not present this claim in state court. Kiles can overcome any default by showing cause and prejudice, as the ineffective assistance of Kiles's state post-conviction counsel in failing to raise this claim constitutes cause for the default and resulted in prejudice to Kiles. *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). Kiles will demonstrate at an evidentiary hearing that state post-conviction counsel fell below the standards of minimally competent capital post-conviction attorneys when they failed to raise this meritorious claim. Because this claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider the merits of the claim de novo.

**A.      A defendant has a Sixth Amendment right to the effective assistance of counsel during voir dire.**

The Sixth Amendment guarantees to a defendant the right to effective assistance of counsel, which in turn protects the due-process right to a fair trial. *Strickland*, 466 U.S. at 684; *see also Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986) ("The right to counsel is a fundamental right of criminal defendants; it assures the fairness, and thus the legitimacy, of our adversary process."). A defendant was denied effective assistance when (1) the "representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have

60

1    been different." *Strickland*, 466 U.S. at 687–88, 694. Ultimately, "[t]he benchmark

2    for judging any claim of ineffectiveness must be whether counsel's conduct so

3    undermined the proper functioning of the adversarial process that the trial cannot

4    be relied on as having produced a just result." *Id.* at 686.

5        With respect to the first prong of the *Strickland* test, "[t]he proper measure

6    of attorney performance remains simply reasonableness under prevailing

7    professional norms." *Id.* at 688. The Supreme Court has consistently relied upon

8    guidelines from the ABA and similar professional groups to inform the inquiry into

9    reasonable professional conduct. *See, e.g.*, *Padilla v. Kentucky*, 559 U.S. 356, 366–

10   67 (2010) ("We long have recognized that the '[p]revailing norms of practice as

11   reflected in American Bar Association standards and the like . . . are guides to

12   determining what is reasonable. . . .'" (omissions in original) (quoting *Strickland*,

13   466 U.S. at 688)); *see also* 1989 ABA Guidelines; 2003 ABA Guidelines. Courts

14   have regularly used these and similar guidelines to help determine whether counsel

15   performed deficiently. *See, e.g.*, *Rompilla v. Beard*, 545 U.S. 374, 387 & n.7 (2005)

16   (citing the 1982 ABA Criminal Justice Standards for Criminal Justice when

17   deeming trial counsel ineffective for their failure to conduct a thorough

18   investigation); *Wiggins v. Smith*, 539 U.S. 510, 524–25 (2003) ("Counsel's conduct

19   similarly fell short of the standards for capital defense work articulated by the

20   American Bar Association (ABA)—standards to which we long have referred as

21   'guides to determining what is reasonable.'").

22       With respect to the prejudice prong of the *Strickland* test, the inquiry is

23   whether there is a "reasonable probability" that the jury would have reached a

24   different result absent counsel's errors. *Strickland*, 466 U.S. at 694. A "reasonable

25   probability" is just one "sufficient to undermine confidence in the outcome"—a

26   "defendant need not show that counsel's deficient conduct more likely than not

27   altered the outcome." *Id.* at 693–94.

28       The effective assistance of counsel is particularly necessary to ensure that a

1    defendant's rights are protected during one of the most critical phases of trial: jury

2    selection. "*Voir dire* plays a critical function in assuring the criminal defendant that

3    his [constitutional] right to an impartial jury will be honored. Without an adequate

4    *voir dire* the trial judge's responsibility to remove prospective jurors who will not

5    be able impartially to follow the court's instructions and evaluate the evidence

6    cannot be fulfilled." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981)

7    (plurality opinion). The importance of jury selection is heightened in a capital

8    case—jury selection can even be dispositive. *See Harris ex rel. Ramseyer v.*

9    *Blodgett*, 853 F. Supp. 1239, 1265 (W.D. Wash. 1994); Gary Goodpaster, *The Trial*

10   *for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. Rev.

11   299 (1983). Because of the critical nature of jury selection, capital counsel can be

12   ineffective for failing to conduct an adequate voir dire. *See Strickland*, 466 U.S. at

13   688, 694; *Ybarra v. McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2011) (analyzing claim

14   of ineffective assistance of counsel with respect to jury selection).

15        As elaborated below, defense counsel performed deficiently in multiple ways

16   during jury selection at Kiles's guilt-phase proceeding, and Kiles was prejudiced as

17   a result. *See Strickland*, 466 U.S. at 688, 694.

18   **B.    Counsel were deficient in failing to adequately or meaningfully**
         **question prospective jurors to ensure a fair and impartial jury,**
19       **thereby prejudicing Kiles.**

20        To ensure a fair trial, defendants have a right to have their cases heard "by a

21   panel of impartial, indifferent jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)

22   (internal quotation marks omitted). Voir dire is a critical tool in ensuring that

23   prospective jurors who cannot fairly assess the evidence and follow the law are not

24   seated. *See Rosales-Lopez*, 451 U.S. at 188 (plurality opinion).

25        The 1989 ABA Guidelines list requirements counsel must meet to adequately

26   represent a capital defendant during voir dire. *See* 1989 ABA Guideline 11.7.2.

27   These guidelines instruct capital counsel to familiarize themselves "with the

28   precedents relating to questioning and challenging of potential jurors, including the

62

procedures surrounding 'death qualification' concerning any potential juror's beliefs about the death penalty." *Id.* The standards require counsel to ask about more than just prospective jurors' views on the death penalty. For example, a juror might feel that a lesser-included charge is never appropriate if a defendant has committed a crime involving children or domestic violence. Effective counsel must uncover such impairments during voir dire. In order to avoid seating biased jurors, counsel must use vigorous voir dire to fully explore each prospective juror's views, keeping in mind the particulars of the case. Here, counsel failed to satisfy even the most minimal standards for competent jury selection.

### 1.   Counsel were deficient in failing to adequately screen prospective jurors through questionnaires.

Prior to Kiles's trial, prospective jurors were asked to complete a questionnaire. (*See* Tr. July 5, 2000 at 7–8.) Pursuant to a stipulation off the record, the State drafted a proposed questionnaire and sent it to defense counsel, who had the opportunity to add questions before submitting it to the court.[40] The State's questionnaire provided a brief summary of the crime and then asked the prospective juror for limited background information, as well as information about views on the death penalty. The questionnaire was superficial, and defense counsel should have taken the opportunity to add questions needed to adequately evaluate prospective jurors. Counsel should have requested questions on such topics as race, views on addiction, whether the prospective juror or someone close to that person had been a victim of domestic violence, and whether the death of young children in a crime would have an effect. Counsel should likewise have asked whether any prospective juror had been or knew someone who had been the victim of a similar crime.

Moreover, there were no questions asking prospective jurors about the depth of their personal knowledge about Kiles's case. This was unreasonable in light of

---

[40] The State's proffered questionnaire was entered into the record. (CR89-15577 ROA 169 at 2–10.)

1   Kiles's first trial and convictions; it was even more unreasonable given that defense
2   counsel were litigating the extensive coverage of the ongoing 2000 proceedings in
3   the local news. (*See* Tr. Apr. 11, 2000 at 8; DA2 Dkt. 86 at 85–87; Case No. CV-
4   00-0143, Pet. For Special Action, May 5, 2000.)

5        Though defense counsel were given the opportunity to do so, they failed to
6   add any questions or request additional information; the State's proffered
7   questionnaire was given to jurors unaltered. Defense counsel's failure to solicit
8   meaningful information from prospective jurors crippled counsel's ability to
9   conduct voir dire effectively and ensure an impartial jury was empaneled.

10        Defense counsel have a duty to question jurors beyond "general inquiries,"
11  as such inquiries are inadequate to "detect those jurors with views preventing or
12  substantially impairing their duties in accordance with their instructions and oath."
13  *Morgan v. Illinois*, 504 U.S. 719, 734–35 (1992). Kiles's counsel had the
14  opportunity to use questionnaires to investigate the ability of prospective jurors to
15  be fair and impartial given the facts and defenses in Kiles's case, but counsel failed
16  to take it. Counsel were thus unable to make strategic decisions during voir dire,
17  violating their duty to ensure a fair and impartial duty. *See id.* As described below,
18  that failure to elicit critical information led to the empaneling of a biased jury.

19        **2.   Counsel were deficient in failing to question those
20              prospective jurors who were biased in favor of the death
              penalty.**

21

22        While the Constitution "does not dictate a catechism for *voir dire*," it entitles
23  a defendant to a jury selection that is adequate to ensure that an impartial jury is
24  empaneled. *Morgan*, 504 U.S. at 729; *Dennis v. United States*, 339 U.S. 162, 171–
25  72 (1950). To effectuate that right, counsel must elicit information about whether a
26  prospective juror is unable to be impartial. *See Morgan*, 504 U.S. at 729; 1989 ABA
27  Guideline 11.7.2.

28        Despite the paucity of information elicited by the questionnaires, some of the

jurors who were ultimately seated gave answers on the questionnaires that should have alerted defense counsel of their pro-death penalty bias. Those jurors had a "substantial[] impair[ment]" that required counsel to challenge them for cause or, at the very least, to further examine them. *See Morgan*, 504 U.S. at 728. Counsel did neither. The failure to ask follow-up questions or to challenge prospective jurors for cause, which was the result of lack of preparation and investigation, was unreasonable. *See Wiggins*, 539 U.S. at 521–22 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.").

The questionnaire given to prospective jurors asked as follows: "Which of the following statements comes closest to your feeling on the death penalty?"[41] Several prospective jurors indicated that they had strong views in favor of the death penalty, by marking either (1) that they were in favor of the death penalty in every case where the State has proven beyond a reasonable doubt a person killed another with premeditation, or (2) that they felt the death penalty should be used when a person knowingly or intentionally takes the life of another. Among these prospective jurors were nine jurors who were ultimately seated: Jurors L.G., L.W., D.W., B.S., D.M., B.M., A.M., C.A.K., and T.D.[42] Even though these jurors provided glaring indications of a likely "substantial impairment" under *Morgan*, counsel failed to ask these nine prospective jurors any questions before they were seated. (*See* Tr. July 7, 2000 at 75–80, 100–70.)

One juror, Juror H.D., expressed strong pro-death penalty beliefs and was

_____

[41] Prospective jurors were given six options. They ranged from being so opposed to the death penalty that the juror would not vote guilty for first-degree murder even if it were proven beyond a reasonable doubt, to feeling that the death penalty should be used in every case when a person knowingly or intentionally takes the life of another. The middle-ground option was "I am not opposed to the death penalty, but feel it should be used only in special cases." (CR89-15577 ROA 169 at 8–9.)

[42] Voir dire at the guilt phase used last names rather than numbers.

65

1    questioned at voir dire before being seated. However, defense counsel did not
2    question him on his views on capital punishment. (*See* Tr. July 7, 2000 at 114–16.)
3    Juror H.D. was only asked cursorily about his exposure to the case in the media.[43]
4    (Tr. July 7, 2000 at 114–16.)

5         Because the ineffectual voir dire led to the seating of jurors with actual pro-
6    death biases, Kiles was prejudiced. *See Ybarra*, 656 F.3d at 1001.

7         ### 3.    Counsel were deficient in failing to question jurors who were likely biased due to past personal experiences.
8

9         Counsel also deficiently failed to question or challenge jurors who had a
10   "substantial impairment" based on their prior personal experiences, prejudicing
11   Kiles. *See Morgan*, 504 U.S. at 728.

12        Two of the empaneled jurors, Jurors L.W. and C.A.K., stated on their
13   questionnaires that they had been victims of domestic violence. Neither of these
14   jurors were asked *any* questions at voir dire. (*See* Tr. July 7, 2000 at 75–80, 100–
15   70.) This failure was especially egregious given counsel's guilt-phase strategy,
16   which was to contend that Gunnel's murder was a "heat of passion" crime. Such a
17   defense invited association with domestic violence. Accordingly, defense counsel
18   should have sought to determine whether prospective jurors—especially those who
19   had been victims of domestic violence—would have difficulty being impartial in a
20   case involving a female victim who had been killed by her partner. When a
21   prospective juror has been the victim of a crime similar to the one at issue, it is
22   imperative that counsel question the prospective juror about that experience. If, in
23   response, the juror cannot conclusively state that he can be impartial, bias is
24   presumed. *Cf. United States v. Kechedzian,* No. 16-50326, 2018 WL 4200969, at
25   *6 (9th Cir. Sept. 4, 2018) (holding that where a juror has been a victim of a similar
26   crime, he must be excused for cause if he does not unequivocally state he can be
27
28   _____

[43] Juror H.D. ultimately served as an alternate juror. (Tr. July 19, 2000 at 99.)

1   impartial). Therefore, Kiles's counsel should have been particularly diligent in

2   questioning jurors who had been involved in or were victims of domestic violence.

3   It was unreasonable for defense counsel to not question these jurors about whether

4   those experiences impaired their ability to remain impartial.

5         Juror C.L.K. wrote on her questionnaire that her great-grandfather was

6   murdered, as was her best friend's father. But defense counsel asked Juror C.L.K.

7   no questions about these murders at voir dire. Rather, Clark questioned her what

8   she remembered about the instant crime from the media. (Tr. July 7, 2000 at 134.)

9   Juror C.L.K. remembered that a woman and children had died, that one of the

10   children was found in a canal, and that the other was never found. (Tr. July 7, 2000

11   at 134.) Clark asked no follow-up questions. (*See* Tr. July 7, 2000 at 75–80, 100–

12   70.) Asking Juror C.L.K. solely about her media exposure, when her ability to

13   remain indifferent may have been compromised by her personal experience with

14   murder, was neither reasoned nor strategic, and counsel were deficient for making

15   such a glaring error. *See Wiggins*, 539 U.S. at 521–22.

16         Instead of asking pertinent questions of prospective jurors whose

17   questionnaires revealed potential bias, defense counsel failed wholesale to inquire

18   into whether any of the jurors who were ultimately seated were *Morgan*-impaired.

19   (*See* Tr. July 7, 2000 at 75–80, 100–70.) Defense counsel's failure to meaningfully

20   question, or to question at all, those jurors was deficient. That failure resulted in the

21   seating of several jurors who likely had significant actual biases based on their

22   personal experiences. *See United States v. Gonzalez*, 214 F.3d 1109, 1112 (9th Cir.

23   2000) (explaining that a court may assume a juror is biased where he "has had some

24   personal experience that is similar or identical to the fact pattern at issue in the

25   trial"). Because counsel's deficient voir dire resulted in the seating of a jury that

26   was not impartial, counsel were ineffective. *See Ybarra*, 656 F.3d at 1001.

27         Finally, Juror A.B. babysat a little girl who was kidnapped, raped, and

28   murdered in 1988. Juror A.B. was close with the girl's family, worked with her

father, and saw how her murder affected him. While not addressed on A.B.'s questionnaire, this experience directly affected the way in which Juror A.B. heard the evidence at Kiles's trial; the testimony of Shemaeah's father deeply affected her because she had seen another father of a murdered child go through a similar tragedy. But counsel did not know any of this. Counsel asked Juror A.B. a few questions about whether she had seen anything about Kiles's case or the crime in the media when it occurred. (Tr. July 7, 2000 at 106–07.) She was seated without further questioning. Having been close to a victim and family of a similar crime is a substantial impairment under *Morgan*, and adequate defense counsel would have uncovered that impairment.

That these jurors were seated deprived Kiles of his rights to an impartial jury, a fair trial, and a reliable verdict. Defense counsel's ineffective assistance at voir dire resulted in a jury that could not "stand impartial and indifferent to the extent commanded by the Sixth Amendment." *Morgan*, 504 U.S. at 727.

### 4. Counsel were deficient in failing to question prospective jurors about their knowledge of Kiles's previous convictions and sentences.

At capital re-trials or re-sentencings, it is universally acknowledged as extremely damaging and prejudicial to inform the new jury of the prior death sentence or to make repeated references to the fact that defendant has been previously convicted and on death row. *See, e.g.*, *Fullwood v. Lee*, 290 F.3d 663, 682–83 (4th Cir. 2002) (remanding for hearing to determine whether jurors were exposed to information about prior death sentence because "generally speaking, such information is prejudicial in nature"); *Atkins v. Commonwealth*, 631 S.E.2d 93, 100 (Va. 2006) (reversing death sentence reached at resentencing because the jury was made aware of prior death sentence); *People v. Woolley*, 793 N.E.2d 519, 524 (Ill. 2002) (reversing death sentence because "[t]he fact that the jurors heard that another jury sentenced defendant to death could have mitigated the serious consequences of their decision"); *Hammond v. State*, 776 So.2d 884, 889 (Ala.

68

Crim. App. 1998) (holding that the prosecutor "committed reversible error when he informed the jury that Hammond had previously been sentenced to death for the same offense at a previous trial"); *State v. Miller*, 771 S.W.2d 401, 404 (Tenn. 1989) ("[I]t is clearly improper, as a general rule, to inform a jury at a resentencing hearing that at a prior trial defendant was sentenced to death."); *State v. Britt*, 220 S.E.2d 283, 292 (N.C. 1975) ("[N]o instruction by the court could have removed from the minds of the jurors the prejudicial effect that flowed from knowledge of the fact that defendant had been on death row as a result of his prior conviction of first degree murder in this very case."). For this reason, competent capital counsel should have questioned jurors individually as to whether they had prior personal knowledge of the crime or defendant. Counsel not only failed to elicit such information through the questionnaire; counsel also failed by not questioning the prospective jurors on these matters in person. (*See* Tr. July 7, 2000 at 75–80, 100–70.) Given the risks associated with a seated juror having knowledge of Kiles's prior convictions and death sentences, counsel's failure to address this topic even obliquely was deficient. *See Strickland*, 466 U.S. at 688.

At least one juror was aware at the time he was seated on the jury that Kiles had been convicted at a prior trial and that the jury was not supposed to know that fact. The juror was uncertain whether he was supposed to alert counsel or the judge about his knowledge of the case. Because the juror was not questioned on the matter, he assumed it was of no consequence. That this juror was seated without any questioning is on its own evidence of ineffective assistance. However, the failure by counsel to uncover his knowledge of Kiles's prior conviction was prejudicial to Kiles. *See, e.g.*, *Fullwood*, 290 F.3d at 682–83.

### 5. Counsel were deficient in failing to meaningfully question jurors about their exposure to Kiles's case in the media.

Kiles's guilt-phase voir dire was completely unproductive. Counsel did not ask *any* individual questions of eleven people who were seated on the jury: Jurors

69

1   E.B., T.D., C.A.K., A.M., B.M., D.M., B.S., L.W., D.W., L.G., and C.M. Jurors

2   L.G. and C.M. were alternates. (*See* Tr. July 7, 2000 at 75–80, 100–70; ROA 479.)

3        This was especially unreasonable because defense counsel were well aware

4   of the extensive coverage in local news of the crime, the court proceedings, and

5   Kiles's prior convictions and sentences. To combat bias from media exposure, the

6   defense filed a petition for special action with the Arizona Supreme Court for a

7   change of venue. The petition detailed how pervasive news coverage was in Yuma

8   regarding Kiles's case. (Case No. CV-00-0143, Pet. For Special Action, May 5,

9   2000 at 4–46.) The defense further argued against a motion by the Yuma Sun, a

10  prominent local newspaper, to print information about Kiles's former trial and

11  conviction; the Yuma Sun was given permission to print the information. (ROA

12  491 at 3–8; Tr. July 7, 2000 at 9–14.) On another occasion, defense counsel told the

13  court, "It is apparent, based upon my investigation of the pleadings, when they're

14  filed with the court that the press is—they come and get them almost the next day,

15  if not the very same day, and then they're reported in the press." (Tr. Apr. 11, 2000

16  at 8.) Defense counsel knew exactly how widespread the media coverage of the

17  case was. Yet counsel still failed to ask a single question of the majority of jurors

18  who were seated on Kiles's jury. This failure was unreasonable.

19       Given the importance of capital jury selection, legal precedent and

20  established professional norms require counsel to question prospective jurors on

21  their knowledge of a prior capital sentence when a case is being retried, as well as

22  their potential biases or inability to fairly consider the evidence before them. Kiles's

23  counsel permitted 11 of 16 jurors to be selected without asking *any* questions.

24  Kiles's counsel's failure to ask even one question of these jurors to assess whether

25  they were substantially impaired constitutes deficient performance. *See Morgan*,

26  504 U.S. at 728; *Virgil v. Dretke*, 446 F.3d 598, 613 (5th Cir. 2006) (counsel must

27  make reasonable efforts "to explore the depth or intensity" of potentially

28  disqualifying views among the venire).

70

1    Kiles's counsel's failure to ask any questions of most seated jurors, and
2    failure to adequately question other seated jurors, resulted in the seating of multiple
3    jurors whose biases rendered them substantially impaired. *See Ybarra*, 656 F.3d at
4    1001. Such a jury was unconstitutional, as "due process alone has long demanded
5    that, if a jury is to be provided the defendant, regardless of whether the Sixth
6    Amendment requires it, the jury must stand impartial and indifferent to the extent
7    commanded by the Sixth Amendment." *Morgan*, 504 U.S. at 727.

8    **C.    Counsel failed to challenge the denial of a fair cross-section of the
       community in the venire.**
9

10   A venire comprised of "a representative cross section of the community is an
11   essential component of the Sixth Amendment right to a jury trial." *Taylor v.*
12   *Louisiana*, 419 U.S. 522, 528 (1975). It is unconstitutional where a "distinctive"
13   group is not fairly represented due to systematic exclusion, without a significant
14   state interest justifying it. *Duren v. Missouri*, 439 U.S. 357 (1979); *Taylor*, 419 U.S.
15   at 533–35. The under-representation need not be intentional or a product of bad
16   faith. *Glasser v. United States,* 315 U.S. 60, 86 (1942).

17   Kiles's guilt-phase jury was chosen through a selection process that involved
18   excessive unsupervised discretion and that was therefore susceptible to abuse. The
19   Jury Commissioner for the County of Yuma mailed questionnaires to prospective
20   jurors who were selected from voter registration lists. (ROA 225 at 5; ROA 225 Ex.
21   55 at 1.) If the questionnaire was returned due to a bad address, there was no follow
22   up or attempt to locate these individuals. (ROA 225 at 5; ROA 225 Ex. 55 at 1.)
23   The Jury Commissioner eliminated prospective jurors based on the returned
24   questionnaires at the Jury Commissioner's sole discretion. (ROA 225 at 5; ROA
25   225 Ex. 55 at 1–2.) These questionnaires were then destroyed, without any
26   possibility for review by litigants or judicial officers. (ROA 225 at 5; ROA 225 Ex.
27   63 at 2.) There was therefore no way to ensure that the venire represented a fair
28   cross-section of the community.

71

1    Counsel's failure to object to the fair cross-section violation in Kiles's case

2    was deficient, as *Taylor* long pre-dated Kiles's 2000 guilt phase. *See* 1989 ABA

3    Guideline 11.7.2(A) (requiring counsel to consider challenges to the venire panel).

4    Moreover, counsel failed to seek information about race on the juror questionnaires.

5    (*See* CR89-15577 ROA 169 at 4–11.) It is unknown whether the defense took

6    contemporaneous notes on prospective jurors, or whether counsel otherwise looked

7    at the racial makeup of the prospective juror pool.[44]

8    Kiles was prejudiced by his counsel's failure to investigate or object, as the

9    failure to do so deprived Kiles of a fair trial. *Strickland*, 466 U.S. at 687. Jury

10   selection from a venire that violates the fair cross-section guarantee is structural

11   error. *United States v. Rodriguez-Lara*, 421 F.3d 932, 940 (9th Cir. 2005), *overruled*

12   *on other grounds by United States v. Hernandez-Estrada*, 749 F.3d 1154 (9th Cir.

13   2014). Here, had counsel objected to the denial of the fair cross-section, "there is a

14   reasonable probability that the claim [counsel] failed to raise at trial would have

15   prevailed, either at trial or on appeal." *Doe v. Ayers*, 782 F.3d 425, 432 (9th Cir.

16   2015) (citing *Strickland*, 466 U.S. at 694).

17   **D.    Counsel failed to make a record as to the reasons underlying the
             removal of many prospective jurors.**

18

19   Finally, counsel failed to make a complete record regarding jury selection,

20   compromising Kiles's right to meaningful appellate review. *See Gregg v. Georgia*,

21   428 U.S. 153, 195 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.);

22   *Dobbs v. Zant*, 506 U.S. 357, 358 (1993) ("We have emphasized before the

23   importance of reviewing capital sentences on a complete record."). Counsel's

24   failure was deficient and prejudiced Kiles. *See Strickland*, 466 U.S. at 688, 694; *see*

25   *also* Claim 15, *infra*.

26   _____

27   [44] Defense counsel failed to preserve the 2000 guilt-phase proceeding juror
28   questionnaires. This was part of a pattern of failing to create a record. *See* Claim
     15, *infra*.

Kiles's counsel and the State stipulated to the removal of a vast majority of prospective jurors, without providing any reason for their removal on the record. After reviewing the questionnaires, but without engaging in any voir dire of these prospective jurors, trial counsel and the State stipulated that 41 prospective jurors should be excused. (ROA 456.) The record of jury selection does not reflect the fact of these prospective jurors' removal, let alone the reasons underlying removal. (*See* Tr. July 7, 2000 at 19–28.) Thus, the record on appeal lacked critical information necessary for Kiles's appellate lawyer to challenge his convictions, prejudicing Kiles. The failure to make a complete record constituted ineffective assistance by Kiles's counsel. *See* Claim 15, *infra*.

In capital cases, "certain inquiries must be made to effectuate constitutional protections." *Morgan*, 504 U.S. at 730. Reasonably competent capital attorneys would have worked to uncover jurors' biases justifying their removal for cause, as well as information that would have enabled counsel to make informed peremptory strikes. The failure of Kiles's counsel to do so undermined his right to an impartial jury, and therefore to a fair trial, such that Kiles is entitled to relief.

## Claim Three

**Kiles was denied effective assistance of counsel at his guilt-phase proceedings because counsel failed to investigate, develop, and present critical evidence, among other significant errors.**

Kiles's trial counsel failed to investigate and prepare adequately for the guilt phase of trial and consequently neglected to develop and present Kiles's only viable defense to first-degree murder for the death of Valerie Gunnel. Counsel's deficient performance in that respect and others, both individually and cumulatively, prejudiced Kiles and thereby violated his rights under the Sixth and Fourteenth Amendments to the U.S. Constitution. Kiles presented this claim below. (ROA 1189 at 23–25, 30–40, 42–46; PFR2 Dkt. 1 at 23–46.) Kiles incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

1
## A.      Background on guilt-phase proceedings.

2        The trial commenced on July 10, 2000, with prosecutor David Powell's
3  opening statement. Powell offered the jury a brief overview of the State's theory of
4  the crime: Late on February 9, 1989, Kiles returned home to Gunnel's apartment,
5  where he and Gunnel argued over food stamps that he had taken from her. (Tr. July
6  10, 2000 at 12–13.) She slapped him twice, after which he went to his car, returned
7  with a tire jack, and began beating her. (Tr. July 10, 2000 at 12–13.) Powell
8  contended that the assault began in the east bedroom and continued into the living
9  room, where Gunnel died. (Tr. July 10, 2000 at 13.) According to Powell, Kiles
10 then went into the west bedroom, where "the carnage continued" as Kiles beat
11 Gunnel's children, Shemaeah and LeCresha, to death. (Tr. July 10, 2000 at 13.) He
12 later disposed of the children's bodies in the river. (Tr. July 10, 2000 at 13.)

13       Powell laid out for the jury the three types of witnesses the State planned to
14 present. First, the State would offer the testimony of several witnesses who would
15 help lay the scene for what occurred on the day of the crime and until Kiles's arrest.
16 (Tr. July 10, 2000 at 14–15.) Second, the State would present several "scientific
17 witnesses." (Tr. July 10, 2000 at 16.) Powell overstated what these experts could
18 attest to, claiming for example that, through DNA evidence, the State would explain
19 "the chronology of what happened inside that apartment." (Tr. July 10, 2000 at 16–
20 17.) Powell similarly insisted that blood-spatter expert Tom Bevel would be able to
21 "explain exactly what happened," including that "there were a minimum of 14
22 blows struck" in the west bedroom. (Tr. July 10, 2000 at 19–20.) In addition, the
23 State would use the DNA expert and a statistician to establish that Shemaeah had
24 been killed, even though her body had not been found, and would present the
25 testimony of R.B. Mallon, M.D., who conducted the autopsies. (Tr. July 10, 2000
26 at 18–20.) Lastly, the State would call witnesses who could speak to Kiles's
27 statements in the wake of the killings. (Tr. July 10, 2000 at 21.) One such witness
28 would be Kiles's mother; Powell asserted that she would testify that Kiles said,

1    "point blank, 'I killed Valerie and the kids.'" (Tr. July 10, 2000 at 21.)

2        Lead defense counsel Greg Clark had three focal points during his opening.

3    First, despite Powell's misrepresentations, Clark extolled the scientific evidence in

4    this case, hammering home for the jury that it was incontrovertible. Clark informed

5    the jury that "Mr. Powell [wa]s absolutely correct with regard to the blood spatter

6    evidence." (Tr. July 10, 2000 at 34.) The field was "a very scientific area"; further,

7    "[y]ou can't fight the DNA. You can't. You can't find [sic] that blood spatter

8    because that is a forensic fact in this case." (Tr. July 10, 2000 at 34–35.) In that

9    same vein, Clark confirmed for the jury, "I can tell you now that the physical

10   evidence, that scientific evidence doesn't lie. It's not going to lie and it's never lied.

11   It is what it is." (Tr. July 10, 2000 at 41.)

12       Second, Clark laid out the defense's theory of the case. Clark made clear

13   from the outset that Kiles was "absolutely responsible for the death of Valerie

14   Gunnel. That is not [the] issue." (Tr. July 10, 2000 at 39–40.) What was at issue

15   was Kiles's degree of culpability for the death, which Clark noted occurred "during

16   the heat of the passion, a heated, ugly fight." (Tr. July 10, 2000 at 40.) With respect

17   to the children's deaths, Kiles "didn't act alone." (Tr. July 10, 2000 at 40.)

18       Third, Clark previewed for the jury Kiles's anticipated testimony. Clark

19   explained that Gunnel and Kiles had used drugs together on February 9, 1989, to

20   celebrate his new job, until Kiles eventually used Gunnel's food stamps to buy

21   drugs and use them with friends. (Tr. July 10, 2000 at 42–43.) When he went home

22   with his friends to "face the music," Gunnel started an argument because Kiles had

23   returned without the drugs he had promised. (Tr. July 10, 2000 at 44–45.) Clark

24   noted Kiles had had "a little bit to drink, he's had a lot of drugs," and "[h]e [was]

25   not having any of it." (Tr. July 10, 2000 at 44.) He started preparing to leave, but

26   the argument escalated when Gunnel slapped Kiles twice. (Tr. July 10, 2000 at 45.)

27   At that point, he reached down, grabbed the tire jack by his side, and hit her. (Tr.

28   July 10, 2000 at 45–46.) After the shock lessened, Kiles went to look for his friends;

75

1   he found them in the bedroom and saw that they had killed the children. (Tr. July

2   10, 2000 at 46.) Kiles tried to clean the apartment while his friends left to dispose

3   of the children's bodies. (Tr. July 10, 2000 at 47–48.) Later, because he still "wants

4   to get high," Kiles tried to sell some of Gunnel's property in order to get money for

5   more drugs. (Tr. July 10, 2000 at 49.)

6       As Powell had pledged, the State did offer three types of witnesses over the

7   course of six days of testimony. Through several witnesses, the State tried to

8   develop a timeline of events starting on February 9, 1989. (*See, e.g.*, Tr. July 12,

9   2000 at 6–9, 11–13 (Gunnel's sister giving overview of when she saw Gunnel on

10  February 9, 1989); Tr. July 12, 2000 at 42–43 (Shemaeah's father testifying about

11  when he saw Gunnel and Shemaeah on that day).) Several Yuma Police Department

12  officers, including lead investigator Detective Brian Rodgers, detailed the crime

13  scene and aspects of the investigation. (*See, e.g.*, Tr. July 11, 2000 at 143–44

14  (Rodgers describing crime scene at Gunnel's apartment).) Defense counsel

15  concentrated on asserting that Kale Johnson was responsible for the deaths of the

16  children, so counsel focused their cross-examinations on undercutting the

17  credibility of these witnesses, especially those who suggested that Johnson was not

18  involved in the crime. (*See, e.g.*, Tr. July 12, 2000 at 158–61, 168–69, 172–83

19  (defense counsel trying to impeach credibility of Deirdre Johnson, who had

20  suggested that Kale Johnson had not seen Kiles on the morning of February 10,

21  1989).) Defense counsel further elicited testimony on cross-examination regarding

22  forensic evidence, including Kale Johnson's shoeprints at Gunnel's apartment and

23  blood on Johnson's clothing, tying Johnson to the crime scene. (*See, e.g.*, July 17,

24  2000 at 74–76 (Rodgers testifying that Converse prints appearing to match

25  Johnson's shoes were found in the hallway and back patio area of Gunnel's

26  apartment); July 17, 2000 at 83–84 (Rodgers testifying that Gunnel's blood was

27  found on Johnson's shoes and pants)).) Little, if anything, of relevance to how

28  Gunnel's death unfolded emerged.

The State then presented the testimony of four experts.[45] First, DNA analyst David Duplissa informed the jury that he had analyzed 11 items from the crime scene for DNA profiles and had compared those profiles to five known standards, including those of Gunnel, Kiles, and Kale Johnson. (Tr. July 12, 2000 at 114–17.) Among the items that had blood with Gunnel's DNA profile were a tire jack ratchet, a shoe, and a swab from the living room door. (Tr. July 12, 2000 at 122–23.) Kiles's trial counsel, seeking to bolster their third-party defense, drew out on cross-examination that one of Johnson's Converse shoes and his pants had Gunnel's blood on them, as well as that the blood on Johnson's jacket had a DNA profile from an unidentified individual. (Tr. July 12, 2000 at 132–38.)

The State next sought to establish the fact of Shemaeah's death through Thomas Wiltbank, M.D., who testified that it was "extremely likely" that the blood on the bedsheet submitted for testing came from an offspring of Gunnel and Ward Wade, namely Shemaeah. (Tr. July 13, 2000 at 87, 92.) The defense asked no questions of Dr. Wiltbank.

Third, the State called Dr. Mallon, who had conducted the autopsies of Gunnel and LeCresha Kirklin. Dr. Mallon identified the primary cause of death of both victims as blunt trauma to the head. (Tr. July 13, 2000 at 97, 101.) He further defined the term "defensive wound" and indicated that he saw evidence of such a wound with Gunnel's broken arm. (Tr. July 13, 2000 at 99.) On cross-examination, the defense made a particular point of getting Dr. Mallon to agree that this defensive wound must have occurred when Gunnel was conscious, meaning that it must have occurred early on during the beating. (Tr. July 13, 2000 at 105.)

Fourth, blood-spatter expert and crime-scene reconstructionist Tom Bevel testified on behalf of the State. He declared that blood-stain analysis can provide "in essence, a reconstruction of the occurrences that might have taken place in order

---

[45] The State also presented Rodgers as a crime-scene management expert. (ROA 446 at 2.)

1    to produce the blood as it is found." (Tr. July 14, 2000 at 8–9.) From his photograph-

2    based analysis of the west bedroom, where the children were killed, Bevel testified

3    that there had been a minimum of 14 blows and that the attacker was right-handed.

4    (Tr. July 14, 2000 at 15, 19, 27.) On cross-examination, the defense once again

5    focused on its third-party defense and had Bevel discuss what the implications

6    would be (in terms of who was swinging the weapon) if the blood on Johnson's

7    jacket were castoff or spatter. (Tr. July 14, 2000 at 37–39.) Bevel also testified that

8    for a shoeprint to be made in blood, that blood still has to be in a liquid state; he

9    was unable to identify any clotting in the photographs of the bloody Converse

10   shoeprints in Gunnel's apartment, suggesting that the blood was "[f]resher" when

11   the Converse shoe was placed in it. (Tr. July 14, 2000 at 40–44.) Bevel

12   acknowledged that a compromised crime scene—one that has changed since the

13   crime—can limit what blood-stain evidence can say about the crime. (Tr. July 14,

14   2000 at 47–48.) Defense counsel's cross-examination focused nearly exclusively

15   on information relating to the children's deaths, not to Gunnel's. (*See* Tr. July 14,

16   2000 at 30–50, 55–59.)

17        Lastly, the State called Imojean Kiles, Jesse Solomon, Larry Hawkins, and

18   Kale Johnson to testify about the admissions Kiles made to them. The State's

19   purpose was to establish that Kiles had repeatedly confided to family and close

20   friends that he had killed Gunnel and her children and had disposed of the children's

21   bodies, and moreover that he had not implicated Johnson in the crimes. (*See, e.g.*,

22   Tr. July 13, 2000 at 12–13.) The State further elicited testimony from Hawkins

23   about what he claimed to have learned from Kiles, including that (1) the assault

24   began after Gunnel slapped Kiles, "enrag[ing] him," (2) Kiles went outside to get

25   the tire jack from the car and then returned and struck Gunnel, and (3) Gunnel

26   regained consciousness at one point during the attack, after which Kiles beat her

27   again until she died. (Tr. July 13, 2000 at 23–24, 28–29, 32–33.)

28        For all of these witnesses, the defense focused heavily on undercutting any

78

1    suggestion that Kiles had admitted to killing the children or disposing of their
2    bodies. (*See, e.g.*, Tr. July 11, 2000 at 79 (Imojean Kiles testified that she
3    understood from Johnson that he had been involved in the killings); Tr. July 13,
4    2000 at 57–58 (defense getting Hawkins to admit that some of the information he
5    gave to police must have been based on news sources, not just information from
6    Kiles).) During the cross-examination of Johnson and other testimony about
7    Johnson, the defense determinedly sought to highlight inconsistencies in his prior
8    statements, his inadequate explanation for Gunnel's blood on his clothing, the fact
9    that he spent much of the day after the killings with Kiles, and the fact that he was
10   spared murder charges once he named Kiles as the sole culprit in the killings. (*See,*
11   *e.g.*, Tr. July 14, 2000 at 113–15 (Johnson indicating he signed affidavit stating he
12   would have been indicted for murder if he did not testify); Tr. July 14, 2000 at 129
13   (Johnson dismissing the blood spots on his clothing as having gotten there "some
14   type of way" when he was in Gunnel's apartment); Tr. July 17, 2000 at 89 (Rodgers
15   admitting that Johnson "didn't have an explanation for the [blood on his] jacket").)
16   Once again, the defense focused on Johnson's involvement and paid little heed to
17   Gunnel's death.

18        The centerpiece of the defense case was Kiles's testimony. After briefly
19   presenting only three other witnesses (*see* Tr. July 17, 2000 at 127, 138, 145), the
20   defense called Kiles to the stand. Kiles set out in detail his relationship with Gunnel,
21   that he had just gotten a job the morning of February 9, 1989, and how he and
22   Gunnel planned to sell her food stamps for drugs so they could celebrate. (Tr. July
23   17, 2000 at 153–55.) Kiles walked the jury through much of the day in question,
24   including his drinking and drug use with Johnson and others in the afternoon. (Tr.
25   July 17, 2000 at 157–58.) Kiles further testified that he and his friends, including
26   Johnson and a man named Mike Parker, used all of the drugs and the money—such
27   that they had to return to Gunnel's apartment with no food stamps, no money, and
28   no drugs. (Tr. July 17, 2000 at 158–60.)

Kiles continued that Gunnel started arguing with him because he had come back empty-handed, so he and his friends started packing his stuff to move out. (Tr. July 17, 2000 at 160.) To make room in his car for his belongings, which included a television, clothes, and a bed, Kiles had to move some of the items in his car—including a tire jack—into the apartment. (Tr. July 17, 2000 at 160–62.) But Gunnel was still arguing with him, and things got "so heated." (Tr. July 17, 2000 at 164.) Kiles testified, "She slapped me. I asked her not to do that. Well, I told her, Don't slap me again. More words was exchanged and she slapped me again." (Tr. July 17, 2000 at 165.) Then Kiles "just reached down and grabbed the jack and just swung it." (Tr. July 17, 2000 at 165.) Gunnel, who had been facing Kiles, fell into a leather chair; Kiles continued, "I guess I hit her more than one time." (Tr. July 17, 2000 at 165–66.) Kiles explained that Gunnel went down quickly: once he hit her, "[s]he didn't move again." (Tr. July 17, 2000 at 166.) She did not regain consciousness or speak again. (Tr. July 17, 2000 at 166.) He went into shock and dropped the tire jack; it was only once a noise roused him that he went to the west bedroom, where he saw Johnson swinging the tire jack at the children and Parker watching from nearby. (Tr. July 17, 2000 at 167–70.)

Afterward, Parker, Johnson, and Kiles devised a plan: Parker and Johnson would dispose of the children's bodies, while Kiles cleaned the apartment. (Tr. July 17, 2000 at 170–73.) As part of the attempted clean-up, Kiles wrapped Gunnel's body in a blanket and moved her from the chair into the hallway, out of sight from the apartment's front door. (Tr. July 17, 2000 at 171.) Kiles testified that he later passed out; afterward, he and Johnson ransacked Gunnel's apartment for property they could sell to feed their addictions. (Tr. July 17, 2000 at 177, 190.)

On cross-examination, Kiles testified that anyone who said that he had killed all three victims was wrong—that Johnson was lying. (Tr. July 17, 2000 at 215.)

Powell's closing argument for the State emphasized just how much time Kiles had, according to the State's version of events, to think about what he was

80

doing. (Tr. July 19, 2000 at 36.) Powell announced, "The state maintains to you, ladies and gentlemen, never has a case exhibited more premeditation than the one we exhibit now." (Tr. July 19, 2000 at 36–37.) Powell further shared that he personally did not credit Kiles's testimony that Johnson had killed the children. (Tr. July 19, 2000 at 30.) During closing argument, with regard to Gunnel's death, defense counsel countered that the State's theory that the attack on Gunnel started in the bedroom was untenable. (Tr. July 19, 2000 at 51.) Lauding Bevel as "the foremost expert" in blood-stain analysis, Clark noted that some of Bevel's testimony corroborated Kiles's statement that he did not kill the children. (Tr. July 19, 2000 at 57.) Clark also told the jury that it could consider intoxication when assessing whether the killings were premeditated. (Tr. July 19, 2000 at 70–71.)

With respect to Gunnel's death, the court instructed the jury on premeditated first-degree murder, second-degree murder, heat-of-passion manslaughter, and reckless manslaughter. The court also provided additional instructions for the counts regarding Shemaeah and LeCresha. (Tr. July 19, 2000 at 86–99.) After what appears to have been more than a full day of deliberations, the jury returned verdicts of guilty as to three counts of first-degree murder and two counts of child abuse. (*See* ROA 479 at 1; CR89-15577 ROA 217 at 1.)

**B.    A defendant has a Sixth Amendment right to the effective assistance of counsel at guilt-phase proceedings.**

As described in Claim 2, *supra*, the Sixth Amendment guarantees to a defendant the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 684 (1984). Under *Strickland*, counsel is ineffective when (1) the "representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 687–88, 694.

Whether an attorney performed deficiently depends on the "reasonableness [of the attorney's actions] under prevailing professional norms." *Id.* at 688. As

noted previously, the Supreme Court has consistently relied upon guidelines from the ABA and similar professional groups to inform the inquiry into reasonable professional conduct. *See, e.g.*, *Padilla v. Kentucky*, 559 U.S. 356, 366–67 (2010); *Rompilla v. Beard*, 545 U.S. 374, 387 & n.7 (2005); *see also* 1989 ABA Guidelines; 2003 ABA Guidelines. While counsel's strategic choices are presumed reasonable, deference applies only insofar as the choices resulted from a "thorough investigation of law and facts relevant to plausible options[.]" *Strickland*, 466 U.S. at 689–90. "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Wiggins v. Smith*, 539 U.S. 510, 521–22 (2003).

Notably, whether an attorney performed reasonably takes into account the attorney's professional history: the "character of a particular lawyer's experience may shed light in an evaluation of his actual performance." *United States v. Cronic*, 466 U.S. 648, 665 (1984); *see supra*, Claim 1 (discussing some of trial counsel's relevant history).

Whether an attorney's deficient performance caused prejudice depends on whether there is a "reasonable probability" that the jury would have reached a different result absent counsel's errors. *Cronic*, 466 U.S. at 694. A "reasonable probability" is just one "sufficient to undermine confidence in the outcome"—a "defendant need not show that counsel's deficient conduct more likely than not altered the outcome." *Id.* at 693. Further, because of the requirement of unanimity, prejudice turns on whether there is a reasonable probability that even one juror would have made a different decision. *Wiggins*, 539 U.S. at 537.

When evaluating prejudice, a court must consider "the totality of the evidence—both that adduced at trial, *and the evidence adduced in the habeas proceeding[s]*." *Id.* at 536 (alteration in original) (quoting *Williams v. Taylor*, 529

1   U.S. 362, 397–98 (2000)). Critically, the question is not only whether each instance
2   of deficient performance was on its own prejudicial, but also whether the combined
3   effect of all of those instances was to undermine confidence in the outcome. *See*
4   *Strickland*, 466 U.S. at 694; *see also, e.g.*, *Martin v. Grosshans*, 424 F.3d 588, 592
5   (7th Cir. 2005) ("[E]ven if these [unprofessional] errors, in isolation, were not
6   sufficiently prejudicial, their cumulative effect prejudiced Martin's defense.").

7   **C.   Trial counsel were ineffective for failing because of their**
       **constitutionally inadequate investigation to present a reasonable**
8      **defense for the death of Gunnel.**

9        One of the primary duties of trial counsel is to conduct a reasonable
10  investigation. *See Kimmelman*, 477 U.S. at 384 (concluding that the adversarial
11  process "will not function properly unless defense counsel has done some
12  investigation into the prosecution's case and in to various defense strategies").
13  Counsel must "conduct a prompt investigation of the circumstances of the case and
14  . . . explore all avenues leading to facts relevant to the merits of the case." *Doe v.*
15  *Ayers*, 782 F.3d 425, 434 (9th Cir. 2015) (alteration and internal quotation marks
16  omitted). Then, once counsel has conducted a reasonable investigation, counsel
17  may make strategic decisions based upon the information gathered—including the
18  decision to curtail further investigation. Simply put, investigation must precede and
19  inform strategy. *See Wiggins*, 539 U.S. at 521–22. Counsel's decisions warrant
20  deference only when those decisions follow a "thorough investigation of law and
21  facts relevant to plausible options[.]" *Strickland*, 466 at 689–90. Such is not the
22  case when counsel (1) adopts a strategy after an inadequate investigation, and then
23  (2) limits further investigation based on that ill-conceived strategy. *See Wiggins*,
24  539 U.S. at 521–22; *Weeden v. Johnson*, 854 F.3d 1063, 1070 (9th Cir. 2017)
25  ("[C]ounsel could not have reasonably concluded that obtaining a psychological
26  examination would conflict with his trial strategy without first knowing what such
27  an examination would reveal.").

28       Trial counsel failed to adequately investigate the law and facts related to

Kiles's guilt-phase proceedings, especially as they related to the charge of first-degree murder with premeditation for the death of Gunnel. Instead of conducting a reasonable investigation and then developing a strategy for the defense, counsel conducted an extremely limited investigation, settled on a strategy, and then tailored subsequent investigative and other decisions to fit with that predetermined and unsupportable strategy. As described below, had counsel conducted a reasonable investigation and *then* determined trial strategy, taking into account expert consultations, witness interviews, and the like, counsel would have been able to present a reasonable defense and undercut the State's case, such that there is a reasonable probability that at least one juror would have concluded that Kiles was guilty of second-degree murder, not first-degree murder, in Gunnel's death.

>    1.    **Trial counsel performed deficiently by failing to conduct a reasonable investigation; that performance resulted in them settling on a legally unsound and ill-considered guilt-phase strategy.**

From the outset, lead counsel Greg Clark had a wealth of information on valuable avenues of investigation for Kiles's guilt-phase proceedings. Indeed, Kiles had previously been convicted of all three counts of first-degree murder, and first state post-conviction counsel had obtained relief from those convictions based on ineffective assistance both of trial counsel in preparing and presenting a defense and of appellate counsel. (*See* CR89-15577 ROA 60 at 3–4.)

First, state post-conviction counsel had alleged that Kiles's 1989 trial counsel performed deficiently in numerous respects, including by (1) failing to request the appointment of experts to evaluate blood spatter and other forensic evidence, and (2) failing to investigate and present evidence that Kiles could not and did not premeditate murder because of his intoxication and impulsivity. (ROA 225 at 37–41, 66.) Counsel attached to their petition over 80 exhibits, including an affidavit from expert criminalist Peter Barnett critiquing the work of Tom Bevel, the State's blood-spatter expert (*see* ROA 225 Ex. 59; ROA 225 Ex. 79), and an affidavit from

84

1    psychiatrist and neurologist Albert Globus, M.D., discussing such topics as Kiles's
2    dysfunctional family, childhood trauma, struggles with addiction, and impulsivity
3    (ROA 225 Ex. 60). At the subsequent state post-conviction hearing in 1996, Dr.
4    Globus testified extensively about Kiles's impulsivity, which Dr. Globus concluded
5    was likely attributable to in utero toxic exposure and aggravated by chronic
6    depression and intoxication. (*See, e.g.*, Tr. Feb. 21, 1996 at 177–78.) Dr. Globus
7    further described how organic brain damage and genetic predisposition contributed
8    to Kiles's addictions and how Kiles's "toxic psychosis from the drugs" led to
9    "severely disordered" thought processes at the time of the offense. (*See, e.g.*, Tr.
10   Feb. 21, 1996 at 177–85.) Persuaded by such testimony, the state post-conviction
11   court granted relief in 1996. (*See* CR89-15577 ROA 60.)

12         Competent subsequent trial counsel would have regarded prior counsel's
13   extensive investigation as a resource and would have reviewed it carefully. Clark,
14   however, did not do so. *See Rompilla*, 545 U.S. at 383–84 (counsel performed
15   deficiently when they were on notice that a readily available file had relevant,
16   helpful information but failed to review it). After Clark's appointment as lead
17   counsel in September 1998 (*see* Tr. Oct. 7, 1998 at 2–4), Clark moved for funding
18   for an investigator and for a mental-health expert (ROA 384 at 1–2). At a hearing
19   on that motion, Clark indicated that the mental-health expert would conduct "just,
20   I think, probably a pre-screen type examination." (Tr. Oct. 30, 1998 at 45–46.)
21   Clark further specified that the court should appoint Dr. Globus, noting that "[i]t
22   appears this gentleman has had some contact with Mr. Kiles. . . . [Dr. Globus] was
23   somebody, I think, referenced in the appellate procedure, judge. Possibly a PCR."
24   (Tr. Oct. 30, 1998 at 45–46.) Clark had no idea that Dr. Globus had testified at the
25   state post-conviction hearing, let alone knowledge of the substance of his testimony.
26         The court[46] granted Clark's request for funding for an investigator and for

27
28   _____

[46] Kiles's case was, by this time, in front of a different judge than the one who had granted state post-conviction relief.

85

1 Dr. Globus's pre-screening examination. (ROA 386 at 1); *see also* 1989 ABA
2 Guideline 8.1 cmt. (recognizing the importance of trained investigators as support
3 for counsel). But Clark made no move to contact either an investigator or Dr.
4 Globus. *See Richey v. Bradshaw*, 498 F.3d 344, 362 (6th Cir. 2007) ("[T]he mere
5 hiring of an expert is meaningless if counsel does not consult with that expert to
6 make an informed decision about whether a particular defense is viable.").

7 Sixth Amendment precedent and professional guidelines required Clark to
8 expeditiously investigate guilt/innocence issues. *See, e.g.*, *Doe*, 782 F.3d at 434;
9 1989 ABA Guideline 11.4.1(A); *see also, e.g.*, ABA Standards for Criminal
10 Justice—Defense Function (3d ed. 1993) ("ABA Defense Standard(s)"), Standard
11 4-4.1(a) ("Defense counsel should conduct a prompt investigation of the
12 circumstances of the case and explore all avenues leading to facts relevant to the
13 merits of the case. . . .").

14 Nearly nine months later, however, "no investigation or pretrial work of any
15 kind [had been] conducted in this case." (ROA 409 at 2.) On July 16, 1999, then-
16 second counsel Mary Boyte cited the complete lack of investigation and trial
17 preparation as a justification for her motion to withdraw from the case. (ROA 409
18 at 1–5.) Boyte informed the court that Clark, despite having done none of the
19 requisite investigation, was pushing for a November 1999 trial date. (ROA 409 at
20 2.) Boyte also alerted the court to Clark's failure to investigate to that point:

21 1.   No investigator had been hired or had done any work on this
22      case, despite the court's allocation of funding;

23 2.   No witnesses had been interviewed;

24 3.   No contact had been made with Dr. Globus, again despite the
     court's appointment of the expert; and

25 4.   Clark had not reviewed the prior trial and post-conviction
26      investigation files, which were in Boyte's possession and which
     Clark refused to collect.

27 (ROA 409 at 2.) At that point, to Boyte's knowledge Clark had possession of and
28 had reviewed only police reports and the 1989 trial transcripts, as well as a few

86

1    pages of additional information. (ROA 409 at 2.) Boyte further cited the breakdown

2    in communication between Clark and Kiles and her belief that "the Defendant is

3    not receiving effective assistance of counsel" before seeking permission to

4    withdraw from the case. (ROA 409 at 2–4.)

5         At the hearing on Boyte's motion to withdraw, Clark laid out for the court

6    his investigation to date: he had (1) been "to the place where the bodies were

7    found," (2) obtained the court's appellate and post-conviction records, (3) reviewed

8    the trial exhibits and evidence with the prosecutor, (4) "ordered additional pieces

9    of evidence," as well as copies of all of the relevant photographs, and (5) had the

10   investigator at the Office of the Legal Defender—which was conflicted off this

11   case—locate witnesses.[47] (Tr. Aug. 6, 1999 at 31–33.) Clark made no mention of

12   having contacted a single potential expert or witness. (*See* Tr. Aug. 6, 1999 at 27–

13   37.) Prosecutor David Powell confirmed that Clark had received police reports and

14   grand jury transcripts, had reviewed exhibits, and had "made numerous requests [to

15   the State] to do interviews." (Tr. Aug. 6, 1999 at 41–42.) Powell also made clear

16   that no interviews had occurred—"we haven't really done any interview

17   discovery." (Tr. Aug. 6, 1999 at 41–42.) After professing his belief that the state

18   post-conviction investigation materials were "worthless" (Tr. Aug. 6, 1999 at 30–

19   31), Clark announced that Kiles—whose prior counsel had won post-conviction

20   relief—was "in a better position now than he has ever been with regards to being

21   represented adequately and effectively." (Tr. Aug. 6, 1999 at 35.)

22        Clark so proclaimed despite having neglected some of the most basic aspects

23   of a criminal-defense investigation. *See, e.g.*, *Cannedy v. Adams*, 706 F.3d 1148,

24   1166 (9th Cir. 2013) (highlighting importance of interviewing potentially crucial

25   witnesses); *see also, e.g.*, *Weeden*, 854 F.3d at 1070 (faulting counsel for failing to

---

26   [47] Clark added that he had "made a complete review of all of the documentation in
27   this case," but he appears to have been referring to the trial and appellate
     documentation. Certainly he had not read state post-conviction counsel's file. (Tr.
28   Aug. 6, 1999 at 31–32.)

investigate psychological guilt-phase defense with assistance of expert); *Elmore v. Ozmint*, 661 F.3d 783, 786, 859 (4th Cir. 2011) (holding that counsel were ineffective for failing to conduct an independent examination of the State's forensic evidence, when such evidence was central to conviction); 1989 ABA Guideline 11.4.1(D)(3) (listing the types of witnesses counsel should consider interviewing, including "witnesses familiar with aspects of the client's life history that might affect the likelihood that the client committed the charged offense(s)"). Having not even conducted a minimally adequate investigation, Clark was in no position to make reasonable, sound, deference-worthy strategic decisions at that time. *See, e.g.*, *Bemore v. Chappell*, 788 F.3d 1151, 1165 (9th Cir. 2015) (deference to strategic judgments is defined in terms of the adequacy of the investigation supporting those judgments); *Phillips v. Woodford*, 267 F.3d 966, 978 (9th Cir. 2001) (emphasizing that the rejection of an alternative defense cannot be considered strategic when not preceded by an investigation allowing for an informed decision).

The lack of preparation, however, did not stop Clark. Although he had done no interviews, had consulted with no experts, and had no investigator working on the case (*see* ROA 414 at 31–49), he had done one thing by the time of the August 1999 hearing on co-counsel's motion to withdraw: he had already settled on his trial strategy. By the time new co-counsel Treasure VanDreumel and investigator Mary Meyer joined the defense just days after that hearing,[48] Clark had committed to the strategy later presented at trial. There were no team strategy discussions, and VanDreumel accepted Clark's uninformed plan without question. For the death of Gunnel, the defense would argue that Kiles was guilty of a heat-of-passion crime that was not premeditated and therefore not first-degree murder. For the deaths of

---

[48] After the August 1999 hearing, the court granted Boyte's motion to withdraw. (Tr. Aug. 6, 1999 at 48.) Treasure VanDreumel signed on to the case as second counsel within four days of that hearing, and it appears that she brought with her investigator Mary Meyer—the first defense investigator to work on the case and to use the funding granted over nine months prior. (*See, e.g.*, Tr. Oct. 8, 1999 at 74.)

1    the children, counsel would argue that Kiles was not the perpetrator.[49]

2        Kiles, whose relationship with Clark had fractured many months earlier, filed

3    in September 1999 a motion for new counsel.[50] (*See* ROA 413); *see also* Claim 1,

4    *supra*. At the hearing on that motion, the court had Clark give sworn testimony

5    about a number of issues, including his work to date. (Tr. Oct. 8, 1999 at 39.) Clark

6    testified that he had "interviewed more witnesses—more witnesses than anybody

7    has interviewed prior to this time, in this case, because the file I received never had

8    any transcripts of any witnesses that testified at this trial." (Tr. Oct. 8, 1999 at 40.)

9    In other words, Clark claimed to have interviewed more than the zero witnesses

10   interviewed (as far as Clark was aware) by prior trial counsel. Clark so testified

11   despite the fact that he still had not bothered to review first state post-conviction

12   counsel's investigative file—he again dismissed it as "worthless" (Tr. Oct. 8, 1999

13   at 65)—even though the file included notes on state post-conviction counsel's

14   interviews of many of the 100 or more witnesses to whom they had spoken (PFR2

15   Dkt. 21 Ex. 7 at 1–3). And Clark so testified even though his time logs from the day

16   of his appointment to the day prior to the hearing reflected not even one minute

17   spent interviewing any witness.[51] (*See* ROA 414 at 31–49.)

---

18

19   [49] Even if Clark's actions to this point could be construed as investigation, that does
20   not render the strategy decision reasonable. *See, e.g.*, *Wiggins*, 539 U.S. at 526
     (stating that "*Strickland* does not establish that a cursory investigation
21   automatically justifies a tactical decision"); *Driscoll v. Delo*, 71 F.3d 701, 709 (8th
     Cir. 1995) (even when defense counsel elicited a concession from state expert,
22   counsel was deficient for having failed to take measures to understand the testing
     performed and the meaning of the results); *Dugas v. Coplan*, 428 F.3d 317, 328 (1st
23   Cir. 2005) (defense counsel failed to adequately investigate a defense that no arson
     occurred, even though counsel had inspected the fire scene, talked with the state's
24   experts, done some reading, and spoken with other defense attorneys).

25   [50] This was Kiles's third such plea to the court. (*See* ROA 395 at 1; ROA 407 at 1.)

26   [51] Clark also testified that he had reviewed the evidence, read "all of the transcripts,"
     reviewed the "entire appellate file" and made arrangements to have it copied,
27   ordered photographs, reviewed exhibits, requested additional evidence not
     presented at trial with forensic significance, been to the crime scene, and been to
28   the river bed, "where the bodies were recovered." (Tr. Oct. 8, 1999 at 39–40.) He

89

1    In the two months before trial, long after determining their trial strategy (*see*
2    Tr. Oct. 8, 1999 at 44), Clark and VanDreumel did have the prosecutor set up
3    interviews of several witnesses, including law enforcement personnel and State's
4    experts. Apart from the defense's contact with Imojean Kiles, there is no indication
5    that trial counsel conducted a single interview that was not organized by the
6    prosecutor.[52] Further, trial counsel knew full well that the State planned to call
7    several experts, among them the pathologist who conducted the autopsies of two
8    victims, the blood-spatter expert who had testified during the 1989 trial, and a DNA
9    expert. (*See* ROA 446.) Even so, and despite Kiles's pleas to bring defense experts
10   on board, counsel still declined—based on their previously determined trial
11   strategy—to retain and consult with even one independent expert before trial.[53]

12   As a result, the defense theory presented at trial for the death of Gunnel was
13   deeply problematic. Counsel conceded that Kiles had killed Gunnel, but argued that
14   he had done so (1) while intoxicated, and (2) in the heat of passion. (*See, e.g.*, Tr.
15   July 10, 2000 at 40 (Clark announcing during opening statement that Kiles struck
16   Gunnel "during the heat of the passion, a heated, ugly fight").) Counsel evidently
17   hoped that intoxication, heat of passion, or the combination of the two would
18   convince the jury to determine that Kiles was guilty not of first-degree murder but
19   instead of a lesser-included offense.

20   _____

21   still did not hint at any expert consultation.

22   [52] Investigator Mary Meyer had two primary tasks: (1) maintain contact with
     Imojean Kiles, and (2) unearth background information on other witnesses. Her
23   focus was not on interviewing witnesses.

24   [53] Clark's reliance on the prosecutor to arrange what little investigation occurred is
     further cause for alarm. Clark repeatedly cited his friendship with Powell as a virtue
25   in court, and he depended upon Powell and law enforcement to arrange witness
     interviews and the like. In doing so, Clark butted up against the fundamental
26   principle that the purpose of defense counsel is to ensure "a reliable adversarial
     testing process." *Strickland*, 466 U.S. at 688. Counsel's duty to make that "testing
27   process work in the particular case [is] an obligation that cannot be shirked because
     of the lawyer's unquestioning confidence in the prosecution." *Elmore*, 661 F.3d at
28   859 (citation and internal quotation marks omitted).

90

Counsel's focus should have been on undercutting evidence of premeditation. In order to convict Kiles of first-degree murder, the State had to convince the jury that Kiles knowingly killed Gunnel and that he did so with premeditation. Given Kiles's admission that he killed Gunnel, the only real issue was that of premeditation.[54] Importantly, the jury would have had to conclude that Kiles was not guilty of first-degree murder before the jury could even consider any lesser-included offense. (Tr. July 19, 2000 at 95–96.) In other words, if the jury found that the State had proven beyond a reasonable doubt that the killing was premeditated and knowing, then nothing else mattered.

Under Arizona case law, however, intoxication was not a legal defense to first-degree murder as charged in this case (i.e., to premeditation). The Arizona Supreme Court had previously rejected the argument that intoxication could negate either premeditation or the mens rea of "knowingly." *See State v. Rankovich*, 765 P.2d 518, 524 (Ariz. 1988) (holding that a defendant charged with knowingly committing first-degree murder was not entitled to a voluntary-intoxication instruction and that "the fact that first-degree murder requires a finding of premeditation has no bearing on this result"). Even while trial counsel argued that the jury could consider intoxication, they acknowledged that it was not on its own a legal defense to the charge of knowing first-degree murder. (Tr. July 18, 2000 at 18 (VanDreumel agreeing with court that "from a legal standpoint intoxication is not or was not at the time a defense to a crime charged as knowingly" and that the jury "will not be instructed" otherwise).) Ultimately, the trial court gave the jury the legal definition of voluntary intoxication, but in accordance with state law did not instruct jurors that intoxication could figure into their determination as to

---

[54] "Knowingly means that a defendant acted with awareness of the existence of conduct or circumstances constituting an offense." (Tr. July 19, 2000 at 91.) Trial counsel did not attempt to argue that the crime was not "knowingly" committed.

premeditation.[55] (Tr. July 19, 2000 at 92.) Accordingly, the jury had no court-sanctioned mechanism through which to conclude that intoxication could affect its decision on first-degree murder.[56] This aspect of counsel's defense was, at best, legally and strategically suspect.

Trial counsel's heat-of-passion argument against premeditation fared no better. Kiles's testimony was the principal evidence of how his fight with Gunnel unfolded and, therefore, of heat of passion. Kiles testified that Gunnel was angry at him for using her food stamps to get drugs and then using the drugs before he returned home; the two were arguing. (Tr. July 17, 2000 at 159.) (In contrast, Kiles's mother had previously suggested that Gunnel had needed the food stamps to buy food for her children. (Tr. July 17, 2000 at 145.)) Kiles continued, "[Gunnel] had pretty much been fighting with me the whole night, pushing on me, pulling— this and that. Then she just slapped me. . . . It was so heated." (Tr. July 17, 2000 at 163–64.) "She slapped me. I asked her not to do that. Well, I told her, [d]on't slap me again. More words was exchanged and she slapped me again." (Tr. July 17, 2000 at 165.) When asked what happened next, Kiles testified, "I just reached down and grabbed the jack and just swung it." (Tr. July 17, 2000 at 165.)

The problem was that, in order for the jurors to determine that the crime occurred in the heat of passion and was therefore not premeditated, counsel needed two things to happen. The jury not only needed to accept as true Kiles's testimony,

---

[55] This instruction declared to the jury that "[n]o act committed by a person while in the state of voluntary intoxication is less criminal by reason of his having been in such condition." (Tr. July 19, 2000 at 92.)

[56] If counsel were going to argue effectively that intoxication could negate premeditation even without an accompanying jury instruction, that argument required substantial evidentiary support of the sort discussed below. Clark's proffer to the jury that Kiles's "perception [wa]s a little skewed from having imbibed, you know, the cocaine and the alcohol," supported largely by Kiles's own testimony, was far from sufficient. (Tr. July 10, 2000 at 44–45; *see also* ROA 225 Ex. 49 at 1 (juror at 1989 trial noting that lackluster intoxication argument made at first trial was unimpressive in light of jury instructions, but that juror had wanted to know more about how Kiles's cocaine addiction affected him).)

but also needed to conclude that his testimony was sufficient to establish that he had acted in the heat of passion and to give rise to reasonable doubt regarding premeditation. That counsel failed to corroborate Kiles's testimony was one major hurdle to success. *See Bennett v. Cate*, 407 F. App'x 213, 215 (9th Cir. 2010). That counsel also did little to challenge the State's theory or purported forensic evidence of premeditation practically ensured that this argument would fall flat.

Finally, counsel argued that the jury should find that Kiles committed heat-of-passion manslaughter. In order to so find, the jury would have had to find, among other things, that (1) Kiles "acted upon a sudden quarrel or heat of passion," and (2) the quarrel "resulted from adequate provocation by the person who was killed." (Tr. July 19, 2000 at 94.) "Adequate provocation" required "conduct or circumstances sufficient to deprive a reasonable person of self control." (Tr. July 19, 2000 at 94.) In arguing that the killing occurred in the heat of passion, counsel were contending to the jury that Gunnel's second slap was adequate provocation that would cause a reasonable person—not Kiles himself, not an intoxicated person, but a reasonable person—to lose control.[57] This is a particularly high hurdle when the jury may have concluded from Imojean Kiles's and others' testimony that Gunnel's anger stemmed from the fact that her food stamps, which she had needed to buy food for her children, had instead been used to purchase drugs for others. In effect, counsel were telling the jury that Gunnel's second slap was provocation enough that it was reasonable to kill her. A jury could easily have found that argument more offensive than persuasive, leaving the defense with no defense at all to first-degree murder.[58]

---

[57] Clark argued in closing that the jury had to consider Kiles's intoxication when considering what constituted adequate provocation (Tr. July 19, 2000 at 72), but again, that seemed inconsistent with the objective standard laid out in the jury instructions.

[58] Because of the inadequate guilt-phase voir dire, counsel did not know, for example, whether seated jurors had personal and familial experience with domestic-

93

1    Trial counsel had scant hope of such success with such a legally flawed and

2    factually dubious strategy. But having settled on that strategy early on, counsel

3    tailored their subsequent investigative decisions to bolster that approach, leaving

4    them—and Kiles—ill-equipped for trial when the time came.

5                **2.      Had trial counsel conducted an adequate investigation,
                            counsel would have been able to develop a persuasive
6                           defense strategy.**

7            Instead of embracing a deficient defense strategy early on, trial counsel could

8    have conducted an adequate investigation—one that involved consulting with

9    independent forensic experts, speaking with one or more experts who could have

10   helped explore viable defenses to premeditation, and interviewing witnesses

11   familiar with Kiles's character, history, and addictions. Armed with that

12   information, counsel would then have been able to prepare a legally and factually

13   defensible challenge to the charge of first-degree murder.

14           Preliminarily, as the Supreme Court has recognized, "[c]riminal cases will

15   arise where the only reasonable and available defense strategy requires consultation

16   with experts or introduction of expert evidence." *Hinton v. Alabama*, 571 U.S. 263,

17   273 (2014). That is particularly true when the State's case features several experts,

18   including forensic experts who would, per the State, explain to the jury "exactly

19   what happened" at the crime scene. (Tr. July 10, 2000 at 19–20); *see Richey*, 498

20   F.3d at 362 (identifying cases with critical scientific evidence and "wherein lawyers

21   altogether fail to hire an expert" as the "most egregious" of cases); *see also Hinton*,

22   571 U.S. at 273 (highlighting import of consulting with an adequate expert when

23   forensic evidence was a centerpiece of the State's case). In this case, trial counsel

24   should have consulted with several experts to fulfill counsel's obligation to

25   independently examine the forensic evidence. *Elmore*, 661 F.3d at 859; *Dees v.*

26

27   violence incidents or how such jurors might have perceived such an argument. *See*
     Claim 2, *supra*. In fact, at least one seated juror had personal exposure to a similarly
28   violent homicide before her jury service.

94

1  *Caspiri*, 904 F.2d 452, 454 (8th Cir. 1990) (per curiam) ("Considering the

2  importance of the shoe print evidence in this case, counsel had a duty to make a

3  diligent investigation of the forensic evidence and its potential weaknesses."); *see*

4  *also, e.g.*, 1989 ABA Guideline 11.4.1(D)(7) (requiring independent experts to help

5  with preparation of the defense).

6        Counsel should have consulted with the following medical and forensic

7  experts:

8        Pathologist: The State's medical examiner, Dr. Mallon, testified at trial that

9  Gunnel showed evidence of a defensive wound on her forearm. (Tr. July 13, 2000

10  at 99.) At the defense's prodding, Dr. Mallon further testified that Gunnel must

11  have received that wound early on during the altercation, as she needed to have

12  been conscious to incur a defensive wound. (Tr. July 13, 2000 at 105.) It appeared

13  that defense counsel had accepted that Gunnel had a defensive wound and were

14  trying to spin it as evidence of a serious fight between Gunnel and Kiles—evidence

15  that he acted in the heat of passion. (Tr. July 10, 2000 at 46 (Clark promising the

16  jury "medical testimony" corroborating that there was a fight).) However, that

17  attempted spin made no sense and was thus unreasonable: One person can attack

18  another out of the blue and still cause a defensive wound.

19        If, instead, counsel had consulted an independent pathologist, that expert

20  would have educated counsel about defensive wounds. *See, e.g.*, *Lindstadt v.*

21  *Keane*, 239 F.3d 191, 201 (2d Cir. 2001) (criticizing counsel for failing to educate

22  themselves on meaning of physical "evidence" of abuse cited by state expert).

23  Counsel would have learned that, while Gunnel's wound was "consistent with" a

24  defensive wound, that meant only that the possibility that the wound was defensive

25  could not be excluded. There is no way to establish that the wound was in fact a

26  defensive wound. Indeed, as an independent pathologist would have testified, it is

27  eminently possible that Gunnel received the arm wound after she had already died.

28        Had counsel known that Gunnel's broken forearm was very plausibly not a

defensive wound, they could have challenged Dr. Mallon's premise, rather than committing to a bizarre story that the wound was evidence of a fight and emphasizing the aggravating possibility that Gunnel was conscious for that wound. Counsel could have had their expert testify to the facts, as opposed to Dr. Mallon's suppositions. *See Thomas v. Clements*, 789 F.3d 760, 769–71 (7th Cir. 2015) (finding counsel ineffective when decision "[t]o not even contact an expert . . . was to accept [the State's expert's] finding of intentional death without challenge and basically doom the defense's theory of the case"). At the very least, a defense expert could have helped fashion an effective cross-examination, in particular one that highlighted the fact that Dr. Mallon seemed during his 1989 testimony far less certain then he seemed in his 2000 testimony that the wound was defensive in nature. (*Compare* Mallon Tr. Dec. 12, 1989 at 8 (such wounds "can be defensive wounds"), *with* Tr. July 13, 2000 at 105 (agreeing that arm wound was a defensive wound)); *see Lindstadt*, 239 F.3d at 201–02 (deeming counsel ineffective for failing to retain expert or otherwise conduct adequate research to cross-examine State's expert); *see also* 1989 ABA Guideline 11.4.1(D)(7) (instructing counsel on importance of independent experts to help provide "adequate understanding of the prosecution's case").

Blood-spatter expert: State's expert Tom Bevel testified that, among other things, there had been a minimum of 14 blows in the bedroom where the children were killed, their attacker was right-handed, and there was evidence of movement on the bed. (Tr. July 14, 2000 at 16, 19, 23, 27.) The defense embraced his testimony—Clark later hailed Bevel in closing as "the foremost expert" in the field (Tr. July 19, 2000 at 57)—but not because any testimony elicited by the State was helpful to the defense. Instead, trial counsel had Bevel explain to the jury how blood moves and that there was no evidence of coagulation on the bloody shoeprints that appeared to have been made by Kale Johnson's Converse shoes. (Tr. July 14, 2000 at 40–44.) The lack of evidence of coagulation meant that the blood was "[f]resher"

96

1   when stepped in (Tr. July 14, 2000 at 43–44), suggesting that Johnson was at

2   Gunnel's apartment closer in time to the killings than he had admitted. In response

3   to a jury question, not one from the defense, Bevel testified that the most "primitive

4   stages" of coagulation are visible approximately 30 minutes after the blood is

5   released. (Tr. July 14, 2000 at 54.)

6        Even though counsel sought some helpful testimony from Bevel, that did not

7   obviate their duty to independently investigate his work. They could well have hired

8   an independent expert in blood-spatter analysis, such as Peter Barnett, to describe

9   blood movement and coagulation for the jury. (*See, e.g.*, ROA 225 Ex. 59; ROA

10  1189 at 32–35.) Moreover, the need for due diligence on Bevel's work was

11  heightened because of his checkered history: his testimony in other cases has come

12  into question for its unreliability or indefensibility. *See Rivas v. Fischer*, 780 F.3d

13  529 (2d Cir. 2015) (concluding counsel's conduct in failing to investigate medical

14  examiner's qualifications and background was deficient).

15       Indeed, an independent expert could have informed counsel that Bevel's

16  conclusions were incorrect on several fronts. First, Bevel's claim that he could

17  count the minimum number of blows in an area was unfounded. (*See* Tr. July 14,

18  2000 at 9.) As a different expert could have explained to trial counsel—and as was

19  well known by 2000—a separate blow or impact is not needed to produce each

20  castoff pattern; a separate movement of the instrument carrying blood (even if it

21  does not strike anything) is sufficient. In other words, the number of castoff patterns

22  reflects the number of swings of the instrument, not the number of times it hit

23  anything. (*See* ROA 225 Ex. 79 at 4 (noting that castoff "comes off a bloody object

24  as it is swung"); *see also* ROA 1189 at 35.) Second, Bevel erred in saying that the

25  rightward arcing pattern of the blood stains indicated a right-handed assailant. (*See*

26  Tr. July 14, 2000 at 19.) Instead, all that the pattern meant was that the *swing* was

27  to the right, which can be achieved with the right hand, with both hands, or with the

28  left hand. Nothing could be concluded about handedness. Third, normal clotting

97

time for blood that has left the body is five to eight minutes, not the 30 minutes posited by Bevel. (*See* Tr. July 14, 2000 at 54.) Finally, Bevel appeared to assume that all of the blood spatter on the walls occurred during the attack; however, it is possible that some of the spatter happened afterward, for example when the bodies were moved.

Trial counsel were on notice of the need for independent evaluation, not only because of the State's heavy reliance on Bevel's testimony, but because the first state post-conviction counsel had asserted that 1989 trial counsel were ineffective for not challenging that same testimony from Bevel. (*See* ROA 225 at 37–41); *see also, e.g.*, *Elmore*, 661 F.3d at 786 (admonishing defense counsel for "blind acceptance of the State's forensic evidence"). With testimony from an independent expert, counsel could have conveyed the information about blood spatter and bloody shoeprints that they wanted to highlight, along with the useful detail that coagulation occurs even faster than Bevel had suggested. That testimony would have undercut Kale Johnson's testimony and, by extension, bolstered Kiles's credibility—both that he was not responsible for the children's death and more generally, including his description of not premeditating Gunnel's death. Counsel could further have elicited expert testimony (1) on the fact that the blood spatter and castoff in the living room was near the ground, suggesting that Gunnel was not standing for any blow that produced spatter,[59] and (2) that the blood stain in the chair was consistent with the blood source—presumably Gunnel's head injury— being low to the chair cushion.[60] Those tidbits would have provided key corroboration for Kiles's testimony that Gunnel fell into the chair after a single blow and, in turn, for his lack of premeditation. (Tr. July 17, 2000 at 165–66.)

[59] The first blow to a victim does not produce spatter. (Tr. July 14, 2000 at 26.)

[60] Bevel testified to these two points in 2006, during the State's aggravation-phase direct examination. (Tr. Mar. 27, 2006 at 65–66, 71.) With proper preparation and the aid of a defense expert, trial counsel could have brought out this corroborative information at the guilt-phase proceedings.

Anything—especially expert testimony—that corroborated Kiles's testimony would have buttressed the defense as a whole. *See, e.g.*, *Cunningham v. Wong*, 704 F.3d 1143, 1168 (9th Cir. 2013) (Pregerson, J., concurring in part and dissenting in part) (recognizing that "[a]n expert opinion is one from an objective third party that carries an aura of special reliability and trustworthiness," while a defendant's testimony "may be viewed by the jury as a desperate attempt to save himself" (internal quotation marks omitted)).

Finally, counsel could further have damaged the credibility of a crucial State witness through an effective cross-examination on Bevel's work in other cases, as well as on how Bevel counted his minimum number of blows and determined handedness. *See Dugas*, 428 F.3d at 331–32 (counsel deficient for failing to consult expert or research science sufficiently to challenge State's expert witnesses). That the jurors asked questions on Bevel's testimony reflected its import to them, and counsel's failure to consult an expert about blood-stain analysis before trial meant that they missed crucial opportunities to advance their case. (*See* Tr. July 14, 2000 at 54); *see also, e.g.*, *Bennett*, 407 F. App'x at 215 ("The jury asked questions . . . that revealed the critical importance of the blood evidence.").

Crime-scene management expert: Law enforcement officers, including Rodgers, testified that a number of items of forensic interest had not been tested, including latent prints lifted from surfaces in the apartment, a bloody fingerprint from the living room door, and blood on a pillow found in the east bedroom. (*See, e.g.*, Tr. July 17, 2000 at 29, 63–64.) Rodgers further testified that photographs had not been taken of tire tracks and shoeprints found near the river, even though the tire tracks appeared similar to those from Kiles's car and the shoeprints resembled Kale Johnson's shoeprints. (Tr. July 17, 2000 at 92–95.) Analysis of such items could have helped corroborate the defense on important points, including that (1) the fingerprint on the door and the blood on the pillow may have belonged to someone other than Gunnel, leaving no forensic indication that she was conscious

1   after the initial blow, and (2) Johnson's shoeprints were at the likely disposal site
2   for the children's bodies (and therefore that Johnson was lying during his
3   testimony). Counsel clearly recognized the importance of these matters—they
4   requested a *Willits* instruction allowing the jury to draw an adverse inference from
5   the police's failure to preserve evidence. (Tr. July 18, 2000 at 21; ROA 489 at 4.)
6   Even the jury's interest was piqued, as illustrated by the question submitted by the
7   jury to Rodgers about the failure to analyze latent prints. (Tr. July 17, 2000 at 108.)

8       Had defense counsel consulted with an expert in crime-scene investigation,
9   that expert would have informed them as to whether the Yuma Police Department's
10  decisions regarding what to test and what not to test were reasonable or whether to
11  request testing of additional items. *See Lindstadt*, 239 F.3d at 201–02. An expert
12  would also have helped counsel develop effective cross-examinations on the
13  reasonableness of law enforcement's decisions, as well as about the nature and
14  magnitude of the problems created for investigators by a compromised crime scene.
15  With such information in hand, counsel might well have been able to convey that
16  the attack against Gunnel had not started in the bedroom and that she had not left a
17  fingerprint on the door after being hit—both support for Kiles's testimony. *See, e.g.*,
18  *Cunningham*, 704 F.3d at 1168 (Pregerson, J., concurring in part and dissenting in
19  part). Counsel could also have more conclusively established that Johnson's
20  shoeprints were at the disposal site, which would have further undercut Johnson's
21  credibility and bolstered Kiles's.

22      If counsel had consulted with such experts as a pathologist, blood-spatter
23  expert, and crime-scene management expert, counsel would have been far better
24  equipped to start making certain strategy decisions.[61] But, because their

25  _____

26  [61] Counsel should also have consulted with a DNA expert or other appropriate
    experts before deciding not to challenge the State's evidence regarding Shemaeah's
27  death. (*See* ROA 1189 at 36.) This is especially true given Dr. Wiltbank's improper
    use of statistics in his testimony. *See* Nat'l Institute of Justice, *DNA for the Defense*
28  *Bar*, June 2012, at 34 ("Consulting is invaluable in DNA cases and can assist

1   "investigation into the State's forensic evidence never started, there could be no

2   reasonable strategic decision either to stop the investigation or to forgo use of the

3   evidence that the investigation would have uncovered." *Elmore*, 661 F.3d at 864.

4         Likewise, counsel should have consulted with appropriate experts before

5   declining to pursue the impulsivity defense recognized by *State v. Christensen*, 628

6   P.2d 580 (Ariz. 1981). *See, e.g.*, *Bemore*, 788 F.3d at 1165 (deeming counsel

7   ineffective when "a potentially viable alternative defense" was available but not

8   explored); *Phillips*, 267 F.3d at 976; *Sowell v. Anderson*, 663 F.3d 783, 790–91 (6th

9   Cir. 2011) (counsel did not make a reasonable choice among alternative strategies

10  when choice stemmed from ignorance about evidence); *see also Wiggins*, 539 U.S.

11  at 521. In *Christensen*, the Arizona Supreme Court held that a tendency to act

12  impulsively can negate premeditation: "The establishment of the character trait of

13  acting without reflection tends to establish that appellant acted impulsively. From

14  such a fact, the jury could have concluded that he did not premeditate the homicide."

15  628 P.2d at 583. While an expert could not testify to the ultimate jury question

16  whether the defendant was acting reflexively at the time of the killing, the expert

17  could testify to a defendant's tendency to act reflexively and the bases of such an

18  opinion. *Id.* at 582–84. Counsel were well aware of the *Christensen* defense and its

19  potential applicability to Kiles's case, as first state post-conviction counsel had

20  successfully asserted that 1989 trial counsel was ineffective for failing to investigate

21  and present the defense.[62] (ROA 225 at 1–2, 66); *see also Bemore*, 788 F.3d at

22  _____

23  counsel in understanding all of the issues. . . . Typically, the question in a DNA case
    is not 'Do I need an expert?' but rather 'What kind of expert do I need?'. . . . If the

24  statistics are questionable or flawed, a statistician or population geneticist is a much
    better choice. . . ."). While Kiles is not presently challenging his conviction for

25  Shemaeah's death, the defense's failure to investigate before making this decision
    confirms the broader failure to investigate.

26

27  [62] Counsel's failures in this aspect are even more pronounced because Clark and
    VanDreumel believed that the crime was caused by Kiles's impulsivity, as counsel

28  latched onto his impulsivity as mitigation shortly after the guilt-phase proceedings
    and made impulsivity a central theme of the 2006 mitigation case. (*See, e.g.*, ROA

1   1165–66 (noting that counsel was on notice of the defense he ineffectively failed to

2   investigate). And, as the only viable way to counter the first-degree murder charge

3   was to undercut the case for premeditation, counsel should not have discounted so

4   lightly a defense to premeditation that had been espoused by Arizona courts.

5        To adequately investigate the applicability of the *Christensen* defense,

6   counsel should have spoken to at least some of the following experts:

7        Psychiatrist and/or psychologist: As psychiatrist and neurologist Dr. Globus

8   demonstrated at the 1996 state post-conviction hearing and again during the 2006

9   penalty phase, a psychiatrist or psychologist would have helped defense counsel

10  understand impulsivity and how it plays out in real-life situations. (*See* Tr. Feb. 21,

11  1996 at 167–221; Tr. May 8, 2006 at 3–51.) Had counsel consulted a psychiatrist

12  or psychologist, that person would have explained that impulsivity is a "term of art"

13  meaning a "behavior or more often a whole series of behaviors that are performed

14  in a semi-automatic way without evaluating the goals . . . or assessing the

15  consequences of the behavior." (Tr. May 8, 2006 at 33.) It is not the case that an

16  impulsive person can *never* consider consequences—that would involve complete

17  ablation of the frontal lobe—but only that such a person's ability to consider

18  consequences is significantly impaired. An impulsive person might do something,

19  or even a sequence of things, without thinking, especially when impaired.[63] (Apr.

20  25, 2006 at 99–100.) He might also do something impulsively, again without

21  thinking, and regret it immediately *afterward* or even take steps to mitigate his

22  actions. (Tr. Feb. 21, 1996 at 220.) Even acts that do not on their face seem

23

24  509 Ex. A at 1; Tr. Apr. 25, 2006 at 101 (Dr. Globus testifying that homicides were,
    to a reasonable degree of medical certainty, attributable to Kiles's impulsivity, over
25  which he had no control).)

26  [63] According to Dr. Globus, in response to an environmental stimulus, "like being
    struck . . . instead of going through the process of thinking about the consequences
27  of behavior, [an impulsive person] go[es] directly to the behavior. So there's no
    imposition of thinking between the impulse . . . and the behavior." (Tr. May 8, 2006
28  at 34–35.)

1    impulsive may be done without any thought as to consequence. (Tr. May 8, 2006
2    at 36–37 (Dr. Globus explaining why Kiles's involvement in a 1984 fight might
3    well have been impulsive, even though Kiles claimed he "sat down and thought"
4    before assaulting the other individual).) The operative issue is whether the person
5    considered the consequences of his actions before acting. (Tr. May 8, 2006 at 36.)

6        Moreover, an expert could have informed trial counsel of some of the major
7    causes of impulsivity, such as brain damage (including damage due to in utero
8    exposure to toxins), mental illness that interferes with someone's ability to
9    understand his surroundings, and intoxication. (Tr. Feb. 21, 1996 at 177, 192; Tr.
10   May 8, 2006 at 33–34.)

11       A psychiatrist or psychologist could, relatedly, have reviewed Kiles's
12   personal history and his family history—including his sister's and parents' own
13   struggles with impulsivity[64]—and interviewed him to assess whether he had a
14   tendency toward impulsivity. (*See* ROA 225 Ex. 60.) By reviewing Kiles's personal
15   history, an expert would have seen that Kiles suffered from all of the major causes
16   of impulsivity and that his behavior over many years reflected that impulsive nature.
17   (*See* ROA 225 Ex. 60 at 26–37.)

18       With that background, counsel would have understood how to educate the
19   jury about Kiles's seemingly lifelong impulsivity, as they did at the mitigation
20   phase through Dr. Globus's testimony. Such evidence would have been pivotal to
21   counsel in trying to determine an appropriate guilt-phase strategy.

22       Neuropsychologist and/or neuroimaging specialist: Trial counsel should
23   further have consulted with a neuropsychologist and/or a neuroimaging specialist
24   prior to settling on their defense strategy. *See Bemore*, 788 F.3d at 1165–66;
25   *Phillips*, 267 F.3d at 976–80. Impulsivity is a result of brain dysfunction generally

---

27   [64] For example, Kiles's sister, Janell Hawkins, suffered from kleptomania (*cf., e.g.*,
28   Tr. Feb. 21, 1996 at 185; ROA 225 Ex. 36 at 23–24, 34–35, 42–43), evidencing her
     struggles with impulsivity (Tr. May 9, 2006 at 38–39).

1  attributable to some combination of brain damage, mental illness, childhood
2  trauma, and substance abuse. Accordingly, counsel should have sought out
3  neuropsychological testing and neuroimaging to learn whether Kiles had
4  demonstrable deficits of the sort associated with impulsivity and its underlying
5  causes. Indeed, later neuropsychological, especially executive-function, testing
6  revealed "clear indications . . . of impulsivity and difficulties with self-regulation,"
7  which became even more apparent when considered in the context of Kiles's
8  history.[65] (PFR2 Dkt. 27 Ex. 24 at 1.) In that testing, neuropsychologist John Toma,
9  Ph.D., repeatedly highlighted Kiles's impulsivity (*see, e.g.*, PFR2 Dkt. 27 Ex. 24 at
10  2), and he diagnosed Kiles with a disorder defined in large part by that impulsivity
11  (PFR2 Dkt. 27 Ex. 24 at 2). Similarly, had trial counsel obtained brain imaging and
12  consulted a neuroimaging expert (for example, a radiologist), counsel would have
13  learned that Kiles had brain damage, including a reduced-size corpus callosum and
14  frontal-lobe damage, that was observable on brain scans. (*See* PFR2 Dkt. 28 Ex. 25
15  at 7 (expert during second state post-conviction proceedings discussing Kiles's
16  brain abnormalities and damage observable on images).) Both forms of brain
17  damage are causally related to impulsivity. (*See, e.g.*, Tr. May 8, 2006 at 33–34.)

18      If counsel had armed themselves with such information, they would have
19  understood that they could (1) contend persuasively that Kiles had an impulsive
20  nature, and, as importantly, (2) ground that information in neuropsychological and
21  neuroimaging evidence to make clear that impulsivity is not simply a bad
22  personality trait, but the result of brain dysfunction. Expert consultations would
23  have painted for counsel a picture of an individual whose brain did not work the
24  same way a "normal" adult brain is expected to work. Counsel, in turn, could have
25  painted that picture for the jury to help demonstrate why Kiles did not premeditate
26  the killing of Gunnel. Counsel had a duty to obtain such information before

27
28  [65] Kiles has also been diagnosed with Attention Deficit Hyperactivity Disorder, an
impulse-control related disorder. (Tr. May 9, 2006 at 41, 64.)

104

1    deciding strategy. *See Bemore*, 788 F.3d at 1165–66, *Phillips*, 267 F.3d at 976–80.

2    <u>Pharmacologist or neurotoxicologist</u>: Additionally, counsel should have

3    consulted with a pharmacologist, neurotoxicologist, or similar individual with

4    expertise in the effect on the brain of drugs and alcohol. Counsel were on notice of

5    Kiles's alcoholism, cocaine addiction, and related issues, as well as of his familial

6    history of alcoholism and other addictions. (*See, e.g.*, Tr. Feb. 21, 1996 at 178–86.)

7    Indeed, counsel made a feeble attempt to communicate Kiles's drug use to the jury

8    and to use that as evidence of a lack of premeditation. (*See, e.g.*, Tr. July 10, 2000

9    at 44 (Clark setting forth in opening that "Alvie by this time has had a little bit to

10   drink, he's had a lot of drugs to do.").)

11   Still, in order to fulfill the obligation to investigate, counsel should have

12   consulted a pharmacologist or comparable expert. *See Bemore*, 788 F.3d at 1165–

13   66, *Phillips*, 267 F.3d at 976–80. Such an expert could have explained the effects

14   of long-term addiction on the brain and on an individual's thought processes. That

15   sort of expertise is particularly useful in a case like this, where counsel needed to

16   understand the interplay of numerous substances, including alcohol. In fact, if

17   provided with an adequate social history, a pharmacologist would have offered that

18   Kiles was in a drug-induced psychosis at the time of the crime. (PFR2 Dkt. 28 Ex.

19   25 at 5.) Because of the extent to which that psychosis disordered Kiles's thought

20   processes, Kiles was experiencing severe paranoid delusions, impaired judgment,

21   and impaired mental flexibility when he killed Gunnel. (PFR2 Dkt. 28 Ex. 25 at 5.)

22   Counsel tendered to the jury only meager evidence of drug use, primarily through

23   Kiles's own testimony. Instead, counsel could have had an expert present a

24   compelling explanation of what was happening inside Kiles's head at the time. Such

25   evidence would have supported the idea that Kiles was acting impulsively and

26   without premeditation at the time of the crime and, accordingly, was crucial for

27

28

1 counsel to know before adopting a strategy.[66]

2 Beyond speaking with experts, counsel had a duty to interview lay witnesses

3 who could have enlightened counsel on issues bearing on premeditation, including

4 Kiles's impulsivity, the causes of his impulsivity, and the debilitating extent of his

5 addictions. *See Cannedy*, 706 F.3d at 1161 (counsel deficient for failing to interview

6 potentially favorable witness "when that witness had been clearly identified, . . .

7 was easily accessible[,] and [was] willing to provide information"); *see also* 1989

8 ABA Guideline 11.4.1(D)(3) (directing counsel to interview potential witnesses

9 regarding "aspects of the client's life history that might affect the likelihood that

10 the client committed the charged offense(s)" (i.e., premeditated murder)). While

11 counsel had access to much of this information from earlier proceedings, nothing

12 counsel did reflects that they made use of—or even that they reviewed—the

13 relevant affidavits and expert reports discussing Kiles's impulsivity or addictions

14 before Clark committed to his approach. (*See* Tr. Aug. 6, 1999 at 31–33.) That

15 noted, as part of a reasonable investigation preceding that decision, counsel should

16 have tried to speak to at least some of the following witnesses:

17 Witnesses regarding impulsivity: Numerous people who knew Kiles

18 throughout his life could have provided trial counsel with information that bore

19 upon his impulsive nature and/or the causes of such impulsivity. For example,

20 Kiles's sister Janell Hawkins could have informed counsel of Kiles's history of

21 childhood trauma and physical abuse—terrors of the sort that lead to mental

22 illness—as well as the familial history of addiction, including her own. (*See* ROA

23 225 Ex. 39.) As noted earlier, such problems are known causes of the brain

---

[66] Such information about the effects of addiction was critical even to the intoxication defense that trial counsel ultimately presented, as presumably only powerful evidence of the effects of intoxication could have convinced jurors to take intoxication into account when assessing premeditation. Instead, counsel offered the jury some paltry evidence of Kiles's drug use and none at all of the effects of his addictions on his thinking or his ability to premeditate.

dysfunction associated with impulsivity. Janell Hawkins could also have spoken of her own problems with shoplifting (*see, e.g.*, ROA 225 Ex. 39 at 5, 7), reflecting an issue with impulsivity that mirrored Kiles's.

Imojean Kiles could have told counsel about any number of aspects of Kiles's childhood, including the head trauma he suffered when struck by a car at age five—childhood traumatic brain injury is a major causal factor in producing impulse-control disorders—and the violence he endured at his father's hands.[67] (*See, e.g.*, ROA 225 Ex. 37.) Again, brain damage and mental illness stemming from childhood trauma can cause impulsivity.

Similarly, Kiles's aunt, Darnella Long, among numerous other relatives, could have spoken to the trauma Kiles endured as a child and the severe dysfunction of the Kiles family. (*See* ROA 225 Ex. 54 at 5.) Moreover, Kiles's associates from around the time of the crime and the years before, including Griffen Lewis, Jimmy Gilmore, and Virgil Schultz, would have been able to tell counsel that Kiles was short-fused and would have been able to provide anecdotes about his outbursts. (*See, e.g.*, ROA 225 Ex. 44 at 1; ROA 225 Ex. 46 at 1.) Such behavior is strongly associated with impulsivity. (PFR2 Dkt. 27 Ex. 24 at 3.)

Accordingly, these witnesses could have provided useful social-history context for experts in diagnosing Kiles's impulsivity and its causes and for counsel in determining whether and how to present that information to the jury. *See Bemore*, 788 F.3d at 1164–66 (counsel ineffective for failing to explore viable mental-health defense, including by investigating statements from friends and family that should have put counsel on notice of possible defense).

<u>Witnesses regarding Kiles's addictions</u>: Any number of people who knew Kiles in the years, and particularly in the weeks, around the time of the crime could have furnished useful information to counsel about Kiles's addictions and their

---

[67] While counsel spoke to Imojean Kiles before guilt-phase proceedings, there is nothing to indicate that the discussion covered the types of matters noted above.

107

effects on his thinking. For example, Kiles's associates, such as John Hendrix, Jr., Griffen Lewis, Virgil Schultz, and Walter "Pierre" Hogan, could have conveyed just how terribly Kiles's drug usage had disordered his thinking around the time of the crime. According to Hendrix, "Alvie was completely out of it. He acted crazy. He was really high on some kind of drug. . . . [He] was rambling and making little sense. . . . He seemed deranged." (ROA 225 Ex. 41 at 1.) Lewis, who had seen Kiles's addictions worsen over time, described Kiles as being around the time of the crime "as deep into drugs as [Lewis] had ever seen him." (ROA 225 Ex. 44 at 1.) Schultz noted that on February 10, 1989, Kiles was "strung out. . . . Alvie was acting very crazy. He was coming off the wall." (ROA 225 Ex. 46 at 1.) Schultz had to leave Kiles because of how "high and out of control" Kiles was that day. (ROA 225 Ex. 46 at 1.) Even some of Kiles's friends and colleagues from the Air Force had valuable information on the progression of Kiles's alcoholism. (*See, e.g.*, ROA 225 Ex. 58 at 1 (noting that while in the Air Force, Kiles started drinking "more and more," to the point that "he couldn't lift his head off the bed" and "started having blackouts").)

Witnesses such as Kiles's probation officer, Ramon Mendoza, and the Yuma County Adult Detention Center nursing director at the time of Kiles's arrest, Linda Rautenberg, had similarly useful information.[68] (*See, e.g.*, ROA 225 Ex. 48 at 2 (noting that when Kiles was arrested, he weighed a measly 147.5 pounds); *see also* 2006 Trial Ex. 169 at 2 (Mendoza reporting that just after arrest, Kiles had said he was on crack cocaine, alcohol, and heroin at the time of the offense).) And counsel should certainly have interviewed Janell Hawkins to appreciate fully how poorly Kiles was functioning at the time of the crime. As she had previously stated, "I know better than anyone what drugs do to Alvie and me. It makes us crazy." (ROA

---

[68] Kiles also told Mendoza shortly after being arrested that he had not killed the children, so Mendoza's testimony would have been useful on multiple fronts. (*See* 2006 Trial Ex. 169 at 2.)

225 Ex. 39 at 8.) As sustained alcohol and drug use both causes and exacerbates impulsivity, such information was important for counsel to know when evaluating the viability of the impulsivity defense. *See Bemore*, 788 F.3d at 1164–66.

The fact that many of these witnesses spoke to first state post-conviction counsel and were willing to provide affidavits suggests that (1) the witnesses could be located, and (2) attempts to speak with them would have been fruitful. (*See, e.g.*, ROA 225 Ex. 39 at 8.) But counsel appears to not have interviewed any lay witness, save some witnesses noticed by the State.[69] (*See* ROA 446 at 1–2.)

Finally, as part of a reasonable investigation, counsel should have made use of the two resources most easily available to them: previously collected records and their own client. First state post-conviction counsel had collected myriad records and materials concerning Kiles and his family, many of which had information relevant to an impulsivity defense. (*See, e.g.*, ROA 225 Ex. 5; ROA 225 Ex. 36.) Once again, it does not appear that counsel were aware of the contents of the vast majority of these records and accordingly performed deficiently. *See Rompilla*, 545 U.S. at 383–84 (counsel deficient for failure to review easily accessible known to have critical information); *Bemore*, 788 F.3d at 1165–66 (counsel deficient for failing to investigate readily available evidence). Additionally, nobody had more information pertaining to the crime, the days around the time of the crime, and possible defenses than Kiles himself. As discussed in detail previously, counsel did not develop a relationship with the client that was adequate to ensure that Kiles was willing and able to communicate with them. *See* Claim 1, *supra.* Because of that and counsel's lack of interest in Kiles's thoughts, counsel were unable to avail themselves of the beneficial information they had in determining strategy. *See United States v. Tucker*, 716 F.2d 576, 582 (9th Cir. 1983) ("Adequate consultation

---

[69] Counsel also should have interviewed witnesses, like Louie Gomez, who could have corroborated Kiles's testimony that he was in Gunnel's apartment with two other men. Clark was notified well before trial that Gomez had relevant information.

1   between attorney and client is an essential element of competent representation of

2   a criminal defendant. . . . While the amount of consultation will depend on the facts

3   of each case, the consultation should be sufficient to determine all legally relevant

4   information known to the defendant."); *see also, e.g.*, *Correll v. Ryan*, 539 F.3d

5   938, 943 (9th Cir. 2008); 1989 ABA Guideline 11.4.1(D)(2) (requiring counsel to

6   seek information from client regarding events giving rise to charges, as well as

7   regarding client's mental state).

8       In sum, counsel failed to conduct an adequate investigation before making

9   strategy decisions for Kiles's guilt-phase proceedings. Accordingly, counsel's

10  decisions were uninformed, unreasoned, and unworthy of any sort of deference. *See*

11  *Wiggins*, 539 U.S. at 521; *Bemore*, 788 F.3d at 1162–69. Even if counsel's strategy

12  was reasonable in the abstract, "it was not reasonable in this case because counsel

13  were not fully aware of their options." *Sowell*, 663 F.3d at 794. That counsel's

14  strategy—to try to establish intoxication and heat-of-passion manslaughter in the

15  death of Gunnel—was legally and factually not viable only emphasizes the

16  unreasonableness of counsel's actions.

17      If counsel had instead conducted a constitutionally adequate investigation,

18  they would have had access to a wealth of information regarding the accuracy of

19  the State's forensic evidence and the applicability of a court-approved alternative

20  defense to premeditation. With such information in hand, counsel could have made

21  an informed and reasoned decision as to when to discontinue their investigation and

22  as to which defense to pursue at trial. *See Wiggins*, 539 U.S. at 521. But counsel did

23  not do so, and the fact that counsel may have performed capably at some points

24  during trial does not excuse their foundational failure to investigate. *See Rogers v.*

25  *Israel*, 746 F.2d 1288, 1295 n.5 (7th Cir. 1984) ("The fact that trial counsel's

26  performance was otherwise admirable would not excuse the failure to conduct a

27  proper investigation."); *see also Moore v. United States*, 432 F.2d 730, 739 (3d Cir.

28  1970 (en banc); ABA Defense Standard 4-4.1 cmt. ("The effectiveness of advocacy

110

1   is not to be measured solely by what the lawyer does at the trial; without careful

2   preparation, the lawyer cannot fulfill the advocate's role."). Here, counsel failed to

3   conduct a reasonable investigation and, because of that abridged investigation,

4   adopted a faulty strategy. Counsel thus performed deficiently under *Strickland*.

### 3.    Trial counsel's deficient performance prejudiced Kiles.

6        As discussed previously, defense counsel went into trial equipped with at

7   best a half-baked defense against the charge of first-degree murder for the death of

8   Gunnel. Nearly the only evidence proffered by the defense regarding Gunnel's

9   death was Kiles's testimony—everything hinged on whether the jury found his

10   account credible.[70] Practically speaking, the jury not only needed to believe Kiles,

11   but also needed to find that his account gave rise to reasonable doubt as to

12   premeditation.[71] For that, counsel sought to rely on evidence of intoxication and

13   heat of passion. But, while other witnesses mentioned Kiles's drug use (*see, e.g.*,

14   Tr. July 12, 2000 at 200–01; Tr. July 13, 2000 at 61), only Kiles testified about his

15   drug use on the day of the crime (*see* Tr. July 17, 2000 at 157–58, 177, 209). And

16   even he hardly alluded to the effects of that drug use—that is, to why his drug use

17   scrambled his thinking and, relatedly, his ability to premeditate. (*See generally* Tr.

18   July 17, 2000 at 151–222.) Similarly, Kiles's testimony offered little basis for the

19   jury to understand why Gunnel's actions—just two slaps—roiled Kiles so much

20   that he grabbed the tire jack in a heat of passion and reacted without thinking. (*See*

21   *generally* Tr. July 17, 2000 at 151–222.)

---

23   [70] As a further consequence of this reliance on Kiles's testimony alone, nearly all
of the trial testimony focused on the deaths of Shemeah and LeCresha. That the
defense spent relatively little time on Gunnel's death likely made it seem to jurors
as though defense counsel recognized the uphill battle they faced on the resultant
charge.

[71] While the burden of proof for premeditation remained on the State, the fact that
Kiles testified that he killed Gunnel by beating her with a tire jack effectively meant
that the defense needed to undercut the State's proffered evidence of premeditation
to avoid the first-degree murder conviction.

111

1     Trial counsel were thus asking the jury to believe Kiles and to find that there

2  was no premeditation despite having presented no evidence explaining *why* Kiles's

3  addictions might have affected his ability to premeditate or *why* he was in such a

4  heat of passion that he did not premeditate. Counsel were further doing so despite

5  the fact that Kiles, as the State pointed out, was not entitled under state law to have

6  the court instruct the jury that voluntary intoxication could negate premeditation.[72]

7  *See Rankovich*, 765 P.2d at 524. As a result, the jury had little reason to conclude

8  that the State had not proven premeditation beyond a reasonable doubt. That, in

9  combination with Kiles's testimony that he killed Gunnel, led directly to the first-

10 degree murder conviction. *See Yun Hseng Liao v. Junious*, 817 F.3d 678, 694 (9th

11 Cir. 2016) ("[O]ur precedent recognizes that prejudice is established when . . .

12 counsel's error left the defense with weaknesses that were exploited by the

13 prosecution." (internal quotation marks omitted).)

14    If counsel had conducted an adequate investigation, however, the defense

15 could have taken on an entirely different hue. Counsel could have submitted to the

16 jury that Kiles had an impulsive nature due to brain dysfunction, *see Christensen*,

17 628 P.2d at 582–84, which was partly due to and partly exacerbated by his

18 addictions. Instead of gambling entirely on Kiles's ability to persuade the jury,

19 counsel could have offered a psychiatrist or psychologist to explain the nature of

20 Kiles's impulsivity and how his thought processes were consequently impaired. *See*

21 *id.* (allowing expert testimony to explain a defendant's impulsive nature); (*see also,*

22 *e.g.*, Tr. Feb. 21, 1996 at 167–21; Tr. May 8, 2006 at 33–34). Counsel could have

23 presented a neuropsychologist and a neuroimaging expert to show to the jury that

24 Kiles had demonstrable markers of brain damage, trauma, and other known causes

25 of impulsivity, as well as that his performance on testing made clear his struggles

26 _____

27 [72] Powell announced during the State's closing that "[a]nything about intoxication
   does not apply when you consider first-degree murder. That is all there is to it. . . .
28 That's the law." (Tr. July 19, 2000 at 42.)

112

1    with impulsivity. (*See, e.g.*, PFR2 Dkt. 27 Ex. 24 at 1–2; PFR2 Dkt. 28 Ex. 25 at

2    7.) In addition, counsel could have had a pharmacologist or comparable expert lay

3    out for the jury the effect of Kiles's addictions on his tendency toward impulsivity

4    and thought processes around the time of the crime. (*See, e.g.*, PFR2 Dkt. 28 Ex. 25

5    at 5.) Lay-witness testimony could have corroborated that expert testimony about

6    Kiles's impulsivity, its causes, and its effects. (*See, e.g.*, ROA 225 Ex. 44 at 1; ROA

7    225 Ex. 46 at 1.)

8         While an impulsivity defense could have opened the door for the State to

9    introduce parts of Kiles's criminal history, even such testimony could have been

10   used by the defense to further illustrate Kiles's impulsivity. Indeed, much of Kiles's

11   criminal history is proof of his impulsive nature. (*See, e.g.*, PFR2 Dkt. 27 Ex. 24 at

12   1–2.) Further, such evidence would have given Kiles's experts an opportunity to

13   explain that even superficially reflective actions may well be impulsive and done

14   without prior thought to consequences.[73] (Tr. May 8, 2006 at 36–37 (Dr. Globus

15   detailing how Kiles's actions in a 1984 fight could have been impulsive even though

16   Kiles said he "sat down and thought" before responding to assault against him).)

17        Overall, then, defense experts on impulsivity, corroborated appropriately by

18   lay witnesses, would have given the jurors what they were missing: a compelling

19   explanation as to *why* Kiles's actions were, given his nature, inconsistent with

20   premeditation.

21        An even minimally adequate investigation would also have allowed defense

22   counsel to confront head-on critical aspects of the State's forensic case. Had counsel

23   retained a pathologist, they could have persuasively challenged the State's claim

24   that the assault against Gunnel was prolonged—and thus more likely

25   premeditated—because Gunnel had a defensive wound. Through a blood-spatter

---

[73] Any argument that opening the door to Kiles's criminal history would have increased the likelihood of conviction in Gunnel's death falls flat, as Kiles testified that he was responsible for her death and had no chance of escaping a conviction.

113

expert, counsel could have conveyed to the jury that the forensic evidence strongly indicated that Gunnel quickly went down once attacked, as well as that several of Tom Bevel's key conclusions were unsound. (*See* ROA 225 Ex. 79 at 4.) In so doing, defense counsel could have decimated the testimony of an expert whom the State lionized as a centerpiece of its case. Finally, a crime-scene management expert could have helped trial counsel attack the reasonableness of key aspects of the crime-scene investigation. Such information both would have given the jury reason to view the State's evidence with great skepticism and would have highlighted the absence of reliable physical evidence of premeditation. *See Elmore*, 661 F.3d at 870 ("With investigation, the jury undeniably would have seen a drastically different—and significantly weaker—prosecution case.").

Critically, an adequate investigation would have allowed counsel to present evidence that both corroborated and provided critical context for Kiles's testimony. The Ninth Circuit has repeatedly found that the failure to corroborate the defendant's testimony, when possible to do so, is prejudicial. For example, in *Riley v. Payne*, counsel was ineffective for failing to call a witness who could have corroborated portions of the defendant's account of self defense. 352 F.3d 1313, 1319–20 (9th Cir. 2003) (finding prejudice when the witness's "testimony would have been consistent with [the defendant's] account and would have created more equilibrium in the evidence presented to the jury" (internal quotation marks omitted).). Similarly, the court found *Strickland* prejudice in *Brown v. Myers*, when counsel neglected to have several witnesses testify who could have "buttressed [the defendant's] account on [a] crucial point." 137 F.3d 1154, 1157–58 (9th Cir. 1998); *see also, e.g.*, *Bennett*, 407 F. App'x at 215 ("Because [the defendant] took the stand, it was critical to have any objective physical and forensic evidence to support his version."). Accordingly, while Kiles's testimony would still have been the linchpin of the defense's case, corroborating that testimony with forensic evidence and with evidence of his impulsivity would have bolstered the defense case

114

1    immeasurably.

2         Because counsel failed to adequately investigate, they lost the opportunity to
3    present a legally sound, reasonable defense to first-degree murder that was
4    compelling because it both undermined the State's forensic evidence and explained
5    why Kiles's character for impulsivity undercut premeditation. And, because
6    counsel had instead opted for a legally and factually problematic defense to the
7    first-degree murder charge for Gunnel's death, counsel allowed that charge—and
8    Gunnel's death—to get lost in the stream of information about the remaining
9    charges. The result was a breakdown in the adversarial system sufficient to
10   undermine confidence in the conviction. *See Strickland*, 466 U.S. at 687. In this
11   case, all that is needed to undermine confidence is a reasonable probability that at
12   least one juror would have rejected first-degree murder in favor of, for example,
13   second-degree murder. *See Jennings v. Woodford*, 290 F.3d 1006, 1019 (9th Cir.
14   2002); *see also Strickland*, 466 U.S. at 694 (declaring that "a reasonable
15   probability" is a lesser standard than "a preponderance of the evidence").

16        Here, the jurors could have heard an entirely different story than the one
17   presented. They could have heard that key aspects of the State's forensic case were
18   exaggerated or wholly unsupportable. They could have heard that the little physical
19   evidence offered regarding Gunnel's killing did not suggest, let alone prove, that
20   the killing was premeditated. They could have learned that Kiles suffered from
21   brain dysfunction and, consequently, impulsivity, which bore heavily upon whether
22   he premeditated the killing. Importantly, such powerful evidence that Kiles did not
23   premeditate Gunnel's death would not have been lost or obscured in the grand
24   scheme of the trial. If the jury had been offered this evidence, then "it might
25   nonetheless have convicted [Kiles of premeditated first-degree murder]. . . . But
26   there is at least a reasonable probability that it would not have done so." *Thomas v.*
27   *Chappell*, 678 F.3d 1086, 1098 (9th Cir. 2012).

28

1    **D.    Counsel were ineffective for failing to object to Kiles's shackling.**

2    Kiles's counsel were deficient for failing to object to Kiles's shackling, as

3    well as for failing to ensure that Kiles's restraints were not visible to the jury, and

4    counsel's deficient performance prejudiced Kiles.

5    Throughout guilt-phase proceedings, Kiles was forced to wear a leg brace—

6    designed to lock up if a defendant moved too quickly—and ankle shackles. Kiles

7    had to hold the leg brace in place when he was walking, including to the witness

8    stand to testify, to prevent it from locking up as he moved. Multiple jurors saw

9    and/or heard Kiles's shackles, and at least one juror noticed Kiles's odd gait,

10   attributable to the leg brace.

11   However, Kiles had a right under the Due Process Clause not to be tried

12   wearing shackles unless there were no acceptable alternatives. The Supreme Court

13   has "defined shackling as 'the sort of inherently prejudicial practice that . . . should

14   be permitted *only* where justified by an essential state interest specific to each

15   trial.'" *Hedlund v. Ryan*, 854 F.3d 557, 568 (9th Cir. 2017) (footnote omitted)

16   (quoting *Holbrook v. Flynn*, 475 U.S. 560, 568–69 (1986)).

17   Counsel had a duty to protect Kiles from the inherent prejudice of shackling,

18   but failed to do so. *See Roche v. Davis*, 291 F.3d 473, 483 (7th Cir. 2002) (holding

19   that counsel's performance was deficient in failing to object to client's shackling

20   and in failing to ensure that shackles were not visible to the jury); *see also*

21   *Strickland*, 466 U.S. at 688. Preliminarily, counsel failed to object when the court

22   neglected to inquire into whether there were compelling circumstances to justify

23   the use of physical restraints. *Spain v. Rushen*, 883 F.2d 712, 716 (9th Cir. 1989).

24   In failing to conduct that individualized inquiry, the court committed constitutional

25   error. *See id.*; *see also infra*, Claim 7. By extension, counsel performed deficiently

26   in failing to ensure that Kiles's due-process rights were vindicated.[74] *See Roche*,

27   _____

28   [74] Had counsel objected and forced the trial court to conduct the constitutionally
requisite inquiry, the court would likely have determined that less-restrictive

116

1    291 F.3d at 483. Then, having failed to object to the unjustified use of restraints,

2    counsel did not ensure that the jury could not see Kiles's physical restraints.[75] In

3    that way, too, counsel performed deficiently. *See id.*

4           The prejudice arising from shackling—and the ways in which it undermined

5    Kiles's rights—is manifold. First, shackling compromises the defendant's right to

6    a fair trial by (1) crippling the presumption of innocence, and (2) denying the

7    defendant an impartial jury. *See Illinois v. Allen*, 397 U.S. 337, 344–45 (1970);

8    *Estelle v. Williams*, 425 U.S. 501, 504–05 (1976) (recognizing shackles as a

9    "constant reminder of the accused's condition . . . [that] may affect a juror's

10   judgment" and are "so likely to be a continuing influence throughout the trial that

11   . . . an unacceptable risk is presented of impermissible factors coming into play");

12   *see also Deck v. Missouri*, 544 U.S. 622, 633 (2005) (noting that shackles imply

13   that the court considers the defendant dangerous, which is "nearly always a relevant

14   factor in jury decisionmaking" in a capital case). Second, restraints inhibit the

15   defendant, thereby impeding his ability to assist counsel in his own defense, which

16   is critical to his ability to present a meaningful defense. *See id.* at 631–32 ("The use

17   of physical restraints diminishes that right."). Shackling has been found to impede

18   easy communication with counsel. *See Allen*, 397 U.S. at 344. Physical restraints

19   can further "confuse and embarrass the defendant, thereby impairing his mental

20   faculties; and they may cause him pain." *Duckett v. Godinez*, 67 F.3d 734, 747–48

21   (9th Cir. 1995) (quoting *Spain*, 883 F.2d at 720–21). Third, "the use of [shackling]

22   is itself something of an affront to the very dignity and decorum of judicial

23   proceedings." *Allen*, 397 U.S. at 344.

24

---

25   alternatives were appropriate. The court had a lot of evidence to consider in its
26   individualized review. By the time of trial, Kiles had spent 11 years in jail and
     prison, and his record was exemplary. (*See* Tr. Apr. 27, 2006 at 6, 31–32.)

27   [75] Kiles may also have been wearing a stun belt. If that was so, then that restraint,
28   even though not visible to the jury, only exacerbated the problems caused by Kiles's
     visible restraints. *See Gonzalez v. Pliler*, 341 F.3d 897, 900 (9th Cir. 2003).

117

1    All of these forms of prejudice plagued Kiles's guilt-phase proceedings,
2   rendering counsel ineffective for failing to protect Kiles's rights. *See State v.*
3   *Gomez*, 123 P.3d 1131, 1141 (Ariz. 2005) (remanding for new sentencing when
4   shackling of defendant during capital-sentencing proceedings was unjustified and
5   prejudicial). The fragility of the presumption of innocence and the crucial need for
6   an impartial jury were only heightened in Kiles's case, where at least one juror was
7   aware that Kiles had previously been convicted of the crimes at issue and multiple
8   jurors had been exposed to media about the crimes and Kiles's legal proceedings.
9   In a case involving such brutal crimes, when jurors were able to see and hear Kiles's
10  restraints, the jurors were able to quickly and reasonably infer that the court had
11  already deemed him a danger. *See Deck*, 544 U.S. at 633. As a result, the
12  presumption of innocence was vitiated. *See Spain*, 883 F.2d at 721 (recognizing
13  that shackling can "revers[e] the presumption of innocence"). Further, the restraints
14  limited Kiles's ability to communicate freely with his counsel and undermined the
15  dignity and decorum of the judicial proceedings. Given the degree of prejudice on
16  multiple fronts from the visible shackles, there is a reasonable probability that,
17  absent counsel's failures, at least one juror would have voted differently. *See*
18  *Strickland*, 466 U.S. at 694.

19          **E.    Counsel rendered ineffective assistance during the defense's**
20                  **opening statement.**

21          A criminal defendant has the right to effective assistance of counsel during
22  the defense's opening statement. *See, e.g.*, *Wilson v. Mazzuca*, 570 F.3d 490, 502–
23  07 (2d Cir. 2009) (finding counsel ineffective in part due to failures during opening
24  statement). However, Clark's opening statement worked to Kiles's detriment in a
25  number of ways. *See Strickland*, 466 U.S. at 688.

26          Clark undermined the defense's credibility from the outset, by making
27  promises he did not keep. *See, e.g.*, *Anderson v. Butler*, 858 F.2d 16, 17 (1st Cir.
28  1988) ("[L]ittle is more damaging than to fail to produce important evidence that

118

ha[s] been promised in an opening."). After lauding the State's blood-spatter evidence as a "forensic fact in this case" that would be "foolish" to challenge[76] (Tr. July 10, 2000 at 35), Clark guaranteed the jury that the DNA and blood-spatter evidence would establish that Gunnel died in the leather chair: "[T]he DNA, the blood spatter and Mr. Kiles' testimony will all tell that that's where [Gunnel] expired at, in the living room, in that chair." (Tr. July 10, 2000 at 46.) That never came to pass. The location where Gunnel died was critical to the defense, as it spoke both to premeditation and to the credibility of Kiles's narrative. But, after having promised this "very scientific" support for Kiles's testimony (Tr. July 10, 2000 at 34), the defense failed to follow through. The DNA evidence did not establish that Gunnel died in the chair, because the blood on the chair was never tested by the DNA analyst. (*See* Tr. July 12, 2000 at 114–16 (DNA analyst listing items with bloodstains that he tested).) Similarly, no blood-spatter evidence established that Gunnel died in the chair, because defense counsel neglected to elicit such evidence when questioning the State's expert.[77] (*See* Tr. July 14, 2000 at 30–50, 55–59.)

Clark then, for no discernible reason, told the jury the following:

> [Kiles] and his friends . . . decide to do what they have done in the past, and that's—they're going to shoplift some Circle K's. . . . They steal some cigarettes and they steal some liquor. They take the cigarettes and trade them for some more cocaine. They do this three times.

---

[76] That the defense was, because of counsel's inadequate investigation, vouching for unreliable blood-spatter evidence was an independent problem.

[77] Clark made other promises the defense failed to keep. For example, he began his opening by insisting that attorneys "don't come into these rooms at this point in time and ask questions we don't already know the answers to." (Tr. July 10, 2000 at 29.) But defense counsel were repeatedly stumped when State's witnesses failed to respond to questions as anticipated. As another example, Clark announced, "I'll tell you now that a great number of these [State's] witnesses will be recalled in the defense's case in chief. . . . [T]hat's going to happen." (Tr. July 10, 2000 at 37.) Of the State's 20 or so witnesses, the defense recalled only two. (*See* Tr. July 17, 2000 at 127, 145.) In doing so after promising "a great number" of witnesses, counsel intimated that the defense had less to offer—that it was weaker—than anticipated. *See, e.g.*, *Williams v. Woodford*, 859 F. Supp. 2d 1154, 1173 (E.D. Cal. 2012).

119

1    (Tr. July 10, 2000 at 43–4.) Even assuming this information were true, none of it
2    came into evidence at trial. As counsel knew or should have known, the only
3    witness noticed by the State who could potentially have testified to these matters
4    was Kale Johnson. (*See* ROA 446 at 1–2.) Johnson, however, had committed to
5    saying that he did not leave his aunt's apartment on the day in question. (*See* Tr.
6    July 14, 2000 at 136–37.) And the State could not produce such "other crimes"
7    evidence during Kiles's cross-examination. *See* Ariz. R. Evid. 404(b). The defense
8    thus announced to the jury that their client had spent the day of the crime robbing
9    stores for money for drugs. In doing so, counsel undermined Kiles's credibility for
10   no reason whatsoever, even though the case hinged on Kiles's testimony.

11        In sum, defense counsel promised corroboration for a key aspect of Kiles's
12   testimony—one going to whether Kiles premeditated Gunnel's death—and failed
13   to deliver. In addition, counsel affirmatively undercut Kiles's credibility by alerting
14   the jury that Kiles had been robbing stores for money for drugs, on which point
15   there was no testimony whatsoever. Given the centrality of Kiles's testimony to the
16   case, these errors prejudiced Kiles. *See, e.g.*, *United States v. Gonzalez-Maldonado*,
17   115 F.3d 9, 15 (1st Cir. 1997) ("A defendant's opening statement prepares the jury
18   to hear his case. If the defense fails to produce promised expert testimony that is
19   critical to the defense strategy, a danger arises that the jury will presume . . . the
20   defense is flawed."); *Cunningham*, 704 F.3d at 1168 (Pregerson, J., concurring in
21   part and dissenting in part); *see also Strickland*, 466 U.S. at 694.

22        **F.    Counsel were ineffective for failing to effectively cross-examine
23             crucial State's witnesses on matters relating to whether Gunnel's
             death was premeditated.**

24        Trial counsel likewise had a duty under the Sixth Amendment to test the
25   State's case by adequately cross-examining the State's witnesses on points critical
26   to the defense. *See Crawford v. Washington*, 541 U.S. 36, 61 (2004) (recognizing
27   the "testing [of evidence] in the crucible of cross-examination" as crucial
28   constitutional guarantee of reliability); *see also, e.g.*, *Richey*, 498 F.3d at 362–64

120

1    (holding counsel ineffective in part for failure to prepare sufficiently to cross-
2    examine State's witnesses). Again, trial counsel's strategy was to have Kiles admit
3    that he killed Gunnel, but then to convince the jury that the crime was not
4    premeditated and therefore not first-degree murder. (Tr. July 10, 2000 at 39–40.)
5    Indeed, counsel made a point during closing argument of dismissing the State's
6    theory that the attack on Gunnel started in the bedroom and moved to the living
7    room—a theory suggestive of a prolonged attack and therefore of premeditation.
8    (Tr. July 19, 2000 at 51.) Having committed to this approach, though, counsel was
9    obligated to take every opportunity to undercut the State's case for premeditation.
10   Instead, counsel missed critical chances to effectively cross-examine several of the
11   State's witnesses, thereby unnecessarily ceding key points to the prosecution.

12           For example, as laid out above, counsel failed to cross-examine two of the
13   State's forensic experts on critical issues. At no point during the cross-examination
14   of Tom Bevel did counsel touch on the blood-stain evidence in the living room.
15   (*See* Tr. July 14, 2000 at 30–50, 55–59.) However, had counsel done so, counsel
16   could have elicited from Bevel that the low-to-the-ground blood spatter and castoff
17   in the living room suggested that Gunnel was not standing for any blow that
18   produced such spatter. (Tr. Mar. 27, 2006 at 65–66, 71.) Counsel could moreover
19   have had Bevel testify that the blood stain in the leather chair was consistent with
20   the blood source (i.e., Gunnel's head injury) being low to the chair cushion. (Tr.
21   Mar. 27, 2006 at 65–66, 71.) Counsel could even have elicited from Bevel that he
22   had no way of knowing how the ratchet got to the east bedroom and that it could
23   have been moved there after the killings. (*Cf.* Tr. Mar. 27, 2006 at 113–14.) This
24   testimony—much of which was elicited during the aggravation phase—would have
25   corroborated Kiles's account of the attack on Gunnel, including that it was not
26   premeditated. (Tr. July 17, 2000 at 165–66); *see also Bennett*, 407 F. App'x at 215.
27           Similarly, instead of blindly accepting Dr. Mallon's assertion that Gunnel
28   exhibited "evidence of a defensive wound" (Tr. July 13, 2000 at 99), counsel could

121

have confronted Dr. Mallon with his far-less-definitive statement at the 1989 trial that Gunnel's forearm wound merely could be a defensive wound.[78] (Tr. Dec. 12, 1989 at 8.) Clearly counsel was interested in impeaching Dr. Mallon with his prior testimony, as she did so on a different issue. (*See* Tr. July 13, 2000 at 106–07.) But the failure to confront him about the defensive wound marked another missed opportunity to buttress Kiles's version of events.[79] *See Nixon v. Newsome*, 888 F.2d 112, 114–15 (11th Cir. 1989) (counsel ineffective for failing to cross-examine witness on the "crucial discrepancies" between her testimony at two trials).

Counsel's failure to effectively cross-examine extended to lay witnesses. As an example, counsel did not adequately cross-examine Larry Hawkins using the affidavit he had provided in 1994, his 1989 testimony, or other impeachment material. (ROA 1189 at 6.) Hawkins's Silent Witness Letter and testimony were key evidence of premeditation (*see, e.g.*, Tr. July 13, 2000 at 32–35), and counsel missed chances to undermine this testimony. Counsel could have asked Hawkins about the following sworn statement he made in 1994: "Alvie came to my house the day of the homicides, as I testified in court. He was not himself. He had a crazed look in his eyes and was rambling and at times, incoherent. I don't know that anything he told me that day was accurate." (PFR2 Dkt. 20 Ex. 2 at 2–3.) Confronting Hawkins with that prior attestation would have undermined the value of his testimony about what Kiles had said after the homicides. Counsel could further have impeached Hawkins with his 1989 testimony about Kiles's alcohol problem and that Kiles was "shooting cocaine" when he spoke to Hawkins on

---

[78] Relatedly, counsel could have confronted Dr. Mallon with his 1989 testimony that he could not say whether Gunnel was conscious for any particular blow. (*See* Tr. Dec. 12, 1989 at 15 (testifying that "it would be speculation" to say whether Gunnel was conscious after the first blow).)

[79] Of course, as discussed previously, counsel should have retained experts to help them understand and navigate the State's experts' conclusions. Even lacking such help, though, counsel could have better fashioned their attacks on these experts during cross-examination.

1    February 10, 1989. (Tr. Dec. 13, 1989 (Hawkins testimony) at 27–28.) And,

2    because the State framed Hawkins as Kiles's confidant from its opening statement

3    onward (*see, e.g.*, Tr. July 10, 2000 at 24), counsel could have elicited testimony

4    from Hawkins that he and Kiles had a falling out when Hawkins beat up Kiles's

5    sister (*see* PFR2 Dkt. 21 Ex. 3 at 34). Instead, counsel failed to counter testimony

6    regarding premeditation on which the State relied heavily. *See Reynoso v. Giurbino*,

7    462 F.3d 1099, 1114 (9th Cir. 2006) (counsel ineffective for failing to investigate

8    material for cross-examination).

9         Counsel could likewise have impeached Kale Johnson with his August 1994

10   affidavit. (*See* ROA 1189 at 39–40; ROA 225 Ex. 45 at 1–3.) In that affidavit,

11   Johnson attested that when he returned with Kiles to Gunnel's apartment,

12
13        Alvie was not bragging about what he had done at all. He
          was really freaked out and upset. Alvie was very high on
          drugs and alcohol, and he was staggering. . . . He started
14        down the hallway, but because he was so messed up he
          accidentally stumbled over Valerie's body. . . . He did not
15        deliberately step on Valerie's face, and he did not step on
          her face to prove that she was dead.
16

17   (ROA 225 Ex. 45 at 2.) While Clark attempted to impeach Johnson's testimony at

18   trial, Clark did not use this affidavit. Instead, Clark highlighted Johnson's April

19   2000 unsworn statement to defense counsel, as well as Johnson's 1989 testimony,

20   in which Johnson testified that Kiles stepped on Gunnel on purpose to show that

21   she was dead. (Tr. July 14, 2000 at 165–66.) That counsel failed to use this affidavit

22   for impeachment was not strategic, as much of counsel's guilt-phase focus was on

23   undercutting Johnson's testimony.

24        Finally, counsel failed to adequately cross-examine certain law-enforcement

25   witnesses. Perhaps most importantly, counsel did not ask Rodgers, who was the

26   lead investigator on the case, whether the evidence supported the State's theory that

27

28

                                          123

1   the attack on Gunnel started in the bedroom.[80] Had counsel done so, he would

2   presumably have testified as he did during the 2006 aggravation-phase cross-

3   examination: "[A]fter things started, I don't think [Gunnel] ever made it to the east

4   bedroom." (Tr. Apr. 3, 2006 at 100.) He could have elaborated that the ratchet,

5   along with Gunnel's tooth fragment and hair, found in the east bedroom could have

6   been transferred there—there was no way to tell from the physical evidence whether

7   the ratchet was used in the bedroom. (Tr. Apr. 3, 2006 at 99–100.) The State harped

8   on this theory that the attack on Gunnel started in the bedroom; it came up time and

9   time again in the State's closing as the basis for premeditation. Had Rodgers, the

10  State's crime-scene management expert (ROA 446 at 2), obliterated that theory, the

11  State's case for premeditation would have been in shambles. Counsel were

12  ineffective for missing—with no justification—such a valuable opportunity to

13  strike at the core of the State's case.[81] *See Reynoso*, 462 F.3d at 1099; *Richey*, 498

14  F.3d at 362–64.

15      Counsel's failures with respect to cross-examination were not based on any

16  informed, reasoned decisions, but on a lack of preparation and investigation. Had

17  counsel effectively challenged the testimony of these key State witnesses, there is

18  a reasonable probability that the jury's verdict would have been different. *See*

19  *Strickland*, 466 U.S. at 688, 694.

20      **G.    Counsel were ineffective for stipulating to the admission of**
21          **hearsay statements from Gunnel at the guilt-phase proceedings.**

22      As part of counsel's duty to test the State's case, counsel were required to

23  _____

24  [80] It is unclear whether defense counsel interviewed Rodgers prior to trial.

25  [81] Further, if the defense was aware that Officer David Sherman, Kiles's arresting
    officer, had previously falsified a urine test, counsel should have raised that
26  information on cross-examination. Although Sherman did not testify on matters
    related to premeditation, casting his credibility into question could have affected
27  the jurors' perception of the State's law enforcement witnesses. And, if the State
    did not disclose this impeachment information about Sherman to the defense, that
28  withholding of material violated Kiles's rights.

contest the admission of unreliable hearsay. *See Pearce v. Nooth*, No. 17-35326, 2018 WL 3639534, at *2 (9th Cir. Aug. 1, 2018) (finding counsel ineffective for failing to make meritorious hearsay objection). Kiles's counsel were ineffective for failing to object to such hearsay. (*See* ROA 1189 at 37–39.)

Before Kiles's guilt-phase proceedings, defense counsel—specifically, VanDreumel—made several stipulations in a letter to the State. (*See* ROA 497.) One of those stipulations was as follows:

> Next, consistent with the doctrine of the law of the case, [the defense] will not challenge the admissibility of Valerie Gunnel's statements to ImoJean [sic] Kiles reference her needing money because our client took her food stamps. Similarly, we will not challenge the admissibility of Sandra Mercado's claim that Valerie told her that she (Valerie) didn't have any money, and that she (Valerie) wanted our client to move out, and that our client responded that the only way he would move out were if she (Valerie) called the police. Please know that we are not stipulating that these witnesses['] claims regarding Valerie's statements are truthful, and we intend to challenge the testifying witnesses thereon. We simply understand that those statements will be admitted.

(ROA 497 at 3.) At trial, Imojean Kiles and Sandra Brown (formerly Mercado) testified to these and other hearsay statements from Gunnel pursuant to counsel's stipulation. (*See, e.g.*, Tr. July 11, 2000 at 32 (Imojean Kiles testifying that Gunnel said that Alvie Kiles had taken her food stamps); Tr. July 12, 2000 at 9–10 (Brown testifying that Gunnel complained that she wanted Kiles to leave her apartment and that she was going to throw him out); Tr. July 12, 2000 at 11 (Brown testifying that Gunnel believed Kiles had taken her purse).)[82]

---

[82] At one point during Brown's testimony, Clark objected to the hearsay. (Tr. July 12, 2000 at 9.) There was an off-the-record bench conference (Tr. July 12, 2000 at 9), at which point Clark was presumably reminded that the defense had stipulated to the admission of hearsay testimony. If, instead, the defense withdrew their stipulation, objected to the hearsay, and were overruled by the trial court, the constitutional error lies with the trial court for allowing the admission of unreliable hearsay in violation of Kiles's rights to due process, confrontation, and a fair trial.

125

1       Preliminarily, while counsel claimed to be deferring to the law-of-the-case
2 doctrine, counsel later argued against the doctrine on a matter related to aggravating
3 circumstances. (*See* ROA 756 at 2–5.) Accordingly, counsel's stated justification
4 for the stipulation is untenable.[83]

5       Gunnel's statements—particularly that she needed money because Kiles had
6 taken her food stamps and that he would only move out if she called the police on
7 him—were inadmissible hearsay. The statements were offered to prove the truth of
8 the matters asserted. Moreover, there was no dispute that, for example, Gunnel was
9 angry with Kiles at the time of the crime. Because these statements do not fall within
10 exceptions to the prohibition on hearsay under Arizona law, they were inadmissible.
11 *See, e.g.*, *State v. Charo*, 754 P.2d 288 (Ariz. 1988) (holding that hearsay from
12 deceased victim to prove an unwitnessed prior bad act by the defendant was
13 inadmissible); Ariz. R. Evid. 803. Accordingly, counsel were deficient in
14 stipulating to their admission. *See Pearce*, 2018 WL 3639534, at *2.

15       Counsel's failure to object was, moreover, prejudicial. The State relied on
16 the hearsay in its closing, arguing that the jury should believe Brown's testimony
17 as to what Gunnel had said and, in turn, reject Kiles's testimony. (*See* Tr. July 19,
18 2000 at 25–26.) In particular, Gunnel's hearsay statements made it harder for a jury
19 to accept that her later fight with Kiles, if attributable to the fact that he took her
20 food stamps, was the adequate provocation necessary for a finding of heat-of-
21 passion manslaughter. If the jury had not heard this hearsay, there is a reasonable
22 probability that it would not have convicted Kiles of first-degree murder for
23 Gunnel's death. *See Strickland*, 466 U.S. at 694.

24
25 ——————————
26 Regardless, defense did not object to Imojean Kiles's relaying of hearsay (*see* Tr. July 11, 2000 at 32), and the failure of counsel to ensure a complete record of this
27 important discussion regarding hearsay was ineffective, *see infra*, Claim 15.

28 [83] Moreover, the hearsay issues were not raised to the Arizona Supreme Court during Kiles's first direct appeal. *See State v. Kiles*, 857 P.2d 1212 (Ariz. 1993).

1

2

### H.   Counsel were ineffective for failing to object to the worst of the gruesome photographs repeatedly displayed at trial.

3   Despite the excessively disturbing nature of some of the photographs of the
4   victims, Kiles's counsel failed to object to their admission and repeated display at
5   trial. That failure was particularly abject with respect to the photograph admitted
6   into evidence of LeCresha Kirklin, Gunnel's nine-month-old daughter. (*See* 2000
7   Trial Ex. 72.) Because of the particularly haunting nature of that image, counsel's
8   failure to object to its admission at trial was ineffective. *See Strickland*, 466 U.S. at
9   688, 694; *see also, e.g.*, *Duncan v. Henry*, 513 U.S. 364, 366 (1995) (recognizing
10   due-process violation when evidence is admitted that is so inflammatory as to
11   prevent a fair trial); (ROA 1189 at 30–32).

12   Exhibit 72 from the 2000 trial showed LeCresha on an autopsy table, her skin
13   grossly discolored and speckled by her prolonged submersion in water. (*See* Tr.
14   July 13, 2000 at 103.) The photograph showed her skin slippage and the erosion of
15   her soft tissue—also attributable to the immersion (Tr. Dec. 12, 1989 at 10; Tr. July
16   13, 2000 at 103), as well as bites and other marks from fish and aquatic animals (Tr.
17   Mar. 20, 2006 at 26). LeCresha's face appeared bloated, and at least one of her eyes
18   appeared to have been lost when she was submerged.

19   Defense counsel knew or should have known how inflammatory the
20   photograph of LeCresha was. During Kiles's first state post-conviction
21   proceedings, multiple jurors from his 1989 trial had commented on how troubling
22   the photographs were. (ROA 225 Ex. 49 at 1 ("I remember the case very well,
23   particularly the gruesome photographs. I had nightmares for a long time after seeing
24   them. [They] seemed unnecessary. The photographs really influenced the jury.");
25   ROA 225 Ex. 51 at 1 ("The photographs of the crime scene and the victims were
26   particularly gruesome and upsetting.").) Indeed, VanDreumel challenged the
27   admission of Exhibit 72 and other graphic photographs in 2006, before the penalty
28   phase, noting the photograph of LeCresha in particular "still bothers me, that

127

1    photograph does." (Tr. Mar. 20, 2006 at 26–27.)

2          As evidenced by the fact that counsel later challenged the photograph,

3    counsel had no justification for failing to do so at the guilt phase. (*See* Tr. Mar. 20,

4    2006 at 26–27.) VanDreumel even acknowledged that "perhaps, [the failure] was

5    an error of some magnitude" on the defense's part. (Tr. Mar. 20, 2006 at 35.)

6          Moreover, had counsel challenged the admission of Exhibit 72, they would

7    have prevailed. Inflammatory photographs are inadmissible under Arizona Rule of

8    Evidence 403 when they have little tendency to establish any issue in dispute in the

9    case; in such cases, the photographs serve primarily to inflame the jury. *State v.*

10   *Bocharski*, 22 P.3d 43, 56 (Ariz. 2001). Here, the photograph was not probative of

11   any matter in dispute. The defense did not dispute the identity of the child, that she

12   had died, her cause of death, or that she had been placed in the river. The defense

13   disputed only who caused LeCresha's death, a matter on which the photograph shed

14   no light whatsoever. Therefore, the photograph was inadmissible. *Id.* (recognizing

15   that when defense does not contest the facts of which an inflammatory photograph

16   is probative, the "prejudicial effect [of such a photograph] can be significant").[84]

17         Powell knew how disturbing—and potent—the image of the decomposed

18   body of the infant was. (*See* Tr. July 12, 2000 at 61.) Even so, he displayed Exhibit

19   72 for the jurors multiple times during the course of the guilt phase. (*See* Tr. July

20   12, 2000 at 61; Tr. July 13, 2000 at 103.) The jurors were subjected to a deeply

21   disturbing image that some continue to find haunting. Because of the power and

22   inflammatory nature of such a photograph, its prejudice is not just limited to crimes

23   against LeCresha; the photograph surely colored the jurors' view of all of the

24   evidence and affected all of the verdicts. Exhibit 72 was particularly prejudicial

25   with respect to the child-abuse charges, as the photograph showed all sorts of

26   _____

27   [84] Even when the trial court ruled the photograph admissible for the aggravation
     phase, the court acknowledged that the calculus would be different at guilt-phase
28   proceedings, where there would be greater prejudice. (*See* Tr. Mar. 20, 2006 at 38.)

1    horrifying damage to LeCresha's body that occurred long after any alleged child

2    abuse by Kiles. Seeing a child in that state, with the effects of the immersion of

3    water, must have made a difference. Had the jury not been repeatedly shown Exhibit

4    72, there is a reasonable probability that its verdicts would have been different. *See*

5    *Strickland*, 466 U.S. at 694.

6    **I.      Counsel rendered ineffective assistance by failing to request**

7    **critical jury instructions.**

8         Defense counsel failed to request several critical jury instructions; the court,

9    accordingly, neglected to instruct the jury appropriately. Because counsel's failure

10   prejudiced Kiles with respect to his conviction for first-degree murder for the death

11   of Gunnel and his convictions for child abuse, counsel provided ineffective

12   assistance. *See Strickland*, 466 U.S. at 688, 694; *see also Pirtle v. Morgan*, 313 F.3d

13   1160, 1162 (9th Cir. 2002) (deeming counsel ineffective for failing to request a

14   guilt-phase instruction on diminished capacity).

15        As Kiles testified that he killed Gunnel, the issue of premeditation—the

16   difference between first-degree murder and second-degree murder—was pivotal.

17   (*See* Tr. July 19, 2000 at 92–93.) Counsel thus had an absolute duty to ensure that

18   the jury was properly instructed on premeditation. (*See* ROA 1189 at 42–45); *see*

19   *also Pirtle*, 313 F.3d at 1162 (instructions relating to premeditation were crucial

20   when "the only issue in dispute was whether [the defendant] acted with

21   premeditation). The court instructed the jury as follows:

22            Premeditation means the defendant acts with the
     knowledge that he will kill another human being when such
23            intention or knowledge proceeds [sic] the killing by a
     length of time to permit reflection. An act is not done with
24            premeditation if there is any instant—if it is the instant
     effect of a sudden quarrel or heat of passion.
25

26   (Tr. July 19, 2000 at 92–93.) That statutory definition was confusing, as evidenced

27   by the string of later opinions trying to make sense of the term's meaning. *See, e.g.*,

28   *State v. Thompson*, 65 P.3d 420, 425–27 (Ariz. 2003) (discussing various

                                         129

1   interpretations of "premeditation" over time). Further, the definition effectively

2   elided the distinction between the elements of "premeditation" and "knowledge"

3   and robbed "premeditation" of any actual meaning.[85] In order to assist the jury in

4   understanding premeditation, counsel should have requested clarifying instructions

5   to supplement and shed light on the definition provided. (*See* ROA 489 at 1–6

6   (noting instructions requested by defense).)

7       First, counsel should have asked the court to instruct the jury that it must find

8   "beyond a reasonable doubt that the defendant actually reflected." *Thompson*, 65

9   P.2d at 428.[86] Such an instruction, which was presaged before Kiles's trial by *State*

10  *v. Ramirez*, would have made clear to the jury that premeditation was distinct from

11  knowledge and required actual reflection. 945 P.2d 376, 380–81 (Ariz. 1997) ("Just

12  as murder requires actual killing, premeditation requires actual reflection."),

13  *superseded by statute as stated in State v. Zamora*, 63 P.3d 1050 (Ariz. Ct. App.

14  2003). Kiles's jury was left to deliberate without knowing that premeditation does

15  in fact require reflection—not merely time to reflect.

16      Second, and relatedly, counsel should have requested that the court define

17  "reflection" as an intentional act when deciding the issue of premeditation. (*See*

18  ROA 1189 at 42.) Such an instruction would have further given substance to the

19  meaning of premeditation.

20      Third, to ascertain that the jury understood that premeditation differed from

21  knowledge, counsel should have asked the court to specifically state that "reflection

22  differs from the intent or knowledge that conduct will cause death." *Ramirez*, 945

23

24  _____

25  [85] The court gave the following unhelpful definition of "knowingly": "Knowingly
    means that a defendant acted with awareness of the existence of conduct or
26  circumstances constituting an offense. It does not mean that the defendant must
    have known the conduct is forbidden by law." (Tr. July 19, 2000 at 91.)

27  [86] While *Thompson* contemplated a revised definition of premeditation, the
    requirement that the jury find actual reflection necessarily applies to the 1989
28  definition of premeditation offered by the trial court.

130

1  P.2d at 378 (quoting Recommended Arizona Criminal Jury Instruction 11.051);
2  (*see also* ROA 225 at 20). Such an instruction would have ensured that the jury
3  recognized that premeditation did not necessarily follow from knowledge and that
4  it was a discrete element of the crime of first-degree murder. *Cf. Riley v. McDaniel*,
5  786 F.3d 719, 723–27 (9th Cir. 2015) (holding that a jury instruction that combined
6  defined premeditation in terms of deliberation, another element of the crime,
7  relieved the state of its burden of proof on each distinct element). Informing the
8  jury as much was of particular importance when premeditation was defined in terms
9  of knowledge. (*See* Tr. July 19, 2000 at 92–93); *Riley*, 786 F.3d at 723–27.

10      Because these instructions were available under Arizona law, and because
11  premeditation was the primary controverted issue for Gunnel's death, counsel was
12  obligated to request these clarifying instructions. Had the jury been given any one
13  or any combination of these instructions, the jurors would have understood that the
14  State needed to prove actual reflection and that reflection differed from knowledge.
15  *See Strickland*, 466 U.S. at 694; *see also Pirtle*, 313 F.3d at 1162. If the jury had so
16  understood, there is a reasonable probability that one juror would not have
17  convicted Kiles of having premeditated Gunnel's killing.[87]

18      Finally, counsel should have requested clarifying instructions with regard to
19  the definition of "child abuse." Specifically, counsel should have requested an
20  instruction making clear to the jury that child abuse had not been proven if the child
21  abuse necessarily occurred as part of the premeditated murder of a child. *See State*
22  *v. Styers*, 865 P.2d 765, 771 (Ariz. 1993) ("If a defendant cannot be convicted for
23  an intentional aggravated assault that necessarily occurs when there is a
24  premeditated murder, it logically follows that he also cannot be convicted for an

---

26  [87] Counsel should similarly have asked for an instruction explaining that the jury
27  could take into account voluntary intoxication when determining whether Kiles was
   in the "heat of passion," for the purposes of undercutting premeditation. (*See* Tr.
   July 19, 2000 at 92–93 (noting that "[a]n act is not done with premeditation . . . if
28  it is the instant effect of a sudden quarrel or heat of passion"); ROA 1189 at 44.)

131

intentional child abuse that necessarily occurs when there is a premeditated murder of a child victim.") Trial counsel knew full well the import of *Styers* to Kiles's case: counsel argued repeatedly before, during, and after trial that the child-abuse charges, and later convictions, should be dismissed under *Styers*. (*See, e.g.*, ROA 443; Tr. July 17, 2000 at 109–13.) However, counsel failed to request a simple instruction that would have clarified for the jurors that, if they concluded that Kiles had committed premeditated murder of one or both children, they could not also convict him of child abuse without finding that he had committed some other harmful act that was separate from the premeditated murder.

The prejudice from this error is clear. With respect to Shemaeah, ten jurors found Kiles guilty of premeditated murder. (ROA 482 at 5.) With respect to LeCresha, seven jurors found Kiles guilty of premeditated murder. (ROA 482 at 6.) Had the jurors understood that they had to find child abuse separate and apart from premeditated murder, it is likely that each juror who found premeditated murder would *not* have found Kiles guilty of child abuse. Accordingly, Kiles was easily prejudiced by counsel's failure to request this important instruction properly explaining child abuse to the jury.

Trial counsel's failure to request clarifying instructions on key issues, with respect to the first-degree murder charge for Gunnel and both child-abuse charges, prejudiced Kiles. *See Strickland*, 466 U.S. at 688, 694; *Pirtle*, 313 F.3d at 1162. He is therefore entitled to relief from all three of the resulting convictions.

### J.    Counsel provided ineffective assistance when they failed to object to numerous aspects of the State's closing argument.

Trial counsel listened as the State repeatedly mischaracterized and misrepresented evidence, vouched for witnesses, and otherwise engaged in improper conduct. In failing to object to these and other aspects of the State's closing argument, counsel were ineffective. *See Zapata v. Vasquez*, 788 F.3d 1106, 1112 (9th Cir. 2015).

1    The most egregious of the State's transgressions during its closing occurred
2    when the State fabricated evidence supporting its theory of how Gunnel was killed.
3    The Supreme Court has recognized that a prosecutor "overstep[s] the bounds of . . .
4    propriety" when he "put[s] into the mouths of . . . witnesses things which they had
5    not said." *Berger v. United States*, 295 U.S. 78, 84 (1935). In doing so, the Court
6    cautioned that "while [a prosecutor] may strike hard blows, he is not at liberty to
7    strike foul ones," and that it is "his duty to refrain from improper methods calculated
8    to produce a wrongful conviction." *Id.* at 88.

9    Here, the State flouted *Berger*'s proscription against "foul" blows. The State
10   wanted to persuade jurors that Gunnel's death was premeditated, in part by arguing
11   that she endured a prolonged attack that started in the east bedroom and moved to
12   the living room. (*See, e.g.*, Tr. July 10, 2000 at 13.) To do so, the State relied heavily
13   on Larry Hawkins's testimony, and accordingly, focused a great deal during its
14   closing on depicting Hawkins's testimony as accurate. "Let's talk about Larry
15   Hawkins. Larry Hawkins, he said it all," the prosecutor proclaimed. (Tr. July 19,
16   2000 at 14.) He improperly vouched for the correctness of Hawkins's testimony,
17   noting that after the initial stumbles during questioning, "[Hawkins] finally said
18   completely, accurate [sic] everything that was said to him by the defendant." (Tr.
19   July 19, 2000 at 16); *see also United States v. Sanchez*, 176 F.3d 1214, 1224 (9th
20   Cir. 1999) ("As a general rule, a prosecutor may not express his opinion of the
21   defendant's guilt or his belief in the credibility of government witnesses.") (quoting
22   *United States v. Molina*, 934 F.2d 1440, 1444 (9th Cir. 1991). The State continued
23   that Hawkins's letter to Silent Witness had details that were just "not something . . .
24   Mr. Hawkins would have come up with." (Tr. July 19, 2000 at 18.) In case the
25   State's embrace of Hawkins was not yet clear, the State continued, "But we have
26   Larry Hawkins and the [S]tate [is] saying you should believe Larry Hawkins." (Tr.
27   July 19, 2000 at 19.)

28   Having impressed upon the jury the importance and accuracy of Hawkins's

133

testimony, the State then spun a tale about what Hawkins had in fact said. At no point had any witness testified that Kiles said that the attack on Gunnel started in the east bedroom. Hawkins certainly had not done so. (*See* Tr. July 13, 2000 at 3–79.) Instead, Hawkins had testified that after grabbing the tire jack, Kiles went into the apartment and "struck her." (Tr. July 13, 2000 at 29.) Hawkins made no mention of Kiles attacking Gunnel in the bedroom, either when testifying or in the Silent Witness letter Hawkins had submitted to the police in the wake of the crime. (*See* 2000 Trial Ex. 90 at 1.) That, however, did not prevent the State from asserting, over and over, that Hawkins had testified that the attack on Gunnel started in the bedroom. When trying to discredit Kiles's testimony, the prosecutor announced,

> However, we also have the ratchet over here in the other bedroom along with the bloody pillow. Now, what makes more sense? [Kiles's version or the] Larry Hawkins version about the thing [i.e., the attack on Gunnel] happening back there first and then coming on out and the rest happening in the front?

(Tr. July 19, 2000 at 27.) Shortly afterward, the prosecutor again declared, "The ratchet was back in the bedroom along with the blood, just as Larry said." (Tr. July 19, 2000 at 27.) The State misrepresented Hawkins's testimony once more in closing: "No reason for that pillow to get bloody unless that is where the assault initiated like Mr. Hawkins told you." (Tr. July 19, 2000 at 30.) And, for good measure, when discussing the east bedroom, the State punctuated its rebuttal with one more reference to Hawkins:

> Look at the photograph of that pillow. You got the jack, the ratchet part in there, but that's where it began. Again, just like Larry Hawkins' letter says and just like he testified here. (Tr. July 19, 2000 at 82.)

As noted, Hawkins had never said any such thing. But the State's repetition of its convenient misrepresentation—and trial counsel's failure to object—would certainly have convinced the jury otherwise. *See Berger*, 295 U.S. at 88 ("[I]mproper suggestions, insinuations, and, especially, assertions of personal

134

1   knowledge are apt to carry much weight against the accused when they should
2   properly carry none.").

3       The State's misrepresentations did not end there. The State made a concerted
4   effort to undermine Kiles's credibility, telling the jury that, in order to believe Kiles,
5   it would "need to forge through and bastardize the facts of this case." (Tr. July 19,
6   2000 at 19; Tr. July 19, 2000 at 25–26, 33, 35 (dismissing Kiles's "concocted"
7   account as an attempt "to put square pegs in the portions of his round holes" in order
8   to challenge premedication and "maintain[ing]" defendant's guilt); *see Sanchez*, 176
9   F.3d at 1224. Then, the State proceeded to mischaracterize Kiles's testimony to
10  suggest that it could not be reconciled with the physical evidence. When Kiles was
11  asked whether he struck Gunnel more than once before she hit that chair, Kiles
12  testified, "I hit her. I – yeah, I guess I hit her more than one time." (Tr. July 17,
13  2000 at 166.) Powell, however, claimed that Kiles testified that "he remembers
14  [hitting Gunnel] once." (Tr. July 19, 2000 at 27.) The State again misquoted Kiles
15  in an attempt to damage Kiles's credibility: "The back of her head is nothing but
16  blood. Do you think that was from one blow in the living room when she was
17  standing up?" (Tr. July 19, 2000 at 29.) As even Kiles had acknowledged, it was
18  not. The State had spun yet another tale to persuade the jury to find that Gunnel's
19  death was premeditated.

20      Beyond misstating the evidence to bolster its case for premeditation,[88] the
21  State made a multitude of other improper comments. For example, its closing
22  teemed with inflammatory statements, including the racially tinged and repeated
23  claim that the crimes were "a feeding frenzy" and Powell's reference to Kiles, Kale

24

25  [88] The State's mischaracterizations of evidence did not end there. As just one more
26  example, the State claimed, "[W]e do know that Valerie had absolutely no drugs in
    her system when she died. . . . You heard that from the doctor." (Tr. July 19, 2000
27  at 83.) As Dr. Mallon had testified, however, Gunnel's negative drug test results
    were necessarily limited to the drugs for which Dr. Mallon had tested, and he had
28  not tested her body for marijuana. (Tr. July 13, 2000 at 100–01.)

Johnson, and Mike Parker as "the three amigos." (*See, e.g.*, Tr. July 19, 2000 at 30, 31, 77); *see also Zapata*, 788 F.3d at 1114 (declaring improper any inflammatory statements designed to appeal to jury's passions). When trying to explain his own use of the phrase "feeding frenzy," Powell offered the inflammatory and wildly speculative claim that the killer was thinking, "I guess since we're killing one we may as well kill them all. Let's kill the whole family. Let's kill two generations." (Tr. July 19, 2000 at 77); *see Zapata*, 788 F.3d at 1112–13 (criticizing prosecutor for speculative and "falsified story" of defendant's last words to victim). The State further speculated, again improperly, that there were at the time of trial Converse prints near the river, suggesting that the shoeprints found there earlier should be dismissed as meaningless. (Tr. July 19, 2000 at 80.)

In addition, the State misrepresented the defense's position by suggesting that counsel was arguing for the jury "to excuse[] [Kiles's] conduct on the murder of three people" (Tr. July 19, 2000 at 84), when defense counsel were by no means asking the jury to let Kiles off scot-free for Gunnel's death. The State also misstated the law, in telling the jury that premeditation required only "a time to permit reflection, that can be instantaneous." (Tr. July 19, 2000 at 35.) The prosecutor even injected into his closing his personal belief that he could not follow the defense's argument. (*See* Tr. July 19, 2000 at 30.) As a final example, the State closed its rebuttal argument by basically telling the jurors that it was their duty, in the name of justice, to convict Kiles:

> The [S]tate is here asking for justice. . . . The best definition of justice I ever heard was assignment of responsibility. Because we base our community and society on acceptance of responsibility, whether it's done willingly or unwillingly. You get that old speeding ticket and April 15th comes around and you write that big check. It is a part of being a citizen. Some people don't accept it and we have to assign responsibility to them. They won't accept it. It's a big job. . . . Ladies and gentlemen, it's you, and you know who it is. . . . You can assign responsibility. That's what we're asking you to do now, ladies and gentlemen, please.

136

1    (Tr. July 19, 2000 at 85.) In effect, the State ended the trial by telling the jurors that

2    it was their job, as citizens who cared about their community and their society, to

3    convict Kiles. *See Sanchez*, 176 F.3d at 1224–25 (finding prosecutorial misconduct

4    because it is "improper for the prosecutor to state that the duty of the jury is to find

5    the defendant guilty").[89]

6         Despite all of these errors, defense counsel objected only once to the State's

7    closing, when the State improperly "maintain[ed] to you . . . [that] never has a case

8    exhibited more premeditation" than Kiles's case. (*See* Tr. July 19, 2000 at 36–37.)

9    Even then, counsel did nothing when the trial court gave an instruction that did not

10   address the underlying problem: that the State expressed its belief that the evidence

11   before the jury clearly showed premeditation. (*See* Tr. July 19, 2000 at 36–37.) In

12   the face of so many other missteps by the State, including the misrepresentation of

13   evidence going to premeditation—the core issue for Gunnel's death—trial

14   counsel's failure to object was deficient. *See Zapata*, 788 F.3d at 1112. Because of

15   that deficient performance, the last few things the jury heard were that Hawkins had

16   testified that the attack on Gunnel started in the bedroom, that Kiles's testimony did

17   not fit with the physical evidence, and that it was the jury's duty to assign

18   responsibility when Kiles had chosen not to accept it himself. Had counsel objected

19   to this prosecutorial display, at least signaling to the jury that the State was

20   misguided, then there is a reasonable probability that at least one juror would have

21   come out differently with regard to premeditation, and therefore first-degree

22   murder, for Gunnel's death. *See Strickland*, 466 U.S. at 694.

23        **K.    Counsel also rendered ineffective assistance in failing to ensure**
24             **that a record was made of key parts of the guilt-phase proceedings.**

25        As discussed in depth in Claim 15, *infra*, Kiles's counsel let significant

26   _____

27   [89] The State's repeated statement that some people do not accept responsibility—
     and the implication that Kiles was such a person and that he was wrong for not
28   accepting responsibility—further suggested to the jury that Kiles was wrong for
     having asserted his Sixth Amendment right to go to trial on the charges against him.

1    portions of the pretrial and trial proceedings go unrecorded. Counsel did so despite
2    Kiles's specific request that a record be made of all proceedings (*see, e.g.*, Tr. Aug.
3    6, 1999 at 13), and despite the need for meaningful appellate review, *see Gregg v.*
4    *Georgia*, 428 U.S. 153, 197–98 (1976) (joint opinion of Stewart, Powell, and
5    Stevens, JJ.). In doing so, counsel performed deficiently and prejudiced Kiles. *See*
6    *Strickland*, 466 U.S. at 688, 694.

7         **L.    Counsel's numerous errors, individually and cumulatively,**
8                 **undermined the reliability of Kiles's guilt-phase proceedings.**

9         While each instance of deficient performance described above is prejudicial
10   on its own, counsel's guilt-phase errors were decidedly prejudicial when considered
11   cumulatively. When evaluating an ineffective-assistance claim, this Court must
12   consider the cumulative impact of counsel's various errors. As the Supreme Court
13   has stated, "In making this [prejudice] determination, a court hearing an
14   ineffectiveness claim must consider the totality of the evidence before the judge or
15   jury." *Strickland*, 466 U.S. at 695; *see Williams v. Taylor*, 529 U.S. 362, 397–98
16   (2000); *see also White v. Ryan*, 895 F.3d 641, 645 n.1 (9th Cir. 2018) (ruling that
17   the district court erred by granting a certificate of appealability on a portion of an
18   ineffective assistance claim because the petitioner "has but a single claim regarding
19   his right to the effective assistance of counsel at the penalty phase"); *Martin*, 424
20   F.3d at 590–92 ("[E]ven if [trial counsel's] errors, in isolation, were not sufficiently
21   prejudicial, their cumulative effect prejudiced Martin's defense."); *Alcala v.*
22   *Woodford*, 334 F.3d 862, 882–83 (9th Cir. 2003) (granting relief on basis of
23   cumulative impact of multiple errors by counsel); *Lindstadt*, 239 F.3d 191, 205 (2d
24   Cir. 2001) (granting relief where petitioner was prejudiced by cumulative effect of
25   errors committed by trial counsel); *Harris ex rel. Ramseyer v. Wood*, 64 F.3d 1432,
26   1439 (9th Cir. 1995) (holding that cumulative impact of numerous deficiencies in
27   defense counsel's performance was prejudicial, warranting habeas relief).

28        Here, had counsel not performed deficiently, the jury would have heard a

                                         138

legally cognizable and factually supported defense to premeditation, would have seen the State's forensic case get undercut on cross-examination and by defense experts, and would have been properly instructed that premeditation requires more than just the passage of time. The jury would not have been misled by the State's closing into overestimating the strength of the State's case that Gunnel's death was premeditated. Further, the jury would have been spared unduly prejudicial photographs and would have known the appropriate definition of child abuse under Arizona law. Had counsel performed competently, there is at least a reasonable probability that one juror would have decided differently on the first-degree murder count for Gunnel's death and on each of the child-abuse counts. *See Strickland*, 466 U.S. at 694.

### M. The state post-conviction court's decision that Kiles failed to state a colorable claim is no bar to this Court's de novo review of this claim.

The state post-conviction court said the following in rejecting Kiles's guilt-phase claim of ineffective assistance of counsel:

> Defendant's claims regarding deficient attorney performance related to Exhibit 2 [Larry Hawkins's affidavit from 1994] do not demonstrate a prejudice that would have been suffered by defendant.
>
> Defendant's claims concerning the blood spatter expert and blood volume evidence do not demonstrate a deficient performance by counsel *or that the outcome would have been different*.
>
> Nor has Defendant shown deficient performance or prejudice as to the impeachment of Kale Johnson.
>
> Defendant's claims as to the reflection instruction is [sic] also precluded.
>
> Defendant has failed to make the requisite showing as to deficient performance or prejudice in relationship to the Christensen defense . . . and presentation of impulsivity evidence.

(ROA 1214 at 2 (emphasis added).)

139

First, the court invoked a procedural bar with respect to "Defendant's claims as to the reflection instruction." (ROA 1214 at 2.) Preliminarily, that ruling is insufficiently explicit as to the basis of preclusion to constitute a procedural bar to this Court's review. *See McKenna v. McDaniel,* 65 F.3d 1483, 1488 (9th Cir. 1995). More critically, any preclusion bar here is neither adequate nor independent of federal grounds for relief. The state post-conviction court ruled an ineffective-assistance-of-counsel claim precluded, even though the claim could not have been brought during earlier proceedings. *See Martinez v. Ryan*, 566 U.S. 1, 10–11 (2012). Because Arizona state courts do not regularly treat ineffective-assistance claims as precluded during initial state post-conviction proceedings—the state court here did not attempt to do so with regard to other ineffective-assistance claims—the procedural ruling is not adequate and is no bar to federal review. *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991); *Beard v. Kindler*, 558 U.S. 53, 60–61 (2009) (on adequacy requirement); *Ford v. Georgia*, 498 U.S. 411, 423–24 (1991) (holding that a state procedural bar is not adequate unless it is "firmly established and regularly followed").

The state-court merits ruling on this claim is, moreover, contrary to and/or an unreasonable application of clearly established federal law for two distinct reasons. *See* 28 U.S.C. § 2254(d)(1). First, as described below, the court applied the wrong prejudice standard for *Strickland* claims. Second, the court failed to consider the cumulative impact of counsel's instances of deficient performance.

Under the clearly established federal law in *Strickland*, counsel's deficient performance prejudices a defendant when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 687–88, 694. The *Strickland* Court explicitly rejected an "outcome-determinative standard." *Id.* at 693–94. Indeed, any standard other than that explicitly laid out in *Strickland* is contrary to clearly established Supreme Court precedent. *See Williams*, 529 U.S. at 397.

140

Here, the state post-conviction court adopted an outcome-determinative standard, as opposed to the *Strickland* standard. The court dismissed part of Kiles's claim as not colorable because he did "not demonstrate . . . that the outcome would have been different." (ROA 1214 at 2.) At no point did the court cite any other prejudice standard for an ineffective-assistance claim, and at no point did the court cite a case applying the correct *Strickland* standard.[90] (*See* ROA 1214 at 1–2.) Accordingly, the state court unambiguously applied a standard that was contrary to and/or an unreasonable application of clearly established federal law, satisfying 28 U.S.C. § 2254(d)(1). *See, e.g.*, *Thomas*, 789 F.3d at 767–68 (holding that court's "would have led to a different result" prejudice standard was an unreasonable application of *Strickland*, when the state court did not explain why there was no prejudice or otherwise demonstrate that it had used the correct standard); *Martin*, 424 F.3d at 592 (holding that the state court's prejudice inquiry—whether "the result of the proceeding would have been different"—was contrary to *Strickland*).

In addition, under *Strickland* and other Supreme Court precedent, the court must evaluate prejudice cumulatively. *See Strickland*, 466 U.S. at 694–95 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional *errors*, the result of the proceeding would have been different."); *see also, e.g.*, *Williams*, 529 U.S. at 397–98. In fact, *Strickland* explicitly adopted the materiality standard in *United States v. Agurs*, 427 U.S. 97 (1976), for a suppression-of-evidence claim. *Strickland*, 466 U.S. at 694. The Supreme Court has forcefully held that the materiality standard considers cumulative prejudice; in other words, when assessing materiality, the suppressed evidence must be "considered collectively, not item by item." *Kyles v. Whitley*, 514 U.S. 419, 436 (1995).

---

[90] Indeed, at no point did the state post-conviction court cite any case at all. (*See* ROA 1214 at 1–2.) Further, because the state court never gave any indication that it was applying the correct prejudice standard under *Strickland*, it must have applied the incorrect standard—the sole standard for prejudice it cited—to every ineffective-assistance claim it considered.

141

1    Accordingly, in order to comply with clearly established Supreme Court precedent,

2    "[s]eparate errors by counsel at trial and at sentencing should be analyzed together

3    to see whether their cumulative effect deprived the defendant of his right to

4    effective assistance." *Sanders v. Ryder*, 342 F.3d 991, 1001 (9th Cir. 2003). "They

5    are, in other words, not separate claims, but rather different aspects of a single claim

6    of ineffective assistance of trial counsel." *Id.* Even if prejudice does not result from

7    an individual error, it may nevertheless result from cumulative errors. *See Boyde v.*

8    *Brown*, 404 F.3d 1159, 1176 (9th Cir. 2005).

9           Kiles's state post-conviction court, however, considered the prejudice from

10   each instance of deficient performance (albeit using the wrong standard) separately.

11   The court did not consider or even allude to cumulative prejudice. The ruling was

12   therefore an unreasonable application of and/or contrary to Supreme Court

13   precedent. *See Strickland*, 466 U.S. at 694–95.

14          The state court's decision of no colorable showing with respect to deficient

15   performance was likewise an unreasonable application of or contrary to Supreme

16   Court precedent; further, the decision on both prongs turned on an unreasonable

17   determination of fact. *See* 28 U.S.C. § 2254(d)(2); *see also, e.g.*, *Taylor v. Maddox*,

18   366 F.3d 992, 999–1001 (9th Cir. 2004) (discussing ways in which § 2254(d)(2)

19   can be satisfied). As an example, the court necessarily ignored counsel's wholesale

20   lack of investigation before adopting a trial strategy, which is an unreasonable

21   application of *Strickland* and/or an unreasonable determination of fact. *See Taylor*,

22   366 F.3d at 1001 ("the state-court fact-finding process is undermined where the

23   state court has before it, yet apparently ignores, evidence that supports the petition's

24   claim"). Because Kiles has satisfied § 2254(d), this Court's analysis is

25   "unconstrained" by AEDPA deference.[91] *See Williams*, 529 U.S. at 405–06.

26   _____

27   [91]Alternatively, Kiles alleges he can overcome any default by showing cause and
     prejudice attributable to the ineffective assistance of state post-conviction counsel.
28   *See Martinez*, 566 U.S. at 9; *Strickland*, 466 U.S. at 688, 694.

142

1    **N.    Conclusion.**

2    For the reasons stated above, Kiles's counsel provided ineffective assistance

3    at Kiles's guilt-phase proceedings, thereby prejudicing Kiles. The state-court

4    decision is no bar to this Court's de novo review of this claim, and Kiles is entitled

5    to relief from his unconstitutional convictions.

6                                  **Claim Four**

7    **Counsel's ineffective assistance in jury selection at the penalty phase**
     **of trial deprived Kiles of his rights to counsel, a fair trial, an**

8    **impartial jury, reliable sentencing proceedings, due process, and**
     **equal protection.**

9

10   Counsel's ineffective assistance in penalty-phase jury selection deprived

11   Kiles of his rights to counsel, a fair trial, impartial jury, reliable sentencing

12   proceedings, due process, and equal protection in violation of the Fifth, Sixth,

13   Eighth, and Fourteenth Amendments to the U.S. Constitution. Kiles incorporates

14   by specific reference all facts, allegations, and arguments made elsewhere in this

15   Petition.

16   Kiles did not present this claim in state court. Kiles can overcome any default

17   by showing cause and prejudice, as the ineffective assistance of Kiles's state post-

18   conviction counsel in failing to raise this claim constitutes cause for the default and

19   resulted in prejudice to Kiles. *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *Strickland*

20   *v. Washington*, 466 U.S. 668, 688, 694 (1984). Kiles will demonstrate at an

21   evidentiary hearing that state post-conviction counsel fell below the standards of a

22   minimally competent capital post-conviction attorney when they failed to raise this

23   meritorious claim. Because this claim has not been adjudicated by the Arizona state

24   courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this

25   Court's review, and the Court may consider the merits of the claim de novo.

26   As noted in Claim 2, *supra*, "the selection of jurors is a critical area of a jury

27   trial, especially in a capital case." *Harris ex rel. Ramseyer v. Blodgett*, 853 F. Supp.

28   1239, 1265 (W.D. Wash. 1994); *see also* Gary Goodpaster, *The Trial for Life:*

1    *Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. Rev. 299,

2    325 n.125 (1983) (because a death verdict must be unanimous, "it is critically

3    important that the defense secure jurors disfavoring the death penalty").

4         The Constitution safeguards against a mandatory death sentence upon

5    conviction. *Woodson v. North Carolina*, 428 U.S. 280 (1976) (plurality opinion).

6    At the core of that protection is the right to be sentenced by jurors who make an

7    individualized, reasoned moral decision whether life or death is the appropriate

8    sentence, by considering and giving full effect to all mitigation. *See Lockett v. Ohio*,

9    438 U.S. 586 (1978); *Eddings v. Oklahoma*, 455 U.S. 104 (1982). Thus, in selecting

10   a capital jury, counsel must elicit sufficient information to determine whether a

11   prospective juror has a "substantial[] impair[ment]" regarding sentencing—if the

12   answer is yes, that juror cannot serve. *See Morgan v. Illinois*, 504 U.S. 719, 728

13   (1992).

14        Jurors with absolutist views for or against the death penalty must be

15   disqualified. *Wainwright v. Witt*, 469 U.S. 412, 424–26 (1985). Such jurors include

16   those who would automatically vote for the death penalty if, for example, a certain

17   type of aggravating circumstance were established. "The risk that such jurors may

18   have been empaneled [] and 'infected petitioner's capital sentencing [is]

19   unacceptable in light of the ease with which that risk could have been minimized.'"

20   *Morgan*, 504 U.S. at 736 (quoting *Turner v. Murray*, 476 U.S. 28, 36 (1986)). To

21   avoid such an outcome, counsel must learn jurors' feelings on issues relevant to the

22   individual case. Counsel must utilize vigorous voir dire to fully explore each

23   prospective juror's views and mitigation impairments, which requires familiarity

24   with the information that both parties will likely present at the penalty phase. *See*

25   *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) ("*Voir dire* plays a critical

26   function in assuring the criminal defendant that his [constitutional] right to an

27   impartial jury will be honored. Without an adequate *voir dire* the trial judge's

28   responsibility to remove prospective jurors who will not be able impartially to

1  follow the court's instructions and evaluate the evidence cannot be fulfilled.")

2      The 2003 ABA Guidelines obligated counsel to familiarize themselves "with

3  the precedents relating to questioning and challenging of prospective jurors,

4  including the procedures surrounding 'death qualification' concerning any

5  prospective juror's beliefs about the death penalty." 2003 ABA Guideline

6  10.10.2(B). The Guidelines further required capital counsel to be familiar with how

7  to do the following: (1) expose those prospective jurors who would automatically

8  impose the death penalty following a murder conviction or a finding that the

9  defendant is death-eligible, regardless of the individual circumstances of the case;

10  (2) uncover those prospective jurors who could not give meaningful consideration

11  to mitigating evidence; and (3) rehabilitate prospective jurors whose initial

12  indications of opposition to the death penalty could make them excludable. *Id.*

13      By the time of Kiles's 2006 sentencing, the proper methods for selecting a

14  capital jury were established and routinely followed in other cases nationwide.

15  While capital jury selection was relatively new to Arizona, and literature and

16  trainings were widely available in Arizona well before Kiles's trial. *See, e.g.*, John

17  H. Blume, et al., *Probing "Life Qualification" Through Effective Voir Dire*, 29

18  Hofstra L. Rev. 1209 (2001).

19      Kiles's counsel, however, lacked the requisite training and experience in

20  capital jury selection. As a result, counsel's voir dire failed to uncover the jurors

21  who were unable to give full and fair consideration to Kiles's mitigation evidence

22  as constitutionally required. As impaired jurors were seated, that ineffective voir

23  dire prejudiced Kiles. *See Ybarra v. McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2011)

24  (prejudice from deficient voir dire shown when "any juror who harbored an actual

25  bias was seated on the jury as a result of counsel's failure to voir dire" on the

26  relevant subject matter).

27

28

1

2

> **A.    Despite having won the right to question prospective jurors on specific types of mitigation, counsel failed to do so, thereby prejudicing Kiles.**

3    Kiles's counsel performed deficiently, as the failure to question jurors

4  individually about the specific types of mitigation to be presented, after winning the

5  right to do so, fell short of "prevailing professional norms." *Strickland*, 466 U.S. at

6  688. The 2003 ABA Guidelines required counsel to learn techniques for

7  "uncovering those prospective jurors who [were] unable to give meaningful

8  consideration to mitigating evidence." 2003 ABA Guideline 10.10.2(B).

9    The right to adequate voir dire as guaranteed by *Morgan* hinges on counsel

10  making reasoned professional judgments. While counsel's decisions are typically

11  given deference, this deference applies only insofar as counsel makes a strategic

12  decision based on reasonable professional judgment. *Strickland*, 466 U.S. at 690–

13  91; *Williams v. Taylor*, 529 U.S. 362, 373 (2000). Deference is not warranted where

14  a decision is based on inattention. *See Rompilla v. Beard*, 545 U.S. 374, 395–96

15  (2005) (finding deficient performance where counsel made a decision as a "result

16  of inattention, not reasoned strategic judgment") (quoting *Wiggins v. Smith*, 539

17  U.S. 510, 534 (2003)).

18    Kiles's second counsel, Treasure VanDreumel, knew the importance of

19  questioning prospective jurors individually, particularly on their views on specific

20  mitigation. Shortly before voir dire began on March 6, 2006, VanDreumel filed a

21  "Request to Voir Dire Prospective Jurors re: Mitigating Factors Recognized by

22  Law," accompanied by a memorandum arguing the need to question jurors

23  individually about mitigation, with hypotheticals, to ensure that the jurors would

24  consider mitigation and not automatically impose the death penalty. (ROA 729.)

25  The State opposed the motion (*see* ROA 742 at 2), but the defense won the right to

26  individually question jurors on specific areas of mitigation.

27    However, Clark conducted the voir dire, and he did not ask prospective jurors

28  about specific types of mitigation or hypotheticals relevant to Kiles or his case.

1    Indeed, shortly after jury selection ended, Kiles's mitigation specialist, Tyrone
2    Mayberry, e-mailed VanDreumel expressing his frustration with the jury-selection
3    process, and specifically with the fact that Clark had picked a jury without knowing
4    anything about Kiles's mitigation. VanDreumel responded that she normally would
5    agree, especially as she fought to win the motion, but that at least none of the seated
6    jurors admitted to being an automatic vote for a death sentence. She noted that Clark
7    was not familiar with the Colorado Method.[92] Lead counsel was not trained to
8    conduct or experienced with the premier method for conducting capital voir dire;
9    even worse, he knew nothing about the mitigation his own team planned to
10   present.[93] Still, he conducted the bulk of the penalty-phase voir dire.

11        Moreover, Clark's deficient performance prejudiced Kiles. Clark failed to
12   question multiple people who served on Kiles's jury who indicated that they could
13   not be impartial or fully consider mitigation. For example, Juror 6 wrote repeatedly
14   on his questionnaire that, when he was a child about the same age as a victim in
15   Kiles's case, his father had murdered his mother. He wrote that he received mental-
16   health treatment because of the domestic violence in his home, ending with his
17   father murdering his mother. Juror 6 wrote that his father was paroled after 12½
18   years, and moreover that parole should not be allowed for such a crime. In response
19   to the question whether a particular life event influenced his view on the death
20   penalty, he cited on his questionnaire his experience with his mother's murder. The
21   State asked him about his mother's murder, and he said that he was adopted by his

22

23   [92] The "Colorado Method" is a system of *Morgan*-based voir dire that includes
24   questions on hypothetical, case-specific mitigation, "developed for use [in] capital
     cases to rate potential jurors . . . based on their views on the death penalty." *Fulks*
25   *v. United States*, 875 F. Supp. 2d 535, 600 (D.S.C. 2010). By September 2002, the
     Maricopa County Office of the Public Defender's Capital Unit required that its
26   attorneys be trained on and use the Colorado Method for jury selection.

27   [93] As discussed in Claim 6, *infra*, Clark's failure to familiarize himself with any of
     Kiles's mitigation, and the team's general dysfunction, denied Kiles effective
28   assistance of counsel throughout proceedings, including at voir dire.

147

mother's side of the family, but he could not specify how her murder affected him, beyond forcing him to grow up quickly. (Tr. Mar. 7, 2006 at 7–8.) Inexplicably, Clark asked him zero questions. (*See* Tr. Mar, 7, 2006 at 9.) This juror was victimized by a domestic-violence crime with facts strikingly similar to those alleged by the State in Kiles's case, calling into question Juror 6's ability to remain impartial and fair. It is inexcusable that counsel did not ask Juror 6 a single question or ask that he be struck for cause. *See United States v. Gonzalez*, 214 F.3d 1109, 1112 (9th Cir. 2000) (explaining that a court may assume a juror is biased where he "has had some personal experience that is similar or identical to the fact pattern at issue in the trial"); *see also Tinsley v. Borg*, 895 F.2d 520, 528 (9th Cir. 1990) (explaining that "[c]ourts have been willing to presume bias where a juror or his close relatives have been personally involved in a situation involving a similar fact pattern").

Juror 2 said that her sister had been severely beaten and moved "from room to room" during an assault in her home—another crime notably reminiscent of the State's version of the crime at issue. (Tr. Mar. 6, 2006 at 81.) Further, for years Juror 2 had worked on criminal cases in the county attorney's office, and her best friend's sister had been killed. (Tr. Mar. 6, 2006 at 81–89.) Again, even though Juror 2's prior experiences begged for further questioning to explore her ability to be impartial, Clark asked her no questions about her personal experience with violent crime. (Tr. Mar. 6, 2006 at 81–89.) He also did not challenge her for cause, even though such a challenge would have been granted. *See Gonzalez*, 214 F.3d at 1112; *Tinsley*, 895 F.2d at 528.

Clark failed to question other prospective jurors who were later seated on critical topics. Juror 3 wrote on her questionnaire that her friend had been killed by a drunk driver. Clark did not ask about this experience or whether it would impair her ability to consider substance-abuse mitigation; he also did not challenge her for cause. (Tr. Mar. 6, 2006 at 95–98.) Juror 5's siblings worked as police officers and

1    for the county attorney. Clark asked Juror 5 no questions on this or on whether she
2    would give greater weight to the prosecutor or to the testimony of law-enforcement
3    witnesses because of her familial connections. (Tr. Mar. 7, 2006 at 10–16.) Juror
4    14 wrote that his wife and step-daughter were in treatment for post-traumatic stress.
5    Clark did not ask why they were in treatment or whether that could limit his ability
6    to consider Kiles's mitigation fairly. (Tr. Mar. 15, 2006 at 38–45.)

7        Counsel's unprofessional failure to ask questions on hypothetical mitigation
8    given the facts of the case resulted in the seating of multiple jurors who were
9    unwilling to consider as mitigating some of the evidence presented at trial or who
10   were otherwise biased. *Ybarra*, 656 F.3d at 1001; *see also, e.g.*, *Gonzalez*, 214 F.3d
11   at 1112. Accordingly, counsel were ineffective during the penalty-phase voir dire.

12   **B.    Counsel deficiently failed to question a number of seated jurors
13          about their pro-death sentence biases, thereby prejudicing Kiles.**

14       Counsel failed to ask any questions of some seated jurors and failed to
15   meaningfully question other seated jurors. This resulted in multiple people serving
16   on Kiles's jury who should have been struck for cause because their ability to
17   consider voting for a life sentence was substantially impaired.

18       In *Morgan*, the Supreme Court reiterated that any juror who would
19   automatically impose the death penalty upon conviction must be disqualified for
20   cause. 504 U.S. at 729, 735–36. The Court further held that capital defendants are
21   constitutionally entitled to examine prospective jurors on voir dire with enough
22   specificity to identify and challenge any juror holding such views. *Id.* at 729, 735–
23   36. Clark was obligated to familiarize himself with techniques for uncovering
24   prospective jurors who are unable to meaningfully consider the mitigating evidence
25   at issue. *See* 2003 ABA Guideline 10.10.2(B); *Morgan*, 504 U.S. at 736. Indeed,
26   "the starkest failures of capital voir dire are the failure to uncover jurors who will
27   automatically impose the death penalty following a conviction or finding of the
28   circumstances which make the defendant eligible for the death penalty[.]" 2003

1  ABA Guideline 10.10.2(B) cmt.; *see also Virgil v. Dretke*, 446 F.3d 598, 613 (5th
2  Cir. 2006) (counsel must make reasonable efforts "to explore the depth or intensity"
3  of prospective jurors' potentially disqualifying views).

4      Instead, Clark repeatedly failed to ask prospective jurors questions sufficient
5  to uncover biases in favor of death, including biases warranting disqualification.
6  Moreover, he did so even though the prospective jurors' questionnaires and other
7  voir dire answers raised serious concerns that they could not be impartial and could
8  not meaningfully consider mitigation evidence. In doing so, Clark performed
9  deficiently. *See Strickland*, 466 U.S. at 694.

10      For example, Juror 1 wrote on her questionnaire that, if there were a fair trial,
11  she would support the death penalty; she added that the death penalty was more
12  appropriate for a first-degree murder than a life sentence. Juror 2 wrote on her
13  questionnaire that she was okay with the death penalty for first-degree murder if the
14  person was convicted beyond a reasonable doubt; she could vote for life with parole
15  eligibility after 25 years, but she did not like that sentence for such a crime. Instead
16  of challenging these jurors for cause, or questioning them to establish that they
17  should be disqualified as automatic death votes, Clark asked a few questions, and
18  the jurors were seated. (Tr. Mar. 6, 2006 at 70–72, 86–89.) Similarly, Juror 12 wrote
19  that the death penalty was appropriate for first-degree murder, because you pay for
20  what you do in life. Clark did not ask him a single question and did not challenge
21  him for cause. (Tr. Mar. 8, 2006 at 71–72.) Juror 12 was then seated.[94]

22      Because jurors were seated despite their inability to fairly consider a life
23  sentence, counsel's deficient performance at voir dire prejudiced Kiles. *See Ybarra*,
24  656 F.3d at 1001.

25
26
27
28  [94] Ultimately, Juror 12 served as an alternate juror. (Tr. Apr. 12, 2006 at 29–30.)

1

2

### C.   Counsel deficiently altogether failed to question eight seated jurors, thereby prejudicing Kiles.

3       Kiles's counsel failed to ask a single question of eight jurors who were
4   selected. As discussed above, given the importance of jury selection in a capital
5   case, it is incumbent upon counsel to ensure that seated jurors are able to consider
6   mitigating circumstances and are able to consider a life sentence. 2003 ABA
7   Guideline 10.10.2(B) cmt.; *see also Virgil*, 446 F.3d at 613. In failing abjectly to do
8   so, counsel performed deficiently.

9       More specifically, Kiles's counsel did not ask a single individual question of
10  eight people who were selected for Kiles's jury: Jurors 6, 9, 10, 11, 12, 13, 15 and
11  16.[95] (Tr. Mar. 7, 2006 at 9, 117; Tr. Mar. 8, 2006 at 32, 43–44, 71–72; Tr. Mar. 15,
12  2006 at 70, 74.) This was despite statements on their questionnaires and during the
13  State's voir dire that called into question their ability to be fair and impartial and
14  their ability to fully consider mitigating evidence. In addition to the jurors discussed
15  in Sections A and B, *supra*, other jurors raised what should have been red flags for
16  the defense. For example, Juror 14 said during the State's questions that he
17  volunteered at a crisis center for abused children. (Tr. Mar. 15, 2006 at 64.) Given
18  that Kiles had been convicted of the first-degree murder of two children and two
19  counts of child abuse, counsel was required to follow up on how Juror 14's
20  volunteer work affected his ability to be fair in this case. Similarly, Jurors 11 and 9
21  stated that they were burglary victims. (Tr. Mar. 8, 2006 at 11–12.) Still, Clark
22  asked them no questions.

23      Again, because jurors who harbored actual biases based on their personal
24  experiences were seated because of counsel's deficient performance during voir
25  dire, Kiles was prejudiced. *See Ybarra*, 656 F.3d at 1001.

26

27

28  _____

[95] Jurors 10, 12, and 13 were alternates.

151

**D.    Counsel failed to question adequately and to challenge for cause jurors with biases, forcing counsel to use peremptory strikes.**

Clark was ineffective in failing to adequately question multiple jurors whose questionnaires or answers to the State's questions indicated that the prospective jurors should be struck for cause. As a result of this failure of advocacy, Kiles's counsel had to use peremptory strikes against these jurors, depriving Kiles of a fair and impartial jury.

For example, Prospective Juror 23 wrote on her questionnaire that she believed the death penalty was appropriate for first-degree murder because she believed in an eye for an eye, you get what you give. She wrote that a life sentence was not fair or just: Why should a person be allowed to live when he took a life? She expanded that in prison you get three meals, showers, library, and a clean bed to sleep in. The defense did not even attempt to challenge this juror for cause; counsel instead wasted a peremptory strike to remove her.

Similarly, Prospective Juror 63 said in voir dire that the death penalty should be used in cases with aggravating factors, such as child victims. (Tr. Mar. 7, 2006 at 103.) Clark questioned him, but did not ask if the prospective juror would impose the death penalty in every case with child victims—whether he could consider a life sentence in this case. (Tr. Mar. 7, 2006 at 105–06.) Again, defense counsel did not challenge the prospective juror for cause and instead used a peremptory strike.

Further, defense counsel failed altogether to question three prospective jurors whom the defense later struck: Prospective Jurors 37, 98, and 85. Competent voir dire would likely have elicited that they were substantially impaired under *Morgan*. For example, Prospective Juror 37 wrote on her questionnaire and said during the State's voir dire that her friend's two-year-old granddaughter had been killed the prior year. (Tr. Mar. 7, 2006 at 72.) She said in response to the State's questioning that this experience would not affect her; she could be impartial, as long as she was not facing the person who had killed her friend's grandchild. (Tr. Mar. 7, 2006 at

152

73.) However, she wrote on her questionnaire that the death penalty took too long, hurting victims' families, and that it was not imposed frequently enough. Clark could have questioned her to elicit specific instances in which she could not be impartial, such as when there was a child victim. Instead, he asked no questions.[96] (Tr. Mar. 7, 2006 at 75.)

While Kiles's counsel did challenge two prospective jurors for cause, counsel's failure to effectively argue the challenges caused counsel to lose both times. (*See* Tr. Mar. 16, 2006 at 9–15.) Counsel made for-cause challenges against only Prospective Jurors 78 and 82. (Tr. Mar. 16, 2006 at 9, 13.) But counsel failed to properly ask them questions to fully expose that they would have automatically imposed death. (*See* Tr. Mar. 8, 2006 at 47–61, 88–106.) Prospective Juror 78 stated on his questionnaire and in voir dire that he would vote for death for first-degree murder if it were an option; if a person were guilty beyond a reasonable doubt, he would give death. (Tr. Mar. 8, 2006 at 58.) Prospective Juror 82 stated that the death penalty should be mandatory where there is no remorse. (Tr. Mar. 8, 2006 at 103–04.) He also said that his aunt was murdered in 2001 by a man who entered her home and beat her, that proceedings were ongoing in that case, and that he had voted to sentence a person to death while serving on a Nevada jury in the late 1980s. (Tr. Mar. 8, 2006 at 99–102.) When arguing the challenge for cause against Prospective Juror 82, counsel did not even mention that the prospective juror's aunt was murdered or his prior capital-jury service. As a result, the court did not disqualify these jurors for cause. (Tr. Mar. 16, 2006 at 13, 15.)

Counsel's tepid advocacy left counsel with no option but to use peremptory strikes against these prospective jurors. As a result, once counsel had used all of

---

[96] Counsel failed to preserve the jury questionnaires of Prospective Jurors 98 and 85. Given that the defense struck these two prospective jurors, it is likely that the questionnaires contained something indicating that bias against the defense. Counsel could have elicited these biases through questioning, obviating the need to use peremptory strikes against these prospective jurors.

153

1    their allotted strikes (*see* ROA 895), counsel were unable to remove biased jurors,
2    including those described above. And, because at least one biased juror served on
3    Kiles's jury as a result of counsel's deficient performance, Kiles suffered prejudice.
4    *Ybarra*, 656 F.3d at 1001.

5          **E.    Counsel failed to rehabilitate prospective jurors who expressed
            discomfort with the death penalty but who still could have
6            properly served.**

7          Not only did defense counsel allow pro-death jurors to serve, counsel made
8    little attempt to rehabilitate prospective jurors who expressed some opposition to
9    the death penalty. Indeed, counsel often stipulated to their removal without
10   questioning them at all.

11         Constitutional principles carefully restrict the disqualification of jurors based
12   on anti-death penalty views. The Supreme Court has made clear that the exclusion
13   of prospective jurors from service solely because they have reservations about
14   capital punishment violates a defendant's due-process right not to be placed on trial
15   before a "tribunal organized to return a verdict of death." *Witherspoon v. Illinois*,
16   391 U.S. 510, 521–22 (1968). The Court has reformulated this rule to forbid courts
17   from disqualifying a juror on the basis of death-penalty opposition unless that
18   opposition is so categorical that it "would prevent or substantially impair the
19   performance of his duties as a juror in accordance with his instructions and his
20   oath." *Witt*, 469 U.S. at 420. "Those who firmly believe that the death penalty is
21   unjust may nevertheless serve as jurors in capital cases so long as they state clearly
22   that they are willing to temporarily set aside their own beliefs in deference to the
23   rule of law." *Lockhart v. McCree*, 476 U.S. 162, 176 (1986). Accordingly, counsel
24   had a duty to "rehabilitate jurors who appear to have made it unmistakably clear
25   that they would never vote for death by eliciting that, in some set of circumstances,
26   such a juror could vote for the imposition of the death penalty." Goodpaster, *The
27   Trial for Life*, 58 N.Y.U. L. Rev. at 326; *see also* 2003 ABA Guideline 10.10.2(B);
28   *see also Morgan*, 504 U.S. at 719, 728. Here, however, rather than attempt to

1   rehabilitate these jurors, Kiles's counsel stipulated with the State to disqualify them.
2   This constituted deficient performance.

3        As far as the record shows, only five of the 142 prospective jurors were
4   challenged for cause by either side.[97] A majority of prospective jurors were
5   dismissed via stipulation between Kiles's counsel and the State. Many expressed
6   the type of opposition to the death penalty for which a person may not
7   constitutionally be excluded. For example, Prospective Juror 59's questionnaire
8   indicated that she would not administer the death penalty herself and that she did
9   not consider the death penalty a moral and proper function of the justice system.
10  Still, she specified that her decision to impose would depend on the facts and
11  circumstances of the case, she would follow instructions, and she had no objections
12  to the death penalty. She was asked no questions at voir dire, and no reason was
13  given for her dismissal. There were no other obvious grounds for her dismissal.

14       Counsel stipulated with the State to dismiss multiple jurors who, like
15  Prospective Juror 59, evinced some opposition to the death penalty on their
16  questionnaires but may have been eligible to serve. Counsel made no effort to
17  rehabilitate these jurors, who include Prospective Jurors 110, 136, and 138, even
18  where they stated they could follow the law. The prosecutor sent a list to Kiles's
19  counsel of prospective jurors who should be removed, including Prospective Jurors
20  110, 136 and 138, citing their opposition to the death penalty. Defense counsel
21  appear to have agreed to removing all 22 prospective jurors suggested by the State
22  without counter-proposing a single prospective juror; all 22 were struck without
23  questioning at the day's start, with no names added. (Tr. Mar. 15, 2006 at 3–4.)

24       Further, the court struck one prospective juror for cause because of defense
25  counsel's failure to adequately rehabilitate her. The State moved to strike
26  Prospective Juror 56 because of her opposition to the death penalty. (Tr. Mar. 16,

27
28  [97] This count excludes prospective jurors who were excused for hardship reasons
    and challenges for cause that the non-moving party did not oppose.

155

2006 at 3.) Defense counsel failed to rehabilitate her through voir dire and advocacy. (Tr. Mar. 16, 2006 at 3–5.) Though the prospective juror expressed that she did not personally believe in the death penalty, she also said she could impose it. (Tr. Mar. 7, 2006 at 92–93.) However, after the State argued that she should be dismissed for cause, VanDreumel argued only briefly against it, then quickly ceded that she would "leave this one to the Court's discretion." (Tr. Mar. 16, 2006 at 4.) In response, the court stated that he would dismiss the prospective juror because she was "just too conflicted . . . to be fair and impartial." (Tr. Mar. 16, 2006 at 5.)

Counsel's failure to rehabilitate these jurors prejudiced Kiles. Had counsel successfully rehabilitated them, they would have either served on Kiles's jury or the State would have had to use peremptory strikes on them. The resulting jury would have less resembled one "organized to return a verdict of death." *Witherspoon*, 391 U.S. at 521. The Supreme Court has underscored the importance of jurors with concerns regarding the death penalty—but still willing to impose it—serving on a capital defendant's jury. Where a "scrupled, yet eligible" juror is removed in violation of *Witherspoon* and *Witt*, it constitutes fundamental error, and prejudice is assumed. *Gray v. Mississippi*, 481 U.S. 648, 668 (1987). Had counsel rehabilitated these jurors and avoided the apparent *Witherspoon* violations, there is a "probability sufficient to undermine confidence in the outcome" that the proceeding's outcome would have differed. *Strickland*, 466 U.S. at 694.

### F. Counsel failed to challenge the prosecutor's discriminatory use of peremptory strikes to exclude an African-American prospective juror.

Kiles's counsel provided ineffective assistance in failing to object under *Batson v. Kentucky*, 476 U.S. 79 (1986), at the penalty-phase jury selection when the State used a peremptory strike to exclude an African-American prospective juror based on race. In *Batson*, the Supreme Court held that the use of peremptory challenges based on race violates the Equal Protection Clause. *Id.* at 89.

156

The three-step analysis applied to a *Batson* challenge is well-known: "First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race." *Hernandez v. New York*, 500 U.S. 352, 358–59 (1991) (plurality opinion). To establish a prima facie case, a defendant must show "that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Batson*, 476 U.S. at 94. A comparative analysis of seated and challenged jurors may raise an inference of discrimination. *Green v. LaMarque*, 532 F.3d 1028, 1030 n.3 (9th Cir. 2008). The burden to make a prima facie *Batson* showing is "minimal." *Johnson v. Finn*, 665 F.3d 1063, 1071 (9th Cir. 2011). However, counsel must make a timely objection to the discriminatory strike. *See Doe v. Ayers*, 782 F.3d 425, 432 (9th Cir. 2015).

Once counsel establishes prima facie discrimination, the burden shifts to the prosecutor to "explain adequately the racial exclusion by offering permissible race-neutral justifications for the strikes." *Johnson v. California*, 545 U.S. 162, 168 (2005). The State must "(1) assert that specific, race-neutral reasons were the *actual* reasons for the challenged strikes, and (2) offer some evidence which, if credible, would support the conclusion that those reasons were the *actual* reasons for the strikes." *Shirley v. Yates*, 807 F.3d 1090, 1104 (9th Cir. 2016). Finally, the court must determine whether the defendant has proven purposeful discrimination by a preponderance of the evidence. *Hernandez*, 500 U.S. at 359.

At the time of Kiles's trial, *Batson* was longstanding precedent. Counsel were obligated to consider "challenges to the procedures for selecting the jury that would be available in any criminal case (particularly those relating to bias on the basis of race or gender)." 2003 ABA Guideline 10.10.2(A).

It was unreasonable for counsel to fail to raise a *Batson* objection to the strike of Prospective Juror 96. *See Doe*, 782 F.3d at 432 (counsel performed deficiently where of the four African-American prospective jurors, the State struck one, with no objection from the defense, and one was empaneled). Kiles's counsel's notes

157

indicate that, to their knowledge, out of 142 prospective jurors, four were African American. The State used a peremptory strike to remove one, Prospective Juror 96, without apparent cause. (ROA 895 at 4.) Defense counsel wrote "*Batson*" next to his name, but did not object on the record. (*See* Tr. Mar. 16, 2006; ROA 804 at 1.) Only one African-American person served on Kiles's penalty-phase jury.

There is no clear reason other than race for the State to have stricken Prospective Juror 96. While he indicated that he had a long-ago acquaintance who had been killed (Tr. Mar. 8, 2006 at 110–11), Juror 6 was seated despite his mother having been killed. (Tr. Mar. 7, 2006 at 7–8.) Prospective Juror 96's father-in-law was a corrections officer (Tr. Mar. 8, 2006 at 110–12), but Jurors 7 and 9 had close relatives in corrections and were still seated. (Tr. Mar. 7, 2006 at 79–80.) Prospective Juror 96's father, to whom Prospective Juror 96 had not spoken in years, had drug problems, but seated Juror 3 also had an immediate family member with drug problems. Finally, Prospective Juror 96 wrote on his questionnaire that some people may deserve the death penalty, but he was not sure if he would be comfortable imposing it. However, he noted that his decision to impose death would depend on the facts and circumstances of the case, that he would follow the law, and that he had no objections to the death penalty. When questioned by the State, he repeated that he would decide on a "case-by-case" basis. (Tr. Mar. 8, 2006 at 113, 116.) When questioned by the defense, he explained his uncertainty was because he did not know the facts of the case. (Tr. Mar. 8, 2006 at 115–16.) Multiple jurors who were not African-American were seated even though they expressed similar discomfort with the death penalty; they include Juror 7, who called the death penalty "a necessary evil," and Juror 16, who wrote that it could be a deterrent but that he worried about error.

Kiles was prejudiced by counsel's failure to object. To prove ineffective assistance for counsel's failure to make a *Batson* motion, petitioner must show prejudice by "showing that there is a reasonable probability that the claim [counsel]

158

1    failed to raise at trial would have prevailed, either at trial or on appeal." *Doe*, 782

2    F.3d at 432 (citing *Strickland*, 466 U.S. at 694). Given the absence of any reason

3    other than race for the State's peremptory strike, there is a reasonable probability

4    that counsel would have prevailed, at trial or on appeal, on an objection to the

5    State's discriminatory use of its peremptory strike.

6          **G.**    **Counsel failed to challenge the denial of a fair cross-section of the**
7                    **community in the venire.**

8          As laid out *supra*, Claim 2, a venire comprised of "a representative cross

9    section of the community is an essential component of the Sixth Amendment right

10   to a jury trial." *Taylor v. Louisiana*, 419 U.S. 522, 528 (1975). In this case, counsel's

11   failure to object to the lack of a fair cross-section was deficient, as *Taylor* was well-

12   known and long-established precedent at the time of Kiles's penalty phase. The

13   2003 ABA Guidelines also required counsel to consider challenges to the venire.

14   2003 ABA Guideline 10.10.2(A). Kiles's counsel's notes indicate that, to their

15   knowledge, there were four African Americans out of the 142 people in the venire.

16   The notes further suggest that counsel knew of the need for a racially representative

17   venire. Given prevailing professional norms, it was unreasonable for counsel to fail

18   to object to the denial of a fair cross-section. *See Strickland*, 466 U.S. at 688.

19         Moreover, in July 2006, shortly after Kiles's trial ended, an e-mail from a

20   former Maricopa County Superior Court project manager informed Kiles's counsel

21   that the program the county had used since 2002 to select the venire was flawed: it

22   was not updated with new census data or ZIP codes. The program excluded people

23   from certain ZIP codes due to an algorithm failure. An exclusion based on

24   geographical location violated Kiles's rights. *See Lockhart*, 476 U.S. at 174 (noting

25   that a group whose recognition would advance the purposes of the fair cross-section

26   requirement may not be systematically excluded absent a significant government

27   interest). Upon receiving this information, instead of seeking to address the

28   violation in Kiles's case, VanDreumel asked Clark to send her the questionnaires

of seated jurors in Kiles's case—for use in another case.

Kiles was prejudiced by his counsel's failure to object, as the failure to do so deprived Kiles of a fair trial. *Strickland*, 466 U.S. at 687. Like a *Batson* violation, a violation of the fair cross-section requirement is structural error. *United States v. Rodriguez-Lara*, 421 F.3d 932, 940 (9th Cir. 2005), *overruled on other grounds by United States v. Hernandez-Estrada*, 749 F.3d 1154 (9th Cir. 2014). Here, had counsel objected to the denial of the fair cross-section, "there is a reasonable probability that the claim [counsel] failed to raise at trial would have prevailed, either at trial or on appeal." *Doe*, 782 F.3d at 432 (citing *Strickland*, 466 U.S. at 694). Kiles was therefore prejudiced by his counsel's deficient performance.

### H.     Counsel failed to make a record as to the reasons underlying the removal of many prospective jurors.

Finally, a complete record regarding jury selection is necessary to protect Kiles's right to meaningful appellate review. *See Gregg v. Georgia*, 428 U.S. 153, 195 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.); *Dobbs v. Zant*, 506 U.S. 357, 358 (1993) ("We have emphasized before the importance of reviewing capital sentences on a complete record.").

In failing to make such a record, counsel performed deficiently and prejudiced Kiles. *See Strickland*, 466 U.S. at 688, 694; *see also* Claim 15, *infra*. A majority of prospective jurors were removed by stipulation between Kiles's counsel and the State, without any reason provided on the record as to why they were removed. Many prospective jurors were removed without either side asking a single individual question at voir dire. The official juror sheet lists 23 people struck for cause, and even the fact of their removal—let alone the underlying reasons for their removal—appears nowhere on the record. (*See* ROA 895; *see also generally* Tr. Mar. 6, 2006; Tr. Mar. 7, 2006; Tr. Mar. 8, 2006; Tr. Mar. 15, 2006: Tr. Mar. 16, 2006.) Thus, Kiles's appellate lawyer lacked critical information to challenge his sentence, compromising Kiles's appeals.

In sum, counsel's voir dire performance did not comport with objective standards of capital representation. The standards were developed to ensure capital counsel's performance adhered to prevailing Supreme Court law, and counsel were obligated to know and follow these standards. Reasonably competent capital attorneys would have uncovered disqualifying impairments of prospective jurors justifying removal for cause and information that would have enabled counsel to make informed peremptory strikes. Competent counsel would have objected to the State's discriminatory strike and to the lack of a fair cross-section, and they would have made a complete record. Counsel's deficient performance undermined Kiles's constitutional right to an individualized sentencing by jurors capable of giving full effect and consideration to his mitigation evidence, entitling Kiles to relief.

### Claim Five

**Kiles was denied effective assistance of counsel at his aggravation-phase proceedings because counsel failed to adequately challenge the alleged aggravating circumstances and otherwise defend against a death sentence.**

Kiles's trial counsel failed to investigate and prepare adequately for the aggravation phase of trial, and as a result counsel failed to mount necessary challenges to the State's aggravation case. Counsel's deficient performance in that respect and others, both individually and cumulatively, prejudiced Kiles and thereby violated his rights under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution. Kiles presented this claim below. (ROA 1189 at 32–35, 39–40, 46–48; PFR2 Dkt. 32–36, 39–41, 47–48.) Kiles incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

### A.     Background on aggravation-phase proceedings.

After a delay caused by, among other things, Arizona's switch to jury sentencing, Kiles's penalty phase began with his aggravation hearing in March 2006. At the aggravation phase, the State sought first to prove that Kiles had sufficient personal culpability in the deaths of Shemaeah Gunnel and LeCresha

161

Kirklin to potentially be eligible for the death penalty. (Tr. Mar. 20, 2006 at 56–57 (preliminary jury instructions regarding *Enmund/Tison* factors).) The State also alleged and sought to prove the following aggravating factors with respect to each victim: (1) Kiles was convicted of a prior felony involving the use or threat of violence, A.R.S. § 13-703(F)(2) (1988)[98]; (2) the homicide occurred in a manner that was "especially heinous, cruel or depraved," *id.* § 13-703(F)(6); and (3) Kiles was convicted of one or more homicides during the commission of the offense, *id.* § 13-703(F)(8).[99] (ROA 503 at 1–2.) For the deaths of Shemaeah and LeCresha, the State further alleged that Kiles was an adult at the time of the offense and that each victim was under 15 years of age. (ROA 503 at 2); *see also* A.R.S. § 13-703(F)(9).

The State provided notice that it would offer two prior convictions to support the (F)(2) aggravating circumstance: an attempted aggravated assault conviction from 1984, and an aggravated assault conviction from 1986. (ROA 743 at 2.) Before the penalty phase, trial counsel argued that the attempted aggravated assault could not support the (F)(2) aggravating circumstance. (*See* ROA 743 at 4.) The trial court rejected that argument, even though the Arizona Supreme Court had agreed in *State v. Williams* that the crime of attempt could not satisfy the (F)(2) aggravating circumstance. 904 P.2d 437, 451 (Ariz. 1995); (Tr. Mar. 20, 2006 at 23). In so ruling, the trial court relied on the opinion in Kiles's direct appeal upholding the attempted aggravated assault as a valid basis for the (F)(2) aggravator. (Tr. Mar. 20, 2006 at 23); *see State v. Kiles*, 857 P.2d 1212, 1224 (Ariz. 1993). Trial counsel did not attempt to challenge the aggravated assault as a basis for the (F)(2) aggravator. (*See* Tr. Mar. 20, 2006 at 16–17.)

Further, trial counsel conceived of the aggravation phase as, in essence, a re-

---

[98] Kiles cites to statutory provisions in their current form when they are substantially similar to the provisions in effect at the relevant time.

[99] The State alleged both that the homicides were especially cruel and that they were especially heinous or depraved. (*See* ROA 719 at 5–6.)

162

do of the guilt phase. (*See* Tr. Mar. 27, 2006 at 40 (counsel informing the court that they "have been parroting for this jury what took place in Yuma back in 2000); Tr. Mar. 27, 2006 at 42 (counsel asking court "that th[e] testimony and evidence to be adduced is the same that was adduced in Yuma [at the guilt phase].").) Counsel did so despite the fact that the State was seeking to prove significantly different matters, for example that the killings were especially cruel, than it had proven at the guilt phase. But, because counsel were largely seeking to repeat the guilt phase, counsel conducted no investigation directed toward challenging the alleged aggravating circumstances.[100] The record reflects no attempt to retain an expert for aggravation-phase purposes, even though counsel knew the State intended to present expert testimony. For example, counsel noted on the record that they had not consulted with a crime-scene expert to counter the testimony of State's expert Tom Bevel, even though "[t]here are experts out there who disagree with Mr. Bevel." (*See* Tr. Mar. 27, 2006 at 41.) In fact—despite the centrality of Bevel's testimony to the State's case—counsel had not even interviewed Bevel for purposes of the aggravation phase.[101] (Tr. Mar. 27, 2006 at 38.) This approach made no sense as an aggravation-phase plan for Kiles's conviction in Gunnel's death, where there was no question that Kiles had committed the killing.[102] And, because of counsel's focus on re-doing the guilt phase, counsel missed opportunities to start introducing the

---

[100] The most charitable justification for counsel's focus on guilt-phase issues is that counsel were seeking to establish reasonable doubt on the *Enmund/Tison* findings for the deaths of the children. That, however, cannot justify a failure to investigate counsel's ability to challenge the aggravating factors, especially as there was no doubt as to who killed Gunnel.

[101] Further, counsel did not re-interview guilt-phase witnesses. (*See, e.g.*, Tr. Mar. 22, 2006 at 56 (counsel noting that he had interviewed witness Larry Hawkins "some years ago").)

[102] While this approach made better sense with respect to the deaths of the children, as counsel could focus on residual doubt (*see, e.g.*, Tr. May 22, 2006 at 48–56), counsel needed an approach or approaches that minimized the likelihood of all three death sentences—not just of two out of three.

1    jury to Kiles's mitigation.

2        After the completion of voir dire, discussed *supra*, Claim 4, the aggravation

3    phase continued over 11 days. Two of the centerpieces of the State's case that

4    Gunnel's death was "especially heinous, cruel or depraved" were pathologist

5    Robert Mallon, M.D., and blood-spatter expert Tom Bevel, both of whom testified

6    at Kiles's guilt phase. *See supra*, Claim 3. Dr. Mallon had conducted the autopsies

7    of Gunnel and LeCresha. (Tr. Mar. 21, 2006 a.m. at 4, 11; Tr. Mar. 21, 2006 at 8.)

8    On direct examination, Dr. Mallon reviewed in detail each of Gunnel's injuries,

9    which included "extensive trauma mostly to the head and neck area, as well as the

10   upper forearms. And in the rest of the body there wasn't evidence of trauma." (Tr.

11   Mar. 21, 2006 a.m. at 15–26; Tr. Mar. 21, 2006 at 4–7.) The prosecutor walked Dr.

12   Mallon through the severity of each wound, including that Gunnel's skull exhibited

13   a severe fracture that looked like "an eggshell that's been broken in multiple

14   pieces." (Tr. Mar. 21, 2006 a.m. at 23.) The prosecutor also had Dr. Mallon confirm

15   that Gunnel's right forearm wound was "consistent with a defensive wound," as

16   well as that it would be "axiomatic that a person would have to be conscious to have

17   a defensive wound." (Tr. Mar. 21, 2006 a.m. at 21.)

18       On cross-examination, defense counsel did not question whether Gunnel's

19   forearm wound was indeed a defensive wound. (*See* Tr. Mar. 21, 2006 at 20.)

20   Instead, counsel tried to get Dr. Mallon to acknowledge that it was possible for the

21   forearm wound and one of the facial wounds to have resulted from the same blow.

22   (*See* Tr. Mar. 21, 2006 at 20–21.) In response, Dr. Mallon testified that,

23           [Gunnel] could have guarded herself against the first blow.
             She was conscious and was aware of what was going on,
24           otherwise she wouldn't have used her arm. . . . But that
             forearm was used. She was conscious and was aware, using
25           that forearm in a defensive posture and as a defensive
             method.
26

27   (Tr. Mar. 21, 2006 at 23.) Dr. Mallon also continued that Gunnel "could very easily

28   have sustained those kinds of frontal injuries and still remained conscious. That's

                                        164

1   possible." (Tr. Mar. 21, 2006 at 24.) Dr. Mallon then proceeded to testify, still on

2   cross-examination, that Gunnel could have remained conscious for many of the

3   wounds. (Tr. Mar. 21, 2006 at 24.) He added, "If I were guessing . . . I would say

4   probably the blow to the forearm was the first one." (Tr. Mar. 21, 2006 at 27.)

5         The State also prominently featured the testimony of Tom Bevel, the State's

6   blood-spatter expert, in its case for the (F)(6) aggravating circumstance in Gunnel's

7   death. Bevel described the blood stains visible in Gunnel's living room, pointing

8   out that there were blood stains, fairly low to the ground, on two different walls.

9   (Tr. Mar. 27, 2006 at 62–69.) Bevel explained his opinion that the source of the

10   blood on the walls had to be "lower toward the floor, as opposed to, for example,

11   standing" in order to cause those blood stains. (Tr. Mar. 27, 2006 at 71.) He also

12   testified that the blood stains on two different walls suggested "movement . . .

13   usually the victim and/or the person that is delivering the blows." (Tr. Mar. 27, 2006

14   at 71.) Bevel also suggested that the blood on the pillowcase found in the east

15   bedroom showed "some movement . . . where the blood source has had lateral

16   motion." (Tr. Mar. 27, 2006 at 72–73.) Bevel did not testify on these topics at the

17   2000 guilt-phase proceedings, and defense counsel had not interviewed him prior

18   to the 2006 proceedings to prepare themselves for cross-examination. (Tr. Mar. 27,

19   2006 at 38.) Bevel further testified to topics he had addressed in his 2000 testimony,

20   among them the blood spatter in the west bedroom, where the children were killed.

21   (*See, e.g.*, Tr. Mar. 27, 2006 at 82–85.)

22         The defense, with its focus on residual doubt and Kale Johnson's

23   involvement in the killing of the children, started its cross-examination by

24   questioning Bevel about shoe impressions made in blood. (Tr. Mar. 27, 2006 at 99–

25   101.) Later, after having Bevel confirm that the crime scene had been altered before

26   and while photographs were taken of it (*see, e.g.*, Tr. Mar. 27, 2006 at 106–07, 112),

27   the defense turned to the blood spatter in the room where the children were killed.

28   (Tr. Mar. 27, 2006 at 108–12.) Bevel also discussed the blood stain in the chair in

the living room,[103] before returning to the blood spatter in the west bedroom and the shoe impressions (*see* Tr. Mar. 27, 2006 at 112–18)—matters primarily relevant to the aggravating factors alleged in the deaths of the children. Counsel accepted Bevel's testimony that the source of the blood on the pillowcase found in the east bedroom moved, but Bevel confirmed that he could not say how the blood source was moved. (Tr. Mar. 27, 2006 at 119.) Counsel then focused much of the remainder of cross-examination on questions regarding the bloody shoe impressions and blood found on Kale Johnson's shoes and clothing. (*See* Tr. Mar. 27, 2006 at 122–34.)

The State also had lead investigator Detective Brian Rodgers testify, as well as Larry Hawkins. (Tr. Mar. 22, 2006 at 31.) Hawkins recounted for the jury Kiles's statement that he had killed Gunnel with a tire iron by striking her on the head after she had slapped him twice. (Tr. Mar. 22, 2006 at 37–38.) Hawkins testified that he did not remember where Kiles and Gunnel were when he struck her or what Kiles might have done after striking Gunnel, but he did say that Gunnel "asked him why was this happening and I think he said he struck her again." (Tr. Mar. 22, 2006 at 37–39.) The State had Hawkins review line-by-line his Silent Witness letter, which was admitted into evidence. (*See* Tr. Mar. 22, 2006 at 40–49; *see also* 2006 Trial Ex. 90.) On cross-examination, counsel tried to establish that Hawkins had based that information on a number of sources, not on Kiles's statements. (*See, e.g.*, Tr. Mar. 22, 2006 at 61.)

Notably, because counsel conceived of the proceedings as a re-do of the guilt phase, counsel allowed the 2000 guilt-phase testimony of several witnesses to be read into the record. (*See, e.g.*, Tr. Mar. 22, 2006 at 28–30 (discussing testimony);

---

[103] Having done insufficient investigation, counsel did not realize there were two similar-looking chairs in the living room and so asked Bevel some questions suggesting that a single chair had been moved around the living room. (Tr. Mar. 27, 2006 at 113–14.) The State later pointed out counsel's errors on redirect. (Tr. Mar. 27, 2006 at 136–37.)

166

1    Tr. Mar. 23, 2006 at 59 (testimony of Sandra Mercado); Tr. Mar. 29, 2006 at 113

2    (testimony of Harman Burton); Tr. Apr. 4, 2006 at 4–5 (testimony of Cynthia

3    Anderson).) Counsel even allowed the testimony of Kale Johnson to be read into

4    the record (*see* Mar. 23, 2006 at 60; Mar. 27, 2006 at 142), even though that left

5    them unable to cross-examine him on aggravation-specific issues. Kiles's guilt-

6    phase testimony was also read into the record. (Tr. Mar. 23, 2006 at 54–55.) The

7    defense offered no live witness testimony to the jury. (Tr. Apr. 4, 2006 at 4–5.)

8         After deliberations, the jury unanimously determined that the *Enmund/Tison*

9    factors were satisfied for the deaths of Shemaeah and LeCresha; however, for each

10   victim, two jurors did not find that Kiles had actually killed the victim. (*See* ROA

11   879 at 4.) For the deaths of Shemaeah and LeCresha, the jury found each of the four

12   alleged aggravators proven. (ROA 879 at 5–10, 14–15.)

13        With respect to Gunnel's death, the jury found the (F)(2) aggravating

14   circumstance proven, with unanimous findings as to each of the prior convictions

15   proffered by the State. (ROA 879 at 11–12.) The jury also unanimously found the

16   (F)(6) aggravating circumstance proven. (ROA 879 at 12.) The only component of

17   that aggravator that the jury unanimously found was "cruelty." (ROA 879 at 12.)

18   Finally, the jury also found that the State had proven the (F)(8) aggravating

19   circumstance. (ROA 879 at 12.)

20        **B.    Trial counsel has a duty to make every effort to avoid a death
21             sentence, including by investigating and contesting the
             aggravating circumstances alleged against Kiles.**

22        Under Supreme Court precedent, the Sixth Amendment right to effective

23   assistance of counsel, and in turn the right to a fair trial, extends to the aggravation

24   phase of trial. *See, e.g.*, *Rompilla v. Beard*, 545 U.S. 374, 385–93 (2005) (counsel

25   were ineffective in part for failing to investigate State's aggravation case); *see also*

26   *Strickland v. Washington*, 466 U.S. 668, 684 (1984). Capital-defense counsel have

27   an obligation to contest aggravating factors alleged by the State against their client.

28   *See, e.g.*, *Correll v. Ryan*, 539 F.3d 938, 947–48 (9th Cir. 2008) (finding deficient

1   performance when, among other things, counsel failed to challenge three of five

2   alleged aggravating factors); 2003 ABA Guideline § 10.11(A) (discussing

3   counsel's duty to investigate issues and seek information that establishes mitigation

4   or rebuts aggravation); *id.* § 10.11(H) (requiring counsel to determine as quickly as

5   possible what aggravating factors will be alleged and the evidence used to support

6   them); *id.* § 10.11(I) (requiring counsel at all stages to consider whether evidence

7   offered in aggravation is improper, inaccurate, misleading or inadmissible).

8       Simply put, the aim of a capital-defense attorney at penalty-phase

9   proceedings is to avoid the imposition of the death penalty. *See, e.g.*, *id.* § 10.11(A)

10   (emphasizing "continuing duty" to rebut aggravation and bolster mitigation); 1989

11   ABA Guideline 11.8.2(E) (requiring counsel to "develop a plan for seeking to avoid

12   the death penalty"). Discharging that duty requires counsel to make every

13   reasonable effort to contest or otherwise undercut the aggravating factors alleged

14   by the prosecution. *See Correll*, 539 F.3d at 948.

15       Kiles's counsel, however, failed to investigate and make critical challenges,

16   supported by Arizona Supreme Court precedent, to the alleged aggravating

17   circumstances. Instead, counsel treated the aggravation phase as a re-do of the guilt

18   phase. (*See, e.g.*, Tr. Mar. 27, 2006 at 40–41.) Such failures rendered counsel's

19   performance deficient and prejudiced Kiles. *See Strickland*, 466 U.S. at 688, 694.

20       **C.**    **Counsel were ineffective for failing to effectively challenge the**

21               **(F)(2) aggravating circumstance, especially as Kiles's prior**

                   **aggravated assault conviction was an invalid basis for that**

22               **circumstance.**

23       The sole prior conviction currently supporting Kiles's conviction under

24   A.R.S. § 13-703(F)(2) (1988) is a 1986 conviction for aggravated assault. However,

25   that conviction—under Arizona Supreme Court precedent that predated Kiles's

26   trial—is an invalid basis for the (F)(2) aggravating circumstance. Counsel were

27   ineffective for failing to challenge this proffered basis for the (F)(2) aggravating

28   circumstance. (ROA 1189 at 46–48.)

1

2

### 1. Kiles's 1986 conviction for aggravated assault does not qualify as a prior violent felony for the purposes of the (F)(2) aggravator.

3

4

5

6

7

8

9

10

11

12

13

Prior to the penalty phase, the State alleged the (F)(2) aggravator, that "the defendant was previously convicted of a felony in the United States involving the use or threat of violence on another person." (ROA 503 at 1 (quoting A.R.S. § 13-703(F)(2) (1988).) In support, the State sought to prove that Kiles had committed two prior felonies that fell within the ambit of the aggravator: (1) attempted aggravated assault on April 17, 1984, and (2) aggravated assault on May 15, 1986. (ROA 637 at 2.) Trial counsel challenged the *attempted* aggravated assault vigorously, arguing that under Arizona Supreme Court precedent, the conviction did not qualify as support for the (F)(2) aggravator. (*See* ROA 743 at 1.) However, counsel did not challenge Kiles's prior conviction for aggravated assault, even though that too could not support the 1989 version of the (F)(2) aggravator.

14

15

16

17

18

19

20

21

22

In 1989, the (F)(2) aggravating circumstance required that the defendant have been "previously convicted of a felony in the United States involving the use or threat of violence on another person."[104] A.R.S. § 13-703(F)(2) (1988). The Arizona Supreme Court then defined "violence" for the purposes of (F)(2) as follows: "the exertion of any physical force with the intent to injure or abuse." *State v. Walden*, 905 P.2d 974, 996 (Ariz. 1995) (citing *State v. Fierro*, 804 P.2d 72, 82 (Ariz. 1990), *overruled on other grounds by State v. Ives*, 927 P.2d 762 (Ariz. 1996)); *see also, e.g., State v. Williams*, 904 P.2d 437, 451 (Ariz. 1995) (applying this definition of "violence" when the capital crime and prior conviction supporting (F)(2) both

23

24

25

26

27

28

---

[104] "[I]n 1993, the [Arizona] legislature abandoned the (F)(2) language 'use or threat of violence' and replaced it with 'serious offense.'" *State v. Martinez*, 999 P.2d 795, 806 (Ariz. 2000). Kiles was convicted of crimes that occurred in 1989. To avoid a violation of the Ex Post Facto Clauses of the state and U.S. Constitutions, the aggravating circumstance as it was defined in 1989—involving "the use or threat of violence"—applies to Kiles's case. *See State v. Schackart*, 947 P.2d 315, 324–35 (Ariz. 1997); (*see also* ROA 503 at 1 (State alleging (F)(2) aggravating circumstance as it was worded in 1989)).

1   occurred in 1990).

2       When evaluating whether a prior conviction can support the (F)(2)
3   aggravator, a court must look to whether the earlier felony "*by statutory definition*,
4   involved violence or the threat of violence." *Schackart*, 947 P.2d at 323 (emphasis
5   added). Because "violence" requires "the intent to injure or abuse," to qualify under
6   (F)(2), the statutory definition of the earlier felony must require the mental state of
7   intent. *Id.* If the statutory definition of the prior felony does not require that same
8   mental state, then the felony is not a valid basis for the (F)(2) aggravator. *Id.*

9       Further, when considering whether a defendant has a prior conviction whose
10  statutory definition qualifies under (F)(2), courts can only consider a limited range
11  of judicial documents. *See State v. Rogovich*, 932 P.2d 794, 800 (Ariz. 1997)
12  (noting that court can review "relevant statutes, pleadings, jury instructions, and
13  verdicts" when evaluating whether prior conviction qualifies as a basis for (F)(2)
14  aggravating circumstance). However, testimony or other evidence from the victims
15  of the prior crime must not be considered. *See, e.g.*, *State v. Van Adams*, 984 P.2d
16  16 (1999) (holding that court erred in considering testimony of victim of prior
17  felony to establish basis of (F)(2) aggravating circumstance); *State v. Gillies*, 662
18  P.2d 1007, 1018 (Ariz. 1983) ("We cannot allow what is, in effect, a second trial
19  on defendant's prior conviction to establish the existence of an A.R.S. § 13-
20  703(F)(2) aggravating circumstance.").

21      Kiles was convicted of one count of aggravated assault under A.R.S.
22  § 13-1204(A)(8), a subsection of the aggravated assault statute. (2006 Trial Ex. 140
23  at 10.) Under § 13-1204(A)(8), aggravated assault occurs when a person "commits
24  assault as defined in § 13-1203 . . . while the victim is bound or otherwise
25  physically restrained or while the victim's capacity to resist is substantially
26  impaired." A.R.S. § 13-1204(A)(8) (1985). Assault under § 13-1203 can occur in
27  one of three ways: (1) "Intentionally, knowingly or recklessly causing any physical
28  injury to another person," A.R.S. § 13-1203(A)(1); (2) "Intentionally placing

1    another person in reasonable apprehension of imminent physical injury," A.R.S.

2    § 13-1203(A)(2); or (3) "Knowingly touching another person with the intent to

3    injure, insult or provoke such person," A.R.S. § 13-1203(A)(3). In other words,

4    assault can occur with the mental state of "intentionally," "knowingly," or even

5    "recklessly," for someone charged under § 13-1203(A)(1).

6        Moreover, § 13-1204(A)(8) includes no mens rea requirement at all. *See*

7    A.R.S. § 13-1204(A)(8) (1989) (aggravated assault occurs when a person "commits

8    assault as defined in § 13-1203 . . . while the victim is bound or otherwise

9    physically restrained or while the victim's capacity to resist is substantially

10   impaired."). First, the subsection does not require that the person who commits the

11   assault is the person who restrained the victim or limited the victim's capacity to

12   resist. In fact, the statute was derived from an older statute, which deemed assault

13   aggravated "when committed by a person of robust health or strength upon one who

14   is decrepit." *Matter of Appeal in Maricopa Cnty. Juvenile Action* No. JV-123196,

15   834 P.2d 160, 164 (Ariz. Ct. App. 1992). Decrepitude is not a condition caused by

16   the person committing assault, and likewise the restraint of limited capacity to resist

17   need not be caused by the person committing assault. Second, it is entirely possible

18   to recklessly assault someone who—through no action or intent of the person

19   committing the assault—is restrained or unable to resist.[105] Accordingly,

20   § 13-1204(A)(8) does not provide the mens rea necessary for violence that is

21   missing from § 13-1203.

22       Then, because aggravated assault under § 13-1204(A)(8) could well be based

23   on a reckless act under § 13-1201(A)(1), the statutory definition of aggravated

24   assault does not constitute a crime that *necessarily* involves violence—the intent to

25   injure or abuse—for the purposes of the 1989 (F)(2) aggravating circumstance.

26   _____

27   [105] For example, under § 13-1204(A)(8), recklessly throwing a ball in the air—with

28   no intent to injure or abuse—and hitting and injuring someone in a wheelchair
     constitutes aggravated assault.

1   *Schackart*, 947 P.2d at 323.

2      The Arizona Supreme Court laid this out unambiguously when considering

3   the (F)(2) aggravating circumstance as it existed in 1989. "If an assault is committed

4   recklessly pursuant to § 13-1203(A)(1), the former (F)(2) factor cannot be

5   established because the required mental state is lacking." *Id.*; *see also, e.g.*, *Walden*,

6   905 P.2d at 996 (holding that aggravated assault did not provide basis for (F)(2)

7   aggravating circumstance when it could have been committed recklessly); *State v.*

8   *McKinney*, 917 P.2d 1214, 1230 (Ariz. 1996) (holding that "because [the

9   defendant's] prior conviction was for a crime that, on the face of the statute, might

10  have been committed recklessly, it does not qualify as a crime of violence" for the

11  purposes of the former (F)(2) aggravating circumstance).

12     Consequently, unless the conviction reflects that the predicate assault was

13  under § 13-1203(A)(2) or (A)(3)—meaning that the aggravated assault was

14  committed knowingly or intentionally—then aggravated assault under § 13-

15  1204(A)(8) is not a valid basis for the (F)(2) aggravating factor.[106] *See Schackart*,

16  947 P.2d at 323 (rejecting aggravated assault as support for (F)(2) when there was

17  no proof as to which subsection of § 13-1203(A) was the basis for defendant's prior

18  conviction). As the Arizona Supreme Court erred in 1993 in upholding the

19  attempted aggravated assault as a basis for the (F)(2) aggravating circumstance, so

20  did it err with respect to the aggravated assault. *See Kiles*, 857 P.2d at 1223–24.

21     Here, the State did not specify whether Kiles was convicted under

22  § 13-1203(A)(1), or § 13-1203(A)(2), or § 13-1203(A)(3).[107] (*See* 2006 Trial Ex.

23  ────────────────

24  [106] Moreover, even under § 13-1203(A)(3), it is possible to commit assault with the

25  intent to provoke or insult, which does not satisfy the intent requirement of
    "violence."

26  [107] In fact, the judgment from 1986 originally failed to mention the assault statute

27  altogether and instead mistakenly cited the statute for endangerment. (*See* Trial Ex.
    140 at 10 (listing conviction for A.R.S. § 13-1201).) In 1990, the superior court

28  corrected the judgment to reflect that Kiles was convicted for assault under A.R.S.
    § 13-1203, instead of for endangerment under A.R.S. § 13-201. Even then, the court

140 at 8–11.) There is no way to tell whether he was convicted of acting with intent, knowledge, or just recklessness. As a result, Kiles's 1986 conviction for aggravated assault does not support the (F)(2) aggravating circumstance.

### 2. Counsel performed deficiently and prejudiced Kiles in failing to challenge the 1986 conviction as a basis for the (F)(2) aggravator.

Not only did counsel have a duty to investigate the alleged aggravators, counsel had a further duty to contest them on legal grounds as appropriate. *See Correll*, 539 F.3d at 947–48. Counsel did make some legal challenges to the alleged aggravators, by arguing for example that Kiles's prior conviction for attempted aggravated assault could not support the (F)(2) aggravator.[108] (*See* ROA 743 at 1.) However, counsel failed to contend that the aggravated assault could not support the (F)(2) aggravating circumstance. Instead, when arguing that the attempted aggravated assault should be precluded, counsel conceded, "[t]he other one, the aggravated assault, clearly comes in." (Tr. Mar. 20, 2006 at 16–17.)

Counsel were deficient for not disputing whether the aggravated assault could support the (F)(2) aggravating circumstance. Counsel had an obligation under the Sixth Amendment to contest aggravators. *See White v. Ryan*, 895 F.3d 641, 664, 666 (9th Cir. 2018) (recognizing counsel's obligation to challenge aggravating circumstances and holding counsel deficient for failing to do so). Here, counsel made no strategic decision not to contest the aggravating circumstance. Instead, counsel made a mistake of law. Counsel knew that the former version of the (F)(2)

---

provided no indication of which subsection of § 13-1201 was at issue. Powell sought to enter the 1990 order correcting the judgment into evidence, but then withdrew the proffered exhibit. (*See* Tr. Apr. 4, 2006 at 3–4.)

[108] While the Arizona Supreme Court had previously upheld the aggravated assault as a valid basis for the (F)(2) aggravator in this case, it had held the same for the attempted aggravated assault conviction. *See State v. Kiles*, 857 P.2d 1212, 1224 (Ariz. 1993). That ruling did not stop counsel from challenging the latter conviction. (*See* Tr. Mar. 20, 2006 at 14–20.) Also, counsel did try, unavailingly, to challenge the authentication of the State's evidence of the aggravated assault under the Arizona Rules of Evidence. (*See* Tr. Apr. 3, 2006 at 6–9.)

173

1    aggravator applied—they corrected the court's proposed jury instruction to ensure

2    that it reflected the statutory text at the time of Kiles's crime. (*See* Tr. Mar. 16, 2006

3    at 24.) Even so, counsel did not research adequately and find the Arizona Supreme

4    Court cases making clear that Kiles's conviction did not suffice under the old

5    statutory text. Counsel wrongly believed that Kiles's conviction for aggravated

6    assault supported the (F)(2) aggravator. (*See* Tr. Mar. 20, 2006 at 16–17.) But a

7    mistake of law is not a reasoned judgment; it is deficient performance. *See Hinton*

8    *v. Alabama*, 571 U.S. 263, 275 (2014) (deeming counsel's "inexcusable mistake of

9    law" deficient performance); *White*, 895 F.3d at 666 ("A decision based on a

10   misunderstanding of the law is not sound trial strategy."). Accordingly, counsel's

11   error was unreasonable and deficient.[109]

12        Had counsel raised this challenge to the trial court, there is a reasonable

13   likelihood that there would have been a different outcome. Because Arizona

14   Supreme Court precedent is clear that Kiles's aggravated assault did not constitute

15   a prior violent felony for the purposes of the (F)(2) aggravating circumstance as it

16   existed in 1989, the trial court could not have submitted the conviction for the jury's

17   consideration. That, in turn, would have significantly changed the jury's calculus,

18   as Kiles no longer had a pattern of criminal convictions that predated his capital

19   conviction. (*See* ROA 911 at 11–12 (noting that every juror found proven that Kiles

20   was previously convicted of aggravated assault).) This was especially important

21

22   ───────────────

23   [109] Independently, counsel had an obligation to investigate the basis for the State's
     alleged aggravator. *See* 2003 ABA Guideline 1.1 cmt. (noting that counsel may
24   need to mount a collateral attack on a prior conviction); *id.* § 10.7 cmt. Had counsel
     investigated Kiles's 1986 aggravated assault, upon information and belief counsel
25   would have learned that Kiles's attorney at the time had not interviewed the eye-
     witnesses to the incident before advising Kiles to plead guilty and that the 1984
26   attorney was potentially ineffective for failing to have done so. Trial counsel might
     have been able to challenge the conviction directly on constitutional grounds.
27   (Notably, counsel for Kiles's first state post-conviction proceedings had
     investigated the attempted aggravated assault and had filed a petition challenging
28   that conviction. (*See* ROA 225 at 80.))

1   because the defense made Kiles's good behavior—the fact that he was not a future

2   danger—central to the mitigation story (*see* Tr. Apr. 27, 2006 at 4–54 (defense

3   expert testimony on Kiles's exemplary behavior in prison))—and the improper

4   consideration of a prior aggravated assault undercut that story.[110] In such

5   circumstances, the fact that the jury improperly considered a prior aggravated

6   assault conviction—indeed, a pattern of escalating criminal violence that the jury

7   should not have seen—undermines the reliability of the verdict. *See Strickland*, 466

8   U.S. at 694.

9       Even if the trial court had rejected counsel's challenge, trial counsel's

10  objection would have preserved the error for appellate review. Had the Arizona

11  Supreme Court properly analyzed the issue instead of relying on its 1993 opinion

12  in Kiles's case, the court would have been forced to strike down the conviction as

13  a basis for the (F)(2) aggravator. *See infra,* Claim 12. And, because the court

14  determined that the *attempted* aggravated assault was likewise invalid as support,

15  the court would have had to strike down the (F)(2) aggravator altogether. The

16  Arizona Supreme Court would then have had to remand the case for a new jury

17  sentencing so that a jury would have the opportunity to determine if the mitigation

18  was sufficiently substantial to call for leniency, in light of the State's diminished

19  aggravation case. *See Ring v. Arizona*, 536 U.S. 584, 589 (2002); *see also id.* at

20  618–19 (Breyer, J., concurring) (concluding that "the Eighth Amendment requires

21  individual jurors to make . . . a decision to sentence a person to death"); Claim 20,

22  *infra*. At the very least, the Arizona Supreme Court would have had to reweigh the

23  remaining aggravation, without the (F)(2) aggravator, against all of Kiles's

24  mitigation. *See Styers v. Schriro*, 547 F.3d 1026, 1028 (9th Cir. 2008) (per curiam).

25  Either way, there can be no confidence in the reliability of Kiles's penalty-phase

26  ───────────────

27  [110] Further, because effective counsel would not only have challenged the
aggravated assault as a basis for (F)(2), but also would have presented a
significantly better mitigation story, *see infra*, Claim 6, the jury's entire analysis

28  would have been different. *See infra*, Claim 38.

175

1    proceeding. *See Strickland*, 466 U.S. at 694.

2        **D.    Counsel were ineffective for failing to investigate and adequately**
         **challenge the (F)(6) "especially heinous, cruel or depraved"**
3        **aggravating circumstance.**

4        Because counsel treated the aggravation phase as a reprise of the guilt phase,

5    counsel failed to conduct any investigation geared toward challenging the (F)(6)

6    aggravator, in particular the State's assertion that the killing of Gunnel was

7    "especially cruel," prejudicing Kiles. (ROA 1189 at 39–40.)

8        Cruelty concerns primarily the victim's pain and suffering before death. *State*

9    *v. Anderson*, 111 P.3d 369, 394 n.19 (Ariz. 2005). To establish that a crime was

10   "especially cruel," the State must prove beyond a reasonable doubt that the "victim

11   was conscious during the infliction of the violence and experienced significant

12   uncertainty as to his or her ultimate fate." *Id.* Moreover, the State must prove that

13   "[t]he defendant [knew] or should have known that the victim would suffer." *Id.*

14       In failing to investigate, counsel squandered the opportunity to develop and

15   present a viable attack on the State's evidence of cruelty in the killing of Valerie

16   Gunnel. For Gunnel's death, the State had to rely on some combination of the

17   following evidence in its attempt to establish cruelty: (1) the testimony of the

18   medical examiner, (2) evidence from the crime scene, as interpreted by blood-

19   spatter expert Bevel and as described by lead investigator Rodgers, and (3) the

20   testimony of Hawkins about statements purportedly made to him by Kiles. As the

21   State had relied on generally the same types of evidence to establish premeditation

22   at the guilt phase, counsel should have known what they were facing. Even so,

23   counsel failed entirely in their duty to investigate. Because of that failure, the jury

24   unanimously found that the State had proven cruelty in Gunnel's killing.[111] (ROA

25   _____

26   [111] Because the jury did not unanimously find either heinousness or depravity (ROA
     879 at 11–12), the Arizona Supreme Court considered and upheld only the finding
27   of cruelty on direct appeal, *State v. Kiles*, 213 P.3d 174, 188 (2009). Accordingly,
     Kiles presently details only counsel's ineffectiveness with respect to that
28   component of the (F)(6) aggravator. However, counsel also could and should have

                                      176

879 at 11–12.) Had counsel adequately investigated and presented a challenge to the (F)(6) aggravator, there is a reasonable probability that at least one juror would have found otherwise. *See Strickland*, 466 U.S. at 694.

> **1.   Counsel unreasonably failed to investigate in preparation for a challenge to "cruelty" for the purposes of the (F)(6) aggravating circumstance.**

Just as with the guilt phase, counsel had a duty to investigate before the aggravation phase. 2003 ABA Guideline 10.11 ("[C]ounsel . . . have a continuing duty to investigate issues bearing upon penalty and to seek information that supports mitigation or rebuts the prosecution's case in aggravation."); *see also Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (ineffectiveness inquiry looks into "whether the investigation supporting counsel's decision [regarding penalty-phase presentation] *was itself reasonable*"). And, just as with the guilt phase, counsel failed to do so. In particular, counsel failed to consult with or retain experts who could have helped them combat the State's case for cruelty. Indeed, counsel did nothing that could constitute investigation with respect to the State's alleged aggravators, even though proving, for example, cruelty under the (F)(6) aggravator required a different focus than what occurred at Kiles's guilt phase. There is nothing to suggest, for example, that counsel re-interviewed any witnesses (*see, e.g.*, Tr. Mar. 22, 2006 at 56), or adequately reviewed the crime-scene photographs (*see* Tr. Mar. 27, 2006 at 136–37 (State eliciting during redirect examination that defense counsel had misinterpreted the crime-scene photographs).

Most critically, though, counsel once again failed to consult with any expert prior to the aggravation phase. This, despite the fact that counsel knew full well that much of the State's case for (F)(6) hinged on expert testimony. *See Hinton*, 571 U.S. at 273 (recognizing that in some cases the only available defense strategy

---

mounted a strong challenge to heinousness and depravity in Gunnel's killing, by presenting evidence of the effects on Kiles of his intoxication at the time of the crime, *see infra*, Claim 6, and were ineffective for failing to do so.

177

1 demands expert assistance). That counsel did not bother to contact an expert before

2 the aggravation phase, even if only to understand the testimony that the State's

3 experts could offer, was deficient. *See, e.g.*, *Dees v. Caspiri*, 904 F.2d 452, 454 (8th

4 Cir. 1990) (per curiam) (determining that counsel had to "make a diligent

5 investigation of the forensic evidence"); *Correll*, 539 F.3d at 947–48 (recognizing

6 that counsel's duties extend to the State's aggravation case); 2003 ABA Guideline

7 10.11 cmt. (requiring counsel to "thoroughly investigate to determine whether [the

8 State's aggravation] can be excluded, rebutted, or undercut").

9      In light of the types of evidence that counsel knew the State would present in

10 support of cruelty, counsel should have consulted with the following experts:

11      Pathologist: The State's medical examiner, Dr. Mallon, testified at the

12 aggravation phase the Gunnel had a defensive wound on her right forearm, and,

13 because of an ill-conceived cross-examination, stated conclusively that Gunnel

14 must have been conscious for the blow that caused that wound. (Tr. Mar. 21, 2006

15 a.m. at 21; Tr. Mar. 21, 2006 at 23–24.) Because counsel had done no reasonable

16 investigation before the guilt or aggravation phases, defense counsel again never

17 questioned Dr. Mallon's premise: whether the wound was in fact defensive in

18 nature. (*See* Tr. Mar. 21, 2006 at 20.) Instead, counsel tried repeatedly to establish

19 that the same blow during which Gunnel incurred the wound could also have hit

20 her head and knocked her unconscious. (Tr. Mar. 21, 2006 at 21–25.) Counsel

21 succeeded primarily in getting Dr. Mallon to say, over and over, that Gunnel was

22 conscious and aware for that part of the attack.[112] (Tr. Mar. 21, 2006 at 21–25.)

23      As noted *supra*, Claim 3, however, counsel should have consulted an

24 independent pathologist. *See Thomas v. Clements*, 789 F.3d 760, 769–71 (7th Cir.

25 ———————————

26 [112] Counsel's attempt to get Dr. Mallon to say generally that there could have been
fewer blows than injuries—because a single blow could have caused multiple

27 injuries—also backfired. Dr. Mallon simply explained "And the opposite is true . . .
[T]he blow in the back of the head could be as a result of one blow or three or four."

28 (Tr. Mar. 21, 2006 at 17.)

2015). Counsel's disastrous cross-examination revealed a complete lack of understanding of Dr. Mallon's findings and how best to address them, which a consultation with an independent pathologist could have cured. As a pathologist could have informed counsel and could have testified, there is no way to determine whether Gunnel's forearm wound was a defensive wound. Gunnel may well have already been dead when the trauma to her arm occurred.

That very basic piece of knowledge would have transformed defense counsel's approach to Dr. Mallon's testimony. Counsel conceded that Gunnel had a defensive wound and argued about how long she could have remained conscious after the first blow, undercutting Kiles's testimony that Gunnel went down after the first blow. (*See* 2006 Trial Ex. 134 at 165–66.) By presenting independent expert testimony or by fashioning a better cross-examination after consulting with an independent expert, counsel could instead have established that what Kiles said— that Gunnel was not conscious after the first blow—was as consistent with the pathologist's testimony as the State's theory that Gunnel had remained conscious for some period of time. *See Lindstadt v. Keane*, 239 F.3d 191, 201–02 (2d Cir. 2001) (holding counsel ineffective when counsel failed to educate themselves on the meaning of State's expert's findings).

Blood-spatter expert: Just as counsel should have consulted with a blood-spatter expert before the guilt phase, they should have done so before the aggravation phase. *See supra*, Claim 3; (*see also* ROA 1189 at 32–35). Through Tom Bevel, the State elicited that the blood stains on more than one wall of the living room, where Gunnel was killed, showed "movement." (Tr. Mar. 27, 2006 at 71.) Bevel said the same for the pillowcase found in the east bedroom, where the State alleged that the attack on Gunnel began: the blood on the pillowcase evinced "some movement . . . where the blood source has had lateral motion." (Tr. Mar. 27, 2006 at 72–73.)

An independent expert could have explained to counsel how to challenge

179

these conclusions, both of which suggested that Gunnel was moving during the attack and was therefore conscious and perhaps aware of the uncertainty of her fate. *See Anderson*, 111 P.3d at 394 n.19 (defining "especially cruel"). Both conclusions likewise contradicted Kiles's testimony. (*See* 2006 Trial Ex. 134 at 165–66.) First, an independent expert would have informed counsel that there is no way to tell whether the blood stains on the various living room walls all occurred *during* the attack. It is entirely plausible that some of the stains were caused by a flick of a hand with blood on it or the swing of another item with blood *after* Gunnel's death. This is especially true as there was a pool of blood on the floor, and people such as Kiles and Kale Johnson were moving around the apartment long before the blood dried. (Tr. July 17, 2000 at 8–9 (Rodgers testifying that the blood in the living room was "still quite wet" when police were at the crime scene); Tr. July 17, 2000 at 190 (Kiles testifying that he and Johnson ransacked the apartment looking for things to sell).) Similarly, while counsel accepted Bevel's testimony that the source of the blood on the pillowcase moved (Tr. Mar. 27, 2006 at 119), an independent expert could have testified that it was plausible that the pillowcase instead moved across a blood source, for example the bloody mattress in the west bedroom (*see* Tr. Feb. 21, 1989 at 37–38 (Rodgers testifying that the blood on the mattress was still wet when police arrived)).

Armed with such information, counsel could have vigorously challenged both the State's assertions that (1) the attack started in the bedroom, where the pillowcase was found, and (2) Gunnel was conscious and moving around the living room. (*See* Tr. Mar. 20, 2006 at 69–70.) Moreover, an independent expert would have alerted counsel to the fact that Bevel's methodology for determining the number of blows was incorrect, as discussed *supra*, Claim 3; had counsel pointed this out through a defense expert or through cross-examination, that testimony would have damaged Bevel's credibility overall. (*See, e.g.*, ROA 225 Ex. 59.) Because competent counsel has a duty to "understand the basics of the science

180

involved" in expert testimony, "at least for purposes of cross-examining the State's experts," counsel's failure was deficient. *Richey v. Bradshaw*, 498 F.3d 344, 362 (6th Cir. 2007); *see also* 2003 ABA Guideline 1.1 cmt. (capital trial counsel "must be able to challenge zealously the prosecution's evidence and experts through effective cross-examination").

Counsel went into the aggravation phase having conducted no aggravation-focused investigation and entirely unprepared to reasonably challenge the State's case for cruelty. Had counsel consulted with experts beforehand, counsel would have had the information necessary to develop an appropriate strategy for their presentation and to introduce at least reasonable doubt into the State's presentation of the aggravating factors. Just as before, though, counsel's "investigation into the State's forensic evidence never started," and so counsel were ill-equipped to make any kind of reasonable decision as to how to proceed. *Elmore v. Ozmint*, 661 F.3d 783, 865 (4th Cir. 2011). But "[u]nder *Strickland*, counsel's investigation must determine trial strategy, not the other way around." *Weeden*, 854 F.3d at 1070. Because counsel conducted none of the investigation needed to determine strategy, their decisions on how to contest the State's aggravation case were neither informed nor reasoned. *See Wiggins*, 539 U.S. at 521; *Bemore*, 788 F.3d at 1162–69.

### 2. Because of the insufficient investigation and lack of preparation, counsel failed to mount an adequate challenge to the (F)(6) aggravator, thereby prejudicing Kiles.

Counsel's unreasoned decision to treat the aggravation phase as a second guilt phase—in general, the lack of preparation—left counsel scrambling in their attempt to defend against the State's allegation that Gunnel's death was especially cruel. Instead of corroborating Kiles's testimony through expert testimony that Gunnel's forearm wound could well have occurred after unconsciousness or post-mortem, counsel had Dr. Mallon state over and over that Gunnel was conscious and

1    aware past the first blow.[113] (Tr. Mar. 21, 2006 at 23–4.) Counsel could have had a

2    blood-spatter expert corroborate Kiles's testimony, damage Bevel's credibility, and

3    undermine the theory that Gunnel moved around the apartment by eliciting

4    testimony that the blood-stain evidence was consistent with Gunnel having fallen

5    unconscious (and having remained unconscious) after the initial below. (*See, e.g.*,

6    ROA 225 Ex. 59.) Instead, counsel allowed Bevel's testimony to suggest that

7    Gunnel moved around the living room during the attack. (Tr. Mar. 27, 2006 at 62–

8    71.) In so doing, counsel performed deficiently. *See Richey*, 498 F.3d at 362;

9    *Elmore*, 661 F.3d at 865.

10         Moreover, because counsel indefensibly treated the aggravation phase as a

11   guilt phase redux, they failed to challenge the lay-witness testimony that supported

12   the State's depiction of Gunnel's killing as especially cruel. Notably, the defense

13   did not object when Kale Johnson's testimony was read into the record. (*See* Tr.

14   Mar. 23, 2006 at 60; Mar. 27, 2006 at 141.) Indeed, defense counsel actively sought

15   to have the transcript of Johnson's testimony admitted into the record. (*See* Tr. Mar.

16   23, 2006 at 60; *see also* 2006 Trial Ex. 136.) In doing so, counsel sacrificed Kiles's

17   opportunity to confront Johnson, even though different issues were important at

18   aggravation than had been dispositive at the guilt phase. (*See* ROA 1189 at 39–40.)

19   For example, at the guilt phase, counsel had attempted to get Johnson to agree that

20   he had previously testified that his "fingerprints in blood are on the doorframe in

21   Valerie's bedroom." (2006 Trial Ex. 136 at 168.) Johnson repeatedly said, "I don't

22   remember" and expressed confusion about the question, so counsel just moved on.

23   (2006 Trial Ex. 136 at 168–69.) If counsel had properly prepared for the aggravation

24   phase and had not unreasonably permitted Johnson's prior testimony to come in,

25   counsel could have elicited testimony about (or impeached him with) his August

26   1994 affidavit. In that affidavit, Johnson stated under oath, "When I was in the

27

28   [113] As noted *supra*, Claim 3, counsel also could have confronted Dr. Mallon about
     his evolving testimony regarding defensive wounds.

1    apartment, I got some blood on my hands. I tried to get rid of it by wiping my hand

2    on the inside frame of the apartment door." (ROA 225 Ex. 45 at 2.) Counsel's failure

3    to elicit such testimony during the aggravation phase was deficient.[114]

4         Counsel's unreasonable missteps with respect to the State's case for cruelty

5    prejudiced Kiles. The Arizona Supreme Court later highlighted the evidence that it

6    believed supported that cruelty had been proven beyond a reasonable doubt:

> The evidence shows beyond a reasonable doubt that the murder of Valerie was especially cruel. Kiles admitted that Valerie remained conscious after the attack began, and the medical testimony regarding defensive wounds supported that conclusion. . . . A pillow with blood on it consistent with a source that continued to move was found in Valerie's bedroom. A transfer stain consistent with a person running a bloody hand along a door was also identified. Blood spatter was found between eighteen and twenty-four inches from the ground, indicating that "the source of the blood would be lower toward the floor." The transfer stain on the door, together with spatter on the lower part of the north and south walls of the living room, indicated that either the blood source or the attacker was moving. A piece of the jack itself was found in the bedroom with Valerie's blood on it. This evidence directly contradicts Kiles' trial testimony, when, contrary to his earlier admissions,[115] he claimed that when he hit Valerie with the jack, she fell down in a living room chair and never got up.

19    *Kiles*, 213 P.3d at 188. If counsel had investigated reasonably and presented a

20    defense based on that investigation, counsel could have hammered back at nearly

21    every piece of evidence later cited by the court. Had counsel performed reasonably,

22    the "medical testimony regarding defensive wounds"[116] would not have supported

23    the conclusion that Gunnel had a defensive wound, but would have said that the

---

[114] Counsel should also have confronted Johnson as discussed *supra*, Claim 3, as the issues discussed in that section also mattered to aggravation.

[115] The only contrary statement Kiles purportedly made was the one about which Hawkins testified. (*See* Tr. Mar. 22, 2006 at 35–39.)

[116] Even accepting as true Dr. Mallon's testimony, Gunnel had only one defensive wound. (*See* Tr. Mar. 21, 2006 a.m. at 15–26.)

183

trauma to Gunnel's forearm was consistent either with a defensive wound or with a wound inflicted after loss of consciousness, or even with a wound inflicted after death. The bloody pillowcase would have suggested only that the pillowcase was moved while the apartment was ransacked (Tr. July 17, 2000 at 190), not that Gunnel moved after the attack began. Similarly, the blood stains in the living room would have been evidence of movement by someone at some time, plausibly after the attack was over, not movement by Gunnel during the attack. That the jack was found in the bedroom would have been immaterial, as much of the crime scene had been compromised by the time it was photographed. And the jury would have known that Kale Johnson left the transfer stain on the door (*see* ROA 225 Ex. 45 at 2); Gunnel did not do so during the attack.

Perhaps most importantly, counsel would have neutralized much of the State's expert and other testimony that contradicted Kiles's claim and that therefore damaged his credibility. Kiles's testimony was critical, in that it explained to the jury how this crime could have occurred *without* being especially cruel under Arizona law. Accordingly, bolstering Kiles's credibility—instead of making concessions that affirmatively damaged it—was essential to the defense case. *See Bennett v. Cate*, 407 F. App'x 213, 215 (9th Cir. 2010) ("Because [the defendant] took the stand, it was critical to have any objective physical and forensic evidence to support his version.").

Had counsel investigated and prepared in accordance with their Sixth Amendment obligations, the jury would have been left with no "conclusive evidence that the victim was conscious during the infliction of the violence and experienced significant uncertainty as to [her] ultimate fate." *Anderson*, 111 P.3d at 395 n.19. Practically every facet of the State's case for cruelty would have been countered by equally compelling evidence from the defense. The State could not have proven beyond a reasonable doubt that Gunnel was conscious after the first

1   blow or that she experienced any pain.[117] *See State v. Clark*, 616 P.2d 888, 896

2   (Ariz. 1980) (rejecting a finding of cruelty when there was insufficient evidence

3   that the victims suffered pain). In such circumstances, there is a reasonable

4   probability that at least one juror would have concluded that the State had not

5   proven beyond a reasonable doubt that the killing of Gunnel was especially cruel.

6   *See Strickland*, 466 U.S. at 694. Counsel were thus ineffective for failing to

7   reasonably challenge the (F)(6) aggravator with respect to Gunnel's death.

8         **E.    Counsel performed deficiently and prejudiced Kiles by failing to
               frontload mitigation at the aggravation phase.**
9

10        As the primary goal of a capital-defense attorney is to avoid a death sentence,

11  counsel must take every reasonable opportunity to ensure that outcome. *See* 2003

12  ABA Guideline 10.11 ("[c]ounsel at every stage of the case should take advantage

13  of all appropriate opportunities to argue why death is not suitable punishment for

14  their particular client"). One critical way of doing so is to ensure that the jury is

15  introduced to the defense's mitigation story as early as possible during proceedings.

16  In other words, counsel must "frontload" the mitigation. *See Eaton v. Wilson*, No.

17  09-CV-261-J, 2014 WL 6622512, at *149 (D. Wyo. Nov. 20, 2014) (citing expert

18  testimony on frontloading and calling the frontloading of mitigation "so crucial in

19  a death penalty case"). This is especially important as there is "reason to believe

20  that a number of jurors make up their minds about the defendant's punishment even

21  before they hear any evidence in the penalty phase." Stephen Garvey, *Aggravation

22  and Mitigation in Capital Cases: What Do Jurors Think?* 98 Colum. L. Rev. 1538,

23  1543 (Oct. 1998). Here, given the near certainty that the State would be able to

24  establish at least one aggravator for at least one victim in Kiles's case, counsel had

25  a duty to frontload mitigation for Gunnel's death during the aggravation phase. *See*

26  _____

27  [117] This is not to suggest that proof beyond a reasonable doubt of consciousness
     alone would have sufficed to establish cruelty. *See State v. Soto-Fong*, 928 P.2d
28  610, 627–28 (Ariz. 1996).

185

1    2003 ABA Guideline 10.11; *see also Strickland*, 466 U.S. at 688.

2         As the State had alleged Gunnel's and the children's deaths were especially

3    heinous and depraved for purposes of the (F)(6) aggravator, trial counsel had an

4    opportunity to frontload mitigation. Under Arizona law, the "terms 'heinous' and

5    'depraved' focus on the defendant's mental state and attitude at the time of the

6    offense as reflected by his words and actions." *Anderson*, 111 P.3d at 395 n.19.

7    Because the State put Kiles's mental state at issue, counsel had a clear opportunity

8    to introduce evidence going to Kiles's mental state that also previewed for the jury

9    Kiles's impairments. Indeed, the Ninth Circuit has specifically concluded that

10   evidence of a defendant's mental impairments can counter the State's evidence that

11   a crime was committed in an especially heinous manner under Arizona's (F)(6)

12   aggravator. *Summerlin v. Schriro*, 427 F.3d 623, 641–42 (9th Cir. 2005) (en banc).

13        Counsel's failure to frontload mitigation relating to Gunnel's death was not

14   strategic. Counsel did not even consider the possibility of frontloading mitigation.

15   As counsel did not even make a conscious decision not to begin introducing

16   mitigation at the aggravation phase, counsel's performance is owed no deference as

17   a matter of strategy. *Cf. Wiggins*, 539 U.S. at 521–22 (counsel's decisions are due

18   deference only when informed by reasonable investigation).

19        Had counsel considered introducing mitigation at the aggravation stage,

20   counsel could have previewed for the jury a number of relevant themes that the jury

21   later saw. *See infra*, Claim 6 (discussing mitigation available in this case). For

22   example, counsel could have offered evidence of Kiles's impulsivity, a major focus

23   of the mitigation phase, to rebut the allegation of heinousness; similarly, counsel

24   could have offered evidence of Kiles's organic brain dysfunction to demonstrate

25   Kiles's state of mind around the time of the crime. (*See, e.g.*, Tr. Apr. 25, 2006 at

26   101 (defense expert testifying that homicides were, to a reasonable degree of

27   medical certainty, attributable to Kiles's impulsivity).) In fact, in *Summerlin*, the

28   Ninth Circuit held that the "strong psychiatric evidence of Summerlin's lack of

186

1   impulse and emotional control and organic brain dysfunction could have provided
2   significant mitigating evidence countering the State's circumstantial evidence" of
3   heinousness. 427 F.3d at 641–42. Kiles's counsel could have done the same.
4   Moreover, Kiles's counsel could have started to introduce the jury to Kiles's
5   addictions and their effects on him. While counsel sporadically had witnesses touch
6   upon Kiles's drug use during the aggravation phase (*see, e.g.*, Tr. Mar. 22, 2006 at
7   67–68), no effort was made to start explaining to the jury the *effects* of those
8   addictions on Kiles's brain and mental state—including the effects of his drug-
9   induced psychosis—around the time of the crime (*see, e.g.*, Tr. Feb. 21, 1996 at
10  177–85). Counsel's failure to do so was deficient performance.

11          Kiles was, moreover, prejudiced by counsel's failure. Counsel could have
12  framed the jury's understanding of Kiles's crime from the outset in terms of his
13  impairments, giving the jury and integrated understanding of both the crime and
14  why it occurred. As the jurors learned about the crime, they would also have learned
15  about Kiles's mental illness and impairments. *See Eaton*, 2014 WL 6622512 at
16  *149 (quoting expert testimony on how frontloading "help[s] the jury to understand
17  [the defendant] as fully human as early as possible"). This approach would have
18  helped the jurors absorb Kiles's ensuing mitigation presentation and use it to give
19  context to the crime. While this may not have affected the aggravation-phase
20  outcome, there is a reasonable probability that at least one juror, having heard the
21  mitigation at the outset and throughout the penalty-phase proceedings, would have
22  voted differently on the sentence for Gunnel's death. *Cf. Jackson v. Calderon*, 211
23  F.3d 1148, 1164 (9th Cir. 2000) (noting the importance of mitigation and finding
24  prejudice from deficient performance with respect to mitigation when crime was
25  "an unplanned encounter between a grossly intoxicated, originally unarmed
26  defendant and a victim suddenly ending in death").

27
28

1
2

**F.    Counsel were ineffective for failing to properly object to Kiles's restraints.**

3
4
5

Kiles's counsel were deficient for failing to properly object to Kiles's shackling, as well as for failing to ensure that Kiles's restraints were not visible to the jury, and counsel's deficient performance prejudiced Kiles.

6
7
8
9
10
11
12

Throughout penalty-phase proceedings, Kiles was forced to wear a leg brace—designed to lock up if he moved too quickly—and an electric stun belt around his waist. Kiles had to hold the leg brace in place at times when he was walking to prevent it from locking up as he moved. At least one juror saw Kiles's physical restraints—including a belly chain with handcuffs—both when a door opened when he was waiting to come into the courtroom and when he was sitting at the defense table.

13
14
15
16
17
18
19
20
21
22

As detailed *supra*, Claim 3, Kiles had a right under the Due Process Clause not to be tried wearing shackles unless there were no acceptable alternatives, because of the inherent prejudice of shackles. *Holbrook v. Flynn*, 475 U.S. 560, 568–69 (1986). That right was intended to protect the presumption of innocence and the impartiality of the jury, preserve Kiles's ability to assist counsel in his own defense, and to ensure the dignity of judicial proceedings. *See Illinois v. Allen*, 397 U.S. 337, 344–45 (1970); *see also supra*, Claim 3. However, Ninth Circuit precedent makes clear that even restraints that are not visible to the jury—namely, the electric stun belt—can undermine those rights and interests. *See Gonzalez v. Pliler*, 341 F.3d 897, 900 (9th Cir. 2003).

23
24
25
26
27
28

Before Kiles's aggravation phase, trial counsel objected to visible shackling and leg braces, but did not object to making Kiles wear the electric stun belt. (*See* Tr. Feb. 14, 2006 at 41–43 ("I'm agreed with what they make him wear under his clothes. I just don't want him to be hobbling in here with those leg things that lock up.").) However, as detailed *infra*, Claim 8, even non-visible restraints such as the electric stun belt can have a devastating effect on, for example, a defendant's ability

188

1   to communicate easily with counsel. *Gonzalez*, 341 F.3d at 900 (noting that the use
2   of a stun belt "raises all of the traditional concerns about the imposition of physical
3   restraints".) Accordingly, counsel had a duty to challenge the use of that restraint
4   without an individualized finding of necessity just as much as counsel had a duty
5   to challenge visible shackles. *See id.*; *see also, e.g.*, *Roche v. Davis*, 291 F.3d 473,
6   483 (7th Cir. 2002). Moreover, for the reasons stated *infra*, Claim 8, and *supra*,
7   Claim 3, if faced with such a challenge, the trial court likely would not have
8   required Kiles to wear a stun belt, because as even the court recognized, Kiles was
9   no security threat. (Tr. Feb. 14, 2006 at 42 (court "[could not] recall any time that
10  Mr. Kiles ha[d] been a security problem, or risk").)

11      Counsel's failure to protect Kiles's due-process rights not to be restrained
12  unnecessarily, in conjunction with counsel's failure to ensure that Kiles's restraints
13  were not visible, was prejudicial. This is especially true because of the particular
14  dangers of stun belts, *see Gonzalez*, 341 F.3d at 901, and the fact that at least one
15  juror saw Kiles's wearing chains around his waist. Had counsel properly protected
16  Kiles's rights, there is a reasonable probability that at least one juror would have
17  voted differently. *See Strickland*, 466 U.S. at 694; *see also State v. Gomez*, 123 P.3d
18  1131, 1139–42 (Ariz. 2005) (reversing death sentence because capital defendant
19  was shackled without necessary individualized finding).

20      **G.   Counsel were ineffective for failing to object to, or to request a
21          curative instruction for, the prosecutor's misconduct in opening
            and closing statements.**

22      During the aggravation phase, the prosecutor gave an opening statement that
23  consisted largely of improper argument and gave a closing statement filled with
24  vouching, mischaracterizations of the evidence, insults to the defense, and other
25  misconduct. Counsel were ineffective for failing to object to the State's closing and
26  to request a curative instruction regarding the opening or the closing. *See Zapata v.*
27  *Vasquez*, 788 F.3d 1106, 1112 (9th Cir. 2015).

28      As discussed in detail *infra*, Claim 9, Powell used his aggravation-phase

opening statement to lay out an improper argument, filled with vouching and other misconduct, for the jury. Throughout the statement, Powell repeatedly informed the jury of what "we know." For example, he declared,

> February 9th, Thursday. What do we know about that day? We know that the defendant and Valerie did laundry. We know that Wade Ward . . . stopped by to visit. Stopped by the apartment to see Shemaeah and to talk to Valerie. And we also know that during that day the defendant stole Valerie's food stamps; the food stamps that she used to feed her children. We then know that the defendant sold them so that he could purchase drugs, which he did, so that he and his friends could use drugs, which they did.

(Tr. Mar. 20, 2006 at 67–68.) Powell continued in that vein, instructing the jurors as to what the State *knew* to be true—even though some of this information had been contested at the guilt phase—and therefore throwing the weight of the State behind the credibility and accuracy of certain testimony that was to come. *See United States v. Younger*, 398 F.3d 1179, 1191 (9th Cir. 2005) (prosecutor should not use the phrase "we know" unless summarizing evidence already admitted at trial). Powell further improperly vouched for the credibility of evidence and misled the jury. (*See, e.g.*, Tr. Mar. 20, 2006 at 79 (Powell telling the jury that Hawkins's Silent Witness letter was "consistent with the physical evidence")); *see also United States v. Kerr*, 981 F.2d 1050, 1053 (9th Cir. 1992) ("A prosecutor has no business telling the jury his individual impressions of the evidence.").

Trial counsel repeatedly objected to the prosecutor's improper argument (*see* Tr. Mar. 20, 2006 at 76, 79), and eventually moved for a mistrial (Tr. Mar. 20, 2006 at 84). The court denied that motion, but failed to give—and counsel failed to request—a curative instruction as to the prosecutor's vouching. (*See* Tr. Mar. 20, 2006 at 91.) Given the obvious harm from the prosecutor's vouching, counsel should have requested a jury instruction that the prosecutor's comments on the veracity of the evidence or what the State knew to be true should be disregarded. Counsel knew full well how hard it would be for the defense "to unring this bell"

190

1   (Tr. Mar. 20, 2006 at 87), and counsel were deficient for failing to request an

2   instruction from the court to help them do so. *See Strickland*, 466 U.S. at 688.

3       Counsel failed also to object to most of the prosecutor's closing, although

4   that too was littered with instances of misconduct. *See* Claim 9, *infra*. Throughout

5   his closing, Powell belittled the defense, calling it "this ruse" and dismissing the

6   "defense story." (Tr. Apr. 11, 2006 at 18, 22.) Powell even disparaged defense

7   lawyers, proclaiming that "where defense attorneys make their money is arguing

8   reasonable doubt." (Tr. Apr. 11, 2006 at 39); *see Wilson v. Sirmons*, 536 F.3d 1064,

9   1119 (10th Cir. 2008) (recognizing that a prosecutor's attacks on defense counsel

10  can constitute misconduct). Powell further misstated the evidence, just as he had in

11  the guilt phase, for example, by asserting that Larry Hawkins's Silent Witness letter

12  said that after attacking Gunnel, "the defendant then went out into the living room

13  and sat there." (Tr. Apr. 11, 2000 at 25); *see also supra*, Claim 3; *infra*, Claim 9.

14  But the letter did not even intimate that the attack had moved from room to room.

15  (*See* 2006 Trial Ex. 90 at 1; *see also* Tr. Apr. 11, 2006 at 66.) Then, to corroborate

16  his own misstatements of the evidence, Powell repeatedly announced to the jury

17  that "we know," for example, "that it was a prolonged beating [of Gunnel]," when

18  such matters were in dispute. (*See, e.g.*, Tr. Apr. 11, 2006 at 25); *see also United*

19  *States v. Sanchez*, 176 F.3d 1214, 1224 (9th Cir. 1999) ("As a general rule, a

20  prosecutor may not express his opinion of the defendant's guilt or his belief in the

21  credibility of government witnesses.") (quoting *United States v. Molina*, 934 F.2d

22  1440, 1444 (9th Cir. 1991). The prosecutor even closed by instructing the jurors as

23  to exactly what they were going to do: "Twelve people are going to find

24  unanimously that he killed." (Tr. Apr. 12, 2006 at 25.)

25      Even so, trial counsel failed to object to all but one instance of the

26  prosecutor's misconduct and failed to seek any kind of curative instruction. (*See* Tr.

27  Apr. 11, 2006 at 16–84; Tr. Apr. 12, 2006 at 3–25.) Given the prosecutor's

28  concerted effort—starting in his opening—to mislead the jury as to the strength of

1   the State's evidence and to cement in the jury's minds the credibility of State's

2   witnesses, that failure was deficient. *See Zapata*, 788 F.3d at 1112.

3       Moreover, much of prosecutor's improper argument went directly toward an

4   attempt to establish that Gunnel's death was especially cruel for the purposes of the

5   (F)(6) aggravator. (*See, e.g.*, Tr. Apr. 11, 2006 at 25.) The harm from that

6   misconduct was only exacerbated by the fact that defense counsel said nothing

7   regarding the evidence in his own opening (*see* Tr. Mar. 20, 2006 at 94–106),[118]

8   and, further, lauded Powell as "a very skilled lawyer" and as "a very good lawyer"

9   who "knows what he's doing" (Tr. Mar. 20, 2006 at 96, 98). Because of the

10  prosecutor's pervasive misconduct in opening and closing, there is a reasonable

11  probability that absent counsel's errors in failing to cure that harm at least one juror

12  would have come to a different conclusion. *See Strickland*, 466 U.S. at 694.

### H.   Counsel were ineffective for failing to object to the trial court's erroneous instruction defining reasonable doubt.

15      Counsel were ineffective in failing to object to the reasonable-doubt

16  instruction given to the jury. The trial court instructed the jury that "[p]roof beyond

17  a reasonable doubt is proof that leaves you firmly convinced that the alleged

18  aggravating factor is proven." (Tr. Apr. 11, 2006 at 7–8.) Later, the court instructed

19  the jury that "conclusive evidence" of cruelty sufficed to establish the (F)(6)

20  aggravator. (Tr. Apr. 11, 2006 at 13.) Even though counsel had, at the guilt phase,

21  objected to the instruction lessening the standard of proof that the State had to

22  satisfy (Tr. July 18, 2000 at 27), counsel neglected to do so at the aggravation phase.

---

[118] Except for the brief mentions of Powell, the defense team, the dates at issue with the crime, and the fact that Kiles would never be eligible for parole, counsel said nothing that was specific to Kiles's case. (*See* Tr. Mar. 20, 2006 at 94–106.) Instead, perhaps reflecting the fact that he had not worked on the case for years, counsel said such things as, "During the course of the trial – and in any trial – we are here because of a dispute. We're here because the State has a view of facts different than the defense. We're here because things have happened outside of your view – outside of even your concern at this point – has [sic] brought us to this point, to this precise moment." (Tr. Mar. 20, 2006 at 97.)

192

But the phrase "firmly convinced" reduced the State's burden of proof to something less than reasonable doubt; it is akin to "clear and convincing." *See, e.g.*, *State v. Perez*, 976 P.2d 427, 442 (Haw. Ct. App. 1998), *aff'd in part, rev'd in part on other grounds*, 976 P.2d 379 (Haw. 1999). "[T]he reasonable-doubt standard is indispensable to command the respect and confidence of the community in applications of the criminal law." *In re Winship*, 397 U.S. 358, 364 (1970). "It is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned." *Id.* A lesser standard of proof, such as "firmly convinced" violates a defendant's rights to due process under the Fifth and Fourteenth Amendments to the U. S. Constitution. *See id.* Given the defense's focus on reasonable doubt throughout its presentation (*see, e.g.*, Tr. Apr. 11, 2006 at 76), there is a reasonable probability that the proceeding would have had a different outcome if the jury had been properly instructed on the definition of reasonable doubt. *See Strickland*, 466 U.S. at 694.

**I.** **Counsel were ineffective for failing to ensure that a complete record was made of aggravation-phase proceedings.**

As discussed in Claim 15, *infra*, Kiles's counsel permitted significant portions of the aggravation phase to go unrecorded. Counsel did so despite Kiles's specific request that a record be made of all proceedings (*see, e.g.*, Tr. Aug. 6, 1999 at 13), and despite the need for meaningful appellate review, *see Gregg v. Georgia*, 428 U.S. 153, 197–98 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.). In doing so, counsel performed deficiently and prejudiced Kiles. *See Strickland*, 466 U.S. at 688, 694.

**J.** **Counsel's numerous errors, individually and cumulatively, undermined the reliability of Kiles's aggravation phase.**

Each instance of deficient performance described above is prejudicial was on its own, but counsel's aggravation-phase errors caused even more pronounced prejudice. When evaluating an ineffective-assistance claim, this Court must

193

consider the cumulative impact of counsel's various errors. As the Supreme Court has stated, "In making this [prejudice] determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695; *see Williams v. Taylor*, 529 U.S. 362, 397–98 (2000); *see also White*, 895 F.3d at 645 n.1 (ruling that the district court erred by granting a certificate of appealability on a portion of an ineffective assistance claim because the petitioner "has but a single claim regarding his right to the effective assistance of counsel at the penalty phase"); *Martin v. Grosshans*, 424 F.3d 588, 590–92 (7th Cir. 2005) ("[E]ven if [trial counsel's] errors, in isolation, were not sufficiently prejudicial, their cumulative effect prejudiced Martin's defense."); *Alcala v. Woodford*, 334 F.3d 862, 882–83 (9th Cir. 2003) (granting relief on basis of cumulative impact of multiple errors by counsel); *Lindstadt*, 239 F.3d 191, 205 (2d Cir. 2001) (granting relief where petitioner was prejudiced by cumulative effect of errors committed by trial counsel); *Harris ex rel. Ramseyer v. Wood*, 64 F.3d 1432, 1439 (9th Cir. 1995) (holding that cumulative impact of numerous deficiencies in counsel's performance was prejudicial, warranting habeas relief).

Here, had counsel not performed deficiently, the jury would not have heard that Kiles had a prior "violent" felony conviction for aggravated assault, but would instead have been introduced to his brain dysfunction and addictions, giving some sort of context to the crime. Moreover, the jury would have heard that the State's case that Gunnel's killing was cruel came down to possibilities and conjecture, but certainly nothing that could establish beyond a reasonable doubt that she was conscious and in pain for a prolonged beating or that she experienced great uncertainty as to her fate. Had counsel performed competently, there is at least a reasonable probability that the outcome of the aggravation phase would have been different. *See Strickland*, 466 U.S. at 694.

1

2

### K.    The state post-conviction court's decision that Kiles did not state a colorable claim is no bar to this Court's de novo review of this claim.

3

4

5

6

The state post-conviction court's reasoned decision on this claim stated that, with respect to counsel's failure to challenge the 1986 aggravated assault as a basis for the (F)(2) aggravating circumstance, Kiles had shown neither deficient performance nor prejudice. (*See* ROA 1214 at 2.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

The state-court merits ruling on this claim is contrary to and/or an unreasonable application of clearly established federal law for two distinct reasons. *See* 28 U.S.C. § 2254(d)(1). As noted *supra*, Claim 3, the only standard the state post-conviction court ever stated with respect to the prejudice prong of an ineffectiveness-of-counsel claim was an outcome-determinative standard: whether "the outcome would have been different." (ROA 1214 at 2.) That standard, however, is contrary to or an unreasonable application of the prejudice standard in *Strickland*. *See, e.g.*, *Thomas*, 789 F.3d at 767–68 (holding that court's "would have led to a different result" prejudice standard was an unreasonable application of *Strickland*); *Martin*, 424 F.3d at 592 (holding that the state court's prejudice inquiry—whether "the result of the proceeding would have been different"—was contrary to *Strickland*). Moreover, the state court's failure to consider the cumulative effect of the prejudice from the various challenges to aggravators foregone by trial counsel was likewise an unreasonable application of or contrary to clearly established Supreme Court precedent. *See, e.g.*, *Strickland*, 466 U.S. at 694–95 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional *errors*, the result of the proceeding would have been different."); *White*, 895 F.3d at 671; *see also, supra*, Claim 3.

25

26

27

28

In addition, the ruling that there was no showing of deficient performance was an unreasonable application of *Strickland* and *Wiggins*, which hold that unreasoned "decisions" based on no investigation or preparation are afforded no deference. *See Strickland*, 466 U.S. at 688; *Wiggins*, 539 U.S. at 521. To the extent

195

1    that the state court made a determination of fact on this front, that too was

2    unreasonable. *See* 28 U.S.C. § 2254(d)(2); *see also, e.g.*, *Taylor v. Maddox*, 366

3    F.3d 992, 999–1001 (9th Cir. 2004) (discussing ways in which § 2254(d)(2) can be

4    satisfied). As the state-court record makes clear—indeed, as counsel effectively

5    acknowledged on the record—counsel did no investigation to prepare specifically

6    for the aggravation phase. (*See, e.g.*, Tr. Mar. 22, 2006 at 56; Tr. Mar. 27, 2006 at

7    38.) Given this failure to investigate, counsel's choices to forego a meritorious

8    challenge to the (F)(2) aggravator and to mount an uninformed defense to the (F)(6)

9    aggravator, among other errors, were necessarily deficient.

10        The finding of no prejudice was likewise unreasonable, both because the state

11   court used the improper legal standard as described above, but also because the state

12   court—to the extent it made a factual finding—relied on an unreasonable

13   determination under § 2254(d)(2). *See Taylor*, 366 F.3d at 1001 ("[W]here the state

14   courts plainly misapprehend or misstate the record in making their findings, and the

15   misapprehension goes to a material factual issue that is central to petitioner's claim,

16   that misapprehension can fatally undermine the fact-finding process, rendering the

17   resulting factual finding unreasonable."). Here, the state post-conviction court

18   ignored the prejudice from the improper finding of the (F)(6) aggravator in coming

19   to this conclusion (*see* ROA 1214 at 1–2), rendering it unreasonable within the

20   meaning of § 2254(d)(2).

21        Because Kiles has satisfied § 2254(d), this Court's analysis is

22   "unconstrained" by AEDPA deference.[119] *See Williams*, 529 U.S. at 405–06.

23        **L.    Conclusion.**

24        For the reasons stated above, Kiles's counsel provided ineffective assistance

25   at Kiles's aggravation phase, thereby prejudicing Kiles. The state-court decision is

26   

27   [119]Alternatively, Kiles alleges he can overcome any default by showing cause and
      prejudice attributable to the ineffective assistance of state post-conviction counsel.
28   *See Martinez*, 566 U.S. at 9; *Strickland*, 466 U.S. at 688, 694.

1    no bar to this Court's de novo review of this claim, and Kiles is entitled to relief.

2                              **Claim Six**

3         **Kiles was denied effective assistance of counsel at his mitigation**
        **phase when his counsel failed to investigate and present powerful**
4         **mitigating evidence, among other significant errors.**[120]

5         Counsel's failure to investigate and present powerful mitigating evidence,

6 and counsel's other significant errors, violated Kiles's rights under the Sixth,

7 Eighth, and Fourteenth Amendments to the U.S. Constitution. Kiles presented this

8 claim below in similar form. (ROA 1189 at 23–25, 48–61; PFR2 Dkt. 1 at 23–25,

9 48–61.) He incorporates by specific reference all facts, allegations, and arguments

10 made elsewhere in this Petition.

11        **A.**     **A capital defendant must receive an individualized sentencing**
              **after a full and fair consideration by the jury.**
12

13         "There is no more important hearing in law or equity than the penalty phase

14 of a capital trial." *Correll v. Ryan,* 539 F.3d 938, 946 (9th Cir. 2008) (quoting

15 *Gerlaugh v. Stewart*, 129 F.3d 1027, 1050 (9th Cir. 1997) (Reinhardt, J., concurring

16 and dissenting)). The Eighth and Fourteenth Amendments enshrine the guarantee

17 of individualized sentencing and due process in the capital context. *See, e.g.*,

18 *Lockett v. Ohio*, 438 U.S. 586, 602–05 (1978) (plurality opinion). Accordingly, a

19 capital sentencer must be afforded the opportunity to assess "the character and

20 record of the individual offender." *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982)

21 (quoting *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) (plurality opinion)).

22 As the Supreme Court has explained,

23            If the sentencer is to make an individualized assessment of
           the appropriateness of the death penalty, "evidence about
24            the defendant's background and character is relevant
           because of the belief, long held by this society, that
25            defendants who commit criminal acts that are attributable

26

27     [120] As noted earlier, Kiles uses "mitigation phase" to describe the phase at which
     the defense put on its case for leniency and "penalty phase" to describe his
28     aggravation and mitigation phases together.

1        to a disadvantaged background, or to emotional and mental

2        problems, may be less culpable than defendants who have
         no such excuse."

*Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002). The assistance of competent and qualified counsel is necessary to safeguard these fundamental principles. *E.g.*, *Strickland v. Washington*, 466 U.S. 668, 685 (1984) ("[C]ounsel's skill and knowledge is necessary to accord defendants the 'ample opportunity to meet the case of the prosecution to which they are entitled.'" (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 275 (1942))).

### B.    Kiles's personal history.

Kiles was born on May 21, 1961, to Imojean Long Kiles and Alvie Kiles, Sr., in Yuma, Arizona. (ROA 225 Ex. 1 at 1.)

Imojean's father, Thomas Mansfield Long, was one of 13 children. His parents, Nelson and Mariah Long, were born into slavery in Plain Dealing, Louisiana. (ROA 225 Ex. 40 at 1.) Subjected to pervasive racism and forced into sharecropping—slavery in all but name—after traditional slavery was outlawed, the family, including Thomas Mansfield Long, eventually fled Louisiana in the middle of the night in a covered wagon. (ROA 225 Ex. 40 at 1.) They went to Boley, Oklahoma, an all-black town founded on Native American land by African Americans fleeing racial brutality in the South. (ROA 225 Ex. 40 at 1); Oklahoma Historical Society, Boley, *The Encyclopedia of Oklahoma History and Culture*, www.okhistory.org/publications/enc/entry.php?entry=BO008.    There, Kiles's great-grandfather was permitted to own land and bought a farm. The entire family worked in the cotton fields and slept on pallets. (ROA 225 Ex. 40 at 1.)

Thomas Mansfield Long, Kiles's grandfather, married his grandmother Elancie when she was 13 and he was approximately 34. Long's first wife had died, and he needed a new wife in order to continue to live on the farm. (ROA 225 Ex.

1    40 at 2.) Thomas also treated Elancie's younger sister, Odessa, like a wife. (ROA

2    225 Ex. 40 at 2.) In the 1920s, the Long family moved to Yuma from Oklahoma.

3    (Tr. Feb 20, 1996 at 114.)

4        Thomas had 21 children, 14 with Elancie. (Tr. Feb. 20, 1996 at 7.) Imojean

5    was born in Yuma in 1933. (PFR2 Dkt. 23 Ex. 19 at 1.) Her father was cruel—an

6    alcoholic who whipped his wife after drinking. (Tr. Feb. 20, 1996 at 10–12.) He

7    physically abused his children, leaving them covered with welts from his

8    whippings. (ROA 225 Ex. 60 at 10.) Elancie, too, was distant and cruel—perhaps

9    from the trauma of being a child bride—and Imojean described both of her parents

10   as "evil." (Tr. Feb. 20, 1996 at 12.)

11       When Imojean was just 12 years old, her mother died. Elancie suffered an

12   excruciating and painful death; the doctor sent her home saying that nothing could

13   be done for her. (ROA 225 Ex. 60 at 10; ROA 225 Ex. 54 at 4.) Imojean and her

14   siblings witnessed their mother's agony as she writhed and screamed in pain on her

15   deathbed. (ROA 225 Ex. 60 at 10.)

16       The Long family endured abject poverty in Yuma. Imojean and her family

17   lived in small shack made of two-by-fours; the family had so little that when the

18   soles came off Imojean's shoes, Imojean had to tie them together with a piece of

19   wire and keep wearing them. (Tr. Feb. 20, 1996 at 8–9.) Her father picked cotton

20   and did construction work. (Tr. Feb. 20, 1996 at 8.) Imojean, too, picked cotton and

21   fruit; she also cooked and cleaned at home and took care of her younger siblings,

22   especially after her mother died. (Tr. Feb. 20, 1996 at 10.) When she went to school,

23   Imojean and other black students were forced to attend classes in the basement of

24   the school building—segregated from the non-black students—with three grade

25   levels taught in each room. (Tr. Feb. 20, 1996 at 9.) She eventually dropped out of

26   school to work, and only one of her siblings graduated high school. (Tr. Feb. 20,

27   1996 at 12.)

28       Alcoholism ran rampant in the Long family. (ROA 225 Ex. 54 at 5.)

199

Imojean's parents were both alcoholics, and practically all of the Long children abused alcohol. (ROA 225 Ex. 60 at 12; ROA 225 Ex. 54 at 5.) Four of her siblings died from alcoholism-related issues. (ROA 225 Ex. 54 at 5.) Similarly, mental illness afflicted many members of the Long family. Imojean's brother was believed to be mentally ill based on his impulsive, erratic, and generally odd behavior. Moreover, Imojean and at least two of her sisters suffered from depression.

Alvie, Sr.'s family also had ties to Oklahoma. His mother, Bertha Kiles, was born and raised there, and that is where she met Alvie, Sr.'s father, Wesley Kiles, who was originally from Louisiana. Bertha and Wesley eventually made their way to El Centro, California, where Alvie, Sr. was born. He was one of seven children. (ROA 225 Ex. 60 at 12.)

Wesley and Bertha were strict disciplinarians—they indiscriminately used switches, cords, and belts on their children. Wesley worked as a tractor driver and at times traveled to find work, while Bertha remained home with the children. The family contended with the overt racism in El Centro, including segregated schools and places where "no coloreds" were allowed.

When Alvie, Sr. was 19 years old, his father died suddenly. Unbeknownst to his children, Wesley had been ill. Wesley left home one day to visit his doctor and never returned. The police came to the home and delivered the news to the family that Wesley had died suddenly at the doctor's office. Alvie, Sr.'s brother can still remember their mother wailing over the news. Years later, Bertha died in the hospital of a brain hemorrhage. She had a history of chronic headaches and, later on in life, suffered from frequent nosebleeds.

As with the Long family, alcohol and drug addictions were pervasive in the Kiles family. Bertha was an alcoholic, and all of her sons, including Alvie, Sr., drank to excess and used drugs. (Tr. Feb. 20, 1996 at 27–29.) His sister drank so heavily that she was concerned about the effect it could have on her newborn baby.

Imojean met Alvie, Sr. when she was 16 years old. (PFR2 Dkt. 23 Ex. 19 at

200

3.) A few years later, after his marriage to another woman was annulled, Alvie, Sr. and Imojean married in 1952. (PFR2 Dkt. 23 Ex. 19 at 3.) She did not love him and married him only to escape her own violent and unpredictable father. (PFR2 Dkt. 23 Ex. 19 at 2–3.) Alvie, Sr. sent a letter from California to Imojean, proposing and stating that he needed to be married by the year's end. She agreed, and they married two months later.

Imojean and Alvie, Sr.'s relationship, marred by alcoholism and mental illness, was chaotic from the start. Alvie, Sr. drank often. (PFR2 Dkt. 23 Ex. 19 at 3.) The two fought constantly. (Tr. Feb. 20, 1996 at 15.) Alvie, Sr. began hitting Imojean whenever she said something he did not like; she quickly learned that he was mean and violent. (Tr. Feb. 20, 1996 at 16, 21.) After just four months of marriage, he beat her so hard she was left with scars on both of her legs. (Tr. Feb. 20, 1996 at 20–21.) She fled back to her abusive and alcoholic father's house in Yuma, as even the violence of that home was preferable to her life with Alvie, Sr. (Tr. Feb. 20, 1996 at 21.) Alvie, Sr. followed her, and she agreed to get back together with him on the condition that they move to Yuma, which they did. (Tr. Feb. 20, 1996 at 21.) This was the first go-around in an unending cycle of Imojean and Alvie, Sr. separating and reuniting, a pattern that recurred for the duration of their relationship. (Tr. Feb. 20, 1996 at 21–22.)

When they married, Imojean was unaware of Alvie, Sr.'s addiction to alcohol and its effects. He initially drank excessively only on the weekends, when he was not working. (Tr. Feb. 20, 1996 at 20.) But his drinking worsened over time. Alvie, Sr. drank heavily for decades, stopping only when forced to near the end of his life because of medical conditions. (PFR2 Dkt. 22 Ex. 3 at 3.) His alcoholism was presumably both an inheritance and a coping mechanism.

Likely unbeknownst to Imojean, Alvie, Sr. had also been struggling with serious mental-health issues. One month before he proposed to her, he was diagnosed with Schizoid Personality Disorder. (ROA 225 Ex. 66 at 4.) At the height

201

of the Korean War, when the military was desperate for servicemen, U.S. Navy medical officers deemed him unfit for service because of his mental illness and discharged him. (ROA 225 Ex. 66 at 5.) There were other indications that he was unwell, such as reports of his heavy alcohol intake and persistent headaches.

Alvie, Sr. never wanted to have children, while Imojean wanted a big family. (PFR2 Dkt. 23 Ex. 19 at 4.) She miscarried three times before giving birth to a stillborn child; it was the son she had desperately wanted. (PFR2 Dkt. 23 Ex. 19 at 4.) Alvie, Sr. disposed of the baby without getting Imojean's consent or giving her the chance to say goodbye. (PFR2 Dkt. 23 Ex. 19 at 4.) Their first surviving baby was Janell Kiles, born in 1956. (PFR2 Dkt. 23 Ex. 19 at 4.)

About three years after Janell was born, Imojean's own mental illness became unmanageable. Imojean had suffered with mental illness for years, which went untreated because of her impoverished upbringing and dysfunctional childhood. As an adult, her illness was exacerbated by the abuse and unhappiness of her marriage. (PFR2 Dkt. 23 Ex. 19 at 1–2, 4.) Eventually, Imojean crumbled into a state of complete emotional distress; she mentally decompensated so thoroughly that she had to be hospitalized. (PFR2 Dkt. 23 Ex. 19 at 4.) Her doctor insisted that she stay in bed, and Janell was sent to California to stay with Alvie, Sr.'s mother, whom Janell described as "mean." (PFR2 Dkt. 23 Ex. 19 at 4; PFR2 Dkt. 22 Ex. 3 at 4.) Imojean was prescribed anti-anxiety medication and antidepressants. (ROA 225 Ex. 60 at 28.) Following her mental-health crisis, Imojean and Alvie, Sr. continued to fight viciously; she coped by downing alcohol and taking prescription medication. (PFR2 Dkt. 23 Ex. 19 at 4; PFR2 Dkt. 22 Ex. 3 at 4; ROA 225 Ex. 60 at 14–15.)

While Imojean drank alcohol daily and ingested medication, a combination that took an irreparable physical toll, she and Alvie, Sr. conceived another child. (ROA 225 Ex. 60 at 14–15.) Because of her history of difficulty in carrying babies to term, she did not expect her baby to survive. Thus, she ignored signs of distress,

1  including her nonstop illness, and continued to drink throughout her pregnancy.

2  However, the child did survive. Kiles was born in 1961, five years after his sister

3  and only surviving sibling. (ROA 225 Ex. 1 at 1.)

4        Kiles began suffering from asthma as an infant. (ROA 225 Ex. 60 at 3.) He

5  was prescribed medication, potentially harmful stimulant drugs, as treatment both

6  as a child and as an adult. (ROA 225 Ex. 60 at 3, 31–32.) Kiles experienced life-

7  threatening breathing difficulties—traumatic to a young child—and was tossed in

8  the back of the family car and rushed to medical treatment. (PFR2 Dkt. 23 Ex. 19

9  at 5.) His parents were incapable of properly tending to Kiles's serious health

10  problems due to their own struggles with addiction and mental illness. At times,

11  instead of getting Kiles proper asthma treatment, his family told him to hold a

12  Chihuahua in his lap to "help" him breathe as he struggled for air.

13        Kiles was hit by a car shortly before he turned five and rushed to the doctor.

14  He had to stay in bed for weeks afterward. Following this, he suffered from regular

15  nosebleeds and severe headaches. (ROA 225 Ex. 60 at 4.) Also as a child, Kiles was

16  struck in the head with a baseball bat and lost consciousness. Kiles dealt with

17  chronic headaches into adulthood, and even in prison years later, he requested

18  ibuprofen nearly every day for his debilitating headaches. In addition, as a child

19  Kiles wet the bed; he endured bouts of sleep disturbance, nightmares, and

20  sleepwalking into his teenage years.

21        Alvie, Sr. and Imojean were seemingly good financial providers. They

22  worked a variety of jobs throughout Kiles's childhood. Kiles's father did

23  maintenance for U.S. Border Patrol and ran a cleaning business. (ROA 225 Ex. 60

24  at 17.) His mother did domestic work; she also worked at the local country club, a

25  marine base, and a cafeteria. (Tr. Feb. 20, 1996 at 14–15.) Though his parents

26  worked hard and tried to maintain a veneer of normalcy outside the home, their

27  struggles with alcohol addiction and mental illness shaped their parenting behind

28  closed doors. (ROA 225 Ex. 60 at 27.)

1    Within their home, Alvie, Sr. and Imojean were ill-equipped to provide a
2  safe, nurturing environment conducive to child-rearing. The home in which Kiles
3  and his sister grew up was an unstable, dangerous place. (ROA 225 Ex. 60 at 28–
4  29.) It was filled with vicious fights and violence. (ROA 225 Ex. 60 at 15.) Alvie,
5  Sr. continued to physically assault Imojean and did so in front of Kiles and Janell.
6  (PFR2 Dkt. 22 Ex. 3 at 1.) He "cold-cocked" her on multiple occasions. (ROA 225
7  Ex. 42 at 1.) The cruelty in their relationship was not one-sided. Imojean mistreated
8  Alvie, Sr. (ROA 225 Ex. 38 at 4.) They beat each other up, and threatened each
9  other with weapons, including hatchets and butcher knives. (PFR2 Dkt. 20 Ex. 2 at
10  1; Tr. May 9, 2006 at 57.) One time, Imojean drew a knife on Alvie, Sr. (Tr. Feb.
11  20, 1996 at 34.) In another incident after he got another woman pregnant, Imojean
12  hit him in the head with a telephone. The assault was so brutal that Janell felt ill at
13  the sight of her father's bloody head. (PFR2 Dkt. 22 Ex. 3 at 1.)

14    Imojean's alcoholism was one of the greatest sources of turbulence in the
15  family, contributing to the home's unpredictability and chaos. (ROA 225 Ex. 61 at
16  10.) Her drinking was a source of tension with her husband and emotional distress
17  for her children. (ROA 225 Ex. 61 at 10.) Alcohol fueled her temper, causing her
18  to lash out at those around her, including her son and daughter. Kiles hated that his
19  mother drank; he often had to deal with the aftermath, especially when she was in
20  public in a drunken stupor and he had to retrieve her from a bar and put her to bed.
21  (ROA 225 Ex. 61 at 10–11.) He missed many Mondays at school because he did
22  not want to have to deal with what people said about his mother's behavior over the
23  prior weekend. (Tr. May 16, 2006 at 26.)

24    Kiles and Janell were tormented by their parents' behavior toward each other,
25  and at times they threw themselves in between their parents. (ROA 225 Ex. 60 at
26  15.) The children were, quite literally, caught in the middle; they often had to pull
27  their parents off each other to get them to stop hurting one another. (PFR2 Dkt. 22
28  Ex. 3 at 1.) This incubation of terror had dire effects on Kiles and Janell. The

204

constant fighting terrified them. Kiles and Janell called the police on multiple occasions to get them to stop the fighting, out of fear of what their parents might do to each other. (PFR2 Dkt. 22 Ex. 3 at 1.) Despite the children's pleas, the police usually did not come. (PFR2 Dkt. 22 Ex. 3 at 1.)

When Kiles reached a certain age, he tried to protect his mother from his father by telling his father not to hit her anymore; Imojean was proud of her son, despite the fact that this thrust Kiles further into his parents' dysfunctional relationship. (PFR2 Dkt. 23 Ex. 19 at 6; ROA 225 Ex. 60 at 22.) Once, Alvie, Sr. was choking Imojean, and she had started turning blue; Kiles had to pull his father away before he could choke her to death. Kiles also had to protect his father from his mother at times. One time, Kiles had to stop Imojean from pouring hot grease on Alvie, Sr. while he slept. (Tr. May 9, 2006 at 57.)

Kiles's parents were not only violent to each other, they were violent to the children as well. Kiles and Janell were disciplined harshly. They were beaten if they did not finish all of the food on their plates, or if they got dirty playing outside. (PFR2 Dkt. 22 Ex. 3 at 2.) Their father derived a sinister pleasure from beating his kids. (PFR2 Dkt. 23 Ex. 19 at 6.) Alvie, Sr. left marks and scars on Kiles and Janell after whipping them with belts and cords. (ROA 225 Ex. 60 at 16.) Imojean also hit her kids and threw things at them. (ROA 225 Ex. 60 at 16.) After particularly severe whippings, Janell was covered with welts. (PFR2 Dkt. 22 Ex. 3 at 2.) And though Alvie, Sr. favored Janell over Kiles, that did not protect her from the brutal attacks. He whipped Janell so hard with a rope that he drew blood. (Tr. Feb. 20, 1996 at 18.)

Kiles's father also verbally and physically assaulted and belittled Kiles. (ROA 225 Ex. 60 at 16.) Alvie, Sr. never wanted a son, and he was jealous of the close relationship that Imojean and Kiles shared. (Tr. Feb. 20, 1996 at 19.) He rarely took any interest in Kiles, but when he did, it was violent. Alvie, Sr. once pulled a gun on his own son. (ROA 225 Ex. 60 at 16.)

Alvie, Sr. and Imojean also had ongoing, repeated extramarital affairs, which

205

they wielded as weapons against each other. (PFR2 Dkt. 22 Ex. 3 at 4.) Alvie, Sr. constantly, and accurately, accused Imojean of sleeping with other men. (ROA 225 Ex. 42 at 1.) However, he also serially cheated on her, including with members of her own family. (ROA 225 Ex. 54 at 5.) Alvie, Sr. had an affair with Imojean's sister Darnella, which Imojean discovered while pregnant with Kiles; Alvie, Sr. and Darnella even had a child together. Additionally, Alvie, Sr. twice impregnated his niece, the daughter of another one of Imojean's sisters.

In 1970, when Kiles was eight years old, Imojean filed for and was granted a divorce for reasons of cruel treatment causing great mental pain and anguish. (ROA 225 Ex. 17 at 4, 8.) After his parents' separation, Kiles lived with his mother, and his father had visitation rights. (Tr. Feb. 20, 1996 at 21.) Post-divorce, Imojean and Alvie, Sr. continued to fight. Alvie, Sr. did not want Imojean to have a life without him, so he stalked her, parking his car outside of her house to watch her. (2006 Trial Ex. 174 at 22.) One time, he saw her boyfriend's car parked outside and smashed all of the windows. (PFR2 Dkt. 22 Ex. 3 at 4.) Even so, Imojean and Alvie, Sr. remarried in 1976. Kiles was 15 years old, and his parents' reunion felt like an intrusion into the life that Kiles and his mother had created.

Imojean regularly threw wild parties at the family home that lasted late into the night. (PFR2 Dkt. 22 Ex. 3 at 4.) People drank, danced, and stripped their clothing off. (Tr. Apr. 26, 2006 at 93.) The next morning, with the adults passed out from drinking too much, Kiles (who was used to alcohol from when his grandfather babysat him) walked through the house, taking sips of alcohol from cups left out. Kiles and other children were left unsupervised at these parties, but they were privy to their parents' and other adults' behavior.

These parties were symptomatic of the family's complete lack of appropriate sexual boundaries. At the parties, Kiles's aunt Darnella regularly performed sexual dances, during which she moaned and simulated sex in view of the children. When Kiles was a teenager, Darnella threatened Imojean by telling Imojean that she was

going to sleep with Kiles, even though he was her nephew. Later, Darnella got into a fight with Kiles's sister Janell because Darnella tried to sleep with Janell's husband. Kiles's uncle and father figure Thom Long was known for sexually propositioning family members and for his fixation with watching his pet rabbits have sex; he constantly invited Kiles to watch. Kiles himself began having sexual experiences as young as age six or eight, likely because of his early exposure to adult sexual activity.

Throughout his childhood, Kiles was sometimes left to the care of others. These "caretakers" variously abused and neglected Kiles. At the age of four or five, his grandfather babysat him and regularly plied him with alcohol. (Tr. May 11, 2006 at 38.) Kiles spent time with his uncle Thom, who was famous in town for stripping naked and crowing like a rooster. Kiles was left unsupervised with Janell, who sought him out as a target after suffering through her own beatings. She regularly kicked him in the face, knocked him down, and otherwise assaulted him.

Kiles and his sister shared traumatic experiences growing up in the same dysfunctional home, and the damaging effects of their childhood manifested throughout their lives in ways both similar and different. Their troubles stemmed from a profound lack of parental instruction in appropriate socialization. (ROA 225 Ex. 60 at 27.) They were deprived of stable primary caregivers who modeled appropriate behavior. For example, Alvie, Sr. was a compulsive shoplifter, and he taught Janell to shoplift because it was a fun thing to do. (ROA 225 Ex. 54 at 5.) This behavior haunted Janell from the time she was a young girl through adulthood, as she racked up an extensive history of legal problems related to theft and other charges, which led to frequent arrests and incarceration. Even when Janell was young and her parents gave her things she wanted, she still compulsively stole.

Imojean described her daughter as being "trouble since the day she was born." Janell's life-long legal troubles were both caused by and complicated by a relentless battle with addiction. Burdened by a genetic predisposition to alcoholism

207

and shaped by a traumatic childhood, Janell began drinking when she was just a girl. Janell and Kiles were allowed to drink at home; their mother purchased wine coolers and beer for them. (PFR2 Dkt. 22 Ex. 3 at 5.) As a teenager, Janell was already drinking heavily; she was suspended from high school for drinking and fighting, and she did not graduate. (PFR2 Dkt. 22 Ex. 3 at 5.) Her teachers told Imojean that Janell needed counseling due to her behavior. But Alvie, Sr. and Imojean had their own problems to deal with, and they never got Janell help.

It was also during high school that Janell turned to drugs as a means of coping with her intolerable life. (PFR2 Dkt. 22 Ex. 3 at 5.) Janell introduced her younger brother Kiles to drugs—a decision she would later regret. (PFR2 Dkt. 22 Ex. 3 at 5.) Janell also ran away from home many times. (PFR2 Dkt. 22 Ex. 3 at 5.)

In an eerie repeat of Imojean's history decades earlier, a teenage Janell attempted to escape her miserable home life by running away with a man. She married him and moved to California. She conceived a child, but the marriage only lasted for a few months. (PFR2 Dkt. 22 Ex. 3 at 5–6.) Janell then returned home and, a few years later, married Larry Hawkins, a fellow addict who physically abused and mistreated her. (PFR2 Dkt. 22 Ex. 3 at 6.) During one assault, he knocked her front teeth out. Kiles, just a teenager at the time, tried his best to defend his sister from Hawkins's brutality. (PFR2 Dkt. 22 Ex. 3 at 6.)

Janell suffered from cocaine addiction and spent years in and out of prison as a result. (Tr. Feb. 20, 1996 at 22–23.) The disease of addiction took precedence over everything else for Janell, including her children. (PFR2 Dkt. 22 Ex. 3 at 7.) Janell eventually had three daughters, all of whom were raised by Imojean and other family members because Janell was unable to care for them herself. (Tr. Feb. 20, 1996 at 25.) At least one of her children was born cocaine-addicted and taken away by the state. (Tr. Feb. 20, 1996 at 26.) There were indications that Janell suffered from significant psychological problems starting in childhood, yet she received no meaningful treatment.

1    Kiles, too, failed to escape the long-lasting effects of family dysfunction.
2  Imojean developed an emotionally unhealthy bond—one that was hyper-dependent
3  and pathological—with her son. Everyone in the extended family and in their small
4  town knew that Kiles was close with his mother and that Janell was close with her
5  father. (PFR2 Dkt. 27 Ex. 23 at 9.) Imojean declared that her son was the only man
6  in her life (PFR2 Dkt. 23 Ex. 19 at 5), and that she loved him more than she loved
7  God. Alvie, Sr. was jealous of Imojean and Kiles's close relationship. (PFR2 Dkt.
8  23 Ex. 19 at 5.) Later, Imojean's boyfriend was so disturbed by their relationship
9  that the boyfriend accused Imojean of sleeping with her son. (PFR2 Dkt. 23 Ex. 19
10  at 7.)

11    Kiles also struggled in school, likely because of his brain damage and
12  resultant attention-deficit issues. He had no parents to advocate for him, and he
13  attended a small-town school system ill-equipped to provide for students whose
14  limitations were not immediately apparent. Eventually, Kiles was put into a
15  vocational program in high school. He worked at a store for much of the day, and
16  he received failing grades in the classes he did take.

17    Kiles learned early on, long before he could make reasoned decisions for
18  himself, that alcohol and substances were a means to self-medicate and deal with
19  unpleasant emotions and experiences. (ROA 225 Ex. 60 at 22–23.) The promise of
20  escape through alcohol and other mind-altering drugs was irresistible in a world
21  where he had been exposed daily to circumstances that threatened his existence and
22  over which he had no control. (ROA 225 Ex. 60 at 22–23.) The mental instability
23  that resulted from living in constant fear and desperation further exacerbated the
24  effects of both Kiles's inherited and acquired mental and physical impairments. The
25  combination allowed his addiction to flourish.

26    Kiles maintained a facade of functionality, even as his dependence on
27  substances increased. He graduated from high school, worked low-wage jobs, and
28  made a brief attempt to attend college. (ROA 225 Ex. 4.) But he struggled in the

1 absence of structure. Kiles realized he was going nowhere; there were no

2 opportunities, and he was falling prey to his addictions. Drugs were heavily

3 trafficked in Yuma and thus were readily available to feed his habit.

4      Growing up in Yuma provided its own threats to Kiles's development. Yuma

5 is famously an agricultural community and, for long periods, carried with it a

6 serious risk of environmental-toxin exposure. The pesticides used when Kiles was

7 a child in the 1960s and 1970s were toxic to a child's development, and many have

8 since been banned. Kiles picked fruit for local farmers as a youth, and he spent time

9 playing in fields with friends, picking fruit off trees and eating it. He fished out of

10 the Colorado River, which runs through Yuma, and ate the fish that he caught. The

11 Colorado River was also polluted from pesticides and likely provided Yuma's

12 drinking water.[121] Yuma is even home to a Superfund site: the Yuma Marine Corps

13 Air Station, where Kiles's mother worked. All of these toxic exposures affected

14 Kiles's environment and potentially his development.

15      Struggling to find a place for himself, Kiles saw the military as a viable

16 opportunity to make something of himself and get out of Yuma. He knew that if he

17 stayed in Yuma, he would be doomed to a life he knew he did not want for himself.

18 He wanted something better. He had relatives, including his father, who had served

19 in the armed forces; he saw other young men from the community who served and

20 returned with good, stable employment. He wanted that for himself.

21      Kiles joined the Air Force and moved out of Yuma to a base in Spokane, in

22 an effort to regain control of his life. His effort was not supported by everyone in

23 his family. Imojean could not handle her son's departure, and she suffered another

24

25 ───────────────

[121] Yuma experienced excessive pesticide use, and studies from the 1960s showed
26 that the Colorado River in Yuma was so polluted by agricultural pesticides that it
constituted a "serious hazard" to fish and users of its water, which was used for
27 domestic consumption. *See* EPA, *Review and Evaluation Report on Pesticide
Pollution of the Lower Colorado River* (May 1973), https://nepis.epa.gov/Exe/
28 ZyPDF.cgi/91022Q8X.PDF?Dockey=91022Q8X.PDF at 2, 4.

1   mental decline because of the separation from her son. (ROA 225 Ex. 60 at 17.)
2   After he left, she drank excessively, cried continuously, and slept in his bed. (ROA
3   225 Ex. 60 at 17.)

4       Kiles enlisted with the full intent and the earnest desire to stop using alcohol
5   and drugs and to embark on a military career. He envisioned a whole future for
6   himself, a full and stable life, including a plan to retire from the military and become
7   a firefighter. The structure of the military helped Kiles focus on his future, and for
8   a time he excelled in the Air Force. (*E.g.*, ROA 225 Ex. 56 at 1; ROA 225 Ex. 57
9   at 1.) He was selected to return to Yuma as a hometown recruiter for the Air Force,
10  and he marched in the annual rodeo parade.

11      But the grip of alcoholism—a progressive disease worsened by his genetic
12  predisposition to addiction and his brain damage—proved too strong. (ROA 225
13  Ex. 60 at 25.) Kiles's drinking greatly increased while he was in the Air Force.
14  (ROA 225 Ex. 58 at 1.) He began getting so drunk that he could not lift his head up.
15  His girlfriend at the time reported that he started to have blackouts where he was
16  unable to remember what he had done. (ROA 225 Ex. 58 at 1.) Because of his
17  addiction, Kiles endured an earlier-than-wanted departure from the service and
18  faced a humiliating return to Yuma.

19      Kiles's father, Alvie, Sr., had become ill while Kiles was a teenager, and for
20  years, Alvie, Sr. dealt with myriad health issues. (ROA 225 Ex. 60 at 17–18.) Once,
21  Kiles found his father sitting on a bed with a gun in his mouth, and Kiles had to
22  wrestle the gun away. While Kiles was away in the military, his father took a turn
23  for the worse, which greatly upset Kiles. (ROA 225 Ex. 57 at 2.) Shortly after Kiles
24  returned from the military, Alvie, Sr. died. Even though Kiles had been endlessly
25  beaten and berated by his father, the death devastated Kiles. (ROA 225 Ex. 60 at
26  28–29.) Kiles was aware that his father resented him, but he was still desperate for
27  his father's affection. Now, he would never have a chance to gain his approval.

28      Kiles's ejection from the Air Force in 1983 took a psychological toll on Kiles

211

and derailed his sole plan for success. Kiles was clinically depressed; he felt defeated, hopeless, and lost, and he coped the same way he had learned to cope during his childhood—by escaping with substance abuse. (PFR2 Dkt. 22 Ex. 3 at 5; ROA 225 Ex. 60 at 35–36.) Friends and family noticed an immediate difference in Kiles after his discharge; "he was empty inside." After he returned to Yuma, Kiles was heavily addicted to drugs and alcohol. (ROA 225 Ex. 44 at 1.) He mixed alcohol with drugs, including cocaine, PCP, and heroin. (ROA 225 Ex. 44 at 1.) He began associating with other addicts. In the ensuing years, Kiles's life devolved into a pattern of increased drinking and drug dependence linked to legal troubles, incarcerations, difficulty maintaining employment, and general instability.

In an attempt to escape his environment, Kiles fled Yuma again for Las Vegas in 1985. There, he was involved in an automobile collision and lost consciousness. Despite the head injury and continued substance use, he had a modicum of success—he was holding down two jobs and living with relatives. Then his mother, grieving the loss of her on-again-off-again husband, threatened to kill herself if Kiles did not return to Yuma. Kiles was so torn about the prospect of returning to Yuma that he cried while debating his options with his cousin.

Once forced to return to Yuma, Kiles's emotional instability worsened each day. Every time Kiles attempted to dig himself out, he failed. By this time, his addiction was dictating his behavior. Every impulsive reaction or decision—the ones that often led to an altercation or a legal problem—occurred while Kiles was high. He managed to stay clean when in the structure of a prison setting, but he struggled when in the community, particularly considering the superficial interventions and minimal treatment available in Yuma at the time. The parole officer to whom Kiles was assigned did not make Kiles submit to regular urinalysis testing, as required by his conditions of release. He also allowed Kiles to visit the

"Black Elks" Club, a well-known local watering hole, full of partying alcoholics.[122] Kiles made some progress: He attended some AA/NA meetings. He sought vocational rehabilitation services. He strived for sobriety and began to realize the detrimental effects of growing up in a family of people struggling with addiction. Still, he was unable to overcome his addictions without sufficient outside support.

In early 1989, Kiles encountered Kale Johnson at a local park. Johnson, who was also an addict, urged Kiles to shoot up cocaine. The following weeks were one extended drug and alcohol binge, during which Kiles was not eating or sleeping, and was both losing weight and losing touch with reality. Kiles was into drugs as deep as he had ever been. (ROA 225 Ex. 44 at 1.) He lost control of his behavior when he drank or used drugs. (ROA 225 Ex. 44 at 1.) He was high for weeks straight. (Tr. Dec. 6, 1989 at 16.) He started blacking out, losing track of days at a time, and developed a crippling fear that he was in danger. (ROA 225 Ex. 60 at 6.)

In a moment of desperation, Kiles asked his mother to get him into the hospital for help, but he was so impaired that he could not follow through. At her wit's end, Imojean tried to convince her son's parole officer to find Kiles in violation of his parole, so that Kiles would end up back in jail and could get some help for his debilitating addiction. The parole officer neither investigated further nor made available to Kiles the appropriate services. By that time, Kiles was incoherent, rambling, and paranoid—in the throes of a drug-induced psychosis, with no way out. (ROA 225 Ex. 38 at 2–3; ROA 225 Ex. 41 at 1.)

## C.   A defendant's right to a full mitigation investigation and presentation necessitates effective counsel at the mitigation phase.

As discussed above, a defendant's right to place before the sentencer all relevant evidence during the mitigation phase hinges on the right to effective

---

[122] In Yuma, there were two Elks Clubs, and they were segregated by race. They were referred to as the "Black Elks" and the "White Elks." Yuma was an extremely racially segregated place, and racism was pervasive.

counsel. Kiles's counsel had a duty to ensure that the jury heard the full scope of mitigating evidence, including Kiles's full social history. The consideration of the defendant's life history is a "constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson*, 428 U.S. at 304 (plurality opinion).

In *Strickland*, the Supreme Court outlined the standard for determining when counsel has provided ineffective assistance. *See, e.g.*, Claim 2, *supra*. Under *Strickland*, counsel is constitutionally ineffective if (1) "representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 687–88, 694. When evaluating prejudice, a court must consider "the totality of the evidence—*both that adduced at trial, and the evidence adduced in the habeas proceeding[s]*." *Wiggins v. Smith*, 539 U.S. 510, 536 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 397–398 (2000)).

The Supreme Court has since repeatedly applied the requirements of *Strickland* and the Sixth Amendment to the capital-sentencing context. It is clearly established federal law that counsel provides ineffective assistance where he or she "fail[s] to investigate and to present substantial mitigating evidence to the sentencing jury." *Williams*, 529 U.S. at 390. Absent an objectively reasonable basis for doing otherwise, "counsel must conduct sufficient investigation and engage in sufficient preparation to be able to 'present [ ] and explain[ ] the significance of all the available [mitigating] evidence.'" *Correll*, 539 F.3d at 942 (alterations in original) (quoting *Mayfield v. Woodford*, 270 F.3d 915, 927 (9th Cir. 2001) (en banc)); *see also, e.g.*, *Sears v. Upton*, 561 U.S. 945, 953 (2010) (holding that trial counsel's inadequate investigation, which led to a misleading portrayal of petitioner's upbringing, was deficient and prejudicial); *Wiggins*, 539 U.S. at 534–35 (counsel's decision to limit mitigation investigation was unreasonable and prejudicial). Of course, individualized sentencing demands that the jury be able to consider mitigating evidence, and so the Court has also made clear that counsel has

214

1  a constitutional duty to present to the jury the mitigation. *See Williams*, 529 U.S. at

2  396 (faulting counsel's failure to introduce mitigating evidence as an abrogation of

3  duty); *see also Bean v. Calderon*, 163 F.3d 1073, 1079 (9th Cir. 1998).

4       Further, as noted earlier, the Supreme Court has consistently relied upon

5  guidelines from professional groups to inform the inquiry into reasonable

6  professional conduct. *See, e.g.*, *Rompilla v. Beard*, 545 U.S. 374, 387 & n.7 (2005).

7  The 2003 ABA Guidelines outlined the key aspects of competent capital

8  representation applicable to Kiles's mitigation proceeding, which commenced in

9  mid-2006. At that time, Arizona Rule of Criminal Procedure 6.8 required counsel

10  to be familiar with the ABA Guidelines to be eligible for appointment. Ariz. R.

11  Crim. P. 6.8(b)(1)(iii) (2000). By the time of Kiles's penalty phase, there was no

12  question as to counsel's duty to thoroughly investigate, present, and explain the

13  significance of all relevant mitigation.

14  **D.   Lead counsel's derogation of his duties and the resulting team**
       **dysfunction led to a deficient mitigation investigation and**
15     **inadequate presentation.**

16       Kiles's legal team did not operate as a unit. Lead counsel Greg Clark

17  effectively abdicated responsibility for Kiles's case after the guilt-phase verdicts on

18  July 20, 2000, leaving second chair Treasure VanDreumel as the sole attorney for

19  Kiles's aggravation and mitigation phases.

20       "Lead counsel bears overall responsibility" for a capital case. 2003 ABA

21  Guideline 10.4(B). Moreover, "the provision of high quality legal representation in

22  capital cases requires a team approach that combines the different skills, experience,

23  and perspectives of several disciplines." *Id.* § 10.4(B) cmt. Kiles's capital

24  representation met neither of these standards. Lead counsel's failure to assemble

25  and manage a functional defense team fell below prevailing professional norms and

26  resulted in an unreasonable mitigation investigation. *See, e.g.*, *Correll*, 539 F.3d at

27  942; *Mayfield*, 270 F.3d at 927; *Williams*, 529 U.S. at 399.

28

215

1

## 1.   Lead counsel did not assist in the mitigation-phase investigation, leaving Kiles with one attorney, in violation of prevailing professional norms.

2

3   Because of the complex nature of capital cases, the 2003 ABA Guidelines

4   call for at least two attorneys in capital cases; even the 1989 ABA Guidelines

5   required two attorneys for a capital case. 2003 ABA Guideline 4.1(A)(1); 1989

6   ABA Guideline 2.1. However, Clark did little, if any, work for Kiles's mitigation-

7   phase investigation and trial. Clark's contract granted a set sum for taking Kiles's

8   case and an additional set sum if the case went to a guilt-phase trial. *See* Claim 1,

9   *supra*. Clark received no further funds for post-guilt-phase proceedings, which

10   stretched on for nearly six years. Clark did little on Kiles's case after the guilty

11   verdict, other than conducting the penalty-phase voir dire. He did not even prepare

12   for that voir dire, as evidenced by his lack of familiarity with Kiles's mitigation.

13   *See* Claim 4, *supra*. VanDreumel requested time after time that Clark contact one

14   expert, but he did not accomplish even that one task.

15   Kiles sought to remove Clark for his failure to assist in mitigation-phase

16   preparation. (ROA 615.) However, the court permitted Clark to stay on the case,

17   effectively leaving VanDreumel as Kiles's sole lawyer for the penalty phase.[123]

18

## 2.   Counsel failed to request a mitigation specialist or to begin a mitigation investigation upon appointment.

19

20   Counsel did not request a mitigation specialist or begin a mitigation

21   investigation until after the guilty verdict. Given prevailing professional norms, and

22   that a review of Kiles's first state post-conviction file would have revealed the vast

23   complexity of potential mitigation, it was unreasonable for counsel to fail to request

24   a mitigation specialist until after Kiles was found guilty.

25   "[L]egal experts agree that preparation for the sentencing phase of a capital

26

---

27   [123] VanDreumel wrote to the judge on September 10, 2003, requesting additional

28   funds, because she had exclusively handled the investigation and preparation of the mitigation phase. Her request was granted.

216

case should begin early and even inform preparation for a trial's guilt phase." *Allen v. Woodford*, 395 F.3d 979, 1001 (9th Cir. 2005). The 1989 ABA Guidelines, in effect at the time of Kiles's guilt phase, required that counsel's mitigation-phase investigation "begin immediately upon counsel's entry into the case and should be pursued expeditiously." 1989 ABA Guideline 11.4.1(A). Attorney Robert J. Roberson, who was appointed in March 1998 to represent Kiles at trial after Kiles obtained state post-conviction relief, asked the court to appoint a mitigation specialist and fact investigator in August 1998.[124] (ROA 372 at 1.) Roberson withdrew for unrelated conflict reasons, and when Clark was appointed, he did not argue the need for a mitigation specialist despite the pending motion. (*See* Tr. Aug. 21, 1998 at 40–43.) After the guilt phase, VanDreumel acknowledged that counsel should have hired a mitigation specialist and begun an investigation upon appointment.

Kiles was found guilty on July 20, 2000. (ROA 482 at 1–8.) It was not until October 4, 2000 that Kiles's counsel moved for the appointment of a mitigation specialist. (ROA 509 at 1.) Within days, the court appointed Jan Dowling, an experienced mitigation specialist. (ROA 510 at 1.)

### 3. Counsel's failure to be involved in the investigation and the subsequent resignation of the mitigation specialist resulted in a disjointed mitigation investigation.

After the court appointed Jan Dowling, VanDreumel failed to provide the resources Dowling requested and to supervise Dowling's investigation. Because of counsel's failure to be involved in the mitigation investigation, Dowling resigned, resulting in a disjointed mitigation investigation and an inexperienced mitigation

---

[124] Roberson argued in his motion that "[c]urrent law clearly provides that the mitigation phase of the sentencing portion of this case is extremely important. . . . It is suggested that waiting until after sentencing to appoint such a specialist would be impractical since the magnitude of the job would take a considerable amount of time. The only real practical way to proceed in this matter is to appoint a mitigation specialist now and allow that person to get to work seeking out records, people, and events which would have a bearing on sentencing." (ROA 372 at 1.)

1  specialist taking over Kiles's case.

2          a.    **Clark's abdication and VanDreumel's unreasonable**
3                **mitigation decisions led to a team breakdown.**

4          Dowling began her investigation immediately after her appointment to
5  Kiles's case, meeting with Kiles within days and his mother within weeks. The
6  team's lack of communication and direction were apparent from the start, as no one
7  notified Kiles that Dowling had been appointed or that she was visiting him.
8  Throughout late 2000, Dowling worked independently on the mitigation
9  investigation, without direction from counsel, while counsel focused on Kiles's
10 motion for a new trial. In December 2000, the court denied defense counsel's
11 motion for a new trial and set the penalty-phase hearing for April 2001. (ROA 518;
12 Tr. Dec. 29, 2000 at 29.)

13         Counsel's failure to maintain contact with Kiles critically hindered the
14 mitigation investigation. "Adequate consultation between attorney and client is an
15 essential element of competent representation." *United States v. Tucker*, 716 F.2d
16 576, 581 (9th Cir. 1983); (*see also* ROA 519). Even after the court denied the
17 motion for a new trial, the attorneys neither participated in the investigation nor
18 visited Kiles. During this time, Kiles had no contact with Clark and only one phone
19 call with VanDreumel. (ROA 519 at 5.) On January 30, 2001, Kiles filed a pro se
20 request for new counsel, citing counsel's lack of investigation and lack of
21 communication with him. (ROA 519); *see also supra*, Claim 1. The court scheduled
22 a status hearing for April 2001 to hear Kiles's motion.[125]

23         By April 2001, Dowling and VanDreumel's working relationship had
24 crumbled. As described in detail *supra*, Claim 1, VanDreumel sent Dowling's
25 confidential interview memos to Kiles, even though Dowling had warned her that

26 _____

27 [125] At one hearing, Kiles pled with the court to set a time for him to speak with his
   counsel, as he had been trying since July 2000 to reach them. The court had to
28 arrange an appointment for Kiles and Clark to speak by phone. (ROA 521 at 1.)

218

doing so would impede the investigation. (ROA 533 Ex. A at 2.) Then, when Dowling requested VanDreumel's input into the mitigation investigation, VanDreumel explained that she did not feel it was her role to participate in the mitigation investigation until after Dowling had interviewed people, gathered information, and written a final report. Only then would VanDreumel get involved, to decide who should testify. VanDreumel rejected Dowling's request for team meetings and other support. Instead, she expected Dowling to interview whomever Dowling could find and to know Arizona's statutory and non-statutory mitigators, even though Dowling was based outside Arizona. VanDreumel also described Dowling's visits to meet with Kiles and his family as "useless" trips.

Dowling wrote to the court to identify her concerns about Kiles's attorneys: They showed no interest in the case; they did not want to talk about potential themes and theories; they did not initiate meetings with witnesses; and they failed to address questions and issues arising during the investigation. Based on her extensive experience, she knew that standard practice required that counsel provide input on the mitigation investigation. (ROA 533 Ex. A at 2.)

On June 4, 2001, Dowling resigned from the case because of ethical concerns regarding Clark's and VanDreumel's failure to adequately investigate mitigation and to communicate. She noted that counsel had stated incorrectly at the April status hearing that they had "nothing to do at this stage" but wait for her report, that counsel's lack of participation fell well below the prevailing norms in her other capital cases, and that she had been abandoned by counsel. She affirmed that Kiles was cooperative and that his repeated complaints about his counsel were "justified and legitimate." Dowling also added that she had reviewed the files from the first state post-conviction proceedings, which counsel had not done. (ROA 533 Ex. A at 3–4.) Kiles then filed a motion echoing Dowling's concerns about his counsel's lack of involvement in the investigation.

On June 19, 2001, VanDreumel moved for the appointment of a new

219

mitigation specialist and used the filing as an opportunity to lambast Dowling and her work. (ROA 533 Ex. C at 1–2.) VanDreumel rejected Dowling's assertion that she should have reviewed the state post-conviction files, saying that she had reviewed sworn statements and pleadings provided by the Attorney General's office. (ROA 533 Ex. C at 3.) VanDreumel reiterated her belief that there was nothing for counsel to discuss with the mitigation specialist. VanDreumel also reported to the court that Dowling had been fired by another capital client, while failing to note that the client had fired the attorney on the case, too. (ROA 533 Ex. C at 5–6.)

In response, Dowling explained to the court counsel's failure to direct the mitigation investigation. (ROA 533 Ex. D at 1.) Dowling further noted her belief that VanDreumel's lies to the court about Dowling's investigation warranted sanction. (ROA 533 Ex. D at 1.) Dowling stated that she had sent counsel memos starting in October 2000, but months later, it was apparent that counsel had not read them. Further, she delineated VanDreumel's various lies, such as that Dowling was unavailable, that she had provided no records, and that VanDreumel had reviewed records obtained from sources other than Dowling. (ROA 533 Ex. D at 2–3.)

Of note, Dowling stated that VanDreumel had lied about possessing vital records from the first state post-conviction proceeding. In November 2000, VanDreumel had e-mailed Dowling to tell her she did not have mental-health records, school records, or police or presentence reports on Kiles's prior convictions; VanDreumel had only documents she and Clark had created for purposes of the guilt phase. (ROA 533 Ex. D at 3.) Dowling continued:

> It has been my experience that *competent* counsel in capital cases do meet and discuss testimony with witnesses long before the actual hearing. Competent counsel do not consider witness discussions to be "unnecessary.". . . I can think of no circumstances under which it is appropriate for counsel in a capital case to not discuss the case with their mitigation specialist.

220

(ROA 533 Ex. D at 3.) Dowling pointed out that VanDreumel had not identified any work she had done on the mitigation investigation, beyond organizing the file, in the eight months since the guilt-phase verdict. (ROA 533 Ex. D at 3.)

The court responded to Dowling in a letter on which all parties, including the prosecutor, were copied. The court noted that Kiles and his first state post-conviction counsel, Boyte, had "voiced similar concerns." However, the court wrote, "I strongly suspect that whatever sentence I end up imposing, there will be filed a petition for post conviction relief alleging ineffective assistance of trial counsel . . . [T]hat would be the appropriate time for me to take action, if any." (ROA 533 Ex. E at 1.) After Dowling resigned, she sent VanDreumel her files and the records she had gathered.

### b.   Counsel failed to direct the second mitigation specialist.

When Dowling resigned, Kiles's counsel specifically requested the appointment of seasoned capital-mitigation specialist Mary Durand. (ROA 533 Ex. B at 1.) VanDreumel, however, did not ensure that Durand was available before asking the court to appoint her. (ROA 530 at 1.) VanDreumel then misrepresented to Durand that the investigation was practically done. As a result, Durand agreed to the appointment, but she enlisted Tyrone Mayberry, who was quite new to capital mitigation, to work on Kiles's case in her stead. (Tr. Dec. 3, 2001 at 17.)

Kiles was thus left with only one attorney—who at one point leading up to Kiles's penalty phase had four other capital cases—and an inexperienced mitigation specialist.

After Dowling's withdrawal, the penalty phase was rescheduled for July 2002. (ROA 561 at 1.) Two weeks before the penalty phase was scheduled to begin, the U.S. Supreme Court struck down Arizona's capital-sentencing scheme as unconstitutional in *Ring v. Arizona*, 536 U.S. 584 (2002). Kiles's proceedings were delayed further, and VanDreumel turned her attention to motions related to the

221

1  sentencing scheme. (Tr. July 8, 2002 at 3–4; *see also, e.g.*, ROA 579; ROA 580.)

2  Lead counsel Clark abdicated responsibility for the mitigation investigation.
3  Second chair VanDreumel then failed to direct that investigation, even though the
4  mitigation specialist was inexperienced. Due to counsel's failure to direct the
5  investigation, the mitigation specialist relied largely on the investigation that had
6  been done over a decade prior. The result of the team's dysfunction was an
7  inadequate and unreasonable investigation during which, as discussed below, the
8  team missed critical red flags that warranted attention. And the result of that
9  insufficient investigation was an internally contradictory and confusing mitigation
10 presentation that gave the jury no reason to consider leniency for the killing of
11 Gunnel.

12 **E. Trial counsel were ineffective for failing to reasonably investigate,**
13 **develop, and present important mitigation evidence.**

14 Competent counsel must conduct a thorough mitigation investigation, and
15 the failure to do so constitutes deficient performance. The Sixth Amendment
16 imposes on a capital-defense attorney "a duty to investigate, develop, and present
17 mitigation evidence during penalty phase proceedings." *Summerlin v. Schriro*, 427
18 F.3d 623, 630 (9th Cir. 2005) (en banc).

19 "[A] decision not to present . . . particular mitigating evidence is
20 unreasonable unless counsel has explored the issue sufficiently to discover the facts
21 that might be relevant to his making an informed decision." *Lambright v. Schriro*,
22 490 F.3d 1103, 1116 (9th Cir. 2007) (citing *Wiggins*, 539 U.S. 510, 522–23 (2003)
23 and *Stankewitz v. Woodford*, 365 F.3d 706, 719 (9th Cir. 2004)). It "is imperative
24 that all relevant mitigating information be unearthed for consideration at the capital
25 sentencing phase." *Wharton v. Chappell*, 765 F.3d 953, 970 (9th Cir. 2014) (quoting
26 *Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1999)). "To that end, trial counsel
27 must inquire into a defendant's social background, family abuse, mental
28 impairment, physical health history, and substance abuse history; obtain and

222

examine mental and physical health records, school records, and criminal records; consult with appropriate medical experts; and pursue relevant leads." *Bemore v. Chappell*, 788 F.3d 1151, 1171 (9th Cir. 2015) (quoting *Wharton*, 765 F.3d at 970). "Where counsel is aware of potentially mitigating evidence, he or she must investigate that evidence, absent a reasonable strategic reason not to do so." *Id.* (quoting *Hendricks v. Calderon*, 70 F.3d 1032, 1039 (9th Cir. 1995)). Moreover, the mitigation that is presented must not just support a "superficially reasonable mitigation theory," *Sears v. Upton*, 561 U.S. 945, 953–54 (2010), nor may it be "haphazard." *Doe v. Ayers*, 782 F.3d 425, 435 (9th Cir. 2015). Pursuant to *Strickland*, *Williams*, and *Wiggins*, in addition to the prevailing professional norms in Arizona at the time, counsel had a duty to conduct a thorough investigation of Kiles's background and mitigation in preparation for sentencing.

### 1.    Counsel failed to properly investigate, develop, and present mitigation evidence pertaining to lay witnesses.

A thorough mitigation investigation, designed to develop a picture of the defendant's history, should include speaking to lay witnesses such as family members, past and present friends, and co-workers, among many others. *See, e.g.*, *Allen*, 395 F.3d at 1001; *Hamilton v. Ayers*, 583 F.3d 1100, 1114 (9th Cir. 2009). Both the 1989 and 2003 ABA Guidelines require a full investigation into a defendant's background, including consultation with lay witnesses. 2003 ABA Guideline 10.11(F)(1), (2); 1989 Guideline 11.8.3(F)(1). It is unreasonable for counsel to fail to interview favorable, willing, and accessible witnesses. *Cf. Cannedy v. Adams*, 706 F.3d 1148, 1161 (9th Cir. 2013).

Further, "when 'tantalizing indications in the record' suggest that certain mitigating evidence may be available, those leads must be pursued." *Lambright*, 490 F.3d at 1117 (quoting *Stankewitz v. Woodford*, 365 F.3d at 719–20). This is particularly true where defense counsel has possession of files that contain leads to mitigating evidence. *Stankewitz v. Wong*, 698 F.3d 1163, 1171 (9th Cir. 2012).

223

1   Critically, it is not sufficient to start an investigation and not continue to pursue

2   leads, or to rely exclusively on existing documents. *Douglas v. Woodford*, 316 F.3d

3   1079, 1088 (9th Cir. 2003) (finding ineffective assistance where counsel was on

4   notice of defendant's difficult childhood, yet there was no attempt to contact

5   witnesses who might have had more information about the defendant's past).

6   Kiles's mitigation specialist did interview some family members and friends, but

7   that alone was not sufficient for a reasonable investigation. *See Hamilton*, 583 F.3d

8   at 1114 (finding ineffective assistance where counsel conducted some lay-witness

9   interviews but failed to further investigate).

10
11                    a.      **Counsel failed to conduct an adequate investigation
                             into witnesses who could speak first-hand about
                             Kiles's background.**

12          The defense team failed to locate and investigate readily available mitigation

13   witnesses, including family members, people who had written affidavits in 1994 for

14   the first state post-conviction proceeding, and some people who had testified at the

15   1996 hearing. Counsel relied heavily on the mitigation investigation conducted in

16   1994 for Kiles's first state post-conviction proceedings, but counsel needed to re-

17   interview the witnesses who had provided statements. The prevailing professional

18   norms for a mitigation investigation had changed since 1994, with the updated ABA

19   Guidelines going into effect in 2003. *See* 2003 ABA Guidelines. Further, there were

20   ample leads from the 1994 investigation that could have been fruitful. The team

21   failed to locate and follow up with witnesses whom Dowling had identified as

22   needing follow up.

23          VanDreumel had minimal involvement with the lay-witnesses investigation

24   until just prior to the start of the mitigation phase. While she had seen, likely years

25   earlier, the first state post-conviction exhibits with information from lay witnesses,

26   she did not review them again until March 2006, on the eve of Kiles's penalty phase.

27   She then seemed pleasantly surprised by them, remarking to Mayberry that they

28   were great; still, the fact that she had not re-read the affidavits earlier indicates that

she did not take them into account when coordinating expert testimony.[126] Even after jury selection was complete and the aggravation phase had begun, VanDreumel had no sense of who many of the lay witnesses Mayberry wanted to present were.

As part of a reasonable mitigation investigation to follow up on "tantalizing leads," the defense team should have contacted at least some of the following witnesses:

Family members: It appears that in Kiles's family, Mayberry spoke only with Kiles's mother Imojean, his sister Janell Hawkins, his niece, and his cousin. Mayberry spoke with the niece and cousin once each, shortly before the penalty phase began.

However, Kiles's first state post-conviction proceedings and Dowling's preliminary investigation had ample evidence that Kiles's childhood and family history were essential to mitigation. Relatives could have provided information on Kiles's childhood and family history. Further, relatives could have provided more information on his mental health and brain damage, including the head trauma Kiles experienced when struck by a car at age five. Dowling had spoken with many of Kiles's relatives in May 2001, but no one followed up with them or with the other relatives listed in Dowling's memos. These conversations revealed important red flags for further investigation, including intergenerational substance addiction, mental illness, and other trauma, as well as anecdotes about Kiles's traumatic childhood and his resultant impairments at the time of the crime. Mayberry could have spoken with many other members of Kiles's large extended family, most of whom were still in close touch with Kiles's mother and living in Arizona or over the border in California. Many were willing to help, as they had cooperated with

---

[126] Though VanDreumel had told Kiles in 2001 that she would participate in follow-up interviews with witnesses that Dowling identified, her lack of knowledge of these witnesses on the eve of trial indicates that she did not.

225

the first state post-conviction investigation and with Dowling. (*See, e.g.*, ROA 225 Ex. 54 at 6; ROA 225 Ex. 38 at 3.) Indeed, in May 2002, Mayberry created a "Family History" document that listed numerous members of Kiles's extended family, noting their experiences with substance abuse, domestic violence, and mental illness. This incomplete document shows that Mayberry knew of many relatives and the topics on which they could speak, but still did not interview them.

For example, Mayberry should have spoken to Kiles's aunt Darnella Long. (ROA 225 Ex. 54; Tr. Feb. 20, 1996 at 110–30.) Her testimony at the first state post-conviction hearing and affidavit discussed the family history as slaves in Louisiana, intergenerational domestic violence, mental illness, child abuse, substance addiction, and racism in Yuma. (ROA 225 Ex. 54; Tr. Feb. 20, 1996 at 110–30.) She also spoke about Imojean's and Janell's mental illnesses and alcohol addictions.[127] (ROA 225 Ex. 54; Tr. Feb. 20, 1996 at 127–28.) Kiles's brother-in-law Larry Hawkins also signed an affidavit for the first state post-conviction proceeding with information on Kiles's parents' abusive relationship and the violence they inflicted on their children, Janell's mental illness, Imojean's alcoholism, and other relatives' substance addictions and mental illness. Hawkins attested to Kiles's substance addiction and mental illness, throughout Kiles's life and in the days surrounding the crime. (PFR2 Dkt. 20 Ex. 2 at 12–15.) VanDreumel also should have contacted Kiles's uncle Alan Long, who wrote an affidavit for Kiles's second post-conviction petition about the family history and racism in Yuma. (PFR2 Dkt. 28 Ex. 29 at 51–52.)

<u>Friends who wrote affidavits for the first state post-conviction proceedings</u>: Kiles's first state post-conviction attorneys gathered signed affidavits from 17 people who knew Kiles throughout his life. (ROA 225 Exs. 37–64; PFR2 Dkt. 23 Ex. 18 at 1–2.) Mayberry failed to contact most of these people. Mayberry should

---

[127] Though Darnella Long died before the penalty-phase hearing, she could have provided further information and investigative leads to Mayberry.

have, for example, interviewed Kiles's Air Force colleagues, who could have provided insight into the progression of Kiles's alcoholism and his efforts to overcome his addiction and mental illness while in the military. (*E.g.*, ROA 225 Ex. 57; ROA 225 Ex. 58; PFR2 Dkt. 28 Ex. 31; PFR2 Dkt. 28 Ex. 32.)

People who knew Kiles in the years, and particularly in the weeks, leading up to the crime could have furnished useful information about Kiles's addictions and his worsening mental decompensation at the time of the crime. For example, Kale Johnson signed two affidavits for the first state post-conviction proceeding and was cooperative with Kiles's prior counsel. (PFR2 Dkt. 20 Ex. 1.) His affidavit described Kiles as "on a binge" in the weeks leading to the crime and detailed Kiles's extensive drug use. (PFR2 Dkt. 20 Ex. 1 at 1–2.) Johnson said Kiles was "very high on drugs and alcohol" and "staggering" around at the time of the crimes. (PFR2 Dkt. 20 Ex. 1 at 2.) Additionally, Willie Shepherd and Virgil Schultz both saw Kiles around the day of the crime; they knew of his substance addiction and intoxication that day, as well as his resulting mental decompensation. (ROA 225 Ex. 46; Tr. Apr. 26, 2006 at 113; Tr. Apr. 27, 2006 at 62–63.)

Family and friends who assisted in the 1989 mitigation investigation: At Kiles's 1989 trial, people who knew Kiles as a child wrote letters about his character and his childhood. (2006 Tr. Ex. 152; Tr. Apr. 26, 2006 at 40–50.) It is likely that in the intervening years, some may have been willing to speak more openly and provide new leads.

Other witnesses named in Kiles's records: Counsel should also have contacted people listed in Kiles's criminal, medical, school, and other records. For example, it appears that counsel did not reach out to anyone referenced in Kiles's records relating to his time on probation and his attempts to obtain vocational rehabilitation and substance-abuse counseling, even in the months directly before the crime. These witnesses could have provided insight into Kiles's struggle to maintain sobriety and his worsening mental illness before the crime.

227

1

2

        **b.**    **Because counsel failed to adequately investigate, counsel could not present lay witnesses who could adequately describe Kiles's history.**

3

4

5

6

7

8

9

10

    To put on a competent mitigation presentation, counsel must "use lay witnesses as much as possible to provide the factual foundation for the expert's conclusions," as "[f]amily members and friends can provide vivid first-hand accounts of the poverty and abuse that characterize the lives of many capital defendants. These witnesses can also humanize the client. . . ." 2003 ABA Guideline 10.11 cmt. Here, counsel were deficient because, despite the availability of numerous lay witnesses who could have provided compelling testimony, counsel presented next to no first-hand lay-witness testimony.

11

12

13

14

15

16

17

18

19

    VanDreumel had only two lay witnesses testify about Kiles's life before the crime: Kathy Perrone, his sister's high school friend, and Yolanda Biebrich, his high school girlfriend. Neither knew Kiles well, and together they relayed a misleading image that cut against the core of VanDreumel's mitigation presentation.[128] Neither had had much interaction with Kiles in many years. (Tr. Apr. 24, 2006 at 34–35, 51); *see Libberton v. Ryan*, 583 F.3d 1147, 1168–69 (9th Cir. 2009) (finding ineffective assistance where counsel called only lay witnesses who did not know defendant well). And yet, VanDreumel had them set the stage for the rest of the defense's mitigation presentation.

20

21

22

23

    While Kathy Perrone testified about the whippings Kiles's sister Janell had endured as a youth and her struggles with shoplifting, fighting, and drug addiction, she had little to offer about Kiles himself as a child. (Tr. Apr. 24, 2006 at 35, 38, 40–43.) Her testimony was damaging to Kiles's case, as she chose to move in with

24

---

25

26

27

28

[128] Counsel presented two other lay witnesses: Harold Ulmer and James Prather Gill, two correctional officers who had overseen Kiles while he was incarcerated. They spoke about his exemplary behavior while in custody, which made him seem like a mentally healthy and well-adjusted person. (*See generally* Tr. Apr. 26, 2006 at 4–23.) While it was reasonable to present their testimony, counsel's decision to present it so early on, without the context of experts who could explain that Kiles did well in structured settings, was unreasonable.

the Kiles family in high school, undercutting much of the later testimony about the Kiles's dysfunctional and violent home. (Tr. Apr. 24, 2006 at 34.) On cross-examination, she testified that she never saw Kiles struck by his parents and that she never saw him use drugs. (Tr. Apr. 24, 2006 at 45–46.) She described him as generally a "happy" person who did well in school. (Tr. Apr. 24, 2006 at 37.)

Biebrich similarly minimized the dysfunction of the Kiles home and Kiles's mother's mental illness and addiction, offering only that Kiles's mother had a drinking problem and got "loud." (Tr. Apr. 24, 2006 at 52.) She painted a picture of Kiles as happy and highly functional, and she took pains to emphasize that he did not use drugs. (Tr. Apr. 24, 2006 at 53–54, 59.) She testified on cross-examination that Kiles had everything he could ever have wanted in terms of material goods and that she had never seen fights at the Kiles home or Kiles struck by either of his parents. (Tr. Apr. 24, 2006 at 61.)

Then, instead of presenting vivid first-hand accounts of Kiles's abusive childhood and his resulting addiction and impairment through Kiles's family and others who knew him, VanDreumel offered the testimony of the mitigation specialist. Mayberry offered second- and third-hand accounts that were misleading and confusing. Mayberry began by reading a set of character letters written for Kiles's 1990 sentencing, which conveyed that Kiles was a happy child who grew up in a nice family, but who had a personality change and turned to drinking and drugs. (Tr. Apr. 26, 2006 at 40–59.) He did so even though the story conveyed in those letters conflicted with many of the mitigation themes VanDreumel was attempting to present at the 2006 mitigation phase.

Mayberry also provided second- and third-hand testimony on numerous other topics. Instead of calling Kiles's friends and family members, VanDreumel had Mayberry—a member of the defense team—testify about people he had spoken with about Kiles's childhood, family, and drug use leading up to and at the time of the crime, some of whom had previously written affidavits. (E.g., Tr. Apr. 26, 2006

229

at 85–108; Tr. Apr. 27, 2006 at 59–62, 86–91, 94–109.) He testified about information from a nurse at the Yuma Jail who saw Kiles after he was first arrested, sharing second-hand that she said that at the time of his arrest, Kiles showed signs of psychological impairment. (Tr. Apr. 27, 2006 at 82–86.) Mayberry even testified about information provided by Kiles's mother and sister regarding such topics as Kiles's traumatic childhood and the family history of mental illness. (Tr. Apr. 27, 2006 at 111–23.) But as the information did not come directly from the nurse or Kiles's mother or sister, it lacked mitigating effect. *See Powell v. Collins*, 332 F.3d 376, 400 (6th Cir. 2003) (finding ineffective assistance where counsel presented mitigation testimony about a client's background through an expert discussing information contained in affidavits by friends and family members, instead of through first-hand accounts).

As a result, the jury heard an inaccurate account of Kiles's childhood, addictions, and mental illness from Biebrich and Perrone, who knew Kiles for a limited time but who appeared to be the only two of Kiles's family and friends willing to testify for him. "The inescapable message sent to the jury was that no one who really knew the young man [] found guilty of murder—not parents, not family members, not friends—would take the stand to explain why his life was still worth saving." *Cargle v. Mullin*, 317 F.3d 1196, 1211 (10th Cir. 2003).

Moreover, counsel did not adequately prepare these two witnesses in order to present Kiles's social history "to the jury in a sufficiently detailed and sympathetic manner." *Douglas*, 316 F.3d at 1087–89. Their testimony undermined many of the mitigating factors that centered on Kiles's traumatic childhood and his limitations in functioning. (Tr. May 22, 2006 at 19–21.) The State used Perrone's and Biebrich's testimony to cross-examine defense mental-health experts on their findings that were based on Kiles and others reporting that he was abused as a child. (*E.g.*, Tr. May 9, 2006 p.m. at 22–23.) Moreover, Biebrich's and Perrone's in-person testimony likely painted a more vivid picture than the second- and third-

hand accounts Mayberry provided. The ABA Guidelines note that in-person testimony is more likely to affect a jury's decision-making. *See* 2003 ABA Guideline 10.11 cmt. ("Community members [with] relevant personal knowledge or experience often speak to the jury with particular credibility.") Social science research indicates that defense experts are viewed with great skepticism and often regarded as "hired guns" unless their conclusions are supported by abundant, credible evidence from lay witnesses. *See, e.g.*, Scott E. Sundby, *The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert and Lay Testimony,* 83 Va. L. Rev. 1109 (1997) (finding that two-thirds of the witnesses who "backfired" according to jurors were defense experts).

In sum, then, the defense's first two witnesses—the only two people who knew Kiles before the crime and who testified in person on his behalf—directly contradicted and undermined the credibility of much of the rest of the mitigation presentation, especially the expert mental-health testimony emphasizing Kiles's addiction, mental illness, and abusive childhood.

VanDreumel's decision to present the lay-witness testimony through Perrone, Biebrich, and Mayberry was not a reasoned decision but the product of a grossly inadequate investigation. Counsel's failure to be involved in the investigation and preparation of lay witnesses, or to even learn what they would testify about until just before trial, was deficient, and that failure led to a disjointed and misleading mitigation presentation. Counsel's duty to investigate and present a case to spare a client's life is not "discharged merely by . . . providing the sentencing court with a cursory or 'abbreviated' presentation of potentially mitigating factors." *Lambright,* 490 F.3d at 1120 (quoting *Stankewitz v. Woodford*, 365 F.3d at 716). Counsel's decision to have Mayberry testify about information from lay witnesses indicates that VanDreumel felt the information was relevant mitigation. But VanDreumel also had a duty to present these witnesses to the jury—to investigate and then reach out to them to explain to them the importance of

mitigation in an effort to get them to testify. *See Allen*, 395 F.3d at 1002 (finding deficient performance where at habeas evidentiary hearing, "many family members, friends, and former associates [] affirmed that they would have testified as mitigation witnesses if [] counsel had asked them or if he had explained the importance of their testimony," which "then-prevailing professional norms required"). Counsel's failure to do so—counsel's deficient performance—was the result of an inadequate investigation. *See, e.g.*, *Wiggins*, 539 U.S. at 521–22.

The deficient performance with regard to the lay-witness presentation prejudiced Kiles. This testimony gave jurors the false impression that Kiles was a well-adjusted man who had a fine childhood, calling into doubt the credibility of the experts who followed. *See Mayfield*, 270 F.3d at 932. VanDreumel should have called such witnesses as Janell Hawkins, Kiles's uncle Alan Long, and any number of Kiles's friends and associates from the Air Force. These witnesses could have provided powerful testimony to the jury and helped to "humanize" Kiles. *See White v. Ryan*, 895 F.3d 641, 671 (9th Cir. 2018). They could have spoken first-hand to Kiles's addiction at the time of the crime, his mental illness, the abuse he endured as a child, and his family's multigenerational history of addiction and mental illness, corroborating and adding color to the expert testimony that was to come.

Instead, VanDreumel had Mayberry read old testimony and affidavits into the record, resulting in a cursory presentation of Kiles's social history that was "not particularly useful or compelling."[129] *Douglas*, 316 F.3d at 1090 (finding ineffective assistance where counsel "introduced some of [the defendant's] social history" but did so in a "cursory manner that was not compelling"); *see also Powell*, 332 F.3d at 400 (finding prejudice where counsel presented background evidence through an expert, because "if counsel had actually conducted an investigation and

---

[129] Counsel knew that the jury wanted to hear live testimony; at the aggravation phase only days before, the jury had asked why so much testimony was being read into the record instead of being presented in-person. (*See* ROA 870 at 1.)

1   produced pertinent witnesses, jurors would have heard first-hand accounts from
2   those who knew Petitioner best"). "[C]ounsel's gross mishandling of the penalty-
3   phase defense left [her] client's fate to jurors who could only wonder why . . . [no]
4   member of his family would step up to explain, in personal human terms, why his
5   life should be spared notwithstanding the reprehensible conduct of which he had
6   been found guilty." *See Cargle*, 317 F.3d at 1211.

7      That the jury did not hear evidence of Kiles's background and addiction in a
8   reasonable manner "undermine[s] confidence in the outcome." *See Douglas*, 316
9   F.3d at 1091 (quoting *Strickland*, 466 U.S. at 694). Had the jury heard any of this
10   evidence, there is a reasonable probability that at least one juror would have voted
11   for life for the killing of Gunnel. *See Bemore*, 788 F.3d at 1176.

12          **2.    Counsel failed to retain the necessary experts to properly
                    investigate and explain several avenues of mitigation.**
13

14      Kiles's counsel were ineffective in failing to hire the necessary and
15   appropriate experts who could evaluate Kiles and explain his personal history and
16   impairments to the jury. Hiring appropriate experts is a central duty of capital
17   counsel. "It is not enough just to present 'extensive mitigating evidence' where
18   particularly persuasive evidence—especially evidence in the form of expert
19   testimony—was omitted." *Bemore*, 788 F.3d at 1172; *see also* 2003 ABA Guideline
20   10.11(F)(2), 10.11 cmt.

21      Counsel should have consulted with experts on trauma, brain damage, and
22   neurotoxin exposure. In failing to pursue obvious lines of investigation,
23   VanDreumel's actions fell below prevailing professional norms. Counsel need not
24   "investigate every conceivable line of mitigating evidence no matter how unlikely
25   the effort would be to assist the defendant at sentencing," but a "decision not to
26   investigate [] 'must be directly assessed for reasonableness in all the
27   circumstances.'" *Wiggins*, 539 U.S. at 533 (quoting *Strickland* 466 U.S. at 691).
28   Where "'tantalizing indications in the record' suggest that certain mitigating

1    evidence may be available, those leads must be pursued." *Lambright*, 490 F.3d at
2    1117 (quoting *Stankewitz v. Woodford*, 365 F.3d at 719–20). Here, VanDreumel
3    missed just such "tantalizing indications in the record" of necessary follow-up
4    investigation, and the decision not to pursue these paths of mitigation was not based
5    on adequate investigation or sound strategic judgment.

6         Counsel should have consulted with the following experts:

7         Trauma expert: The mitigation investigation uncovered extensive evidence
8    of Kiles's childhood trauma, as detailed above, and various experts and the
9    mitigation specialist presented this to the jury in scattershot form. But counsel failed
10   to consult a trauma expert who could have put Kiles's crimes and substance
11   addiction into context by explaining how chronic abuse of varied kinds during his
12   formative years caused Kiles's mental illness. Further, a trauma expert could have
13   properly explored evidence of sexual abuse, of which there were many indications.
14   Kiles suffered from nightmares, sleepwalking, and enuresis as a child—all red flags
15   for potential sexual abuse. (1990 Trial Def. Ex. 4 at 7.) Kiles's grandfather regularly
16   babysat Kiles and plied him with alcohol when he was as young as four or five. (Tr.
17   May 11, 2006 at 38.) Moreover, Kiles's childhood was marked by his family's
18   complete lack of sexual boundaries. His mother regularly threw wild family parties,
19   where his mother and her sisters would take off their clothes. (Tr. Apr. 26, 2006 at
20   93.) VanDreumel knew as much, as prior mitigation specialist Jan Dowling
21   discussed these parties in memos she gave VanDreumel. At these parties, Kiles's
22   aunt, Darnella Long, would regularly perform sexual dances in view of the children.
23   Dowling's memos also noted that Kiles's father had a child with Darnella (Kiles's
24   mother's sister) and that Kiles's uncle was known for sexually propositioning
25   relatives and frequently invited a young Kiles to watch pet rabbits have sex. The
26   family history compiled by Mayberry noted that Darnella told her sister, Kiles's
27   mother, that she was going to sleep with Kiles, her nephew. In a 1994 affidavit,
28   Kiles's mother even stated that her boyfriend had accused her of sleeping with her

1   son. (PFR2 Dkt. 23 Ex. 19 at 7.) That Kiles began having sexual relations at a young

2   age was just one more indicator of possible sexual abuse.

3        Despite these "tantalizing indications," VanDreumel failed to hire an expert

4   who could have used her specialized skills to investigate and then present to the

5   jury that Kiles was exposed at an early age to sexual violence, was subjected to the

6   complete obliteration of normal adult-child sexual boundaries, and perhaps suffered

7   other forms of sexual abuse. *See Stankewitz v. Woodford*, 365 F.3d at 719. The ABA

8   Guidelines note the need to hire a mental-health expert to examine sexual abuse, as

9   having suffered such trauma is "common among persons convicted of violent

10  offenses on death row." 2003 ABA Guideline 4.1 cmt.; *see also* 1989 ABA

11  Guideline 11.8.6(B)(5) (obligating counsel to consider presenting evidence of

12  sexual abuse). The 2003 ABA Guidelines further recognize that it can be difficult

13  to elicit such information. 2003 ABA Guideline 4.1 cmt. The Supreme Court has

14  specifically pointed to sexual abuse as the type of "powerful" evidence that counsel

15  is ineffective for failing to present. *Wiggins*, 539 U.S. at 534–35.

16       Because VanDreumel failed to retain someone with the appropriate expertise

17  about trauma, she was unable to appropriately present the full extent of Kiles's

18  trauma. Instead, witnesses sporadically alluded to the possibility of childhood

19  sexual abuse, without context or meaning. Because VanDreumel had not adequately

20  investigated, she actively undercut this mitigating evidence. When she asked

21  psychiatrist Albert Globus, M.D., about Kiles's experience living with his mother,

22  Imojean, and her abusive boyfriend shortly before the crime, VanDreumel noted

23  that Imojean had written she had been accused of sleeping with her son. (Tr. Apr.

24  24, 2006 at 111.) VanDreumel then said she wanted to "clean up" that there was no

25  sexual element to Kiles's relationship with his mother. (Tr. Apr. 25, 2006 at 39.)

26  VanDreumel failed to appreciate that such abuse, if it had occurred, would have

27  been compelling mitigation. *See Wharton v. Chappell*, 765 F.3d 953, 978 (9th Cir.

28  2014) (finding failure to present sexual abuse by parent prejudicial because it was

235

1     compelling in part due to its "personal" nature).

2         An expert is important to contextualize and explain the effects of trauma.
3 Such an expert could have shed light on just how out of control and unsafe life was
4 for Kiles growing up. *See, e.g., Caro v. Woodford*, 280 F.3d 1247, 1255 (9th Cir.
5 2002) ("'[T]he introduction of expert testimony would also have been important'
6 to explain the effects that 'serious physical and psychological abuse and neglect as
7 a child' had on the defendant" (quoting *Ainsworth v. Woodford,* 268 F.3d 868, 876
8 (9th Cir. 2001)). As a child, Kiles had mentally ill parents who were constantly
9 violent to each other and to their children. Their children were caught in the middle.
10 Kiles often had to stop his parents from hurting each other—which resulted in
11 physical and psychological abuse directed at him. Kiles's mother regularly drank
12 to the point where, even as a child, Kiles had to pick her up and carry her home.
13 (Tr. Apr. 27, 2006 at 59.) He missed school after this happened because he was so
14 embarrassed. An expert would have been able to illuminate the degree to which
15 Kiles's family dynamic shaped Kiles throughout his life, and VanDreumel's
16 decision not to consult one was unreasonable.

17         <u>Neuroimaging specialist</u>: Trial counsel failed to consult with an expert who
18 could have conducted and evaluated appropriate brain imaging to investigate signs
19 that Kiles had organic brain damage. (ROA 1189 at 48–52, 60–61.) Second state
20 post-conviction counsel hired neuroimaging specialist Joseph Wu, M.D., to
21 perform an MRI of Kiles's brain, which revealed abnormalities consistent with
22 brain damage. (ROA 1189 at 50; PFR2 Dkt. 28 Ex. 25 at 4–20.) These images
23 revealed observable white-matter hyperintensities in the frontal lobe of Kiles's
24 brain and a reduced-size corpus callosum. Both are consistent with traumatic brain
25 injury. This type of injury as a child is related to attention-deficit (i.e., impulsivity)
26 disorders. Dr. Wu concluded that Kiles had brain damage. (ROA 1189 at 50.)

27         The use of brain scans, in particular MRIs, to investigate and present brain
28 damage was widespread before the 2006 penalty phase. Brain injury is considered

1  "classic mitigation evidence," and "Arizona courts place significant weight on brain
2  injuries as mitigating evidence." *Correll*, 539 F.3d at 950 & n.3. The 2003 ABA
3  Guidelines emphasize the need to investigate brain impairment, noting that brain
4  scans may be necessary. 2003 ABA Guideline 4.1 cmt. Further, the Ninth Circuit
5  has made clear that, "where counsel is on notice that his client may be mentally
6  impaired, counsel's failure to investigate his client's mental condition as a
7  mitigating factor in a penalty phase hearing, without a supporting strategic reason,
8  constitutes deficient performance." *Hendricks v. Calderon*, 70 F.3d 1032, 1043 (9th
9  Cir. 1995); *see Smith v. Mullin*, 379 F.3d 919, 943 (10th Cir. 2004) (recognizing
10  that jury knew of defendant's impulsivity and lack of emotional control, but counsel
11  was ineffective for failing to explain how organic brain damage "caused this 'kind
12  hearted' person to commit such a shocking crime").

13  VanDreumel knew that Kiles had risk factors for and signs of brain damage.
14  For example, medical and legal records available to VanDreumel showed that Kiles
15  was hit by a car around age five, after which he suffered from regular nosebleeds
16  and severe headaches.[130] Further, Dr. Globus testified at the 1996 hearing that Kiles
17  was addicted to substances as a consequence of "organic disorders in the brain."
18  (Tr. Feb. 21, 1996 at 177.) Dr. Globus described Kiles's impulsivity and specifically
19  noted that impulsivity is often concomitant to brain damage. (Tr. Feb. 21, 1996 at
20  198.) Moreover, when requesting funding in 2000, VanDreumel wrote, "When the
21  matter was overturned on PCR, the PCR had several affidavits indicating an
22  impulsivity disorder which is likely related to brain damage, so we are pursuing
23  that." (ROA 509 Ex. A at 1.)

24  VanDreumel knew as early as July 2001 that imaging was necessary to
25  determine the extent of Kiles's brain damage. Still, counsel failed to hire an expert
26  who could produce and evaluate brain scans to investigate Kiles's brain damage.

27
28  ───────────────
[130] Regular nosebleeds in the wake of a head trauma can indicate a fractured skull.

237

1   This failure was particularly unreasonable given that a central mitigation theme was

2   Kiles's impulsivity, a form of brain dysfunction often attributable to brain damage.

3   (*See* Tr. May 22, 2006 at 19 (jury instructions listing "possible neurological

4   damage" as a mitigating factor for the jury to consider).) Had VanDreumel retained

5   an expert to investigate Kiles's brain damage using the proper imaging, there would

6   have been no question that Kiles has neurological damage. (ROA 1189 at 50.)

7       A qualified expert would have obtained the necessary images and would have

8   been able to show the jury Kiles's brain damage. Instead, the jury heard

9   disorganized and easily dismissed testimony about Kiles's "possible" brain

10  damage. (*E.g.*, Tr. Apr. 24, 2006 at 86; Tr. May 8, 2006 at 20; Tr. May 10, 2006 at

11  106.) For example, the State elicited from Dr. Globus that there was no evidence of

12  organic brain damage—based on the lack of testing.[131] (Tr. May 8, 2006 at 37.)

13      Critically, irrefutable evidence of brain damage would have undercut a key

14  aspect of the State's rebuttal evidence. Evidence of brain damage would have

15  undermined the State's experts' testimony that Kiles had anti-social personality

16  disorder ("ASPD"), as such a diagnosis requires ruling out that the underlying

17  behavior is not a consequence of head trauma. *See Mann v. Ryan*, 828 F.3d 1143,

18  1172 (9th Cir. 2016) (en banc) (Thomas, C.J., dissenting); Am. Psychiatric Ass'n,

19  *Diagnostic and Statistical Manual of Mental Disorders* 630 (4th ed. Text Revision

20  2000) ("DSM-IV-TR").

21      The failure to hire a brain-imaging specialist had further consequences that

22  reverberated throughout Kiles's trial. For example, because of the lack of brain

23  imaging, VanDreumel ultimately decided not to present testimony from her

24  _____

25  [131] On redirect, Dr. Globus testified incorrectly (without being qualified to do so)
    that a scan would not have helped determine brain damage, based on the type of

26  damage he believed Kiles had and because Kiles had been off drugs and in prison
    for so long. (Tr. May 8, 2006 at 26.) Dr. Globus though, was not a brain-damage

27  expert; he testified that he did not find Kiles's severe lifelong headaches to be
    significant, showing his lack of expertise in brain damage. VanDreumel seemed

28  surprised when he answered this way. (Tr. Apr. 24, 2006 at 94.)

238

1   substance-abuse expert. This was because VanDreumel was concerned that the

2   expert would be cross-examined on the lack of brain-imaging evidence. But, as

3   Kiles's addictions were central in so many ways to his story—both as the result of

4   his trauma and as a direct cause of the crime—the absence of testimony by a

5   substance-abuse expert left a gaping hole in the defense's presentation.

6       "An uninformed strategy is not a reasoned strategy. . . . [I]n the absence of

7   diligent investigation, counsel cannot make a reasoned tactical decision regarding

8   whether or not to present mitigating evidence." *Correll*, 539 F.3d at 949. Here,

9   counsel's failure to get brain imaging was not strategic. VanDreumel did not have

10  the expertise to make this determination, and it was unreasonable insofar as it was

11  based on a lack of a proper investigation into Kiles's social history.[132] Further,

12  counsel must engage experts to evaluate specific mental conditions: "[c]ounsel's

13  own observations of the client's mental status . . . can hardly be expected to be

14  sufficient to detect the array of conditions . . . that could be of critical importance."

15  2003 ABA Guideline 4.1 cmt.

16      Counsel's decision to abandon the investigation at a critical juncture, with

17  red flags of brain damage abounding, was deficient performance, and the lack of

18  brain-damage evidence at Kiles's mitigation phase prejudiced him.

19      <u>Expert in environmental toxins</u>: Kiles was born and raised in Yuma, Arizona,

20  and he lived there at the time of the crimes. Kiles's family had lived in Yuma for

21  generations. Yuma is famously an agricultural community, which carried a serious

22  risk of environmental-toxin exposure.[133] Yuma is also home to a Superfund site: the

---

24  [132] To the extent that VanDreumel's decision was based on the report of
25  neuropsychologist Scott Sindelar, Ph.D., the decision cannot be considered
    strategic or defensible. As discussed below, Dr. Sindelar was inadequately prepared
26  for his examination of Kiles, and his report was unreliable and demonstrably
    inaccurate.

27  [133] By 2000, there was widespread knowledge about the long-term dangers—
28  including brain damage—of agricultural toxins, including pesticides used when
    Kiles was a child in the 1960s and 1970s. *See, e.g.*, Natural Resources Defense

239

1    Yuma Marine Corps Air Station, where Kiles's mother worked.[134]

2         In 2002, the Ninth Circuit found ineffective assistance where counsel

3    consulted four experts, but failed to hire a neurologist or toxicologist to investigate

4    exposure to pesticides and the effects on the client's brain. *Caro v. Woodford*, 280

5    F.3d at 1255. Still, Kiles's counsel did not consult with an expert about this matter.

6    Kiles's counsel was further on notice because Dowling noted in a 2000 memo to

7    counsel that Kiles had picked fruit for local farmers. Counsel knew that Kiles

8    possibly had brain damage and that he had other symptoms associated with

9    pesticide exposure, such as headaches and asthma. (ROA 1189 at 50–51.) Even so,

10   counsel failed to retain the necessary expert to assess Kiles's exposure to toxins and

11   the potential effects thereof. It was unreasonable to forgo this line of inquiry without

12   justification. *See Porter*, 558 U.S. at 40.

13        Counsel were ineffective in failing to consult with experts in these fields.

14   "[I]t is not enough that some of the defense witnesses informed the jury of the facts

15   that might *underlie* a mental health mitigation defense; expert testimony to explain

16   Council, *Trouble on the Farm: Growing Up with Pesticides in an Agricultural*
17   *Community* (Oct. 1998) (discussing Yuma among agricultural communities where
     children are exposed to toxins); *see also* Matthew L. Wald, *Citing Children, EPA*
18   *is Limiting Use of a Pesticide*, N.Y. Times, Aug. 2, 1999 (describing a ban on
     widely used agricultural pesticides); EPA, *Review and Evaluation Report on*
19   *Pesticide Pollution of the Lower Colorado River* (May 1973), https://
20   nepis.epa.gov/Exe/ZyPDF.cgi/91022Q8X.PDF?Dockey=91022Q8X.PDF at 2, 4
     (discussing extensive pesticide use in Yuma and how 1960s studies showed that the
21   Colorado River in Yuma was so polluted by agricultural pesticides that it
     constituted a "serious hazard" to fish and users of its water, which was for
22   consumption); Patricia Sánchez Lizardi et al., *The Effects of Organophosphate*
23   *Pesticide Exposure on Hispanic Children's Cognitive and Behavioral*
     *Functioning*, 33 *Journal of Pediatric Psychology*, Jan. 1 2008, at 91–
24   101, https://doi.org/10.1093/jpepsy/jsm047 (describing articles from the 1980s
     through early 2000s on the harmful effects of pesticides).

25   [134] Superfund sites are designated by the Environmental Protection Agency as
26   containing chemical contaminants that pose an "unacceptable risk to human health
     or the environment." The Yuma site contains groundwater polluted by four different
27   contaminants of concern. It was placed on the National Priorities List in 1990. EPA,
     *Yuma     Marine     Corps     Air     Station*:     *Background*,
28   https://cumulis.epa.gov/supercpad/cursites/csitinfo.cfm?id=0900885.

the ramifications of those experiences on [petitioner's] behavior . . . is necessary." *Bemore*, 788 F.3d at 1172 (internal quotation marks omitted). Absent a sound strategic reason for not doing so, counsel were required to conduct sufficient investigation and preparation to be able to present and explain the significance of all the available mitigating evidence. Counsel could not fulfil this duty without consulting the above experts, and as a result, the evidence that the jury saw was incomplete and misleading. *Lambright,* 490 F.3d at 1120. Because counsel's decisions to truncate the investigation meant that counsel failed to present a variety of critical and compelling mitigation, counsel's errors "undermine confidence in the outcome" of Kiles's mitigation-phase hearing. *See Douglas*, 316 F.3d at 1091.

### 3. Counsel performed deficiently in failing to provide the experts she did retain with complete and accurate information.

Beyond retaining experts, counsel have "an affirmative duty to provide mental-health experts with information needed to develop an accurate profile of the defendant's mental health." *Caro v. Woodford*, 280 F.3d at 1254. The "duty to provide the appropriate experts with pertinent information about the defendant is key to developing an effective penalty phase presentation." *Id.* at 1255 (citing *Bean*, 163 F.3d at 1079–80); *see also, e.g.*, *Lambright*, 490 F.3d at 1117 (counsel has an affirmative duty to provide experts with social-history information needed to develop an accurate mental-health profile of the defendant). Counsel must provide experts sufficient information to ensure that they can "present[] and explain[] the significance of all available [mitigating] evidence." *Correll*, 539 F.3d at 942 (alternations in original) (quoting *Mayfield*, 270 F.3d at 927).

In order to provide that foundational information, counsel must first conduct a reasonable investigation into mitigation. *See Caro v. Woodford*, 280 F.3d at 1255 (finding deficient performance when counsel "neither investigated fully this history nor informed the experts . . . of those facts that were known to him"). Only once counsel has assembled an adequate social history and provided that information to

1    experts will they be able to conduct a reliable mental-health evaluation and to
2    recommend additional experts as needed. *See, e.g.*, Russell Stetler, *Mental Health*
3    *Evidence and the Capital Defense Function: Prevailing Norms*, 82 UMKC L. Rev.
4    407 (2014); George W. Woods et al., *Neurobehavioral Assessment in Forensic*
5    *Practice*, 35 Int'l J. of L. & Psychiatry 432 (2012).

6         Though VanDreumel hired experts, she unreasonably failed to prepare these
7    experts with an adequate social history. As discussed above, VanDreumel did not
8    direct the mitigation investigation insofar as it involved lay witnesses, instead
9    leaving it in Mayberry's inexperienced hands. The resulting investigation was
10   incomplete and fell below prevailing professional norms. The social history
11   provided to experts was, in turn, inadequate. Even when VanDreumel had important
12   records in her possession, she in some instances failed to give them to experts.

13        In April 2002, with trial scheduled for July 2002, counsel asked the court to
14   appoint three mental-health experts: Scott Sindelar, Ph.D., a neuropsychologist,
15   Thomas Gaughan, M.D., a psychiatrist, and Ashley Hart, Ph.D., a psychologist.[135]
16   (Tr. Apr. 8, 2002 at 10, 14.) Dr. Hart was an expert for the State at Kiles's trial in
17   1989 and 1990, but he then signed an affidavit for the defense in Kiles's first state
18   post-conviction proceedings.[136]

19   _____

20   [135] While the transcript reflects that counsel requested and the court appointed all
21   three experts, the filed motion and the order only call for the appointment of Dr.
     Gaughan and Dr. Sindelar. (*See* ROA 572 at 1; Tr. Apr. 4, 2002 at 10, 14.) This was
22   likely because Clark filed the motion and proposed order, and he was not involved
     in the case beyond the simple tasks delegated to him. Dr. Hart was appointed a
23   month later, when Kiles himself asked the judge about the discrepancy. (Tr. May 6,
     2002 at 36.)

24   [136] Dr. Hart evaluated Kiles and testified at the first sentencing hearing that Kiles
25   suffered from a personality disorder and would not have committed the crimes had
     a police officer been at his shoulder, rebutting defense counsel's theory that Kiles
26   was impaired at the time under a statutory mitigator, A.R.S. § 13-703(G)(1). (Tr.
     Feb. 7, 1990 at 99, 138, 142.) In 1996, he signed an affidavit stating that after
27   reviewing the extensive social history created by post-conviction counsel, he
     concluded that Kiles's use of intoxicants was an attempt to self-medicate his
28   longstanding mental illness. (Tr. May 9, 2006 at 60, 65; ROA 304 Ex. A at 3.) There

1    Following their appointment, Mayberry, the mitigation specialist, contacted
2 VanDreumel to say he wanted to touch base and get on the same page, because he
3 had learned from Kiles that experts had been hired. As Mayberry was not consulted
4 in connection with the hiring of experts, the selection of experts was entirely
5 divorced from the little lay-witness investigation that had occurred.

6    In May 2002, counsel sent each expert a stack of papers that constituted
7 counsel's mitigation "binder." VanDreumel included a cover letter that detailed the
8 facts of the crime, rather than any background on Kiles's social history. The letter
9 included, on its final page, one paragraph on Kiles's social history, which focused
10 on the possibility that Kiles suffered from a character trait of impulsivity and lack
11 of anger control and coping mechanisms. The paragraph framed Kiles's character
12 as the result of the fact that he was struck by a car as a young child, grew up in a
13 household with domestic violence, and had previously been sent to prison for
14 beating a woman after she slapped him.

15    The materials provided lacked many of the documents considered classic
16 examples of the social history necessary for capital-sentencing experts.[137] *See, e.g.*,
17 *Correll*, 539 F.3d at 943; *see also Caro v. Calderon*, 165 F.3d at 1226–27.
18 VanDreumel provided the experts with some records, including the following:
19 parole records with psychological evaluations and information on Kiles's attempts

20 _____
is nothing to suggest that Dr. Hart conducted an updated evaluation of Kiles.

21 [137] In July 2002, Dr. Gaughan requested additional documents—the documents that
22 VanDreumel should have initially provided to him and all experts. These included
the following: witness statements from the first trial and affidavits gathered for the
23 first state post-conviction proceedings; Kiles's missing medical, birth and school
records; military records of discipline, military psychological or psychiatric
24 evaluations referenced by date in other evaluations; legible copies of Kiles's
Arizona Department of Corrections ("ADOC") records of psychological evaluation
25 and vocational rehabilitation services; ADOC testing from 1986 including IQ
testing; interviews with Janell Kiles regarding Kiles and their childhood; and
26 divorce records for Kiles's parents. Dr. Gaughan's request reveals the extent to
which the information that counsel initially provided was below prevailing
27 professional norms. While counsel sent Dr. Gaughan the materials he requested, it
is unclear whether Dr. Hart and Dr. Sindelar ever received them.
28

243

to obtain addiction counseling and vocational rehabilitation services after prison; Kiles's father's naval records and other medical records; Kiles's incarceration and medical records from ADOC through 1990; medical records from Kiles's childhood; some of his mother's mental health and medical records; and his sister's criminal history and a summary of presentence reports in her cases. VanDreumel provided a mix of expert testimony and reports on Kiles's mental health from the first trial, as well as a mental-health expert's affidavit from the first state post-conviction proceedings.[138]

Counsel had in their possession, but failed to give experts, additional critical records, including Kiles's incarceration and medical records beyond 1990; more-complete documentation of his parents' medical and mental-health history; Kiles's school records and Air Force records; family vital records; and legal records from when Kiles was hit by a car as a child. (*E.g.*, ROA 225 Exs. 1–3, 5, 16, 19, 22.)

In addition to missing important school, military, and updated ADOC records, VanDreumel failed to provide any of the affidavits painstakingly collected by Kiles's first state post-conviction counsel. VanDreumel also failed to include testimony from the 1996 state post-conviction hearing. This mitigation-focused information from the first state post-conviction proceedings would have provided important context on, for example, the violent household in which Kiles was raised, potential brain damage, his mother's alcohol and prescription drug use while

---

[138] Moreover, VanDreumel relayed the documents she did provide in an unreasonable manner which fell below prevailing professional norms. Mayberry, new to capital mitigation, sent the documents in a large pile to save money. Experts received a 950-page pile without any context or indication as to what the documents were and which were important. On top, for some experts, were graphic photographs of Gunnel's head injuries, photographs of the blood-spattered apartment, and a photograph of the nine-month-old victim after her body was found in a river. Following the photographs, counsel included police reports on the crime, and Kiles's and the medical examiner's 1989 testimony. Potentially helpful documents, such as the timeline that Mayberry had compiled, were hidden in the middle of this stack.

1    pregnant with him, and an intergenerational history of mental illness and substance

2    addiction. These affidavits included ones by Kiles's mother and sister. (PFR2 Dkt.

3    23 Ex. 19; PFR2 Dkt. 22 Ex. 3.) VanDreumel also did not include testimony from

4    the 1990 trial that spoke about Kiles's childhood and substance abuse, or any letters

5    written on his behalf as character references for that trial. While counsel could not

6    rely solely on this information as the basis for the mitigation investigation, it was

7    important to provide this already-collected information to experts.

8        Counsel's failure to provide experts with a full social history, including the

9    already-obtained affidavits and records, was particularly egregious given that Kiles

10   was previously granted relief for ineffective assistance of counsel. In particular,

11   Kiles's first state post-conviction counsel argued that Kiles's original trial counsel

12   "failed to gather the records and background information necessary for a thorough

13   and complete mental health evaluation of Alvie Kiles." (ROA 225 at 69.)

14       The materials that VanDreumel failed to send were important to making

15   mental-health diagnoses. After Kiles's 1989 trial attorney failed to provide many of

16   these same materials to experts, Kiles's first post-conviction counsel later provided

17   these materials to one of those experts, psychiatrist Alexander Don, M.D. Dr. Don

18   wrote in a 1995 affidavit that the additional information allowed him to more

19   accurately diagnose Kiles's mental illnesses, underscoring the importance of these

20   materials. (ROA 225 Ex. 78 at 3.) He specifically listed materials that were not

21   provided to him initially that he later was able to review; these almost identically

22   match the list of materials counsel failed to provide to experts at the second trial.[139]

23   (ROA 225 Ex. 78 at 2–3.)

24       Dr. Sindelar was hired to conduct a neuropsychological evaluation of Kiles

25   to determine if he had issues such as frontal-lobe brain injury, which caused him to

26   _____

27   [139] Inexplicably, counsel did not provide Dr. Don's 1995 affidavit to the 2006
28   penalty-phase experts; instead, she gave them an earlier one he had written before
     he had an opportunity to review the new information. (ROA 225 Ex. 62.)

245

1    act impulsively. VanDreumel had determined that Kiles's impulsivity would be a

2    central mitigation theme, even before having contacted any experts. However, due

3    to the failure to provide Dr. Sindelar with adequate background information, it

4    appears that he did not know it was a death-penalty case. The resulting report was

5    unusable and directly contradicted Kiles's known history. As a result, VanDreumel

6    was not able to provide other experts with a valid, up-to-date neuropsychological

7    assessment of Kiles. This undermined the entire mitigation investigation and

8    presentation.

9    Once it was clear that Kiles would have a jury sentencing, counsel retained

10   additional experts.[140] In September 2005, counsel contacted Dr. Albert Globus, a

11   psychiatrist who had testified at the 1996 state post-conviction hearing. Dr. Globus

12   agreed to testify, but as he had not been involved in the case for nearly a decade, he

13   said he needed to meet with Kiles again. It appears, however, that that did not

14   happen. (*See* Tr. Apr. 25, 2006 at 93.) The court also appointed Lesley Hoyt Croft,

15   Ph.D., a substance-abuse expert, and Mark Cunningham, Ph.D., a forensic

16   psychologist. (ROA 630 at 1; ROA 681 at 1.)

17   VanDreumel hired Dr. Croft because she recognized the need for a

18   substance-abuse expert, given the importance of Kiles's addiction as a mitigating

19   factor and the effects of substance abuse on the brain. However, counsel gave Dr.

20   Croft the same minimal information she had given to Drs. Gaughan, Hart, and

21   Sindelar in 2002, with the addition of the new expert reports. Dr. Croft met with

22   Kiles and drafted multiple versions of her report. VanDreumel, though, voiced

23   concern with Dr. Croft's description of the brain damage sustained by heavy drug

24   users such as Kiles. Ultimately, VanDreumel appears to not have called her because

25   she was concerned that Dr. Croft could be cross-examined on the lack of brain-

26   

27   [140] The penalty phase was delayed for several years following *Ring*; however, it
     does not appear that any of the experts hired in 2002 further evaluated Kiles, nor
28   did counsel send them new information beyond updated ADOC records.

damage evidence.[141]

VanDreumel also failed to provide experts with adequate information and to ensure that the experts' testimony, taken together, was coherent. This was in part due to Clark's almost-complete abdication of responsibilities in this case and to Mayberry's lack of experience. VanDreumel consulted with Mayberry, but she repeatedly voiced the need to sit down with Clark, Mayberry, and Durand, who was supposed to be supervising Mayberry's investigation. However, it appears that this meeting never happened. When Mayberry sought to be involved in meetings with experts, VanDreumel declined, saying that she would handle the experts and that he should focus on the Yuma investigation. In the months before the trial, VanDreumel reached out to Clark asking for help, saying she was struggling to get the experts in line by herself. When VanDreumel contacted experts, she noted the need to meet but said she did not have time, given her five capital cases and the time she was losing trying to get Clark up to speed. VanDreumel similarly conveyed to Mayberry in the months before trial that she was overwhelmed and ready to quit because she had not signed up to be in charge. All of this was happening while VanDreumel was attempting to address pretrial evidentiary and jury-instruction matters. (*E.g.*, ROA 677, ROA 678, ROA 682, ROA 692.)

As jury selection began in March 2006, VanDreumel had neither finalized the mitigation presentation nor spoken to all experts about their testimony. Even after jury selection was complete and the penalty phase was starting, VanDreumel did not know who many of Mayberry's intended lay witnesses were.

When Dr. Globus reached out to VanDreumel in late March 2006, she responded that she was sorry she could not return his phone calls because she was so busy, but relayed instructions about his testimony via e-mail. VanDreumel e-

---

[141] Kiles's second state post-conviction counsel retained an expert to conduct neuroimaging, which demonstrated that Kiles had brain damage. (PFR2 Dkt. 28 Ex. 25 at 1.) VanDreumel was not aware of this due to her failure to hire an expert to conduct the necessary and clearly indicated brain imaging.

1    mailed Dr. Hart—who had evaluated Kiles in 1990—in late April 2006, just days

2    before his testimony, to introduce herself and indicate what she hoped he would

3    testify about. (1990 Trial State Ex. 8 at 1; ROA 304 Ex. A.)

4         The resulting presentation of mental-health expert testimony "did not arise

5    from the requisite informed judgment, and constituted ineffective assistance of

6    counsel." *See Bean*, 163 F.3d at 1079 (internal quotation marks omitted) (finding

7    counsel performed deficiently where they did not provide experts with records or

8    prepare them to testify); *see also Caro v. Woodford*, 280 F.3d at 1254 (extending

9    this to records that the experts do not specifically request and explaining that the

10   "duty to provide the appropriate experts with pertinent information about the

11   defendant is key to developing an effective penalty phase presentation"). Counsel

12   performed deficiently by failing to adequately prepare experts. A failure to prepare

13   witnesses is an "inadequac[y] in rudimentary trial preparation and presentation,"

14   and as such is "not a strategic decision." *Bean*, 163 F.3d at 1079–80.

15   **4.    Counsel's unreasonable investigation and failure to provide
            experts with critical information resulted in the jury hearing
16           a constitutionally inadequate mitigation presentation.**

17        Counsel's failure to conduct an adequate investigation resulted in a string of

18   mental-health expert witnesses testifying on an assortment of topics. They did not

19   build on each other or present a coherent story; instead, they undercut each other's

20   testimony and credibility. While some of the evidence that jurors heard may have

21   been persuasive independently, it was contradicted by other defense testimony.

22   Because counsel did not properly investigate Kiles's childhood sexual abuse,

23   childhood trauma, brain damage, or neurotoxin exposure, the mental-health experts

24   were left to speculate and make conclusions based on incomplete information,

25   leaving them less credible to the jury and vulnerable on cross-examination. This

26   incoherent presentation underscored that counsel's strategy was not based on a

27   reasonable investigation. *See Correll*, 539 F.3d at 949. Insofar as there was a theme

28   presented in mitigation, it was the harmful theme that Kiles was violent.

248

1    Had counsel conducted an adequate investigation, including allowing experts

2  to re-evaluate Kiles close to the time of the penalty phase, the experts would not

3  have contradicted each other and undermined both the reliability of their diagnoses

4  and their own credibility as experts before the jury. Instead, the jury heard a series

5  of conflicting diagnoses even before the State presented its case.

6    Dr. Globus diagnosed Kiles with polysubstance abuse, alcohol and cocaine

7  dependency, chronic depression stemming from childhood, drug use resulting in

8  psychotic decompensation, and partial fetal alcohol syndrome. (Tr. Apr. 24, 2006

9  at 107, 118; Tr. May 8, 2006 at 14.)

10    Dr. Gaughan testified the following day but said that, while Kiles may have

11  faced situations that caused him to feel depressed, he did not have depression—

12  "nothing pervasive or primary." (Tr. May 9, 2006 a.m. at 37.) Dr. Gaughan found

13  that Kiles did not have a psychotic disorder, though he did hallucinate under the

14  influence of drugs. (Tr. May 9, 2006 a.m. at 36.) He diagnosed Kiles with Post-

15  Traumatic Stress Disorder ("PTSD") resulting from his childhood (Tr. May 9, 2006

16  at 53–64), and attention-deficit hyper-activity disorder ("ADHD"), which often

17  follows from fetal alcohol exposure (Tr. May 9, 2006 a.m. at 64–66). As a result of

18  his ADHD, Kiles developed substance-abuse problems. (Tr. May 9, 2006 a.m. at

19  69.) Dr. Gaughan also diagnosed Kiles with obsessive compulsive disorder

20  ("OCD") and narcissistic personality traits. (Tr. May 9, 2006 a.m. at 75, 80.)

21    Having had no opportunity to re-evaluate Kiles, Dr. Hart stood by his 1996

22  diagnoses of long-standing dysthymia, depression, and pre-existing bi-polar

23  disorder. (Tr. May 9, 2006 p.m. at 65.)

24    Dr. Cunningham said that Kiles had substance abuse, hyperactivity, and

25  attention-deficit issues, a probable learning disability, indications of attention-

26  deficit issues, cocaine psychosis, fetal alcohol exposure, and potentially OCD. (Tr.

27  May 10, 2006 at 108, 131; Tr. May 11, 2006 at 35, 63; Tr. May 15, 2006 at 38.)

28    Counsel's failure to adequately investigate and inform their experts resulted

not only in an incomprehensible mess of conflicting diagnoses, but also in other contradictory conclusions. For example, given the State's focus on portraying Kiles as a high-functioning individual who chose a "selfish lifestyle" (Tr. May 22, 2006 at 60), and given the defense's lack of brain imaging, it was imperative that counsel prepare defense experts to present a coherent story of Kiles's mental impairment. This included his performance in school, which was a focal point for the State. (Tr. May 22, 2006 at 74.) While Dr. Cunningham referenced Kiles's "academic failure" and Dr. Gaughan said he was a "marginal" student with a possible learning disorder, Dr. Globus said Kiles was an average student. (Tr. May 10, 2006 at 52; Tr. May 9, 2006 a.m. at 22; Tr. May 8, 2006 p.m. at 20.)

Moreover, given the State's focus on Kiles's "choice" to drink, counsel had to clearly convey how and why Kiles developed alcoholism and what that meant. However, the defense experts provided different reasons as to why Kiles began drinking: Dr. Globus testified it was due to Kiles's chronic depression, stemming from childhood. (Tr. Apr. 24, 2006 at 118.) Dr. Gaughan testified it was as a result of impaired impulse control, stemming from Kiles's attention-deficit disorder and fetal alcohol exposure. (Tr. May 9, 2006 a.m. at 69–70.) Dr. Hart testified that it was an attempt to self-medicate his long-standing dysthymia, depression, and bi-polar disorder. (Tr. May 9, 2006 p.m. at 65.) Dr. Cunningham attributed it to a constellation of factors, including the fact that Kiles was given alcohol when he was five years old. (Tr. May 15, 2006 at 69.) Additionally, Dr. Globus testified that people are not predisposed to alcohol; instead, they are predisposed to depression, which leads them to alcohol. (Tr. May 8, 2006 at 22.) The very next day, both Drs. Gaughan and Hart testified about predisposition to alcohol (Tr. May 9, 2006 a.m. at 78; Tr. May 9, 2006 p.m. at 66), and a few days later Dr. Cunningham testified about predisposition to alcohol and drugs (Tr. May 15, 2006 at 47). The State took advantage of these inconsistencies in cross-examination and closing.

The failure to provide each of these mental-health experts with proper

250

1    records, to prepare them for testimony, and to properly investigate Kiles's
2    mitigation to form a reasonable mitigation strategy damaged each expert at trial.
3    The following examples illustrate the problems that arose due to counsel's failures:

4        Dr. Globus: Though Dr. Globus was a neuropsychiatrist, he was not a brain-
5    damage expert. He testified that he did not find Kiles's severe lifelong headaches
6    to be significant and did not explore them (Tr. Apr. 24, 2006 at 94), despite chronic
7    headaches being an indication of head injury. Dr. Globus also provided a cursory
8    overview of Kiles's social history, based on affidavits Kiles's first state post-
9    conviction counsel gathered in 1994.[142] (Tr. Apr. 25, 2006 at 5–18, 21–24.)

10       Dr. Globus appears to have testified in lieu of a substance-abuse expert. (Tr.
11   Apr. 25, 2006 at 63–68.) Instead of accurately presenting addiction as a progressive
12   disease that vitiates a person's ability to make "choices" in the traditional sense of
13   the word, he repeatedly used disparaging terms, such as that Kiles was "acting
14   crazy," "fried," "tweaking," and that people using drugs "freak out." (Tr. Apr. 25,
15   2006 at 69, 71–75.) Juror questions show that Dr. Globus did not adequately convey
16   that addiction and depression were uncontrollable diseases that weighed in favor of
17   leniency. For example, one asked: "To what degree is a pathological lack of
18   personal responsibility contributory to substance abuse and/or addiction?" (Tr. Apr.
19   25, 2006 at 102–03.) At the end of Dr. Globus's testimony, the jury also asked: "Do
20   people suffering from depression typically act irresponsibly and/or fail to be
21   accountable for their actions?" and "Can a person with depression still act within
22   the legal constraints of society, without treatment?" (Tr. May 8, 2006 p.m. at 49–
23   51.) To the last question, Dr. Globus answered that "most do," thereby undercutting
24   the case for leniency. (Tr. May 8, 2006 p.m. at 51.)

25   _____

26   [142] At times, Dr. Globus was confused as to what he was supposed to be testifying
     to. (Tr. Apr. 25, 2006 at 21.) Counsel did not ask him to elaborate on any of these
27   "tantalizing" leads, such as Kiles's parents getting divorced and then remarrying,
     likely because he could not—he only knew what was contained in the affidavits he
28   conspicuously read from. (Tr. Apr. 25, 2006 at 22.)

251

1        <u>Dr. Gaughan</u>: Counsel next called Dr. Gaughan, another psychiatrist. (Tr.
2    May 9, 2006 at 4.) His testimony was also framed around a theme of Kiles's
3    "violence" and "drug problems." (*E.g.*, Tr. May 9, 2006 a.m. at 17–18.) The gap in
4    time between Dr. Gaughan's evaluation in 2003 and his testimony, and counsel's
5    failure to prepare him, came out as well—he could not recall whether he had
6    reviewed Kiles's father's military records: "You know, at this point, I don't
7    remember. I will be guessing that's true." (*E.g.*, Tr. May 9, 2006 a.m. at 19.)

8        <u>Dr. Hart</u>: When Mayberry first contacted Dr. Hart, he indicated that he did
9    not fully stand behind the affidavit that first state post-conviction counsel had
10   prepared for him. VanDreumel apparently did not follow up on this concern. As a
11   result, when testifying, Dr. Hart told the jury that he had not written the affidavit
12   and that the prior lawyers had "put the grind on" him to sign it. (Tr. May 9, 2006
13   p.m. at 82.) And he enthusiastically agreed with the State's theory on cross-
14   examination: Kiles had chosen to use substances, despite knowing that drinking
15   caused him to be violent. Dr. Hart stated, "Yes, the childhood then could have been
16   abusive, but it doesn't change the fact that he understood that if he used drugs he
17   became violent." (Tr. May 9, 2006 p.m. at 81–82.) He also undercut the defense
18   theory that Kiles suffered from PTSD when he wrongly stated that science said
19   PTSD had to result from a single event, and he expressed that he shared the
20   prosecutor's doubts about Kiles having been abused as a child. (Tr. May 9, 2006
21   p.m. at 79–81.)

22       <u>Dr. Cunningham</u>: Dr. Cunningham testified for two-and-a-half days. While
23   his testimony presented a broad view of Kiles's life and family history, it was
24   largely focused on Department of Justice ("DOJ") studies on the causes of criminal
25   violence. (Tr. May 10, 2006 at 20.) Thus, instead of explaining how Kiles's trauma
26   experiences and genetic dispositions left him mentally ill, brain-damaged, and
27   struggling to overcome his resulting addiction, his testimony told the jury how Kiles
28   ended up a violent person with "bad outcomes": "psychological disorder,

1    victimized relationships, drug dependency, criminal activity." (Tr. May 10, 2006 at
2    37.) Dr. Cunningham discussed risk factors and adverse developmental factors that
3    shaped Kiles, as well as how trauma shapes a person throughout his life, but the
4    picture painted was that Kiles was a violent person who was not deserving of
5    leniency. (*See* Tr. May 10, 2006 at 93–106, 135.) Counsel's questions were framed
6    in terms of violence and further supported this picture. (*See, e.g.*, Tr. May 10, 2006
7    at 85.)

8         Further, VanDreumel's failure to adequately prepare Dr. Cunningham led her
9    to elicit testimony that seemed to suggest a connection between race and violence.
10   At trial, Dr. Cunningham referenced an NAACP study saying that, "at any given
11   point in time in Washington, D.C. or Baltimore, about half of the black males are
12   in the criminal justice system." (Tr. May 11, 2006 at 16.) He also cited a study that
13   found that the rate of homicide among black males 18 to 24 is "about 30 times
14   greater" than in the population as a whole. (Tr. May 11, 2006 at 17.) While Dr.
15   Cunningham tried to explain that it is "not about race. It isn't being black that
16   creates that issue," he failed. (Tr. May 11, 2006 at 16–17.) A juror submitted a
17   question asking how Yuma could be compared to Washington, D.C., which the
18   juror wrote was 99% black and had the highest crime rate in the nation.[143] (Tr. May
19   11, 2006 at 88.) Race was on the jurors' minds, and Dr. Cunningham was raising
20   questions in at least some jurors' minds on the connection between race and violent
21   crime. *Cf. Buck v. Davis*, 137 S. Ct. 759, 775 (2017) (finding ineffective assistance
22   where capital-defense counsel called an expert who testified that African-American
23   client's race increased his risk of being a continuing threat to society, reasoning that
24   "race [is] among factors that are 'constitutionally impermissible or totally irrelevant
25   to the sentencing process'" (quoting *Stephens*, 462 U.S. at 885) and that "[n]o

26   ───────────────
27   [143] In responding to the jury question, Dr. Cunningham repeated that "black
     overrepresentation in criminality and violence" was not because of race. (Tr. May
28   11, 2006 at 90–91.) But he added that most homicides among African-American
     men were because "[t]hey're killing their own." (Tr. May 11, 2006 at 92.)

competent defense attorney would introduce [racially prejudicial] evidence about his own client"). VanDreumel's elicitation of this troubling testimony amounts to ineffective assistance.

Had counsel conducted an adequate mitigation investigation, consulted with the necessary experts, and provided their experts with proper information, they could have presented Kiles to the jury as described above, in section B: a seriously impaired man, who suffered brain damage as a child and who inherited mental illness, all of which was compounded by the trauma of being raised in a terrifying and chaotic home with parents and a sister who abused him because of their own mental illnesses, addictions, and a history of trauma. The jury could have learned that despite his life-long efforts to escape and project a veneer of normalcy, Kiles was ultimately unable to overcome his limitations, manage his addictions, or escape the traumatic family dynamic that had shaped his life. Counsel failed to conduct sufficient investigation and engage in sufficient preparation to ensure that the experts could "present and explain the significance of all available mitigating evidence." *Correll*, 539 F.3d at 942.

Rather, based on the inadequate investigation, counsel arrived at an incoherent and ultimately harmful theme of mitigation: that Kiles was violent as a result of his violent parents and his drug abuse. Kiles's traumatic childhood was framed as the reason why Kiles was violent, not why he was mentally ill. His substance use was similarly framed as the reason he became aggressive and violent before and leading up to the crime, instead of being framed as a disease that, when compounded with his brain damage, seriously impaired him.

Kiles was violent, but that was not really his fault. This was the mitigation VanDreumel offered the jury to request leniency for premeditated murder.

### 5. Counsel provided ineffective assistance in failing to adequately investigate and address the State's evidence and arguments in mitigation rebuttal.

The State hired John Scialli, M.D., a psychiatrist, and John Moran, Ph.D., a

clinical psychologist, who interviewed Kiles together in 2003. (Tr. May 16, 2006 at 16, 19.) Defense counsel failed to investigate these experts and the validity of their test results and reports, resulting in a failure to object to their improper testimony, an inadequate cross-examination, and a failure to properly prepare the defense's own witnesses to rebut the State's witnesses.

While the only statutory limit on the State's rebuttal evidence at the mitigation phase is that it must be "relevant" to the mitigation, the rebuttal evidence is also constrained by the Due Process Clause of the Fourteenth Amendment. *State v. Hampton*, 140 P.3d 950, 962 (Ariz. 2006); *see also Gardner v. Florida*, 430 U.S. 349, 358 (1977) (plurality opinion) ("the sentencing process . . . must satisfy the requirements of the Due Process clause"). Counsel had a duty to ensure that the State's case did not exceed those bounds, as well as a duty to test the State's case by adequately cross-examining the State's witnesses. *See Crawford v. Washington*, 541 U.S. 36, 61 (2004) (recognizing the "testing [of evidence] in the crucible of cross-examination" as central to the constitutional guarantee of reliability).

To discharge their duties, counsel should have been present at the experts' interviews of Kiles, interviewed the experts, investigated the experts' opinions and the bases for their conclusions, and, as appropriate, objected to the experts' testimony. *Tucker*, 716 F.2d at 581 ("Pretrial investigation and preparation are the keys to effective representation of counsel. Courts have repeatedly stressed the importance of . . . interviewing of important witnesses."); *see also* 2003 ABA Guideline 10.11 cmt. ("[c]ounsel should also object to and be prepared to rebut arguments that improperly minimize the significance of mitigating evidence").

However, VanDreumel was not present when the State's experts interviewed Kiles, despite Dr. Scialli's testimony that counsel could have attended the evaluation had she chosen to. (Tr. May 16, 2006 at 22.) Compounding this error, counsel failed to interview the State's experts before trial, even though she was

255

permitted to do so.[144] *See* Ariz. R. Crim. P. 14.1(b)(1); 15.3(a)(2). VanDreumel also failed to adequately investigate how to undercut the State's rebuttal evidence. *See* 2003 ABA Guideline 10.11 cmt. Instead, counsel sat idly while the jurors heard the following evidence:

<u>Dr. Scialli</u>: In a full day's worth of testimony, Dr. Scialli gave misleading information about Kiles's childhood abuse and his family's histories of mental illness and addiction. (*E.g.*, Tr. May 16, 2006 at 27–30.) He minimized Kiles's struggles in school and his neurological impairments. (Tr. May 16, 2006 at 28.) He characterized Kiles as a violent person who was not impulsive but instead felt a need to hurt others as retribution for perceived transgressions. (Tr. May 16, 2006 at 33–36.) He diagnosed Kiles with ASPD and attributed many mitigating factors, including Kiles's impulsivity and his genetic predisposition to alcoholism, to ASPD.[145] (Tr. May 16, 2006 at 40, 44, 56.)

VanDreumel failed to object when Dr. Scialli testified on topics he was unqualified to discuss. For example, he testified that Kiles did not have Fetal Alcohol Syndrome ("FAS"), because such a diagnosis requires a low birth weight. (Tr. May 16, 2006 at 38.) This was false. Still, counsel neither objected to Dr. Scialli testifying outside his expertise nor cross-examined Dr. Scialli on the matter.[146] Relatedly, counsel failed to impeach Dr. Scialli when his testimony deviated from his report. For example, Dr. Scialli testified that Kiles did not have PTSD because he did not have symptoms such as "vigilance," and he had not experienced any

---

[144] In contrast, the State interviewed several defense experts before trial.

[145] Counsel should have objected to the prosecutor's misconduct during his examination. For example, when Dr. Scialli could not answer a question about Kiles's parents' substance abuse, Powell answered his own question. (Tr. May 16, 2006 at 29.) Counsel also failed to object when the State asked questions in a leading and prejudicial manner. For example, Powell asked Dr. Scialli: "Doctor, tell us about the defendant's progression of violence." (Tr. May 16, 2006 at 30.)

[146] Powell referenced this specific testimony in closing and highlighted that it came from a "doctor." (Tr. May 22, 2006 at 72.) *See* Claim 9, *infra*.

1  precipitating event like threatened death. (Tr. May 16, 2006 at 51.) However, he
2  wrote in his report that Kiles was "vigilant" and a "sentry" because of his parents'
3  violence, and that Kiles was shot at multiple times in his youth. Defense counsel
4  failed to point out this obvious inconsistency in Dr. Scialli's testimony. (Tr. May
5  16, 2006 at 72–130.)

6      Dr. Scialli also gave damaging testimony dismissing the genetic component
7  of substance and alcohol addiction and, instead, suggested that addiction can be
8  attributed to ASPD. (Tr. May 16, 2006 at 43–44.) He emphasized that even for an
9  alcoholic, the decision to drink is a choice. (Tr. May 16, 2006 at 47.) While counsel
10 attempted to cross-examine Dr. Scialli on this issue, counsel did not call or recall a
11 witness, such as an FAS expert or a substance-abuse expert, to rebut Dr. Scialli's
12 harmful and false claims.[147]

13     Through Dr. Scialli, the State propounded its theory that Kiles was a violent
14 person with ASPD who sought to inflict violence on anyone who he perceived as
15 slighting him. (Tr. May 16, 2006 at 32–36.) Powell finished his direct examination
16 of Dr. Scialli by returning to the State's theme of choice: Powell asked if Kiles's
17 substance addiction "in any way negated his ability to make choices," including on
18 the night of the crime. Dr. Scialli answered no. (Tr. May 16, 2006 at 71.) Counsel
19 did not object, allowing the jury to believe that relevant mitigation was limited to
20 that with a casual nexus to the crime or that which proved the statutory (G)(1)
21 mitigator.[148]

23 [147] Counsel contacted Dr. Cunningham after Dr. Scialli's testimony to ask about the
24 link between genetics and non-alcohol substance abuse, and the expert provided
   scientific studies that rebutted Dr. Scialli's conclusions, but by that time it was too
25 late to cross-examine Dr. Scialli with the information. She did not recall Dr.
   Cunningham to the stand.

26 [148] A.R.S. § 13-751(G)(1) provides that the sentencer "shall consider as mitigation"
27 that the "defendant's capacity to appreciate the wrongfulness of his conduct or
   conform his conduct to the requirements of law was significantly impaired, but not
28 so impaired as to constitute a defense to prosecution." VanDreumel was ineffective
   for failing to allege this as a mitigating factor. There was no justification for

257

1    <u>Dr. Moran</u>: During his day-long testimony, Dr. Moran mainly read aloud the

2    results of the Millon Clinical Multiaxial Inventory-III ("MCMI") test, which he

3    used to diagnose Kiles with ASPD. (Tr. May 17, 2006 at 4–57.)

4    The MCMI was widely discredited as a mental-health assessment by the time

5    of trial. It is not a diagnostic measure of mental disorders, nor does it formally use

6    the DSM criteria for psychiatric diagnoses. *See* Richard Rogers, *Forensic Use and*

7    *Abuse of Psychological Tests: Multiscale Inventories*, 9(4) J. Psychiatric Practice

8    316, 319 (2003) ("Rogers").[149] The MCMI is particularly unreliable in a forensic

9    context, because there is no "normal" reference group and the test "exaggerates an

10   individual's psychopathology." Gerald Young, et al., *Causality of Psychological*

11   *Injury: Presenting Evidence in Court*, Springer (2007) ("In forensic work, in

12   contrast, the exaggeration can make a 'normal' individual appear psychologically

13   pathological.") Most importantly, "MCMI-III scales cannot be used to diagnose

14   DSM-IV personality disorders; the test may generate errors in about 80% of

15   diagnosed cases." Rogers, *supra*, at 319. Experts have pointed to the diagnosis of

16   ASPD as an improper use of the MCMI: "Should elevations on these scales—even

17   marked ones—be seen as evidence of antisocial personality disorder? The answer

18   is *definitely not*." Rogers, *supra*, at 319–20. Courts have forbidden the use of the

19   MMPI, a similar inventory, because of the "inadequacy of the correlation factors

20   and the validity factors." *Usher v. Lakewood Engineering & Mfg. Co.*, 158 F.R.D.

21   _____

22   completely foreclosing this avenue. A wealth of information, of which VanDreumel
     was aware, supported a (G)(1) finding in this case, including Kiles's mental

23   impairments, brain damage, mental illness, and intoxication. However,
     VanDreumel did not allege any statutory mitigators.

24   [149] Multi-scale inventories like the MCMI are sometimes referred to as "objective

25   tests" because answers are input into a testing service, which spits out a series of
     potentially responsive answers. However, "the term 'objective tests' is a

26   misnomer. . . . Although the scoring is objective, the interpretation is not." Rogers,
     *supra*, at 316. The clinician chooses from multiple set interpretations; this leads to

27   cherry-picking and confirmation-bias errors, which Dr. Moran did. (Tr. May 17,
     2006 at 23 ("I included in the report only information that I thought was

28   confirmed.").)

258

411, 413 (N.D. Ill. 1994). All of this was known years before the penalty phase, but counsel failed to object to the use of the tests and to Dr. Moran's testimony about his results. (*See* Tr. May 17, 2006.) Counsel failed to offer any expert to rebut it.

Dr. Moran's resulting testimony was highly damaging, painting a picture of Kiles as someone who exploited others and who did not think that rules applied to him. (Tr. May 17, 2006 at 26.) Beyond diagnosing Kiles with ASPD, Dr. Moran expanded on the MCMI results without support, noting for example that "[t]he highest elevation on [Kiles's] Millon is sadism. And sadism is a person who derives pleasure from inflicting pain or humiliation." (Tr. May 17, 2006 at 29.) He added,

> [s]o he's an impulsive person who instead of taking responsibility and saying I shouldn't get angry, I have to find some way of approaching this that's polite and acceptable and constructive, he's like I'm angry. It's okay if I express it I think because he felt that he was entitled, he had some special entitlement to be the person that he was. . . . And that he's, you know, he's a dangerous person because of that sadistic quality and because of the fact he doesn't feel empathy.

(Tr. May 17, 2006 at 30.) Counsel did not object to Dr. Moran's "explanation" of the already-invalid MCMI results, which were pure speculation. Counsel also did not object when Dr. Moran used the MCMI results to rebut the concept of mitigation in general: "So again, we're looking at his way of thinking. Is he taking personal responsibility or is he saying I behaved badly because of things that happened to me or because people mistreated me." (Tr. May 17, 2006 at 28–29); *see also* 2003 ABA Guideline 10.11 cmt. n.315 (noting that counsel should object on Eighth Amendment grounds to rebuttal testimony that seeks to nullify mitigation in general). And, rather than framing Kiles's addiction as an illness, Dr. Moran suggested it evinced Kiles's belief that the rules did not apply to him. Dr. Moran explained that Kiles used it to relieve himself of the guilt he normally felt about discharging his hostile impulses, which Dr. Moran summed up as "instant A-hole, just add alcohol." (Tr. May 17, 2006 at 33–34.) Still, VanDreumel did not object.

1      Dr. Moran also testified about another inapposite and speculative test, which
2  he said could be used to predict future violent behavior: the Violence Risk
3  Assessment Guide ("VRAG"). (Tr. May 17, 2006 at 48.) The VRAG was not in Dr.
4  Moran's report, and on this basis alone, counsel should have objected to Dr.
5  Moran's testimony. Moreover, the VRAG was both widely criticized and
6  inapplicable to Kiles. *See* Daryl G. Kroner, *A coffee can, factor analysis, and*
7  *prediction of antisocial behavior: The structure of criminal risk*, Internat'l J.L. &
8  Psychiatry, 28(4), 360–74 (2005) (finding that the VRAG did not predict post-
9  release failure better than randomly generated instruments); *See* John M. Fabian, *A*
10 *Literature Review of the Utility of Selected Violence and Sexual Violence Risk*
11 *Assessment Instruments,* J. Psychiatry & L., 34(3), 307–50 (2006) (explaining that
12 the VRAG was meant to measure short-term, low-risk offenders' risk of
13 reoffending when released from secure confinement, not the risk of reoffending in
14 a high-security prison). The State wielded the VRAG to rebut Dr. Cunningham's
15 testimony on Kiles's upbringing and Aiken's testimony that Kiles did not present a
16 future danger if sentenced to life in prison. (Tr. May 17, 2006 at 53–54.)

17     Powell concluded his direct examination by having Dr. Moran testify that
18 Kiles was able to make the choice to stop drinking, and that none of the factors that
19 the mental-health experts on both sides had identified—including Kiles's
20 childhood, substance abuse, and ASPD—negated Kiles's ability to make choices
21 on the night of the crime. (Tr. May 17, 2006 at 55–56.) Counsel should have
22 objected to the State's continued effort to mischaracterize the nature of the
23 mitigation at issue and to mislead the jury that a causal nexus was required.

24     VanDreumel had Dr. Moran's report, which indicated that he was going to
25 discuss the MCMI, in 2003, years ahead of trial. Still, counsel did not make any
26 attempt to investigate its validity with the help of experts, and she did not prepare
27 defense experts to rebut it in advance. She did not try to prevent the use of
28 invalidated testing, she did not interview Dr. Moran before he testified, and she did

260

1    not object to this testimony at trial. During cross-examination, VanDreumel

2    neglected to confront Dr. Moran with the well-established problems with the

3    MCMI, the basis of hours of disastrous testimony. While she got Dr. Moran to say

4    that the results of the MCMI testing only "probably" applied to Kiles (Tr. May 17,

5    2006 at 64), that hardly sufficed to counteract the damage. *See Driscoll v. Delo*, 71

6    F.3d 701, 709 (8th Cir. 1995) (even when defense counsel elicited a concession

7    from state expert, counsel was deficient for having failed to take measures to

8    understand the testing performed and the meaning of the results). The 2003 ABA

9    Guidelines obligate counsel to "consider witnesses familiar with and evidence . . .

10   that . . . would rebut or explain evidence presented by the prosecutor" and "expert

11   and lay witnesses along with supporting documentation . . . to rebut or explain

12   evidence presented by the prosecutor." 2003 ABA Guideline 10.11(F)(1), (2).

13   There is no evidence that counsel made a strategic decision to conduct at most a

14   perfunctory investigation of the State's experts and their reports, and any such

15   decision was unreasonable. Counsel performed deficiently.

16        Dr. Scialli and Dr. Moran reframed and mischaracterized Kiles's mitigation

17   evidence to portray him as a violent, anti-social pleasure-seeker who sought to get

18   high and hurt people, instead of a man with a constellation of impairments including

19   substance addiction, whose traumatic abuse was crushingly formative.

20        Had counsel objected to this testimony or objected to the State's experts'

21   testing measures, there is a probability the jury never would have heard any of this

22   damaging evidence. Moreover, counsel should have prepared and recalled defense

23   experts to rebut the invalid testing and conclusions of the State's witnesses.[150] It

24   was imperative that counsel at least recall Dr. Cunningham to explain to the jury

25   that ASPD and the effects of trauma and mental illness are often conflated, as well

26   _____

27   [150] For example, counsel could have presented expert testimony explaining that the DSM-IV-TR requires that, to diagnose any personality disorder, the underlying behavior cannot be due to the effect of a medical condition such as head trauma.

28   DSM IV-TR at 630. Brain imaging evidence would have addressed this as well.

261

as that addiction is not a choice. But counsel did not. Instead, the last thing jurors heard before determining whether Kiles should live or die was two full days of testimony from the State's inflammatory, unsubstantiated, and largely unchallenged witnesses. Had counsel performed adequately, it would have substantially "altered the sentencing profile presented" to the jury, *Strickland*, 466 U.S. at 700, and there is a reasonable probability that at least one juror would have voted for life, *see Bemore*, 788 F.3d at 1176.

### 6. Counsel's mitigation-phase closing argument constituted deficient performance that prejudiced Kiles.

Competent counsel must "take advantage of all appropriate opportunities to argue why death is not [a] suitable punishment for their particular client." 2003 ABA Guideline 10.11(L). There is perhaps no more important moment to fulfill this obligation than closing argument. "The right to effective assistance extends to closing arguments. . . . Closing arguments should 'sharpen and clarify the issues for resolution by the trier of fact. . . .'" *Yarborough v. Gentry*, 540 U.S. 1, 5–6 (2003) (citations omitted) (quoting *Herring v. New York*, 422 U.S. 853, 862 (1975)); *see also Strickland*, 466 U.S. at 669.

However, VanDreumel failed to use this critical opportunity and performed deficiently. VanDreumel failed to argue that there was mitigation to warrant leniency for all three crimes for which Kiles faced death. Instead, she spent most of the closing arguing the circumstances supporting residual doubt that Kiles was responsible for the deaths of the two child victims. (Tr. May 22, 2006 at 48–56, 76–77.) That this affected the jury is clear given that the jury sentenced Kiles to death for the adult victim, but failed to reach a verdict on the two child victims—surely an unusual result. But, at the end of the day, Kiles was still sentenced to death.

Instead of making the case for life, VanDreumel continued to push the narrative that everything in Kiles's life had made Kiles inherently and inevitably violent. She argued that, based on Kiles's life, "subsequent violence should not

262

surprise anybody in here," and that abused children "are more likely to be arrested as juveniles and adults for violent crime." (Tr. May 22, 2006 at 31, 32.) She asked: "Does it surprise anybody that Alvie's crime was a crime of domestic violence?" (Tr. May 22, 2006 at 40.) This was particularly damaging given that one of the jurors had written extensively on his questionnaire that his father had murdered his mother, a "victim of domestic violence." *See supra*, Claim 4.

VanDreumel minimized Kiles's serious mental illness, neurological impairments, brain dysfunction, and addiction as "mental health problems, educational difficulties, alcohol and drug abuse." (Tr. May 22, 2006 at 32.) She repeatedly described his addiction as "drinking and drugging." (Tr. May 22, 2006 at 41.) VanDreumel asked: "Did Alvie drink to self-medicate to quash the depression? Don't know. That's one of the reasons people use drugs." (Tr. May 22, 2006 at 81.) This failed to sharpen the issues for consideration and contradicted the testimony of defense experts. Instead of framing cocaine's effect as mental impairment, counsel framed it as follows: "cocaine causes aggression. Cocaine causes hostility. Cocaine causes impulsivity." (Tr. May 22, 2006 at 34.) Counsel needlessly highlighted to the jurors an image of Kiles as a violent, aggressive man. Moreover, VanDreumel highlighted inconsistencies in defense experts' testimony, listing all of their diagnoses on large sheets of paper, despite the fact that some had directly contradicted each other, noting "you know, for the most part, all of the doctors agree, even the State's doctors." (Tr. May 22, 2006 at 33.)

Strikingly, VanDreumel early in her closing repeated the State's greatest theme: that Kiles "had a choice, he chose drugs, he could have just stopped." (Tr. May 22, 2006 at 28.) She further argued that she had no "quarrel" with the State's diagnoses, despite the fact that the State's experts had diagnosed Kiles with ASPD and had called him a sadist. (Tr. May 22, 2006 at 38; Tr. May 17, 2006 at 29.) After she effectively conceded the State's damaging diagnoses, she next argued that the only question was how he ended up that way. This was not going to convince any

1    juror that leniency was warranted.

2        Had Kiles's counsel offered the jury some explanation as to how Kiles's

3    mitigation warranted leniency, there is a reasonable probability that at least one

4    juror would have voted for life. *See Smith v. Spisak*, 558 U.S. 139, 155 (2010)

5    (recognizing the importance of having fresh in jurors' minds the connection

6    between mitigating circumstances and the crimes). Had VanDreumel focused on

7    why leniency was warranted for all three convictions, or had she not cemented the

8    image of Kiles as a violent, amoral person, there is a reasonable probability that the

9    outcome of the proceeding would have been different. Kiles was thus prejudiced by

10   counsel's deficient closing argument. *See Strickland*, 466 U.S. at 669.

11
            **7.    Counsel provided ineffective assistance when she failed to
                    object to numerous aspects of the State's closing argument.**
12

13       Trial counsel failed to object during the State's closing argument to several

14   instances of misconduct. *See* Claim 9, *infra.*

15       The purpose of closing argument "is to explain to the jury what it has to

16   decide and what evidence is relevant to its decision." *Sandoval v. Calderon*, 241

17   F.3d 765, 776 (9th Cir. 2000). Arguments that frustrate this purpose are improper.

18   *Id.* When a prosecutor crosses the line of permissible advocacy, a defendant relies

19   on his attorney to challenge the misconduct and seek corrective action, by objecting,

20   urging curative or limiting instructions, or seeking a mistrial. *See Zapata v.*

21   *Vasquez,* 788 F.3d 1106, 1116 (9th Cir. 2015). Counsel's decision to leave

22   unchallenged the prosecutor's misconduct was unreasonable.

23       Most egregiously, the prosecutor urged jurors to disregard the law and the

24   Constitution's requirements. Noting that the instructions permitted the jurors to

25   sentence Kiles to life based on mercy without finding any specific mitigation

26   proven, Powell argued "that might be the law, but is that justice? Is that right?" (Tr.

27   May 22, 2006 at 75.)

28       Additionally, the prosecutor misled the jury on the law. For example, he

argued that, while he agreed that childhood trauma affects adult behavior and that substance use affects people, it affects moral culpability only "when it takes away volition, when a person cannot control, when it's to that degree or to that extent." (Tr. May 22, 2006 at 58.) The State argued throughout its closing that Kiles retained the ability to make choices, so leniency was not warranted. For example, Powell argued that, even if Kiles did suffer child abuse, the jury had to decide "the grade agent, how much is there, if it was really so bad that it took away his ability to make choices, to make proper choices." (Tr. May 22, 2006 at 73–74; *see also* Tr. May 22, 2006 at 58–59, 71.) This implied that the jury could only consider mitigation evidence if it rendered a defendant incapable of volition or if it had a causal connection to the crime.[151] The Supreme Court has repeatedly held this is unconstitutional. *See, e.g.*, *Tennard v. Dretke*, 542 U.S. 274, 284–87 (2004).

The prosecutor also argued non-statutory aggravating factors and urged jurors to consider mitigation evidence as aggravation, in violation of the Due Process Clause. *See* A.R.S. § 13-703(F) (1988). For example, the State argued that Kiles's model behavior in prison should weigh against him, as it showed he could do the right thing when he wanted to. (Tr. May 22, 2006 at 59, 61.) The prosecutor told the jury to consider the victims, as "we have aggravation as well as mitigation." (Tr. May 22, 2006 at 75.) This was improper. *See Humphries v. Ozmint*, 397 F.3d 206, 235 (4th Cir. 2005) (Wilkinson, C.J., dissenting) (arguing to overturn a death sentence where the State urged the jury to weigh the victim's life against the defendant's, as "[n]o person should be executed in America on the theory that his life is of less worth than that of someone else").

---

[151] The Ninth Circuit has held that Arizona's use of a causal-nexus test was contrary to clearly established federal law. *McKinney v. Ryan*, 813 F.3d 798, 821 (9th Cir. 2015) (en banc). Although the Arizona courts paid lip service to *Tennard* at the time of Kiles's penalty phase, *see, e.g.*, S*tate v. Anderson,* 111 P.3d 369, 391 (Ariz. 2005), the errors continued in part because prosecutors urged juries to give no weight to mitigation evidence alleged not to have a causal nexus.

265

1    The prosecutor also misrepresented the evidence in order to mislead the jury.

2    *See Darden v. Wainwright*, 477 U.S. 168, 181–82 (1986); *see also Berger v. United*

3    *States*, 295 U.S. 78, 88 (1935) (prosecutor's improper suggestions "are apt to carry

4    much weight against the accused when they should properly carry none"). For

5    example, Powell emphasized that Dr. Scialli testified that one must have low birth

6    weight to be diagnosed with fetal "exposure or to have any type of syndrome or

7    anything like that." (Tr. May 22, 2006 at 72.) Because Kiles did not have a low

8    birth weight, "[w]e don't have anything there." (Tr. May 22, 2006 at 72.) This was

9    false, as Dr. Scialli was specifically discussing FAS, not any of the related

10   disorders. (Tr. May 16, 2006 at 37.) Drs. Cunningham and Gaughan made clear that

11   FAS and fetal alcohol exposure are not the same and that Kiles had the latter. (Tr.

12   May 9, 2006 a.m. at 40–41; Tr. May 15, 2006 at 38.) As another example, Powell

13   stated that Kiles was never in special education or "anything like that," when Kiles

14   had been placed in a vocational program in high school. (Tr. May 22, 2006 at 74.)

15   Further, the prosecutor stated that Kiles cut a man with a box-cutter "just

16   because of a foul in a basketball game"—conveniently leaving out that the man had

17   knocked out Kiles's teeth. (*Compare* Tr. May 22, 2006 at 61, *with* Tr. May 9, 2006

18   p.m. at 34.) He said that Kiles had assaulted his brother-in-law, but made no

19   mention of the fact that Kiles was protecting his sister from a beating. (*Compare*

20   Tr. May 22, 2006 at 62, *with* Tr. May 9, 2006 a.m. at 27.)

21   The prosecutor argued facts outside of the record when he told the jury a

22   detail of the crime that was not in the evidence; it had come up only at Kiles's 1990

23   hearing. (Tr. May 22, 2006 at 63 (stating that Kiles took Gunnel's food stamps

24   while she was in the shower); Tr. Feb. 7, 1990 at 133; PFR2 Dkt. 27 Ex. 23 at 2.)

25   The prosecutor improperly vouched for evidence presented at trial. *See*

26   *United States v. Younger*, 398 F.3d 1179, 1190 (9th Cir. 2005). For example, he

27   repeatedly used the term "we know" to describe a sequence of events that had not

28   been proven. (Tr. May 22, 2006 at 64.) The Ninth Circuit has specifically cautioned:

266

1   "We emphasize that prosecutors should not use 'we know' statements in closing
2   argument." *Younger*, 398 F.3d at 1191.

3          Counsel also failed to object to Powell's improper inflammatory comments.
4   S*ee Zapata*, 788 F.3d at 1114 (declaring inflammatory statements designed to
5   appeal to jury's passions improper, and ineffective assistance where defense fails
6   to object). For example, the prosecutor told the jurors that life outside of prison was
7   "like a jungle for [Kiles]," relying on racist stereotypes. (Tr. May 22, 2006 at 61.)
8   "The Constitution prohibits racially biased prosecutorial arguments." *McCleskey v.*
9   *Kemp*, 481 U.S. 279, 309 n.30 (1987). Further, the prosecutor preyed on the jurors'
10  fears, telling them that, if Kiles was not sentenced to death and put in solitary
11  confinement, he would be around other people and "someone might touch him
12  inappropriately. And who knows what will happen at that time." (Tr. May 22, 2006
13  at 61.) This was misleading, as Kiles had not been on death row in the eight prior
14  years and had been a model inmate. (*E.g.,* Tr. Apr. 27, 2006 at 32.)

15         The prosecutor's misleading and inflammatory remarks prejudiced Kiles by
16  creating the risk that he was sentenced to death in an arbitrary and capricious
17  manner. *See Furman*, 408 U.S. at 274 (Brennan, J., concurring). Had trial counsel
18  objected, the trial court would have appropriately restrained the State, and there is
19  a reasonable probability that the outcome of the sentencing proceeding would have
20  been different. The failure was also prejudicial because it limited appellate review
21  of the prosecutor's misconduct. *See Kiles*, 213 P.3d at 187.

22             **8.    Counsel's deficient performance at the mitigation phase**
                       **prejudiced Kiles.**
23

24         As discussed above, defense counsel conducted a deficient mitigation
25  investigation. Had counsel adequately investigated and prepared for mitigation,
26  Kiles's jury would "have been faced with a strikingly different and more accurate
27  picture" of Kiles's life circumstances. *Hovey v. Ayers*, 458 F.3d 892, 927 (9th Cir.
28  2006). A defendant is prejudiced where there is a reasonable probability that at least

267

one juror would have been persuaded to vote for life by what could have been presented in mitigation had counsel not performed deficiently. *See, e.g.*, *Sears*, 561 U.S. at 954–55.

Because of counsel's insufficient investigation and unreasoned decisions, the mitigation presentation consisted of two lay witnesses who did not know Kiles well, but who suggested he had a fine childhood and was a well-functioning individual; a member of the defense team who testified to second- and third-hand information from Kiles's friends and family, leaving the impression that no family member was willing to testify on Kiles's behalf; witnesses who testified that Kiles did well in prison—which, when not given the appropriate neuropsychological context, implied that Kiles could behave well when he chose to do so; mental-health experts who failed to accurately describe addiction as a disease and conveyed that Kiles was violent; and Dr. Hart, who essentially testified for the State.

The State followed this ineffectual presentation by offering two full days of testimony by experts who hammered home that Kiles had ASPD and was a selfish, violent person who enjoyed inflicting pain on others. They dismissed Kiles's serious mental illness, childhood trauma, and substance addiction, instead attributing everything to ASPD and violent choices. Dr. Moran read from and expanded on the baseless MCMI results as if they were fact. VanDreumel did not object to any of this and failed to meaningfully cross-examine the State's experts, effectively validating the expert's test results.

Even VanDreumel focused on a theme of Kiles as an inherently violent and aggressive individual with a quick temper, which she drove home in questioning witnesses and in closing. (*E.g.*, Tr. May 9, 2006 a.m. at 67–68; Tr. May 22, 2006 at 31, 38, 45.) She minimized his mental illness, substance addiction, and childhood trauma. Thus, she framed the question to the jury as whether this violent and aggressive man—who may have become this way through no fault of his own, but instead due to his family and how he was raised—warranted leniency. Had counsel

conducted an adequate investigation, the discussion at the mitigation phase would not have been about a violent man, but a mentally ill man, struggling to overcome lifelong trauma and addiction.

With an adequate mitigation investigation and testimony from a trauma expert, an addiction expert, and a brain-damage expert, the jury would have heard a properly contextualized mitigation story. These experts could have shown the jury how Kiles suffered brain damage and explained how it impaired his ability to cope with the world around him. A substance-abuse expert could have explained the truth about addiction: it is a disease, not a choice, that over time damages a person's brain and ability to engage in impulse control and emotional regulation. A trauma expert could have explained how the instability and constant state of fear that Kiles experienced as a child—and the family dysfunction that continued throughout his life—impaired his ability to respond to life's challenges. These experts could have explained how Kiles's organic brain damage, combined with his traumatic childhood and addiction, caused a number of deficits that seriously impaired his ability to cope with the world around him, despite his desperate efforts to overcome his addictions and other impairments and to a better life for himself. They could have made clear that Kiles did not make choices to use substances or to hurt others—his actions were a product of his addictions and mental illness, which were beyond his control. Especially in conjunction with additional lay-witness testimony to humanize Kiles, such expert testimony would have mattered.

Further, an adequate investigation would have undercut key elements of the State's case. First, appropriate and adequately prepared experts would have been able to directly undercut the State's claims about Kiles's ASPD and the MCMI results. The State would not have been able to point to the lack of concrete brain-damage evidence. This would have provided a counterweight to the State's efforts to reframe the results of Kiles's mental illness, addiction, and life-shaping trauma as signs of a personality disorder. Additionally, it would have counteracted the

State's claims that Kiles's mental-health and background-centered mitigation was all based on Kiles's self-report, which he had a motive to lie about. (Tr. May 9, 2006 p.m. at 24, 26; Tr. May 15, 2006 at 27–29, 50; Tr. May 22, 2006 at 72.)

Had counsel provided effective assistance to Kiles, the question to the jury would not have been whether this violent man had the capacity to make choices, but instead whether a mentally ill man in the throes of addiction warranted mercy. Had Kiles's jury been presented with this more accurate picture, there is a reasonable probability that at least one of Kiles's jurors would have imposed a different sentence. *Hovey*, 458 F.3d at 927. This is especially true where the jury "ultimately return[ed] a death verdict [for one death] and a verdict of life without parole [for the other deaths]." *Bean*, 163 F.3d at 1081. Because counsel failed to present critical and compelling mitigation, counsel's errors undermine confidence in the outcome of Kiles's mitigation phase.

### F.   Counsel provided ineffective assistance in failing to request a special verdict form listing which mitigating circumstances the jury found proven.

Trial counsel performed deficiently and prejudiced Kiles by failing to request special verdict forms, which would have clarified what mitigating circumstances jurors found proven before imposing death. The Eighth and Fourteenth Amendments require states to provide a mechanism for meaningful direct review of death sentences. *Gregg v. Georgia*, 428 U.S. 153, 197–98 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.); *see also State v. Brewer*, 826 P.2d 783, 790 (Ariz. 1992). To achieve such meaningful review, "it is important that the record on appeal disclose to the reviewing court the considerations which motivated the death sentence in every case in which it is imposed." *Gardner*, 430 U.S. at 361 (plurality opinion). Arizona law helps to ensure meaningful review in non-capital cases, for which the court is required to state for the record the mitigating and aggravating factors it considers and applies when imposing any sentence other than the presumptive term. A.R.S. § 13-701(C); *State v. Harrison*, 985 P.2d 486 (Ariz.

270

1   1999). However, Arizona law fails to offer such protections to capital defendants.

2   Arizona's death-penalty statute does not require the jury to identify in its verdict

3   form which mitigating circumstances individual jurors deemed proven. *See* A.R.S.

4   § 13-701 (1988). Counsel must request that specific findings be made. Because

5   Kiles's counsel did not make such a request, the verdict forms in Kiles's case reflect

6   only the ultimate sentence the jury imposed for each first-degree murder conviction.

7   (*See* ROA 919 at 1–3.)

8       As a result, when the Arizona Supreme Court conducted its independent

9   review of the "aggravation, mitigation, and the propriety of the sentence" in Kiles's

10  case, *Kiles*, 213 P.3d at 187, it did so without the benefit of knowing which

11  mitigating circumstances jurors had found proven. In other words, the court

12  conducted its appellate review without knowing the considerations that motivated

13  the death sentence. That appellate review was not the meaningful review

14  contemplated by *Gregg*. *See Gardner*, 430 U.S. at 361 (plurality opinion). That such

15  a review—done without information on what informed the jury's decision—could

16  not have been meaningful is especially true in this case, where the jury was asked

17  to consider 30 mitigating circumstances and where the jury determined that death

18  was the appropriate sentence on one count but failed to reach a unanimous verdict

19  for other counts. (*See* Tr. May 22, 2006 at 19–21; ROA 919 at 1–3.)

20      Counsel's failure to request special verdict forms indicating which mitigating

21  circumstances the jurors had found proven deprived Kiles of an adequate appellate

22  review and violated his rights under the Eighth and Fourteenth Amendments. Kiles

23  was thus prejudiced by counsel's deficient performance.

24      **G.    Counsel were ineffective in failing to object to juror questionnaires
25          and jury instructions that primed the jury to find that death was
            the appropriate sentence.**

26      The Eighth Amendment demands a heightened degree of "reliability in the

27  determination that death is the appropriate punishment in a specific case."

28  *Woodson*, 428 U.S. at 305 (plurality opinion). A sentencer must make an

271

"*individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Stephens*, 462 U.S. at 879. Moreover, the Sixth Amendment requires that an independent and impartial jury, not a judge, make the requisite findings for a death sentence. *See Ring*, 536 U.S. at 609. Consequently, for a death sentence to pass constitutional muster, an independent jury must impose it after an individualized determination of the appropriate punishment.

Counsel provided ineffective assistance in failing to object to the juror questionnaires and the jury instructions on the grounds that they conditioned the jury to favor the death penalty. As a result, Kiles did not receive an independent or individualized jury sentencing.

From the first part of the penalty phase, jurors were given the impression that they needed to be comfortable with imposing death because their role was to sentence Kiles to death. In the questionnaire, 10 of the 67 questions were about the death penalty, whereas only two asked about a life sentence. Moreover, the questions implied that it was the jury's duty to impose the death penalty. For example, question 56 asked:

> Assume you are on a jury to determine the punishment for a defendant who has already been convicted of murder and the law gives you a choice of imposing death or life imprisonment with parole eligibility after 25 years. Please check the statement below that best describes your feelings. Check only one.

Jurors were given the following four options, all focused on the death penalty:

> (1) I cannot vote to give the death penalty under any circumstances.
>
> (2) I am opposed to the death penalty but could vote to impose it in a proper case.
>
> (3) My decision on whether to impose the death penalty would depend upon the facts and circumstances of the case.
>
> (4) I would vote to impose the death penalty in every case where I could.

The questionnaire did not frame the jurors' choice as one between life or death, but

272

instead as among four different death-focused options. Through such questions, the jurors were conditioned from the outset to view death as the default sentence,[152] with no objection from trial counsel.

The mitigation-phase instructions similarly primed jurors to favor a death sentence. The jurors received instructions at the beginning of the mitigation phase and at the end, shortly before they began deliberations. (Tr. Apr. 24, 2006 at 4–10; Tr. May 22, 2006 at 14–26.) The instructions made the desired end point clear from the start, declaring that this was a "death penalty case[.]" (Tr. Apr. 24, 2006 at 7.) The instructions stated that the jurors needed to decide "whether to *oppose* the death penalty" and that "each juror may vote for death or against," again framing a decision for a life sentence as a contrary or aberrant position. (Tr. Apr. 24, 2006 at 8–9 (emphasis added); Tr. May 22, 2006 at 23.) Further, the instructions framed the question for the jurors as "whether to impose the death penalty" without providing a life sentence as an equal choice. (Tr. Apr. 24, 2006 at 9; Tr. May 22, 2006 at 23.)

Both the preliminary and final mitigation-phase instructions included the following particularly stark statement: "If your verdict is that the Defendant should be sentenced to death, the Defendant will be sentenced to death. If your verdict is that the Defendant should be sentenced to life, the Defendant will not be sentenced to death and the Court will sentence the Defendant to life in prison." (Tr. Apr. 24, 2006 at 9–10; Tr. May 22, 2006 at 24.). Again, the instruction insinuated to the jury that its duty was to impose death and that, should the jury abdicate that duty, then the court would be forced to step in and sentence the defendant.

In acceding to such instructions, counsel allowed the sentencing jurors to be given the impression that they had to act outside of the norm to impose a life sentence. As a result, Kiles's sentencing jurors were primed to impose death,

---

[152] Given the importance of primacy in learning, this emphasis on the death penalty when the jurors were first introduced to the case would have had a profound effect. *See* Claim 28, *supra*.

1    instead of making an independent and individualized decision based on the facts of

2    his case. *See Hurst v. Florida*, 136 S. Ct. 616, 624 (2016); *see also Ring*, 536 U.S.

3    at 597. Counsel's failure to object to these instructions undermined Kiles's

4    constitutional right to a reliable, individualized sentencing decision by an unbiased

5    jury and amounts to deficient performance. Moreover, this failure prejudiced Kiles:

6    had counsel objected to the instructions, there is a reasonable probability that the

7    court would have reworded the instructions and that, in turn, at least one juror would

8    have voted differently. Accordingly, counsel were ineffective with respect to the

9    mitigation-phase instructions, and Kiles is entitled to sentencing relief.

10       **H.    The cumulative effect of trial counsel's many instances of deficient
11              performance deprived Kiles of his right to counsel at the
              mitigation phase and resulted in an unreliable sentencing
12              proceeding.**

13       While each instance of counsel's deficient performance prejudiced Kiles, the

14   cumulative effect of those unreasonable missteps was particularly pronounced.

15       Here, counsel committed multiple errors during the mitigation proceeding.

16   Even when each error examined in isolation is not sufficiently prejudicial to warrant

17   reversal, the cumulative effect of multiple errors can still require relief. *See Alcala*

18   *v. Woodford*, 334 F.3d 862, 882–83 (9th Cir. 2003) (affirming grant of habeas relief

19   on the basis of cumulative effect of multiple errors by counsel); *Killian v. Poole*,

20   282 F.3d 1204, 1211 (9th Cir. 2002) (stating that the cumulative effect of errors

21   may be so prejudicial as to require reversal); *Harris ex rel. Ramseyer v. Wood*, 64

22   F.3d 1432, 1439 (9th Cir. 1995) (holding that the cumulative impact of numerous

23   deficiencies in defense counsel's performance was prejudicial). Even if this Court

24   were to find that no single error merits relief, the cumulative effect of all the errors

25   is so prejudicial that Kiles is entitled to relief. *See Boyde v. Brown*, 404 F.3d 1159,

26   1176 (9th Cir. 2005).

27       To the extent the post-conviction court declined to find cumulative error

28   because the Arizona state courts do not recognize the doctrine of cumulative

274

prejudice, its decision contravenes *Strickland*. See 28 U.S.C. § 2254(d); *see also White*, 895 F.3d at 671 (holding that the Arizona post-conviction court erred by separately addressing the prejudice arising from individual deficiencies at mitigation phase and observing that "[t]he test is whether it is reasonably likely that the result of the proceeding would have been different but for counsel's 'errors'" (quoting *Strickland*, 466 U.S. at 694)). This Court should find that, taken together, the multiple unreasonable actions and errors of trial counsel warrant relief.

**I.    The state post-conviction court's decision that Kiles did not state a colorable claim is no bar to this Court's de novo review of this claim.**

The state post-conviction court's reasoned decision with respect to counsel's failures at the mitigation phase, including the failure to present brain scans and evidence of intermittent explosive disorder, stated that Kiles had shown neither deficient performance nor prejudice. (*See* ROA 1214 at 2.)

The state-court merits ruling on this claim is contrary to and/or an unreasonable application of clearly established federal law for two distinct reasons. *See* 28 U.S.C. § 2254(d)(1). As noted *supra*, Claim 3, the only standard the state post-conviction court ever stated with respect to the prejudice prong of an ineffectiveness-of-counsel claim was an outcome-determinative standard: whether "the outcome would have been different." (ROA 1214 at 2.) That standard, however, is contrary to or an unreasonable application of the prejudice standard in *Strickland*. *See, e.g.*, *Thomas v. Clements*, 789 F.3d 760, 767–68 (7th Cir. 2015) (holding that the state court's "would have led to a different result" prejudice standard was an unreasonable application of *Strickland*); *Martin v. Grosshans*, 424 F.3d 588, 592 (7th Cir. 2005) (holding that the state court's prejudice inquiry— whether "the result of the proceeding would have been different"—was contrary to *Strickland*). Moreover, as noted earlier, the state court's failure to consider the cumulative effect of the prejudice from the various failures by trial counsel in the mitigation investigation and presentation was likewise an unreasonable application

275

1    of or contrary to clearly established Supreme Court precedent. *See, e.g.*, *Strickland*,

2    466 U.S. at 694–95; *supra*, Section H.

3         In addition, the ruling that there was no showing of deficient performance

4    was an unreasonable application of *Strickland* and *Wiggins*, which unambiguously

5    provide that unreasoned "decisions" based on an unreasonable investigation are

6    afforded no deference. *See Strickland*, 466 U.S. at 688; *Wiggins*, 539 U.S. at 521.

7    The Supreme Court has made clear that a state court must look beyond whether the

8    mitigation presented supports a "superficially reasonable mitigation theory" and to

9    the underlying investigation. *Sears*, 561 U.S. at 953–54.

10        To the extent that the state court made a determination of fact on this front,

11   that too was unreasonable. *See* 28 U.S.C. § 2254(d)(2); *see also, e.g.*, *Taylor v.*

12   *Maddox*, 366 F.3d 992, 999–1001 (9th Cir. 2004) (discussing ways in which

13   § 2254(d)(2) can be satisfied). As the state-court record makes clear, counsel failed

14   to investigate obvious lines of mitigation; failed to hire crucial experts who could

15   investigate such lines of mitigation, including brain damage; failed to provide their

16   own experts with critical information; failed to investigate the State's rebuttal

17   experts; and failed to develop a theory of mitigation that would persuade any jury

18   that leniency was warranted. In light of this failure to investigate, counsel's choice

19   to present no lay witnesses who knew Kiles well, to present no brain-damage expert

20   or evidence of brain damage, to present no trauma expert or anyone who could

21   properly explain and contextualize Kiles's traumatic upbringing, and to present a

22   mitigation theory that centered on Kiles as a violent individual, among other errors,

23   were necessarily deficient.

24        The finding of no prejudice was likewise unreasonable, both because the state

25   court used the improper legal standard, as described above, but also because the

26   state court—to the extent it made a factual finding—relied on an unreasonable

27   determination under § 2254(d)(2). *See Taylor*, 366 F.3d at 1001 ("[W]here the state

28   courts plainly misapprehend or misstate the record in making their findings, and the

276

misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable."). Here, the state post-conviction court ignored the prejudice demonstrated by the totality of persuasive mitigation evidence that trial counsel could have presented had they conducted an adequate investigation and been able to present and explain the significance of all relevant mitigating evidence. The finding was thus unreasonable under § 2254(d)(2). *See Williams,* 529 U.S. at 397–398; *Wiggins,* 539 U.S. at 536.

Because Kiles has satisfied § 2254(d), this Court's analysis is "unconstrained" by AEDPA deference.[153] *See Williams,* 529 U.S. at 405–06.

### J.   Conclusion

For the reasons stated above, Kiles's counsel provided ineffective assistance at Kiles's mitigation phase, thereby prejudicing Kiles. The state-court decision is no bar to this Court's de novo review of this claim, and Kiles is entitled to relief.

Claim Seven

**The trial court's numerous errors during the guilt phase of trial violated Kiles's constitutional rights.**

The trial court committed numerous errors during Kiles's guilt phase, infringing upon his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution. Kiles incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

### A.   The trial court erred by not appointing qualified, un-conflicted counsel, violating Kiles's rights under the Sixth and Fourteenth Amendments.

This claim was presented in Kiles's state post-conviction relief petition.

---

[153] Alternatively, Kiles alleges he can overcome any default by showing cause and prejudice attributable to the ineffective assistance of state post-conviction counsel. *See Martinez v. Ryan,* 566 U.S. 1, 9 (2012); *Strickland,* 466 U.S. at 688, 694.

(ROA 1189 at 10–18, 23–30.) The state post-conviction court denied the claim on the merits. (ROA 1214 at 1.) For the reasons below, the state court's denial of this claim constituted an unreasonable application of clearly established federal law, 28 U.S.C. § 2254(d)(1), and an unreasonable determination of the facts, *id.* § 2254(d)(2). Accordingly, § 2254(d) places no limitation on relief, and this Court may review the exhausted claims de novo.

### 1. The trial court erred by failing to conduct an appropriate inquiry into counsel's conflicts.

Kiles petitioned the trial court for appointment of un-conflicted counsel on numerous occasions. (*See* ROA 392 at 5; ROA 407 at 4; ROA 413 at 1–2; ROA 519 at 4; ROA 522 at 1–3; ROA 585 at 7); *see also supra*, Claim 1. There were two specific conflicts that the trial court was constitutionally required to address to protect Kiles's Sixth Amendment right to counsel. *See Cuyler v. Sullivan*, 446 U.S. 335, 347 (1980). The first was the irrevocably fractured relationship between Kiles and lead counsel Greg Clark. The second was the conflict of interest with co-counsel, Treasure VanDreumel.[154] Clark hired VanDreumel to defend his conduct as an attorney before the Arizona State Bar Association ("Bar"). (ROA 585 at 7.) At the same time, VanDreumel was representing Kiles while he was actively litigating Clark's ineffective assistance and conduct as an attorney in front of the Arizona Supreme Court and the Bar. (Tr. Jan. 7, 2002 at 68–69); *see* Claim 1, *supra*. The court failed to address either, and as a result Kiles was deprived of effective

---

[154] There were two other issues to which Kiles alerted the court regarding counsel: (1) Clark was unqualified to be appointed as capital counsel under the Arizona Rules of Criminal Procedure, and (2) the contract structure under which both his attorneys were paid created a conflict of interest. *See* Claim 1, *supra*. As to the first, the trial court held a hearing about Clark's qualifications, but deemed him qualified partly based on misrepresentations by Clark. (Tr. Oct. 7, 1998 at 21.) As to the second, the court decided that claim was best left for collateral review to determine whether a "plausible alternative defense strategy or tactic might have been pursued but was not" due to the attorneys' financial interests. *See United States v. Wells*, 394 F.3d 725, 733 (9th Cir. 2005).

1   assistance of counsel in violation of the Sixth Amendment.

2        Even though Kiles "alleged an actual conflict and adverse effect in sufficient

3   and not implausible detail," the court failed to conduct more than perfunctory,

4   superficial hearings on the truth of the allegations. *See United States v. Hearst*, 638

5   F.2d 1190, 1195 (9th Cir. 1980). The first time Kiles requested new counsel, the

6   court accused Kiles of trying to inject error into the proceedings.[155] (Tr. Jan. 22,

7   1999 at 14.) In another hearing, Kiles informed the court, "[i]f you keep Mr. Clark

8   on my case, I don't know how he is going to be able to defend me because there is

9   some things I need to tell my attorney, but I will not tell him." (Tr. Aug. 6, 1999 at

10  17.) The court failed to recognize the irreparable conflict between Kiles and Clark,

11  and instead held that Kiles had not yet received ineffective assistance of counsel.

12  (Tr. Aug. 6, 1999 at 47.)

13       Often the court chose to do whatever was most expedient rather than consider

14  Kiles's pleas for his right to counsel. For instance, when the conflict was first raised,

15  the court said, "I think if I appoint new counsel, we are going to be no further ahead.

16  In fact, we will be—in terms of time—we will be that much farther behind." (Tr.

17  Jan. 22, 1999 at 10.) This was nearly 18 months before Kiles's trial began. And

18  when Kiles alerted the court of the conflict under which VanDreumel represented

19  him, the court, without any reasoning, denied the request for un-conflicted counsel.

20  The judge was leaving the issue for appeal, as all he stated as a basis for his denial

21  was, "[W]e are making a record." (Tr. Jan. 7, 2002 at 70.) This was not a

22  determination on the merits, as constitutionally required. *See Schell v. Witek*, 218

23  F.3d 1017, 1025 (9th Cir. 2000).

24       The superficial hearings and cursory dismissals of Kiles's repeated pleas fell

25  well short of the trial court's duty to ensure Kiles's right to effective representation.

---

26  [155] The court even believed that *because* Kiles was facing a death sentence, his

27  attorney did not need to have substantive communication with him. "Well, if this

    were a simple burglary case, I would have expected Mr. Clark to be down and have

28  a heart-to-heart conversation with Mr. Kiles." (Tr. Jan. 22, 1999 at 10.)

1
2

## 2.    The trial court erred by failing to appoint qualified, un-conflicted counsel.

3    "[A] court confronted with and alerted to possible conflicts of interest must
4    take adequate steps to ascertain whether the conflicts warrant separate counsel."
5    *Wheat v. United States*, 486 U.S. 153, 160 (1988); *see also Holloway v. Arkansas*,
6    435 U.S. 475, 483–84 (1978); *Cuyler*, 446 U.S. at 347. Given the Sixth
7    Amendment's right to counsel, "a state trial court has no discretion to ignore an
8    indigent defendant's timely motion to relieve an appointed attorney." *Schell*, 218
9    F.3d at 1025. Where there is a conflict, generally a court may not resort to a concern
10    about a delay in the proceedings in denying a request for appointment of un-
11    conflicted counsel. *See United States v. Moore*, 159 F.3d 1154, 1161 (9th Cir. 1998)
12    (holding that if a request for un-conflicted counsel was not on the eve of trial, a
13    court could not dismiss such a request to avoid delay).

14    The trial court here was continually "confronted with and alerted to possible
15    conflicts of interest." *Wheat*, 486 U.S. at 160. Kiles informed the court explicitly in
16    pro per motions and at hearings that he had an irreparably fractured relationship
17    with lead counsel. (*See, e.g.*, ROA 413 at 1–2; Tr. Aug. 6, 1999 at 12–15.) Kiles
18    alerted the court that Clark had hired VanDreumel to represent Clark in Bar
19    proceedings, creating a conflict between VanDreumel's loyalties to both clients.
20    (Tr. Jan. 7, 2002 at 68–69.) Because Kiles's motions and statements on the conflicts
21    made "a strong showing" and the "matter was called to the attention of the trial
22    court well before the date of trial," the "denial of appellant's motion for a change
23    of appointed counsel was error." *United States v. Williams*, 594 F.2d 1258, 1261
24    (9th Cir. 1979).

25    "[T]o compel one charged with [a] grievous crime to undergo a trial with the
26    assistance of an attorney with whom he has become embroiled in irreconcilable
27    conflict is to deprive him of the effective assistance of any counsel whatsoever."
28    *Brown v. Craven*, 424 F.2d 1166, 1170 (9th Cir. 1970). The trial court deprived

280

1   Kiles of his Sixth Amendment right to counsel, leading to a "substantial and
2   injurious effect" on his conviction. *See Brecht v. Abrahamson*, 507 U.S. 619, 623
3   (1993). As such, Kiles's habeas relief must be granted.

**B.    The trial court denied Kiles a fair trial by denying his motion for a change of venue.**

6   Kiles raised this claim in his direct appeal. (DA2 Dkt. 86 at 85–90.) The state
7   court denied the claim. *See State v. Kiles*, 213 P.3d 174, 184–85 (Ariz. 2009). The
8   state court's ruling was contrary to and/or an unreasonable application of clearly
9   established federal law, 28 U.S.C. § 2254(d)(1), and it turned on an unreasonable
10   determination of fact, *id.* § 2254(d)(2). The strictures of § 2254(d) therefore do not
11   apply, and this Court can review the exhausted claims de novo.

**1.    Kiles's trial was marked by pervasive, prejudicial media coverage.**

14   "The requirement that a jury's verdict must be based upon the evidence
15   developed at the trial goes to the fundamental integrity of all that is embraced in the
16   constitutional concept of trial by jury." *Turner v. Louisiana*, 379 U.S. 466, 472
17   (1965) (internal quotation marks omitted). Given the rampant, negative publicity
18   Kiles and his case had received in Yuma, defense counsel moved before trial for a
19   change of venue. Defense counsel argued pretrial publicity had the probable effect
20   of precluding a trial with fair and impartial jurors. (Tr. Apr. 11, 2000 at 10.)

21   At argument on the motion, defense counsel stated, "Since the inception of
22   this case there's been two motions for change of venue. Both times it was reported
23   in the press, and not only was it reported in the press, but the comments made by
24   defense counsel as to why venue should be changed was reported." (Tr. Apr. 11,
25   2000 at 7.) In other words, because of how extensively the press was covering the
26   proceedings, counsel's complaints about what the press were reporting were then
27   re-reported in the press, exacerbating the very problem counsel hoped to proscribe.

28   The State told the court, "I really don't care where we try this case" (Tr. Apr.

281

1    11, 2000 at 29), but believed the motion for change of venue was premature because

2    there had not yet been any voir dire (Tr. Apr. 11, 2000 at 29).

3         The court denied the motion, in part because the judge stated that if he had

4    not been involved, he personally "would really have remembered very little about

5    this case." (Tr. Apr. 11, 2000 at 33–34.) The court did acknowledge that the press

6    coverage had been prejudicial against Kiles: "You kind of have to trust the press to

7    give a balanced account. I would hope from this point forward the press does give

8    a balanced account and that their news accounts would not seem to have Mr. Kiles

9    convicted before the trial even starts." (Tr. Apr. 11, 2000 at 34.) Still, the court

10   agreed to file the change-of-venue motions under seal, as they would be reported

11   on by the media and further prejudice Kiles. (Tr. Apr. 11, 2000 at 35–36.)

12        Upon that denial, defense counsel filed a petition for special action with the

13   Arizona Supreme Court, arguing that the media coverage was so pervasive and

14   negative that Kiles could not receive a fair trial in Yuma. (Case No. M-00-0006,

15   Pet. for Special Action, Mar. 10, 2000.) The Arizona Supreme Court declined to

16   accept jurisdiction over the complaint. (ROA 441 at 1.)

17                    **2.    Clearly established federal law required a change of venue**
                          **to ensure Kiles's due process rights.**
18

19        "[T]he right to jury trial guarantees to the criminally accused a fair trial by a

20   panel of impartial, indifferent jurors" whose decisions "must be based upon the

21   evidence developed at the trial." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (internal

22   quotation marks omitted). While total ignorance of the facts and issues is not

23   required, a court "cannot foreclose inquiry as to whether, in a given case, the

24   application of that rule works a deprivation of the prisoner's life or liberty without

25   due process of law." *Id.* at 723 (quoting *Lisenba v. California*, 314 U.S. 219, 236

26   (1941)). Where, as in Kiles's case, the "build-up of prejudice is clear and

27   convincing," the court erred in denying a motion for change of venue. *Id.* at 725.

28        In *Irvin*, the facts are remarkably similar to those in Kiles's case. In that case,

                                         282

1    news stories revealed the details of the petitioner's prior crimes and called him a
2    "confessed slayer." *Id.* at 725–26. The newspaper articles in *Irvin* "reported
3    petitioner's offer to plead guilty if promised a 99-year sentence, but also the
4    determination, on the other hand, of the prosecutor to secure the death penalty." *Id.*
5    No matter jurors' statements at voir dire, "influence that lurks in an opinion once
6    formed is so persistent that it unconsciously fights detachment from the mental
7    processes of the average man." *Id.* at 727–28.

8        A court has committed error in failing to grant a motion for change of venue
9    if there was "reasonable likelihood that prejudicial news prior to trial . . .
10   prevent[ed] a fair trial." *Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966). Prejudice
11   is presumed where the pretrial publicity is "massive," "pervasive," and "virulent."
12   *Id.* at 335, 354. When determining whether a change of venue is warranted, courts
13   must analyze such factors as the timing of the media, the degree of exposure to the
14   investigation, and whether the media is primarily factual or prejudicial. *See Casey
15   v. Moore*, 383 F.3d 896, 907–08 (9th Cir. 2004); *Ainsworth v. Calderon*, 138 F.3d
16   787, 795 (9th Cir. 1998), as amended, 152 F.3d 1223 (9th Cir. 1998).

17       Here, the trial court erred in not granting Kiles's motion for change of venue,
18   as the pervasive, negative, prejudicial media denied his constitutional right to trial
19   before a fair and unbiased jury. First, the media reporting on Kiles's case was
20   pervasive enough that motions had to be filed under seal. Defense counsel reported
21   that the press was reporting on motions as she filed them. (Tr. Apr. 11, 2000 at 8.)
22   There was no break in time between reporting and Kiles's trial, and he was tried
23   before a biased jury as a result.

24       In addition, the reporting was not simply factual but highly prejudicial. One
25   article printed in the Yuma Sun before Kiles's second trial declared, "Judge Denies
26   Killer Use of a Pen." Other headlines included, "Retrial for Convicted Murderer in
27   Limbo," and "Convicted Killer's Attorney Gets More Time to Appeal." (Case No.
28   CV-00-0143, Pet. for Special Action, May 5, 2000 at 37, 43–44.) As in *Irvin*, 366

283

U.S. at 725–26, news articles in Yuma before Kiles's trial in 2000 consistently reported that Kiles had been convicted before "based on overwhelming evidence of premeditation" and that he had confessed to multiple people. (Case No. CV-00-0143, Pet. for Special Action, May 5, 2000 at 36; Tr. Apr. 11, 2000 at 16.) And as in *Irvin*, news articles also published statements from Kiles's prior trial and appellate attorneys that Kiles was not innocent and would have pled guilty but for the State seeking the death penalty. (Tr. Apr. 11, 2000 at 13–15.)

Moreover, the press reported inflammatory details that jurors could not have heard in the courtroom. For instance, the newspapers reported about Kiles's prior violent felony—details that were so similar to the facts of the current case that they "could never come inside of a criminal trial." (Tr. Apr. 11, 2000 at 11.)

Finally, using materials from the first trial, newspaper articles in Yuma opined on the testimony and credibility of witnesses at the second trial, including Kiles himself. (Tr. Apr. 11, 2000 at 20–21.) Given the ineffective assistance of counsel that Kiles received at his first trial, "there was plenty of testimony and information that came in that was totally excludable from any other criminal case." (Tr. Apr. 11, 2000 at 26.) As a result, the press reporting was much more damaging than in the majority of cases covered by the media.

Because the newspaper reporting of Kiles's case was "massive," "pervasive," and "virulent," there was a "reasonable likelihood that prejudicial news prior to trial . . . prevent[ed] a fair trial." *Sheppard*, 384 U.S. at 335, 363. As such, the trial court erred and violated Kiles's Fifth, Sixth, Eighth, and Fourteenth Amendment rights. *See Brecht*, 507 U.S. at 623. Kiles is entitled to relief.

### C.    The trial court erred by not dismissing the venire after a highly prejudicial statement poisoned the jury pool.

Kiles did not present this claim in state court. Kiles can overcome any default by showing cause and prejudice, as the ineffective assistance of Kiles's state post-conviction counsel in failing to raise this claim constitutes cause for the default and

284

1   resulted in prejudice to Kiles. *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *Strickland*

2   *v. Washington*, 466 U.S. 668, 688, 694 (1984). Because this claim has not been

3   adjudicated by the Arizona state courts, the limitations on relief imposed by 28

4   U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider

5   the merits of the claim de novo.

### 1.    A prospective juror disclosed highly prejudicial information before the venire.

8       The voir dire for Kiles's second trial was conducted on July 7, 2000. Before

9   any juror questionnaires had been given out or counsel had an opportunity to ask

10   questions, the court began by asking the entire venire, "Have any of you ever seen

11   or heard or read anything about this case or have any of you ever heard anyone

12   express an opinion about this case?" (Tr. July 7, 2000 at 39.) The question itself

13   was anodyne, but invited prospective jurors to introduce extraneous information

14   about the case to the entire venire if they offered details beyond a yes or no answer.

15       At the court's instigation, one person did just that. One venire member who

16   raised her hand told the judge that Shemaeah's uncle worked with her husband and

17   was a family friend when the crime occurred. Rather than speak to the prospective

18   juror individually, the court asked follow-up questions before the entire venire,

19   inviting details. The court asked, "Did you talk to the—talk about the case either to

20   him or talk to your husband and he talked about things. . . ." The juror answered

21   that the uncle had told them about the crime and about the service held for the child.

22   The court continued, asking a question that would naturally elicit prejudicial details:

> THE COURT: Do you feel that you perhaps might have some inside information that other people don't?
>
> JUROR: No.
>
> THE COURT: Okay.
>
> JUROR: I just don't -- when they found the defendant guilty I was happy, you know.

(Tr. July 7, 2000 at 45–46.)

1   Defense counsel immediately requested that questioning stop being
2   conducted in this manner and moved to strike the venire. (Tr. July 7, 2000 at 46.)
3   Counsel correctly pointed out that a curative instruction would only have
4   exacerbated the problem, drawing more attention to the juror's statements about
5   Kiles's prior conviction. (Tr. July 7, 2000 at 47.) The judge denied the motion,
6   saying that it was premature, as the court and counsel could continue asking
7   individual jurors generally about media exposure to Kiles's case. It is worth noting
8   that the judge failed to even identify the problem, as the prejudicial information
9   introduced to the venire was not from the media, but rather from a prospective juror
10  who stated that she was happy when she learned of Kiles's previous conviction.

11      Despite this being a capital case, the court failed to take even basic
12  precautions to ensure Kiles received his right to a fair and impartial jury.

13  **2.      The trial court erred by failing to grant the motion to
14  dismiss the venire.**

15      "The requirement that a jury's verdict must be based upon the evidence
16  developed at the trial goes to the fundamental integrity of all that is embraced in the
17  constitutional concept of trial by jury." *Turner v. Louisiana*, 379 U.S. 466, 472
18  (1965) (internal quotation marks omitted). The integrity of the jury, especially in a
19  capital case, is paramount, and "any ground of suspicion that the administration of
20  justice has been interfered with" cannot be tolerated. *Mattox v. United States*, 146
21  U.S. 140, 149 (1892), *superseded by rule as stated in Peña-Rodriguez v. Colorado*,
22  137 S. Ct. 855 (2017).

23      Here, a juror introduced highly inflammatory, prejudicial information to the
24  entire venire that the court and both parties had "gone to extraordinary lengths" to
25  keep out of the proceedings. (Tr. July 7, 2000 at 46.) The court could not have
26  conducted an inquiry into whether this extraneous information biased jurors without
27  further reference to that prejudicial information. Though constitutional rights
28  should never be subject to scheduling concerns, as this information was introduced

1    on the first day of venire, the court could easily have dismissed the pool of

2    prospective jurors and started without a biased jury pool.

3         Because the court denied the motion to strike the venire, Kiles was denied

4    his constitutional right to a fair and impartial jury. Moreover, as noted by defense

5    counsel, a number of jurors most certainly overheard that prejudicial, extraneous

6    information introduced. (Tr. July 7, 2000 at 46.) If even one juror's deliberations

7    was affected, the defendant is denied the constitutional right to an impartial jury.

8    *Mach v. Stewart*, 137 F.3d 630, 633 (9th Cir. 1997). The trial court's denial of the

9    motion to strike the venire violated Kiles's due process rights under the Fourteenth

10   Amendment and had a "substantial and injurious effect" on his conviction. *See*

11   *Brecht*, 507 U.S. at 623.

12        **D.    The trial court's admission of an excessively gruesome photograph
                during Kiles's trial resulted in the denial of a fair trial and due
13              process.**

14        The admission of a photograph of LeCresha's decomposed body (*see* 2000

15   Trial Ex. 72) was raised by Kiles's appellate counsel as both a guilt-phase and

16   penalty-phase trial-court error. (DA2 Dkt. 86 at 56–66.) The Arizona Supreme

17   Court held that because the penalty-phase jury did not sentence Kiles to death for

18   the killing of the children, Kiles suffered no prejudice. *See Kiles*, 213 P.3d at 183.

19   Where, as in Kiles's case, there were different guilt- and penalty-phase juries, the

20   court's holding was unreasonable. It failed to recognize that regardless of the

21   sentence imposed, the photograph was so unduly prejudicial that it rendered the

22   guilt phase fundamentally unfair. The state court's denial of this claim was an

23   unreasonable application of or contrary to clearly established federal law, *see* 28

24   U.S.C. § 2254(d)(1), and rested on an unreasonable determination of the facts, *id.*

25   § 2254(d)(2). Accordingly, the strictures of § 2254(d) do not apply to this claim,

26   and this Court may review the merits of this claim de novo.

27        During questioning of the medical examiner, the State introduced Exhibit 72,

28   a gruesome photograph of the body of LeCresha, to the jury. (Tr. July 13, 2000 at

287

101–03; 2000 Trial Ex. 72); *see* Claim 3, *supra.* LeCresha's body had been discovered in a Mexican canal two weeks after her death. The photograph was illustrative not of her injuries from the crime, but of the grisly result of decomposition during prolonged submersion in water. The photograph showed "skin slippage," skin discoloration, soft tissue loss, and damage from crabs and other aquatic animals feeding on the body. (Tr. July 13, 2000 at 102–03.)

Notably, because of the damage to the body, the photograph did not demonstrate the wounds that caused LeCresha's death. While the photograph showed "evidence of skin laceration," which may have been caused during the assault, the pathologist stated that the "hole in the skull where the soft tissue has been eroded" was "all probably due—part of it—due to immersion" in the water. (Tr. July 13, 2000 at 103.) The photograph showed no evidence of an assault otherwise. The photograph served no evidentiary purpose, as it did not illustrate or support the medical examiner's testimony about LeCresha's cause of death. The defense asked no questions about LeCresha's autopsy or the photo, as there was no material issue of fact for which the photograph had any evidentiary value. (*See* Tr. July 13, 2000 at 103–07.)

The introduction of gruesome photographs of victims in capital trials raises issues of constitutional dimension. The Due Process Clause of the Fourteenth Amendment is violated when the jury is permitted to consider evidence that is so unduly prejudicial that it renders the trial fundamentally unfair. *See Romano v. Oklahoma*, 512 U.S. 1, 12 (1994); *Darden v. Wainwright*, 477 U.S. 168, 179–83 (1986); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).

Here, the admission of the photograph undermined the fairness of the trial and amounted to a denial of due process. *See Romano*, 512 U.S. at 12; *Bruton v. United States*, 391 U.S. 123, 131 n.6 (1968) ("An important element of a fair trial is that a jury consider only relevant and competent evidence bearing on the issue of guilt or innocence."). The medical examiner's testimony regarding the victims'

288

1   injuries and causes of death was uncontroverted by the defense. (Tr. July 13, 2000
2   at 103–07.) The medical examiner gave a cause of death without reference to the
3   photograph. (Tr. July 13, 2000 at 101–03). The gruesome photograph had no
4   probative value, as the photograph was not illustrative of the injuries suffered.

5        Instead, the photograph showed the state of the child's body after having been
6   in water for weeks, and so its admission at trial served only to incite the passions of
7   the jurors. The highly prejudicial effect of this evidence easily outweighed any
8   potential minimal probative value, and the introduction of the photograph
9   undermined the fairness of the trial and sentencing proceeding. It had a "substantial
10  and injurious effect" on Kiles's conviction. *See Brecht*, 507 U.S. at 623. The trial
11  court abused its discretion by allowing the photo to be admitted by the jury,
12  violating due process. *See Romano*, 512 U.S. at 12; *Bruton*, 391 U.S. at 131 n.6.

13  **E.    The trial court declined to give the jury instructions to which Kiles
14          was constitutionally entitled.**

15       At Kiles's guilt phase, despite the fact that Kiles had been charged with
16  premeditated murder, the trial court declined to instruct the jury that it could
17  consider an intoxication defense. The court likewise declined to properly instruct
18  the jury on premeditation and on reasonable doubt. The court's ineffectual jury
19  instructions denied Kiles his rights to a fair trial, to a complete defense, and to due
20  process under the Fifth, Sixth, and Fourteenth Amendments to the U.S.
21  Constitution.

22       Except as noted below, Kiles presented this claim on direct appeal. (DA2
23  Dkt. 86 at 42–56.) The Arizona Supreme Court's denial of this claim was contrary
24  to or involved an unreasonable application of the clearly established federal law
25  discussed below, *see* 28 U.S.C. § 2254(d)(1); it further rested on an unreasonable
26  determination of fact, *see id.* § 2254(d)(2).

27
28

289

**1.    The trial court erred in failing to instruct the jury that premeditation requires actual reflection.**

Despite Arizona law explaining that premeditation requires actual reflection, the trial court declined to give an instruction properly defining premeditation. The court instructed the jury as follows:

> Premeditation means the defendant acts with the knowledge that he will kill another human being when such intention or knowledge proceeds [sic] the killing by a length of time to permit reflection. An act is not done with premeditation if there is any instant – if it is the instant effect of a sudden quarrel or heat of passion.

(Tr. July 19, 2000 at 92–93.) Without additional clarification, the jury could not tell whether premeditation required actual reflection or simply time to premeditate. Further, the trial court's definition amounted to telling the jury that premeditation equaled knowledge plus "a length of time to permit reflection." In other words, premeditation equaled knowledge plus time. But then the prosecutor argued that premeditation "can be instantaneous. I mean that can be so fast." (Tr. July 19, 2000 at 35.) In essence, the court's instruction, especially as eroded by the State's argument, informed the jury that the State did not need to prove Kiles actually reflected for the jury to convict him of premeditated murder.

Under Arizona law, however, premeditation required *actual* reflection. *State v. Thompson*, 65 P.3d 420, 428 (Ariz. 2003) (explaining that the jury must find "beyond a reasonable doubt that the defendant actually reflected"); *see also State v. Dann*, 74 P.3d 231, 239 (Ariz. 2003) ("[I]f a court's instruction or a prosecutor's comment to the jury signals that the mere passage of time will suffice to establish the element of premeditation, those instructions or comments constitute error."); *supra*, Claim 3. Because the jury was not so instructed, it did not need to find anything more than knowledge and time in order to find Kiles guilty of Gunnel's premeditated first-degree murder.

The omission of actual reflection from the jury instructions meant that,

290

1  ultimately, the State was relieved of its burden to prove Kiles guilty of every

2  element of first-degree murder. That violated one of the most basic tenets of due

3  process: "the Due Process Clause protects the accused against conviction except

4  proof beyond a reasonable doubt of every fact necessary to constitute the crime with

5  which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970); *see also Sullivan v.*

6  *Louisiana*, 508 U.S. 275, 277–78 (1993). The Arizona Supreme Court decision

7  contravened and/or unreasonably applied this Supreme Court precedent and,

8  further, relied on an unreasonable determination of fact that the jury instruction

9  conveyed that premeditation required reflection. *Kiles*, 213 P.3d at 179–80.

10  Premeditation was the only issue in dispute for Gunnel's death, and the defense

11  sought to argue that her killing was not first-degree murder because it was not

12  premeditated. (*See* Tr. July 19, 2000 at 92–93); *see also supra*, Claim 3. Because

13  of the singular importance of premeditation in this case and the fundamental nature

14  of the constitutional violation that occurred, the violation had a substantial and

15  injurious effect on the verdict. *Brecht*, 507 U.S. at 623.

16          **2.    The trial court erred in denying Kiles an intoxication**
               **defense, which he was constitutionally entitled to present.**
17

18          Kiles was charged with the knowing premeditated first-degree murder of

19  Gunnel. *Kiles*, 213 P.3d at 181. The State charged Kiles with knowing, instead of

20  intentional, murder to take advantage of a workaround in Arizona law: a defendant

21  charged with *intentional* first-degree murder may raise the defense of voluntary

22  intoxication under Arizona law, but a defendant charged with *knowing* first-degree

23  murder may not. *Id.* at 182 (noting that A.R.S. § 13-503 (1989) "unambiguously

24  provides that intoxication is a defense only against the culpable mental state of

25  intentionally"). Because Kiles was not charged with a crime of intent, the court

26  declined to instruct the jury that intoxication was a defense to the crime of first-

27  degree murder. (*See* Tr. July 19, 2000 at 86–99.) The jury then had no legal avenue

28  to consider whether and how Kiles's intoxication at the time of the crime bore upon

the element of premeditation. (*See, e.g.*, Tr. July 17, 2000 at 157–58, 177.)

The court's denial of an instruction on an intoxication defense was unconstitutional for multiple reasons. First, it resulted from arbitrary State action, in violation of Kiles's due-process and equal-protection rights. Kiles was charged with a crime of knowledge solely to vitiate his intoxication defense. *Cf. State v. Lavers*, 814 P.2d 333, 346 (Ariz. 1991) ("Even if the State charged knowingly rather than intentionally to preclude the introduction of evidence of defendant's intoxication, we find such a legal strategy acceptable."). However, in the context of premeditated murder, there is no meaningful difference between intentional murder and knowing murder.[156] Under Arizona law, "'[p]remeditation' is the distinguishing feature of first degree murder. Its essence is reflective intent to kill." *State v. Walton*, 650 P.2d 1264, 1271 (Ariz. Ct. App. 1982 (quoting Judge R. Gerber, Criminal Law of Arizona at 147 (1978)). In such a scheme, allowing a State to discriminate against comparably situated defendants who could be charged with either knowing or intentional premeditated first-degree murder, based on whether the State wants to give the defendant the opportunity to present an intoxication defense, is both a due-process and an equal-protection violation. *Cf. Walton*, 650 P.2d at 1270 (recognizing that "[a] statute which prescribes different degrees of punishment for the same acts committed under like circumstances by persons in like situations is violative of a person's right to equal protection of the laws" (alteration in original) (quoting *People v. Calvaresi*, 534 P.2d 316, 318 (Colo. 1975)).

Second, the denial of the intoxication defense infringed on Kiles's right to present a complete defense. "Whether rooted directly in the Due Process Clause of

---

[156] This is in part because the definition of premeditated knowing murder, as given to Kiles's jury and as discussed above, makes little sense and effectively stripped "premeditation" of any meaning. Even the standard legal meaning of premeditation incorporates intent: premeditation is defined as the "[c]onscious consideration and planning that precedes an act." Black's Law Dictionary (10th ed. 2014). "[P]lanning" necessarily involves intent.

1   the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses
2   of the Sixth Amendment, the Constitution guarantees criminal defendants 'a
3   meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476
4   U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)
5   (citations omitted); *see also Simmons v. South Carolina*, 512 U.S. 154, 175 (1994)
6   (O'Connor, J., concurring) ("[O]ne of the hallmarks of due process in our adversary
7   system is the defendant's ability to meet the State's case against him."). While a
8   State can limit the availability of an affirmative defense based on a "valid" reason
9   without contravening due process, *Montana v. Egelhoff*, 518 U.S. 37, 53, 56 (1996),
10  the State cannot do so arbitrarily. Arizona allows defendants charged with crimes
11  of intent access to an intoxication defense; it can have no valid reason to deny other
12  defendants the ability to meet the State's case against them.

13          The denial of the opportunity to present a meaningful defense is particularly
14  stark in this context because, under Arizona law, the State need not *prove* actual
15  reflection. *Thompson*, 65 P.3d at 427 (premeditation requires actual reflection, but
16  the State need not offer direct proof of that actual reflection). When the State need
17  not directly prove premeditation, eliminating the intoxication defense drastically
18  curtails the opportunity to fairly challenge the element of premeditation, even when
19  the defendant was intoxicated to the point that he lacked the capacity to premeditate.
20  Especially in these circumstances, the denial of the intoxication defense amounted
21  to the denial of Kiles's right to present a meaningful defense.

22          Finally, given that the State need not offer direct proof of premeditation, the
23  denial of the intoxication defense effectively allowed the jury to find the defendant
24  guilty without the State having to prove every element of the crime. *See In re*
25  *Winship,* 397 U.S. at 364.

26          The court unconstitutionally denied Kiles the right to present an intoxication
27  defense, and the Arizona Supreme Court's contrary decision was an unreasonable
28  application of the clearly established federal law cited herein. A legal mechanism

293

for consideration of intoxication evidence would have altered the jury's analysis considerably, so the error violated Kiles's rights.[157] *See Brecht*, 507 U.S. at 623.

**3.      The trial court erred in improperly instructing the jury on the definition of "reasonable doubt."**

Kiles did not present this issue in state court. Kiles alleges he can overcome any default by showing cause and prejudice because of the ineffective assistance of appellate and state post-conviction counsel. *See Martinez*, 566 U.S. at 9; *Evitts v. Lucey*, 469 U.S. 387, 396 (1985); *Strickland*, 466 U.S. at 688, 694. Because this claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider the merits of the claim de novo.

Contrary to the wishes of trial counsel, the court instructed the jury that "[p]roof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt." (Tr. July 19, 2006 at 87; *see also* Tr. July 18, 2006 at 27–28 (counsel requesting a different instruction on the definition of reasonable doubt).) The phrase "firmly convinced" reduced the standard of proof the State had to satisfy to something less than reasonable doubt; it is akin to "clear and convincing." *See, e.g.*, *State v. Perez*, 976 P.2d 427, 442 (Haw. Ct. App. 1998), *aff'd in part, rev'd in part on other grounds*, 976 P.2d 379 (Haw. 1999).

The reasonable-doubt standard "is indispensable to command the respect and confidence of the community in applications of the criminal law." *In re Winship*, 397 U.S. at 364. "It is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned." *Id.* As there is a reasonable likelihood that the jury interpreted "firmly convinced" as a lesser standard of proof than "beyond a reasonable doubt," the court's instruction violated Kiles's rights to due process and trial by jury under the

---

[157] That the court's instructions on intoxication were unclear only exacerbated the problem. *See United States v. Bagby*, 451 F.2d 920, 927 (9th Cir. 1971).

294

1   Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution. *See id.*; *see also*

2   *Sullivan*, 508 U.S. at 278; *Estelle v. McGuire*, 504 U.S. 62, 72 (1991). Further,

3   given the nature of this constitutional error and the fact that the defense contended

4   that the State could not prove issues like premeditation beyond a reasonable doubt,

5   the error was not harmless under *Brecht*. *See Brecht*, 507 U.S. at 623.

### F.   The trial court unconstitutionally required that Kiles be physically restrained at the guilt phase.

8   Kiles did not present this claim in state court. Kiles alleges he can overcome

9   any default by showing cause and prejudice because of the ineffective assistance of

10  appellate and state post-conviction counsel. *See Martinez*, 566 U.S. at 9; *Evitts*, 469

11  U.S. at 396; *Strickland*, 466 U.S. at 688, 694. Because this claim has not been

12  adjudicated by the Arizona state courts, the limitations on relief imposed by 28

13  U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider

14  the merits of the claim de novo.

15  The trial court abused its discretion by requiring that Kiles be physically

16  restrained during the guilt-phase proceeding in violation of Kiles's rights under the

17  Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution. As discussed in

18  Claims 3 and 5, *supra*, Kiles had a due-process right to be tried without physical

19  restraints absent a compelling justification that those restraints were necessary.

20  Without any individualized determination of necessity by the court, Kiles was

21  forced to wear a leg brace and ankle shackles throughout his guilt-phase

22  proceedings. *See* Claim 3, *supra*. Multiple jurors saw and/or heard the shackles, or

23  noticed Kiles's odd gait due to the leg brace.

24  By failing to determine that shackling was necessary before requiring

25  restraints, the trial court denied Kiles the right to a fair trial. Juror observance of

26  shackling undermined the presumption of innocence to which Kiles was entitled,

27  and it denied him an impartial jury. *See Illinois v. Allen*, 397 U.S. 337, 344–45

28  (1970); *Estelle v. Williams*, 425 U.S. 501, 504–05 (1976); *see also Deck v.*

*Missouri*, 544 U.S. 622, 633 (2005). As the restraints were not justified, *see supra*, Claim 3, the court violated Kiles's due-process rights and substantially affected his trial. *See Brecht*, 507 U.S. at 623; *see also State v. Gomez*, 123 P.3d 1131, 1139–42 (Ariz. 2005) (vacating death sentence because defendant was shackled at penalty phase without individualized finding of necessity).

### G.   The trial court failed to make a complete record of the guilt-phase proceeding in violation of Kiles's constitutional rights.

Kiles did not present this claim in state court. Kiles alleges he can overcome any default by showing cause and prejudice because of the ineffective assistance of appellate and state post-conviction counsel. *See Martinez*, 566 U.S. at 9; *Evitts*, 469 U.S. at 396; *Strickland*, 466 U.S. at 688, 694. Because this claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider the merits of the claim de novo.

As discussed in Claim 15, *infra*, a complete record is necessary to protect Kiles's Fourteenth Amendment right to meaningful appellate review. *See Parker v. Dugger*, 498 U.S. 308, 321 (1991); *Draper v. Washington*, 372 U.S. 487, 500 (1963). This is especially true in capital cases, which demand heightened reliability. *See Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality opinion).

During the guilt phase, the trial court failed to record bench conferences (*see, e.g.*, Tr. July 12, 2000 at 82 ("THE COURT: We are back on the record. We talked about several things.")); conferences on jury instructions (Tr. July 18, 2000 at 2); discussions on how Kiles's penalty-phase would proceed after Arizona's sentencing scheme was declared unconstitutional in *Ring v. Arizona*, 536 U.S. 584 (2002) (*see* ROA 584 at 1); and a conference on the failure to give appropriate jury instructions resulting in a questionable verdict (Tr. July 20, 2000 at 3). The failure to make a record is not harmless; these off-the-record conferences concerned substantive constitutional issues that required appellate review to ensure Kiles was not denied

296

1   his fundamental rights. Because there was not a "'record of sufficient

2   completeness,' for adequate consideration of the errors assigned," *Draper*, 372 U.S.

3   at 497 (quoting *Coppedge v. United States*, 369 U.S. 438, 446 (1962)), the trial

4   court's failures denied Kiles meaningful appellate review in violation of due

5   process, and Kiles is entitled to relief. *See Brecht*, 507 U.S. at 623.

6   ### H.  The trial court violated Kiles's right to be free from double

7   jeopardy and a reliable sentencing determination.

8       Kiles did not present this claim in state court. Kiles alleges he can overcome

9   any default by showing cause and prejudice because of the ineffective assistance of

10  appellate and state post-conviction counsel. *See Martinez*, 566 U.S. at 9; *Evitts*, 469

11  U.S. at 396; *Strickland*, 466 U.S. at 688, 694. Because this claim has not been

12  adjudicated by the Arizona state courts, the limitations on relief imposed by 28

13  U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider

14  the merits of the claim de novo.

15      For the deaths of the children, Kiles was charged with four counts: two counts

16  of child abuse and two counts of first-degree murder, either premeditated or felony

17  murder with child abuse as the predicate felony. (ROA 1 at 2; CR89-15577 ROA 1

18  at 1–2.) He was convicted on all counts, and for each victim, at least seven jurors

19  convicted Kiles of both child abuse and premeditated murder. (ROA 482 at 5–8.) As

20  explained in Claim 11, *infra*, by allowing the child-abuse convictions to stand, the

21  trial court subjected Kiles to double jeopardy. A child-abuse charge necessarily

22  merges with premeditated murder where the only child abuse alleged *is* the

23  premeditated murder. As the Arizona Supreme Court explained:

24          [T]he child abuse-murder situation is akin to the assault-
25          murder situation. Although "assault and battery are always
            included in an unlawful homicide, they are not degrees of
26          such offense requiring the court where death results, to
            instruct that the defendant may be found guilty thereof."

27

28  *State v. Styers*, 865 P.2d 765, 771 (Ariz. 1993) (quoting *State v. Myers*, 125 P.2d

297

441, 444 (Ariz. 1942)). Notably, Kiles was charged with only one crime in Gunnel's death—premeditated murder. He was not also charged with assault. (ROA 1 at 2.)

Included in the Fifth Amendment to the U.S. Constitution is "protect[ion] against multiple punishments for the same offense." *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969). Since the child-abuse convictions should be subsumed by the premeditated murder convictions for the child victims, Kiles's separate child-abuse convictions violate his right to be free from double jeopardy.

While the prosecution for child abuse was itself improper, the trial court erred by not striking the child-abuse convictions upon receipt of the jury verdicts. A number of jurors found Kiles guilty of premeditated murder and child abuse, thereby convicting Kiles of the same crime twice. The defense requested the child-abuse verdicts be vacated, as the Arizona Supreme Court had explicitly held that "[t]he first degree murder statute, A.R.S. § 13-1105(A)(l ), *not the child abuse statute*, applies when a person intentionally kills a child victim." *Styers*, 865 P.2d at 772 (emphasis added). But rather than address the multiple convictions on the same offense, the trial court stated that while the defense motion raised "interesting issues," it would not vacate the verdicts. (Tr. Dec. 29, 2000 at 19–20.) As Kiles was subject to double jeopardy, the trial court's error violated Kiles's Fifth Amendment right and had "a substantial and injurious effect" on his convictions and resultant sentences. *See Brecht*, 507 U.S. at 623.

## I.   The cumulative effect of these trial-court errors prejudiced Kiles.

The Ninth Circuit recognizes that the cumulative effect of multiple errors may prejudice a defendant, even where no single trial error examined alone does so. *See Parle v. Runnels*, 505 F.3d 922, 934 (9th Cir. 2007) (finding habeas relief warranted when combined effect of multiple trial errors resulted in injurious effect on jury's verdict); *Alcala v. Woodford*, 334 F.3d 862, 894–95 (9th Cir. 2003) (affirming grant of habeas relief where multiple errors by court and counsel deprived defendant of a fundamentally fair trial); *Killian v. Poole*, 282 F.3d 1204,

1211 (9th Cir. 2002) (stating that cumulative effect of errors may be so prejudicial as to require reversal).

The trial court committed numerous errors during the guilt phase of Kiles's trial. Even if this Court were to find that none of them merits relief alone, the cumulative effect of all the errors is so prejudicial that Kiles is entitled to relief.

## Claim Eight

### The trial court's numerous errors during the penalty phase of trial violated Kiles's constitutional rights.

The trial court committed numerous errors during Kiles's penalty phase, infringing upon his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution. Kiles incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Except as noted below, Kiles did not present this claim in state court. Kiles alleges he can overcome any default by showing cause and prejudice, including the ineffective assistance of state counsel. *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *Strickland v. Washington*, 466 U.S. 668 (1984). He alternatively alleges that any procedural bar is not adequate or independent and that imposing default would be a miscarriage of justice. Because this claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply, and the Court may consider the merits of the claim de novo.

### A.    The trial court unconstitutionally required that Kiles be physically restrained at the penalty phase.

The trial court's error in requiring that Kiles be physically restrained during the penalty phase of trial violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.

As discussed in Claims 3, 5, and 7, *supra*, Kiles had a right under the Due Process Clause and the fair-trial guarantee not to be tried wearing physical restraints unless there was a compelling reason. "[G]enerally, a criminal defendant has a

constitutional right to appear before a jury free of shackles." *Gonzalez v. Pliler*, 341 F.3d 897, 900 (9th Cir. 2003) (quoting *Spain v. Rushen*, 883 F.2d 712, 716 (9th Cir. 1989)). The use of a stun belt in particular both "raises all of the traditional concerns about the imposition of physical restraints" and interferes with "a different set of a defendant's constitutionally guaranteed rights," including the right to confer with counsel and to participate in his case. *Gonzalez*, 341 F.3d at 900 (quoting *United States v. Durham*, 287 F.3d 1297, 1305 (11th Cir. 2002)). Absent a determination by the court that restraints are necessary for security and that no less-restrictive option exists, the Constitution prohibits the use of restraints during any phase of a capital case. *See id.*

Throughout penalty-phase proceedings, Kiles was forced to wear a leg brace and an electric stun belt around his waist.[158] At least one juror saw Kiles's physical restraints—including, once, a belly chain with handcuffs—both as Kiles was waiting to enter the courtroom and when he was sitting at the defense table.

The court failed to make the required finding before forcing Kiles to wear

---

[158] As the Ninth Circuit explained:

> A stun belt is an electronic device that is secured around a prisoner's waist. Powered by nine-volt batteries, the belt is connected to prongs attached to the wearer's left kidney region. When activated remotely, the belt delivers a 50,000-volt, three to four milliampere shock lasting eight seconds. Upon activation of the belt, an electrical current enters the body near the wearer's kidneys and travels along blood channels and nerve pathways. The shock administered from the activated belt 'causes incapacitation in the first few seconds and severe pain during the entire period. Activation may also cause immediate and uncontrolled defecation and urination, and the belt's metal prongs may leave welts on the wearer's skin requiring as long as six months to heal. Activation of a stun belt can cause muscular weakness for approximately 30–45 minutes and heartbeat irregularities or seizures. Accidental activations are not unknown.

*Gonzalez*, 341 F.3d at 901 (citations and internal quotation marks omitted).

300

1   physical restraints. On February 14, 2006, defense counsel raised the issue of
2   restraints at a hearing. (Tr. Feb. 14, 2006 at 41.) The trial judge agreed that he would
3   not have Kiles shackled while in the courtroom as he could not "recall any time that
4   Mr. Kiles has been a security problem, or risk." (Tr. Feb. 14, 2006 at 42.) The
5   prosecutor agreed that Kiles was not a bad prisoner and did not see any need for
6   shackles. (Tr. Feb. 14, 2006 at 42.) However, the prosecutor argued for leg braces,
7   and the parties decided that the Sheriff's Office needed to be involved. (Tr. Feb. 14,
8   2006 at 43.) They agreed that, at an already-scheduled hearing the following week,
9   they would discuss shackling with someone representing the Sheriff's Office. (Tr.
10  Feb. 14, 2006 at 45.) However, the record includes no minute order or transcript
11  from that subsequent hearing. Regardless of what transpired at that hearing, Kiles
12  was restrained at trial in a stun belt and leg braces, despite the court's finding (and
13  the prosecutor's agreement) that Kiles did not present a security risk. This violated
14  Kiles's constitutional rights.[159]

15       Because of the variety of prejudices attributable to restraints—both visible to
16  the jury and not—the fact that the court forced Kiles to wear restraints without an
17  individualized finding of necessity violated Kiles's rights to a fair trial, to an
18  impartial jury, and to effective assistance of counsel. The stun belt in particular
19  "may have [had] significant psychological consequences . . . [which] cannot be
20  understated." *Gonzalez*, 341 F.3d at 900. Even more so than shackles, the stun belt
21  "may impede the defendant's ability to communicate with his counsel and to
22  participate in the defense of the case." *Id.*; *see also Deck v. Missouri*, 544 U.S. 622,
23  631–32 (2005). All of these forms of prejudice infected Kiles's penalty phase and
24  had a "substantial and injurious effect" on his sentence. *See Brecht v. Abrahamson*,

25  ───────────────

26  [159] Further, to the extent that the Sheriff's Office made the decision regarding the
    stun belt, that decision process was unconstitutional. *See Gonzalez*, 341 F.3d at 902
27  (finding a court violated defendant's constitutional rights where correctional
    officers made the stun-belt determination, as "[t]he use of physical restraints is
28  subject to close *judicial,* not law enforcement, scrutiny").

1  507 U.S. 619, 623 (1993); *see also State v. Gomez*, 123 P.3d 1131, 1139–42 (Ariz.

2  2005) (vacating death sentence because defendant was shackled at penalty phase

3  without individualized finding of necessity). Kiles is entitled to relief.

4  **B.    The trial court violated Kiles's constitutional rights during his**

5  **penalty-phase voir dire.**

6        As discussed in Claim 4, *supra*, the Constitution safeguards against a

7  mandatory death sentence upon conviction. *Woodson v. North Carolina*, 428 U.S.

8  280 (1976) (plurality opinion). At the heart of that protection is the right to be

9  sentenced by jurors who make an individualized and reasoned moral decision

10  whether life or death is the appropriate sentence by considering and giving full

11  effect to all mitigation. *See, e.g.*, *Lockett v. Ohio*, 438 U.S. 586 (1978).

12        **1.    The trial court should not have struck Prospective Juror 56**

13        **based on her views of the death penalty, as she evidenced her**
     **ability to be fair and impartial.**

14        The trial court's removal of Prospective Juror 56 for cause violated Kiles's

15  federal constitutional rights. As discussed in Claim 4, *supra*, a state may not

16  "entrust the determination of whether a man should live or die to a tribunal

17  organized to return a verdict of death." *Witherspoon v. Illinois*, 391 U.S. 510, 521

18  (1968). In *Witherspoon*, the Supreme Court held that "a sentence of death cannot

19  be carried out if the jury that imposed or recommended it was chosen by excluding

20  veniremen for cause simply because they voiced general objections to the death

21  penalty or expressed conscientious or religious scruples against its infliction." *Id*.

22  at 522. The operative question is "whether the juror's views would 'prevent or

23  substantially impair the performance of his duties as a juror in accordance with his

24  instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (quoting

25  *Adams v. Texas*, 448 U.S. 38, 45 (1980)).

26        In *Adams*, the Court reversed a defendant's death sentence under

27  circumstances similar to those in Kiles's case. There, a trial court excused

28  prospective jurors from jury service who stated during voir dire "that they would

302

be 'affected' by the possibility of the death penalty, but who apparently meant only that the potentially lethal consequences of their decision would invest their deliberations with greater seriousness and gravity or would involve them emotionally." 448 U.S. at 49. The trial court also excluded for cause jurors who "were unable positively to state whether or not their deliberations would in any way be 'affected.'" *Id*. at 50. In reversing the defendant's death sentence, the Supreme Court stated: "[N]either nervousness, emotional involvement, nor inability to deny or confirm any effect whatsoever is equivalent to an unwillingness or an inability on the part of the jurors to follow the court's instructions and obey their oaths, regardless of their feelings about the death penalty." *Id*. It concluded that the trial court's "grounds for excluding these jurors were consequently insufficient under the Sixth and Fourteenth Amendments." *Id*.

As in *Adams*, the trial court's for-cause removal of Prospective Juror 56 due to her views on capital punishment violated Kiles's constitutional rights. The record contains no indication that Prospective Juror 56's views on capital punishment "would [have] prevent[ed] or substantially impair[ed] the performance of [her] duties as a juror[.]" *Witt*, 469 U.S. at 434. The record illustrates that she instead expressed that, though she did not personally believe in the death penalty, she could impose it. (Tr. Mar. 7, 2006 at 93.) The court dismissed her because she did not want to be a part of the process and was "just too conflicted, I think, in her views to be fair and impartial." (Tr. Mar. 16, 2006 at 5.) However, Prospective Juror 56 stated that she could consider all evidence and keep an open mind. (Tr. Mar. 7, 2006 at 92–93.) She explained more than once that she would follow the law. (Tr. Mar. 7, 2006 at 94, 96.) In sum, she was qualified to serve on Kiles's jury.

The trial court's decision to strike Prospective Juror 56 for cause prejudiced Kiles. Where a "scrupled, yet eligible" juror is removed in violation of *Witherspoon* and *Witt*, it constitutes prejudice and no harmless-error analysis is required. *Gray v. Mississippi*, 481 U.S. 648, 668 (1987).

1

2

### 2.    The trial court should have struck Prospective Jurors 78 and 82 for cause based on their views of the death penalty.

3   The trial court erred in refusing to strike for cause Prospective Jurors 78 and

4   82, who would have automatically imposed the death penalty. Under the Sixth and

5   Fourteenth Amendments, a defendant has a right to an unbiased and impartial jury.

6   *Morgan v. Illinois*, 504 U.S. 719, 727 (1992). In *Morgan*, the Supreme Court

7   emphasized that any juror who would automatically impose the death penalty upon

8   conviction of the offense charged must be removed for cause. *Id.* at 729, 735–36.

9   Kiles's counsel moved to strike Prospective Jurors 78 and 82 for cause

10   because their impartiality was substantially impaired by their strong support for the

11   death penalty. (Tr. Mar. 16, 2006 at 9–15.) These were the only two prospective

12   jurors whom counsel moved to strike for cause.

13   Prospective Juror 78 stated on his questionnaire and in voir dire that he would

14   vote for death for first-degree murder if it were an option, that he would give death

15   if a person were guilty beyond a reasonable doubt, and that a person should "expect

16   the max." (Tr. Mar. 8, 2006 at 55.) The court stated that he would not dismiss

17   Prospective Juror 78 for cause because:

18   
19   
20   
21
> a lot of people come into the process thinking that if you're convicted it's an automatic thing, the death penalty's an automatic thing, and they kind of have to be educated and they have to be impartially so, so I don't give an extreme amount of weight to those comments.

22   (Tr. Mar. 16, 2006 at 12.) This reasoning flies in the face of constitutional

23   precedent. The court conceded that "it's a little bit of a close case." (Tr. Mar. 16,

24   2006 at 12.) The prospective juror's statements were particularly concerning given

25   that a different jury had already found Kiles guilty beyond a reasonable doubt in

26   2000; the penalty-phase jury was going to be instructed to rely on that finding.

27   Prospective Juror 82 stated that the death penalty should be required where

28   there is no remorse. (Tr. Mar. 8, 2006 at 103–04.) He also said that his aunt was

304

1    beaten and murdered in 2001 by a man who entered her home, that proceedings

2    were ongoing for mental-illness reasons, and that he had sentenced a person to death

3    while serving on a Nevada jury in the late 1980s. (Tr. Mar. 8, 2006 at 99–102.) The

4    court denied counsel's motion to dismiss for cause because any concerns could be

5    addressed with jury instructions and argument.[160] (Tr. Mar. 16, 2006 at 15.)

6         This decision by the trial court was in error and prejudiced Kiles.

7    Preliminarily, the "presence of a biased juror cannot be harmless; the error requires

8    a new trial without a showing of actual prejudice." *United States v. Gonzalez*, 214

9    F.3d 1109, 1111 (9th Cir. 2000) (quoting *Dyer v. Calderon*, 151 F.3d 970, 973 n.2

10   (9th Cir. 1998)); *Hughes v. United States*, 258 F.3d 453, 463 (6th Cir. 2001). Here,

11   as a result of the trial court's errors, defense counsel was required to use two

12   peremptory strikes to remove these biased jurors from the panel. This violated

13   Kiles's Sixth Amendment rights. *See Ross v. Oklahoma* 487 U.S. 81, 89 (1988)

14   ("[T]he right to peremptory challenges is denied or impaired only if the defendant

15   does not receive that which state law provides." (internal quotation marks omitted)).

16   Further, the trial court's failure to strike these prospective jurors meant that Kiles's

17   peremptory challenges were unavailable to remove other jurors who ultimately

18   served on his jury even though they too were biased against Kiles. *See* Claim 4,

19   *supra.* The trial court's refusal to strike these two prospective jurors for cause had

20   a "substantial and injurious effect" on Kiles's sentence. *See Brecht*, 507 U.S. at 623.

21

22

23

24   _____

25   [160] The court relied on the State's arguments that both Prospective Jurors 78 and 82
     said that they could follow instructions. Promises that a juror can be fair or follow
26   the law are insufficient under the Constitution. "It may be that a juror could, in good
     conscience, swear to uphold the law and yet be unaware that maintaining such
27   dogmatic beliefs about the death penalty would prevent him or her from doing so."
     *Morgan*, 504 U.S. at 735. The court failed to search beyond the promise to follow
28   instructions, as required by *Morgan*.

305

**3.    The trial court erred in permitting statements in voir dire and on the juror questionnaire that implied that, if sentenced to life in prison, Kiles would be eligible for parole in 25 years.**

Both the juror questionnaire and voir dire proceedings included multiple statements that implied that Kiles could be eligible for parole after serving 25 years. This was not accurate based on the crimes of which he had been convicted. While the court later attempted to correct this misstep with a jury instruction (Tr. May 22, 2006 at 15; Tr. Mar. 16, 2006 at 17–19), that instruction was insufficient to counter the belief implanted in jurors' minds from the outset that Kiles could be eligible for parole after 25 years. This was particularly damaging given that Kiles had already served 17 years in prison by the time the penalty phase commenced.

The Supreme Court has held that a jury must be properly informed of a defendant's lack of eligibility for parole. *See Simmons v. South Carolina*, 512 U.S. 154, 163 (1994); *see also Lynch v. Arizona*, 136 S. Ct. 1818, 1819 (2016).

The first page of the juror questionnaire stated that, if the jury found that there were aggravating factors in this case, they would determine the penalty to be imposed. The questionnaire indicated, "[t]here would be two options. They include (a) death or (b) life in prison for which the defendant will be eligible for parole after serving 25 years. There are no other possible sentences for the murder charge." This statement was misleading, as it both failed to mention that Kiles already faced two sentences of 35 years in prison without the possibility of parole for his child-abuse convictions, and minimized that Kiles had been found guilty of three counts of first-degree murder. The questionnaire asked jurors their feelings on "a sentence of life in prison with parole eligibility after 25 years for a person convicted of first-degree murder." The questionnaire also posed a question that started as follows: "Assume you are on a jury to determine the punishment for a defendant who has already been convicted of murder and the law gives you a choice of imposing death or life imprisonment with parole after 25 years." Throughout voir dire, the prosecutor

306

1    made reference to these questions, including when speaking to jurors who were

2    eventually seated. (*E.g.*, Tr. Mar. 6, 2006 at 98, 129; Tr. Mar. 8, 2006 at 53, 102.)

3         This clearly influenced prospective jurors, likely including those who were

4    ultimately seated. The majority of the venire voiced objections to the release of a

5    person convicted of first-degree murder after 25 years. (ROA 760 at 4.) After voir

6    dire, defense counsel argued a motion to clarify that Kiles would not be eligible for

7    parole after 25 years. (Tr. Mar. 16, 2006 at 18.) The court admitted his error during

8    voir dire, stating: "Yeah, and I feel bad about that." (Tr. Mar. 16, 2006 at 19.) The

9    court decided that they could "probably undo the damage."[161] He continued: "I

10   wasn't thinking in terms of the 35 with the kids, and I was only thinking about the

11   murder counts. I wasn't even factoring in the child abuse." (Tr. Mar. 16, 2006 at

12   19.) Even the prosecutor noted: "That was the one theme that ran through all the

13   juror questionnaires more than anything else. People were concerned with life with

14   a possibility in 25." (Tr. Mar. 16, 2006 at 26.)

15        The trial court's error in permitting the jurors to hear via questionnaire and

16   voir dire that Kiles would be eligible for parole after 25 years had a "substantial and

17   injurious effect" on Kiles's sentence. *See Brecht*, 507 U.S. at 623. Jurors who

18   believed that Kiles could be released if they did not sentence Kiles to death were

19   much more likely to vote for death. *See Simmons*, 512 U.S. at 163 ("Holding all

20   other factors constant, it is entirely reasonable for a sentencing jury to view a

21   defendant who is eligible for parole as a greater threat to society than a defendant

22   who is not."). "The shorter the period of time a juror thinks the defendant will be

23   imprisoned, the more likely he or she is to vote for death on the final ballot." John

24   H. Blume et al., *Future Dangerousness in Capital Cases: Always "At Issue,"* 86

25   Cornell L. Rev. 397, 404 (2001). Kiles was prejudiced and is entitled to relief.

26   _____

27   [161] The trial court compounded this error—and did not undo the damage—by
     declining to sentence Kiles on the two child-abuse counts prior to the aggravation

28   phase, despite defense counsel's request that the court do so to make clear to the
     jury that Kiles was not going to be released from prison. (Tr. Mar. 16, 2006 at 30.)

307

1
2

### C. The trial court erred in denying defense counsel's motion for a directed verdict on the "especially heinous, cruel or depraved" aggravating circumstance.

3
4
5
6
7
8

The trial court denied defense counsel's motion pursuant to Arizona Rule of Criminal Procedure 20 for a directed verdict on the "especially heinous, cruel or depraved" aggravator under A.R.S. § 13-703(F)(6) (1988). (Tr. Apr. 4, 2006 at 25.) That denial was of constitutional magnitude, as no reasonable factfinder could find beyond a reasonable doubt that the aggravating circumstance existed based on the facts presented at trial.

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Kiles raised this claim on direct appeal. (DA2 Dkt. 86 at 91–92.) The Arizona Supreme Court determined that its analysis of this claim was subsumed by its independent review of the aggravating circumstances and denied the claim. *State v. Kiles*, 213 P.3d 174, 188 n.18 (Ariz. 2009). As explained in Claim 12, *infra*, that ruling was an unreasonable application of or contrary to clearly established federal law, *see* 28 U.S.C. § 2254(d)(1), and was based on unreasonable determination of facts, *see id*. § 2254(d)(2). Preliminarily, the Arizona Supreme Court relied upon Kiles's "admissions" and the testimony regarding "defensive wounds" in finding that the State had established "cruelty." *Kiles*, 213 P.3d at 188. Kiles made only one admission about how Gunnel's death unfolded, to Larry Hawkins, and there was testimony about only one defensive wound. (Tr. July 13, 2000 at 99; *see also* Tr. Mar. 21, 2006 at 21.) The Arizona Supreme Court also relied, for example, on the transfer blood stain on the door as evidence that Gunnel or her attacker was moving; however, Kiles's friend, Kale Johnson, had given a sworn statement acknowledging that he had left the blood stain on the door. (Tr. July 14, 2000 at 134–35; Tr. July 17, 2000 at 35; Tr. Apr. 27, 2006 at 78; PFR2 Dkt. 20 Ex. 1 at 7.)

25
26
27
28

As explained in detail in Claim 12, *infra*, based on the State's evidence at trial, no reasonable jury could find the (F)(6) aggravating circumstance proven beyond a reasonable doubt. *Lewis v. Jeffers*, 497 U.S. 764, 783 (1990). The trial court's finding that sufficient evidence existed to support this aggravator "was so

308

1   arbitrary or capricious as to" violate Kiles's due-process and Eighth Amendment

2   rights. *See id.* at 780. "Cruelty" was the sole aspect of the (F)(6) aggravator found

3   unanimously by the jury and affirmed on appeal with respect to Gunnel's death, and

4   the elimination of the (F)(6) aggravator would have significantly affected the jury's

5   sentencing deliberations. The trial court's denial thus had a substantial and injurious

6   effect on the sentencing verdict. *See Rogers v. McDaniel*, 793 F.3d 1036, 1042 (9th

7   Cir. 2015) ("[W]here a judge in a habeas proceeding is in grave doubt as to the

8   harmlessness of the error, the habeas petitioner must win." (quoting *Pensinger v.*

9   *Chappell*, 787 F.3d 1014, 1029 (9th Cir. 2015)).

10   **D.    The trial court erred in not striking the (F)(8) aggravator as**
11   **unconstitutionally vague.**

12   After the aggravation phase, the jury made *Enmund*/*Tison* findings regarding

13   the deaths of the two children. (*See* ROA 879 at 1–4.) Those findings reflected that

14   two of the jurors were not convinced beyond a reasonable doubt that Kiles himself

15   killed the children. (ROA 879 at 1–4.) Even so, the jury proceeded to find that the

16   State had proven the (F)(8) aggravator for multiple homicides. (*See* ROA 879 at 6,

17   9, 12); *see also* A.R.S. § 13-703(F)(8) (1988) ("[t]he defendant has been convicted

18   of one or more other homicides . . . during the commission of the offense").

19   Accordingly, the jury applied the (F)(8) aggravator even though it found the

20   State had not proven beyond a reasonable doubt that the defendant himself killed

21   more than one victim. If the aggravating circumstance applies in such broad

22   circumstances, it fails to genuinely narrow the class of offenders eligible for the

23   death penalty. *See Maynard v. Cartwright*, 486 U.S. 356, 363 (1988) (aggravating

24   circumstances that do not appropriately limit application of the death penalty are

25   unconstitutional because they fail to adequately channel the sentencing discretion

26   of the jury). The (F)(8) aggravator thus runs afoul of the Eighth Amendment. *See*

27   *id.*; *see also, e.g.*, *Godfrey v. Georgia*, 446 U.S. 420, 433 (1980).

28   Kiles raised this claim on direct appeal. (DA2 Dkt. 86 at 92–93.) However,

309

at no point did the Arizona Supreme Court consider or address Kiles's argument of vagueness under the Eighth Amendment. Instead of considering the issue raised by Kiles, the court misconstrued Kiles's argument and reaffirmed that the jury finding of the (F)(8) aggravator was not in error. *Kiles*, 213 P.3d at 186. Because the state court did not adjudicate this claim on the merits, this Court is not bound by the strictures of § 2254(d). The trial court erred in not striking this aggravator as vague, and—because Arizona is a weighing state in which jurors weigh the aggravators against the mitigation—that error was substantial and injurious. *See Brecht*, 507 U.S. at 623; *see also Brown v. Sanders*, 546 U.S. 212, 220 (2006).

**E.    The trial court denied Kiles's due-process rights by admitting a gruesome and unduly prejudicial photograph.**

Over defense objection, the trial court admitted into evidence a gruesome photograph, described in Claims 3 and 7, *supra*, at Kiles's aggravation phase. (Tr. Mar. 20, 2006 at 25–38; *see also* 2006 Trial Ex. 72.) The admission of that photograph, which was so haunting as to infect the reliability of Kiles's entire penalty phase, violated Kiles's due-process rights. *See, e.g.*, *Zant v. Stephens*, 462 U.S. 862, 879, 885 (1983) (the jury should not be allowed to consider evidence that is "totally irrelevant to the sentencing process" and fails to focus on "the character of the individual and circumstances of the crime"); *Romano v. Oklahoma*, 512 U.S. 1, 12 (1994).

Kiles raised this claim on appeal. (DA2 Dkt. 86 at 56–66) As discussed *supra*, Claim 7, the Arizona Supreme Court's determination that this photograph did not prejudice Kiles, *see Kiles*, 213 P.3d at 183, was an unreasonable application of or contrary to clearly established Supreme Court precedent, *see* 28 U.S.C. § 2254(d)(1), and rested on an unreasonable determination of fact, *see id.* § 2254(d)(2). Certainly the prejudice from such a disturbing image can infect matters beyond whether the defendant is sentenced to death for killing the particular victim in the photograph. Because of the horrifying nature of Exhibit 72 and its

1    tendency to arouse emotion in the jurors, along with its complete lack of probative

2    value, the trial court's admission of the photograph violated Kiles's due-process

3    rights and prejudiced him. *See Brecht*, 507 U.S. at 623.

4        **F.    The trial court unconstitutionally permitted the victims' attorney**
            **to file pleadings, including a requested jury instruction.**
5

6        The trial court permitted the victims' attorney to file pleadings and suggest

7    jury instructions. This caused the victims' attorney to effectively become a second

8    prosecutor, which violated Kiles's rights to due process and to a fair trial under the

9    Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.

10       The laws of Arizona prescribe in detail the rights of victims. Here, the trial

11   court erred when it permitted the victims' attorney to file pleadings. The victims'

12   attorney both filed a motion in response to the defense's motion to preclude victim-

13   impact evidence and filed a motion in limine to request a jury instruction on victim-

14   impact evidence (ROA 724; ROA 775.) The court adopted this instruction, but

15   added limitations. (Tr. May 22, 2006 at 22.)

16       That the trial court allowed Kiles to face prosecution by not one, but two,

17   entities violated his constitutional rights to due process and a fair trial. This error

18   had a "substantial and injurious effect" on Kiles's sentence. *See Brecht*, 507 U.S. at

19   623. Kiles is entitled to relief.

20       **G.    The trial court unconstitutionally permitted the introduction of**
            **victim-impact evidence.**
21

22       The trial court violated Kiles's constitutional rights when it permitted

23   prejudicial victim-impact evidence to be presented to the jury. The admission at a

24   capital-sentencing proceeding of any victim-impact evidence violates the Sixth,

25   Eighth, and Fourteenth Amendments to the U.S. Constitution. The constitutionality

26   of a capital-sentencing proceeding hinges entirely on its reliability—on minimizing

27   the risk that the sentencer will impose a death sentence based on an impermissible

28   consideration. *See, e.g., Gardner v. Florida*, 430 U.S. 349, 358 (1977) (plurality

1  opinion) ("It is of vital importance to the defendant and to the community that any

2  decision to impose the death sentence be, and appear to be, based on reason rather

3  than caprice or emotion.").

4          Victim-impact evidence is emotionally laden; it provokes in jurors a response

5  that is neither reasoned nor rational and that jurors are ill-equipped to set aside. The

6  Supreme Court has recognized that such evidence can be so unduly prejudicial as

7  to render a sentencing fundamentally unfair.[162] *See Payne*, 501 U.S. at 825; *see also*

8  *Gretzler v. Stewart*, 112 F.3d 992, 1009 (9th Cir. 1997). And, when members of the

9  victim's family offer characterizations and opinions about the crime, such evidence

10  violates due process and the Eighth Amendment. *See Booth v. Maryland*, 482 U.S.

11  496, 509 (1987), *overruled on other grounds by Payne*, 501 U.S. at 808.

12          Over defense objection (*see* ROA 695 at 1), the State presented victim-

13  impact statements at the mitigation phase, including the reading of letters by

14  Gunnel's siblings and an in-person statement by Gunnel's mother. (Tr. Apr. 24,

15  2006 at 22–27.) While the jury listened to the victim-impact statements, the State

16  displayed a large exhibit on an easel that was a collage of photographs of the

17  victims. (Tr. Apr. 24, 2006 at 22; 2006 Trial Ex. 163 at 1–2.)

18          The victim-impact evidence violated Kiles's constitutional rights to a fair

19  trial and a reliable sentence by injecting an irrelevant and highly prejudicial

20  characterization of the crime into his capital sentencing proceedings. The

21  statements detailing the victims' lives from childhood on, in conjunction with

22  numerous photographs shown to the jury, were so prejudicial as to undermine the

23  reliability of the sentencing proceeding. (Tr. Apr. 24, 2006 at 22, 24–26.) The

24  statements likely aroused in jurors enormous sympathy toward the victims and

25

26  [162] Indeed, any victim-impact evidence violates a defendant's rights. *See* Susan A.
   Bandes & Jessica M. Salerno, *Emotion, Proof and Prejudice: The Cognitive*
27  *Science of Gruesome Photos and Victim Impact Statements*, 46 Ariz. St. L.J. 1003,
   1035–36 (2014) (citing research on the increased punitiveness of jurors exposed to
28  victim-impact evidence); *but see Payne*, 501 U.S. at 808.

antipathy toward the defendant, especially when Gunnel's mother detailed how her granddaughter's body was found floating in a river. (Tr. Apr. 24, 2006 at 26.) Accordingly, the victim-impact testimony in this case violated Kiles's constitutional rights by inviting a verdict based on sentiment.

Finally, witnesses, including victim-impact witnesses, making statements at penalty-phase proceedings must be under oath and subject to cross-examination. The Sixth and Fourteenth Amendments guarantee a defendant the "right to be confronted with the witnesses against him." *See Pointer v. Texas*, 380 U.S. 400, 405 (1965) (internal quotation marks omitted). The Supreme Court made clear in *Crawford v. Washington* that the Confrontation Clause guarantees confrontation against those "who bear testimony" against a defendant. 541 U.S. 36, 51 (2004). The right to confrontation is the favored procedure for determining the reliability of a witness's statements, *see id.* at 61, and under the Eighth Amendment, nowhere is that reliability more necessary than in a capital-sentencing proceeding, *see Woodson*, 428 U.S. at 305 (plurality opinion).

Here, the State presented one in-person victim-impact witness who was neither under oath nor subject to cross-examination, and the State read two letters by people who were not present. (Tr. Apr. 24, 2006 at 22–27.) Kiles was thus denied the opportunity to cross-examine these witnesses, and that denial violated Kiles's Sixth, Eighth, and Fourteenth Amendment rights.

The presentation of victim-impact evidence influenced the jury. One juror commented that as soon as they saw the victim-impact photographs, the juror decided to vote for a death sentence. The admission of victim-impact evidence thus had a "substantial and injurious effect" on Kiles's sentence, *see Brecht*, 507 U.S. at 623, and Kiles is entitled to relief.

313

1
2
3

**H.    The trial court unconstitutionally permitted the State to ask witnesses at trial about statements contained in the reports of experts who testified at the first trial but not at the second trial, in violation of Kiles's rights.**

4    The trial court violated Kiles's rights under the Sixth, Eighth, and Fourteenth
5 Amendments when it permitted the State to ask witnesses about the content of
6 reports by experts who testified at Kiles's penalty-phase hearing in 1990, but who
7 did not testify at the second trial in 2006.

8    As discussed above, the Constitution guarantees a criminal defendant the
9 "right to be confronted with the witnesses against him." *Pointer*, 380 U.S. at 405
10 (internal quotation marks omitted). The Supreme Court has repeatedly held that
11 admitting testimonial out-of-court statements where defense counsel has not had
12 the opportunity to cross-examine the witness violates this guarantee. *E.g.*,
13 *Crawford*, 541 U.S. at 68–69 ("Where testimonial statements are at issue, the only
14 indicium of reliability sufficient to satisfy constitutional demands is the one the
15 Constitution actually prescribes: confrontation."); *see also State v. Prince*, 250 P.3d
16 1145, 1159 (Ariz. 2011) (holding that a "defendant has a right to confront
17 testimonial hearsay evidence introduced to establish an aggravating factor");
18 *Woodson*, 428 U.S. at 305 (plurality opinion) (highlighting heightened need for
19 reliability at capital sentencing). Testimonial evidence—that is, evidence prepared
20 in anticipation of trial—must be presented by the person who prepared it. *See, e.g.*,
21 *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 308–11 (2009).

22    At trial, the State directly asked multiple experts about statements made by
23 Kiles to experts who had been retained for the 1990 penalty-phase hearing. (*E.g.*,
24 Tr. May 8, 2006 at 41–44; Tr. May 9, 2006 p.m. at 11–12; Tr. May 15, 2006 at 50,
25 55.) However, these experts were retained and their reports were produced for a
26 trial that was deemed unreliable because of the ineffective assistance of counsel.
27 (*See* ROA 314 at 4.) Nevertheless, the court allowed the State to ask the 2006
28 experts about the content of prior experts' reports, which included statements by

314

1    Kiles, and whether they differed from Kiles's later statements. (*E.g.*, Tr. May 8,
2    2006 at 41–44; Tr. May 9, 2006 p.m. at 11–12; Tr. May 15, 2006 at 50, 55.)

3        VanDreumel objected under *Crawford* the first time the State asked about
4    Kiles's statements to prior experts. (Tr. May 8, 2006 at 41, 43, 54.) She argued that
5    Kiles was being denied his right to cross-examine the doctors who wrote the reports
6    as to whether Kiles made the statements in question. (Tr. May 8, 2006 at 54.) While
7    VanDreumel objected during the testimony, the grounds for her objection were not
8    placed on the record until the end of the day, and the court did not clearly rule on
9    the objection on the record. (Tr. May 8, 2006 at 54–58.) The court did state that he
10   would not allow a particular question. (Tr. May 8, 2006 at 44.) However, Powell
11   continued to ask questions along these lines, apparently with the court's approval,
12   even though the prior experts' reports had been prepared for trial and were clearly
13   testimonial. (Tr. May 8, 2006 at 44–47; 1990 Trial Def. Ex. 3; 1990 Trial Def. Ex.
14   4; 1990 Trial State Ex. 7.)

15       This penalty-phase testimony about what prior experts had written, without
16   confrontation, violated Kiles's Sixth, Eighth, and Fourteenth Amendment rights
17   and prejudiced Kiles. Throughout the penalty phase, the State maintained that Kiles
18   was not telling the truth—in particular, that his story had changed over the years.
19   (*E.g.*, Tr. May 22, 2006 at 72; Tr. May 8, 2006 at 48; Tr. May 9, 2006 p.m. at 11–
20   12; Tr. May 15, 2006 at 55.) As a result, the State argued that the jury should not
21   believe his mitigation pertaining to his traumatic childhood, substance abuse, and
22   mental illness. (*E.g.*, Tr. May 22, 2006 at 72.) In closing, the State focused on how
23   Kiles's experts' diagnoses were based on Kiles's "self-serving" statements. (Tr.
24   May 22, 2006 at 72.) The State went so far as to say "as you have heard from some
25   of the earlier doctors that examined him, everything was fine," as if the experts from
26   the 1990 hearing had testified. (Tr. May 22, 2006 at 73.) However, Kiles did not
27   have a chance to cross-examine these doctors, as required by *Crawford*. The jury
28   was likely influenced by this testimony, which became central to the State's

315

1    penalty-phase case. The constitutional violation therefore had a substantial and

2    injurious effect at the penalty phase. *See Ocampo v. Vail*, 649 F.3d 1098, 1114 (9th

3    Cir. 2011) (citing *Brecht,* 507 U.S. at 623, in finding that a confrontation clause

4    violation warranted habeas relief). Accordingly, Kiles is entitled to relief.

5    **I.    The trial court unconstitutionally failed to provide the jury with a**
         **special verdict form listing the specific mitigating factors they**
6        **found proven, violating Kiles's rights.**

7        The trial court violated Kiles's rights under the Eighth and Fourteenth

8    Amendments to the U.S. Constitution because it did not require the jurors to make

9    specific findings as to each proffered mitigating factor. *See supra*, Claim 6.

10       The Eighth and Fourteenth Amendments require states to provide a

11   mechanism for meaningful direct review of death sentences. *Gregg*, 428 U.S. at

12   197–98 (joint opinion of Stewart, Powell, and Stevens, JJ.). In order to achieve such

13   meaningful review, "it is important that the record on appeal disclose to the

14   reviewing court the considerations which motivated the death sentence in every

15   case in which it is imposed." *Gardner*, 430 U.S. at 361 (plurality opinion).

16   However, the trial court did not require the jury to identify which mitigating

17   circumstances individual jurors deemed proven. *See* A.R.S. § 13-701. The verdict

18   forms in Kiles's case thus reflect only the ultimate sentence the jury deemed

19   appropriate for each first-degree murder conviction. (*See* ROA 919 at 1–3.)

20       As a result, when the Arizona Supreme Court conducted its independent

21   review of the "aggravation, mitigation, and the propriety of the sentence" in Kiles's

22   case, *see Kiles*, 213 P.3d at 187–92, it did so without knowing the considerations

23   that motivated the death sentence. That appellate review was not the meaningful

24   review contemplated by *Gregg*. *See Gardner*, 430 U.S. at 361 (plurality opinion).

25   That such a review could not have been meaningful is especially true in this case,

26   where the jury was asked to consider an enumerated list of mitigating circumstances

27   and where the jury determined that death was the appropriate sentence on one count

28   of first-degree murder but that life imprisonment was appropriate for two other

316

1    counts. (*See* Tr. May 22, 2006 at 19–21; ROA 919 at 1–3.)

2    The trial court's failure to require special verdict forms indicating which

3    mitigating circumstances the jurors found proven deprived Kiles of an adequate

4    appellate review and violated his rights under the Eighth and Fourteenth

5    Amendments to the U.S. Constitution. This error had a "substantial and injurious

6    effect" on Kiles's sentence. *See Brecht*, 507 U.S. at 623. Accordingly, Kiles is

7    entitled to relief.

8    **J.    The trial court unconstitutionally failed to make a complete record**
     **at trial, in violation of Kiles's rights.**

9

10   As discussed above, a complete record is necessary to protect Kiles's

11   Fourteenth Amendment right to meaningful appellate review. *See Gregg*, 428 U.S.

12   at 195 (joint opinion of Stewart, Powell, and Stevens, JJ.). Kiles's trial court failed

13   to make a record of a number of essential penalty-phase proceedings. For example,

14   there is no transcript or other record of any discussion regarding either party's

15   proposed penalty-phase jury instructions. Further, at multiple points, counsel

16   approached the bench and had discussions that were not recorded. (*E.g.*, Tr. Apr.

17   27, 2006 at 50; Tr. May 16, 2006 at 45.) In addition, the questionnaires completed

18   by Prospective Jurors 98 and 85, whom the defense struck using peremptory strikes,

19   were not preserved. (ROA 895 at 4.)

20   Because of the omissions from the record, it was impossible for subsequent

21   counsel or the courts to conduct a proper review of the proceedings against Kiles.

22   The trial court's failure to ensure a complete record deprived Kiles of a meaningful

23   appellate review and violated his rights under the Eighth and Fourteenth

24   Amendments. This error had a "substantial and injurious effect" on Kiles's

25   sentence. *See Brecht*, 507 U.S. 619 at 623. Accordingly, Kiles is entitled to relief.

26   **K.    The cumulative effect of these trial-court errors prejudiced Kiles.**

27   The Ninth Circuit recognizes that the cumulative effect of multiple errors

28   may still prejudice a defendant where no single trial error examined in isolation is

317

sufficiently prejudicial to warrant reversal. *See, e.g.*, *Parle v. Runnels*, 505 F.3d 922, 934 (9th Cir. 2007); *Alcala v. Woodford*, 334 F.3d 862, 894–95 (9th Cir. 2003); *Killian v. Poole*, 282 F.3d 1204, 1211 (9th Cir. 2002). The trial court committed numerous errors during Kiles's penalty phase. Even if this Court were to find that none of them merits relief alone, the cumulative effect of all the errors is so prejudicial that Kiles is entitled to relief.

<b>Claim Nine</b>

**Kiles was deprived of his right to due process and a fair trial because the prosecutor engaged in pervasive misconduct.**

The State's misconduct violated Kiles's rights to a fair trial, to present a complete defense, to due process, and to reliable guilt and sentencing determinations in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution. Kiles incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.[163]

This claim was raised by Kiles's appellate counsel, but it was waived because Kiles's appellate attorney failed to argue the claim in his opening brief. (*See* ROA 1189 at 64–65); *see* Claim 11, *infra*. However, the claim was addressed on the merits by the state post-conviction court when the court considered appellate counsel's ineffective assistance. (ROA 1214 at 2; *see also* ROA 1189 at 61–65.) The state court's denial of this claim as not colorable was an unreasonable application of or contrary to clearly established federal law, *see* 28 U.S.C. § 2254(d)(1), and rested on an unreasonable determination of the facts, *id.* § 2254(d)(2). Accordingly, the strictures of § 2254(d) do not apply to this claim, and this Court may review the merits of this claim de novo.[164]

---

[163] In particular, Kiles incorporates the instances of prosecutorial misconduct laid out in Claims 3, 5, and 6, *supra*.

[164] Alternatively, Kiles alleges he can overcome any default by showing cause and prejudice attributable to the ineffective assistance of state post-conviction counsel. *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *Strickland v. Washington*, 466 U.S.

318

Prosecutors occupy a unique position in the justice system and are therefore subject to uniquely rigorous standards. Although a prosecutor "may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger v. United States*, 295 U.S. 78, 88 (1935). His interest in a criminal prosecution is not to win a case, but "that justice shall be done." *Id.* at 88; *see also United States v. Kojayan*, 8 F.3d 1315, 1323 (9th Cir. 1993) (explaining that a "prosecutor's job isn't just to win, but to win fairly, staying well within the rules"). Kiles's prosecutor David Powell engaged in misconduct at all phases of trial: he vouched for witnesses, mischaracterized or misstated evidence, put words into the mouths of witnesses, and put his own testimony into the record. The cumulative effect of Powell's acts rendered the trial fundamentally unfair and prejudiced Kiles's substantive rights.

To prevail on a prosecutorial misconduct claim, a petitioner must demonstrate that the prosecutor's conduct either (1) prejudiced a substantive right, *see Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) (citing *Griffin v. California*, 380 U.S. 609 (1965)), or (2) rendered the trial fundamentally unfair, *see Berger*, 295 U.S. at 78. When evaluating instances of prosecutorial misconduct, the reviewing court must consider the cumulative effect of the harm. *See Berger*, 295 U.S. at 89 (awarding a new trial because of "probable cumulative effect" of instances of prosecutorial misconduct). As the prosecutor's conduct both prejudiced Kiles's substantive rights and rendered the trial fundamentally unfair, the misconduct had a "substantial and injurious effect" on Kiles's convictions and sentences. *See Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993).

### A. The prosecutor committed misconduct in the guilt-phase proceedings.

Powell argued a theory of how the crime was committed that could not be
_____
668, 688, 694 (1984).

1   reasonably inferred from the evidence. *See United States v. Hermanek*, 289 F.3d
2   1076, 1101 (9th Cir. 2002) (holding that the prosecutor committed misconduct in
3   urging the jury to assume facts that were not in evidence and could not be
4   reasonably inferred from the evidence). There was scant evidence to support
5   Powell's theory of how the crime occurred. (*See* Tr. July 12, 2000 at 104–41; Tr.
6   July 13, 2000 at 93–107; Tr. July 14, 2000 at 4–61; Tr. Mar. 21, 2006 at 4–34; Tr.
7   Mar. 27, 2006 at 11–140; Tr. Mar. 29, 2006 at 26–74.)

8       Additionally, Powell's misleading and inflammatory arguments were not
9   based on the evidence and were improper. *See Darden v. Wainwright*, 477 U.S. 168,
10  180–81 (1986) (explaining that a prosecutor commits misconduct when he
11  manipulates or misstates the evidence at trial); *Zapata v. Vasquez*, 788 F.3d 1106,
12  1113–14 & n.6 (9th Cir. 2015) (explaining that the prosecutor committed "serious
13  misconduct" by offering "as though it was fact" a "fictional" account of the
14  defendant's use of racial slurs as the victim died).

15      **1.   The prosecutor repeatedly mischaracterized testimony,
16           made speculative arguments, and used inflammatory
             language in his guilt-phase opening and closing.**

17      A prosecutor may not make inaccurate statements that may mislead or
18  confuse the jury about the evidence. *See King v. United States*, 372 F.2d 383, 395
19  (D.C. Cir. 1966); *United States v. Robledo-Vela*, 45 F. App'x 567, 568 (9th Cir.
20  2002) (finding "significant prosecutorial misconduct in the form of misstating
21  evidence, and that this error was not harmless"). A prosecutor's comments create
22  prejudicial error if they provide personal and institutional guarantees of
23  trustworthiness of the government and its case. *See United States v. Smith*, 962 F.2d
24  923, 933 (9th Cir. 1992).

25      As discussed in Claim 3, *supra*, Powell's theory of the crime had next to no
26  support from the evidence. In his guilt-phase opening statement, Powell claimed
27  that Kiles began beating Valerie Gunnel in her bedroom. (Tr. July 10, 2000 at 13.)
28  The beating continued into the living room, where Gunnel died. (Tr. July 10, 2000

320

at 13.) Presumably, Powell's objective was to convey that the prolonged, moving attack was evidence that Kiles premeditated the killing. However, as Detective Brian Rodgers testified, there was no blood spatter or castoff on the walls in Gunnel's bedroom. (Tr. July 17, 2000 at 65.) Though a bloody pillow and a ratchet were found in Gunnel's bedroom, Rodgers testified that items were moved around after the murder in what looked like an attempt to clean up the scene. (Tr. July 11, 2000 at 166–67.) Powell never asked the State's experts—the pathologist or the blood-spatter expert—about evidence probative of where the attack on Gunnel had started. (Tr. July 13, 2000 at 93–107; Tr. July 14, 2000 at 4–61.) Regardless, Powell asserted that Gunnel was first attacked in her bedroom.

Because Powell had little evidentiary support for this theory, he mischaracterized—and even made up—testimony to support his claim that Kiles had first hit Gunnel in her bedroom. Perhaps most egregious were Powell's repeated and forceful misrepresentations during closing argument of Larry Hawkins's testimony. *See supra*, Claim 3. For instance, Powell proclaimed several times that Hawkins had testified that Kiles first attacked Gunnel in her bedroom. (Tr. July 18, 2000 at 22; Tr. July 19, 2000 at 27; Tr. July 19, 2000 at 30; Tr. July 19, 2000 at 81–82.) However, Hawkins never testified to this, and his Silent Witness letter nowhere suggested that Kiles beat Gunnel in her bedroom. (Tr. July 13, 2000 at 3–80; 2000 Trial Ex. 90.) Powell further alleged in closing that Gunnel "put up a fight," and he claimed that Hawkins had testified to that point. (Tr. July 19, 2000 at 82.) But Hawkins never did. (Tr. July 13, 2000 at 3–80.) Powell intentionally misstated Hawkins's testimony to mislead the jury into believing the State had a clear-cut case that Gunnel's death was premeditated.

Powell also told the jury in closing that photographs of blood patterns from the crime scene were "physical evidence." Powell continued, "Like [defense] counsel told you in opening, it can't be argued with." (Tr. July 19, 2000 at 29.) This argument purposefully misstated defense counsel's position and conflated physical

321

evidence with scientific or forensic evidence. Defense counsel had conveyed in opening that the scientific evidence in Kiles's case was not subject to argument. (Tr. July 10, 2000 at 34–35); *see* Claim 3, *supra*. However, counsel had not said the same of the photographs. Moreover, there was no scientific evidence that Gunnel was attacked in her bedroom; none of the State's experts gave any such testimony at the guilt phase. (Tr. July 12, 2000 at 104–41; Tr. July 13, 2000 at 93–107; Tr. July 14, 2000 at 4–61.) Rather, Powell told the jury, "Let's all be blood spatter experts for a little bit now, okay." (Tr. July 19, 2000 at 28.) Powell misled the jurors, insinuating that the State's theory of the crime and the "physical evidence" had the same credibility as expert testimony on forensic evidence.

Compounding the mischaracterizations of evidence, Powell made comments intended to inflame the jury. For example, he announced that Gunnel had "savage wounds" on her; the wound on her face was "ungodly." (Tr. July 19, 2000 at 28.) He also made speculative and inflammatory comments during his rebuttal argument, surmising that Kiles's thought process must have been, "I guess since we're killing one we may as well kill them all. Let's kill the whole family. Let's kill two generations." (Tr. July 19, 2000 at 77.)

Finally, in his closing statement of the guilt-phase proceeding, Powell told the jury: "The [S]tate maintains to you, ladies and gentlemen, never has a case exhibited more premeditation than the one we exhibit now." (Tr. July 19, 2000 at 36–37.) Powell's comments created prejudicial error, as they constituted personal and institutional guarantees of trustworthiness of the government and its case. *See Smith*, 962 F.2d at 933. The purpose of a closing argument "is to explain to the jury what it has to decide and what evidence is relevant to its decision." *Sandoval v. Calderon*, 241 F.3d 765, 776 (9th Cir. 2000). Instead of offering relevant evidence, Powell gave the jury extraneous information about this case by comparing it to other cases—information that the jury could not consider in its deliberations. *See Fields v. Brown*, 503 F.3d 755, 779 (9th Cir. 2007) (holding that "evidence developed

against a defendant must come from the witness stand"). This was improper and prejudicial. *See Darden*, 477 U.S. at 180–81; *Smith*, 962 F.2d at 933; *Robledo-Vela*, 45 F. App'x at 568; *Zapata*, 788 F.3d at 1113–14.

> ## 2. The prosecutor mischaracterized the scientific evidence during his guilt-phase opening.

In his opening statement at the guilt phase, Powell also misled the jury in a different way, by misrepresenting what the scientific evidence in Kiles's case could prove. Powell stated that DNA could show the "chronology of what happened inside [Gunnel's] apartment" and "it's going to prove to you what the defendant did, that he killed three people." (Tr. July 10, 2000 at 16–17.) But DNA testing can do neither of those things. In this case, it was used to determine whether an "individual can be the source of this stain" of blood taken from the crime scene. (Tr. July 12, 2000 at 112–13.) Still, Powell attempted to falsely ascribe forensic certainty to the State's theory. *See United States v. Ruiz*, 710 F.3d 1077, 1085 (9th Cir. 2013) (holding that improper vouching includes "suggesting that information not presented to the jury supports the witness's testimony"); *see also United States v. Kerr*, 981 F.2d 1050, 1053 (9th Cir. 1992) (holding that a prosecutor "has no business telling the jury his individual impressions of the evidence").

Powell also misled the jury as to what blood-spatter expert Tom Bevel could tell them when he testified at trial. Powell told them that Bevel would tell the jury "what happened in that west bedroom to those two children." (Tr. July 10, 2000 at 20.) Blood-spatter science is an inexact one, and while it can perhaps provide background on how blood evidence came to be in a crime scene, like DNA it cannot tell the jury who committed the crime. (Tr. July 12, 2000 at 112–13.)

Powell's repeated insistence that the scientific and forensic evidence given at trial supported the State's theory of the crime was misleading. Powell tried to stamp the State's theory of the crime with the imprimatur of scientific certainty (*see* Tr. July 10, 2000 at 16–17), and, in doing so, committed misconduct.

**3.    The prosecutor improperly testified on the record during the guilt phase.**

Powell improperly put his own testimony on the record when questioning witnesses. In one example, when questioning a witness for the State about statements made by Kiles, Powell asked leading, testimonial questions:

> Q. Do you recall him saying anything about, Valerie just went off on me. I had no choice in the matter. I had to beat her to death.
>
> A. No, sir, no, sir.
>
> Q. Did he tell you anything about, I'm really in a bind, I got three bodies I need to get rid of here?
>
> A. No, sir, no, sir.
>
> Q. Did he mention anything about the two guys that also helped him kill someone leaving him in a lurch?
>
> A. He didn't mention nothing like that to me, sir.

(Tr. July 10, 2000 at 173.) While the jury was instructed before deliberations that "what the lawyers said is not evidence" (Tr. July 19, 2000 at 87), that charge was far from adequate to cure the State's pattern of improper questioning. That Powell testified to the crime and how it was committed, rather than eliciting that testimony from the witness, was prejudicial misconduct.

**4.    The prosecutor failed to disclose impeachment evidence about one of its witnesses.**

Kiles's arresting officer, Officer David Sherman, who testified for the State, had committed malfeasance by previously falsifying a urine test. The malfeasance was discovered prior to Kiles's trial, and Sherman chose to retire rather than face disciplinary sanctions.

Under *Brady v. Maryland*, 373 U.S. 83 (1963), the State was required to disclose this impeachment information about Sherman to the defense. It is unclear whether this material information was disclosed to defense counsel in a timely manner. Without this information, defense counsel was hindered from effectively

324

impeaching Sherman. Any withholding of this or other impeachment material by the State constituted misconduct. *See Brady*, 373 U.S. at 90.

### 5. The prosecutor improperly dehumanized the defendant in the guilt-phase closing.

"[P]resented with a criminal defendant, even well-meaning people fall prey to the stereotype that, whether for reason of biology or culture, Black people are inherently violent and dangerous." *See* Br. for the Nat'l Black Law Students Ass'n as Amicus Curiae in Supp. of Pet'r, *Buck v. Davis*, 137 S. Ct. 759 (2017) (No. 15-8049), at 2.

Where the State could not support its narrative with evidence, it tried to draw on jurors' implicit racial biases. The State improperly used the phrase "feeding frenzy" to dehumanize Kiles, an African-American male, and to invoke the racial stereotype of African-American men as dangerous and animalistic.[165] "By describing a defendant in animalistic terms, a prosecutor is improperly bringing race into the courtroom." Shana Heller, *Dehumanization and Implicit Bias: Why Courts Should Preclude References to Animal Imagery in Criminal Trials*, 51 No. 4 Crim. L. Bulletin ART 4 (Summer 2015).

Powell first used the term while cross-examining Kiles. Powell asked Kiles about Kale Johnson, another African-American male, and his involvement in the crime. Kiles testified that Johnson killed the children. Powell asked, "Was it like a feeding frenzy now?" Later, in closing, Powell repeatedly invoked this highly prejudicial phrase against Kiles. "[I]t's gory, this feeding frenzy." (Tr. July 19, 2000 at 30.) Powell went on to say "feeding frenzy was a word I generated, of course, because. . . . How else do you describe that?" (Tr. July 19, 2000 at 77.) In his

---

[165] According to Merriam-Webster, a "feeding frenzy" is defined as "a wildly aggressive attack of prey by an animal or group of animals" or an "aggressive human activity likened to frenzied feeding by predatory animals." Merriam-Webster, *Feeding Frenzy* (Sept. 18, 2018), https://www.merriam-webster.com/dictionary/feeding%20frenzy.

325

attempt to portray Kiles as a hyper-violent predator, Powell told the jury that, when Kiles was beating the children, he was "just walking around, just making sure they were dead." (Tr. July 19, 2000 at 36.) Such statements were intended to play on the jury's implicit biases about African-American men as predatory.

Studies have confirmed that implicit racial biases affect how jurors make determinations of guilt or innocence. *See, e.g.*, Justin D. Levinson et al., *Devaluing Death: An Empirical Study of Implicit Racial Bias on Jury-Eligible Citizens in Six Death Penalty States*, 89 N.Y.U. L. Rev. 513, 563 (2014). Crucially, "jurors unknowingly misremember case facts in racially biased ways." Justin D. Levinson, *Forgotten Racial Equality: Implicit Bias, Decisionmaking, and Misremembering*, 57 Duke L.J. 345 (2007). The State's invoking of a racial stereotype to improperly influence the jurors' determinations prejudiced Kiles and rendered his conviction unreliable. As the prosecutor's conduct during the guilt phase both prejudiced Kiles's substantive rights and rendered the trial fundamentally unfair, habeas relief is warranted. *Donnelly*, 416 U.S at 643. These errors individually and cumulatively caused prejudice. *See Berger*, 295 U.S. at 89 (granting a new trial because of "probable cumulative effect" of instances of prosecutorial misconduct).

**B.    The prosecutor committed further misconduct in the penalty-phase proceedings.**

The State's misconduct continued during the penalty-phase proceeding, prejudicing Kiles. Kiles can again show that the prosecutor's conduct both prejudiced his substantive rights and rendered the trial fundamentally unfair. *See Donnelly*, 416 U.S. at 643; *Berger*, 295 U.S. at 78.

**1.    The prosecutor improperly struck a juror on the basis of race during voir dire.**

The State committed misconduct in using a peremptory strike to exclude an African-American prospective juror from the jury based on race. *See Batson v. Kentucky*, 476 U.S. 79 (1986). Kiles's counsel's notes indicate that there were four

African-American prospective jurors out of a total of 142. Only one African-American person ultimately served on Kiles's jury. (ROA 895.) The State used a peremptory strike to remove another African-American person, Prospective Juror 96, without apparent cause other than race. (ROA 895 at 4.) As discussed *supra*, Claim 4, nothing in the juror's questionnaire evidenced a justification for the strike, and several non-black jurors who expressed similar discomfort with the death penalty (and who were comparable to Prospective Juror 96 in other ways) were not struck. *See Miller-El v. Dretke*, 545 U.S. 231, 241 (2005) (holding "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination"). Because the prosecutor's race-based strike undermined the fairness of Kiles's trial, the misconduct prejudiced Kiles. *Id.*

### 2.     The prosecutor improperly vouched for witnesses and evidence.

Powell's opening statement at Kiles's aggravation phase involved repeated improper vouching, "placing the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggesting that information not presented to the jury supports the witness's testimony." *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993). Powell told the jury he was going to prove the case through "good police work." (Tr. Mar. 20, 2006 at 72.) He also vouched for the letter Hawkins had written, telling the jury it was "consistent with the physical evidence." (Tr. Mar. 20, 2006 at 79.) But doing so was misconduct. *See Kerr*, 981 F.2d at 1053.

In addition, in his opening, Powell repeatedly—and improperly—used the phrase "we know" to tell the jury what facts "we know" about the crime. (*See* Tr. Mar. 20, 2006 at 67–69, 71, 72, 73.) For instance, after listing several things "we know," Powell told the jury, "We know this because the defendant admitted it to several people" (Tr. Mar. 20, 2006 at 68), though these admissions had been

1    contested by witnesses at the guilt phase. (*See, e.g.*, Tr. July 13, 2000 at 12; Tr. July
2    17, 2000 at 149.) The Ninth Circuit has held that "we know" is only properly used
3    if it is used "to marshal evidence actually admitted at trial and reasonable inferences
4    from that evidence, not to vouch for witness veracity or suggest that evidence not
5    produced would support a witness's statements." *United States v. Younger*, 398
6    F.3d 1179, 1191 (9th Cir. 2005). In Kiles's case, the State committed misconduct
7    by telling the jury "we know" to treat as proven the State's theory of the crime
8    before any evidence had been introduced.

9        Because of the improper vouching and argument in Powell's opening at the
10   aggravation phase, the defense moved for a mistrial. (Tr. Mar. 20, 2006 at 84–88.)
11   Defense counsel argued that it would be "hard to unring this bell." (Tr. Mar. 20,
12   2006 at 87.) Despite recognizing that "Mr. Powell did cross the line in terms of
13   arguing his case," the trial court denied the motion, and the jury was left with the
14   State's insupportable theory framing the proceedings. (Tr. Mar. 20, 2006 at 91.)
15   The court declined to issue a contemporaneous curative instruction (Tr. Mar. 20,
16   2006 at 91), and the State's vouching went uncured, causing prejudice to Kiles.

17/18    **3.    The prosecutor continued to advance an unsupported theory of the crime through improper questioning of expert witnesses.**

19       Rather than eliciting testimony based on the facts of the crime, at the penalty
20   phase Powell asked hypothetical questions of the State's forensics experts in order
21   to support his theory of the crime. As Powell's hypotheticals were divorced from
22   the evidence, this method of questioning was misleading to the jury. Powell
23   questioned the medical examiner who autopsied Gunnel with such a hypothetical:

24/25/26       Q. Doctor, if the testimony in this case were that an assault took place on Valerie in one room and that she was knocked unconscious and that she later regained consciousness and walked into another room where the assault continued, would that mean to you that she was awake at the time?

27       A. Well, she would have to be able to walk.

28       Q. And that means the first blow would not have been the

1    fatal blow?

2         A. That's correct.

3         MR. POWELL: Nothing further. Thank you.

4    (Tr. Mar. 21, 2006 at 34.) Of course, there was no such testimony in this case.

5         In similar fashion, Powell asked the State's blood-spatter expert, Tom Bevel,

6    to opine on hypotheticals outside of Bevel's area of expertise to try to establish the

7    State's theory of the crime. For example, Powell asked Bevel how much force was

8    necessary to cause a skull fracture—when it was unclear whether the bone fragment

9    in question was the result of a skull fracture. (Tr. Mar. 27, 2006 at 68.) Beyond the

10   unsupported hypothetical, Bevel was not a medical examiner or a forensic

11   pathologist. That, however, did not stop Powell from trying to elicit testimony

12   beyond the scope of Bevel's expertise. *See Cheney v. Washington*, 614 F.3d 987,

13   996 n.4 (9th Cir. 2010) (holding that "prosecutorial misconduct may occur through

14   the prosecutor's own vouching remarks or when the prosecutor elicits vouching

15   testimony from witnesses").

16        Finally, Powell misstated Kiles's testimony to better suit the State. For,

17   example, while questioning a detective about Kiles's arrest, Powell asked, "[W]e

18   have a man who's testified that he killed his girlfriend and her two children by

19   beating them to death and there's no blood on those shoes, correct?" (Tr. Apr. 3,

20   2006 at 130.) But Kiles had never testified that he had killed the children. (Tr. July

21   17, 2000 at 151–224.) Powell's assertion was "calculated to mislead the jury,"

22   undermining the trial's integrity and prejudicing Kiles. *See Berger*, 295 U.S. at 85.

23             **4.    The prosecutor used inflammatory language to influence the**
24                     **jury.**

25        As he had done during the guilt phase, Powell improperly used inflammatory

26   phrases during the aggravation and mitigation phases. He told the jurors they would

27   see "ungodly amounts of blood" from Gunnel's death. (Tr. Mar. 20, 2006 at 70.)

28   He said that "as disturbing as that is," Kiles then beat the girls "so fiercely that one

329

1    of his hands become [sic] raw, torn, and bloody." (Tr. Mar. 20, 2006 at 70–71.) In
2    truth, the testimony had been that Kiles's hand was "scratched up" (Tr. July 17,
3    2000 at 223), and that Kiles had "a few scars on his hand" (Tr. July 10, 2000 at
4    144–45). Powell called the crime scene "carnage." (Tr. Mar. 20, 2006 at 71.) Powell
5    used such language to inflame the jury and influence their deliberations.

6    **5.    The prosecutor's theory of the crime was not reasonably inferred from the evidence.**
7

8    Once again, the State's theory of the crime was not a reasonable inference
9    based on the evidence presented at trial. *See Hermanek*, 289 F.3d at 1101.

10   Detective Brian Rodgers again testified at the penalty phase that there was
11   no blood spatter or castoff in Gunnel's bedroom to support the State's theory. (Tr.
12   Apr. 3, 2006 at 22.) Though there were individual bloody items found in Gunnel's
13   bedroom, Rodgers testified he believed they had been transferred there, as many of
14   the items in the house were moved after the crime. (Tr. Apr. 3, 2006 at 99–100.)
15   Moreover, Rodgers was the only person to testify directly about the validity of the
16   State's theory. Rodgers, an experienced detective and lead investigator on Kiles's
17   case, opined, "I don't think [Gunnel] was—after things started, I don't think she
18   ever made it to the east bedroom." (Tr. Apr. 3, 2006 at 100.)

19   Even so, in his closing, Powell continued to assert the State's fictional
20   version of the crime by saying that "the physical evidence is very strong" that
21   Gunnel "ran to the east bedroom. The defendant chased her there." (Tr. May 22,
22   2006 at 64.) Gunnel's death "had to be a long, drawn out fight." (Tr. May 22, 2006
23   at 64.) These allegations were still almost wholly unsupported by the evidence and
24   were far from a reasonable inference from the evidence. (Tr. July 12, 2000 at 104–
25   41; Tr. July 13, 2000 at 93–107; Tr. July 14, 2000 at 4–61; Tr. Mar. 21, 2006 at 4–
26   34; Tr. Mar. 27, 2006 at 11–141; Tr. Mar. 29, 2006 at 26–74.) They served only to
27   influence the jury's determination of Kiles's sentence. *See Brecht*, 507 U.S. at 623.

28

330

**6.   The prosecutor committed misconduct during his penalty-phase closing.**

The prosecutor committed misconduct in his mitigation-phase closing argument by urging the jury to disregard the law and misleading the jury on the law. First, he suggested that the jury disregard the law on mitigation because following the law would not serve "justice." (Tr. May 22, 2006 at 75.) Second, he implied that the jury could only consider mitigating evidence if it had a causal connection to the crime (Tr. May 22, 2006 at 58–59, 73–74), which the Supreme Court has repeatedly held is unconstitutional, *see, e.g.*, *Tennard v. Dretke*, 542 U.S. 274, 284–87 (2004). These improper arguments were among the last things the jury heard before retiring to deliberate Kiles's fate and prejudiced Kiles.

As the prosecutor's penalty-phase misconduct both prejudiced Kiles's substantive rights and rendered the trial fundamentally unfair, habeas relief is warranted. *See Griffin*, 380 U.S. at 623; *Zapata*, 788 F.3d at 1114–15; *Hermanek*, 289 F.3d at 1101; *Berger,* 295 U.S. at 78.

**C.   The prosecutor's performance rendered the trial fundamentally unfair and violated Kiles's substantive rights.**

A prosecutor oversteps "the bounds of that propriety and fairness which should characterize the conduct of such an officer" when he, among other things, misstates facts in his cross-examination of witnesses, "put[s] into the mouths of such witnesses things which they had not said," and assumes prejudicial facts not in evidence. *Berger*, 295 U.S. at 84. As the Supreme Court has acknowledged, "the average jury, in a greater or less degree, has confidence that these obligations . . . will be faithfully observed. Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." *Id*. at 88.

The State committed each of these indiscretions, prejudicing Kiles. The cumulative effect of the State's misconduct rendered Kiles's proceedings unfair and

331

1    violated his due-process rights. *See Wood v. Ryan*, 693 F.3d 1104, 1116 (9th Cir.

2    2012) (explaining that "[e]ven when separately alleged incidents of prosecutorial

3    misconduct do not independently rise to the level of reversible error, '[t]he

4    cumulative effect of multiple errors can violate due process.'" (quoting *United*

5    *States v. Nobari*, 574 F.3d 1065, 1082 (9th Cir. 2009))). The State's misconduct

6    had a substantial and injurious effect on Kiles's convictions and sentences. *See*

7    *Brecht*, 507 U.S. at 623. Kiles is therefore entitled to habeas relief.

**Claim Ten**

8

9    **Juror misconduct at Kiles's guilt- and penalty-phase proceedings**
     **deprived Kiles of his rights to a fair and impartial jury, the**
10   **assistance of counsel, confrontation, equal protection, and a fair**
     **trial.**
11

12   Because of juror misconduct, Kiles was denied the right to be tried by a fair

13   and impartial jury and to a fair trial, among other rights, in violation of the Fifth,

14   Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution. Kiles

15   incorporates by specific reference all facts, allegations, and arguments made

16   elsewhere in this Petition.

17   While this claim was not presented below, there was no adequate state-court

18   mechanism for this claim to be heard previously. *See* 28 U.S.C. § 2254(b)(1)(B).

19   Under Rule 32 of the Arizona Rules of Criminal Procedure, extra-record claims are

20   appropriately brought in state post-conviction proceedings. *See, e.g.*, *Lambright v.*

21   *Stewart*, 241 F.3d 1201, 1203–04 (9th Cir. 2001) (explaining that Arizona courts

22   required that claims needing factual development be raised in post-conviction relief

23   proceedings rather than on direct appeal); *State v. West*, 845 P.2d 1097, 1102 (Ariz.

24   Ct. App. 1992) (explaining that petitioner's claims of prosecutorial misconduct

25   "would require an evidentiary record that could be created through a petition for

26   post-conviction relief pursuant to Rule 32, Arizona Rules of Criminal

27

28

1    Procedure").[166] In this case, however, state post-conviction counsel were precluded

2    by order from speaking to jurors. (ROA 1056 at 1.) Because this claim has not been

3    adjudicated by Arizona state courts, the limitations on relief imposed by 28 U.S.C.

4    § 2254(d) do not restrict review, and the Court may consider the claim de novo.

5         The Supreme Court has long held that "[t]he requirement that a jury's verdict

6    must be based upon the evidence developed at the trial goes to the fundamental

7    integrity of all that is embraced in the constitutional concept of trial by jury." *Turner*

8    *v. Louisiana*, 379 U.S. 466, 472 (1965) (internal quotation marks omitted). "It is

9    vital in capital cases that the jury should pass upon the case free from external

10   causes tending to disturb the exercise of deliberate and unbiased judgment." *Mattox*

11   *v. United States*, 146 U.S. 140, 149 (1892), *superseded by rule as stated in Peña-*

12   *Rodriguez v. Colorado*, 137 S. Ct. 855 (2017).

13        If a juror brings in extraneous evidence and introduces it to the jury,

14             a defendant has effectively lost the rights of confrontation,
15             cross-examination, and the assistance of counsel with
               regard to jury consideration of the extraneous evidence. In
16             one sense the violation may be more serious than where
               these rights are denied at some other stage of the
17             proceedings because the defendant may have no idea what
               new evidence has been considered. It is impossible to offer
18             evidence to rebut it, to offer a curative instruction, to
               discuss its significance in argument to the jury, or to take
19             other tactical steps that might ameliorate its impact.

20

21

22   _____

     [166] Though the Arizona Supreme Court has recently stated that juror-misconduct
23   claims are not appropriate for state post-conviction proceedings, this holding was
     not in effect at the time of Kiles's trial, and the trial court and counsel could not
24   have predicted this ruling. *See, e.g.*, *State v. Kolmann*, 367 P.3d 61, 67 (Ariz. 2016)
     (holding that "[b]ecause claims of juror misconduct can be raised on post-trial
25   motion under Rule 24, Kolmann generally is precluded from raising them in a
     petition for post-conviction relief. Ariz. R. Crim. P. 32.2(a)(1)"). If trial counsel
26   should have raised this claim, then they were ineffective for failing to do so. State
     post-conviction counsel's ineffectiveness excuses the default of the ineffective-
27   assistance-of-trial-counsel claim. *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012);
     *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984).
28

                                          333

*Gibson v. Clanon*, 633 F.2d 851, 854 (9th Cir. 1980); *see also Sassounian v. Roe*, 230 F.3d 1097, 1108 (9th Cir. 2000); *Fields v. Brown*, 503 F.3d 755, 779 (9th Cir. 2007) ("[E]vidence developed against a defendant must come from the witness stand.").

Moreover, misconduct need not have infected the entire jury. If even one juror has committed misconduct affecting his or her own deliberations, the defendant is denied the constitutional right to an impartial jury. *Mach v. Stewart*, 137 F.3d 630, 633 (9th Cir. 1997). And because of the potential for prejudice, it is immaterial whether any juror admits that the extraneous information mattered to the ultimate decision, as "[t]estimony as to the subjective effects of extraneous information is outside the relevant scope of inquiry of a reviewing court." *Jeffries v. Blodgett*, 5 F.3d 1180, 1191 (9th Cir. 1993) (citing *United States v. Bagnariol*, 665 F.2d 877 (9th Cir. 1981)).

Jurors in Kiles's guilt- and penalty-phase proceedings variously considered extraneous evidence (including extraneous information regarding race), slept through portions of trial, and compromised or curtailed their deliberations because of an ill juror. Individually and cumulatively, these incidents of juror misconduct denied Kiles's rights to due process, a fair trial, and a fair and impartial jury.

## A.   Jurors considered extraneous evidence at Kiles's guilt-phase proceedings.

Upon information and belief, Kiles's constitutional rights were violated by the introduction of extraneous information into a juror's deliberations. *See generally Turner*, 379 U.S. at 472.

The court admonished Kiles's guilt-phase jury on multiple occasions to avoid media during the trial. After the jurors were sworn in, the judge instructed them to "avoid any reading of newspapers or watching TV news accounts and things like that during the trial, and if you do encounter something about this case in the news media during the trial we ask that you end your exposure to it immediately and also

1  bring that to my attention through the court staff." (Tr. July 7, 2000 at 183.) The

2  judge reminded the jurors of the admonition continually throughout the

3  proceedings. (*See, e.g.*, Tr. July 7, 2000 at 82, 174; Tr. July 10, 2000 at 83; Tr. July

4  11, 2000 at 63, 101, 177; Tr. July 12, 2000 at 94.)

5      Upon information and belief, at least one juror consistently ignored the

6  admonition and read the newspaper every day during the trial. Given the pervasive

7  news coverage of trial, the juror would have been exposed to extrinsic information

8  about the case on which he was empaneled.[167] Also upon information and belief,

9  another juror was aware of the extraneous and prejudicial information that Kiles

10  had previously been convicted of the crimes for which he was on trial.

11      The jury's knowledge of and reliance upon extrinsic evidence violated

12  Kiles's constitutional rights to confrontation, due process, a fair trial, assistance of

13  counsel, and a fair and impartial jury. A jury's verdict "must be based upon the

14  evidence developed at the trial" to protect the right to trial by jury. *Irvin v. Dowd*,

15  366 U.S. 717, 722 (1961); *see also Fields*, 503 F.3d at 779. Bringing extrinsic facts

16  into deliberations also implicates the Confrontation Clause. *Sassounian*, 230 F.3d

17  at 1108. Upon information and belief, the extrinsic information had a "substantial

18  and injurious effect or influence" on at least one juror's decision. *Brecht v.

19  Abrahamson*, 507 U.S. 619, 623 (1993); *Mach*, 137 F.3d at 634.

20      **B.    Jurors committed misconduct in multiple ways at Kiles's penalty-
        phase proceeding.**

21

22      Multiple jurors at Kiles's penalty phase sought out and considered evidence

23  extraneous to the proceedings, slept through trial, and considered incorrect and

24  extraneous information about race during their deliberations. In addition, the jury

25  _____

26  [167] The media coverage of Kiles's case was extensive, as described in the defense's
    petition for special action seeking a change of venue. (Case No. CV-00-0143, Pet.

27  for Special Action, May 5, 2000 at 4–46.) Additionally, the Yuma Sun published
    information about Kiles's prior trial and conviction after winning the right to do so

28  based on First Amendment grounds. (ROA 491 at 3–8; Tr. July 7, 2000 at 9–14.)

1  compromised or curtailed deliberations due to the severe illness of one of the jurors.

2  These actions violated Kiles's rights to due process and a fair trial, among other

3  rights. *See Turner*, 379 U.S. at 472.

**1.   Jurors' deliberations were affected by extraneous information.**

6  The judge gave the seated jurors at Kiles's penalty phase an admonition: "Do

7  not do any research or make any investigation about the case on your own." (Tr.

8  Mar. 20, 2006 at 54–55.) In addition, the judge instructed, "Do not talk to anyone

9  about the case." (Tr. Mar. 20, 2006 at 55.) The jurors were reminded of the

10  admonition throughout the proceedings. (*See, e.g.*, Tr. Mar. 20, 2006 at 160; Tr.

11  Mar. 22, 2006 at 29; Tr. Mar. 27, 2006 at 35, 142.)

12  However, upon information and belief, several jurors actively sought out

13  extraneous information to assist in deliberations. This violated Kiles's

14  constitutional rights to confrontation, assistance of counsel, and a fair and impartial

15  jury. "Private communications, possibly prejudicial, between jurors and third

16  persons . . . are absolutely forbidden . . . ." *Mattox*, 146 U.S. at 150; *see also Fields*,

17  503 F.3d at 779. Jurors researched Kiles's case—seeking out extraneous

18  information—because they were curious about information beyond what was being

19  presented at trial. Especially given the extensive media coverage that had

20  surrounded Kiles's earlier proceedings, including coverage of his original

21  convictions and death sentences, this error was not harmless. *See, e.g.*, *Bulger v.*

22  *McClay*, 575 F.2d 407, 409, 412 (2d Cir. 1978) (affirming grant of habeas relief

23  where one juror later admitted that he changed his vote after another juror discussed

24  contents of a newspaper article during deliberations).

25  In addition, upon information and belief, one juror spoke to her husband, who

26  was incarcerated at the time, to assess the credibility and accuracy of penalty-phase

27  defense expert James Aiken. Aiken testified about the classification system in

28  Arizona prisons; he further testified about Kiles's history as a model prisoner. (*See*

336

1    Tr. Apr. 27, 2006 at 4–54.) Aiken told the jury:

2
3              Like I said, I have been in this business well over 30 years,
               and I have classified a lot of inmates, thousands and
3              thousands of inmates. And they come in and they commit
4              some type of violation. Some type of violation, whether it's
               not tucking their shirt in or having a junkie room, and this
5              is baffling. I mean, I don't see one significant report in
               relationship to [Kiles's] behavior while confined. And like
6              I said, I have been doing this for many, many years. And
7              counsel can tell you I had to go back through it and look
               through it and back through it and check and double-check,
8              because I have never seen anything like this.

9    (Tr. Apr. 27, 2006 at 32.)

10         After asking her husband about Aiken's testimony, the juror conveyed to the

11   panel her husband's opinion that Aiken's testimony was not credible—it was either

12   an exaggeration or flatly inaccurate. This undermined the credibility of a defense

13   expert during Kiles's mitigation phase, and the defense had no opportunity to

14   address or correct the information the jury received. *See Gibson*, 633 F.2d at 854;

15   *Sassounian*, 230 F.3d at 1108. Moreover, jurors were in effect told, by what

16   appeared to be a well-informed source, that a defense expert was lying. This also

17   undercut the credibility of defense counsel and their entire mitigation

18   presentation—including the other defense experts who formed the bulk of the case

19   for leniency. Additionally, the extraneous information was singularly important, as

20   it contradicted the defense's argument that Kiles posed no future danger if

21   sentenced to life in prison. Notably, future dangerousness is always a matter of

22   significant concern for capital juries. *See* John H. Blume, Stephen P. Garvey &

23   Sheri Lynn Johnson, *Future Dangerousness in Capital Cases: Always "At Issue,"*

24   86 Cornell L. Rev. 397, 410 (2001). If Aiken's testimony was dismissed, jurors

25   would have been more likely to consider the factor of Kiles's potential for future

26   violence in their vote for a death sentence. That the jury heard such extraneous

27   information was prejudicial. *See Jeffries*, 5 F.3d at 1191.

28         It is critical that the penalty-phase jurors charged with determining the

337

1   appropriate punishment consider all of the mitigation evidence presented to them,

2   without being influenced by information outside the proceedings. *See Lockett v.*

3   *Ohio*, 438 U.S. 586, 605 (1978). Juror misconduct thus undermined the integrity of

4   the deliberations, prejudicing Kiles. *See Brecht*, 507 U.S. at 623.

5                   **2.      Jurors slept through the proceedings.**

6          At least three jurors slept through various parts of Kiles's aggravation phase.

7   Defense counsel notified the court that Jurors 9, 11, and 13 were nodding off; Juror

8   13 slept soundly enough that counsel "thought he was going to fall out of his chair

9   a couple times." (Tr. Mar. 22, 2006 at 4.) The defense asked the record to reflect

10  that, with respect to Jurors 11 and 13, "they have been continually nodding off."

11  (Tr. Mar. 22, 2006 at 4.) Juror 9 was "a newcomer to the sleep fest here." (Tr. Mar.

12  22, 2006 at 4.) The prosecutor confirmed that Juror 11 may have been sleeping; he

13  (the prosecutor) and members of his team had also seen Juror 13 sleep "on a pretty

14  regular basis" for substantial periods of time. (Tr. Mar. 22, 2006 at 5–6.) While

15  Juror 13 was made an alternate, Jurors 9 and 11 participated in deliberations. (Tr.

16  Apr. 12, 2006 at 29–30.)

17         Given the importance of the penalty phase of a capital trial, the jurors charged

18  with determining the appropriate punishment must hear and consider all of the

19  evidence presented to them. *See Lockett*, 438 U.S. at 605; *see also Eddings v.*

20  *Oklahoma*, 455 U.S. 104, 110 (1982). Prolonged juror inattentiveness in a criminal

21  trial, especially a capital trial, jeopardizes the defendant's Sixth, Eighth, and

22  Fourteenth Amendment rights. *See Peña-Rodriguez*, 137 S. Ct. at 866. "A fair trial

23  presupposes careful attention by the jurors to all of the testimony, and that both the

24  court and counsel must do all in their power to ensure that jurors do not in fact sleep

25  through any part of the proceedings." *Welch v. United States*, 807 A.2d 596, 604

26  n.8 (D.C. 2002); *see also United States v. Freitag*, 230 F.3d 1019, 1023 (7th Cir.

27  2000) ("If sleep by a juror makes it impossible for that juror to perform his or her

28  duties or would otherwise deny the defendant a fair trial, the sleeping juror should

338

1    be removed from the jury.").

2         Here, as reflected on the record, jurors were seen sleeping during at least one
3    day of the State's presentation supporting the charged aggravators. Among other
4    witnesses, these jurors missed the questioning of Imojean Kiles, a key witness who
5    testified largely in Kiles's favor. As neither the court nor counsel took affirmative
6    steps to correct the jurors' behavior (Tr. Mar. 22, 2006 at 6), it is likely that these
7    and other jurors missed evidence and testimony that was important to their
8    deliberations.

9         Jurors sleeping through proceedings is not harmless, especially given the
10   law's requirement of heightened reliability in capital cases. *See United States v.*
11   *Barrett*, 703 F.2d 1076, 1083 (9th Cir. 1983); *see also Romano v. Oklahoma*, 512
12   U.S. 1, 20–21 (1994). This jurors' misconduct had a substantial and injurious effect
13   on the outcome of Kiles's capital sentencing. *See Brecht*, 507 U.S. at 623.

14        **3.    Jurors improperly considered extraneous and incorrect**
          **information about race and criminality during their**
15        **deliberations.**

16        Upon information and belief, the jury in Kiles's penalty phase considered
17   Kiles's race, in the context of extraneous and incorrect information about African
18   Americans, during their penalty-phase deliberations. This violated, among other
19   rights, Kiles's rights to a fair and impartial jury, equal protection, and a fair trial.

20        During the mitigation presentation, the defense called psychologist Mark
21   Cunningham, Ph.D., to discuss the predictors of violence. (Tr. May 11, 2006 at 3.)
22   Dr. Cunningham was asked to explain how broad historic and socio-cultural factors
23   can affect individual decision-making. (Tr. May 11, 2006 at 10–22.) He told the
24   jury that a study found that, "at any given point in time in Washington, D.C. or
25   Baltimore, about half of the black males are in the criminal justice system." (Tr.
26   May 11, 2006 at 16.) Dr. Cunningham clarified that "[t]his is not about race. It isn't
27   being black that creates the issue." However, he told the jury that the rate of
28   homicide for black males was "[a]bout 30 times greater" than that of white males.

339

(Tr. May 11, 2006 at 16–17.)

Unfortunately, Dr. Cunningham's testimony supported racial stereotypes of black men as more dangerous and violent.[168] Regardless of whether the testimony was that black men are inherently more violent because of their race, or that black men end up more violent because of historic, economic, or socio-cultural factors, the jurors would have had the same takeaway: black men are more violent.

It was clear that race and criminality were on the jurors' minds after Dr. Cunningham's testimony. The jury submitted the following question him:

> For your representative city regarding violent crime, you chose the District of Columbia. As D.C. is 99% Black and has the highest violent crime rate in the nation, is that an accurate comparison to a community like Yuma, AZ? According to Professor John Lott's book "More Guns, Less Crime," the disproportional rate of crime is due to the fact that D.C. has the strictest gun laws in the nation, rather than socio-economic conditions. Does your comparison still apply regarding Yuma?

(ROA 885 at 1.) The juror's question, which was read in open court, introduced extraneous information about race and criminality, as well as about the expert's credibility, into the proceedings. Particularly concerning is that it raised *incorrect* extraneous information about race and criminality to determine the credibility of expert testimony. It was incorrect because (1) while exact numbers for 2006 are unknown, according to the U.S. Census, in 2000, D.C. was 60% black; by 2010 the black population had dropped to 51%,[169] (2) in 2006, D.C. did not even make the

---

[168] "[P]resented with a criminal defendant, even well-meaning people fall prey to the stereotype that, whether for reason of biology or culture, Black people are inherently violent and dangerous." *See* Br. for the Nat'l Black Law Students Ass'n as Amicus Curiae in Supp. of Pet'r, *Buck v. Davis*, 137 S. Ct. 759 (2017) (No. 15-8049), at 2; *see also* Justin D. Levinson et al., *Devaluing Death: An Empirical Study of Implicit Racial Bias on Jury-Eligible Citizens in Six Death Penalty States*, 89 N.Y.U. L. Rev. 513, 563 (2014).

[169] *See* United States Census Bureau, District of Columbia (last visited Sept. 19, 2018), https://factfinder.census.gov/faces/nav/jsf/pages/communityfacts.xhtml?src=bkmk.

340

1    top 25 most dangerous cities,[170] and (3) Lott's scholarship has been discredited.[171]

2        Unfortunately, Dr. Cunningham's reply could not correct the error—the juror
3    had already inserted extraneous information that both cast doubt on Dr.
4    Cunningham's testimony and explicitly linked race to criminality. And Dr.
5    Cunningham's reply did not correct the juror's erroneous information about race
6    and crime rates in the District of Columbia. Indeed, the reply seemingly
7    substantiated the extraneous, incorrect information in the jury question by even
8    more explicitly connecting race and criminality.[172] (Tr. May 11, 2006 at 90–92.)

9        Kiles's jurors were considering racial stereotypes in relation to criminality
10   and dangerousness, including extraneous information, during their deliberations.
11   This was improper. "Permitting racial prejudice in the jury system damages 'both
12   the fact and the perception' of the jury's role as 'a vital check against the wrongful
13   exercise of power by the State.'" *Peña-Rodriguez*, 137 S. Ct. at 868 (quoting
14   *Powers v. Ohio*, 499 U.S. 400, 411 (1991)). The juror's introduction of incorrect
15   information regarding the link between race and criminality into the proceedings
16   constituted misconduct and prejudiced Kiles. *See Brecht*, 507 U.S. at 637–38.

17       **4.    Jurors curtailed their deliberations or compromised their
18           votes because one member of the jury was gravely ill.**

19       Upon information and belief, the jurors at Kiles's mitigation phase curtailed
20   their deliberations because one juror was gravely ill and was delaying cancer

---

22   [170] *See* Les Christie, *Top 25: Most Dangerous and Safest Cities*, CNN Money (Oct.
23   30, 2006), https://money.cnn.com/2006/10/30/realestate/Mostdangerouscities/
     index.htm.

24   [171] *See* Emily Badger, *More Guns, Less Crime? Not Exactly*, The Washington Post
25   (July 29, 2014), https://www.washingtonpost.com/news/wonk/wp/2014/07/29/
     more-guns-less-crime-not-exactly/.

26   [172] Dr. Cunningham responded to the question saying, "Nationwide, I think about
27   14 percent of the population is African-American. And my recollection is that those
     individuals account for about half of the homicides, about three times the expected
28   rate nationwide. . . . They're killing their own." (Tr. May 11, 2006 at 90–92); *see*
     Claim 6, *supra*.

1    treatment until a verdict was reached.

2        The Arizona Constitution requires that "[t]he right of trial by jury shall

3    remain inviolate. . . . In all criminal cases the unanimous consent of all the jurors

4    shall be necessary to render a verdict." Ariz. Const. art. II, § 23; *see also, e.g.*,

5    *Parker v. Gladden*, 385 U.S. 363, 366 (1966). At Kiles's mitigation phase, the jury

6    was scheduled to deliberate for only two days, including one partial day. (ROA 888

7    at 1.) The schedule was set partly because one of the jurors had to begin a course of

8    radiation and chemotherapy, which was set to last for six weeks. (ROA 888 at 1.)

9    Upon information and belief, some of the jurors were holding out for a life sentence

10   for the killing of Gunnel. If they had not been rushed to reach a verdict to allow a

11   juror necessary medical treatment, there is a reasonable probability the jury would

12   not have been unanimous with respect to Gunnel's death sentence. The jury's

13   curtailed deliberations violated Kiles's federal constitutional rights and prejudiced

14   Kiles. *See Brecht*, 507 U.S. at 623; *cf. United States v. Evanston*, 651 F.3d 1080,

15   1087–88 (9th Cir. 2011) (holding that outside influences being injected into the

16   jury's deliberative process raised the specter of jury coercion).

17       **C.    Juror misconduct throughout the course of proceedings violated**
18           **Kiles's right to due process and a fair trial.**

19       The number of jurors affected by the misconduct "does not weigh heavily in

20   the prejudice calculus for even a single juror's improperly influenced vote deprives

21   the defendant of an unprejudiced, unanimous verdict." *Lawson v. Borg*, 60 F.3d

22   608, 613 (9th Cir. 1995); *see also Parker*, 385 U.S. at 366 (a defendant is "entitled

23   to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors"). In Kiles's

24   case, these instances of misconduct demonstrate that jurors were improperly

25   influenced in multiple ways, individually and cumulatively causing a substantial

26   and injurious effect on the verdicts and rendering Kiles's convictions and death

27   sentence unreliable. *See Brecht*, 507 U.S. at 623. Kiles is therefore entitled to relief.

28

## Claim Eleven

### Kiles was denied effective assistance of counsel on direct appeal.

Kiles was denied effective assistance of appellate counsel in violation of the Sixth and Fourteenth Amendments to the U.S. Constitution. Kiles incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

"Is it a violation of the ABA standards not to brief mitigation in an appellate case?"

The Arizona Supreme Court asked this question of Paul Mattern, Kiles's counsel on direct appeal, during oral argument. Mattern had started his argument by apologizing for not briefing the issue of the court's independent review.[173] Mattern then spent the majority of his time before the court trying to argue a claim that was not cognizable on appeal: ineffective assistance of trial counsel. When one of the justices interrupted him to ask about his own failure to address a key issue in the case, Mattern had no answer.

Kiles previously raised several aspects of this claim in his state post-conviction proceedings. (ROA 1189 at 31–32, 61–69.) The state court denied these claims on the merits, saying that Kiles had not stated a colorable claim for relief. (ROA 1214 at 2.) The state court's denial of these claims constituted an unreasonable application of or was contrary to clearly established federal law, 28 U.S.C. § 2254(d)(1), and rested on an unreasonable determination of the facts, *id.* § 2254(d)(2). Accordingly, § 2254(d) places no limitation on relief, and this Court may review the exhausted sections de novo.

Parts B(4) through B(7) of this claim were not raised in Kiles's state-court proceedings. Kiles alleges he can overcome any default by showing cause and

---

[173] Because Kiles was convicted of a crime that occurred before August 1, 2002, by statute the Arizona Supreme Court was required to independently review Kiles's death sentence. *See State v. Grell*, 291 P.3d 350, 351 (Ariz. 2013); A.R.S. § 13-755(A)–(C) (Supp. 2008).

1   prejudice, including because of the ineffective assistance of state post-conviction

2   counsel. *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *Edwards v. Carpenter*, 529

3   U.S. 446, 453 (2000); *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984); *but

4   see Davila v. Davis*, 137 S. Ct. 2058 (2017). Alternatively, Kiles alleges that any

5   procedural bar is not adequate or independent and that imposing default would be

6   a miscarriage of justice.

7        Effective assistance of appellate counsel is guaranteed by the Due Process

8   Clause of the Fourteenth Amendment. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985)

9   ("A first appeal as of right . . . is not adjudicated in accord with due process of law

10   if the appellant does not have the effective assistance of an attorney."); *see id.* at

11   395 ("Because the right to counsel is so fundamental to a fair trial, the Constitution

12   cannot tolerate trials in which counsel, though present in name, is unable to assist

13   the defendant to obtain a fair decision on the merits."). As such, "nominal

14   representation" during an appeal "does not suffice to render the proceedings

15   constitutionally adequate." *Id.* at 396.

16        Claims of ineffective assistance of appellate counsel are governed by the

17   standard set forth in *Strickland*, 466 U.S. at 686–87. *See Smith v. Robbins*, 528 U.S.

18   259, 285 (2000). Accordingly, Kiles must show that appellate counsel's

19   representation "fell below an objective standard of reasonableness," *Strickland*, 466

20   U.S. at 688, and that "there is a reasonable probability that, but for counsel's

21   unprofessional errors, the result of the proceeding would have been different," *id.*

22   at 694. In addition, the ABA Guidelines are instructive in evaluating the

23   reasonableness of counsel's conduct. *See, e.g.*, *Rompilla v. Beard*, 545 U.S. 374,

24   387 (2005). Regarding appellate counsel's performance, the ABA Guidelines

25   indicate that "counsel should seek to litigate all issues . . . that are arguably

26   meritorious[.]" 2003 ABA Guideline § 10.15.1(C). Therefore, when appellate

27   counsel fails to raise a meritorious issue and there is a reasonable probability that

28   such a challenge would have resulted in the reversal of a conviction or sentence,

1  counsel has necessarily caused prejudice to the defendant. *See, e.g.*, *Strickland*, 466

2  U.S. at 694. Because he fixated on a claim he could not bring on direct appeal,

3  Mattern failed to raise several viable claims. Mattern's failure to raise these

4  meritorious claims prejudiced Kiles.

### A. Appellate counsel focused his efforts on a claim that was not cognizable on appeal.

7  Kiles's appellate attorney unreasonably focused his investigation and

8  briefing on a single claim: ineffective assistance of trial counsel. This narrow focus

9  was inexplicable, because in Arizona ineffective-assistance claims—particularly

10  those that depend on extra-record evidence—are *not* cognizable on appeal. In

11  Arizona, it has been long established that claims about the ineffective assistance of

12  trial counsel are properly brought in a state post-conviction petition. *See* Ariz. R.

13  Crim. P. 32; *e.g., State v. Spreitz*, 39 P.3d 525, 527 (Ariz. 2002). In fact, in Kiles's

14  case, the Arizona Supreme Court explained:

> Because we cannot consider facts outside the record, our consideration of ineffective assistance of counsel claims on direct appeal would rarely result in reversal. We caution that raising an argument such as this on direct appeal gains very little, but risks a great deal, as the defendant who asks this Court to determine issues of ineffectiveness on the appellate record faces the possibility of later preclusion.

20  *State v. Kiles*, 213 P.3d 174, 183–84 (Ariz. 2009) (citing Ariz. R. Crim. P. 32.2(a)(2)

21  ("A defendant shall be precluded from relief under this rule based upon any ground

22  . . . [f]inally adjudicated on the merits on appeal or in any previous collateral

23  proceeding. . . .")). Despite the clear, then-existing authority to the contrary,

24  Mattern pursued an ineffective-assistance claim during the appeal, to Kiles's

25  detriment.

26  Mattern was appointed as Kiles's attorney on direct appeal on June 21, 2006.

27  (ROA 931 at 1.) Kiles was Mattern's first capital appellate client, and Mattern made

28  many critical mistakes. The first was in building an inappropriate relationship with

Kiles that revolved around the ineffective assistance of Kiles's trial counsel, which, as explained above, Mattern could not properly bring as a claim on direct appeal.

Mattern's correspondence with Kiles was filled with foul language, diatribes against courts, lawyers, and the justice system, and a fixation specifically on Kiles's prior counsel, Clark and VanDreumel. Kiles was particularly vulnerable, having just been sentenced to death for a second time, and Mattern's correspondence was often unprofessional. Mattern promised he would risk financial ruin, his reputation, and even his health in his crusade to defend Kiles. By Mattern's second letter to Kiles, his focus on Clark was evident. Mattern acknowledged to Kiles that information about Clark's ineffectiveness would not legally assist Kiles in his appeal, but Mattern nonetheless told Kiles that he was going to follow that lead.

Mattern did not direct his efforts toward reviewing the record for claims that were appropriate to bring on appeal. *See Kiles*, 213 P.3d at 183. Instead, Mattern investigated Clark and VanDreumel, drafted complaints about Clark for Kiles to file with the State Bar, and spent considerable time trying to obtain extra-record materials from VanDreumel that could not be submitted to support claims in Kiles's direct appeal. Mattern's insistence on obtaining records from VanDreumel that could not be cited in his appeal was finally resolved by court order. (ROA 1016 at 1–2.) Though Mattern gained the ability to access files best left for state post-conviction proceedings, he wasted time that he could have spent identifying, researching, and presenting cognizable and meritorious claims.

Kiles's opening brief on appeal was filed on July 14, 2008. (DA2 Dkt. 86.) The brief was 97 pages long, but the statement and facts of the case comprised a full 42 pages of the brief, most of which were irrelevant to the legal claims raised therein. As noted by the Arizona Supreme Court during argument, Mattern failed in his remaining pages to argue that mitigation in Kiles's case was compelling

1   enough to warrant leniency.[174] Of the pages remaining for substantive legal

2   arguments, Mattern devoted nearly half to the non-cognizable ineffective-

3   assistance-of-counsel claim. (DA2 Dkt. 86 at 66–84.)

4          Mattern's singular focus on the ineffective-assistance claim was not

5   "reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688.

6   Although defense counsel has broad discretion when making strategic decisions,

7   those decisions must be reasonable and informed. *Id.* at 691; *see also Correll v.*

8   *Ryan*, 539 F.3d 938, 949 (9th Cir. 2008). In fact, the Arizona Supreme Court stated

9   that, as the ineffective-assistance claim was improvidently raised, it would not

10  consider the merits of the argument. *Kiles*, 213 P.3d at 183–84. Focusing one's

11  effort on a claim that the appellate court predictably finds was improvidently raised

12  does not amount to reasonable professional judgment.

13         As justification for pursuing his non-cognizable claim, Mattern repeatedly

14  invoked the 2003 ABA Guidelines, which state that appellate counsel should "make

15  every professionally appropriate effort to present issues in a manner that will

16  preserve them for subsequent review." 2003 ABA Guideline 10.15.1(C). Had the

17  Arizona Supreme Court decided to rule on the merits of the ineffectiveness claims

18  as raised, Kiles would then have been precluded from raising them in his state post-

19  conviction proceedings, when he would have had the opportunity to investigate,

20  develop, and present extra-record evidence in support of his claims. Rather than

21

---

22  [174] This failure is particularly striking in that the Arizona Supreme Court had
23  repeatedly addressed similar failures in opinions issued before the brief in this case
    was filed. *State v. Andriano*, 161 P.3d 540, 554 n.11 (Ariz. 2007) ("Andriano did
24  not argue why the Court should find in its independent review that the mitigating
    circumstances were 'sufficiently substantial to call for leniency.' A.R.S.
25  § 13-703(E). Counsel in capital cases 'should take advantage of all appropriate
    opportunities to argue why death is not suitable punishment for their particular
26  client.' *ABA Guidelines for the Appointment and Performance of Defense Counsel*
    *in Death Penalty Cases* Guideline 10.11(L) (2003)."); *see also State v. Garza*, 163
27  P.3d 1006, 1021 n.16 (Ariz. 2007) (same); *State v. Morris*, 160 P.3d 203, 219 n.10
28  (Ariz. 2007) (same).

347

1    preserving issues for subsequent review, Mattern risked forfeiting Kiles's chance
2    to raise the claims in a procedurally appropriate manner.

3         That this singular focus on a non-cognizable claim worked to the detriment
4    of raising meritorious claims was clear at oral argument. Mattern spent all of his
5    available time at argument either addressing the issue he acknowledged he failed to
6    raise—the Arizona Supreme Court's independent review—or arguing with the
7    justices about his decision to inappropriately bring an ineffective-assistance-of-
8    counsel claim on direct appeal. Several cognizable issues that required appellate
9    review in Kiles's case therefore went un-briefed and un-argued.

10        **B.    Appellate counsel was ineffective for failing to raise meritorious
11              claims.**

12        Because Mattern was so focused on bringing a non-cognizable claim on
13   direct appeal, he failed to identify and properly brief important appellate issues that
14   were apparent from the record. If Kiles had had competent appellate counsel, there
15   is a reasonable probability he would have had his conviction or death sentence
16   reversed. *See Strickland*, 466 U.S. at 694.

17        **1.    Appellate counsel failed to challenge the child-abuse
18              convictions.**

19        Mattern stated in his opening brief that his challenges were limited to the
20   premeditated murder of Valerie Gunnel and the imposition of the death sentence
21   for her murder. (DA2 Dkt. 86 at 2.) Therefore, he neglected to bring the meritorious
22   claim that Kiles's child-abuse convictions should have been dismissed by the court.

23        Kiles was indicted on first-degree premeditated murder charges for LeCresha
24   Kirklin and Shemaeah Gunnel; the State charged him in the alternative with felony
25   murder, based upon the separately charged predicate felony of child abuse. (ROA
26   1 at 2; CR89-15577 ROA 1 at 2.) Before Kiles's guilt phase, defense counsel
27   submitted a pretrial motion to dismiss the child-abuse charges pursuant to *State v.*
28   *Styers*, 865 P.2d 765 (1993). (ROA 443 at 3–6.) *Styers* held that a separate child-

abuse conviction cannot stand in a case where the premeditated murder of the child *is* the abuse alleged in a separate count. The Arizona Supreme Court made it clear that child abuse may still be a predicate felony for felony murder where the abuse results in the death of the child. This, however, is at odds with premeditated murder, where a person knowingly or intentionally causes the death of another. "Although felony murder is first degree murder, it is arrived at differently than premeditated murder." *Styers*, 865 P.2d at 772. One cannot be guilty of murder for the death of a child as the result of intentional child abuse, where the only act of child abuse is the premeditated murder of the child.

The Arizona Supreme Court's holding in *Styers* emphasized the fact that the defendant had been convicted of premeditated murder. Any assault on a child during a premeditated murder of that child necessarily merged with the murderous assault. "If a defendant cannot be convicted for an aggravated assault that necessarily occurs when there is a premeditated murder, it logically follows that he also cannot be convicted for an intentional child abuse that necessarily occurs where there is a premeditated murder of a child victim." *Styers*, 865 P.2d at 771.

Kiles's counsel argued this issue multiple times at trial, including in a pretrial motion requesting that the child-abuse charges be struck. (ROA 443 at 3–6.) The State responded that Kiles's motion was premature. (ROA 444 at 2.) There was no argument on the issue before trial. After the State rested its case, however, defense counsel moved for a directed verdict on the two counts each of child abuse and felony murder based on the holding in *Styers*. (Tr. July 17, 2000 at 109–25; Tr. July 18, 2000 at 3–11.) Defense counsel urged that the State had failed to support a felony-murder charge, as it had presented no evidence that the deaths of the children were in "furtherance" of the alleged child abuse. (Tr. July 17, 2000 at 113–14.) The court denied the motion as premature, saying, "[W]e can vacate some of the verdicts if that's what needs to be done, but I think I mostly agree with Mr. Powell that this is a jury question to determine what happened and it is premature at this present

1    point for me to take anything from the jury." (Tr. July 17, 2000 at 125.)

2        The jury verdict, however, made the issue ripe, as some guilt-phase jurors

3    found Kiles guilty of premeditated murder of the children and *also* guilty of child

4    abuse. (ROA 482 at 5–8.) That even one juror so found invalidated the child-abuse

5    verdicts. The defense thus renewed its motion to have the felony-murder and child-

6    abuse convictions vacated. (ROA 488 at 2–8.) Despite Arizona Supreme Court

7    precedent, the trial court said that, while the defense had raised "interesting issues,"

8    it would not vacate the child-abuse verdicts. (Tr. Dec. 29, 2000 at 19–20.)

9        The trial court's decision to allow the child-abuse convictions to stand,

10   despite the findings of premeditated murder, was in error and was ripe for appellate

11   review.[175] Mattern should have been on notice of the issue, given the concerted

12   efforts of trial counsel during Kiles's proceedings. Trial counsel raised the issue in

13   motions practice (ROA 443 at 3–6), requested a directed verdict (Tr. July 17, 2000

14   at 109–25; Tr. July 18, 2000 at 3–11), filed a motion for judgment of acquittal on

15   the child-abuse charges (ROA 488 at 1–8), included the issue in a motion for new

16   trial (ROA 500 at 17–18), and presented the issue at argument (Tr. Dec. 29, 2000

17   at 2–12). Moreover, the trial court's suggestion that the issue could be addressed at

18   a later time "if that's what needs to be done" should have alerted Mattern to its

19   suitability for appellate review.

20       Mattern failed to challenge this issue, despite the likelihood of a successful

21   challenge, given the clear precedent on the same issue and near-identical facts. The

22   Arizona Supreme Court had explicitly said, "The first degree murder statute, A.R.S.

23   § 13-1105(A)(l), *not the child abuse statute*, applies when a person intentionally

24   kills a child victim." *Styers*, 865 P.2d at 772 (emphasis added). In failing to

25   challenge the trial court's error that disregarded that holding, Mattern provided

26   ineffective assistance, and Kiles was thereby prejudiced. *See Evitts*, 469 U.S. at

27   _____

28   [175] While Mattern could also have challenged the felony-murder convictions under *Styers*, Kiles is not challenging those convictions at this time.

350

1    396; *Strickland*, 466 U.S. at 694.

2    **2.    Appellate counsel failed to challenge the trial court's denial**
3    **of a mistrial due to prosecutorial misconduct.**

4    Mattern also failed to challenge in his direct appeal the improper
5    prosecutorial opening argument during the aggravation phase. (ROA 1189 at 62.)

6    After the State's opening statement in the aggravation phase, the defense
7    moved for a mistrial. (Tr. Mar. 30, 2006 at 84–88.) Prosecutor Powell's opening
8    statement repeatedly commented on the evidence, told the jurors to be prepared for
9    "ungodly amounts of blood," improperly vouched for witnesses and evidence by
10   repeating phrases like "we know" and "I believe," and improperly misstated Kiles's
11   former testimony. (Tr. Mar. 30, 2006 at 84–88.) Kiles's defense counsel stated that
12   the remarks hamstrung the defense from the beginning. When Powell, as a
13   representative of the State, commented on evidence or vouched for witnesses,
14   Kiles's counsel asked the court, "I mean, how are we going to confront that?" (Tr.
15   Mar. 30, 2006 at 91.) The court agreed that "to some extent Mr. Powell did cross
16   the line in terms of arguing his case," but denied the motion for a mistrial.[176] (Tr.
17   Mar. 30, 2006 at 91); *see* Claim 8, *supra*.

18   Mattern was deficient in failing to challenge on appeal the judge's denial of
19   the mistrial. This failure prejudiced Kiles, as there was a reasonable probability that
20   the trial-court error claim before the Arizona Supreme Court would have prevailed.
21   In Arizona, a conviction may be reversed on appeal for prosecutorial misconduct if
22   "(1) misconduct is indeed present; and (2) a reasonable likelihood exists that the
23   misconduct could have affected the jury's verdict, thereby denying [the] defendant
24   a fair trial." *State v. Gallardo*, 242 P.3d 159, 167 (2010) (quoting *State v. Velazquez*,
25   166 P.3d 91, 102 (Ariz. 2007)). If the defendant objects, the trial court's
26   determination is reviewed for harmless error. *Id.*

27
28   [176] Relatedly, the trial court's error in denying the motion for mistrial violated
     Kiles's constitutional rights to due process and a fair trial.

351

In Kiles's case, the prosecutor's opening statement contained pervasive improper vouching, "placing the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggesting that information not presented to the jury supports the witness's testimony." *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993); *see also United States v. Younger*, 398 F.3d 1179, 1191 (9th Cir. 2005) (recognizing that the use of the phrase "we know" by a prosecutor blurs the line between improper vouching and legitimate summary). The Ninth Circuit has held that "we know" is only properly used if it is used to "to marshal evidence actually admitted at trial and reasonable inferences from that evidence, not to vouch for witness veracity or suggest that evidence not produced would support a witness's statements." *Younger*, 398 F.3d at 1191. In Kiles's case, where "we know" was used by the State before any evidence or witnesses had even been introduced to the jury, it amounted to prosecutorial misconduct.

Additionally, in his opening statement, Powell repeatedly and improperly conveyed his personal beliefs about the credibility of witnesses. (Tr. Mar. 20, 2006 at 72, 79); *State v. Lamar*, 72 P.3d 831, 841 (Ariz. 2003) ("A prosecutor must not convey his personal belief about the credibility of a witness."). And as the prosecutor had set the stage for the rest of the penalty phase, defense counsel argued it would be "hard to unring that bell." (Tr. Mar. 20, 2006 at 87.) Given the extent of the prosecutor's misconduct, there is a reasonable likelihood that the conduct denied Kiles a fair trial, and the trial court's error was not harmless.

There was no reasonable strategy for Mattern to fail to raise this claim on appeal. However, Mattern's opening brief contained only one brief reference to prosecutorial misconduct. (DA2 Dkt. 86 at 47.) His reply brief attempted to raise, for the first time, an additional nine arguments in support of the prosecutorial misconduct claim. (ROA 1189 at 64–65.) But having failed to raise the arguments in his opening brief, Mattern had waived them. *See State v. Aleman*, 109 P.3d 571,

575 (Ariz. Ct. App. 2005) (holding issues raised for first time in reply brief untimely and may be disregarded by court).

Because of Mattern's deficient performance, the appellate court was denied the ability to assess the cumulative impact of repeated instances of prosecutorial misconduct on the jury's verdict. (ROA 1189 at 64–65.) A pattern of pervasive misconduct was reasonably likely to have affected the outcome of the trial. "[E]ven if there [is] no error or an error [is] harmless and so by itself does not warrant reversal, an incident may nonetheless contribute to a finding of persistent and pervasive misconduct if the cumulative effect of the incidents shows that the prosecutor intentionally engaged in improper conduct and 'did so with indifference, if not a specific intent, to prejudice the defendant.'" *State v. Morris*, 160 P.3d 203, 214 (Ariz. 2007) (quoting *State v. Roque*, 141 P.3d 368, 403 (Ariz. 2006)). Mattern's failure to preserve arguments for appellate review fell short of the standards of reasonableness required for appellate counsel. *See* ABA Guideline 10.15.1(C).

When appellate counsel fails to raise meritorious issues that could have resulted in a reversal of conviction or a sentence, counsel has necessarily caused prejudice to the defendant. There was a reasonable probability that the Arizona Supreme Court would have found that the trial court's denial of a mistrial, as well as the pervasive prosecutorial misconduct, required reversal of Kiles's sentence. Thus, Kiles was prejudiced due to his appellate counsel's ineffective assistance. *See Strickland*, 466 U.S. at 694.

### 3.   Appellate counsel failed to adequately brief his challenge to the improperly admitted gruesome photographs.

Mattern failed to adequately challenge inflammatory and unduly prejudicial photographs introduced as evidence during Kiles's trial.

Kiles's opening brief on appeal objected to a number of gruesome photographs that were improperly introduced during the guilt-phase proceeding

353

1    without objection by trial counsel.[177] (DA2 Dkt 86 at 56.) While Mattern listed

2    several exhibits that should not have been admitted, the Arizona Supreme Court

3    held that the claim was inadequately briefed: "Kiles' opening brief does not specify

4    his objection to any but two of the challenged photographs. He has therefore waived

5    any argument as to the other photographs." *Kiles*, 213 P.3d at 183. The court found

6    the two photographs that Mattern sufficiently objected to did not prejudice Kiles.

7    This was due to Mattern's failure to challenge the child-abuse convictions. *Id.*

8        As a result of Mattern's failure to provide reasoning for his challenges to all

9    of the photographs, as well as his failure to challenge the child-abuse convictions,

10   the trial court found that there was no prejudice to Kiles. Mattern's deficient

11   performance resulted in the waiver of claims regarding several inflammatory

12   photographs. The 2003 ABA Guidelines state that appellate counsel are required to

13   litigate all issues "that are arguably meritorious under the standards applicable to

14   high quality defense representation," as well as "make every professionally

15   appropriate effort to present issues in a manner that will preserve them for

16   subsequent review." 2003 ABA Guideline 10.15.1(C). Mattern failed to do either.

17   Given Mattern's failure to raise claims on appeal adequately to ensure effective

18   review, the state post-conviction court's holding that Mattern was not ineffective

19   was an unreasonable application of both law and fact under § 2254(d).

20         **4.      Appellate counsel failed to challenge the trial court's error
21               in allowing the State to question statements made to defense
                 experts in a prior trial.**

22       Mattern failed to raise a claim that the trial court erred by letting the State

23   cross-examine defense experts about statements Kiles made to different experts in

24   the 1989 and 1990 trial when the verdicts from that trial were overturned. Although

25

26   ──────────────

27   [177] Defense counsel later tried to object to the photographs being introduced as
     evidence at the penalty phase, acknowledging that the failure to object at the guilt
28   phase perhaps "was an error of some magnitude on our part." (Tr. Mar. 20, 2006 at
     35.) The court denied the motion. (Tr. Mar. 20, 2006 at 38.)

1  trial counsel objected to this line of cross-examination, the trial court overruled the
2  objection. (Tr. May 8, 2006 at 54–55.) Mattern should have been on notice that this
3  issue presented a claim ripe for appellate review, as the State explicitly said, "This
4  is something that hasn't been resolved yet. . . . It's for the appellate courts to decide
5  later." (Tr. May 8, 2006 at 56.) Mattern's failure to recognize and allege this
6  meritorious claim was deficient performance. *See Strickland*, 466 U.S. at 694.

7      Effective counsel would have brought a claim that the trial court improperly
8  allowed the questioning based on an evidentiary ruling that was determined in a
9  "never, neverland" where "the Rules of Evidence could not apply." (Tr. May 8,
10  2006 at 55.) Because Kiles's prior statements to the experts directly undermined his
11  counsel's strategy at trial, there is a reasonable probability that their admission
12  affected the outcome of his trial. Upon review, there is a reasonable probability that
13  the Arizona Supreme Court would have recognized that allowing testimony to
14  Kiles's statements made in the course of a case that was overturned due to
15  ineffective assistance of counsel would be unduly prejudicial in Kiles's second trial.
16  The mistakes of previous counsel, especially where those mistakes would not have
17  been made but for previous counsel's deficient performance, should not then be
18  repeated. To allow the use of reports produced through the ineffectiveness of prior
19  counsel is to deny the curative value of a new trial. *See* Claim 8, *supra*. Thus,
20  Mattern's failure to challenge the admissibility of this line of cross-examination on
21  appeal prejudiced Kiles. *See Evitts*, 469 U.S. at 396; *Strickland*, 466 U.S. at 694.

22          **5.    Appellate counsel failed to argue for leniency on
23                  independent review by the Arizona Supreme Court.**

24      As stated above, the Arizona Supreme Court conducted an independent
25  review in Kiles's case. The question in this independent review was "not whether
26  the trial court properly imposed the death penalty, but whether, based upon the
27  record before [the Arizona Supreme Court], we believe that the death penalty
28  should be imposed." *State v. Trostle*, 951 P.2d 869, 888 (Ariz. 1997) (quoting *State*

355

1   *v. Watson*, 628 P.2d 943, 946 (Ariz. 1981)).

2   By his own admission, Mattern failed to include argument in his opening

3   brief regarding the Arizona Supreme Court's independent review, the only issue on

4   which Kiles was entitled to de novo review. When the justices asked Mattern at oral

5   argument to address independent review, he was unprepared to discuss

6   mitigation.[178] And after argument, Mattern was ineffective in failing to challenge

7   independent review in the motion for reconsideration, especially in light of his

8   admission that he had neglected to adequately brief the issue. (DA2 Dkt. 118 at 1.)

9   For a defendant, independent review was a second chance to argue his

10  mitigation case—"something anathema in any other context." *State v. Stuard*, 863

11  P.2d 881, 902 (Ariz. 1993) (quoting *State v. Salazar*, 844 P.2d 566, 585 (Ariz. 1992)

12  (Martone, J., specially concurring)). This second chance had proven successful for

13  many defendants. The Arizona Supreme Court has overturned several death

14  sentences based on its independent review of aggravating and mitigating

15  circumstances. *See, e.g.*, *Grell*, 291 P.3d at 351; *Roque*, 141 P.3d at 405–06; *Trostle*,

16  951 P.2d at 888; *Stuard*, 863 P.2d at 902; *State v. Herrera*, 850 P.2d 100, 113 (Ariz.

17  1993); *State v. Jiménez*, 799 P.2d 785, 801 (Ariz. 1990); *State v. Rockwell*, 775 P.2d

18  1069, 1080 (Ariz. 1989); *State v. Mauro*, 766 P.2d 59, 81 (Ariz. 1988); *State v.

19  Valencia*, 645 P.2d 239, 241 (Ariz. 1982); *Watson*, 628 P.2d at 947.

20  The 2003 ABA Guidelines emphasize that capital counsel have a

21  professional obligation to "take advantage of all appropriate opportunities to argue

22  why death in not a suitable punishment" for their client. 2003 ABA Guideline

23  10.11(L). Mattern failed to do so, offering no reasonable explanation at oral

24  _____

25  [178] Though Mattern was able to identify some of the mitigation that was introduced
    at the penalty phase, he also argued that the guilty verdicts returned on the children

26  in Kiles's guilt phase were invalid based on the evidence presented.  This was not
    an issue the Arizona Supreme Court could have considered in its independent

27  review. Rather, the court must "independently review the aggravating and
    mitigating factors found by the trial court to ensure that they were properly

28  determined and weighed." *State v. Fierro*, 804 P.2d 72, 81 (Ariz. 1990).

356

1   argument, instead stating: "I neglected to brief independent review. It's my own
2   fault entirely. I accept responsibility." *Cf. Correll*, 539 F.3d at 949 (holding that an
3   "uninformed strategy" is "no strategy at all").

4       If Mattern had briefed independent review, there is a reasonable likelihood
5   the Arizona Supreme Court would not have ignored or mischaracterized the
6   mitigation evidence when conducting its independent review. As laid out in greater
7   detail in Claim 12, *infra*, the court failed to consider the majority of the 30 non-
8   statutory mitigators Kiles alleged at trial (Tr. May 22, 2006 at 19–21), claimed Kiles
9   failed to prove two statutory mitigators when neither was alleged (Tr. May 22, 2006
10  at 19–21), and discounted the extensive evidence presented that Kiles had an
11  abusive childhood. *Kiles*, 213 P.3d at 189. Mattern thus squandered Kiles's
12  opportunity to have his death sentence reduced to life in prison, prejudicing Kiles.

13
        **6.    Appellate counsel failed to adequately challenge the (F)(2)
                aggravating circumstance.**
14

15      The State alleged the (F)(2) aggravator in Kiles's case, which applies when
16  a defendant "was previously convicted of a felony in the United States involving
17  the use or threat of violence on another person." (ROA 503 at 1 (quoting A.R.S.
18  § 13-703(F)(2) (1988).) The State alleged that Kiles had committed two prior
19  felonies that qualified—an attempted aggravated assault and an aggravated assault.
20  Trial counsel challenged the attempted aggravated assault, claiming it did not
21  qualify under (F)(2), but lost. Mattern then successfully challenged the attempted
22  assault as a basis for the (F)(2) aggravator on appeal. *See Kiles*, 213 P.3d at 185–
23  86. However, appellate counsel failed to challenge the use of Kiles's aggravated
24  assault as a basis for the (F)(2) aggravating circumstance. This failure was
25  unreasonable, given that Mattern clearly realized that challenging the (F)(2)
26  aggravator was a viable strategy. Mattern's deficient performance prejudiced Kiles,
27  because, as discussed *supra*, Claim 5, and *infra*, Claim 12, there is a reasonable
28  likelihood the Arizona Supreme Court would have found that Kiles's aggravated

357

1    assault conviction did not support the (F)(2) aggravator and that the aggravator was
2    therefore invalid.

3    **7.    Appellate counsel failed to challenge Kiles's shackling**
     **during his proceedings.**
4

5    Mattern failed to challenge the use of shackles and a stun belt, which Kiles
6    was forced to wear throughout his proceedings. "[G]enerally, a criminal defendant
7    has a constitutional right to appear before a jury free of shackles." *Gonzalez v.*
8    *Pliler*, 341 F.3d 897, 900 (9th Cir. 2003) (quoting *Spain v. Rushen*, 883 F.2d 712,
9    716 (9th Cir. 1989)). The trial court failed to make the requisite finding that shackles
10   and a stun belt were necessary, as discussed in Claims 3, 5, 7, and 8, *supra*. There
11   is a reasonable likelihood that such a claim would have succeeded on appeal. Kiles
12   was thus prejudiced. *See Strickland*, 466 U.S. at 694; *see also State v. Gomez*, 123
13   P.3d 1131, 1139–42 (Ariz. 2005) (reversing death sentence when capital defendant
14   was shackled without necessary individualized finding).

15   **C.    Conclusion.**
16   Individually and cumulatively, these deficiencies constitute ineffective
17   assistance of appellate counsel. The state court's determination that this claim was
18   not colorable and did not warrant an evidentiary hearing constituted an
19   unreasonable application of clearly established federal law, 28 U.S.C. § 2254(d)(1),
20   and an unreasonable determination of the facts, *id.* § 2254(d)(2). As to sections
21   B(4)–B(7), the ineffective assistance of Kiles's post-conviction counsel in failing
22   to raise these parts of this claim constitutes cause for the default and resulted in
23   prejudice to Kiles. *See Martinez*, 132 S. Ct. at 1320; *but see Davila*, 137 S. Ct. at
24   2065. Kiles is therefore entitled to relief.

25                                  **Claim Twelve**

26   **The Arizona Supreme Court's decision affirming Kiles's death**
     **sentence violated Kiles's constitutional rights.**
27

28   The Arizona Supreme Court's decision affirming Kiles's death sentence

1    violated Kiles's rights under the Sixth, Eighth, and Fourteenth Amendments to the

2    U.S. Constitution. Kiles hereby incorporates by specific reference all facts,

3    allegations, and arguments made elsewhere in this Petition.

4         This claim is exhausted, as the Arizona Supreme Court considered and ruled

5    on its merits on direct appeal.[179] *See Kiles*, 213 P.3d at 187–92. The state-court

6    decision was an unreasonable application of, or contrary to, clearly established

7    federal law, *see* 28 U.S.C. § 2254(d)(1), and an unreasonable determination of the

8    facts, *id.* § 2254(d)(2). Accordingly, § 2254(d) places no limitation on relief, and

9    this Court should review the claim de novo.

10        In order to try to satisfy the heightened standard of reliability necessary in

11   the death-penalty context, *see Woodson v. North Carolina*, 428 U.S. 280, 305

12   (1976) (plurality opinion), the U.S. Supreme Court has "emphasized repeatedly the

13   crucial role of meaningful appellate review in ensuring that the death penalty is not

14   imposed arbitrarily or irrationally." *Parker v. Dugger*, 498 U.S. 308, 321 (1991);

15   *see also Zant v. Stephens*, 462 U.S. 862, 890 (1983) ("Our decision in this case

16   depends in part on the existence of an important procedural safeguard, the

17   mandatory appellate review of each death sentence by the Georgia Supreme Court

18   to avoid arbitrariness and to assure proportionality.").

19        As the purpose of appellate review is to ensure the constitutionality of a death

20   sentence, the review must itself be constitutional. *Cf. Clemons v. Mississippi*, 494

21   U.S. 738, 748–51 (1990) (evaluating constitutionality of appellate review). To that

22

23   [179] To the extent this claim was not raised on direct appeal, it was still exhausted
     because "[e]ven if a petitioner fails to raise a constitutional claim in state court, the
24   exhaustion requirement may be satisfied . . . where the state court itself exhausts
     the claim." *Comer v. Schriro*, 480 F.3d 960, 981 (9th Cir. 2007). The Arizona
25   Supreme Court did so in conducting its independent review. *State v. Kiles*, 213 P.3d
     174, 187 (Ariz. 2009). In the alternative, if any portion of this claim was found not
26   to have been decided by the state court on the merits, the ineffective assistance of
     Kiles's post-conviction counsel in failing to raise this claim constitutes cause for
27   the default and resulted in prejudice to Kiles. *See Martinez v. Ryan*, 566 U.S. 1, 9
     (2012); *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984).
28

359

1    end, meaningful appellate review cannot lose sight of the fact that "[t]he primary

2    concern in the Eighth Amendment context [is] that the sentencing decision be based

3    on the facts and circumstances of the defendant, his background, and his crime." *Id.*

4    at 748; *cf. Smith v. Texas*, 543 U.S. 37, 44–45 (2004) (rejecting state court's reliance

5    during appellate review on causal-nexus text that limited consideration of relevant

6    mitigation). Moreover, the appellate review must not inject "arbitrar[iness] or

7    irrational[ity]" into the sentencing process. *Parker*, 498 U.S. at 321. Finally, once

8    a state has provided a mechanism for meaningful appellate review, it must follow

9    its own laws on that mechanism; the failure to do so results in the denial of a liberty

10   interest protected by the Due Process Clause of the Fourteenth Amendment. *See*

11   *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980) (recognizing that the grant of a state-

12   law procedural right to a criminal defendant at sentencing can give rise to a

13   constitutionally protected liberty interest).

14        The Arizona Supreme Court has defined its procedure for independent

15   review:

16        When a death sentence is imposed in Arizona, this court
         independently reviews the entire record for error,
17        determines whether the aggravating circumstances have
         been proved beyond a reasonable doubt, considers any
18        mitigating circumstances, and then weighs the aggravating
         and mitigating circumstances in deciding whether there are
19        mitigating circumstances sufficiently substantial to call for
         leniency.
20

21   *State v. Stokley*, 898 P.2d 454, 465 (1995). The court has emphasized that

22   independent review is broad: "We must [] conduct a de novo review of the trial

23   court's rulings concerning aggravation and mitigation, and then decide

24   independently whether the death sentence should be imposed." *State v. Brewer*, 826

25   P.2d 783, 790–91 (Ariz. 1992). The court must "painstakingly examine the record

26   to determine whether [the death penalty] has been erroneously imposed." *State v.*

27   *Stuard*, 863 P.2d 881, 897 (Ariz. 1993) (quoting *State v. Richmond*, 560 P.2d 41,

28   51 (Ariz. 1976)). The court has itself recognized that it must follow its own

360

1    procedures: "we are bound by the gravity of the death penalty to insure proper

2    compliance with Arizona's death penalty statute." *Brewer*, 826 P.2d at 790.

3        In 2009, the Arizona Supreme Court conducted an independent review of

4    Kiles's death sentence under A.R.S. § 13-755(A)-(C). *Kiles*, 213 P.3d at 187. The

5    manner in which the Arizona Supreme Court conducted its independent review

6    violated Kiles's constitutional rights by denying him meaningful appellate review

7    and due process, in violation of the Sixth, Eighth, and Fourteenth Amendments.

8        **A.    The Arizona Supreme Court violated Kiles's due process rights in
         its review of the prior-conviction aggravating circumstance.**

9

10       The Arizona Supreme Court violated federal constitutional guarantees in its

11   review of whether the (F)(2) aggravator had been properly found.

12           **1.    The Arizona Supreme Court denied Kiles his right to due
                 process in upholding the prior-conviction aggravating
                 circumstance.**

13

14       The Arizona Supreme Court improperly upheld the (F)(2)[180] aggravating

15   circumstance based upon Kiles's 1986 conviction for aggravated assault, which was

16   in fact not a valid basis for the aggravator. *See* Claim 5, *supra*.

17       The (F)(2) aggravator when the defendant was previously convicted of a

18   felony in the United States "involving the use or threat of violence on another

19   person." A.R.S. § 13-703(F)(2) (1988). The jury found the (F)(2) aggravator proven

20   based on two prior offenses, an aggravated assault under A.R.S. § 13-1204(A)(8)

21   and § 13-1203, and an attempted aggravated assault under A.R.S. § 13-1001(A).

22   *Kiles*, 213 P.3d at 185; (*see also* ROA 879 at 5–6).

23       In its decision, the Arizona Supreme Court correctly held that Kiles's prior

24   *attempted* aggravated assault could not establish the (F)(2) aggravator, as by the

25   crime's statutory definition it *could* have been committed without the use or threat

26   _____

27   [180] As noted *supra*, Claim 5, the text of the (F)(2) aggravating circumstance was
     changed in 1993. *State v. Martinez*, 999 P.2d 795, 806 (Ariz. 2000). The pre-1993

28   version of the aggravating circumstance applies to Kiles's case.

1    of violence. *Kiles*, 213 P.3d at 185–86 (citing *State v. McCray*, 183 P.3d 503, 508
2    (Ariz. 2008)); *see also State v. Williams*, 904 P.2d 437, 451 (Ariz. 1995).

3          However, the court did not review whether this same reasoning applied to
4    the aggravated assault conviction. The court had a duty to do so as part of its
5    established independent review procedure. The court addressed the (F)(2)
6    aggravator twice in its decision: first in part (III)(A), and again as part of its
7    independent review in part (IV). *Kiles*, 213 P.3d at 185, 187–88. In each instance,
8    the court summarily assumed that Kiles's aggravated assault conviction satisfied
9    (F)(2). However, A.R.S. § 13-1204(A)(8) does not by its statutory definition
10   necessarily involve the mens rea necessary to establish the use or threat of violence.
11   Nor does the general assault statute. *See* Claim 5, *supra*.

12         Prior to its review of Kiles's case, the Arizona Supreme Court had analyzed
13   the (F)(2) aggravating circumstance applicable here (i.e., the pre-1993 version),
14   which requires the use or threat of violence, and had found it was not supported by
15   a prior conviction for aggravated assault. *See, e.g.*, *State v. Walden*, 905 P.2d 974,
16   996 (Ariz. 1995) (holding that aggravated assault did not provide basis for (F)(2)
17   aggravating circumstance when it could have been committed recklessly),
18   *overruled on other grounds by State v. Ives*, 927 P.2d 762 (Ariz. 1996); *State v.*
19   *McKinney*, 917 P.2d 1214, 1230 (Ariz. 1996) (holding that "because [the
20   defendant's] prior conviction was for a crime that, on the face of the statute, might
21   have been committed recklessly, it does not qualify as a crime of violence" for the
22   purposes of the former (F)(2) aggravating circumstance); *State v. Schackart*, 947
23   P.2d 315, 323 (Ariz. 1997). Thus the Arizona Supreme Court should have similarly
24   struck the (F)(2) aggravator in Kiles's case, as neither the conviction for aggravated
25   assault nor the conviction for attempted aggravated assault were sufficient to prove
26   the (F)(2) aggravator under the applicable statute.

27         The Eighth Amendment requires capital sentencing to meet exacting
28   standards. "The fundamental respect for humanity underlying the Eighth

362

1   Amendment's prohibition against cruel and unusual punishment gives rise to a
2   special 'need for reliability in the determination that death is the appropriate
3   punishment' in any capital case." *Johnson v. Mississippi*, 486 U.S. 578, 584 (1988)
4   (quoting *Gardner v. Florida*, 430 U.S. 349, 363–64 (1977) (White, J., concurring
5   in judgment)). Capital sentencing must also be individualized. *Clemons*, 494 U.S.
6   at 748. Reliable, individualized sentencing does not occur when a death sentence is
7   imposed based in part on an invalid aggravator. *See Johnson*, 486 U.S. at 585.

8       The Eighth Amendment error is even more serious where the invalid
9   aggravating factor caused the jury to consider irrelevant evidence, such as
10  inapplicable prior convictions. *Id.* at 590; *see also Brown v. Sanders*, 546 U.S. 212,
11  220 (2006). This concern is particularly heightened in a "weighing" state like
12  Arizona, where the jury must weigh the aggravators and mitigators against each
13  other to determine whether to impose death. *See Styers v. Schriro*, 547 F.3d 1026,
14  1034 (9th Cir. 2008). The court should have struck the (F)(2) aggravator and
15  remanded to a jury for resentencing. *See Apprendi v. New Jersey*, 530 U.S. 466
16  (2000); *Ring v. Arizona*, 536 U.S. 584 (2002); *Hurst v. Florida*, 136 S. Ct. 616
17  (2016); *Pavatt v. Royal*, 894 F.3d 1115, 1152–53 (10th Cir. 2017) (Briscoe, C.J.,
18  concurring in part and dissenting in part) (noting that, in light of *Ring*'s and *Hurst*'s
19  holdings that a defendant is entitled to a jury determination of all facts that can
20  increase his sentence, *Clemons*'s rule permitting reweighing by an appellate court
21  was unconstitutional, as *Hurst* and *Ring* explicitly overruled the cases on which
22  *Clemons* was based). Though a jury resentencing was constitutionally mandated, at
23  a minimum, the court should have conducted its own reweighing of the remaining
24  aggravators and all of the mitigation.

25      The Arizona Supreme Court's failure to painstakingly review the entire
26  record in search of error, including this significant error regarding the (F)(2)
27  aggravator, injected arbitrariness and irrationality into the sentencing process and
28  denied Kiles the due-process protections afforded other capital defendants in

Arizona. The Arizona Supreme Court's decision was thus contrary to clearly established federal law. *See* 28 U.S.C. § 2254(d)(1); *Parker*, 498 U.S. at 321; *Hicks*, 447 U.S. at 346. Its finding that the (F)(2) aggravator was applicable based on Kiles's prior convictions also amounts to an unreasonable determination of fact in light of the evidence presented at trial. *See* 28 U.S.C. § 2254(d).

### 2. The Arizona Supreme Court violated Kiles's rights by summarily determining that the invalidation of one prior conviction was immaterial.

The Arizona Supreme Court violated Kiles's right to be free from cruel and unusual punishment under the Eighth Amendment and his right to due process under the Fourteenth Amendment when it summarily determined that the invalidation of his prior conviction for attempted aggravated assault as a basis for the (F)(2) aggravator was immaterial. *Kiles*, 213 P.3d at 188.

As discussed above, the Arizona Supreme Court should have struck the (F)(2) aggravating circumstance entirely. Setting aside the court's error with respect to the aggravated assault conviction explained above, the court erred in summarily upholding the (F)(2) aggravator when it struck one of the supporting convictions. The court correctly held that one of the prior convictions that the jury found supported the (F)(2) aggravating circumstance was legally inadequate to establish that circumstance. *Id.* at 186. But the court committed constitutional error by then summarily upholding the (F)(2) aggravator without further discussion. *Id.* at 188.

That conclusion was contrary to clearly established federal law, as the Arizona Supreme Court failed to follow its own procedures requiring it to "consider the quality and the strength, not simply the number, of aggravating and mitigating factors," *see id.* at 187; *see Hicks*, 447 U.S. at 346. Whether the aggravating circumstance was supported by multiple or only one prior conviction went directly to the quality and strength of that aggravating circumstance and was therefore of great significance. The Arizona Supreme Court's failure to conduct a "painstaking" de novo review of the trial court's determination regarding the legally valid bases

364

1    for the (F)(2) aggravator and the propriety of the death sentence violated Kiles's

2    Eighth and Fourteenth Amendment rights and was an unreasonable application of

3    federal law. *See Hicks*, 447 U.S. at 346.

4         The magnitude of the Arizona Supreme Court's constitutional error in

5    summarily dismissing the invalid prior conviction as immaterial is exacerbated by

6    the fact that the jury considered irrelevant evidence—the inapplicable prior

7    conviction—as aggravating evidence. *See Johnson*, 486 U.S. at 590. It was

8    improper for the court not to analyze whether the additional prior conviction may

9    have affected the jury's deliberations. This need is particularly heightened in a state

10   like Arizona, where the jury must weigh the aggravators and mitigators against each

11   other to determine whether to impose death.

12        Here, the court instructed the jury that the decision whether there was

13   mitigation sufficiently substantial to call for leniency was to be based on "each

14   juror's individual qualitative evaluation of the facts of the case, the *severity of the*

15   *aggravating factors*, and the quality of any mitigating evidence." (Tr. May 22, 2006

16   at 23–24 (emphasis added).) Where there was a pattern of escalating violence, as

17   opposed to just one prior conviction, jurors were likely to find the aggravating factor

18   more severe and weigh it more heavily against the mitigation. A capital sentence is

19   unconstitutional where, as here, an element of an invalid sentencing factor adds an

20   "improper element to the aggravation scale in the weighing process." *Sanders*, 546

21   U.S. at 220; *see also Stringer v. Black*, 503 U.S. 222, 232–33 (1992) ("But when

22   the sentencing body is told to weigh an invalid factor in its decision . . . the weighing

23   process itself has been skewed. . . ."). None of the other sentencing factors enabled

24   the sentencer to give aggravating weight to the same facts and circumstances as

25   Kiles's inapplicable prior conviction. It was an unreasonable application of federal

26   law for the Arizona Supreme Court to summarily conclude that the partial

27   invalidation of an aggravating factor based on an inapplicable prior conviction was

28   immaterial. *See Johnson*, 486 U.S. at 585. As discussed above, the court should

1    have remanded for jury resentencing or at a minimum, conducted an appellate

2    reweighing. *See Ring*, 536 U.S. at 589; *Hurst*, 136 S. Ct. at 616; *Pavatt*, 894 F.3d

3    at 1152–53 (Briscoe, C.J., concurring in part and dissenting in part).

**B.    The Arizona Supreme Court denied Kiles meaningful appellate review when it arbitrarily upheld the (F)(6) aggravating factor.**

6        The evidence in Kiles's case did not support the (F)(6) aggravating factor

7    beyond a reasonable doubt; the Arizona Supreme Court violated his constitutional

8    rights in upholding it.[181] An appellate court cannot uphold a death sentence that

9    rests on an aggravating circumstance "that upon the record evidence adduced at the

10   trial no rational trier of fact could have found [proven] beyond a reasonable doubt."

11   *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *see also Lewis v. Jeffers*, 497 U.S.

12   764, 781 (1990) (applying the standard from *Jackson* to the question whether, on

13   habeas review, an aggravating circumstance was unsupported by the record).

14       The Arizona Supreme Court deprived Kiles of meaningful appellate review

15   when it upheld the (F)(6) aggravating factor where it could not have been proven

16   beyond a reasonable doubt had the court "review[ed] the entire record." *Stokley*,

17   898 P.2d at 465. The court cherry-picked parts of the record that supported this

18   factor, while ignoring those that did not. It is critical that an aggravator is proven

19   beyond a reasonable doubt. "The specified statutory aggravators in Arizona's death

20   penalty scheme are designed to narrow, in a constitutional manner, the class of first

21   degree murderers who are death-eligible. If proof of an aggravator does not rise to

22   the necessary standard, the aggravator has not been proven and may not be

23   considered at sentencing." *State v. Soto-Fong*, 928 P.2d 610, 626 (Ariz. 1996).

---

25   [181] The (F)(6) aggravating circumstance, *see* A.R.S. § 13-703(F)(6) (1988), is also

26   unconstitutionally overbroad and vague. *See infra*, Claim 29; *see also Maynard v. Cartwright*, 486 U.S. 356, 363 (1988); *Walton v. Arizona*, 497 U.S. 639, 654 (1990)

27   (finding Arizona's especially heinous, cruel, or depraved aggravating factor facially vague, but that it did not violate the Eighth and Fourteenth Amendments because

28   capital-sentencing decisions were made by judges who could be presumed to follow the law), *overruled on other grounds by Ring*, 536 U.S. 584.

366

The court upheld the (F)(6) aggravator based on a finding of cruelty. *Kiles*, 213 P.3d at 188. The State argued at trial its theory that Kiles began attacking Gunnel in her bedroom, where he struck her a number of times in the head with a tire iron and she lost consciousness. (*See* Tr. Apr. 11, 2006 at 34–35; Tr. May 22, 2006 at 64.) The State argued that she then regained consciousness and came into the living room, where Kiles killed her. The Arizona Supreme Court adopted the State's theory of the crime, even though it was not supported by the evidence beyond a reasonable doubt. *See* Claim 9, *supra*. In upholding the (F)(6) aggravator, the court found that "the evidence shows that Valerie was conscious after the attack began." *Kiles*, 213 P.3d at 188. The court based this finding on its conclusion that "Kiles admitted that Valerie remained conscious after the attack began, and the medical testimony regarding defensive wounds supported that conclusion." *Id.* The court apparently based this finding on Kiles's purported admission after-the-fact to his brother-in-law, Larry Hawkins.[182] *See id.* ("Additional evidence supports the (F)(6) aggravator and the version of events Kiles admitted to Hawkins.").

However, at the aggravation phase, Hawkins's testimony did not support this theory. He testified twice that he did not remember Kiles telling him where in the apartment Kiles struck Gunnel. (Tr. Mar. 22, 2006 at 38, 39.) Both in his testimony and in a Silent Witness letter describing a version of events, Hawkins made no mention of Gunnel moving from room to room. (2006 Trial Ex. 90 at 1; Tr. July 13, 2000 at 3–79.) Notably, the detective who investigated the case, Brian Rodgers, testified at the aggravation phase that "I don't think [Gunnel] was – after things started, I don't think she ever made it to the east bedroom." (Tr. Apr. 3, 2006 at 100.) Even the State's lead investigator rejected the State's theory of the crime.

Moreover, there was ample reason to doubt Hawkins's testimony and letter on this purported admission. Hawkins was telling a story second-hand, based on

---

[182] The State never alleged that Hawkins was present for the crime; instead, his testimony was based on what he remembered Kiles telling him after the crime.

what Kiles told him while intoxicated on alcohol, cocaine, and other drugs. (Tr. July 13, 2000 at 60–62.) At the guilt phase, Hawkins admitted that his letter was only a rough picture of what Kiles had told him. (Tr. July 13, 2000 at 18.) Further, he testified at the aggravation phase that he wrote the letter after seeing news reports about the crime and speaking to other people, including the detective investigating the crime, which would have improperly infected his recollection of what Kiles told him. (Tr. Mar. 22, 2006 at 61–63, 75.)

The Arizona Supreme Court stated that additional evidence supported the version of events Kiles purportedly admitted to Hawkins. *Kiles*, 213 P.3d at 188. But, the physical evidence the court did have before it did not prove at all, much less beyond a reasonable doubt, that Gunnel regained consciousness. For example, the court noted that a piece of the jack was found in Gunnel's bedroom. *Id.* However, many sources, including Rodgers, testified that items in the house were moved after the crime.[183] (Tr. July 11, 2000 at 166–67; Tr. Apr. 3, 2006 at 99–100.) The court itself recognized that Kiles attempted to clean up the scene—and therefore that the crime scene was compromised—as reason for discounting his intoxication as a mitigating factor. *Kiles* 213 P.3d at 190.

The court also pointed to a pillow that was found with blood on it "consistent with a source that continued to move." *Id.* at 188. However, the testimony of Tom Bevel, the blood-spatter expert, was that something was "smearing the blood," which indicated that "the blood source or something that is in fact bloody, isn't just resting down." (Tr. Mar. 27, 2006 at 72–73.) This smear easily could have occurred while Kiles was moving things around, or after the victim was deceased. *See* Claim 5, *supra.* The court also cited "a transfer stain consistent with a person running a bloody hand along a door" as evidence supporting the theory that Gunnel regained consciousness during the attack. But the evidence demonstrated that it was not

---

[183] Rodgers also testified at the aggravation phase that there was no blood spatter or castoff in Gunnel's bedroom to support the State's theory. (Tr. Apr. 3, 2006 at 22.)

1    Gunnel who had made the transfer stain. Kale Johnson, who pleaded guilty to

2    hindering the prosecution in Kiles's case, testified via affidavit that he got blood on

3    his hand and tried to wipe it off on the inside frame of the apartment door; this

4    sworn statement was read into the record at the mitigation phase. (Tr. July 14, 2000

5    at 134–35; Tr. July 17, 2000 at 35; Tr. Apr. 27, 2006 at 78; PFR2 Dkt. 20 Ex. 1 at

6    7.) The court noted that this transfer stain, along with blood-spatter evidence,

7    "indicated that *either* the blood source or the attacker was moving." Kiles, 213 P.3d

8    at 188 (emphasis added). The ambiguous blood-stain evidence certainly does not

9    prove beyond a reasonable doubt that Gunnel was conscious after the attack began.

10   (Tr. July 13, 2000 at 93–107; Tr. July 14, 2000 at 4–61.)

11        The Arizona Supreme Court similarly erred when it cited the medical

12   examiner's testimony on "defensive wounds" as supporting the conclusion that

13   Gunnel remained conscious. The medical expert testified that Gunnel's arm had

14   evidence of a single "defensive wound." (Tr. July 13, 2000 at 99; *see also* Tr. Mar.

15   21, 2006 at 21 (Gunnel's injury "consistent with" a defensive wound).)

16        Finally, the court distinguished Kiles's case from *Soto-Fong*, in which it

17   rejected the (F)(6) factor because, although the defendant thought a victim remained

18   conscious, it was not proven beyond a reasonable doubt. *See Soto-Fong*, 928 P.2d

19   at 625 (it would be unconstitutional for "an alternative finding based on a

20   hypothetical set of facts" to support an aggravating factor). The Arizona Supreme

21   Court referred to Kiles's "admissions" as evidence that Gunnel regained

22   consciousness. But Hawkins's testimony and Silent Witness letter alone did not

23   support that finding beyond a reasonable doubt, and the State presented no other

24   alleged admission from Kiles regarding how Gunnel's death unfolded. Kiles later

25   testified on the stand that, once he hit Gunnel with the jack, she fell down in a chair

26   and never got up. (Tr. July 17, 2000 at 165.) And there was no other evidence to

27   support the (F)(6) aggravator beyond a reasonable doubt.

28        Thus, in upholding the (F)(6) aggravator, the court appears to have relied on

369

argument and hypotheticals offered by the State, not on evidence. (Tr. Mar. 21, 2006 at 34); *see* Claim 9 *supra.* "To conclude that a murder would be especially cruel or heinous if committed in an assumed manner, without evidence that it was committed in that manner, falls short of the mark." *Soto-Fong*, 928 P.2d at 626. On this record, no rational factfinder could have found beyond a reasonable doubt that Gunnel regained consciousness after Kiles struck her, a requirement for finding cruelty. *See Lewis*, 497 U.S. at 781. The Arizona Supreme Court's decision upholding this aggravating factor unconstitutionally denied Kiles his right to meaningful appellate review and is an unreasonable application of federal law.[184] *See Parker*, 498 U.S. at 321; *Jackson*, 443 U.S. at 324; *Lewis*, 497 U.S. at 781.

### C.   The Arizona Supreme Court denied meaningful appellate review by inflating the weight of the (F)(8) aggravating circumstance.

The court deprived Kiles of meaningful appellate review by automatically assigning "extraordinary weight" to the multiple-homicides aggravating circumstance. *See* A.R.S. § 13-703(F)(8) (1988). Without considering the particulars of Kiles's case, the court gave this circumstance "extraordinary weight." *Kiles*, 213 P.3d at 191 (quoting *State v. Boggs*, 185 P.3d 111, 130 (Ariz. 2008)). This violated Kiles's constitutional rights. *See Parker*, 498 U.S. at 321.

That premise originated in *State v. Rogovich*, 932 P.2d 794 (Ariz. 1997), in which the defendant had been found guilty of four counts of first-degree murder and two counts of armed robbery, among other convictions. *Id.* at 796. The trial court found in aggravation that the defendant had "been convicted of: (1) another offense in the United States for which under Arizona law a sentence of life imprisonment or death was imposable; (2) a felony involving the use or threat of violence on another person; and (3) one or more other homicides committed during the commission of the offense." *Id.* at 800 (citations omitted). On appeal, the

---

[184] The court compounded this constitutional harm when it arbitrarily decided to accord "significant weight" to the (F)(6) aggravator. *Kiles*, 213 P.3d at 191.

Arizona Supreme Court found that, of the three aggravating circumstances found, "the (F)(8) circumstance carrie[d] the most weight." *Id.* at 802.

Since *Rogovich*, however, the Arizona Supreme Court has made an unconstitutional blanket declaration that the multiple-homicides aggravating circumstance warrants "extraordinary weight." The court has then cited to *Rogovich*, or to a case citing *Rogovich*, despite the fact that *Rogovich* does not support such a declaration. For example, in *State v. Hampton*, the defendant was convicted of murdering a man and a pregnant woman, and the jury found that two aggravating circumstances, including multiple homicides, had been proven. 140 P.3d 950, 954–55 (Ariz. 2006). During its independent review, the Arizona Supreme Court declared that "[t]he (F)(8) multiple homicides aggravator is extraordinarily weighty." *Id.* at 967. And the court cited *Rogovich*, which made no such sweeping statement. More recently, the court has cited *Hampton* for the principle that the multiple-murders circumstance carries "extraordinary weight." *See, e.g.*, *Boggs*, 185 P.3d at 118, 130, 132 (upholding death sentences in a case where defendant was convicted of three counts of first-degree murder).

The Arizona Supreme Court in this case likewise afforded the multiple-homicides aggravating factor "extraordinary weight," with no support or explanation beyond the citation to *Boggs*. *Kiles*, 213 P.3d at 191. The court ignored the fact that, in the *Enmund/Tison* findings for the two child victims, the jury could not reach a unanimous verdict as to whether Kiles had intentionally killed them.[185] *Id.* at 186. The court should further have considered that Kiles did not receive death sentences for all of the victims—it seems even the jury did not assign such weigh to the aggravator. Instead, the court assigned the multiple-homicide aggravating

---

[185] The court further erred when it stated that "Kiles no longer disputes that he murdered the children." *Kiles*, 213 P.3d at 188. Kiles did not concede his guilt, but instead made a strategic decision to waive his appellate rights to challenge the convictions and sentences to avoid the risk of additional potential death sentences. (*See* DA2 Dkt. 86 at 12, 13.)

371

1    circumstance the same "extraordinary weight" that the court would have afforded
2    it had Kiles been sentenced to death for all three convictions.

3         The court's arbitrary assigning of extraordinary weight to the multiple-
4    homicides aggravating circumstance, with complete disregard for the
5    circumstances of the offense, violates the individualized sentencing at the
6    cornerstone of Eighth-Amendment jurisprudence and is contrary to federal law. *See*
7    *Parker*, 498 U.S. at 321 ("[M]eaningful appellate review requires that the appellate
8    court consider the defendant's actual record. 'What is important . . . is an
9    *individualized* determination on the basis of the character of the individual and the
10   circumstances of the crime.'" (quoting *Stephens*, 462 U.S. at 879)). A denial of this
11   individualized consideration thus equates to a denial of meaningful appellate
12   review. *See id.*; *see also Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982) ("[A]
13   consistency produced by ignoring individual differences is a false consistency.").

14        **D.    The Arizona Supreme Court denied Kiles his constitutionally
15              protected right to meaningful independent review when it ignored
                many of his mitigating factors and mischaracterized others.**

16        Because Arizona defined its appellate review process to include independent
17   review, its independent review was required to comport with the requirements of
18   the Sixth, Eighth, and Fourteenth Amendments. *See Hicks*, 447 U.S. at 346. It was
19   also required to comport with the requirements that the Arizona Supreme Court has
20   itself outlined, described above. Here, the court did not conduct a "de novo,"
21   "painstaking" review. Instead, it upheld all of the aggravators with little thought
22   and misconstrued or minimized mitigating evidence. Though Kiles alleged 30 non-
23   statutory mitigating factors, the court did not even mention or address most of them.
24   *See Kiles*, 213 P.3d at 189; (*see also* Tr. May 22, 2006 at 19–21). In its
25   "independent" review, the court instead discussed Kiles's failure to prove two
26   statutory factors. *Id.* But, at trial Kiles did not allege either of those two statutory
27   mitigators. (Tr. May 22, 2006 at 19–21.) The court similarly misconstrued Kiles's
28   extensive mental-health evidence as an attempt to prove the statutory mitigating

372

factor of impaired capacity. *Kiles*, 213 P.3d at 189. In fact, the defense sought to use that evidence to prove a variety of non-statutory mitigating circumstances, including depression, possible neurological damage, and psychological disorders, in order to demonstrate that Kiles warranted leniency. (Tr. May 22, 2006 at 19–21.) In discussing Kiles's abusive childhood, the court focused disproportionately on the few pieces of evidence that pointed to a happy childhood and discounted extensive testimony to the contrary. *Kiles*, 213 P.3d at 189. The court found only that his childhood was "less than ideal." *Id.* In sum, the Arizona Supreme Court failed to independently and fairly analyze whether mitigation was sufficiently substantial to warrant leniency, in violation of Kiles's rights to due process and meaningful appellate review. Its decision is therefore contrary to clearly established federal law. *See Hicks*, 447 U.S. at 346; *Parker*, 498 U.S. at 321.

> ### E. The Arizona Supreme Court's decision denied Kiles meaningful appellate review by irrationally discounting and failing to give effect to the mitigating circumstances it did acknowledge.

To achieve the reliability demanded of a capital sentence, state courts must not only provide meaningful appellate review, but must ensure that the review does not inject any irrationality into the sentencing process. *See Parker*, 498 U.S. at 321. Moreover, the process must allow the sentencer not only to consider, but also to give effect to, mitigation. *Tennard v. Dretke*, 542 U.S. 274, 285 (2004). And, just as the jury must be able to give effect to mitigation in a rational manner, so must a state appellate court. *Cf. Eddings*, 455 U.S. at 114–15.

When considering mitigating factors, the Arizona Supreme Court has developed a body of case law to determine what weight to give to each factor. The effect of this case law, however, is that individualized consideration of the defendant's character is gutted based on irrelevancies. *See Eddings*, 455 U.S. at 112 (requiring focus "on the characteristics of the person who committed the crime" (quoting *Gregg v. Georgia*, 428 U.S. 153, 197 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.)). Moreover, the considerations the state supreme court

373

1   uses to determine the weight to give a particular mitigating circumstance ultimately

2   preclude the court from giving effect to certain types of mitigation. *See Tennard*,

3   542 U.S. at 285.

4          The court made an unconstitutional error in imposing a causal-nexus

5   requirement on the mitigating factors it found proven. *Kiles*, 213 P.3d at 191.

6   Because the psychiatric testimony "did not establish a sufficient connection to the

7   murder to warrant significant weight," the court essentially discounted it. *Id.*

8   Similarly, the court held that Kiles's childhood "carries minimal weight 'because

9   the evidence . . . is far removed from the crime.'" *Id.* (quoting *State v. Armstrong*,

10   189 P.3d 378, 392–93 (Ariz. 2008)). The U.S. Supreme Court has repeatedly held

11   that such a causal-nexus test violates the Eighth and Fourteenth Amendments

12   because it precludes the sentencer from giving effect to certain types of mitigation.

13   *See Tennard*, 542 U.S. at 285. The Arizona Supreme Court's use of a causal-nexus

14   test in reviewing Kiles's sentence is contrary to *Edding*'s clearly established federal

15   law. *See McKinney v. Ryan*, 813 F.3d 798, 821 (9th Cir. 2015) (en banc).

16          The court discounted the other mitigation it found Kiles had proven for

17   various arbitrary reasons. For example, it arbitrarily discounted Kiles's model

18   behavior in prison: "though Kiles established that he has been a model prisoner

19   since being taken into custody, this Court accords this mitigating factor minimal

20   weight because of the expectation that prisoners behave in prison." *Kiles*, 213 P.3d

21   at 191 (quoting *State v. Dann*, 207 P.3d 604, 628 (Ariz. 2009)). This was not

22   individualized consideration, as it failed to take into account that Kiles had spent

23   nearly 20 years in various prison and jail settings and had demonstrated exemplary

24   behavior in all of them.[186] This was also in violation of clearly established federal

25   law, as the U.S. Supreme Court held in *Skipper v. South Carolina*, 476 U.S. 1, 5,

26

27   _____

   [186] Two of Kiles's former prison guards testified on his behalf at his penalty-phase
28   trial. (Tr. Apr. 26, 2006 at 4–23.) A prison expert testified that he had never seen a
   record as spotless as Kiles's. (Tr. Apr. 27, 2006 at 32); *see* Claim 6, *supra*.

374

(1986), that a capital sentencer must give consideration to a defendant's good behavior in custody as mitigation evidence.

The court further dismissed Kiles's "psychiatric testimony" because "at most it established his bad judgment, not his inability to judge." *Kiles*, 213 P.3d at 191 (citing *State v. Tucker*, 160 P.3d 177, 202 (Ariz. 2007) and *State v. Pandeli*, 161 P.3d 557, 576 (Ariz. 2007) for the proposition that "insubstantial impairment and defendant's ability to discern right from wrong lead to according such mitigation lesser weight").) If Kiles had a psychiatric condition that rendered him unable to judge right from wrong, he could not have been held legally accountable for the crimes at issue. To refuse to give effect to any mitigation that falls below this threshold is unconstitutional. *See Eddings*, 455 U.S. at 114–15.

Moreover, the court held that it would not give great weight to the fact that Kiles acted impulsively, "suggesting this means he could not control his behavior," because this "does not account for the sustained attack on Valerie, nor his decision to murder the children." *Kiles*, 213 P.3d at 191. As discussed above, the State did not prove beyond a reasonable doubt that there was a sustained attack on Gunnel. Second, in so concluding, the court improperly relied on facts not found by the jury: neither the guilt-phase jury nor the penalty-phase jury unanimously found that Kiles had made a premeditated "decision" to kill the children. *Kiles*, 213 P.3d at 186. The Sixth Amendment does not allow a defendant to be "expose[d] . . . to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone." *Apprendi*, 530 U.S. at 483. This applies to capital sentencing as well: a defendant is "entitled to a jury determination" of facts that can increase the sentence he faces. *Ring*, 536 U.S. at 589.

Finally, the court found that Kiles had established chronic intoxication, but that it warranted reduced weight "given that his efforts to cover up the crime demonstrate his knowledge of its wrongfulness." *Kiles* 213 P.3d at 191 (citing *State v. Rienhardt*, 951 P.2d 454, 466–67 (Ariz. 1997)). The blanket application of a rule

375

1    like this is arbitrary and contrary to federal law. *See Parker*, 498 U.S. at 321.

2    Moreover, the court ignored the fact that Kiles's ineffectual and haphazard effort to

3    clean up the crime scene also involved ransacking the apartment to find property to

4    sell for drugs—again, a product of Kiles's intoxication and addictions.

5          The court effectively and unreasonably eviscerated mitigation stemming

6    from Kiles's background and character. The court relied on illogical considerations

7    to undercut established mitigating factors' weight, thereby arbitrarily failing to give

8    that form of mitigation any effect.

9          The Arizona Supreme Court's consideration of Kiles's mitigating

10   circumstances violated the bedrock principles of reliability in sentencing. *See, e.g.*,

11   *Tennard*, 542 U.S. at 285; *Eddings*, 455 U.S. at 112–15. By conditioning the value

12   of a factor like mental health or intoxication on the circumstances of the crime, the

13   court failed to take into account Kiles's personal characteristics, as required by

14   *Eddings* and the Eighth Amendment. *See Eddings*, 455 U.S. at 112. Further, the

15   court injected an impermissible dose of irrationality into capital sentencing. *See*

16   *Parker*, 498 U.S. at 321. And, by applying a causal-nexus test and otherwise

17   arbitrarily undercutting the significance of mitigating circumstances, the court

18   failed to give effect to mitigation. *See Tennard*, 542 U.S. at 285. As a result, the

19   Arizona Supreme Court's decision is contrary to clearly established federal law.

20   *See* 28 U.S.C. § 2254(d)(1). Kiles's sentence is constitutionally infirm, and he is

21   entitled to relief.

22          **F.   The Arizona Supreme Court's individual and cumulative errors**
             **deprived Kiles of his constitutional rights.**
23

24          The Arizona Supreme Court's various errors, including the denial of

25   meaningful appellate review, due process, and individualized sentencing, violated

26   Kiles's rights under the Sixth, Eighth, and Fourteenth Amendments. Moreover,

27   each of the court's errors deprived Kiles of his protected liberty interest in the

28   Arizona Supreme Court's independent review. *See Hicks*, 447 U.S. at 346. Had the

376

1    court provided meaningful appellate review unmarred by constitutional error, it

2    would not have upheld Kiles's lone death sentence.

3          **G.     This Court may review this claim de novo.**

4          This Court may review this claim de novo, as 28 U.S.C. § 2254(d) poses no

5    bar to relief. The state court's decision was contrary to, or involved an unreasonable

6    application of, clearly established federal law, as determined by U.S. Supreme

7    Court precedent. *See* 28 U.S.C. § 2254(d)(2); *see also, e.g.*, *Hicks*, 447 U.S. at 346

8    (due process requires meaningful appellate review); *Parker*, 498 U.S. at 321

9    (meaningful appellate review in the capital-sentencing context requires an

10   individualized determination based on the character of the individual and the

11   circumstances of the crime); *Lewis*, 497 U.S. at 781 (1990) (aggravating factor

12   cannot be upheld where no rational trier of fact could have found it proven beyond

13   a reasonable doubt); *Johnson*, 486 U.S. at 585 (death sentence cannot be imposed

14   based in part on invalid aggravating factor); *Tennard*, 542 U.S. at 285 (sentencer

15   must be able to give effect to all mitigation). Moreover, the state-court decision was

16   based on an unreasonable determination of the facts in light of the evidence

17   presented, as discussed above. *See* 28 U.S.C. § 2254(d)(2). Accordingly, Kiles is

18   entitled to relief.

19                              **Claim Thirteen**

20   **Kiles's second state post-conviction counsel were constitutionally
     ineffective.**

21

22        Kiles's second state post-conviction counsel were ineffective and deprived

23   Kiles of his constitutional rights to due process and effective assistance of counsel

24   in violation of the Sixth and Fourteenth Amendments to the U.S. Constitution. Kiles

25   incorporates by specific reference all facts, allegations, and arguments made

26   elsewhere in this Petition.

27        By the nature of this claim, these proceedings are the first in which Kiles can

28   raise these issues. Because no state court has decided the merits of this claim, the

                                          377

1    limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply, and this Court's
2    review of this claim should be de novo.

3         In Arizona, "the initial-review collateral proceeding is the first designated
4    proceeding for a prisoner to raise a claim of ineffective assistance at trial, the
5    collateral proceeding is in many ways the equivalent of a prisoner's direct appeal."
6    *Martinez v. Ryan*, 566 U.S. 1, 11 (2012); *see Parker v. Dugger*, 498 U.S. 308, 321
7    (1991) (discussing importance of meaningful review on appeal). "Without the help
8    of an adequate attorney, a prisoner will have . . . difficulties vindicating a
9    substantial ineffective-assistance-of-trial-counsel claim." *Martinez*, 566 U.S. at 11.
10   Ineffective-assistance claims "often require investigative work and an
11   understanding of trial strategy. When the issue cannot be raised on direct review,
12   moreover, a prisoner asserting an ineffective-assistance-of-trial counsel claim"
13   during post-conviction proceedings cannot "rely on a court opinion or the prior
14   work of an attorney addressing that claim." *Id.* at 11–12. Thus, "[t]o present a claim
15   of ineffective assistance at trial in accordance with the State's procedures . . . a
16   prisoner likely needs an effective attorney." *Id.*

17        Kiles's second state post-conviction team failed to provide effective
18   representation. Kerrie Droban and Sharmila Roy, Kiles's appointed counsel, had
19   difficulty working together. The physical file was divided between their offices,
20   and their approach was divided as well. They let go of a seasoned mitigation
21   specialist and, in her stead, they hired someone with no capital mitigation
22   experience. Droban and Roy struggled to agree on what was important at
23   mitigation, leading to a disjointed, incomplete presentation of Kiles's personal
24   mitigating history. Their inability to work together culminated in a failure to file a
25   reply brief in Kiles's state post-conviction proceedings.

26        The 2003 ABA Guidelines state that post-conviction counsel have a duty to
27   "seek to litigate all issues, whether or not previously presented, that are arguably
28   meritorious under the standards applicable to high quality capital defense

378

representation, including challenges to any overly restrictive procedural rules." 2003 ABA Guideline 10.15.1(C). This Droban and Roy did not do. Their representation fell below the standards required for constitutionally effective post-conviction counsel, *see Martinez*, 566 U.S. at 11–12, and Kiles was prejudiced.

### A.     Post-conviction counsel were ineffective.

For the reasons articulated throughout this Petition, Kiles's second state post-conviction counsel's performance fell below the standard of minimally competent assistance. Because Kiles did not receive effective assistance during his state post-conviction proceedings, he failed to have effective post-conviction review of a number of meritorious claims, including ineffective assistance of trial and appellate counsel, before the state courts. Three non-exhaustive examples underscore post-conviction counsel's deficiencies.

### 1.     Post-conviction counsel failed to adequately raise claims.

State post-conviction counsel failed to raise several meritorious claims, specifically ineffective-assistance-of-counsel claims, which could only be appropriately raised in a state post-conviction proceeding. *See State v. Kiles*, 213 P.3d 174, 183–84 (Ariz. 2009).

For example, Droban and Roy did not raise ineffective-assistance claims for failure to competently conduct voir dire at the guilt and penalty phases, *see* Claims 2 and 4, *supra*, failure to make a complete record, *see* Claim 15, *infra*, and failure to challenge Kiles's grand-jury proceedings, *see* Claim 14, *infra*. Notably, post-conviction counsel raised a challenge to Kiles's grand-jury proceedings as a standalone constitutional claim, even though counsel knew or should have known that such a claim would be precluded. This is especially problematic when the record itself included signs of deficient performance by trial counsel: counsel requested an extension of time to file a motion to challenge the grand-jury proceedings, but then never filed the motion. (ROA 388 at 1–2.)

Droban and Roy's failure to raised meritorious ineffective-assistance claims

379

1   fell below the standards for post-conviction counsel and prejudiced Kiles. *See Kiles*,
2   213 P.3d at 183; *Martinez*, 566 U.S. at 11; *Strickland v. Washington*, 466 U.S. 668
3   (1984); *see also* 2003 ABA Guideline 10.15.1(C).

4   **2.   Post-conviction counsel failed to adequately develop**
5   **mitigation evidence with both lay and expert witnesses.**

6   Post-conviction counsel failed to uncover significant mitigation. Their
7   performance was deficient as to both lay witnesses and experts.

8   Droban and Roy's initial error was dismissing an experienced mitigation
9   specialist in part because of a personality conflict. Moreover, the mitigation
10  specialist believed based on experience that a reasonable mitigation investigation
11  would require more extensive effort than what the attorneys were willing to
12  undertake. Droban and Roy hired a replacement, Jeff Trollinger, who had never
13  previously worked on a capital mitigation case, received no training prior to his
14  appointment, and got very little direction from Droban and Roy. As a result, he did
15  not conduct an independent, thorough mitigation investigation but rather focused
16  on re-investigating the crime. Trollinger mainly interviewed witnesses who had
17  signed affidavits in the mid-1990s to determine whether their statements were still
18  consistent. Because of his lack of training, most of his questions went toward re-
19  investigating the facts of Kiles's guilt.[187] He failed to conduct a lay-witness
20  mitigation investigation beyond the existing record. Due to counsel's failure to
21  conduct a thorough investigation, Kiles never had the full scope of his mitigation
22  reviewed in state court.

23  While Trollinger failed to effectively investigate lay witnesses for Kiles's
24  post-conviction mitigation presentation, Droban and Roy failed to work effectively
25  with mitigation experts. First, Droban and Roy failed to hire a trauma specialist to
26  interview Kiles and present a compelling portrait of the trauma he had suffered and

27
28  [187] For instance, Trollinger spent a considerable amount of time trying to investigate
    a baseless rumor that Shemeah was not dead but had been trafficked.

380

the effect it had on him. They failed to reasonably present to the state post-conviction court that starting at a young age, Kiles had suffered from mental illness and depression, which stemmed from abuse, neglect, and the predisposition toward mental illness and addiction in his family. They further failed to adequately explain that, compounding Kiles's genetic predisposition toward addiction, Kiles had been given alcohol from a young age and his sister had exposed him to drugs by the time he was a pre-teen. Counsel did not adequately convey the level of abuse and dysfunction present around Kiles throughout his formative years, further hindering his ability to function successfully as an adult.

Rather than hire an appropriate trauma specialist, Droban and Roy hired an expert who could discuss the effects of racism on African Americans, but who had little to offer about the effects of racism on Kiles specifically. (ROA 1189 at 52–57.) For example, while the expert stated that certain events "may have resulted in racism-based traumatic stress," some of these events concerned Yuma broadly, rather than Kiles specifically. The expert interviewed Kiles, but he did not interview Kiles's family. Moreover, the expert's report was unable to explain how the effects of trauma that African Americans endure in general in America manifested in Kiles in particular, which was necessary for the report to be effective mitigation. Had Droban and Roy hired appropriate experts in trauma, they would have been able to present evidence that was both comprehensive and also specific to Kiles, his family, and his history.

Second, Droban and Roy hired a series of neuropsychologists to evaluate Kiles. (ROA 1047 at 1; ROA 1057 at 1; ROA 1132 at 1.) However, they directed each neuropsychologist to give the same or similar tests, rendering certain results unreliable due to the practice effect. "[U]nder the practice effect, a person scores higher on a test when it is readministered within a short period of time because he has become familiar with the test." *See Smith v. Ryan*, 813 F.3d 1175, 1183 (9th Cir. 2016). Droban and Roy should have been aware of the practice effect, as

381

1   Arizona courts had already recognized its existence. *See State ex rel. Thomas v.*
2   *Duncan*, 216 P.3d 1194, 1195 n.4 (Ariz. Ct. App. 2009) ("The practice effect occurs
3   when a person performs better on a test because he or she has taken it before.").
4   Clinical guidelines widely available before the state petition was filed also
5   recognized the practice effect. *See, e.g.*, Am. Psychiatric Ass'n, Diagnostic and
6   Statistical Manual of Mental Disorders 37 (5th ed. 2013) ("DSM-5").

7       In defiance of best practices and prevailing clinical information on
8   neuropsychological testing, Droban and Roy elected to have three
9   neuropsychologists evaluate Kiles using the same or similar tests within a short
10  period. Two neuropsychologists evaluated Kiles just a year apart: Paul Connor,
11  Ph.D., administered tests on April 12 and 13, 2012, and John Toma, Ph.D., tested
12  Kiles on May 8 and 10, 2013.[188] (*See* PFR2 Dkt. 27 Ex. 24 at 1.) While some of Dr.
13  Toma's results remain well-founded, some are affected by the practice effect and
14  are not reliable.[189] (ROA 1189 at 57–58.) Post-conviction counsel's deficient
15  performance left Kiles unable to present reliable neuropsychological results to the
16  state post-conviction court. Had counsel obtained valid neuropsychological test
17  results, they would have found that, for example, Kiles had deficits related to
18  memory and deficits indicative of impaired executive functioning. These results
19  would have corroborated Kiles's history of trauma and the resultant neural
20  dysfunction. They would also have informed Kiles's other experts as they explored
21  issues such as the nature and extent of Kiles's brain damage.[190]

---

23  [188] The practice effect varies depending on the test, but clinicians have recognized
24  that the practice effect can render scores unreliable even if several years have passed
    between tests. *See, e.g.*, *United States v. Williams*, 1 F. Supp. 3d 1124, 1143–45 (D.
25  Haw. 2014) (discussing practice effect).

26  [189] It is worth noting that the third neuropsychologist who was asked to evaluate
    Kiles, Karen Froming, Ph.D., refused to re-test Kiles, citing the practice effect.

27  [190] State post-conviction counsel's inability to get valid neuropsychological test
28  results only exacerbated trial counsel's failure to do the same years before. *See
    supra*, Claim 6.

382

1    Third, Droban and Roy retained psychiatrist Joseph Wu, M.D., to do imaging

2  of Kiles's brain. However, some of Dr. Wu's quantitative results were unreliable.

3  While there are clear signs of brain damage on the images, Dr. Wu used a diffusion

4  tensor imaging ("DTI") scan, which is very sensitive and specific to the scanner

5  used. (PFR2 Dkt. 28 Ex. 25 at 5.) Therefore, any quantitative analysis of a DTI scan

6  should be made using a comparison group that was imaged with the same scanner.

7  Dr. Wu did not do so. Instead, he compared Kiles's images to images developed on

8  a different scanner. Additionally, Dr. Wu failed to include in his report critical

9  information about the comparison group whose DTI scans were used for Kiles's

10  comparison. (PFR2 Dkt. 28 Ex. 25 at 16.)

11    Perhaps most concerning, Dr. Wu failed to remark upon signs of brain

12  damage that are indisputable based on a visual review of Kiles's brain scans. While

13  Dr. Wu correctly concluded that Kiles has brain damage, some of Dr. Wu's

14  quantitative conclusions are suspect, and he failed to note some of the obvious

15  damage revealed by the brain scans. Had Droban and Roy obtained a reliable expert

16  in the field, they would have been able to present more persuasive and credible

17  findings of brain damage.

18    Finally, Droban and Roy retained pharmacologist Edward French, Ph.D., to

19  evaluate how Kiles's polysubstance abuse affected his behavior. Dr. French's report

20  was not filed with the post-conviction petition. State post-conviction counsel

21  maintained that this was because Dr. French would not say with certainty that, while

22  under the influence of cocaine, Kiles could do routine acts like driving, but would

23  still have significant impairment in decision-making ability and perception of

24  reality. This was an inaccurate interpretation of Dr. French's report, as the report

25  explained that while cocaine use can cause psychotic symptoms and severely impair

26  impulse control, it does not impair the ability to engage in organized activities like

27  driving. Because counsel failed to read their own expert's report thoroughly and

28  undertake basic, necessary follow-up with the expert, they failed to present

383

additional, compelling mitigation information to the court.[191]

Individually and cumulatively, these mistakes prevented Kiles from having an effective state post-conviction review. Kiles was thus prejudiced. *See Martinez*, 566 U.S. at 9; *Strickland*, 466 U.S. at 694.

### 3. Post-conviction counsel failed to file a reply.

Kiles's second state post-conviction counsel failed to file a reply in support of Kiles's petition for post-conviction relief, prejudicing his ability to have a full and effective review of meritorious claims raised in the opening brief.

Kiles's state post-conviction opening brief was filed on November 24, 2014. (ROA 1189 at 1.) The State's response was filed on July 6, 2015. (ROA 1198 at 1.) On February 1, 2016, the date the reply brief was due, Kiles's state post-conviction counsel filed a motion asking the court to allow Roy to withdraw and requesting a short extension of time. (ROA 1213 at 1–2.) The motion stated that Roy's "personal and family circumstances have prevented her from drafting her portion of the reply." (ROA 1213 at 2.) Additionally, "Roy's inability to contribute as expected to the drafting of this reply has caused conflict between her and Ms. Droban, which is likely to impair the representation of Mr. Kiles from this time forward." (ROA 1213 at 3–4.) Droban stated in the motion she would be able to complete the petition with only a two-week extension of time, asking for a new filing date of February 15, 2016. (ROA 1213 at 5.)

Two days later, without ruling on either Roy's request to withdraw or Droban's request for an extension of time, and thus without the benefit of a reply brief, the state post-conviction court denied relief. (ROA 1214 at 1–2.)

---

[191] This was especially troubling in light of the pervasive effects of Kiles's addictions and trial counsel's ineffectiveness in failing to have a substance-abuse expert counter the State's narrative that addiction is a choice. *See supra*, Claim 6. Further, despite counsel's reservations about Dr. French's report, they shared it with at least one other expert, who then relied on it to inform his own findings. (*See* PFR2 Dkt. 28 Ex. 25 at 2 (Dr. Wu discussing Dr. French's conclusions).)

1   The failure to file a reply brief in Kiles's case was not a strategic decision
2   warranting deference. Indeed, the motion that Droban and Roy filed requesting a
3   short extension of time explicitly acknowledged that Roy had provided ineffective
4   assistance to Kiles. The failure to file a reply brief denied a full and effective review
5   of Kiles's state post-conviction claims.

6   Further, the failure to file a reply was not harmless. The State argued in its
7   response that claims were, for instance, precluded, or that they were not colorable.
8   (ROA 1198 at 8–10.) Without a reply, Droban and Roy were unable to refute these
9   points and to correct points of law and fact the State had misstated. Moreover, the
10  2003 ABA Guidelines provide that state post-conviction counsel have a duty to
11  "seek to litigate all issues, whether or not previously presented, that are arguably
12  meritorious under the standards applicable to high quality capital defense
13  representation, including challenges to any overly restrictive procedural rules."
14  2003 ABA Guideline 10.15.1(C). Therefore, under the prevailing standards,
15  Droban and Roy were required to file a reply that not only argued all meritorious
16  claims, but that also (1) refuted the State's arguments regarding preclusion, and (2)
17  explained where the State applied the law incorrectly.

18  Droban and Roy's deficient performance impaired the state post-conviction
19  court's opportunity to make an informed ruling on Kiles's claims and prejudiced
20  Kiles. There is a reasonable likelihood that with adequate briefing, the court would
21  have found these claims colorable. *See Strickland*, 466 U.S. at 694.

22  **B.    Post-conviction counsel's ineffectiveness excuses any procedural
        default of claims raised throughout this Petition.**
23

24  This Court may consider the merits of any claims that would otherwise be
25  procedurally defaulted because Kiles can demonstrate cause and prejudice to
26  overcome any default. *See generally Edwards v. Carpenter*, 529 U.S. 446, 451
27  (2000); *see also Smith v. Murray*, 477 U.S. 527, 533 (1986). "Inadequate assistance
28  of counsel at initial-review collateral proceedings may establish cause for a

385

prisoner's procedural default of a claim of ineffective assistance at trial." *Martinez*, 566 U.S. at 9.

Kiles can demonstrate cause under *Martinez* because the underlying claims (i.e., the defaulted claims) are substantial, and post-conviction counsel's performance was inadequate. *See id.* at 14. To show his claims are "substantial," Kiles must demonstrate they have "some merit." *Id.* at 12. *In Martinez*, the Court specifically cited the standard for issuance of a Certificate of Appealability ("COA"). *Id.* at 14 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)). By citing *Miller-El*'s discussion of COA standards, the Court indicated that the COA standard applies when determining if an underlying claim is "substantial." Under the COA standard, a "petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). *Slack*'s holding "would mean very little if appellate review were denied because the prisoner did not convince a judge, or, for that matter, three judges, that he or she would prevail." *Miller-El*, 537 U.S. at 337. The COA standard is a low bar intended to screen out only clearly frivolous claims, and therefore, any doubt whether Kiles has advanced a non-frivolous claim should be resolved in his favor. *See Lambright v. Stewart*, 220 F.3d 1022, 1025 (9th Cir. 2000). Further, "[a]lthough not dispositive," a death sentence "is a proper consideration" in deciding whether to issue a COA. *Id.* (internal quotation marks omitted).

Conducting a full merits review on the undeveloped record would frustrate the intention of *Martinez* to avoid the circumstance of a prisoner never receiving a proper hearing on a claim involving a "bedrock principle," *Martinez*, 566 U.S. at 1, the right to effective trial counsel. The Ninth Circuit's jurisprudence on *Martinez* supports these principles. In *Detrich v. Ryan*, a four-judge plurality explained that, where a prisoner demonstrates that his post-conviction counsel performed deficiently and failed to raise a "substantial" claim of ineffective assistance of trial

386

counsel, the prisoner satisfies *Martinez*'s cause-and-prejudice standard. 740 F.3d 1237, 1245 (9th Cir. 2013) (en banc). A petitioner shows cause by showing post-conviction counsel was deficient and demonstrates prejudice by showing that the ineffective-assistance-of-trial-counsel claim is substantial. *Id.* at 1245–46. Judge Fletcher explained that, for the "narrow purpose" of showing cause under *Martinez*, a "prisoner need not show actual prejudice resulting from his [post-conviction] counsel's deficient performance, over and above his required showing that the trial-counsel [ineffectiveness] claim be 'substantial[.]'" *Id.* The plurality reasoned that, if a petitioner "were required to show that the defaulted trial-counsel [ineffectiveness] claims fully satisfied *Strickland* . . . this would render superfluous the first *Martinez* requirement of showing that the underlying *Strickland* claims were 'substantial[.]'" *Id.* at 1246.

In *Dickens v. Ryan*, an eight-judge majority largely paralleled the plurality's analysis in *Detrich*. 740 F.3d 1302 (9th Cir. 2014) (en banc). In *Dickens*, the Court instructed that the petitioner could show cause for default if he could show the first two *Martinez* elements: "(1) the [defaulted] claim is substantial and (2) his PCR counsel was ineffective under *Strickland*." *Id.* at 1320. Thus, because Kiles's post-conviction counsel were inadequate and substantial claims went un-reviewed in state court, he can show cause to overcome any procedural default.

The prejudice element of the cause-and-prejudice test remains settled. Generally, once the petitioner has shown cause, the Court should consider whether there is prejudice based on the underlying constitutional claim. *See, e.g.*, *Walker v. Martin*, 562 U.S. 307, 315 (2011) (describing cause and prejudice as "cause for the delay in asserting his claims and actual prejudice resulting from the State's alleged violation of his constitutional rights"); *Smith*, 477 U.S. at 533 ("actual prejudice resulting from the alleged constitutional violation" (quoting *Wainwright v. Sykes*, 433 U.S. 72, 84 (1997))).

Thus, this Court should determine whether there is a reasonable probability

387

1    that the errors alleged undermined confidence in the outcome of Kiles's
2    proceedings. The Court should bear in mind that *Martinez* provided an equitable
3    avenue for federal courts to review the merits of non-frivolous constitutional
4    violations, and that evidentiary development is necessary to establish cause and
5    prejudice. *See, e.g.*, *Woods v. Sinclair*, 764 F.3d 1109, 1138 n.16 (9th Cir. 2014)
6    (rejecting argument that "*Pinholster* and 2254(e)(2) categorically bar [habeas
7    petitioners] from obtaining such a hearing or from presenting extra-record evidence
8    to establish cause and prejudice for the procedural default").

9        The circumstances described above and those uncovered during habeas
10   counsel's investigation of this case demonstrate post-conviction counsel were
11   ineffective. That ineffectiveness provides cause and prejudice sufficient to excuse
12   the default of the claims raised in this Petition.

13       **C.    Post-conviction counsel's ineffectiveness entitles Kiles to relief.**

14       While acknowledging contrary authority, *see Coleman v. Thompson*, 501
15   U.S. 772, 757 (1991), Kiles respectfully asserts that he is constitutionally entitled
16   to the effective assistance of post-conviction counsel, and this Court should grant
17   relief on this basis. Arizona's post-conviction process was inadequate and
18   ineffective to protect Kiles's constitutional right to counsel, and his post-conviction
19   counsel performed deficiently and prejudiced him. As explained in *Martinez*,
20   Arizona prisoners must raise ineffectiveness of trial counsel in a petition for post-
21   conviction relief. *See State v. Spreitz*, 39 P.3d 525, 527 (Ariz. 2002). Kiles's state
22   post-conviction proceedings were his only opportunity to pursue ineffective-
23   assistance claims (and any other claims that relied on more than the trial record).
24   Thus, those proceedings were a "first appeal as of right" as to those claims, and he
25   should have a constitutional right to the effective assistance of counsel in those
26   proceedings. *See Evitts v. Lucey*, 469 U.S. 387, 396 (1985).

27       In Arizona, post-conviction proceedings are part of an established,
28   mandatory appellate process, initiated by the Arizona Supreme Court. *See* Ariz. R.

388

Crim. P. 32.4(a) (on issuance of mandate affirming conviction and death sentence on direct appeal, clerk of court files automatic notice for post-conviction relief); *State v. Bolton*, 896 P.2d 830, 839 (Ariz. 1995) (explaining that Rule 32 proceeding is mandatory on affirmance of death sentence). Here, state post-conviction proceedings are not only automatic on the affirmance of a death sentence; they are also a defendant's only chance to present constitutional claims based on evidence outside the record, including the ineffective assistance of trial and appellate counsel. They are, thus, appeals "as of right" for these claims, and the State must provide the effective assistance of counsel. *See Jackson v. State*, 732 So. 2d 187, 190 (Miss. 1999) ("The reality is that post-conviction efforts, though collateral, have become an appendage, or part, of the death penalty appeal process at the state level."). By not assuring competent counsel for these claims, post-conviction review of the competence of capital attorneys becomes a "meaningless ritual." *See Evitts*, 469 U.S. at 394 (internal quotation marks omitted); *see also Jackson v. Weber*, 637 N.W.2d 19, 24–25 (S.D. 2001) ("If the defense attorney was ineffective in the original criminal proceeding and habeas counsel was thereafter ineffective in ferreting out the invalidity of the conviction, we may never know if the convicted person had a fair trial or, God forbid, was actually innocent.").

Further, because Arizona entitles a defendant to the appointment of state post-conviction counsel and has standards that attempt to ensure counsel's competence, due process requires that counsel be effective. The implementation of this statutory right must comport with due process: "when a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution—and, in particular, in accord with the Due Process Clause." *Evitts*, 469 U.S. at 401. Due process demands that when a statutory right to counsel is established, the concomitant right to effective assistance of counsel must also be recognized; otherwise, the statutory right is meaningless. *See id.* at 396 ("[A] party whose counsel is unable to provide effective

representation is in no better position than one who has no counsel at all.").

Other state courts have recognized that, because their state statutes provide for counsel in post-conviction proceedings, due process demands that counsel perform effectively: "[W]e will not presume that our legislature has mandated some 'useless formality' requiring the mere physical presence of counsel as opposed to effective and competent counsel." *Jackson*, 637 N.W.2d at 23. Their reasoning has been based on the well-established principle that the right to counsel means the right to the effective assistance of counsel. The Due Process Clause of the Constitution ensures fundamental fairness. If Arizona ignores the dictates of its own statute and appoints incompetent counsel, the petitioner is entitled to relief. *Cf. Lozada v. Warden*, 613 A.2d 818, 822 (Conn. 1992) ("[F]undamental fairness opens the door for relief by habeas corpus when the state, in discharging its statutory duty, appoints incompetent counsel.").

In sum, Kiles's post-conviction counsel were ineffective. This deprived him of his constitutional rights to due process and the effective assistance of counsel, and also provides cause and prejudice to overcome the default of any claims raised in this Petition. Kiles is entitled to evidentiary development and relief.

## Claim Fourteen

**Trial counsel was ineffective for failing to file a motion to remand because of errors rendering the grand-jury proceedings unconstitutional.**

Counsel's ineffectiveness in failing to file a motion to remand for new grand-jury proceedings deprived Kiles of his rights to counsel, reliable proceedings, due process, and equal protection in violation of the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution. Kiles incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Kiles did not present this claim in state court. Kiles alleges he can overcome any default by showing cause and prejudice, as the ineffective assistance of his state post-conviction counsel in failing to raise this claim constitutes cause for the default

and resulted in prejudice to Kiles.[192] *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). Kiles will demonstrate at an evidentiary hearing that state post-conviction counsel fell below the standards of minimally competent capital post-conviction attorneys when they failed to raise this meritorious claim. Because this claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider the merits of the claim de novo.

"Pretrial investigation and preparation are the keys to effective representation of counsel." *United States v. Tucker*, 716 F.2d 576, 581 (9th Cir. 1983); *see also Strickland*, 466 U.S. at 684 (guaranteeing defendants the effective assistance of counsel under the Sixth Amendment); *supra*, Claim 2 (discussing *Strickland* standard). Filing relevant pretrial motions—particularly one that counsel himself describes as significant—constitutes rudimentary trial preparation. Failure to file such motions "is not a strategic decision." *See Strickland*, 466 U.S. at 689–90; *see also Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) (finding counsel ineffective for failing to file a pretrial motion). It is deficient where counsel's decisions result from inattention instead of reasoned judgment. *See Wiggins v. Smith*, 539 U.S. 510, 534 (2003). Further, counsel were obligated to identify "any issues, constitutional or otherwise," that could be raised to attack the charging documents. 1989 ABA Guideline 11.4.1(D)(1)(C). The 1989 ABA Guidelines also include that counsel should consider pretrial motions related to "potential defects in the charging process." *Id.* § 11.5.1(B)(3); *see also id.* § 11.5.1(B) (instructing counsel to consider all potential pretrial motions).

---

[192] Kiles's state post-conviction counsel did raise a standalone challenge to the grand-jury proceedings, but should have anticipated that the court would deem that challenge defaulted. (*See* ROA 1214 at 1 ("The court rejects Defendant's arguments regarding the grand jury composition and the testimony of Imogene Kiles before the grand jury. Those claims are precluded under the rule.").)

1

2

      **A.**    **Counsel planned to file a motion to remand to address improprieties with the grand-jury session and the resulting indictment.**

3

4

As early as fall 1998, Kiles's trial counsel Greg Clark planned to file a motion

5

to remand for a new grand-jury proceeding, based largely on the unconstitutional

6

elements of the grand-jury proceedings described below. (Tr. Oct. 30, 1998 at 47;

7

PFR2 Dkt. 21 Ex. 6 at 1–11.) In October 1998, the court ordered that the motion be

8

filed within a reasonable time. (Tr. Oct. 30, 1998 at 47.) Kiles's counsel during his

9

first state post-conviction proceedings had extensively investigated the information

10

underlying the motion; it was clear the claims were well-supported. (*See* PFR2 Dkt.

11

23 Ex. 19; PFR2 Dkt. 27 Ex. 22; ROA 225 Ex. 55; ROA 225 Ex. 63; Tr. Feb. 20,

12

1996 at 40–43, 47–49, 53–55, 71–75, 90–96; Tr. Feb. 22, 1996 at 225–26.) Clark

13

even asked for and received multiple extensions of time to file this motion to

14

remand. (Tr. Dec. 9, 1998 at 4; Tr. Jan. 22, 1999 at 11.)

15

In February 1999, the parties stipulated to extending the deadline for Clark

16

to file a motion to remand. (ROA 397 at 1.) Clark exchanged drafts of this motion

17

with Mary Boyte, who was briefly his co-counsel and who had represented Kiles in

18

his first state post-conviction proceedings.[193] (PFR2 Dkt. 21 Ex. 6 at 1–11.)

19

In April 1999, Clark stated at a status hearing that he and the prosecutor were

20

going to sit down to discuss the motion and potentially enter into a stipulation to

21

remand. (Tr. Apr. 2, 1999 at 4.) He said: "I thought the issues we have developed

22

in that regard are significant to the point where I think that's justified and it may be

23

fruitful and it would certainly save a tremendous amount of court time just from

24

that standpoint." (Tr. Apr. 2, 1999 at 4.) In July 1999, Kiles filed a pro per motion

25

complaining that the motion to remand had not yet been filed, and he did not know

26

why. (ROA 407 at 7.) Also in July 1999, Boyte filed a motion to withdraw as

---

27

28

[193] One of these drafts was an exhibit to Kiles's second post-conviction petition, but Boyte had urged Clark to include additional claims not listed in that draft, including racial discrimination in grand-jury selection. (*See* PFR2 Dkt. 21 Ex. 6 at 1–11.)

1   counsel based on Clark's incompetent representation and failure to communicate
2   with her and Kiles. (ROA 409 at 2.) This was partly because she had prepared the
3   motion to remand, but Clark had not filed it—she did not know and could not
4   determine why. (Tr. Aug. 6, 1999 at 15.) In October 1999, Kiles stated at a status
5   hearing that he did not know what was happening with the motion, though he had
6   seen a draft. (Tr. Oct. 8, 1999 at 75.)

7   Although his co-counsel had prepared a draft, Clark never filed this motion.
8   The failure to file this motion was not based on reasoned strategic judgment.
9   *Strickland*, 466 U.S. at 689–90.

10  **B.    Counsel was deficient in failing to file a motion to remand based
11         on the fact that a grand juror had prior knowledge of the facts of
       the crime.**

12  Clark was ineffective for failing to file a motion to remand for a new
13  indictment because one of the grand jurors knew about the facts of the crime from
14  Valerie Gunnel's brother-in-law.

15  A defendant has a right to be "prosecuted only 'on the basis of the facts
16  presented to the grand jury. . . .'" *United States v. Du Bo*, 186 F.3d 1177, 1179 (9th
17  Cir. 1999) (quoting *United States v. Rosi*, 27 F.3d 409, 414 (9th Cir. 1994)). It
18  violates due process where a defendant is tried "on an indictment returned by a
19  biased grand jury." *United States v. Samango*, 607 F.2d 877, 881 (9th Cir. 1979)
20  (overturning an indictment where the prosecutor's conduct created a biased jury).
21  Further, the prosecutor has a duty to ensure the "wise exercise" of the grand jury's
22  investigatory power. *Hoffman v. United States*, 341 U.S. 479, 485 (1951). While
23  prosecutors have broad discretion before a grand jury, "this prosecutorial discretion
24  is not boundless." *United States v. De Rosa*, 783 F.2d 1401, 1404 (9th Cir. 1986)
25  (quoting *United States v. Al Mudarris*, 695 F.2d 1182, 1185 (9th Cir. 1983)). "The
26  prosecutor may not circumvent the constitutional safeguard of a grand jury by
27  overreaching conduct that impinges on the grand jury's autonomy and interferes
28  with its exercise of unbiased judgment." *De Rosa*, 783 F.2d at 1404.

Kiles's grand-jury proceedings violated his rights because one grand juror knew the facts of the crime beforehand. At the start of the grand-jury hearing, after mentioning the victims' names, Yuma County Attorney Phillip Hall asked the grand jurors if they had any reason to believe they could not be fair and impartial. (Tr. Feb. 21, 1989 at 9.) One grand juror raised his hand and explained that he worked with Gunnel's brother-in-law, Nate Bailey; upon further prompting, he added that Bailey had told him about the crime a few days earlier. (Tr. Feb. 21, 1989 at 9.) Hall pressed on, asking if he had any conversations with Bailey about the alleged evidence or what may have occurred and who was responsible. (Tr. Feb. 21, 1989 at 9–10.) The grand juror responded that Bailey had told him "what had happened to the woman; the injuries she received." (Tr. Feb. 21, 1989 at 10.) Instead of removing this man from the grand jury based on his extraneous knowledge, Hall asked him:

> I have got to come back to you and ask you whether or not you can lay aside any conversations that you may have had with Mr. Bailey and determine based solely upon the evidence presented here whether or not probable cause exists to believe that Mr. Kiles or anyone else for that matter should be indicted for the death of Mrs. Gunnel[].

(Tr. Feb. 21, 1989 at 10.) The grand juror stated that he did not have any prejudice, and Hall allowed him to remain. (Tr. Feb. 21, 1989 at 10.) This was an abuse of prosecutorial discretion. Hall should not have allowed that grand juror to consider the indictment, given his outside information. Instead, Hall perfunctorily asked the grand juror if he could lay it aside, and the juror agreed. Where a juror is biased, it is not sufficient for him to perfunctorily agree that he can be fair. *See Morgan v. Illinois*, 504 U.S. 719, 735 (1992).

It was below prevailing professional norms for counsel to fail to file a motion to remand because a grand juror had outside knowledge of the crime, which resulted in Kiles being charged based on facts outside of the grand jury presentation. Clark's stated plan to file the motion, and his assertion that he thought there was strong

394

1   support for it, further underscore this. Had counsel filed the motion to remand, the
2   constitutionally deficient indictment would have required reversal. *See Du Bo*, 186
3   F.3d at 1179. "Failing to enforce this requirement would allow a court to 'guess as
4   to what was in the minds of the grand jury at the time they returned the indictment.'"
5   *Id.* (quoting *United States v. Keith*, 605 F.2d 462, 464 (9th Cir. 1979)). Clark's
6   failure thus prejudiced Kiles.

7         **C.**    **Counsel was deficient in failing to file a motion to remand based**
8                   **on the fact that the State knew that Imojean Kiles was an**
                **incompetent witness during her grand-jury testimony.**

9          The grand-jury proceedings were further infected by prosecutorial
10  misconduct because the prosecutor knew that a central witness, Kiles's mother
11  Imojean Kiles, was an incompetent witness. (Tr. Feb. 21, 1989 at 52–83.) The
12  morning of her grand-jury testimony, Imojean took two nerve pills and shots of
13  brandy. (PFR2 Dkt. 23 Ex. 19 at 9.) She arrived at court, but she was told to return
14  in the afternoon, so she went home and drank more brandy. (PFR2 Dkt. 23 Ex. 19
15  at 9.) Before taking the stand, Imojean told Hall and the lead detective on the case,
16  Brian Rodgers, that she needed to take a nerve pill. Hall gave her a glass of water,
17  and he and Rodgers watched her take the pill. (PFR2 Dkt. 23 Ex. 19 at 9.) In an
18  affidavit written for the first state post-conviction proceedings, she explained her
19  resulting mental state while testifying: "I was really out of it. I was so confused. I
20  had trouble thinking clearly. I didn't understand some of the questions. I said things
21  I knew wasn't right but I was so out of it I no longer knew what was right anymore.
22  I don't remember much of it." (PFR2 Dkt. 23 Ex. 19 at 9–10.) Imojean's friend
23  Geraldine Dickey accompanied her to the grand-jury proceedings and swore in an
24  affidavit to Imojean Kiles's drinking, pill-taking, and resultant incompetence on the
25  stand. (PFR2 Dkt. 27 Ex. 22 at 2.)

26         Imojean Kiles was a key witness at the grand-jury proceedings. She testified
27  about Kiles's admission to her that he killed Valerie Gunnel. (Tr. Feb. 21, 1989 at
28  52–60.) However, her testimony reflected that she was impaired and confused on

the stand. (*E.g.*, Tr. Feb. 21, 1989 at 63–64.) At the second grand-jury hearing in April 1989, the prosecutor gave the grand jurors a transcript of the prior proceedings, including Imojean Kiles's testimony. (Tr. Apr. 4, 1989 at 31.)

As discussed above, a prosecutor has a duty to ensure that justice is done at a grand-jury proceeding. Hall violated this duty—and Kiles's due-process rights—when he had Imojean Kiles testify in front of the grand jury, knowing that she was an incompetent witness. Clark was deficient for failing to file the motion to remand on this basis when he knew that the motion was "significant" and when his failure had no strategic justification. (Tr. Apr. 2, 1999 at 4.) This prejudiced Kiles, as it is reasonably probable that his motion would have prevailed.

> **D.** **Counsel was ineffective for failing to file a motion to remand because Kiles was denied his right to a grand jury free from discrimination.**

Counsel was ineffective for not seeking a remand because of discrimination in the selection of Kiles's grand jury. *See Strickland*, 466 U.S. at 688.

It violates the Equal Protection Clause of the Fourteenth Amendment where there is racial discrimination in the grand-jury selection process. Even a conviction cannot "cure the taint attributable to a charging body selected on the basis of race." *Vasquez v. Hillery*, 474 U.S. 254, 264 (1986). The Supreme Court has established "mandatory reversal" in this circumstance. *Id.* at 264. The Court has emphasized that, "having found discrimination in the selection of a grand jury, we simply cannot know that the need to indict would have been assessed in the same way by a grand jury properly constituted." *Id.* A defendant need not be the same race as excluded jurors to challenge a grand jury infected by discrimination. *Campbell v. Louisiana*, 523 U.S. 392, 398 (1998).

In *Castañeda v. Partida,* 430 U.S. 482 (1977), the Supreme Court articulated a three-part test to evaluate equal-protection violations in grand-jury selection:

> The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied. Next, the

396

1
2
3
4
5

> degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors. . . . Once the defendant has shown substantial underrepresentation of his group, he has made out a prima facie case of discriminatory purpose and the burden then shifts to the State to rebut that case.

6   *Id.* at 494–95 (internal citations omitted). Racial discrimination in grand-jury

7   selection may be inferred via statistical underrepresentation combined with

8   subjective selection procedures. *Id.*

9       A Yuma County grand jury indicted Kiles in February and April 1989. (ROA

10  1; CR89-15577 ROA 1.) Nearly the same grand jury panel indicted him both times.

11  (Tr. Apr. 4, 1989 at 3–4.) At the time of the 1990 U.S. census, Yuma County was

12  2.9% African-American and 40.6% "Hispanic origin." *See* U.S. Bureau of the

13  Census, *1990 Census: Arizona, Table 5: Race and Hispanic Origin*,

14  https://www2.census.gov/library/publications/decennial/1990/cp-1/cp-1-4.pdf   at

15  29. The February grand jury included three people of Hispanic origin out of 15

16  grand jurors, or 20% of the panel. (ROA 225 at 4–5.) The April grand jury included

17  three people of Hispanic origin out of 15 grand jurors, or 13% of the panel. (ROA

18  225 at 5.) No grand juror in either panel was African American. (ROA 225 at 4.)

19      The grand jury selection procedure at the time of Kiles's indictments resulted

20  in a significant underrepresentation of non-white grand jury members. The selection

21  process was subject to abuse because of an excess of unsupervised discretion. (ROA

22  225 Ex. 63 at 2.) The Jury Commissioner selected prospective juror names from

23  voter-registration and Department of Motor Vehicles lists and mailed out

24  questionnaires. (ROA 225 Ex. 63 at 2.) No one attempted to locate the intended

25  recipient when a letter was returned due to a bad address or to follow up with people

26  who did not turn in their questionnaires. (ROA 225 Ex. 55 at 1.) The Jury

27  Commissioner had total discretion to remove names from consideration based on

28  questionnaire responses. (ROA 225 Ex. 63 at 2.) The questionnaires were destroyed

397

after 90 days, without any possibility for review by litigants or judicial officers. (ROA 225 Ex. 63 at 3.) Of the 60 prospective grand jurors called to court, the judge and county attorney selected 16 grand jurors and four alternates. (ROA 225 Ex. 63 at 3.) It is unclear what, if any, criteria they used.

It is improper to allow a jury commissioner unfettered discretion in selecting prospective grand jurors. When statistics demonstrate the dramatic under-representation of a suspect class in a grand jury, together with a highly subjective selection procedure, that discretion must be challenged. *See Partida*, 430 U.S. at 482 (holding it unconstitutional where statistical underrepresentation of Mexican-Americans in grand-jury service was the result of "highly subjective" selection procedures). It is difficult to imagine a process more susceptible to abuse than one in which not only the Jury Commissioner, but also the defendant's prosecutor, have unbridled discretion to exclude potential grand jurors. The facts of Kiles's case are very similar to those in *Partida*.[194]

It was unreasonable and fell below prevailing professional norms for Clark to fail to challenge this unconstitutional selection process. *Vasquez* and *Partida* were both well-known, longstanding precedent at the time. The need to examine the record for any instances of racial discrimination should have been clear to competent counsel. The 1999 Arizona Capital Case Defense Manual, which counsel had, also instructed counsel to investigate the composition of the grand and petit venires. Further, Clark was on notice of this concern because the first state post-conviction counsel had raised this claim in their petition. (ROA 225 at 3–9; ROA 268 at 5–21.) In addition, correspondence shows that in February and March 1999,

---

[194] The state post-conviction court ruled in 2016 that Kiles had not shown a colorable claim as to discriminatory intent in grand jury composition. (ROA 1214 at 1.) This ruling on the merits is contrary to and/or an unreasonable application of clearly established federal law under *Partida*. *See* 28 U.S.C. § 2254(d)(1). To the extent that the state court made a determination of fact, that too was unreasonable, as described above. *See* 28 U.S.C. § 2254(d)(2).

1   Boyte sent Clark the materials from the first state post-conviction proceedings for
2   use in his motion to remand. (*See* PFR2 Dkt. 21 Ex. 6 at 1–11.)

3       Counsel's failure to file a motion to remand based on the grand jury's racially
4   discriminatory composition prejudiced Kiles. Had counsel challenged the grand
5   jury composition, "there is a reasonable probability that the claim [counsel] failed
6   to raise at trial would have prevailed, either at trial or on appeal." *Doe v. Ayers*, 782
7   F.3d 425, 432 (9th Cir. 2015) (citing *Strickland*, 466 U.S. at 694).

8       **E.    Conclusion.**

9       In sum, Clark provided ineffective assistance by failing to file a motion to
10  remand for new grand-jury proceedings. His failure to do so was not based on
11  reasoned strategic judgment, and such a motion likely would have been granted.
12  Further, the motion would have improved Clark's position during ongoing plea
13  negotiations—particularly important because the crime had occurred a decade
14  earlier, and Kiles was eager to settle for a life sentence. Clark's ineffectiveness
15  undermined the reliability of the proceedings. *Strickland*, 466 U.S. at 693; *see also*
16  *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality opinion).

17                              **Claim Fifteen**

18      **Counsel were ineffective for failing to ensure that critical portions**
        **of the record were preserved and recorded.**
19

20      Counsel's failure to ensure that all proceedings were recorded and that all
21  crucial documents were preserved hindered Kiles's ability to effectively challenge
22  his convictions and sentences, violating his rights under the Sixth, Eighth, and
23  Fourteenth Amendments to the U.S. Constitution. Kiles incorporates by specific
24  reference all facts, allegations, and arguments made elsewhere in this Petition.

25      Kiles did not present this claim in state court. Kiles can overcome any default
26  by showing cause and prejudice, as the ineffective assistance of Kiles's state post-
27  conviction counsel in failing to raise this claim constitutes cause for the default and
28  resulted in prejudice to Kiles. *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *Strickland*

*v. Washington*, 466 U.S. 668, 688, 694 (1984). Kiles will demonstrate at an evidentiary hearing that state post-conviction counsel fell below the standards of minimally competent capital post-conviction attorneys when they failed to raise this meritorious claim. Because this claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider the merits of the claim de novo.

**A.   Trial counsel failed to preserve evidence needed for proper consideration of Kiles's claims on appeal.**

Kiles's counsel made a practice of conducting proceedings off the record and, as a result, failed to preserve critical portions of the record for subsequent review. In the capital context, where heightened reliability is required, *see Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality opinion), the Supreme Court has "emphasized repeatedly the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally." *Parker v. Dugger*, 498 U.S. 308, 321 (1991); *see also Zant v. Stephens*, 462 U.S. 862, 890 (1983) (recognizing mandatory appellate review as "an important procedural safeguard . . . to avoid arbitrariness.") Counsel's failure to ensure a complete record crippled Kiles's ability to seek meaningful appellate review. This was deficient and prejudiced Kiles. *See Strickland*, 466 U.S. at 694; *see also* 2003 ABA Guideline 10.7 ("Counsel at every stage have an obligation to satisfy themselves independently that the official record of the proceedings is complete and to supplement it as appropriate.").

**1.   Trial counsel denied Kiles's right to be present at unrecorded proceedings.**

First, during pretrial proceedings, Kiles specifically informed his trial counsel that he would like to be present for any off-record conferences between the State, defense counsel, and the court. (Tr. Aug. 6, 1999 at 14.) Kiles was concerned that these informal meetings were not recorded and could not be challenged, so he

1   requested that he at least be present for them. (Tr. Aug. 6, 1999 at 13–14.) But

2   Kiles's attorney refused the request and indicated that he would continue to have

3   off-the-record discussions. (Tr. Aug. 6, 1999 at 14.)

4       Kiles's request was well-founded. For example, Kiles expressed concern to

5   counsel about a minute entry dated October 7, 2002, where defense counsel waived

6   his presence and no transcript was made of the proceedings. (ROA 584 at 1.)

7   Though the minute entry states "no real substance [was] being discussed," the

8   discussion was likely about how Kiles's sentencing would move forward after *Ring

9   v. Arizona*, 536 U.S. 584 (2002), in which the Supreme Court had found Arizona's

10  death-penalty scheme unconstitutional just a few months earlier. (ROA 584 at 1.)

11  This conference may have contained critical information for appellate counsel.

12  Counsel were ineffective both for an unauthorized waiver of his client's rights, *see*

13  Claim 1, *supra*, and for failing to make a record such that appellate counsel could

14  ensure a meaningful review of the proceedings. *See Strickland*, 466 U.S. at 694.

15      **2.    Trial counsel failed to record and retain evidence during
16              voir dire.**

17      Defense counsel failed to maintain a record and preserve evidence necessary

18  to allow Kiles effective review on appeal of his jury selection. During voir dire at

19  the guilt phase, defense counsel erred in failing to add a question about the

20  prospective jurors' race to the State's questionnaire. (CR89-15577 ROA 169 at 2–

21  11.) Without a question regarding the race of the juror, appellate counsel could not

22  determine whether the State sought to remove jurors by stipulation or peremptory

23  challenge based on race, which would be impermissible under *Batson v. Kentucky*,

24  476 U.S. 79 (1986). Trial counsel then failed to preserve the guilt-phase juror

25  questionnaires, frustrating appellate counsel's ability to determine if there were

26  other errors that needed to be raised to the Arizona Supreme Court.

27      Compounding these hindrances to effective review of voir dire, Kiles's trial

28  counsel failed to note on the record why each juror was excluded. The majority of

prospective jurors, 41 in the guilt phase, were removed by stipulation between Kiles's counsel and the State, without any reason on the record justifying removal. (ROA 456 at 1.) In the penalty phase, 23 prospective jurors were struck for cause, though even the fact of their removal, let alone the reasons underlying removal, appears nowhere on the record during jury selection. (ROA 895; Tr. Mar. 6, 2006; Tr. Mar. 7, 2006; Tr. Mar. 8, 2006; Tr. Mar. 15, 2006; Tr. Mar. 16, 2006.) Thus, Kiles's appellate lawyers lacked critical information necessary to challenge his convictions and sentence, prejudicing his appeals.

Defense counsel was ineffective for failing to maintain a complete and proper record of the voir dire proceedings in both the guilt and penalty phase, including why each juror was excluded. These errors prevented Kiles from effectively raising claims regarding the death-qualification of jurors or other potential voir dire issues.

### 3.    Trial counsel failed to ensure bench conferences were on the record.

On numerous occasions in the state-court proceedings, the court and counsel held off-the-record discussions without making a record of, in many instances, what was discussed or argued or, in other instances, the reasons specific decisions were made. During the guilt phase, the pretrial and trial transcripts reveal at least 15 separate unrecorded bench conferences between the trial judge and counsel. (*See* Tr. July 7, 2000 at 139; Tr. July 10, 2000 at 82; Tr. July 10, 2000 at 140; Tr, July 10, 2000 at 174; Tr. July 11, 2000 at 62; Tr. July 11, 2000 at 83; Tr. July 12, 2000 at 9; Tr. July 12, 2000 at 30; Tr. July 12, 2000 at 82 ("THE COURT: We are back on the record. We talked about several things."); Tr. July 13, 2000 at 75; Tr. July 17, 2000 at 144; Tr. July 17, 2000 at 224; Tr. July 18, 2000 at 31 ("THE COURT: Okay. If you will stick around, we will informally go over the forms of verdict. MS. VANDREUMEL: Thank you, Judge."); Tr. July 20, 2000 at 2; Tr. July 20, 2000 at 3.) The specific contents of these bench conferences is, of course, unknown, but a review of the record surrounding the conferences suggests that they included

1   discussions regarding whether the State could impeach its own witnesses, whether

2   testimony from the victim was hearsay and should be excluded (the testimony was

3   subsequently given), objections to juror questions, an issue with the jury verdicts,

4   and various unknown subjects.

5        Counsel were no more effective at ensuring that a complete record of

6   proceedings was made during Kiles's penalty phase. There were again numerous

7   off-the-record bench conversations. (*See* Tr. Mar. 20, 2006 at 178; Tr. Mar. 21,

8   2006 at 66; Tr. Mar. 21, 2006 at 98; Tr. Mar. 22, 2006 at 7; Tr. Mar. 22, 2006 at 27;

9   Tr. Mar. 22, 2006 at 79; Tr. Mar. 23, 2006 at 31; Tr. Mar. 23, 2006 at 60; Tr. Mar.

10  29, 2006 at 54; Tr. Apr. 3, 2006 at 6; Tr. Apr. 3, 2006 at 76; Tr. Apr. 4, 2006 at 3–

11  4; Tr. Apr. 4, 2006 at 5–6; Tr. Apr. 12, 2006 at 30; Tr. Apr. 26, 2006 at 23; Tr. Apr.

12  27, 2006 at 50; Tr. May 11, 2006 at 87–88; Tr. May 16, 2006 at 45.) Some of these

13  bench conferences may have been about juror questions, hearsay objections, and

14  the admission of exhibits, but for the majority of these off-the-record discussions,

15  their content is entirely opaque. Because the preserved record was so far from

16  complete, appellate counsel had little idea what happened at numerous important

17  points during the proceedings below. This prevented Kiles from receiving effective

18  assistance of appellate counsel and meaningful appellate review of key issues raised

19  at trial.

20              **4.    Trial counsel failed to ensure conferences on jury
                        instructions were on the record.**
21

22        One example from the guilt phase highlights the difficulties created by a

23  Swiss-cheese record. There were a series of informal conferences about the jury

24  instructions at the guilt-phase proceeding. The judge stated on the record, "The

25  record will show that I have been meeting informally with counsel and the

26  defendant has been here regarding the process of arriving at jury instructions that

27  are still in progress, but I think we can make a record at this point." (Tr. July 18,

28  2000 at 2.) However, counsel were deficient for not ensuring that the actual

conferences were on the record. Without a complete record, appellate counsel was unable to effectively challenge any issues raised regarding jury instructions.

These off-the-record conferences may have ultimately led to a problem with the verdict. After the judge received the verdict from the jury, he announced:

> THE COURT: Ladies and gentlemen, the possibility exists—and I and the attorneys aren't sure that you misunderstood the numerical part of the calculations of the verdict, so what I'm going to do is ask you to go back down to the jury room and the attorneys and I will meet and discuss it further. We may be resubmitting that portion of the verdict to you for your further deliberation, because our instructions may not have been all that great. I'll have you go back down with Ms. Robbins and go back down to the jury room and we'll proceed. Counsel wish to meet in chambers to discuss this?
>
> MR. CLARK: Yes.

(Tr. July 20, 2000 at 3.) A problem with jury instructions and verdicts at the guilt phase is an important issue for appellate review. This is especially so in a capital case, where the reliability of verdicts is of utmost importance. But defense counsel's failure to ensure the conferences were on the record before and after the verdict forms were submitted to the jury precluded meaningful review of the issue.

## B. Counsel's ineffectiveness for failing to ensure a complete record violated Kiles's rights.

"As any effective appellate advocate will attest, the most basic and fundamental tool of his profession is the complete trial transcript, through which his trained fingers may leaf and his trained eyes may roam in search of an error, a lead to an error, or even a basis upon which to urge a change in an established and hitherto accepted principle of law." *Hardy v. United States*, 375 U.S. 277, 288 (1964) (Goldberg, J., concurring). The Supreme Court has made clear that an indigent defendant has both due-process and equal-protection rights to the "basic tools" of an adequate judicial review—a constitutionally effective attorney acting as an advocate, *e.g.*, *Strickland*, 466 U.S. at 684–85; *Evitts v. Lucey*, 469 U.S. 387

404

1    (1985), and a record that allows meaningful, effective presentation of claims, *e.g.*,

2    *Griffin v. Illinois*, 351 U.S. 12, 18–19 (1956).

3        In the death-penalty context, the opportunity to have "meaningful appellate

4    review" is especially crucial "in ensuring that the death penalty is not imposed

5    arbitrarily or irrationally." *Parker*, 498 U.S. at 321. There must be a "'record of

6    sufficient completeness,' for adequate consideration of the errors assigned." *Draper*

7    *v. Washington*, 372 U.S. 487, 497 (1963) (quoting *Coppedge v. United States*, 369

8    U.S. 438, 446 (1962)). In the absence of a "complete verbatim transcript," a "record

9    of sufficient completeness" must include an "equivalent report of the events at trial

10   from which the appellant's contentions arise." *Mayer v. City of Chicago*, 404 U.S.

11   189, 194 (1971) (quoting *Draper*, 372 U.S. at 495–96).

12       Because Kiles cannot know what was discussed at the many unrecorded

13   bench conferences throughout his proceedings, he could not previously and cannot

14   here raise constitutional claims arising out of those discussions. For example, courts

15   have held that prejudicial comments made by the judge during a bench conference

16   and overheard by the jury could be cause for a mistrial. *See, e.g.*, *Coast-to-Coast*

17   *Stores, Inc. v. Womack-Bowers, Inc.*, 818 F.2d 1398, 1402 (8th Cir. 1987) (stating

18   that the judge's comments during a bench conference, "if overheard by the jury,

19   constituted prejudicial error" and would have been grounds for mistrial (emphasis

20   omitted)). But, on this incomplete and insufficient record, there is no way of

21   knowing whether this or other errors of constitutional magnitude occurred during

22   Kiles's trial. Counsel's failure to object to the lack of recording was deficient. *See*

23   *Strickland*, 466 U.S. at 688. Further, counsel's failure to maintain a complete record

24   of the voir dire proceedings, including why each juror was excluded, has prevented

25   Kiles from effectively raising such claims as the improper exclusion of jurors based

26   on race in his guilt-phase proceedings under *Batson*, 476 U.S. at 79. (*See, e.g.*, Tr.

27   Mar. 8, 2006 at 2–3); *see also* Claims 2 and 4, *supra*.

28       Throughout Kiles's proceedings, trial counsel consistently, and therefore

405

1  ineffectively, failed to preserve these crucial pieces of the record. This prejudiced
2  Kiles, because it has deprived and continues to deprive him of an adequate and
3  complete review and undermines confidence in the reliability of his proceedings.
4  *See Strickland*, 466 U.S. at 694. Kiles is therefore entitled to relief.

5                                      **Claim Sixteen**
6                    **Capital punishment is per se cruel and unusual.**

7          Capital punishment is per se cruel and unusual in violation of the Eighth and
8  Fourteenth Amendments to the U.S. Constitution. Kiles incorporates by specific
9  reference all facts, allegations, and arguments made elsewhere in this Petition.

10         Kiles raised this claim on direct appeal. (DA2 Dkt. 86 at 94.) The Arizona
11  Supreme Court noted in the Appendix to its Opinion that this claim was preserved
12  and had previously been rejected. *State v. Kiles*, 213 P.3d 174, 192 (Ariz. 2009).
13  That notation does not constitute an adjudication on the merits, so the limitations
14  on relief laid out by 28 U.S.C. § 2254(d) do not apply to this Court's review of this
15  claim. Even if the notation does qualify as a decision on the merits, the state court's
16  denial of this claim was (1) contrary to, or involved an unreasonable application of,
17  clearly established federal law, and (2) based on an unreasonable determination of
18  the facts. 28 U.S.C. § 2254(d). Section 2254(d) thus places no bar on relief.[195]

19         The Eighth Amendment precludes the imposition of punishments that are
20  "cruel and unusual" as assessed according to the "evolving standards of decency
21  that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 100–01
22  (1958). In 1976, the Supreme Court held the "the death penalty is not a form of
23  punishment that may never be imposed," assuming that the penalty could further
24  the "two principal social purposes" of retribution and deterrence. *Gregg v. Georgia*,
25  428 U.S. 153, 183, 187 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.).
26  Since that time, however, scholarship and empirical work has emerged eroding

27
28  [195] To conserve space and avoid repetition, Kiles will incorporate this discussion of
    the applicability of § 2254(d) into subsequent claims as appropriate.

1    these two justifications for capital punishment. *See, e.g.*, Carol S. Steiker, *No,*
2    *Capital Punishment Is Not Morally Required: Deterrence, Deontology, and the*
3    *Death Penalty*, 58 Stan. L. Rev. 751, 766–76, 786–89 (2005); John J. Donohue &
4    Justin Wolfers, *Uses and Abuses of Empirical Evidence in the Death Penalty*
5    *Debate*, 58 Stan. L. Rev. 791, 794 (2005). Because the death penalty serves neither
6    retribution nor deterrence under modern standards of decency, the death penalty is
7    unconstitutional.

8         In addition, the death penalty is cruel for two reasons: it is both unreliable
9    and arbitrarily imposed. First, in spite of the need for heightened reliability in a
10   capital proceeding, *see Woodson v. North Carolina*, 428 U.S. 280, 305 (1976)
11   (plurality opinion), capital punishment is unreliable because of the significant risk
12   that an innocent person will be sentenced to death or even executed, *see Glossip v.*
13   *Gross*, 135 S. Ct. 2726, 2757 (2015) (Breyer, J., dissenting). Between 1989 and
14   2012, there were 115 exonerations from capital convictions; there were six more
15   based on actual innocence in 2014 alone. *Id*. Research suggests that 4.1% of the
16   people on death row are actually innocent. *See id*. at 2758 (citing Samuel R. Gross
17   et al., *Rate of False Conviction of Criminal Defendants Who Are Sentenced to*
18   *Death*, 111 Proc. of the Nat'l Acad. of Sci. 7230 (2014)). Moreover, there is
19   compelling evidence that innocent individuals have in fact been executed. *See, e.g.*,
20   David Grann, *Trial by Fire: Did Texas Execute an Innocent Man?*, The New Yorker
21   (Sept. 7, 2009), http://www.newyorker.com/ magazine/2009/09/07/trial-by-fire.

22        Capital punishment is also unreliable because it is frequently imposed on
23   people whose impairments make them insufficiently culpable for such a sentence.
24   The Supreme Court has held that the death penalty cannot be imposed on those
25   without extreme culpability. *See Atkins v. Virginia*, 536 U.S. 304, 319 (2002).
26   Those who are impaired as the result of mental illness, intellectual limitation, child
27   abuse, substance addiction, or other deprivation have lessened moral culpability.
28   *See, e.g.,* Steiker, *supra*, at 766–67; *see also, e.g.*, *California v. Brown*, 479 U.S.

538, 545, (1987) (O'Connor, J., concurring) ("evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse"). Even so, people whose impairments make them insufficiently culpable for capital punishment are routinely executed, rendering the death penalty unreliable. *See, e.g.*, Steiker, *supra*, at 766–68.

Second, the death penalty is cruel because it is wholly arbitrary. The imposition of the death penalty should turn on the crime and the offender's culpability. *See Roper v. Simmons*, 543 U.S. 551, 568 (2005). Instead, research demonstrates that irrelevant factors, including the race and gender of the victim or defendant and the location of the crime, impermissibly affect the probability of a death sentence. *See, e.g.*, Steven F. Shatz & Terry Dalton, *Challenging the Death Penalty with Statistics: Furman, McCleskey, and a Single County Case Study*, 34 Cardozo L. Rev. 1227, 1244–56 (2013) (citing studies finding gender, racial, and geographic disparities in the imposition of death sentences).

That the death penalty is both unreliable and turns on constitutionally irrelevant factors renders it cruel. *Cf. Furman v. Georgia*, 408 U.S. 238, 309–10 (1972) (Stewart, J., concurring) (deeming "cruel and unusual" the "wanton[] and so freakish[]" imposition of death sentences).

The death penalty has also become unusual. The number of death sentences, the number of states that use the death penalty, and the number of executions nationally have declined significantly over the last 15 years. *See Glossip*, 135 S. Ct. at 2772–75. Perhaps most striking is the "consistency of the direction of change." *Atkins*, 536 U.S. at 315. As a result, the vast majority of death sentences originate in just a handful of counties. *See Glossip*, 135 S. Ct. at 2774. Now, especially, geography "plays an important role in determining who is sentenced to death," and "[b]etween 2004 and 2009, for example, just 29 counties (fewer than 1% of counties

408

1  in the country) accounted for approximately half of all death sentences imposed

2  nationwide." *See id.* at 2761.

3          The death penalty is cruel and unusual and incompatible with the evolving

4  standards of decency; it is therefore unconstitutional. Accordingly, Kiles's death

5  sentence is unconstitutional, and he is entitled to relief.

6                                    **Claim Seventeen**

7          **Arizona's death-penalty statute unconstitutionally serves no**
   **deterrent purpose, exceeds any legitimate retributive aim, is**
8  **without penological justification, and results in the gratuitous**
   **infliction of suffering.**
9

10         Because Arizona's death-penalty statute serves no deterrent purpose, exceeds

11  any legitimate retributive aim, is without penological justification, and results in the

12  gratuitous infliction of suffering, the statute violates the Eighth and Fourteenth

13  Amendments to the U.S. Constitution. Kiles raised this claim on direct appeal.

14  (DA2 Dkt. 86 at 97.) For the reasons set forth in Claim 16, *supra*, 28 U.S.C.

15  § 2254(d) places no limitation on relief. Kiles incorporates by specific reference all

16  facts, allegations, and arguments made elsewhere in this Petition.

17         The Supreme Court recognized two potential "principal social purposes:

18  retribution and deterrence of capital crimes by prospective offenders." *Gregg*, 428

19  U.S. at 183 (joint opinion of Stewart, Powell, and Stevens, JJ.). Unless the death

20  penalty "measurably contributes to one or both of these goals, 'it is nothing more

21  than the purposeless and needless imposition of pain and suffering,' and hence an

22  unconstitutional punishment." *Enmund v. Florida*, 458 U.S. 782, 798 (1982)

23  (quoting *Coker v. Georgia*, 433 U.S. 584, 592 (1977) (plurality opinion)). Kiles's

24  death sentence serves neither of these purposes, particularly now, more than 28

25  years after he was first sentenced to death. *See Foster v. Florida*, 537 U.S. 990

26  (2002) (mem.) (Breyer, J., dissenting from denial of certiorari); *Lackey v. Texas*,

27  514 U.S. 1045 (1995) (mem.) (Stevens, J., respecting denial of certiorari); *see also*

28  *supra*, Claim 16; *infra*, Claim 33.

                                    409

First, the death penalty serves no deterrent value. The theory of deterrence assumes that humans will not commit a crime if the consequence of committing that crime becomes too high. Frank G. Carrington, *Deterrence, Death, and the Victims of Crime: A Common Sense Approach*, 35 Vand. L. Rev. 587, 588 (1982). This deterrence theory assumes all individuals act rationally and will undertake a cost/benefit analysis before acting. *See* Rudolph J. Gerber, *Economic and Historical Implications for Capital Punishment Deterrence*, 18 Notre Dame J.L. Ethics & Pub. Pol'y 437, 440 (2004). This assumption has proven faulty. Murders are often committed by perpetrators who lack the capacity to act rationally, perhaps because they are under the influence of alcohol or drugs, in a sudden fit of rage, or mentally impaired. *See* Jeffrey Fagan, *Death and Deterrence Redux: Science, Law and Causal Reasoning on Capital Punishment*, 4 Ohio St. J. Crim. L. 255, 276–77 (2006). Relatedly, even for potential perpetrators who might have the capacity to be deterred, the arbitrariness of the imposition of the death penalty, the length of time that elapses between the crime and any execution, and the real possibility that no execution will ever occur wholly undercut any possible deterrent effect. *See, e.g.*, *Glossip*, 135 S. Ct. at 2767–68 (Breyer, J., dissenting); *Coleman v. Balkcom*, 451 U.S. 949 (1981) (mem.) (Stevens, J., respecting denial of certiorari) (recognizing that an execution adds no deterrent value beyond that of the lengthy incarceration that precedes it); *see also* Claim 18, *infra*.

Recent studies largely confirm that the death penalty has no measurable deterrent effect. *See* Thomas E. Robins, *Retribution, the Evolving Standard of Decency, and Methods of Execution: The Inevitable Collision in Eighth Amendment Jurisprudence*, 119 Penn. St. L. Rev. 885, 897 (2015) ("[a] recent study conducted by the National Academy of Sciences found no evidence that capital punishment affected homicide rates"); Michael L. Radelet & Traci L. Lacock, *Do Executions Lower Homicide Rates?: The Views of Leading Criminologists*, 99 J. Crim. L. & Criminology 489, 489–90 (2009) ("The findings demonstrate an overwhelming

410

consensus among these criminologists that the empirical research conducted on the deterrence question strongly supports the conclusion that the death penalty does not add deterrent effects to those already achieved by long imprisonment.").

Second, the death penalty does not measurably advance any legitimate retributive goal. That it is regularly imposed on individuals with mild or borderline intellectual disability, organic brain damage, severe mental illness, and other forms of mental impairments—individuals such as Kiles—demonstrates as much. *See Atkins*, 536 U.S. at 319 (recognizing that mentally impaired offenders are less culpable and therefore less deserving of retribution); Frank R. Baumgartner & Betsy Neill, *Does the death penalty target people who are mentally ill? We checked*, Wash. Post, Apr. 3 2017, https://wapo.st/2o1BzG7?tid=ss_tw&utm_term=.6912986df42d (describing a study which found that "43 percent of inmates executed between 2000 and 2015 had received a mental illness diagnosis at some point in their lives"); *see also* Bob Taft and Joseph E. Kernan, *End the death penalty for mentally ill criminals*, Wash. Post, Mar. 24 2017, http://wapo.st/2n2UJIu?tid=ss_tw&utm_term=.8fc0f21f3401 (describing that recently executed prisoners include a man diagnosed with bipolar disorder and placed on lithium at age four and a decorated Vietnam War veteran who qualified for 100 percent disability because of his PTSD and bipolar disorder).

And, as with deterrence, the marginal retributive value of execution over a sentence of life imprisonment is negligible at best. *See Glossip*, 135 S. Ct. at 2769. Finally, any interest in retribution is eroded by the time that passes between the crime and the ultimate punishment. *See Knight v. Florida*, 528 U.S. 990 (1999) (mem.) (Breyer, J., dissenting from denial of certiorari) ("[The] longer the delay, the weaker the justification for imposing the death penalty in terms of punishment's basic retributive or deterrent purposes.").

The "pointless and needless extinction of life with only marginal contributions to any discernible social or public purposes . . . [is] patently excessive

411

1    and . . . violative of the Eighth Amendment." *Furman*, 408 U.S. at 312 (White, J.,

2    concurring). As the death penalty, including in Arizona, serves no cognizable

3    penological end, it amounts to the infliction of gratuitous suffering and violates the

4    Eighth and Fourteenth Amendments. Accordingly, Kiles's sentence is

5    unconstitutional, and he is entitled to relief.

6                                    **Claim Eighteen**

7        **Arizona's capital-sentencing scheme unconstitutionally does not**
         **genuinely narrow the murder cases eligible for the death penalty**
8        **and fails to channel the discretion of the sentencing jury.**

9        Because Arizona's capital-sentencing scheme does not genuinely narrow the

10   murder cases eligible for the death penalty and fails to channel the discretion of the

11   sentencing jury, it is arbitrary and irrational and violates the Eighth and Fourteenth

12   Amendments to the U.S. Constitution. Kiles raised this claim on direct appeal.

13   (DA2 Dkt. 86 at 95.) For the reasons set forth in Claim 16, *supra*, 28 U.S.C.

14   § 2254(d) does not limit relief. Kiles incorporates by specific reference all facts,

15   allegations, and arguments made elsewhere in this Petition.

16       In *Furman*, the Supreme Court declared that a capital-sentencing scheme is

17   unconstitutional when it provides "no meaningful basis for distinguishing the few

18   cases in which [death] is imposed from the many cases in which it is not." 408 U.S.

19   at 313 (White, J., concurring). "*Furman* mandates that where discretion is afforded

20   a sentencing body on a matter so grave as the determination of whether a human

21   life should be taken or spared, that discretion must be suitably directed and limited

22   so as to minimize the risk of wholly arbitrary and capricious action." *Gregg*, 428

23   U.S. at 189 (joint opinion of Stewart, Powell, and Stevens, JJ.).

24       For the death penalty to be constitutional, the legislature must establish a

25   narrowing process. *See id*. at 207 (the selection of who can be prosecuted and

26   ultimately sentenced to death "[must] always [be] circumscribed by . . . legislative

27   guidelines"); *Lowenfield v. Phelps*, 484 U.S. 231, 246 (1988) (the "legislature"

28   must provide a means of "narrow[ing] the class of death-eligible murderers"). "Part

                                           412

1    of a State's responsibility in this regard is to define the crimes for which death may

2    be the sentence in a way that obviates 'standardless [sentencing] discretion.'"

3    *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980) (alteration in original) (quoting

4    *Gregg*, 428 U.S. at 196 n.47 (joint opinion of Stewart, Powell, and Stevens, JJ.)).

5    Ultimately, "[t]o pass constitutional muster, a capital sentencing scheme must

6    'genuinely narrow the class of persons eligible for the death penalty and must

7    reasonably justify the imposition of a more severe sentence on the defendant

8    compared to others found guilty of murder.'" *Lowenfield*, 484 U.S. at 244 (quoting

9    *Zant v. Stephens*, 462 U.S. 862, 877 (1983)); *see also Brown v. Sanders*, 546 U.S.

10   212, 216 (2006) (explaining the Supreme Court has "required States to limit the

11   class of murderers to which the death penalty may be applied.")

12          Arizona's statute violates these mandates. While narrowing can occur with

13   either the defining of death-eligible murder or the requirement of aggravating

14   circumstances that apply to only a fraction of murders, Arizona's statute features

15   neither approach. First, the narrowing process does not occur with Arizona's

16   definition of death-eligible murders. Under Arizona law, first-degree murder is

17   comprised of a broad range of conduct, including intentional killings, knowing

18   killings, premeditated killings, and killings committed in the course of numerous

19   other crimes. *See* A.R.S. § 13-1105(A). This "pool" of crimes initially eligible to

20   be charged as capital crimes is so broadly defined that it encompasses the vast

21   majority of murders actually committed. This is seen both through a reading of the

22   statute, which fails to meaningfully distinguish between first-degree murder and

23   second-degree murder, and through a review of actual cases, which demonstrates

24   that almost all murders in Arizona qualify as first-degree murder. *See Hidalgo v.

25   Arizona*, 138 S. Ct. 1054, 1055 (2018) (mem.) (Breyer, J., respecting denial of

26   certiorari) ("Perhaps not surprisingly, Arizona did not argue below and does not

27

28

1   suggest now that the State's first-degree murder statute[196] alone can meet the Eighth

2   Amendment's narrowing requirement.").

3         The narrowing function, then, is ostensibly performed by the aggravators; a

4   jury must find at least one to make a first-degree-murder defendant death-eligible.

5   *See id.* ("Because Arizona law broadly defines capital murder, the State has sought

6   to comply with the narrowing requirement through the second method—namely,

7   by setting forth statutory 'aggravating circumstances' designed to permit the 'jury

8   . . . at the penalty phase' to make 'findings' that will narrow the legislature's broad

9   definition of the capital offense." (quoting *Lowenfield*, 484 U.S. at 246)); *see also*

10  A.R.S. § 13-703(F) (1988). However, Arizona's aggravating circumstances are so

11  expansive that they do not meaningfully separate out the group of defendants whose

12  crimes are so egregious they should be eligible for the death penalty. *See Hidalgo*,

13  138 S. Ct. at 1056 (mentioning unrebutted evidence that "'one or more aggravating

14  circumstances were present in'" 98% of first-degree murder defendants prosecuted

15  between 2002 and 2012 in Maricopa County, Arizona (quoting *State v. Hidalgo*,

16  390 P.3d 783, 789 (Ariz. 2017)). Moreover, individual aggravators cover a wide

17  swath of conduct. *See, e.g.*, Claim 29, *infra.* Accordingly, Arizona's aggravating

18  circumstances do not narrow the pool of death-eligible murders.

19        Where there is no meaningful basis to distinguish between those first-degree

20  murder defendants who do receive the death penalty and those who do not, and a

21  sentencer's discretion to impose the death penalty is not adequately channeled, the

22  imposition of the death penalty is arbitrary and irrational. *Furman*, 408 U.S. at 313.

23  There is no rational, constitutionally permissible basis for distinguishing Kiles's

---

[196] The homicide statute and the section of the capital-punishment statute on aggravating circumstances have been modified since 1989 but are largely unchanged. While not every aggravating circumstance relied upon in *Hidalgo* existed in the statute under which Kiles was sentenced, the vast majority did, including the particularly broad-reaching circumstance that applies when "[t]he defendant committed the offense in an especially heinous, cruel or depraved manner." *See* A.R.S. § 13-703(F)(6) (1988).

414

case, or the few cases in which the death penalty has been imposed in Arizona and in the United States, from the majority of first-degree murder cases in which it has not been imposed. The arbitrary imposition of the death penalty in Kiles's case amounts to cruel and unusual punishment and violates his rights to a reliable sentence and to due process. *See Glossip*, 135 S. Ct. at 2755–56 (Breyer, J., dissenting); *Jeffers v. Lewis*, 38 F.3d 411, 425 (9th Cir. 1994) (en banc) (Noonan, J., dissenting) ("[T]he administration of the death penalty in Arizona is so arbitrary as to constitute cruel and unusual punishment . . . ."). Accordingly, Kiles's death sentence is unconstitutional, and Kiles is entitled to relief.

**Claim Nineteen**

**Arizona's capital-sentencing scheme unconstitutionally affords the prosecutor unlimited discretion to seek the death penalty.**

Because Arizona's capital-sentencing scheme affords the prosecutor unlimited discretion to seek the death penalty, it violates the Eighth and Fourteenth Amendments to the U.S. Constitution. Kiles raised this claim on direct appeal. (DA2 Dkt. 86 at 96.) For the reasons set forth in Claim 16, *supra*, 28 U.S.C. § 2254(d) places no limitation on relief. Kiles incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

In Arizona, each prosecutor has the sole authority and complete discretion to determine whether to seek the death penalty as a sentencing option, following his or her unreviewable determination that one or more aggravating circumstances exists. The prosecutor's discretion is limited only by his or her individual whims as to which cases are appropriate for the death penalty. *See State v. Harding*, 670 P.2d 383, 397 (Ariz. 1983). Further, each prosecutor has significant discretion to choose whether to accept a plea deal in exchange for a life sentence. Here, the prosecutor stated on the record that with regard to plea deals, "it's my case; I make the calls on it." (Tr. Aug. 6, 1999 at 38–39.) Thus, whether a defendant is offered a plea deal or sentenced to death may arbitrarily turn on such a factor as the prosecutor's personal

1   relationship with defense counsel, which may have occurred in this case,[197] instead

2   of constitutionally permissible factors such as "the character and record of the

3   individual offender." *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982).

4       Arizona's scheme therefore allows arbitrary and capricious charging

5   decisions and creates a substantial risk of variation across similar cases. Such

6   "arbitrary and wanton" discretion in seeking a death sentence, *see Woodson*, 428

7   U.S. at 303 (plurality opinion), leads to the "wanton[] and so freakish[]" imposition

8   of the death penalty, *see Furman*, 408 U.S. at 310 (Stewart, J., concurring).

9       That Arizona prosecutors have unbridled discretion, without objective

10  standards, to seek the death penalty—and to decide not to continue seeking the

11  death penalty—violates the Eighth and Fourteenth Amendments. *See Godfrey*, 446

12  U.S. at 428; *Gregg*, 428 U.S. at 195 n.47 (joint opinion of Stewart, Powell, and

13  Stevens, JJ.); *Furman*, 408 U.S. at 313 (White, J., concurring). Accordingly, Kiles's

14  sentence is unconstitutional, and he is entitled to relief.

15                              **Claim Twenty**

16  **Arizona's capital-sentencing scheme is unconstitutional because it**
    **does not require the State to prove, or the jury to find beyond a**
17  **reasonable doubt, that the aggravating factors outweighed the**
    **mitigating circumstances.**
18

19      Because Arizona's capital-sentencing scheme does not require the State to

20  prove beyond a reasonable doubt that the aggravation outweighs the mitigation and

21  that the death penalty is appropriate, the scheme violates the Fifth, Sixth, Eighth,

22  and Fourteenth Amendments to the U.S. Constitution. Kiles raised this claim on

23  direct appeal. (DA2 Dkt. 86 at 96.) For the reasons set forth in Claim 16, *supra*, 28

24  U.S.C. § 2254(d) places no limitation on relief. Kiles incorporates by specific

25  reference all facts, allegations, and arguments made elsewhere in this Petition.

26  _____

27  [197] Other impermissible considerations include race, the prosecutor's career
    ambitions, and the wishes of the victims—the last of which may also have played a
28  role in this case.

                                    416

1

2

3

**A.**   **The trial court's penalty-phase instructional error regarding the burden and standard of proof, derived from Arizona's unconstitutional statute, violated Kiles's rights under clearly established precedent.**

4     Before the jury may impose a death sentence, Arizona's death-penalty statute

5  requires the jury to find that aggravating circumstances outweigh mitigating

6  circumstances. However, Arizona's capital-sentencing scheme does not specify

7  either which party bears the burden of proof or what the appropriate standard of

8  proof is with regard to the weighing of aggravating and mitigating circumstances.

9  *See* A.R.S. § 13-751(E). The trial court in Kiles's case accordingly instructed the

10 jurors only that they "decide whether there is mitigation that is sufficiently

11 substantial to call for leniency." (Tr. May 22, 2006 at 24.) At no point did the trial

12 court instruct the jury about a burden of persuasion with regard to the weighing of

13 aggravating and mitigating circumstances. (*See* Tr. May 22, 2006 at 14–26.) Like

14 Arizona's statute, the jury instructions therefore relieved the prosecutor of his

15 burden of proving beyond a reasonable doubt that the mitigation was not

16 sufficiently substantial to call for leniency. By extension, the instructions also

17 relieved the jury of having to determine beyond a reasonable doubt that the death

18 penalty was the appropriate punishment, violating Kiles's clearly established rights.

19     The Supreme Court has repeatedly held that "any fact (other than prior

20 conviction) that increases the maximum penalty for a crime must be charged in an

21 indictment, submitted to a jury, and proven beyond a reasonable doubt." *Jones v.*

22 *United States*, 526 U.S. 227, 243 n.6 (1999); *see also Apprendi v. New Jersey*, 530

23 U.S. 466, 476 (2000) (applying this principle to states through the Fourteenth

24 Amendment). The Court reaffirmed this principle in the capital context in *Ring v.*

25 *Arizona*: "If a State makes an increase in a defendant's authorized punishment

26 contingent on the finding of a fact, that fact—no matter how the State labels it—

27 must be found by a jury beyond a reasonable doubt." 536 U.S. 584, 602 (2002); *see*

28 *also id.* at 610 (Scalia, J., concurring) ("[T]he fundamental meaning of the jury-trial

417

guarantee of the Sixth Amendment is that all facts essential to imposition of the level of punishment that the defendant receives—whether the statute calls them elements of the offense, sentencing factors, or Mary Jane—must be found by the jury beyond a reasonable doubt."). Because aggravating circumstances must be found to outweigh mitigating circumstances before a death sentence can be imposed in Arizona, under *Ring* and its antecedents, that weighing is a fact that must be found by a jury beyond a reasonable doubt. *See Murdaugh v. Ryan*, 724 F.3d 1104, 1115 (9th Cir. 2013) ("In [*Ring*], the Supreme Court described several determinations that had to occur under Arizona law before a defendant became death-eligible, including the judge's determination that 'there are no mitigating circumstances sufficiently substantial to call for leniency.'").

The accuracy of Kiles's position on appeal was made explicit when the Supreme Court decided *Hurst v. Florida*, 136 S. Ct. 616 (2016), in which the Court held that the failure to require a jury to determine the relative weight of aggravating and mitigating circumstances beyond a reasonable doubt violates the Sixth Amendment right to a jury trial as well as the Fourteenth Amendment's Due Process Clause. The Court reiterated the Sixth Amendment's basic requirement that "any fact that 'expose[s] the defendant to a greater punishment than that authorized by the jury's guilty verdict' is an 'element' that must be submitted to the jury." *Id.* at 621 (quoting *Apprendi*, 530 U.S. at 494). The Court also emphasized that under *Ring*, this principle applies with equal force to death-penalty statutes: "The Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death." *Id.* at 619. The Court further recognized that under *Alleyne v. United States*, 133 S. Ct. 2151, 2156 (2013), "each element of a crime [must] be proved to a jury beyond a reasonable doubt." *Hurst*, 136 S. Ct. at 621; *see also Apprendi*, 530 U.S. at 498 (Scalia, J., concurring).

In *Hurst*, the State of Florida argued that the weighing process fell outside the ambit of *Ring* and *Apprendi*, as the defendant was death eligible after the jury

418

1     found at least one aggravating circumstance. *Hurst*, 136 S. Ct. at 622. The Court
2     rejected this contention, and *Hurst* therefore stated what earlier Sixth Amendment
3     precedent had already established: It is not constitutionally sufficient for a jury to
4     find the existence of at least one aggravating circumstance beyond a reasonable
5     doubt, because the determination regarding the relative weight of aggravating and
6     mitigating circumstances is also a factual finding necessary to a defendant's
7     eligibility for a sentence of death. *Id.*; *see also Rauf v. State*, 145 A.3d 430 (Del.
8     2016) (per curiam) (striking down Delaware's death-penalty scheme following
9     *Hurst* and holding that the Sixth Amendment requires a jury to find, beyond a
10    reasonable doubt, that the aggravation outweighs mitigation); *Hurst v. State*, 202
11    So.3d 40, 57 (Fla. 2016) (finding that *Hurst* "mandates that all the findings
12    necessary for the imposition of a death sentence are 'elements' that must be found
13    by a jury" and holding that "before the trial judge may consider imposing a sentence
14    of death, the jury in a capital case must . . . unanimously find that the aggravating
15    factors outweigh the mitigating circumstances").

16        *Hurst* built upon *Ring* and *Apprendi* but did not create new law.
17    Section 2254(d)(1) is no bar to relief, because the state court's failure to recognize
18    the violation of Kiles's rights was an unreasonable application of clearly established
19    federal law, and Kiles is entitled to relief.

20        **B.    If *Hurst* instead announced a new rule of constitutional law, it is**
21        **retroactive to cases on collateral review.**

22        In the alternative, if *Hurst* did not simply apply existing precedent and instead
23    created a new rule of constitutional law, that ruling applies retroactively on
24    collateral review. *But see Ybarra v. Filson*, 869 F.3d 1016, 1033 (9th Cir. 2017).
25    First, *Hurst* is retroactive because it is substantive. *See Montgomery v. Louisiana*,
26    136 S. Ct. 718, 728 (2016) (explaining that under *Teague v. Lane*, 489 U.S. 288
27    (1989), "courts must give retroactive effect to new substantive rules of
28    constitutional law"). The Supreme Court consistently held that decisions

419

establishing a requirement of proof beyond a reasonable doubt apply retroactively. *See Hankerson v. North Carolina*, 432 U.S. 233, 240–42 (1977); *Ivan V. v. City of New York*, 407 U.S. 203, 205 (1972) (per curiam). *Hurst*, which implicates the standard of proof by which the weighing finding must be made, is similarly substantive in nature and therefore retroactive.

Further, *Hurst* is substantive because it prohibits the death penalty—a category of punishment—for those made eligible for the penalty other than by a jury finding beyond a reasonable doubt that aggravation outweighs mitigation—a class of defendants. *See Montgomery*, 136 S. Ct. at 728. *Hurst* also imposes a new burden on the State whenever it seeks a death sentence and places that punishment outside the power of the State unless that burden has been met. *See Summerlin*, 542 U.S. at 352 (describing "substantive" rules as those that put particular punishments beyond the power of the State to impose). Finally, *Hurst* narrowed the scope of Arizona's capital sentencing statute, which does not impose any standard of proof on a capital jury's weighing determination, by making it more difficult for juries to return death verdicts. *See id.* at 351 (describing "substantive" rules as those that "narrow the scope of a criminal statute by interpreting its terms").

Even if procedural and not substantive, *Hurst*'s beyond-a-reasonable-doubt holding would constitute a "watershed" procedural rule under *Teague*. *See Powell v. State*, 153 A.3d 69, 74–75 (Del. 2016) (finding retroactive its prior decision in *Rauf*, which invalidated Delaware's death penalty statute under *Hurst*, because it fell "squarely within the second exception set forth in *Teague* requiring retroactive application of 'new rules' of criminal procedure"). This is because *Hurst* "implicate[s] the fundamental fairness and accuracy," of sentencing. *Welch*, 136 S. Ct. at 1264. *Hurst* does so by mandating the use of the beyond-a-reasonable-doubt standard, which "is a prime instrument for reducing the risk of convictions resting on factual error." *Ivan*, 407 U.S. at 204 (quoting *In re Winship*, 397 U.S. 358, 363–64 (1970)). Accordingly, if the Court finds that *Hurst* announced a new rule of

420

1    constitutional law, it applies retroactively to Kiles's case.

2        **C.    Conclusion**

3        The statutorily driven failure to instruct Kiles's jury on the proper burden of

4    proof is structural error not subject to harmlessness review. *See Sullivan v.*

5    *Louisiana*, 508 U.S. 275, 281 (1993) (refusing to apply harmless-error analysis

6    where trial court erred in describing burden of proof in a criminal case, reasoning

7    that "a misdescription of the burden of proof . . . vitiates *all* the jury's findings").

8    Even if the error was not structural, Kiles was prejudiced. *See Valerio v. Crawford*,

9    306 F.3d 742, 763 (9th Cir. 2002) (noting that the inquiry under *Brecht v.*

10   *Abrahamson*, 507 U.S. 619, 637–38 (1993), is whether "a single member of the

11   jury . . . could have" found in favor of the petitioner). The jury instructions in this

12   case violated Kiles's rights, and Arizona's statute is unconstitutional. Under any

13   construction of the import of *Hurst*, Kiles is entitled to relief.

14                        **Claim Twenty-One**

15       **Arizona's capital-sentencing scheme unconstitutionally requires a**
         **defendant to affirmatively prove that the jury should spare his life.**
16

17       Arizona's death-penalty statute creates a presumption that death is the

18   appropriate sentence and forces the defendant to affirmatively prove that the jury

19   should spare his life, in violation of the Fifth, Eighth, and Fourteenth Amendments

20   to the U.S. Constitution. Kiles raised this claim on direct appeal. (DA2 Dkt. 86 at

21   95.) For the reasons stated in Claim 16, *supra*, 28 U.S.C. § 2254(d) does not limit

22   relief. Kiles incorporates by specific reference all facts, allegations, and arguments

23   made elsewhere in this Petition.

24       Arizona law required Kiles to prove mitigating circumstances by a

25   preponderance of the evidence before the sentencing jury could rely on those

26   circumstances to spare his life. *See* A.R.S. § 13-751(C); (Tr. May 22, 2006 at 18);

27   *see also State v. Ramirez*, 871 P.2d 237, 252–53 (Ariz. 1994) (requiring the

28   defendant to prove mitigating evidence by a preponderance of the evidence before

                                    421

the sentencer may "accept[]" the evidence as mitigating). Further, Arizona law required the jury to weigh the aggravation against the mitigation and determine whether the mitigation was "sufficiently substantial" before deciding whether to impose a death sentence. *See Richmond v. Lewis*, 506 U.S. 40, 47 (1992). In effect, then, Arizona law required the jury to presume that death was the appropriate sentence for Kiles and for him to prove that it was not.[198]

However, the Eighth Amendment demands a heightened degree of "reliability in the determination that death is the appropriate punishment in a specific case." *Woodson*, 428 U.S. at 305 (plurality opinion). That reliability is undermined when a jury is instructed to presume that death is appropriate. *See Walton v. Arizona*, 497 U.S. 639, 687–88 (1990) (Blackmun, J., dissenting) (recognizing that, with the statutory presumption of death, imposing a death sentence may "run[] directly counter to the Eighth Amendment requirement" of reliability), *overruled on other grounds by Ring*, 536 U.S. at 584.

In *Kansas v. Marsh*, 548 U.S. 163 (2006), the Supreme Court indirectly questioned the constitutionality of Arizona's death-penalty statute when it upheld the Kansas statute, which permitted a death sentence when the aggravating and mitigating circumstances were in equipoise. The Court noted that Arizona's statute is comparable to that of Kansas, except that Arizona, "once the State has met its burden, tasks the defendant with the burden of proving sufficient mitigating circumstances to overcome the aggravating circumstances and that a sentence less than death is therefore warranted." *Id.* at 173. Unlike Arizona's statute, "the Kansas statute requires the State to bear the burden of proving to the jury, beyond a reasonable doubt, that aggravators are not outweighed by mitigators and that a sentence of death is therefore appropriate; it places no additional evidentiary burden

---

[198] Arizona's capital statute also requires a sentence of death when one aggravating circumstance is proven and no sufficiently substantial mitigation is proven, *see* A.R.S. § 13-751(E), further entrenching the presumption in favor of death.

1    on the capital defendant." *Id.* The Court noted that "[t]his distinction operates in
2    favor of Kansas capital defendants," and in light of this distinction, the Court upheld
3    Kansas's statute as constitutional. *Id.*

4          Without such safeguards, Arizona's capital-sentencing scheme cannot ensure
5    the requisite reliability, and accordingly, it violated Kiles's rights under the Fifth,
6    Eighth, and Fourteenth Amendments. *See Woodson*, 428 U.S. at 305 (plurality
7    opinion); *Patterson v. New York*, 432 U.S. 197, 210–11 (1977); *but see Walton*, 497
8    U.S. at 651–52. Kiles's sentence is unconstitutional, and he is entitled to relief.

9                                  **Claim Twenty-Two**
10   **Arizona's capital-sentencing scheme unconstitutionally fails to**
     **require the cumulative consideration of mitigation.**
11

12         Arizona's capital-sentencing scheme violates the Eighth and Fourteenth
13   Amendments to the U.S. Constitution because it does not require the cumulative
14   consideration of mitigation. Kiles raised this claim on direct appeal. (DA2 Dkt. 86
15   at 96.) For the reasons set forth in Claim 16, *supra*, 28 U.S.C. § 2254(d) does not
16   bar relief. Kiles incorporates by specific reference all facts, allegations, and
17   arguments made elsewhere in this Petition.

18         The Eighth Amendment requires that a sentencer "be able to consider and
19   *give effect to*" all mitigating evidence when making its sentencing determination.
20   *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (emphasis added), *abrogated on other*
21   *grounds by Atkins*, 536 U.S. at 304. "[E]ven if [specific mitigating facts] are not in
22   themselves cause for a sentence less than death, they are still relevant to mitigation
23   and must be weighed in conjunction with other factors to determine if all of the
24   circumstances together warrant a lesser sentence." *Smith v. McCormick*, 914 F.2d
25   1153, 1168 (9th Cir. 1990).

26         At trial, the court instructed the jury that its sentencing decision came down
27   to "whether there is mitigation that is sufficiently substantial to call for leniency."
28   (Tr. May 22, 2006 at 24.) However, the court did not make clear that each juror

                                          423

could consider the cumulative effect of the mitigation, as opposed to considering only whether each piece of mitigation individually was sufficiently substantial to warrant leniency. (*See* Tr. May 22, 2006 at 14–26.) Indeed, some of the court's instructions suggested the opposite: "A mitigating factor that motivates one juror to vote for a sentence of life in prison may be evaluated by another juror as . . . not significant to the assessment of the appropriate penalty." (Tr. May 22, 2006 at 22–23.) Absent an explicit instruction to consider the cumulative effect of the mitigation, Kiles's jury was unable to adequately give effect to the sum of the mitigation presented in his case.

Due process requires that a jury be fully and correctly instructed on sentencing law to prevent an unconstitutional and arbitrary deprivation of the defendant's liberty. *See Hicks v. Oklahoma*, 447 U.S. 343, 346–47 (1980); *see also Taylor v. Kentucky*, 436 U.S. 478, 488–89 (1978) (holding that the "arguments of counsel cannot substitute for instructions by the court"). The jury instructions in this case on the consideration of mitigation did not—and Arizona's death-penalty statute does not—comply with the Eighth and Fourteenth Amendments. As a result, Kiles's death sentence is unconstitutional, and he is entitled to relief.

### Claim Twenty-Three

**Arizona's death-penalty statute is unconstitutional because it fails to require the jury to make specific findings as to each mitigating circumstance.**

Arizona's death-penalty statute violates the Eighth and Fourteenth Amendments to the U.S. Constitution because it neglects to require the jurors to make specific findings as to each proffered mitigating factor. Kiles raised this claim on direct appeal. (DA2 Dkt. 86 at 96.) For the reasons set forth in Claim 16, *supra*, 28 U.S.C. § 2254(d) does not bar relief. Kiles incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

The Eighth and Fourteenth Amendments require states to provide a mechanism for meaningful direct review of death sentences. *Gregg*, 428 U.S. at

424

197–98 (joint opinion of Stewart, Powell, and Stevens, JJ.); *see also State v. Brewer*, 826 P.2d 783, 790 (Ariz. 1992) ("Appellate review of sentencing is, of course, even more necessary in the context of a capital case. The penalty of death . . . may not be exacted in the absence of certain constitutional safeguards."). In order to achieve meaningful review, "it is important that the record on appeal disclose to the reviewing court the considerations which motivated the death sentence in every case in which it is imposed." *Gardner v. Florida*, 430 U.S. 349, 361 (1977) (plurality opinion). Arizona law helps to ensure meaningful review in non-capital cases, in which the court is required to state for the record the mitigating and aggravating factors it considers and applies when imposing any sentence other than the presumptive term. A.R.S. § 13-701(C); *State v. Harrison*, 985 P.2d 486 (Ariz. 1999). However, Arizona fails to offer such protections to capital defendants.

Under Arizona law, the trier of fact in a capital case is charged with determining whether the mitigating circumstances are "sufficiently substantial to call for leniency"; whether a mitigating circumstance is proven is determined by each juror individually. A.R.S. § 13-751(C), (E). But Arizona's death-penalty statute does not require the jury to identify in its verdict form which mitigating circumstances individual jurors deemed proven. *See id.* The verdict forms in Kiles's case thus reflect only the ultimate sentence the jury deemed appropriate for each first-degree murder conviction. (*See* ROA 919 at 1–3.)

As a result, when the Arizona Supreme Court conducted its independent review in Kiles's case, *Kiles*, 213 P.3d at 187, the court did so without the benefit of knowing which mitigating circumstances jurors had found proven. In other words, the court conducted its appellate review without knowing the considerations that motivated the death sentence. That appellate review was not the meaningful review contemplated by *Gregg*. *See Gardner*, 430 U.S. at 361 (plurality opinion). That such a review could not have been meaningful is especially true in this case, where the jury was asked to consider an enumerated list of mitigating circumstances

425

1    and where the jury determined that death was the appropriate sentence on one count

2    but that life imprisonment was appropriate for other counts. (*See* Tr. May 22, 2006

3    at 19–21; ROA 919 at 1–3.)

4         The trial court's failure to require special verdict forms—and the fact that

5    such forms are not statutorily required—deprived Kiles of an adequate appellate

6    review and violated his rights under the Eighth and Fourteenth Amendments.

7    Accordingly, Kiles is entitled to relief.

8                                **Claim Twenty-Four**

9    **Arizona's capital-sentencing scheme unconstitutionally limits the**
     **jury's full consideration of mitigation by requiring that mitigating**
10   **circumstances be proven by a preponderance of the evidence.**

11        In requiring that mitigation be proven by a preponderance of the evidence,

12   Arizona's capital-sentencing scheme violates the Eighth and Fourteenth

13   Amendments to the U.S. Constitution. Kiles raised this claim on direct appeal.

14   (DA2 Dkt. 86 at 96.) For the reasons set forth in Claim 16, *supra*, 28 U.S.C.

15   § 2254(d) places no limitation on relief. Kiles incorporates by specific reference all

16   facts, allegations, and arguments made elsewhere in this Petition.

17        At trial, in accordance with Arizona statute, the court instructed the jury as

18   follows: "The burden of proving the existence of mitigation is on the defendant.

19   The defendant must prove the existence of mitigation by a preponderance of the

20   evidence." (Tr. May 22, 2006 at 18); *see also* A.R.S. § 13-751(C). The court further

21   instructed the jury that "[a] party having the burden of proof by a preponderance of

22   the evidence must persuade you by the evidence that the claim or a fact is more

23   probably true than not true. This means the evidence that favors that party

24   outweighs the opposing evidence." (Tr. May 22, 2006 at 18.) By requiring Kiles to

25   prove mitigation by a preponderance of the evidence, the jury instruction

26   constrained the jury's ability to consider all of the mitigation presented.

27        In *Lockett v. Ohio*, the Supreme Court concluded that, "in all but the rarest

28   kind of capital case," the sentencer must "not be precluded from considering, as a

                                          426

1  mitigating factor, any aspect of a defendant's character or record and any of the
2  circumstances of the offense . . . [offered] as a basis for a sentence less than death."
3  438 U.S. 586, 604–05 (1978) (emphasis omitted). Moreover, "it is not enough
4  simply to allow the defendant to present mitigating evidence to the sentencer. The
5  sentencer must also be able to consider and give effect to that evidence in imposing
6  [the] sentence." *Penry*, 492 U.S. at 319, *abrogated on other grounds by Atkins*, 536
7  U.S. at 304; *see also Tennard v. Dretke*, 542 U.S. 274, 285 (2004) ("[T]he 'Eighth
8  Amendment requires that the jury be able to consider and give effect to' a capital
9  defendant's mitigating evidence.") (quoting *Boyde v. California*, 494 U.S. 370,
10 377–78 (1990)). Imposing a standard that limits the mitigating evidence considered
11 by the jury violates the Eighth Amendment's requirement that the sentencer be
12 allowed to consider any aspect of the defendant's character or record that counsels
13 in favor of a sentence other than death. *See, e.g.*, *Smith v. Texas*, 543 U.S. 37 (2004)
14 (per curiam); *Tennard*, 542 U.S. at 285; *Lockett*, 438 U.S. at 604. *But see Walton*,
15 497 U.S. at 649–51 (plurality opinion), *overruled on other grounds by Ring*, 536
16 U.S. at 584.

17      The jury instruction limiting the mitigation the jury could consider, alone and
18 when considered cumulatively with the other instructional errors, violated Kiles's
19 constitutional rights and prejudiced him. Kiles's death sentence is therefore
20 unconstitutional, and he is entitled to relief.

21                                    **Claim Twenty-Five**

22      **Arizona's capital-sentencing scheme unconstitutionally fails to set
        forth objective standards to guide the sentencer in weighing the
23      aggravating circumstances against the mitigating circumstances.**

24      Because Arizona's death-penalty statute offers no objective standards to
25 guide the sentencer in weighing the aggravating versus mitigating evidence, the
26 statute violates the Eighth and Fourteenth Amendments to the U.S. Constitution.
27 Kiles raised this claim on direct appeal. (DA2 Dkt. 86 at 96.) For the reasons set
28 forth in Claim 16, *supra*, 28 U.S.C. § 2254(d) places no limitation on relief. Kiles

                                          427

1  incorporates by specific reference all facts, allegations, and arguments made
2  elsewhere in this Petition.

3          Under the Eighth and Fourteenth Amendments, a capital defendant is entitled
4  to an individualized sentencing determination. *See Stephens*, 462 U.S. at 879. That
5  determination cannot be arbitrary, *see Furman*, 408 U.S. at 310 (Stewart, J.,
6  concurring), or made without adequate consideration of factors that might call for
7  a sentence less than death, *see, e.g.*, *Atkins*, 536 U.S. at 320–21. Kiles was denied a
8  constitutionally appropriate individualized sentencing determination because his
9  sentencing jury had no objective guidance in determining whether the mitigating
10  evidence presented was sufficiently substantial to call for leniency. (*See* Tr. May
11  22, 2006 at 22 ("Sufficiently substantial to call for leniency means that the
12  mitigation must be of such quality or value that it is adequate in the opinion of an
13  individual juror to persuade that juror to vote for a sentence of life
14  imprisonment.")); *see also State ex rel. Thomas v. Granville*, 123 P.3d 662, 666
15  (Ariz. 2005) (recognizing that, under Arizona's statute, neither party bears the
16  burden on whether the mitigation warrants leniency). In the absence of such
17  guidance, there is an intolerably high risk that Kiles's death sentence was the result
18  of unfettered discretion. *See, e.g.*, *Furman*, 408 U.S. at 239–40 (1972) (per curiam).
19  Accordingly, Kiles's sentence is unconstitutional, and he is entitled to relief.

20                                    **Claim Twenty-Six**

21          **Arizona's capital-sentencing scheme unconstitutionally denies**
          **capital defendants the benefit of proportionality review of their**
22          **sentences.**

23          The capital-sentencing scheme in Arizona under which Kiles was sentenced
24  denies a proportionality review in violation of the Fifth, Eighth, and Fourteenth
25  Amendments of the U.S. Constitution. Kiles raised this claim on direct appeal.
26  (DA2 Dkt. 86 at 97.) For the reasons set forth in Claim 16, *supra*, 28 U.S.C.
27  § 2254(d) places no limitation on relief. Kiles incorporates by specific reference all
28  facts, allegations, and arguments made elsewhere in this Petition.

                                          428

1       The Arizona Supreme Court failed to conduct a comparative proportionality
2    review of Kiles's death sentence, rendering the sentence unconstitutional. When the
3    United States Supreme Court sanctioned the modern death-penalty scheme, it did
4    so based on the belief that state supreme courts would conduct careful and effective
5    proportionality reviews in individual cases to guard against the arbitrary and
6    capricious infliction of the death penalty. *See Gregg*, 428 U.S. at 203–06 (joint
7    opinion of Stewart, Powell, and Stevens, JJ.) (highlighting proportionality review
8    on appeal as an important protection against caprice in sentencing); *Proffitt v.*
9    *Florida*, 428 U.S. 242, 258 (1976) (joint opinion of Stewart, Powell, and Stevens,
10   JJ.); *see also Glossip*, 135 S. Ct. at 2763 (Breyer, J., dissenting); *but see Pulley v.*
11   *Harris*, 465 U.S. 37, 50–51 (1984). The Arizona Supreme Court, however, has
12   abandoned this procedural safeguard. *See State v. Salazar*, 844 P.2d 566, 583–84
13   (Ariz. 1992). The denial of proportionality review allows for the death penalty to
14   be applied arbitrarily in Arizona and violates the Fifth, Eighth, and Fourteenth
15   Amendments. Kiles's sentence, affirmed without such a review, is constitutionally
16   unsound, and Kiles is entitled to relief.

17                            **Claim Twenty-Seven**

18       **Arizona's death-penalty scheme unconstitutionally discriminates**
         **against poor, young, African-American male defendants.**
19

20       Kiles was sentenced to death under a statutory scheme that discriminates
21   against poor, young, African-American males in violation of the Fourteenth
22   Amendment to the U.S. Constitution. Kiles incorporates by specific reference all
23   facts, allegations, and arguments made elsewhere in this Petition.

24       This claim was not raised in state court. Kiles alleges he can overcome any
25   default of this claim by showing that it was caused by the ineffective assistance of
26   appellate and state post-conviction counsel and that he was prejudiced by the
27   default. *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *Edwards v. Carpenter*, 529
28   U.S. 446, 453 (2000); *but see Davila v. Davis*, 137 S. Ct. 2058 (2017). Kiles will

demonstrate at an evidentiary hearing that appellate and post-conviction counsel's performance fell below the standards of minimally competent capital attorneys and that their failures prejudiced him. Alternatively, he alleges that any procedural bar is neither adequate nor independent and that imposing default would be a miscarriage of justice. Because this claim has not been adjudicated on the merits by the Arizona state courts, the barrier to relief imposed by 28 U.S.C. § 2254(d) does not apply, and the Court may consider the merits of the claim de novo.

Kiles, an African-American male who was 27 years old at the time of the crime for which he was sentenced to death (*see* ROA 1 at 1; ROA 225 Ex. 1), was condemned pursuant to a statutory scheme that is discriminatorily applied. The Equal Protection Clause protects criminal defendants from being sentenced based on purposeful discrimination. *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987); *see also* U.S. Const. amend. XIV, § 1. Still, Arizona's death row is predominantly populated by indigent males. For example, although women commit nearly 12 percent of all murders and non-negligent manslaughters, only three of the 117 persons on Arizona's death row are women. *See* FBI, *Crime in the United States 2015, Table 42: Arrests by Sex, 2015,* https://ucr.fbi.gov/crime-in-the-u.s/2015/crime-in-the-u.s.-2015/tables/table-42; Arizona Department of Corrections, *Death Row Demographics* (last visited Aug. 13, 2018), http://corrections.az.gov/node/431. Indeed, research suggests that "women homicide defendants receive more favorable treatment at each stage of the criminal process," even in capital cases. Shatz & Dalton, *supra*, at 1251–53 (citing studies finding gender disparities in the imposition of death sentences).

Additionally, studies have found that, along with gender, "the racial composition of and distribution within a county plays an important role" in determining who receives the death penalty while "proper factors—such as 'egregiousness'—do not." *Glossip*, 135 S. Ct. at 2760–62 (Breyer, J., dissenting). That Kiles was sentenced by a Maricopa County jury on its own likely affected his

430

1    sentence. *See, e.g.*, Levinson, Smith, & Young, *Devaluing Death: An Empirical*
2    *Study of Implicit Racial Bias on Jury–Eligible Citizens in Six Death Penalty States*,
3    89 N.Y.U. L. Rev. 513, 533–36 (2014). As "numerous studies have criticized the
4    death penalty as disproportionately affecting defendants of color," and defendants
5    have had death sentences "fortuitously imposed simply because of the county" in
6    which the defendant is sentenced, "our historic inability to devise a method to
7    implement the death penalty free from human bias and error" has been laid bare.
8    *State v. Bush*, 423 P.3d 370, 395–96 (Ariz. 2018) (Winthrop, J., dissenting). Given
9    that race, gender, geography, and access to resources determine the likelihood of a
10   death sentence, there is no question that Kiles, a poor, young, African-American
11   man, faced the arbitrary imposition of a capital sentence. *See, e.g.*, Shatz & Dalton,
12   *supra*, at 1245–51; Stephen Bright, *Counsel for the Poor: The Death Sentence Not*
13   *for the Worst Crime but for the Worst Lawyer*, 103 Yale L.J. 1835 (1994).

14          If a defendant similarly situated to Kiles happened to have been a woman, or
15   white, or wealthy, there would likely have been no sentence of death imposed.
16   Nothing regarding the nature of the crime, or the aggravating or mitigating
17   circumstances, can explain this disproportionate pattern other than systemic
18   discrimination on the basis of age, race, class, and sex. The discriminatory
19   application of the death penalty in Arizona violates Kiles's constitutional rights as
20   guaranteed by the Due Process and Equal Protection Clauses of the Fourteenth
21   Amendment. This discrimination prejudiced Kiles at all phases of his proceedings,
22   and he is entitled to relief.

23                              **Claim Twenty-Eight**

24          **The death qualification of Kiles's guilt- and penalty-phase juries**
        **was unconstitutional.**
25

26          Kiles's convictions and death sentence result from the unconstitutional
27   "death qualification" of his juries in violation of the Sixth, Eighth, and Fourteenth
28   Amendments to the U.S. Constitution. Kiles incorporates by specific reference all

1    facts, allegations, and arguments made elsewhere in this Petition.

2        Before Kiles's guilt phase, defense counsel moved to preclude the "death

3    qualification" of the jury. (ROA 493 at 2–3 (citing studies showing that "death

4    qualified juries are substantially more likely to convict or to convict on more serious

5    charges than juries on which opponents of capital punishment are permitted to

6    serve").) The trial court denied Kiles's request and proceeded to excuse prospective

7    jurors because of their opposition to the death penalty. (*See, e.g.*, Tr. July 7, 2000

8    at 67, 157.) The trial court also excused at least one prospective juror at Kiles's

9    penalty phase because she expressed some opposition to the death penalty. (*See,

10   e.g.*, Tr. Mar. 16, 2006 at 3–5.) Because there was a substantial record made at the

11   trial-court level, the Arizona Supreme Court was on notice of this claim, and it was

12   impliedly exhausted during that court's independent review in this case. *See Comer*

13   *v. Schriro*, 480 F.3d 960, 981 (9th Cir. 2007) (en banc) (finding that "[e]ven if a

14   petitioner fails to raise a constitutional claim in state court, the exhaustion

15   requirement may be satisfied . . . where the state court itself exhausts the claim").

16   The state-court denial of this claim was contrary to or an unreasonable application

17   of Supreme Court precedent; the denial further turned on an unreasonable

18   determination of facts. *See* 28 U.S.C. § 2254(d). Accordingly, this Court may

19   review the merits of this claim de novo.[199]

20       Death qualification—"the exclusion for cause, in capital cases, of jurors

21   opposed to capital punishment," *Wainwright v. Witt*, 469 U.S. 412, 439 (1985)

22   (Brennan, J., dissenting)—violates the Sixth, Eighth, and Fourteenth Amendments

23   for two reasons. First, it produces a biased jury. Second, it violates the fair cross-

---

25   [199] To the extent that this claim is not sufficiently exhausted, Kiles alleges he can
26   overcome any default of this claim by showing that it was caused by the ineffective
     assistance of appellate and state post-conviction counsel and that he was prejudiced
27   by the default. *See Martinez*, 566 U.S. at 9; *Carpenter*, 529 U.S. at 453;
     *but see Davila*, 137 S. Ct. at 2058. Alternatively, he alleges that any procedural bar
28   is neither adequate nor independent and that imposing default would be a
     miscarriage of justice.

1    section requirement of the Sixth Amendment.

2         A defendant has the right to an unbiased and impartial jury. *Morgan v.*
3    *Illinois*, 504 U.S. 719, 726–27 (1992) (identifying an impartial tribunal as a
4    fundamental requirement of due process); *see also Groppi v. Wisconsin*, 400 U.S.
5    505, 509 (1971). The "'presence of a biased juror cannot be harmless; the error
6    requires a new trial without a showing of actual prejudice.'" *United States v.*
7    *Gonzalez*, 214 F.3d 1109, 1111 (9th Cir. 2000) (quoting *Dyer v. Calderon*, 151 F.3d
8    970, 973 n.2 (9th Cir. 1998)). The process of death qualification, however, produces
9    not an unbiased jury, but a jury predisposed both to convict and to impose death.
10   Empirical research demonstrates that the death-qualification process facilitates the
11   selection of jurors who are more likely to return a guilty verdict and then more
12   likely to return a death sentence. *See* Susan D. Rozelle, *The Principled Executioner:*
13   *Capital Juries' Bias and the Benefits of True Bifurcation*, 38 Ariz. St. L.J. 769, 784–
14   85 (2006) (reviewing data showing that "[t]he death qualification process today still
15   seats juries uncommonly willing to find guilt, and uncommonly willing to mete out
16   death"); William J. Bowers & Wanda D. Foglia, *Still Singularly Agonizing: Law's*
17   *Failure to Purge Arbitrariness from Capital Sentencing*, 39 Crim. L. Bull. 51, 61–
18   66 (2003) (reviewing studies demonstrating that death-qualified jurors are more
19   likely to convict and to return a death verdict); *see also Wainwright*, 469 U.S. at
20   460 & n.11 (Brennan, J., dissenting) ("Death-qualification works to the advantage
21   of only the prosecutor; if not carefully controlled, it is [a] tool with which the
22   prosecutor can create a jury perhaps predisposed to convict and certainly
23   predisposed to impose the ultimate sanction." (footnote omitted)).

24        Moreover, research has established that even the process of death
25   qualification influences jurors to adopt pro-conviction and pro-death attitudes. *See,*
26   *e.g.*, Craig Haney, *On the Selection of Capital Juries: The Biasing Effects of the*
27   *Death-Qualification Process*, 8 L. & Hum. Behav. 121, 128–29 (1984), available
28   at https://capitalpunishmentincontext.org/files/resources/deathqual/Haney1984.pdf

("Exposure to death qualification increased subjects' belief in the guilt of the defendant and their estimate that he would be convicted. . . . And it led jurors to choose the death penalty as an appropriate punishment much more frequently than persons not exposed to it."). The effects of death qualification are enhanced because voir dire is the "jurors' first introduction to the substantive factual and legal issues in a case." *Powers v. Ohio*, 499 U.S. 400, 412 (1991) (internal quotation marks omitted) (recognizing that "[t]he influence of the voir dire process may persist through the whole course of the trial proceedings"). Critically, when a sentencing jury is death-qualified and therefore biased in favor of death, any resulting death sentence is not a reliable measure of the defendant's culpability, as is required by the Eighth Amendment. *See Woodson*, 428 U.S. at 305 (plurality opinion).

Beyond producing a biased jury, death qualification violates the defendant's right to a jury pool that represents a fair cross-section of the community. A jury unlikely to reflect such community views violates the Sixth Amendment. *See Taylor v. Louisiana*, 419 U.S. 522, 537 (1975). However, the process of death qualification permits the broad exclusion of jurors, even though some may possess the ability to judge impartially, regardless of their beliefs about the death penalty. With that exclusion, the right to a fair cross-section is lost.

Because Kiles's guilt-phase and sentencing-phase juries were selected using death qualification, his convictions and sentences are unconstitutional under the Sixth, Eighth, and Fourteenth Amendments. Kiles is entitled to relief.

### Claim Twenty-Nine

**The "especially heinous, cruel or depraved" aggravating circumstance is unconstitutionally vague.**

The move to jury sentencing in Arizona rendered the "especially heinous, cruel or depraved" aggravating circumstance, which the jury found proven in Kiles's case, unconstitutionally vague under the Eighth and Fourteenth Amendments to the U.S. Constitution. Kiles incorporates by specific reference all

434

1    facts, allegations, and arguments made elsewhere in this Petition.

2        Before the sentencing phase, defense counsel moved to dismiss the "heinous,

3    cruel, or depraved" aggravator, arguing that it was unconstitutionally vague and

4    overbroad and that it was applied in an arbitrary and capricious manner. (ROA 600);

5    *see* A.R.S. §13-703(F)(6) (1988). Counsel cited *Maynard v. Cartwright*, 486 U.S.

6    356, 363 (1988), and *Gregg*, 428 U.S. at 158 (joint opinion of Stewart, Powell, and

7    Stevens, JJ.), to establish that the Supreme Court had previously struck language

8    that was no more vague than the aggravating circumstance in Kiles's case. The trial

9    court denied Kiles's request without fully addressing the merits, ruling not that the

10   statute was constitutional, but that the court could attempt to deal with the

11   vagueness through jury instructions. (ROA 650 at 1; Tr. Feb. 15, 2005 at 28.)[200]

12   Because of the substantial record at the trial-court level, the Arizona Supreme Court

13   was on notice of this claim, and it was impliedly exhausted during that court's

14   independent review in this case. *See Comer*, 480 F.3d at 981 (en banc) (finding that

15   "the exhaustion requirement may be satisfied . . . where the state court itself

16   exhausts the claim"). The state-court denial of this claim was contrary to or an

17   unreasonable application of Supreme Court precedent; the denial further turned on

18   an unreasonable determination of facts. *See* 28 U.S.C. § 2254(d). Accordingly, this

19   Court may review the merits of this claim de novo.[201]

20       The Eighth Amendment requires that the aggravating factors genuinely

21   _____

22   [200] "I'm going to deny the request. You've made a great record. We'll see where we
23   end up. I feel hesitant to just say we're totally precluded at this point from at least
     attempting to fashion some kind of instruction that—that gets it right for the jury
24   and for all of us." (Tr. Feb. 15, 2005 at 28.)

25   [201] To the extent that this claim is not sufficiently exhausted, Kiles alleges he can
     overcome any default of this claim by showing that it was caused by the ineffective
26   assistance of appellate and state post-conviction counsel and that he was prejudiced
     by the default. *See Martinez*, 566 U.S. at 9 (2012); *Carpenter*, 529 U.S. at 453;
27   *but see Davila*, 137 S. Ct. at 2058. Alternatively, he alleges that any procedural bar
     is neither adequate nor independent and that imposing default would be a
28   miscarriage of justice.

435

narrow the class of offenders who are eligible for the death penalty. *See, e.g.*, *Loving v. United States*, 517 U.S. 748, 755 (1996); *Stephens*, 462 U.S. at 877. To comply with the Eighth Amendment, states must establish a threshold below which the death penalty cannot be imposed and must "establish rational criteria that narrow the decisionmaker's judgment as to whether the circumstances of a particular defendant's case meet the threshold." *McCleskey*, 481 U.S. at 305; *see also Lowenfield*, 484 U.S. at 231; *Stephens*, 462 U.S. at 877. A state's sentencing scheme must also "suitably direct[] and limit[]" the sentencer's discretion "so as to minimize the risk of wholly arbitrary and capricious action." *Stephens*, 462 U.S. at 874 (quoting *Gregg*, 428 U.S. at 189 (joint opinion of Stewart, Powell, and Stevens, JJ.)). Vague standards are unconstitutional because they fail to adequately "channel the sentencing decision patterns of juries." *Gregg*, 428 U.S. at 195 n.46 (joint opinion of Stewart, Powell, and Stevens, JJ.).

The Supreme Court has repeatedly held that aggravating factors based on the heinousness, cruelty, or depravity of a murder on their face fail to narrow death-penalty eligibility because their wording is too vague to constrain the discretion of the sentencer. *See, e.g.*, *Cartwright*, 486 U.S. at 363 ("There is nothing in these few words, standing alone, that implies any inherent restraint on the arbitrary and capricious infliction of the death sentence." (quoting *Godfrey*, 446 U.S. at 428–29)). The plain language of the heinous, cruel, or depraved aggravating circumstance could easily apply to any intentional or knowing homicide and therefore fails to "suitably direct[] and limit[]" the sentencer's discretion in imposing the death penalty. *See Gregg*, 428 U.S. at 189.

In *Walton*, the Supreme Court noted that "there is no serious argument that Arizona's 'especially heinous, cruel or depraved' aggravating factor is not facially vague." 497 U.S. at 654, *overruled on other grounds by Ring*, 536 U.S. at 584. The Court went on to conclude that while Arizona's (F)(6) aggravating circumstance was facially vague, it did not violate the Eighth and Fourteenth Amendments

436

1  because sentencing was the responsibility of the trial judge, who could be presumed
2  to follow the narrowing construction provided by the Arizona Supreme Court. *Id.*
3  at 653–54. However, *Walton* does not apply in the context of jury sentencing. *Id.* at
4  653 (distinguishing prior cases which struck similar aggravating circumstance
5  under jury-sentencing schemes because the "logic of those cases has no place in the
6  context of sentencing by a trial judge").

7       With the shift to jury sentencing in Arizona, this aggravator became
8  unconstitutionally vague. When the jury is the factfinder, the vague statutory
9  definition of especially cruel does not suffice. How the jury interprets this factor
10 can "only be the subject of sheer speculation." *Godfrey*, 446 U.S. at 429 (discussing
11 the aggravating circumstance of "outrageously or wantonly vile, horrible and
12 inhuman"). A standardless capital-punishment statute allows for the imposition of
13 the death penalty in an arbitrary and capricious manner, violating the Eighth
14 Amendment. *Cartwright*, 486 U.S. at 361–62.

15      In addition, state-court interpretations of the heinous, cruel, or depraved
16 aggravating circumstance, and any jury instructions based on such interpretations,
17 have failed to narrow the class of offenders eligible for the death penalty. For
18 example, in Arizona, a murder in which the killer uses excessive force is considered
19 "cruel" for purposes of the death penalty. *State v. Summerlin*, 675 P.2d 686, 696
20 (Ariz. 1983). But using insufficient force to commit a murder is also "cruel." *See*
21 *State v. Chaney*, 686 P.2d 1265, 1282 (Ariz. 1984) (finding "cruelty" because
22 defendant used insufficient force, causing the victim to suffer). Given the
23 susceptibility of this aggravating circumstance to arbitrary imposition, this Court
24 cannot be sure that Kiles's death sentence was not imposed in a wanton and freakish
25 manner. *Cf. Gregg*, 428 U.S. at 195. Thus, the fact that the trial court defined the
26 element of cruelty as whether the infliction of pain was "in an especially wanton"
27 or "insensitive" manner did not constitutionally narrow this facially vague
28 aggravating circumstance. (ROA 909 at 12.) If anything, the terms used by the trial

437

1   court make the aggravating circumstance more arbitrary and fluid.

2   In any event, jury instructions cannot cure the unconstitutional vagueness.
3   Jurors, unlike judges who see a range of first-degree murders, have no points of
4   comparison as to whether a particular murder imposes "extreme" pain or mental
5   anguish. Jurors are quite likely to believe that every murder causes extreme pain or
6   anguish. *Cf. Cartwright*, 486 U.S. at 364 ("[A]n ordinary person could honestly
7   believe that every unjustified, intentional taking of human life is 'especially
8   heinous.'"). Additionally, in this case, the definitions offered to the jury were
9   hopelessly convoluted. For example, the jury was instructed that it could consider
10  whether the murder was "senseless" to help determine whether the crime was
11  "heinous or depraved." (ROA 909 at 13.) Recognizing that all murders are
12  senseless, the court tried to clarify this further, instructing the jury that a
13  "'senseless' murder is one that is unnecessary to achieve Defendant's objective."
14  (ROA 909 at 13–14.) This "clarification" only further confused and expanded the
15  aggravating circumstance. *See Cartwright v. Maynard*, 822 F.2d 1477, 1489 (10th
16  Cir. 1987) ("Vague terms do not suddenly become clear when they are defined by
17  reference to other vague terms."). The jury instructions in the instant case failed to
18  cure the statute's unconstitutionality; instead, they further enabled the jury to
19  capriciously apply the aggravating circumstance.

20  Arizona's shift to jury sentencing undermines *Walton*'s analysis on whether
21  the "especially heinous, cruel or depraved" aggravating circumstance passes
22  constitutional muster. Arizona's (F)(6) aggravating circumstance is vague and
23  overbroad and fails to adequately narrow the class of offenders subject to the death
24  penalty. Accordingly, Kiles was sentenced to death in violation of his Eighth and
25  Fourteenth Amendment rights, and he is entitled to relief.

26

27

28

438

## Claim Thirty

**Arizona's prior felony conviction aggravating circumstance is unconstitutionally vague.**

The aggravating circumstance of a prior felony conviction does not genuinely narrow the class of death-eligible offenders and therefore violates the Eighth and Fourteenth Amendments to the U.S. Constitution. Kiles incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

While Kiles did not present this claim in state court, the Arizona Supreme Court implicitly considered the claim when it affirmed this aggravating circumstance during its independent review of the aggravating factors and mitigating circumstances. *See Kiles*, 213 P.3d at 187–88; *see also Comer*, 480 F.3d at 981 (en banc) (finding that "[e]ven if a petitioner fails to raise a constitutional claim in state court, the exhaustion requirement may be satisfied . . . where the state court itself exhausts the claim"). The denial of this claim (1) was contrary to, or involved an unreasonable application of, clearly established federal law, and (2) was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d).[202]

The Eighth Amendment requires that a state's capital-sentencing scheme genuinely narrow the class of offenders eligible for the death penalty, which some states achieve by requiring proof of at least one aggravating circumstance before a death sentence can be imposed. *See Stephens*, 462 U.S. at 877; *Loving*, 517 U.S. at 755. Aggravators that do not suitably limit application of the death penalty are unconstitutional because they fail to adequately channel the jury's discretion. *Cartwright*, 486 U.S. at 361–62.

---

[202] To the extent that this claim was not adequately presented below, Kiles alleges he can overcome any default of this claim by showing cause and prejudice, including because of the ineffective assistance of appellate and state post-conviction counsel. *See Martinez*, 566 U.S. at 9; *Carpenter*, 529 U.S. at 453; *Strickland*, 466 U.S. at 687–88; *but see Davila*, 137 S. Ct. at 2058. Alternatively, any procedural bar is neither adequate nor independent, and imposing default would be a miscarriage of justice.

439

1     The (F)(2) aggravating circumstance applies when the defendant was
2     previously convicted of a violent offense. A.R.S. § 13-703(F)(2) (1988). A prior
3     conviction satisfies the (F)(2) circumstance if "by its statutory definition" the prior
4     conviction "involves violence or the threat of violence on another person." *State v.*
5     *Gillies*, 662 P.2d 1007, 1018 (Ariz. 1983). The trial court may not look to the
6     underlying facts of the prior conviction. *See id.*

7     Because the (F)(2) aggravating circumstance does not discriminate among
8     prior violent felonies, it impermissibly fails to genuinely narrow the class of death-
9     eligible defendants. *See Loving*, 517 U.S. at 755. The (F)(2) aggravating
10    circumstance fails to differentiate between a defendant who has multiple prior
11    murder convictions as a principal and a defendant who has been convicted of a
12    single, far less violent offense as an accomplice. As a result, such a broad swath of
13    capital defendants satisfy this aggravating circumstance that it does not "establish
14    rational criteria that narrow the decisionmaker's judgment" as to whether death may
15    be an appropriate sentence. *McCleskey*, 481 U.S. at 305.

16    Kiles was sentenced on the basis of an unconstitutional aggravating
17    circumstance, and he is therefore entitled to relief. *See Johnson v. Mississippi*, 486
18    U.S. 578, 580, 590 (1988).

## Claim Thirty-One

### Kiles is innocent of first-degree murder and of the death penalty.

21    Because Kiles is innocent both of first-degree murder in the death of Valerie
22    Gunnel and of the death penalty, his conviction and sentence violate the Fifth, Sixth,
23    Eighth, and Fourteenth Amendments to the U.S. Constitution. Kiles incorporates
24    by specific reference all facts, allegations, and arguments made elsewhere in this
25    Petition.

26    Kiles did not present this claim in state court. However, because declining to
27    hear this claim on the merits would result in a fundamental miscarriage of justice,

28

1   this Court should disregard any default.[203] *See Coleman v. Thompson*, 501 U.S. 722,

2   735 n.1 (1991). Alternatively, Kiles alleges he can overcome any default of this

3   claim by showing that it was caused by the ineffective assistance of appellate and

4   state post-conviction counsel and that he was prejudiced by the default.

5   *See Martinez*, 566 U.S. at 9; *Carpenter*, 529 U.S. at 453; *but see Davila*, 137 S. Ct.

6   at 2058. He further alleges that any procedural bar asserted by Respondents is

7   neither adequate nor independent. As this claim has not been adjudicated on the

8   merits by the state courts, the barrier to relief imposed by 28 U.S.C. § 2254(d) does

9   not apply, and this Court may consider the merits of the claim de novo.

10      Kiles is innocent of the crime of first-degree murder with which he was

11   charged. At the time of the crime, first-degree murder under Arizona law required

12   either premeditation or felony murder, meaning that the killing occurred in the

13   course of, in furtherance of, or in the immediate flight from an enumerated offense.

14   *See* A.R.S. § 13-1105(A) (1988). Kiles was not charged with felony murder in the

15   killing of Valerie Gunnel; he was charged with, and convicted of, only premeditated

16   murder. (*See* ROA 1 at 1–2; ROA 482 at 1.) However, as detailed previously, Kiles

17   did not premeditate the murder. Not only did he have a tendency toward impulsivity

18   as a result of extensive childhood trauma, prior head injuries, and the disease of

19   addiction, *see supra*, Claim 3, he also was in a drug-induced psychosis at the time

20   of the crime and was therefore, at that moment, incapable of premeditating, *see*

21   *supra*, Claim 6. The killing was unplanned; it involved no time for reflection and

22   no actual reflection. Instead, when he felt provoked by Gunnel's slap, he

23   immediately and reflexively picked up a nearby instrument and attacked. Because

24   there was no premeditation involved, no rational trier of fact could find proof of

25   guilt beyond a reasonable doubt, and Kiles is innocent of first-degree murder. *See*

26   *Herrera v. Collins*, 506 U.S. 390, 429 (1993) (White, J., concurring). Accordingly,

27

28   [203] Indeed, procedural default should not apply to freestanding innocence claims
     precisely because of the gravity of the constitutional interests at stake.

1   neither his first-degree murder conviction nor his resultant death sentence can stand.

2   Kiles is independently innocent of the death penalty. Kiles was death-eligible

3   for the murder of Gunnel because the jury found that the State had proven beyond

4   a reasonable doubt the three aggravating circumstances it had alleged: (1) prior

5   conviction of a violent felony, A.R.S. § 13-703(F)(2) (1988), (2) the offense was

6   "especially heinous, cruel or depraved," *id.* § 13-703(F)(6), and (3) multiple

7   homicides during the commission of the offense, *id.* § 13-703(F)(8). (*See* ROA 911

8   at 11–13.) First, as discussed earlier, Kiles's 1986 aggravated-assault conviction is

9   an invalid basis for the (F)(2) aggravating circumstance; as that conviction is the

10  sole support for that aggravator, the (F)(2) aggravating circumstance must be

11  stricken. *See, e.g.*, *supra*, Claim 5. As illustrated by Claims 11 and 12, *supra*, among

12  others, no rational trier of fact could find any of these three aggravating

13  circumstances beyond a reasonable doubt. *See Herrera*, 506 U.S. at 429 (White, J.,

14  concurring). Moreover, the (F)(2) and (F)(6) aggravating circumstances are

15  unconstitutionally overbroad and thus cannot stand as aggravating circumstances in

16  this case. *See supra* Claim 29; Claim 30. Because no constitutional aggravating

17  circumstance supported by the evidence exists in this case, Kiles is innocent of the

18  death penalty, and he is entitled to relief from his capital sentence.

19  **Claim Thirty-Two**

20  **Kiles's death sentence constitutes an impermissible violation of the
    Ex Post Facto Clause.**

21

22  Kiles's death sentence results from the unconstitutional ex post facto

23  application of Arizona's current death-penalty statute to his crime. Kiles

24  incorporates by specific reference all facts, allegations, and arguments made

25  elsewhere in this Petition.

26  This claim was not raised in state court. Kiles alleges he can overcome any

27  default of this claim by showing that it was caused by the ineffective assistance of

28  appellate and state post-conviction counsel and that he was prejudiced by the

1     default. *See Martinez*, 566 U.S. at 9; *Carpenter*, 529 U.S. at 453; *but see Davila*,
2     137 S. Ct. at 2058. Kiles will demonstrate at an evidentiary hearing that appellate
3     and post-conviction counsel's performance fell below the standards of minimally
4     competent capital attorneys and that their failures prejudiced him. Alternatively, he
5     alleges that any procedural bar is neither adequate nor independent and that
6     imposing default would be a miscarriage of justice. Because this claim has not been
7     adjudicated on the merits by the Arizona state courts, the barrier to relief imposed
8     by 28 U.S.C. § 2254(d) does not apply, and the Court may consider the merits of
9     the claim de novo.

10         Article I, section 10 of the U.S. Constitution prohibits ex post facto laws. In
11    *Weaver v. Graham*, the Supreme Court recognized that the problem with ex post
12    facto laws is "the lack of fair notice and governmental restraint when the legislature
13    increases punishment beyond what was prescribed when the crime was
14    consummated." 450 U.S. 24, 30 (1981). Pursuant to *Weaver*, a newly enacted law
15    is being applied in violation of the ex post facto doctrine when (1) the law "appl[ies]
16    to events occurring before its enactment," and (2) the law disadvantages the
17    defendant with respect to a substantial, not procedural, right. *Id*. at 29 & n.12.

18         The application of Arizona's current death-penalty scheme to Kiles
19    constitutes an ex post facto violation under *Weaver*. First, the offense for which
20    Kiles was convicted and sentenced to death occurred on February 10, 1989. (ROA
21    1 at 1–2.) The statute under which Kiles was charged capitally in 1989 was
22    unconstitutional. (*See* ROA 1 at 1–2 (citing A.R.S. § 13-703)); *Ring*, 536 U.S. at
23    609 (striking down Arizona's then-extant capital-sentencing statute as
24    unconstitutional under the Sixth Amendment because it did not require that a jury
25    find the aggravating circumstances that rendered a capital defendant death-eligible).
26    The statute enforced at Kiles's sentencing trial was not enacted until August 1,
27    2002, well over a decade after the crime in question. 2002 Ariz. Sess. Laws, 5th
28    Spec. Sess., ch.1. The newly enacted statute was therefore applied retrospectively

1   to a crime predating its enactment. *See Weaver*, 450 U.S. at 29.

2       Second, the enactment of the new statute changed substantial rights and
3   disadvantaged Kiles. In compliance with *Ring*, the statute required that a jury find
4   the enumerated aggravating factors, which "operate as 'the functional equivalent of
5   an element of a greater offense.'" 536 U.S. at 609 (quoting *Apprendi v. New Jersey*,
6   530 U.S. 466, 494 n.19 (2000)). Further, the new law expanded the State's authority
7   to present "any evidence that demonstrates that the defendant should not be shown
8   leniency." A.R.S. § 13-752(G). The new law also allowed for victim-impact
9   evidence in any format, *id.* § 13-752(Q), and it did not require any special verdict
10  form, *see* A.R.S. § 13-752. Such changes implicated substantial rights and
11  disadvantaged Kiles. At its core, the change allowed Arizona to sentence Kiles to
12  death even though no constitutionally sound death-penalty statute existed at the
13  time of the crime.

14      The application to Kiles of Arizona's current death-penalty statute
15  "increase[d] the possible penalty" he faced, *Lindsey v. Washington*, 301 U.S. 397,
16  401 (1937), thereby violating the Ex Post Facto Clause. *But see Dobbert v. Florida*,
17  432 U.S. 282, 294 (1977); *Summerlin*, 542 U.S. at 358. Kiles is entitled to relief.

18                          **Claim Thirty-Three**

19  **Executing Kiles after more than 28 years on death row violates the
    Eighth and Fourteenth Amendments.**
20

21      To subject Kiles to execution after nearly 30 years either charged with a
22  capital crime or on death row violates the Eighth and Fourteenth Amendments to
23  the U.S. Constitution. Kiles presented this claim on direct appeal. (DA2 Dkt. 86 at
24  97.) For the reasons set forth in Claim 16, *supra*, 28 U.S.C. § 2254(d) places no
25  limitation on relief. In the event that this Court determines that this claim is not yet
26  ripe, Kiles hereby preserves it for future review in light of *Allen v. Ornoski*, 435
27  F.3d 946, 958 (9th Cir. 2006). Kiles incorporates by specific reference all facts,
28  allegations, and arguments made elsewhere in this Petition.

                              444

The Eighth and Fourteenth Amendments require that state-imposed punishment remain within civilized standards. *See Robinson v. California*, 370 U.S. 660, 675 (1962) (Douglas, J., concurring). Kiles has been in prison for nearly 30 years, of which he has spent approximately 20 years on death row.[204] For several reasons, executing Kiles after so long on death row exceeds those civilized bounds.

First, executing Kiles after so long spent on death row is inconsistent with the history of the Eighth Amendment and foundational British and American jurisprudence. At the time the Bill of Rights was adopted, the Anglo-American legal tradition—which had a direct influence on the framers of the U.S. Constitution—had uniformly denounced undue delays between death sentences and executions as cruel and unusual. *See, e.g.*, Blackstone's Commentaries on the Laws of England, Book IV, reprinted in 2 Jones, Blackstone at 2650 (1976) ("[I]t has been well observed, that it is of great importance, that [capital] punishment should follow the crime as early as possible."); Beccaria, An Essay on Crimes and Punishments, ch. XIX at 73 (5th ed. 1804) (immediate punishment will be more just "because it spares the criminal the cruel and superfluous torment of uncertainty . . .; and because the privation of liberty, being [in and of itself] a punishment, ought to be inflicted before condemnation, but for as short a time as possible"); *see also, e.g.*, *Harmelin v. Michigan*, 501 U.S. 957, 966 (1991) (there is no doubt the English Declaration of Rights of 1689, which prohibited "cruel and unusual punishments," is the "antecedent of our constitutional text[s]"); *Ex parte Grossman*, 267 U.S. 87, 108–09 (1925) (Eighteenth-century English criminal jurisprudence directly relevant to determining what framers intended in drafting Bill of Rights). Historically, then, executing Kiles after nearly 30 years charged with a capital crime or on death row would have been considered cruel and unusual.

---

[204] That Kiles has been imprisoned for so long before entering federal-habeas proceedings is not his own fault, but is largely attributable to his initial trial and appellate counsel's ineffective assistance, resulting in a new trial, and delays outside of Kiles's control between his second trial and penalty phase.

445

1    Second, such a punishment is no less cruel and unusual under modern
2    jurisprudence. The current death-penalty scheme is purported to serve two
3    purposes: retribution and deterrence. *Gregg*, 428 U.S. at 183 (joint opinion of
4    Stewart, Powell, and Stevens, JJ.). But, the "longer the delay, the weaker the
5    justification for imposing the death penalty in terms of punishment's basic
6    retributive or deterrent purposes." *Knight*, 528 U.S. at 990 (mem.) (Breyer, J.,
7    dissenting from denial of certiorari); *see also Lackey*, 514 U.S. at 1045 (mem.)
8    (Stevens, J., dissenting from denial of certiorari) ("It is arguable that neither
9    [retribution nor deterrence] retains any force for prisoners who have spent some 17
10   years under a sentence of death."). The lengthy delay between the day of
11   incarceration and the day of execution "can inflict 'horrible feelings' and 'in (sic)
12   immense mental anxiety amounting to a great increase of the offender's
13   punishment.'" *Foster v. Florida*, 537 U.S. 990, 992 (2002) (mem.) (Breyer, J.,
14   dissenting from denial of certiorari). After inflicting such anxiety on the petitioner
15   by making him wait long periods before carrying out his death sentence, the State
16   hardly furthers the goal of retribution by finally executing him. *See, e.g., District
17   Attorney for the Suffolk Cnty. Dist. v. Watson,* 411 N.E.2d 1274, 1287 (Mass. 1980).
18   Further, the added deterrent effect of executing someone who has spent a long time
19   on death row awaiting his execution is slight indeed. *See Coleman v. Balkcom*, 451
20   U.S. 949, 952 (1981) (mem.) (Stevens, J., respecting denial of certiorari). When the
21   death penalty ceases to realistically further the purposes of retribution and
22   deterrence, its imposition is simply "the pointless and needless extinction of life
23   with only marginal contributions to any discernible social or public purposes."
24   *Lackey*, 514 U.S. at 1046 (mem.) (Stevens J., dissenting from denial of certiorari)
25   (quoting *Furman*, 408 U.S. at 312 (White, J., concurring)). "A penalty with such
26   negligible returns to the State would be patently excessive and cruel and unusual
27   punishment violative of the Eighth Amendment." *Id.*
28   Any penological goals served in 1990, when Kiles was first sentenced to

446

death, no longer apply. Executing Kiles almost three decades after the crime for which he was condemned has no deterrent or retributive purpose.

Third, the stress of living under threat of death for lengthy periods is so oppressive that it, on its own, can constitute cruel and inhuman treatment. *See infra,* Claim 36. Conditions of confinement on death row can be "so degrading and brutalizing to the human spirit as to constitute psychological torture." *People v. Anderson*, 493 P.2d 880, 894 (Cal. 1972), *superseded as stated in Strauss v. Horton*, 207 P.3d 48 (Cal. 2009); *see also Solesbee v. Balkcom*, 339 U.S. 9, 14 (1950) (Frankfurter, J., dissenting) ("[T]he onset of insanity while awaiting execution of a death sentence is not a rare phenomenon."); *In re Medley*, 134 U.S. 160, 172 (1890) ("[W]hen a prisoner sentenced by a court to death is confined in the penitentiary awaiting execution of the sentence, one of the most horrible feelings to which he can be subjected during that time is the uncertainty during the whole of it."). "Whatever one believes about the cruelty of the death penalty itself, this violence done to the prisoner's mind must afflict the conscience of enlightened government and give the civilized heart no rest." *Watson*, 411 N.E.2d at 1291 (Liacos, J., concurring). Certainly, then, such cruel treatment also renders any further punishment, namely execution, unconstitutional.

Finally, Kiles spent 11 years in solitary confinement—in the particularly oppressive conditions that prevailed on Arizona's death row—after his 2006 sentencing. "[R]esearch still confirms what [the] Court suggested over a century ago: Years on end of near-total isolation exact a terrible price." *Davis v. Ayala*, 135 S. Ct. 2187, 2210 (2015) (Kennedy, J., concurring). Accordingly, the ABA and the United Nations Special Rapporteur on Torture have recommended limitations on the use of solitary confinement. *See Glossip*, 135 S. Ct. at 2765 (Breyer, J., dissenting). Execution after prolonged solitary confinement is cruel and unusual.

Given the length of time Kiles has spent on death row, the conditions of confinement, including the unique stress of living under threat of execution,

1  historical understandings of "cruel and unusual" punishment, and the evolving
2  standards of decency, executing Kiles at this time would constitute cruel and
3  unusual punishment in violation of the Eighth and Fourteenth Amendments.

### Claim Thirty-Four

4

5  **Due process requires that this Court re-evaluate Kiles's death**
**sentence in light of the significant changes to Kiles's circumstances**
6  **in the 12 years since he was sentenced.**

7  Kiles's death sentence must be reevaluated to satisfy the due-process and
8  reliability requirements of the Fifth, Eighth, and Fourteenth Amendments to the U.S
9  Constitution. Kiles incorporates by specific reference all facts, allegations, and
10  arguments made elsewhere in this Petition.

11  This claim was not raised in state court because this claim previously was not
12  available or ripe for review, and there is no longer any mechanism for state merits
13  review. *See* 28 U.S.C. § 2254(b); *see also Panetti v. Quarterman*, 551 U.S. 930,
14  947 (2007). Because this claim has not been adjudicated by Arizona state courts,
15  the limitations on relief imposed by 28 U.S.C. § 2254(d) do not restrict review, and
16  the Court may consider the claim de novo.

17  Kiles was sentenced to death over 12 years ago; he is currently approaching
18  60 years of age and has an impeccable prison record. In light of these circumstances,
19  due process requires that his death sentence be re-evaluated.

20  "The fundamental requirement of due process is the opportunity to be heard
21  'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S.
22  319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). A capital
23  sentencing "must satisfy the requirements of the Due Process Clause," *Gardner v.*
24  *Florida*, 430 U.S. 349, 358 (1977) (plurality opinion), and capital defendants retain
25  a liberty interest in life even after conviction and sentence, *see Ohio Adult Parole*
26  *Auth. v. Woodard*, 523 U.S. 272, 288 (1998) (O'Connor, J., concurring in part and
27  concurring in the judgment, joined by Souter, J., Ginsburg, J., and Breyer, J.); *id*. at
28  290–91 (Stevens, J., concurring in part and dissenting in part). In accordance with

448

these principles and the heightened reliability requirement for the death penalty, if a defendant's circumstances change significantly between the time when his death sentence is imposed and the time when it will be carried out, due process requires that the propriety of the sentence be re-evaluated in light of the changed circumstances and characteristics of the defendant. *See Kelly v. Brewer*, 525 F.2d 394, 399–400 (8th Cir. 1975) (finding due process required meaningful periodic reviews of inmates in segregation to determine if segregation is still appropriate).

The Court should consider whether a capital sentence is still appropriate for Kiles. Since Kiles was sentenced in 2006, he has been a model of good behavior. *See State v. Watson*, 628 P.2d 943, 945 (Ariz. 1981) (setting aside death sentence in part because of defendant's good conduct while in prison); *State v. Richmond*, 886 P.2d 1329, 1336–37 (Ariz. 1994) (reducing death sentence to life imprisonment in part because of defendant's changed character), *abrogated on other grounds by State v. Mata*, 916 P.2d 1035 (Ariz. 1996).

Recently, Arizona made significant changes to the housing of death-row prisoners; these changes diminish the differences between the incarceration conditions of those sentenced to life without the possibility of parole and those sentenced to death. *See generally* Gabriella Robles, Condemned to Death—And Solitary Confinement, The Marshall Project (July 23, 2017), https://www. themarshallproject.org/2017/07/23/condemned-to-death-and-solitary-confinement (explaining policy change allowing death-row prisoners with suitable disciplinary records to be housed in lower-security settings). Under the old rules, death-row prisoners were automatically classified as maximum security and kept in solitary confinement. New rules permit death-row prisoners who do not pose a security threat to be kept in lower-security settings with more out-of-cell time, contact visits with family and legal counsel, outdoor group recreation, and the opportunity to work or take education courses. In recognition of Kiles's consistently good behavior on death row, Kiles was granted close-custody status and moved to the

lower-security facility. He continues to do well in this setting. In addition, since his reclassification, ADOC has entrusted Kiles to serve as an aide for another prisoner with disability issues. Kiles assists the prisoner with reading and writing, cleans his cell, and ensures that he is able to participate in activities. Kiles thus contributes to smooth functioning of the prison and to the well-being of the prison community.

Kiles is now approaching 60 years of age. He is not the same person who was sentenced to death in 2006 and certainly not the same person he was when first sentenced to death in 1990. He has not committed any violence in this setting, is unlikely to do so in the future, and should be able to continue being of assistance to others, especially given that he is incarcerated with an aging population increasingly in need of such aid. Due process dictates that Kiles have the appropriateness of his death sentence re-evaluated in light of the changes that have occurred since he was sentenced. At an evidentiary hearing, Kiles will demonstrate that these changes are significant and that they change the calculus of whether his death sentence is an appropriate punishment. Accordingly, Kiles is entitled to relief.

## Claim Thirty-Five

**Executing Kiles is unconstitutional because he has a serious mental illness.**

Because Kiles has a serious mental illness, his sentence of death violates the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution. Kiles incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

This claim was not raised in state court. Kiles alleges he can overcome any default of this claim by showing that it was caused by the ineffective assistance of appellate and state post-conviction counsel and that he was prejudiced by the default. *See Martinez*, 566 U.S. at 9; *Carpenter*, 529 U.S. at 453; *but see Davila*, 137 S. Ct. at 2058. Kiles will demonstrate at an evidentiary hearing that appellate and post-conviction counsel's performance fell below the standards of minimally

competent capital attorneys and that their failures prejudiced him. Alternatively, he alleges that any procedural bar is neither adequate nor independent and that imposing default would be a miscarriage of justice. Because this claim has not been adjudicated on the merits by the Arizona state courts, the barrier to relief imposed by 28 U.S.C. § 2254(d) does not apply, and the Court may consider the merits of the claim de novo.

Kiles suffers from serious mental illness. Though experts differed on their specific diagnoses at his trial, they all agreed that Kiles suffered from serious mental illness. (*See* Tr. May 22, 2006 at 32–34 (counsel listing in closing the experts' various mental-illness diagnoses).) Additional experts hired in state post-conviction proceedings similarly found that Kiles was mentally ill. (*See* ROA 1189 at 60.) As a result of Kiles's serious mental illness, discussed throughout this Petition, he suffered substantial impairment of his ability to appreciate and understand the actions of others, to act rationally, to make fully reasoned decisions, and to otherwise conform his conduct to the requirements of the law and societal norms. The imposition of the death penalty on an individual like Kiles, whose mental illness limits his ability to modulate or control his behavior, violates his right to be free from cruel and unusual punishment, and his rights to a fair trial, due process, equal protection, and punishment that is not arbitrarily and capriciously imposed, as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments.

The Eighth Amendment precludes the imposition of punishments that are "cruel and unusual," as assessed according to the "evolving standards of decency that mark the progress of a maturing society." *Trop*, 356 U.S. at 100, 101. "The Eighth Amendment 'is not fastened to the obsolete but may acquire meaning as public opinion becomes enlightened by a humane justice.'" *Hall v. Florida*, 134 S. Ct. 1986, 1992 (2014) (quoting *Weems v. United States*, 217 U.S. 349, 378 (1910)). The evolving standards of decency embodied in the Eighth and Fourteenth Amendments demand that the imposition of the death penalty on seriously mentally

1   ill defendants be recognized as unconstitutional.

2       Whether someone is constitutionally eligible for the death penalty under the

3   Eighth Amendment turns on whether he is sufficiently "culpable" to deserve such

4   a penalty. *See, e.g.*, *Tison v. Arizona*, 481 U.S. 137, 149 (1987). Personal culpability

5   hinges upon a defendant's ability to make fully reasoned decisions and conform his

6   behavior to societal norms. *Thompson v. Oklahoma*, 487 U.S. 815, 835 (1988)

7   (plurality opinion). Moreover, in order for the death penalty to be constitutional, it

8   must serve either the goal of retribution or that of deterrence of capital crimes; when

9   it does not, "it 'is nothing more than the purposeless and needless imposition of

10  pain and suffering,' and hence an unconstitutional punishment." *Enmund v.*

11  *Florida*, 458 U.S. 782, 798 (1982) (quoting *Coker v. Georgia*, 433 U.S. 584, 592

12  (1977) (plurality opinion)). Based on these considerations, in *Atkins*, 536 U.S. at

13  304, *Simmons*, 543 U.S. at 551, and *Ford v. Wainwright*, 477 U.S. 399 (1986), the

14  Supreme Court ruled categorically unconstitutional the execution of, respectively,

15  intellectually disabled individuals, juveniles, and those who are incompetent.

16      The reasoning of *Atkins* and *Simmons*, in particular, applies with equal force

17  to a person, like Kiles, who suffers from serious mental illness. Those who are

18  seriously mentally ill have characteristics that diminish their culpability in precisely

19  the ways the Supreme Court has relied on in establishing the categorical exemptions

20  in *Atkins* and *Simmons*. "The diminished capacity of the intellectually disabled

21  lessens moral culpability and hence the retributive value of the punishment." *Hall*,

22  134 S. Ct. at 1993. For example, in *Atkins*, one cited characteristic that decreased

23  the culpability of people with intellectual disability was "significant limitations in

24  adaptive skills such as communication, self-care, and self-direction." 536 U.S. at

25  318. Serious mental illness similarly results in extreme functional impairments and

26  limitations in adaptive behavior. *See* Helen Shin, Note, *Is the Death of the Death*

27  *Penalty Near? The Impact of* Atkins *and* Roper *on the Future of Capital*

28  *Punishment for Mentally Ill Defendants*, 76 Fordham L. Rev. 465, 488 (2007). The

*Atkins* Court also focused on the cognitive deficiencies suffered by the intellectually disabled. *Atkins*, 536 U.S. at 320. Mentally ill individuals typically experience disorganized thinking and "deficits in sustaining attention and concentration." *Indiana v. Edwards*, 544 U.S. 164, 176 (2008). The nature of the impairments relied on in *Atkins* and *Simmons* as indicators of lessened culpability are directly analogous to the impairments suffered by the seriously mentally ill.

Moreover, in *Simmons*, the Supreme Court reasoned that the limitations of juveniles make them less likely to engage in the "cost-benefit analysis that attaches any weight to the possibility of execution." *Simmons*, 543 U.S. at 571–72 (quoting *Thompson*, 487 U.S. at 837). The same is true of those with serious mental illness. They suffer from comparable deficits in cognitive and adaptive functioning, so the distant possibility of execution does not act as a deterrent. Any decision-making process is infected by the deficits in perception that are characteristic of serious mental illness; "[c]ertainly no one believes that the death penalty can deter people from becoming psychotic." Amnesty Int'l, *United States of America: The Execution of Mentally Ill Offenders* 50, Al Index AMR 51/003/2006 (Jan. 2006), www.amnesty.org/en/documents/AMR51/003/2006/en/.

A person who is seriously mentally ill is also likely to have his or her rights to a fair trial and to the effective assistance of counsel compromised by illness. The Supreme Court has reasoned that the intellectually disabled face "a special risk of wrongful execution" because they are more likely to give false confessions, are often poor witnesses, and are less able to give meaningful assistance to their counsel. *Hall*, 134 S. Ct. at 1993 (quoting *Atkins*, 536 U.S. at 320–21). The same is true of those with serious mental illness. *See, e.g.*, Brandon L. Garrett, *The Substance of False Confessions*, 62 Stan. L. Rev. 1051, 1067 (2010) ("[P]olice have long known that suspects may admit to crimes that they did not commit for a range of reasons, including mental illness.").

Finally, both legal and professional mental-health organizations have

453

expressed their opposition to the execution of the seriously mentally ill. The ABA and most major mental health professional associations in the United States recognize that executing mentally ill persons serves no penological purpose and advocate an end to executing mentally ill offenders. *See, e.g.*, ABA, Death Penalty Representation Project, Mental Illness Resolution (2006), www.americanbar.org/ groups/committees/death_penalty_representation/resources/dp-policy/mental-illne ss-2006.html; Am. Psychiatric Ass'n Position Statement, *Diminished Responsibility in Capital Sentencing* (2004).

The imposition of the death penalty on the seriously mentally ill, like its imposition on the intellectually disabled, juveniles, and the incompetent, does not further either retribution or deterrence. It amounts to the infliction of gratuitous suffering. As executing Kiles, who is seriously mentally ill, serves no cognizable penological end, Kiles's sentence is unconstitutional, and he is entitled to relief.

**Claim Thirty-Six**

**Subjecting Kiles to execution in Arizona will deny his fundamental human rights under binding international law norms.**

The death penalty as carried out in Arizona denies Kiles's fundamental human rights under international law and thereby violates the Eighth Amendment to the U.S. Constitution. Kiles incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

This claim was not raised in state court. Kiles alleges he can overcome any default of this claim by showing cause and prejudice, including because of the ineffective assistance of appellate and state post-conviction counsel. *See Martinez*, 566 U.S. at 9; *Carpenter*, 529 U.S. at 453; *Strickland*, 466 U.S. at 687–88; *but see Davila*, 137 S. Ct. at 2058. Appellate and post-conviction counsel's performance fell below the standards of minimally competent capital attorneys and prejudiced Kiles; alternatively, any procedural bar is neither adequate nor independent, and

454

1    imposing default would be a miscarriage of justice.[205] As this claim has not been

2    adjudicated on the merits, the limitations on relief imposed by 28 U.S.C. § 2254(d)

3    do not apply to this Court's review, and the Court may consider the merits of the

4    claim de novo.

5          First, Kiles's prolonged stay on death row violates his basic human rights as

6    guaranteed under international law. Kiles was first sentenced to death in 1990 (*see*

7    ROA 174 at 3–5); he has remained in prison since 1990 and has been on death row

8    for approximately 20 years (*see* ROA 345 at 1; ROA 924 at 3–4). The Inter-

9    American human-rights system has previously found that keeping those sentenced

10   to death on death row for a significant amount of time amounts to a denial of an

11   individual's human rights. In *Hilaire, Constantine and Benjamin et al. v. Trinidad*

12   *and Tobago*, Judgment of June 21, 2002. (Ser. C) No. 94, ¶ 170, the Inter-American

13   Court of Human Rights found that the harsh conditions on death row over extended

14   periods "impinge[d] on the [prisoners'] physical and psychological integrity and

15   therefore constitute[d] cruel, inhuman and degrading treatment." The European

16   Court of Human Rights has held similarly, finding that "the foreknowledge of death

17

18   [205] Procedural default and other bars to this claim are themselves a violation of
     international law in a capital case. *See Germany v. United States*, 2001 I.C.J. 466
19   (2001); *Mexico v. United States*, 2004 I.C.J. 12 (2004); IACHR, Report No. 78/15,
     Case 12.831. Merits (Publication). Kevin Cooper. United States. Oct. 28, 2015, at
20   ¶ 125. AEDPA and the doctrines of exhaustion and procedural default restrict
     safeguards that ensure Kiles a full and effective review of his trial and sentence,
21   bringing the United States in violation of its obligations under the International
     Covenant on Civil and Political Rights ["ICCPR"], adopted Dec. 19, 1966, 999
22   U.N.T.S. 171 (entered into force Mar. 23, 1976). Under Article 6, "Every human
     being has the inherent right to life. This right shall be protected by law. No one shall
23   be arbitrarily deprived of his life." Per the Safeguards Guaranteeing Protections of
     the Rights of those Facing the Death Penalty, the United Nations council clarified:
24   "Capital punishment may only be carried out . . . after legal process which gives all
     possible safeguards to ensure a fair trial[.]" E.S.C. Res. 1948/50, U.N. ESCOR,
25   Supp. No. 1, at 33, U.N. Doc. E/1984/92, 5 (1984). Additionally, "'arbitrariness' is
     not to be equated with 'against the law', but must be interpreted more broadly to
26   include elements of inappropriateness, injustice and lack of predictability." U.N.
     Doc. CCPR/C/39/D/305/1988, Hugo van Alphen v. the Netherlands, adopted 23
27   July 1990.

28

at the hands of the State must inevitably give rise to intense psychological suffering." Detaining prisoners on death row for extended periods thus violates Article 3 of the European Charter of Human Rights, "which prohibits torture and inhumane or degrading treatment or punishment." *Al-Saadoon and Mufdhi v. United Kingdom*, App. No. 61498/08, Eur. Ct. H.R., ¶ 137 (Apr. 10, 2010). Kiles has been either on death row or facing capital charges for nearly 30 years, a clear violation of his human rights as protected by international law.

Second, the death penalty as carried out in Arizona is a per se violation of international law norms. Subjecting Kiles to death by lethal injection or lethal gas is nonconsensual human experimentation and a grave violation of the customary international law norms as originally set out in the Nuremberg Code.[206] *See, e.g.,* Ben Crair, *Lethal Entanglements*, The New Republic (May 20, 2015), https://newrepublic.com/article/121845/lethal-injection-has-become-testing-ground-toxic-drugs (reporting that Arizona executed death-row prisoner with an illegal drug). The Commentary to the Geneva Convention Relative to the Protection of Civilian Persons in Time of War makes explicit that medical experimentation must be consensual, and "[p]rotected persons must not in any circumstances be used as 'guinea pigs' for medical experiments." Commentary on the Geneva Conventions of 12 August 1949: IV Geneva Convention Relative to the Protection of Civilian Persons in Time of War 224 (Oscar Uhler and Henri Coursier eds., 1958). Under United States law, "protected persons" include those in vulnerable positions, such as prisoners. *Cf.* 45 C.F.R. § 46.302; 43 Fed. Reg. 53652 (Nov. 16, 1978).

Nonconsensual human experimentation is prohibited by a wide range of treaties and agreements, as well as by customary international law. *See generally Abdullahi v. Pfizer*, 562 F.3d 163 (2d Cir. 2009). Article 7 of the ICCPR reads, "No

---

[206] In Arizona, death sentences are inflicted by lethal injection. *See* A.R.S. Const. art. 22, § 22. Because, however, Kiles's crime predated the adoption of that constitutional provision, Kiles will have the choice between lethal injection and lethal gas. *See id.*

1    one shall be subjected to torture or to cruel, inhuman or degrading treatment or

2    punishment. In particular, no one shall be subjected without his free consent to

3    medical or scientific experimentation." 999 U.N.T.S. 171.[207] Arizona is currently

4    under a stipulated agreement to not utilize a specific lethal-injection method in

5    executions. *See* Order for Dismissal of Claim One, *First Amendment Coal. of Ariz.*

6    *v. Ryan*, No. 2:14-CV-01447-NVW (D. Ariz. Dec. 22, 2016), ECF No. 155; Order

7    for Dismissal of Claims Six and Seven, *First Amendment Coal. of Ariz. v. Ryan*,

8    No. 2:14-CV-01447-NVW (D. Ariz. June 22, 2017), ECF No. 187. However,

9    nothing is preventing the State from moving forward under a new, untested

10    execution protocol. This puts Kiles at risk of being subject not only to

11    nonconsensual human experimentation, but also to torture, should the experimental

12    method not proceed as the State intends. *See Filártiga v. Peña-Irala*, 630 F.2d 876,

13    884 (2d Cir. 1980) ("[W]e conclude that official torture is now prohibited by the

14    law of nations. The prohibition is clear and unambiguous.").

15         As early as 1900, the Supreme Court recognized that "[i]nternational law is

16    part of our law, and must be ascertained and administered by the courts of justice

17    of appropriate jurisdiction, as often as questions of right depending upon it are duly

18    presented for their determination." *The Paquete Habana*, 175 U.S. 677, 700 (1900).

19    International legal norms have binding effect where it is "accepted and recognized

20    by the international community of states as a whole as a norm from which no

21    derogation is permitted and which can be modified only by a subsequent norm of

22    general international law having the same character." *Siderman de Blake v.*

23    *Republic of Argentina*, 965 F.2d 699, 714 (9th Cir. 1992). Pursuant to binding

24    international law norms, (1) the constraints on habeas proceedings imposed by

25    AEDPA, *see* Section VI, *supra*, (2) the prolonged period of time a person spends

26

27    [207] The treaty makes clear that this right is non-derogable; even those who have

28    been convicted of crimes may not be stripped of this right and involuntarily
      experimented upon by the State.

1    on death row, and (3) the experimental and nonconsensual nature of executions
2    violate basic human rights. Accordingly, the death penalty as applied in Arizona
3    violates the Eighth and Fourteenth Amendments.

4          Further, the Supreme Court has explained that the Eighth Amendment's
5    prohibition on cruel and unusual punishments takes into account "the evolving
6    standards of decency" as reflected, in part, by international legal norms. *Simmons*,
7    543 U.S. at 560–61; *id.* at 575 ("[A]t least from the time of the Court's decision in
8    *Trop* [356 U.S. at 86], the Court has referred to the laws of other countries and to
9    international authorities as instructive for its interpretation of the Eighth
10   Amendment's prohibition of 'cruel and unusual punishments.'"). While the
11   international community has largely evolved away from capital punishment,
12   Arizona has remained committed to this irrevocable sanction—and has become an
13   outlier in a world that regards the death penalty as a violation of fundamental human
14   rights. Amnesty International, Global Report: Death Sentences and Executions
15   2017 5 (Apr. 2018), https://www.amnesty.org/download/Documents/ACT507955
16   2018ENGLISH.PDF (reporting that by the end of 2017, "106 countries had
17   abolished the death penalty in law for all crimes and 142 countries had abolished
18   the death penalty in law or practice," while "[o]nly an isolated minority of countries
19   continue to resort to executions").

20         Because the U.S. Constitution specifies that states are bound by international
21   treaties, *see* U.S. Const. art. VI, cl. 2, and because the constitutionality of Arizona's
22   death penalty must be measured against the "evolving standards of decency that
23   mark the progress of a maturing society," *Trop*, 356 U.S. at 101, Kiles's sentence
24   is unconstitutional. He is entitled to relief.

### Claim Thirty-Seven
**Kiles will be unable to receive a fair clemency process in Arizona.**

27         Kiles will be denied a fair clemency process, in violation of the Eighth and
28   Fourteenth Amendments to the U.S. Constitution. Kiles incorporates by specific

458

1    reference all facts, allegations, and arguments made elsewhere in this Petition.

2        Kiles has not yet presented this claim to the state courts, as his opportunity

3    to seek executive clemency has not yet become ripe. He presents this claim now in

4    order to avoid difficulties with raising this claim in future habeas proceedings. *See*

5    *Stewart v. Martinez-Villareal*, 523 U.S. 637, 643–46 (1998).

6        Under Arizona law, Kiles has the right to seek executive clemency before

7    execution. *See* Ariz. Const. art. V, § 5; A.R.S. §§ 31-401–31-403 (2016). Clemency

8    is, in effect, part of the constitutional scheme that ensures the reliability of criminal

9    convictions and the propriety of sentences. *See Herrera v. Collins*, 506 U.S. 390,

10   415 (1993). Accordingly, Kiles has a due-process liberty interest in the impartiality

11   of the system that will consider his request for clemency by which clemency may

12   be afforded to him. *See generally Mathews v. Eldridge*, 424 U.S. 319 (1976).

13       Contrary to the dictates of due process, Kiles's clemency proceedings will

14   not be impartial. Arizona's Board of Executive Clemency ("Board") consists of five

15   members appointed by the Governor, who also designates the Board's chairman.

16   A.R.S. § 31-401(A), (F). The Governor can remove Board members for cause. *Id.*

17   § 31-401(E). Pursuant to statute, the Arizona Attorney General's Office, which

18   advocated for Kiles's death at trial, on appeal, and in state post-conviction

19   proceedings, is involved with training Board members regarding their duties. *Id.*

20   § 31-401(C). On information and belief, Kiles asserts that both the selection process

21   for members of the Board and the conflicting roles of the Attorney General's

22   Office—as his litigation adversary and as the office that trains the arbiters of

23   clemency—will work to deprive him of a fair clemency proceeding. *See Concrete*

24   *Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S.

25   602, 617–18 (1993) (declaring that due process demands a neutral arbiter). Without

26   judicial review of the bias inherent in the clemency process, Kiles will not have an

27   opportunity to vindicate his right to a fair and impartial clemency proceeding. For

28   these reasons, Arizona's clemency procedures do not comport with the procedural

1  due-process protections guaranteed to Kiles by the Eighth and Fourteenth

2  Amendments, and he is entitled to relief.

3  **Claim Thirty-Eight**

4  **Kiles's convictions and sentences must be vacated because of the
   cumulative prejudicial effect of all of the errors in this case.**

5

6  The cumulative prejudice of the constitutional errors in Kiles's case demands

7  that his convictions and sentences be vacated under the Fifth, Sixth, Eighth, and

8  Fourteenth Amendments to the U.S. Constitution. Kiles incorporates by specific

9  reference all facts, allegations, and arguments made elsewhere in this Petition. He

10 also re-urges and incorporates by specific reference all objections, arguments, and

11 claims of error made at trial, on appeal, and during post-conviction proceedings.

12 Kiles presented this claim below. (*See* ROA 1189 at 23, 25, 61; PFR2 Dkt. 1

13 at 23, 25, 61.) The denial of this claim (1) was contrary to, or involved an

14 unreasonable application of, clearly established federal law, and (2) was based on

15 an unreasonable determination of the facts. 28 U.S.C. § 2254(d).[208]

16 Even in cases where no single trial error examined on its own is sufficiently

17 prejudicial to warrant reversal, the cumulative effect of multiple errors may still

18 prejudice a defendant. *See, e.g.*, *Parle v. Runnels*, 505 F.3d 922, 934 (9th Cir. 2007)

19 (affirming grant of habeas relief based on the cumulative prejudicial effect of

20 multiple errors); *Alcala v. Woodford*, 334 F.3d 862, 894–95 (9th Cir. 2003) (same);

21 *Duckett v. Mullin*, 306 F.3d 982, 992 (10th Cir. 2002) ("[T]he 'cumulative effect of

22 two or more individually harmless errors has the potential to prejudice a defendant

23 to the same extent as a single reversible error.'" (quoting *United States v. Rivera*,

24 _____

25 [208] Should this Court consider this claim defaulted, Kiles alleges he can overcome

26 any default of this claim by showing cause and prejudice, including because of the
   ineffective assistance of appellate and state post-conviction counsel. *See Martinez*,

27 566 U.S. at 9; *Carpenter*, 529 U.S. at 453; *Strickland*, 466 U.S. at 687–88; *but see
   Davila*, 137 S. Ct. at 2058. Alternatively, any procedural bar is neither adequate nor

28 independent, and imposing default would be a miscarriage of justice.

460

900 F.2d 1462, 1469 (10th Cir. 1990))). When evaluating cumulative error, while only guilt-phase errors are relevant to Kiles's convictions, "all errors are relevant to the sentence." *Darks v. Mullin*, 327 F.3d 1001, 1018 (10th Cir. 2003); *see also Satterwhite v. Texas*, 486 U.S. 249, 261 (1988) (Marshall, J., concurring).

The combination of errors in this case, discussed in the preceding claims, deprived Kiles of such rights as his rights to a fair trial, trial by impartial jury, equal protection, due process, effective assistance of counsel, freedom from cruel and unusual punishment, presentation of a complete defense, confrontation, a reliable determination at both the guilt and penalty phases, and fundamental fairness. The errors' cumulative effect substantially prejudiced Kiles and undermined the fairness and reliability of his proceedings. *See Brecht*, 507 U.S. at 638 n.9. As a result of the cumulative effect of the errors in the guilt and penalty phases, Kiles's convictions and sentences were unconstitutionally imposed, and this Court should grant relief.

## PRAYER FOR RELIEF

WHEREFORE, Kiles respectfully prays this Court to do the following:

1.     Order that Kiles be granted leave to conduct discovery pursuant to Rule 6 of the Rules Governing Section 2254 Cases and permit him to use the processes of discovery set forth in Federal Rules of Civil Procedure 26 through 37, to the extent necessary to fully develop and identify the facts supporting his Petition and any defenses thereto raised by Respondents' answer;

2.     Order that upon completion of discovery, Kiles be granted leave to amend his Petition to include any additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the course of discovery, and that Kiles be granted leave to expand the record pursuant to Rule 7 of the Rules Governing Section 2254 Cases to include additional materials related to the Petition;

3.     Grant an evidentiary hearing pursuant to Rule 8 of the Rules Governing Section 2254 Cases, at which proof may be offered concerning the

1  allegations set forth in this Petition;

2      4.      Issue a writ of habeas corpus to have Kiles brought before this Court,

3  to the end that he may be discharged from his unconstitutional confinement and

4  restraint;

5      5.      In the alternative to the relief requested in Paragraph 4, if this Court

6  should deny the relief as requested in Paragraph 4, issue a writ of habeas corpus to

7  have Kiles brought before this Court to the end that he may be relieved of his

8  unconstitutional sentences; and

9      6.      Grant such other relief as may be appropriate and dispose of the matter

10  as law and justice require.

11      Respectfully submitted this 5th day of October, 2018.

12                                Jon M. Sands
13                                Federal Public Defender
14                                District of Arizona

15                                Mridula S. Raman
16                                Sara Chimene-Weiss

17                                By  s/Mridula S. Raman
18                                Counsel for Petitioner

19

20

21

22

23

24

25

26

27

28

462

1

**Certificate of Service**

2        I hereby certify that on October 5, 2018, I electronically filed the foregoing

3   Amended Petition for Writ of Habeas Corpus with the Clerk's Office by using the

4   CM/ECF system. I certify that all participants in the case are registered CM/ECF

5   users and that service will be accomplished by the CM/ECF system.

6

7   s/ Catherine Jacobs

    Assistant Paralegal
8   Capital Habeas Unit

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28