Jon M. Sands
Federal Public Defender
District of Arizona
Sara Chimene-Weiss (MA Bar No. 691394)
Scott Wisniewski (AZ Bar No. 035280)
Assistant Federal Public Defenders
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
sara_chimene-weiss@fd.org
scott_wisniewski@fd.org
602.382.2816 Telephone
602.889.3960 Facsimile

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Alvie Copeland Kiles, | No. CV-17-04092-PHX-GMS |
| Petitioner, | |
| vs. | DEATH-PENALTY CASE |
| David Shinn, Director, Arizona Department of Corrections, Rehabilitation & Reentry, et al., | |
| Respondents. | |

# REPLY IN SUPPORT OF AMENDED PETITION FOR WRIT OF HABEAS CORPUS
## 28 U.S.C. § 2254

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Table of Contents**

I.      Introduction ................................................................................ 1

II.     Preliminary Matters ................................................................... 2

    A.   Respondents' recitation of facts ............................................ 2

    B.   Exhaustion and procedural default ........................................ 3

    C.   AEDPA's constitutionality and limitations on relief ........... 18

III.    Claims for Relief ..................................................................... 25

**Claim One** ...................................................................................... 25

Representation at trial was so marred by conflicts, misrepresentations, and procedural violations that Kiles was denied effective counsel and fair and reliable capital proceedings.................................................................. 25

    A.   Lead counsel's lack of qualifications and affirmative misrepresentations of those qualifications deprived Kiles of his right to due process and qualified counsel..................................... 25

    B.   Kiles's counsel were ineffective due to a conflict of interest, denying Kiles his right to competent and un-conflicted representation. ........... 30

    C.   The irreparably fractured relationship between Kiles and Clark adversely affected the representation Kiles received. ........................... 36

    D.   The contract structure under which Kiles's counsel were appointed created a financial conflict of interest. ................................. 41

    E.   Taken individually and together, these conflicts plaguing counsel, following from an initial denial of a liberty interest, resulted in a conviction and sentencing that cannot withstand constitutional scrutiny. .......................................................................... 45

**Claim Two** ...................................................................................... 46

Counsel's ineffective assistance in jury selection at the guilt-phase proceedings deprived Kiles of his rights to counsel, a fair trial, an impartial jury, due process, and equal protection. .................................................................... 46

    A.   Respondents fail to establish a procedural bar. ..................... 46

    B.   Respondents fail to rebut this claim on the merits. ............... 47

**Claim Three** ................................................................................... 54

Kiles was denied the effective assistance of counsel at his guilt-phase proceedings because counsel failed to investigate, develop, and present critical evidence, among other significant errors.............................................. 54

i

A.   Post-conviction counsel presented a colorable claim that trial counsel were ineffective when they failed to challenge the element of premeditation. ......................................................................54

B.   Trial counsel were ineffective for failing to object to Kiles's shackling. ..................................................................................66

C.   Trial counsel rendered ineffective assistance during the defense's opening statement. ...............................................................68

D.   Post-conviction counsel presented a colorable claim that trial counsel were ineffective for failing to effectively cross-examine crucial State's witnesses on matters relating to whether Gunnel's death was premeditated. ........................................................................70

E.   Counsel were ineffective for stipulating to the admission of hearsay statements from Gunnel at the guilt-phase proceedings. .....................77

F.   Counsel were ineffective for failing to object to the worst of the gruesome photographs repeatedly displayed at trial. ...........................80

G.   Counsel rendered ineffective assistance by failing to request critical jury instructions. ...............................................................83

H.   Counsel provided ineffective assistance when they failed to object to numerous aspects of the State's closing argument...............................88

I.   Counsel also rendered ineffective assistance in failing to ensure that a record was made of key parts of the guilt-phase proceedings. .............91

J.   Post-conviction counsel presented a colorable claim of cumulative error, which is now subject to de novo review by this Court...............92

**Claim Four** ..........................................................................94
Counsel's ineffective assistance in jury selection at the penalty phase of trial deprived Kiles of his rights to counsel, a fair trial, an impartial jury, reliable sentencing proceedings, due process, and equal protection. ................94

A.   Respondents fail to establish a procedural defense..............................94

B.   Respondents fail to rebut the merits of this claim................................96

C.   Respondents' arguments regarding the lack of prejudice fail............101

**Claim Five** .........................................................................103
Kiles was denied effective assistance of counsel at his aggravation-phase proceedings because counsel failed to adequately challenge the alleged aggravating circumstances and otherwise defend against a death sentence. .......103

A.  Respondents fail to establish procedural default of this claim............103

B.  Respondents' other arguments regarding *Martinez* fail. .....................104

C.  State post-conviction counsel presented a colorable claim that trial counsel were ineffective for failing to effectively challenge the (F)(2) aggravating circumstance. ....................................................106

D.  State post-conviction counsel were ineffective for failing to investigate and adequately challenge the (F)(6) "especially heinous, cruel or depraved" aggravating circumstance. ....................................110

E.  Counsel performed deficiently and prejudiced Kiles by failing to frontload mitigation at the aggravation phase. ....................................117

F.  Counsel were ineffective for failing to properly object to Kiles's restraints. ............................................................................119

G.  Counsel were ineffective for failing to object to, or to request a curative instruction for, the prosecutor's misconduct in opening and closing statements...............................................................120

H.  Counsel were ineffective for failing to object to the trial court's erroneous instruction defining reasonable doubt. ...............................121

I.  Counsel were ineffective for failing to ensure that a complete record was made of aggravation-phase proceedings. ....................................122

J.  Counsel's numerous errors, individually and cumulatively, undermined the reliability of Kiles's aggravation phase.....................122

K.  AEDPA presents no barrier to review of this claim............................124

**Claim Six** ...............................................................................124

Kiles was denied effective assistance of counsel at his mitigation phase when his counsel failed to investigate and present powerful mitigating evidence, among other significant errors. ...........................................................124

A.  Post-conviction counsel stated a colorable claim of ineffective assistance of counsel. ........................................................125

B.  De novo review requires that this Court grant Kiles a hearing on his colorable claim ............................................................138

C.  In the alternative, Kiles is entitled to de novo review and relief under *Martinez v. Ryan*............................................................139

iii

D.   Counsel provided ineffective assistance in closing, in failing to object to the State's closing argument, in failing to request a special verdict form listing which mitigating circumstances the jury found proven, and in failing to object to juror questionnaires and jury instructions that primed the jury to find that death was the appropriate sentence..143

**Claim Seven** .................................................... 146

The trial court's numerous errors during the guilt phase of trial violated Kiles's constitutional rights............................................. 146

A.   The trial court erred by not appointing qualified, un-conflicted counsel, violating Kiles's rights under the Sixth and Fourteenth Amendments................................................... 147

B.   The trial court denied Kiles a fair trial by denying his motion for a change of venue................................................ 147

C.   The trial court erred by not dismissing the venire after a highly prejudicial statement poisoned the jury pool..................... 153

D.   The trial court's admission of an excessively gruesome photograph during Kiles's trial resulted in the denial of a fair trial and due process. ................................................. 156

E.   The trial court declined to give the jury instructions to which Kiles was constitutionally entitled................................. 158

F.   The trial court unconstitutionally required that Kiles be physically restrained at the guilt phase.................................. 159

G.   The trial court failed to make a complete record of the guilt-phase proceedings in violation of Kiles's constitutional rights................ 161

H.   The trial court violated Kiles's right to be free from double jeopardy and a reliable sentencing determination. ........................ 162

I.   The cumulative effect of these trial-court errors prejudiced Kiles. .... 164

**Claim Eight** .................................................... 164

The trial court's numerous errors during the penalty phase of trial violated Kiles's constitutional rights. ........................................ 164

A.   The trial court unconstitutionally required that Kiles be physically restrained at the penalty phase.................................. 164

B.   The trial court violated Kiles's constitutional rights during his penalty-phase voir dire. ............................................ 166

iv

C.  The trial court erred in denying defense counsel's motion for a directed verdict on the "especially heinous, cruel or depraved" aggravating circumstance. ..................................................... 168

D.  The trial court erred by not striking the (F)(8) aggravator as unconstitutionally vague ................................................. 170

E.  The trial court denied Kiles's due process rights by admitting a gruesome and irrelevant photograph. .................................. 171

F.  The trial court unconstitutionally permitted the victims' attorney to file pleadings, including a requested jury instruction. ........................ 173

G.  The trial court unconstitutionally permitted the introduction of victim-impact evidence. ................................................. 174

H.  The trial court unconstitutionally permitted the State to ask witnesses at trial about statements contained in the reports of experts who testified at the first trial but not at the second trial, in violation of Kiles's rights. ..................................................... 176

I.  The trial court unconstitutionally failed to provide the jury with a special verdict form listing the specific mitigating factors they found proven, violating Kiles's rights. ......................................... 180

J.  The trial court unconstitutionally failed to make a complete record at trial, in violation of Kiles's rights. .................................. 183

K.  The cumulative effect of these trial-court errors prejudiced Kiles. .... 184

**Claim Nine** .......................................................... 186

Kiles was deprived of his right to due process and a fair trial because the prosecutor engaged in pervasive misconduct. ................................ 186

A.  This claim is exhausted and Respondents have failed to show otherwise. ................................................................ 186

B.  Respondents fail to rebut this claim on the merits. ........................ 188

**Claim Ten** ........................................................... 194

Juror misconduct at Kiles's guilt- and penalty-phase proceedings deprived Kiles of his rights to a fair and impartial jury, the assistance of counsel, confrontation, equal protection, and a fair trial. ................................ 194

A.  Respondents have failed to prove procedural default. ........................ 194

B.  Respondents fail to rebut the merits of Kiles's claim. ........................ 198

**Claim Eleven** ........................................................ 200

Kiles was denied effective assistance of counsel on direct appeal. .................... 200

    A.   Appellate counsel focused his efforts on a claim that was not cognizable on appeal. ...................................................................201

    B.   Appellate counsel was ineffective for failing to raise meritorious claims. ...................................................................................203

**Claim Twelve** ............................................................................. 209

The Arizona Supreme Court's decision affirming Kiles's death sentence violated Kiles's constitutional rights. ........................................... 209

    A.   Respondents fail to establish a procedural defense. ...........................210

    B.   Respondents fail to rebut the merits of this claim. ..............................212

**Claim Thirteen** .......................................................................... 215

Kiles's second state post-conviction counsel were constitutionally ineffective. 215

**Claim Fourteen** .......................................................................... 219

Trial counsel was ineffective for failing to file a motion to remand because of errors rendering the grand-jury proceedings unconstitutional. ........................... 219

    A.   Respondents fail to establish a procedural defense. ...........................219

    B.   Respondents fail to rebut the merits of this claim. ..............................222

    C.   Respondents rely on an incorrect prejudice standard. .........................224

**Claim Fifteen** ............................................................................. 225

Counsel were ineffective for failing to ensure that critical portions of the record were preserved and recorded. .......................................................... 225

    A.   Respondents fail to establish a procedural defense. ...........................225

    B.   Respondents fail to rebut the merits of this claim. ..............................227

    C.   Respondents assert the incorrect standard for prejudice. ....................229

**Claim Sixteen** ............................................................................. 230

Capital punishment is per se cruel and unusual. ................................................ 230

**Claim Seventeen** ......................................................................... 232

Arizona's death-penalty statute unconstitutionally serves no deterrent purpose, exceeds any legitimate retributive aim, is without penological justification, and results in the gratuitous infliction of suffering. ................................. 232

**Claim Eighteen** .......................................................................... 233

Arizona's capital-sentencing scheme unconstitutionally does not genuinely

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

narrow the murder cases eligible for the death penalty and fails to channel the discretion of the sentencing jury. ...................................................................... 233

**Claim Nineteen** ................................................................................................ 233

Arizona's capital-sentencing scheme unconstitutionally affords the prosecutor unlimited discretion to seek the death penalty. .................................................... 233

**Claim Twenty** .................................................................................................... 235

Arizona's capital-sentencing scheme is unconstitutional because it does not require the State to prove, or the jury to find beyond a reasonable doubt, that the aggravating factors outweighed the mitigating circumstances. ........................... 235

**Claim Twenty-One** ............................................................................................ 235

Arizona's capital-sentencing scheme unconstitutionally requires a defendant to affirmatively prove that the jury should spare his life. ....................................... 235

**Claim Twenty-Two** ............................................................................................ 235

Arizona's capital-sentencing scheme unconstitutionally fails to require the cumulative consideration of mitigation. ........................................................... 235

**Claim Twenty-Three** ......................................................................................... 236

Arizona's death-penalty statute is unconstitutional because it fails to require the jury to make specific findings as to each mitigating circumstance. ................... 236

**Claim Twenty-Four** ........................................................................................... 237

Arizona's capital-sentencing scheme unconstitutionally limits the jury's full consideration of mitigation by requiring that mitigating circumstances be proven by a preponderance of the evidence. .................................................................. 237

**Claim Twenty-Five** ........................................................................................... 237

Arizona's capital-sentencing scheme unconstitutionally fails to set forth objective standards to guide the sentencer in weighing the aggravating circumstances against the mitigating circumstances. .......................................... 237

**Claim Twenty-Six** ............................................................................................. 238

Arizona's capital-sentencing scheme unconstitutionally denies capital defendants the benefit of proportionality review of their sentences. .................. 238

**Claim Twenty-Seven** ......................................................................................... 239

Arizona's death-penalty scheme unconstitutionally discriminates against poor, young, African-American male defendants. ....................................................... 239

**Claim Twenty-Eight** .......................................................................................... 240

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The death qualification of Kiles's guilt- and penalty-phase juries was unconstitutional. ................................................................................................ 240

**Claim Twenty-Nine** ........................................................................................ 242

The "especially heinous, cruel or depraved" aggravating circumstance is unconstitutionally vague. ...................................................................................... 242

**Claim Thirty** ................................................................................................... 243

Arizona's prior felony conviction aggravating circumstance is unconstitutionally vague. ...................................................................................... 243

**Claim Thirty-One** ........................................................................................... 244

Kiles is innocent of first-degree murder and of the death penalty ...................... 244

**Claim Thirty-Two** ........................................................................................... 245

Kiles's death sentence constitutes an impermissible violation of the Ex Post Facto Clause. ...................................................................................................... 245

**Claim Thirty-Three** ........................................................................................ 245

Executing Kiles after more than 28 years on death row violates the Eighth and Fourteenth Amendments. .................................................................................... 245

**Claim Thirty-Four** .......................................................................................... 247

Due process requires that this Court re-evaluate Kiles's death sentence in light of the significant changes to Kiles's circumstances in the 12 years since he was sentenced. ........................................................................................................... 247

**Claim Thirty-Five** ........................................................................................... 248

Executing Kiles is unconstitutional because he has a serious mental illness. .... 248

**Claim Thirty-Six** ............................................................................................ 249

Subjecting Kiles to execution in Arizona will deny his fundamental human rights under binding international law norms. .................................................... 249

**Claim Thirty-Seven** ........................................................................................ 250

Kiles will be unable to receive a fair clemency process in Arizona. .................. 250

**Claim Thirty-Eight** ......................................................................................... 251

Kiles's convictions and sentences must be vacated because of the cumulative prejudicial effect of all of the errors in this case. ............................................. 251

IV.        Conclusion ........................................................................................... 252

## I.    Introduction

Petitioner Alvie Copeland Kiles hereby replies to Respondents' Answer to his Petition for Writ of Habeas Corpus. (ECF No. 49, hereinafter "Answer.") Kiles incorporates all factual allegations and arguments presented in his Amended Petition for Habeas Corpus (ECF No. 35, hereinafter "Petition") into this Reply and addresses specific issues raised by Respondents in the individual claims discussed below.

In an application for a writ of habeas corpus, a petitioner alleges facts and argues specific grounds for relief from an unconstitutional conviction, sentence, or both. *See Franzen v. Brinkman*, 877 F.2d 26, 26 (9th Cir. 1989) (per curiam). On its own, a petition need not prove entitlement to relief. Instead, a petitioner need only set forth colorable claims for relief, "alleg[ing] specific facts which, if true, would entitle [the petitioner] to relief." *Earp v. Ornoski*, 431 F.3d 1158, 1167 n.4 (9th Cir. 2005) (quoting *Ortiz v. Stewart*, 149 F.3d 923, 934 (9th Cir. 1998)). Similarly, with regard to procedural default, a petitioner need only make sufficient allegations that, for example, post-conviction counsel ineffectively failed to present a substantial claim of trial counsel's ineffectiveness. *See Martinez v. Ryan*, 566 U.S. 1 (2012). A petitioner need not prove cause and prejudice in his Petition.

For the reasons discussed in his Petition and in this Reply,[1] Kiles has

---

[1] In his Reply, Kiles will cite to the state-court record in the same manner as he did in his Petition. Therefore, when counsel is referring to the state-court record, transcripts are designated "Tr." followed by the relevant date and page number. Indexed documents from Case No. CR89-15444 supplied by the Arizona Supreme Court as part of the record on appeal are designated "ROA," followed by the docket number. If the indexed document appears only in Case No. CR89-15577, the document is designated "CR89-15577 ROA," followed by the docket number. Exhibits from the 1989 trial, the 1990 sentencing proceeding, the 2000 guilt phase, and 2006 penalty phase are designated, respectively, "1989 State [or Def.] Trial Ex.," "1990 State [or Def.] Trial Ex.," "2000 Trial Ex.," and "2006 Trial Ex.," followed by the exhibit number. Direct appeal documents from Case No. CR-90-0106-AP supplied by the Arizona Supreme Court are designated "DA1," followed

presented colorable claims for relief. Accordingly, he is entitled to further factual development of his claims, including an evidentiary hearing, through which he will establish his right to relief.

## II.    Preliminary Matters

### A.    Respondents' recitation of facts

In setting forth the facts of Kiles's case, Respondents paraphrase the factual background from the Arizona Supreme Court's opinion in Kiles's second direct appeal. (Answer at 8–10, citing *State v. Kiles*, 213 P.3d 174 (Ariz. 2009).) Although Respondents assert that this background sets forth the "facts" of the crime, these are not "findings of fact" to which the Court owes a presumption of correctness. (*See* Answer at 8.)

Under 28 U.S.C. § 2254(e)(1), "a determination of a factual issue made by a State court shall be presumed to be correct." The Arizona Supreme Court's recitation of facts in Kiles's appeal, however, was not "a determination of a factual issue." As that court explained, when stating the facts in criminal appellate

---

by the docket number. Direct appeal documents from Case No. CR-06-0240-AP supplied by the Arizona Supreme Court are designated "DA2," followed by the docket number. Documents from the first and second state post-conviction proceedings are also designated "ROA," followed by the docket number. Exhibits to the first post-conviction petition are labeled "ROA 225 Ex.," followed by the exhibit number. Exhibits from the second post-conviction petition are labeled "PFR2," with the appropriate docket and exhibit number, as these exhibits were re-filed during the second petition for review proceedings before the Arizona Supreme Court. Documents from the 1996 and 1997 petition for review proceedings are labeled "PFR1," followed by the docket number. Documents from the petition for review proceedings under Case No. CR-16-0072 are designated "PFR2," followed by the docket number. Special action documents are designated by the case number, name of pleading, date, and page number.

For information contained in documents that are not part of the state court record, Kiles will request that this Court expand the record to include the relevant documents, in accordance with this Court's Orders. (*See* ECF No. 5 at 4; ECF No. 57.)

opinions, it presents the facts of the trial below "in the 'light most favorable to sustaining the [guilty] verdict.'" *Kiles*, 213 P.3d at 178 n.5 (quoting *State v. Tucker*, 68 P.3d 110, 113 n.1 (Ariz. 2003) (alteration in original)).

The state court's statement of facts thus represents the version of the facts most strongly supporting the prosecution's case rather than an independent or impartial resolution of factual issues. Accordingly, the court did not make determinations of factual issues within the meaning of § 2254(e)(1) and its statement of facts therefore is not entitled to the statutory presumption of correctness.

## B.    Exhaustion and procedural default

Kiles addresses Respondents' procedural defenses in his discussion of individual claims. Here, he briefly sets forth a few general responses to Respondents' explanation of the relevant law.

### 1.    Exhaustion

A state prisoner "must normally exhaust available state judicial remedies before a federal court will entertain his Petition for habeas corpus." *Picard v. Connor*, 404 U.S. 270, 275 (1971); *see also* 28 U.S.C. § 2254(b)(1)(A) (codifying the exhaustion defense). To exhaust his claims, a petitioner need only have given the state courts a "*fair* opportunity" to address them. *O'Sullivan v. Boerckel*, 526 U.S. 838, 844 (1999). "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in [the] appropriate state court . . . thereby alerting that court to the federal nature of the claim." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (quoting *Duncan v. Henry*, 513 U.S. 364, 365–66 (1995) (per curiam)); *see also Kelly v. Small*, 315 F.3d 1063, 1067 (9th Cir. 2003) (holding that a petitioner fairly presents his claims when he "explicitly raises the federal claims before a lower court and that court addresses the questions in its decision in a manner sufficient to put a reviewing court on notice of the specific federal claims"), *overruled on other grounds by Robbins v. Carey*, 481 F.3d 1143 (9th Cir. 2007). A

state court need not actually review or address a claim, however, so long as the petitioner has properly presented it. *See Castille v. Peoples*, 489 U.S. 346, 350–51 (1989) ("[O]nce [a] federal claim has been *fairly presented* to the state courts, the exhaustion requirement is satisfied.").

Federal courts should "avoid hypertechnicality" in applying the fair presentation doctrine. *Williams v. Washington*, 59 F.3d 673, 677–68 (7th Cir. 1995). For example, fair presentation does not require mechanical recital of the federal constitutional claims in the state court. Federal courts have consistently held that a state prisoner cannot be denied access to federal courts solely because he failed to cite "book and verse on the federal constitution." *Picard*, 404 U.S. at 278 (internal quotation marks and citation omitted). He must simply "cit[e] in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or . . . simply label[] the claim 'federal.'" *Reese*, 541 U.S. at 32. Finally, the law is clear that a habeas petitioner need not have proffered the claim in an identical form in state court for the claim to be exhausted. *See Picard*, 404 U.S. at 277–78 ("Obviously there are instances in which 'the ultimate question for disposition' will be the same despite variations in the legal theory or factual allegations urged in its support. . . . We simply hold that the substance of a federal habeas corpus claim must first be presented to the state courts." (citations omitted) (quoting *United States ex rel. Kemp v. Pate*, 359 F.2d 749, 751 (7th Cir. 1966))). And where the state-law analysis on an issue is "functionally identical" to the federal-law analysis, there has been a "fair presentment" of the federal claim. *Scarpa v. DuBois*, 38 F.3d 1, 7 (1st Cir. 1994).

### 2.    Procedural default

Procedural default is an affirmative defense, which the state bears the burden of proving. *Trest v. Cain*, 522 U.S. 87, 89 (1997) ("[P]rocedural default is normally a 'defense' that the State is 'obligated to raise' and 'preserv[e]' if it is not to 'lose the right to assert the defense thereafter.'" (quoting *Gray v. Netherland*, 518 U.S.

152, 166 (1996))); *see also Bennett v. Mueller*, 322 F.3d 573, 585 (9th Cir. 2003) ("[P]rocedural default is an affirmative defense. As an affirmative defense, the state must plead, and it follows, prove the default." (citation omitted)).

For this reason, Respondents are incorrect when they repeat that Kiles has somehow waived any challenges to affirmative defenses, including procedural default, by not sufficiently briefing those challenges before Respondents asserted them. (*See* Answer at 117, 136, 151.) To support their argument, Respondents rely on a footnote from *Cook v. Schriro*, 538 F.3d 1000, 1014 n.5 (9th Cir. 2008). There, however, the Ninth Circuit merely determined that the petitioner abandoned any challenge to three of the district court's procedural default rulings by failing to brief them on appeal. *Id.* at 1014 & n.5. *Cook* does not require Kiles to preemptively brief procedural default in his initial pleading before Respondents even assert it.

To establish procedural default, Respondents must prove that a procedural rule applicable to the claim exists and that Kiles failed to comply with that rule.

First, to show that an applicable procedural bar exists, Respondents must prove that the procedural rule is based on adequate and independent state law grounds. *Coleman v. Thompson*, 501 U.S. 722, 729 (1991) ("This Court will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment."). For a state procedural forfeiture to constitute an "independent" ground, the state court decision must not appear to rest primarily upon federal law or to be interwoven with federal law. *Id.* at 730–32. Second, Respondents must establish that the state courts have actually enforced the procedural sanction. A valid procedural bar must be both established in advance and strictly and regularly applied. *Ford v. Georgia*, 498 U.S. 411, 423–24 (1991); *Johnson v. Mississippi*, 486 U.S. 578, 587–89 (1988). Absent these conditions, there can be no valid procedural bar to federal relief.

Just as Respondents bear the burden of proving procedural default generally,

they also bear the burden of proving adequacy specifically. *See Bennett*, 322 F.3d at 585. "[T]here is good reason to place the burden of proving adequacy on the state," including because it is "the most just. It is the state, not the petitioner, often appearing pro se, who has at its hands the records and authorities to prove whether its courts have regularly and consistently applied the procedural bar." *Id.*; *see also Insyxiengmay v. Morgan*, 403 F.3d 657, 665–66 (9th Cir. 2005) ("Procedural default is an affirmative defense, and the *state* has the burden of showing that the default constitutes an adequate and independent ground. Thus, it is the law of this circuit that the ultimate burden is on the State, not the petitioner, to show that a procedural state bar was clear, consistently applied, and well-established at the time the party contesting its use failed to comply with the rule in question."). Absent proof by Respondents that any asserted state-law ground is independent and adequate, there can be no valid procedural bar to federal merits review.

Respondents generally assert, both in preliminary discussion and throughout their Answer in the context of specific claims, that Arizona's preclusion rule, contained in Arizona Rule of Criminal Procedure 32.2, is both independent and adequate. (*See* Answer at 16.) But it is not the case that this rule is necessarily adequate, as Respondents contend, as the application of the rule to a particular claim must be examined. Respondents' blanket assertion is therefore misplaced.

Because procedural default is not jurisdictional, there are other circumstances under which the habeas court may review a claim which the petitioner has procedurally defaulted. If "the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law," the claim is reviewable notwithstanding the default. *Coleman*, 501 U.S. at 750; *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *see also Martinez*, 566 U.S. 1 (2012). Ineffective assistance of trial, appellate, or post-conviction counsel may excuse procedural default. *See Martinez*, 566 U.S. at 11, 16–17; *Carrier*, 477 U.S. at 488. To establish cause for procedural default on the basis of post-conviction counsel's performance,

1    an Arizona petitioner needs to show that counsel's assistance was ineffective and
2    that the defaulted claim is substantial. *See Martinez*, 566 U.S. at 18.

3          Finally, the petitioner may obtain review if he can "demonstrate that failure
4    to consider the claims will result in a fundamental miscarriage of justice." *Coleman*,
5    501 U.S. at 750. This means the petitioner must show either that he is "actually
6    innocent" or that he is "innocent of the death penalty." *Schlup v. Delo*, 513 U.S.
7    298, 323 (1995); *see also Sawyer v. Whitley*, 505 U.S. 333, 336 (1992). As a legal
8    standard, this means the prisoner must "show by clear and convincing evidence that,
9    but for constitutional error, no reasonable juror would have found the petitioner"
10   either guilty of the underlying offense or "eligible for the death penalty under the
11   applicable state law." *Sawyer*, 505 U.S. at 336; *see also, e.g.*, *Herrera v. Collins*,
12   506 U.S. 390, 402 (1993). The petitioner may show he is "innocent of the death
13   penalty" by attacking "those elements [of the judgment imposing the death
14   sentence] that render a defendant eligible for the death penalty." *Sawyer*, 505 U.S.
15   at 347. This must include "those facts which are prerequisites under state or federal
16   law for the imposition of the death penalty," *Sawyer v. Whitley*, 945 F.2d 812, 820
17   (5th Cir. 1991), *aff'd*, 505 U.S. 333 (1992), whether designated as elements or
18   merely "aggravating factors" or other considerations of state law, *see Ring v.*
19   *Arizona*, 536 U.S. 584 (2002). Kiles alleges that under this standard, the default of
20   any claim in his Petition would be excused and does not repeat this argument within
21   individual claims for the sake of brevity.

22         **3.    Application of *Martinez v. Ryan***

23         In *Martinez v. Ryan*, the U.S. Supreme Court explained that in order to show
24   cause to overcome default, a petitioner needs to show that post-conviction counsel
25   performed deficiently under *Strickland v. Washington*, 466 U.S. 668 (1984),
26   resulting in the default of a substantial claim of ineffective assistance of trial
27   counsel. 566 U.S. at 15–16. To satisfy the second of these requirements, that a claim
28   is "substantial," a petitioner need only demonstrate that it has "some merit." *Id*. at

14. The Court equated the showing required for substantiality to that necessary for a certificate of appealability. *Id.* at 14–15; *see also Runningeagle v. Ryan*, 825 F.3d 970, 983 n.14 (9th Cir. 2016), *cert. denied*, 137 S. Ct. 1439 (2017); *Detrich v. Ryan*, 740 F.3d 1237, 1245 (9th Cir. 2013) (en banc). Therefore, the inquiry is whether "jurists of reason would find it debatable" whether Kiles has stated a "valid claim of the denial of a constitutional right." *Gonzalez v. Thaler*, 565 U.S. 134, 140–41 (2012) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). The Court has made clear that the standard for a certificate of appealability is "relatively low." *Williams v. Woodford*, 384 F.3d 567, 583 (9th Cir. 2004). It is intended to screen out only clearly frivolous claims, and any doubt as to whether the petitioner has advanced a non-frivolous claim should be resolved in the petitioner's favor. *See Lambright v. Stewart*, 220 F.3d 1022, 1025 (9th Cir. 2000). In a capital case the "nature of the penalty is a proper consideration." *Id.* (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983)).

The two en banc panels of the Ninth Circuit to address the question of the application of *Martinez* have offered conflicting instructions. First, in *Detrich*, Judge Fletcher, writing for a four-judge plurality, explained that where a prisoner demonstrates that his post-conviction counsel performed deficiently and failed to raise a substantial claim of ineffective assistance of trial counsel, he has satisfied the cause-and-prejudice standard under *Martinez*. *See Detrich*, 740 F.3d at 1245. Judge Fletcher reasoned that under *Martinez*, cause is met by showing that post-conviction counsel's performance was deficient (the first prong of *Strickland*), and prejudice is met by showing that the claim that trial counsel rendered ineffective assistance is substantial. *Id.* at 1245–46. After these showings, the district court can then review the merits of the petitioner's defaulted ineffective-assistance-of-trial-counsel claim. Judge Fletcher in *Detrich* explained that for the "narrow purpose" of showing cause under *Martinez*, a "prisoner need not show actual prejudice resulting from his PCR counsel's deficient performance, over and above his required

showing that the trial-counsel IAC claim be 'substantial[.]'" *Id*. He reasoned that if a petitioner "were required to show that the defaulted trial-counsel IAC claims fully satisfied *Strickland* . . . this would render superfluous the first *Martinez* requirement of showing that the underlying *Strickland* claims were 'substantial[.]'" *Id*. However, a majority of the en banc panel in *Detrich* rejected Judge Fletcher's analysis that in order to show cause a petitioner need not show that he was prejudiced by post-conviction counsel's performance under the *Strickland* standard, namely that there is a reasonable probability that but for post-conviction counsel's deficient performance, the outcome of the post-conviction proceedings would have been different. *Id*. at 1265 n.3 (Graber, J., dissenting, joined in full by four judges); *id*. at 1262 (Nguyen, J., concurring in the result) ("I agree with the dissent inasmuch as it would require the usual *Strickland* prejudice showing to overcome the procedural default[.]").

A few months after *Detrich*, the Ninth Circuit, again sitting en banc, addressed *Martinez* in *Dickens v. Ryan*, 740 F.3d 1302 (9th Cir. 2014) (en banc). A majority of the en banc panel joined Judge N.R. Smith's opinion regarding the application of *Martinez* to Dickens's new claim of trial counsel ineffectiveness. Under Judge Smith's analysis in *Dickens*, *Martinez* requires a showing that (1) "PCR counsel's ineffective assistance constituted 'cause'" and (2) "there is 'prejudice,' that is that petitioner's claim is 'substantial.'" *Id*. at 1321. The analysis further holds that "§ 2254(e)(2) does not bar a cause and prejudice hearing on Dickens's claim of PCR counsel's ineffectiveness, which requires a showing that Dickens's underlying trial-counsel IAC claim is substantial." *Id*. at 1322. Although the court did not specifically hold, Judge Smith's opinion in *Dickens* implies that showing prejudice under *Martinez* requires a showing only that the underlying trial-counsel claim is substantial, and not a showing that the outcome of the post-conviction proceeding likely would have been different.

Six weeks after the en banc decision in *Dickens*, a three-judge panel of the

Ninth Circuit decided *Clabourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014), *overruled on other grounds by McKinney v. Ryan*, 813 F.3d 798 (9th Cir. 2015) (en banc). The *Clabourne* panel waded through the opinions of the en banc court in *Detrich*[2] to determine the law of the circuit under *Martinez* and held that the prejudice prong of the cause-and-prejudice test for excusing procedural default would be satisfied by a showing that the underlying claim of trial counsel ineffectiveness is substantial. *Id.* at 377. The panel further held that to demonstrate cause, a petitioner must show that his post-conviction counsel was ineffective under *Strickland*. *Id.* at 376. And to prove post-conviction counsel's ineffectiveness, "*Strickland* . . . requires him to establish that both (a) post-conviction counsel's performance was deficient, and (b) there was a reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different." *Id.* at 377. With respect to the latter element, the *Clabourne* panel held that "[t]o demonstrate that there was a reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different, it will generally be necessary to look through to what happened at the trial stage." *Id.* at 377–78. Later in the opinion, the panel clarified its methodology:

> Determining whether the result of the post-conviction proceedings would have been different will require consideration of the underlying claim of ineffective assistance by resentencing counsel and the questions of (a) whether resentencing counsel performed deficiently, and (b) whether there was a reasonable probability that . . . the result of the resentencing proceedings would have been different.

*Id.* at 382. Therefore, the *Clabourne* panel held that the prejudice prong of the cause-and-prejudice standard is satisfied by demonstrating that the underlying

---

[2] The *Clabourne* decision does not mention *Dickens*, even though the en banc *Dickens* decision pre-dated the decision in *Clabourne*.

1    ineffectiveness claim against trial counsel is substantial. The cause prong is satisfied
2    by showing that post-conviction counsel's performance was deficient under
3    *Strickland* and that absent this deficient performance, there is a reasonable
4    probability that the result of the post-conviction proceeding would have been
5    different. This second half of the cause inquiry in turn requires a petitioner to satisfy
6    both prongs of *Strickland* for the underlying claim that trial counsel rendered
7    ineffective assistance. *See Runningeagle*, 825 F.3d at 982 ("[F]or us to find a
8    reasonable probability that PCR counsel prejudiced a petitioner by failing to raise a
9    trial-level IAC claim, we must also find a reasonable probability that the trial-level
10   IAC claim would have succeeded had it been raised.").

11        In *Runningeagle*, the petitioner correctly argued that the framework adopted
12   in *Clabourne* and subsequently applied in *Pizzuto* was inconsistent with the en banc
13   opinion in *Dickens* and misconstrued *Martinez*. *See Runningeagle*, 825 F.3d at 982
14   n.13. He stated the obvious: the *Clabourne* framework was "impossible-to-meet"
15   because it "requires a petitioner to 'prove the merits of his ineffective assistance
16   claim before any evidentiary development of the defaulted, undecided claim just to
17   clear the cause-and-prejudice hurdle to excuse the claim's prejudicial default.'" *Id.*
18   The panel "decline[d] to revisit the *Clabourne*/*Pizzuto* standard," however, because
19   in *Runningeagle* the petitioner "had the opportunity to fully develop . . . the
20   evidentiary basis for his procedurally defaulted IAC claims. Under these
21   circumstances, there is no meaningful difference between finding a claim in default
22   and reviving it but denying it on its merits." *Id.* Panels of the Ninth Circuit have
23   subsequently relied on the analysis in *Clabourne* and *Pizzuto*, but they have not
24   attempted to reconcile it with *Dickens*. *See, e.g.*, *Kayer v. Ryan*, 923 F.3d 692, 725
25   (9th Cir. 2019); *Rodney v. Filson*, 916 F.3d 1254 (9th Cir. 2019); *Atwood v. Ryan*,
26   870 F.3d 1033, 1060 (9th Cir. 2017).[3]

27   ───────────────────

28   [3] Like the three-judge panel in *Clabourne*, Respondents ignore *Dickens* in their
     preliminary discussion of *Martinez*. (Answer at 18–20.) Instead, they rely on

In sum, Kiles notes that he disagrees with the *Clabourne* methodology. The Supreme Court in *Martinez* did not hold that a petitioner must show that there was a reasonable probability of a different outcome during post-conviction proceedings, but only that counsel "perform[ed] below constitutional standards" and that the underlying claim is substantial. *Martinez*, 566 U.S. at 16. Therefore, the *Clabourne* panel engrafted an additional prejudice requirement onto the cause element, contradicting the holding in *Martinez*. Especially because the panel in *Clabourne* (and in *Pizzuto*, for that matter) lacked the power to overrule the en banc opinion in *Dickens*, Kiles maintains that the proper standard is in Judge Fletcher's opinion in *Detrich* and Judge Smith's opinion in *Dickens*.

However, even under *Clabourne*, *see Runningeagle*, 825 F.3d at 982; *Pizzuto v. Ramirez*, 783 F.3d 1171, 1178 (9th Cir. 2015), Kiles can demonstrate that post-conviction counsel's performance was deficient and that his performance prejudiced Kiles, which can be demonstrated by showing prejudice under *Strickland* caused by trial counsel's deficient performance. *See Clabourne*, 745 F.3d at 377–78.

Contrary to Respondents' arguments, Kiles has alleged sufficient facts to entitle him to an evidentiary hearing regarding his previous counsel's ineffective assistance. (*See* Pet. at 377–90 (specifically alleging facts demonstrating post-conviction counsel's deficient performance and the prejudice resulting from his failure to adequately investigate, to understand governing legal principles, and to properly present evidence related to both guilt- and sentencing-related issues); Pet. at 343–58 (specifying allegations of appellate counsel ineffectiveness; *see infra* Claims 11 and 13). The Ninth Circuit has specifically held that a petitioner is entitled to an evidentiary hearing to demonstrate cause and prejudice under *Martinez* once such allegations have been made. *Dickens*, 740 F.3d at 1321. And,

---

*Clabourne* and *Pizzuto*, as well as a third three-judge panel decision, *Sexton v. Cozner*, 679 F.3d 1150 (9th Cir. 2012), which predated both *Dickens* and *Detrich*.

in these circumstances, evidentiary development is constrained neither by *Cullen v. Pinholster*, 563 U.S. 170 (2011) (*see infra at* Section II.C) nor by 28 U.S.C. §§ 2254(d), (e).[4] *Jones v. Shinn*, 943 F.3d 1211, 1221 (9th Cir. 2019). "28 U.S.C. § 2254(e)(2) does not prevent a district court from considering new evidence, developed to overcome a procedural default under *Martinez v. Ryan*, when adjudicating the underlying claim on de novo review." *Id.* at 1222.

Next, contrary to Respondents' argument (Answer at 20), *Martinez* applies—or should apply—even when the underlying claim is not one of ineffective assistance of counsel. While *Martinez* concerned claims of trial ineffectiveness, the same rationale that underlies *Martinez* requires that certain other claims be treated in the same way. For example, in *Martinez* the Court explained that when a post-conviction proceeding was the first time a type of claim could be raised, that proceeding "is in many ways the equivalent of a prisoner's direct appeal as to" that claim, because the post-conviction court will decide the merits of that claim, no other court has addressed the claim, and because prisoners are not well equipped to represent themselves in such initial proceedings. *Martinez*, 566 U.S. at 11; *see also Murray v. Giarratano*, 492 U.S. 1, 24–29 (1989) (Stevens, J., dissenting).

Accordingly, for the same reasons that post-conviction counsel's deficient performance can prevent the litigation of ineffective-assistance-of-trial-counsel claims, other claims involving constitutional error of structural magnitude or that could not have been raised or litigated properly at earlier stages can never be

---

[4] Respondents are incorrect that *Martinez* incentivizes habeas petitioners to forego state court review of their claims and instead present them first to federal courts. (*See* Answer at 18 n.4.) As Respondents stress throughout their Answer, habeas petitioners must surmount multiple hurdles to have their claims reviewed on the merits in federal court; thus it remains prudent for habeas petitioners to fully exhaust all their claims in state court, as anticipated by AEDPA. *Martinez* merely provides an avenue for certain federal habeas petitioners—like Kiles—to present in federal court claims that their constitutionally defective post-conviction counsel failed to raise on their behalf in state court.

addressed if post-conviction counsel fail to properly raise them. Like an ineffective-assistance-of-trial-counsel claim, there are other claims that can only be brought in post-conviction because evidence outside the trial record is necessary to establish the claim, because the factual basis was discovered after the direct appeal, or because new counsel was required in order to raise the claim. *See, e.g.*, *Martinez*, 566 U.S. at 13 ("Ineffective-assistance claims often depend on evidence outside the trial record. Direct appeals, without evidentiary hearings, may not be as effective as other proceedings for developing the factual basis for the claim."). Indeed, Justice Scalia noted the general applicability of the *Martinez* majority's analysis in his dissent:

> There is not a dime's worth of difference in principle between those cases and many other cases in which initial state habeas will be the first opportunity for a particular claim to be raised: claims of "newly discovered" prosecutorial misconduct, for example, see *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L.Ed.2d 215 (1963), claims based on "newly discovered" exculpatory evidence or "newly discovered" impeachment of prosecutorial witnesses, and claims asserting ineffective assistance of appellate counsel.

*Id.* at 19.

As predicted by Justice Scalia, this analysis has been most developed with regard to *Brady* claims. While the Ninth Circuit has held, in a split decision, that *Martinez* does not apply to *Brady* claims, *Hunton v. Sinclair*, 732 F.3d 1124, 1126–27 (9th Cir. 2013), the majority recognized that the Supreme Court's limitation on the *Martinez* exception was logically inconsistent. And, in dissent, Judge Fletcher explained that, like Justice Scalia, he found no difference at all between an ineffective-assistance-of-trial-counsel claim and a *Brady* claim in the same posture. *Id.* at 1131 (Fletcher, J., dissenting). Like the Ninth Circuit, other courts have recognized the inconsistency inherent in the Supreme Court's recognition of an exception applicable to one type of federal constitutional claim and not to others,

14

but have felt likewise constrained by *Martinez. See, e.g., Hamm v. Comm'r, Ala. Dep't of Corr.*, 620 F. App'x 752, 784 (11th Cir. 2015) ("Until the Supreme Court instructs otherwise, we are constrained to respect the explicitly limited holding of *Martinez* and the narrow construction our opinions have given that decision.").

*Brady* claims, however, are not the only ones that fall within the *Martinez* Court's description of those claims which require the effective assistance of post-conviction counsel. Other constitutional claims that meet these standards include, but are not limited to, the following: (1) competency claims, including competency to stand trial, competency to waive counsel, and competency to be executed; (2) jury claims, including juror misconduct, biased jurors, extrinsic evidence submitted to the jury, and jury tampering; (3) prosecutorial misconduct not apparent from the trial record, including failures to disclose deals with witnesses, use of perjured testimony, use of threats to suppress evidence, and elicitation of incriminating statements from a charged defendant without the presence of counsel; and (4) claims based on newly discovered exculpatory or impeachment evidence. In essence, this analysis should apply to any claim involving "a bedrock principle [of] our [criminal] justice system," as the *Martinez* Court characterized the right to effective assistance of counsel at trial. 566 U.S. at 12.

### 4.     Application of *Davila v. Davis*

Kiles argues that any procedural default of claims of ineffective assistance of appellate counsel can be excused by the ineffective assistance of post-conviction counsel. In *Davila v. Davis*, 137 S. Ct. 2058, 2067 (2017), the Supreme Court held that *Martinez* generally does not apply to procedurally defaulted claims of ineffective assistance of appellate counsel.[5] The Court specifically considered the default by post-conviction counsel of a claim that appellate counsel was ineffective

---

[5] Kiles acknowledges that this Court is bound by decisions of the Supreme Court, but seeks to preserve the argument that the Supreme Court should reconsider *Davila* as it is inconsistent with *Martinez, Carrier*, and *Carpenter*.

for not challenging a preserved trial error. *Id.* at 2063. The Court identified the "chief concern" of *Martinez* as the need to "ensure that meritorious claims of trial error receive review by at least one state or federal court[.]" *Id.* at 2067. As the Court's discussion shows, this concern can still be present when the defaulted claim is one of ineffective assistance of appellate counsel:

> A claim of appellate ineffectiveness premised on a preserved trial error thus does not present the same concern that animated the *Martinez* exception because at least "one court" will have considered the claim on the merits.
>
> If trial counsel failed to preserve the error at trial, then petitioner's proposed rule *ordinarily* would not give the prisoner access to federal review of the error, anyway. Effective appellate counsel should not raise every nonfrivolous argument on appeal, but rather only those arguments most likely to succeed. . . . Thus, *in most instances* in which the trial court did not rule on the alleged trial error (because it was not preserved), the prisoner could not make out a substantial claim of ineffective assistance of appellate counsel[.]

*Id.* (emphasis added) (citations omitted). The Court therefore recognized that it is not categorically true that trial errors will be reviewed by at least one court when appellate counsel fails to raise them and post-conviction counsel fails to then raise appellate counsel's failure. In those instances, the concern animating *Martinez* is still implicated, and it thus could apply to overcome default. *Davila* therefore does not automatically impair the ability to show cause and prejudice under *Martinez* to overcome the default of claims of ineffective assistance of appellate counsel.

In addition, the *Davila* Court explained how a petitioner still could obtain review, by at least one court, when a substantial trial error occurred that was not raised on direct appeal: "If an unpreserved trial error was so obvious that appellate counsel was constitutionally required to raise it on appeal, then trial counsel likely provided ineffective assistance by failing to object to it in the first instance." *Id.* at 2067–68. Accordingly, *Martinez* could then be used to overcome any default if

16

1   post-conviction counsel likewise failed to raise a claim regarding trial counsel's

2   ineffectiveness on this point. *Id.* at 2068. Accordingly, if this Court decides that

3   *Martinez* does not apply to Kiles's claims involving appellate ineffectiveness,

4   *Martinez* should nevertheless apply to overcome the default of the related

5   trial-ineffectiveness claims.

6         When considered in connection with the Supreme Court's holding in

7   *Edwards v. Carpenter*, 529 U.S. 446 (2000), *Martinez* provides an avenue for this

8   Court to review on the merits substantive constitutional claims that were defaulted

9   in state court. Under *Carpenter*, a claim of ineffective assistance of counsel can

10   serve as cause to overcome the default of a substantive claim. 529 U.S. at 451; *cf.*

11   *Carrier*, 477 U.S. at 488 ("Ineffective assistance of counsel, then, is cause for a

12   procedural default.") And *Martinez* allows the ineffective assistance of post-

13   conviction counsel in an initial review collateral proceeding to supply cause for the

14   procedural default of a substantial claim of ineffective assistance of trial counsel.

15   *Martinez*, 566 U.S. at 15. Taken together, *Carpenter* and *Martinez* hold that a

16   defaulted claim of ineffective assistance of counsel can serve as cause to overcome

17   the default of a substantive claim if the default of the ineffective-assistance claim

18   can itself be overcome, which under *Martinez* can be accomplished through

19   demonstrating post-conviction counsel's ineffectiveness. *See Carpenter*, 529 U.S.

20   at 458–59 (Breyer, J. concurring). *Carpenter* and *Martinez* therefore must be read

21   together to allow the ineffective assistance of post-conviction counsel to serve as

22   cause to overcome the default of trial counsel's ineffectiveness, which in turn

23   overcomes the default of an underlying substantive claim. *See Zagorski v. Mays*,

24   907 F.3d 901, 909–10 (6th Cir. 2018) (Cole, C.J., dissenting). As explained in both

25   this Reply and in his Petition (*see* Claims 1 and 13, *infra*; Pet. at 332–58), Kiles

26   asserts that he has established "cause" under *Martinez* with undisputed evidence

27   that post-conviction counsel never recognized the numerous substantive trial errors

28   identified herein.

## C.    AEDPA's constitutionality and limitations on relief

Respondents include a section entitled "AEDPA Review" setting forth their views of how AEDPA and various Supreme Court opinions should apply to Kiles's case. (Answer at 13–26.) Kiles briefly responds to some of those arguments as a preliminary matter, and otherwise relies on the arguments made in his Petition and elsewhere in this Reply.

### 1.    28 U.S.C. § 2254(d)

Throughout his Petition, Kiles discussed the operation of 28 U.S.C. § 2254(d), which limits the federal courts' power to remedy a constitutional violation. *See Williams (Terry) v. Taylor*, 529 U.S. 362, 412 (2000) (explaining that § 2254(d) "places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court"). By the terms of the statute, § 2254(d) applies only when a claim has been adjudicated on the merits by the state court. *See Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002). Consequently, § 2254(d) does not limit the review of claims that were not adjudicated on the merits by the state courts, including those claims that were, for example, procedurally defaulted or raised but not adjudicated by the state courts.

A summary state-court order is presumed to adjudicate the merits of a claim absent evidence or state-law principles to the contrary. *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Further, the unexplained decision of a state Supreme Court is presumed to have adopted the rationale of the reasoned lower-court decision. *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018); *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).

When determining whether § 2254(d)(1) forecloses a remedy for a violation of federal law, the federal court must consider the Supreme Court authority as it stood at the time the state court last adjudicated the merits of the claim. *Mayes v. Premo*, 766 F.3d 949, 957 (9th Cir. 2014). Moreover, under *Cullen v. Pinholster*,

18

1   review under § 2254(d)(1) is limited to the record that was before the state court
2   that adjudicated the claim on the merits. 563 U.S. at 181.

3       Review under § 2254(d)(2) questions whether the state court's factual
4   determinations were reasonable. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). When
5   reviewing a claim under § 2254(d)(2), the federal court need not consider the
6   presence or absence of clearly established federal law. Additionally, review under
7   § 2254(d)(2) does not implicate the presumption of correctness applied to state-
8   court findings of fact under § 2254(e)(1). The Ninth Circuit has held that
9   presumption of correctness, and the associated standard of proof, "do[es] not apply
10  to a challenge that is governed by the deference implicit in the 'unreasonable
11  determination' standard of section 2254(d)(2)." *Taylor v. Maddox*, 366 F.3d 992,
12  1000 (9th Cir. 2004) *overruled in part by Murray v. Schriro*, 745 F.3d 984, 1001
13  (9th Cir. 2014) (noting that Ninth Circuit case law has varied on the relationship
14  between § 2254(d)(2) and § 2254(e)(1)).

15      Once a petitioner has satisfied either § 2254(d)(1) or § 2254(d)(2), then the
16  claim is reviewed de novo. "Section 2254(d) operates like a two-lane highway, with
17  each lane guarded by a tollbooth. To pass through, a petitioner must demonstrate
18  that the state court adjudication *either* clashed with federal law (section 2254(d)(1))
19  *or* 'was based on an unreasonable determination of the facts' (section 2254(d)(2))."
20  *Williams v. Woodford*, 859 F. Supp. 2d 1154, 1161 (E.D. Cal. 2012) (Kozinski, C.J.,
21  sitting by designation). Once a petitioner has made one of these two showings, then
22  "[section] 2254(d) poses no further obstacle to [the petitioner] developing his claim
23  in federal court." *Id.*; *see also Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir. 2014)
24  ("If we determine, considering only the evidence before the state court, that the
25  adjudication of a claim on the merits resulted in a decision contrary to or involving
26  an unreasonable application of clearly established federal law, or that the state
27  court's decision was based on an unreasonable determination of the facts, we
28  evaluate the claim de novo, and we may consider evidence properly presented for

1     the first time in federal court.").

2            **2.**     **Clearly established federal law**

3         The phrase "clearly established Federal law" refers to the "holdings, as

4 opposed to the dicta," of its cases. *Williams*, 529 U.S. at 412. "Section 2254(d)(1)

5 permits a federal court to grant habeas relief based on the application of a governing

6 legal principle to a set of facts different from those of the case in which the principle

7 was announced." *Andrade*, 538 U.S. at 76; *see also Thaler v. Haynes*, 559 U.S. 43,

8 47 (2010) (per curiam) (observing that "clearly established" law includes legal

9 principles that are derived from a Supreme Court holding); *Abdul-Kabir v.*

10 *Quarterman*, 550 U.S. 233, 258 (2007) (holding that a state court decision may be

11 contrary to or an unreasonable application of clearly established federal law when

12 it "ignor[es] the fundamental principles established by [the Supreme Court's] most

13 relevant precedents").

14         "Virtually every one of the [Supreme] Court's opinions announcing a new

15 application of a constitutional principle contains some explanatory language that is

16 intended to provide guidance to lawyers and judges in future cases." *Carey v.*

17 *Musladin*, 549 U.S. 70, 79 (2006) (Stevens, J., concurring) (citations omitted). In

18 the course of identifying "clearly established" law, federal habeas courts should not

19 "discount the importance of such guidance on the ground that it may not have been

20 strictly necessary as an explanation of the Court's specific holding in the case." *Id.*

21 "AEDPA does not require state and federal courts to wait for some nearly identical

22 factual pattern before a legal rule must be applied." *Id.* at 81 (Kennedy, J.,

23 concurring) (citing *Wright v. West*, 505 U.S. 277, 308–09 (1992) (Kennedy, J.,

24 concurring)).

25         Moreover, Respondents assert that "[t]his Court also should not grant habeas

26 relief merely because a state court decision conflicts with authority from the United

27 States Court of Appeals." (Answer at 23–24.) As noted above, Kiles agrees that for

28 purposes of § 2254(d)(1) "clearly established federal law" refers to the holdings of

1  the Supreme Court. But this does not restrict the binding nature of Ninth Circuit

2  law on all other matters not limited by application of § 2254(d)(1). Nor does it

3  negate that decisions of the federal courts of appeals are persuasive in interpreting

4  application of Supreme Court law for purposes of applying § 2254(d)(1).

### 3.    Application of *Cullen v. Pinholster*

6  Respondents read *Pinholster* too expansively in arguing that new evidence is

7  irrelevant and inadmissible to support claims that have been resolved on their merits

8  in state court. (*See* Answer at 22–23.)

9  A federal court may not grant habeas relief on any claim "adjudicated on the

10  merits in State court proceedings" unless the state court's decision satisfies either

11  of the two criteria listed in § 2254(d). Because the § 2254(d)(1) inquiry "focuses on

12  what a state court knew and did," *Pinholster* held that application of § 2254(d)(1)

13  "is limited to the record that was before the state court that adjudicated the claim on

14  the merits." 563 U.S. at 181–83.

15  But *Pinholster* addressed only a fully developed claim, adjudicated on the

16  merits in state court and decided in federal habeas corpus after applying §

17  2254(d)(1). *See Pinholster*, 563 U.S. at 186. The petitioner in *Pinholster* never

18  claimed an inability to discover or present any facts in his state post-conviction

19  proceedings. The issue in *Pinholster* was the Ninth Circuit's decision to permit an

20  evidentiary hearing at which the petitioner could present unrestricted evidence in

21  federal district court to develop his claim. The Supreme Court rejected this

22  approach in light of § 2254(d)(1) and decided that the California Supreme Court

23  had not unreasonably applied *Strickland v. Washington*, 466 U.S. 668 (1984), when

24  it adjudicated the petitioner's fully developed claim. In that narrow context of a

25  fully developed claim adjudicated on the merits, the Court interpreted § 2254(d)(1)

26  to foreclose unrestricted additional fact development in federal habeas. *See*

27  *Pinholster*, 563 U.S. at 184–85. *Pinholster* is therefore consistent with prior

28  Supreme Court opinions requiring habeas petitioners to exhibit diligence in state

court and admonishing that the "state courts are the principal forum for asserting constitutional challenges to state convictions." *Richter*, 562 U.S. at 103.

Pinholster* does not support Respondents' argument, however, that new evidence is "irrelevant" to claims that have been resolved on their merits in state court and is therefore inadmissible in a habeas proceeding. (Answer at 22.) Although the Supreme Court's decision in *Pinholster* is important respecting the application of § 2254(d)(1), it is equally important to recognize what *Pinholster* did not do. *Pinholster* did not restrict the federal courts' power to consider new evidence after applying § 2254(d)(1) and concluding that the state court contravened or unreasonably applied state court law.

Pinholster* also did not address the reasonableness of state-court factual determinations under § 2254(d)(2). It did not retreat from the Supreme Court's pertinent discussion in *Wellons v. Hall*:

> Indeed, it would be bizarre if a federal court had to defer to state-court factual findings, made without any evidentiary record, in order to decide whether . . . the factual findings were erroneous. If that were the case, then almost no habeas petitioner could ever get an evidentiary hearing: So long as the state court found a fact that the petitioner was trying to disprove through the presentation of evidence, then there could be no hearing. AEDPA does not require such a crabbed and illogical approach to habeas procedures[.]

558 U.S. 220, 223 n.3 (2010) (per curiam).

Moreover, in *Pinholster* the Supreme Court was not concerned with, and did not determine, when and in what circumstances a federal habeas court may conduct an evidentiary hearing under § 2254(e)(2). The Court stated that it "need not decide whether § 2254(e)(2) prohibited the District Court from holding the evidentiary hearing or whether a district court may ever choose to hold an evidentiary hearing before it determines that § 2254(d) has been satisfied." 563 U.S. at 203 n.20. Indeed, with respect to evidentiary hearings, *Pinholster* emphasized that federal courts are

able to consider new evidence in some circumstances, a point it cemented by stating that its interpretation of § 2254(d)(1) does not render § 2254(e)(2) superfluous. *Id.* at 216 n.8 (Sotomayor, J., dissenting). Significantly, in *Pinholster* the Supreme Court explicitly stated it was not departing from its prior law regarding post-AEDPA evidentiary hearings. *See id.* at 183 (majority opinion). As noted above, the Ninth Circuit has recently made clear that federal district courts may take new evidence to determine whether post-conviction counsel's deficient performance was cause for the default of a an ineffective-assistance-of-trial-counsel claim, and may rely on that new evidence to determine the underlying merits of the claim. *Jones*, 943 F.3d at 1221–22.

Respondents' reading of *Pinholster* ignores these limitations in the opinion, and adoption of such a broad rule would bar federal habeas courts from reviewing Kiles's claims de novo, with the benefit of new evidence presented in federal court, upon determining that the relevant state-court decision was unreasonable under either prong of § 2254(d). *See Taylor*, 366 F.3d at 1008 ("When we determine that state-court fact-finding is unreasonable, therefore, we have an obligation to set those findings aside and, if necessary, make new findings."), *abrogated by Murray*, 745 F.3d at 999–1000 (noting inconsistency in application of § 2254(d)(2) and § 2254(e)(1)).

Moreover, Respondents' overbroad interpretation of *Pinholster* would create a situation in which AEDPA would render a federal habeas court powerless to remedy constitutional errors in the presence of a state-court merits decision, even if that decision resulted from state procedures that, through no fault of a petitioner's, failed to provide him with an adequate avenue for developing the factual basis of his claims.

### 4. Harmlessness analysis

Respondents argue that after Kiles has shown a constitutional violation occurred, he must also show that the error "had substantial and injurious effect or

influence in determining the jury's verdict." (Answer at 25 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993)).)

They assert that this standard, found in *Brecht*, is always the appropriate harmlessness inquiry. But *Brecht* applies to claims that have been denied by the state court. If a claim was not adjudicated on the merits by the state court, then this standard does not apply. Instead, the proper harmlessness test to apply on de novo review is found in *Chapman v. California*, 386 U.S. 18 (1967). *See Fry v. Pliler*, 551 U.S. 112, 118–19 (2007) (holding that *Brecht* applies when the petitioner actually obtained appellate review of his claim). Under *Chapman*, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." 386 U.S. at 24. Kiles therefore asserts that this is the proper harmlessness inquiry for his unexhausted or unadjudicated claims that require harmlessness analysis.

For some claims, however, no harmlessness inquiry is necessary at all. *See, e.g.*, *Gray v. Mississippi*, 481 U.S. 648, 668 (1987) (holding a violation of the right to an impartial capital jury is not subject to harmless-error analysis); *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (en banc) (holding that only materiality needs to be established in a *Napue* claim and that harmless-error analysis under *Brecht* is not conducted).

Respondents also incorrectly attempt to shift the burden to Kiles to establish harmlessness. (Answer at 25.) As the Supreme Court has explained, for those errors that do not require automatic reversal, habeas relief is appropriate "if the prosecution cannot demonstrate harmlessness." *Davis v. Ayala*, 135 S. Ct. 2187, 2197 (2015) (emphasis added); *see also Brecht*, 507 U.S. at 640–41 (Stevens, J., concurring) (explaining that the harmless-error standard employed by the Court in *Brecht* for cases on collateral review is appropriate in part because it "places the burden on prosecutors to explain why those errors were harmless"). Thus, it is Respondents—not Kiles—who bear the burden of establishing that errors not

requiring automatic relief are so benign that they may be ignored.

The harmlessness inquiry under *Brecht* does not assess whether a constitutional error was outcome determinative. In other words, "[t]he inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error." *Brecht*, 507 U.S. at 642 n.2 (Stevens, J., concurring) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)). Rather, the proper inquiry "requires a reviewing court to decide that the error did not influence the jury, . . . and that the judgment was not substantially swayed by the error." *Id.* (internal citation and quotation marks omitted). "[I]f a judge has 'grave doubt' about whether an error affected a jury . . . the judge must treat the error as if it did so." *O'Neal v. McAninch*, 513 U.S. 432, 438 (1995).

## III.    Claims for Relief

For each claim below, Kiles incorporates all facts, allegations, and arguments made in his Petition and elsewhere in this Reply. Kiles relies on the arguments raised in his Petition in support of these claims, and specifically replies to the following arguments made by Respondents.

### Claim One

**Representation at trial was so marred by conflicts, misrepresentations, and procedural violations that Kiles was denied effective counsel and fair and reliable capital proceedings.**

Kiles incorporates by specific reference all facts, allegations, and arguments made in his Petition and elsewhere in this Reply. Kiles relies on the arguments raised in his Petition in support of this claim (*see* Pet. at 18–59), but specifically replies to the following arguments made by Respondents.

**A.    Lead counsel's lack of qualifications and affirmative misrepresentations of those qualifications deprived Kiles of his right to due process and qualified counsel.**

**1.    This claim is exhausted and the state court's denial of a hearing is owed no deference.**

Respondents acknowledge that this claim is exhausted. (Answer at 30.) They

do not raise, and thereby waive, the affirmative defense of procedural default as to this claim. *See Bennett*, 322 F.3d at 585  ("[I]t is the obligation of the state 'to raise procedural default as a defense, or lose the right to assert the defense thereafter.'" (quoting *Gray v. Netherland*, 518 U.S. 152, 166 (1996))); *Franklin v. Johnson*, 290 F.3d 1223, 1229–33 (9th Cir. 2002) (finding that the State's failure to timely raise its procedural default argument waived the defense).

> **2.    Respondents' attack on the merits misconstrues the law and the facts.**

First, Respondents attempt to argue that Kiles has raised a state-law claim that is not cognizable in federal habeas. (Answer at 29–30.) But, as even Respondents acknowledge, Kiles explicitly argued that Arizona's failure to ensure that he received qualified counsel as required by state law violated his constitutional rights to counsel and due process. (*See* Pet. at 43–49; Answer at 30 (noting that Kiles "assert[s] a general 'due process' right").)

Second, Respondents argue that no clearly established federal law imposes specific qualifications for appointed counsel. (Answer at 30–31.) But that is not the issue. The clearly established law lies elsewhere, and as Respondents do not dispute, under *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980), it is "clearly established federal law" that where the State creates a right, federal due process protects against the arbitrary deprivation of that right by the State. (Answer at 30–31.) Respondents' effort to distinguish *Hicks* is unavailing. They argue that the *Hicks* principle cannot be applied to the facts underlying this claim because "*Hicks* involved a faulty jury instruction, not the qualifications and/or performance of defense trial counsel." (Answer at 31.) But that is a distinction without a difference. "AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied." *Carey v. Musladin*, 549 U.S. 70, 81 (2006) (Kennedy, J., concurring); *see also Lockyer v. Andrade*, 538 U.S. 63, 76 (2003) ("Section 2254(d)(1) permits a federal court to grant habeas relief based

on the application of a governing legal principle to a set of facts different from those of the case in which the principle was announced.").

Thus, while Arizona was not constitutionally required to adopt minimum qualifications for appointed counsel in capital cases, when it elected to do so, it acquired the obligation to implement procedures that comport with the requirements of due process. *See Hicks*, 447 U.S. at 345–46 (finding that where a state statute provided for jury sentencing, the defendant had a due process right not to be deprived of his liberty except to the extent determined by a properly instructed jury); *Evitts v. Lucey*, 469 U.S. 387, 393 (1985) (holding that if a state created appellate courts as an integral part of finally adjudicating a defendant's guilt or innocence, the procedures used in deciding appeals must satisfy due process); *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 293 (1998) (Stevens, J., concurring in part and dissenting in part) ("[I]f a State establishes postconviction proceedings, these proceedings must comport with due process."). Because the standards for attorney appointment set forth in Rule 6.8 of the Arizona Rules of Criminal Procedure were promulgated to ensure competent representation in capital cases, Arizona's *arbitrary* failure to appoint the qualified counsel to which Kiles was entitled under state law deprived him of due process.

Respondents next argue that the post-conviction court's rejection of this claim was not unreasonable because an attorney who had previously been disciplined may be in good standing with the State Bar of Arizona at the time of appointment. (Answer at 31–32.) This argument misses the point. As Respondents have not disputed, an attorney is not in good standing *while* he is suspended. (Answer at 32 (observing that only an active, inactive, judicial, or retired member of the Bar may be in good standing).) Respondents also do not dispute that Clark had been suspended by the Bar for non-payment of dues mere months before he was appointed to represent Kiles. Therefore, even though Clark was eventually reinstated after he submitted payment, under state law he remained per se

unqualified to represent Kiles: he was not "a member in good standing of the State Bar of Arizona *for at least five years immediately before the appointment*," as required by Ariz. R. Crim. P. 6.8. *See* Ariz. R. Crim. P. 6.8(a)(1) (1998) (emphasis added).

Kiles's state post-conviction relief petition included details on Clark's disciplinary record and provided evidence of his suspension for non-payment of dues. (ROA 1189 at 11, 15–18.) Kiles sought a hearing on this petition to establish further facts showing that Clark himself encouraged the post-conviction court to ignore Rule 6.8's requirements in light of evidence that (1) Clark had misrepresented to the trial court that his suspension was a mistake on the part of the Bar, and (2) that Clark had misrepresented the nature and severity of his censure for ineffective assistance of counsel in a juvenile transfer case. (ROA 1189 at 11, 21, 25–28, 74.) Respondents fail to address these issues.[6] They therefore fail to refute that Clark's misrepresentations during the trial court's inquiry into his eligibility for appointment under Rule 6.8 resulted in a decision by the post-conviction court that was uninformed and ultimately unreasonable in violation of Kiles's statutory right to procedural due process. (*See* Pet. at 19–22, 46–48.)

---

[6] Respondents accuse Kiles of falsely implying that Clark was censured by the Bar for his conduct in this case. (Answer at 32.) In support, Respondents cite page 51 of Kiles's Petition, which PACER imprinted with page 51 in its ECF header. However, in this Reply, Kiles uses the original document's page numbers, as according to Bluebook rule B17.1.4: "Documents filed on PACER are imprinted with an ECF header. If these pages numbers are different from the page numbers of the filed document, use the page numbers of the original document." Respondents appear to take issue with the sentence, "During the course of his representation of Kiles, Clark was also informally reprimanded for ineffective assistance of counsel twice." (Pet. at 40 n.25.) Kiles intended to convey that Clark was twice issued informal reprimands in other matters during the period of time that Clark represented Kiles. As Respondents appear to acknowledge, the documents Kiles cited in support of the challenged assertion clarify that he was referring to Clark's conduct in "other matters, not this case." (*See* Answer at 32.)

1        Under Arizona law, the post-conviction court was required to conduct a
2   hearing before deciding this claim, if the claim was colorable. This required the
3   post-conviction court to ask if Kiles's factual allegations—assuming them to be
4   true—stated a ground for relief under the Sixth and Fourteenth Amendments. *See*
5   *State v. Watton*, 793 P.2d 80, 85 (Ariz. 1990). As demonstrated above, Kiles
6   presented a colorable claim to the post-conviction court that entitled him to a
7   hearing. Because the allegations in Kiles's post-conviction petition would, if
8   proved, establish a due process violation, the state court's ruling that Kiles did not
9   "state a colorable claim" (ROA 1214 at 1) resulted in a decision that was both
10  contrary to and an unreasonable application of clearly established federal law. *See*
11  § 2254(d)(1).

12       And where a post-conviction petitioner presents a colorable claim for relief
13  and requests a hearing—as Kiles did—and the state court nonetheless makes factual
14  findings without affording the petitioner the benefit of one, then the state court's
15  decision is necessarily based on unreasonable determinations of fact within the
16  meaning of § 2254(d)(2). *See Brumfield v. Cain*, 135 S. Ct. 2269, 2278–79, 2281–
17  83 (2015) (holding that state court unreasonably determined the facts when it
18  dismissed petitioner's colorable claim without a hearing where state law entitled
19  petitioner to one); *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004) , *overruled
20  on other grounds by Murray v. Schriro*, 745 F.3d 984, 999–1000 (9th Cir. 2014)
21  (finding that where "a state court makes evidentiary findings without holding a
22  hearing and giving petitioner an opportunity to present evidence, such findings
23  clearly result in an unreasonable determination of the facts" under § 2254(d)(2).)

24       For example, in their response to Kiles's state post-conviction petition,
25  Respondents disputed Kiles's contention that "Clark's suspension for 2 weeks in
26  July 1998 'voided his "good standing" for purposes of capital appointment' and that
27  Clark was no longer qualified under Rule 6.8" (ROA 1198 at 26 (citing ROA 1189
28  at 25–28; Ariz. R. Crim. P. 6.8(a)(1)).) Respondents also argued that an attorney

29

1   with a record of discipline could be in good standing and on that basis disputed that
2   Clark had not been in good standing in the five years preceding his appointment
3   due to his censure for ineffective assistance of counsel in a juvenile transfer case.
4   (*Compare* ROA 1198 at 23, 26, *with* ROA 1189 at 15–18, 25–28.) The post-
5   conviction court could not reasonably resolve those disputed issues of fact without
6   a hearing. And because Kiles was improperly denied a hearing on his colorable
7   claim, the post-conviction court's decision resulted from an unreasonable
8   determination of the facts under § 2254(d)(2). Moreover, no fairminded jurist could
9   agree with the post-conviction court's determination that Kiles's claim lacked
10   colorable merit sufficient to warrant a hearing. *See Harrington v. Richter*, 562 U.S.
11   86, 101–02 (2011).

12       "Where a petitioner has not failed to develop the factual basis of his claim in
13   state court, as required by 28 U.S.C. § 2254(e)(2), an evidentiary hearing on a
14   habeas corpus petition is *required* where the petitioner's allegations, if true, would
15   entitle him to relief, and the petitioner has satisfied the requirements of *Townsend*
16   *v. Sain*, 372 U.S. 293 (1963)." *Stanley*, 598 F.3d at 624  (emphasis added); *see also*
17   *Insyxiengmay*, 403 F.3d at 669–70. Kiles can satisfy each of these requirements.
18   Therefore, because the state court unreasonably denied Kiles a hearing, he is
19   entitled to a hearing in this Court.

20   **B.    Kiles's counsel were ineffective due to a conflict of interest,**
21   **denying Kiles his right to competent and un-conflicted**
       **representation.**

22       **1.    This claim is exhausted and not procedurally defaulted, and**
23       **Respondents have failed to show otherwise.**

24       Respondents argue that this claim was not raised in Kiles's post-conviction
25   petition or petition for review and is therefore procedurally defaulted without
26   excuse. (Answer at 35.) Their argument fails for the reasons set forth below.

27

28   / / /

### a.   Kiles fairly presented this claim to the Arizona state courts.

Despite Respondents' protestations, this claim was fairly presented in state court. Kiles detailed in both his post-conviction petition and petition for review his repeated requests for new counsel, in part because he did not believe that Clark met the qualifications of Rule 6.8. (ROA 1189 at 12–15; PFR2 Dkt. 1 at 12–16.) Kiles also alleged that while Treasure VanDreumel was serving as his second-chair counsel, she concurrently represented Clark in disciplinary proceedings before the Bar. (ROA 1189 at 16 (citing Tr. Jan. 7, 2002 at 61, 66, 68); PFR2 Dkt. 1 at 16 (same).) In support of this allegation, Kiles cited the portion of the trial transcript in which he raised before the trial court his concerns about VanDreumel's representation of Clark. (ROA 1189 at 16 (citing Tr. Jan. 7, 2002 at 61, 66, 68); PFR2 Dkt. 1 at 16 (same).) Specifically, Kiles was concerned that his counsel actively represented conflicting interests:

> So here we have a capital case and here's my attorney and he is in trouble with the State Bar and I have my other attorney representing him. I just don't think it's right, Your Honor. I think it's a conflict. I think I should be given new attorneys. I think because I opposed Mr. Clark from the beginning -- and the record speaks for itself -- I think I should be given a new trial with adequate attorneys. . . .

(Tr. Jan. 7, 2002 at 68.) Kiles also cited *United States v. Miskinis*, 966 F.2d 1263, 1268 (9th Cir. 1992), for the proposition that he "need only show that some effect on counsel's handling of particular aspects of the trial was 'likely'" in order to establish that an actual conflict of interest adversely affected counsel's performance. (ROA 1189 at 29; PFR2 Dkt. 1 at 29.)

Thus, Kiles presented both the factual support for, and the federal underpinnings of, his claim that Clark's retention of VanDreumel to defend his conduct as an attorney before the Bar at the same time Kiles was seeking Clark's removal created a conflict of interest that adversely affected counsel's performance.

*See Wells v. Maass*, 28 F.3d 1005, 1008–09 & n.1 (9th Cir. 1994) (concluding that, read in context, claim that guilty plea was involuntary put state court on notice of ineffective-assistance-of-counsel-claim); *Beam v. Paskett*, 3 F.3d 1301, 1305 (9th Cir. 1993), *overruled on other grounds by Lambright v. Stewart*, 191 F.3d 1181 (9th Cir. 1999) (ruling that claim in state court that statute was "unconstitutionally arbitrary" fairly presented Eighth Amendment challenge because it necessarily called to mind that Amendment's prohibition of arbitrary aggravating circumstances). Moreover, "federal courts should take care to 'avoid hypertechnicality'" in applying the fair presentation requirement. *Williams*, 59 F.3d at 677   (citation omitted). Kiles's claim is therefore properly exhausted. *See Peoples*, 489 U.S. at 350–51  ("[O]nce [a] federal claim has been fairly presented to the state courts, the exhaustion requirement is satisfied." (emphasis and citation omitted).)

### b.   In the alternative, cause and prejudice excuses any default.

If this Court instead agrees with Respondents that the claim was not fairly presented and is defaulted, then Kiles can overcome that default due to the ineffective assistance of post-conviction counsel. (*See* Pet. at 59 n.39.) Kiles has made a colorable showing that any procedural default should be excused because his claim against his conflicted and therefore ineffective trial counsel has "some merit," and his post-conviction counsel were ineffective for not raising it. *See Martinez v. Ryan*, 566 U.S. 1, 14 (2012). (*See* Pet. at 377–90; Claim 13, *infra*.)

Post-conviction counsel was on notice of the underlying claim against trial counsel. For example, the claim was raised on direct appeal (DA2 Dkt. 86 at 80–84), but the Arizona Supreme Court declined to consider it, admonishing that it was more appropriate for a state post-conviction proceeding. *See State v. Kiles*, 213 P.3d 174, 183–84 & n.12 (Ariz. 2009) ("Because we do not address his claims of ineffective assistance, we express no opinion on the allegations or their veracity and

leave them for Kiles to raise in a proper proceeding."). It is also clear that post-conviction counsel recognized the importance of this issue, as they alleged numerous conflicts of interest under the heading concerning trial counsel's ineffectiveness (ROA 1189 at 23–30), and then actually cited the portion of the trial transcript in which Kiles argued to the court that VanDreumel's representation of Clark created a conflict of interest (ROA 1189 at 16 (citing Tr. Jan. 7, 2002 at 68).) Nevertheless, on the date the reply in support of the post-conviction petition was due, post-conviction counsel filed a motion asking the court to allow Sharmila Roy to withdraw and requesting a short extension of time. (ROA 1213 at 1–2.) The post-conviction court denied relief two days later, without ruling on either the request to withdraw or the request for an extension of time. (ROA 1214 at 1–2.) Post-conviction counsel unreasonably failed to challenge the denial of the opportunity to file a reply brief, or the *premature* ruling, which deprived Kiles of a full, fair, and effective review of his state post-conviction claims.

Because Kiles has presented a colorable claim of *Martinez* cause and prejudice, he is entitled to a hearing to prove both cause and prejudice and the underlying merits of his claim against trial counsel. *See Jones v. Ryan*, No. CV-01-00592-TUC-TMB, 2017 WL 264500, at *12 (D. Ariz. Jan. 20, 2017).

### c. Failure to consider the merits of this claim would result in a fundamental miscarriage of justice.

Finally, the Court's failure to review the merits of this claim would result in a fundamental miscarriage of justice because Kiles is innocent both of first-degree murder in the death of Valerie Gunnel and of the death penalty. *See Coleman*, 501 U.S. at 750; *Sawyer*, 505 U.S. at 336  (holding that "to show 'actual innocence' [of the death penalty] one must show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law"). Kiles's first state post-conviction counsel had successfully asserted that 1989 trial counsel was ineffective for failing

to investigate and present the defense recognized in *State v. Christensen*, 628 P.2d 580 (Ariz. 1981), which held that a tendency to act impulsively can negate premeditation. (*See* Pet. at 101–02; ROA 314 at 3–4.) As set forth in his Petition, Kiles requested new counsel in part because Clark insisted that the file from Kiles's successful post-conviction petition was worthless and refused to read the file. (*See* Pet. at 24–25, 56–57.) Further, Clark and VanDreumel failed to consult with appropriate experts before declining to pursue the *Christensen* defense. (*See* Pet. at 73–143; Claim 3, *infra*.) And because there was no premeditation involved, no rational trier of fact could find proof of guilt beyond a reasonable doubt, and Kiles is innocent of first-degree murder and his resultant death sentence. (*See* Pet. at 440–42; Claim 31, *infra*.) *See Herrera v. Collins*, 506 U.S. 390, 429 (1993) (White, J., concurring).

For all of the foregoing reasons, Kiles is entitled to federal review of this claim on the merits.

## 2. Respondents fail to rebut the merits of the colorable underlying claim against trial counsel.

Respondents argue that this claim is a mere "extension of Kiles's attempts to undermine his effective and competent counsel," and therefore "is not a conflict of interest as contemplated by *Cuyler* [*v. Sullivan*, 446 U.S. 335 (1980)]." (Answer at 36.) But Respondents can only reach this conclusion by ignoring the actionable facts: VanDreumel undermined Kiles's interests—representing Clark in further disciplinary proceedings so he would remain eligible to represent Kiles—thus undermining Kiles's efforts to have Clark removed, due in part to his recurrent violation of the Arizona Rules of Professional Conduct as well as the irreparable breakdown in their relationship and Clark's substandard representation. (Tr. Jan. 7, 2002 at 68–70.) A conflict is overwhelmingly in evidence since VanDreumel's work to save Clark from further discipline harmed Kiles's interest in having a repeated violator of the Rules of Professional Conduct, who was not adequately

34

representing Kiles removed as his counsel. VanDreumel failed in her duty to represent Kiles's interests, as she should have, because she could not do so without undermining Clark's interests in disciplinary proceedings before the Bar. (*See* Pet. at 49–51.) Moreover, Respondents do not mention, let alone attempt to distinguish, the cases on which Kiles relied in arguing that "the presumption of prejudice extends to conflicts between a client and his lawyer's personal, professional, or financial interests." (*Compare* Pet. at 49 *with* Answer at 36.) *See also Bonin v. Calderon*, 59 F.3d 815, 826 (9th Cir. 1995) (explaining that *Cuyler* provides appropriate standard for analyzing claims of conflict generated by attorney's private financial interests and assessing "argument that an attorney created a conflict by his desire to keep information about himself from the court").

Respondents next argue that the alleged conflict did not "adversely affect[] *Clark's* representation of Kiles." (Answer at 36 (emphasis added).) They reach this mistaken conclusion only by failing to address the numerous examples of how *VanDreumel's* representation was adversely affected by her conflict of interest. (*See* Pet. at 50–51.) What's more, because VanDreumel actively represented conflicting interests, Kiles can satisfy both prongs of the *Cuyler* test. Prejudice must be presumed, *see Cuyler*, 446 U.S. 335, 348–50, and Kiles need not "establish[] prejudice under *Brecht* [*v. Abrahamson*, 507 U.S. 619 (1993)]" (*see* Answer at 36). But even if *Brecht* supplies the appropriate standard for harmlessness, Respondents have not carried their burden. *See Brecht v. Abrahamson*, 507 U.S. 619, 641 (1993) (Stevens, J., concurring) (explaining that the state has the burden of demonstrating harmlessness); *Ayala*, 135 S. Ct. at 2197 (stating that habeas relief "is appropriate only if the prosecution cannot demonstrate harmlessness").

Respondents have therefore failed to refute that the allegations in Kiles's post-conviction petition, which would, if proved, establish that a conflict of interest deprived Kiles of his right to counsel. *See Watton*, 793 P.2d at 85. Because Kiles presented a colorable claim for relief and requested a hearing, but the state court

made factual findings without affording the petitioner the benefit of one, then the state court's decision was based on unreasonable determinations of fact under § 2254(d)(2). *See Brumfield*, 135 S. Ct. at 2278–79, 2281–83; *Taylor*, 366 F.3d at 1001 (9th Cir. 2004). Moreover, no fairminded jurist could agree with the post-conviction court's determination that Kiles's claim lacked colorable merit sufficient to warrant a hearing. *See Richter*, 562 U.S. at 101–02. Because Kiles was denied a hearing in state court, and his claim is colorable, Kiles is entitled to a federal hearing and ultimate relief.

Also, because Kiles presented a colorable claim to the post-conviction court, as demonstrated *supra* and in his Petition, the state court's ruling that Kiles did not "state a colorable claim" (ROA 1241 at 1) and its denial of relief without affording Kiles the hearing to which he was entitled under Arizona law was both contrary to and an unreasonable application of clearly established federal law. *See* § 2254(d)(1).

"Where a petitioner has not failed to develop the factual basis of his claim in state court, as required by 28 U.S.C. § 2254(e)(2), an evidentiary hearing on a habeas corpus petition is *required* where the petitioner's allegations, if true, would entitle him to relief, and the petitioner has satisfied the requirements of *Townsend v. Sain*, 372 U.S. 293 (1963)." *Stanley*, 598 F.3d at 624 (emphasis added); *see also Insyxiengmay*, 403 F.3d at 669–70. Kiles can satisfy each of these requirements. Therefore, because the state court unreasonably denied Kiles a hearing, he is entitled to a hearing in this Court.

C.    **The irreparably fractured relationship between Kiles and Clark adversely affected the representation Kiles received.**

1.    **This claim is exhausted and not procedurally defaulted, and Respondents have failed to show otherwise**

Respondents have arbitrarily parsed this claim into two sub-claims, which they acknowledge were raised in Kiles's post-conviction petition. (Answer at 32–35, 36–37.) But this claim, as raised in post-conviction proceedings and in the

Petition, rests on a single foundational premise—that the irreparably fractured relationship between Kiles and Clark deprived Kiles of the effective assistance of counsel. (*See* Pet. at 51–53; ROA 1189 at 12–18, 23–25, 28–30.) Respondents' effort to parse this claim into discrete sub-claims lacks justification and therefore must be rejected.

Respondents also argue that both sub-claims were precluded under Ariz. R. Crim. P. 32.2(a)(3), and are therefore procedurally defaulted without excuse. (Answer at 32–35, 36–37.) In support of their assertion that the post-conviction court found this claim procedurally barred, Respondents cite the opinion on direct appeal (Answer at 36), which noted that Kiles did not "contend on appeal he had an irreconcilable conflict with counsel." *Kiles*, 213 P.3d at 183. However, Respondents ignore that the Arizona Supreme Court subsequently declined to consider Kiles's claims that he was effectively deprived of counsel, stating that claims of ineffective assistance were more appropriate for a state post-conviction proceeding. *See Kiles*, 213 P.3d at 183–84 & n.12. Kiles thus appropriately presented this claim, which relies on extra-record evidence, in his post-conviction petition.[7] (Pet. at 51–53; ROA 1189 at 12–18, 23–25, 28–30.) *See Martinez v. Ryan*, 566 U.S. 1, 10–11 (2012); *see, e.g., Lambright v. Stewart*, 241 F.3d 1201, 1203–04 (9th Cir. 2001) (explaining that Arizona courts required that claims needing factual development be raised in post-conviction relief proceedings rather than on direct appeal).

Respondents cite only the post-conviction petition in support of their bald assertion that this claim "was precluded for failure to raise on direct appeal" (Answer at 36 (citing ROA 1189 at 28–30)) and do not point to any language from

---

[7] Kiles was unable to relay all of his concerns about Clark's representation to the trial court for fear of endangering his case. (Tr. Aug. 6, 1999 at 15.) Extra-record evidence marshaled in post-conviction proceedings revealed, for example, that VanDreumel assured Kiles that both she and Clark were "equipped to handle [his] case" and expressed that she was not eager to spend her time "working for someone who does not appreciate it or thinks they can do better." (PFR2 Dkt. 22 Ex. 9 at 4.)

1   the post-conviction court's decision suggesting that the court invoked a procedural
2   bar to preclude review of this claim. This is because the post-conviction court
3   adjudicated this claim on the merits, ruling that Kiles did not "state a colorable
4   claim." (ROA 1214 at 1.) And because the state post-conviction court did not hold
5   the claim procedurally barred and adjudicated the claim on the merits, the claim is
6   not defaulted and remains subject to federal review.

7       Further, Respondents have waived any argument demonstrating the
8   adequacy and independence of the state procedural bar they allege is at issue by
9   failing to brief it. *See Bennett*, 322 F.3d at 585 ("As an affirmative defense, the state
10  must plead, and it follows, prove the default."); *see also Insyxiengmay* , 403 F.3d at
11  665–66 ("Procedural default is an affirmative defense, and the *state* has the burden
12  of showing that the default constitutes an adequate and independent ground. Thus,
13  it is the law of this circuit that the ultimate burden is on the State, not the petitioner,
14  to show that a procedural state bar was clear, consistently applied, and well-
15  established at the time the party contesting its use failed to comply with the rule in
16  question."). Respondents have failed to carry their burden here, for nowhere in
17  Respondents' discussion of this claim is the word "adequacy," or its variant, ever
18  mentioned. Respondents simply argue, in conclusory fashion, that this claim "is
19  procedurally defaulted" and without excuse. (Answer at 32, 37–38.)

20      Even assuming that the claim is procedurally defaulted, then for the reasons
21  detailed in Section 1.B.1.c, *supra*, and Claims 31 and 35, *infra*, and in the Petition
22  (*See* Pet. at 440–42, 450–54), a fundamental miscarriage of justice would result
23  from the Court's failure to consider this claim on the merits.

24          **2.    Respondents' attack on the merits misconstrues the law and**
25                  **the facts**

26      On the merits, Respondents ignore material facts, and rely on the trial court's
27  own error in arbitrarily accusing Kiles of falsely claiming a conflict in order to inject
28  error into the proceedings. (Answer at 33–35 (citing Tr. Jan. 22, 1999 at 10–11, 14);

Answer at 34–35 (citing Tr. Jan. 22, 1999 at 13–14).) But, as even Respondents acknowledge, the trial court's accusation was made "early in Clark's representation of Kiles" (Answer at 34–35), and they fail to address Kiles's subsequent and numerous efforts to have the trial court take proper steps to address Kiles's concerns that Clark avoided Kiles's calls, that Clark misrepresented to the court the work he had done on the case, that Clark failed to follow through on promises, and that Clark had been dishonest with Kiles and lied to the court about their communications. (*See* Pet. at 23–43.) Respondents also ignore that later that year, Judge Kongable acknowledged on the record his belief that Kiles's concerns about Clark were "genuine" and expressed concern over the continued lack of communication. (*See* Pet. at 29 (citing Tr. Aug. 6, 1999 at 46–47).)

Nor do Respondents squarely address facts demonstrating that other members of the defense team found Kiles an easy client to work with, but—like Kiles—they also struggled to maintain communication and a working relationship with Clark. (*See* Pet. at 25–27, 40–42.) In fact, Judge Kongable eventually acknowledged that attorney Mary Boyte, and mitigation specialist Jan Dowling had—like Kiles—voiced concerns about Clark, but ultimately declined to determine "who is right and who is wrong." (ROA 533 Ex. E at 1 ("I strongly suspect that whatever sentence I end up imposing, there will be filed a petition for post conviction relief alleging ineffective assistance of trial counsel. In the overall scheme of things that would be the appropriate time for me to take action, if any.").)

Respondents next argue that this claim does not "reach[] the actual conflict standard in *Cuyler*." (Answer at 37.) Kiles acknowledges that on December 26, 2019, a three-judge panel of the Ninth Circuit determined in *Carter v. Davis*, 946 F.3d 489, 508 (9th Cir. 2019) (per curiam), that no clearly established Supreme Court precedent has "held that an irreconcilable conflict with one's attorney constitutes a per se denial of the right to effective counsel." Kiles argued in his post-conviction proceedings and in his Petition that a presumption of prejudice applies

1  to an ineffectiveness claim predicated on an irreconcilable conflict. (*See* Pet. at 51–
2  53; ROA 1189 at 28–30.) Even if *Carter* applies, Kiles can show actual prejudice
3  under *Strickland v. Washington*, 466 U.S. 668, 694 (1984), as detailed in his
4  numerous claims of ineffective assistance of counsel. (*See* Pet. at 18, 48 n.34
5  ("Kiles incorporates by specific reference into this discussion of prejudice the
6  following claims of ineffective assistance of trial counsel: Claim 2, Claim 3, Claim
7  4, Claim 5, Claim 6, Claim 14, and Claim 15, *infra*.").)[8]

8       Because Kiles can satisfy both prongs of the *Cuyler* test and alleged that he
9  suffered actual prejudice as a result (*see* ROA 1189 at 10–18, 23–61), the
10  allegations in Kiles's post-conviction petition would, if proved, entitle him to relief.
11  *See Watton*, 793 P.2d at 85. And because Kiles presented a colorable claim for relief
12  and requested a hearing, but the state court made factual findings without affording
13  the petitioner the benefit of one, then the state court's decision was based on
14  unreasonable determinations of fact under § 2254(d)(2). *See Brumfield*, 135 S. Ct.
15  at 2278–79, 2281–83; *Taylor*, 366 F.3d at 1001 (9th Cir. 2004). Moreover, no
16  fairminded jurist could agree with the post-conviction court's determination that
17  Kiles's claim lacked colorable merit sufficient to warrant a hearing. *See Richter*,
18  562 U.S. at 101–02. Because Kiles was denied a requisite hearing in state court, and
19  his claim is colorable, Kiles is entitled to a federal hearing and ultimate relief.

20       Also, because Kiles presented a colorable claim to the post-conviction court,

21

---

22  [8] Kiles respectfully disagrees with the *Carter* panel, and notes that the decision is
23  not final. The Ninth Circuit recently granted Carter's request for an extension of
   time, until March 9, 2020, in which to file a petition for rehearing and rehearing en
24  banc. *See* Order, *Carter v. Chappell*, No. 13-99003 (9th Cir. Jan. 3, 2020), ECF No.
25  60. And Respondents do not point to any Supreme Court authority holding that a
   presumption of prejudice cannot be applied to an ineffectiveness claim predicated
26  on an irreconcilable conflict. Thus, Kiles relies on his arguments in his Petition that
27  his irreparably fractured relationship with Clark constituted an actual conflict of
   interest that adversely affected counsel's performance under *Cuyler*. (*See* Pet. at
28  51–53.)

1   the state court's ruling that Kiles did not "state a colorable claim" (ROA 1214 at 1)

2   and its denial of relief without affording Kiles the hearing to which he was entitled

3   under Arizona law both contravened and unreasonably applied clearly established

4   federal law. *See* § 2254(d)(1).

5        As further evidence of the unreasonableness of the state court decision, in

6   their response to Kiles's state post-conviction petition, Respondents summarized

7   the history of Kiles's relationship with Clark, including: Kiles's multiple

8   complaints about Clark's quality of representation and lack of communication;

9   Boyte's own concerns about Clark's lack of communication and oversight; and

10  Clark's defense of his performance, including his contested representations about

11  the amount of record review and investigation he had done in Kiles's case. (*See*

12  ROA 1198 at 23–28.) The post-conviction court could not reasonably resolve those

13  disputed issues of fact without a hearing. The state court's deficient fact-finding

14  process therefore is unreasonable under § 2254(d)(2). *See Taylor*, 366 F.3d at 1001;

15  *Hurles v. Ryan*, 752 F.3d 768, 790 (9th Cir. 2014).

16       "Where a petitioner has not failed to develop the factual basis of his claim in

17  state court, as required by 28 U.S.C. § 2254(e)(2), an evidentiary hearing on a

18  habeas corpus petition is *required* where the petitioner's allegations, if true, would

19  entitle him to relief, and the petitioner has satisfied the requirements of *Townsend*

20  *v. Sain*, 372 U.S. 293 (1963)." *Stanley*, 598 F.3d at 624 (emphasis added); *see also*

21  *Insyxiengmay*, 403 F.3d at 669–70. Kiles can satisfy each of these requirements.

22  Therefore, because the state court unreasonably denied Kiles a hearing, he is

23  entitled to a hearing in this Court.

24       **D.   The contract structure under which Kiles's counsel were**
         **appointed created a financial conflict of interest.**

25
             **1.   This claim is exhausted and not procedurally defaulted, and**
26               **Respondents have failed to show otherwise.**

27       Respondents argue that this claim was not raised in Kiles's post-conviction

28  petition and is therefore procedurally defaulted without excuse. (Answer at 37.)

Despite Respondents' protestations, this claim was fairly presented in state court. Kiles explained in both his post-conviction petition and petition for review that although "the ABA Guidelines prohibit lump sum contracts for capital defense" (ROA 1189 at 27; PFR2 Dkt. 1 at 27), Clark's contract with Yuma County stated that he would receive $25,000 for accepting appointment as lead counsel on Kiles's case and would receive another $25,000 if the case went to trial (ROA 1189 at 26; PFR2 Dkt. 1 at 26). And when VanDreumel accepted appointment as second chair counsel, her contract was also structured on a flat fee, contingency basis.[9] (ROA 1189 at 26; PFR2 Dkt. 1 at 26–27.) Kiles further alleged that the "unreasonable restrictions and compensation" imposed on attorneys representing indigent defendants in Yuma County "suggests that Mr. Clark's retention was a desperate measure motivated by financial rather than ethical concerns." (ROA 1189 at 29; PFR2 Dkt. 1 at 29.) Kiles noted that his previous attorneys who had withdrawn due to a conflict of interest were required to refund their fees and argued that this may have motivated Clark to fight "valiantly to remain as Mr. Kiles' attorney (despite Mr. Kiles' multiple motions to remove him) because he lacked the financial resources to return any monies received." (ROA 1189 at 26–27; PFR2 Dkt. 1 at 27.) In addition, Kiles cited *Miskinis*, 966 F.2d at 1268, for the proposition that he "need only show that some effect on counsel's handling of particular aspects of the trial was 'likely'" in order to establish that an actual conflict of interest adversely affected counsel's performance. (ROA 1189 at 29; PFR2 Dkt. 1 at 29.)

Kiles therefore presented both the factual support for, and the federal underpinnings of, his claim that the fee arrangement with his counsel created a conflict of interest adversely affecting their representation of Kiles. *See Gray v. Netherland*, 518 U.S. 152, 162–63 (1996) (explaining that to be fairly presented, "a

---

[9] VanDreumel agreed to accept $10,000 for taking Kiles's case with another $10,000 if the case went to trial, although the court later approved additional monies.

42

claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts that entitle the petitioner to relief"). His claim is properly exhausted. *See Castille*, 489 U.S. at 350–51.

If this Court instead agrees with Respondents that the claim was not fairly presented and is defaulted, then Kiles can overcome that default due to the ineffective assistance of post-conviction counsel. (*See* Pet. at 59 n.39.) Kiles has made a colorable showing that any procedural default should be excused because his claim against his conflicted and therefore ineffective trial counsel has "some merit", and his post-conviction counsel were ineffective for not raising it. *See Martinez v. Ryan*, 566 U.S. 1, 14 (2012). (*See* Pet. at 377–90; Claim 13, *infra*.)

There is ample factual support for the claim that post-conviction counsel were ineffective. Post-conviction counsel were aware that flat fee contracting incentivizes lawyers to minimize their efforts, as well as other ethical concerns. And, as detailed above and in Claim 13, post-conviction counsel unreasonably failed to challenge the denial of the opportunity to file a reply brief, which deprived Kiles of a full and effective review of his state post-conviction claims.

Because Kiles has presented a colorable claim of *Martinez* cause and prejudice, he is entitled to a hearing to prove both cause and prejudice and the underlying merits of his claim against trial counsel.

Even assuming that the claim is procedurally defaulted, then for the reasons detailed in Section 1.B.1.c, *supra*, and Claims 31 and 35, *infra*, and in the Petition (*See* Pet. at 440–42, 450–54), a fundamental miscarriage of justice would result from the Court's failure to consider this claim on the merits.

**2.    Respondents fail to rebut this claim on the merits.**

Respondents argue that the record does not support an inference that the contract structure created an actual conflict of interest under *Cuyler* or that Clark performed deficiently. (Answer at 38.) Respondents are incorrect on both points. Kiles's Petition demonstrates how the contract structure adversely affected Clark's

efforts on his behalf at the pretrial stage and after the guilt phase. (*See* Pet. at 54–57.) Kiles also established that both his counsel's financial incentives led to deficient performance, including a failure to investigate and present a wealth of mitigation, as detailed in Claim 6. (*See* Pet. at 54–57, 197–277.)

Respondents next argue that "the ABA Guidelines are not clearly established federal law." (Answer at 38.) But Kiles never argued that they were. Rather, he relied on the 1989 ABA Guidelines to inform his analysis of how the financial conflict of interest created by the contract structure adversely affected his counsel's performance under *Cuyler*. (*See* Pet. at 55–57.) *See also Bonin*, 59 F.3d at 825 (explaining that *Cuyler* applies to conflicts of interest generated by attorney's private financial interests relating to client's trial). Respondents have therefore failed to refute that Kiles can satisfy both prongs of the *Cuyler* test. And because prejudice must be presumed, *see Cuyler*, 446 U.S. at 348–50, Kiles need not "show[] *Brecht* prejudice," notwithstanding Respondents argument to the contrary (*see* Answer at 38). But even if *Brecht* supplies the appropriate standard for harmlessness, Respondents have not carried their burden. *See Brecht*, 507 U.S. at 641 (Stevens, J., concurring); *Ayala*, 135 S. Ct. at 2197.

Thus, the allegations in Kiles's post-conviction petition would, if proved, establish that a conflict of interest deprived Kiles of his right to counsel. *See Watton*, 793 P.2d at 85. Because Kiles presented a colorable claim for relief and requested a hearing, but the state court made factual findings without affording the petitioner the benefit of one, then the state court's decision was based on unreasonable determinations of fact under § 2254(d)(2). *See Brumfield*, 135 S. Ct. at 2278–79, 2281–83; *Taylor*, 366 F.3d at 1001 (9th Cir. 2004). Moreover, no fairminded jurist could agree with the post-conviction court's determination that Kiles's claim lacked colorable merit sufficient to warrant a hearing. *See Richter*, 562 U.S. at 101–02. Because Kiles was denied a requisite hearing in state court, and his claim is colorable, Kiles is entitled to a federal hearing and ultimate relief.

1      Also, because Kiles presented a colorable claim to the post-conviction court,

2  as demonstrated *supra* and in his Petition, the post-conviction court's ruling that he

3  failed to "state a colorable claim" (ROA 1214 at 1) and its denial of relief without

4  affording Kiles the hearing to which he was entitled under state law was contrary

5  to and unreasonably applied clearly established federal law. *See* § 2254(d)(1).

6      As further evidence of the unreasonableness of the state court decision,

7  Respondents noted in their response to Kiles's state post-conviction petition that

8  Mary Boyte took issue with the incentives created by Clark's fee arrangement, but

9  Clark argued that his fee was ethical. (ROA 1198 at 24.) The post-conviction court

10  could not reasonably resolve this disputed issue of fact without a hearing. The state

11  court's deficient fact-finding process is therefore unreasonable under § 2254(d)(2).

12  *See Taylor*, 366 F.3d at 1001; *Hurles*, 752 F.3d at 790.

13      "Where a petitioner has not failed to develop the factual basis of his claim in

14  state court, as required by 28 U.S.C. § 2254(e)(2), an evidentiary hearing on a

15  habeas corpus petition is *required* where the petitioner's allegations, if true, would

16  entitle him to relief, and the petitioner has satisfied the requirements of *Townsend*

17  *v. Sain*, 372 U.S. 293 (1963)." *Stanley*, 598 F.3d at 624 (emphasis added); *see also*

18  *Insyxiengmay*, 403 F.3d at 669–70. Kiles can satisfy each of these requirements.

19  Therefore, because the state court unreasonably denied Kiles a hearing, he is

20  entitled to a hearing in this Court.

21      **E.    Taken individually and together, these conflicts plaguing counsel,**
22  **following from an initial denial of a liberty interest, resulted in a**
23  **conviction and sentencing that cannot withstand constitutional**
   **scrutiny.**

24      To the extent Respondents argue that this claim was rejected on direct appeal

25  (Answer at 39), they are mistaken. As explained above, the Arizona Supreme Court

26  ultimately declined to consider Kiles's claims that he was effectively deprived of

27  counsel, stating that claims of ineffective assistance were more appropriate for a

28  state post-conviction proceeding. *See Kiles*, 213 P.3d at 183–84 & n.12. Kiles thus

appropriately presented this claim, which relies on extra-record evidence, in his post-conviction petition. (Pet. at 18–59; ROA 1189 at 10–18, 25–30.) *See Martinez*, 566 U.S. at 10–11; *Lambright*, 241 F.3d at 1203–04. Finally, Kiles relies on the arguments in his Petition in support of the merits of this claim. He is entitled to relief.

### Claim Two
**Counsel's ineffective assistance in jury selection at the guilt-phase proceedings deprived Kiles of his rights to counsel, a fair trial, an impartial jury, due process, and equal protection.**

Kiles incorporates by specific reference all facts, allegations, and arguments made in his Petition and elsewhere in this Reply. Kiles relies on the arguments raised in his Petition in support of this claim (*see* Pet. at 60–73), but specifically replies to the following arguments made by Respondents.

### A.      Respondents fail to establish a procedural bar.

The Court should reject Respondents' argument that "[b]ecause Kiles cannot return and properly present Claim 2 to the state courts, it is subject to an implied bar." (Answer at 39.) Respondents do not demonstrate that this is the kind of claim that would be procedurally barred if presented in the state courts beyond citing generally to Arizona Rules of Criminal Procedure 32.1, 32.2, and 32.4, which govern successive petitions, and time bars, and federal cases applying those rules. (Answer at 40.). *See* Section II.B.2, *supra*; *Bennett*, 322 F.3d at 585. They have failed to meet their burden of specifically pleading and proving a default. *See* Section II.B.2, *supra*.

Respondents argue that Kiles cannot show default under *Martinez v. Ryan*, 566 U.S. 1 (2012), "because none of the procedurally defaulted claims is substantial." (*See* Answer at 40.) But, a claim is substantial so long as it has "some merit." *Martinez*, 566 U.S. at 14. To have some merit, a petitioner need not prove the full merits of a claim. *See Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). Rather, he must show that a reasonable jurist could determine that further inquiry

1    is warranted. *Id*.; *see also* Section II.B, *supra*.

2        This claim is substantial. As discussed in Kiles's Petition and below, by 2000

3    it was the standard of care for defense counsel to adequately voir dire jurors to

4    ensure that they were not biased, to ensure a fair cross-section, and to make a record

5    of voir dire. (Pet. at 60–73); *see also* Am. Bar Ass'n, Guidelines for the

6    Appointment and Performance of Counsel in Death Penalty Cases, Guideline 11.7.2

7    (ed. 1989) (hereinafter "1989 ABA Guidelines");[10] *Ybarra v. McDaniel*, 656 F.3d

8    984, 1001 (9th Cir. 2011) (analyzing claim of ineffective assistance of counsel with

9    respect to jury selection).

10       As discussed in Kiles's Petition and below, trial counsel's failures are

11   apparent. (*See* Pet. at 60–72.) Post-conviction counsel could not have any

12   reasonable strategic justification for omitting it in their briefs, and they provided

13   ineffective assistance by failing to raise this claim. *See Richardson v.*

14   *Superintendent Coal Twp.*, 905 F.3d 750, 763 (3d Cir. 2018.)

15       **B.    Respondents fail to rebut this claim on the merits.**

16       First, Respondents make arguments about what the appropriate "clearly

17   established federal law" was that applied to Kiles's case. (Answer at 40–41.) But

18   because no state court has ruled on the merits of this claim, an analysis of what was

19   "clearly established federal law" at the time of the State court's decision as required

20   under 28 U.S.C. § 2254(d)(1) is irrelevant. *See* Section II.C.2, *supra*; *see also*

21   *Williams v. Ryan*, 623 F.3d 1258, 1264 (9th Cir. 2010) (where there is no state

22   decision to which the federal court can defer, the deference AEDPA requires for

23

---

24   [10] The Supreme Court has consistently relied upon guidelines from the ABA and

25   similar professional groups to inform the inquiry into reasonable professional

26   conduct. *See, e.g.*, *Padilla v. Kentucky*, 559 U.S. 356, 366– 67 (2010) ("We long

     have recognized that the '[p]revailing norms of practice as reflected in American

27   Bar Association standards and the like . . . are guides to determining what is

28   reasonable. . . .'" (omissions in original) (quoting *Strickland*, 466 U.S. at 688)); *see*

     *also Wiggins v. Smith*, 539 U.S. 510, 524–25 (2003).

state court determinations does not apply and review is de novo). In any event, this is an ineffective-assistance claim, even though Respondents do not address the *Strickland* standard in any detail, and the right to effective counsel is clearly established.[11] As this claim was not adjudicated in state court, review in this Court is de novo. *See Dickens*, 740 F.3d at 1321.

### 1. Counsel were deficient in failing to adequately or meaningfully question prospective jurors to ensure a fair and impartial jury, thereby prejudicing Kiles.

By the time of Kiles's 2000 trial, it was a prevailing professional norm that defense counsel had a duty to sufficiently question jurors through screening questionnaires and in-person voir dire to protect their client's right to an unbiased and impartial jury. *Morgan v. Illinois*, 504 U.S. 719, 726–27 (1992); 1989 ABA Guideline 11.7.2(B). Biases can be actual or implied. *United States v. Gonzalez*, 214 F.3d 1109, 1111 (9th Cir. 2000). If a juror suffers from bias, their "presence [] cannot be harmless; the error requires a new trial without a showing of actual prejudice." *Gonzalez*, 214 F.3d at 1111 (quoting *Dyer v. Calderon*, 151 F.3d 970, 973 n.2 (9th Cir. 1998)).

Respondents ignore the bulk of Kiles's argument and factual recitations and instead focus on improperly narrowing *Morgan* so as to argue that counsel had no duty to conduct meaningful jury selection through questionnaire screening and voir dire. To the extent Respondents have failed to respond to many aspects of Kiles's argument, including counsel's failures to question jurors who were biased based on past experiences, who knew about Kiles's previous conviction and sentences, and

---

[11] Respondents include that "Kiles cannot show prejudice under" *Brecht v. Abrahamson*, 507 U.S. 619 (1993). (Answer at 43.) Because this claim asserts ineffective assistance of counsel, the proper prejudice inquiry is instead the one found in *Strickland*, 466 U.S. at 688. Further, under *Brecht*, Respondents bear the burden of showing that that constitutional errors not requiring automatic relief are so benign that they may be ignored. *Davis v. Ayala*, 135 S. Ct. 2187, 2197 (2015); *see also Brecht*, 507 U.S. at 640–41 (Stevens, J., concurring); Section II.C.4, *supra*.

48

1   who had been exposed to Kiles's case in the media, he rests on his Petition with

2   respect to those elements of his claim. (Pet. at 60–72.)

3          Respondents absolve counsel's deficient jury selection because "the

4   Constitution does not require that counsel ask any specific voir dire (or screening

5   questionnaire) questions, question any individual jurors, or challenge any jurors for

6   cause." (Answer at 42.) Respondents' answer is not responsive. Further, the

7   Constitution requires that trial counsel comport with "prevailing professional

8   norms." *Strickland*, 466 U.S. at 688. So, the Constitution requires that trial counsel

9   ask specific voir dire (or screening questionnaire) questions, question any

10  individual jurors, or challenge jurors for cause when the failure to do so would fall

11  "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688.

12         Respondents are also incorrect that certain questions are not constitutionally

13  required of a prospective jury panel. *See Morgan*, 504 U.S. at 730 (observing that

14  the Court had "not hesitated, particularly in capital cases, to find that certain

15  inquiries must be made to effectuate constitutional protections"); *Turner v. Murray*,

16  476 U.S.28, 36–37 (1986) (holding that in a capital case involving a black defendant

17  charged with murdering a white victim, prospective jurors must be questioned as to

18  racial prejudice); *see also, e.g*., *Crace v. Herzog*, 798 F.3d 840, 852 (9th Cir. 2015)

19  (concluding that under the circumstances counsel performed deficiently in failing

20  to request a jury instruction on lesser-included state-law offense); *Shaw v. Wilson*,

21  721 F.3d 908, 914–18 (7th Cir. 2013) (concluding that counsel performed

22  deficiently in failing to challenge amendment of charging document as untimely

23  under state law).

24         *Morgan*'s holding is not as narrow as Respondents suggest. While *Morgan*

25  does not dictate the format of voir dire, it requires voir dire to be sufficiently

26  meaningful so as to uncover any prospective juror who has a "substantial[]

27  impairment" of their ability to be impartial. 504 U.S. at 728. Otherwise, voir dire

28  violates a defendant's constitutional rights.

1    Respondents further suggest that trial counsel's duties to question
2    prospective jurors or challenge any prospective juror for cause arise only once they
3    raise "suspicions." (Answer at 42.) Respondents are mistaken. As the Supreme
4    Court explained in *Morgan*, the need to inquire beyond generic questions about
5    whether jurors can be impartial exists precisely because searching voir dire is
6    necessary to ferret out bias. *See* 504 U.S. at 720, 734–35 (recognizing the
7    inadequacy of "general fairness and 'follow the law' questions" because a
8    prospective juror may perceive herself able to uphold the law and be unaware that
9    certain beliefs prevent her from doing so). Even if counsel's duty to meaningfully
10   question prospective jurors did require some precondition, however, here that duty
11   was triggered, as evidenced in part by the extensive media coverage Kiles's case
12   and first conviction received, and many jurors' answers on their questionnaires and
13   when questioned by the court. (*See* Pet. at 63–64.)

14   *Morgan* entitles a defendant to a jury selection that is adequate to ensure that
15   an impartial jury is empaneled. 504 U.S. at 729. To effectuate that right, counsel
16   has a duty to elicit information about whether a prospective juror is unable to be
17   impartial. *Id.*, 1989 ABA Guideline 11.7.2. Thus, it was a prevailing professional
18   norm at the time of Kiles's 2000 trial that defense counsel had a duty to question
19   jurors through questionnaires and voir dire beyond "general inquiries," as such
20   inquiries are inadequate to "detect those jurors with views preventing or
21   substantially impairing their duties in accordance with their instructions and oath."
22   *Morgan*, 504 U.S. at 734–35.

23   Respondents argue that Kiles cannot show deficient performance regarding
24   the jury questionnaires because he "admits that the questionnaires that were actually
25   submitted to the jurors were stipulated to by both parties, so Kiles had an
26   opportunity to ask more and/or different questions on the questionnaire." (Answer
27   at 43.) This argument only underscores Kiles's point: it was deficient performance
28   for Kiles's counsel to stipulate to the State's juror questionnaire and give up the

opportunity to pose "more and/or different" meaningful questions that would have helped Kiles ensure the impartiality of the panel.

Further, Respondents are incorrect that Kiles has not argued or demonstrated that there "was any reason to suspect that any members of the jury panel would be unable to serve in a fair and impartial manner." (Answer at 41; *see* Pet. at 65–68.) The assembled jury was demonstrably biased. But these biases went undiscovered, unexplored, and unchallenged due to trial counsel's deficient performance in all aspects of the jury selection process.

For example, prior to jury selection, the State proffered a questionnaire which was acceded to by trial counsel. (CR89-15577 ROA 169.) In it, venire persons were asked "[w]hich of the following statements comes closest to your feeling on the death penalty?" (CR589-15577 ROA 169 at 8.)

The answers provided by the State were:

> "(a) I am extremely opposed to the death penalty. My position against the death penalty is so strong that I could not vote guilty (On the first degree murder) even if the defendant was proven guilty beyond a reasonable doubt.

> (b) I am philosophically opposed to the death penalty. However, I would be able to vote guilty if the state proved the defendant was guilty of first degree murder beyond a reasonable doubt.

> (c) I am not opposed to the death penalty, but feel it should be used in only very special cases.

> (d) I am in favor of the death penalty. I feel that the death penalty should be imposed in all cases when the state has proven beyond a reasonable doubt that a person killed another with premeditation.

> (e) I feel that the death penalty should be used when a person knowingly or intentionally takes the life of another. This includes premeditated murder, intentional murder, and murder that results with (sic) a person knowingly kills another.

> (f) I have no opinion about the death penalty."

1  (CR89-15577 ROA 169 at 8–9.)

2      Answers (a), (d) and (e) describe a juror who is unfit to serve in a capital

3  sentencing proceeding.[12] Of the twelve jurors who ultimately voted to convict Kiles,

4  at least eight indicated views on the death penalty which would render them

5  ineligible to serve on a death penalty jury: L.W., D.W., B.S., D.M., B.M., A.M.,

6  C.L.K., and T.D. Counsel had a duty under prevailing professional norms to work

7  to exclude jurors who fell into this category, but did not attempt to do so.

8      Empirical research demonstrates that jurors who indicate their willingness to

9  impose the death penalty are more likely than other jurors to return a verdict of

10  guilt. *See* Susan D. Rozelle, *The Principled Executioner: Capital Juries' Bias and*

11  *the Benefits of True Bifurcation*, 38 Ariz. St. L.J. 769, 784–85 (2006) (reviewing

12  data showing that "[t]he death qualification process today still seats juries

13  uncommonly willing to find guilt"); William J. Bowers & Wanda D. Foglia, *Still*

14  *Singularly Agonizing: Law's Failure to Purge Arbitrariness from Capital*

15  *Sentencing*, 39 Crim. L. Bull. 51, 61–66 (2003) (reviewing studies demonstrating

16  that death-qualified jurors are more likely to convict and to return a death verdict),

17  *see also Wainwright v. Witt*, 469 U.S. 412, 460 & n.11 (1985) (Brennan, J.,

18  dissenting) ("Death-qualification works to the advantage of only the prosecutor; if

19  not carefully controlled, it is [a] tool with which the prosecutor can create a jury

20  perhaps predisposed to convict. . . .").

_____

21  [12] A juror indicating that they "could not vote guilty . . . even if the defendant was

22  proven guilty beyond a reasonable doubt" fails at a subset of what has been called

23  "death qualification." *Witherspoon v. Illinois*, 391 U.S. 510 (1968). A juror who

24  indicates that "the death penalty should be imposed in all cases when … a person

25  killed another with premeditation" is ineligible to serve in multiple ways. First, use

26  of the language "should be imposed in all cases" reveals that this juror believes that

27  death is the only appropriate verdict, thus not giving a defendant the individualized

28  consideration mandated by the Eighth Amendment. Second, it implicitly rejects the

possibility of mitigation being considered by the juror. Finally, answer E suffers

from the same failures as answer D, in addition to calling for a death sentence for

persons convicted of Second Degree Murder.

Multiple jurors also demonstrated implied biases which would call into question their ability to serve impartially to any effective capital defense attorney. In this case, where Kiles was ultimately sentenced to death for the killing of his romantic partner, two jurors (C.K., L.W.) were past victims of domestic violence. Six jurors (E.B., T.D., A.M., R.M., B.S., D.T.) expressed their belief that police officers always, or usually, told the truth. One juror, A.B., expressed that a family friend's child was murdered, and later expressed that she thought of her friend during the testimony of the father of one of the child victims in this case. One juror, T.D., indicated that a prior felony conviction would render someone, in their eyes, an unreliable witness. And, of greatest concern, one juror, D.W., knew that Kiles had previously been convicted of the murders they were now called upon to judge, and had worked with a friend of Valerie Gunnel.

Had counsel performed reasonably during voir dire, this information would have been uncovered and could have formed the basis of a challenge for cause or peremptory challenge. Counsel's failure to uncover and challenge the inclusion of a biased juror constituted deficient performance. *Strickland*, 466 U.S. at 694. By failing to uncover and act on this information, counsel allowed a jury to be seated which was biased, which is inherently prejudicial. *Gonzalez*, 214 F.3d at 1111.

### 2.    Counsel failed to challenge the denial of a fair cross-section of the community in the venire.

Respondents fail to dispute the allegations in this section. (*See* Answer at 41–43). As such they implicitly accept that numerous members of the community were excluded from jury service due to selection methods which were inadequate to ensure a fair cross-section was assembled. (*See* Pet. at 71). They also accept that the Yuma County Jury Commissioner destroyed all records, preventing courts or litigants from ensuring that a fair cross-section was assembled. (Pet. at 71).

Finally, they fail to dispute that trial counsel failed to investigate or object to the procedures employed here, and that such failure fell below prevailing

53

professional norms and deprived Kiles of a fair trial before an impartial jury. *Strickland*, 466 U.S. at 688. And they implicitly accept that had counsel objected to the denial of a fair cross-section, "there is a reasonable probability that the claim [counsel] failed to raise at trial would have prevailed. . ." *Doe v. Ayers*, 782 F.3d 425, 432 (9th Cir. 2015).

### 3.     Counsel failed to make a record as to the reasons underlying the removal of many prospective jurors.

Respondents fail to dispute the allegations in this section. (*See* Answer at 41–43). They thus fail to dispute that 41 prospective jurors were excused at trial without any indication as to whether or why they were unfit for service. (ROA 456.) They fail to dispute that this violated Kiles's right to meaningful appellate review of jury selection decisions. *See Gregg v. Georgia*, 428 U.S. 153, 195 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.). Because trial counsel failed to take the steps necessary to ensure adequate appellate review, they performed deficiently and Kiles was prejudiced. *See Strickland*, 466 U.S. at 694; *see also* Claim 15, *infra*.

### Claim Three
### Kiles was denied the effective assistance of counsel at his guilt-phase proceedings because counsel failed to investigate, develop, and present critical evidence, among other significant errors.

Kiles incorporates by specific reference all facts, allegations, and arguments made in his Petition and elsewhere in this Reply. Kiles relies on the arguments raised in his Petition in support of this claim (*see* Pet. at 73–143), but specifically replies to the following arguments made by Respondents.

### A.     Post-conviction counsel presented a colorable claim that trial counsel were ineffective when they failed to challenge the element of premeditation.

Respondents concede this claim was exhausted in state court. (Answer at 44.) Trial counsel failed to conduct sufficient investigation into the viability of an impulsivity defense, which would have undermined the element of premeditation. Instead trial counsel settled on a failed strategy without investigating obvious red

54

flags pointing to a credible defense. Respondents ignore the bulk of Kiles's allegations, and attempt to re-characterize Kiles as asserting that trial counsel "could have improved his defense of Kiles first-degree murder of Valerie Gunnell" and that "as an alternate defense, Kiles argues that Clark should have presented an 'impulsivity' defense." (Answer at 44.) Respondents also attempt to narrow and reframe this part as alleging that Kiles's lawyers should have put on two specific expert witnesses to support the impulsivity defense. (Answer at 45–48.) But Kiles's arguments are not confined as Respondents allege.[13]

Notwithstanding Respondents' argument to the contrary, Kiles did not argue that his trial counsel "could have improved his defense." (Answer at 44.) Kiles

---

[13] To the extent Respondents attempt to narrow his claim and to assert that only some parts were raised in state court, Respondents err. First, Kiles asserts one claim of ineffective assistance of counsel, and although Kiles has provided examples of deficient performance that were not alleged in the state courts, and although he divides the allegations into organizational headings for ease of analysis, all represent an exhausted claim of ineffective assistance of counsel, which cumulatively resulted in prejudice, depriving Kiles of his right to effective assistance of counsel. Second, Respondents cite only limited pages in Kiles's state post-conviction pleadings. (Answer at 44.) This claim was fairly presented in other parts of Kiles's state petition for post-conviction relief, and petition for review. (*See* ROA 1189 at 6 (asserting counsel's failure to impeach Larry Hawkins), 10–15 (asserting trial counsel's failure to investigate and form a relationship with Kiles), 23–25 (asserting the constitutional right to effective assistance of counsel), 30-37 (asserting counsel's failure to consult with appropriate experts to counter the State's case and develop a coherent defense, including a blood spatter expert, a pathologist, a criminalist/crime-scene management expert), 37–40 (asserting counsel's failure to impeach key state lay witnesses including Kale Johnson and Larry Hawkins), 45–46 (failure to investigate and raise impulsivity defense); PFR2 Dkt. 1 at 23–46.) Should this Court find that this claim was not fairly presented in state-court proceedings, any failure to do so was the result of ineffective assistance of post-conviction counsel. *See Martinez*, 566 U.S. at 14. Cause and prejudice would excuse any default. *Id*. Post-conviction counsel clearly recognized the importance of this substantial claim, but failed to adequately brief these issues by failing to file a reply brief supporting the post-conviction petition. (*See* Claim 12 *infra*, Pet. at 358–77.) This constitutes ineffective assistance.

argued to the state post-conviction court that by failing to conduct a reasonable investigation, counsel settled on a legally unsound and ill-considered guilt-phase strategy which was unreasonable given prevailing professional norms. (*See, e.g.*, ROA 1189 at 6, 10–15, 23–25, 30–40, 45–46; Pet. at 83–115.) *See Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (reasonable decisions can only follow investigation). Kiles sought a hearing in state court to demonstrate that this deficient performance prejudiced him, because it left him with an implausible defense, when an effectively presented impulsivity defense could have convinced at least one juror to find him not guilty of first-degree murder. (ROA 1189 at 21, 74.) Had counsel investigated the impulsivity defense, they could have made an informed choice of defense, then properly challenged the State's case with convincing expert and lay testimony.[14] Their failure to do so undermines confidence in the verdict.

The state court record is replete with examples of trial counsel's failure to conduct a reasonable investigation. For starters, counsel failed to review Kiles's original trial file and first post-conviction counsel's file. (*See, e.g.*, ROA 409 at 2; Tr. Aug. 6, 1999 at 30–31; *see also* Pet. at 25, 84–96.) These neglected files contained substantial evidence about Kiles and his family, raising red-flags relevant to an impulsivity defense, as well as evidence developed at a three-day evidentiary hearing on Kiles's first state post-conviction petition, which demonstrated Kiles's impulsivity and its relation to the crime. (*See, e.g.*, ROA 225 Ex. 5 ROA 225 Ex. 36; Tr. Feb. 20–22, 1996.) Indeed, Kiles's earlier post-conviction counsel succeeded in having Kiles's first conviction overturned, in part because Kiles's first trial counsel failed to investigate an impulsivity defense. (ROA 225 at 66; ROA 314

---

[14] In Arizona, a defendant may present evidence that they have a tendency to act impulsively in order to contest the premeditation element of a first-degree murder charge. *State v. Christensen*, 628 P.2d 580 (Ariz. 1981). Though no witness may directly opine that a defendant actually did act impulsively at the time of a crime, this character trait may help a jury conclude that premeditation was lacking. *Id.* at 583.

1    at 3–4.)

2        Despite the fact that their client's conviction was overturned due to earlier

3    counsel's failure to investigate an impulsivity defense to the premeditation element

4    of first-degree murder, the evidence before the state post-conviction court

5    established that trial counsel never examined the file containing evidence of this

6    obvious defense or, otherwise investigated before deciding on a trial strategy.

7    Instead, trial counsel deemed the file "worthless." (Tr. Oct. 8, 1999 at 65.) This

8    resulted in constitutionally deficient performance. *See Rompilla v. Beard*, 545 U.S.

9    374, 380; *Vega v. Ryan*, 757 F.3d 960, 967 (9th Cir. 2014) (per curiam) ("If

10   Rompilla's counsel had a duty to review the court file *in a prior case,* it is minimally

11   incumbent on Vega's counsel to review the file of the previous attorneys who

12   handled the charges *in the same case*"); (ROA 409 at 2; Tr. Aug. 6, 1999 at 30–31).

13       The state post-conviction court had before it evidence that trial counsel also

14   failed to consult with any independent experts before trial, despite Kiles's pleas,

15   and interviewed no witnesses not arranged by the prosecutor, with the exception of

16   Kiles's mother. Counsel knew the State planned to present experts, but

17   unreasonably failed to investigate or consult with experts for the defense to

18   determine whether the State's experts could be challenged. Counsel should have

19   consulted with experts and lay witnesses before deciding against the impulsivity

20   defense, in favor of an unviable defense. (*See* ROA 1189 at 45–46; PFR2 Dkt. 23,

21   Exs. 19 (index of exhibits from Kiles's first post-conviction relief petition), 21

22   (evidentiary hearing transcript from Kiles's first post-conviction relief proceeding);

23   *see also* Pet. at 94–111.)

24       Because of counsel's failure to reasonably investigate or avail themselves of

25   these resources, counsel decided on their guilt-phase strategy without the benefit of

26   investigation. And due to these failures, counsel's decisions were uninformed and

27   objectively unreasonable. *See Wiggins*, 539 U.S. at 521; s*ee also Bemore v.*

28   *Chappell*, 788 F.3d 1151, 1167 (9th Cir. 2015) ("[S]trategic decisions . . . [must] be

1    reasonable and informed." (quoting *Jennings v. Woodford*, 290 F.3d 1006, 1014

2    (9th Cir. 2002)); *Correll v. Ryan*, 539 F.3d 938, 949 (9th Cir. 2008) ("An

3    uninformed strategy is not a reasoned strategy").

4        Because Kiles admitted to killing Gunnel (Tr. July 10, 2000 a.m. at 40), his

5    level of premeditation was the only issue for the jury to consider in assessing guilt.

6    As the record before the state post-conviction court showed, in the absence of any

7    investigation into the very defense which led to the reversal of Kiles's conviction,

8    trial counsel made an uninformed decision to combine an intoxication and a heat-

9    of-passion defense, neither of which, alone, were plausible. For example, under

10   Arizona case law, intoxication was not a legal defense to first-degree murder or to

11   premeditation. (*See* Pet. at 91–92); *see State v. Rankovich*, 765 P.2d 518, 524 (Ariz.

12   1988). Thus, trial counsel had to admit to the jury that intoxication was not a legal

13   defense to the charge of first-degree murder. (Tr. July 18, 2000 at 18.)

14       Counsel's heat-of-passion arguments against premeditation were

15   unsubstantiated but the key point is this: a heat-of-passion defense was not mutually

16   exclusive to a thoroughly investigated and presented impulsivity defense. (*See* Pet.

17   at 92.) Counsel failed to challenge the State's evidence of premeditation, and failed

18   to corroborate Kiles's testimony that he struck Gunnel in the heat of passion. (Tr.

19   July 17, 2000 at 159–64.) As a result, the entire defense theory rested on Kiles's

20   credibility—when it could have rested on substantial evidence supporting Kiles's

21   description of the events. Respondents ignore—as trial counsel did—the wealth of

22   evidence that would have supported an impulsivity defense, which was readily

23   available and should have been presented to the jury.

24       In Kiles's first, successful post-conviction petition, the defense relied on the

25   testimony of psychiatrist Albert Globus, M.D. that Kiles suffered from, among

26   other deficits, a personality trait of impulsivity. (*See, e.g.*, Tr. Feb. 21, 1996 at 177–

27   78.) Here, Clark retained Dr. Globus for "probably, a pre-screen type examination."

28   (Tr. Oct. 30 1998 at 45–46.) But, there is no evidence that trial counsel ever

1    consulted with Dr. Globus before settling on a guilt-phase defense strategy. (ROA

2    409 at 2); *Richey v. Bradshaw*, 498 F.3d 344, 362 (6th Cir. 2007) ("[T]he mere

3    hiring of an expert is meaningless if counsel does not consult with that expert to

4    make an informed decision about whether a particular defense is viable.").

5          Trial counsel should have, at a minimum, discussed impulsivity with Kiles's

6    friends and acquaintances. Several of Kiles's friends from the years before the

7    crime would have told counsel and testified that Kiles had a short fuse, and was

8    prone to outbursts. (*See, e.g.*, ROA 225 Ex. 44 at ¶ 5; ROA 225 Ex. 46.) The post-

9    conviction affidavits also make clear that Kiles's sister had a years-long problem

10   with kleptomania, an impulse-related mental illness. (Tr. Feb. 21, 1996 at 185; ROA

11   225 Ex. 36 at 23–24, 34–35, 42–43; Tr. May 9, 2006 at 38–39.)

12         Further, trial counsel should have known an impulsivity defense was likely

13   to succeed—especially since Kiles's earlier conviction was overturned in part

14   because such evidence was neither investigated nor presented. (ROA 225 at 1–2,

15   66.) Trial counsel did not have a strategic basis for not investigating an impulsivity

16   defense at the guilt phase: trial counsel eventually presented Kiles's impulsive

17   nature to the penalty jury. (ROA 509 Ex. A at 1); *Bemore v. Chappell*, 788 F.3d

18   1151, 1168 (9th Cir. 2015) ("In capital cases, 'counsel must consider in conjunction

19   both the guilt and penalty phases in determining best how to proceed.'" (citing

20   *Florida v. Nixon*, 543 U.S. 175, 192 (2004).).

21         Respondents argue that a report authored by neuropsychologist Donald

22   Tatro, Ph.D., in 1989 as part of Kiles's first trial would have undercut any

23   impulsivity defense. (Answer at 46.) But effective counsel would have been able to

24   prevent Dr. Tatro's findings from being presented to the jury during Kiles's 2000

25   re-trial. Dr. Tatro's report was completed as part of Kiles's first defense counsel's

26   strategy. Both Kiles's conviction and sentence resulting from that trial were

27   overturned in state post-conviction proceedings due to counsel's ineffective

28

assistance.[15] (ROA 314 at 4.) Where a trial is overturned due to ineffective assistance of counsel, a "court should aim to restore [the petitioner] to the position he would have occupied, had the first trial been constitutionally error-free." *Bittaker v. Woodford*, 331 F.3d 715, 722 (9th Cir. 2003). This requires that harmful information borne of prior counsel's ineffectiveness be suppressed from use at retrial. *See Mancusi v. Stubbs*, 408 U.S. 204, 214 (1972) (finding that where first trial counsel had performed constitutionally-effective cross-examination, testimony of witness could be read into record at retrial without violating confrontation principles). Here, not only was first-trial counsel found to be ineffective, but his ineffectiveness was found to extend throughout his entire handling of the case. (ROA 314 at 3.) First-trial counsel had "only a smattering of knowledge or experience in the area of first degree murder cases" and "was conscripted to handle the case and caused to continue with the case even in face of his shown unwillingness to do so." (ROA 314 at 3.) First-trial counsel "went to trial only partially prepared and, as it turned out, with no real, viable plan of action." (ROA 314 at 3.) This was reflected by his admitting Dr. Tatro's report at Kiles's first penalty hearing, despite Dr. Tatro not being available to explain or give insight as to the questions asked or conclusions made. (Tr. Feb. 07, 1990 at 64–65.) And, his representation in this manner squarely conflicted with prevailing standards of capital representation. *See, e.g.* 1989 ABA Guideline 11.4.1(7)(D). Thus, skilled counsel could have ensured that Dr. Tatro's report was excluded at any retrial, and he would have been disallowed from testifying consistent with it, as his evaluation was borne of the ineffective assistance of counsel. *Mancusi*, 408 U.S. at 214.

As to the substance of Dr. Tatro's report, Respondents argue that it concluded that "Kiles acts impulsively when he is intoxicated, and not because of a character trait." (Answer at 46.) But this selective citation distorts Dr. Tatro's actual finding,

---

[15] The order overturning Kiles's first conviction and sentence noted that trial counsel "knew of but one defense": substance intoxication. (ROA 314 at 3.)

which was that "Alvie's homicidal behavior was the result of cocaine intoxication *interacting with long-standing psychological conflicts and traits of personality*." (PFR2 Dkt. 27, Ex. 23 at 23 (emphasis added).) Dr. Tatro's report thus bolsters an impulsivity defense. Kiles had a long-standing personality trait of impulsivity that affected his behavior leading to and during the crime. Respondents ignore that the bulk of the report supports an impulsivity defense, and take other statements from the report out of context. For example, Respondents assert that in the report Kiles attributed his lack of control to drugs and alcohol (Answer at 45), which is not an accurate framing of the quotation in Dr. Tatro's report (PFR2 Dkt. 27 Ex. 23 at 23). Even if Dr. Tatro could not have testified about Kiles's behavior during the crime, his findings would have spurred an investigation of the defense.

Respondents also argue that had Dr. Tatro testified, the jury would have heard that Kiles told Dr. Tatro he killed the children, undercutting his residual doubt defense, and the jury may have imposed death for those crimes. (Answer at 46–47.) But at the penalty phase of trial, the jury did hear through another witness that Kiles told Dr. Tatro that he killed the children. (Tr. May 8, 2006 a.m. at 42.) These arguments from the Respondents suggest nothing more than the fact that the state post-conviction court should have granted a hearing to settle the differing factual issues concerning Dr. Tatro.

Nor does neuropsychologist John Toma, Ph.D. detract from an impulsivity defense, as Respondents claim. (Answer at 47.) Contrary to Respondents' argument, Dr. Toma's report supports that an impulsivity defense would have been fruitful if investigated and presented to a jury, particularly since defense counsel had no other coherent theory. (PFR2 Dkt. 27 Ex. 24 at 20.) Further, Dr. Toma evaluated Kiles in 2013—nearly thirteen years after the jury reached its guilt-phase verdict. Trial counsel did not determine whether to pursue the impulsivity defense based on Dr. Toma's report, as a report generated thirteen years post-verdict could

1    not have influenced the reasonableness of trial counsel's actions.[16]

2    Respondents' version of the crime—which alleged that Kiles left the

3    apartment to retrieve the tire jack before striking Valerie—was in dispute. (*See*

4    Answer at 47–48; Tr. July 17, 2000 at 164–65 (Kiles describing how he reached

5    down during an argument and grabbed the tire jack, which was at hand).)

6    Additionally, the fact that Kiles testified that he acted reflexively when he hit

7    Valerie Gunnel with the tire iron would not have rendered additional evidence from

8    an expert (or from friends and family) cumulative. (*See* Answer at 48.) Rather, it

9    would have shown that he had a life-long character trait of impulsivity, and been

10    corroborative. *See Yun Hseng Liao v. Junious*, 817 F.3d 678, 695 (9th Cir. 2016)

11    (noting the difference between cumulative evidence, which "unnecessarily proves

12    a point already sufficiently established . . . by the existing evidence (esp[ecially]

13    that which does not need further support)," and corroborating evidence, which

14    "differs from but strengthens or confirms what other evidence shows (esp[ecially]

15    that which needs support)"). Moreover, factual questions regarding whether

16    evidence was cumulative should have been determined at a state post-conviction

17    evidentiary hearing. What's more, Kiles's credibility was in question. *See infra*.

18    However, counsel undermined Kiles's credibility by failing to present

19    substantiating expert evidence to the jury.

20    Ultimately, whether Drs. Tatro and Toma should have been called to testify

21    is irrelevant, and Respondents' focus is misplaced. These allegations of ineffective

22    assistance by trial counsel are not about the selection or utilization of a particular

23

24    _____

25    [16] Respondents quote at length from the 5th edition of the Diagnostic and Statistical
    Manual ("DSM-5") regarding ASPD. Respondents speculate without citation that
    its elements regarding truthfulness apply to him. But, the 5th edition of the DSM

26    was not published until 2013, so it could not have influenced counsel's
    reasonableness more than a decade earlier. Further, the State found an expert who

27    diagnosed Kiles with ASPD during the penalty phase (Tr. May 16, 2006 at 67), so

28    the jury already heard an expert diagnose Kiles with ASPD.

expert, but about the failure to adequately investigate, develop, and present a viable defense.[17] *See Wiggins*, 539 U.S. at 521–22. Counsel's actions are not subject to deference where, as here, they are not supported by adequate investigation. *Id.*; *Bemore*, *supra.* Trial counsel's failure to engage in this foundational aspect of case preparation prejudiced Kiles. *Strickland*, 466 U.S. at 694; *see, e.g.*, *Brown v. Myers*, 137 F.3d 1154, 1157–58 (9th Cir. 1998) (finding *Strickland* prejudice when counsel neglected to have several witnesses testify who could have "buttressed [the defendant's] account on [a] crucial point.").

Under Arizona law, the post-conviction court was required to determine the colorability of Kiles's ineffective-assistance claim by asking if Kiles's factual allegations—assuming them to be true—stated a ground for relief. *See State v. Watton*, 793 P.2d 80, 85 (Ariz. 1990). As demonstrated above, Kiles presented a colorable claim to the post-conviction court that entitled him to a hearing. The evidence that trial counsel performed deficiently in failing to investigate an impulsivity defense is substantial. And so is the prejudice resulting therefrom. State post-conviction counsel presented extensive evidence to the state court substantiating the viability of this defense, and satisfied the low threshold of colorability needed to warrant a hearing.

In state post-conviction proceedings, post-conviction counsel presented the court with allegations that an impulsivity defense would have been viable, and evidence substantiating those allegations. (ROA 1189 at 32–34, 45–46.) This included numerous exhibits and affidavits from friends, family and experts developed during Kiles's first post-conviction proceedings describing his lifelong

---

[17] Kiles does not claim that counsel provided ineffective assistance by failing to present experts to discuss Kiles's impulsivity, but rather, that they failed to investigate and present an impulsivity defense, and as a result presented a non-viable defense to first-degree murder. An impulsivity defense could have included family and friends testifying about Kiles's life-long characteristic of impulsivity. Consulting with experts would have been but one part of investigating this defense.

character trait of impulsivity and his family members' impulsivity. (*See, e.g.*, PFR2 Dkt. 23 Ex. 19 (listing affidavits filed during first post-conviction proceedings).) The exhibits also included transcripts from the hearing during Kiles's first post-conviction proceeding, which included testimony from Kiles's family and friends, and an expert, describing Kiles's life-long character trait of impulsivity. (PFR2 Dkt. 23 Exs. 21; PFR2 Dkt. 24 Ex. 21 cont'd; PFR2 Dkt. 25 Ex. 21 cont'd; PFR2 Dkt. 26 Ex. 21 cont'd; PFR2 Dkt. 27 Ex. 21.)

The exhibits also included a new 2014 affidavit from Kiles's mother that specifically detailed Kiles's impulsive personality trait. (PFR2 Dkt. 29 Ex. 34.) Post-conviction counsel presented a report by Dr. Toma from Kiles's first trial detailing Kiles's personality trait of acting impulsively, and how drugs exacerbated this underlying trait, which was independent from Kiles's use of substances. (PFR2 Dkt. 27 Ex. 23 at 23.) Post-conviction counsel also included a new expert report by Dr. Toma detailing Kiles's character trait of impulsivity. (PFR2 Dkt. 27 Ex. 24 at 1–2, 20.) Post-conviction counsel included a report by neuroimaging specialist Dr. Joseph Wu, M.D., that included brain damage evidence corroborating and supporting that Kiles acted impulsively. (PFR2 Dkt. 28 Ex. 25.)

State post-conviction counsel also included allegations and evidence that rebutted the State's version of the crime as premeditated, and supported Kiles's version of the crime as reflexive. For example, the post-conviction petition exhibits included two expert reports from a defense blood-spatter expert (one originally developed for his first post-conviction proceeding and one new one) supporting the impulsivity defense. (PFR2 Dkt. 33 Exs. 14–15.) This showed the impulsivity defense was viable because it rebutted the State's expert trial testimony contradicting Kiles's version of the crime as reflexive, rather than premeditated.

Though the court may not have permitted counsel to present all of this evidence at trial, it showed that the impulsivity defense was viable and well-grounded—and that counsel should have investigated it.

1    Because the allegations in Kiles's post-conviction petition would, if proved,

2    establish that trial counsel were ineffective, the state court's ruling that his claim

3    lacked colorable merit (ROA 1214 at 2) resulted in a decision that was both contrary

4    to and an unreasonable application of clearly established federal law. *See*

5    § 2254(d)(1).

6    And where a post-conviction petitioner presents a colorable claim for relief

7    and requests a hearing—as Kiles did—and the state court nonetheless makes factual

8    findings without affording the petitioner the benefit of one, then the state court's

9    decision is necessarily based on unreasonable determinations of fact within the

10   meaning of § 2254(d)(2).[18] *See Brumfield*, 135 S. Ct. at 2278–79, 2281–83 (holding

11   that state court unreasonably determined the facts when it dismissed petitioner's

12   colorable claim without a hearing where state law entitled petitioner to one); *Taylor*,

13   366 F.3d at 1001  (finding that where "a state court makes evidentiary findings

14   without holding a hearing and giving petitioner an opportunity to present evidence,

15   such findings clearly result in an unreasonable determination of the facts" under §

16   2254(d)(2).) As detailed above, the post-conviction court necessarily ignored trial

17   counsel Greg Clark and Treasure VanDreumel's wholesale lack of investigation

18   before adopting a trial strategy, which is an unreasonable application of *Strickland*,

19

---

20   [18] Respondents suggest the applicability of § 2254(e)(1) which presumes factual
21   findings to be correct, unless they are shown to be incorrect by clear and convincing
     evidence. (Answer at 71–72). However, as explained below, in this instance the
22   (e)(1) subsection is inapplicable to this Court's review of the state court decision.
23   Here, Kiles is not challenging the state court's findings; he is challenging a *defective
     process* leading to those findings. Kiles argues that the state court decision was
24   based on an unreasonable determination of the facts under § 2254(d), because the
25   decision was made without a hearing. A decision based on an unreasonable
     determination of the facts under § 2254(d)(2), when facts have been decided *without*
26   a hearing, does not challenge the correctness of the fact-finding—it challenges the
27   *process*. *See Taylor*, 366 F.3d at 1001. *See also State v. Cruz*, No. CV-13-0389-
     TUC-JGZ, Doc. 60 (2018) (same, citing *Taylor*). Therefore § 2254(e)(1) is
28   inapplicable to the review of the state court decision.

as well as an unreasonable determination of fact. *See Taylor*, 366 F.3d at 1001 ("the state-court fact-finding process is undermined where the state court has before it, yet apparently ignores, evidence that supports the petition's claim"). In addition to ignoring evidence of trial counsel's failures, the post-conviction court resolved disputed factual questions without affording Kiles a hearing. The state court's deficient fact-finding process therefore is unreasonable under § 2254(d)(2). *See Miller-El v. Cockrell*, 537 U.S. 322, 346 (2003); *Taylor*, 366 F.3d at 1000–01; *Hurles v. Ryan*, 752 F.3d 768, 790 (9th Cir. 2014).

"Where a petitioner has not failed to develop the factual basis of his claim in state court, as required by 28 U.S.C. §2254(e)(2), an evidentiary hearing on a habeas corpus petition is *required* where the petitioner's allegations, if true, would entitle him to relief, and the petitioner has satisfied the requirements of *Townsend v. Sain*, 372 U.S. 293 (1963)." *Stanley*, 598 F.3d at 624  (emphasis added); *see also Insyxiengmay* , 403 F.3d at 669–70. Kiles can satisfy each of these requirements. Therefore, because the state court unreasonably denied Kiles a hearing, he is entitled to a hearing in this Court.

## B.    Trial counsel were ineffective for failing to object to Kiles's shackling.

The Court should reject Respondents' argument that this claim is procedurally defaulted because it was not presented in state court and "Arizona's procedural rules prevent Kiles from returning to the state courts to present it." (Answer at 49.) Respondents do not demonstrate that this is the kind of claim that would be barred if presented in the state courts beyond citing generally to Ariz. R. Crim. P. 32.1 and 32.2, which govern successive petitions, and federal cases applying those rules. (Answer at 49.) *See Bennett*, 322 F.3d at 585. Respondents fail to meet their burden of specifically pleading and proving a default. (*See* Answer at 49.) Section II.B.2, *supra*.

Even if Respondents' general invocation of Arizona's procedural rules

suffices to establish procedural default, this Court can review the merits of the claim because Kiles has made a colorable claim that ineffective assistance of post-conviction counsel led to the default of this "substantial" ineffective-assistance-of-trial-counsel claim. *Martinez*, 566 U.S. at 18. Kiles will prove at an evidentiary hearing that any default should be excused due to the ineffective assistance of post-conviction counsel under *Martinez*. *See* Section II.B.3, *supra*. This Court should review this on the merits.

Respondents appear to attempt to mischaracterize this section as a "challenge to a trial court's shackling of a capital defendant," which "should be raised on direct appeal." (Answer at 49.) However, Kiles specifically challenges trial counsel's actions in failing to object to Kiles's shackling, not the trial court's actions. In Arizona, ineffective-assistance-of-counsel claims must be raised in state collateral proceedings, and cannot be raised on direct appeal. *Martinez*, 566 U.S. at 4.

Counsel's failure to object to the routine shackling of Kiles was below prevailing professional norms and resulted in him being shackled throughout trial. Given Kiles's years-long exemplary disciplinary record (Tr. Apr. 26, 2006 at 4–54), it is likely that had counsel objected and meaningfully argued against shackling, Kiles would not have been shackled.

As discussed in his Petition, trial counsel's failure to object to the routine shackling utilized here had a host of negative effects, prejudicing Kiles. (*See* Pet. at 116–18.) Being shackled deprived Kiles of the presumption of innocence in the minds of the jurors who knew that he was restrained,[19] and thus denied him an impartial jury. Further, it interfered with his ability to communicate with his counsel and participate in his defense. Had Kiles's counsel performed reasonably and objected to his unwarranted shackling, this prejudice would have been eliminated and there is a reasonable probability that at least one juror may have voted not to

---

[19] At an evidentiary hearing, Kiles would present proof that multiple jurors were aware that Kiles was shackled during his trial.

convict him of first-degree murder. *Strickland*, 466 U.S. at 694. Respondents incorrectly assert that Kiles must show prejudice as though this were a claim alleging trial court error. (Answer at 50–51.) Rather, Kiles must show prejudice under *Strickland*, 466 U.S. at 694. This discrepancy between what occurred at trial and what could have occurred had counsel acted reasonably undermines confidence in the outcome of Kiles's trial, alone and when considered cumulatively with counsel's other errors and the resulting prejudice. *See id.*

### C.    Trial counsel rendered ineffective assistance during the defense's opening statement.

This Court should reject Respondents' argument that this claim is procedurally defaulted because it was not presented in state court and "Arizona's procedural rules prevent Kiles from returning to the state courts to present it." (Answer at 49.) Respondents do not demonstrate that this is the kind of claim that would be barred if presented in the state courts beyond citing generally to Ariz. R. Crim. P. 32.1 and 32.2, which govern successive petitions, and federal cases applying those rules. (Answer at 51.) *See Bennett*, 322 F.3d at 585. Respondents fail to meet their burden of specifically pleading and proving default. (*See* Answer at 51); Section II.B.2, *supra*.

Even if Respondents' general invocation of Arizona's procedural rules suffices to establish procedural default, the Court can review the merits of the claim because Kiles has made a colorable showing that ineffective assistance of post-conviction counsel led to the default of this colorable "substantial" ineffective-assistance-of-trial-counsel claim. *Martinez*, 566 U.S. at 18. Kiles will prove at an evidentiary hearing that any default should be excused due to the ineffective assistance of post-conviction counsel under *Martinez*. *See* Section II.B.3, *supra*. This court should review this claim on its merits.

Respondents ignore the bulk of Kiles's arguments regarding the merits in his Petition, and instead argue that counsel did not perform deficiently because he gave

a "lengthy" statement where he "reminded the jurors that Kiles was innocent until proven guilty," and acknowledged that Kiles killed Gunnel, but began to lay the foundation for an explanation. (Answer at 52.) These meager adequacies do not make up for counsel's unreasonable errors. Further, the failure to coherently build on this alleged "foundation" of a defense was unreasonable. Last, that Clark's detrimental opening statement was "lengthy" only further prejudiced Kiles.

Respondents fail to address the merits arguments in Kiles's Petition regarding ineffective assistance during trial counsel's opening statement, and thus fail to dispute that trial counsel made several promises he did not keep, and that he vouched for the credibility of an impeachable state's witness. (*See* Pet. at 118–19; Answer at 51–52.) Respondents fail to offer even a tepid justification for why reasonable trial counsel would, without prompting, tell the jury that:

> [Kiles] and his friends . . . decide to do what they have done in the past, and that's -- they're going to go shoplift some Circle K's. Evidently, it's an easy thing to do. They steal some cigarettes and they steal some liquor. They take the cigarettes and trade them for some more cocaine. They do this three times.

(Tr. July 10, 2000 at 43–44.)

There is no indication that any of this is true, and no evidence supporting it was introduced by either party at trial. The prejudice from portraying Kiles as a chronic thief is self-evident, particularly when his defense hinged on Kiles's testimony and credibility. This bad character evidence would have been inadmissible had the prosecution attempted to introduce it. *See* Ariz. R. Evid. 404(b). That trial counsel did so for no apparent aim, and when no witnesses scheduled to be heard could have testified to these matters, defies any belief that this was reasonable trial strategy. (*See* Pet. at 120; ROA 446 at 1–2; Tr. July 14, 2000 at 136–37). Trial counsel's unfulfilled promises, vouching for impeachable witnesses, and introduction of irrelevant, unprovable, and harmful character

1    evidence against his own client prejudiced the jury against Kiles from the outset.

2    Kiles need not, as the State argues, prove prejudice under *Brecht*, 507 U.S.

3    at 637–38. (Answer at 52.) As with any ineffective-assistance-of-counsel claim,

4    Kiles need only show prejudice under *Strickland*. 466 U.S. at 694.[20] Kiles has

5    shown that there is a reasonable probability that, had counsel not performed

6    deficiently during opening statements, and not undermined Kiles's credibility, at

7    least one juror may have reached a different conclusion. *Id*. This discrepancy

8    between what occurred at trial and what could have occurred had counsel acted

9    reasonably undermines confidence in the outcome of Kiles's trial, both alone and

10   when considered cumulatively with counsel's other errors and the resulting

11   prejudice.

12         **D.    Post-conviction counsel presented a colorable claim that trial
13                counsel were ineffective for failing to effectively cross-examine
                  crucial State's witnesses on matters relating to whether Gunnel's
14                death was premeditated.**

15   First, this Court should reject Respondents' argument that this claim was

16   defaulted (Answer at 52), given that it was fairly presented in state court (*see* ROA

17   1189 at 5–6, 13, 23–25, 30–40; PFR2 Dkt. 1 at 5–6, 13, 23–46). Respondents

18   concede that Kiles raised in state court, in their words, a claim "that defense counsel

19   should have gotten additional experts to challenge the State's experts, not that cross-

20   examination of the State's witnesses was inadequate. (ROA 1189 at 32–37; [PFR2

21   Dkt. 1] at 1217 at 32–37.)" (Answer at 52 n.9.) However, Respondents are plainly

22   mistaken. Respondents ignore that Kiles's state post-conviction petition specifically

23   includes the allegation that trial counsel failed to meaningfully cross-examine two

24   non-expert witnesses, Larry Hawkins and Kale Johnson, by pointing out blatant

25   _____

26   [20] Respondents also attempt to assert that Kiles should have shown prejudice under
27   *Brecht* in their responses to Sections (E)-(K), *infra*. For sake of brevity, Kiles
     incorporates this discussion of the inapplicability of *Brecht* into his response to
28   those sections and does not repeat it.

1    inconsistencies in their statements, just as Kiles now alleges. (*See* ROA 1189 at 5–

2    6, 39–40, PFR2 Dkt. 1 at 6–7, 39–41.) Further, Respondents ignore that the state

3    court specifically adjudicated Kiles's challenge to counsel's failure to impeach Kale

4    Johnson's testimony. (ROA 1214 at 2.) Respondents also ignore that Kiles's present

5    claim rests on the same facts, and alleges the same theory as the fairly presented

6    claim in state court: that trial counsel performed deficiently and prejudiced Kiles

7    by failing to challenge the state's witnesses regarding the circumstances of

8    Gunnel's death at the guilt phase of trial.[21] This was due to their unreasonable

9    failure to investigate Kiles's character for impulsivity—as fully described above.

10   This failure was particularly egregious given the inconsistent testimony of the

11   State's witnesses during Kiles's trial.

12        Kiles has thus exhausted this claim by giving the state courts "a fair

13   opportunity" to address it. *Boerckel*, 526 U.S. at 844 (emphasis omitted). In other

14   words, "the prisoner must 'fairly present' his claim in [the] appropriate state court

15   . . . thereby alerting that court to the federal nature of the claim." *Baldwin v. Reese*,

16   541 U.S. 27, 29 (2004) (quoting *Duncan v. Henry*, 513 U.S. 364, 365–66 (1999)

17   (per curiam).) The Supreme Court has explained that "[o]bviously there are

18   instances in which the ultimate question for disposition will be the same despite

19   variations in the legal theory or factual allegations urged in its support." *Picard v.

20   Connor*, 404 U.S. 270, 277 (1971) (citations and internal quotation marks omitted).

21   This Court "should take care to avoid hypertechnicality" in applying the fair

22   presentation doctrine. *Williams*, 59 F.3d at 677 (citation and internal quotation

23   marks omitted); *see* Section II.B.1, *supra*. Here, the substance of Kiles's claim—

24   that trial counsel was ineffective for failing to meaningfully challenge the witnesses

25   ─────────────

26   [21] Further, Kiles's claim here rests on the same facts and legal argument as those
raised in state court: that had counsel hired their own independent experts or
27   reviewed the prior experts' testimony, they would have been able to challenge the
state witnesses' testimony. This failure constituted ineffective assistance. Different
28   topical headings do not change this.

1   who supported the State's theory of Gunnel's death—was presented to the state
2   court.[22]

3       With respect to the merits, Respondents challenge to the colorability of the
4   claim presented in state court mischaracterizes Kiles's allegations and minimizes
5   counsel's failures by claiming that Kiles argued that counsel was constitutionally
6   ineffective "for not more vigorously cross-examining some state witnesses."
7   (Answer at 52.) This is incorrect. As Kiles's Petition shows, counsel failed to meet
8   their duty under the Sixth Amendment to test the State's case by adequately cross-
9   examining the State's witnesses on points critical to the defense. *See Crawford v.*
10  *Washington*, 541 U.S. 36, 61 (2004) (recognizing the "testing [of evidence] in the
11  crucible of cross-examination" as crucial constitutional guarantee of reliability).
12  (*See* ROA 1189 at 5–6, 13, 23–25, 30–40; *see also* Pet. at 120.)

13      As an initial matter, the test for prejudice outlined in *Strickland* is not whether
14  effective performance "would [] have changed the outcome of the trial." (Answer
15  at 53.) Prejudice exists where "there is a reasonable probability that, but for
16  counsel's unprofessional errors, the result of the proceeding would have been
17  different." *Strickland*, 466 U.S. at 669, 694. The *Strickland* Court explicitly rejected
18  the outcome-determinative standard contemplated by the phrase "would [] have
19  changed the outcome of the trial. *Id.* at 693-94; (Answer at 53.) Thus, the question
20  presented is whether effective cross-examination of crucial state witnesses would
21  have had a reasonable probability of effecting at least one juror's perception of the
22  degree of blame to assign Kiles, such that they would not have voted to convict him
23  of first-degree murder.

24      Respondents assert that trial counsel's failure to meaningfully cross-examine

25  _____

26  [22] Alternatively, if the court finds that this claim was not fairly presented in state
    court, or that new factual allegations fundamentally alter the claim, *see Dickens*,
27  740 F.3d at 1330, Kiles alleges he can overcome any default by showing cause and
    prejudice attributable to the ineffective assistance of state post-conviction counsel.
28  *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *Strickland*, 466 U.S. at 688, 694.

1    crucial state witnesses was not deficient; nor did it produce sufficient prejudice to

2    warrant relief. (Answer at 53.) They note that Kiles confessed his involvement in

3    the crime, and thus the outcome of trial would not have been changed had an

4    adequate cross-examination occurred. (Answer at 53.)

5        Trial counsel's apparent trial strategy was to concede guilt, but argue that the

6    State had failed to prove premeditation. Thus, whether Kiles confessed to a role in

7    Gunnel's death is immaterial to any contested element of proof. Kiles already

8    conceded involvement in Gunnel's homicide. Instead, defense counsel needed to

9    adequately cross-examine these witnesses to undermine their claims that Kiles

10   killed Gunnel with premeditation. The State's version of events was based largely

11   on the testimony of pathologist Robert Mallon, M.D., and Tom Bevel, a blood

12   spatter expert.[23] Bevel's and Dr. Mallon's testimony were both rife with

13   inconsistencies, inaccuracies, and subjective opinions presented as objective

14   science. Kiles's post-conviction petition discussed how Bevel had testified in

15   Kiles's first proceedings in 1989, and then in the guilt and aggravation phases in

16   2000 and 2006. (ROA 1189 at 32.) It noted how his testimony changed over time,

17   specifically that he revised his testimony regarding the number of blows received.

18   (ROA 1189 at 32 n.78.) It also noted how Bevel's testimony directly contradicted

19   Kiles's testimony regarding how many times he struck Gunnel, and how his

20   testimony was "pivotal" both to the jury's conviction of Kiles and the finding of

21   (F)(6) in the aggravation phases. (ROA 1189 at 33.) The post-conviction petition

22   further noted that a defense blood spatter expert was "imperative" to rebut Bevel's

23   testimony. (ROA 1189 at 33.) Post-conviction counsel noted that Kiles's first post-

24   conviction counsel had hired Peter Barnett, a forensic scientist, to challenge Bevel's

25   testimony, and had Clark reviewed the first post-conviction file, he might have hired

26

27   [23] At an evidentiary hearing, Kiles would present evidence that jurors remembered
     the testimony of Bevel as particularly persuasive, and had no reason to doubt its
28   accuracy.

him as well. (ROA 1189 at 33.) Post-conviction counsel detailed Barnett's findings, and how they would have undercut the State's case, particularly with respect to Bevel's failure to substantiate his findings regarding the number of blows struck in the west bedroom; the nature of the weapon used; the handedness of the assailant; the manner in which the blows were struck; and the identification of specific bloodstain patterns from specific blows. (ROA 1189 at 34, citing Barnett's first report.)

Likewise, Dr. Mallon's testimony was exaggerated and speculative, and this could have easily been revealed with adequate cross-examination. Kiles argued in his post-conviction petition that some of Dr. Mallon's findings were speculative and should have been challenged. (ROA 1189 at 36–37.) The post-conviction petition also noted that Gunnel "had a 'deformed' broken arm, which Dr. Mallon identified as a defensive wound. (ROA 1189 at 8 (Tr. July 13, 2000 at 97, 99–100, 105).) The petition further noted that "Dr. Mallon opined that the blow to the back of Valerie's head would have caused loss of consciousness, possibly even death." (ROA 1189 at 8 (Tr. July 13, 2000 at 106, 107).) But trial counsel blindly accepted Dr. Mallon's assertions instead of confronting him with his far-less-definitive statement at the 1989 trial that Gunnel's forearm wound merely could be a defensive wound. (Tr. Dec. 12, 1989 at 8.) Relatedly, counsel could have confronted Dr. Mallon with his 1989 testimony that he could not say whether Gunnel was conscious for any particular blow. (*See* Tr. Dec. 12, 1989 at 15 (testifying that "it would be speculation" to say whether Gunnel was conscious after the first blow).)

Had counsel adequately investigated—which they failed to do—they could have effectively cross-examined the state's witnesses, and revealed that available forensic evidence was equally consistent with Kiles's testimony as with the prosecution's version of events. Further, it would have undermined the reliability of Kale Johnson and Larry Hawkins' testimony. Indeed, counsel could have cross-examined Hawkins on his testimony's inconsistencies with a prior affidavit (PFR2

1    Dkt. 20 Ex. 2 at 2–3), or about the falling-out Hawkins and Kiles experienced after

2    Hawkins beat up Kiles's sister (PFR2 Dkt. 21 Ex. 3, ¶¶ 27–28.)

3         The State's case regarding premeditation rested almost entirely on the

4    testimony of the above witnesses. Thus, if they had been adequately cross-

5    examined, the prosecution's version of events would have been called into

6    substantial doubt. Counsel's failure to utilize readily available and easily

7    discoverable information to support their theory of the case was deficient. And, if

8    the jury had been presented this evidence, there is a reasonable probability that at

9    least one juror might have voted not to convict Kiles of first-degree murder.

10   *Strickland*, 466 U.S. at 694.

11        Respondents have therefore failed to refute that the allegations in Kiles's

12   post-conviction petition, which would, if proved, establish both deficient

13   performance and prejudice. *See Watton*, 793 P.2d at 85. Because Kiles presented a

14   colorable claim for relief and requested a hearing, but the state court made factual

15   findings without affording the petitioner the benefit of one, then the state court's

16   decision was based on unreasonable determinations of fact under § 2254(d)(2). *See*

17   *Brumfield*, 135 S. Ct. at 2278–79, 2281–83; *Taylor*, 366 F.3d at 1001 (9th Cir.

18   2004). Also, because Kiles presented a colorable claim to the post-conviction court,

19   as demonstrated *supra*, the state court's finding that this claim lacked colorable

20   merit and its denial of relief without affording Kiles the hearing to which he was

21   entitled under Arizona law was both contrary to and an unreasonable application of

22   clearly established federal law. *See* § 2254(d)(1). And because Kiles was denied a

23   requisite hearing in state court, and his claim is colorable, Kiles is entitled to a

24   federal hearing and ultimate relief.

25        Therefore, Kiles can demonstrate that based on evidence before the state

26   court, when that court decided this ineffectiveness claim, it made serious errors,

27   which render its decision not subject to the limitations on habeas relief set forth in

28   28 U.S.C. § 2254(d). Once these limitations on relief are lifted, this Court will be

75

1    required to consider the claim de novo. *Panetti v. Quarterman*, 551 U.S. 930, 953

2    (2007); *Frantz v. Hazey*, 533 F.3d 724, 735-36 (9th Cir. 2008) (§ 2254(d) limits the

3    authority granted in § 2241 for granting relief but, once a petitioner is able to show

4    that his claims are not precluded by § 2254(d), then federal court is permitted to

5    consider the presented constitutional claim de novo). It follows, because the state

6    court disallowed an evidentiary hearing and development of the factual record in a

7    manner that contravenes subsection § 2254(d)(2), Kiles will be entitled to

8    supplement the state court record with some new facts within the limits that

9    exhaustion permits. *See Williams v. Woodford*, 859 F.Supp.2d 1154, 1161 (E.D.

10   Cal. 2012) (Ninth Circuit Judge, sitting by designation, granting expansion of

11   record where state court denied evidentiary hearing and its decision was based on

12   an unreasonable determination of the facts under § 2254(d)(2)); *Lor v. Felker*, 2012

13   WL1604519 (E.D. Cal. 2012) (where state court improperly decided issues of fact

14   without granting evidentiary hearing its decision ran afoul of § 2254(d)(2) and

15   habeas petitioner would be granted a hearing and permitted to expand the record).

16       Therefore, based generally on the principles above, some new evidence

17   supporting this claim will be admissible to the extent permitted under exhaustion

18   principles: expert testimony further demonstrating that trial counsel missed critical

19   chances to effectively cross-examine Bevel and Dr. Mallon, thereby unnecessarily

20   ceding key points that could have undercut the State's premeditation case. For

21   example, Bevel inaccurately stated that he determined the "handedness" of the

22   attacker, which cannot be done based on cast-off patterns. (Tr. July 14, 2000 at 16,

23   19.) Bevel also opined that he could determine the number of blows received, which

24   again was an overstatement. (Tr. July 14, 2000 at 16, 23, 27.) At most, spatter

25   analysis can reveal how many times a weapon was swung—it cannot determine

26   from cast-off pattern how many strikes occurred. Further, Dr. Mallon testified that

27   Gunnel's arms presented defensive wounds, despite the fact that he was not able to

28   state this with certainty. Trial counsel further obtained from Dr. Mallon a statement

that Gunnel was "conscious" during the assault, an assessment which could not be determined from the evidence available to a pathologist. (Tr. July 13, 2000 at 105.)

Such testimony would show that counsel's failures with respect to cross-examination were not based on any informed, reasoned decisions, but on a lack of preparation and investigation. *See Wiggins*, 539 U.S. at 521–22 (counsel's decisions are due deference only when informed by reasonable investigation). Had counsel effectively challenged the testimony of these key State witnesses, there is a reasonable probability that the jury's verdict would have been different. *See Strickland*, 466 U.S. at 688, 694.

### E. Counsel were ineffective for stipulating to the admission of hearsay statements from Gunnel at the guilt-phase proceedings.

Respondents concede that this section is exhausted, and not subject to any procedural bars. (Answer at 53.) However, Respondents argue that to the extent that state post-conviction counsel phrased trial counsel's actions as error in "failure to object" to the inclusion of Gunnel's hearsay statements, and the instant claim is phrased as "error in stipulating" to the inclusion of these statements, this part is procedurally defaulted. (Answer at 53.) This argument is incorrect. The claim raising this issue in Kiles's state petition for post-conviction relief and petition for review include in their first lines: "the defense *stipulated* under the law of the case doctrine that Valerie's hearsay statements regarding her decision to ask Mr. Kiles to leave would be admitted." (ROA 1189 at 37; PFR2 Dkt. 1 at 38 (emphasis added) (footnotes omitted).)

This issue has been fairly presented to the state courts, as failing to object to something being admitted and stipulating to its admission are materially the same thing. *See* Section II.B.1, *supra*; *Reese*, 541 U.S. at 29. In his state pleadings, Kiles asserted that counsel's ineffective assistance in not challenging the State's efforts to admit Gunnel's hearsay statements violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution. (*See* ROA 1189 at 37-

1   39; PFR2 Dkt. 1 at 38.) The court had adequate notice. Respondents have not

2   successfully pled and proven a default. *See* Section II.B.2, *supra*.

3       Respondents argue that the state post-conviction court's decision was

4   "neither contrary to nor an unreasonable application of clearly established federal

5   law or was based on an unreasonable determination of the facts." (Answer at 54.)

6   As discussed, the state court's application of *Strickland* was an unreasonable

7   application of clearly established federal law. *See* Section 3.A, *supra*; *Strickland*,

8   466 U.S. at 693–94; *Williams*, 529 U.S. at 397; § 2254(d)(1). Further, the state-

9   court decision was an unreasonable determination of the facts in light of the

10  evidence, as no reasonable fact-finder could have determined that Kiles failed to

11  state a colorable claim without a hearing. *See* § 2254(d)(2); *Taylor*, 366 F.3d at

12  1001. Kiles's counsel stipulated to allowing harmful hearsay into the record based

13  on the theory of the law of the case—a theory she later rejected. (Tr. July 12, 2000

14  at 9; Tr. Oct. 7, 2005 at 88.)

15      The State's arguments to the contrary are unpersuasive. First, the state post-

16  conviction court's determination that Kiles failed to state a colorable claim of

17  deficient performance by trial counsel and failed to present a material issue of fact

18  or law rested on limited grounds. (*See* ROA 1214 at 1–2.) The court found that

19  "[w]ith regard to Attorney Clark's deficient performance, Defendant's allegations

20  lack the requisite specificity to state a colorable claim." (*See* ROA 1214 at 1.) No

21  other reasons were given.

22      Respondents instead improperly create other reasons underlying the state

23  court's decision. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1191–92 (2018) ("Deciding

24  whether a state court's decision 'involved' an unreasonable application of federal

25  law or 'was based on' an unreasonable determination of fact requires the federal

26  habeas court to 'train its attention on the particular reasons—both legal and

27  factual—why state courts rejected a state prisoner's federal claims[.]'" (quoting

28  *Hittson v. Chatman*, 135 S. Ct. 2126, 2126 (2015) (Ginsburg, J., concurring in

denial of certiorari).)The state court's guilt-phase decision did not rely on these bases, but they were nevertheless unreasonable under § 2254(d).

First, Respondents argue that Kiles was not prejudiced by the hearsay statements of the decedent being admitted through the testimony of other witnesses. (Answer at 55.) But the prosecution relied heavily on this hearsay in their closing argument as a reason to reject the truthfulness of Kiles's testimony. (*See* Tr. July 19, 2000 at 25–26.) As Kiles's entire defense revolved around the jury believing his version of events, and the hearsay was utilized to question his credibility, this is a paradigmatic example of prejudice. Further, the content of Ms. Gunnel's statements portrayed Kiles in an exceedingly poor light, further prejudicing him.

Respondents further argue that Kiles has failed to identify any conduct by trial counsel that was deficient. (Answer at 55.) But Kiles's Petition makes clear that defense counsel's stipulation to the introduction of this damaging information constitutes deficient performance, as it was unreasonable in light of prevailing professional norms. (*See* Pet. at 124–25.) Counsel later objected to the use of the "law of the case" doctrine, but here made no such objections. (*See* ROA 756 at 2–5.) And Respondents argue that the information was not hearsay, as it was offered to show the victim's state of mind. (Answer at 55.) But in their closing argument, the prosecution argued that the statements should be considered for their truth. (Tr. July 19, 2000 at 26.)

Gunnel's hearsay statements should not have been admitted, but trial counsel unreasonably stipulated to their admission. The prosecution then relied upon this damaging hearsay to argue that Kiles was not credible and harm counsel's heat-of-passion defense. Had counsel not performed deficiently, there is a reasonable probability that at least one juror would not have voted to convict Kiles of first-degree murder for Gunnel's death. *See Strickland*, 466 U.S. at 694. It was unreasonable for the state court to find that Kiles had not stated a colorable claim and deny this part without holding a hearing.

79

1    **F.    Counsel were ineffective for failing to object to the worst of the**
2    **gruesome photographs repeatedly displayed at trial.**

3    Respondents agree that the state court addressed this argument on the merits.
4    (Answer at 56.)

5    Trial counsel's ineffectiveness for stipulating to the admission of a
6    photograph of a baby's water-bloated, partially-eaten corpse was raised as a claim
7    by post-conviction counsel. (ROA 1189 at 30–32; PFR2 Dkt. 1 at 30–32.) The post-
8    conviction court found that Kiles had failed to prove deficient attorney performance
9    and prejudice (ROA 1214 at 2), an unreasonable application of clearly established
10   federal law and an unreasonable determination of fact in light of the evidence
11   presented. *See* § 2254(d).

12   The court admitted as Exhibit 72 a photograph of LeCresha's body after it
13   had spent roughly a week in a canal. *Kiles*, 213 P.3d at 183, ¶ 38, n.11. Counsel
14   stipulated to its admission at the guilt phase, despite counsel's later recognition that
15   its inclusion was prejudicial to Kiles and that it may have been an error not to
16   contest its inclusion. (Tr. Mar. 20, 2006 at 35.) As Kiles did not contest LeCresha's
17   cause of death or identity, the photograph had no relevance to any material issue in
18   dispute. Further, the prejudice is apparent. Jurors from Kiles's first trial in 1989
19   described in written affidavits filed as part of Kiles's first post-conviction
20   proceedings that the photograph was haunting and horrifying, and were upset that
21   it was introduced for no apparent purpose. (ROA 225 Ex. 49, ¶ 2; ROA 225 Ex. 51,
22   ¶¶ 3–4.) Jurors at Kiles's second trial echoed this.

23   Respondents ignore the bulk of Kiles's argument on this issue, including that
24   counsel should have been on notice that the photograph would disturb the jurors
25   given the affidavits from jurors at Kiles's first trial. (ROA 225 Ex. 49, ¶ 2; ROA
26   225 Ex. 51, ¶¶ 3–4.) Respondents focus their arguments on the Arizona Supreme
27   Court's ruling on the underlying issue of the admission of the photo, which is
28   distinct from the ineffective-assistance claim. (Answer at 56–59.) Respondents

1    make no argument specific to this section that the state-court decision presents no

2    barrier to merits review under AEDPA.

3          Respondents argue that it was reasonable for Kiles's counsel not to object to

4    the photo given defense counsel's third party defense theory, as it may have

5    engendered the jury's anger toward the third party, Kale Johnson, and away from

6    Kiles. (Answer at 58.) However, it is unclear how the gruesome photo in itself

7    supported the third-party defense. Further, it is likely that much of the damage to

8    the body was the result of being submerged in water for a week.

9          Respondents argue that there is a "presumption that counsel's conduct falls

10   within the wide range of reasonable professional assistance." (Answer at 57, citing

11   *Strickland*, 466 U.S. at 689.) However, this presumption only attaches to conduct

12   resulting from reasonable decision-making, it does not attach where conduct results

13   from inattention or a lack of diligence, as here. *See Strickland*, 466 U.S. at 690–91;

14   *Williams*, 529 U.S. at 373; *Rompilla*, 545 U.S. at 395–96.

15         Respondents argue that it is irrelevant that Kiles's trial counsel later admitted

16   during the aggravation phase that she should have objected to the admission of the

17   photo of LeCresha during the guilt phase. (Answer at 58.) However, while counsel's

18   assessment of her performance may not be dispositive, it is relevant because it

19   shows that counsel acted as the result of inattention or mistake of law rather than

20   strategic decision-making. Thus, counsel's actions are entitled to no deference. *See*

21   *Wiggins*, 539 U.S. at 534; *Hinton v. Alabama*, 571 U.S. 263, 275 (2014) (per

22   curiam); *White v. Rayan*, 895 F.3d 641, 666 (9th Cir. 2018) ("A decision based on

23   a misunderstanding of the law is not sound trial strategy.") The state court's finding

24   that Kiles failed to state a colorable claim regarding the gruesome photo was an

25   unreasonable determination of fact, given counsel's statement on the record

26   regarding how she should have objected, and given how gruesomely prejudicial the

27   photo was—particularly given its limited probative value. The state court's decision

28   ignored key evidence supporting Kiles's argument. *Taylor*, 366 F.3d at 1001. The

1   state court's decision was also an unreasonable application of *Strickland*.

2        Respondents' argument that the trial court was permitted to admit the photo

3   (Answer at 58) is unresponsive to Kiles's ineffective-assistance claim, which

4   challenges counsel's conduct and the resulting prejudice. Respondents' argument

5   that counsel did not provide ineffective assistance by failing to object because the

6   Arizona Supreme Court found no error with its admission is incorrect. (Answer at

7   59.) On appeal, the court must defer to the decisions of the trial court, whereas at

8   trial, the trial court has broad discretion on these types of rulings, as Respondents

9   note. (Answer at 58.) Thus, Kiles's counsel may have prevailed had they objected

10  at trial. Additionally, the State's arguments defending the trial court's admission of

11  the photo, and the Supreme Court's review of that error, are incorrect. *See* Claim

12  8.E, *infra*. The Arizona Supreme Court held that because the penalty-phase jury did

13  not sentence Kiles to death for the killing of the children, Kiles suffered no

14  prejudice. *See Kiles*, 213 P.3d at 183.Where, as here, there were different guilt- and

15  penalty-phase juries, the court's holding was unreasonable. It failed to recognize

16  that regardless of the sentence imposed, the photograph was so unduly prejudicial

17  that it rendered the guilt phase fundamentally unfair. The state court's denial of this

18  claim was an unreasonable application of or contrary to clearly established federal

19  law, *see* 28 U.S.C. § 2254(d)(1), and rested on an unreasonable determination of

20  the facts, *id*. § 2254(d)(2).

21       Kiles has shown that there is a reasonable probability that, had counsel

22  objected to the inclusion of Exhibit 72, they would have prevailed. Had jurors not

23  seen this gruesome photo, there is a reasonable probability that at least one juror

24  may have reached a different verdict. *Strickland*, 466 U.S. at 669. This discrepancy

25  between what occurred at trial and what could have occurred had counsel acted

26  reasonably undermines confidence in the outcome of Kiles's trial, alone and when

27  considered cumulatively with counsel's other errors and the resulting prejudice.

28

1
2

### G.    Counsel rendered ineffective assistance by failing to request critical jury instructions.

3    Respondents, in part, agree that this issue was raised in state post-conviction

4    proceedings, as post-conviction counsel challenged counsel's failure to request

5    critical jury instructions regarding premeditation. (Answer at 59; citing ROA 1189

6    at 42–45; ROA 1217 at 42–45.) However, Respondents attempt to parse and

7    reframe Kiles's arguments, claiming that this Petition "actually appeared to be

8    arguing" the "voluntary intoxication" instruction to the exclusion of other

9    instructional errors. (Answer at 59.) This is not so. Their "hypertechnical[]"

10   application of the exhaustion doctrine must be rejected. *Williams*, 59 F.3d at 677–

11   68. Respondents may not attempt to reframe Kiles's claim to assert that it was not

12   exhausted. Further, the post-conviction court ruled on this, finding it precluded.

13   (ROA 1214 at 2.) Kiles made extensive arguments in the state post-conviction court

14   regarding counsel's failure to request jury instructions adequately defining

15   reflection and other elements of premeditation, and how that violated Kiles's

16   constitutional rights. (ROA 1189 at 42–45; PFR2 Dkt. 1 at 42–45.) On direct appeal,

17   Kiles also made many arguments challenging the propriety of the jury instructions

18   regarding premeditation, and the Arizona Supreme Court analyzed them. Thus, this

19   was fairly presented to the state courts. *See* Section II.B.1, *supra*.

20   Respondents fail to address Kiles's arguments related to trial counsel's

21   failure to clarify instructions defining "child abuse." (Pet. at 131–32; *see* Answer at

22   59–67.) Respondents thus fail to dispute the allegations contained in Kiles's

23   Petition, and have waived their opportunity to argue that this claim is procedurally

24   defaulted. *See James v. Ryan*, 733 F.3d 911, 913–14 (9th Cir. 2013).

25   To the extent that this Court agrees that some elements of this claim were not

26   exhausted in state court, the Court should reject Respondents' argument that this

27   claim is "precluded as procedurally defaulted without excuse and not properly

28   before this Court." (Answer at 60.) Respondents do not demonstrate that this is the

1    kind of claim that would be barred if presented in the state courts beyond citing

2    generally to Ariz. R. Crim. P. 32.1 and 32.2, which govern successive petitions, and

3    federal cases applying those rules. (Answer at 60.) *See Bennett*, 322 F.3d at 585.

4    Respondents fail to meet their burden of specifically pleading and proving a default.

5    (*See* Answer at 60); Section II.B.2, *supra*.

6        Even if Respondents' general invocation of Arizona's procedural rules

7    suffices to establish procedural default, the Court can review the merits of the claim

8    because Kiles has made a colorable claim that the ineffective assistance of post-

9    conviction counsel excuses the default of this "substantial" ineffective-assistance-

10   of-trial-counsel claim. *Martinez*, 566 U.S. at 18. Kiles will demonstrate at an

11   evidentiary hearing that any default should be excused due to the ineffective

12   assistance of post-conviction counsel under *Martinez*. *See* Section II.B.3, *supra*.

13   Post-conviction counsel was ineffective for failing to properly plead this claim in

14   state court, despite recognizing its importance, and the failure to file a reply brief in

15   state court compounded this error and prejudiced Kiles. (*See* Pet. at 377-90, Claim

16   13, *infra*.) This Court should conduct a de novo review of the merits.

17       The state court's ruling is no bar to de novo review of this claim. The post-

18   conviction court held that "Defendant's claims as to the reflection instruction is also

19   precluded." (ROA 1214 at 2.) Respondents insert reasoning that is present nowhere

20   in the court's order: Respondents argue that the preclusion was due to a failure to

21   raise on direct appeal, but the post-conviction court's order is silent as to reasoning.

22   (*Compare* Answer at 59-60 *with* ROA 1214 at 2.) Because the post-conviction

23   court's order was vague as to the basis of preclusion, it cannot constitute a

24   procedural bar for federal purposes. *See McKenna v. McDaniel*, 65 F.3d 1483, 1488

25   (9th Cir. 1995).

26       Indeed, the post-conviction court's ruling, taken at face-value, was

27   unreasonable. In addressing an ineffective-assistance-of-counsel claim (*see* ROA

28   1189 at 42–45), Respondents argue that the post-conviction court held that this

1   matter should have been brought on direct appeal. (Answer at 59–60.) But it could
2   not have been brought on direct appeal because trial-counsel-ineffectiveness claims
3   may only be brought in post-conviction proceedings in Arizona. *Martinez*, 566 U.S.
4   at 10–11. And Arizona state courts do not regularly treat trial-counsel-
5   ineffectiveness claims as precluded during initial state post-conviction proceedings,
6   so if that was done here, the procedural ruling is not adequate and does not bar
7   federal review. *See Coleman*, 501 U.S. at 729.

8       Respondents' citation to clearly established federal law is unresponsive, as
9   no state court has ruled on the merits of this part. Respondents devote the bulk of
10  their argument to the Arizona Supreme Court's ruling on Kiles's claim on direct
11  appeal that the trial court erred by refusing to give appropriate instructions
12  regarding premeditation. (*See* Answer at 60–64 (citing *Kiles*, 213 P.3d at 181–82,
13  ¶¶ 23–33).) Respondents argue that the Arizona Supreme Court's ruling rejecting
14  the allegations regarding the need for correct instructions on premeditation and the
15  intoxication defense is determinative. (Answer at 60.) However, the Arizona
16  Supreme Court's ruling was incorrect. (*See* Pet. at 289–94.) Further, just because
17  the Arizona Supreme Court found that the court had not abused its discretion by
18  giving the instructions it gave does not mean that Kiles was not prejudiced by
19  counsel's failure to request clearer and more favorable instructions. Had counsel
20  argued to ensure that the jury received more favorable and clearer instructions
21  regarding premeditation and the intoxication defense, there is a reasonable
22  probability that at least one juror may not have voted to convict Kiles of first-degree
23  murder. *See Strickland*, 466 U.S. at 694. It was unreasonable in light of prevailing
24  professional norms to do so.

25      Had counsel advocated this point at trial, it is likely that they would have
26  prevailed. The Arizona Supreme Court has explained that premeditation requires
27  actual—not merely potential—reflection. *See State v. Thompson*, 65 P.3d 420, 427
28  (Ariz. 2003). Yet the instruction which was read to the jury indicated that

85

premeditation may be implied: "Premeditation means the defendant acts with the knowledge that he will kill another human being when such intention or knowledge precedes the killing by a length of time *to permit reflection*. An act is not done with premeditation if there is any instant - - if it is the instant effect of a sudden quarrel or heat of passion." (Tr. July 19, 2000 at 92–93) (emphasis added).)

But trial counsel failed to ensure that the jury was instructed on reflection. Respondents cite *State v. Hausner* for the proposition that an instruction detailing "calm and cool" reflection provided sufficient guidance to the jury. (Answer at 66; 280 P.3d 604, 627 (Ariz. 2012).) But this reinforces that the lone term "reflection," without context, does not adequately guide jurors as to what mental state a defendant must possess. Here, trial counsel presented a defense theory that Kiles killed Gunnel in the heat of passion. But there was nothing to explain to jurors that the heat of passion could not exist coordinately with actual reflection. Indeed, the prosecutor implicitly argued this by claiming that premeditation can occur with great rapidity, during the commission of the crime itself. (Tr. July 19, 2000 at 35.) And, in fact, at least one juror was actually confused about whether reflection could occur during the heat of passion leading to the killing, and expressed that she would have appreciated a better definition of premeditation.

Curiously, Respondents claim that Kiles fails to proffer a definition of reflection that should have been advanced by trial counsel. (Answer at 66). But Kiles argued in his Petition that an instruction stating that "reflection differs from the intent or knowledge that conduct will cause death" (*see* Pet. at 130), would have satisfactorily apprised the jury that reflection is distinct from knowledge. Further, Kiles's proposed instruction is in conformity with Arizona law. (Pet. at 130–31 (citing *State v. Ramirez*, 945 P.2d 376, 378 (Ariz. Ct. App. 1997) (quoting Recommended Arizona Criminal Jury Instruction 11.051).)

Because of trial counsel's failure to ensure that an instruction defining "reflection" was given to the jury, the prosecution was free to minimize its role in

argument. Although *Thompson* disapproved of the use of the phrase "as instantaneous as successive thoughts of the mind" in jury instructions because of its tendency to mislead juries, here the prosecution argued that premeditation "can be instantaneous. I mean that can be so fast." 65 P.3d at 428; (Tr. July 19, 2000 at 35); *see also State v. Dann*, 74 P.3d 231, 239 (Ariz. 2003) ("[I]f a court's instruction or a prosecutor's comment to the jury signals that the mere passage of time will suffice to establish the element of premeditation, those instructions or comments constitute error.").

Arizona law creates a false distinction between *knowing* premeditated first-degree murder and *intentional* premeditated first-degree murder. *See* A.R.S. § 13-1105(A)(1); *State v. Lavers*, 814 P.2d 333, 346 (Ariz. 1991). Although historically first-degree premeditated murder has required a specific intent to kill or seriously injure, Arizona's murder statute does away with this in order to deprive defendants of the ability to assert lack of specific intent as a defense. *Kiles*, 213 P.3d at 182; Givelber, D., *The New Law of Murder*, 69 Ind. L.J. 375 (Spring, 1994). Although, a defendant does not necessarily possess a right to present evidence as to a defense which the state has abolished, where the state retains that defense, they cannot arbitrarily offer it to some defendants and deny it to others. *See Montana v. Egelhoff*, 518 U.S. 37, 42 (1996). By creating this false dichotomy, Arizona allows for the arbitrary imposition of death on a select few, non-differentiable defendants at the whim of a prosecutor.

The failure to give jurors clearer instructions is particularly harmful here because Arizona does not require the State to prove actual reflection as a component of premeditation. *See Thompson*, 65 P.3d at 427. Because the state did not need to directly prove reflection, one of the only ways for the defense to convincingly argue that no actual reflection occurred would be by presenting evidence of intoxication. By failing to advocate for Kiles's rights, trial counsel ineffectively acquiesced in Kiles's inability to present a defense to which he was entitled. *Strickland*, 466 U.S.

at 694; *see also In re Winship*, 397 U.S 358, 364 (1970). By allowing the prosecution to select Kiles, out of similarly-situated defendants, to be unable to present this defense, Arizona's murder statute operates in a cruel and unusual manner. *See Furman v. Georgia*, 408 U.S. 238, 245 (1972). (Douglas, J., concurring) (per curiam).

Kiles has shown that there is a reasonable probability that, had counsel advocated for necessary jury instructions, they would have prevailed. Had jurors heard these instructions, there is a reasonable probability that at least one juror may have reached a different verdict. *Strickland*, 466 U.S. at 694. This discrepancy between what occurred at trial and what could have occurred had counsel acted reasonably undermines confidence in the outcome of Kiles's trial, alone and when considered cumulatively with counsel's other errors and the resulting prejudice.

## H.    Counsel provided ineffective assistance when they failed to object to numerous aspects of the State's closing argument.

The Court should reject Respondents' argument that this claim is procedurally defaulted without excuse because it was not presented in state court and "Arizona's procedural rules prevent Kiles from returning to the state courts to present it." (Answer at 67–68.) Respondents do not demonstrate that this is the kind of claim that would be barred if presented in the state courts beyond citing generally to Ariz. R. Crim. P. 32.1 and 32.2, which govern successive petitions, and federal cases applying those rules. (Answer at 67–68.) *See Bennett*, 322 F.3d at 585. Respondents fail to meet their burden of specifically pleading and proving default. (*See* Answer at 67–68); Section II.B.2, *supra*.

Even if Respondents' general invocation of Arizona's procedural rules suffices to establish procedural default, the Court can review the merits of the claim because Kiles has made a colorable claim that ineffective assistance of post-conviction counsel led to the default of this colorable "substantial" ineffective-assistance-of-trial-counsel claim. *Martinez*, 566 U.S. at 18. Post-conviction counsel

88

raised a claim alleging ineffective assistance of appellate counsel for failing to raise the prosecutor's misconduct during argument. (ROA 1189 at 61–65; PFR2 Dkt. 1 at 62–66.) This included discussion of the prosecutor's misconduct during closing argument in the guilt phase. (ROA 1189 at 64–65; PFR2 Dkt. 1 at 65–66.) Thus, despite being on notice that prosecutorial misconduct occurred, post-conviction counsel unreasonably did not raise that trial counsel was ineffective for failing to vigorously object to it. Trial counsel did object, once, when the prosecutor argued that "never has a case exhibited more premeditation" (Tr. July 19, 2000 at 36–37.) However, trial counsel sat idly while the prosecutor made a host of other improper and inflammatory comments. (*See* Pet. at 132–37.) Kiles will prove at an evidentiary hearing that any default should be excused due to the ineffective assistance of post-conviction counsel under *Martinez*. *See* Section II.B.3, *supra*. This Court should conduct a de novo review of the merits.

In addressing the merits, Respondents attempt to reframe these allegations as asserting prosecutorial misconduct, claiming that the Court's determination must be limited to the narrow issue of whether there was a due process violation. (Answer at 68.) But this is incorrect. Here, Kiles asserts ineffective assistance of trial counsel. Whether inadequate defense counsel deprived Kiles of a Sixth Amendment right is a separate inquiry from whether the prosecution deprived Kiles of a Fifth Amendment right. *See Ybarra v. McDaniel*, 656 F.3d 984, 999 (9th Cir. 2011) (faulting district court for failure to recognize that ineffective assistance of counsel based on failure to object to prosecutorial misconduct was separate claim, with separate analysis, from bare prosecutorial misconduct claim); *see also Strickland*, 466 U.S. at 688, 694. Kiles need not prove a due process violation.

Respondents' argument therefore relies entirely on an unpersuasive attempt to show that no misconduct occurred. For the reasons outlined in Claim 9.A, *infra* and in Kiles's Petition (Pet. at 318–23), this is incorrect. Further, Kiles notes that in evaluating the claim of ineffective assistance, the legal question is not precisely the

same as for the underlying claim of prosecutorial misconduct. Respondents'
reliance on the Arizona Supreme Court's reasoning on direct appeal, which is itself
flawed, is thus misplaced. (Answer at 69.) Under *Strickland*, 466 U.S. at 669, Kiles
"must demonstrate that counsel's performance was deficient . . . that the deficient
performance prejudiced [his] defense." *Zapata v. Vazques*, 788 F.3d at1106, 1112
(9th Cir. 2015) (applying two-prong Strickland standard to claim that petitioner's
"trial counsel was constitutionally ineffective for failing to object to the
prosecutor's fabricated and inflammatory remarks"); *see also Trillo v. Biter*, 769
F.3d 995, 1002 (9th Cir. 2014) (analyzing instances of prosecutorial misconduct to
which trial counsel did not object as ineffective assistance claims). Kiles refers the
Court to the *Strickland* analysis set forth in his Petition. (Pet. at 132–37.)

Respondents' arguments regarding whether Kiles's counsel would have
succeeded had they objected to the prosecutor's opening statement are incorrect.
Respondents assert that "[a]ll the inferences the prosecutor drew in his closing
argument were well supported by the evidence" and that "[t]he prosecutor's
argument did not 'manipulate or misstate the evidence, nor did it implicate other
specific rights of the accused'" (Answer at 69 (quoting *Darden v. Wainwright*, 477
U.S. 168, 181–82 (1986)).) Respondents not only fail to cite to anything actually
said at trial, but ignore the lengthy list of examples of prosecutorial misconduct in
Kiles's Petition. (Pet. at 132–37.)

At least four times during closing, the prosecution invented information that
witness Larry Hawkins never attested to. Each of these incidents dealt with the
location of Gunnel's death, and were used to discredit the testimony of Kiles. (*See
e.g.*, Tr. July 13, 2000 at 3–79.) The prosecution also improperly vouched for the
accuracy of Hawkins's testimony. (Tr. July 19, 2000 at 19 ("[T]he state [is] saying
you should believe Larry Hawkins.")); *see also United States v. Sanchez*, 176 F.3d
1214, 1224 (9th Cir. 1999).

The State also mischaracterized Kiles's testimony in closing to "impeach" its

90

misrepresentations. (*Compare* Tr. July 17, 2000 at 166 (Kiles remembers hitting Gunnel more than one time) *with* Tr. July 19, 2000 at 27 (prosecutor claims that Kiles testified that he only hit Gunnel once); *see also* Tr. July 19, 2000 at 29.) These misrepresentations of the substance of Kiles's testimony were in addition to the prosecution's unchallenged use of racially-inflammatory descriptors. (*See* Tr. July 19, 2000 at 30, 77.)

These instances of prosecutorial misconduct had a pervasive effect on the trial. Had trial counsel objected, there is a reasonable probability that they would have prevailed, and that at least one juror would have decided differently on the issue of premeditation, and therefore voted against a first-degree murder conviction. *See Strickland*, 466 U.S. at 694.

## I.    Counsel also rendered ineffective assistance in failing to ensure that a record was made of key parts of the guilt-phase proceedings.

This Court should reject Respondents' argument that this claim is procedurally defaulted. (*See* Answer at 70 (*citing* Answer at 135–36).) Respondents not only fail to meet their burden of pleading and proving a specific default, but attempt to shift the burden to Kiles to prove his entitlement to excusal of a default that has not been pled. (Answer at 136.) *See also* Section II.B.2, *supra*.

Even if Respondents' general invocation of Arizona's procedural rules suffices to establish procedural default, the Court can review the merits of the claim because Kiles has made a colorable claim that ineffective assistance of post-conviction counsel led to the default of this colorable "substantial" ineffective-assistance-of-trial-counsel claim. *Martinez*, 566 U.S. at 18. Trial counsel had an undeniable duty to make a record of proceedings, and the gaps of critical information are apparent from the transcripts and Kiles's pleas for there to be a record. Kiles will prove at an evidentiary hearing that any default should be excused due to the ineffective assistance of post-conviction counsel under *Martinez*. *See* Section II.B.3, *supra*. This Court should conduct a de novo review of the merits.

In capital cases, heightened reliability is required. *See Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality opinion). The Supreme Court has "emphasized repeatedly the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally." *Parker v. Dugger*, 498 U.S. 308, 321 (1992); *see also Zant v. Stephens*, 462 U.S. 862, 890 (1983). By failing to ensure a complete record, trial counsel denied Kiles the opportunity for meaningful appellate review. (*See* Claim 15, *infra*).

### J. Post-conviction counsel presented a colorable claim of cumulative error, which is now subject to de novo review by this Court.

Respondents argue that a claim of cumulative error was not presented in state court. (Answer at 70.) That is incorrect. State post-conviction counsel argued that "[t]he cumulative prejudicial impact of [trial counsel's] deficient performance produced a trial and appeal that were fundamentally unfair and denied Mr. Kiles his rights under the Sixth and Fourteenth Amendments to the United States Constitution." (ROA 1189 at 23.) Post-conviction counsel detailed how numerous instances of error by trial counsel combined to deprive Kiles of his right to the effective assistance of counsel. (*See* ROA 1189 at 23–61.) Post-conviction counsel concluded by noting that "the combined effect of multiple trial errors violates due process where it renders the resulting trial fundamentally unfair." (ROA 1189 at 61 (*citing Alcala v. Woodford*, 334 F.3d 862, 883 (9th Cir. 2003).) Kiles raised the same legal arguments in his petition for review. (PFR2 Dkt. 1 at 23, 61.) Thus, the claim was fairly presented to the state courts. *See* Section II.B.1, *supra*.

Here, the state post-conviction petition included an extended argument within its central prejudice argument regarding the need to consider multiple errors and their prejudice together, with citations to amendments to the U.S. Constitution, and to Ninth Circuit case law with explicatory parentheses. (*See* ROA 1189 at 23 (citing the Sixth and Fourteenth Amendments to the U.S. Constitution), 25 (citing *Alcala v. Woodford*, 334 F.3d 862, 883 (9th Cir. 2003); *Harris v. Wood* 64 F.3d

1432, 1439 (9th Cir. 1995); *Mak v. Blodgett*, 970 F.2d 614, 622 (9th Cir. 1992) (per curiam); 61 (citing *Alcala*, *Harris*, and *Karis v. Calderon*, 283 F.3d 1117, 1132 (9th Cir. 2002).)

Addressing the merits, Respondents argue—without citing any evidence—that no deficient performance occurred and that even if trial counsel did perform deficiently, no prejudice resulted. As such, there is no error to accumulate. (Answer at 71.) However, this is incorrect.

At trial, unchallenged by the defense, the State was able to convincingly argue that Kiles, in the middle of an argument, went to his car—giving himself time to cool off and reflect upon his actions—retrieved a tire jack, returned to the house, and mercilessly beat Gunnel to death. (Tr. July 10, 2000 at 12–13.) The State argued that this beating involved numerous blows, defensive wounds, and occurred in multiple locations—strongly inferring that Gunnel attempted to flee and fight back. (Tr. July 10, 2000 at 12–21.) It supported this with the unchallenged testimony of several forensic experts. (Tr. July 12, 2000 at 114–138; Tr. July 13, 2000 at 97–99, 105; Tr. July 14, 2000 at 8–9.) And the State bolstered it with the testimony of several people to whom Kiles allegedly admitted his actions. (*See, e.g.* Tr. July 13, 2000 at 23–24, 28–29, 32–33.)

Had counsel performed consistent with their constitutional obligations, the jury would have heard a very different story. That Kiles killed Gunnel was undisputed, but the defense could have presented evidence supported by competent forensic testimony that he reflexively grabbed a tire jack that was at hand and swung it, felling Gunnel in one blow and causing minimal pain or trepidation. (Tr. July 17, 2000 at 164–65.) The jury would have heard testimony of medical experts and lay witnesses—members of Kiles's family and the community—who knew that Kiles had a long-standing character trait of impulsivity and that his actions were completely consistent with this trait. *See* Section 3.A, *supra*. And they would have learned that many of the witnesses to whom Kiles allegedly admitted wrongdoing

93

1    had motives of bias and prejudice and were interested in concealing their own
2    wrongdoing. *See* Section 3.A, *supra*.

3    The jury also would not have seen Kiles shackled, heard hearsay statements
4    from Gunnel, or seen gruesome photos of the victims. In addition, the jury would
5    have heard about serious inconsistencies and falsehoods in the statements of critical
6    state witnesses.

7    Further, the jury would have been appropriately instructed on the difference
8    between first-degree murder, premeditated murder and second-degree murder. If
9    the jury had heard an effectively planned and litigated case, and been appropriately
10   instructed, there is at least a reasonable probability that one juror could have decided
11   differently, and found Kiles not guilty only of first-degree murder. Thus, the jury
12   would have heard a complete case, rather than the partial picture put forth by the
13   prosecution. And at least one juror may have voted differently on the ultimate
14   verdict. *See White*, 895 F.3d at 671; *Strickland*, 466 U.S. at 694.

15   Because the state court denied Kiles a hearing, the question of cumulative
16   error must be decided by this Court under a de novo review standard at a hearing.

**Claim Four**

18   **Counsel's ineffective assistance in jury selection at the penalty phase**
19   **of trial deprived Kiles of his rights to counsel, a fair trial, an**
     **impartial jury, reliable sentencing proceedings, due process, and**
20   **equal protection.**

21   Kiles incorporates by specific reference all facts, allegations, and arguments
22   made in his Petition and elsewhere in this Reply. Kiles relies on the arguments
23   raised in his Petition in support of this claim (*see* Pet. at 143–61), but specifically
24   replies to the following arguments made by Respondents.

25   **A.    Respondents fail to establish a procedural defense.**

26   The Court should reject Respondents' argument that this claim is
27   procedurally defaulted "because Arizona procedural law prevents Kiles from
28   returning to the Arizona courts to properly present this claim." (Answer at 72.)

94

1  Respondents do not demonstrate that this is the kind of claim that would be barred
2  if presented in the state courts beyond citing generally to Arizona Rules of Criminal
3  Procedure 32.1 and 32.2, which govern successive petitions, and federal cases
4  applying those rules. (Answer at 72.) *See Bennett*, 322 F.3d at 585. Respondents
5  fail to meet their burden of specifically pleading and proving a default. (*See* Answer
6  at 49); Section II.B.2, *supra*. Respondents assert that this claim is "admittedly
7  procedurally defaulted." (Answer at 72.) While petitioner agrees that this claim was
8  not presented in state court, he does not agree that it is procedurally defaulted.

9      Respondents argue that Kiles cannot show default under *Martinez v. Ryan*,
10  566 U.S. 1 (2012), "because the claim was not properly raised on direct appeal, and
11  *Martinez* does not apply to excuse default for failure of post-conviction counsel to
12  raise any alleged deficiency of appellate counsel. *See Davila*, 137 S. Ct. at 2063,
13  2065–66." (Answer at 72.) However, as the U.S. Supreme Court made clear in the
14  first line of *Martinez*: "The State of Arizona does not permit a convicted person
15  alleging ineffective assistance of trial counsel to raise that claim on direct review.
16  Instead, the prisoner must bring the claim in state collateral proceedings." *Martinez*,
17  566 U.S. at 4. Thus, this claim could not have been raised on direct appeal, and
18  Respondents' argument fails on its face.

19      Respondents further attempt to argue that Kiles's invocation of *Martinez* fails
20  because the "underlying claim is trial error—an allegedly not fair and impartial jury,
21  not ineffective assistance of counsel." (Answer at 72.) However, this is incorrect,
22  as this claim specifically challenges trial counsel's performance during jury
23  selection, not actions by the trial court. That Kiles's constitutional rights were
24  violated by an unfair and impartial jury is not the underlying claim, but is part of
25  the prejudice analysis of this type of ineffective assistance of counsel claim. *See*
26  *Ybarra v. McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2011) (prejudice from deficient
27  voir dire shown when "any juror who harbored an actual bias was seated on the jury
28  as a result of counsel's failure to voir dire" on the relevant subject matter); *see* also

1    *Strickland*, 466 U.S. at 688, 694.

2        Respondents' arguments regarding the procedural posture of this claim fail,
3 and this claim may be reviewed on its merits because Kiles can show cause and
4 prejudice under *Martinez*, 566 U.S. 1, in the form of ineffective assistance of post-
5 conviction counsel. Kiles's claim of ineffective assistance of trial counsel at voir
6 dire, as outlined in his Petition, meet *Martinez*'s threshold of substantiality, or
7 having "some merit." 566 U.S. at 14. Kiles can demonstrate at an evidentiary
8 hearing that the ineffective assistance of his post-conviction counsel excuses any
9 default. *See Martinez*, 566 U.S. at 15–16. As discussed in Kiles's Petition and
10 below, by 2006 it was the standard of practice for counsel to adequately voir dire
11 jurors to ensure that they were not biased, and to object to peremptory strikes made
12 on the basis of race. (Pet. at 143–61); 2003 ABA Guideline 10.10.2(B). As
13 discussed in Kiles's Petition and below, Counsel's deficient performance is
14 apparent from the record. Post-conviction counsel could not have any reasonable
15 strategic justification for omitting it from their briefs. *See Richardson v.*
16 *Superintendent Coal Twp.*, 905 F.3d 750, 763 (3d Cir. 2018.)

17       **B.**    **Respondents fail to rebut the merits of this claim.**

18        Respondents' arguments regarding the merits of this claim fail. First,
19 Respondents make arguments about what the appropriate "clearly established
20 federal law" was that applied to Kiles's case. (Answer at 72.) But because no state
21 court has ruled on the merits of this claim, an analysis of what was "clearly
22 established federal law" at the time of the State court's decision, as required under
23 28 U.S.C. § 2254(d)(1) is irrelevant and does not apply. *See, e.g.*, *Williams v. Ryan*,
24 623 F.3d 1258, 1264 (9th Cir. 2010). In any event, this is an ineffective-assistance
25 claim, even though Respondents do not address the *Strickland* standard in any
26 detail, and the right to effective counsel is clearly established. As this claim was not
27 adjudicated in state court, review in this Court is de novo. *See Dickens*, 740 F.3d at
28 1321.

1    Respondents' arguments only address two sections of Kiles's ineffective
2    assistance of counsel at voir dire claim: counsel's failure to adequately question
3    jurors regarding the death penalty, and counsel's failure to make an objection under
4    *Batson v. Kentucky*, 476 U.S. 79 (1986). (*See* Answer at 72–74.) Respondents have
5    thus waived any argument rebutting the other elements of Kiles's claim.

6    **1.    Counsel's unreasonably deficient questioning of prospective**
7    **jurors.**

8    Respondents absolve Clark's deficient jury selection because "the
9    Constitution does not require that counsel ask any specific voir dire (or screening
10   questionnaire) questions, question any individual jurors, or challenge any jurors for
11   cause." (Answer at 73.) Respondents' answer is not responsive.

12   The Constitution requires that trial counsel comport with "prevailing
13   professional norms." *Strickland*, 466 U.S. at 688. So, the Constitution requires that
14   trial counsel ask specific voir dire (or screening questionnaire) questions, question
15   any individual jurors, or challenge jurors for cause when the failure to do so would
16   fall "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688;
17   *see also, e.g.*, *Crace v. Herzog*, 798 F.3d 840, 852 (9th Cir. 2015) (concluding that
18   under the circumstances counsel performed deficiently in failing to request a jury
19   instruction on lesser-included state-law offense); *Shaw v. Wilson*, 721 F.3d 908,
20   914–18 (7th Cir. 2013) (concluding that counsel performed deficiently in failing to
21   challenge amendment of charging document as untimely under state law).

22   Respondents are also incorrect that certain questions are not constitutionally
23   required of a prospective jury panel. *See Morgan v. Illinois*, 504 U.S. 719, 730
24   (1992) (observing that the Court had "not hesitated, particularly in capital cases, to
25   find that certain inquiries must be made to effectuate constitutional protections");
26   *Turner*, 476 U.S. at 36–37 (holding that in a capital case involving a black defendant
27   charged with murdering a white victim, prospective jurors must be questioned as to
28   racial prejudice).

1    *Morgan*'s holding is not as narrow as Respondents suggest. While *Morgan*

2    does not dictate the format of voir dire, it requires voir dire be sufficient to uncover

3    any prospective juror who has a "substantial[] impairment" regarding sentencing.

4    504 U.S. at 728. Otherwise, voir dire violates a defendant's constitutional rights.

5    Respondents further suggest that trial counsel's duties to question

6    prospective jurors or challenge any for cause arise only once there are "suspicions."

7    (Answer at 73.) Respondents are mistaken. As the Supreme Court explained in

8    *Morgan*, the need to inquire beyond generic questions about whether jurors can be

9    impartial exists precisely because searching voir dire is necessary to ferret out bias.

10    *See* 504 U.S. at 720, 734–35 (recognizing the inadequacy of "general fairness and

11    'follow the law' questions" because a prospective juror may perceive herself able

12    to uphold the law and be unaware that certain of her beliefs prevent her from doing

13    so).

14    Even if counsel's duty to meaningfully question prospective jurors did

15    require some precondition, however, here that duty was triggered, as evidenced in

16    part by counsel filing, arguing, and winning, a motion to question jurors on specific

17    types of voir dire subjects. (ROA 729.) Further, as discussed in Kiles's Petition,

18    many jurors' answers on their questionnaire and when questioned by the State

19    raised cause for concern. (*See* Pet. 147–53.)

20    *Morgan*, the ABA guidelines[24], and other case law establishing the right to

21    adequate voir dire and an impartial jury demonstrate that Kiles's counsel's

22    performance during jury selection was unreasonable in light of prevailing

23    professional norms. *See Strickland*, 466 U.S. at 688; (*See* Pet. at 143–61.) These

24    sources demonstrate that prevailing professional norms at the time of Kiles's 2006

---

25

26    [24] The Supreme Court has consistently relied upon guidelines from the ABA and
similar professional groups to inform the inquiry into reasonable professional

27    conduct. *See, e.g., Padilla v. Kentucky*, 559 U.S. 356, 366–67 (2010); *Rompilla v.
Beard*, 545 U.S. 374, 387 & n.7 (2005); *see also* 1989 ABA Guidelines; 2003 ABA

28    Guidelines.

1  penalty voir dire required that counsel adequately question jurors to uncover
2  relevant biases and challenge for cause jurors who could not be impartial. *See*
3  *Morgan*, 504 U.S. at 727; 2003 ABA Guideline 10.10.2(B); *see also, e.g.,*
4  *Wainwright v. Witt*, 469 U.S. 412, 424–26 (1985); *Witherspoon v. Illinois*, 391 U.S.
5  510, 521–22 (1968); *Harris ex rel. Ramseyer v. Blodgett*, 853 F. Supp. 1239, 1265
6  (W.D. Wash. 1994); *Turner v. Murray*, 476 U.S. 28, 36 (1986); *Rosales-Lopez v.*
7  *United States*, 451 U.S. 182, 188 (1981).

8       Prevailing professional norms also required that counsel rehabilitate potential
9  jurors who expressed some discomfort with the death penalty but still could have
10 fairly served, challenge discriminatory use of peremptory strikes, challenge the
11 denial of a fair cross-section of the community in the venire, and make a record of
12 voir dire to preserve their client's rights on appeal. *See Witt*, 469 U.S. at 420;
13 *Lockhart v. McCree*, 476 U.S. 162, 176 (1986); *Taylor v. Louisiana*, 419 U.S. 522,
14 528 (1975); 2003 ABA Guideline 10.10.2(A); *Gregg v. Georgia*, 428 U.S. 153, 195
15 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.); *Dobbs v. Zant*, 506 U.S.
16 357, 358 (1993) (per curiam).

17      These cases and the ABA guidelines, taken together, also emphasize the
18 crucial importance of voir dire in a capital case, and of the importance that counsel
19 take voir dire seriously. Counsel's failure to adequately prepare for and conduct
20 voir dire fell below prevailing professional norms, to Kiles's prejudice.

21      Respondents are incorrect in stating that the venire was well-vetted for the
22 ability to be fair and impartial. (Answer at 74.) This is belied by the fact that
23 multiple biased jurors were seated. (*See* Pet. at 146–50.) This is also belied by other
24 facts in Kiles's Petition, including, for example, that despite winning a motion to
25 question jurors about individual types of voir dire, defense counsel failed to do so
26 (ROA 729; Tr. Mar. 6, 2006; Tr. Mar. 7, 2006; Tr. Mar. 8, 2006; Tr. Mar. 15, 2006;
27 Tr. Mar. 16, 2006), and that defense counsel failed to question at all eight seated
28 jurors, despite causes for concern on their questionnaires and during the State's

1  questioning. (*See* Pet. at 151; Tr. Mar. 7, 2006 at 9, 117; Tr. Mar. 8, 2006 at 32, 43–
2  44, 71–72; Tr. Mar. 15, 2006 at 70, 74.) The prosecution and the judge's limited
3  questions do not make up for defense counsel's deficient performance.

4      Further, that Kiles's counsel, Greg Clark, performed the bulk of voir dire
5  with no knowledge of Kiles's mitigation presentation belies the State's argument.
6  Perhaps recognizing that Clark performed deficiently in conducting voir dire,
7  Respondents note that both of Kiles's counsel questioned jurors. (Answer at 74.)
8  However, Kiles's second-chair counsel Treasure VanDreumel (who did nearly all
9  of the penalty-phase work) questioned six prospective jurors out of 142, as she
10  intentionally delegated voir dire to Clark because he had barely contributed
11  otherwise—in part because his set-fee contract did not pay him more for the penalty
12  phase. (Tr. Mar. 6, 2006 at 76–79; Tr. Mar. 8, 2006 at 55–59, 67–71; Tr. Mar. 15 at
13  24–28, 49–52, 101–112; ROA 864.)

14      **2.    Counsel's deficient failure to make a *Batson* objection.**

15      Lastly, Respondents' arguments regarding Kiles's counsel's failure to
16  challenge the discriminatory use of peremptory strikes in violation of *Batson v.*
17  *Kentucky*, 476 U.S. 79 (1986) are not persuasive. Respondents argue that there was
18  no cause for a *Batson* strike because the prosecutor only struck one African-
19  American juror. (Answer at 74.) However, in *Doe v. Ayers*, 782 F.3d 425, 432 (9th
20  Cir. 2015), the Ninth Circuit found that counsel performed deficiently for failing to
21  make a *Batson* objection in circumstances identical to those in Kiles: four African-
22  American prospective jurors remained after dismissals for cause and hardship, and
23  the State struck one, with no objection from the defense, and one was empaneled.

24      Respondents argue that there was no need for a *Batson* strike in this case
25  because the African-American prospective juror who the prosecutor struck
26  (Prospective Juror 96) expressed discomfort with the death penalty. (Answer at 74.)
27  However, Prospective Juror 96 noted that his decision to impose death would
28  depend on the facts and circumstances of the case, that he would follow the law,

1    and that he had no objections to the death penalty. When questioned by the State,

2    he repeated that he would decide on a "case-by-case" basis. (Tr. Mar. 8, 2006 at

3    113, 116.) When questioned during voir dire, he explained his uncertainty was

4    because he did not know the facts of the case. (Tr. Mar. 8, 2006 at 115–16.) Multiple

5    jurors who were not African-American were seated even though they expressed

6    similar discomfort with the death penalty; including Juror 7, who called the death

7    penalty "a necessary evil," (Tr. Mar. 15, 2006 at 83) and Juror 16, who wrote that

8    he worried about error.

9         Respondents contend that Kiles's allegation of ineffective assistance for

10    failure to assert a *Batson* challenge fails because the only evidence that exists of the

11    venire's racial composition is counsel's notes. (Answer at 74 n.14.) This

12    emphasizes the need for evidentiary development and a hearing on this claim to

13    determine the facts.

14         Kiles's counsel's performance was unreasonable given prevailing norms.

15    Their deficient performance was not due to strategic decision-making, but instead

16    was due to inattention and a lack of preparation and investigation, and thus is not

17    entitled to deference. *See Wiggins,* 539 U.S. at 521–22.

18    **C.    Respondents' arguments regarding the lack of prejudice fail.**

19         Respondents are also incorrect that Kiles was not prejudiced. Rather, Kiles's

20    counsel's deficient performance undermines confidence in his verdict.[25] First, the

21    argument that he was not prejudiced because he received only one death sentence

22    instead of three carries no weight, as one death sentence still ultimately results in

---

23    [25] Respondents include that "Kiles cannot show prejudice under" *Brecht v.*

24    *Abrahamson*, 507 U.S. 619 (1993). (Answer at 43.) Because this claim asserts

25    ineffective assistance of counsel, the proper prejudice inquiry is instead the one

26    found in *Strickland*, 466 U.S. at 688. Further, under *Brecht*, Respondents bear the

27    burden of showing that that constitutional errors not requiring automatic relief are

28    so benign that they may be ignored. *Davis v. Ayala*, 135 S. Ct. 2187, 2197 (2015);

      *see also Brecht*, 507 U.S. at 640–41 (Stevens, J., concurring).

execution, the same way three death sentences would. (Answer at 73–74.) And, contrary to Respondents' argument (Answer at 73–74), Kiles did argue and demonstrate that seated jurors were unable to serve in a fair and impartial manner. (*See* Pet. at 146–50.) This included a seated juror whose mother was murdered by her romantic partner when he was approximately the same age as one of the child victims, and a juror whose sister had been severely beaten and moved from room to room during an assault in her home—another crime notably reminiscent of the State's version of the events here. (Tr. Mar. 6, 2006 at 81.) *See United States v. Gonzalez*, 214 F.3d 1109, 1112 (9th Cir. 2000) (explaining that a court may assume a juror is biased where he "has had some personal experience that is similar or identical to the fact pattern at issue in the trial"); *see also Tinsley v. Borg*, 895 F.2d 520, 528 (9th Cir. 1990) (explaining that "[c]ourts have been willing to presume bias where a juror or his close relatives have been personally involved in a situation involving a similar fact pattern"). This also included seated jurors who appeared to be poised to automatically impose death in a case like Kiles's.

Further, Kiles was prejudiced by a jury that was shaped on the basis of race, where a prospective juror was struck because he was the same race as Kiles, in violation of the Equal Protection Clause. Had counsel raised a *Batson* objection, it is likely that it would have succeeded at trial or on appeal. *Doe*, 782 F.3d at 432 (citing *Strickland*, 466 U.S. at 694). Last, Kiles was prejudiced by the failure of counsel to make an adequate record of voir dire.

Defense counsel's constitutionally deficient performance during voir dire was unreasonable under prevailing professional norms, and undermines confidence in the outcome of Kiles's trial and sentencing. He is entitled to relief.

/ / /

**Claim Five**

**Kiles was denied effective assistance of counsel at his aggravation-phase proceedings because counsel failed to adequately challenge the alleged aggravating circumstances and otherwise defend against a death sentence.**

Kiles incorporates by specific reference all facts, allegations, and arguments made in his Petition and elsewhere in this Reply. Kiles relies on the arguments raised in his Petition in support of this claim (*see* Pet. at 161–97), but specifically replies to the following arguments made by Respondents.

**A.    Respondents fail to establish procedural default of this claim.**

Respondents argue that this claim is technically exhausted but procedurally defaulted. (Answer at 75.)

As detailed below some parts of this claim were presented in state court and some were not.[26] Respondents have failed to carry their burden of proving procedural default, and any procedural default should be excused due to the ineffective assistance of post-conviction counsel.

While Kiles addresses below the specifics of each part where applicable, as a general matter, Respondents' arguments in Section E.1 (addressing the procedural status of this claim) are in error for the following reasons.

First, the Court should reject Respondents' argument that this claim is

---

[26] Kiles maintains that he presented a single claim alleging ineffective assistance of counsel in the aggravation-phase to the state post-conviction court, raising many of the same specific allegations and failures. (ROA 1189 at 23–26, 32–35, 39–40, 46–48; PFR2 Dkt. 1 at 32–36, 39–41, 47–48.) Thus, this claim was "fairly presented" to the state courts and is exhausted. *See Castille v. Peoples*, 489 U.S. 346, 350–51 (1989); *see* Section II.B.1, *supra*. To the extent that the instant claim contains new examples of trial counsel's ineffectiveness which were not previously raised, this claim was still fairly presented below. *See* Section II.B.1, *supra*. Because fair presentation pertains to claims and not to particular factual examples, *see Weaver v. Thompson*, 197 F.3d 359, 364 (9th Cir. 1999), any previously unrepresented examples do not render this claim unexhausted. Respondents appear to recognize that this is a single claim in their section addressing this claim's procedural status, as it refers to "this claim," in the singular, repeatedly. (Answer at 75.)

procedurally defaulted because it was not presented in state court and "Arizona procedural law prevents Kiles from returning to the Arizona courts to properly present this claim." (Answer at 75.) Respondents do not demonstrate that this is the kind of claim that would be barred if presented in the state courts beyond citing generally to Ariz. R. Crim. P. 32.1 and 32.2, which govern successive petitions, and federal cases applying those rules. (Answer at 75.) *See Bennett*, 322 F.3d 573, 585 (9th Cir. 2003.) They have not cited any Arizona case applying Rules 32.1 and 32.2 to bar this particular type of claim. State courts, rather than federal courts, are in the best position to determine whether state procedural rules would bar consideration on the merits. Respondents fail to meet their burden of specifically pleading and proving procedural default. (*See* Answer at 75); Section II.B.2, *supra*.

Second, to the extent the parts below were not presented in state court, and the Court accepts that Respondents' general invocation of Arizona's procedural rules suffices to establish procedural default, the Court can review the merits of the claim because Kiles has made a colorable claim that the ineffective assistance of post-conviction counsel excuses the default of this "substantial" ineffective-assistance-of-trial-counsel claim. *Martinez v. Ryan*, 566 U.S. 1, 18 (2012). *See* Claim 13, *infra*; (*see also* Pet. at 377–90.) This Court should conduct a de novo review.

### B. Respondents' other arguments regarding *Martinez* fail.

Respondents claim that any alleged procedural default is not excused under *Martinez* for two reasons. First, Respondents argue that procedural default "is not excused pursuant to *Martinez*, because the claim was not raised on direct appeal, and *Martinez* does not apply to excuse default for failure of post-conviction counsel to raise any alleged deficiency of appellate counsel. *See Davila*, 137 S. Ct. at 2063, 2065–66." (Answer at 75.) However, as the U.S. Supreme Court made clear in the first line of *Martinez*: "The State of Arizona does not permit a convicted person alleging ineffective assistance of trial counsel to raise that claim on direct review.

1    Instead, the prisoner must bring a claim in state collateral proceedings." *Martinez*,

2    566 U.S. at 4. Thus, the appropriate forum for the claim at issue here, one of trial

3    counsel's ineffectiveness, was collateral post-conviction proceedings, and

4    Respondents' argument fails.[27]

5         Second, Respondents argue that *Martinez* does not apply because "[t]he

6    underlying claims are trial error, not ineffective assistance of counsel, and thus

7    Kiles's invocation of *Martinez* fails." (Answer at 75.) In support, Respondents cite

8    *Davila*, 137 S. Ct. at 2063, 2065–66. (Answer at 75.) But *Davila* merely declined

9    to extend *Martinez*'s excusal of procedurally defaulted ineffective assistance of trial

10   counsel claims to cases of ineffective assistance of appellate counsel.[28] *See* Section

11   II.B.4, *supra*; *Davila*, 137 S. Ct. at 2065. It did not diminish *Martinez*'s scope, it

12   merely declined to expand it.

13        Respondents are wrong that "Kiles's invocation of *Martinez* fails." (Answer

14   at 75.) This claim specifically challenges the actions taken by trial counsel, not the

15   trial court, and therefore, the claim is not alleging trial court error. (Answer at 75.)

16   Counsel's failure to protect Kiles's rights by objecting to trial court errors results in

17   claims of ineffective assistance.

18        Under *Martinez,* a federal court must consider the merits of a substantial

19   ineffective-assistance-at-sentencing claim when the failure to assert that claim in

20   state court results from the ineffectiveness of post-conviction counsel. 566 U.S. 1

21   at 15. *Martinez* does not requires a petitioner to separately exhaust the underlying

22   ―――――――――――――

23   [27] Indeed, the Arizona Supreme Court in this case on direct appeal rejected appellate
     counsel's inviable attempt at challenging the constitutionality of trial counsel's

24   representation, and called for such a claim to be raised in state post-conviction

25   proceedings. *See Kiles*, 213 P.3d at 184 ¶ 45.

26   [28] *Davila* left open the possibility that *some* ineffective assistance of appellate
     counsel claims could fall under *Martinez*'s procedural default excusal mechanism,

27   should they be sufficiently egregious. *Davila*, 137 S. Ct. at 2067 ("[d]eclining to
     raise a claim on appeal, therefore, is not deficient performance unless that claim

28   was plainly stronger than those actually presented to the appellate court").

1    trial court error, and Respondents fail to cite any authority to the contrary.

2        **C.    State post-conviction counsel presented a colorable claim that trial**
3            **counsel were ineffective for failing to effectively challenge the**
4            **(F)(2) aggravating circumstance.**

5        Respondents are incorrect that this claim is procedurally defaulted, for the
6    reasons laid out in Section 5.A, *supra*, and because Kiles's state-court post-
7    conviction petition and petition for review fairly presented this issue, with the same
8    legal theory and factual allegations. (*See* ROA 1189 at 46–48 (detailing that
9    aggravated assault could be committed without use or threat of violence; that
10   therefore, it was an invalid basis for the (F)(2) aggravating factor[29]; and thus, trial
11   counsel's failure to challenge it constituted prejudicial ineffective assistance of
12   counsel); PFR2 Dkt. 1 at 47–48.) Kiles also included a detailed legal argument
13   laying out the standard for ineffective assistance, and described in detail Kiles's
14   trial counsel's ineffective assistance. (*See* ROA 1189 at 6, 10–18, 23–40, 42–61.)
15   Post-conviction counsel also attached 40 exhibits to the post-conviction petition,
16   much of which supported this ineffective-assistance-of-trial counsel claim. (*See*
17   ROA 1189 Appendix.)

18       Further fair presentation of the claim is substantiated by the adjudication of
19   the claim by the state post-conviction court, which held: "[w]ith regard to the
20   Defendant's claims. . . challenging the use of the agg (sic) assault conviction as an
21   aggravating factor. . . there is no showing of deficient performance or prejudice."
22   (ROA 1214 at 2.)

23       Kiles fairly presented this claim to the state court, and thus there is no bar to
24   this Court's review. *See Reese*, 541 U.S. at 29; Section II.B.1, *supra*. Respondents
25   have failed to carry their burden of proving procedural default and therefore the
26   claim must be reviewed by this Court on the merits. Further, as explained below,

27   _____
28   [29] A.R.S. § 13-703(F)(2) (1988) (the defendant was convicted of a prior felony
     involving the use or threat of violence).

1   the state-court merits ruling is contrary to and an unreasonable application of clearly

2   established federal law for multiple reasons. *See* 28 U.S.C. § 2254(d); (Pet. at 195–

3   96.)

4           With respect to the merits, Respondents argue that a jury cannot challenge

5   the finding of guilt by a prior jury when determining the existence of aggravators

6   or imposing a sentence. (Answer at 75.) This misses the point entirely. Kiles's claim

7   does not suppose trial counsel failed to make an argument to the jury. Counsel's

8   failure was permitting the jury to consider the aggravator at all. Rather, trial counsel

9   should have filed a pre-trial motion, which would have resulted in dismissal of the

10  aggravator under clearly-established Arizona law or its elimination on independent

11  review.

12          At the aggravation phase, the jury found proven with respect to each victim

13  that Kiles was convicted of a prior felony involving the use or threat of violence,

14  A.R.S. § 13-703(F)(2) (1988). (ROA 879.) The sole prior conviction supporting the

15  (F)(2) finding was a 1986 conviction for aggravated assault. Reasonably competent

16  counsel would have asserted that Kiles's 1986 conviction did not qualify as a prior

17  violent felony for the purposes of the (F)(2) aggravator. At trial, prior counsel had

18  challenged Kiles's 1984 aggravated assault conviction as being inapplicable to the

19  (F)(2) factor. On appeal, the Arizona Supreme Court recognized its inapplicability

20  and removed it from consideration. *See Kiles*, 213 P.3d at 185–86. However, the

21  1986 conviction was challengeable for the same reasons which led to the

22  disqualification of the 1984 conviction, and therefore counsel was inexplicably

23  ineffective for not moving to preclude 1986 conviction's application to (F)(2).

24          Without any supporting facts, Respondents claim that such a challenge would

25  have been "meritless." (Answer at 76.) Kiles's post-conviction petition

26  demonstrates otherwise. (*See* ROA 1189 at 46–48.) At the time of Kiles's trial, it

27  was clearly established that the 1986 version of the aggravated assault statute was

28  an invalid basis for (F)(2). *See State v. Schackart*, 947 P.2d 315, 323 (Ariz. 1997)

(invalidating previous aggravated assault felony aggravator because assault could be committed recklessly); *State v. McKinney*, 917 P.2d 1214, 1229–30 (Ariz. 1996); *State v. Walden*, 905 P.2d 974, 996 (Ariz. 1995); *State v. Fierro*, 804 P.2d 72, 82 (Ariz. 1990). Defense counsel had a duty to assess the viability of the alleged aggravating circumstances. *Rompilla v. Beard*, 545 U.S. 374, 389-90 (2005); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (citing professional norms in the 1989 ABA Guidelines and the need for counsel to conduct reasonable investigation to discover rebuttal of aggravating circumstances). Counsel's ability to reasonably investigate whether a prior conviction supports an aggravating circumstance is fundamental to defense of a capital trial, and failure to investigate is per se ineffective. *Hinton v. Alabama*, 571 U.S. 263, 274 (2014) (per curiam) ("An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*."). Under the *Strickland* standard, Kiles's counsel was indisputably ineffective. Given clearly established Arizona law, there is no reasonable probability that the aggravator would not have been stricken.

Respondents claim that the (F)(2) factor remains valid because the Arizona Supreme Court, in its independent review, failed to sua sponte overturn it. (*See* Answer at 75–76.) The simple answer to this is that the Arizona Supreme Court did not adjudicate the (F)(2) error; if it had, it would have overturned the factor in accordance with its established precedent. *See Strickland*, 466 U.S. at 695 (assessment of *Strickland* prejudice "should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision"). Following Kiles's original 1989 trial, the Arizona Supreme Court upheld the validity of the 1984 attempted aggravated assault conviction as a basis for (F)(2). *See State v. Kiles*, 857 P.2d 1212, 1224 (Ariz. 1993). However, on Kiles's second direct appeal following his second trial,

1    trial counsel challenged this conviction and the Arizona Supreme Court found it
2    could not support the (F)(2) aggravator because, based on the statute, the prior
3    offense did not necessarily involve violence or the threat of violence. *See Kiles*, 213
4    P.3d at 186. Since, the 1986 conviction suffered from the same infirmity as the 1984
5    conviction, under the *Strickland* standard, it must be presumed the state court would
6    have followed the law and corrected the (F)(2) error had it been raised.

7         By failing to challenge the 1986 aggravated assault conviction as a basis for
8    (F)(2), trial counsel acted unreasonably under prevailing professional norms. Had
9    counsel challenged the use of the conviction here, given the clear Arizona Supreme
10   Court precedent, the trial court could not have submitted the conviction for the
11   jury's consideration.

12        The fact that the jury improperly considered a prior aggravated assault
13   conviction—indeed, a pattern of escalating criminal violence that the jury should
14   not have seen—undermines the reliability of the verdict. *See Strickland*, 466 U.S.
15   at 694. Even if the trial court erroneously rejected counsel's challenge, the objection
16   would have preserved the error for appellate review, and the Arizona Supreme
17   Court would have struck the (F)(2) aggravator. (Pet. at 169–72.) Then the court
18   would have, at the very least, had to reweigh the remaining aggravation, without
19   the (F)(2) aggravator, against all of Kiles's mitigation. *See Styers v. Schriro*, 547
20   F.3d 1026, 1028 (9th Cir. 2008) (per curiam). And there is a reasonable probability
21   that, without consideration of the (F)(2) aggravator, the Arizona Supreme Court
22   would have struck a different balance and determined that Kiles's mitigation was
23   sufficiently substantial to call for leniency. *See Strickland*, 466 U.S. at 694.

24        Kiles's death sentence unconstitutionally rests upon an invalid aggravating
25   circumstance. *See Johnson v. Mississippi*, 486 U.S. 578, 584 (1988).State post-
26   conviction counsel presented a colorable claim that trial counsel were ineffective
27   for not challenging it. The state court's summary dismissal of the claim was an
28   unreasonable application of *Strickland*.  Upon de novo review, this Court should

1    grant relief.

2    **D.    State post-conviction counsel were ineffective for failing to**
3    **investigate and adequately challenge the (F)(6) "especially**
     **heinous, cruel or depraved" aggravating circumstance.**

4         As explained in Section 5.A, *supra*, Respondents' argument to the contrary

5    notwithstanding, this claim was not procedurally defaulted. Further, because this

6    issue was raised in Kiles's state post-conviction proceeding and adjudicated by that

7    court, any claim of procedural default fails. (*See* ROA 1189 at 32–40; PFR2 Dkt. 1

8    at 32–41; ROA 1214 at 1.) Kiles fairly presented this claim to the state court, and

9    thus there is no bar to this court reviewing it. *See Reese*, 541 U.S. at 29; Section

10   II.B.1, *supra*.

11        In state post-conviction proceedings, Kiles alleged that he received

12   ineffective assistance of trial counsel, violating his Sixth and Fourteenth

13   Amendment rights. This included trial counsel's failure to investigate and challenge

14   the (F)(6) aggravator.[30] For example, Kiles alleged that trial counsel performed

15   deficiently and prejudiced Kiles by failing to request the appointment of a

16   criminalist to evaluate the blood spatter evidence and rebut the findings of the

17   State's expert, Tom Bevel. (ROA 1189 at 32–33.) The state-court petition detailed

18   Bevel's testimony supporting the (F)(6) aggravator, and explained how "Bevel's

19   testimony was pivotal to the . . . finding of the (F)(6) cruelty aggravator (both mental

20   and physical) and to the imposition of the death sentence. . . . Hence, it was

21   imperative to rebut Mr. Bevel's findings with a defense blood spatter expert." (ROA

22   1189 at 33.) In support, the petition Kiles cited "*State v. Boggs*, [] 185 P.3d 111,

23   127 ([Ariz.] 2008) (affirming (F)(6) aggravator based on admissions by defendant

24   corroborated by physical evidence)." (ROA 1189 at 33.) The petition discussed how

25   Bevel's blood-spatter testimony directly supported the State's theory regarding

26   ─────────────────────

27   [30] As described *supra*, Kiles's post-conviction petition included detailed legal
28   argument and allegations regarding trial counsel's ineffective assistance, and
     exhibits in support as well.

1    (F)(6): that Gunnel had received multiple blows, and that she had regained
2    consciousness after the first blow. (ROA 1189 at 32–33.)

3        The state-court petition next described how first post-conviction counsel
4    (who had obtained a new trial for Kiles) had retained the services of forensic
5    scientist Peter D. Barnett, to challenge Bevel's conclusions, including those
6    regarding the number of blows, the nature of the weapon, whether the assailant was
7    left or right handed, the manner in which the blows were struck, and the
8    identification of specific bloodstain patterns from specific blows. (ROA 1189 at
9    34.) The state-court petition describes how a simple review of the file from first
10   post-conviction proceedings would have alerted Kiles's counsel to an obvious and
11   detailed challenge to Bevel's findings, thus undermining the factual support for the
12   (F)(6) aggravator. (ROA 1189 at 33–34.) *See Vega v. Ryan*, 757 F.3d 960, 967–69
13   (9th Cir. 2014) (per curiam) (counsel ineffective for failing to read and act on
14   contents of client's case file and for failing to present evidence that a competent
15   attorney would have introduced).

16       Trial counsel's failure to investigate whether there were any grounds to
17   challenge the prosecution's expert evidence supporting the (F)(6) aggravator was
18   objectively unreasonable. *Rompilla*, *supra*. Instead, trial counsel lacked the
19   necessary information to challenge Bevel and jurors heard no reason to doubt his
20   testimony, which directly contradicted Kiles's version of events.

21       Post-conviction defense expert Barnett also challenged the findings of the
22   State's crime scene expert/criminalist Edward Trujillo, who testified to the source
23   of the blood on the door handle. (ROA 1189 at 34–35.) The post-conviction petition
24   details how counsel's failure to challenge the State's experts prejudiced Kiles, and
25   how Bevel's testimony "was used in sentencing Mr. Kiles to death." (ROA 1189 at
26   35.) The petition also demonstrated how defense counsel should have challenged
27   Dr. Robert Mallon's findings. (ROA 1189 at 37.)

28       The state petition also presents factual allegations and legal argument

1    regarding trial counsel's failure to challenge the (F)(6) aggravator through
2    investigating and presenting contradictory evidence from lay witnesses—
3    particularly, Kale Johnson. (ROA 1189 at 39–40.) The petition discusses how
4    counsel performed deficiently by failing to impeach Johnson with his prior
5    affidavits, and how the failure to do so "encouraged jurors to find cruelty." (ROA
6    1189 at 39.)

7        Thus, Kiles presented both the factual support for, and the federal
8    underpinnings of, his claim that counsel provided ineffective assistance at the
9    aggravation phase of trial by failing to challenge the (F)(6) aggravator. *See Wells v.*
10   *Maass*, 28 F.3d 1005, 1008–09 & n.1 (9th Cir. 1994) (concluding that, read in
11   context, claim that guilty plea was involuntary put state court on notice of
12   ineffective-assistance-of-counsel-claim); *Beam v. Paskett*, 3 F.3d 1301, 1305 (9th
13   Cir. 1993), *overruled on other grounds by Lambright v. Stewart*, 191 F.3d 1181 (9th
14   Cir. 1999) (ruling that claim in state court that statute was "unconstitutionally
15   arbitrary" fairly presented Eighth Amendment challenge because it necessarily
16   called to mind that Amendment's prohibition of arbitrary aggravating
17   circumstances). Moreover, "federal courts should take care to 'avoid
18   hypertechnicality'" in applying the fair presentation requirement. *Williams v.*
19   *Washington*, 59 F.3d 673, 677 (7th Cir. 1995) (citation omitted). Kiles's claim is
20   therefore properly exhausted. *See Peoples*, 489 U.S. at 351 (1989) ("[O]nce [a]
21   federal claim has been fairly presented to the state courts, the exhaustion
22   requirement is satisfied." (emphasis and citation omitted)). Respondents have failed
23   to carry their burden of proving procedural default. As discussed in Kiles's petition,
24   this Court may review this claim on the merits, as the state-court merits ruling is
25   contrary to and an unreasonable application of clearly established federal law for
26   multiple reasons. *See* 28 U.S.C. § 2254(d); (Pet. at 195–96.)

27       Under Arizona law, the post-conviction court was required to determine the
28   colorability of Kiles's ineffective assistance claim by asking if Kiles's factual

112

1    allegations—assuming them to be true—stated a ground for relief. *See State v.*
2    *Watton*, 793 P.2d 80, 85 (Ariz. 1990). As demonstrated above, Kiles presented a
3    colorable claim to the post-conviction court that entitled him to a hearing. Although
4    the allegations in Kiles's post-conviction petition would, if proved, establish that
5    trial counsel were ineffective, the post-conviction court resolved this claim in
6    conclusory fashion, holding that "Defendant's claims concerning the blood spatter
7    expert and blood volume evidence do not demonstrate a deficient performance by
8    counsel or that the outcome would have been different. Nor has Defendant shown
9    deficient performance or prejudice as to the impeachment of Kale Johnson." (ROA
10   1214 at 2.) As explained in Kiles's Petition, the state post-conviction court
11   erroneously and unreasonably applied an outcome-determinative standard: whether
12   "the outcome would have been different." (ROA 1214 at 2.) That standard,
13   however, is contrary to or an unreasonable application of the prejudice standard in
14   *Strickland*. *See, e.g., Thomas*, 789 F.3d at 767–68 (holding that court's "would have
15   led to a different result" prejudice standard was an unreasonable application of
16   *Strickland*); *Martin*, 424 F.3d at 592 (holding that the state court's prejudice
17   inquiry—whether "the result of the proceeding would have been different"—was
18   contrary to *Strickland*). The state court's decision also contravened and
19   unreasonably applied clearly established federal law because the allegations in
20   Kiles's post-conviction petition would, if proved, establish that trial counsel were
21   ineffective. *See* § 2254(d)(1).

22       And where a post-conviction petitioner presents a colorable claim for relief
23   and requests a hearing—as Kiles did—and the state court nonetheless makes factual
24   findings without affording the petitioner the benefit of one, then the state court's
25   decision is necessarily based on unreasonable determinations of fact within the
26   meaning of § 2254(d)(2). *See Brumfield*, 135 S. Ct. at 2278–79, 2281 (holding that
27   state court unreasonably determined the facts when it dismissed petitioner's
28   colorable claim without a hearing where state law entitled petitioner to one); *Taylor*,

1    366 F.3d at 1001 (finding that where "a state court makes evidentiary findings
2    without holding a hearing and giving petitioner an opportunity to present evidence,
3    such findings clearly result in an unreasonable determination of the facts" under §
4    2254(d)(2).) The post-conviction court's ruling was also unreasonable pursuant to
5    § 2254(d)(2), both because its findings of fact were not supported by the state-court
6    record, and because the fact-finding process was deficient: Kiles presented a
7    colorable claim to the post-conviction court, but the court denied relief without
8    affording him the hearing to which he was entitled under Arizona law. *See Taylor*,
9    366 F.3d at 999–1001. Because of the wealth of evidence presented challenging the
10   bases for the (F)(6) aggravator detailed above, the post-conviction court necessarily
11   either ignored the clear evidence supporting Kiles's claim, or it resolved disputed
12   factual questions without affording Kiles a hearing. (*See* ROA 1214 at 2.) Either
13   way, the court's deficient fact-finding process renders its resulting decision
14   unreasonable. *See Miller-El*, 537 U.S. at 346; *Taylor*, 366 F.3d at 1000–01; *Hurles*,
15   752 F.3d at 790. Because Kiles has satisfied § 2254(d), this Court's analysis is
16   unconstrained by AEDPA deference, and this Court should review this claim's
17   merits de novo. *See Williams v. Taylor*, 529 U.S. 362, 405–06 (2000).

18          With respect to the merits of this claim, Respondents ignore, and thus fail to
19   refute, evidence supporting both deficient performance and prejudice. (*See* Pet at
20   176–85.) Instead, Respondents argue that the claim lacks merit based on a passage
21   from the Arizona Supreme Court's 2009 direct appeal opinion, *Kiles*, 213 P.3d at
22   188, where the court summarized the prosecution's evidence in support of the (F)(6)
23   aggravator, and found it sufficient to prove mental and physical cruelty. (Answer at
24   76.) However, the fact that the record contains sufficient evidence to prove the
25   aggravator is immaterial. *Rompilla*, 545 U.S. at 393. The question, rather, is
26   whether there is a reasonable probability that evidence counsel should have
27   presented would have changed the outcome. *Id.*

28          The Arizona Supreme Court found that "Kiles admitted that Valerie

114

remained conscious after the attack began, and the medical testimony regarding defensive wounds supported that conclusion." *Kiles*, 213 P.3d at 188. But had trial counsel adequately investigated this issue and challenged the aggravator in the form of cross-examination and presentation of expert witnesses, there is a reasonable probability that the State would not have been able to prove this aggravator to at least one juror beyond a reasonable doubt.

There is abundant evidence that would have raised reasonable doubts in the minds of one or more jurors. First, Kiles never made the admission attributed to him by the Arizona Supreme Court. To the contrary, Kiles testified that after the initial blows, Gunnel never regained consciousness. (Tr. July 17, 2000 at 166.) An independent pathologist would have testified that there was no way to determine whether the wound on Gunnel's arm was a "defensive wound." (Tr. July 13, 2000 at 99, 105.)

The Arizona Supreme Court also found relevant that blood spatter and transfer stains indicated "that either the blood source or the attacker was moving." *Kiles*, 213 P.3d at 188. This finding was dependent on the testimony of the State's expert, Tom Bevel. (*See* Tr. Mar. 27, 2006 at 71–73.) But, an independent blood spatter expert would have explained that blood stains do not indicate whether movement occurred during, or after, an attack. And, an independent expert could have allowed Kiles to dispute Bevel's testimony as to the number of blows struck, the handedness of the attacker, and the location of the attack—thoroughly discrediting him and bolstering Kiles's description of events. Further, an independent crime-scene management expert could have undermined the prosecution evidence with testimony that the failure to test the fingerprint and pillowcase upon which Bevel's testimony relied made it impossible to draw conclusions about what happened at the scene from this evidence.

Finally, the Supreme Court found that a piece of a tire jack, which tested positive for the presence of blood, was found in the bedroom, thus "contradicting"

1    Kiles's testimony. *Kiles*, 213 P.3d at 188. Kiles testified during the guilt phase that

2    Kale Johnson was in the bedroom when Johnson used the tire jack to kill the two

3    children. (*See* Tr. July 17, 2000 at 167–70 (read into the record during the

4    aggravation phase, Tr. Mar. 23, 2006 at 54–55.).) Thus, the presence of a piece of

5    the jack, in the bedroom, is consistent with Kiles's testimony. But again, had

6    counsel consulted with an independent expert on crime scene management, they

7    could have explained that the transfer of the piece of tire jack could have occurred

8    at any point in the days between Valerie's death and the police entering the

9    apartment. Such an expert would, likewise, have been able to explain to the jury

10   that the presence of a piece of a tire jack in a bedroom does not indicate that a crime

11   was committed in that bedroom.

12        Thus, each of the factual elements of the prosecution's case, on which the

13   state supreme court relied in upholding this aggravator, would have been rebutted

14   with defense expert testimony and cross-examination, if only trial counsel had

15   performed effectively by conducting a reasonable investigation and presenting the

16   results of that investigation to the jury. Instead, defense counsel ignored exculpatory

17   evidence in their own file, they conducted no investigation, they presented no live

18   testimony at the aggravation phase, and they unreasonably regarded the aggravation

19   phase as, in essence, a re-do of the guilt phase. (*See* Tr. Mar. 27, 2006 at 40 (counsel

20   informing the court that they "have been parroting for this jury what took place in

21   Yuma back in 2000."); Tr. Mar. 27, 2006 at 42 (counsel asking court if "th[e] []

22   testimony and evidence to be adduced is the same that was adduced in Yuma [at the

23   guilt phase]."").) Counsel failed to apprehend that the aggravation phase posed

24   investigatory issues for the defense over and above and dissimilar from whether

25   their client was guilty for the crime, *e.g.*, whether the State could prove the specific

26   facts essential to the finding of an aggravating circumstance beyond a reasonable

27   doubt.

28        Had defense counsel acted reasonably and challenged the State's aggravation

case at trial, there is a reasonable probability that at least one juror would have determined that the State had not proven the (F)(6) aggravator beyond a reasonable doubt. And given that the jurors failed to reach a unanimous decision on whether to impose the death penalty for the child victims' deaths, there is a reasonable probability that, absent consideration of the (F)(6) aggravator, at least one juror would have voted not to impose the death penalty for Gunnel's death. *Strickland*, 466 U.S. at 694. [31]

### E. Counsel performed deficiently and prejudiced Kiles by failing to frontload mitigation at the aggravation phase.

Respondents ignore the bulk of Kiles's arguments demonstrating that counsel acted unreasonably in light of prevailing professional norms and prejudiced Kiles by failing to frontload mitigation during the aggravation phase of the proceedings. (Answer at 77; Pet. at 185–87.) Instead, Respondents mistakenly claim that the Arizona statute "prohibits" this practice, and attempt to minimize the ABA Guidelines as "nonbinding." (Answer at 77.)

First, the U.S. Supreme Court has consistently relied upon guidelines from the ABA and similar professional groups to inform the inquiry into reasonable professional conduct. *See, e.g., Padilla v. Kentucky*, 559 U.S. 356, 366–67 (2010); *Rompilla v. Beard*, 545 U.S. 374, 387 & n.7 (2005); *see also* 1989 ABA Guidelines; 2003 ABA Guidelines. The ABA Guidelines' instruction to frontload mitigation is important when considering whether counsel acted in accordance with the standard of care at the time of Kiles's trial.

Arizona's death penalty scheme does not prohibit frontloading mitigation, as Respondents claim. (Answer at 77 (citing A.R.S. § 13-752 (E) and (G)).) Instead, § 13-752 (E) establishes that "[a]t the aggravation phase, the trier of fact shall make a special finding on whether each alleged aggravating circumstance has been

---

[31] Moreover, the prejudicial effects of the submission of the (F)(2) and (F)(6) factors must be considered cumulatively. *See* Section 5.J, *infra*.

1    proven based on the evidence that was presented at the trial or at the aggravation

2    phase." § 13-752(E)'s silence on the issue of mitigation should not be read as a

3    prohibition.

4         This is especially true in light of surrounding sections of A.R.S. § 13-752.

5    Section (G) deals with the mitigation phase of Arizona's capital sentencing scheme,

6    during which the defendant may present mitigation.[32] At the time of Kiles's 2006

7    penalty hearing, § 13-752(G) was silent as to whether aggravating evidence not

8    presented during the aggravation phase could be presented during the mitigation

9    phase. The Arizona Supreme Court found that this silence did not bar the

10   prosecution from introducing additional aggravating evidence even in a

11   circumstance where a defendant presented no mitigation. *State v. Nordstrom*, 280

12   P.3d 1244, 1248–49 (Ariz. 2012).[33] If it was implicit in the statute that aggravation

13   evidence, not offered to rebut any mitigation, could be presented to the jury during

14   the mitigation phase, then rebuttal mitigation evidence can be presented during the

15   aggravation phase.

16        If this Court holds that presentation of mitigating evidence is ordinarily

17   proscribed during Arizona's aggravation phase, the prosecution nonetheless opened

18   the door to its introduction when it chose to put Kiles's mental state at issue by

19   charging him with the (F)(6) aggravating circumstance which required proof of his

20   mental state. *See, e.g.*, *State v. Anderson*, 111 P.3d 369, 394, n.19 (Ariz. 2005)

21   (heinous and depraved aggravator puts mental state at issue). This presented Kiles

22   _____

23   [32] Though the statute refers to the portion of proceedings where defendant may
     present mitigation and the jury determines the punishment, throughout his Petition
24   and this Reply, Kiles uses "mitigation phase" to describe the phase at which the
     defense put on its case for leniency and "penalty phase" to describe his aggravation
25   and mitigation phases together.

26   [33] After Kiles's 2006 sentencing proceeding, the Arizona legislature amended the
     relevant statute to make explicit that previously un-offered aggravating evidence
27   could be presented during the penalty phase, "regardless of whether the defendant
     presents evidence of mitigation." A.R.S. § 13-752(G).

28

with the opportunity to offer evidence in rebuttal, including mental-health evidence. *Kansas v. Cheever*, 571 U.S. 87, 94 (2013); *see also State v. Kountz*, 501 P.2d 931, 935 (1972) (a party "may offer any competent evidence which is a direct reply to or a contradiction of any material evidence introduced by [the opposing party]"). And it was incumbent upon trial counsel to take that opportunity in order to effectively advocate for their client. *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 353 (2009). This practice was a prevailing professional norm.

Counsel's failure to contemporaneously rebut evidence offered by the prosecution with mitigating evidence allowed the jury's negative impression of Kiles to cement. *See* Garvey, S., *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?* 98 Colum. L. Rev. 1538, 1543 (Oct. 1998). Counsel could have rebutted the State's arguments about Kiles's mental state. And, counsel could have humanized Kiles and explained his mental illness and impairments, the result of lifelong trauma and substance addiction. Had counsel done so, there is a reasonable probability that Kiles would have been more worthy of leniency in the eyes of at least one juror, who may have voted for a life sentence. As a result of this unreasonable failure to advocate for his interest, Kiles suffered prejudice. *Strickland*, 466 U.S. at 694.

### F.    Counsel were ineffective for failing to properly object to Kiles's restraints.

Kiles possessed a right to be free from unnecessary restraints during his trial. *Hedlund v. Ryan*, 854 F.3d 557, 568 (9th Cir. 2017). Respondents are incorrect that this is limited to visible restraints, as the Ninth Circuit in 2003, three years before Kiles's penalty-phase proceedings, held that this is true for both seen, and unseen, restraints. *See Gonzalez v. Pliler*, 341 F.3d 897, 900 (9th Cir. 2003). And it was incumbent upon trial counsel to protect this right.

Respondents ignore and thus fail to contest the bulk of Kiles's arguments regarding counsel's deficient performance in failing to object to the routine use of

a stun belt on Kiles, and the resulting prejudice. (*See* Pet. at 188–89.) During his penalty hearing, Kiles was forced to wear an electric stun belt despite the trial court's acknowledgement that Kiles posed no security threat and his years-long exemplary prison record. (Tr. Feb. 14, 2006 at 42.) Under these circumstances trial counsel performed deficiently in failing to object to the use of an electric stun belt. Had counsel objected, the judge would have conducted an individualized analysis and concluded that, as Kiles posed no threat, a stun belt was not necessary. *Gonzalez*, 341 F.3d at 900. Kiles suffered prejudice due to the imposition of a stun belt, and there is a reasonable probability that, had counsel properly objected, Kiles would not have had to wear this restraint. This raises the reasonable probability that at least one juror would have voted differently. *See Strickland*, 466 U.S. at 694.

## G. Counsel were ineffective for failing to object to, or to request a curative instruction for, the prosecutor's misconduct in opening and closing statements.

Respondents incorrectly argue that "misconduct claims on federal habeas review are limited to the narrow issue of whether there was a violation of due process and not where there was misconduct." (Answer at 78.) But this is not a prosecutorial misconduct claim (*see* Claim 9), this is an ineffective assistance of counsel claim alleging that one aspect of aggravation-counsel's deficient performance consisted of failing to object to prosecutorial misconduct in opening and closing arguments. (Pet. at 189–92.) Thus, it must be analyzed under *Strickland*. This claim challenges behavior by trial counsel, not the prosecutor.

In his petition, Kiles provided a detailed accounting of the prosecutor's misconduct, trial counsel's unreasonable failure to object, and the resulting prejudice. (Pet. at 189–92.) Respondents' principal retort is that the misconduct did not occur, or if it did, it did not result in a violation of due process. (Answer at 78.) This again misses the point. Kiles's claim is grounded in ineffective-assistance and he need only establish deficient performance and a reasonable probability of a

1  different outcome. *Strickland*, 466 U.S. at 694.

2  At multiple points in opening and closing statements, the prosecution
3  misrepresented evidence; vouched for the truthfulness of state's witnesses; and
4  disparaged trial counsel. (Tr. Mar. 20, 2006 at 67–68, 79; Tr. Apr. 11, 2006 at 18,
5  22, 25, 39.) Although trial counsel objected to some of these statements (Tr. Mar.
6  20, 2006 at 76, 79; Tr. Apr. 12, 2006 at 3), they never requested a curative
7  instruction from the judge. Nor did they request to strike the majority of offending
8  comments. This was despite the fact that the jurors would not have been able to
9  consider the offending comments if they were stricken from the record. (Tr. Apr.
10  11, 2006 at 6.)

11  Finally, Respondents mischaracterize Kiles's argument. (*Compare* Answer
12  at 79 ("In arguing that defense counsel did not object…") *with* Pet. at 190 ("Trial
13  counsel repeatedly objected…").) Kiles need not, as the State argues, prove
14  prejudice under *Brecht*, 507 U.S. at 637–38, to prevail. (Answer at 79.) As with any
15  ineffective-assistance claim, Kiles only needs to show prejudice under *Strickland*,
16  466 U.S. at 694; *see also Musladin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009).
17  Because of the prosecutor's blatant misconduct in opening and closing, Kiles was
18  prejudiced. There is a reasonable probability that, absent counsel's deficient failure
19  to object, request the offending statements be stricken from the record, and request
20  a curative instruction, at least one juror may have come to a different finding on the
21  aggravating circumstances, and may have weighed aggravating and mitigating
22  circumstances in a way that resulted in a vote for life. *See id.*

23  ## H. Counsel were ineffective for failing to object to the trial court's
24  erroneous instruction defining reasonable doubt.

25  Kiles's counsel acted unreasonably when failing to object to a
26  constitutionally deficient "reasonable doubt" instruction. The reasonable doubt
27  instruction given to the jury lowered the quantum of proof below what the
28  Constitution contemplates. The trial court instructed the jury that "[p]roof beyond

a reasonable doubt is proof that leaves you firmly convinced that the alleged aggravating factor is proven." (Tr. Apr. 11, 2006 at 7–8.) The court also instructed the jury that "conclusive evidence" of cruelty established the F(6) aggravating factor. (Tr. Apr. 11, 2006 at 13.)

The trial court's use of the phrases "firmly convinced" and "conclusive evidence" reduced the State's burden of proof to a level below that of reasonable doubt. *See In re Winship*, 397 U.S. 358, 364 (1970). But trial counsel unreasonably failed to object to this erroneous standard being read to the jury. As a result, Kiles was prejudiced. There is a reasonable probability that, had counsel effectively advocated for an instruction that clearly explained reasonable doubt to the jury, at least one juror would have reached a different outcome. *Strickland*, 466 U.S. at 694.

## I.  Counsel were ineffective for failing to ensure that a complete record was made of aggravation-phase proceedings.

Kiles specifically instructed his attorneys that a record should be made of all proceedings, because he had concerns regarding counsel's failure to ensure a complete record, and because proceedings were held without his presence. (*See, e.g.*, Tr. Aug. 6, 1999 at 13.) Despite this, trial counsel failed to do so, and denied Kiles the opportunity for meaningful appellate review. *See Gregg v. Georgia*, 428 U.S. 153, 197–98 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.). This was below the standard of care, and undermines confidence in the verdict. Counsel performed deficiently and prejudiced Kiles. *See Strickland*, 466 U.S. at 688, 694; *see also* Claim 15.

## J.  Counsel's numerous errors, individually and cumulatively, undermined the reliability of Kiles's aggravation phase.

In response to Kiles's detailed argument showing how counsel's errors must be considered cumulatively, and how the cumulative effect of trial counsel's errors during the aggravation phase prejudiced Kiles (Pet. at 193–194), Respondents assert: "For the reasons previously stated in Subsection C (Claim 3), Kiles cannot

1    show *Strickland* or *Brecht* prejudice and is not entitled to relief for individual or

2    cumulative IAC error. (Dkt. 35 at 204–05.)" (Answer at 82.)

3        Respondents presumably refer to the part of their Subsection C (Claim 3)

4    addressing Kiles's argument that he is entitled to relief based on the cumulative

5    errors and resulting prejudice by his trial counsel in the guilt phase. (Answer at 70–

6    71; *see* Pet. at 138–39.) As such, Respondents' answer is non-responsive and they

7    waive the right to further contest Kiles's arguments on cumulative error. *See James*

8    *v. Ryan*, 733 F.3d 911, 913–14 (9th Cir. 2013).

9        The jury found three aggravating factors as to the death of Gunnel: (1) that

10   Kiles had been previously convicted of a violent felony; (2) that he had committed

11   the instant offense in an especially cruel, heinous, or depraved manner; and (3) that

12   he had been convicted of multiple homicides. (ROA 879 at 11 –13); *see* A.R.S. §§

13   13-703(F)(2), (F)(6), (F)(8) (1988). The jury found the same three aggravators for

14   the deaths of the child victims, but also found a fourth aggravating factor: that the

15   crime was committed by an adult against a person less than 15 years of age. (ROA

16   879 at 7, 10); *see* A.R.S. § 13-703(F)(9) (1988). However, all of these aggravating

17   factors would have played a diminished role in the ultimate decision whether to

18   sentence Kiles to death had trial counsel not been ineffective. Two of the four

19   factors related to the child victims, but the jury did not impose the death sentence

20   for those victims' deaths, and thus those factors ultimately would have added

21   minimal to no weight in the sentencing calculus. If the (F)(2) aggravator had been

22   properly challenged—invalid under established Arizona law—it too would not have

23   entered the sentencing calculus. Accordingly three of the four factors would have

24   little or no aggravating weight. That leaves (F)(6), and if counsel had been effective,

25   there is a reasonable probability that at least one juror would have determined the

26   State had not proven the factor beyond a reasonable doubt. However, even if the

27   (F)(6) factor remained in play, when the errors caused by counsel's failure to

28   investigate and present mitigation (Claim 6, *infra*) are added to the cumulative error

123

1    analysis, there is no reasonable probability that Kiles's jury—after failing to return

2    a death verdict for two of the victims— would have sentenced Kiles to death.

3    **K.    AEDPA presents no barrier to review of this claim.**

4    Respondents conclude by arguing that "[f]or the reasons previously stated in

5    Subsection C, this Court must apply AEDPA." (Answer at 82.) Respondents

6    presumably refer to their arguments in their Section C.11, which asserts that with

7    respect to Kiles's Claim 3 (ineffective assistance of counsel at the guilt phase), this

8    Court must apply AEDPA and give deference to state-court decisions. (Answer at

9    71.) Kiles rests on his arguments in Claim 3.A, *supra*, regarding the inapplicability

10   and incorrectness of Respondents' arguments, and on his discussion in his Petition

11   regarding the inapplicability of AEDPA's strictures to this claim. Finally, to the

12   extent that Respondents argue that this claim was not raised in state court, they

13   cannot also argue that AEDPA requires deference to the state-court factual

14   determinations on this claim.

15   **Claim Six**

16   **Kiles was denied effective assistance of counsel at his mitigation**

17   **phase when his counsel failed to investigate and present powerful
     mitigating evidence, among other significant errors.[34]**

18   Kiles incorporates by specific reference all facts, allegations, and arguments

19   made in his Petition and elsewhere in this Reply. Kiles relies on the arguments

20   raised in his Petition in support of this claim (*see* Pet. at 197–277), but specifically

21   replies to the following arguments made by Respondents.

22   Counsel's failure to investigate and present powerful mitigating evidence,

23   considered alone and together with counsel's other significant errors, violated

24   Kiles's rights under the Sixth, Eighth, and Fourteenth Amendments to the U.S.

25   Constitution.

26   _____

27   [34] Kiles uses "mitigation phase" to describe the phase at which the defense put on

28   its case for leniency and "penalty phase" to describe his aggravation and mitigation
     phases together.

1    **A.    Post-conviction counsel stated a colorable claim of ineffective**
2        **assistance of counsel.**

3        Kiles was denied his Sixth Amendment right to ineffective assistance of
4    counsel during the mitigation phase of trial. It is undisputed that this claim was
5    exhausted, and as demonstrated below, the State court had all of the evidence before
6    it to warrant the conclusion that Kiles's claim was colorable and therefore merited
7    a full and fair hearing. The record before the state court established that trial counsel
8    failed to adequately investigate Kiles's mitigation and as a result, the jury heard
9    conflicting, unsupported evidence, which was ultimately inaccurate, unreliable and
10   misleading. In responding to this problem, post-conviction counsel presented a
11   colorable claim that Kiles received ineffective assistance of counsel at the
12   mitigation phase of his trial, substantiated with supporting witness affidavits, expert
13   reports and other exhibits, including testimony from the hearing during Kiles's first
14   post-conviction proceedings. (*See* ROA 1189 at 12–18, 23–30, 48–68; PFR2 Dkt.
15   20, Exs. 1–2; PFR2 Dkt. 21 Exs. 3–7; PFR2 Dkt. 22 Exs. 3–4, 8–14; PFR2 Dkt. 23
16   Exs. 15–21; PFR2 Dkt. 24 Ex. 21 cont'd; PFR2 Dkt. 25 Ex. 21 cont'd; PFR2 Dkt.
17   26 Ex. 21 cont'd; PFR2 Dkt. 27 Exs. 21–24; PFR2 Dkt. 28 Exs. 25–33; PFR2 Dkt.
18   29 Exs. 34–40.)

19       Arizona law required the post-conviction court to determine the colorability
20   of Kiles's claim by first assuming that his factual allegations were true, and by next
21   asking whether the facts alleged and the evidence presented might have changed
22   the outcome. *Watton*, 793 P.2d at 85. When the answer to such question is yes, then
23   an evidentiary hearing must be granted. *Id*.

24       As explained below, pursuant to this standard, Kiles presented a colorable
25   claim that entitled him to a hearing. Because the allegations in Kiles's post-
26   conviction petition would, if proved, establish that his trial counsel's
27   constitutionally deficient performance prejudiced him, the state court's ruling that
28   Kiles made "no showing of deficient performance or prejudice" (ROA 1214 at 2)

125

was a decision that was both contrary to and an unreasonable application of clearly established federal law, and based on unreasonable factual determinations. *See* 28 U.S.C. § 2254(d)(1). Because the post-conviction court reached its decision by resolving factual disputes without a hearing, the decision was also based on an unreasonable factual determination under § 2254(d)(2). Respondents' arguments to the contrary are unavailing.

The evidence before the State court demonstrated that Kiles's lead counsel Greg Clark effectively abdicated his duties after Kiles's guilt-phase proceedings ended in 2000. Second-chair counsel Treasure VanDreumel wrote to the judge on September 10, 2003, requesting additional payment, because she had exclusively handled the investigation and preparation of the mitigation phase. Her request was granted. Kiles sought to remove Clark for his failure to assist in mitigation-phase preparation. (ROA 615.) However, the court permitted Clark to stay on the case, effectively leaving VanDreumel as Kiles's sole lawyer for the penalty phase. It is likely that Clark abandoned his client because his contract structure provided for no extra funding after the guilt-phase trial. (Tr. Nov. 29, 1999 at 6; PFR2 Dkt. 22 Ex. 10.) But proceedings lasted almost six years longer.

Kiles was found guilty on July 20, 2000. (ROA 482 at 1–8.) It was not until October 2000 that Kiles's counsel moved for the appointment of a mitigation specialist. (ROA 509 at 1.) Within days, the trial court appointed Jan Dowling, an experienced mitigation specialist. (ROA 510 at 1.) Dowling eventually withdrew from her appointment based on ethical concerns due to counsel's disinterest and failure to participate in the mitigation investigation. In June 2001, Dowling wrote to the court to identify her concerns about Kiles's attorneys: They showed no interest in the case; they would not even discuss potential themes and theories; they would not assist in initiating meetings with witnesses; and they failed to address her questions and issues arising during the investigation. Based on her extensive experience, she knew that standard practice required that counsel must direct and

1   provide input on the mitigation investigation. (ROA 533 Ex. A.) In a further letter,

2   she outlined her concerns regarding counsel's refusal to consult with her, refusal to

3   review the file from the first post-conviction proceedings, and VanDreumel's lies

4   to the court meant to cover this up. (ROA 533 Ex. D.) Dowling's concerns were

5   ignored and she was replaced with an inexperienced mitigation specialist. (Tr. Dec.

6   3, 2001 at 17.)

7        Nonetheless, counsel's overt neglect—as so aptly reported by Dowling—

8   resulted in counsel's failure to conduct the thorough mitigation investigation that

9   prevailing norms required at the time of Kiles's sentencing proceedings. *See, e.g.*,

10  *Summerlin v. Schriro*, 427 F.3d 623, 630 (9th Cir. 2005) (en banc) (the Sixth

11  Amendment imposes on a capital-defense attorney "a duty to investigate, develop,

12  and present mitigation evidence during penalty phase proceedings"); *see also*

13  *Wiggins v. Smith*, 539 U.S. 510, 524–25 (2003). Because counsel failed to conduct

14  an adequate investigation, the decisions they made were not the result of reasonable

15  strategic judgment, they were the product of constitutionally deficient performance.

16  *Wiggins*, 539 U.S. at 521–23; *Sears v. Upton*, 561 U.S. 945, 954 (2010) ("A 'tactical

17  decision' is a precursor to concluding that counsel has developed a 'reasonable'"

18  mitigation theory in a particular case").

19       Trial counsel failed to conduct a reasonable mitigation investigation, with

20  respect to both lay and expert witnesses. (Pet. at 215–70.) Counsel ignored red flags

21  and obvious leads in the record, including leads contained in their own file from

22  Kiles's first post-conviction proceedings. *See Lambright v. Schriro*, 490 F.3d 1103,

23  1117 (9th Cir. 2007); *Stankewitz v. Woodford*, 365 F.3d 706, 719–20 (9th Cir.

24  2004); *Stankewitz v. Wong,* 698 F.3d 1163, 1171 (9th Cir. 2012). This file, which

25  Clark dismissed as "worthless" (Tr. Aug. 6, 1999 at 30), contained witness

26  affidavits and other investigatory mitigation leads which any reasonable counsel

27  would have pursued (ROA 225 Exs. 37–64; PFR2 Dkt. 23 Ex. 18 (re-filing Kiles's

28  first post-conviction petition's exhibits 37–64).) Ignoring leads in counsel's own

1   file reflects quintessential deficient performance. *Vega v. Ryan*, 757 F.3d 960, 967
2   (9th Cir. 2014) (per curiam) ("[I]t [was] minimally incumbent on Vega's counsel
3   to review the file of the previous attorneys.").

4          The resulting mitigation presentation that the jury heard was incoherent,
5   conflicting, not credible, and did not present a case for life with respect to all three
6   victims. Respondents identify some of the mitigation presented to the jury regarding
7   Kiles's background and mental health. (Answer at 84–90.) However, Respondents
8   ignore the fact that because counsel abandoned their investigation before pursuing
9   obvious red flags, the jury never received evidence from experts, who could have
10  supported Kiles mitigation with objective evidence, including objective testing
11  instruments that demonstrate Kiles suffers from brain damage with associated
12  functional deficits. It is not in question that a thorough mental health investigation
13  requires consultation with experts. But here, counsel's neglect allowed the State to
14  persuade the jury that Kiles's mental-health and background-centered mitigation
15  was suspect and unconvincing because it was only based on Kiles's uncorroborated
16  self-report. (Tr. May 9, 2006 p.m. at 24, 26; Tr. May 15, 2006 at 27–29, 50; Tr.
17  May 22, 2006 at 72.)

18         Although counsel presented evidence in the mitigation phase, that does not
19  alone satisfy *Strickland*. *Sears,* 561 U.S. at 954 ("We have never limited the
20  prejudice inquiry under *Strickland* to cases in which there was only "little or no
21  mitigation evidence" presented"). The mitigation evidence the jury did receive
22  included testimony from two lay witnesses who did not know Kiles well, but who
23  misled the jury to believe Kiles had a fine childhood and was a well-functioning
24  individual (Tr. Apr. 24, 2006 at 34, 37, 45–46, 52–54, 59, 61). Competent counsel
25  would have known that this lay testimony would conflict with Kiles's experts'
26  accounts of Kiles's traumatic childhood. And predictably, the prosecution
27  impeached the credibility of Kiles's experts with this lay witness testimony. (*E.g.*,
28  Tr. May 9, 2006 p.m. at 22–23.) Next, a member of the defense team, a mitigation

1   specialist, testified to second- and third-hand, largely outdated, information from
2   Kiles's friends and family, without any live family testimony, leaving the
3   impression that no family member was willing to testify on Kiles's behalf. (Tr. Apr.
4   26, 2006 at 40–59; 85–108; Tr. Apr. 27, 2006 at 59–62, 86–91, 94–109.) He read
5   affidavits from Kiles's first, overturned-for-ineffective-assistance trial, which told
6   a story that conflicted with many of the mitigation themes counsel was attempting
7   to present at the 2006 mitigation phase. (*See*, e.g., Tr. Apr. 26, 2006 at 40–59 (letters
8   describing how Kiles was a happy child who grew up in a nice family, but later had
9   a personality change).)

10       Two witnesses testified that Kiles did well in prison, but the prosecution
11  turned this against Kiles, arguing that Kiles could behave well when he chose to do
12  so. (*See generally* Tr. Apr. 26, 2006 at 4–23.) Had counsel conducted a thorough
13  investigation they could have contextualized Kiles's ability to behave well in
14  prison—in contrast to his inability to function well in the community—for reasons
15  related to his troubled background and neuropsychological impairments.
16  Meanwhile, counsel's constitutionally deficient performance once again allowed
17  the jury to be misled. *See Sears v. Upton*, 561 U.S. 945, 953 (2010) (trial counsel's
18  inadequate investigation, which led to a misleading portrayal of petitioner's
19  upbringing, was deficient and prejudicial); *Lambright,* 490 F.3d at 1120.

20       It is indisputable that competent trial lawyers from whatever stripe, including
21  capital defense counsel, avoid calling multiple experts who contradict one another–
22  –this is embarrassing to the expert—but worse, it will leave a jury unpersuaded by
23  any of the proffered testimony. Kiles's trial counsel were oblivious to these norms.
24  They presented the jury with multiple inadequately prepared, contradictory mental
25  health experts. (*see* Pet. at 249–50, describing the conflicting testimony of defense
26  experts), speculated about Kiles's "possible" brain damage, (*E.g.*, Tr. May 22, 2006
27  at 19; Apr. 24, 2006 at 86; Tr. May 8, 2006 p.m. at 20; Tr. May 10, 2006 at 106),
28  failed to accurately describe addiction as a disease (*see, e.g.*, Tr. Apr. 25, 2006 at

69, 71–75), and conveyed that Kiles was violent. (*E.g.*, Tr. May 9, 2006 a.m. at 17–18; Tr. May 10, 2006 at 37 (defense expert psychologist Mark Cunningham, Ph.D., testifying how Kiles ended up a violent person with "bad outcomes": "psychological disorder, victimized relationships, drug dependency, criminal activity"); Tr. May 10, 2006 at 93–106, 135.)

Defense counsel called psychologist Ashley Hart, Ph.D. to testify, despite indications that he would undermine Kiles's mitigation and he essentially became a witness for the State. (Tr. May 9, 2006 p.m. at 79–82 (telling the jury that prior defense counsel "put the grind on" him to sign a favorable affidavit, after he testified for the State in Kiles's first trial, agreeing with the prosecutor that even if Kiles's childhood was abusive, that did not change that he "understood that if he used drugs he became violent"; agreeing with the prosecutor that he had doubts whether Kiles was abused as a child, and agreeing that Kiles likely did not have post-traumatic stress disorder ("PTSD")).)

Further, trial counsel's deficient investigation led them to an uninformed strategy; one that was both unpersuasive and damning: that Kiles was an inherently violent and aggressive individual with a quick temper. This theme was driven home by defense counsel during witness examinations and in closing. (*E.g.*, Tr. May 9, 2006 a.m. at 67–68; Tr. May 10, 2006 at 85; Tr. May 22, 2006 at 31, 38, 45.) Lacking the results that a thorough mitigation investigation would have reaped, VanDreumel minimized Kiles's mental illness, his childhood trauma and the substance disorder closely interrelated to his illness and trauma. Accordingly, Respondents' suggestion that because mitigation was presented, counsel must have been effective is not persuasive.

Fundamental to the conclusion that Kiles's state post-conviction claim was colorable, the state court had before it new mitigation evidence that would have given the jury "a strikingly different and more accurate picture" of Kiles's life circumstances and mental health. *Hovey v. Ayers*, 458 F.3d 892, 927 (9th Cir. 2006).

130

1   As explained below, the fact that Kiles's jury was deprived of an accurate account
2   of his troubled life circumstances undermines confidence in the reliability of Kiles's
3   sentence. *See Strickland*, 466 U.S. at 694. Here the jury decided that Kiles should
4   suffer the penalty of death for only one of the three victims. Accordingly, after
5   failing to agree whether Kiles should have been sentenced to death for the murders
6   of Shemaeah and LeCresha, there was more than a reasonable probability that at
7   least one juror would have voted for life, if only they had received accurate evidence
8   of his traumatic past and the sequelae: neurological damage, complex PTSD, and
9   other associated problems. *See Bemore*, 788 F.3d at 1176. Post-conviction counsel
10  substantially altered the mitigation profile in material respects. (ROA 1189 at 48–
11  61, PFR2 Dkt. 20, Exs. 1–2; PFR2 Dkt. 21 Exs. 3–7; PFR2 Dkt. 22 Exs. 3–4, 8–14;
12  PFR2 Dkt. 23 Exs. 15–21; PFR2 Dkt. 24 Ex. 21 cont'd; PFR2 Dkt. 25 Ex. 21 cont'd;
13  PFR2 Dkt. 26 Ex. 21 cont'd; PFR2 Dkt. 27 Exs. 21–24; PFR2 Dkt. 28 Exs. 25–33;
14  PFR2 Dkt. 29 Exs. 34–40.)

15      First, trial counsel ignored leads from Kiles's first, successful post-
16  conviction proceedings and Kiles's life history that Kiles might suffer from
17  neurological deficits and failed to consult with an appropriate expert. (ROA 1189
18  at 48–52, 60–61.) The trial record includes repeated mentions and allusions to
19  Kiles's possible neurological damage, and it was listed as a mitigating factor for the
20  jury to consider—without concrete evidence. (*E.g.,* Tr. May 22, 2006 at 19; Tr. Apr.
21  24, 2006 at 84; Tr. May 8, 2006 p.m. at 20; Tr. May 10, 2006 at 106.)

22      Though trial counsel did not adequately investigate whether suspicions that
23  Kiles's brain damage could be proved with objective evidence, state post-
24  conviction counsel did. They retained neuroimaging specialist Joseph Wu, M.D., to
25  perform an MRI of Kiles's brain, which revealed abnormalities consistent with
26  brain damage. (ROA 1189 at 50; PFR2 Dkt. 28 Ex. 25 at 4–17.) These images
27  revealed observable white-matter hyperintensities in the frontal lobe of Kiles's
28  brain and a reduced-size corpus callosum. Both are consistent with traumatic brain

1    injury, which are often manifested in attention-deficit (i.e., impulsivity) disorders.

2    Dr. Wu concluded that Kiles suffered from brain damage and associated

3    impairments in functioning. (ROA 1189 at 50.)

4          Utilization of brain scanning technology to investigate the presence of brain

5    damage was widespread before the 2006 penalty phase. Brain injury is considered

6    "classic mitigation evidence," and "Arizona courts place significant weight on brain

7    injuries as mitigating evidence." *Correll v. Ryan*, 539 F.3d 938, 950 & n.3 (9th Cir.

8    2008). The 2003 ABA Guidelines stress the importance of investigating brain

9    impairment, and emphasize that brain scans may be useful and necessary. 2003

10    ABA Guideline 4.1 cmt. Further, the Ninth Circuit has long recognized that "where

11    counsel is on notice that his client may be mentally impaired, counsel's failure to

12    investigate his client's mental condition as a mitigating factor in a penalty phase

13    hearing, without a supporting strategic reason, constitutes deficient performance."

14    *Hendricks v. Calderon*, 70 F.3d 1032, 1043 (9th Cir. 1995). *See also Washington v.*

15    *Ryan,* 922 F.3d 419, 432 (9th Cir. 2019) ("Evidence of brain damage and mental

16    disorders is important to the mitigation analysis."); *see also  Caro v. Woodford*, 280

17    F.3d 1247, 1258 (9th Cir. 2002) ("More than any other singular factor, mental

18    defects have been respected as a reason for leniency in our criminal justice

19    system."); *Mitchell v. United States*, 790 F.3d 881, 903–04 (9th Cir. 2015)

20    ("Evidence that [Petitioner] was a chronic user of alcohol and drugs from a young

21    age is the kind of 'classic mitigating evidence' that counsel must pursue at the

22    penalty phase. . .").

23          Kiles's trial counsel VanDreumel knew that Kiles had signs of brain damage.

24    For example, psychiatrist Albert Globus, M.D. testified at a 1996 hearing in

25    connection with Kiles's first post-conviction proceedings that Kiles was addicted

26    to substances as a consequence of "organic disorders in the brain." (Tr. Feb. 21,

27    1996 at 177.) Dr. Globus[35] described Kiles's impulsivity and specifically noted that

28                                    _____

[35] Respondents argue that Dr. Globus's testimony at trial was sufficient to present

1   impulsivity is often concomitant to brain damage. (Tr. Feb. 21, 1996 at 198.)

2   Moreover, when requesting funding in 2000, VanDreumel wrote, "When the matter

3   was overturned on PCR, the PCR had several affidavits indicating an impulsivity

4   disorder which is likely related to brain damage, *so we are pursuing that*." (ROA

5   509 Ex. A at 1.) (emphasis added).

6        Still, even with all this evidence at hand, and promises to "pursue" the

7   investigation, counsel failed to initiate the next logical investigative step: to consult

8   with an appropriate expert who could provide objective proof that Kiles suffered

9   from brain damage. This failure was particularly unreasonable given that a central

10  mitigation theme was Kiles's impulsivity, a form of brain dysfunction often

11  attributable to brain damage. (*See* Tr. May 22, 2006 at 19 (jury instructions listing

12  ────────────

13  this mitigator to the jury. (Answer at 86.) However, this ignores that the State was
    able to essentially eviscerate Dr. Globus's testimony due to counsel's failure to

14  adequately prepare him for his testimony or to corroborate his testimony, as any
    reasonably competent counsel would have, with *objective* evidence; e.g., brain

15  imaging and neuropsychological testing. (E.g., Tr. May 8, 2006 at 37–38.)

16  Respondents assert that "trial counsel are entitled to rely upon their consulted
    experts." (Answer at 88.) This is true only to the extent that counsel adequately

17  prepare experts and provide them with necessary information. *See Caro v.*

18  *Woodford*, 280 F.3d at 1254–55; *Bean*, 163 F.3d at 1079–80; *Lambright*, 490 F.3d
    at 1117; *Correll*, 539 F.3d at 942. Respondents appear to rely on Dr. Globus to

19  support the lack of a need for a PET scan. However, a PET scan is not the sole type

20  of brain imaging available. Indeed, in post-conviction proceedings, Dr. Joseph Wu

21  conducted an MRI-DTI scan of Kiles's brain. (PFR2 Dkt. 28 Ex. 25 at 6.)
    Respondents argue that "Kiles's own trial expert counseled against the very course

22  of action Kiles now demands." (Answer at 90.) Dr. Globus was a psychiatrist, and

23  not a brain scan expert. He testified that headaches are not a sign of brain damage,
    which is false and demonstrates a lack of basic knowledge. (Tr. Apr. 24, 2006 at

24  94.)

25        Dr. Globus's testimony about how a PET scan would not be useful only came

26  up on re-direct examination, after the State had crossed examined him about the
    lack of brain scans and investigation into Kiles's organic brain damage in this case.

27  (Tr. May 8, 2006 p.m. at 24–26 (Dr. Globus answers "not that I know of" when the
    prosecutor asks him "there was no finding in this case of neurological damage to

28  the defendant, is there?"); Tr. May 8, 2006 at 26.)

133

"possible neurological damage" as a mitigating factor for the jury to consider).)
Trial counsel's abandonment of the investigation was constitutionally deficient and
deprived the jury of indisputable evidence that Kiles suffered from genuine deficits
in neurological function and brain damage. (ROA 1189 at 50.) "[W]here counsel is
on notice that his client may be mentally impaired, counsel's failure to investigate
his client's mental condition as a mitigating factor in a penalty phase hearing,
without a supporting strategic reason, constitutes deficient performance."
*Hendricks*, 70 F.3d at 1043; *Washington*, 922 F.3d at 429–30 (deficient
investigation will not support counsel's decision not to present mitigating mental
health evidence).

A qualified expert would have demonstrated that Kiles suffered from damage
to his brain. Instead, Kiles's jury heard unpersuasive, speculative testimony about
the mere possibility that Kiles suffered from brain damage, which was readily
impeached because it lacked objective corroboration. (*E.g.*, Tr. Apr. 24, 2006 at 86;
Tr. May 8, 2006 p.m. at 20; Tr. May 10, 2006 at 106.) Thus, the prosecution
compelled Dr. Globus to admit that there was no objective evidence of organic brain
damage—based on the lack of testing. (Tr. May 8, 2006 at 37.)

"Mental health experts are essential to the defending of capital cases." 2003
ABA Guideline 4.1 cmt. Further, "[c]ounsel should choose experts who are tailored
specifically to the needs of the case." 2003 ABA Guideline 10.11 cmt. It is also
recognized that counsel has "an affirmative duty to provide mental health experts
with information needed to develop an accurate profile of the defendant's mental
health." *Caro*, 280 F.3d 1247, 1254 (9th Cir. 2002). The "duty to provide the
appropriate experts with pertinent information about the defendant is key to
developing an effective penalty phase presentation." *Id*. at 1255 (citing *Bean v.
Calderon*, 163 F.3d 1073, 1079-80 (9th Cir. 1998)). Here, if trial counsel had
adhered to these reasonable professional norms they would have thoroughly
investigated and would have discovered evidence of Kiles's traumatic background

and they would have consulted with an expert who could have properly explained the effects of trauma on Kiles to the jury.

Had they done so, they would have discovered and presented the expert evidence presented by post-conviction counsel, who proffered evidence from Dr. Shaun Utsey, an expert in ethnocultural allodynia, a type of complex trauma. Unlike the experts presented at Kiles's sentencing, Dr. Utsey was provided with reliable evidence concerning Kiles's life history and this enabled him to do what the sentencing experts were unable to reliably do: corroborate and explain the deleterious effects of Kiles's traumatic childhood. The evidence presented to the post-conviction court stood in stark contrast to the incoherent, unsupported, and contradictory mental-health experts presented to the jury.

Family dysfunction marred Kiles's childhood. His parents were mentally ill substance addicts who physically abused Kiles and engaged in repeated acts of domestic violence toward each other in the home, which Kiles often was forced to resolve. However, at trial, counsel's deficient performance left Kiles's history in question, due to misleading testimony from lay witnesses who hardly new Kiles; conflicting expert testimony, that left experts vulnerable on cross-examination, and the lack of an expert to *reliably* contextualize his trauma.

As the state-court record makes clear, counsel failed to investigate obvious lines of mitigation; failed to hire appropriate experts who could investigate such lines of mitigation, including brain damage; failed to provide their experts with critical information; failed to investigate the State's rebuttal experts; and failed to develop a theory of mitigation that would persuade any jury that leniency was warranted. In light of this failure to investigate, counsel's choice to present lay witnesses who barely knew Kiles; to present speculative, non-objective evidence regarding impairments to Kiles's brain; and to present mental health experts who were unprepared to reliably explain and contextualize Kiles's traumatic upbringing bespeaks a colorable claim of prejudicial constitutionally deficient performance.

1    All of the above-described evidence in the state court record was before the

2    state post-conviction court. Based on this, the state post-conviction court should

3    have granted Kiles a hearing on this colorable claim.

4    A colorable claim is demonstrated when the allegations would, if proved,

5    entitle the petitioner to relief. *See Watton*, 793 P.2d at 85. As the above record

6    demonstrates, Kiles satisfied this test. And because Kiles presented the state court

7    with evidence that demonstrated a colorable claim satisfying both prongs of the

8    *Strickland* test, the state court was required to grant him a hearing. Thus the state

9    court's ruling and its denial of relief without affording Kiles the hearing to which

10    he was entitled under Arizona law both contravened and unreasonably applied

11    clearly established federal law. *See* § 2254(d)(1).

12    Moreover, where a post-conviction petitioner presents a colorable claim for

13    relief and requests a hearing—as Kiles did—and the state court nonetheless resolves

14    factual disputes without affording the petitioner the benefit of one, then the state

15    court's decision is necessarily based on unreasonable determinations of fact within

16    the meaning of § 2254(d)(2). *See Brumfield*, 135 S. Ct. at 2278–79, 2281–83

17    (holding that state court unreasonably determined the facts when it dismissed

18    petitioner's colorable claim without a hearing where state law entitled petitioner to

19    one); *Taylor*, 366 F.3d at 1001 (finding that where "a state court makes evidentiary

20    findings without holding a hearing and giving petitioner an opportunity to present

21    evidence, such findings clearly result in an unreasonable determination of the facts"

22    under § 2254(d)(2)).

23    Here there were factual disputes in the state court record that required the

24    post-conviction court to grant a hearing. For example, in their briefing submitted to

25    the state post-conviction court the State erroneously claimed that Kiles started

26    abusing substances while in the Air Force. (ROA 1198 at 87; Answer at 84.)

27    However, the record showed that Kiles used substances from a tender age, years

28    before enlisting. (*See, e.g.*, Tr. Apr. 26, 2006 at 75–77; Tr. Apr. 24, 2006 at 93–

136

1  100.) The age of onset was significant. Childhood exposure to drugs helps explain

2  the damaging influences of Kiles's family dysfunction and trauma and potential

3  causative factors of Kiles's brain damage. The State's briefing in state post-

4  conviction proceedings also created a factual dispute regarding for example, the

5  extent to which the relationship between Clark and Kiles broke down and the

6  conflict between Kiles and counsel, as it ignored the facts post-conviction counsel

7  alleged. (ROA 1198 at 21–28.) The State's briefing raised a factual dispute

8  regarding *critical* question: the extent of Kiles's brain damage and whether brain

9  scans can reliably show brain damage evidence. (ROA 1198 at 93–99.) Similarly,

10  the State's briefing raised a factual dispute regarding whether Kiles could be

11  diagnosed with "ethnocultural allodynia," a form of complex PTSD, and

12  intermittent explosive disorder. (ROA 1198 at 99–109.)

13      The post-conviction court could not reasonably resolve those disputed issues

14  of fact without a hearing. And because Kiles was improperly denied a hearing on

15  his colorable claim, the post-conviction court's decision resulted from an

16  unreasonable determination of the facts under § 2254(d)(2). Moreover, no fair-

17  minded jurist could agree with the post-conviction court's determination that

18  Kiles's claim lacked colorable merit sufficient to warrant a hearing, given all of the

19  evidence the state court had before it. *See Harrington v. Richter*, 562 U.S. 86, 101–

20  02 (2011).

21      Where, as here, a post-conviction petitioner has presented a colorable claim

22  for relief and requested a hearing, but the state court makes factual findings without

23  affording the petitioner the benefit of one, then the state court's decision was based

24  on unreasonable determinations of fact under § 2254(d)(2). *See Brumfield*, 135 S.

25  Ct. at 2278–79, 2281–83; *Taylor*, 366 F.3d at 1001. The state court's deficient fact-

26  finding process therefore is not entitled to deference. *See Taylor*, 366 F.3d at 1001;

27  *Hurles v. Ryan*, 752 F.3d 768, 790 (9th Cir. 2014). Kiles is entitled to relief. Further,

28  because the State court denied Kiles a hearing, he is entitled to a hearing in this

1    Court.

2    The post-conviction court's determination is also no bar to review of this

3    claim on the merits because it failed to cumulatively analyze prejudice, and used an

4    outcome-determinative standard.[36] (ROA 1214 at 1–2.) This was contrary to clearly

5    established federal law. *See White v. Ryan*, 895 F.3d 641, 671 (9th Cir. 2018)

6    (holding that the Arizona post-conviction court erred by separately addressing the

7    prejudice arising from individual deficiencies at mitigation phase and observing

8    that "[t]he test is whether it is reasonably likely that the result of the proceeding

9    would have been different but for counsel's 'errors'" (quoting *Strickland*, 466 U.S.

10   at 694)). In establishing prejudice, "it is not necessary for the habeas petitioner to

11   demonstrate that the newly presented mitigation evidence would necessarily

12   overcome the aggravating circumstances." *Correll*, 539 F.3d at 951-52; *Rompilla*

13   *v. Beard*, 545 U.S. 374, 393 (2005) ("[A]lthough we suppose it is possible that [the

14   sentencer] could have heard it all and still have decided on the death penalty, that

15   is not the test.").

16   For this reason, their analysis is incorrect, and underscores how the state-

17   court decision is not subject to AEDPA deference. *See* 28 U.S.C. § 2254(d).

18   The state court's summary denial of the post-conviction petition contravened

19   28 U.S.C. § 2254(d) and therefore this Court must review the claim de novo.

20
21   **B.    De novo review requires that this Court grant Kiles a hearing on his colorable claim**

22   As demonstrated above, Kiles has stated a colorable claim of ineffective

23   assistance of counsel. Further, because Kiles has overcome the limitations on

24   review in § 2254(d), this Court must review the merits of the claim de novo. *See*

25   *Williams*, 529 U.S. at 405–06. The same considerations that applied to require the

26   state court to conduct a hearing apply here. "Where a petitioner has not failed to

27   develop the factual basis of his claim in State court, as required by 28 U.S.C.

28   _____

[36] Respondents repeat the same error in their Answer. (Answer at 90, 94, 96.)

§ 2254(e)(2), an evidentiary hearing on a habeas corpus petition is required where the petitioner's allegations, if true, would entitle him to relief, and the petitioner has satisfied the requirements of *Townsend v. Sain*, 372 U.S. 293 (1963)." *Stanley*, 598 F.3d at 624; *see also Insyxiengmay*, 403 F.3d at 669–70. As already demonstrated above, Kiles has satisfied each of these requirements. Because the state court unreasonably denied Kiles a hearing, he is entitled to a hearing in this Court.

### C.    In the alternative, Kiles is entitled to de novo review and relief under *Martinez v. Ryan*.

Kiles maintains, contrary to Respondents' argument, that all of Claim 6 is one claim alleging ineffective assistance of trial counsel for failure to properly investigate and present mitigation. Indeed, Respondents' alternative, divide-and-conquer approach to exhaustion is contrary to how claims of ineffective assistance are analyzed. *See White*, 895 F.3d at 671 (holding that the Arizona post-conviction court erred by separately addressing the prejudice arising from particular deficiencies and observing that "[t]he test is whether it is reasonably likely that the result of the proceeding would have been different but for counsel's 'errors'" (quoting *Strickland*, 466 U.S. at 694)); *id.* at 645 n.1 (the district court erred by granting a certificate of appealability on a portion of an ineffective-assistance claim because the petitioner "ha[d] but a single claim regarding his right to the effective assistance of counsel at the penalty phase").

And, the additional examples and factual support Kiles raises here do not "fundamentally alter" the claim that was presented to the state court such that it was not exhausted. *Dickens*, 740 F.3d at 1317 . Respondents appear to argue otherwise. (Answer at 83, arguing that only a narrow construction of this claim, limited to some of the specific examples raised in state court, are exhausted.)

If the Court determines that Kiles's federal claim is unexhausted because the allegations he presented "fundamentally alter" it, then Kiles can show the default of any such claims is excused due to post-conviction counsel's failures to properly

139

1  investigate and present this claim. *See Martinez v. Ryan*, 566 U.S. 1, 14 (2012).

2  To the extent that this Court finds portions of this claim have not been fairly

3  presented in state court, the ineffective assistance of post-conviction counsel in

4  failing to properly raise this substantial ineffective-assistance-of-trial-counsel claim

5  serves as cause to excuse any default, and Kiles can show at a hearing that this

6  prejudiced him. Thus, this Court may review the merits of this claim de novo. This

7  ineffective-assistance-of-trial-counsel claim has "some merit." *See id.* And the

8  allegations in both the Petition and this Reply are sufficient to support Kiles's

9  assertion that the ineffective assistance of post-conviction counsel excuses any

10  default. (*See* Claim 13, *infra*; Pet. at 377–88.)

11  Because post-conviction counsel failed to properly investigate and develop

12  Kiles's ineffective-assistance-of-sentencing-counsel claim, no state court ever had

13  occasion to assess all of the evidence and arguments in support of Kiles's claim.

14  Thus, this Court's review should be de novo and the limitations on evidentiary

15  development, such as *Pinholster*, do not apply. *See Dickens*, 740 F.3d at 1320.

16  As explained in Claim 13 and in the Petition, Kiles's second state post-

17  conviction counsel failed to provide effective representation. Kerrie Droban and

18  Sharmila Roy, Kiles's appointed counsel, had difficulty working together. The

19  physical file was divided between their offices, and their approach was divided as

20  well; resulting in a lack of integration or cohesion. Counsel lost a seasoned

21  mitigation specialist over their disagreement with her decision to first investigate

22  Kiles's social history before settling on what would be an uninformed strategy.

23  Then counsel replaced their experienced mitigation investigator with someone who

24  had no capital mitigation investigation experience. Droban and Roy argued over

25  what was important at mitigation, leading to a disjointed, incomplete presentation

26  of Kiles's personal mitigating history.

27  Their inability to work together culminated in a failure to file a reply brief in

28  Kiles's state post-conviction proceedings. The failure to file a reply was not the

result of reasoned strategic decision making, but instead was the result of a lack of diligence, and thus is not entitled to deference. (ROA 1213 at 1–4.) When the state court prematurely denied the petition without the benefit of a reply or a ruling on the request for another extension, counsel should have filed a motion for reconsideration, objecting. Had counsel filed a reply, they could have more fully elaborated on their allegations and provided more examples of counsel's ineffective assistance at the mitigation phase. The State argued in its response that claims were, for instance, precluded, or that they were not colorable. (ROA 1198 at 8–10.) Indeed, the State's post-conviction brief contained many of the same arguments made in their Answer in these proceedings. (*Compare* ROA 1198 at 85–109 *with* Answer at 84–97.) Without a reply, Droban and Roy were unable to refute these points and to correct points of law and fact the State had misstated.

Further, post-conviction counsel's performance was below prevailing professional norms because they did not undertake a reasonable investigation into Kiles's mitigation. (*See* Pet. at 380–84.) For example, rather than hire an appropriate trauma specialist, Droban and Roy hired an expert who could discuss the effects of racism on African-Americans, but who had little to offer about Kiles's trauma specifically, despite evidence in the record. (ROA 1189 at 52–57.) At an evidentiary hearing or if permitted evidentiary development, Kiles could present evidence that in defiance of best practices and prevailing clinical information on neuropsychological testing, Droban and Roy elected to have three neuropsychologists evaluate Kiles using the same or similar tests within a short period, despite the fact that repeating the same test on a person minimizes its effect. And, counsel failed to file a report by Dr. Edward French, Ph.D., a pharmacologist, detailing Kiles's substance addiction and its effects, due to a misreading of his report and a failure to properly consult with him.

Kiles could also present evidence at a hearing showing how, like trial counsel, Droban and Roy parted ways with an experienced mitigation specialist

because the mitigation specialist was concerned that they had decided on a theory of mitigation before conducting an investigation, contrary to the standard of care. Like trial counsel, they replaced her with an inexperienced investigator who they failed to guide.

At an evidentiary hearing, Kiles could present a wealth of new mitigation evidence never raised in state court, and which undermines confidence in his sentence. *See Jones*, 943 F.3d at 1221. ("*Martinez*'s procedural-default exception applies to merits review, allowing federal habeas courts to consider evidence not previously presented to the state court.") "28 U.S.C. § 2254(e)(2) does not prevent a district court from considering new evidence, developed to overcome a procedural default under *Martinez*, when adjudicating the underlying claim on de novo review." *Id*. at 1222. A trauma expert could properly put Kiles's crimes and substance addiction into context by explaining how chronic abuse of varied kinds during his formative years shaped him and impaired him for life.

And Kiles could present his full social history, which a jury has never heard, that shows how at the time of the crime he was an impaired, mentally ill individual, in the throes of drug addiction, struggling to overcome his family dysfunction, genetic predisposition to substance abuse, and resulting impairments. (*See* Pet. at 198–213, describing Kiles's social history.) He could present properly prepared, strategically-selected experts (*see* Pet. at 233–41 (describing how reasonable counsel would have hired experts on trauma and brain damage to contextualize Kiles's life to the jury and show physical, concrete brain damage evidence)), and live testimony from family and friends who knew Kiles during childhood and at the time of the crime. (*See* Pet. at 223–27, (describing the humanizing testimony family and friends could have provided.).)

Last, at an evidentiary hearing, Kiles could present detailed evidence showing how counsel could have reasonably investigated and thus rebutted the State's experts' testimony, comprised of two full days of unfounded, damaging

1    allegations about Kiles based on inapplicable testing. (*See* Tr. May 16, 2006; Tr.
2    May 17, 2006.)

3    Counsel could have interviewed the State's experts before trial, and could
4    have attended the State's experts' joint interview and testing of Kiles. (Tr. May 16,
5    2006 at 22.) Counsel failed to investigate the information contained in the experts'
6    reports, and were thus completely unprepared to adequately cross-examine them as
7    they misrepresented the value of certain tests in the forensic context. (*See* Pet. at
8    254–62.) Counsel did not consult with her own hired expert, Dr. Cunningham, until
9    after the State's experts had testified, at which point he provided her with literature
10   and explanation about why they were wrong. Had counsel consulted with him
11   before, they could have challenged the State's witnesses and called Dr.
12   Cunningham in rebuttal. It was unreasonable for counsel to fail to do so. *See*
13   *Crawford*, 541 U.S. at 61  (recognizing the "testing [of evidence] in the crucible of
14   cross-examination" as central to the constitutional guarantee of reliability); *United*
15   *States. v. Tucker*, 716 F.2d 576, 581(9th Cir. 1983) ("Courts have repeatedly
16   stressed the importance of . . . interviewing of important witnesses."); *see also* 2003
17   ABA Guideline 10.11 cmt. ("[c]ounsel should also object to and be prepared to
18   rebut arguments that improperly minimize the significance of mitigating
19   evidence").

20   Because counsel did not call any witnesses in sur-rebuttal, these two days of
21   State's expert testimony were the last testimony the jury heard before deliberating
22   Kiles's fate. (*See* Tr. May 16, 2006; Tr. May 17, 2006; Tr. May 22, 2006.)

23   **D.    Counsel provided ineffective assistance in closing, in failing to**
24   **object to the State's closing argument, in failing to request a**
25   **special verdict form listing which mitigating circumstances the**
         **jury found proven, and in failing to object to juror questionnaires**
26   **and jury instructions that primed the jury to find that death was**
27   **the appropriate sentence.**

28   With respect to Respondents' summary allegation that these topical

subheadings are each a "procedurally defaulted claim," (Answer at 97, 99, 100), Kiles refers to his argument above regarding the singular nature of this ineffective-assistance-of-trial-counsel claim, regarding Respondents' burden to fully prove and plead procedural default, and regarding the application of *Martinez*, 566 U.S. at 14.

Kiles has here raised additional examples of counsel's ineffective assistance, which cumulatively demonstrate how Kiles's counsel performed deficiently and prejudiced Kiles.

### 1.   Counsel's mitigation-phase closing argument constituted deficient performance that prejudiced Kiles.

With respect to the merits, Respondents do not respond and thus fail to rebut Kiles's central argument: that in mitigation-phase closing, counsel performed deficiently by failing to make a case for life for the murder of Valerie Gunnel, which prejudiced Kiles. (*See* Pet. at 262–64.) Their argument that the jury could not agree on a sentence for the murder of the two children underscores Kiles's point and demonstrates that he was prejudiced by counsel's failures, as it shows that jurors were open to mitigating evidence, and to hearing a case for life. Kiles does not dispute that trial counsel made a case for life for the deaths of the two children, predicated on residual doubt. (*See* Pet. at 262.) No argument for life was made for the death of Gunnel, and the jury sentenced Kiles to death. (*See* Tr. May 22, 2006 at 48–56, 76–77.)

### 2.   Counsel was ineffective for failing to object to the prosecutor's misconduct in closing argument.

On the merits, Respondents argue that trial counsel was not ineffective in failing to object to the prosecutor's misconduct because "[n]othing about the State's closing argument was improper." (Answer at 98.) This argument fails for the reasons outlined in Kiles's Petition (Pet. at 264–67, 318–32) and in Claim 9, *infra*.

Respondents also incorrectly argue that "misconduct claims on federal habeas review are limited to the narrow issue of whether there was a violation of

due process and not whether there was misconduct. . ." (Answer at 97.) But in evaluating an ineffective assistance claim, the legal question is not precisely the same as for the underlying claim of prosecutorial misconduct. Under *Strickland*, 466 U.S. at 687, Kiles "must demonstrate both that his counsel's performance was deficient and that the deficient performance prejudiced his defense." *Zapata*, 788 F.3d at 1112 (applying two-prong *Strickland* standard to claim that petitioner's "trial counsel was constitutionally ineffective for failing to object to the prosecutor's fabricated and inflammatory remarks.") Kiles refers the Court to the *Strickland* analysis set forth in his Petition. (Pet. at 264–67.) His counsel entirely failed to protect him from the prosecutor's misconduct during mitigation-phase closing argument. This was below prevailing professional norms, and Kiles is entitled to relief.

> **3.     Counsel was ineffective for failing to request a special verdict form listing which mitigating circumstances the jury found proven.**

Respondents' citation to Arizona Supreme Court precedent (Answer at 99) does not resolve that the failure to request a special verdict form listing which mitigating circumstances the jury found violated Kiles's rights under the U.S. Constitution. Respondent's arguments are non-responsive, as they do not address special-verdict forms, which serve as a record of the jury's decision. (Answer at 99.) Respondents ignore Kiles's arguments about how the lack of special verdict forms denied him the right to meaningful appellate review. (Answer at 99–100; *see also* Pet. at 270–71.) Kiles refers otherwise to Claims 8 and 23, *infra*, and his arguments in the Petition regarding the rights denied by the lack of a special verdict form, which counsel here unreasonably failed to protect. (Pet. at 270–71; 316–17; 424–26.)

/ / /

4.    **Counsel was ineffective for failing to object to juror questionnaires and jury instructions that primed the jury to vote for death.**

While the Supreme Court has held that death-qualification is not unconstitutional, this is only where the process itself is in compliance with the Constitution. (Answer at 100); *see Wainwright v. Witt*, 469 U.S. 412 (1985). While death-qualification itself may have been deemed constitutional, it is not constitutional where, due to counsel's deficient performance, the jury is primed to find death because of the jury questionnaire.

Respondents' citation to *Brecht* is in error, as the relevant inquiry for this ineffective-assistance claim is in *Strickland.* Here, counsel's failure to object undermined Kiles's constitutional right to a reliable, individualized sentencing by an unbiased jury and constitutes deficient performance. Moreover, this failure prejudiced Kiles: had counsel objected to the instructions, there is a reasonable probability that the court would have reworded the instructions and at least one juror would have voted differently.

Finally, Respondents are incorrect that "the jury returned life verdicts on two of three charged death sentences," rendering Kiles's claim meritless. (Answer at 101–02.) First, the jury did not return life verdicts, instead, they were unable to reach a verdict. (ROA 887 at 2–3.) Second, Respondents make no attempt to explain how this renders Kiles's allegations meritless. Their arguments are unpersuasive, and Kiles is entitled to de novo review and relief.

**Claim Seven**

**The trial court's numerous errors during the guilt phase of trial violated Kiles's constitutional rights.**

Kiles incorporates by specific reference all facts, allegations, and arguments made in his Petition and elsewhere in this Reply. Kiles relies on the arguments raised in his Petition in support of this claim (*see* Pet. at 277–99), but specifically replies to the following arguments made by Respondents.

1
2
3

    **A.**    **The trial court erred by not appointing qualified, un-conflicted counsel, violating Kiles's rights under the Sixth and Fourteenth Amendments.**

4
5
6
7
8
9
10

        Respondents do not assert any procedural defenses to this claim (Answer at 103), thereby waiving any such argument and failing to carry their burden of pleading and proving default. *See Bennett*, 322 F.3d at 585–86; *Franklin*, 290 F.3d at 1229–33; *see also* Section II.B.2, *supra*. On the merits, Respondents refer to their arguments in Claim 1. (Answer at 103.) Kiles therefore incorporates his arguments in his Petition concerning this claim (Pet. at 277–81), as well as his arguments in his Petition and this Reply concerning Claim 1 (Pet. at 18–59; Claim 1, *supra*).

11
12
13
14
15
16
17
18
19
20
21
22
23

        Respondents too narrowly frame this claim as alleging that "his counsel, Greg Clark, was conflicted, and thus the trial court erred in his appointment." (Answer at 103.) As set forth in the Petition, Kiles alleged that his second-chair trial counsel Treasure VanDreumel was also conflicted and that the trial court failed to conduct an appropriate inquiry into two conflicts that arose during the course of trial counsel's representation of Kiles: (1) the irrevocably fractured relationship between Clark and Kiles; and (2) the conflict created by VanDreumel's concurrent representation of Clark in disciplinary proceedings before the State Bar. (*See* Pet. at 277–81.) These allegations were fairly presented in state court, and that court's determination was contrary to, or an unreasonable application of, clearly established federal law, and based on an unreasonable factual determination, given the state-court record. *See* 28 U.S.C. § 2254(d). As such, this court may review the merits de novo.

24
25

    **B.**    **The trial court denied Kiles a fair trial by denying his motion for a change of venue.**

26
27
28

        Respondents acknowledge that this claim is exhausted, and they do not assert any procedural defenses. (*See* Answer at 103–04.) Respondents focus only on asserting that the Arizona Supreme Court's rejection of this claim was not contrary

1  to, or an unreasonable application of, clearly established federal law under

2  § 2254(d). (*See* Answer at 103–07.) Respondents make numerous arguments in

3  support of the state court's rulings on this claim, but none of them are significant

4  enough to rebut Kiles's argument.

5         Respondents first argue that the Arizona Supreme Court properly found that

6  Kiles failed to establish that prejudice should be presumed based on pretrial

7  publicity in Yuma. (Answer at 106.) In making this finding, however, the state court

8  applied the incorrect legal standard: "Whether a change of venue must be ordered

9  turns on whether 'pretrial publicity will *probably* deprive the party of a fair trial[.]'"

10  *State v. Kiles*, 213 P.3d 174, 184 (Ariz. 2009) (emphasis added) (citing *State v.*

11  *Cruz*, 181 P.3d 196, 203 (Ariz. 2008).)[37] As Kiles explained in his Petition (Pet. at

12  283), the U.S. Supreme Court has held that a court errs in failing to grant a motion

13  for a change of venue "where there is a *reasonable likelihood* that prejudicial news

14  prior to trial . . . prevent[ed] a fair trial." *Sheppard v. Maxwell*, 384 U.S. 333, 363

15  (1966) (emphasis added).

16         The U.S. Supreme Court has explained in a variety of different contexts that

17  there is an important distinction between "probably" and a "reasonable likelihood."

18  *See Kyles v. Whitley*, 514 U.S. 419, 434 (1995) ("*Bagley*'s touchstone of materiality

19  is a 'reasonable probability' of a different result, and the adjective is important. The

20  question is not whether the defendant would more likely than not have received a

21  different verdict with the evidence, but whether in its absence he received a fair

22  trial, understood as a trial resulting in a verdict worthy of confidence."); *see, e.g.*,

23  *Nix v. Whiteside*, 475 U.S. 157, 175 (1986) ("Although a defendant need not

24  ───────────────

25  [37] In *Cruz*, the Arizona Supreme Court cited Ariz. R. Crim. P. 10.3(b), *see* 181 P.3d

26  at 203, upon which Respondents also rely (Answer at 106). That rule provides: "If the grounds to change the place of trial are based on pretrial publicity, the moving

27  party must prove that the dissemination of the prejudicial material *probably* will result in the party being deprived of a fair trial." Ariz. R. Crim. P. 10.3(b) (emphasis

28  added).

1    establish that the attorney's deficient performance more likely than not altered the
2    outcome in order to establish prejudice under *Strickland*, a defendant must show
3    that 'there is a reasonable probability that, but for counsel's unprofessional errors,
4    the result of the proceeding would have been different.'"); *Schlup v. Delo*, 513 U.S.
5    298, 327 (1995) ("To establish the requisite probability, the petitioner must show
6    that it is more likely than not that no reasonable juror would have convicted him in
7    the light of the new evidence. The petitioner thus is required to make a stronger
8    showing than that needed to establish prejudice [under *Strickland* or *Bagley*].").
9    Therefore, in requiring Kiles to make the stronger showing that pretrial publicity
10   "probably" deprived him of a fair trial, the state court unreasonably applied clearly
11   established U.S. Supreme Court precedent holding that he need only demonstrate a
12   "reasonable likelihood" that it prevented a fair trial. *See Sheppard*, 384 U.S. at 363.

13        In addition, the Arizona Supreme Court incorrectly narrowed the standard
14   for a change of venue to require a "carnival or circus atmosphere." *See Kiles*, 213
15   P.3d at 185. But as Kiles explained in his Petition, the U.S. Supreme Court has held
16   that prejudice is also presumed where, as in Kiles's case, the pretrial publicity was
17   "massive," "pervasive," and "virulent." (*See* Pet. at 283 (citing *Sheppard*, 384 U.S.
18   at 335, 363).) Respondents appear to argue that the news coverage of Kiles's case
19   did not have this effect because, as the Arizona Supreme Court recognized, *see*
20   *Kiles*, 213 P.3d at 184, the trial court determined that Yuma was a "growing
21   community" with a "transient population." (*See* Answer at 106–07 (citing Tr. Apr.
22   11, 2000 at 34).) The state-court record belies this factual determination. *See Taylor*,
23   366 F.3d at 1001 (noting that state-court fact-finding processes are undermined
24   where the state court has before it, yet ignores, evidence that supports petitioner's
25   claim (citing *Miller-El v. Cockrell*, 537 U.S. 322, 346 (2003))).

26        No evidence was presented to establish that Yuma has a "transient
27   population." (Tr. Apr. 11, 2000 at 34.) This appears to be based on the trial court's
28   subjective, personal impression of the population characteristics of Yuma,

1    uncontestable by any party. The trial court had no evidence before it upon which it

2    could competently find that Yuma has a "transient population." Ariz. R. Evid.

3    201(b) (judicial notice may only be taken of facts which are generally known within

4    the court's jurisdiction, and not subject to reasonable dispute); *State v. Prince*, 250

5    P.3d 1145, 1170 (Ariz. 2011) (judicial notice may only be taken if fact is "so

6    notoriously true as not to be subject to reasonable dispute.").

7         Indeed, the prospective jurors' answers to questioning during voir dire

8    showed the opposite: that Yuma was a close-knit community (at least among U.S.

9    citizens, the Yuma residents who could serve on a jury). For example, the trial court

10   recognized that it "usually" happens that members of the jury panel know each

11   other, and several prospective jurors indicated that they did know each other. (*See*

12   Tr. July 7, 2000 at 61–62, 102.) Another of the prospective jurors knew the judge

13   because they had played tennis together. (*See* Tr. July 7, 2000 at 147.) To the extent

14   the Arizona Supreme Court relied on a purported fact that could not be judicially

15   noticed,[38] its decision constituted a per se unreasonable fact-finding process and is

16   entitled to no deference. *See* 28 U.S.C. § 2254(d); *Taylor*, 366 F.3d at 1000–01.

17        Further, although the Arizona Supreme Court characterized the pretrial

18   publicity in Yuma as "[a]t most . . . regular press coverage over the course of some

19   ten years," *see Kiles*, 213 P.3d at 185, the state court record makes clear that

20   newspaper coverage in this case occurred close in time to the trial, was

21   sensationalist, and revealed to the community numerous prejudicial items which

22   would be inadmissible at trial. Trial counsel filed a petition for special action to

23   move the venue, which included exhibits showing a January 27, 1999 headline

24   quoting former prosecutor and then-Judge Hall implying that if Kiles's second trial

25   did not start soon, important witnesses may die. (Case No. CV-00-0143-SA, Appx.

26   _____

27   [38] The trial court also failed to apprise the parties that it was taking judicial notice
     of the population characteristics, and failed to give them an opportunity to respond.
28   *See* Ariz. R. Evid. 201(c), (e).

1  to Pet. for Special Action, May 5, 2000 at Ex. 74, Tony Carroll, *Convicted killer's*
2  *attorney gets more time to appeal,* January 27, 1999.) It also included a March 6,
3  1999 article reporting that Kiles had been denied the use of a pen because he could
4  use it as a weapon, headlined "Judge denies killer use of pen." (Case No. CV-00-
5  0143-SA, Appx. To Pet. For Special Action, May 5, 2000 at Ex. 76, Tony Carroll,
6  *Judge denies killer use of a pen,* March 6, 1999.)

7      The trial transcript reflects that defense counsel had to file motions to change
8  venue under seal, because the press was reporting on those motions as they were
9  filed. (Tr. Apr. 11, 2000 at 7.) Multiple headlines in the paper around the time of
10 trial included that Kiles had been convicted. (Case No. CV-00-0143, Pet. for Special
11 Action, May 5, 2000 at Ex. 4, Tony Carroll, *Friends talk about Kiles' confession*,
12 Ex. 31, Tony Carroll, *Murder trial winds down, Bloodstains are linked to missing*
13 *girl*, December 14, 1989.) Further, the newspapers reported about Kiles's prior
14 felony conviction—details that were so similar to the facts of the current case that
15 they "could never come inside of a criminal trial." (Tr. Apr. 11, 2000 at 11.)
16 Accordingly, the state court's characterization of the pretrial publicity in this case
17 was based on an unreasonable determination of the facts.

18     Respondents also attempt to bolster the Arizona Supreme Court's findings
19 by arguing that the trial court properly concluded that prejudice could not be
20 presumed because "if I had not been involved in the legal community during this
21 last 12 years, and basing what I know just on newspaper, TV reports, at this late
22 date I would really have remembered very little about this case." (Answer at 106
23 (citing Tr. Apr. 11, 2000 at 33).) As an initial matter, this reason was not given by
24 the state court and thus cannot rehabilitate the state court's reasoning under a
25 § 2254(d) analysis. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1191–92 (2018)
26 ("Deciding whether a state court's decision 'involved' an unreasonable application
27 of federal law or 'was based on' an unreasonable determination of fact requires the
28 federal habeas court to 'train its attention on the *particular reasons*—both legal and

1    factual—why state courts rejected a state prisoner's federal claims[.]'" (emphasis

2    added) (quoting *Hittson v. Chatman*, 135 S. Ct. 2126, 2126 (2015) (Ginsburg, J.,

3    concurring in denial of certiorari))); *cf. Fox v. Johnson*, 832 F.3d 978, 985 (9th Cir.

4    2016), *cert. denied*, 137 S. Ct. 1437 (2017) ("AEDPA applies to a single state court

5    decision, not to some amalgamation of multiple state court decisions." (internal

6    quotation marks and citation omitted).)

7         Moreover, it was improper for the trial judge to speculate as to what he would

8    or would have not remembered had he "not been involved in the legal community,"

9    and then to extrapolate from his own subjective experience what the population of

10   Yuma would have remembered about Kiles's case. Thus, if the Arizona Supreme

11   Court's decision did rely on this basis, it was unreasonable under § 2254(d).

12        Respondents also argue that the trial court did not err because the pretrial

13   publicity in *Bible* was "much more extensive and just as damaging." (Answer at

14   107 (citing Tr. Apr. 11, 2003 at 35).) But as detailed in the Petition (*see* Pet. at 282–

15   83), the facts in Kiles's case are remarkably similar to those in *Irvin v. Dowd*, 366

16   U.S. 717, 728 (1961), in which the U.S. Supreme Court vacated the petitioner's

17   conviction and death sentence to allow for a new trial because "[w]ith his life at

18   stake, it is not requiring too much that petitioner be tried in an atmosphere

19   undisturbed by so huge a wave of public passion . . . ." There, news stories revealed

20   the details of the petitioner's prior crimes and called him a "confessed slayer." *Irvin*,

21   366 U.S. at 725–26. The newspaper articles also "reported petitioner's offer to plead

22   guilty if promised a 99-year sentence, but also the determination, on the other hand,

23   of the prosecutor to secure the death penalty." *Id*.

24        Here, the trial court failed in its constitutionally mandated gatekeeping

25   function of ensuring that the jury pool was not exposed to prejudicial pretrial

26   publicity, and compounded this error by denying Kiles's motion for a change of

27   venue. The Arizona Supreme Court's denial on direct appeal was contrary to, and

28   an unreasonable application of, clearly established federal law, and based on

1   unreasonable determinations of fact. *See* 28 U.S.C. § 2254(d). Finally, because
2   prejudice must be presumed, *see Sheppard*, 384 U.S. 333, Kiles need not "show
3   *Brecht* prejudice" (*see* Answer at 107). And even if *Brecht* does apply, Respondents
4   have not carried their burden of establishing the harmlessness of the trial court's
5   error. *See Brecht*, 507 U.S. at 641  (Stevens, J., concurring) (explaining that the
6   state has the burden of demonstrating harmlessness); *Ayala*, 135 S. Ct. at 2197
7   (stating that habeas relief "is appropriate only if the prosecution cannot demonstrate
8   harmlessness"). Accordingly, Kiles is entitled to de novo review and relief on the
9   merits.

10
11   **C.    The trial court erred by not dismissing the venire after a highly prejudicial statement poisoned the jury pool.**

12   Respondents are wrong that "Kiles admits that this claim is procedurally
13   defaulted for failing to present it in state court." (Answer at 107.) Rather, Kiles
14   acknowledged only that this claim was not presented in state court. (Pet. at 284.)
15   Indeed, although Respondents assert that this claim is procedurally defaulted, they
16   do not cite to a single procedural rule or Arizona court decision that would bar this
17   claim if presented in the state courts in a second-in-time petition. To the extent
18   Respondents intend simply to rely on their general discussion of Rule 32 in the
19   introduction to their Answer, such vague and generalized incorporation cannot
20   discharge their burden to prove that the asserted procedural rule is adequate to bar
21   this claim. Respondents have not offered any authority demonstrating that the
22   Arizona state courts bar second-in-time petitions presenting a claim of trial court
23   error for failure to dismiss a poisoned jury pool. Respondents do not even allege
24   that the Arizona courts apply Rule 32 to bar this type of claim.

25   In sum, because Respondents do not allege any particular procedural bar to
26   this claim or demonstrate that such a bar is adequate to preclude this type of claim,
27   they have not discharged their burden to plead and then prove default based on any
28   implied procedural bar. *See* Section II.B.2, *supra* (citing *Bennett v. Mueller*, 322

1    F.3d 573, 585 (9th Cir. 2003); *Insyxiengmay v. Morgan*, 403 F.3d 657, 665–66 (9th
2    Cir. 2005).) Especially in the absence of any guidance from Respondents, this Court
3    should not weigh into the adequacy of any procedural bars and should instead
4    reserve that question to the state courts.

5    Even assuming, however, that any aspect of this claim is procedurally
6    defaulted pursuant to an adequate and independent state procedural bar, any default
7    can be overcome because appellate counsel rendered ineffective assistance in
8    failing to properly present the claim. *See Coleman*, 501 U.S. at 753–54; *Carrier*,
9    477 U.S. at 488.

10   Kiles presented in his state post-conviction proceeding a claim alleging that
11   his appellate counsel rendered ineffective assistance. (*See* ROA 1189 at 23–25, 31–
12   32, 43, 61–69, 73–74.) The post-conviction petition explained that "if counsel
13   ignores issues that are clearly stronger than those selected for appeal," then a
14   defendant can overcome the presumption of effective assistance of appellate
15   counsel. (ROA 1189 at 61 (quoting *State v. Bennett*, 146 P.3d 63, 68 (Ariz. 2006).)
16   And, as discussed *infra* in Claim 11, Kiles further alleged in his post-conviction
17   petition that his appellate counsel was ineffective for raising claims based on the
18   ineffective assistance of trial counsel—"claims that cannot be properly raised on
19   appeal"—and for failing to raise claims that should have been raised on appeal.
20   (ROA 1189 at 61.) *See Kiles*, 213 P.3d at 183–84. In other words, as a result of
21   appellate counsel's unreasonable focus on pleading a claim that was not cognizable
22   on direct appeal in Arizona, he unreasonably failed to raise several meritorious
23   claims that were cognizable, including a challenge to the trial court's errors in
24   failing to take appropriate action after a prospective juror disclosed prejudicial
25   information before the venire. Because that claim of ineffective assistance of
26   appellate counsel is therefore exhausted, it can serve as cause to excuse any default.
27   *See Coleman*, 501 U.S. at 753–54; *Carrier*, 477 U.S. at 488.

28   If the Court instead finds that post-conviction counsel's failure to list this trial

154

1    court error among the examples of the claims appellate counsel ignored renders
2    Kiles's ineffective-assistance-of-appellate-counsel claim unexhausted as to this
3    part, then post-conviction counsel performed deficiently by neglecting to
4    adequately raise this substantial claim of appellate counsel's ineffectiveness. *See*
5    *Martinez*, 566 U.S. at 15–16; *Carpenter*, 529 U.S. at 453; Section II.B.3–4, *supra*.
6    Post-conviction counsel committed a host of errors in pleading Kiles's post-
7    conviction claims, including failing to file a reply brief that would have elaborated
8    on appellate counsel's errors—including the failure to challenge this trial court
9    error. (*See* Claim 13, *infra*.) This serves as cause to excuse any alleged default. For
10   the reasons contained in Section II.B.4, *supra*, *Davila* should not compel a different
11   result. *See Davila v. Davis*, 137 S. Ct. 2058, 2067 (2017).

12        Finally, the Court's failure to review the merits here would result in a
13   fundamental miscarriage of justice for the reasons detailed in Section 1.B.1.c,
14   Claims 31, 35 and in the Petition. (Pet. at 440–42, 450–54); *see also* Section II.B.2.

15        On the merits, Respondents do not squarely address Kiles's argument that
16   during jury selection, a prospective juror informed the venire that Kiles had
17   previously been convicted of the charges he was now facing. (*See* Pet. at 285 (citing
18   Tr. July 7, 2000 at 45–46.)) Nor do Respondents specifically address Kiles's
19   argument that the trial court "could not have conducted an inquiry into whether this
20   extraneous information biased jurors without further reference to that prejudicial
21   information." (Pet. at 286.) Instead, Respondents appear to rely on their response to
22   Claim 2, arguing that "a review of the extensive voir dire process reveals the venire
23   was well vetted for the ability to be fair and impartial. . ." (Answer at 107.) This
24   reliance is misplaced because, as Kiles noted in his Petition, a curative instruction
25   or asking the venire specific questions about the prospective juror's statements
26   would only have exacerbated the problem by calling attention to Kiles's prior
27   conviction. (*See* Pet. at 286.) Thus, the trial court's and counsel's cursory
28   questioning of prospective jurors during voir dire was not sufficient to reveal

1    whether the jury heard the venire member's inflammatory statements that she had

2    a personal connection to Shemaeah's uncle, that she had talked to him about the

3    crime and the service held for the child, and that she was "happy" that Kiles had

4    been previously convicted. (*See* Pet. at 285 (citing Tr. July 7 2000 at 45–46).) *See*

5    *also Morgan*, 504 U.S. at 735 (cursory questioning about jurors' ability to follow

6    the law and be impartial is not sufficient to reveal true biases.)

7        And, as detailed in Claim 2, counsel's deficient performance in voir dire,

8    including their failure to adequately question prospective jurors about their media

9    exposure and knowledge of Kiles's previous convictions, resulted in the seating of

10   multiple jurors whose biases rendered them substantially impaired. (*See* Pet. at 62–

11   71; Claim 2, *supra*.) For example, at least one juror has said that he knew that Kiles

12   was previously convicted of the crime, but did not say anything about it during jury

13   selection, because he was never asked. Kiles therefore incorporates his argument in

14   his Petition (Pet. at 284–87), as well as his arguments in his Petition and this Reply

15   concerning Claim 2 (Pet. at 60–73; Claim 2, *supra*).

16       Lastly, Respondents are incorrect in arguing that Kiles "cannot show *Brecht*

17   prejudice." (Answer at 107.) As previously discussed, the burden of establishing

18   the harmlessness of the trial court's error rests with Respondents and they fail to

19   carry their burden here. *See Brecht*, 507 U.S. at 641 (Stevens, J., concurring); *Davis*,

20   135 S. Ct. at 2197. Regardless, the trial court's error had a substantial and injurious

21   effect on Kiles's case. *See Brecht*, 507 U.S. at 623. The record indicates that more

22   than ten of the seated jurors were present when the prospective juror made the

23   inflammatory and prejudicial statements at issue. (*See* Tr. July 7, 2000 at 34–48,

24   173.) Accordingly, Kiles is entitled to relief.

25       **D.    The trial court's admission of an excessively gruesome photograph
26             during Kiles's trial resulted in the denial of a fair trial and due
               process.**

27   Respondents appear to acknowledge that this claim is exhausted, and they do

28   not assert any procedural defenses. (*See* Answer at 107–108.) They argue instead

156

1    that the Arizona Supreme Court's decision "was not contrary to, or an unreasonable
2    application of, clearly established federal law." (Answer at 108.) Respondents
3    appear to rely on their arguments in Claim 3 that the post-conviction court properly
4    found that Kiles did "not demonstrate a prejudice that would have been suffered"
5    (ROA 1214 at 2) due to his counsel's failure to object to the worst of the gruesome
6    photographs displayed at trial (*See* Answer at 56–59). But these arguments fail for
7    the reasons in Kiles's Petition and in Claim 3. (*See* Pet. at 127–29, 287–89; Claim
8    3, *supra*.) Respondents have thus failed to refute that the Arizona Supreme Court's
9    finding that the prosecution's needless introduction of a photograph of a baby's
10   water-bloated, partially-eaten corpse was not prejudicial *at the guilt phase* because
11   a different jury at the penalty phase did not sentence Kiles to death for the children's
12   murders, *see Kiles*, 213 P.3d at 183, constituted an unreasonable application of
13   clearly established federal law, and an unreasonable factual determination. *See* 28
14   U.S.C. § 2254(d); *Romano v. Oklahoma*, 512 U.S. 1, 12 (1994).

15        First, the state supreme court ignored that the trial court erred by allowing
16   the photograph to be shown to the jurors at Kiles's 2000 guilt phase. Because the
17   state supreme court had before it but apparently ignored evidence pertaining to the
18   prejudice Kiles suffered in his guilt phase due to the introduction of this photograph,
19   the state court fact-finding process was defective. *Taylor*, 366 F.3d at 1001; *Miller-*
20   *El*, 537 U.S. at 346. As detailed in his Petition, the admission of the gruesome
21   photograph undermined the fairness of the guilt-phase proceeding and amounted to
22   a denial of due process. *See Romano*, 512 U.S. at 12; *Bruton v. United States*, 391
23   U.S. 123, 131 n.6 (1968) ("An important element of a fair trial is that a jury consider
24   only relevant and competent evidence bearing on the issue of guilt or innocence.").

25        The medical examiner's testimony regarding the victims' injuries and causes
26   of death was uncontroverted by the defense before the jury. (Tr. July 13, 2000 at
27   103–07.) The medical examiner gave a cause of death without reference to the
28   photograph. (Tr. July 13, 2000 at 101–03.) The gruesome photograph had no

1   probative value, as the photograph was not illustrative of the injuries suffered. Thus,
2   the photograph's introduction at trial served only to incite the passions of the jurors
3   and to prejudice them against Kiles.

4        Indeed, the prejudice from the trial court's error is apparent from the record.
5   Jurors from Kiles's first trial in 1989 described in written affidavits filed as part of
6   Kiles's first, successful post-conviction proceeding that the photograph were
7   haunting and horrifying, and were upset that it was introduced for no apparent
8   purpose. (ROA 225 Ex. 49, ¶ 2; ROA 225 Ex. 51, ¶¶ 3–4.) The photographs
9   undoubtedly had the same effect on Kiles's 2000 guilt-phase jury. It was therefore
10  unreasonable for the Arizona Supreme Court to conclude that Kiles suffered no
11  prejudice at the guilt phase because six year later, the penalty-phase jury (comprised
12  of new jurors) did not sentence him to death for the two children. *See Kiles*, 213
13  P.3d at 183. As such, Kiles has overcome § 2254(d) and is entitled to de novo
14  review. *See* Section II.C.1. As this claim was not adjudicated in state court, review
15  in this Court is de novo. *See Dickens*, 740 F.3d at 1321.

16       Finally, the wrongful admission of this gruesome photograph had a
17  substantial and injurious effect on the guilt-phase jury's verdict, and Respondents
18  have failed to carry their burden of establishing otherwise. *See Brecht*, 507 U.S. at
19  641 (Stevens, J., concurring); *Davis*, 135 S. Ct. at 2197. Kiles is entitled to relief.

20  **E.   The trial court declined to give the jury instructions to which Kiles
21       was constitutionally entitled.**

22       Kiles alleged in his Petition that the trial court made three instructional errors,
23  which individually and cumulatively denied him due process of law and prejudiced
24  his defense. With the exception of the allegations regarding the reasonable doubt
25  instruction, this claim was exhausted on direct appeal. *Kiles*, 213 P.3d at 180.
26  Respondents assert that this claim is "partially procedurally defaulted," but this
27  unsupported assertion fails to meet their burden of pleading and proving procedural
28  default due to an adequate and independent state procedural bar for the reasons

1    outlined in Section 7.C, *supra*; any procedural defenses are thus waived. (*See*
2    Answer at 108.) Even assuming, however, that any aspect of this claim is
3    procedurally defaulted, any default can be overcome due to the ineffective
4    assistance of prior counsel, as outlined above in Section 7.C. Because appellate
5    counsel's ineffectiveness resulted in any default, this ineffective assistance, which
6    was itself exhausted in state post-conviction proceedings, can serve as cause to
7    overcome the default, and this court may conduct a merits review. *See Coleman*,
8    501 U.S. at 753–54; *Carrier*, 477 U.S. at 488; *but see Davila*, 137 S. Ct. at 2067.
9    Should the Court find that this claim of ineffective assistance of appellate counsel
10   was not exhausted, then any default can be overcome because post-conviction
11   counsel performed deficiently by failing to properly plead this substantial claim of
12   ineffective assistance of appellate counsel. *See Martinez*, 566 U.S. at 15–16;
13   *Carpenter*, 529 U.S. at 453. *Davila* should not compel a different result. *See Davila*,
14   137 S. Ct. at 2067.

15   On the merits, Respondents rely on their arguments in Claims 3 and 5. Kiles
16   incorporates his argument in his Petition concerning this claim (Pet. at 289–95), as
17   well as his arguments in his Petition and this Reply concerning Claims 3 and 5 (*see*
18   Pet. at 129–32, 161–97; Claims 3 and 5, *supra*). The Arizona Supreme Court's
19   denial was an unreasonable application of clearly established federal law and based
20   on an unreasonable factual determination. *See* 28 U.S.C. § 2254(d). Kiles is entitled
21   to de novo review and relief.

22   **F.    The trial court unconstitutionally required that Kiles be physically
23         restrained at the guilt phase.**

24   For the reasons outlined in Section 7.C, *supra*, Respondents' unsupported
25   assertion that this claim is procedurally defaulted fails to meet their burden of
26   pleading and proving procedural default due to an adequate and independent state
27   procedural bar; any procedural defenses are thus waived. (*See* Answer at 108.) Even
28   assuming, however, that any aspect of this claim is procedurally defaulted, Kiles

can overcome any default due to the ineffective assistance of post-conviction counsel. As discussed *supra* in Section II.B.2, even when the underlying claim is not one of ineffective assistance of counsel, *Martinez* should apply if the claim is one that should have been raised in post-conviction proceedings. Arizona law blocks the disclosure of jurors' information, which makes investigation of shackling claims difficult. *See* Ariz. R. Crim. P. 18.3(b). This state action deprived appellate counsel of the opportunity to raise this claim. Thus, a claim of unconstitutional restraint, where an element of proof relies on extra-record evidence that cannot be gathered due to state action, should have been raised in Kiles's post-conviction proceedings. *See, e.g.*, *Lambright*, 241 F.3d at 1203–04 (explaining that Arizona requires that claims requiring factual development be raised in post-conviction relief proceedings rather than on direct appeal).

As this claim was not adjudicated in state court, review in this Court is de novo. *See Dickens*, 740 F.3d at 1321. On the merits, Respondents rely on their arguments in Claim 3 that trial counsel was not ineffective in failing to object to Kiles being shackled because his restraints were not visible. (*See* Answer at 48–51, 108.) Accordingly, Kiles incorporates his argument in his Petition concerning this claim (Pet. at 295–96), as well as his argument in his Petition and this Reply concerning Claim 3 (Pet. at 116–18; Claim 3, *supra*).

Kiles possessed a due-process right to be free from unnecessary shackles at trial. *See Hedlund v. Ryan*, 854 F.3d 557, 568 (9th Cir. 2017). Restraints are unnecessary unless a trial court makes specific findings of fact as to their necessity, and less-restrictive conditions are considered. *Spain v. Rushen*, 883 F.2d 712, 720–21 (9th Cir. 1989). Even where restraints are found to be necessary, care must be taken to prevent this fact from being presented to the jury, due to the prejudice which arises from observing a shackled defendant. *Illinois v. Allen*, 397 U.S. 337, 343–44 (1970). And, although Respondents argue that Kiles's restraints were not visible, multiple jurors were aware that Kiles was shackled during the course of

1  trial. One juror heard Kiles's leg shackles clinking as he walked.

2      The trial court failed to make an individualized determination that restraints
3  were necessary for Kiles, and failed to consider less-intrusive alternative security
4  measures. Thus, Kiles was unconstitutionally restrained. *Spain*, 883 F.2d at 721.
5  Because multiple jurors were aware of these restraints, Kiles was deprived of the
6  presumption of innocence in their eyes, and denied an impartial jury. This had a
7  substantial and injurious effect on his conviction, and he is entitled to relief. *Brecht*,
8  507 U.S. at 623; *see also State v. Gomez*, 123 P.3d 1131, 1139–42 (Ariz. 2005).

9  **G.    The trial court failed to make a complete record of the guilt-phase**
10 **proceedings in violation of Kiles's constitutional rights.**

11     For the reasons outlined in Section 7.C, *supra*, Respondents' unsupported
12 assertion that this claim is procedurally defaulted fails to meet their burden of
13 pleading and proving procedural default due to an adequate and independent state
14 procedural bar; any procedural defenses are thus waived. (*See* Answer at 108.) Even
15 assuming, however, that any aspect of this claim is procedurally defaulted, any
16 default can be overcome due to the ineffective assistance of prior counsel, as
17 outlined above in Section 7.C. Because appellate counsel's ineffectiveness resulted
18 in any default, this ineffective assistance, which was itself exhausted in state post-
19 conviction proceedings, can serve as cause to overcome the default, and this court
20 may conduct a merits review. *See Coleman*, 501 U.S. at 753–54; *Carrier*, 477 U.S.
21 at 488; *but see Davila*, 137 S. Ct. at 2067.

22     Should the Court find that this claim of ineffective assistance of appellate
23 counsel was not exhausted, then any default can be overcome because post-
24 conviction counsel performed deficiently by failing to properly plead this
25 substantial claim of ineffective assistance of appellate counsel. *See Martinez*, 566
26 U.S. at 15–16; *Carpenter*, 529 U.S. at 453. *Davila* should not compel a different
27 result. *See Davila*, 137 S. Ct. at 2067. As this claim was not adjudicated in state
28 court, review in this Court is de novo. *See Dickens*, 740 F.3d at 1321.

1    In capital cases, where heightened reliability is required, *see Woodson v.*
2    *North Carolina*, 428 U.S. 280, 305 (1976) (plurality opinion), the Supreme Court
3    has "emphasized repeatedly the crucial role of meaningful appellate review in
4    ensuring that the death penalty is not imposed arbitrarily or irrationally." *Parker v.*
5    *Dugger*, 498 U.S. 308, 321 (1992); *see also Zant v. Stephens*, 462 U.S. 862, 890
6    (1983). By failing to ensure that bench conferences were recorded and documents
7    retained, the trial court denied Kiles the opportunity for meaningful appellate
8    review. (*See* Claim 15, *infra*.)

9    **H.    The trial court violated Kiles's right to be free from double**
10       **jeopardy and a reliable sentencing determination.**

11    Respondents are wrong that "Kiles concedes that this claim is procedurally
12    defaulted because it was never raised in state court." (Answer at 109.) Rather, Kiles
13    acknowledged only that this claim was not presented in state court. (Pet. at 297.)
14    For the reasons outlined in Section 7.C, *supra*, Respondents' unsupported assertion
15    that this claim is procedurally defaulted fails to meet their burden of pleading and
16    proving procedural default due to an adequate and independent state procedural bar;
17    any procedural defenses are thus waived. (*See* Answer at 108–09.) Even assuming
18    that any aspect of this claim is procedurally defaulted, any default can be overcome
19    due to the ineffective assistance of prior counsel, as outlined in Section 7.C.
20    Because appellate counsel's ineffectiveness caused any default, this ineffective
21    assistance, which was itself exhausted in state post-conviction proceedings, can
22    serve as cause to overcome the default, and this court may conduct a merits review.
23    *See Coleman*, 501 U.S. at 753–54; *Carrier*, 477 U.S. at 488; *but see Davila*, 137 S.
24    Ct. at 2067. Should the Court find that this claim of ineffective assistance of
25    appellate counsel was not exhausted, then any default can be overcome because
26    post-conviction counsel performed deficiently by failing to properly plead this
27    substantial claim of ineffective assistance of appellate counsel. *See Martinez*, 566
28    U.S. at 15–16; *Carpenter*, 529 U.S. at 453. *Davila* should not compel a different

1   result. *See Davila*, 137 S. Ct. at 2067. As this claim was not adjudicated in state

2   court, review in this Court is de novo. *See Dickens*, 740 F.3d at 1321.

3        The Fifth Amendment protects against multiple punishments for the same

4   offense. *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969). Kiles's child abuse

5   convictions are subsumed by the first-degree murder convictions for the children's

6   deaths, and must be vacated as a result.

7        Kiles was charged, as to each child, with child abuse, premeditated first-

8   degree murder, and felony murder with child abuse as the predicate felony. (ROA

9   1 at 2.) He was convicted on all counts, with at least two jurors only finding him

10  guilty of first-degree murder as felony murder predicated upon child abuse. (ROA

11  482 at 5–8.) The defense moved that the child abuse convictions be vacated, as the

12  Arizona Supreme Court had previously held that a separate child abuse conviction

13  could not stand where the only evidence of child abuse was the fatal injuries

14  inflicted as part of the first-degree murder. (ROA 488 at 5); *State v. Styers*, 865 P.2d

15  765, 771 (Ariz. 1993). The trial court denied this motion.

16       Respondents argue that *Styers* is inapposite here because it was decided as a

17  matter of Arizona state law. (Answer at 109.) But it is well-established that although

18  state courts are the final arbiters of state law, the imprimatur of a state court does

19  not render constitutional violations permissible. *Sandstrom v. Montana*, 442 U.S.

20  510, 524 (1979). Kiles does not assert that due process proscribes the use of child

21  abuse as a predicate felony for felony murder in all circumstances. But here, as in

22  *Styers*, there was no evidence of child abuse separate from the fatal injuries. Indeed,

23  the State argued in closing that no evidence of child abuse, separate from the fatal

24  injuries, was presented to the jury. (Tr. July 19, 2000 at 34 ("He was committing

25  child abuse by beating those children and they died as a result.").)

26       Kiles was subject to double jeopardy, and the trial court erred by not vacating

27  the child abuse convictions upon the jury's finding that Kiles was guilty of first-

28  degree murder under the theory of felony murder with child abuse as the predicate

1    felony. This error had a substantial and injurious effect on his sentences, *see Brecht*,

2    507 U.S. at 623, and Respondents have failed to show otherwise.

3    **I.    The cumulative effect of these trial-court errors prejudiced Kiles.**

4          The cumulative impact of multiple errors provides a basis for relief even

5    where no single error, viewed in isolation, would do so. *Parle v. Runnels*, 505 F.3d

6    922, 934 (9th Cir. 2007). Here, the trial court committed numerous errors, as

7    detailed above and in Kiles's Petition. (*See* Pet. at 298–99.) If the prejudice resulting

8    from each error, taken individually, is not sufficient to warrant relief, the cumulative

9    impact of multiple errors here entitles Kiles to relief.

10                            **Claim Eight**

11    **The trial court's numerous errors during the penalty phase of trial
      violated Kiles's constitutional rights.**

12          Kiles incorporates by specific reference all facts, allegations, and arguments

13    made in his Petition and elsewhere in this Reply. Kiles relies on the arguments

14    raised in his Petition in support of this claim (*see* Pet. at 299–318), but specifically

15    replies to the following arguments made by Respondents. Kiles will discuss the

16    procedural status of each section of this claim individually. However, as a general

17    matter, Respondents are incorrect in making a blanket claim that "*Martinez* does

18    not excuse procedural default for any procedurally defaulted trial error claim."

19    (Answer at 110.) *See* Section II.B.3–4.

20    **A.    The trial court unconstitutionally required that Kiles be physically
      restrained at the penalty phase.**

21

22          Respondents assert that this is a "procedurally defaulted claim," without

23    explaining what procedural bars they rely upon. *See* Section II.B.2 (citing *Bennett*

24    *v. Mueller*, 322 F.3d 573, 585 (9th Cir. 2003) ("procedural default is an affirmative

25    defense. . . . As an affirmative defense, the state must plead, and it follows, prove

26    the default.")). Nor do Respondents attempt to demonstrate that any procedural bar

27    asserted is adequate and independent under state law. *See* Section II.B.2 (citing

28    *Insyxiengmay v. Morgan*, 403 F.3d 657, 665–66 (9th Cir. 2005) ("[I]t is the law of

                                    164

1    this circuit that the ultimate burden is on the State, not the petitioner, to show that
2    a procedural state bar was clear, consistently applied, and well-established at the
3    time the party contesting its use failed to comply with the rule in question.”)). To
4    the extent Respondents make no effort to plead or prove the existence, adequacy,
5    or independence of any state preclusive bar, they may not invoke procedural default.
6    *See* Section II.B.2.

7        To the extent this Court finds a procedural bar exists, Kiles can demonstrate
8    at a hearing that it is not adequate or independent and that its imposition would
9    constitute a fundamental miscarriage of justice. *See* Section II.B.2; Claim 31.[39]

10        Kiles alternatively alleges that any default was the result of ineffective
11    assistance of trial and post-conviction counsel, which constitute cause for excusal
12    of the default under *Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *see also Strickland v.*
13    *Washington*, 466 U.S. 668, 694 (1984). While *Martinez* decided this issue in the
14    context of an ineffective assistance of trial counsel claim, this principle applies with
15    equal force to claims, like unconstitutional restraint, where an element of proof
16    relies on extra-record evidence that cannot be gathered due to state action.[40] *See*
17    Section II.B.3, *supra*. Post-conviction counsel's error was obvious in light of
18    Kiles's spotless prison disciplinary record. (*See, e.g.*, Tr. Apr. 26, 2006 at 4–54.)
19    Because this claim has not been adjudicated by the Arizona state courts, the
20    limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply, and the Court
21    may consider the merits de novo. *See Dickens*, 740 F.3d at 1321.

---

23    [39] For the sake of brevity, Kiles does not repeat his argument regarding a
      miscarriage of justice in the parts below, but hereby incorporates this discussion
24    into those claims.

25    [40] To prevail on a shackling claim, a petitioner must prove that the jury observed
26    his unnecessary restraints. *See Ghent v. Woodford*, 279 F.3d 1121, 1132 (9th Cir.
      2002). But Arizona precludes extra-record evidence from being presented on direct
27    appeal. *State v. Cabrera*, 560 P.2d 417, 420 (Ariz. 1977). And Arizona law also
      blocks the disclosure of jurors' personally-identifying information, which makes
28    investigation of shackling claims difficult. *See* Ariz. R. Crim. P. 18.3(b).

1      Kiles had a right under the Due Process Clause not to be tried wearing
2  restraints unless justified by an essential state interest. *See Hedlund v. Ryan*, 854
3  F.3d 557, 568 (9th Cir. 2017). All evidence showed Kiles had a years-long
4  exemplary disciplinary record while in custody. (*See, e.g.*, Tr. Apr. 26, 2006 at 4–
5  54.) Indeed, the trial court itself remarked that Kiles had never posed any kind of
6  risk in the courtroom. (Tr. Feb. 14, 2006 at 42.) There was thus no proper basis for
7  the court to subject Kiles to unnecessary restraints throughout his penalty
8  proceedings. Nonetheless, Kiles was forced to wear an electric stun belt and leg
9  braces under his clothing. (Pet. at 300–01.) At least one juror was aware of Kiles's
10  physical restraints.

11      Respondents do not contest the merits of this section, instead referring to their
12  arguments that trial counsel were not ineffective for not objecting to Kiles's
13  shackles during his 2000 guilt phase. (Answer at 110.) As here Kiles challenges the
14  trial court's decision to subject him to unjustified restraints without making specific
15  findings during his 2006 penalty phase, Respondents fail to dispute the merits. *See*
16  *James v. Ryan*, 733 F.3d 911, 913–14 (9th Cir. 2013).

17      The trial court's decision to require Kiles to wear a stun belt and leg braces
18  during his penalty-phase proceedings violated Kiles's Due Process Clause rights.
19  (*See* Pet. at 299–302.) This infected Kiles's proceedings with prejudice sufficient
20  to have a "substantial and injurious effect" on the outcome. *Brecht v. Abrahamson*,
21  507 U.S. at 623; *see also State v. Gomez*, 123 P.3d 1131, 1139-42 (Ariz. 2005)
22  (vacating death sentences where defendant was unnecessarily shackled during
23  penalty proceedings); *Gonzalez v. Pliler*, 341 F.3d 897, 900 (9th Cir. 2003).

24      **B.      The trial court violated Kiles's constitutional rights during his**
25           **penalty-phase voir dire.**

26      For the reasons in Section 8.A, *supra*, Respondents fail to meet their burden
27  of pleading procedural default. *See also* Section II.B.2, *supra*. Even assuming,
28  however, that any aspect of this claim is procedurally defaulted pursuant to an

adequate and independent state procedural bar, any default can be overcome because appellate counsel rendered ineffective assistance in failing to properly present the claim. *See Coleman*, 501 U.S. at 753–54; *Carrier*, 477 U.S. at 488. Post-conviction counsel then performed deficiently by neglecting to raise this substantial claim of ineffective assistance of appellate counsel. *See Martinez*, 566 U.S. at 15–16; *Carpenter*, 529 U.S. at 453; Section II.B.3–4, *supra*. And because this issue was plainly stronger than those challenged by direct appeal counsel, *Davila* does not bar excusal of any default. 137 S. Ct. at 2067–68; *see also* Section II.B.4, *supra*.

Kiles's post-conviction counsel raised a claim alleging ineffective assistance of appellate counsel. (ROA 1189 at 23–25; 30–32; 42–43; 61–68, 73–74.) The post-conviction petition notes that under Arizona law, "if counsel ignores issues that are clearly stronger than those selected for appeal," then a defendant can overcome the presumption of effective assistance of appellate counsel. (ROA 1189 at 61 (quoting *State v. Bennett*, 146 P.3d 63, 68 (Ariz. 2006)).) Appellate counsel unreasonably focused his efforts on pleading a claim that was not cognizable on direct appeal in Arizona: an ineffective-assistance-of-trial-counsel claim. (*See* Pet. at 345–48); *see also State v. Kiles*, 213 P.3d 174, 183–84 (Ariz. 2009). As a result, he unreasonably failed to raise many important trial court error claims that *were* cognizable, including the trial court's errors during voir dire. Given how apparent this was from the record, it fell below prevailing professional norms for post-conviction counsel to fail to raise appellate counsel's failure to challenge the trial court's errors during voir dire. This prejudiced Kiles.

Despite Respondents' contention, the instant allegations are sufficient to present a colorable claim that the ineffective assistance of both appellate and post-conviction counsel excuse any default. (*See* Pet. at 343–58; 377–90, 435–58; Claims 11 and 13, *infra*.) Kiles need not prove entitlement to relief on the merits in order to establish cause and prejudice at this stage. Instead, further factual development of Kiles's assertion of cause and prejudice, including an evidentiary

167

1    hearing, is necessary if this Court finds the claim procedurally defaulted.

2         Respondents fail to contest the merits of Kiles's allegations. Instead,
3    Respondents refer to their argument responding to Claim 4, which addresses
4    ineffective assistance of penalty-phase counsel in jury selection. (Answer at 110.)
5    However, Respondent's argument in Claim 4 pertains to trial counsel's deficient
6    performance, not trial court error. By focusing on trial counsel's failure to ensure
7    that the jury was unbiased regarding the death penalty (*See* Answer at 72–74),
8    Respondents ignore the trial court's constitutional obligation to ensure an unbiased
9    jury, and fail to address its error in improperly informing the jury of Kiles's parole
10   eligibility. (*See* Pet. at 306–07.) With respect to Respondents' mischaracterization
11   of Kiles's right to an impartial jury, Kiles incorporates his discussion in Claim 4,
12   *supra* and his analysis in his Petition. (*See* Pet. at 302–08.)

13        Finally, while prejudice in the context of an ineffective-assistance claim is
14   analyzed under *Strickland*, 466 U.S. at 694, the "presence of a biased juror cannot
15   be harmless; the error requires a new trial without a showing of actual prejudice."
16   *United States v. Gonzalez*, 214 F.3d 1109, 1111 (9th Cir. 2000) (quoting *Dyer v.*
17   *Calderon*, 151 F.3d 970, 973 n.2 (9th Cir. 1998).)

18   **C.    The trial court erred in denying defense counsel's motion for a**
19   **directed verdict on the "especially heinous, cruel or depraved"**
20   **aggravating circumstance.**

21        Respondents erroneously argue that this section is procedurally defaulted.
22   (Answer at 110.) But Kiles raised the trial court's erroneous denial of his motion
23   for directed verdict on the A.R.S. § 13-703(F)(6) aggravator on direct appeal as
24   issue 7, which alleged:

25             the trial court erred by denying the appellant's motion for
26             a rule 20 dismissal as to heinousness, cruelty and depravity
                regarding victim Gunnell, causing reversible error by
27             allowing a capital jury to give weight to an invalid
                aggravating factor in violation of the 8th Amendment to the
28             United States Constitution.

1    (DA2 Dkt. 86 at 91–92 (heading un-capitalized).) This claim was briefed on the

2    merits by both Kiles and the State before the Arizona Supreme Court. (*See* DA2

3    Dkt. 94 at 82–90 (State's Answering Brief); DA2 Dkt. 107 at 28–29 (Kiles's Reply

4    Brief.) Thus, this claim was fairly presented to the appropriate state court. *See*

5    *Baldwin v. Reese*, 541 U.S. 27, 29 (2004); Section II.B.1, *supra*.

6         And as Respondents note five sentences after deeming the matter

7    procedurally defaulted, the Arizona Supreme Court upheld the trial court's ruling

8    on (F)(6). (Answer at 111.) The Arizona Supreme Court reviewed the sufficiency

9    of the evidence supporting (F)(6), which addressed the issue of whether the trial

10   court should have granted a directed verdict. *See Kiles*, 213 P.3d at 187–88, n.18.

11   In analyzing this error, the Arizona Supreme Court relied on the arguments

12   advanced by the State and rejected arguments advanced by Kiles. *Id*. at 188 ("Kiles'

13   argument that *State v. Soto–Fong,* [] 928 P.2d 610 ([Ariz.] 1996), requires the Court

14   to vacate the (F)(6) finding is incorrect."). Indeed, on the merits, Respondents cite

15   their argument in Subsection E, which addresses Kiles's Claim 5. (Answer at 110.)

16   There, Respondents copy and paste in the Arizona Supreme Court's decision on

17   this error. (Answer at 76–77.) In the alternative, should Respondents argue and this

18   Court find that the Arizona Supreme Court did not rule on this error, despite Kiles

19   presenting it, then the strictures of § 2254(d) do not apply and this Court may review

20   it de novo. *See Dickens*, 740 F.3d at 1321.

21        This court should review the merits de novo, as the Arizona Supreme Court's

22   decision constituted an unreasonable application of clearly established federal law,

23   and an unreasonable determination of fact given the evidence adduced at trial. *See*

24   § 2254(d). As Respondents do not address Kiles's argument demonstrating that the

25   state-court decision was an unreasonable application of clearly established federal

26   law mandating meaningful appellate review, and mandating that death sentences

27   not rest on invalid aggravators, and also based on mischaracterized facts, Kiles rests

28   on his arguments in the Petition. (*See* Pet. at 308–09, 366–70); *see also*, *e.g.*, *Parker*

1    *v. Dugger*, 498 U.S. 308, 321 (1991) (meaningful appellate review is essential to

2    ensure that the death penalty is not imposed arbitrarily or irrationally); *Jackson v.*

3    *Virginia*, 443 U.S. 307, 324 (1979) (appellate court cannot uphold a death sentence

4    that upon record evidence no rational fact-finder could have found proven beyond

5    a reasonable doubt); *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980).)

6          **D.    The trial court erred by not striking the (F)(8) aggravator as**

7                 **unconstitutionally vague.**

8          Respondents agree that this error was presented to the Arizona Supreme

9    Court on direct appeal. (Answer at 111; DA2 Dkt. 86 at 92–93.) Respondents make

10   no argument on the merits except to copy and paste in the Arizona Supreme Court's

11   analysis and to proclaim these allegations are "without merit." (Answer at 113.)

12         However, Respondents make the same error that the Arizona Supreme Court

13   made: to misconstrue Kiles's challenge as alleging that the (F)(8)[41] aggravator was

14   not proven, instead of alleging that it was so vague as to violate the Eighth

15   Amendment. (*Compare* Answer at 111–13; *Kiles*, 213 P.3d at 186 *with* DA2 Dkt.

16   86 at 92–93; Pet. at 309–10.) Kiles has alleged that the (F)(8) aggravator, as it

17   operated here, was unconstitutionally vague, because it allowed the same jury that

18   did not find unanimously that he had killed the child victims to find that he had

19   committed multiple homicides. *See* A.R.S. § 13-703(F)(8); (DA2 Dkt. 86 at 92-93;

20   Pet. at 309–10.) Thus, the (F)(8) aggravating circumstance applied so broadly as to

21   fail to genuinely narrow the class of offenders eligible for the death penalty. *See*

22   *Maynard v. Cartwright*, 486 U.S. 356, 363 (1988).

23         Because the state court did not adjudicate this claim on the merits under the

24   Eighth Amendment, and instead reaffirmed the jury finding, this Court is not bound

25   by the strictures of § 2254(d) and may review this claim de novo. *See Stanley v.*

26   *Cullen*, 633 F.3d 852, 860 (9th Cir. 2011).

27

28   [41] A.R.S. § 13-703(F)(8) (1988) ("[t]he defendant has been convicted of one or more other homicides . . . during the commission of the offense").

The trial court erred in not striking this aggravator as vague, and—because Arizona is a weighing state in which jurors weigh the aggravators against the mitigation—that error was substantial and injurious. *See Brecht*, 507 U.S. at 623; *see also Brown v. Sanders*, 546 U.S. 212, 220 (2006). Respondents argue that Kiles "cannot show *Brecht* prejudice." (Answer at 113.) However, the Supreme Court has explained that for errors that do not require automatic reversal, habeas relief is appropriate "if the *prosecution* cannot demonstrate harmlessness." *Ayala*, 135 S. Ct. at 2197 (emphasis added); *see also Brecht*, 507 U.S. at 640–41. Thus, Respondents—not Kiles—bear the burden of establishing that errors not requiring automatic relief are so benign that they may be ignored. They have not carried this burden.[42]

### E.    The trial court denied Kiles's due process rights by admitting a gruesome and irrelevant photograph.

Respondents do not contest that Kiles raised this error on direct appeal. (Answer at 114; DA2 Dkt. 86 at 56–66.) On the merits, Respondents rely on their argument in Subsection C of their Answer, addressing Kiles's Claim 3 (ineffective assistance of trial counsel at the guilt phase). (Answer at 114.) They presumably refer to their discussion in Section C.6, which addresses Kiles's counsel's failure to object to a gruesome photograph at the guilt phase. (Answer at 56–59.) As Claim 3 addresses trial counsel's behavior during the guilt phase, and this claim addresses the trial court's error during the penalty phase, this argument is non-responsive. The Arizona Supreme Court's ruling on this claim is not dispositive.

First, the bulk of the State's argument defending the trial court's decision to admit the photo because it was probative pertains to the guilt-phase of trial, not the penalty phase, and thus is irrelevant. (*See, e.g.*, Answer at 59 ("The photograph

---

[42] For brevity's sake, Kiles does not repeat this argument regarding the State's burden to show harmlessness under *Brecht* and its incorrect attempt to shift this burden, but incorporates it below where appropriate.

1   helped prove LeCresha's identity. (R.T. 7/12/00, at 61); *see also Murray*, 184 Ariz.
2   at 29, 906 P.2d at 562. The photo also helped the jury understand the medical
3   examiner's expert testimony regarding manner and cause of death. (R.T. 7/13/00,
4   at 101–03.").) These facts were not at issue during the penalty-phase. Further, given
5   how long LeCresha was submerged in water, the photo did not support the medical
6   examiner's testimony.

7       The Arizona Supreme Court wrote that because the jury did not determine a
8   sentence of death was appropriate for the children, "we cannot conclude that this
9   photograph prejudiced the jury with regard to the verdict rendered for Valerie's
10  murder." *Kiles*, 213 P3d at 183. However, this is a conclusory statement, and an
11  unreasonable determination of the facts based on the state court record. *See* §
12  254(d)(2). The jury likely found that death was not warranted for the children
13  because of lingering residual doubt, as this was the argument offered in support of
14  a life sentence at the penalty phase for the children. (*See*, *e.g.*, Tr. May 22, 2006 at
15  48–56, 76–77.) In contrast, Kiles admitted to killing Valerie, thus any case for life
16  was based on his character and actions. A photo of a partially decomposed baby
17  was likely to inflame feelings against Kiles, and probably still influenced the jury's
18  consideration of whether leniency was warranted for the death of Gunnel.

19      Respondents argue Exhibit 72 would have been admitted even if trial counsel
20  objected because its probative value exceeded its prejudicial effect. (Answer at 58–
21  59.) They rely on *State v. Spreitz*, where under very similar circumstances, the
22  Arizona Supreme Court found that a trial court abused its discretion by admitting a
23  gruesome photograph of a deceased victim. 945 P.2d 1260, 1273 (Ariz. 1997). In
24  *Spreitz*, the State argued that a photograph of the decedent, taken after the body had
25  spent several days decomposing and being eaten by insects in 100 degree desert
26  weather, bore some small amount of relevance. *Id*. Nonetheless, this relevance was
27  vastly outweighed by its prejudicial impact. *Id.* at 1271.

28      Here, Kiles's jury was presented with a photograph of the water-logged, fish-

eaten corpse of a baby, which was not relevant to any contested issue of material fact. Under the reasoning in *Spreitz*, Exhibit 72 was more prejudicial than probative. And the Arizona Supreme Court's decision denying this claim was unreasonable.[43] § 2254(d); *Kiles*, 213 P.3d at 183. Here, Kiles never contested the identity, cause, or manner of death of LeCresha Kirklin—merely his role as the killer. And Exhibit 72 bore no relevance whatsoever to that issue.

The trial court's error in permitting the introduction of this photograph so undermined the reliability of Kiles's sentencing as to violate his rights to due process. *See Zant v. Stephens*, 462 U.S. 862, 885 (1983). And because of its admission, Kiles suffered prejudice under *Brecht*. 507 U.S. at 623.

### F.    The trial court unconstitutionally permitted the victims' attorney to file pleadings, including a requested jury instruction.

For the reasons outlined in Section 8.A, *supra*, Respondents' summary assertion that these allegations are procedurally defaulted fails to meet their affirmative burden of proving procedural default. (*See* Answer at 114.) Even assuming, however, that any aspect of this claim is procedurally defaulted pursuant to an adequate and independent state procedural bar, any default can be overcome because appellate counsel rendered ineffective assistance in failing to properly present the claim. *See Coleman*, 501 U.S. at 753–54; *Carrier*, 477 U.S. at 488. Post-conviction counsel then performed deficiently by neglecting to raise this substantial claim of ineffective assistance of appellate counsel. (*See* Pet. at 311.) *See Martinez*, 566 U.S. at 15–16; *Carpenter*, 529 U.S. at 453; Section II.B.3–4, *supra*.

As outlined in Section 8.B, *supra*, Kiles's post-conviction counsel alleged ineffective assistance of appellate counsel. (ROA 1189 at 23–25; 30–32; 43; 61–68, 73–74.) Post-conviction counsel should have raised the trial court's error in

---

[43] Even if Exhibit 72 were permitted under Arizona state law, its inclusion in Kiles's trial violated his Fifth Amendment due process right. *See Romano v. Oklahoma*, 512 U.S. 1, 12 (1994).

allowing the victim's attorney to file pleadings among the other errors they listed that appellate counsel failed to pursue due to his unreasonable focus on a non-cognizable claim. The failure to assert a claim of ineffective assistance of appellate counsel for the instant trial court error fell below prevailing professional norms and prejudiced Kiles. *Strickland*, 466 U.S. at 687–88, 694.

Because this claim has not been adjudicated by a state court, the limitations on relief imposed by § 2254(d) do not apply, and the Court may consider the merits de novo. *See Dickens*, 740 F.3d at 1321.

Respondents argue that Kiles cited no federal law to support this claim, and "it is thus waived by failing to argue it." (Answer at 114.) To support their argument, Respondents rely on a footnote from *Cook v. Schriro*, 538 F.3d 1000, 1014 n.5 (9th Cir. 2008). There, however, the Ninth Circuit merely determined that the petitioner abandoned any challenge to some of the district court's rulings by failing to brief them on appeal in the Ninth Circuit. Thus, this is non-responsive. Further, Kiles did cite federal law in support of this claim in his Petition, including multiple amendments to the U.S. Constitution and *Brecht*, 507 U.S. at 623. (Pet. at 311 (explaining how the trial court violated Kiles's rights to due process and a fair trial under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution by allowing him to face prosecution by two entities, which had a "substantial and injurious effect" on Kiles's sentence under *Brecht*, 507 U.S. at 623.).)

Respondents ignore and thus fail to contest the merits of Kiles's allegations here and so Kiles rests on the facts and arguments in his Petition. (Answer at 114; Pet. at 311.)

## G. The trial court unconstitutionally permitted the introduction of victim-impact evidence.

For the reasons outlined in Section 8.A, *supra*, Respondents' summary assertion that these allegations are procedurally defaulted fail to meet their burden of proving procedural default. (*See* Answer at 114.) Even assuming, however, that

1    any aspect of this claim is procedurally defaulted pursuant to an adequate and

2    independent state procedural bar, Kiles can demonstrate at an evidentiary hearing

3    that the ineffective assistance of appellate counsel provides cause to excuse any

4    procedural default. *See Carrier*, 477 U.S. at 488–89; *Carpenter*, 529 U.S. at 453;

5    *Martinez*, 566 U.S. at 9; *Strickland*, 466 U.S. at 694.

6        Because this claim has not been adjudicated by the state courts, the

7    limitations on relief imposed by § 2254(d) do not apply, and the Court may consider

8    the merits de novo. *See Dickens*, 740 F.3d at 1321.

9        On the merits, Kiles rests on his arguments in his Petition that any victim-

10   impact evidence violates the Sixth, Eighth, and Fourteenth Amendments to the U.S.

11   Constitution, as it unbearably heightens the risk that a sentence will be imposed

12   based on impermissible considerations. *See, e.g.*, *Gardner v. Florida*, 430 U.S. 349,

13   358 (1977) (plurality opinion); (Pet. at 311–13.)

14       Respondents admit that some victim-impact testimony is unconstitutional, as

15   the Supreme Court has held that "'evidence about the victim and about the impact

16   of the murder on the victim's family' was properly admitted at the sentencing phase

17   of a capital trial." (Answer at 114 (citing *Payne v. Tennessee,* 501 U.S. 808, 827,

18   830 n.2 (1991)).) Here, the victim-impact testimony included multiple instances of

19   testimony that fell outside of these bounds. For example, one witness discussed how

20   one of the victims' bodies was found floating in a river. (Tr. Apr. 24, 2006 at 26.)

21   Respondents' argument that "Kiles cannot prove prejudice" is incorrect. (Answer

22   at 115.) First, Respondents may not attempt to shift the burden to Kiles to show

23   harmlessness. *See Ayala*, 135 S. Ct. at 2197; *see also Brecht*, 507 U.S. at 640–41.

24   Thus, Respondents—not Kiles—bear the burden of establishing that errors not

25   requiring automatic relief are so benign that they may be ignored. Respondents have

26   not carried their burden of establishing harmlessness.

27       Second, Respondents' summary description of the allegedly heavy weight of

28   the aggravators does not show that there was no prejudice. The Arizona Supreme

175

1  Court's arbitrary inflation of the aggravators' weight was unconstitutional and does
2  not necessarily reflect the view of the jury. (*See* Pet. at 370–72); *see also Parker*,
3  498 U.S. at 321 (capital defendants have a right to non-arbitrary appellate review
4  of their individualized circumstances and crimes); *Eddings v. Oklahoma*, 455 U.S.
5  104, 112 (1982). Third, all capital crimes involve aggravating factors, their mere
6  existence cannot serve as a bar to ever finding prejudice.

7      All of the victim-impact evidence here was so prejudicial as to undermine
8  the reliability of the sentencing proceeding, as it invited a verdict based on
9  sentiment. One juror commented that as soon as they saw the victim-impact
10  photographs, the juror decided to vote for a death sentence. The admission of
11  victim-impact evidence thus had a "substantial and injurious effect" on Kiles's
12  sentence, *see Brecht*, 507 U.S. at 623, and Kiles is entitled to relief.

13  **H.  The trial court unconstitutionally permitted the State to ask
14      witnesses at trial about statements contained in the reports of
      experts who testified at the first trial but not at the second trial, in
15      violation of Kiles's rights.**

16      For the reasons in Section 8.A, *supra*, Respondents' summary assertion that
17  these allegations are procedurally defaulted fails to meet their burden of proving
18  procedural default. (*See* Answer at 115.) Even assuming, however, that any aspect
19  of this claim is procedurally defaulted pursuant to an adequate and independent
20  state procedural bar, any default can be overcome because appellate counsel
21  rendered ineffective assistance in failing to properly present the claim. *See*
22  *Coleman*, 501 U.S. at 753–54; *Carrier*, 477 U.S. at 488. Post-conviction counsel
23  then performed deficiently by neglecting to raise the substantial claim of ineffective
24  assistance of appellate counsel contained in Claim 11.B.4, *infra*. (*See* Pet. at 354–
25  55); *see also* Section II.B.3–4, *supra*; *Martinez*, 566 U.S. at 15–16; *Carpenter*, 529
26  U.S. at 453;

27      As outlined in Section 8.B, *supra*, Kiles's post-conviction counsel alleged
28  ineffective assistance of appellate counsel. (ROA 1189 at 23–25; 30–32; 43; 61–

68, 73–74.) Post-conviction counsel should have raised appellate counsel's failure to raise this trial court error among the other errors they listed that appellate counsel failed to pursue due to his unreasonable focus on a non-cognizable claim. The failure to assert a claim of ineffective assistance of appellate counsel for not appealing this trial court error was below prevailing professional norms and prejudiced Kiles. As discussed below, because the State's ability to ask witnesses about the prior statements of experts from Kiles's first, overturned trial was devastating to Kiles and central to the State's theory of the case, it was thus unreasonable for appellate counsel to fail to continue to litigate this issue.

Because this claim has not been adjudicated by the state courts, the limitations on relief imposed by § 2254(d) do not apply, and the Court may consider the merits de novo. *See Dickens*, 740 F.3d at 1321.

Respondents' brief argument with respect to the merits fails. Substantively, Respondents concede that the prosecution elicited testimonial statements, made by Kiles and reported by prior expert witnesses, from persons other than the original declarants. (Answer at 115.) But, they argue that "[t]he Confrontation Clause was not implicated because the State's questions were not asking the experts in the 2006 penalty phase to state what the previous experts had said—just whether Kiles' statements to the experts had been consistent." (Answer at 115.) This is incorrect. The State's questions were in fact asking the expert witnesses at the 2006 penalty-phase trial to testify about specifics of what the previous experts from Kiles's overturned 1989–90 proceedings had reported regarding Kiles's statements to them. (*See*, *e.g.*, Tr. May 8, 2006 a.m. at 37–47.)

Respondents cite the trial transcript from May 8, 2006 a.m. at 43, presumably to where trial counsel objected to the prosecutor's questions, and he replied: "I'm not asking for him to say what the doctor said. I'm just asking if there were inconsistencies with regard to killing the children." First, this ignores the preceding pages, where the prosecutor asked the expert witness, psychiatrist Albert Globus,

1    M.D. very specifically if "[b]ack in January of 1990," Kiles told various experts
2    that he killed the child victims and specific details about killing the children. (*See*
3    Tr. May 8, 2006 a.m. at 41.) When Dr. Globus could not recall something and
4    looked to his notes, the prosecutor specifically pointed him to the report of
5    Alexander Don, M.D. produced for the first trial. (Tr. May 8, 2006 a.m. at 41–42
6    ("I think that's in Dr. Don's report, and I'll point that out to you in a moment.").)[44]
7    This was based on those experts' reports written as part of Kiles's invalidated first
8    trial.

9        To the extent the State asked experts about whether Kiles's statements were
10    consistent with what he had said to those experts in 1990, this question still asks the
11    expert to testify about what the prior expert wrote in their report about the content
12    of Kiles's statements to them in anticipation of trial. Testimonial evidence—that is,
13    evidence prepared in anticipation of trial—must be presented by the person who
14    prepared it. *See, e.g.*, *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 308–11
15    (2009). The trial court should not have permitted the State to elicit testimony about
16    testimonial evidence by someone other than the person who prepared it.

17        Further, the prior reports the State relied on to "impeach" Kiles during his
18    penalty phase were borne of the ineffective assistance of his first trial counsel and
19    should not have been admissible for any purpose. The reports of Robert Dean,
20    M.D.; Dr. Don; Ashley Hart, Ph.D.; and Donald Tatro, Ph.D. were referenced by
21    the prosecution in Kiles's 2006 penalty-phase trial. (Tr. May 8, 2006 a.m. at 42.)
22    But the reports of Drs. Don and Tatro were prepared in anticipation of Kiles's initial
23    1989 trial, which was overturned due to ineffective assistance of counsel. (ROA
24    314 at 4.) Drs. Dean and Hart's reports were generated by the prosecution in

---

25
26    [44] The prosecutor also questioned psychiatrist Thomas Gaughan, M.D., similarly,
      asking him about the mental health reports generated in 1989 and 1990, and if
27    Kiles's accounts changed. (Tr. May 9, 2006 p.m. at 10–11 (telling him he seems to
      be a "Johnny come lately" expert in this case and asking him about mental health
28    reports "generated in '89 or '90.").)

1    anticipation of sentencing to rebut the conclusions of Drs. Don and Tatro.

2    Where a sentence is overturned due to ineffective assistance of counsel, a
3    "court should aim to restore [the petitioner] to the position he would have occupied,
4    had the first trial been constitutionally error-free." *Bittaker v. Woodford*, 331 F.3d
5    715, 722 (9th Cir. 2003). This requires that harmful information borne of prior
6    counsel's ineffectiveness be suppressed from use at retrial. *See Mancusi v. Stubbs*,
7    408 U.S. 204, 214 (1972).

8    Here, not only was first-trial counsel found to be ineffective, but his
9    ineffectiveness was found to extend throughout his entire handling of the case.
10   (ROA 314 at 3.) First-trial counsel had "only a smattering of knowledge or
11   experience in the area of first degree murder cases" and "was conscripted to handle
12   the case and caused to continue with the case even in face of his shown
13   unwillingness to do so." (ROA 314 at 3.) First-trial counsel "went to trial only
14   partially prepared and, as it turned out, with no real, viable plan of action." (ROA
15   314 at 3.) This was reflected by, for example, his admitting Dr. Tatro's report at
16   Kiles's first penalty hearing, despite Dr. Tatro not being available to explain or give
17   insight as to the questions asked or conclusions made. (Tr. Feb. 7, 1990 at 64–65.)
18   And, his representation in this manner squarely conflicted with standards of capital
19   representation. *See, e.g.* 1989 ABA Guideline 11.4.1(7)(D). Thus, the reports of
20   Drs. Don, Dean, Hart, and Tatro—generated as a result of first-trial counsel's
21   ineffective handling of Kiles's case—should have been excluded from use against
22   him at the 2006 penalty phase. *Mancusi*, 408 U.S. at 214.

23   The trial court's failure to exclude testimony about the contents of these
24   reports, over trial counsel's objection, meant that Kiles continued to be harmed by
25   the prejudicial deficient performance of his first trial counsel. This had a substantial
26   and injurious effect on Kiles, as the State made Kiles's earlier statements to experts
27   central to their theory of the penalty-phase case: that Kiles was not telling the truth
28   about his childhood, his mental health, his substance addiction, or his involvement

1    in the crimes. (*E.g.*, Tr. May 22, 2006 at 72; Tr. May 8, 2006 a.m. at 48; Tr. May 9,

2    2006 p.m. at 11–12; Tr. May 15, 2006 at 55; *see also* Pet. at 314–16.)

3          In closing, the State focused on how Kiles's experts' diagnoses were based

4    on Kiles's "self-serving" statements. (Tr. May 22, 2006 at 72.) The State went so

5    far as to say "as you have heard from some of the earlier doctors that examined him,

6    everything was fine," as if the experts from the 1990 hearing had testified. (Tr. May

7    22, 2006 at 73.) However, Kiles did not have a chance to cross-examine these

8    doctors. The jury was likely influenced by this testimony. Kiles is entitled to relief.

9    *See Ocampo v. Vail*, 649 F.3d 1098, 1114 (9th Cir. 2011) (citing *Brecht*, 507 U.S.

10   at 623, in finding that a confrontation clause violation warranted habeas relief).

11          **I.    The trial court unconstitutionally failed to provide the jury with a**
12                  **special verdict form listing the specific mitigating factors they**
13                  **found proven, violating Kiles's rights.**

14          For the reasons outlined in Section 8.A, *supra*, Respondents' summary

15   assertion that these allegations are procedurally defaulted fail to meet their burden

16   of proving procedural default. (*See* Answer at 115.) Even assuming, however, that

17   any aspect of this claim is procedurally defaulted pursuant to an adequate and

18   independent state procedural bar, any default can be overcome because appellate

19   counsel rendered ineffective assistance in failing to properly present the claim. *See*

20   *Coleman*, 501 U.S. at 753–54; *Carrier*, 477 U.S. at 488. Post-conviction counsel

21   then performed deficiently by neglecting to raise this substantial claim of

22   ineffective assistance of appellate counsel. *See Martinez*, 566 U.S. at 15–16;

23   *Carpenter*, 529 U.S. at 453; Section II.B.3–4, *supra*. Because Kiles's counsel did

24   not present this claim to the trial court, *Davila* does not preclude the use of

25   ineffective assistance of post-conviction counsel to excuse the default of ineffective

26   assistance of appellate counsel, as discussed *supra* in Section II.B.4.

27          As outlined in Section 8.B, *supra*, Kiles's post-conviction counsel alleged

28   ineffective assistance of appellate counsel. (ROA 1189 at 23–25; 30–32; 43; 61–

68, 73–74.) Post-conviction counsel should have raised appellate counsel's failure to raise this trial court error among the other errors they listed that appellate counsel failed to pursue due to his unreasonable focus on a non-cognizable claim. The failure to assert a claim of ineffective assistance of appellate counsel for not appealing this trial court error was below prevailing professional norms and prejudiced Kiles.

Because this claim has not been adjudicated by the state courts, the limitations on relief imposed by § 2254(d) do not apply, and the Court may consider the merits de novo. *See Dickens*, 740 F.3d at 1321.

On the merits, Respondents refer to their argument in Subsection F, addressing Kiles's Claim 6. (Answer at 115.) Respondents presumably refer to the discussion addressing Kiles's allegations in part F of Claim 6, challenging trial counsel's failure to request a special verdict form listing which mitigating circumstances the jury found proven. (*See* Answer at 99; Pet. at 270–71.)

Respondents assert that "special verdict forms for mitigating circumstances are not required, and, in fact, hinder constitutionally individualized sentencing. *See Buchanan* [*v. Angelone*], 522 U.S. [269,] 270 [1998]; [*State v.*] *Johnson*, 133 P.3d [735,] 746–47, ¶¶ 41–47[Ariz. 2006].)" (Answer at 115–116.) With respect to this portion of Respondents' argument, Kiles generally refers to his discussion of the need for a special verdict form for mitigating factors in Claim 23, *infra*, and his arguments in the Petition. (Pet. at 270–71; 316–17; 424–26.) Respondents' citation to *Buchanan*, 522 U.S. at 270, is to the syllabus of the decision, which is not part of the opinion but is prepared by the Reporter of Decisions. *Id. Buchanan* addressed a court's lack of instruction on mitigating factors, and found that based on the facts at issue in that case, it was not unconstitutional for the court not to instruct the jury on the concept of mitigation and on statutory mitigators. *Id*. at 276–79.

First, Respondents ignore that Kiles's challenge to the lack of a special verdict form for mitigators asserts that it denied him meaningful appellate review

because reviewing courts could not know which factors the jury found proven. (*See* Pet. at 316–17.) In contrast, the constitutional challenge in *Buchanan* (and applied in *Johnson*) was that the failure to give certain instructions deprived the defendant of his right to have the jury consider all relevant mitigating evidence under *Eddings*, 455 U.S. at 113–114 and *Lockett v. Ohio*, 438 U.S. 586, 604 (1978); and *Boyde v. California*, 494 U.S. 370, 371 (1990) (standard for determining whether jury instructions satisfy these principles is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence.").

Respondents appear to argue that if Arizona courts did provide special verdict forms, it would hinder constitutionally individualized sentencing. However, this is speculative and unsupported. Kiles's trial court could have included on the special verdict form an element that included a place to list any other mitigation considered, and reminded jurors on the form—and via instruction—that they must consider all constitutionally relevant mitigating evidence. This would comply with the requirements of *Eddings*, *Lockett*, and *Boyde*.

Second, *Buchanan* depended heavily on the facts of the case. *Id.* (basing its conclusion on the content of the testimony and the arguments at trial, finding "[t]he parties in effect agreed that there was substantial mitigating evidence and that the jury had to weigh that evidence against [petitioner's] conduct in making a discretionary decision on the appropriate penalty"). Respondents have made no arguments applying *Buchanan*'s specific factual posture to Kiles's case.

Accordingly, Respondents' argument on the merits fails. The trial court failed to protect Kiles's right to meaningful appellate review under the Eighth and Fourteenth Amendments in failing to require a special verdict form for mitigation. This error had a "substantial and injurious effect" on Kiles's sentence, *see Brecht*, 507 U.S. at 623, and Kiles is entitled to relief.

1
2

### J.    The trial court unconstitutionally failed to make a complete record at trial, in violation of Kiles's rights.

3    For the reasons outlined in Section 8.A, *supra*, Respondents' summary
4    assertion that these allegations are procedurally defaulted fail to meet their burden
5    of proving procedural default. (*See* Answer at 116.) Even assuming, however, that
6    any aspect of this claim is procedurally defaulted pursuant to an adequate and
7    independent state procedural bar, any default can be overcome because appellate
8    counsel rendered ineffective assistance in failing to properly present the claim. *See*
9    *Coleman*, 501 U.S. at 753–54; *Carrier*, 477 U.S. at 488. Post-conviction counsel
10   then performed deficiently by neglecting to raise this substantial claim of
11   ineffective assistance of appellate counsel. *See Martinez*, 566 U.S. at 15–16;
12   *Carpenter*, 529 U.S. at 453; Section II.B.3–4, *supra*. Because Kiles's counsel did
13   not present this claim to the trial court, *Davila* does not preclude the use of
14   ineffective assistance of post-conviction counsel to excuse the default of ineffective
15   assistance of appellate counsel, as discussed *supra* in Section II.B.4.

16   As outlined in Section 8.B, *supra*, Kiles's post-conviction counsel alleged
17   ineffective assistance of appellate counsel. (ROA 1189 at 23–25; 30–32; 43; 61–
18   68, 73–74.) Post-conviction counsel should have raised appellate counsel's failure
19   to raise this trial court error among the other errors they listed that appellate counsel
20   failed to pursue due to his unreasonable focus on a non-cognizable claim. The
21   failure to assert a claim of ineffective assistance of appellate counsel for not
22   appealing this trial court error was below prevailing professional norms and
23   prejudiced Kiles.

24   Because this claim has not been adjudicated by the state courts, the
25   limitations on relief imposed by § 2254(d) do not apply, and the Court may consider
26   the merits de novo. *See Dickens*, 740 F.3d at 1321.

27   Respondents' summary assertion that these allegations are procedurally
28   defaulted fails to meet their burden of proving procedural default. (*See* Answer at

116.) Even assuming, however, that any aspect of this claim is procedurally defaulted pursuant to an adequate and independent state procedural bar, Kiles can demonstrate at an evidentiary hearing that the ineffective assistance of appellate counsel provides cause to excuse any procedural default. *See Carrier*, 477 U.S. at 488–89; *Carpenter*, 529 U.S. at 453; *Martinez*, 566 U.S. at 9; *see also Strickland*, 466 U.S. at 694.

In capital cases, heightened reliability is required. *See Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality opinion). The Supreme Court has "emphasized repeatedly the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally." *Parker*, 498 U.S. at 321; *see also Stephens*, 462 U.S. at 890. By failing to ensure a complete record, the trial court denied Kiles the opportunity for meaningful appellate review. (*See* Claim 15, *infra* Pet. at 317, 399–04.) This error had a "substantial and injurious effect" on Kiles's sentence, *see Brecht*, 507 U.S. at 623, and Kiles is entitled to relief.

**K.    The cumulative effect of these trial-court errors prejudiced Kiles.**

For the reasons outlined in Section 8.A, *supra*, Respondents' summary assertion that these allegations are procedurally defaulted and precluded fails to meet their burden of proving procedural default. (*See* Answer at 116.) Prejudice is one component of a constitutional trial court error claim, not a distinct claim. Thus, this is not a distinct claim that must have been raised independently in state court.

Respondents agree that "'[t]he cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal.' *Parle* [*v. Runnels*,] 505 F.3d [922], 927 [9th Cir. 2007]." (Answer at 162.) However, Respondents assert that Kiles has only asserted "meritless claims." (Answer at 116.) This is incorrect, as Kiles has detailed a series of substantial claims warranting relief.

Respondents' citation to *Parle*'s proposition that "[i]f the evidence of guilt is otherwise overwhelming, the errors are considered 'harmless' and the conviction

184

1    will generally be affirmed" is not applicable to the penalty phase. (Answer at 116.)

2    While overwhelming evidence of guilt may render guilt-phase errors harmless, no

3    corollary exists in the penalty phase. Jurors must determine if aggravators exist, and

4    then determine if mitigating factors exist, then personally weigh the two categories

5    against each other. Any trial court errors may have a substantial and injurious effect,

6    as the mere existence of well-established aggravators does not warrant a death

7    sentence in all cases. A defendant's guilt—and the evidence thereof—also is not

8    dispositive in determining his sentence.

9        Further, here, Kiles disputes that the evidence of aggravating factors in

10   Gunnel's death was "very strong," as Respondents allege. (Answer at 116.) (*see*

11   claims, *supra*) As Kiles has explained, *supra*, the cruelty aspect of the (F)

12   aggravator was not supported by the evidence, and the Arizona Supreme Court

13   erred in upholding it. The (F)(8) aggravator was unconstitutionally vague, as the

14   jury was able to unanimously find that Kiles was guilty of multiple homicides,

15   where it had not unanimously found that he had killed the child victims. The (F)

16   aggravator was based on an invalid prior conviction. (*See* Claim 12, Pet. 366–70.)

17   Further, Kiles's extensive mitigating evidence was substantial, warranting leniency.

18   (*See* Claim 6; Pet. at 198–213 (detailing Kiles's personal history).)

19       Here, the trial court committed numerous errors, as detailed above and in

20   Kiles's Petition. (*See* Pet. at 299–318.) While Kiles maintains that the prejudice

21   from each error, taken individually, warrants relief, the cumulative prejudice of

22   these numerous errors warrants relief even moreso. Respondents claim that Kiles

23   "cannot meet the *Brecht* standard." (Answer at 116.) However, for the reasons

24   detailed in Section 8.G., *supra*, Respondents bear the burden of establishing that

25   errors not requiring automatic relief are so benign that they may be ignored. They

26   have not carried this burden. Kiles has asserted meritorious claims that separately

27   and together had a "substantial and injurious effect" on Kiles's sentence, *see Brecht*,

28   507 U.S. at 623, and he is entitled to relief.

185

**Claim Nine**

**Kiles was deprived of his right to due process and a fair trial because the prosecutor engaged in pervasive misconduct.**

Kiles incorporates by specific reference all facts, allegations, and arguments made in his Petition and elsewhere in this Reply. Kiles relies on the arguments raised in his Petition in support of this claim (*see* Pet. at 318–32), but specifically replies to the following arguments made by Respondents.

**A.    This claim is exhausted and Respondents have failed to show otherwise.**

At the outset, Respondents are wrong to dice this single claim of prosecutorial misconduct into several claims, each of which Respondents assert must separately be exhausted before the Court may consider their merits.[45] (*See* Answer at 116–22.) Claim 9 rests on a single premise—that the cumulative effect of the prosecutor's misconduct so infected Kiles's proceedings as to render his convictions and death sentence a denial of due process. *See Berger v. United States*, 295 U.S. 78, 89 (1935) (ordering new trial where the prosecutor's "misconduct was pronounced and persistent, with a probable cumulative effect"). On direct appeal, Kiles's appellate counsel raised for the first time in his reply brief nine examples of the prosecutor's misconduct (DA2 Dkt. 107 at 4–8), but those arguments were deemed waived because they were not presented in his opening brief. *See State v. Kiles*, 213 P.3d 174, 181 n.8 (Ariz. 2009). In his post-conviction petition, Kiles argued that appellate counsel was ineffective for failing to adequately challenge the prosecutor's pervasive misconduct. (*See* ROA 1189 at 61–65); *see* Claim 11, *infra*. Although Kiles has provided some examples of prosecutorial misconduct that were

---

[45] Respondents attempt to divide Claim 9 into one "subclaim regarding the prosecutor's conduct in the guilt phase" (Answer at 117), and another "subclaim regarding the prosecutor's conduct in the penalty phase" (Answer at 118). They then confusingly assert that each "subclaim" consists of "additional procedurally defaulted claims" (Answer at 117), or "several procedurally defaulted instances of prosecutorial misconduct" (Answer at 118).

1  not identified in his post-conviction petition, and although he divides the allegations

2  in Claim 9 into organizational headings for ease of analysis, these examples and

3  headings are not separate claims for relief, and thus it is not appropriate to divide

4  the single claim incorporating those examples into separate claims or sub-claims.

5      Only claims that are distinct both in nature and in the requisite elements of

6  proof are unrelated for purposes of exhaustion. *See Kimmelman v. Morrison*, 477

7  U.S. 365, 374–75 (1986) (distinguishing between a Fourth Amendment suppression

8  claim and an ineffective-assistance claim based on counsel's failure to competently

9  litigate the Fourth Amendment issue, and noting that "the two claims have separate

10 identities and reflect different constitutional values"); *accord Rose v. Palmateer*,

11 395 F.3d 1108, 1112 (9th Cir. 2005). Here, all the examples described in Claim 9

12 comprise one claim of prosecutorial misconduct. The cumulative effect of those

13 examples results in a singular form of prejudice that deprived Kiles of fair

14 proceedings.

15     Respondents' approach is contrary to the way that claims of prosecutorial

16 misconduct are analyzed. *See Berger*, 295 U.S. at 89; *Floyd v. Meachum*, 907 F.2d

17 347, 353 (2d Cir. 1990) (granting habeas relief for "repeated and escalating

18 prosecutorial misconduct from initial to closing summation" and emphasizing that

19 the holding "is based on the cumulative effect of the three alleged categories of

20 improper remarks"); *Hein v. Sullivan*, 601 F.3d 897, 905 n.4 (9th Cir. 2010)

21 (explaining that the court "cannot review each instance of . . . prosecutorial

22 misconduct in isolation, but rather must view them collectively in light of the entire

23 record"). Accordingly, the Court should reject Respondents' attempt to treat Claim

24 9 as comprising several procedurally defaulted claims. It is a single claim, and it

25 was exhausted when the post-conviction court considered appellate counsel's

26 ineffective assistance. (*See* ROA 1214 at 2; ROA 1189 at 61–65; PFR2 Dkt. 1 at

27 61–66.) *See, e.g., Jones v. Dretke*, 375 F.3d 352, 354 (5th Cir. 2004) ("The

28 presentation requirement, however, is excused 'when a state court with the authority

187

1    to make final adjudications undertook to decide the claim on its merits *sua*
2    *sponte*.'") (citation omitted); *Walton v. Caspari*, 916 F.2d 1352, 1356-57 (8th Cir.
3    1990); *Sandstrom v. Butterworth*, 738 F.2d 1200, 1206 (11th Cir. 1984). Given the
4    state-court record, the state court's denial of this claim as not colorable was an
5    unreasonable application of or contrary to clearly established federal law, *see* 28
6    U.S.C. § 2254(d)(1), and rested on an unreasonable determination of the facts, *id*.
7    § 2254(d)(2). Accordingly, the strictures of § 2254(d) do not apply to this claim,
8    and this Court may review the merits of this claim de novo.

9        If these allegations should have been raised on direct appeal, then appellate
10   counsel's failure to raise them excuses any default. *See Carrier*, 477 U.S. at 492
11   ("[W]e hold that counsel's failure to raise a *particular* claim on appeal is to be
12   scrutinized under the cause and prejudice standard when that failure is treated as a
13   procedural default by the state courts."). Because a claim of appellate
14   ineffectiveness was itself exhausted in the state courts (*see* ROA 1189 at 61–65;
15   PFR2 Dkt. 1 at 61–66), *Martinez* and *Davila* are not relevant. (*Contra* Answer at
16   117.) Finally, the Court can proceed to the merits to avoid a miscarriage of justice.
17   *See* Section II.B.2., Section 1.B.1.c, *supra*; Claims 31 and 35, *infra*.

18       **B.**    **Respondents fail to rebut this claim on the merits.**

19           **1.**    **The prosecutor committed misconduct in the guilt-phase**
20                   **proceedings.**

21       On the merits, Respondents rely primarily on their argument in Claim 3 that
22   the trial prosecutor, David Powell, did not "manipulate or misstate the evidence" or
23   "implicate other specific rights" during his guilt-phase closing argument. (*See*
24   Answer at 117 (quoting *Darden v. Wainwright*, 477 U.S. 168, 181–82 (1986).)
25   Accordingly, Kiles relies on the arguments in his Petition on this point (Pet. at 319–
26   24), as well as his arguments in his Petition and this Reply concerning Claim 3 (Pet.
27   at 73–143; Claim 3, *supra*). Kiles further notes that Respondents do not squarely
28   address, and have thus failed to refute, his argument that Powell repeatedly

1   misstated Larry Hawkins's testimony in order to mislead the jury into believing the

2   State's theory of the crime. (*See* Pet. at 320–21.) Nor do Respondents address

3   Kiles's arguments that Powell's opening statement misled the jury as to what the

4   DNA and blood evidence could prove. (*See* Pet. at 323.)

5          Respondents nevertheless argue that Powell's statements did not deprive

6   Kiles of a fair trial because, after the guilt-phase closing arguments, the jurors were

7   instructed "that what the lawyers say is not evidence." (Answer at 117 (citing Tr.

8   July 19, 2000 at 87).) But Respondents ignore that the jurors were simultaneously

9   instructed that the attorneys' arguments could help them to better understand the

10  evidence. (*See* Tr. July 19, 2000 at 87 ("What the lawyers said is not evidence, but

11  it may help you to understand the law and the evidence.").) Moreover, generalized

12  jury instructions that are not given promptly after improper statements are made

13  and which fail to specifically address the specific statements—like those here—are

14  insufficient to cure the prejudice from improper prosecutorial argument. *See Zapata*

15  *v. Vasquez*, 788 F.3d 1106, 1123 (9th Cir. 2015); *Deck v. Jenkins*, 814 F.3d 954,

16  982 (9th Cir. 2014) (as amended Feb. 9, 2016); *United States v. Weatherspoon*, 410

17  F.3d 1142, 1151 (9th Cir. 2005); *United States v. Sanchez*, 659 F.3d 1252, 1258

18  (9th Cir. 2011). And Powell's arguments were "too clearly prejudicial for . . . a

19  curative instruction to mitigate their effect." *Moore v. Morton*, 255 F.3d 95, 107 (3d

20  Cir. 2001) (alteration in original) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637,

21  644 (1974).)

22         Respondents next argue that Kiles has waived his allegation that the State

23  may have withheld impeachment evidence concerning his arresting officer, David

24  Sherman, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). (Answer at 117–

25  18.) While Respondents assert that this allegation is "without citation or reference"

26  (Answer at 117–18), Kiles intends to file supporting documentation in accordance

27  with this Court's Orders. (*See* ECF No. 5 at 4; ECF No. 59 at 1.) Specifically, Kiles

28  will request expansion of the record to include a letter from the Yuma Police

1    Department notifying the Arizona Attorney General's Office of a *Brady*/*Giglio*
2    record involving Sherman, which was discovered upon review of that office's file.
3    And because it is unclear whether that *Brady*/*Giglio* record was disclosed to trial
4    counsel, further fact finding is necessary. Kiles will also request an evidentiary
5    hearing and discovery on that issue.

6         Respondents also argue that Powell's use of the phrase "feeding frenzy" was
7    supported by the evidence and therefore did not evoke implicit racial bias. (Answer
8    at 118.) This bald assertion fails to rebut Kiles's argument that Powell made his
9    highly inflammatory "feeding frenzy" analogy a theme of the guilt phase in order
10   to draw on the jury's implicit racial biases. For example, Powell suggested that the
11   crime defied description in conventional terms: "The feeding frenzy was a word I
12   generated, of course, because . . . . How else do you describe that?" (*See* Tr. July
13   19, 2000 at 77.) The repeated invocation of a racial stereotype to improperly
14   influence the jury prejudiced Kiles, and Respondents have failed to show otherwise.
15   *See United States v. Doe*, 903 F.2d 16, 21 (D.C. Cir. 1990) ("It is much too late in
16   the day to treat lightly the risk that racial bias may influence a jury's verdict in a
17   criminal case.").

18        Finally, Respondents' contention that Kiles "cannot show prejudice under
19   *Brecht*" (Answer at 118) is wholly without merit. First, Respondents have not
20   carried their burden of proving harmlessness. *See Glebe v. Frost*, 135 S. Ct. 429,
21   430 (2014) (per curiam). And as explained in the Petition, the prosecutor's conduct
22   during the guilt phase, individually and cumulatively, deprived Kiles of a fair trial.
23   (*See* Pet. at 319–26.) *See Berger*, 295 U.S. at 89 (granting a new trial because of
24   "probable cumulative effect" of instances of prosecutorial misconduct).

25             **2.    The prosecutor committed further misconduct in the**
26             **penalty-phase proceedings.**

27        Regarding Kiles's argument that Powell committed misconduct by using a
28   peremptory strike to exclude an African-American prospective juror from the jury

1   in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986), Respondents rely on their
2   arguments in Claim 4. (Answer at 118.) Accordingly, Kiles incorporates his points
3   offered in response to these arguments from Claim 4, above. (*See* Pet. at 143–61;
4   Claim 4, *supra*.)

5   Respondents also rely on their arguments in Claim 6 regarding "Kiles's
6   attack on the prosecutor's closing argument as 'vouching'" and "on the prosecutor's
7   questions and inferences." (Answer at 118.) Respondents' reference to "the
8   prosecutor's questions" appears to refer to Kiles's argument that Powell questioned
9   expert witnesses using improper hypotheticals and misstated Kiles's testimony
10  when questioning a detective. (*See* Pet. at 328–29.) Although it is unclear,
11  Respondents' reference to the prosecutor's "inferences" appears to refer to Kiles's
12  argument that the State's theory of the crime was not a reasonable inference based
13  on the testimony presented at trial. (*See* Pet. at 330.) Respondents' reliance on their
14  arguments in Claim 6 is also unclear given that Kiles provided several examples
15  from the aggravation phase, but Claim 6 pertains only to the mitigation phase.
16  Moreover, Respondents did not even address the specific examples Kiles provided
17  in Claim 6 beyond making the conclusory statement that "[n]othing about the
18  State's closing argument was improper." (Answer at 98.)

19  Respondents quote at length from and summarize Powell's aggravation-
20  phase opening statement, but they do not squarely address the specific vouching
21  statements at issue. (*Compare* Pet. at 327–28, *with* Answer at 118–20.) Rather,
22  Respondents argue that "the trial court did not abuse its discretion by not granting
23  a mistrial" because Powell's comments were reasonable inferences based on the
24  evidence and "the prosecutor used the phrase 'we know' when discussing what the
25  evidence would show." (*See* Answer at 121.) First, "[t]he relevant inquiry is
26  whether the decision of the trial court to deny the motion for a mistrial made the
27  trial fundamentally unfair." *See Armstead v. Neven*, 460 F. App'x 728, 730 (9th Cir.
28  2011) (citing *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991).) Second, Respondents

1    fail to rebut that Powell used "we know" in his aggravation-phase opening

2    statement when discussing things that had been contested by witnesses at the guilt

3    phase in order to throw the weight of the State behind the credibility and accuracy

4    of certain testimony that had not yet been presented to the jury. (*See* Pet at 189–92,

5    327–28; Claim 5, *supra*.) Respondents also ignore that Powell improperly vouched

6    for the credibility of evidence and the quality of the police investigation, even

7    without use of the phrase "we know." (*See, e.g.*, Tr. Mar. 20, 2006 at 72 (Powell

8    telling the jury that he was going to prove the case through "good police work");

9    Tr. Mar. 2006 at 79 (Powell telling the jury that Hawkins's Silent Witness letter

10   was "consistent with the physical evidence");) *see also United States v. Kerr*, 981

11   F.2d 1050, 1053 (9th Cir. 1992) ("A prosecutor has no business telling the jury his

12   individual impressions of the evidence.").

13          Moreover, Respondents concede that the trial court found that "to some

14   extent [the prosecutor] did cross the line in terms of arguing his case" (Answer at

15   120 (quoting Tr. Mar. 20, 2006 at 91)), and they do not appear to dispute this

16   finding. (*See* Answer at 120–21.) They argue instead that the trial court "further

17   held that its instructions would remedy the error." (Answer at 121 (citing Tr. Mar.

18   20, 2006 at 91).) Respondents are incorrect. The transcript reflects that Kiles's

19   counsel Greg Clark stated, "I may come back and ask you before my opening

20   statement to give some type of instruction" (Tr. Mar. 20, 2006 at 91), but the trial

21   court declined to issue a contemporaneous curative instruction (*see* Tr. Mar. 20,

22   2006 at 91–94). And even had a curative instruction been given, it would have been

23   "hard to unring this bell," as Clark recognized (Tr. Mar. 20, 2006 at 87.)

24          Finally, Respondents argue that the prosecutor's conduct was harmless in

25   light of the evidence of guilt and the three aggravating circumstances, "particularly

26   where the jury only returned one of three possible death sentences." (Answer at

27   122.) As an initial matter, the Supreme Court has recognized that "a deliberate and

28   especially egregious error of the trial type, or one that is combined with a pattern of

prosecutorial misconduct, might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict." *Brecht*, 507 U.S. at 638 n.9 (internal citation omitted). This is precisely the situation presented in Kiles's case. And even if *Brecht* supplies the appropriate standard for harmlessness, Respondents have not carried their burden. The fact that the jury was unable to agree on a death sentence for the two other murders for which Kiles was convicted, despite the aggravating circumstances in those cases (*see* ROA 919 at 2–3), supports that, had the jurors not been exposed to the prosecutor's pervasive misconduct, they would have been open to imposing a different sentence for the death of Valerie Gunnel. This is especially true given that the prosecutor's mitigation-phase closing argument urged the jury to disregard the law and misled the jury on the law (Pet. at 331), which Respondents fail to address.

### 3. The prosecutor's performance rendered the trial fundamentally unfair and violated Kiles's substantive rights.

Respondents' remaining argument that "the combined effect of the alleged errors" was harmless (Answer at 122) fails for the reasons set forth above. Powell mischaracterized evidence and testimony, vouched for prosecution witnesses, attempted to draw on jurors' implicit racial biases, and used inflammatory language. This misconduct unquestionably had a substantial and injurious effect on the verdict. *See Sechrest v. Ignacio*, 549 F.3d 789, 808 (9th Cir. 2008) (holding that prosecutor's repeated misstatements violated petitioner's due-process rights and violation had substantial and injurious effect on the jury's decision to impose the death penalty). Accordingly, Kiles is entitled to relief.

/ / /

**Claim Ten**

**Juror misconduct at Kiles's guilt- and penalty-phase proceedings deprived Kiles of his rights to a fair and impartial jury, the assistance of counsel, confrontation, equal protection, and a fair trial.**

Kiles incorporates by specific reference all facts, allegations, and arguments made in his Petition and elsewhere in this Reply. Kiles relies on the arguments raised in his Petition in support of this claim (*see* Pet. at 332–42), but specifically replies to the following arguments made by Respondents.

**A.    Respondents have failed to prove procedural default.**

Respondents argue that this claim is "admittedly procedurally defaulted." (Answer at 123.) Kiles makes no such admission. As an initial matter, it is Respondents' burden to plead and prove any procedural default. *See* Section II.B.2, *supra*. Further, it is Respondents' affirmative burden to demonstrate that any default bar is based upon adequate and independent state law grounds. *See Bennett*, 322 F.3d at 585; *see also Insyxiengmay v. Morgan*, 403 F.3d 657, 665–66 (9th Cir. 2005); *Coleman v. Thompson*, 501 U.S. 722, 729 (1991); Section II.B.2, *supra*. They fail to do so.

Respondents argue that the proper procedural mechanism for review of juror misconduct claims is a motion for new trial pursuant to Rule 24.1 of the Arizona Rules of Criminal Procedure. (Answer at 123.) Although Respondents cite no Arizona authority for this argument, they may have intended to invoke the preclusive bar(s) found in Rule 32.2(a) of the Arizona Rules of Criminal Procedure.

But none of the grounds for preclusion present in Rule 32.2(a) apply here. Rule 32.2(a)(1) bars post-conviction relief for claims "still raiseable" on appeal or via post-trial motion. Ariz. R. Crim. P. 32.2(a)(1). But any appeal or post-trial motion for juror misconduct is no longer raiseable. *See* Ariz. R. Crim. P. 24.1(b); 31.2(a)(2). Kiles has not raised juror misconduct in a prior appeal or prior post-conviction proceeding, so it is not precluded under Rule 32.2(a)(2). And Rule

194

1    32.2(a)(3) does not bar claims, like juror misconduct, which require an express

2    waiver of a constitutional right in order to be effective.

3          Several rights require a knowing waiver by the defendant himself, rather than

4    by counsel, before their omission from a prior proceeding may give rise to a

5    procedural bar pursuant to Rule 32.2(a), including the right to a jury trial. *See*

6    *Stewart v. Smith*, 46 P.3d 1067, 1070 (Ariz. 2002). Whether a claim is of sufficient

7    constitutional magnitude to require an express waiver "depends merely upon the

8    particular right alleged to have been violated." *Id*. at 1071. Generally, rights

9    designed to uphold the fairness of the trial itself have been determined to require an

10    express waiver to be effective. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 237

11    (1973); *Adams v. United States ex rel. McCann*, 317 U.S. 269, 277–78 (1942). Juror

12    misconduct undermines the integrity of the trial itself. *Turner v. Louisiana*, 379

13    U.S. 466, 472 (1965) ("The requirement that a jury's verdict must be based upon

14    the evidence developed at the trial goes to the fundamental integrity of all that is

15    embraced in the constitutional concept of trial by jury.") (internal quotation marks

16    omitted).

17          Arizona courts applying Rule 32.2(a)(3) have found that "preclusion would

18    not apply to claims involving such constitutional rights as … the right to a jury

19    trial." *See State v. Espinosa*, 29 P.3d 278, 280 (Ariz. Ct. App. 2001). Where it is

20    uncertain whether Arizona state courts would find a previously-unraised claim

21    procedurally defaulted, it is not subject to a preclusive bar in federal court. *Cassett*

22    *v. Stewart*, 406 F.3d 614, 623 (9th Cir. 2005). Thus, as Kiles's juror misconduct

23    claim was not expressly waived, the procedural bar codified at Rule 32.2(a) of the

24    Arizona Rules of Criminal Procedure does not bar this Court's consideration of its

25    merits.

26          Further, if this Court finds that Rule 32.2(a) would ordinarily apply to the

27    instant claim, Respondents have failed to affirmatively demonstrate that it is

28    adequate and independent under state law. *See* Section II.B.2, *supra*; *see also*

1    *Bennett*, 322 F.3d at 585–86.

2        In fact, Rule 32.2(a) is not adequate when addressing claims of juror

3    misconduct. A state procedural bar is "adequate" only when it is "firmly

4    established" and "regularly followed." *Ford v. Georgia*, 498 U.S. 411, 423–24

5    (1991) (quoting *James v. Kentucky*, 466 U.S. 341, 348–51 (1984)) (internal

6    quotation marks omitted). A state procedural rule is neither firmly established nor

7    regularly followed where its application is "unpredictable" and "irregular."

8    *Carriger v. Lewis*, 971 F.2d 329, 333 (9th Cir. 1992).

9        Arizona has held, consistent with Respondents' position (*see* Answer at 124),

10   that juror misconduct claims are barred from state post-conviction courts under

11   Rule 32.2(a). *See, e.g. State v. Kolmann*, 367 P.3d 61, 67 (Ariz. 2016) ("Because

12   claims of juror misconduct can be raised on post-trial motion under Rule 24,

13   [defendant] generally is precluded from raising them in a petition for post-

14   conviction relief."). However, Arizona has also held that a post-conviction relief

15   petition is the proper method for raising a juror misconduct claim. *See, e.g., State

16   v. Fitzgerald*, 303 P.3d 519, 523–24 (Ariz. 2013) (citing to *State v. Adamson*, 665

17   P.2d 972, 987 (Ariz. 1983), and opining that "a rule 32 petition for post-conviction

18   relief" is the appropriate mechanism for review of juror misconduct). These

19   contrary rulings, coupled with the disparate practices employed by Arizona courts

20   in adjudicating juror misconduct allegations, demonstrate that Arizona's Rule

21   32.2(a) is not adequate in that its application is unpredictable and irregularly

22   followed. *See*, *e.g., Ford,* 498 U.S. at 423–24.

23       Finally, and as noted above, Respondents argue that failure to pursue a

24   motion for a new trial pursuant to Rule 24.1 of the Arizona Rules of Criminal

25   Procedure operates to waive juror misconduct discovered in the future. (Answer at

26   123.) But such motions must be filed within 10 days of the verdict, long before most

27   instances of juror misconduct come to light. *See* Ariz. R. Crim. P. 24.1(b), (c)(3).

28   The effect of such a stringent filing window unconstitutionally bars meritorious

1  claims of juror misconduct, like that presented here, from being heard. *Turner v.*
2  *Compoy*, 827 F.2d 526, 528 (9th Cir. 1987).

3      If direct appeal were the appropriate venue for raising late-discovered claims
4  of juror misconduct—as Arizona courts have sometimes held—this would present
5  problems which fatally undermine any chance to prove the claim. *See Kolmann*,
6  367 P.3d 61.[46] Arizona law forbids presentation of extra-record evidence on direct
7  appeal. *See, e.g., Lambright v. Stewart*, 241 F.3d 1201, 1203–04 (9th Cir. 2001);
8  *see also State v. Cabrera*, 560 P.2d 417, 420 (Ariz. 1977). And Arizona ordinarily
9  bars dissemination of jurors' personally-identifying information, which makes
10  investigation of potential misconduct claims exceedingly difficult. *See* Ariz. R.
11  Crim. P. 18.3(b).

12      In this case, state post-conviction counsel were unable to pursue relief for the
13  juror misconduct during Kiles's trial. Not only was there confusion within the
14  Arizona court system as to whether juror misconduct claims could be brought in
15  post-conviction, *see above*, but Kiles's counsel were specifically barred from
16  speaking to jurors by the post-conviction court. (ROA 1056 at 1.)

17      Further, Arizona has created a system whereby not all forms of juror
18  misconduct are remediable by a motion for new trial. Only the six forms of juror
19  misconduct listed under Rule 24.1(c)(3) are cognizable in Arizona state courts.
20  *State v. Smith*, 593 P.2d 281, 285 (Ariz. 1979) (noting that "[w]e have limited the
21  scope of inquiry into jury verdicts to those areas specifically set out in rule
22  24.1(c)."). Here, numerous instances of juror misconduct complained-of below

---

24  [46] In the event that this Court finds that trial counsel should have discovered and
25  raised the instant claim of juror misconduct after trial pursuant to Rule 24.1(c), and
26  that this failure could serve as grounds for bringing a state post-conviction claim
     for ineffective assistance of trial counsel, state post-conviction counsel's failure to
27  raise this issue constituted ineffective assistance and serves as cause to excuse any
28  resultant default of this claim. *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012);
     *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

1    would be precluded under the narrow categories of Rule 24.1(c), potentially
2    including a juror reading a newspaper despite the court's admonition not to do so,
3    sleeping through the proceedings, consideration of racial stereotypes, *see Peña-*
4    *Rodriguez v. Colorado*, 137 S. Ct. 855 (2017), and curtailing deliberations because
5    one of their members was ill. *See infra.*

6        Arizona has thus crafted a system where only a small subset of juror
7    misconduct claims may receive judicial review, and only if discovered in an
8    unreasonably and impractically narrow time frame. For the vast majority of claims,
9    trial, appellate, and state post-conviction counsel cannot investigate and litigate
10   issues which go to the heart of the right to an impartial jury, and trial, appellate, and
11   state post-conviction courts are barred from hearing them. Arizona's scheme thus
12   functionally bars the courthouse doors to criminal defendants seeking relief from
13   juror misconduct, violating the Constitution. *See Turner*, 827 F.2d at 528.

14       Because there was no adequate state-court mechanism for this claim to be
15   heard previously, *see* 28 U.S.C. § 2254(b)(1)(B), this Court should review its merits
16   de novo, *see* § 2254(b)(1)(B).

17       **B.    Respondents fail to rebut the merits of Kiles's claim.**

18       Respondents fail to rebut the merits of Kiles's claims of juror misconduct,
19   beyond deeming them "speculative." (Answer at 125.) This ignores the detailed
20   allegations by Kiles of juror misconduct, and the court order forbidding Kiles's state
21   post-conviction counsel from speaking with jurors.

22       Further, as discussed in Section II.C.4, *supra*, Respondents here incorrectly
23   attempt to shift the burden to Kiles to establish harmlessness. (Answer at 125.) As
24   the Supreme Court has explained, for those errors that do not require automatic
25   reversal, habeas relief is appropriate "if the prosecution cannot demonstrate
26   harmlessness." *Ayala*, 135 S. Ct. at 2197 ; *see also Brecht v. Abrahamson*, 507 U.S.
27   619, 640–41 (1993) (Stevens, J., concurring). Thus, it is Respondents—not Kiles—
28   who bear the burden of establishing that errors not requiring automatic relief are so

benign that they may be ignored.

### 1. Jurors considered extraneous evidence at Kiles's guilt-phase proceedings.

Respondents fail to address the merits of Kiles's assertion that jurors introduced extraneous evidence at Kiles's guilt-phase proceedings. As such, they fail to contest the merits of this claim. *James v. Ryan*, 733 F.3d 911, 913–14 (9th Cir. 2013).

It is thus uncontested that at least one juror during Kiles's 2000 guilt phase regularly read the newspaper during trial, choosing to ignore the court's clear instruction not to do so. This juror was also aware of the extraneous and prejudicial information that Kiles had previously been convicted of the crimes for which he was on trial. This information had a "substantial and injurious effect or influence" on at least one juror's decision. *Brecht*, 507 U.S. at 623.

### 2. Jurors committed misconduct in multiple ways at Kiles's penalty-phase proceeding.

Again, Respondents fail to address the merits of the numerous forms of misconduct which occurred during Kiles's 2006 penalty-phase proceedings. As such, they fail to rebut the merits of the Petition. *James*, 733 F.3d at 913–14.

Respondents thus do not contest the particularly alarming instance wherein one juror sought out information on the accuracy of statements made by defense expert James Aiken. Aiken testified about Kiles's years-long history as a model prisoner, thus presenting the jury with relevant information regarding Kiles's future dangerousness. (*See* Tr. Apr. 27, 2006 at 4–54.) This juror's husband, who was incarcerated at the time, informed the juror that Aiken's testimony was not credible. This juror then went back and informed the other jurors what she had been told. Thus, jurors heard from a seemingly credible source that a defense expert was lying about an issue bearing directly upon whether Kiles warranted leniency. Respondents fail to contest these facts.

1    Respondents also fail to contest that multiple jurors were observed sleeping
2    during the penalty-phase presentation, as confirmed by the prosecution at trial. (*See*
3    Tr. Mar. 22, 2006 at 4–6.) Respondents likewise fail to contest that one juror
4    introduced factually incorrect, extraneous "evidence" in the form of a question read
5    in open court that violent crime occurs at a high rate in cities which have
6    predominantly black populations. (ROA 885 at 1); *see also Peña-Rodriguez*, 137
7    S.Ct. at 868. And Respondents fail to contest that one juror was diagnosed with
8    cancer either shortly before, or during trial, and other jurors speeded their
9    deliberations in order to ensure that she received prompt treatment. (ROA 888 at
10   1.)

11   The above-detailed incidents of juror misconduct and those described in
12   Kiles's Petition (*see* Pet. at 332–42) deprived Kiles of a trial before a fair and
13   impartial jury. Further, these instances of misconduct had a "substantial and
14   injurious effect or influence" on at least one juror's decision. *Brecht*, 507 U.S. at
15   623. Accordingly, Kiles is entitled to relief.

16                              **Claim Eleven**
17        **Kiles was denied effective assistance of counsel on direct appeal.**

18   Kiles incorporates by specific reference all facts, allegations, and arguments
19   made in his Petition and elsewhere in this Reply. Kiles relies on the arguments
20   raised in his Petition in support of this claim (*see* Pet. at 343–58), but specifically
21   replies to the following arguments made by Respondents.

22   Respondents argue that various subparts of this claim are procedurally
23   defaulted. (*See generally* Answer at 125–28.) Kiles addresses default for each
24   portion of the claim below, but as a threshold matter addresses two points. First,
25   Respondents nowhere argue that these alleged procedural bars are adequate.
26   Respondents have thus waived any adequacy argument and thereby failed to carry
27   their burden of demonstrating the adequacy of any procedural bars. *See Bennett*,
28   322 F.3d at 585–86; *Franklin*, 290 F.3d at 1229–33; Section II.B.2., *supra*.

Second, assuming the adequacy of any procedural bars, Kiles can demonstrate cause to overcome any default as a result of post-conviction counsel's ineffectiveness for failing to raise various aspects of this claim. As discussed above in Section II.B.3, *supra*, under *Martinez* the ineffective assistance of post-conviction counsel should excuse the default of several types of claims, not merely those dealing with the ineffective assistance of trial counsel. And if appellate counsel's ineffectiveness resulted in the default of a part of this claim, then post-conviction counsel's ineffectiveness again serves as cause to excuse that default. *See Davila,* 137 S. Ct. at 2069; *Carpenter*, 529 U.S. at 453. Where no court has ever been able to address an aspect of this claim, *Davila* does not change this analysis, as discussed in Section II.B.4. And the allegations in both the Petition and this Reply are sufficient to present a colorable claim that the ineffective assistance of post-conviction counsel excuses the default of any portion of this claim. (*See* Pet. at 377–90; Claim 13, *infra*.)

Kiles need not prove ineffective assistance in order to establish cause and prejudice at this stage. Instead, further factual development of Kiles's assertion of cause and prejudice, including an evidentiary hearing, are necessary if this Court finds any portion of the claim procedurally defaulted.

Finally, the Court's failure to review the merits of this claim would result in a fundamental miscarriage of justice for the reasons detailed in Section II.B.2., *supra*, Section 1.B.1.c and Claims 31 and 35, *infra*.

### A. Appellate counsel focused his efforts on a claim that was not cognizable on appeal.

Respondents argue that this portion of the claim was not raised in Kiles's post-conviction petition and is therefore procedurally defaulted. (Answer at 125–26.) Their "hypertechnical[]" approach to the fair presentation doctrine must be rejected. *Williams v. Washington*, 59 F.3d 673, 677 (7th Cir. 1995). Kiles alleged in both his post-conviction petition and petition for review that his appellate

attorney, Paul Mattern, was ineffective for raising claims based on the alleged deprivation of effective trial counsel—"claims that cannot be properly raised on appeal"—and for failing to raise claims that should have been raised on appeal. (ROA 1189 at 61; PFR2 Dkt. 1 at 62.) Thus, Kiles presented both the factual support for, and the federal underpinnings of, his claim that Mattern inexplicably and unreasonably focused his investigation and briefing on a claim that is not cognizable on direct appeal, which could have resulted in Kiles being precluded from later raising an ineffective-assistance-of-trial-counsel claim. *See Gray v. Netherland*, 518 U.S. 152, 162–63 (1996) (explaining that to be fairly presented, "a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts that entitle the petitioner to relief"). This portion of Claim 11 is properly exhausted. *See Castille*, 489 U.S. at 350–51.

Assuming default arguendo, post-conviction counsel were ineffective for failing to raise this clearly meritorious issue, excusing default. *See Martinez*, 566 U.S. at 9; *Carpenter,* 529 U.S. at 453; *Strickland*, 466 U.S. at 687–88. *But see Davila*, 137 S. Ct. 2058. On the merits of appellate counsel's ineffectiveness, Respondents do not dispute that Mattern's myopic focus on a non-cognizable claim "fell below an objective standard of reasonableness." *See Strickland*, 466 U.S. at 688. Rather, they contend that Kiles was not prejudiced as a result. (Answer at 125–26.) But Kiles never argued that this allegation alone entitled him to relief. Kiles explained that because Mattern was so focused on bringing an ineffective-assistance claim, he failed to identify and properly brief viable appellate issues that were apparent from the record. (*See* Pet. at 343–48.) This bolsters Kiles's allegations of deficient performance, and the resulting prejudice is demonstrated by Mattern's failure to raise the meritorious claims discussed below and in the Petition.

/ / /

**B.      Appellate counsel was ineffective for failing to raise meritorious claims.**

**1.      Appellate counsel failed to challenge the child-abuse convictions.**

Respondents agree that this portion of the claim is exhausted, but contend that the post-conviction court reasonably found that it was not colorable. (Answer at 126). On the merits of appellate counsel's ineffectiveness, Respondents do not address, and have thus failed to refute, Kiles's argument that this issue was obvious given the numerous times trial counsel challenged the child abuse counts and subsequent convictions (*see* Pet. at 348–51), as well as the trial court's comment that the defense had raised "interesting issues". (Tr. Dec. 29, 2000 at 19–20) Respondents instead appear to argue that the underlying claim lacks merit, referring to their arguments in Claim 7. (Answer at 126.) Kiles therefore incorporates his argument in his Petition concerning this portion of Claim 11 (Pet. at 348–51), as well as his arguments in his Petition and this Reply concerning Claim 7, *supra* (Pet. at 277–99).

Had appellate counsel challenged the trial court's decision to allow the child abuse convictions to stand, there is a reasonable probability that the challenge would have been successful considering the clear precedent on the same issue and near identical facts in *State v. Styers*, 865 P.2d 765 (Ariz. 1993). Thus, the post-conviction court's determination that Kiles "failed to state a colorable claim as to deficient performance of Appellate Counsel or prejudice as a result thereof" (ROA 1214 at 2) was an unreasonable application of *Strickland*, 466 U.S. at 694, and based on an unreasonable determination of the facts. Moreover, given these facts, there is no reasonable basis to find that Kiles had not stated a colorable claim. *See State v. Runningeagle*, 859 P.2d 169, 173 (Ariz. 1993) (explaining that a colorable claim is "one that, if the allegations are true, might have changed the outcome"); *see also Phillips v. Woodford*, 267 F.3d 966, 973 (9th Cir. 2001) (explaining that a habeas

1    petitioner states a colorable claim where "the *allegations* in his petition would, if
2    proved, entitle him to relief").

3              **2.     Appellate counsel failed to challenge the trial court's denial**
4                       **of a mistrial due to prosecutorial misconduct.**

5              Respondents agree that this portion is exhausted, but contend that the post-
6    conviction court reasonably found that it was not colorable. (Answer at 126.) On
7    the merits of appellate counsel's ineffectiveness, Respondents do not address, and
8    have thus failed to refute, Kiles's argument that Mattern performed deficiently by
9    waiting until the reply to raise the arguments supporting a claim of prosecutorial
10   misconduct, resulting in their waiver. (*See* Pet. at 351–53.) Respondents instead
11   appear to argue that the underlying claim lacks merit, referring to their arguments
12   in Claim 9. (Answer at 126.) Kiles therefore incorporates his argument in his
13   Petition concerning this portion of Claim 11 (Pet. at 351–53), as well as his
14   arguments in his Petition and this Reply concerning Claim 9, *supra* (Pet. at 318–
15   32).

16             As a result of Mattern's deficient performance, the Arizona Supreme Court
17   was denied the ability to assess the cumulative impact of the prosecutor's repeated
18   and pervasive misconduct on the jury's verdict. Had this issue been placed before
19   that court, there is a reasonable probability that it would have found that the trial
20   court's denial of a mistrial and the prosecutor's pattern of misconduct required
21   reversal of Kiles's sentence. Accordingly, the post-conviction court's determination
22   that Kiles "failed to state a colorable claim as to deficient performance of Appellate
23   Counsel or prejudice as a result thereof" (ROA 1214 at 2) was an unreasonable
24   application of *Strickland*, 466 U.S. at 694, and based on an unreasonable
25   determination of the facts. Moreover, given these facts, there is no reasonable basis
26   to find that Kiles had not stated a colorable claim. *See Runningeagle*, 859 P.2d at
27   173; *see also Phillips*, 267 F.3d at 973.

28

1
2

### 3. Appellate counsel failed to adequately brief his challenge to the improperly admitted gruesome photographs.

3    Respondents argue that this portion was not raised in Kiles's post-conviction

4    petition and is therefore procedurally defaulted. (Answer at 126–27.) Their

5    "hypertechnical[]" approach to the fair presentation doctrine must be rejected.

6    *Williams*, 59 F.3d at 677. Kiles explained in both his post-conviction petition and

7    petition for review that Mattern "did not raise meritorious claims related to the

8    deaths of the children that necessarily impacted the jury's consideration of the death

9    penalty in Valerie's murder." (ROA 1189 at 66; PFR2 Dkt. 1 at 66.) Kiles also

10   alleged in his state post-conviction petition that, as a result of appellate counsel's

11   ineffectiveness, the Arizona Supreme Court found that he was not prejudiced by the

12   admission of a gruesome photograph. (ROA 1189 at 30–32; PFR2 Dkt. 1 at 30–32.)

13   Thus, this challenge is properly exhausted. *See Castille*, 489 U.S. at 350–51.

14   Assuming default arguendo, post-conviction counsel were ineffective for

15   failing to raise this clearly meritorious issue, excusing default. *See Martinez*, 566

16   U.S. at 9; *Carpenter*, 529 U.S. at 453; *Strickland*, 466 U.S. at 687–88. *But see*

17   *Davila*, 137 S. Ct. 2058. On the merits of appellate counsel's ineffectiveness,

18   Respondents refer to their arguments in Claim 3.[47] (Answer at 126.) Kiles therefore

19   incorporates his argument in his Petition concerning this portion of Claim 11 (Pet.

20   at 353–54), as well as his arguments in his Petition and this Reply concerning Claim

21   3, *supra* (Pet. at 73–143.)

22

23

24   / / /

25

---

26   [47] Respondents also argue here, and in Sections K.4 through K.7 of their Response
(responding to Sections B.3 through B.7 below), that Kiles cannot show prejudice

27   under either *Strickland* or *Brecht*. (Answer at 127–28.) However, the only proper
prejudice inquiry is the one found in *Strickland*. For brevity's sake, Kiles does not

28   repeat this argument but incorporates it into Sections B.4 through B.7 below.

### 4. Appellate counsel failed to challenge the trial court's error in allowing the State to question statements made to defense experts in a prior trial.

Respondents argue that this portion is procedurally defaulted. (Answer at 127.) Assuming default arguendo, post-conviction counsel were ineffective for failing to raise this clearly meritorious issue, excusing default. *See Martinez*, 566 U.S. at 9; *Carpenter*, 529 U.S. at 453; *Strickland*, 466 U.S. at 687–88. *But see Davila*, 137 S. Ct. 2058. On the merits of appellate counsel's ineffectiveness, Respondents refer to their arguments in Claim 8. (Answer at 127.) Kiles therefore incorporates his argument in his Petition concerning this portion of Claim 11 (Pet. at 354–55), as well as his arguments in his Petition and this Reply concerning Claim 8, *supra* (Pet. at 299–318). Kiles further notes that appellate counsel's failure to raise this challenge was especially egregious given that the State stated on the record, "This is something that hasn't been resolved yet. . . . It's for the appellate courts to decide later." (Tr. May 8, 2006 p.m. at 56.) Appellate counsel failed to raise a meritorious challenge that was clear from the trial record, and Respondents have not shown otherwise.

### 5. Appellate counsel failed to argue for leniency on independent review by the Arizona Supreme Court.

Respondents argue that this portion is procedurally defaulted. (Answer at 127.) Assuming default arguendo, post-conviction counsel were ineffective for failing to raise this clearly meritorious issue, excusing default. *See Martinez*, 566 U.S. at 9; *Carpenter*, 529 U.S. at 453; *Strickland*, 466 U.S. at 687–88. *But see Davila*, 137 S. Ct. 2058.

Respondents do not dispute that making a case for life is a central duty of all counsel representing clients facing the death penalty. *See, e.g.*, *State v. Andriano*, 161 P.3d 540, 554 n.11 (Ariz. 2007) ("Andriano did not argue why the Court should find in its independent review that the mitigating circumstances were 'sufficiently

substantial to call for leniency.' A.R.S. § 13-703(E). Counsel in capital cases 'should take advantage of all appropriate opportunities to argue why death is not suitable punishment for their particular client.'" (citing ABA Guidelines)); Ariz. R. Crim. P. 6.8(a)(5) (stating that counsel appointed in capital cases should be familiar with and guided by the 2003 ABA Guidelines). Nor do Respondents dispute that Mattern performed deficiently by failing to argue independent review in a motion for reconsideration, considering he opened oral argument by apologizing for his failure to adequately brief this issue. (DA2 Dkt. 118 at 1.)

Instead, Respondents argue that this claim is meritless because the Arizona Supreme Court conducted an independent review of Kiles's sentence. (Answer at 127.) However, that court has repeatedly recognized that appellate counsel had performed deficiently by failing to present argument that mitigation warranted leniency and that the court could benefit from argument by counsel in conducting its review. *See State v. Speer*, 212 P.3d 787, 801 (Ariz. 2009) ("We have reminded capital defense counsel on two recent occasions of their professional obligation 'to take advantage of all appropriate opportunities to argue why death is not a suitable punishment' for their client, and not to 'simply rely on this Court's statutory duty to review the record.'" (citing ABA Guidelines)); *see also Penson v. Ohio*, 488 U.S. 75, 82 (1988) (rejecting argument that defendant suffered no prejudice from counsel's failure to submit a merits brief on colorable claims because the appellate court examined the record independently). When appellate counsel fails to raise meritorious issues that could have resulted in a reversal of a conviction or a sentence, counsel has necessarily caused prejudice to the defendant. *See, e.g.*, *Strickland*, 466 U.S. at 694.

Respondents further contend that, in light of the aggravation, Kiles's death sentence would not have been reduced to life in prison. (Answer at 127–28.) As discussed in Claim 6, *supra*, trial counsel presented to the jury in scattershot form evidence that Kiles grew up in a dysfunctional family, experienced childhood

trauma, and suffered from substance addiction and mental illness. Although trial counsel's presentation of this evidence needlessly framed Kiles to the jurors as a violent, aggressive man, a competent appellate attorney would have been able to reframe this mitigation evidence and explain why the mitigating circumstances called for leniency.

The Arizona Supreme Court need only have doubt "that the death sentence should be imposed" to reduce the sentence to life. *See State v. Trostle*, 951 P.2d 869, 888 (1997). Had the Arizona Supreme Court been presented with a compelling argument for leniency, there is a reasonable probability that, in its review of the evidence, it would have imposed a different sentence for the death of Valerie Gunnel, as it has done in other cases. *See, e.g.*, *Trostle*, 951 P.2d at 888; *see also Strickland*, 466 U.S. at 694. This is especially true because the jury was unable to agree on a death sentence for the two other murders for which Kiles was convicted, despite the aggravating circumstances in those cases. (*See* ROA 919 at 2–3.)

### 6. Appellate counsel failed to adequately challenge the (F)(2) aggravating circumstance.

Respondents argue that this portion is procedurally defaulted. (Answer at 128.) Assuming default arguendo, post-conviction counsel were ineffective for failing to raise this clearly meritorious issue, excusing default. *See Martinez*, 566 U.S. at 9; *Carpenter*, 529 U.S. at 453; *Strickland*, 466 U.S. at 687–88. *But see Davila*, 137 S. Ct. 2058. On the merits of appellate counsel's ineffectiveness, Respondents refer to their arguments in Claim 5. (Answer at 128.) Kiles therefore incorporates his argument in his Petition concerning this portion of Claim 11 (Pet. at 357–58), as well as his arguments in his Petition and this Reply concerning Claim 5, *supra* (Pet. at 161–97), and Claim 12, *infra* (Pet. at 358–77).

While Respondents argue that a challenge to Kiles's 1986 aggravated assault conviction as grounds for the (F)(2) aggravator would not have succeeded, the Arizona Supreme Court showed that it was open to this line of argument when it

1   held that Kiles's other conviction supporting that aggravating factor did not qualify
2   under the statute. *Kiles*, 213 P.3d at 185–86. But because Mattern unreasonably
3   challenged only the use of the 1984 aggravated assault—despite recognizing that
4   challenging the (F)(2) aggravator was a viable strategy—the Arizona Supreme
5   Court did not even consider whether the 1986 conviction also did not qualify in
6   Kiles's case. Had Mattern adequately challenged the (F)(2) aggravating
7   circumstance in Kiles's case, there is a reasonable likelihood that the Arizona
8   Supreme Court would have found that the 1986 conviction did not qualify, given
9   the court's rulings on the same issue in similar cases. *See State v. Schackart*, 947
10  P.2d 315, 323 (Ariz. 1997); *State v. Walden*, 905 P.2d 974, 996 (Ariz. 1995); *State
11  v. Fierro*, 804 P.2d 72, 82 (Ariz. 1990).

12                **7.    Appellate counsel failed to challenge Kiles's shackling.**

13          Respondents argue that this portion is procedurally defaulted. (Answer at
14  128.) Assuming default arguendo, post-conviction counsel was ineffective for
15  failing to raise this clearly meritorious issue, excusing default. *See Martinez*, 566
16  U.S. at 9; *Carpenter*, 529 U.S. at 453; *Strickland*, 466 U.S. at 687–88. *But see
17  Davila*, 137 S. Ct. 2058. On the merits of appellate counsel's ineffectiveness,
18  Respondents refer to their arguments in Claim 3. (Answer at 128.) Kiles therefore
19  incorporates his argument in his Petition concerning this portion of Claim 11 (Pet.
20  at 358), as well as his arguments in his Petition and this Reply concerning Claims
21  3, 5, 7, and 8, *supra* (Pet. at 73–143, 161–97, 277–318).

22                                **Claim Twelve**

23          **The Arizona Supreme Court's decision affirming Kiles's death
24          sentence violated Kiles's constitutional rights.**

25          Kiles incorporates by specific reference all facts, allegations, and arguments
26  made in his Petition and elsewhere in this Reply. Kiles relies on the arguments
27  raised in his Petition in support of this claim (*see* Pet. at 358–77), but specifically
28  replies to the following arguments made by Respondents.

**A.    Respondents fail to establish a procedural defense.**

Respondents argue that this claim is procedurally defaulted and that Kiles cannot overcome that default. (Answer at 128.) They attempt to narrow the scope of this claim, asserting that Kiles should have filed a motion for reconsideration. (Answer at 128.) But a motion for reconsideration is not an established part of the exhaustion process in Arizona, and Respondents cite no case law in support of this argument. Because Respondents' exhaustion argument is unsupported, they have failed to carry their burden to prove procedural defenses. *See* Section II.B.2, *supra.*

This claim is exhausted, as the Arizona Supreme Court considered and ruled on its merits on direct appeal. *State v. Kiles*, 213 P.3d 174, 187–91 (Ariz. 2009). Thus, this claim has been "fairly presented" to the state courts. *See* Section II.B.1, *supra*. To the extent this claim was not explicitly raised on direct appeal, it was still exhausted because "[e]ven if a petitioner fails to raise a constitutional claim in state court, the exhaustion requirement may be satisfied . . . where the state court itself exhausts the claim." *Comer v. Schriro*, 480 F.3d 960, 981 (9th Cir. 2007) (en banc). The Arizona Supreme Court did so in conducting its independent review. *Kiles*, 213 P.3d at 187.

The Arizona Supreme Court violated Kiles's constitutional rights during its independent review of his death sentence. In other words, Kiles asserts federal constitutional error by the highest state court, and such a claim is cognizable in habeas proceedings. *See, e.g.*, *McKinney v. Ryan*, 813 F.3d 798, 819 (9th Cir. 2015) (en banc) (considering in habeas proceedings claim that Arizona Supreme Court had applied unconstitutional causal-nexus test to reject mitigation); *Greenway v. Ryan*, 866 F.3d 1094, 1097 (9th Cir. 2017).

Moreover, exhaustion in the traditional sense is inapplicable. Kiles could not seek relief from the state post-conviction court, because that court cannot overrule the state supreme court. *See Sell v. Gama*, 295 P.3d 421, 438 (Ariz. 2013) (citing *State v. Smyers*, 86 P.3d 370, 374 n.4 (Ariz. 2004)); *McKay v. Indus. Comm'n*, 438

1   P.2d 757, 759 (Ariz. 1968) (explaining that the state lower court lacks the authority

2   to overrule the Arizona Supreme Court). And the Ninth Circuit has not required a

3   habeas petitioner to file a motion for reconsideration before the Arizona Supreme

4   Court to exhaust a claim. For exhaustion purposes, it suffices that the highest state

5   court has considered the underlying issue of the propriety of Kiles's sentence on

6   direct appeal. The Arizona Supreme Court engaged in its independent review in

7   what it determined to be a constitutional manner and, in doing so, effectively

8   rejected any claim to the contrary. There is no need to re-exhaust a challenge to that

9   court's independent review.

10          That a challenge to the Arizona Supreme Court's independent review is so

11  exhausted is evident from other cases. Habeas petitioners in other cases have

12  attacked as constitutionally unsound the Arizona Supreme Court's use of a causal-

13  nexus test during its independent review. And federal courts have considered these

14  challenges on the merits, even when the petitioner had not previously raised the

15  claim in a motion for reconsideration or in post-conviction proceedings. *See, e.g.*,

16  *Clabourne v. Ryan*, 745 F.3d 362, 369-70, 372-73 (9th Cir. 2014) (describing state-

17  court history of a causal-nexus claim, without mention of motion for

18  reconsideration or petition for certiorari, and rejecting the claim on the merits),

19  *overruled on other grounds by McKinney v. Ryan*, 813 F.3d 798 (9th Cir. 2015) (en

20  banc); Minute Entry at 3–9, *State v. Clabourne*, No. CR-06824 (Pima Cnty. Super.

21  Ct. Dec. 13, 2002) (listing each issue raised in post-conviction proceedings, with

22  no mention of a causal-nexus challenge); Resp. to Pet'r's Supplemented Rule 32

23  Pet. at 6, *State v. Clabourne*, No. CR-06824 (Pima Cnty. Super. Ct. July 19, 2002)

24  (describing issues raised in petitioner's motion for reconsideration, with no mention

25  of a causal-nexus challenge); Mot. for Recons., *State v. Clabourne*, No. CR-97-

26  0334-AP (Ariz. July 6, 1999) (not challenging the Arizona Supreme Court's use of

27  a causal-nexus test). Again, in these cases, the causal-nexus claims were exhausted

28  by the Arizona Supreme Court's review on direct appeal; it was not necessary to

1   raise the claim in a motion for reconsideration or in post-conviction proceedings.
2   As was true in these other cases, Kiles has exhausted his entire claim before the
3   Arizona Supreme Court. As detailed in Kiles's Petition and here, that determination
4   was an unreasonable application of or contrary to clearly established federal law,
5   and an unreasonable determination of the facts, given the state-court record. *See* 28
6   U.S.C. § 2254(d).

7       In the alternative, if any portion of this claim was found not to have been
8   decided by the state court on the merits, the ineffective assistance of Kiles's post-
9   conviction counsel in failing to raise this claim constitutes cause for the default and
10  resulted in prejudice to Kiles. *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *Strickland
11  v. Washington*, 466 U.S. 668, 688, 694 (1984). In either case, this court may review
12  the merits of this claim de novo.

13      **B.    Respondents fail to rebut the merits of this claim.**

14      The death penalty violates the Eighth Amendment where it is imposed
15  through a scheme that denies meaningful appellate review. *See Parker v. Dugger*,
16  498 U.S. 308, 321 (1991); *see also Zant v. Stephens*, 462 U.S. 862, 890 (1983)
17  ("Our decision in this case depends in part on the existence of an important
18  procedural safeguard, the mandatory appellate review of each death sentence by the
19  Georgia Supreme Court to avoid arbitrariness and to assure proportionality.").
20  Further, once a state has provided a mechanism for meaningful appellate review, it
21  must follow its own laws on that mechanism; the failure to do so results in the denial
22  of a liberty interest protected by the Due Process Clause of the Fourteenth
23  Amendment. *See Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980).

24      As described in Kiles's Petition, the Arizona Supreme Court denied Kiles
25  these guarantees when it made errors of constitutional magnitude during its
26  independent review of his death sentence. (*See* Pet. at 358–77.) Respondents ignore
27  the bulk of Kiles's arguments on the merits and instead reframe this claim as
28  alleging that "unless the state court views the evidence supporting [Kiles's] view of

the aggravating factors and accords his extensive proffered mitigation evidence the weight he wishes, then it hasn't legally 'considered' it pursuant to *Eddings v. Oklahoma*, 455 U.S. 104 (1982) and *Tennard v. Dretke*, 542 U.S. 274 (2004)." (Answer at 128.) This is incorrect. Instead, Kiles detailed in his Petition the legal and factual grounds showing that the Arizona Supreme Court violated Kiles's due process rights and his right to meaningful appellate review when it unconstitutionally upheld the (F)(6) and (F)(8) aggravating factors, and unconstitutionally upheld Kiles's sentence after eliminating one of the prior convictions supporting the (F)(6) factor. (*See* Pet. at 358–72.) Kiles also detailed in his Petition the legal and factual grounds showing that the Arizona Supreme Court violated his constitutionally protected right to meaningful appellate review when it ignored many of his mitigating factors and mischaracterized others, and failed to give effect to the mitigating factors it did consider. (*See* Pet. at 372–76.) In summarily upholding Kiles's sentence, the Arizona Supreme Court failed to undertake the painstaking examination of the entire record that its independent review process requires. *See State v. Stokley*, 898 P.2d 454, 465 (Ariz. 1995).

Respondents largely ignore Kiles's arguments regarding the court's unconstitutional review of the aggravating factors, and instead focus their response on incorrectly arguing that the Arizona Supreme Court properly "considered *all*" of Kiles's mitigation. (Answer at 128.) Though Kiles alleged 30 non-statutory mitigating factors, the court did not mention or address most of them. *See Kiles*, 213 P.3d at 189; (*see also* Tr. May 22, 2006 at 19–21). In its "independent" review, the court instead discussed Kiles's failure to prove two statutory factors. *Id.* But, at trial Kiles did not allege either of those two statutory mitigating factors. (Tr. May 22, 2006 at 19–21.)

The Arizona Supreme Court also unconstitutionally discounted the weight of Kiles's mitigating circumstances for arbitrary reasons not based on Kiles's individual character. This violated the mandate of individualized consideration of

1    mitigation. *See Eddings*, 455 U.S. at 112. The court also imposed boundaries to
2    prevent mitigating evidence from giving effect to a life sentence, in violation of
3    *Tennard v. Dretke*, 542 U.S. 274, 285 (2004). For example, it imposed a causal-
4    nexus test, which meant that evidence that lacked a causal connection to the crime
5    could not carry enough weight to warrant leniency. *Kiles*, 213 P.3d at 191. Because
6    the psychiatric testimony "did not establish a sufficient connection to the murder to
7    warrant significant weight," the court essentially discounted it. *Id.* Similarly, the
8    court held that Kiles's childhood "carries minimal weight 'because the evidence . .
9    . is far removed from the crime.'" *Id.* (quoting *State v. Armstrong*, 189 P.3d 378,
10   392–93 (Ariz. 2008).) This was contrary to *Eddings* and *Tennard*. *See McKinney v.
11   Ryan*, 813 F.3d 798, 821 (9th Cir. 2015) (en banc).

12        The court also arbitrarily discounted Kiles's evidence of excellent prison
13   behavior by applying a broad rule that failed to consider Kiles's individual
14   character: that being a model prisoner should be afforded "minimal weight because
15   of the expectation that prisoners behave in prison." *Kiles*, 213 P.3d at 191. Thus,
16   the Arizona Supreme Court automatically gave minimal weight to evidence the U.S.
17   Supreme Court has said must be considered, contrary to. *Skipper v. South Carolina*,
18   476 U.S. 1, 5 (1986).

19        Thus, contrary to Respondents' assertions, Kiles does not claim that the
20   Arizona Supreme Court erred when it did not accord his mitigation the quality and
21   strength that he desires. (*See* Answer at 129.) Rather, Kiles maintains that the
22   Arizona Supreme Court violated his rights by unconstitutionally ignoring and
23   mischaracterizing his mitigation evidence, and discounting it for unconstitutional
24   reasons, including imposing a causal-nexus requirement. (*See* Pet. at 372–76.); *see
25   Kiles*, 213 P.3d at 187–92.

26        These errors alone, and considered cumulatively with the Arizona Supreme
27   Court's errors in reviewing Kiles's invalid aggravating factors, violated Kiles's
28   constitutional rights to due process and meaningful appellate review. Accordingly,

his sentence cannot stand.

## Claim Thirteen

### Kiles's second state post-conviction counsel were constitutionally ineffective.

Kiles incorporates by specific reference all facts, allegations, and arguments made in his Petition and elsewhere in this Reply. Kiles relies on the arguments raised in his Petition in support of this claim (*see* Pet. at 377–90), but specifically replies to the following arguments made by Respondents.

Kiles alleges that the ineffective assistance of second post-conviction counsel both entitles him to relief as an independent constitutional violation and can be used to overcome any procedural default of other claims raised in his Petition. (Pet. at 385, 388.) In his Petition, he provided three non-exhaustive examples in support— that post-conviction counsel failed (1) to adequately raise several meritorious claims, (2) to adequately develop mitigation evidence, and (3) to file a reply brief to the State's answer to Kiles's post-conviction petition. (Pet. at 379–85.) Respondents do not address and have therefore failed to refute Kiles's argument that post-conviction counsel's failure to challenge the denial of the opportunity to file a reply prejudiced his ability to have a full and effective review of meritorious claims raised in the post-conviction petition. (*Compare* Pet. at 384–85 *with* Answer at 130–31.) Respondents' summary assertion that post-conviction counsel "retained several additional mental health experts and conducted additional mitigation research" (Answer at 131) is insufficient to refute Kiles's detailed allegations regarding post-conviction counsel's failure to uncover significant mitigation due to their deficient performance as to both lay witnesses and experts. (*See* Pet. at 380–84.) Respondents also ignore that post-conviction counsel let go of a seasoned mitigation specialist because, based on her years of experience, she believed that a reasonable mitigation investigation would require more extensive effort than what the attorneys were willing to undertake, and that their strategy should follow an

1    investigation. (*See* Pet. at 378, 380.)

2    Although Respondents argue that *Strickland* requires this Court to apply

3    "deferential presumptions" to counsel's decision-making (Answer at 131), such a

4    presumption only attaches to decisions that are the result of strategic decision-

5    making. *Strickland*, 466 U.S. at 691; *see also Williams v. Taylor*, 529 U.S. 362, 373

6    (2000); *Rompilla v. Beard*, 545 U.S. 374, 395–96 (2005). Here, post-conviction

7    counsel's actions were not the result of strategic decision-making. (*See* Pet. at 377–

8    85.) For example, post-conviction counsel waited until the date the reply brief was

9    due to ask for an extension (ROA 1213), and when the court denied relief two days

10   later without ruling on the extension request (ROA 1214), post-conviction counsel

11   unreasonably failed to challenge the denial of the opportunity to file a reply. (*See*

12   Pet. at 384–85.) The failure to file a reply brief was not a strategic decision, but was

13   the result of a conflict between the two attorneys and one of the attorney's "personal

14   and family circumstances." (ROA 1213 at 2–4.) It is deficient where counsel's

15   decisions result from inattention instead of reasoned judgment. *See Wiggins v.

16   Smith*, 539 U.S. 510, 534 (2003); *Hinton v. Alabama*, 571 U.S. 263, 275 (2014).The

17   failure to file beneficial pleadings constitutes deficient performance. *See

18   Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) (finding counsel ineffective for

19   failing to file a pretrial motion).

20   In another example of post-conviction counsel's inattention and lack of

21   diligence, they raised a challenge to Kiles's grand-jury proceedings as a standalone

22   constitutional claim—which they knew or should have known would be

23   precluded—but failed to allege that trial counsel were ineffective for failing to raise

24   such a challenge in the first instance.

25   Further, the factual basis for the ineffectiveness claim should have been

26   obvious to post-conviction counsel because lead trial counsel Greg Clark stipulated

27   to an extension of the deadline to file the motion to remand (ROA 397 at 1), and his

28   co-counsel had prepared a draft (PFR2 Dkt. 21 Ex. 6 at 1–11), but Clark still failed

1  to file the motion. (*See* Pet. at 379–380, 390–99; Claim 14, *infra*.). Post-conviction

2  counsel's decisions are not entitled to deference, notwithstanding Respondents'

3  argument to the contrary.

4         Regarding Kiles's argument that post-conviction counsel failed to raise

5  meritorious claims, Respondents contend that the ABA Guidelines cannot inform

6  the inquiry into reasonable professional conduct because the function of post-

7  conviction counsel "is similar to that of an appellate attorney" (Answer at 130

8  (citing *Martinez*, 566 U.S. at 11–12)), and "the hallmark of effective appellate

9  advocacy" is winnowing issues on appeal (Answer at 130 (citations omitted)). In

10  *Martinez*, the Supreme Court did not generally equate the role of appellate counsel

11  to that of post-conviction counsel; rather, the Court explained that when a post-

12  conviction proceeding was the first time a claim of trial counsel's ineffectiveness

13  could be raised, that proceeding "is in many ways the equivalent of a prisoner's

14  direct appeal as to the ineffective-assistance claim" because the post-conviction

15  court will decide the merits of the claim, no other court will have addressed it, and

16  prisoners are not well equipped to represent themselves in such a proceeding.

17  *Martinez*, 566 U.S. at 11. Moreover, at the time second post-conviction counsel

18  were appointed to Kiles's case, they were required to "be familiar with and guided

19  by the performance standards in the 2003 American Bar Association Guidelines for

20  the Appointment and Performance of Defense Counsel in Death Penalty Cases."

21  *See* Ariz. R. Crim. P. 6.8(c)(4) (2011).[48] Respondents have therefore failed to refute

22  that post-conviction counsel had a duty to "seek to litigate all issues, whether or not

23

24  _____

     [48] Further, the Supreme Court has consistently relied upon guidelines from the ABA

25  and similar professional groups to inform the inquiry into reasonable professional

26  conduct. *See, e.g.*, *Padilla v. Kentucky*, 559 U.S. 356, 366–67 (2010) (quoting

     *Strickland*, 466 U.S. at 688)); *see also* 1989 ABA Guidelines; 2003 ABA

27  Guidelines. Courts have regularly used these and similar guidelines to help

28  determine whether counsel performed deficiently. *See, e.g.*, *Rompilla v. Beard*, 545

     U.S. 374, 387 & n.7 (2005); *Wiggins v. Smith*, 539 U.S. 510, 524–25 (2003).

217

previously presented, that are arguably meritorious[.]" (*See* Pet. at 378–79 (citing 2003 ABA Guideline 10.15.1(C)).) Instead, Respondents characterize the ABA Guidelines as advocating a "kitchen-sink" approach. (Answer at 130.) But the Guidelines do not require anything like that. As Kiles explained in his Petition, post-conviction counsel failed to raise several substantial claims, and failed to adequately brief other substantial claims as a result of their failure to pursue filing a reply. (*See* Pet. at 378–85.) This fell below prevailing professional norms, and Respondents have not shown otherwise.

Respondents' only other argument regarding post-conviction counsel's performance and the prejudice resulting therefrom is to allege that post-conviction counsel was not ineffective because the underlying claims are meritless. (Answer at 130.) Kiles incorporates his arguments in those claims, which demonstrate that they meet the low bar of having "some merit." *Martinez*, 566 U.S. at 12; (*See, e.g.*, Claims 2, 3, 4, 5, and 6, *supra*; Claims 14 and 15, *infra*.)

Respondents also argue that this claim is not "independently valid." (Answer at 131.) Kiles recognized that *Coleman*, 501 U.S. at, 757, did not establish a right to relief based on the ineffectiveness of post-conviction counsel. (Pet. at 388.) However, he extensively detailed in his Petition the reasoning supporting such a right and this Court's ability to grant relief based on the ineffective assistance of post-conviction counsel. Kiles explained that because Arizona entitles a defendant to the appointment of post-conviction counsel and provides rules aimed at ensuring counsel's competence, due process requires that counsel be effective and that this statutorily-provided right must comport with due process. (*See* Pet. at 388–90.) Thus, Respondents' assertion that there is no "free-standing constitutional right" to effective post-conviction counsel (Answer at 130) does not sufficiently address this reasoning. Accordingly, the Court should find that the right to effective post-conviction counsel exists and was violated in Kiles's case.

Respondents do not contest that a showing of post-conviction counsel's

1   ineffectiveness can excuse a procedural default under *Martinez*. 566 U.S. at 17.

2   They argue instead that the allegations Kiles made in support of this claim do not

3   "form a valid broad basis to overcome cause and prejudice." (Answer at 131.)

4   However, as explained in more detail in Section II.B.3, *supra*, Kiles need not prove

5   ineffective assistance in order to establish cause and prejudice under *Martinez* at

6   this stage of proceedings. Kiles has made a colorable showing that his post-

7   conviction counsel were ineffective under *Strickland* (*see* Pet. at 377–90), and

8   Respondents have failed to rebut this showing. At a hearing, Kiles could

9   demonstrate the full merits of this claim by presenting a standard of care expert,

10  presenting testimony from post-conviction counsel, presenting further mitigation

11  that post-conviction counsel failed to investigate, and presenting extra-record

12  evidence regarding counsel's failures. Accordingly, further evidentiary

13  development is warranted.

### Claim Fourteen

14

15  **Trial counsel was ineffective for failing to file a motion to remand because of errors rendering the grand-jury proceedings unconstitutional.**

16

17      Kiles incorporates by specific reference all facts, allegations, and arguments

18  made in his Petition and elsewhere in this Reply. Kiles relies on the arguments

19  raised in his Petition in support of this claim (*see* Pet. at 390–99), but specifically

20  replies to the following arguments made by Respondents.

21      **A.      Respondents fail to establish a procedural defense.**

22      Respondents assert that this claim is "admittedly procedurally defaulted."

23  (Answer at 131.) While Kiles agrees that this claim was not presented in this exact

24  form in state court, he does not agree that it is procedurally defaulted. Respondents

25  assert that this claim is procedurally defaulted since "Kiles did not raise any claim

26  implicating the grand jury proceedings by special action, the grand jury proceedings

27  are not reviewable below on appeal, or collateral review. *State v. Moody*, 94 P.3d

28  1119, 1134–35, ¶ 31 (Ariz. 2004)." Respondents continue: "As such, the PCR court

1  found Kiles's grand jury claims precluded, as well as not colorable with regard to

2  any discriminatory intent. (ROA 1214 at 1.)" (Answer at 131.)

3      This does not prove procedural default of this claim. The state post-

4  conviction court's decision on a grand jury claim does not address the instant claim:

5  ineffective assistance of trial counsel for failure to file a special action to remand

6  for new grand jury proceedings. Indeed, post-conviction counsel did not file a claim

7  alleging ineffective assistance of trial counsel for failing to file a special action. (*See*

8  ROA 1189; PFR2 Dkt. 1.) Instead, post-conviction counsel included a claim

9  challenging the composition of the grand jury (ROA 1189 at 21–23; PFR2 Dkt. 1

10  at 22–23) and challenging Imojean Kiles's competence (ROA 1189 at 41–42; PFR2

11  Dkt. 1 at 41–42). As Respondents note, these were not cognizable in post-

12  conviction proceedings, and the court found them precluded. (Answer at 131; ROA

13  at 1214.) Thus, the state court has never ruled on this ineffective-assistance-of-trial-

14  counsel claim.[49] This underscores why this Court should review this claim de novo:

15  Kiles has stated a colorable claim of post-conviction counsel's ineffectiveness in

16  failing to raise this "substantial" trial-counsel-ineffectiveness claim, which

17  constitutes excuse for any procedural default. *See Martinez v. Ryan*, 566 U.S. 1, 11

18  (2012); (Answer at 131; Pet. at 390–91).

19      Post-conviction counsel's failure to raise this claim, which clearly had "some

20  merit" and was thus substantial, fell below prevailing professional norms. *Martinez*,

21  566 U.S. at 11; *Strickland v. Washington*, 466 U.S. 668 (1984); *see also* 2003 ABA

22  Guideline 10.15.1(C).

23      Instead, post-conviction counsel stated a non-cognizable form of the claim,

24  and failed to raise this meritorious claim. Counsel knew or should have known that

---

26 [49] As an affirmative defense, Respondents bear the burden of proving any

27  procedural default. *Trest v. Cain*, 522 U.S. 87, 89 (1997); *see* Section II.B.2, *supra*.

28  Respondents have not met this burden here, and this court can consider the claim on the merits.

1    the claim they filed would be precluded, but an ineffective-trial-counsel claim for

2    failure to file the motion challenging the grand jury issue would not have been.

3         Post-conviction counsel was clearly aware of and troubled by the facts

4    supporting this claim. Indeed, post-conviction counsel included in their petition the

5    underlying facts, including that Kiles's trial counsel Greg Clark "planned to file a

6    Rule 12.9 motion to remand for new grand jury proceedings," and attached his draft

7    motion as an exhibit. (ROA 1189 at 41; PFR2 Dkt. 21 Ex.6.) The post-conviction

8    petition details how Clark told the court he planned to file a motion to remand but

9    never did. (ROA 1189 at 12.) Post-conviction counsel also explained in the state

10   petition that Mary Boyte, Kiles's first post-conviction counsel, moved to withdraw

11   due to Clark's deficient performance, including his failure to file the motion to

12   remand for over nine months and failure to review the post-conviction counsel file.

13   (ROA 1189 at 12–13.) Post-conviction counsel also noted in the petition's

14   discussion of the grand jury claim that Kiles's second-chair trial counsel Treasure

15   VanDreumel "appeared to be unaware" of an affidavit from Kiles's first post-

16   conviction proceedings that supported this issue, as "[s]he did not read the PCR file

17   prior to trial." (ROA 1189 at 42.) A challenge to the grand jury proceedings was the

18   first claim raised in Kiles's first post-conviction petition. (ROA 314 at 3–13.) Kiles

19   received relief from his conviction and sentence in his first post-conviction

20   proceedings. (ROA 314.)

21        Second trial counsel's failure to review the file was deficient performance,

22   and prejudiced Kiles. *See Rompilla*, 545 U.S. at 383–84 (counsel performed

23   deficiently when they were on notice that a readily available file had relevant,

24   helpful information but failed to review it). It was below prevailing professional

25   norms for post-conviction counsel to fail to frame this claim in a way that it could

26   be considered by the post-conviction court, when they were fully aware of the

27   supporting facts.

28        This is especially problematic when the record itself included signs of

1   deficient performance by trial counsel. Counsel requested an extension of time to
2   file a motion to challenge the grand-jury proceedings, but then never filed the
3   motion. (ROA 388 at 1–2; Pet. at 392–93.) Trial counsel's failure to file this
4   motion—which he himself noted was "fruitful" (Tr. Apr. 2, 1999 at 4), and which
5   caused, in part, co-counsel to resign (ROA 409 at 2; Tr. Aug. 6, 1999 at 15)—was
6   deficient performance. Further, Kiles himself had filed a motion pro per
7   complaining that the grand jury remand motion had not been filed in July 1999, and
8   raised it again with the court that October. (ROA 407 at 7; Tr. Oct 8, 1999 at 75.)

9       Post-conviction counsel should have known that the claim they raised
10  regarding the need to remand for a new grand jury was going to be precluded, but
11  an ineffective-assistance claim for failure to file the grand jury motion during trial
12  would not have been. It was unreasonable for post-conviction counsel to fail to raise
13  this claim, and prejudiced Kiles.

14          **B.    Respondents fail to rebut the merits of this claim.**

15      Respondents' arguments regarding the merits of this claim ignore that it is an
16  ineffective-assistance-of-counsel claim, and thus should be analyzed under
17  *Strickland*, 466 U.S. at 691–92. Instead, Respondents treat the claim as though it is
18  a standalone challenge to the grand-jury proceedings.

19      However, the claim Kiles asserts presently is based on trial counsel's
20  deficient performance and resulting prejudice, and on post-conviction counsel's
21  failure to assert an ineffective-assistance claim based on that, and should have been
22  analyzed under the relevant ineffective assistance of counsel case law. Respondents
23  make no effort to address this claim under the mandated framework for ineffective
24  assistance-of-counsel claims. And, Respondents make no effort to respond to
25  Kiles's argument that trial counsel Greg Clark performed deficiently by failing to
26  file a motion to remand that he stated on the record was justified (Tr. Apr. 2, 1999
27  at 3–4), and that he failed to file not based on reasoned, strategic judgment.

28      Respondents' arguments rely on the state post-conviction court's ruling on

post-conviction counsel's motion challenging the grand jury, which was procedurally defaulted. (ROA 1214 at 1.) Just because the post-conviction court denied that claim does not mean that a motion by Clark before Kiles's re-trial had begun would have also been denied.

Respondents' arguments regarding Imojean Kiles are incorrect. Respondents' argument that Imojean Kiles was not an incompetent witness because of the judge's finding in 2000 that in that year she was feigning memory loss is irrelevant. (*See* Answer at 132–34.) This argument ignores that in 1989, Imojean Kiles was an incompetent witness due to being under the influence of drugs and alcohol. In addition to her 2000 trial testimony (Tr. Jul. 10, 2000 at 110–11), two sworn affidavits filed in state court by Imojean Kiles and her friend support this (PFR2 Dkt. 23 Ex. 19 at ¶ 40; PFR2 Dkt. 27 Ex. 22 at ¶¶ 11–12). Clark should have known of the existence and contents of these affidavits, as they were filed with Kiles's first post-conviction proceedings, which resulted in Kiles's conviction and sentence being overturned due to ineffective assistance of counsel. (See ROA 225 Exs. 37, 42; ROA 314.) Respondents' contention that Imojean Kiles answered "appropriately and coherently to the questioning at the grand jury proceeding" (Answer at 133) is belied by a plain reading of the transcript. (*E.g.*, Tr. Feb. 21, 1989 at 63–64.) Even if she testified that medication and alcohol do not cause her to lie, this does not mean she was a competent witness while under the influence.

Further, Respondents' statement that "Kiles points to nothing indicating that Imojean was actually under the influence at the time of her grand jury testimony" (Answer at 134) is incorrect. As discussed above, two sworn affidavits by two different people, as well as Imojean Kiles's trial testimony, indicate that she was under the influence at the time of her grand jury testimony. (Tr. Jul. 10, 2000 at 110–11; PFR2 Dkt. 23 Ex. 19 at ¶ 40; PFR2 Dkt. 27 Ex. 22 at ¶¶ 11–12).

Respondents also ignore Kiles's argument that the grand jury proceedings were infected by prosecutorial misconduct, because the prosecutor knew that

Imojean Kiles was under the influence of alcohol and nerve pills when she testified. (*See* Pet. at 395–96.) A sworn affidavit filed in post-conviction proceedings supports this. (PFR2 Dkt. 23 Ex. 19 at ¶ 40.) Respondents make no effort to address Kiles's argument that a prosecutor has a duty to ensure that justice is done at a grand-jury proceeding. The prosecutor violated this duty—and Kiles's due-process rights—when he had Imojean Kiles testify before the grand jury, knowing that she was an incompetent witness.

Respondents' arguments about the racial make-up of the grand jury and Yuma County's improper methods for jury selection ignore the information in the record regarding the grand jury's racial composition, and that Kiles has presented a prima facie case of an Equal Protection Clause violation. (Answer at 134–35; Pet. at 397–98; ROA 225 at 4–5; ROA 225 Ex. 63 at 2–3, ROA 225 Ex. 55 at 1.)

### C.    Respondents rely on an incorrect prejudice standard.

In addressing Kiles's argument that he was prejudiced by this deficient performance, Respondents rely on the prejudice standard in *Brecht v. Abrahamson*, 507 U.S. 619 (1993). (*See* Answer at 138.) Because this claim asserts ineffective assistance of counsel, the proper prejudice inquiry is instead the one found in *Strickland*, 466 U.S. at 694—whether counsel's deficient performance undermines confidence in the outcome of Kiles's case. Kiles's claim meets the *Strickland* standard, as there is a reasonable probability Clark's motion would have prevailed had he filed it. Respondents have waived any argument to the contrary.

In sum, defense counsel's constitutionally deficient performance in failing to file a motion to remand for a new grand jury proceeding due to a lack of attention and diligence was unreasonable under prevailing professional norms, and undermines confidence in the outcome of Kiles's trial, sentencing, and appeal. Post-conviction counsel's failure to raise this substantial claim was deficient performance, and Kiles can show at an evidentiary hearing that it prejudiced him. He is entitled to relief.

1

**Claim Fifteen**

2

3

**Counsel were ineffective for failing to ensure that critical portions of the record were preserved and recorded.**

4    Kiles incorporates by specific reference all facts, allegations, and arguments

5    made in his Petition and elsewhere in this Reply. Kiles relies on the arguments

6    raised in his Petition in support of this claim (*see* Pet. at 399–406), but specifically

7    replies to the following arguments made by Respondents.

8    **A.    Respondents fail to establish a procedural defense.**

9    The Court should reject Respondents' argument that "[b]ecause Kiles cannot

10    return and properly present this claim to the state courts, it is subject to an implied

11    bar, and therefore is procedurally defaulted from habeas review." (Answer at 135–

12    36.) Respondents do not demonstrate that this is the kind of claim that would be

13    barred if presented in the state courts beyond citing generally to Ariz. R. Crim. P.

14    32.1, 32.2, and 32.4, which govern successive petitions and the time bar, and federal

15    cases applying those rules. (Answer at 135–36.) They cite no Arizona cases

16    applying those rules. (Answer at 135–36.) Respondents fail to meet their burden of

17    specifically pleading and proving any default. *See Bennett*, 322 F.3d at 585; Section

18    II.B.2, *supra*.

19    Assuming arguendo that Respondents' general invocation of Arizona's

20    procedural rules suffices to establish procedural default, the Court can review the

21    merits of this claim because Kiles has made a colorable claim that ineffective

22    assistance of post-conviction counsel led to the default of this colorable

23    "substantial" ineffective-assistance-of-trial-counsel claim. *Martinez v. Ryan*, 566

24    U.S. 1, 18 (2012). Any default of these allegations should be excused due to the

25    ineffective assistance of post-conviction counsel under *Martinez*. *See* Section

26    II.B.3, *supra*. This Court should review these allegations on the merits. *Dickens v.*

27    *Ryan*, 740 F.3d 1302, 1321 (9th Cir. 2014) (en banc).

28    In arguing that this claim is procedurally defaulted, Respondents ignore the

1    governing case law establishing that there is cause and prejudice to excuse that this

2    claim was not raised in state court: *Martinez*, 566 U.S. 1. As discussed in Section

3    II.B.3, *supra*, a claim of trial counsel ineffectiveness may be considered in federal

4    court even where not raised in state court where the petitioner can show cause and

5    prejudice resulting from ineffective assistance of post-conviction counsel. *Id.*

6        Respondents are incorrect in asserting that Kiles has waived any challenge to

7    the procedural default of this claim because he "never specifically demonstrates

8    why the procedural defaults of these sub-claims should be excused." (Answer at

9    136.) First, in an application for a writ of habeas corpus, a petitioner alleges facts

10    and argues specific grounds for relief from an unconstitutional conviction, sentence,

11    or both. *See Franzen v. Brinkman*, 877 F.2d 26, 26 (9th Cir. 1989) (per curiam). On

12    its own, a petition need not prove entitlement to relief. Instead, a petitioner need

13    only set forth colorable claims, "alleg[ing] specific facts which, if true, would

14    entitle [the petitioner] to relief." *Earp v. Ornoski*, 431 F.3d 1158, 1167 n.4 (9th Cir.

15    2005) (quoting *Ortiz v. Stewart*, 149 F.3d 923, 934 (9th Cir. 1998)). Similarly, with

16    regard to procedural default, *Martinez* establishes that petitioner need only make

17    sufficient allegations that default should be excused where, as here, post-conviction

18    counsel ineffectively failed to present a substantial claim of trial counsel's

19    ineffectiveness. A petitioner need not prove cause and prejudice in his initial

20    pleadings. For the reasons discussed in his Petition and in this Reply, Kiles has

21    presented colorable claims. Accordingly, he is entitled to further factual

22    development of these claims, including an evidentiary hearing, through which he

23    will establish his right to relief.

24        Second, though the burden does not rest with Kiles, the Petition specifically

25    explains why the procedural default of this claim should be excused, that he can

26    show cause and prejudice,

27        as the ineffective assistance of Kiles's state post-conviction
     counsel in failing to raise this claim constitutes cause for
28        the default and resulted in prejudice to Kiles. *See Martinez*

1

2

3

4

5

> *v. Ryan*, 566 U.S. 1, 9 (2012); *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). Kiles will demonstrate at an evidentiary hearing that state post-conviction counsel fell below the standards of minimally competent capital post-conviction attorneys when they failed to raise this meritorious claim.

6

7

8

(*See* Pet. at 399–400.) Kiles specifically explained that post-conviction counsel performed deficiently in failing to raise this claim with some merit in post-conviction proceedings, resulting in prejudice to Kiles.

9

> **B.    Respondents fail to rebut the merits of this claim.**

10

11

12

13

14

15

16

Respondents include a discussion about "clearly established federal law" in their answer to this claim. (Answer at 136.) However, because no state court has ruled on this claim's merits, this requirement from § 2254(d)(1) does not apply. *See, e.g.*, *Williams v. Ryan*, 623 F.3d 1258, 1264 (9th Cir. 2010). In any event, this is an ineffective-assistance claim, and the right to effective counsel was clearly established by *Strickland v. Washington*, 466 U.S. 668 (1984), even though Respondents do not address the *Strickland* standard.

17

18

19

20

21

22

23

24

25

26

27

28

Next, Respondents include a long passage from *White v. Ryan*, No. CV-08-08139, 2015 WL 4173343, at *24 (D. Ariz. July 10, 2015), *rev'd and remanded*, 895 F.3d 641 (9th Cir. 2018). (Answer at 137–38.) First, this passage addresses a trial-court-error claim, not an ineffective-assistance claim, and thus the standard for assessing a constitutional violation and resulting prejudice cited in that decision are inapplicable. Respondents appear to assert an incorrect standard, arguing that Kiles must prove a due process violation. (Answer at 137–38.) But this is a claim of ineffective assistance. Accordingly, *Strickland* applies despite Respondents' failure to acknowledge the relevant law. Second, *White v. Ryan*, No. CV-08-08139, 2015 WL 4173343, was reversed by *White v. Ryan*, 895 F.3d 641, 673 (9th Cir. 2018). The Ninth Circuit in *White*, 895 F.3d 641, found that White was entitled to habeas relief because he received constitutionally ineffective assistance of counsel,

1   reversing the district court's judgment as to White's counsel's performance.

2       Third, Respondents argue that "Kiles fails to demonstrate how the failure to

3   record these conferences deprived him of his right to a meaningful appeal and

4   merely speculates about various parts of the trial." (Answer at 138.) This merely

5   underscores the need for evidentiary development and an evidentiary hearing on

6   this claim. As discussed *supra*, a petitioner need not prove entitlement to relief.

7   Instead, a petitioner need only set forth colorable claims, "alleg[ing] specific facts

8   which, if true, would entitle [the petitioner] to relief." *Earp*, 431 F.3d at 1167 n.4.

9   For a claim such as this one, which was not heard in state court due to state post-

10  conviction counsel's ineffective assistance, as long as the petitioner can plead a

11  claim that has "some merit," he is entitled to a hearing. Kiles has presented a claim

12  of ineffective assistance of trial counsel that has "some merit." *See Martinez*, 566

13  U.S. at 14. (*See* Pet. at 400–06.)

14      Conducting a full merits review on an undeveloped record would frustrate

15  the intention of *Martinez* to avoid the circumstance of a prisoner never receiving a

16  proper hearing on a claim involving a "bedrock principle" such as the right to

17  effective counsel. *Martinez*, 566 U.S. at 12; *see also Detrich*, 740 F.3d 1237, 1247

18  (9th Cir. 2013).

19      Last, Respondents' claim that the fact that Kiles's counsel was present during

20  the extensive off-the-record proceedings and did not object to the absence of Kiles

21  or a court reporter means that nothing of importance was discussed is belied by the

22  record. As Kiles explained in his Petition, the record surrounding these gaps in the

23  record make clear that the conferences were not exclusively administrative or

24  routine.[50] (*See* Pet. at 402–03.) For example, the state court record makes clear that

---

[50] Tr. July 7, 2000 at 139; Tr. July 10, 2000 at 82; Tr. July 10, 2000 at 140; Tr. July 10, 2000 at 174; Tr. July 11, 2000 at 62; Tr. July 11, 2000 at 83; Tr. July 12, 2000 at 9; Tr. July 12, 2000 at 30; Tr. July 12, 2000 at 82 ("THE COURT: We are back on the record. We talked about several things."); Tr. July 13, 2000 at 75; Tr. July 17, 2000 at 144; Tr. July 17, 2000 at 224; Tr. July 18, 2000 at 31; Tr. July 20, 2000

1  forms of verdict were discussed off the record. (Tr. July 18, 2000 at 31 ("THE

2  COURT: Okay. If you will stick around, we will informally go over the forms of

3  verdict. MS. VANDREUMEL: Thank you, Judge.").) This bears directly on Kiles's

4  conviction. As another example, 41 prospective jurors in the guilt phase of trial and

5  23 in the penalty phase of trial were removed without any discussion of why on the

6  record. (ROA 456; ROA 895; Tr. July 7, 2000 at 19–28; Tr. Mar. 6, 2006; Tr. Mar.

7  7, 2006; Tr. Mar. 8, 2006; Tr. Mar. 15, 2006 at 3–4; Tr. Mar. 16, 2006 at 2–3.)

8       Further, Kiles's counsel informed him that despite Kiles's protestations, he

9  would continue to have off-the-record discussions. (Tr. Aug. 6, 1999 at 13–14.)

10      Last, the record makes clear that many evidentiary and administrative matters

11 were handled on the record; it was not the court's practice to go off the record to

12 handle them. (*E.g.*, Tr. Feb. 26, 2001 at 12; Tr. Mar. 27, 2006 at 14; Tr. Apr. 11,

13 2006 at 3; Tr. Apr. 24, 2006 at 22, 37, 60, 83; Tr. Apr. 27, 2006 at 4; Tr. May 2,

14 2006 at 1–4.)

15      **C.    Respondents assert the incorrect standard for prejudice.**

16      Turning to Kiles's argument that he was prejudiced by this deficient

17 performance, Respondents rely on the standard in *Brecht*, 507 U.S. at 623. (Answer

18 at 138.) Because this claim asserts ineffective assistance of counsel, the proper

19 prejudice inquiry is instead found in *Strickland*, 466 U.S. at 694: whether counsel's

20 deficient performance undermines confidence in the outcome of Kiles's case.

21 Kiles's pleading meets the *Strickland* standard.

22      Defense counsel's constitutionally deficient performance in failing to make

23 a record of Kiles's case was unreasonable under prevailing professional norms, and

24 _____

25 at 2; Tr. July 20, 2000 at 3; *see* Tr. Mar. 20, 2006 at 178; Tr. Mar. 21, 2006 at 66;
   Tr. Mar. 21, 2006 at 98; Tr. Mar. 22, 2006 at 7; Tr. Mar. 22, 2006 at 27; Tr. Mar.
26 22, 2006 at 79; Tr. Mar. 23, 2006 at 31; Tr. Mar. 23, 2006 at 60; Tr. Mar. 29, 2006
27 at 54; Tr. Apr. 3, 2006 at 6; Tr. Apr. 3, 2006 at 76; Tr. Apr. 4, 2006 at 3– 4; Tr. Apr.
   4, 2006 at 5–6; Tr. Apr. 12, 2006 at 30; Tr. Apr. 26, 2006 at 23; Tr. Apr. 27, 2006
28 at 50; Tr. May 11, 2006 at 87–88; Tr. May 16, 2006 at 45.)

1   undermines confidence in the outcome of Kiles's trial, sentencing, and appeal. He

2   is entitled to relief.

3   <center>**Claim Sixteen**</center>

4   <center>**Capital punishment is per se cruel and unusual.**</center>

5   Kiles incorporates by specific reference all facts, allegations, and arguments

6   made in his Petition and elsewhere in this Reply.

7   Respondents acknowledge that this claim is exhausted, and they do not assert

8   any procedural defenses. (Answer at 138–39.) They assert instead that the Arizona

9   Supreme Court reasonably rejected this claim under 28 U.S.C. § 2254(d). (Answer

10   at 138–39.) With respect to this claim, as well as Claims 17 through 26, the Arizona

11   Supreme Court stated only that "Kiles raises several issues previously decided by

12   the Supreme Court, the Ninth Circuit Court of Appeals, or this Court to preserve

13   for federal review. These, with one exception, are listed in the attached appendix,

14   along with authority Kiles identifies as having rejected his arguments." *See State v.*

15   *Kiles*, 213 P.3d 174, 191 n.20 (Ariz. 2009).

16   Contrary to Respondents' argument (Answer at 138–39), the mere listing by

17   the state court is not a summary adjudication on the merits. The state court *declined*

18   to consider the merits of these claims in *Kiles's* case by merely listing them as

19   "previously decided." Accordingly, this claim, as well as Claims 17 through 26,

20   should be reviewed de novo rather than pursuant to § 2254(d). *See Johnson v.*

21   *Williams*, 568 U.S. 289, 302 (2013) ("The language of 28 U.S.C. § 2254(d) makes

22   it clear that this provision applies only when a federal claim was 'adjudicated *on*

23   *the merits* in State court.' A judgment is normally said to have been rendered 'on

24   the merits' only if it was "delivered after the court . . . heard and *evaluated* the

25   evidence and the parties' substantive arguments.'" (quoting Black's Law

26   Dictionary 1199 (9th ed. 2009))).

27   Assuming arguendo that this claim must be reviewed deferentially under

28   § 2254(d), however, Kiles is still entitled to relief. In support of their argument that

<center>230</center>

the Arizona Supreme Court's denial of this claim was reasonable, Respondents cite *Gregg v. Georgia*, 428 U.S. 153, 187 (1976). (Answer at 138.) Although the U.S. Supreme Court ruled in 1976 that capital punishment was not per se prohibited by the Eighth Amendment, the Court's decision rested in part on the belief that, at the time, the death penalty served the social purposes of retribution for, and deterrence of, capital crimes. *Gregg*, 428 U.S. at 183–84 (joint opinion of Stewart, Powell, and Stevens, JJ.).

As detailed in Kiles's Petition, evidence now demonstrates that the contemporary death penalty serves no penological purpose. (*See* Pet. at 406–09.) And the Supreme Court has recognized that a penalty without penological function is unconstitutional. *See Enmund v. Florida*, 458 U.S. 782, 798 (1982). Further, in *Gregg*, the Court relied on the widespread legislative approval of the death penalty in 1976. 428 U.S. at 179 (joint opinion of Stewart, Powell, and Stevens, JJ.). Now, however, the use of the death penalty is concentrated in a handful of counties. *See Glossip v. Gross*, 135 S. Ct. 2726, 2761 (2015) (Breyer, J., dissenting) (citing Richard C. Deiter, *The 2% Death Penalty: How a Minority of Counties Produce Most Death Cases at Enormous Costs to All* 9 (Oct. 2013).)

In addition, *Furman v. Georgia*, 408 U.S. 238 (1972) (per curiam), established that the death penalty violates the Eighth and Fourteenth Amendments when the process is unreliable and the imposition of a death sentence turns on irrelevant factors. *See, e.g.*, 408 U.S. at 309–10 (Stewart, J., concurring)[51] (holding the death penalty unconstitutional when prisoners who receive it have been essentially "struck by lightning"—a "capriciously selected random handful"). When the death penalty is "seldom" imposed, its "marginal contributions to any discernible social or public purposes" make it "patently excessive and cruel and

---

[51] Justice Stewart's and Justice White's concurring opinions in *Furman* constitute the holding of the Court in that case, which lacked a majority or plurality opinion. *Gregg*, 428 U.S. at 169 n.15 (joint opinion of Stewart, Powell, and Stevens, JJ.).

unusual punishment." *Id.* at 312 (White, J., concurring). The Court further explained in *Gregg* that the death penalty is unconstitutional if it does not measurably contribute to either the goal of retribution or deterrence. 428 U.S. at 183–87 (joint opinion of Stewart, Powell, and Stevens, JJ.).

As explained in the Petition, the years that have elapsed since *Gregg* have proven that the death penalty is both unreliable and arbitrarily imposed. The death penalty also has little to no benefit beyond the alternative sentence of life imprisonment without parole. The specific circumstances present when Kiles raised his claim were not—and could not have been—before the Court in 1976. The intervening years have demonstrated that the death penalty is cruel and unusual.

The Arizona Supreme Court failed to evaluate in Kiles's case whether imposition of the death penalty violates the evolving standards of decency, whether it serves a penological purpose, or whether death is imposed arbitrarily or capriciously. That failure resulted in a decision that was contrary to, or an unreasonable application of, the Supreme Court's holdings in *Furman*, *Gregg*, and *Enmund* as well as an unreasonable determination of the facts.

### Claim Seventeen

**Arizona's death-penalty statute unconstitutionally serves no deterrent purpose, exceeds any legitimate retributive aim, is without penological justification, and results in the gratuitous infliction of suffering.**

Kiles incorporates by specific reference all facts, allegations, and arguments made in his Petition and elsewhere in this Reply.

Respondents acknowledge that this claim is exhausted, and they do not assert any procedural defenses. (Answer at 139.) Their assertion that the Arizona Supreme Court adjudicated this claim on the merits by listing it in the appendix (Answer at 139) fails as set forth in Claim 16.

Assuming arguendo that this claim must be reviewed deferentially under 28 U.S.C. § 2254(d), however, Kiles is still entitled to relief. Respondents incorrectly

assert that Kiles cited "no clearly established federal law" (Answer at 139), but that ignores *Furman*, 408 U.S. 312 (White, J., concurring) (Pet. at 411–12). When the death penalty is "seldom" imposed, as it is now, its "marginal contributions to any discernible social or public purposes" make it "patently excessive and cruel and unusual punishment." *Furman*, 408 U.S. at 312 (White, J., concurring). "[T]he penalty is so infrequently imposed that the threat of execution is too attenuated to be of substantial service to criminal justice." *Id.* at 313. With life-without-parole available as an alternative, the marginal societal benefits of the death penalty render it patently cruel and unusual. The Arizona Supreme Court's decision was therefore contrary to, and an unreasonable determination of, clearly established federal law, and an unreasonable determination of the facts. Further, Kiles is entitled to relief on the merits of this claim.

## Claim Eighteen
**Arizona's capital-sentencing scheme unconstitutionally does not genuinely narrow the murder cases eligible for the death penalty and fails to channel the discretion of the sentencing jury.**

Kiles incorporates by specific reference all facts, allegations, and arguments made in his Petition and elsewhere in this Reply.

Respondents acknowledge that this claim is exhausted, and they do not assert any procedural defenses. (Answer at 139.) Their assertion that the Arizona Supreme Court adjudicated this claim on the merits by listing it in the appendix (Answer at 139) fails as set forth in Claim 16.

Assuming arguendo that this claim must be reviewed deferentially under 28 U.S.C. § 2254(d), however, Kiles is still entitled to relief for the reasons explained in his Petition. (*See* Pet. at 412–15.)

## Claim Nineteen
**Arizona's capital-sentencing scheme unconstitutionally affords the prosecutor unlimited discretion to seek the death penalty.**

Kiles incorporates by specific reference all facts, allegations, and arguments made in his Petition and elsewhere in this Reply.

243 of 261

1    Respondents acknowledge that this claim is exhausted, and they do not assert
2    any procedural defenses. (Answer at 139–40.) Their assertion that the Arizona
3    Supreme Court adjudicated this claim on the merits by listing it in the appendix
4    (Answer at 139–40) fails as set forth in Claim 16.

5    Assuming arguendo that this claim must be reviewed deferentially under 28
6    U.S.C. § 2254(d), however, Kiles is still entitled to relief. Respondents incorrectly
7    rely on *Gregg v. Georgia*, 428 U.S. 153 (1976). (*See* Answer at 140.) *Gregg* did not
8    hold that a prosecutor's unfettered discretion cannot violate the Eighth Amendment.
9    Instead, *Gregg* commented that the discretionary action does not, on its own, render
10   a capital-punishment scheme unconstitutional, where that discretion permits an
11   actor to remove a defendant from consideration as a death-penalty candidate. 428
12   U.S. at 199 (joint opinion of Stewart, Powell, and Stevens, JJ.). That noted, a
13   system—like Arizona's—that grants the prosecutor unbridled discretion leads to
14   the wanton and freakish imposition of the death penalty. *See Furman v. Georgia*,
15   408 U.S. 238, 310 (1972) (Stewart, J., concurring).

16   Respondents also suggest that Kiles could have asked the trial court to
17   determine if probable cause existed for the aggravating circumstances under the
18   procedures outlined in *Chronis v. Steinle*, 208 P.3d 210 (Ariz. 2009). (*See* Answer
19   at 140 (citing Ariz. R. Crim. P. 13.5(c); *Chronis*, 208 P.3d at 213–14, ¶¶ 15–20).)
20   But because *Chronis* was not decided until 2009—years after Kiles was sentenced
21   to death (ROA 919; Tr. June 13, 2006 at 9–11)—a "*Chronis* hearing" was not
22   available to Kiles. Thus, Respondents fail to refute that the Arizona Supreme
23   Court's denial of this claim was contrary to, and an unreasonable application of,
24   clearly established federal law, and was based on an unreasonable determination of
25   the facts. *See* § 2254(d). They also fail to rebut this claim on the merits, and Kiles
26   is entitled to relief.

27

28   / / /

**Claim Twenty**

**Arizona's capital-sentencing scheme is unconstitutional because it does not require the State to prove, or the jury to find beyond a reasonable doubt, that the aggravating factors outweighed the mitigating circumstances.**

Kiles incorporates by specific reference all facts, allegations, and arguments made in his Petition and elsewhere in this Reply. Despite recent U.S. Supreme Court precedent to the contrary, Kiles respectfully maintains that the Sixth Amendment requires that a jury specifically find that the proven aggravating factors in a capital trial outweigh the mitigating circumstances in order for imposition of the death penalty to be constitutional. *See McKinney v. Arizona*, No. 18-1109, 2020 WL 889190 at *5 (U.S. Feb. 25, 2020) (Ginsburg, J. dissenting).

**Claim Twenty-One**

**Arizona's capital-sentencing scheme unconstitutionally requires a defendant to affirmatively prove that the jury should spare his life.**

Respondents acknowledge that this claim is exhausted, and they do not assert any procedural defenses. (Answer at 142.) To the extent Respondents assert that the Arizona Supreme Court adjudicated this claim on the merits by listing it in the appendix (Answer at 142), that assertion fails as set forth in Claim 16. On the merits of this claim, Kiles rests on the arguments in the Petition. (Pet. at 421–23.)

**Claim Twenty-Two**

**Arizona's capital-sentencing scheme unconstitutionally fails to require the cumulative consideration of mitigation.**

Kiles incorporates by specific reference all facts, allegations, and arguments made in his Petition and elsewhere in this Reply.

Respondents do not separately respond to this claim; rather, Respondents treat Claim 22 together with Claim 23 in their Answer. (*See* Answer at 142–43.) They then argue that this "combined" claim is exhausted and do not assert any procedural defenses. (Answer at 142.) Kiles therefore relies on the facts and

arguments presented in his Petition (Pet. at 423–26), as well as the arguments made in this Reply in Claim 23, *infra*, in support of this claim. Kiles specifically incorporates his arguments in Claim 23, *infra*, to respond to any arguments by Respondents that Claim 22 was adjudicated on the merits by the Arizona Supreme Court or that this claim cannot succeed on the merits.

<div align="center">

### Claim Twenty-Three

**Arizona's death-penalty statute is unconstitutional because it fails to require the jury to make specific findings as to each mitigating circumstance.**

</div>

Respondents do not separately respond to this claim; rather, Respondents treat Claim 23 together with Claim 22 in their Answer. (*See* Answer at 142–43.) They then argue that this "combined" claim is exhausted and do not assert any procedural defenses. (Answer at 142.) To the extent Respondents assert that the Arizona Supreme Court adjudicated this claim on the merits by listing it in the appendix (Answer at 142), that assertion fails as set forth in Claim 16.

Assuming arguendo that this claim must be reviewed deferentially under 28 U.S.C. § 2254(d), however, Kiles is still entitled to relief. Kiles rests on the arguments in the Petition as to the merits of this claim (Pet. at 424–26), as well as his arguments in his Petition and this Reply concerning Claim 22 (Pet. at 423–24; Claim 22, *supra*), but specifically replies to the following contention made by Respondents. *But see McKinney v. Arizona*, No. 18-1109, 2020 WL 889190 (U.S. Feb. 25, 2020).

They assert that Kiles "cannot demonstrate that he was denied a fair sentencing, because he proffers no evidence that suggests the jurors failed to consider any of the mitigation in his case." (Answer at 143.) This answer is nonresponsive. Kiles alleged in his Petition that the harm arising from the lack of special verdict forms for mitigation is that the Arizona Supreme Court could not determine what circumstances the jury found to be mitigating and entitled to weight. *Contra Gardner v. Florida*, 430 U.S. 349, 361 (1977) (plurality opinion) ("[I]t is

important that the record on appeal disclose to the reviewing court the considerations which motivated the death sentence in every case in which it is imposed."). As a result, the Arizona Supreme Court simply substituted its own judgment for the jury's when it found mitigating circumstances and determined that those circumstances were insufficiently weighty to call for a life sentence. The adequacy of this claim does not turn on allegations or proof that the jurors failed to consider any mitigation. This claim centers on the denial of the right to meaningful appeal. Accordingly, Kiles is entitled to relief on the merits of this claim.

<div align="center">

**Claim Twenty-Four**

</div>

**Arizona's capital-sentencing scheme unconstitutionally limits the jury's full consideration of mitigation by requiring that mitigating circumstances be proven by a preponderance of the evidence.**

Kiles incorporates by specific reference all facts, allegations, and arguments made in his Petition and elsewhere in this Reply.

Respondents acknowledge that this claim is exhausted, and they do not assert any procedural defenses. (Answer at 143.) To the extent Respondents assert that the Arizona Supreme Court adjudicated this claim on the merits by listing it in the appendix (Answer at 143–46), that assertion fails as set forth in Claim 16.

Assuming arguendo that this claim must be reviewed deferentially under 28 U.S.C. § 2254(d), however, Kiles is still entitled to relief for the reasons explained in his Petition. (*See* Pet. at 426–27.)

<div align="center">

**Claim Twenty-Five**

</div>

**Arizona's capital-sentencing scheme unconstitutionally fails to set forth objective standards to guide the sentencer in weighing the aggravating circumstances against the mitigating circumstances.**

Kiles incorporates by specific reference all facts, allegations, and arguments made in his Petition and elsewhere in this Reply.

Respondents acknowledge that this claim is exhausted, and they do not assert any procedural defenses. (Answer at 146.) Their assertion that the Arizona Supreme Court adjudicated this claim on the merits by listing it in the appendix (Answer at

1    146) fails as set forth in Claim 16.

2        Assuming arguendo that this claim must be reviewed deferentially under 28
3    U.S.C. § 2254(d), however, Kiles is still entitled to relief. Respondents repeat their
4    argument from Claim 18 that Arizona's death penalty statute has been upheld
5    "against allegations that particular aggravating factors do not adequately narrow the
6    sentencer's discretion." (*See* Answer at 139, 146.) This answer is nonresponsive.
7    Kiles alleged in his Petition that there was no individualized sentencing
8    determination in his case because the sentencing jury had no guidance regarding
9    how to determine whether the mitigating evidence presented was sufficiently
10   substantial to call for leniency. (*See* Pet. at 428.) Accordingly, Kiles stands by the
11   arguments raised in his Petition concerning the merits of this claim (Pet. at 427–
12   28), as well as his arguments in his Petition and this Reply concerning Claim 18
13   (Pet. at 412–15; Claim 18, *supra*).

14                              **Claim Twenty-Six**
15   **Arizona's capital-sentencing scheme unconstitutionally denies**
16   **capital defendants the benefit of proportionality review of their**
     **sentences.**

17       Kiles incorporates by specific reference all facts, allegations, and arguments
18   made in his Petition and elsewhere in this Reply.

19       Respondents acknowledge that this claim is exhausted, and they do not assert
20   any procedural defenses. (Answer at 146.) To the extent Respondents assert that the
21   Arizona Supreme Court adjudicated this claim on the merits by listing it in the
22   appendix (Answer at 146–47), that assertion fails as set forth in Claim 16.

23       Assuming arguendo that this claim must be reviewed deferentially under 28
24   U.S.C. § 2254(d), however, Kiles is still entitled to relief. The U.S. Supreme Court
25   has recognized the critical role proportionality review plays in avoiding arbitrary
26   death sentences. *See Gregg*, 428 U.S. at 203–06 (joint opinion of Stewart, Powell,
27   and Stevens, JJ.). Respondents contend that there is no federal constitutional right
28   to proportionality review, citing *McCleskey v. Kemp*, 481 U.S. 279, 306 (1987), and

*Pulley v. Harris*, 465 U.S. 37, 43-44 (1984). (Answer at 146.) However, the holding articulated in *Pulley* was not that proportionality review is never required. Instead, the *Pulley* Court ruled that proportionality review is not constitutionally mandated when a death-penalty statute has sufficient alternative safeguards to protect against the infliction of arbitrary and capricious sentences. *Pulley*, 465 U.S. at 44–54. But Arizona's death-penalty statute does not have adequate alternative safeguards against arbitrary application, *see*, *e.g*., Claims 18 and 20, and thus Arizona's capital-sentencing scheme is further compromised by its lack of proportionality review.

Similarly, Respondents reliance on *Ceja v. Stewart*, 97 F.3d 1246 (9th Cir. 1996), is misplaced because *Ceja* assumed that proportionality review is not necessary only where there are adequately narrowed aggravating circumstances. But, as explained in Claims 18, 29, and 30, Arizona's aggravating circumstances, including the ones applied in this case, are inadequate to satisfy the constitutional narrowing function and to protect against disproportionate sentencing. The Arizona Supreme Court's denial of this claim was therefore contrary to, and an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts. *See* § 2254(d). Further, Kiles is entitled to relief on the merits.

### Claim Twenty-Seven

**Arizona's death-penalty scheme unconstitutionally discriminates against poor, young, African-American male defendants.**

Kiles incorporates by specific reference all facts, allegations, and arguments made in his Petition and elsewhere in this Reply.

Respondents summarily assert that this claim is procedurally defaulted. (Answer at 147.) Respondents' failure to fully plead and prove the procedural bar relied upon, including their failure to demonstrate that it is adequate and independent, means that this Court's review is not barred by the doctrine of procedural default. *See* Section II.B.2, *supra*; *see also Bennett*, 322 F.3d at 585.

1  Because Respondents have failed to argue against Kiles's invocation of *Martinez*
2  and the fundamental miscarriage of justice doctrine, he rests on his Petition as to
3  those matters. (*See* Pet. at 429–31.)

4       Kiles further rests on the statistical evidence in his Petition and not factually
5  contested by Respondents that demonstrates that Arizona's capital sentencing
6  scheme discriminates against poor, young, male, African-American defendants.
7  Kiles suffered prejudice as a result of this pattern of discrimination, and is entitled
8  to relief under the Due Process Clause and the Equal Protection Clause of the
9  Fourteenth Amendment. (*See* Pet. at 430–31.)

10  <div align="center">**Claim Twenty-Eight**</div>

11  **The death qualification of Kiles's guilt- and penalty-phase juries
12  was unconstitutional.**

13       Kiles incorporates by specific reference all facts, allegations, and arguments
14  made in his Petition and elsewhere in this Reply.

15       Respondents summarily assert that this claim is procedurally defaulted.[52]
16  (Answer at 147.) But a substantial record of this claim was made at the trial level,
17  thus the Arizona Supreme Court was on notice of this claim, and impliedly
18  addressed it during its independent review. (*See* Pet. at 432; *Comer v. Schriro*, 480
19  F.3d 960, 981 (9th Cir. 2007) (en banc).) Thus, it was exhausted.

20       The state-court denial of this claim was contrary to or an unreasonable
21  application of federal law clearly established by *Wainwright v. Witt*, 469 U.S. 412,
22  439 (1985) (Brennan, J., dissenting); *Morgan v. Illinois*, 504 U.S. 719, 726–27
23  (1992); *Groppi v. Wisconsin*, 400 U.S. 505, 509 (1971); and *Taylor v. Louisiana*,
24  419 U.S. 522, 537 (1975). Further, it turned on an unreasonable determination of
25  fact. *See* 28 U.S.C. § 2254(d). Accordingly, this Court may consider the merits of

---

26  [52] As noted in Section II.B.2, *supra*, Respondents' failure to fully plead and prove
27  any procedural bar relied upon, including Respondents' failure to demonstrate that
28  it is adequate and independent, means this Court's review is not barred by the
doctrine of procedural default. *See also Bennett*, 322 F.3d at 585.

1    this claim de novo. [53]

2         In addressing the merits, Respondents argue that as a general matter the
3    Constitution does not forbid death-qualification of a jury. (Answer at 148.) But
4    Respondents ignore Kiles's contention that death-qualification violated his rights
5    under the Sixth, Eighth and Fourteenth Amendments because it was used to select
6    his guilt-phase jury which—under then-existing Arizona law—would not be asked
7    to render a sentence. (*See* Pet. at 432; ROA 493 at 2–3); *see also Wainwright*, 469
8    U.S. at 460 (Brennan, J., dissenting) ("Death-qualification works to the advantage
9    of only the prosecutor; if not carefully controlled, it is [a] tool with which the
10   prosecutor can create a jury perhaps predisposed to convict…"); *State v. Anderson*,
11   4 P.3d 369, 375 (Ariz. 2000) ("It would . . . defy reality to conclude that a jury's
12   determination of guilt or innocence in a first-degree murder prosecution is
13   unaffected after . . . the jurors have learned . . . that death is a potential result of a
14   guilty verdict.").

15        The fact that death-qualified juries are more likely to convict, and to convict
16   of more serious crimes, than non-death-qualified juries has been borne out by
17   numerous empirical studies. (*See* Pet. at 433–34); *see also Wainwright*, 469 U.S. at
18   460, n. 11. This intrusion on constitutional rights is not justified where, in states
19   like Arizona prior to *Ring v. Arizona*, 536 U.S. 584 (2002), juries were not called
20   upon to decide the sentence in a capital trial. Because the jury that was impaneled
21   was selected in a manner with no purpose other than to increase the likelihood of a
22   conviction, Kiles need not demonstrate particularized prejudice under *Brecht v.*

---

[53] In the alternative, any default of the claim can be overcome because appellate counsel rendered ineffective assistance in failing to properly raise this claim. *See Coleman*, 501 U.S. at 753–54 ; *Murray v. Carrier*, 477 U.S. 478, 488 (1986). And, post-conviction counsel performed deficiently by failing to raise this substantial claim of ineffective assistance of appellate counsel. (*See* Claim 11, *supra*; Pet. at 343); *Martinez v. Ryan*, 566 U.S. 1, 15–16 (2012); *but see Davila v. Davis*, 137 S. Ct. 2058 (2017.). Assuming arguendo that this claim was not addressed by the state courts, this Court should review it de novo.

1    *Abrahamson*, 507 U.S. 619, 623 (1993). (*See* Answer at 149); *Witherspoon v.*

2    *Illinois*, 391 U.S. 510, 522 (1968)). Further, the burden to prove that a constitutional

3    deprivation did not cause prejudice under *Brecht* always rests with the State. *See*

4    Section II.B.4, *supra*, *Davis v. Ayala*, 135 S. Ct. 2187, 2197 (2015); *see also Brecht*,

5    507 U.S. at 640–41 (Stevens, J., concurring).

6        As to all other arguments Kiles stands on the merits of his Petition. (Pet. at

7    431–34.) He is entitled to relief due to the unconstitutional jury-selection process

8    employed here.

9    <div align="center">**Claim Twenty-Nine**</div>

10
11    **The "especially heinous, cruel or depraved" aggravating circumstance is unconstitutionally vague.**

12    Kiles incorporates by specific reference all facts, allegations, and arguments

13    made in his Petition and elsewhere in this Reply.

14    Respondents summarily assert that this claim is procedurally defaulted.[54]

15    (Answer at 149.) But trial counsel moved to dismiss the A.R.S. § 13-703(F)(6)

16    aggravator before sentencing because it was unconstitutionally vague and

17    overbroad, and was applied in an arbitrary and capricious manner. (ROA at 600.)

18    As this issue was substantially presented in the trial court, the Arizona Supreme

19    Court implicitly addressed it during that court's independent review in this case.

20    *See Comer v. Schriro*, 480 F.3d 960, 981 (9th Cir. 2007) (en banc). Indeed,

21    Respondents argue that the Arizona Supreme Court reviewed this claim on

22    independent review, thus undermining their conclusory assertion that the claim is

23    procedurally defaulted. (Answer at 149.) The state-court denial of this claim was

24    contrary to or an unreasonable application of clearly established federal law, and

25    was based on an unreasonable determination of fact. *See* 28 U.S.C. § 2254(d).

---

26    [54] As noted in Section II.B.2, *supra*, Respondents' failure to fully plead and prove

27    the procedural bar relied upon, including Respondents' failure to demonstrate that

28    it is adequate and independent, means that this Court's review is not barred by the
doctrine of procedural default. *See also Bennett*, 322 F.3d at 585.

1   Accordingly, this Court may review the merits of this claim de novo.[55] As to the

2   merits, Kiles rests on the arguments in his Petition. (Pet. at 434–38.)

3                                    **Claim Thirty**

4   **Arizona's prior felony conviction aggravating circumstance is**
    **unconstitutionally vague.**

5

6       Kiles incorporates by specific reference all facts, allegations, and arguments

7   made in his Petition and elsewhere in this Reply.

8       Respondents argue that this claim is "admittedly procedurally defaulted".

9   (Answer at 150.) Kiles makes no such admission. Rather, as Kiles asserts in his

10  Petition, this matter was not presented in state court. (Pet. at 439.) But the Arizona

11  Supreme Court implicitly considered the claim during its independent review of the

12  aggravating and mitigating circumstances. *See Kiles*, 213 P.3d at 187–88; *see also*

13  *Comer*, 480 F.3d at 981 (en banc). The Arizona Supreme Court's denial of this

14  claim was contrary to, or involved an unreasonable application of clearly

15  established federal law, and was based on an unreasonable determination of fact.

16  28 U.S.C. § 2254(d).[56]

17      On the merits, Kiles rests on the arguments in his Petition. (Pet. at 439–40.)

18  _____

19  [55] In the alternative, any default of the claim can be overcome because appellate
    counsel rendered ineffective assistance in failing to properly raise this claim. *See*
20  *Coleman*, 501 U.S. at 753–54; *Carrier*, 477 U.S. at 488. And, post-conviction
    counsel performed deficiently by failing to raise this substantial claim of ineffective
21  assistance of appellate counsel. (*See* Claim 11, *supra*; Pet. at 343; *Martinez* 566
    U.S. at 15–16; *but see Davila*, 137 S. Ct. 2058.) Assuming arguendo that this claim
22  was not addressed by the state courts, this Court should review it de novo.

23  [56] In the alternative, any default of the claim can be overcome because appellate
24  counsel rendered ineffective assistance in failing to properly raise this claim. *See*
    *Coleman*, 501 U.S. at 753–54; *Carrier*, 477 U.S. at 488. And, post-conviction
25  counsel performed deficiently by failing to raise this substantial claim of ineffective
    assistance of appellate counsel. (*See* Claim 11, *supra*; Pet. at 343; *Martinez*, 566
26  U.S. at 15–16; *but see Davila v. Davis*, 137 S. Ct. 2058 (2017).) Assuming arguendo
27  that this claim was not addressed by the state courts, this Court should review it de
    novo.
28

1

**Claim Thirty-One**

2

**Kiles is innocent of first-degree murder and of the death penalty.**

3       Kiles incorporates by specific reference all facts, allegations, and arguments

4   made in his Petition and elsewhere in this Reply.

5       Respondents assert that this claim is "admittedly procedurally defaulted."

6   (Answer at 150.) Kiles makes no such admission. Rather, as Kiles asserts in his

7   Petition, he did not present this matter in state court. (Pet. at 440.) Because this is a

8   free-standing innocence claim, declining to hear this claim on the merits would

9   result in a fundamental miscarriage of justice. Thus, this Court should disregard any

10  default. *See Coleman*, 501 U.S. at 735 n.1. In the alternative, any default of this

11  claim can be overcome because appellate counsel rendered ineffective assistance in

12  failing to properly raise this claim. *See id.* at 753–54; *Carrier*, 477 U.S. at 488. And,

13  post-conviction counsel performed deficiently by failing to raise this substantial

14  claim of ineffective assistance of appellate counsel. (*See* Claim 11, *supra*; Pet. at

15  343); *Martinez*, 566 U.S. at 15–16; *but see Davila v. Davis*, 137 S. Ct. 2058 (2017).

16  In either event, as this claim has not been adjudicated in state court, this Court may

17  consider the merits de novo. 28 U.S.C. § 2254(d).

18      On the merits, Kiles rests on the arguments in his Petition. (Pet. at 440–42.)

19  Because there was no premeditation involved in the crime for which Kiles faces

20  death, no rational trier of fact could find proof of guilt beyond a reasonable doubt,

21  and Kiles is innocent of first-degree murder. *See Herrera v. Collins*, 506 U.S. 390,

22  429 (1993) (White, J., concurring). Accordingly, neither his first-degree murder

23  conviction nor his resultant death sentence can stand. Because no constitutional

24  aggravating circumstance supported by the evidence exists in this case, Kiles is

25  innocent of the death penalty, and he is entitled to relief from his capital sentence.

26

27

28  / / /

**Claim Thirty-Two**

**Kiles's death sentence constitutes an impermissible violation of the Ex Post Facto Clause.**

Kiles incorporates by specific reference all facts, allegations, and arguments made in his Petition and elsewhere in this Reply.

Respondents argue that the ineffective assistance of appellate and post-conviction counsel cannot serve to excuse the default of this claim. (Answer at 152 (citing *Hunton v. Sinclair*, 732 F.3d 1124, 1126–27 (9th Cir. 2013)).) Kiles can demonstrate that both appellate and post-conviction counsel performed deficiently by failing to pursue this claim. In the alternative, Respondents have failed to demonstrate that any procedural bar is adequate and independent. And imposition of a default, given the substantial nature of the constitutional violation presented, would constitute a fundamental miscarriage of justice. In any event, as the Arizona state courts have not adjudicated this claim, this Court may consider the merits of the claim de novo. 28 U.S.C. § 2254(d).

Respondents argue that the U.S. Supreme Court decision in *Ring* constituted no more than a procedural change in Arizona law. (Answer at 153–55.) But *Ring* invalidated Arizona's unconstitutional sentencing statute, which was in place at the time of Kiles's crime, by prohibiting the imposition of a death sentence. 536 U.S. at 609. Although the change in law did not change the legal consequences of the act of first-degree murder, the statute that was in place was declared constitutionally infirm. Because Arizona lacked a constitutional mechanism to sentence someone to death at the time of Kiles's crime, the change in law substantively affected his rights. *See Weaver v. Graham*, 450 U.S. 24, 29 (1981). Kiles's rights under the Ex Post Facto Clause of the U.S. Constitution were violated, and he is entitled to relief.

**Claim Thirty-Three**
**Executing Kiles after more than 28 years on death row violates the Eighth and Fourteenth Amendments.**

Kiles incorporates by specific reference all facts, allegations, and arguments

1    made in his Petition and elsewhere in this Reply.

2        Respondents argue that this claim is procedurally defaulted and meritless.
3    (Answer at 155.) But as of the filing of this Reply it has now been over 31 years
4    since Kiles was first taken into custody on these charges. Because this claim could
5    not have been previously raised, Kiles is not precluded from raising it in the instant
6    Petition, or in a successive state post-conviction petition, and it is thus not defaulted.
7    *See* Ariz. R. Crim. P. 32.2(a); *Panetti v. Quarterman*, 551 U.S. 930, 945 (2007)
8    (holding that a newly-ripe claim is not considered second or successive). Because
9    this claim could not have been raised earlier, and it is meritorious, Kiles reserves
10   the right to request leave to return to state court under the procedure outlined in
11   *Rhines v. Weber*, 544 U.S. 269, 277 (2005).[57]

12       Alternatively, Kiles is excused from the exhaustion requirement because
13   there is an absence of an adequate state corrective process. *See* 28 U.S.C.
14   § 2254(b)(1)(B). Arizona courts have consistently rejected this claim. *See, e.g.*,
15   *State v. Smith*, 159 P.3d 531, 544 n.14 (Ariz. 2007) (citing *State v. Schackart*, 947
16   P.2d 315, 336 (Ariz. 1997).) Raising the claim therefore would have been futile,
17   and Kiles was not required to avail himself of the state's inadequate and unavailable
18   procedure. *See Lynce v. Mathis*, 519 U.S. 433, 436 n.4 (1997); *Nix v. Whiteside*,
19   475 U.S. 157, 163 n.3; *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981) (per curiam).

20       Respondents argue that Kiles should not be permitted to claim an Eighth
21   Amendment violation where he continues his appeals. (Answer at 155.) But it is not
22   a "mockery of justice," to claim that if it takes at least 31 years to ensure that a

23

24   [57] In the alternative, any default of the claim can be overcome because appellate
25   counsel rendered ineffective assistance in failing to properly raise this claim. *See*
     *Coleman*, 501 U.S. at 753–54; *Carrier*, 477 U.S. at 488. And, post-conviction
26   counsel performed deficiently by failing to raise this substantial claim of ineffective
27   assistance of appellate counsel. (*See* Claim 11, *supra*; Pet. at 343); *Martinez*, 566
     U.S. at 15–16. Further, excusal of the default is not barred by *Davila v. Davis*, 137
28   S. Ct. at 2069, because no court of any level has considered this claim before.

1  sentence is free of constitutional error,[58] then the fault lies more with a structurally-

2  inadequate criminal justice system than with Kiles's pursuit of his rights. Kiles

3  cannot be faulted for pursuing constitutionally guaranteed protections. *See*

4  *Thompson v. McNeil*, 556 U.S. 1114 (2009) (Breyer, J., mem. dissenting from

5  denial of certiorari); *Knight v. Florida*, 528 U.S. 990, 993 (1999) (Breyer, J.,

6  dissenting from denial of certiorari) ("Where a delay, measured in decades, reflects

7  the State's own failure to comply with the Constitution's demands, the claim that

8  time has rendered the execution inhuman is a particularly strong one."); *Lackey v.*

9  *Texas*, 514 U.S. 1045, 1047 (1995) (Stevens, J., mem. respecting denial of

10  certiorari) (distinguishing delay caused by frivolous filings and "a petitioner's

11  legitimate exercise of his right to review").

12      Justice Stevens, in his memorandum respecting the denial of certiorari in

13  *Lackey*, called upon state and federal courts to "serve as laboratories in which the

14  issue [of excessive time between imposition of sentence and execution] received

15  further study." 514 U.S. 1045. Kiles asks this Court to take up Justice Stevens's call

16  and grant an evidentiary hearing so that he may demonstrate his entitlement to

17  relief.

### Claim Thirty-Four

18

19  **Due process requires that this Court re-evaluate Kiles's death sentence in light of the significant changes to Kiles's circumstances in the 12 years since he was sentenced.**

20

21      Kiles incorporates by specific reference all facts, allegations, and arguments

22  made in his Petition and elsewhere in this Reply.

23      Respondents argue that this matter is procedurally defaulted, even though it

24

---

25  [58] Respondents also argue, citing to *Jones v. Davis*, 806 F.3d 538, 551 (9th Cir.

26  2015), that it would be improper for the "delay incurred during the prosecution of claims that fail on the merits could [] accrue into a substantive claim." (Answer at

27  155.) Due to the restrictions on relief imposed by 28 U.S.C. § 2254, it is entirely possible that Kiles will have pled a meritorious claim, but nonetheless be denied

28  relief due to a procedural barrier.

247

was not ripe previously. (Answer at 155–156.) They claim that "Kiles's citation to *Panetti*, 551 U.S. at 947 [] provides no support for his argument that this claim was not ripe for review until now." (Answer at 156 n.23.) But *Panetti* is cited for the proposition that a claim which is not ripe until the federal post-conviction process is not considered a second or successive claim, and may be reviewed notwithstanding its procedural default. *Panetti*, 551 U.S. at 945; *see also Stewart v. Martinez-Villareal*, 523 U.S. 637 (1998). On the merits, Kiles rests on the arguments made in his Petition. (Pet. at 448–50.)

## Claim Thirty-Five

**Executing Kiles is unconstitutional because he has a serious mental illness.**

Kiles incorporates by specific reference all facts, allegations, and arguments made in his Petition and elsewhere in this Reply.

Kiles did not raise this claim in state court. But any procedural default should be excused because executing Kiles would constitute a fundamental miscarriage of justice. *McQuiggin v. Perkins*, 569 U.S. 383, 393 (2013) (applying "miscarriage of justice" standard to excuse default caused by state procedural bars). Where an individual is constitutionally exempt from execution, the procedural default of a claim related to that exemption may be excused. *See Hall v. Florida*, 572 U.S. 701, 706 (2014).[59] Kiles recognizes that, as Respondents point out (Answer at 158–61), the Supreme Court has not yet interpreted the Eighth Amendment to categorically prohibit the execution of those suffering from serious mental illness. Yet Kiles

---

[59] In the alternative, any default of this claim can be overcome because appellate counsel rendered ineffective assistance in failing to properly raise this claim. *See Coleman*, 501 U.S. at 753–54; *Carrier*, 477 U.S. at 488. And, post-conviction counsel performed deficiently by failing to raise this substantial claim of ineffective assistance of appellate counsel. (*See* Claim 11, *supra*; Pet. at 343; *Martinez*, 566 U.S. at 15–16. Further, excusal of the default is not barred by *Davila*, 137 S. Ct. at 2069, because no court of any level has considered this claim before.

1    respectfully maintains that the reasoning underlying the categorical exemptions to

2    capital punishment that the Supreme Court carved out in *Atkins v. Virginia*, 536

3    U.S. 304 (2002), and *Roper v. Simmons*, 543 U.S. 551 (2005), apply with equal

4    force to a person who suffers from mental health illnesses similar to Kiles. As to all

5    other merits arguments, Kiles rests on the arguments made in his Petition. (Pet. at

6    450–54.)

### Claim Thirty-Six

7

8    **Subjecting Kiles to execution in Arizona will deny his fundamental**
     **human rights under binding international law norms.**

9

10   Kiles incorporates by specific reference all facts, allegations, and arguments

11   made in his Petition and elsewhere in this Reply.

12   Respondents wrongly argue that this claim is "admittedly procedurally

13   defaulted." (Answer at 161.) Kiles made no such admission, only acknowledging

14   that this matter was not raised in state court. (Pet. at 454.) It is Respondents' burden

15   to fully plead and prove any procedural bar relied upon, as well as prove it is

16   adequate and independent under state law. *See* Section II.B.2, *supra*; *see also*

17   *Bennett v. Mueller*, 322 F.3d 573, 585 (9th Cir. 2003). They have failed to do so

18   here. Respondents likewise fail to address Kiles's argument that procedural default

19   bars are invalid under binding international law norms. (Pet. at 455 n.205.) Their

20   failure to respond constitutes a waiver of the opportunity to do so. *James v. Ryan*,

21   733 F.3d 911, 913–14 (9th Cir. 2013). Respondents further fail to address Kiles's

22   arguments that *Martinez* or the miscarriage of justice doctrine warrant excusal of

23   any assessed default. (Pet. at 454–55.) Again, their failure to do so operates as a

24   waiver of their right to contest these arguments.

25   Respondents admit that "[h]abeas relief is limited to claims alleging that a

26   state prisoner is 'in custody in violation of the Constitution or laws or *treaties* of

27   the United States.'" (Answer at 161 (citing 28 U.S.C. § 2254(a)) (emphasis

28   added)).) But Respondents ignore that the United States is a signatory to both the

1    1949 Geneva Convention, and the International Covenant on Civil and Political
2    Rights ["ICCPR"]. (*See* Pet. at 456); 6 U.S.T. 3316, Art. 13; *see also* 999 U.N.T.S.
3    171 (U.S. Ratification Sept. 8, 1992).[60] And U.S. courts are bound to uphold the
4    protections afforded therein. *Hamdan v. Rumsfeld*, 548 U.S. 557, 627–28 (2006).
5    In all other respects, Kiles stands by the arguments raised in his Petition concerning
6    the merits of this claim. (Pet. at 454–58.)

7                                   **Claim Thirty-Seven**
8             **Kiles will be unable to receive a fair clemency process in Arizona.**

9             Kiles incorporates by specific reference all facts, allegations, and arguments
10   made in his Petition and elsewhere in this Reply.

11            Kiles raised this claim to preserve it for later review. (*See* Pet. at 458–60.)
12   Respondents assert that the claim is not cognizable in habeas proceedings. (Answer
13   at 162.) That argument disregards Supreme Court precedent.

14            In *Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272 (1998), a majority
15   of the Supreme Court concluded that prisoners are entitled to certain minimum due-
16   process guarantees at clemency hearings. *Id.* at 289–92 (O'Connor, Souter,
17   Ginsburg, and Breyer, JJ., concurring in part and concurring in the judgment; and
18   Stevens, J., concurring in part and dissenting in part) (both partially concurring
19   opinions hold that a prisoner sentenced to death possessed a "life interest" entitling
20   him to at least some due process during clemency proceedings). Because the State
21   may likely violate that constitutionally protected interest, Kiles may seek relief
22   during his habeas proceedings. *See Moody v. Rodriguez*, 164 F.3d 893, 893 (5th
23   Cir. 1999) (per curiam) ("Prisoner challenges to the result of a single allegedly
24   defective clemency proceeding must be pursued by writ of habeas corpus, not by
25   suits under § 1983.").

26   _____

27   [60] Although the United States has ratified the ICCPR, it has done so with a
28   reservation as to the "circumstances in which capital punishment is imposed." *Id.*
     at 7.

1    Respondents rely on two per curiam Ninth Circuit cases, *Franzen v.*
2  *Brinkman*, 877 F.2d 26 (9th Cir. 1989) (per curiam), and *Woratzeck v. Stewart*, 118
3  F.3d 648 (9th Cir. 1997) (per curiam) (Answer at 162), but to the extent those cases
4  addressed clemency, they are no longer valid on this point. *Franzen* and *Woratzeck*
5  predated *Woodard* and fail to take into account that a prisoner has a constitutional
6  interest at stake in a clemency hearing. *Woratzeck*, 118 F.3d at 653 (not considering
7  prisoner's due process interest during clemency hearing provided by State);
8  *Franzen*, 877 F.2d at 26 (neither addressing clemency procedure nor addressing a
9  prisoner's due process interest therein).

10    For the reasons outlined in Kiles's Petition, Arizona's clemency procedures
11  do not comport with the procedural due process protections guaranteed by the
12  Fourteenth Amendment. (Pet. at 458–60.) Kiles preserves this claim for when it
13  becomes ripe.

14                              **Claim Thirty-Eight**

15    **Kiles's convictions and sentences must be vacated because of the**
16  **cumulative prejudicial effect of all of the errors in this case.**

17    Kiles incorporates by specific reference all facts, allegations, and arguments
18  made in his Petition and elsewhere in this Reply.

19    Respondents do not dispute that this claim is exhausted, and they do not
20  assert any procedural defenses. (Answer at 162.) Respondents have thus failed to
21  carry their burden of pleading and proving any default by waiving that argument.
22  *See Bennett*, 322 F.3d at 585–86; *Franklin*, 290 F.3d at 1229–33.

23    As to the merits, Respondents acknowledge that the Ninth Circuit has stated
24  that is clearly established federal law that cumulative error is a basis for federal
25  habeas relief. (Answer at 162 (citing *Parle*, 505 F.3d at 927).) Respondents also
26  acknowledge that, in the Ninth Circuit, even when there is no single error that is
27  sufficiently prejudicial to warrant relief, the combined harms from multiple errors
28  may well be prejudicial. (Answer at 162 (citing *Parle*, 505 F.3d at 927).) But they

1   assert that Kiles has established no constitutional error or demonstrated that trial
2   court committed several substantial errors. (Answer at 163.) They are incorrect on
3   both points. Kiles has raised numerous substantial claims. And, as detailed
4   throughout this Reply and his Petition, he has explained how these errors, taken
5   together, resulted in an abridgement of the fundamental fairness of the trial process
6   during all phases. The post-conviction court's denial of this claim was therefore
7   contrary to, and an unreasonable application of, clearly established federal law, and
8   was based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d).

9   Further, for the reasons described in both his Petition and in this Reply, Kiles
10  is entitled to relief on the merits of this claim. The cumulative prejudicial effects of
11  errors in this case renders Kiles's conviction and sentence unconstitutional.

12  **IV.    Conclusion**

13  For the foregoing reasons, Kiles respectfully requests that the Court issue a
14  writ of habeas corpus so that he may be discharged from his unconstitutional
15  convictions and sentences, or grant other relief as may be appropriate. If the Court
16  determines that further fact-finding is necessary, Kiles requests an evidentiary
17  hearing and discovery on those issues, and will request the same in his forthcoming
18  request for evidentiary development.

19  Respectfully submitted this 27th day of February, 2020

20
21                                          Jon M. Sands
                                            Federal Public Defender
22                                          District of Arizona

23                                          Sara Chimene-Weiss
24                                          Scott Wisniewski
                                            Assistant Federal Public Defenders
25

26                                          s/ Sara Chimene-Weiss
27                                          Counsel for Petitioner

28

252